IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JAMES LUCERO,<br><br>　　　　Defendant. | Case No. CR 16-00107 HSG<br><br>DECLARATION OF WENDY SU IN SUPPORT OF GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS COUNTS ONE AND/OR TWO OF THE INDICTMENT |

1. I make this declaration in support of the Government's Consolidated Opposition to Defendant's Two Motions to Dismiss the Indictment based on alleged multiplicity grounds and pre-indictment delay.

2. I am a Special Agent ("SA") with the United States Environmental Protection Agency ("EPA") Criminal Investigation Division ("EPA-CID"). I have been so employed since September 2010. I have a Masters in Environmental Science and Management from the University of California Santa Barbara, and Bachelor's degrees in Sociology and Geography/Environmental Studies from the University of California, Los Angeles. I have completed training at the Federal Law Enforcement Training Center in Glynco, Georgia, which included the Criminal Investigator Training Program, the EPA-CID Environmental Investigation Basic Training Program, and Economic Crimes Investigation and Analysis Training Program. I have received specific training regarding the Clean Water Act, Title 33, United States Code, Sections 1251, et seq., also known as the Federal Water Pollution Control Act. I am the lead EPA-CID SA assigned to the prosecution of James Lucero ("defendant"), and have been so assigned since the inception of the federal investigation of this matter.

3. I have personally participated in this investigation and am aware of the facts contained herein based on my own investigation, as well as my review of documents, records, and information provided to me by other law enforcement officers and technical experts. The other law enforcement officers and experts I have received information from include Alameda County District Attorney's Office Inspector Cristina Harbison; Federal Bureau of Investigation Special Agent Susan Sivok; Newark Police Department ("NPD") Sergeant Vince Kimbrough; Newark Police Department Officer Jeff Neithercutt; and United States Army Corps of Engineers South Branch Chief Katerina Galacatos.

4. Based on my investigation, I believe the defendant, without necessary state or federal permits or even permission of the landowners, caused at least 900 to 1,200 truckloads of construction debris and dirt to be dumped on real property in the City of Newark, County of Alameda, State of California, including two parcels identified by Assessor's Parcel Numbers 537-0850-011-04 and 537-0850-005 (hereinafter referred to as the "Site") on at least 55 separate dates. The trucks used were of four basic types: "super dumps," "end dumps," "10 wheelers," and "transfer trucks." Transfer trucks were 10 wheelers with a trailer. All four types of trucks were able to transport multiple yards of fill material. The Site was located within a larger area known as "Newark Area 4" or "Area 4," generally located west of Stevenson Boulevard, south of Mowry Avenue, west of Union Pacific railroad tracks, and east of Mowry Slough. According to the Corps' February 19, 2014 Jurisdictional Determination ("JD") re-verification memorandum discussed further below, Mowry Slough is a navigable water of the U.S. that is a tributary to the San Francisco Bay. I further believe the defendant charged the truckers an average of between $50 and $80 per load to dump their construction debris and dirt.

5. Your affiant's investigation in the instant matter began on or about September 22, 2014 and continued throughout 2015 and into early 2016. On July 17, 2015, and August 21, 2015, your affiant interviewed a business associate of the defendant (discussed further below) who was a percipient witness to the defendant's dumping activity on the Site. On August 24 and 27, 2015, your affiant interviewed members of the defendant's family regarding aspects of the defendant's statement to the NPD among other matters. On September 1, 2015, your affiant received requested contact information for a bulldozer operator who helped spread illegally dumped material on the Site. On September 17,

1    2015, the attorney representing a trucking company, whose trucks physically brought fill material to the
2    Site, provided identifying information for the truck drivers themselves, as well as records establishing
3    the dates material was dumped on the Site.  On September 21, 2015, your affiant telephonically
4    interviewed the owner of a Newark, California, wood chip lot (discussed further below) who was a
5    percipient witness to some of the illegal dumping.  On October 19, 2015, your affiant received more
6    information from the trucking company mentioned above regarding the origin of the dirt and debris
7    dumped on the Site.  Additionally, on October 19, 2015, your affiant received documents from a
8    Hayward, California, equipment rental agency, Road Machinery, obtained pursuant to a subpoena.
9    These documents consisted of GPS records from heavy machinery used during the illegal dumping.  My
10   review and analysis of this data necessitated the review of hardcopy documents, re-entering data from
11   the hardcopy documents into digital formats, then locating and mapping the GPS coordinates to
12   determine where and when the machinery was operated on the Site.  This analysis, as well as the
13   analysis of trucking and telephone records, among other data, that were directly relevant to my
14   investigation, continued through March 2016.

15          6.      During my investigation, I learned that the Site is owned by Newark Partners, LLC.
16   Newark Partners is a partnership of which The Sobrato Organization, a Cupertino, California-based
17   development firm specializing in commercial and residential real estate, is a part.  Tim Steele, The
18   Sobrato Organization's Senior Director of Real Estate Planning, manages the development project
19   within Newark Area 4 for Newark Partners.  According to Steele, the five principals of Newark Partners
20   are Mike Siri, Dick Peery, John Arrillaga, John A. Sobrato and John M. Sobrato.

