BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

PHILIP KEARNEY (CABN 114978)
SHIAO LEE (CABN 257413)
Assistant United States Attorney

    450 Golden Gate Avenue, 11th Floor
    San Francisco, California 94102-3495
    Telephone: (415) 436-6924
    Fax: (415)436-7234
    Shiao.Lee@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 16-00107 HSG |
|         Plaintiff, | ) |
|     v. | ) GOVERNMENT'S OPPOSITION TO<br>) DEFENDANT'S MOTION TO DISMISS<br>) SUPERSEDING INDICTMENT |
| JAMES PHILIP LUCERO, | ) |
|         Defendant. | ) Date:  July 31, 2017<br>) Time: 2:00 p.m.<br>) Court: Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF RELEVANT FACTS ..........................................................1

        A.      Summary of Charges..................................................................................1

        B.      Jurisdictional Studies of Waters of the United States on the Property ..............2

                1.      Harvey's 2007 Report: ...........................................................3

                2.      The 2007 Corps JD: ..............................................................4

                3.      The 2013 Site Visits to Verify the 2007 Corps JD: ..................4

                4.      The September 2014 Site Visit to Map the Extent of Defendant's Fill:..............4

                5.      The 2017 HBG Study: .........................................................4

III.    THE JURISDICTIONAL REACH OF THE CLEAN WATER ACT ("CWA")..........4

        A.      Regulatory Definition of "Waters of the United States" .......................5

        B.      Supreme Court Precedent Regarding "Waters of the United States" ..............6

        C.      "Waters of the United States" after *Rapanos* .................................8

IV.     ARGUMENT ...................................................................................................8

        A.      The CWA and the Regulations Applying it are Not Unconstitutionally Vague...........8

                1.      Applicable Law ....................................................................8

                2.      Defendant's Vagueness Challenge As Applied to the Circumstances of His Case Must Be Denied Since the Areas Where He Dumped are "Waters of the United States" by Any Test ...............9

                        a)      Adjacent wetlands ...................................................10

                        b)      Significant nexus .....................................................11

                        c)      Plurality test .........................................................12

                3.      The Definition of "Waters of the United States" As Applied to the Defendant Provides Fair Notice....................................12

                4.      Rapanos Did Not Render the Legal Standard Defining "Waters of the United States" So Vague that it is Unconstitutional As Applied to the Defendant and United States v. Davis Did Not Invalidate the "Significant Nexus" Test As Applied in the Ninth Circuit...........15

                5.      The Property's Characteristics Also Defeat Defendant's Vagueness Challenge ...............................................19

6.   The Defendant Should Be Held to a Higher Than Normal Standard Due to His Professional Background ...................................................... 19

7.   The Agencies' regulations applying the CWA statute do not result in arbitrary or discriminatory enforcement ............................................... 21

8.   The President's Executive Order does not affect this Court's analysis of whether the definition of waters of the United States is vague ........................ 22

B.   The Agencies Did Not Exceed Their Authority in Applying the Statute Via the Regulatory Definition of Waters of the United States ...................................... 23

C.   There is No Violation of the Commerce Clause and the Definition of "Waters of the United States" Does Not Run Afoul of Federalism Concerns ................................ 24

V.   CONCLUSION .................................................................................................................. 25

**TABLE OF AUTHORITIES**

Cases

*Baccarat Fremont Developers, LLC v. U.S. Army Corps of Eng'rs*, 425 F.3d 1150 (9th Cir. 2005) ....... 18

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ................................................ 9, 20

*Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007) ......................................... *passim*

*Cal. River Watch v. Wilcox*, 633 F.3d 766 (9th Cir. 2011) ................................................ 8

*Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F.Supp.2d 1059 (E.D. Cal. 2002) ....... 15, 24

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943 (9th Cir. 2002) ............. 14

*Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210 (D. Or. 2009) ........................................... 16

*Duarte Nursery*, 2017 WL 1105993 (E.D. Cal. 2017) ...................................................... 16, 17

*Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000) ................................................... 9

*Gonzales v. Raich*, 545 U.S. 1 (2005) ................................................................... 25

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ....................................................... 9, 21

*Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001) ................................ 14, 18

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................. 10

*Hooper v. California*, 155 U.S. 648 (1895) .............................................................. 9

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................ 8

*Marks v. United States*, 430 U.S. 188 (1977) ............................................................ 16

*Maynard v. Cartwright*, 486 U.S. 356 (1988).......................................................... 20

*Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508 (1941) ................. 25

*Rapanos v. United States*, 547 U.S. 715 (2006)......................................................... *passim*

*Roark & Hardee v. City of Austin*, 522 F.3d 533 ....................................................... 20

*Roundy v. Comm'r*, 122 F.3d 835 (9th Cir. 1997) ..................................................... 16

*San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700 (9th Cir. 2007)............ 5, 10, 23

*San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719 (N.D. Cal. 2011) .................. 14

*Skilling v. United States*, 561 U.S. 358 (2010) ......................................................... 8, 9

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001)................................................................................................. 24

*United States v. Adam Bros. Farming, Inc.*, 369 F.Supp.2d 1166 (C.D. Cal. 2003) ............................... 14

*United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317 (6th Cir. 1974)...................................... 6, 13

*United States v. Bailey*, 571 F.3d 791 (8th Cir. 2009) .............................................. 18

*United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980) ....................................... 12

*United States v. Broncheau*, 597 F.2d 1260 (9th Cir. 1979)..................................... 12

*United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016)............................................. 16

*United States v. Donovan*, 661 F.3d 174 (3d Cir. 2011)........................................... 18

*United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001) ............................................. 20

*United States v. Hockings*, 129 F.3d 1069 (9th Cir. 1997) ...................................... 9

*United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006) ............................................. 18

*United States v. Kay*, 513 F.3d 432 (5th Cir. 2007)................................................... 20

*United States v. Lanier*, 520 U.S. 259 (1997)........................................................... 9

*United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008)............................................... 19

*United States v. Moses*, 496 F.3d 984 (9th Cir. 2007) ............................................. *passim*

*United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963)....................... 9

*United States v. Oxford Royal Mushroom Products, Inc.*, 487 F. Supp. 852 (E.D. Pa. 1980) ............... 13

*United States v. Phelps Dodge Corp.*, 391 F. Supp. 1181 (D. Ariz. 1975) .............. 13

*United States v. Phillips*, 87 Fed. Appx. 650 (9th Cir. 2004) ................................... 20

*United States v. Powell*, 423 U.S. 87 (1975) ............................................................ 9

*United States v. Purdy*, 264 F.3d 809 (9th Cir. 2001) ............................................. 9

*United States v. Rearden*, 349 F.3d 608 (9th Cir. 2003) ......................................... 14

*United States v. RGM Corp.*, 222 F. Supp. 2d 780 (E.D. Va. 2002) ........................ 24

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) ................... *passim*

*United States v. Robison,* 505 F.3d 1208 (11th Cir. 2007) ...................................... 18

*United States v. Tansley*, 986 F.2d 880 (5th Cir. 1993) ........................................... 20

*United States v. Tull*, 769 F.2d 182 (4th Cir. 1985) ............................................ 13, 20

*United States v. Vierstra*, 492 Fed. Appx. 738 (9th Cir. 2012) ............................... 15

*United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993) .................................... 20

*United States v. Williams*, 553 U.S. 285 (2008) ................................................. 10, 21

*United States v. Wilson*, 133 F.3d 251 (4th Cir. 1997) ............................................ 23

*United States v. Wyatt*, 408 F.3d 1257 (9th Cir. 2005) ............................................ 14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ............................. 14

Statutes

33 U.S.C. § 1251(a) ............................................................................................. 4, 7
33 U.S.C. § 1344(a) ................................................................................................. 3
33 U.S.C. § 1362(7) ................................................................................................. 5
33 U.S.C. §§ 1311(a) ............................................................................................... 1
California Penal Code § 182(a)(1) .......................................................................... 19

Regulations

33 C.F.R. § 320.4(b)(2) ............................................................................................ 7
33 C.F.R. § 328.3(a)(1) ................................................................................... *passim*
40 C.F.R. § 232.2 .................................................................................................... 5
82 Fed. Reg. 12 ..................................................................................................... 22

Other Authorities

Or. 2002 ............................................................................................................... 15
Or. 2012 ............................................................................................................... 15
U.S. Dist. LEXIS 19153 ....................................................................................... 15
U.S. Dist. LEXIS 80513 ....................................................................................... 13

# I.   INTRODUCTION

The defendant is charged in a Superseding Indictment with violating three counts of the Clean Water Act (CWA), pursuant to 33 U.S.C. §§ 1311(a), 1319(c)(2)(A) and 1344, for the unpermitted discharge of fill material into "waters of the United States."  Dkt. 39.  Counts One and Three involve the unpermitted discharge of fill material into an adjacent wetland, 33 C.F.R. § 328.3(a)(7) (2014),[1] and Count Two involves the unpermitted discharge of fill material into a tributary.  33 C.F.R. § 328.3(a)(5).

