# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JAMES PHILIP LUCERO,<br><br>    Defendant. | Case No. CR 16-00107 HSG<br><br>DECLARATION OF WENDY SU IN SUPPORT OF GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS SUPERSEDING INDICTMENT<br><br>Date:  July 31, 2017<br>Time:  2:00pm |

1. I make this declaration in support of the Government's Opposition to Defendant's Motion to Dismiss Superseding Indictment.

2. I am a Special Agent ("SA") with the United States Environmental Protection Agency ("EPA") Criminal Investigation Division ("EPA-CID"). I have been so employed since September 2010. I have a master's degree in Environmental Science and Management from the University of California Santa Barbara, and Bachelor's degrees in Sociology and Geography/Environmental Studies from the University of California, Los Angeles. I have completed training at the Federal Law Enforcement Training Center in Glynco, Georgia, which included the Criminal Investigator Training Program, the EPA-CID Environmental Investigation Basic Training Program, and Economic Crimes Investigation and Analysis Training Program. I have received specific training regarding the Clean Water Act (CWA), Title 33, United States Code, Sections 1251, et seq., also known as the Federal Water Pollution Control Act. I am the lead EPA-CID SA assigned to the prosecution of James Lucero ("defendant"), and have been so assigned since the inception of the federal investigation of this matter.

3.     I have personally participated in this investigation and am aware of the facts contained herein based on my own investigation, my review of documents and records including those described below, and information provided to me by other law enforcement officers, lay witnesses, and technical experts, including experts in the field of wetlands. As a result of my investigation, I have learned and consequently believe the following:

a)    The defendant, without necessary state or federal permits or even permission of the landowners, caused approximately 1,545 truckloads of dirt and construction debris ("fill material") to be dumped and moved around on real property in the City of Newark, County of Alameda, State of California, including two parcels identified by Assessor's Parcel Numbers 537-0850-011-04 and 537-0850-005. These parcels were located within a larger area known as "Newark Area 4" or "Area 4" ("property"), consisting of approximately 560 acres generally located west of Stevenson Boulevard, south of Mowry Avenue, west of Union Pacific railroad tracks, and east of Mowry Slough. The Slough, which surrounds the property's western boundary, lies partly within the Don Edwards San Francisco Bay National Wildlife Refuge.

b)    The Slough is subject to the daily ebb and flow of San Francisco Bay's tide cycle and nearly all of the property, including the areas filled by the defendant, is within the original margin of the Bay, separated from the Slough by a man-made levee approximately 60 feet wide. The Slough is a navigable-in-fact water body. But for this levee, much of Newark Area 4 would be subject to tidal flooding from the Bay and Slough almost daily. As a result of the low-lying nature of the property, its proximity to the Bay, and other hydrologic features on the property, such as seeps and a high groundwater table, water drainage from the property is managed through channels, culverts, and an electric pump.

c)    The trucks the defendant used were of four basic types: "super dumps," "end dumps," "10 wheelers," and "transfer trucks." Transfer trucks were 10 wheelers with a trailer. All four types of trucks were able to transport multiple yards of fill material. The fill material contained dirt, soil, and construction debris, including but not limited to concrete, asphalt, polyvinyl chloride (PVC), metal, and electrical wires. At least twelve construction and trucking companies dumped fill

material onto the property. They include Pacific Sanitation, FA Poli Trucking, CityWide Debris Box, Gary Pollack Construction & Excavation, Greg's Trucking Service Inc., O Nelson & Son, Gilroy Construction Inc., Matt Kelley Trucking, Baker Brothers Debris Box and Recycling Services Inc., Alviso Rock, Economy Trucking Services, and DRYCO Construction Inc. I further believe the defendant charged the truckers an average of between $50 and $80 for each load dumped on the property.

