1   BRIAN J. STRETCH (CABN 163973)
    United States Attorney
2
    BARBARA J. VALLIERE (DCBN 439353)
3   Chief, Criminal Division

4   PHILIP KEARNEY (CABN 114978)
    SHIAO LEE (CABN 257413)
5   Assistant United States Attorneys

6       450 Golden Gate Avenue, 11th Floor
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7023
        FAX: (415) 436-7234
8       philip.kearney@usdoj.gov

9   Attorneys for United States of America

10

11                       UNITED STATES DISTRICT COURT

12                     NORTHERN DISTRICT OF CALIFORNIA

13                             OAKLAND DIVISION

14

15   UNITED STATES OF AMERICA,              )   No. CR 16-107-HSG
                                            )
16              Plaintiff,                  )
                                            )
17        v.                                )   **GOVERNMENT'S OPPOSITION TO**
                                            )   **DEFENDANT'S MOTION TO EXCLUDE**
18   JAMES PHILIP LUCERO,                    )   **EXPERT TESTIMONY OR SEEK *DAUBERT***
                                            )   **HEARING**
19                                          )
                Defendant.                  )   Date:  October 30, 2017
20                                          )   Time:  2:00pm
                                            )   Court:  Hon. Haywood S. Gilliam, Jr.
21   _____)

22

23

24

25

26

27

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SUPERSEDING INDICTMENT
16-CR-107 HSG

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF RELEVANT FACTS .............................................................2

III.    THE JURISDICTIONAL REACH OF THE CLEAN WATER ACT ("CWA")...........................2

IV.     IV.  ARGUMENT................................................................................................2

        A.      The Proffered Testimony Does Not Introduce Improper Expert Opinions on
                Questions of Law; On The Contrary, It Allows Experts To Testify Regarding
                Elements and Definitions Given To The Jury By The Court Through Its Jury
                Instructions..........................................................................................2

        B.      The government's proffered expert testimony should not be excluded under
                *Daubert*; no separate pre-trial hearing is necessary because the testimony is
                based on reliable methods and is relevant to the facts at issue. .........................8

                1.      Daubert – legal standard ........................................................8

                2.      Defendant's *Daubert* challenge fails because it does not challenge the
                        qualifications of government experts nor their methodology, the
                        ultimate tests of reliability. ....................................................9

                3.      The presence of wetlands and other waters on the Site before and after
                        the defendant's illegal dumping are highly relevant to the factual
                        questions at issue.....................................................................11

                4.      The defendant's individual objections to the government's wetland
                        experts go to the weight of the evidence, not its admissibility. ...........16

                5.      Defendant's other specific arguments relating to individual
                        government experts must be rejected because such testimony is
                        relevant to the factual issue of CWA jurisdiction.............................18

                6.      The court is not required to hold a Daubert hearing to fulfill its
                        gatekeeping function. ..............................................................24

V.      CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baccarat Fremont Developers, LLC v. U.S. Army Corps of Engineers*,
425 F.3d 1150 (9th Cir. 2005) ............................................................ 20

*Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007) ................................. 20

*Cooper v. Brown*, 510 F.3d 870 (9th Cir.2007) ............................................................ 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ..................................... 8

*Domingo ex. rel. Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002) ........................................ 9

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir.2011) ....................................... 8, 9

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) .................................. 8

*In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124 (2d. Cir. 1995) .................... 17

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ......................................... 8, 9, 24

*Primiano v. Cook*, 598 F.3d 558 (9th Cir.2010) ............................................................ 8

*San Francisco Baykeeper v. West Bay Sanitary Dist.*, 791 F.Supp.2d 719 (N.D.Cal. 2011) ........... 4, 5, 11

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) ................................................ 17

*Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*,
531 U.S. 159 (2001) ............................................................................. 20

*United States v. Adam Bros. Farming, Inc.*, 369 F. Supp. 2d 1166 (C.D. Cal. 2003) .............................. 10

*United States v. Alatorre*, 222 F.3d 1098 (9th Cir.2000) ......................................... 24, 25

*United States v. Bailey*, 571 F.3d 791 (8th Cir. 2009) .................................................. 10

*United States v. Calderon-Segura*, 512 F.3d 1104 (9th Cir. 2008) ....................................... 24

*United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003) ................................................ 10

*United States v. Fennell*, 381 F.Supp.2d 1312 (D. New Mexico, 2005) .................................... 4

*United States v. Gallo*, 543 F.2d 361 (D.C. Cir. 1976) ................................................ 21

*United States v. Gonzales*, 307 F.3d 906 (9th Cir. 2002) ............................................... 4

*United States v. Hankey*, 203 F.3d 1160 (9th Cir.2000) ................................................. 9

*United States v. Jawara*, 474 F.3d 565 (9th Cir.2007) ................................................ 24

*United States v. Jefferson*, 623 F.Supp. 2d 683 (E.D. Va. 2009) ......................................... 5

1   *United States v. Johnson*, 637 F.2d 1224 (9th Cir.1980) ........................................................ 4

2   *United States v. Lukashov*, 694 F.3d 1107 (9th Cir. 2012) ................................................... 24

3   *United States v. Moran*, 493 F.3d 1002 (9th Cir. 2007) ........................................................ 4

4   *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007) ...................................................... 11, 13

5   *United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999) ................................................... 25

6   *United States v. Perkins*, 470 F. 3d 150 (4th Cir. 2006) ......................................................... 3

7   *United States v. Peterson*, 475 F.2d 806 (9th Cir. 1973) ........................................................ 4

8   *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985)................................... 21

9   *United States v. Robertson*, CR 15-07-H-DWM, 2015 WL 7720480 (D. Montana, Nov. 30, 2015)......... 5

10  *United States v. Vallejo*, 237 F.3d 1008 (9th Cir.2001)........................................................... 8

11  *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993) ............................................. 3, 5, 6

12  *United States v. Wilson*, 133 F.3d 251 (4th Cir. 1997) ................................................... 5, 6, 7

13                                    **FEDERAL RULES**

14  Fed.R.Evid. 702 (2010)............................................................................................................ 8

15  Federal Rules of Evidence 704 ...................................................................................... 1, 3, 4

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

After unsuccessfully seeking to dismiss both the initial and superseding indictments, the defendant now moves to exclude or limit the scope of proffered government expert testimony based on two rationales.  First, that the testimony would elicit expert opinion on contested issues of law.  Second, that the expert testimony is neither reliable nor relevant under a traditional *Daubert* analysis.  Both arguments should be rejected.  The defendant is also not entitled to a pre-trial *Daubert* hearing.

Contrary to what the defendant asserts, the government's experts will not be opining on the meaning of contested issues of law.  They will be applying their expertise and observations of the land and its properties to the definition of "waters of the United States" as given to them by the Court.  Their opinion will assist the jury in understanding the evidence at trial and determining facts at issue, such as whether areas dumped in by the defendant were waters of the United States.  With proper jury instructions in place, the government's experts are well-within their right pursuant to Federal Rules of Evidence 704 to give their opinions even on ultimate issues of facts.  Because the Court will instruct the jury on the relevant law and that they can give expert testimony as much or as little weight as they see fit, any objection the defendant has to the government's experts goes to the weight of the evidence, not its admissibility.