21          7.      Based on my investigation, I believe that, at all relevant times, Mowry Slough, located in
22   part of the Don Edwards San Francisco Bay National Wildlife Refuge, was a navigable tributary of San
23   Francisco Bay, and therefore a "water of the United States" as defined in 33 C.F.R. §§ 328.3(a)(1) and
24   (a)(5) and 40 C.F.R. § 232.2, which are regulations of the U.S. Army Corps of Engineers ("Corps") and
25   EPA, respectively, under the Clean Water Act.  These categories of "waters of the United States"
26   include all waters which are currently used, or were used in the past, or may be susceptible to use in
27
28

interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide" (33 C.F.R. § 328.3(a)(1)), and tributaries of waters of the United States (33 C.F.R. § 328.3(a)(5)).

8. Waters of the United States are sometimes referred to as "jurisdictional waters," and wetlands that constitute waters of the United States are sometimes referred to as "jurisdictional wetlands."

9. Newark Area 4, including the Site, was the subject of a JD issued by the Corps on October 11, 2007. The Corps uses JDs to delineate the presence and extent of wetlands and other waters jurisdictional under the Clean Water Act. In Newark Area 4, the JD identified 249.17 acres of jurisdictional wetlands and 34.14 acres of jurisdictional "other waters," for a total of 283.31 acres of jurisdictional waters of the United States. As discussed in further detail below, during my investigation, I learned that the illegal dumping at the Site impacted approximately 11.85 acres of wetlands identified as waters of the United States, adjacent to Mowry Slough, as defined in 33 C.F.R. § 328.3(a)(7) and 40 C.F.R. § 232.2. Additionally, approximately 1.33 acres which were not wetlands, and which were identified as "other waters" by the Corps in its JD, and by ecological consultant H.T. Harvey & Associates were impacted by the dumping. These other waters generally are areas that are more inundated with water than wetlands; such inundation typically prevents the vegetation associated with wetlands from growing. Based on my investigation, I believe these 1.33 acres were at a lower elevation than the 11.85 acres of wetlands described above. These more aquatic waters are "other waters" constituting "waters of the United States" as defined in 33 C.F.R. § 328.3(a)(3) and 40 C.F.R. § 232.2. A map displaying the wetland and other waters areas impacted by the dumping is attached as Exhibit A-1.

10. Under the Clean Water Act, the term "wetlands" are defined to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b); 40 C.F.R. § 232.2.

11. Galacatos visited Newark Area 4 in July 2013 and determined that the Corps should re-verify the 2007 JD that it issued, and that the earlier wetland delineation should remain the same as the 2007 mapping that was submitted by ecological consultant H.T. Harvey and Associates.

12. I am informed and consequently believe that the illegal dumping referenced above began in or around June 2014, and ended on September 8, 2014, when the NPD arrived at the Site after responding to a tip regarding the illegal dumping.

13. Based on my investigation, I believe that on or about September 8, 2014, the Citizens Committee to Complete the Refuge ("CCCR"), an environmental group, notified the EPA, the Corps, and other agencies of potential unauthorized "bulldozing/scraping/filling" on "lands known as Area 4, located at the head of Mowry Slough in Newark, California," noting that a "confirmed wetlands delineation" exists for Area 4, and questioning the purpose of the "wetlands destruction," noting that this area was not proposed for development.

14. I am further informed and believe that Mr. Steele, with The Sobrato Organization, was also notified by CCCR, and drove to the Site on September 8, 2014, with his colleague Robert Tersini. The Sobrato Organization's representatives observed that a lock used to secure the gate at the west end of Stevenson Boulevard to access APN 537-0850-011-04 had been cut. Several large dump trucks filled with dirt were waiting to enter the property. Steele called the NPD. A young man, later identified as Austin Lucero, the defendant's son, appeared to be coordinating the trucks. A tractor was operating where some of the trucks had dumped dirt. Austin Lucero told Tersini that they were dumping an average of fifty truckloads per day. Steele, who for more than six years had been commissioning site characterizations and working to obtain the necessary governmental approvals for the planned development, was outraged. He told Austin Lucero to stop, that he was trespassing on the property, and that they did not have permission to dump dirt. The NPD responded soon thereafter and questioned several of the truck drivers and Austin Lucero. The NPD also interviewed a business associate of the defendant, Kevin Olivero.

15. On September 8, 2014, the defendant's son and multiple truck drivers were detained briefly by the NPD on or near the Site. Thereafter, the NPD initiated an investigation of the defendant.