The defendant moves to dismiss the Superseding Indictment on the grounds that the regulations at issue in this case, which define "waters of the United States" to include tributaries of traditional navigable waters (TNWs) and wetlands adjacent to TNWs and its tributaries, are invalid.  The motion should be denied, as the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers ("Corps") (together, the "Agencies"), did not exceed the authority Congress delegated to them, nor have they violated principles of federalism or the Commerce Clause by including those waters in the definition of "waters of the United States."  The terms "adjacent" and "wetlands" are well-defined by the Agencies' regulations (33 C.F.R. §§ 328.3(b)-(c)), and the term "tributary," in addition to its obvious common meaning, has been defined by Ninth Circuit case authority.  Indeed, the Supreme Court and Ninth Circuit have consistently held that TNWs and their tributaries and adjacent wetlands can constitute "waters of the United States."[2]  Judicial explication and interpretive aids guiding Agencies' determinations of what are "waters of the United States" undermine defendant's claim that the term is unconstitutionally vague.

# II.   STATEMENT OF RELEVANT FACTS

## A.   Summary of Charges

Beginning in approximately July 2014, and continuing until his illegal operation was shut-down on September 8, 2014, the defendant dumped approximately 1,545 industrial-sized truckloads of dirt, soil, metal, asphalt, concrete, plastic, and other material ("fill material"), into more than 13 acres of wetland and tributary areas on an approximate 560-acre parcel known as "Newark Area 4" (referred to

---

[1] All citations to the Code of Federal Regulations are to the version published on July 1, 2014.

[2] *See Rapanos v. United States*, 547 U.S. 715 (2006); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 998, 1000 (9th Cir. 2007); *United States v. Moses*, 496 F.3d 984, 991 (9th Cir. 2007).

1    herein as the "property").  [Declaration of EPA Special Agent Wendy Su (hereinafter "Su Decl."),

2    attached as Exhibit A and incorporated as if fully set forth herein, ¶¶ 3(a), (p), (q)].  The property,

3    owned by Newark Partners, LLC, is generally located west of Stevenson Boulevard, south of Mowry

4    Avenue, west of Union Pacific railroad tracks, and immediately east of Mowry Slough in the City of

5    Newark.  *Id.* at ¶ 3(a).

6        The property consists of two areas: the "Northern Area," which is the area north of the Alameda

7    County Flood Control and Water Conservation District Line D ("Flood Control Line D") that runs

8    northeasterly from Mowry Slough toward the Union Pacific Railroad tracks east of the property; and the

9    "Southern Area," which lies south of Flood Control Line D.  *Id.* at ¶ 3(p); *see also* App. A, Fig. 4d, and

10    Huffman Broadway Group (HBG) Report, discussed *infra,* attached as Exh. B. hereto.  The Superseding

11    Indictment alleges that defendant's illegal conduct directly impacted the following "waters of the United

12    States:" approximately 3.9 acres of wetlands and 1.28 acres of a tributary to Mowry Slough within the

13    Northern Area (Counts One and Two), and approximately 7.95 acres of wetlands in the Southern Area

14    (Count Three).  Dkt. 39.

15        **B.    Jurisdictional Studies of Waters of the United States on the Property**

16        Nearly all of the property, including the areas filled as a result of the defendant's conduct, is

17    within the original margin of San Francisco Bay.  Su Decl. at ¶ 3(b).  Mowry Slough, a tidal inlet (or

18    tributary) of San Francisco Bay that surrounds the property's western boundary and lies partly within the

19    Don Edwards San Francisco Bay National Wildlife Refuge, is tidal and navigable in fact.  *Id.* at ¶ 3(a),

20    (b).  If not for the levee between the property and Mowry Slough, these diked baylands would be subject

21    to near daily tidal flooding from the San Francisco Bay.  *Id.* at ¶ 3(b).  The property still slopes to a low

22    point on its western edge next to the Bay.  Because of its low-lying nature and proximity to the Bay,

23    water on the property must be regularly drained with channels, culverts and an electric pump.  *Id.*

24        The jurisdictional status of the extensive waterbodies located on the property, including those

25    impacted by the defendant, as "waters of the United States" protected and regulated by the CWA has

26    been confirmed repeatedly by numerous studies and field work conducted between 2005 and 2017 by

27    wetland ecologists and other subject matter experts working both outside and within the government.

28    *Id.* at ¶¶ 3(f)-(m), (o), (r).  The studies include: a 2007 report prepared by H.T. Harvey & Associates

("Harvey") for the landowners based on a two-year in-depth study; a 2007 evaluation performed by the Corps, which resulted in the issuance of a formal Jurisdictional Determination (JD) pursuant to CWA Section 404, 33 U.S.C. § 1344(a); visits to the property by Harvey and the Corps in July 2013 to re-verify the 2007 JD; and the 2017 study performed by the government's wetland regulatory expert, Terry Huffman, Ph.D., of HBG.  *Id.*  As summarized below, while the experts differed slightly on the exact acreage of jurisdictional waters, they are unanimous that the property contains widespread wetlands and other jurisdictional waters with an observable hydrological connection to San Francisco Bay and Mowry Slough.

### 1.   Harvey's 2007 Report:

In 2005, Newark Partners hired Harvey to identify the extent and distribution of areas that may meet the physical criteria of jurisdictional waters under the CWA.  Su Decl. at ¶ 3(g).  As part of the study, Harvey conducted detailed review of aerial photographs, maps and other source materials; visited the property no fewer than fifty times between November 2005 and June 2007; and documented the criteria used to identify the presence of wetlands, namely, hydrophytic vegetation, hydric soils, and wetland hydrology.  In conducting this analysis, Harvey followed the U.S. Army Corps of Engineers' 1987 *Wetlands Delineation Manual* and the *Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual:  Arid West Region*.  *Id.* at ¶¶ 3(g)-(k).  Harvey's *Preliminary Delineation of Wetlands and Other Waters*, dated June 20, 2007, sets forth the results of its multi-year study.

Harvey concluded that the property had 242.89 acres of wetlands and 34.21 acres of "other waters" including "lakes, seasonal ponds, channels, tributary waters, and seasonal springs" identified by the presence of standing or running water, and characterized by the presence of an ordinary high water mark ("OHWM").[3]  *Id.* at ¶ 3(j).  Wetlands on the property were found to have three primary sources of hydrology, including incidental rainfall, a high groundwater table fed by springs, and lateral seeps.  *Id.* at ¶ 3(k).

---

[3] An OHWM is a mark on opposing channel banks indicated by the presence of physical characteristics such as a clear, natural line impressed on the bank, the presence of standing water, or the presence of mudflats with no emergent vegetation.

### 2.   The 2007 Corps JD:

In 2007, in response to the landowners' request for a JD, the Corps reviewed Harvey's findings, visited the property in August, dug soil pits, observed flow in tributaries, and made minor adjustments to the total acreage of jurisdictional waters.  Su Decl. at ¶ 3(l).  In its October 11, 2007 JD, the Corps mapped 249.17 acres of jurisdictional wetlands and 34.14 acres of other types of jurisdictional waters.  *Id.*

### 3.   The 2013 Site Visits to Verify the 2007 Corps JD:

To "re-verify" the 2007 JD, consistent with Corps guidance providing for expiration of a JD after five years, Harvey revisited the property with Katerina Galacatos, the Corps' San Francisco Regulatory Division South Branch Chief, in July 2013.  Thereafter, Galacatos determined that the Corps' 2007 wetland delineation should remain the same as its 2007 mapping.  *Id.* at ¶ 3(m).