  d) The parcels on which fill material was dumped are owned by Newark Partners, LLC, which is in partnership with The Sobrato Organization, a Cupertino, California-based development firm specializing in commercial and residential real estate. Tim Steele, Sobrato Organization's Senior Director of Real Estate Planning, manages the development project within Newark Area 4 for Newark Partners. According to Steele, the five principals of Newark Partners are Mike Siri, Richard Peery, John Arrillaga, John A. Sobrato and John M. Sobrato.

  e) On September 10, 2014, the defendant faxed a two-page handwritten letter to Steele after telling Steele that he had a letter granting him permission to dump fill on the property. The letter was dated June 19, 2014, and stated "I Michael Sobrato give permission to you Jim Lucero to put clean fill dirt on my property located at West Mowry and Stevenson Road. You shall spread dirt and mix in with existing soil so you can plant and harvest hay." The letter contained the signature of "Michael Sobrato" and the defendant. Steele said that he knew no one who goes by the name "Michael Sobrato." In addition, all of the principals of Newark Partners told me that they did not authorize the defendant to access the property or to dump anything on the property, and none recognized the signature of "Michael Sobrato."

  f) The owners of Newark Area 4 hired several consultants as part of an effort that spanned almost ten years to obtain regulatory approvals to develop portions of the property. The defendant's illegal dumping derailed the regulatory approval process and caused damage to the property in the range of $862,639 to $1.725 million.

  g) Among the consultants hired was an ecological consulting firm, H.T. Harvey & Associates ("Harvey"), which, in 2005, began evaluating the property to identify the extent and

distribution of areas that may meet the physical criteria of jurisdictional waters under the CWA. Harvey ecologists conducted extensive field work across the property, including walking the property to determine the state of soil saturation, documenting site conditions in photographs, digging hundreds of soil pits to sample soil from various depths, documenting vegetation, and determining surface and subsurface hydrologic features on the property.

h) Harvey's ecologists visited the property at least fifty separate times and took photographs on at least eighteen days during the 2005-06 and 2006-07 winter/spring seasons, when precipitation falls in California. One of Harvey's ecologists, Kelly Hardwicke, recalled visiting the property four to five days a week at times during the project. Harvey created a report entitled "*Preliminary Delineation of Wetlands and Other Waters*," dated June 20, 2007, which sets forth the results of its multi-year study and discusses Harvey's review of other sources of information about the property and vicinity, such as historic aerial photographs and a detailed topographic map of Area 4 prepared by Kier & Wright Engineers in 2005, with resolution at a 0.1-foot contour interval.

i) In the *Preliminary Delineation ("PD")*, Harvey wrote "Small gradients in elevation (less than 1 ft difference between upland areas and potential wetland areas) at this project site result in subtle depressions. The landscape surrounding these slight depressions then becomes the contributing watershed to these potential wetlands." Page 15.

j) Harvey's PD concluded that Area 4 had 242.89 acres of potential jurisdictional wetlands and 34.21 acres of other jurisdictional waters, the latter of which it described as including "lakes, seasonal ponds, channels, tributary waters, and seasonal springs . . . identified by the presence of standing or running water," and characterized by the presence of an ordinary high water mark ("OHWM"). The PD explains that an OHWM is a mark on opposing channel banks indicated by the presence of physical characteristics such as a clear, natural line impressed on the bank, the presence of standing water, or the presence of mudflats with no emergent vegetation. Harvey determined that approximately half of the property consisted of non-jurisdictional upland. Harvey PD at 11.

k) Harvey found that wetlands on the property had three primary sources of hydrology, including incidental rainfall, a high groundwater table fed by springs, and lateral seeps. Harvey

documented the criteria it used to identify whether wetlands are present -- i.e., hydrophytic vegetation, hydric soils, and wetland hydrology -- following the U.S. Army Corps of Engineers' 1987 *Wetlands Delineation Manual* and the *Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region*, and included its data from this effort in the *PD*(Appendix C). Harvey PD at 8, 25.