The defendant's *Daubert* argument, which stems largely from that decision's 'relevance prong,' similarly fails.  The defendant claims that expert testimony regarding the condition of the property on which defendant dumped fill material (the "Site") should be excluded as irrelevant if based on analyses conducted before or after the charged crimes.  The defendant in effect asks this Court to admit only a temporal snapshot of the Site's vegetation, soil, and hydrology.  This request is based on a stated belief that a period of drought during and around the defendant's unprovoked environmental assault changed the character of the land so dramatically that it ceased to be a water of the United States.  This contention, supported by no expert declaration or analysis, stands in direct contradiction to relevant Supreme Court and Ninth Circuit case authority, as well as the methodology set forth in the *U.S. Army Corps of Engineers Wetlands Delineation Manual* ("Wetlands Manual" or "Manual"), published in 1987

1  (attached as Exhibit A), and the regional supplement to that Manual, published in 2008,[1] discussed

2  below.  The defendant's basic factual contention is also unsupported by the evidence.

3  **II.     STATEMENT OF RELEVANT FACTS**

4         Please see the "Statement of Relevant Facts" section in the Government's Amended Opposition

5  To Defendant's Motion To Dismiss Superseding Indictment, filed June 26, 2017 ("Government's June

6  26, 2017 Opposition")  including the summary of charges and description of the jurisdictional studies of

7  waters of the United States on the Property (or "Site").  (Dkt. 51 at 1).

8  **III.    THE JURISDICTIONAL REACH OF THE CLEAN WATER ACT ("CWA")**

9         Please see the "Jurisdictional Reach Of The Clean Water Act" section in the Government's June

10 26, 2017 Opposition, including the regulatory definition of "Waters of the United States," the summary

11 of Supreme Court precedent regarding Waters of the United States, and the discussion of Waters of the

12 United States after *Rapanos*.  (Dkt. 51 at 1).

13 **IV.    IV.     ARGUMENT**

14        **A.     The Proffered Testimony Does Not Introduce Improper Expert Opinions on
                Questions of Law; On The Contrary, It Allows Experts To Testify Regarding
15              Elements and Definitions Given To The Jury By The Court Through Its Jury
                Instructions**

16

17        The experts in this case should be permitted to give their opinion on the following issues,

    including but not limited to: (1) whether the wetlands and tributary into which the defendant dumped

18 have a significant nexus to a navigable water, in this case, Mowry Slough; (2) whether certain tributaries

19 on the Site are relatively permanent; (3) whether the wetlands have a continuous surface connection to a

20 relatively permanent water; (4) whether the wetlands are adjacent to a traditional navigable water; and

21 (5) whether the wetlands and tributary into which defendant dumped are jurisdictional waters of the

22 United States.

23        District Courts are granted wide latitude in determining the scope of expert testimony at trial.  As

24 the Ninth Circuit has concluded, "[t]he admission of expert testimony is within the discretion of the trial

25 court and reversible only for abuse of discretion or manifest error.  Expert testimony is properly

26

27 ─────────────────────

28        [1]*Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region
    (Version 2.0)*, attached as Exhibit B.  ("Regional Supplement").

1  admissible when it serves to assist the trier of fact to understand the evidence or determine a fact in

2  issue." *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (internal citations omitted).

3  With the lone exception being a defendant's *mens rea*, experts may offer opinion evidence on an

4  ultimate issue of fact, so long as it is helpful to the trier of fact and does not waste time.  See Fed. R.

5  Evid. 704, 701, 702, and 403; *see also United States v. Perkins*, 470 F. 3d 150, 157 (4th Cir. 2006)

6  ("The touchstone of admissibility of testimony that goes to the ultimate issue, then, is helpfulness to the

7  jury").

8          Experts in this case are expected to testify about how they evaluate the physical characteristics of

9  wetlands and tributaries (collectively referred to hereinafter as "wetlands/waters"), how they determine

10  whether a wetland is adjacent to a traditional navigable water ("TNW"), how they evaluate whether a

11  wetland or tributary has a significant nexus to a TNW, and how they assess whether a wetland has a

12  continuous surface connection to a relatively permanent water.  In addition, they are expected to testify

13  as to their evaluation of the Site, and how, based on these analyses, they are able to reach a conclusion to

14  a reasonable degree of scientific certainty on whether the wetlands and tributary are waters of the United

15  States.  Their testimony will assist the trier of fact in understanding the evidence and determining key

16  facts in issue.

17          The Advisory Committee Notes for Federal Rule of Evidence 704, concerning expert testimony

18  on ultimate issues, explain not only that these opinions are proper but also why they are so important:

19          The basic approach to opinions, lay and expert, in these rules is to admit them when
            helpful to the trier of fact.  In order to render this approach fully effective and to allay any

20          doubt on the subject, the so-called 'ultimate issue' rule [prohibiting experts from
            expressing an opinion upon ultimate issues in a case] is specifically abolished by the

21          instant rule …. The rule was unduly restrictive, difficult of application, and generally
            served only to deprive the trier of fact of useful information. The basis usually assigned

22          for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly
            characterized as 'empty rhetoric.'  Efforts to meet the felt needs of particular situations

23          led to odd verbal circumlocutions which were said not to violate the rule.

24

25          The Advisory Note goes on to explain how engaging in verbal circumlocution so as to avoid

26  opining on an "ultimate issue" resulted in word play, such as using the phrase "might or could" as

27  opposed to "did," and that the result "was to deprive many opinions of the positiveness to which they

28

1   were entitled, accompanied by the hazard of a ruling of insufficiency to support a verdict."  Fed. R.

2   Evid. 704 Advisory Committee Notes.

3   　　　Many examples illustrate this concept and the courts' acceptance of "ultimate issue" opinion

4   testimony.  *See e.g.*, *United States v. Johnson*, 637 F.2d 1224, 1246–47 (9th Cir.1980) (doctor allowed

5   to testify that patient suffered "serious bodily injury"); *United States v. Moran*, 493 F.3d 1002, 1008 (9th

6   Cir. 2007) (holding admissible expert testimony that the defendant's tax scheme was fraudulent); *United*

7   *States v. Peterson*, 475 F.2d 806, 809–10 (9th Cir. 1973) (Treasury Department official testified that the

8   alleged weapon was an 'incendiary device' within the coverage of 26 U.S.C. § 5845(f)); *United States v.*

9   *Fennell*, 381 F.Supp.2d 1312, 1316 (D. New Mexico, 2005) (expert opinion on the ultimate issue of

10  whether the land in question was within the United States' public domain as a national forest was

11  permissible, and testimony on technical terms in the Presidential Proclamation which supported the

12  expert's opinion was appropriate as well).