During the investigation, the defendant told the NPD he had received permission to conduct the fill from "Randy Sobrato" (who he later referred to as "Michael Sobrato"), and from "Fish and Game." The defendant also told the NPD that someone from "Fish and Game" met Sobrato and the defendant at the site and indicated where the defendant could dump, and where the "wetlands drop line" was. During the investigation your affiant contacted the Sobrato family to assess these claims by the defendant. Family members verified that there is no Randy or Michael Sobrato, and that no one granted the defendant permission to dump on the Site, nor travelled to the Site with the defendant. The California Department of Fish and Wildlife (formerly Fish and Game), U.S. Fish and Wildlife, U.S. Department of Agriculture Wildlife Services, and the Don Edwards San Francisco Bay National Wildlife Refuge all confirmed that there was no record of anyone from their organization who went to the Site with the defendant and told him where to dump or not to dump. Even if this had occurred, the defendant would still have needed to obtain the necessary permits to legally place fill material on the Site. On or about September 22, 2014, the Alameda County District Attorney's Office and EPA-CID joined the investigation.

16. Based in part on my interviews with witnesses, including Kevin Olivero, a business associate of the defendant who was involved with the illegal dumping, as well as an analysis of GPS data generated by a bulldozer used by the defendant and others at the Site, I believe the dumping caused by the defendant occurred in three separate phases, each involving several hundred loads of material in slightly different areas. Olivero characterized these separate dump areas as Fill Areas One, Two, and Three. Dumping in Fill Area One occurred approximately in June and early July 2014, and extended roughly from Mowry Avenue southeast between 50 and 100 yards. Because it is not clear whether Fill Area One contained waters of the United States, it is not encompassed within Counts One or Two of the indictment.

17. Dumping in Fill Area Two (just South of Fill Area One and adjacent to Recycling Unlimited (also known as the wood chip lot), occurred from late-July to early August 2014. Fill Area Two is located on APN 537-0850-011-04. Fill Area Two contained both other waters and wetlands in separate locations. Access to Fill Area Two was from Mowry Avenue and through the Recycling Unlimited lot. The fill in Fill Area Two was not strictly dirt; it contained construction debris. Fill Area

Two is directly adjacent to Mowry Slough. Between 100 and 200 loads went directly into this area, an amount large enough to raise the surface level of the land by several feet, and erase a natural depression previously observed on the Site. Approximately 1.33 acres of this natural depression in Fill Area Two were aquatic waters characterized by the Corps as jurisdictional "other waters" in its JD. This area is referred to in Count 2 of the indictment as "The Other Waters," as defined in 33 C.F.R. § 328.3(a)(3). Some of the illegal dumping in Fill Area Two also occurred on wetlands identified as waters of the United States, adjacent to Mowry Slough, as defined in 33 C.F.R. § 328.3(a)(7) and 40 C.F.R. § 232.2. The jurisdictional wetlands in Fill Area Two on which the illegal dumping occurred are among the approximately 11.85 acres of wetlands referred to in Count One of the indictment as "The Wetlands."

18. The illegal dumping operation was moved to Fill Area Three in August 2014 after complaints were made about the number of trucks running through Recycling Unlimited's lot in order to dump in Fill Area Two. This new area was a few hundred yards to the south of Fill Area Two near Stevenson Boulevard, still on property owned by Newark Partners, on APN 537-0850-005. Fill Area Three was accessed through Stevenson Boulevard, rather than Mowry Avenue. Dumping in this area lasted until the operation was shut down after the NPD and The Sobrato Organization representatives arrived at the Site on September 8, 2014. A large portion of the dumping in Fill Area Three was on wetland adjacent to Mowry Slough, as defined in 33 C.F.R. § 328.3(a)(7) and 40 C.F.R. § 232.2. The jurisdictional wetlands in Fill Area Three on which the illegal dumping occurred are among the approximately 11.85 acres of wetlands referred to in Count One of the indictment as "The Wetlands." On busy days, as many as 100 loads were deposited in this area, for a conservative Fill Area Three total estimate of between 600 to 800 truckloads.

19. I am further informed and believed that other than the collection of soil samples by consultants and the California Department of Toxic Substances Control, the fill at the Site where the alleged illegal dumping took place was intentionally not altered or changed in any way between the cessation of the dumping activity and late June 2016, when a local Fire Marshal apparently ordered that the grass on the property be cut to prevent a potential fire hazard.

20. On December 22, 2014, the defendant was sentenced and taken into custody by state authorities in connection with his 2008 Santa Clara County conviction of California Penal Code Section 182(A)(1) (Conspiracy). This conspiracy conviction stemmed from the defendant's actions in bribing Santa Clara County landfill employees (paying them approximately half a million dollars over eight years), in exchange for allowing his truckloads of intentionally misclassified waste material to be dumped in a county landfill at a reduced rate. The loss to Santa Clara County Department of Waste Management was over $13,000,000. After being remanded into custody in December of 2014, Lucero served time in the California Department of Corrections (CDC) at San Quentin, and was subsequently transferred to the CDC California Institute for Men (CIM) in Chino, California. Lucero was released from CDC CIM and ordered to serve his remaining sentence of Post-Release Community Supervision through the Monterey County Probation Department from November 30, 2015 through November 30, 2018.

Under penalty of perjury, I swear that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: 20 Sept 2016

Wendy Su
Special Agent
Environmental Protection Agency