### 4.   The September 2014 Site Visit to Map the Extent of Defendant's Fill:

The day after the fill was discovered in September 2014, Patrick Boursier, Ph.D., Senior Plant Ecologist at the time of Harvey's 2005-07 study, mapped the areas of illegal fill with a hand-held GPS unit that he later depicted on a map Harvey had produced as part of its initial study.  *Id.* at ¶ 3(o).

### 5.   The 2017 HBG Study:

In connection with this case, the government retained Dr. Huffman, wetland regulatory scientist with HBG, who visited and studied the property over a period of approximately six months, beginning in January 2017.  *Id.* at ¶ 3(r).  Hydrologist Robert Coats, Ph.D., and other specialists contributed to the effort.  *Id.*  The results of Dr. Huffman's study are set forth in HBG's *Clean Water Act Jurisdictional Analysis and Determination for Fill Placement Areas on the Newark Partners, LLC, Newark Property*, June 2017.  [Hereinafter referred to as "HBG Report" attached as Exhibit B hereto].  Dr. Huffman confirmed that the areas of the property identified as jurisdictional waters of the United States by the Corps were also jurisdictional in 2014, at the time of the illegal dumping.  HBG Report at 59.

## III.   THE JURISDICTIONAL REACH OF THE CLEAN WATER ACT ("CWA")

The CWA was enacted to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  33 U.S.C. § 1251(a).  The statute's reach extends to "navigable waters," which are

1  defined to mean "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7), but

2  the statute does not define the term "waters of the United States."

3      However, "Congress chose to define the waters covered by the act broadly," and the broad term

4  "waters of the United States" reflects Congress's intent "to repudiate limits that had been placed on

5  federal regulation by earlier water pollution control statutes and to exercise its powers under the

6  Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the

7  classical understanding of that term."  *United States v. Riverside Bayview Homes*, 474 U.S. 121, 133

8  (1985) (citing S. Conf. Rep. No. 92-1236, p. 144 (1972); 118 Cong. Rec. 33756-33757 (1972)

9  (statement of Rep. Dingell)).

10      "By not defining further the meaning of 'waters of the United States,' Congress implicitly

11  delegated policy-making authority to the EPA and the Corps, the agencies charged with the CWA's

12  administration."  *San Francisco Baykeeper v. Cargill Salt Div.,* 481 F.3d 700, 704 (9th Cir. 2007).

13      A.    **Regulatory Definition of "Waters of the United States"**

14      The Corps and the EPA have separate but identical regulations defining the statutory term "waters

15  of the United States."  The current definition has been in effect since 1986 and was most recently

16  published on July 1, 2014. [4]  See 33 C.F.R. § 328.3(a)(1)-(7) (Corps); 40 C.F.R. § 232.2 (EPA).  For

17  convenience, the Corps' regulation is cited herein.

18      The Agencies' definition includes seven categories of waters. The part of 33 C.F.R. §

19  328.3(a)(1)-(7) relevant to this case states:

20          The term *waters of the United States* means

21          (1) All waters which are currently used, or were used in the past, or may be
22      susceptible to use in interstate or foreign commerce, including all waters which are
        subject to the ebb and flow of the tide[5];
23          …
            (5) Tributaries of waters identified in paragraphs (a) (1) through (4) of this
24      section;

25

---

26  [4] Although a new rule (the "Clean Water Rule") establishing a revised definition of "waters of the
    United States" was promulgated by the Agencies on June 29, 2015, it was stayed shortly thereafter by
27  the Sixth Circuit, and the stay order restored the status quo ante.  In any event, the defendant's conduct
    predated that rule and is controlled by the rules in effect at that time.

28  [5] These waters described in subsection (a)(1) are referred to as "traditional navigable waters" (TNWs).

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1) through (6) of this section.

The term "wetlands" is further defined to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). The term "adjacent" is further defined as: "bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c).

To aid the determination of the jurisdictional extent of wetlands and non-tidal tributaries, the Corps has published manuals, supplements, and guidance, setting forth detailed methodologies for making jurisdictional determinations. *See* pp. 21-22 *infra*.

### B.   Supreme Court Precedent Regarding "Waters of the United States"

The Supreme Court first addressed the scope of the terms "navigable waters" and "waters of the United States" in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). The *Riverside Bayview* Court unanimously held that the Agencies' inclusion of wetlands adjacent to a TNW was a permissible interpretation of the CWA, deferring to the Corps' ecological judgment that adjacent wetlands are "inseparably bound up" with the waters to which they are adjacent. 474 U.S. at 133, 134.

The Court wrote:

> In view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act. *Id.*

Other courts that were among the first to interpret the definition of "waters of the United States" also found the term to extend to more than just navigable waters. *See, e.g., United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1326 (6th Cir. 1974) ("It would, of course, make a mockery of [Congress' power to abate pollution under its interstate commerce powers] if its authority to control pollution was limited to the bed of the navigable stream itself. The tributaries which join to form the river could then be used as open sewers as far as federal regulation was concerned. The navigable part

of the river could become a mere conduit for upstream waste.").

In the most recent Supreme Court decision addressing the scope of the Clean Water Act, *Rapanos*, the Court considered whether the Corps could assert CWA jurisdiction over Michigan wetlands lying near ditches or man-made drains that eventually emptied into TNWs, some located 11 to 20 miles away.  547 U.S. 715 (2006).  The four-justice plurality, in an opinion written by Justice Scalia, concluded that the phrase "waters of the United States" includes only those "relatively permanent, standing or continuously flowing bodies of water" forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes, as well as wetlands that have a "continuous surface connection" to such relatively permanent waters, making it difficult to determine where the "water" ends and the "wetland" begins.  *Id.* at 739, 742.  Thus, "continuous surface connection" is a "physical connection requirement."  *Id.* at 752 n.13.  The plurality also said that, by describing "waters" as "relatively permanent," it did not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months.  *Id.* at 733, n.5.

Justice Kennedy concurred in the judgment, but said that the plurality's limitations on waters of the United States "are without support in the language and purposes of the Act or in our cases interpreting it."  547 U.S. at 768.  With respect to wetlands, he stated "the rationale for Clean Water Act regulation is, as the Corps has recognized [in 33 C.F.R. § 320.4(b)(2)], that wetlands can perform critical functions related to the integrity of other waters such as pollutant trapping, flood control, and runoff storage." *Id.* at 779.  Justice Kennedy concluded that CWA jurisdiction extends to wetlands that, either alone or in combination with "similarly situated lands in the region," have a "significant nexus" to TNWs, and explained that "[t]he required nexus must be assessed in terms of the statute's goals and purposes."  *Id.*  Justice Kennedy noted, in particular, the objective set forth at 33 U.S.C. § 1251(a), to restore and maintain the chemical, physical, and biological integrity of our Nation's waters more readily understood as "navigable."  *Id.* at 779-80.

Justice Kennedy also re-affirmed the Court's holding in *Riverside Bayview* that wetlands adjacent to a TNW are jurisdictional and covered under the CWA.  Justice Kennedy stated that, "[a]s applied to wetlands adjacent to *navigable-in-fact* waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those

1    wetlands is sustainable under the Act by showing adjacency alone.  That is the holding of *Riverside*

2    *Bayview*."  *Id.* at 780 (emphasis added).  However, where the Corps seeks to regulate wetlands based on

3    adjacency to *non-navigable tributaries*, the significant nexus must be established on a case-by-case

4    basis.  *Id.* at 781.

5         The four dissenting justices in *Rapanos* would have upheld the assertion of jurisdiction over the

6    wetlands in question.  Further, given that they would have upheld jurisdiction over wetlands that satisfy

7    "either the plurality's test or Justice Kennedy's," they stated that "in these and future cases the United

8    States may elect to prove jurisdiction under either test."  *Id.* at 810 & n.14 (Stevens, J., dissenting).

9        **C.**     **<u>"Waters of the United States" after *Rapanos*</u>**

10         Significantly, *Rapanos* did not invalidate the Agencies' definition of waters of the United States.

11   Rather, it provides additional tests for how to apply the definition.  In the Ninth Circuit, the test that has

12   been applied is the significant nexus standard set forth in Justice Kennedy's concurrence, described as

13   "the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all

14   cases."  *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 998, 999-1000 (9th Cir. 2007) (holding

15   that Kennedy's *Rapanos* concurrence "provides the controlling rule of law for our case.").  The Ninth

16   Circuit subsequently noted that it had not foreclosed the argument that CWA jurisdiction may also be

17   established under the plurality's standard.  *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir.