  l) Landowners of the property sought a Jurisdictional Determination ("JD") from the U.S. Army Corps of Engineers (Corps), which issues JDs pursuant to Section 404 of the CWA, 33 U.S.C. § 1344. Dan Martel, a wetland specialist with the Corps, visited the property, where he dug soil pits, observed wetland hydrology and flow of tributaries. The Corps issued a JD encompassing the property on October 11, 2007 to Sobrato Organization's Steele, which included a map showing the extent and location of jurisdictional waters. The JD map identified 249.17 acres of jurisdictional wetlands and 34.14 acres of other jurisdictional waters.

  m) As part of an effort to "re-verify" the 2007 JD, consistent with Corps policy that provides for expiration of JDs after five years, Katerina Galacatos, the Corps' San Francisco Regulatory Division South Branch Chief visited the property in July 2013 with Patrick Boursier, Ph.D., Senior Plant Ecologist at the time of Harvey's 2005-07 study. Galacatos determined that the Corps' 2007 wetland delineation should remain the same as what was approved by the Corps in 2007.

  n) The illegal dumping referenced above began in or around June 2014, and dumping in jurisdictional waters began in approximately July 2014. Dumping ended on September 8, 2014, when the Newark Police Department arrived at the property after responding to a tip regarding the illegal dumping. I am informed by Steele, who responded to the property on September 8, 2014, that he observed that the padlock was cut at one of the gates leading to the property, which enabled the trucks to enter the property.

  o) The day after the fill was discovered on September 8, 2014, Boursier mapped the areas of fill with a hand-held GPS unit that he later depicted on a map Harvey had produced as part of its study.

p)   It was determined that the illegal dumping was placed onto approximately 11.85 acres of wetlands previously delineated by the Corps as waters of the United States.  Of the 11.85 acres, approximately 3.90 acres involved wetlands in the portion of the property that is north of the Alameda County Flood Control and Water Conservation District Line D, which runs across the property in a generally northeast direction from Mowry Slough toward the Union Pacific Railroad tracks east of the property.  Fill material was placed into approximately 7.95 acres of wetlands south of the Flood Control Channel Line D.

q)   Fill material from the defendant's illegal dumping operation also was placed into a tributary channel in the northern area of the property.  This tributary connects to Mowry Slough through a one-way culvert that allows water to flow from the property to the Slough when the level of water in the Slough is lower than the water on the property (for example, on low tides).

r)   In connection with this case, the government retained Terry Huffman, Ph.D., a wetland regulatory scientist with Huffman-Broadway Group (HBG), who visited and studied the property on January 9, February 15, March 29, April 6, April 21, and June 8, 2017.  Other specialists with HBG and consultants to HBG, including hydrologist Robert Coats, Ph.D., also contributed to HBG's study, for example by performing certain focused studies of biological or hydrological aspects of the property, or by taking or analyzing water samples.  HBG's efforts and Dr. Huffman's conclusions about jurisdictional waters on the property are set forth in HBG's report entitled *Clean Water Act Jurisdictional Analysis and Determination for Fill Placement Areas on the Newark Partners, LLC, Newark Property, Alameda County, California,* June 2017.

s)   The defendant's business was providing contractors and trucking companies with open space to dump fill material, or dirt, taken from construction sites, for a fee.  His profession was to locate appropriate properties for the disposal of fill material.

t)   On March 28, 2014, the defendant was convicted in Santa Clara County of one count of Conspiracy to Commit Crime, in violation of California Penal Code Section 182(a)(1), and 6 counts of Commercial Bribery by Person Offering and Giving Bribes, in violation of Penal Code Section 641.3.  On December 22, 2014, the defendant was sentenced and taken into custody by state

authorities. These convictions stemmed from the defendant's actions in bribing Santa Clara County landfill employees (paying them approximately half a million dollars over eight years), in exchange for allowing his truckloads of intentionally misclassified waste material to be dumped in a county landfill at a reduced rate. The loss to Santa Clara County Department of Waste Management was over $13,000,000.

Under penalty of perjury, I swear that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: June 26, 2017

Wendy Su
Special Agent
Environmental Protection Agency