13  　　　Courts have admitted expert testimony on a variety of "ultimate issues": intoxication, speed,

14  handwriting, value, and controlled substance and drug trafficking determinations.  *See* Rule 704

15  Advisory Committee Notes; *see e.g.*, *United States v. Gonzales*, 307 F.3d 906 (9th Cir. 2002) (district

16  court did not err in admitting expert testimony that the particular amount of drugs and types of drug

17  paraphernalia found on the defendant were indicative of possession with intent to distribute as opposed

18  to personal consumption).  Not only can an expert opine on whether someone possesses a controlled

19  substance for personal use as opposed to sale, but they can certainly opine on the fact that the controlled

20  substance is what it is alleged to be.  For example, an expert on the identification of cocaine can

21  conclude that the substance based on his training and experience is cocaine.  He does not need to dance

22  around the word "cocaine" in describing why he believes the substance to be cocaine.  As the rule

23  allows, he can simply say that it is.

24  　　　In the context of environmental cases, experts have been allowed to opine on the ultimate issue

25  of whether a property has a significant nexus to a navigable water or is a water of the United States.  For

26  example, in *San Francisco Baykeeper v. West Bay Sanitary Dist.*, 791 F.Supp.2d 719, 740–41 (N.D.Cal.

27  2011), the government's expert stated that the defendant's sanitary sewer overflows reached surface

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERTS AND SEEK DAUBERT
HEARING

1  waters, and concluded that those surface waters in particular were "waters of the United States."  The

2  court in *San Francisco Baykeeper* found that ultimate conclusion to be admissible because it related to

3  an element of the case.  *Id.*  The court ultimately found that the expert testimony was relevant and

4  admissible in that it assisted the trier of fact in reaching a conclusion necessary to the case.  *Id.*

5       In *United States v. Robertson*, CR 15-07-H-DWM, 2015 WL 7720480 (D. Montana, Nov. 30,

6  2015), while the experts did not opine on whether the tributary and adjacent wetlands in question were

7  waters of the United States, they did give an opinion on whether they had a significant nexus to the

8  traditional navigable water in that case, the Jefferson River.  When the government expert was asked

9  "whether he believed 'the tributary and adjacent wetlands flowing through the National Forest Service

10 lands and [the Manhattan Lode] have a significant nexus to the traditional navigable water Jefferson

11 River,' [the expert] responded, 'it does.'"  *Id*. at *11-12.  The *Robertson* court found that based on the

12 expert's testimony, as well as the testimony of others, a rational juror could find that the significant

13 nexus test was met for both the tributary and its adjacent wetlands.  *Id*. at *13.  The *Robertson* court

14 further permitted testimony about the plurality standard in *Rapanos*, specifically whether there was a

15 relatively permanent flow and a continuous surface connection between the tributary and adjacent

16 wetlands with the River.  *Id.*  Not only was this expert testimony deemed admissible, it played a part in

17 the court's ruling that there was sufficient evidence to support a verdict.

18      As the courts did in *San Francisco Baykeeper* and *Robertson*, this Court should allow testimony

19 from the government's experts on issues that will assist the trier of fact in making a determination on a

20 necessary element of the offense.  Such testimony will help the jury perform their function as the finders

21 of fact.  Moreover, by being able to use language that tracks the statute or Agencies' regulations in

22 question, the jurors will be that much better assisted by the experts in being able to perform their job.

23 *See United States v. Jefferson* 623 F.Supp. 2d 683, 688 (E.D. Va. 2009) (reasoning that the similarity

24 between the language of the expert's testimony and the statute helped to ensure that the expert's opinion

25 would be helpful) (internal citations omitted).

26      The defendant cites two cases, *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993), and

27 *United States v. Wilson*, 133 F.3d 251 (4th Cir. 1997), in support of his argument that the government's

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERTS AND SEEK DAUBERT HEARING

1  experts should not be allowed to testify on the above-mentioned matters.  But *Weitzenhoff* does not stand

2  for this proposition; rather, *Weitzenhoff* was a case about jury instructions.

3      There, the central issue was the meaning of technical terms in a permit and whether the

4  defendant's dumping of thousands of gallons of toxic sludge into the ocean was consistent with the

5  terms of the permit.  *Id.* at 1287.  The trial judge treated the interpretation of the permit (defining the key

6  terms of the permit and explanations of its prohibitions) as a question for the jury and allowed witnesses

7  on both sides to testify about the meaning and application of various technical terms contained in the

8  permit.  *Id.*  The court then did not resolve the conflicting testimony by instructing the jury on the

9  court's interpretation of the law as it related to the permit, it simply allowed the jurors to apply "their

10  own rendition(s) of the law, presumably derived … from the conflicting expert testimony, to the facts."

11  *Id.*

12      The Ninth Circuit held that the error was not in allowing the experts to testify about the meaning

13  and application of various technical terms contained in the permit, but in allowing the experts to testify

14  in lieu of the court instructing the jury on the law itself.  *Id.*  The Ninth Circuit recognized that testimony

15  of witnesses "regarding technical terms in the permit might have been permissible had the judge

16  proceeded properly to instruct the jury," citing to Rule 702 and 704, but that it was allowing expert

17  testimony in lieu of instructing the jury that was "manifestly erroneous."  *Id.*

18      There is no such problem here.  The expert opinion proffered in this case will in no way supplant

19  the Court's instructions on the law defining relevant terms (e.g., wetland, tributary, adjacent, water of

20  the United States, etc.) or the legal test for determining jurisdiction (significant nexus and/or the

21  plurality test).  With proper jury instructions, the Court can provide leeway for testimony of expert

22  witnesses to assist the jury in understanding the evidence or determining a fact in issue.  After all,

23  whether something is a "water of the United States" is a question of fact to be determined by the jury.

24      The defendant similarly overstates the effect of the Fourth Circuit's decision in *Wilson*.  In

25  *Wilson*, the defendants challenged the trial court's decision letting in expert testimony on "the proper

26  interpretation of the applicable law" while not letting them counter with their own witnesses to establish

27  the same.  *United States v. Wilson*, 133 F.3d 251, 265 (4th Cir. 1997).  The Fourth Circuit cautioned

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERTS AND SEEK DAUBERT
HEARING
16-CR-107 HSG                              6

1    courts on permitting experts "to give opinion on what the law means or how it is interpreted." *Id.* at

2    265-66.

3          That is not what the government is proposing here.  The government's experts will apply their

4    expertise and observations of the land and its properties to the law's definition – they will have no

5    opinion on what the "law means" beyond what is contained in the Court's instructions.  This type of

6    testimony is no different than the cocaine expert, the toxicology expert, or the expert who views images

7    and concludes that they are child pornography.  Even *Wilson* noted that it is appropriate for the court to

8    permit this kind of testimony so as long as "the jury [is] instructed on the law by the court and not by the

9    witnesses." *Id.* at 265.  The *Wilson* court gave examples of permitted testimony, including the "history,

10   practices and procedures followed by [the experts] in their work, opinions based on demonstrated

11   expertise, and similar matters." *Id.*

12         Applying these principles to the instant case, the Court should allow the government's experts to

13   provide an opinion on key issues that will enable the jurors to make an educated decision on whether the

14   elements of the charged crimes have been met.  Especially in cases such as this involving complex

15   regulations, expert opinion is all the more important to assist jurors with understanding the evidence and

16   determining facts at issue.  The testimony as to whether the areas where the defendant dumped are

17   wetlands or a tributary, whether the wetlands and tributary have a significant nexus to Mowry Slough,

18   whether the wetlands have a continuous surface connection to a relatively permanent water, and whether

19   they are waters of the United States, are factual in nature and for the jury to decide.