18   2011).  To date, neither the Ninth Circuit nor any other circuit court has required that only the plurality's

19   test can be used to establish CWA jurisdiction.

20                        **IV.    ARGUMENT**

21        **A.**     **<u>The CWA and the Regulations Applying it are Not Unconstitutionally Vague</u>**

22            1.    <u>Applicable Law</u>

23        The void for vagueness doctrine is embodied in the Due Process Clauses of the Fifth and

24   Fourteenth Amendments which provide that "[n]o person shall … be deprived of life, liberty, or

25   property, without due process of law."  "To satisfy due process, 'a penal statute [must] define the

26   criminal offense with sufficient definiteness that ordinary people can understand what conduct is

27   prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Skilling*

28   *v. United States*, 561 U.S. 358, 364 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

1   Underpinning the void for vagueness doctrine is the principle that if a law has the ability to take away an

2   individual's life, liberty, or property, it must give ordinary people fair notice of the conduct it punishes,

3   such that "men of common intelligence" would not have to "guess at its meaning and differ as to its

4   application." *United States v. Hockings*, 129 F.3d 1069, 1072 (9th Cir. 1997) (citing *United States v.*

5   *Lanier*, 520 U.S. 259 (1997)).

6         Courts consider declaring a statute unconstitutional under principles of vagueness to be a

7   measure of last resort.  A challenged statute enjoys a presumption of constitutionality, *see Forbes v.*

8   *Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000); *see also United States v. National Dairy Products*

9   *Corp.*, 372 U.S. 29, 32 (1963) (stressing, in response to a vagueness challenge, "[t]he strong

10   presumptive validity that attaches to an Act of Congress").  "The elementary rule is that *every*

11   *reasonable construction* must be resorted to, in order to save a statute from unconstitutionality."

12   *Skilling*, 561 U.S. 358, 405-06 (citing *Hooper v. California*, 155 U.S. 648, 657 (1895) (emphasis

13   added)).  With respect to federal regulations, in deciding whether a regulation provides fair notice of

14   proscribed conduct, "no more than a reasonable degree of certainty can be demanded."  *Boyce Motor*

15   *Lines v. United States*, 342 U.S. 337, 340 (1952).   Regulations need not achieve "meticulous

16   specificity" but instead may employ "flexibility and reasonable breadth."  *Grayned v. City of Rockford*,

17   408 U.S. 104, 110 (1972).

18                    2.   <u>Defendant's Vagueness Challenge As Applied to the Circumstances of His Case</u>
                           <u>Must Be Denied Since the Areas Where He Dumped are "Waters of the United</u>
19                         <u>States" by Any Test</u>

20        "It is well established that vagueness challenges to statutes which do not involve First

21   Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v.*

22   *Powell*, 423 U.S. 87, 91 (1975) (internal citation and quotation marks omitted).   Therefore, the

23   defendant is limited to an argument that the regulation is vague as applied to him.  *See United States v.*

24   *Purdy*, 264 F.3d 809, 811 (9th Cir. 2001) ("Where, as here, a statute is challenged as unconstitutionally

25   vague in a cause of action not involving the First Amendment, we do not consider whether the statute is

26   unconstitutional on its face.  Instead, 'our concern is whether the [statute] is impermissibly vague *in the*

27   *circumstances of this case.*'") (emphasis in original).

28

Here, the challenged statute and regulations pertain to the unpermitted discharge of fill material into waters of the United States, not conduct that is constitutionally protected. Therefore, a vagueness challenge can be made on an as applied basis only. The defendant may not render the definition of waters of the United States vague by hypothesizing about how it might apply to other types of waters or wetlands in a hypothetical case. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (In applying the "ordinary intelligence" standard, the Court must consider "the particular facts at issue," not the hypothetical conduct of others). "Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *United States v. Williams*, 553 U.S. 285, 306 (2008).

Therefore, the defendant's vagueness challenge must be examined in light of the facts of his conduct. In this case, the defendant illegally dumped fill material into portions of wetlands that extend unbroken to only 60 feet from a TNW. HBG Report at 33-35, 47-48. *See also Riverside Bayview*, 474 U.S. at 135 (viewing respondent's property as "part of a wetland" extending to navigable waterbody). Contrast this with *Rapanos*, involving wetlands up to 20 miles from a TNW. By any test for jurisdiction, the areas filled by the defendant are "waters of the United States" under the CWA.

a)    <u>Adjacent wetlands</u>

Both of the wetlands filled by the defendant are waters of the United States as "adjacent wetlands" pursuant to 33 C.F.R. § 328.3(a)(7) since they are adjacent to a TNW. *Riverside Bayview*, 474 U.S. 121 (1985). Mowry Slough is a TNW under 33 C.F.R. § 328.3(a)(1). It is a navigable-in-fact tributary, or "tidal inlet" of San Francisco Bay, subject to the ebb and flow of the tide. *See San Francisco Baykeeper v. Cargill Salt*, 481 F.3d 700, 702 (9th Cir. 2007) (establishing that Mowry Slough is a navigable tributary of San Francisco Bay). Clearly, San Francisco Bay is also a TNW.

Both wetlands are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. 33 C.F.R. § 328.3(b); HBG Report at 16-22. Both are "bordering, contiguous, or neighboring" the Slough, separated from the Slough only by its approximately 60-foot levee, which does not interrupt the adjacency of wetlands under the regulation. 33 C.F.R. § 328.3(c); HBG Report at 33-36 (describing wetlands' adjacency to the Slough).

1   Defendant's argument that the government's asserted jurisdictional basis is "far removed" from a

2   navigable water is feeble.  The wetlands, part of which were filled by the defendant, are within a literal

3   stone's throw of a TNW, and formerly within the tidal margin of San Francisco Bay.  Jurisdiction in this

4   case can therefore be premised on the property's basic location.

5                          b)      Significant nexus

6          Because the wetlands where the defendant dumped are adjacent to the TNW (Mowry Slough), a

7   significant nexus between the wetland and the Slough is conclusively inferred.[6]  In addition, the

8   significant nexus between the wetlands and the Slough (including the tributary in the Northern Area) is

9   well documented in HBG's report.  HBG Report at 39-51.

10         In the Northern Area, the wetland and Tributary 1[7] are separated from the Slough only by the

11  levee, and at low tides are not separated at all from the Slough, due to the 24-inch-diameter culvert that

12  cuts through the Slough levee and drains water from the Northern Area wetland and tributary directly

13  into Mowry Slough.  HBG Report, App. A, Fig 9a, pp. 8, 17-18, 33-34, 38, 41-42.  The Southern Area

14  wetland filled by the defendant also continues to the Slough levee, and its waters ultimately flow into the

15  Slough through an automated pump.  *Id.* at App. A, Fig. 9b, pp. 20, 34-35, 38-39, 43-45.  The culvert

16  and pump are present for the *precise reason* that the property's proximity to the Slough and Bay creates

17  a drainage problem.  Su Decl. ¶ 3(b).

18         The wetlands and Tributary 1 where the defendant dumped fill material have a documented

19  direct hydrological connection to the Slough, through the culvert and the pump.  HBG Report at 38, 41-

20  43.  Based on Dr. Huffman's study of the property, which included chemical analysis of water samples,

21  he found that the wetlands and Tributary 1 have a significant nexus to Mowry Slough, and that they did

22  so in 2014 before the defendant filled portions of the wetlands and Tributary 1.  *Id.* at pp. 54-57.  For

23  instance, Dr. Huffman found significantly higher amounts of total organic carbon and chlorophyll

24

25  ---

    [6] *See City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir. 2007) (stating that Justice Kennedy's statement

26  in his concurring opinion in *Rapanos* "indicates that a significant nexus may be inferred when wetlands
    are adjacent to navigable waters").

27  [7] The Superseding Indictment (¶ 17) characterizes the defendant's discharges of fill material into "an
    approximately 1.28-acre area within the tributary."  Dr. Huffman found that some of this area had been

28  re-vegetated by the time the defendant filled this portion of the property and that the length of Tributary
    1 that was filled in 2014 was 148 linear feet.  HBG Report at 23.

1   entering Mowry Slough from the property through the culvert and the pump, compared with the Slough,

2   as well as lower concentrations of total suspended solids.  *Id.* at pp. 48-51.