20         Therefore, expert opinion on those issues is permissible under Federal Rule of Evidence 704

21   because that testimony would be helpful to the jury.  It will not be given in lieu of instructions from the

22   Court on the law and the applicable tests for determining jurisdiction.  On the contrary, it is relevant

23   testimony to assist the trier of fact in determining whether the legal standard, as instructed by the Court,

24   is met.

25         As long as the testimony satisfies Rule 702 and *Daubert*, the expert may offer opinion evidence,

26   even regarding an ultimate issue of fact, and any objection to the testimony goes only to the weight of

27   the evidence, and not its admissibility.

28

**B.     The government's proffered expert testimony should not be excluded under *Daubert*; no separate pre-trial hearing is necessary because the testimony is based on reliable methods and is relevant to the facts at issue.**

### 1.     Daubert – legal standard

Rule 702 of the Federal Rules of Evidence governs admission of expert testimony in the federal courts:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed.R.Evid. 702 (2010).

The Ninth Circuit has interpreted Rule 702 to require that "[e]xpert testimony...be both relevant and reliable." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.2001).  Relevancy simply requires that "[t]he evidence ... logically advance a material aspect of the party's case." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir.2007).  Reliability focuses on whether an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464-465 (9th Cir. 2014)(*en banc*), *citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).  "[E]videntiary reliability [is] based upon scientific validity." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n. 9 (1993).

The concern is "not [with] the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010) (citations and quotations omitted). The duty falls squarely upon the district court to "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.2011).  The reliability inquiry is "a flexible one." *Kumho Tire*, supra at 150.  The Supreme Court has suggested several factors that can be used to determine the reliability of expert testimony: 1) whether a theory or technique can be tested; 2) whether it has been subjected to peer

review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir.2000) (*citing Daubert*, *supra* at 592–94).   Whether these specific factors are "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, *supra* at 153.   Although styled as a *Daubert* motion, the defendant does not object to the proffered testimony based on any of these reliability factors.[2]   As a consequence, the government will not conduct an in-depth analysis of them.

> **2.  Defendant's *Daubert* challenge fails because it does not challenge the qualifications of government experts nor their methodology, the ultimate tests of reliability.**

As noted, the key purpose of the *Daubert* analysis is to prevent "junk science" posing as expert testimony from reaching the jury. *Ellis v. Costco Wholesale Corp.*, *supra* at 982; *Domingo ex. rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).   Here, Defendant does not question the qualifications of the government's wetlands/waters experts, the majority of which hold Ph.D.s in their respective fields.[3]   Nor does defendant challenge the methodology they followed when delineating wetlands or assessing other jurisdictional waters.

All of the government's experts who analyzed the Site for the presence of wetlands (Boursier, Galacatos, Hardwicke, Huffman, and Martel), based their analyses either on the Wetlands Manual or the Manual in combination with the Regional Supplement to the Manual.   See *Declaration of Terry Huffman In Support of Government's Opposition to Defendant's Motion to Exclude Expert Testimony or Seek Daubert Hearing*, attached as Exhibit C (at ¶ 8).   These documents set forth technical guidelines

---

[2] With potential minor exceptions regarding Carin High and Gary Deghi discussed further below.

[3] Including Patrick Boursier, Ph.D. in Plant Physiology; Robert Coats, Ph.D. in Wildlife Resource Science; Gary Deghi, Masters of Science in Wildlife Ecology; Katarina Galacatos, Ph.D. in Aquatic Ecology; Kelly Hardwicke, Ph.D. in Ecology; and Terry Huffman, Ph.D. in Botany with an emphasis in Wetland Community Ecology.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERTS AND SEEK DAUBERT HEARING
16-CR-107 HSG                                        9

for identifying wetlands and distinguishing them from non-wetlands, and include a wetland

determination data form on which information about a potential wetland is recorded.  Exh. C at ¶¶ 4-6.

Both the Manual and Regional Supplement involve an analysis of three factors in making wetland

determinations: hydrophytic vegetation, hydric soil, and wetland hydrology.  Exh. A at 9-10; Exh. B at

2.

The Manual has been published and peer-reviewed.  Exh. C at ¶ 6.  It is 89 pages long with

approximately 43 additional pages of bibliography and appendices, which include a glossary, data

forms, lists and descriptions of relevant vegetation, and a discussion of hydric soils.  *Id.* at ¶ 4.  Its

included procedures have been determined to be reliable.  *Id*. at ¶ 6.  The National Academy of Sciences

has confirmed the validity of the Manual's three-parameter approach to delineating wetlands.  *Id.*  It

enjoys such widespread acceptance within the relevant scientific community that it is considered a

"bible" by wetland ecologists.  *Id.* at ¶ 6.  Courts have long recognized the Manual as reliable scientific

and technical methodology.  *See United States v. Adam Bros. Farming, Inc.,* 369 F. Supp. 2d 1166 (C.D.

Cal. 2003) (denying defendants' *Daubert* motion because defendants failed to establish that EPA

expert's testimony was not the product of a reliable methodology such that exclusion is warranted under

Rule 702 where expert's conclusions were based on his application of the Corps' Manual); *United States

v. Bailey*, 571 F.3d 791, 800 (8th Cir. 2009) (rejecting defendant's challenge to the reliability of Corps'

expert testimony based on the Manual, reviewing Corps' methodology for evaluating hydrophytic

vegetation, as well as other wetland criteria); *United States v. Deaton*, 332 F.3d 698, 713 (4th Cir. 2003)

(rejecting defendant's challenge to the Manual's method for establishing soil hydrology, deferring to the

Manual because it "deals in a complex scientific field, wetlands ecology and hydrology").

Both the expertise of the government's experts themselves and the methodology they employed

were sound.  Given that no specific objection by the defendant has been raised to these key *Daubert*

factors, this Court should find the proffered testimony reliable.

### 3.   The presence of wetlands and other waters on the Site before and after the defendant's illegal dumping are highly relevant to the factual questions at issue.

The defendant, relying on no apparent factual basis or expert declaration, characterizes the previous and subsequent observed and studied conditions of the Site as "radically different" from those existing during his illegal trespass and dumping campaign in mid-2014.  (Dkt. 67 at 12).  This contention is based on the assertion that "years of severe drought" and "continuous farm[ing]" brought about "constant shifts in water content and flow on the Site," which have produced jurisdictional determinations "subject to varying results."  *Id.*  The defendant argues that the government's proffered expert testimony about the Site other than in the "summer of 2014" is therefore irrelevant.  (Dkt. 67 at 13).  At the outset, the government notes that this approach would effectively bar CWA enforcement for unpermitted discharges of fill material when an illegal act of dumping was not discovered until after the crime had been committed.