3                       c)      Plurality test

4           Both wetlands have a "continuous surface connection" to "relatively permanent" waters since

5   they "abut" such waters.  HBG Report at 36-39, 53, 56, 59-60.  The Northern Area wetland abuts

6   Tributary 1, which is a relatively permanent water with an OHWM and bed and bank, indicative of flow,

7   and which conveys water at least seasonally.  *Id.* at 17-18, 23, 38, 39.  In addition, the wetland abuts

8   Mowry Slough through the culvert buried in the Slough levee.  *Id.* at 33, 38.  As noted, the wetland

9   continues westward along the sides of the Tributary 1 channel, and water from both ultimately flows

10  directly to the Slough on low tides.  *Id.* at p. 17-18, 33-34, 38, 41-42, 43, 53.  Thus, despite the presence

11  of a levee between the Northern Area and the Slough, the culvert provides a physical surface connection

12  between the two areas.

13          The southern wetland has a continuous surface connection to a tributary channel to its south

14  (Tributary A), a relatively permanent water that typically flows year-round or has continuous flow at

15  least seasonally.  *Id.* at App. A, Fig. 9b, pp. 38, 43-45, 60.  Dr. Huffman observed Tributary A's OHWM

16  and bed and bank, and Dr. Coats calculated its flow rate as approximately 3 cubic feet per second.  *Id.* at

17  20, 24, 45.  Tributary A conveys surface water into a larger relatively permanent tributary (Tributary B),

18  which directs water flow southward to a floating electric pump that pumps water into Mowry Slough

19  through an outfall pipe buried in the levee.  *Id.* at App. A, Fig. 9b, pp. 8, 18-21, 34-35, 38-39.

20          Thus, based on the facts and circumstances of the instant case, a vagueness challenge cannot be

21  sustained because the property that the defendant filled, by any test for jurisdiction, are "waters of the

22  United States" under the CWA.  Any remaining dispute is not a question of vagueness, but one

23  involving proof at trial.

24             3.      The Definition of "Waters of the United States" As Applied to the Defendant
                       Provides Fair Notice

25

26          A vagueness challenge will not be upheld if judicial explication of a statute provides sufficient

27  clarity to afford fair notice.  *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979), *cert.*

28  *denied*, 444 U.S. 859 (1979); *United States v. Bohonus*, 628 F.2d 1167, 1174 (9th Cir. 1980); *see also*

*United States v. Lippold*, 2007 U.S. Dist. LEXIS 80513 (C.D. Ill. 2007) (stating "[c]ase law can define a statutory term sufficiently to defeat a void-for-vagueness argument" and rejecting a vagueness challenge to the waters of the United States definition).

The regulatory definition of "waters of the United States," as long interpreted by courts, provides fair notice to the defendant. Although the version of the regulation on which charges against the defendant are based is from 1986, the regulatory definition has been in effect since 1977.

Soon after the definition's promulgation, early challenges on vagueness and overbreadth grounds failed, as courts concluded that Congress had intended that the term "navigable waters" be interpreted broadly. *See, e.g.*, *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1326 (6th Cir. 1974) (upholding the application of the definition to tributaries of navigable waters, else the tributaries could be used as open sewers as far as federal regulation was concerned, and the navigable part of the river could become a mere conduit for upstream waste.); *United States v. Phelps Dodge Corp.*, 391 F. Supp. 1181, 1187 (D. Ariz. 1975) (rejecting defendant's argument that the vagueness and indefiniteness of the term "waters of the United States" failed to give warning that discharging pollutants into a dry arroyo constituted criminal conduct, holding that regulations had adequate notice and definiteness); *United States v. Oxford Royal Mushroom Products, Inc.*, 487 F. Supp. 852, 854-855 (E.D. Pa. 1980) (rejecting defendants' argument that the terms "navigable waters" and "waters of the United States" are void for vagueness "because the precedents are contra; the Act and these terms have been upheld as constitutional.")

The terms "wetlands" and "adjacent" are clearly defined in the Agencies' regulations, and nothing about either term is unconstitutionally vague. Courts have long been able to interpret their meaning and have upheld their application. Significantly, *Riverside Bayview* established that adjacent wetlands were covered by the CWA more than 30 years ago. Many other courts followed suit. *See, e.g., Healdsburg*, 496 F.3d at 998, 1000 (applying the Agency's definition of wetland and *Riverside Bayview* and finding that a pond was part of a larger wetland that was adjacent to a navigable river); *United States v. Tull*, 769 F.2d 182, 186 (4th Cir. 1985), *rev'd on other grounds*, 481 U.S. 412 (1987) (rejecting defendant's argument that the CWA's regulations are unconstitutionally vague because the imprecise definition of "wetlands" makes it too difficult for landowners to determine their potential liability, and

1  holding that, as applied to that case, the regulatory definition of wetlands is sufficiently definite to give a

2  person of ordinary intelligence fair notice of what conduct the CWA prohibits or requires.)

3       With respect to the tributary alleged in Count Two, the common meaning of that term combined

4  with judicial explication provides sufficient clarity to afford fair notice.  In interpreting specific words or

5  phrases within statutes, courts have regularly used accepted dictionary definitions.  *See e.g., Village of*

6  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 501 (1982); *United States v. Wyatt*,

7  408 F.3d 1257, 1261 (9th Cir. 2005); *United States v. Rearden*, 349 F.3d 608, 615 (9th Cir. 2003).

8  Tributaries have variously been described as: a "stream feeding a larger stream or lake" (Merriam

9  Webster Dictionary), "a river or stream that flows into a larger river or lake" (Oxford Dictionary), or "a

10  stream that flows into a larger stream or other body of water" (Dictionary.com).

11       The Ninth Circuit's determination of what constitutes a tributary under the CWA is consistent

12  with the common definition of a tributary.  *See, e.g., Cmty. Ass'n for Restoration of the Env't v. Henry*

13  *Bosma Dairy*, 305 F.3d 943, 954 (9th Cir. 2002) (holding an irrigation canal was properly deemed a

14  tributary, and stating that "[a] stream which contributes its flow to a larger stream or other body of water

15  is a tributary."); *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001) (holding

16  irrigation canals to be waters of the United States as tributaries because they contribute flow to a larger

17  stream or other body of water).

18       The case law also makes clear that tributaries with seasonal flow can constitute waters of the

19  United States, even if there is no flow during dry months of the year.  *See e.g.*, *United States v. Moses*,

20  496 F.3d 984, 991 (9th Cir. 2007) ("[T]he Supreme Court [*in Rapanos*] unanimously agreed that

21  intermittent streams (at least those that are seasonal) can be waters of the United States."); *San*

22  *Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 763, 764 (N.D. Cal. 2011) (holding

23  the CWA does not require that a body of water have a continuous flow for it to be a water of the United

24  States because the CWA includes intermittent bodies of water; *Rapanos* does not exclude waters that

25  sometimes run dry).

26       Courts have made no distinction between natural and artificial tributary flow, and both have been

27  deemed to be tributaries under the CWA if they contribute flow to a TNW.  *See United States v. Adam*

28  *Bros. Farming, Inc.*, 369 F.Supp.2d 1166, 1176-77 (C.D. Cal. 2003) (making no distinction between

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SUPERSEDING INDICTMENT
CASE NO. CR 16-00107 HSG                14

1  natural and man-made flow); *Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F.Supp.2d

2  1059, 1075-76 (E.D. Cal. 2002) (creek which reached a navigable water via an underground tunnel

3  deemed to be a tributary); *ONRC Action v. United States Bureau of Reclamation*, 2012 U.S. Dist. LEXIS

4  118153, *69 (D. Or. 2012) (holding that the fact that the drain in question only reaches the traditional

5  navigable water as the result of human engineering is irrelevant, as "[d]istrict courts in the Ninth Circuit

6  have consistently rejected the notion that whether a water is a 'tributary' depends on whether it reaches a

7  traditionally navigable water by means of "natural" or "artificial" flow"; *United States v. New Portland*

8  *Meadows, Inc.*, 2002 U.S. Dist. LEXIS 19153 (D. Or. 2002) (ditch which contributed water to navigable

9  river only as the result of forced pumping deemed to be a tributary).