The core of the defendant's argument—that seasonal and annual fluctuations in rainfall so fundamentally changed the Site's character that it no longer contained waters of the United States during mid 2014—is both factually mistaken and legally unsupported.  Wetlands and tributaries do not appear and disappear with every drop of precipitation, and neither does CWA jurisdiction.  *See, e.g., United States v. Moses*, 496 F.3d 984, 991 (9th Cir. 2007) ("In short, on this record Teton Creek constitutes a water of the United States and, as the Supreme Court has recognized, regardless of any other disagreements, 'no one contends that federal jurisdiction appears and evaporates along with the water in such regularly dry channels'" (*citing* J. Scalia in *Rapanos* at 733, n.6.); see also *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, *supra* at 764 (holding the CWA does not require that a body of water have a continuous flow for it to be a water of the United States because the CWA includes intermittent bodies of water; "*Rapanos* does not exclude waters that sometimes run dry . . .").  As

discussed below, any changes in the Site's character does not render expert testimony from those who saw it before and after the defendant's illegal dumping unreliable and irrelevant.

The defendant also fails to recognize the documented role of groundwater, including underground aquifers and tidal influences, on the Site's hydrology. Wendy Su Decl. ¶ 3(k) ("[Harvey & Associates] found that wetlands on the property had three primary sources of hydrology, including incidental rainfall, a high groundwater table fed by springs, and lateral seeps."); See August 2017 "*A Supplement to Appendix F Hydrology Studies*, *Huffman-Broadway Group, Inc. June 2017 Clean Water Act Jurisdictional Analysis and Determination for Fill Placement Areas on the Newark Partners, LLC, Newark Property, Alameda County, California* (JL-037203) ("On the basis of the very limited precipitation received in June, the lack of precipitation in July and early August, dry soils surrounding the vegetated seep areas, the presence of standing water and saturated soils in the seep areas, and the actively growing brackish marsh vegetation, it is concluded that the seeps described above are sustained by upwelling of groundwater."). These hydrologic influences are to be expected in a Site perched next to San Francisco Bay; they are also the reason that vast stands of water-loving hydrophytic vegetation were still flourishing in September and October of 2014, soon after the dumping occurred. For example, photographs taken on September 8-9, 2014 of the Northern Fill Area (bates no. JL-021748) and September 9 and October 17, 2014 of the Southern Fill Area (bates no. JL-002014, 000058, and 000172), clearly show the existence of green pickleweed buried by, and adjacent to, the defendant's illegal fill. (See photographs attached collectively as Exhibit D).

But even assuming (wrongly) that the property only received water from rainfall and that no wetland vegetation was present during defendant's dumping, those facts would not mean that the Site did not contain jurisdictional wetlands, and certainly do not render expert testimony regarding the presence of such wetlands at other times irrelevant. Both the Manual and Regional Supplement describe methodology to account for periods of drought, which completely undercuts the notion that a wetland

disappears when the rain stops, or when a particular wetland parameter is not observable for a period of time in the field.  Exh. A at 84-85; Exh. B at 102.  For example, the Manual and Regional Supplement guide practitioners on making wetland determinations in areas where wetlands may lack hydrophytic vegetation or wetland hydrology during the dry season, recognizing that, in certain climates (like the "Mediteranean Climate" of which the Site is part), precipitation typically occurs only during winter months.  *Id.*[4]

As recognized in the Manual, seasonal wetlands (which the Site is not), may have wetland indicators of all three parameters during the wetter portion of the growing season (i.e., the winter months in the Bay Area), but may normally lack wetland indicators of hydrology and/or vegetation during the drier portion of the growing season.  Exh. A at 84-85; see also Exh. B at 104 ("In many wetlands, direct observation of flooding, ponding or a shallow water table would be unexpected during the dry season and, in some situations, hydrology indicators may be absent during the dry season.").  *See also Rapanos* at 761 (J. Kennedy concurring) ("Contrary to the plurality's description, wetlands are not simply moist patches of earth.") (internal citations omitted).

The Regional Supplement also recognizes that wetland hydrology determinations are based on many indicators designed to be used during dry periods when the direct observation of surface water or a shallow water table is not possible, and that some wetlands may lack any of the listed hydrology indicators, particularly during the long dry season, in a dry year, or periods of drought lasting two or more years.  Exh. B at 102, 105.  Such periods of drought are expected, and do not magically transform a wetland into a non-wetland.  *United States v. Moses*, *supra.* at 991.

---

[4]The Regional Supplement at page 102 states that, "[T]he Arid West Region is characterized by long, hot summer dry seasons.  During the dry season, surface water recedes from wetland margins, water tables drop, and many wetlands dry out completely.  Superimposed on this seasonal variability are high spatial and annual variability in precipitation amounts."

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERTS AND SEEK DAUBERT HEARING

16-CR-107 HSG                              13

The Manual and Regional Supplement also dispel the defendant's unsupported notion that observations of the Site outside the Summer of 2014 are irrelevant.  When wetland hydrology indicators may be lacking, the Manual suggests the following procedure for making wetland determinations:

> Such determinations should consider the respective length of time that the area exhibits upland and wetland characteristics, and the manner in which the area fits into the overall ecological system as a wetland.  Evidence concerning the persistence of an area's wetness can be obtained from its history, vegetation, soil drainage characteristics, uses to which it has been subjected, and weather or hydrologic records. Manual at 84-85.

In short, the very historic and temporal data the defendant is trying to suppress.

The Manual also provides step-by-step directions to wetland practitioners on what type of data to gather before rendering an opinion.  Exh. A at 36.  These directions advise to summarize available information on a site's vegetation, including gathering: "Previous wetland determinations made for the area. [To] [e]xtract any pertinent vegetation data."  *Id.* at 40 (Step 4(h).  Far from being irrelevant, conscientious wetland evaluators *should* consider past wetland determinations when making a wetland assessment.  And this obvious approach comports with logic; to confirm that a stand of pickleweed, an "obligate wetland plant" that occurs almost always (>99 percent estimated probability) in wetlands under natural conditions (Exh. A at 14; JL-033106), was present on a particular date, it would be valuable to know if that same stand was present at the same location both before and after the target date.  The Regional Supplement to the Manual takes a similar view.[5]

_____

[5] The Supplement devotes a section to "Difficult Wetland Situations in the Arid West," which recognizes the potential for fluctuations in seasonal or annual rainfall patterns and "temporal shifts in [wetland] vegetation."  Exh. B. at 85-107.  These can be "seasonal shifts in plant communities," for which it recommends "a practitioner return to the site during the normal wet portion of the growing season and re-examine the site for indicators of hydrophytic vegetation; examine the site for identifiable plant remains, either alive or dead, or other evidence that the plant community that was present during the normal wet portion of the growing season was hydrophytic; and use other data sources to determine whether the plant community that is normally present during the wet portion of the growing season is hydrophytic.  Exh. B. at 87-88.  For "drought conditions," it recommends evaluating offsite data that provide information on the plant community that exists on the site during normal years, including aerial photographs, National Wetlands Inventory maps, soil survey reports, and previous site reports, as well as determining whether the vegetation on the drought-affected site is substantially the same as that on a wetland reference site in the same general area having similar soils and known wetland hydrology." *Id.*

In addition to assessing field data gathered over time, the Manual also advises practitioners to consult numerous other sources of information about a property.  They include: historic information such as aerials; a national database of plant species that occur in wetlands including information about ranges and habitat; National Wetlands Inventory maps and databases; records of the U.S. Geological Survey (USGS) and the Soil Conservation Service; hydric soils lists that rate soil components as hydric or non-hydric based on soil property data; and topographic maps.  Exh. A at 84-86; 36-38.