10          4.      Rapanos Did Not Render the Legal Standard Defining "Waters of the United
                   States" So Vague that it is Unconstitutional As Applied to the Defendant and
11                 United States v. Davis Did Not Invalidate the "Significant Nexus" Test As
                   Applied in the Ninth Circuit
12

13          In *Rapanos*, as discussed supra, all justices agreed that adjacent wetlands and tributaries with

14  seasonal flow can constitute waters of the United States.  Therefore, if the government can prove that

15  each of the aquatic features (the wetlands in Counts One and Three, and the tributary in Count Two)

16  meets either the plurality or Kennedy test for jurisdiction, the defendant's claim of vagueness must be

17  rejected.  The fact that there are different methods to assess whether a wetland or tributary is a water of

18  the United States does not render a regulatory standard vague or invalid, and the defendant cites no

19  authority to the contrary.

20          *Rapanos* has been the controlling precedent since 2006, eight full years before the defendant's

21  trespass and dumping, sufficient time to provide notice to a person of ordinary intelligence.  And in the

22  Ninth Circuit, Justice Kennedy's significant nexus test from *Rapanos* has been the controlling standard

23  for nearly as long.  *See, e.g., N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 998, 999 (9th Cir.

24  2007) (applying the significant nexus test and finding that "significant nexus may be inferred when

25  wetlands are adjacent to navigable waters"); *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007);

26  *United States v. Vierstra*, 492 Fed. Appx. 738 (9th Cir. 2012) (unpublished); *United States v. Robertson*,

27  2015 U.S. Dist. LEXIS 160163 (D. Mont. 2015) (affirming jury instructions setting forth the significant

28  nexus test as having provided a "coherent standard" to apply in determining whether the waters in

1   question were waters of the United States); *Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1217 (D.

2   Or. 2009) (stating the Ninth Circuit in *Healdsburg* defined the features necessary to demonstrate a

3   "significant nexus" between a navigable-in-fact water and the wetlands in question).

4          With very little discussion, the defendant claims that, after *United States v. Davis*, 825 F.3d

5   1014, 1016 (9th Cir. 2016) (*en banc*), courts within the Ninth Circuit may no longer rely on Justice

6   Kennedy's "significant nexus" standard and are left without meaningful guidance for interpreting and

7   applying the Agencies' rule.  Defendant's implicit argument, that *Davis* invalidated the Ninth Circuit's

8   holding in *City of Healdsburg*, which held that Justice Kennedy's "significant nexus" standard provides

9   "the controlling rule of law" in a CWA case, is without merit.  *See Duarte Nursery, Inc. v. United States*

10  *Army Corps of Eng'rs*, 2017 U.S. Dist. LEXIS 43552, **15-16 (E.D. Cal. Mar. 23, 2017) (holding

11  *United States v. Davis* did not overrule *Healdsburg*).[8]

12         In *Davis*, the Ninth Circuit addressed how it should utilize *Marks v. United States*, 430 U.S. 188

13  (1977), to interpret fractured decisions of the Supreme Court, i.e., where no opinion has the support of at

14  least a majority of the Justices.  *Marks* instructs that, "when a fragmented Court decides a case and no

15  single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be

16  viewed as that position taken by those Members who concurred in the judgments on the narrowest

17  grounds." 430 U.S. at 193.  *Davis* adopted a "reasoning-based" approach (as opposed to a "results-

18  based" approach) in applying *Marks*, and held that "a fractured Supreme Court decision should only

19  bind the federal courts of appeal when a majority of the Justices agree upon a single underlying rationale

20  and one opinion can reasonably be described as a logical subset of the other.  When no single rationale

21  commands a majority of the Court, only the specific result is binding on lower federal courts."  *Davis* at

22  1021-22.

23         First, it would be speculative and premature to assume that the Ninth Circuit would interpret

24  *Davis* as invalidating *Healdsburg*.  *Davis* did not overrule, or even mention, *Healdsburg*, which remains

25  binding precedent in the Ninth Circuit.  *See, e.g., Roundy v. Comm'r*, 122 F.3d 835, 837 (9th Cir. 1997)

26  ("A three-judge panel is bound by a prior judgment of this court unless the case is taken en banc and the

27

28  ───────────────────
[8] The argument that *Davis* overruled *Healdsburg* has been raised before the Ninth Circuit by Appellant
in *United States v. Robertson*, No. 16-30178.  The appeal is fully briefed and awaiting oral argument.

1   prior decision is overruled."); *see also Duarte Nursery*, 2017 U.S. Dist. LEXIS 43552, *25 (E.D. Cal.

2   Mar. 24, 2017) ("*Davis* did not overrule Healdsburg, either explicitly or implicitly.").

3   Second, the en banc ruling in *Davis* does not lead to the conclusion that no governing law can be

4   derived from *Rapanos*. *Davis* construed a fractured decision of the Supreme Court where, according to

5   the Ninth Circuit, neither the plurality opinion nor the concurring opinion was a subset of the other.

6   With respect to *Rapanos*, by contrast, the Ninth Circuit has applied the "significant nexus" standard

7   because Justice Kennedy's "concurrence is the narrowest ground to which a majority of the Justices

8   would assent if forced to choose in almost all cases." *Healdsburg*, 496 F.3d at 999; *see also Duarte*

9   *Nursery*, 2017 WL 1105993, **16-17 (E.D. Cal. 2017) (analyzing conclusions of other circuits and

10  finding Justice Kennedy's test in his *Rapanos* concurrence to be the narrowest test, as determined by

11  *Healdsburg*).

12  Third, in *Davis* the court wrote, "[h]ere, we assume but do not decide that dissenting opinions

13  may be considered in a *Marks* analysis." It then engaged in such an analysis, yet was unable to "extract

14  a shared reasoning by including the dissent," and concluded that the "concurring opinion is not a logical

15  subset of the dissenting opinion, or vice versa." *Davis* at 1025, 1028. By contrast, in *Rapanos*, both the

16  plurality opinion and the concurring opinion constitute subsets of the dissenting opinion, logically

17  leading to the conclusion that either the plurality standard or Justice Kennedy's standard may be used to

18  demonstrate CWA jurisdiction (i.e., "waters of the United States").[9]

19  Fourth, even if *Rapanos* was binding only in its "specific result," there would still be no basis for

20  this Court to dismiss the CWA counts. In the absence of any governing rule from *Rapanos*, CWA

21  jurisdiction would be determined under the statute, the implementing regulations, and the prior Ninth

22  Circuit case law, unencumbered by any restrictions imposed by the *Rapanos* decision. The Corps'

---

[9] To illustrate, if a water-body satisfies Justice Kennedy's "significant nexus" standard, then five Justices on the *Rapanos* court (Justice Kennedy and the four dissenting Justices) would agree that the water is jurisdictional under the CWA. Similarly, if a water-body satisfies the plurality standard (streams that are relatively permanent and wetlands that have a continuous surface connection with such streams), then eight Justices (the four who joined the plurality opinion and the four who joined the dissenting opinion) would agree that it is jurisdictional under that reasoning. Indeed, the four dissenting Justices in *Rapanos* stated that they would uphold CWA jurisdiction in "all other cases in which either the plurality's or Justice Kennedy's test is satisfied" and that in "future cases the United States may elect to prove jurisdiction under either test." *Id.* at 810 & n.14 (Stevens, J., dissenting).

regulatory definition of "waters of the United States" in effect at the time of Lucero's activities included "tributaries" of and "wetlands adjacent" to a TNW.  33 C.F.R. § 328.3(a)(5), (7).  And the pre-*Rapanos* case law in the Ninth Circuit clearly supported the assertion of regulatory jurisdiction over tributaries and adjacent wetlands, even in the absence of evidence demonstrating "the existence of a significant hydrological or ecological connection between the particular wetlands at issue and waters of the United States."  *Baccarat Fremont Developers, LLC v. U.S. Army Corps of Eng'rs*, 425 F.3d 1150, 1158 (9th Cir. 2005); *see also Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001) (upholding CWA jurisdiction over irrigation canals, finding that they were "tributaries" under the regulatory definition of "waters of the United States.")

Accordingly, *Davis* does nothing to change the continuing validity of *Healdsburg*, namely that Justice Kennedy's "significant nexus" standard in *Rapanos* supplies a controlling rule of law for determining what is a "water of the United States" under the CWA.