Further, testimony about the Site's condition at times other than the Summer of 2014 is relevant to terms central to proving CWA jurisdiction.  For example, whether a water is "relatively permanent," whether an area is "inundated or saturated by surface or ground water" at a "frequency and duration sufficient to support" wetland vegetation, and whether a wetland and tributary significantly affect the chemical, physical and biological integrity of a traditionally navigable water, are all factual determinations that require observations and studies from more than a snapshot in time.  (See Exh. E, Government's Proposed [jury] Instruction No. 51 "Waters Of The United States—Definition" and citations).[6]  The very data the defendant is trying to exclude, namely observations of the Site over time, is exactly the type of information necessary to prove, for instance, that a certain tributary is relatively permanent, or that a particular piece of ground is saturated with enough water over time to support the type of vegetation consistent with a wetland.  Far from being irrelevant, this type of data gathered over an extended period is at the core of any wetland determination, including that made by a jury.

Despite the defendant's assertion noted previously that the jurisdictional determinations made by the government's expert were subject to varying results, the assessments of the Site made before 2014, during 2014, and after 2014 have been remarkably consistent, whether made by experts employed by the Site owners, the government, or concerned citizens with particularized knowledge of wetland ecology.

---

[6] The governments proposed jury instructions were provided to the defendant on March 10, 2017.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERTS AND SEEK DAUBERT HEARING

The defendant repeatedly notes these observations were taken over a ten-year period from 2007-2017, in an apparent attempt to build a temporal distance from the 2014 dumping.  However, many of the involved scientists made repeated visits to the Site both before and after the crime, visits that informed their opinions of the status of the Site in the summer of 2014.

For instance, it is true that Doctors Boursier and Hardwicke (among others) prepared the Harvey & Associates report in 2007, based on over 50 site visits beginning in 2005.  See Dkt. 50, Exh A ¶3(h).  However, both experts continued to visit the Site over time, with Boursier examining the Site in 2008, 2013, 2014 (including the day after the discovery of the dumping), and 2017.  To exclude his historical wealth of knowledge would be a disservice to the triers of fact and inconsistent with the notion that a wetland can persist over time through variable precipitation.  The defendant will also be able to cross-examine such experts on potential changes in the land over time.

Finally, the government finds baseless any claim that human alterations to the property such as occasional farming altered the jurisdictional status of wetlands in July through early September 2014.  In any event, the possible impact of human activity in the area certainly does not justify excluding the testimony of experts who expressly noted and considered such activity in their studies of the Site.  As with matters of precipitation fluctuation, the Manual (Part IV, Section F) recognizes that human activities may influence the character of a wetland indicator, and provides methodology for delineating wetlands in those situations.  Exh. A at 13, 73-83.  The government's expert testimony should not be precluded where the experts rendering that testimony considered these very activities in making their assessments.

### 4. The defendant's individual objections to the government's wetland experts go to the weight of the evidence, not its admissibility.

Most of the defendant's arguments assert, in various fashions, that the government's wetlands/waters experts cannot testify because they did not personally observe the property in the summer of 2014.  Defendant's argument is akin to claiming that the witnesses do not have full

1   knowledge of facts, and that renders their opinions unreliable.  The defendant is conflating reliability

2   and relevance, and misconstruing the purpose of the trial court's gatekeeping function under *Daubert*.

3   The defendant's assertions regarding the effect of rainfall and human modifications are disputed factual

4   claims that do not call into question the underlying principles or methodology utilized by any of the

5   government's proffered experts.  In fact, and as noted, the methodology used by the experts undercuts

6   the defendant's claims and supports the government's contention that their testimony is both reliable and

7

8   relevant.

9       "[T]he court's gatekeeping function focuses on an examination of the expert's methodology.

10  The soundness of the factual underpinnings of the experts' analysis and the correctness of the experts'

11  conclusions based on that analysis are factual matters to be determined by the trier of fact."  *Smith v.*

12  *Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

13

14      The defendants will have an opportunity to challenge the premises upon which the experts rest

15  their opinions.  Because many of their objections are factual in nature, it is the jury, not the Court, who

16  should decide their validity. "Once certain pieces of scientific evidence pass the admissibility threshold .

17  . . the 'appropriate' means of challenging those which appear shaky or unreliable include the

18  'traditional' devices of '[v]igorous cross-examination, presentation of contrary evidence, and careful

19  instruction on the burden of proof.'"  *In re Joint Eastern & Southern District Asbestos Litigation*, 52

20  F.3d 1124, 1132 (2d. Cir. 1995), *citing Daubert*, 509 U.S. at 596.  "The question of whether the expert

21  witness is credible or whether his or her theories are correct given the circumstances of a particular case

22  is a factual one that is left for the jury to determine after opposing counsel has been provided the

23  opportunity to cross-examine the expert regarding his conclusions and the facts on which they are

24

25  based."  *Smith*, *supra* at 719.

26      Because the proffered expert testimonies in this case are both reliable and relevant, there should

27  be no question as to their admissibility.  Any objection the defendant has to their testimony is a matter of

28

1  what weight the jury should afford it.  That is an argument best made at closing, not in a pre-trial motion

2  to exclude.

### 5.   Defendant's other specific arguments relating to individual government experts must be rejected because such testimony is relevant to the factual issue of CWA jurisdiction.

<u>Expert B, Patrick J. Boursier, Ph.D.</u>

Defendant is incorrect that Dr. Boursier's observations cannot reliably support an opinion as to

the presence of wetlands and other waters on the Site at the time of defendant's conduct in the summer

of 2014.  Dr. Boursier was integral to Harvey & Associates' meticulous multi-year study and

documentation of the presence of wetlands, a delineation conducted consistent with the Manual and an

interim version of the Regional Supplement, and a study that documented three primary sources of

hydrology on the Site, including incidental rainfall, a high groundwater table fed by springs, and lateral

seeps.  (Dkt. 50, Exh. A ¶¶ 3(g)-(k)).  For example, Harvey & Associates, noting the impact of farming

on the Site's vegetation, analyzed the vigor and stress related to vegetation growing in wetlands,

consistent with the Manual.  (JL-009848, 009854).