The defendant overstates the split that exists in various Circuits post-*Rapanos*.  No circuit to date has required an aquatic resource to meet the plurality's standard for jurisdiction to be established.  All circuits that have decided the question have allowed jurisdiction to be proven through Justice Kennedy's significant nexus test.  The only split that can be divined is that several circuits have allowed jurisdiction to be proven under either test, while the Eleventh Circuit has concluded that the significant nexus test is the sole controlling standard.  *Compare United States v. Johnson*, 467 F.3d 56, 64-66 (1st Cir. 2006); *United States v. Donovan*, 661 F.3d 174, 182-83 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009) (allowing jurisdiction to be proven under either test) *with United States v. Robison,* 505 F.3d 1208, 1221–22 (11th Cir. 2007) (deeming the significant nexus test to be the sole controlling standard for CWA jurisdiction).  And as *Donovan* correctly holds, no Circuit has adopted the defendant's position that the opinions in *Rapanos* fail to provide any governing standard.  *Donovan*, 661 F.3d at 180.

In any event, both standards have been applied over much of the last decade in CWA cases nationwide, and regardless of which test was used to prove jurisdiction, no case has held the underlying regulations at issue in *Rapanos* (and in this case) to be invalid as vague.  This, alone, amounts to sufficient judicial explication to defeat the defendant's claim of unconstitutional vagueness.

5.    The Property's Characteristics Also Defeat Defendant's Vagueness Challenge

The property's proximity to San Francisco Bay and Mowry Slough, as well as the network of watercourses located thereon (e.g., tributary channels, county flood control channels, levees, and ponds), should have alerted a man of common intelligence to the possibility that there were waters of the United States on the property. *See United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008) (finding the definition of waters of the United States not unconstitutionally vague where a prevalence of wet property and an area network of creeks and their tributaries leading to the Gulf, some of which connected to wetlands on the property, "should have alerted 'men of common intelligence' to the possibility that the wetlands were waters of the United States under the CWA.") *Id.* at 328.

The defendant chose to dump on the last area of somewhat dry land available before hitting the San Francisco Bay. If he had traveled even a handful of yards further west, he would have needed to trade-in his dump trucks for watercraft. Nearly the entire property, including the areas filled as a result of the defendant's conduct, is within the original margin of San Francisco Bay. Su Decl. at ¶ 3(b). The property's owners historically had such a difficult time keeping the property dry that they had to install an electric pump to continually funnel water through a narrow levee into a navigable tributary of the Bay. The property's characteristics would certainly put someone of common intelligence on notice that there were waters of the United States on the property.

6.    The Defendant Should Be Held to a Higher Than Normal Standard Due to His Professional Background

The defendant's business was providing contractors and trucking companies with open space to dump fill material from construction sites for a fee. Su Decl. at ¶ 3(s). In this case, he allowed 1,545 truckloads of material from twelve different construction and trucking companies to be dumped on the property. *Id.* at ¶¶ 3(a), (c).

And this was not the first time that the defendant illegally dumped fill material. On March 28, 2014, he was convicted in Santa Clara County for one count of Conspiracy, in violation of California Penal Code § 182(a)(1), and 6 counts of Bribery, in violation of Penal Code § 641.3. *Id.* at ¶ 3(t). These convictions stemmed from his bribing Santa Clara County landfill employees (paying them approximately half a million dollars, largely in cash and under the table, over eight years) to allow his

1    truckloads of intentionally misclassified waste to be dumped in a county landfill at a reduced rate.  *Id.*

2    The estimated loss to the County was over $13,000,000.  *Id.*  This is a man with actual notice of the

3    governmental legal frameworks in place to stop conduct like his.

4         Because the defendant is in the business of dumping fill material, he should be held to a higher

5    standard when assessing whether a man of "common intelligence" would be placed on fair notice of

6    proscribed conduct.  *See United States v. Tull*, 769 F.2d 182, 186 (4th Cir. 1985) (*rev'd on other*

7    *grounds*) (noting that the lower court, in applying the "ordinary intelligence" standard, highlighted

8    evidence that Tull was a "knowledgeable and sophisticated developer."); *United States v. Phillips*, 87

9    Fed. Appx. 650 (9th Cir. 2004) (unpublished) (finding that the defendant, as a real estate developer, is

10   expected to apprise himself of the reach of the CWA, and should have known his conduct might be

11   prohibited).  *See also United States v. Elias*, 269 F.3d 1003, 1014 (9th Cir. 2001) (standard to evaluate

12   adequate notice of hazardous waste definition lowered as applied to the defendant whose business

13   involved management of hazardous waste); *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir.

14   1993) (the defendants knowledgeable in wastewater field can be expected to have known that CWA

15   permit "did not give them license to dump thousands of gallons of partially treated sewage into the

16   ocean on a regular basis.").

17        In this case, the defendant's conduct did more than simply "tread[] close to a reasonably-defined

18   line of illegality[;]" his conduct trampled that line.  *United States v. Kay*, 513 F.3d 432, 442 (5th Cir.

19   2007).  The defendant did not mistakenly dump on land that he owned.  He cut a padlock and

20   orchestrated a whole operation of illegal dumping that spanned several months.  Su Decl. at ¶ 3(n).  He

21   did this without permission from the landowners.  *Id.* at ¶ 3(e).  Once caught, he blatantly lied, providing

22   a fraudulent hand-written permission note to try and cover his wrongdoing.  *Id.*

23        Indeed, the Supreme Court has stated that "one who deliberately goes perilously close to an area

24   of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340.

25   "The requirement that statutes give fair notice cannot be used as a shield by someone who is already

26   intent on wrongdoing." *Roark & Hardee v. City of Austin*, 522 F.3d 533, 554 (quoting *United States v.*

27   *Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)

28   ("Objections to vagueness . . . may be overcome in any specific case where reasonable persons would

1  know that their conduct is at risk"). The defendant intentionally committed a host of other crimes

2  related to his conduct, including criminal trespass and malicious mischief. His attempts now to shield

3  himself from criminal liability by asserting that the statute failed to give him fair notice of proscribed

4  conduct rings hollow.

5          7.     <u>The Agencies' regulations applying the CWA statute do not result in arbitrary or discriminatory enforcement</u>

6

7        An enactment does not violate the Due Process Clause merely because it allows regulators some

8  discretion to enforce the law. "[S]tatutes are not automatically invalidated as vague simply because

9  difficulty is found in determining whether certain marginal offenses fall within their language." *United*

10  *States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). It is "wholly subjective judgments without

11  statutory definitions, narrowing context, or settled legal meanings" that render a statute

12  unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 306 (2008) (citation omitted). The

13  Supreme Court has recognized that "enforcement requires the exercise of some degree of police

14  judgment." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). Where, as here, a regulation sets

15  forth "explicit standards for those who apply them," arbitrary enforcement is avoided. *Id.*

16        Not only are the Agencies' regulations as they pertain to "waters of the United States" well

17  defined with settled meanings explicated by case law, but the Agencies that enforce them are further

18  guided by several documents to assist them in making JDs. They include the 1987 *Corps of Engineers*

19  *Wetlands Delineation Manual* (the "1987 Manual" or "Manual"), the 2008 *Regional Supplement to the*

20  *Corps of Engineers Wetland Delineation Manual: Arid West Region* (Version 2.0) (the "Supplement"),

21  and the "*Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v.*

22  *United States & Carabell v. United States*," December 2, 2008 (the "*Rapanos* Guidance").

23        The 1987 Manual describes technical guidelines and methods, using a multi-parameter approach,

24  to identify and delineate wetlands for purposes of Section 404 of the Clean Water Act. The approach set

25  forth in the Manual generally requires positive evidence of hydrophytic vegetation, hydric soils, and

26  wetland hydrology for a determination that an area is a wetland. *See* J. Kennedy's concurrence,

27  *Rapanos* at 761. The Manual's Supplement presents wetland indicators, delineation guidance, and other

28  information that is specific to the Arid West Region, of which Newark Area 4 is a part. It provides

information on regional differences in climate, soils, hydrology, plant and animal communities, and more, so as to improve the accuracy and efficiency of wetland delineation in particular climates and geographical areas.  The *Rapanos* Guidance, which focuses only on 33 C.F.R. § 328.3(a)(1) (TNWs), (5) (tributaries to TNWs), and (7) (wetlands adjacent to TNWs and to tributaries of TNWs), provides guidance to the Agencies in making JDs.  It describes waters that are jurisdictional consistent with *Rapanos,* including, *inter alia*, TNWs, wetlands adjacent to TNWs, nonnavigable tributaries of TNWs that typically flow year-round or have continuous flow at least seasonally, and wetlands that directly abut such tributaries.  *Rapanos* Guidance, pp. 4-7.  Together, these guidance documents aid the Agencies in implementing and enforcing the regulations pertaining to the CWA in a non-discriminatory and non-arbitrary manner.