Dr. Boursier's proffered testimony is highly relevant to the issue of the presence and extent of

wetlands and other waters on the Site in 2014.  None of the government's experts have been involved

with the Site as long as Dr. Boursier.  His involvement began with the landowner's efforts to seek and

obtain development entitlements before Harvey & Associates' 2007 study.  He co-authored the *"Newark*

*Specific Plan Area 4 Biotic Constraints and Opportunities Analysis"* August 9, 2002 (JL-022691-

022726), which documents wetland vegetation and species and habitat on the Site, based on

reconnaissance-level field surveys in April and May 2001.  He was also on the Site for the purposes of

the Corps' jurisdictional verification efforts in July 2013, and again on September 9, 2014, the day after

defendant's illegal activity was shut-down by Newark Police.  On that date, he mapped the boundaries

of the fill material.  (Dkt. 50, Exh. A ¶ 3(m)).  Dr. Boursier also visited the Site in November 2014,

when the Corps sampled areas of fill (JL-025158-025188) and in 2017.  His multi-year involvement, rather than at a particular snapshot in time, is highly relevant to the condition of the Site over time and during the Summer of 2014.  If the character of the property truly did change over time, Dr. Boursier would be the person to know about it.  The jury can appropriately weigh his testimony, but it is certainly admissible.

Expert D, Robert Coats, Ph.D.

Dr. Coats' observations about the Site's hydrology, including how surface water flows through tributaries on the Site and into Mowry Slough, are reliable and relevant to the issue of whether jurisdictional waters existed in 2014.  Defendant's claim that precipitation in the days preceding Dr. Coats' visits to the Site in 2017 render his observations unreliable and irrelevant must be rejected. Defendant does not challenge Dr. Coats' qualifications or methodology for measuring flow. Defendant's challenge goes to the weight of the evidence, rather than its admissibility under *Daubert*.

Dr. Coats' observations of flow are highly relevant to several aspects of the case.  Flow in tributaries within the Site and from the Site into Mowry Slough are central to proving jurisdiction, i.e., Justice Kennedy's significant nexus test, and plurality's "relatively permanent" test.  Data, even if from the rainy season of 2017, certainly can shed light on the hydrological regime of the Site in 2014.  Does the water move from the site to the slough, from the slough to the site, or both?  Central questions which Dr. Coats can illuminate for the jury.  The Site's status as jurisdictional under the CWA does not turn on whether there was a lot of or only a little water on the Site at a specified point in time -- i.e., a period of a few months in the summer of 2014, but rather on the relationship of the Site to a traditional navigable water.

Further, defendant's distinction between "flow" and the "volume" of flow is totally meaningless to the question of whether Dr. Coats' testimony is admissible.  As to a tributary, CWA jurisdiction can be established based on either the "significant nexus" test or the plurality's test in *Rapanos*, not on

1   "flow" or "volume."  In any event, Dr. Coats observed flow in January and April 2017, which indeed

2   relates to volume of flow.

3   Expert E, Gary S. Deghi

4        Mr. Deghi's testimony regarding bird species using both the Site and Mowry Slough is legally

5   relevant to the jurisdictional status of the Site under the significant nexus test, and defendant's argument

6   to the contrary should be rejected.  The significant nexus test considers whether wetlands, either alone or

7   in combination with similarly situated wetlands, significantly affect the chemical, physical, and

8   biological integrity of Mowry Slough.  Among the ecological factors that can be considered as part of

9   the test is whether a wetland supports bird populations as an indistinguishable part of the Mowry Slough

10  ecosystem.  *See Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000-01 (9th Cir. 2007) (finding

11  a significant ecological connection where the pond and its wetlands support substantial bird, mammal

12  and fish populations, all as an integral part of and indistinguishable from the rest of the Russian River

13  ecosystem).  Further, contrary to defendant's claim, the SWANCC case merely rejected the assertion of

14  CWA jurisdiction over "non-navigable, isolated, intrastate" waters based solely on their use by

15  migratory birds.  *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of*

16  *Engineers*, 531 U.S. 159, 171-72 (2001); *Baccarat Fremont Developers, LLC v. U.S. Army Corps of*

17  *Engineers*, 425 F.3d 1150, 1156 (9th Cir. 2005) ("the Court in SWANCC refused to allow the Corps to

18  extend its jurisdiction to waters that are not adjacent to jurisdictional waters on the basis of migratory

19  bird patterns.").  To be clear, it does not stand for the proposition that the presence of birds, migratory or

20  otherwise, is irrelevant to jurisdiction under the significant nexus test.

21  Expert F, Katerina Galacatos, Ph.D.

22       Defendant calls into question Dr. Galacatos' reliability because she did not issue an "official

23  reverification" of the 2007 JD for the Site, and that her delay in doing so indicates serious flaws in the

24  conclusions she intends to offer.  This is not a proper *Daubert* challenge based on methodology, nor a

1   question of admissibility, but rather of sufficiency.  The jury can decide how much weight should be

2   given to Dr. Galacatos' opinion about the Site's jurisdictional status based on her July 2013 visit, a

3   seasonally-dry month within the period of drought, claimed by defendant.  Defense counsel can certainly

4   cross-examine her about the rationale for her not completing the reverification.

5   Moreover, the jury can decide how much weight to give to Dr. Galacatos' November 2014 visit

6   to the Site, a mere two months after defendant's activities were discovered, during which she sampled

7   areas of fill material in wetlands and other jurisdictional waters, including vegetation buried by the fill

8   material, as documented in her January 27, 2015 Memorandum, with accompanying maps, photos and

9   wetland data forms.  (JL-025158-025188).  Lastly, *United States v. Riverside Bayview Homes, Inc.*, 474

10  U.S. 121, 134 (1985), does not stand for the proposition that median high water mark is irrelevant.  (Dkt.

11  67 at 17).

12  Expert G, Kelly Hardwicke, Ph.D.

13  Dr. Hardwicke's proposed testimony is also admissible, as she visited and photographed the Site

14  dozens of times, documenting wetland areas, based on the presence of hydric soils, hydrophytic

15  vegetation, and wetland hydrology, as well as transition areas between wetlands and non-wetland

16  uplands.  The jury can appropriately weigh her testimony to determine whether the wetlands/waters

17  observed and exhaustively studied and photographed were on the Site in 2014.

18

19  The court should also reject defendant's claim that allowing Dr. Hardwicke and Dr. Boursier to

20  both testify as to their direct observations would be redundant.  Both are percipient witnesses.  They

21  undertook different tasks and their Site visits did not always overlap.  Even if they did overlap, the

22  government, because of its heavy burden, is entitled to present corroborative evidence.  *United States v.*

23  *Gallo*, 543 F.2d 361, 365 (D.C. Cir. 1976).

24  Expert H., Carin High

25  Carin High is the co-Chair for the Citizens Committee to Complete the Refuge and was the first

26  person notified of the illegal fill material dumped on the Site.  She visited the Site prior to the

27

28

1   defendant's illegal dumping and on the date his actions were stopped by the Newark Police Department

2   on September 8, 2014.  Her testimony will relate to her specialized knowledge of the Site, her

3   observations of dense pickleweed marsh on the Site over time and at the time of dumping, and her

4   knowledge of particular species that use both the Site and Mowry Slough, which is relevant to proving

5   jurisdictional status of the Site under the significant nexus test.  She also provided relevant Site photos

6   taken at the time of the dumping to law enforcement, including JL-021748 (Exh. D).