8.    The President's Executive Order does not affect this Court's analysis of whether the definition of waters of the United States is vague

The President's Executive Order, No. 13778, signed on February 28, 2017, 82 Fed. Reg. 12,497 (Feb. 28, 2017) directed the EPA and the Corps to "review" the 2015 Clean Water Rule concerning navigable waters determinations and  "publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with the law."  Executive Order § 2.  Section 3 of the Executive Order stated:

> Definition of 'Navigable Waters' in Future Rulemaking. In connection with the proposed rule described in section 2(a) of this order [rescinding or revising the 2015 Rule], the Administrator [of EPA] and the Assistant Secretary [of the Army for Civil Works] shall consider interpreting the term "navigable waters" … in a manner consistent with the opinion of Antonin Scalia in *Rapanos v. United States*…. *Id.* § 3.

The Executive Order, by its terms, "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." *Id.* § 4(c).

The President's Executive Order does not affect the defendant's case or change the law.  As noted, the United States has never relied on the 2015 Clean Water Rule in this case to establish jurisdiction.  The regulations in place at the time of the defendant's conduct are controlling – i.e., the

1  regulation published in 2014 (which was initially published in 1986, but was largely unchanged from the

2  1977 regulation).  Thus, the defendant's reference to the 2015 Rule and the Executive Order is inapt.

3  **B.    The Agencies Did Not Exceed Their Authority in Applying the Statute Via the Regulatory Definition of Waters of the United States**

5  The Agencies did not exceed their authority in promulgating the definition decades ago, and

6  *Rapanos* did not invalidate the regulation.  As the defendant recognizes, Congress implicitly delegated

7  policy-making authority to the EPA and the Corps, the Agencies charged with the CWA's

8  administration."  *San Francisco Baykeeper v. Cargill Salt Div.,* 481 F.3d 700, 704 (9th Cir. 2007).

9  As noted, CWA case law is replete with the recognition that Congress intended the statute to be

10  interpreted broadly.  *See, e.g., Riverside Bayview*, 474 U.S. 121, 135-138 (detailing Congressional

11  acquiescence following the Corps' assertion of authority under CWA § 404 over waters not actually

12  navigable, remarking "it is notable that even those [in Congress] who would have restricted the reach of

13  the Corps' jurisdiction would have done so not by removing wetlands altogether from the definition of

14  'waters of the United States,' but only by restricting the scope of 'navigable waters' under § 404 to

15  waters navigable in fact and their adjacent wetlands.")

16  In spite of this, the defendant would have this court dismiss the Superseding Indictment because

17  it is not limited to the "navigable waters" under the statute and is, instead, based on the Agencies'

18  "regulatory expansion" of the statutory term.  It is well settled that the CWA applies to more than simply

19  "navigable-in-fact-waters," but the defendant appears to be asking this court to upend this decades-old

20  principle.

21  The defendant's claim that the regulations as applied to the defendant's case are invalid based on

22  *United States v. Wilson*, 133 F.3d 251 (4th Cir. 1997) is incorrect.  The Fourth Circuit's invalidation of a

23  different prong of the definition of waters of the United States, 33 C.F.R. § 328.3(a)(3) (*i.e.,* other waters

24  "which could affect interstate or foreign commerce") is irrelevant to the case.  As the defendant

25  acknowledges, the government does not rely on this jurisdictional prong in its Superseding Indictment.

26  Moreover, equating the Newark Area 4 property to *Wilson's* facts is unpersuasive because *Wilson*

27

28

1  involved wetlands that were "more than six miles" from the nearest TNW, the Potomac River.  *Id.* at

2  257.[10]

3      **C.**    **There is No Violation of the Commerce Clause and the Definition of "Waters of the**

4          **United States" Does Not Run Afoul of Federalism Concerns**

5         The defendant also mistakenly contends that application of the regulation to this case would

6  violate the Commerce Clause and constitutional federalism principles, and asks the Court to "read the

7  statute as written" to avoid such concerns.  The Supreme Court explicitly recognized the Commerce

8  Clause when interpreting the Agencies' definition in *Rapanos*.  Accordingly, the plurality and

9  significant nexus standards set forth in *Rapanos* have already accounted for the very concerns that the

10  defendant urges the court now to essentially re-decide.  If CWA jurisdiction is demonstrated consistent

11  with Supreme Court precedent, Commerce Clause and federalism concerns are implicitly satisfied.  *See,*

12  *e.g., Rapanos*, 547 U.S. at 782-83 (J. Kennedy, concurring) (reasoning that an interpretation of waters of

13  the United States that relies on a significant nexus between upstream nonnavigable waters and

14  downstream traditional navigable waters raises no serious Commerce Clause concerns); *see also Cal.*

15  *Sportfishing Prot. Alliance v. Callaway*, 2012 U.S. Dist. LEXIS 37847, 13-14 (E.D. Cal. 2012) (holding

16  the Commerce Clause issue to be illusory because "[t]o the extent the "wash" at issue meaningfully

17  connects to tributaries which empty into indisputably navigable waters, the constitutionality of the CWA

18  is in little doubt.  To the extent that the "wash" is simply unimportant and ephemeral as a water source

19  to navigable waters, the constitutionality issue does not come into play as the CWA may not impose

20  liability in the first place.")

21         As applied to this case, the defendant's Commerce Clause argument is even flimsier.  Here,

22  wetlands on the property are adjacent to a traditional navigable water, and not merely to a non-navigable

23  tributary, as was the case in *Rapanos*.

24

25   

---

[10] Nor is the jurisdictional basis similar to *Solid Waste Agency of Northern Cook Cnty. v. U.S. Army*

26  *Corps of Eng'rs*, ("SWANCC"), in which a closely divided Supreme Court rejected the Agencies' assertion of CWA jurisdiction over "nonnavigable, isolated, intrastate" ponds under 33 C.F.R.

27  § 328.3(a)(3) (*i.e.*, "other waters"), based solely on their use by migratory birds.  531 U.S. 159, 171-72 (2001).  Further, among the many reasons that the defendant's reliance on *United States v. RGM Corp.*,

28  222 F. Supp. 2d 780 (E.D. Va. 2002) is misplaced is the fact that the government relies on other regulations to establish jurisdiction, and, in any event, *Rapanos* now controls the facts at issue there.

1    Defendant's argument that CWA regulation over adjacent wetlands and tributaries to TNWs is a

2  "quintessential land use matter" must be rejected.  It is well settled that Congress's power to regulate

3  channels of interstate commerce also includes the power to adopt "appropriate and needful control of

4  activities and agencies which, though intrastate, affect that commerce." *See Rapanos*, 547 U.S. at 782-83

5  (J. Kennedy, concurring) ("[J]ust as control over the non-navigable parts of a river may be essential or

6  desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream

7  be found in whole or in part in flood control on its tributaries . . .") (quoting *Oklahoma ex rel. Phillips v.*

8  *Guy F. Atkinson Co.*, 313 U.S. 508, 525-526 (1941).

9    Regulation of "waters of the United States" as interpreted by the Agencies and Supreme Court

10 precedent is a valid exercise of Congress' power under the Commerce Clause.  As Justice Kennedy

11 recognized in *Rapanos*, "the Act protects downstream States from out-of-state pollution that they cannot

12 themselves regulate."  547 U.S. at 777 (citation omitted).  In short, to limit "waters of the United States"

13 to only navigable-in-fact waters and to, essentially, omit nonnavigable interstate waters from the CWA

14 would "leave a gaping hole" in Congress's comprehensive scheme to regulate water pollution.  *Gonzales*

15 *v. Raich*, 545 U.S. 1, 22 (2005).

16                        **V.    CONCLUSION**

17    For the foregoing reasons, the United States respectfully requests that the Court deny the

18 defendant's motion to dismiss the Superseding Indictment.  The regulations involved in the instant case

19 are neither unconstitutionally vague nor invalid.

20

21 Dated:  June 26, 2017                          Respectfully Submitted,

22                                               BRIAN J. STRETCH
                                                Acting United States Attorney
23

24                                                     /s/
25                                               PHILIP J. KEARNEY
                                                SHIAO C. LEE
26                                               Assistant United States Attorneys

27

28