7   Expert I, Terry Huffman, Ph.D.

8        Defendant's primary arguments about the effect of precipitation fluctuation and human activities

9   are addressed above and relate to the weight of the evidence, rather than to its admissibility.  In

10  preparing his analysis and report, Dr. Huffman visited the Site on January 9, February 15, April 6, April

11  21, June 8, August 7, and August 8, 2017.  (JL-033082-033779; JL-037198).  As defendant recognizes,

12  Dr. Huffman considered recent precipitation in the area through a "WETS analysis" (i.e., Natural

13  Resources Conservation Service (NRCS) Climate Analysis for Wetlands Table for the WETS station

14  nearest to the Site), and discussed precipitation in numerous sections of his report.  Defense counsel will

15  have the opportunity to cross-exam Dr. Huffman along with the government's other experts.  Contrary

16  to defendant's assertion, Dr. Huffman took into account the impact of such precipitation.  For example,

17  numerous wetland data determination forms included with his report (see, e.g. JL-033423-033443)

18  reflect, in the Remarks section pertaining to specified sampling points, whether there had been above-

19  normal precipitation in the period preceding his documentation of wetland indicators.

20        In addition, he reviewed and relied on aerial imagery (e.g., Google imagery between 2000 and

21  2016 using Google Earth Pro, USGS imagery from 2003, 2006, 2008, 2011, and 2015, and National

22  Oceanic and Atmospheric Administration (NOAA) aerial imagery for 2013 and 2014) to reference

23  precipitation at other points in time.  He also utilized historical sources of information spanning

24  numerous years, such as the Corps' and Harvey & Associates' findings, an NRCS Custom Soil

25  Resources Report for the Site, National Wetlands Inventory (NWI) mapping and metadata, and USGS

Watershed Boundary Dataset Hydrologic Unit Code watershed mapping, consistent with the methodology set forth in the Manual and Regional Supplement.  (JL-033091).  Defendant's claim that heavy rainfall allowed Dr. Huffman to observe tributaries at the Site that never before had been observed is also incorrect.  As referenced in the Government's June 26, 2017 Opposition, Dr. Huffman determined that some of the tributary area—previously characterized as jurisdictional "other waters," or "aquatic" by the Corps and Harvey & Associates—had become re-vegetated by the time the defendant filled this portion of the Site in 2014.  (Dkt. 51 at 11, n.7; JL-033110).

Dr. Huffman, in his report and August 2017 Supplement to Appendix F of the report, determined the length of the tributary, observing its bed and bank and ordinary high water mark ("OHWM").  He also noted historic aerial images that confirmed the tributary's location, well before the 2014 dumping.  (JL-010051, 033110, 033472).

Expert J, Dan Martel

Mr. Martel's testimony about his Site visits in 2007, which led to the Corps' jurisdictional determination in October 2007, and which served as a basis for the Corps' decision to re-verify in 2013, is relevant and admissible for the reasons discussed above.

Expert L, Robert Romero

Robert Romero is expected to testify about Alameda County's flood control efforts in and immediately adjacent to the Site, including the construction of the culvert pipe that drains water and silt from the Site's Northern Fill Area into Mowry Slough.  His testimony as to the Site's hydrological connection to Mowry Slough in the Northern Area is highly relevant to establishing CWA jurisdiction under both the significant nexus test as well as the plurality test.  The culvert pipe serves as a direct hydrological and continuous connection between the Site and Mowry Slough, and drains the Site of water and silt derived from incidental rainfall, underground aquifers, lateral seeps and springs, and the tidal nature of Mowry Slough.  This culvert pipe was installed in 2008 by Mr. Romero; it replaced an

1  existing drainage pipe that was there before, and it was in place at the time of the defendant's illegal

2  dumping.  His testimony about pipe diameter, elevation, length, and valving are highly relevant.

3  Expert M, Angela Rydelius

4       Angela Rydelius is expected to testify about her laboratory's analysis of the water samples taken

5  from Mowry Slough.  Her testimony, is based on specialized knowledge, sufficient data (the water

6  samples themselves), and is the product of reliable methods. The defendant argues that because the

7  water samples were taken in 2017, during a period of "record rainfalls," they are not relevant to this case

8  since the rainfall would affect the chemical content of the water.  Even if that were true (as opposed to

9  the equally plausible assertion that the rainfall would dilute and minimize the effects the Site had on the

10  water composition in the Slough), that is an argument that goes to the weight of the evidence, not its

11  admissibility.  As noted previously, wetlands and tributaries do not appear or disappear with every drop

12  of precipitation, and neither does CWA jurisdiction.  The water samples prove the Site's impact on the

13  Slough, a relevant data point.

14

15

16       **6.**     **The court is not required to hold a Daubert hearing to fulfill its gatekeeping function.**

17       A district court has broad latitude in determining the appropriate form of a *Daubert* inquiry. *See*

18  *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir.2000) ("Nowhere...does the Supreme Court

19  mandate the form that the inquiry into relevance and reliability must take.").  While pretrial "*Daubert*

20  hearings" are commonly used, *see*, *e.g.*, *United States v. Lukashov*, 694 F.3d 1107, 1112 (9th Cir. 2012),

21  they are not required.  *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir.2007).

22

23       A district court may exercise its discretion and admit expert testimony without conducting a

24  *Daubert* hearing.  *Kumho Tire*, 526 U.S. at 152-53.  The Ninth Circuit has specifically approved of that

25  approach in situations where the area of expertise at issue was well-established as reliable.  *United*

26  *States v. Calderon-Segura*, 512 F.3d 1104 (9th Cir. 2008); *Alatorre*, *supra* at 1105 (determining that a

27  trial court has the discretion to make its *Daubert* determination during the evidentiary presentation at

28

trial and noting that in using that process, the district court did not "abandon its gatekeeping function" but instead enabled the court to "fulfill its duty to make a determination as to the reliability of the expert's testimony.").

Consequently, this Court need not conduct a separate, pre-trial evidentiary hearing in order to comply with its *Daubert* gatekeeping function; such a determination should be made based on evidence introduced during the trial.  The Court can conserve its judicial resources by hearing the evidence at the same time it is presented to the jury.  If issues of admissibility arise, it has flexibility in handling the resolution of such issues, including the taking of testimony outside the presence of the jury. *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999); see *also Alatorre*, 222 F.3d at 1099.  Defendant, here, seeks a mini-trial of a review of the experts' evidence.  This would require a lengthy and redundant presentation of evidence, is not necessary, and would be contrary to the interests of judicial economy.

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's motion to exclude and limit expert testimony.  The defendant has shown no reason why the Court should entertain his request for a pre-trial *Daubert* hearing.


DATED: October 16, 2017                                    Respectfully Submitted,

                                                           BRIAN J. STRETCH
                                                           United States Attorney


                                                           _____/s/_____

                                                           PHILIP J. KEARNEY
                                                           SHIAO C. LEE
                                                           Assistant United States Attorneys