VOLUME 4

PAGES 480 – 671

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-16-00107 HSG |
| | ) | |
| VS. | ) | MONDAY, FEBRUARY 12, 2018 |
| | ) | |
| JAMES PHILIP LUCERO, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | JURY TRIAL |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**           ALEX G. TSE, ESQUIRE
                            ACTING UNITED STATES ATTORNEY
                            450 GOLDEN GATE AVENUE, 11TH FLOOR
                            SAN FRANCISCO, CALIFORNIA  94102
                      BY:   PHILIP J. KEARNEY,
                            SHIAO C. LEE,
                            ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**          FEDERAL PUBLIC DEFENDER'S OFFICE
                            1301 CLAY STREET, SUITE 1350N
                            OAKLAND, CALIFORNIA 94612
                      BY:   ANGELA M. HANSEN,
                            NED SMOCK,
                            ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER


      TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1                    I N D E X

2    GOVERNMENT'S WITNESSES:              PAGE    VOL.

3    SOBRATO, JOHN

4    DIRECT EXAMINATION BY MR. KEARNEY     492      4

5

6    STEELE, TIMOTHY

7    DIRECT EXAMINATION BY MR. KEARNEY     502      4

8

9    AMAYA, RYAN

10   DIRECT EXAMINATION BY MS. LEE         560      4

11   CROSS-EXAMINATION BY MR. SMOCK        578      4

12   REDIRECT EXAMINATION BY MS. LEE       601      4

13   RECROSS-EXAMINATION BY MR. SMOCK      607      4

14

15   OLIVERO, KEVIN

16   DIRECT EXAMINATION BY MR. KEARNEY     610      4

17   CROSS-EXAMINATION BY MS. HANSEN       668      4

18

19

20

21

22

23

24

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

```
1              E X H I B I T   I N D E X
```

| GOVERNMENT'S EXHIBITS: | WITHDRAWN | ID. | EVD. | VOL. |
|---|---|---|---|---|
| 35 | | | 497 | 4 |
| 38 | | | 540 | 4 |
| 46 | | | 499 | 4 |
| 52 | | | 629 | 4 |
| 53 | | | 627 | 4 |
| 54 | | | 662 | 4 |
| 58 | | | 666 | 4 |
| 59 | | | 658 | 4 |
| 171 | | | 572 | 4 |
| 172 | | | 568 | 4 |
| 173 | | | 573 | 4 |
| 986 | | | 670 | 4 |
| 1138 | | | 575 | 4 |

**DEFENDANT'S EXHIBITS:**

| 2046 | | | 587 | 4 |
|---|---|---|---|---|
| 2047 | | | 587 | 4 |
| 2048 | | | 590 | 4 |
| 2049 | | | 600 | 4 |
| 2101 | | | 579 | 4 |
| 2103 | | | 579 | 4 |
| 2104 | | | 580 | 4 |

```
1    MONDAY, FEBRUARY 12, 2018                          8:04 A.M.

2                    P R O C E E D I N G S

3      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS

5    COURT IS IN SESSION.

6      WE ARE CALLING CR-16-00107, UNITED STATES OF AMERICA

7    VERSUS JAMES PHILIP LUCERO.  PLEASE STEP FORWARD AND STATE

8    YOUR APPEARANCES FOR THE RECORD, PLEASE.

9          MR. SMOCK:  GOOD MORNING, YOUR HONOR.  NED SMOCK WITH

10   MR. LUCERO, AND MS. HANSEN WILL BE JOINING ME IN A MOMENT.

11         MS. HANSEN:  GOOD MORNING, YOUR HONOR.  ANGELA

12   HANSEN.

13         THE COURT:  GOOD MORNING TO YOU BOTH.

14         MS. LEE:  SHIAO LEE ON BEHALF OF THE UNITED STATES.

15   GOOD MORNING, YOUR HONOR.

16         THE COURT:  GOOD MORNING, MS. LEE.

17     I THINK THE ONLY THING THAT WAS TEED UP IMMEDIATELY FOR

18   TODAY WAS THE DEFENDANT'S MOTION FROM YESTERDAY REGARDING

19   ROBERT HUFFMAN AND TIM STEELE.

20     WHAT'S THE STATUS?

21         MS. LEE:  THE GOVERNMENT DOESN'T INTEND TO INTRODUCE

22   ANY OF THOSE EXHIBITS ON THE TIM STEELE CHART ON PAGE 4 OF

23   DOCUMENT 154, SO I THINK THAT RENDERS THAT POINT RESOLVED.

24     AND WITH RESPECT TO ROB HUFFMAN, THE GOVERNMENT IS ONLY

25   INTENDING TO PUT INTO EVIDENCE THINGS THAT I THINK THE DEFENSE
```

1    DOES NOT DISPUTE, FOR INSTANCE, VIDEOS THAT HE TOOK OR VIDEOS

2    THAT HE CAN AUTHENTICATE.  THEY ARE ALL ACTUALLY JUST VIDEOS

3    THAT WE INTEND TO PUT IN AND ALSO EXHIBIT 564, WHICH HE CAN

4    ALSO AUTHENTICATE.  BUT THERE ARE NO OTHER EXHIBITS WE INTEND

5    TO INTRODUCE THROUGH ROB.

6        THERE IS ONE PROCEDURAL THING, WHICH IS UNDER EXHIBIT 867,

7    WE PLAN TO INTRODUCE A VIDEO WHICH IS -- IT IS TITLED

8    1102.MOV.  THAT CURRENTLY IS NOT ON THE EXHIBIT LIST.  THERE

9    ARE OTHER VIDEOS UNDER 867, AND IF IT WOULD BE OKAY, WE WOULD

10   JUST SWAP OUT ONE OF THOSE VIDEOS FOR THE 1102 FILE.

11            **THE COURT:**  I DIDN'T UNDERSTAND THAT.

12            **MS. LEE:**  UNDER THE EXHIBIT LIST FOR 867, ESSENTIALLY

13   THAT IS A CD THAT CONTAINS MULTIPLE SUB-VIDEOS IN THERE, AND

14   YOU WILL SEE THERE IS 867A, B, C, D, E, F.  ONE VIDEO THE

15   GOVERNMENT INTENDS TO INTRODUCE IS 1102.  THAT IS ONE OF THE

16   SUB-FILES ON THAT CD WHICH DIDN'T MAKE IT INTO THE EXHIBIT

17   LIST.  OTHER VIDEOS DID, HOWEVER, AND WE WOULD JUST LIKE TO

18   SUBSTITUTE -- FOR INSTANCE, INSTEAD OF THE VIDEO THAT IS

19   LABELED 1410, WE WOULD ASK FOR IT TO BE LABELED TO PLAY 1102.

20            **THE COURT:**  WHERE -- SO 1102 IS NOT ON THE LIST?

21            **MS. LEE:**  YEAH, IT IS NOT ONE OF THE SUB-PARTS OF

22   867.

23            **THE COURT:**  ALL RIGHT.  ANY OBJECTION?

24            **MR. SMOCK:**  YES.  THIS IS THE FIRST WE'VE HEARD OF

25   IT.  AND WE HAVE TO LOOK AT THE VIDEO OBVIOUSLY.  I DON'T KNOW

1    THAT WE WOULD BE ABLE TO ACCESS IT.  I DON'T KNOW WHY THIS IS

2    COMING UP RIGHT NOW.

3          MS. LEE:  I EMAILED THIS TO YOU YESTERDAY THAT VIDEO

4    1102.MOV.  IT WAS ON THE LIST THAT WE SENT YOU.

5          MS. HANSEN:  WE HAD A LIST WITH 267, AND THEN WE GOT

6    A SUPPLEMENTAL EMAIL AT -- LATE YESTERDAY WHICH LOOKED LIKE

7    THEY WERE DUPS, SO YOU DIDN'T CLARIFY THAT YOU WERE SWITCHING

8    IT OUT.

9          MS. LEE:  WE COULD SHOW YOU THE VIDEO RIGHT NOW.

10         THE COURT:  WHY DON'T YOU MEET AND CONFER?  IT

11   DOESN'T SOUND LIKE THERE IS A SUBSTANTIVE BASIS FOR OBJECTING,

12   BUT WHY DON'T YOU TALK AND FIGURE OUT WHAT IT IS THAT IS AT

13   ISSUE HERE.

14         MR. SMOCK:  YOUR HONOR, CAN I JUST BE HEARD ON ONE

15   MATTER?

16         THE COURT:  YES.

17         MR. SMOCK:  I AM RAISING THIS -- I MEAN, I'M ALWAYS

18   SENSITIVE ABOUT BRINGING UP THINGS LIKE THIS WITH THE COURT

19   BECAUSE I DON'T WANT TO BOTHER THE COURT WITH ISSUES THAT

20   IDEALLY WE CAN BE MEETING AND CONFERRING ABOUT AND RESOLVING,

21   BUT THIS FILING WAS NECESSITATED BECAUSE OF AN ISSUE THAT I

22   DON'T ENTIRELY UNDERSTAND.

23      AS THE COURT UNDERSTANDS AND RECALLS, THE GOVERNMENT WAS

24   ORDERED TO PROVIDE TO THE DEFENSE I THINK THREE OR FOUR DAYS

25   IN ADVANCE OF ANY WITNESS'S TESTIMONY A LIST OF THE EXHIBITS

1  THAT THEY EXPECTED TO INTRODUCE THROUGH THAT WITNESS.  THE

2  GOVERNMENT, I BELIEVE, SAID THAT IT WAS READY FOR TRIAL

3  SEVERAL MONTHS AGO SO ONE WOULD THINK THEY WOULD HAVE IN MIND

4  THE EXHIBITS THAT THEY INTENDED TO INTRODUCE THROUGH THEIR

5  WITNESSES.

6      AS I INDICATED IN THE FILING, INITIALLY THE GOVERNMENT HAD

7  TOLD US THAT THEY WERE GOING TO INTRODUCE TEN EXHIBITS THROUGH

8  ROBERT HUFFMAN.  FRIDAY EVENING THEY INDICATED THEY INTENDED

9  TO INTRODUCE 261.  OUR RESPONSE TO THAT NATURALLY WAS TO SPEND

10 MOST OF THE DAY YESTERDAY LOOKING AT THOSE EXHIBITS AND THEN

11 COMPOSING OBJECTIONS AND EXPLAINING WHY THAT WAS ENTIRELY

12 IMPROPER.  THE GOVERNMENT'S RESPONSE TO THAT WAS AN EMAIL TO

13 US A HALF AN HOUR LATER SAYING, OH, YOU'RE RIGHT, WE ARE ONLY

14 GOING TO INTRODUCE FOUR.

15     SO IT IS AN INCREDIBLE WASTE OF TIME FOR THE DEFENSE TO

16 SPEND LOOKING AT AN EXHIBIT LIST WHICH DOESN'T SEEM TO BE IN

17 ANY WAY REFLECTIVE OF WHAT THE GOVERNMENT ACTUALLY INTENDS TO

18 INTRODUCE AND IT'S COUNTERPRODUCTIVE.  SO OUR CONCERN IS -- I

19 THINK THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE A MEANINGFUL

20 AND ACTUAL EXHIBIT LIST FOR THEIR WITNESSES SO THAT WE ARE NOT

21 SPENDING, YOU KNOW, MOST OF OUR TRIAL PREPARATION TIME ON

22 UNNECESSARY TASKS.

23     I'LL TELL THE COURT THAT ALSO YESTERDAY THE GOVERNMENT

24 PRODUCED A NEW EXHIBIT LIST FOR SUBSEQUENT WITNESSES, AND NOW

25 THEIR NEW LIST INCLUDES MORE THAN 300 EXHIBITS THAT THEY SEEM

1    TO BE PROPOSING TO INTRODUCE THROUGH A MAN NAMED DR. COATS.

2    DR. COATS IS A SUBCONTRACTOR OF TERRY HUFFMAN.

3        MY UNDERSTANDING FROM LOOKING AT HIS REPORTS IS THAT THE

4    MAIN THINGS THAT HE DID IN THIS CASE WAS GO TO THE SITE,

5    MEASURE THE FLOW AND WHAT DR. HUFFMAN SAYS IS THE CONFLUENCE

6    OF TRIBUTARY A AND TRIBUTARY B, DO SOME RAINFALL STUDIES, AND

7    PERHAPS VISIT THE SITE A NUMBER OF OTHER TIMES.

8        NOW, THE GOVERNMENT INDICATES THAT IT'S GOING TO SHIFT

9    THESE EXHIBITS AND TRY TO USE 300 OF THEM THROUGH MR. COATS.

10   I DON'T WANT TO SPEND A DAY OR TWO GOING THROUGH THOSE IF THE

11   GOVERNMENT IS THEN GOING TO SAY, OH, IN FACT, WE ARE NOT GOING

12   TO DO IT.

13       I DON'T SEE HOW MR. COATS IS QUALIFIED TO INTRODUCE 300

14   EXHIBITS GIVEN THE EXTENT OF HIS INVOLVEMENT.  I WOULD ASK THE

15   COURT TO INTERVENE TO SOME EXTENT TO ORDER THE GOVERNMENT TO

16   DO -- TO PRODUCE TO US REALISTIC EXHIBIT LISTS SO THAT WE'RE

17   NOT -- I AM SURE THE COURT SPENT TIME REVIEWING THIS MOTION AS

18   WELL.  AND HERE WE ARE WITH THE GOVERNMENT SIMPLY SAYING, OH,

19   FORGET ABOUT IT.

20       IT'S A PROBLEM.  AND I DON'T BRING THIS UP WITH THE COURT

21   LIGHTLY, BUT IT IS SOMETHING THAT I THINK IS SIGNIFICANT AND

22   NEEDS TO BE DEALT WITH.

23            **THE COURT:**  ALL RIGHT.  WHAT'S YOUR RESPONSE?

24            **MR. KEARNEY:**  YOUR HONOR, REGARDING DR. COATS, HE'S

25   GOING TO TESTIFY PROBABLY FRIDAY AT THIS WEEK AT THE EARLIEST

1    I WOULD IMAGINE.

2        HE WAS A HYDROLOGIST WHO DID HYDROLOGIC ASSESSMENT OF THE

3    PROPERTY.  MANY OF THE EXHIBITS THAT COUNSEL IS TALKING ABOUT

4    ARE PHOTOGRAPHS THAT HE CAN USE TO OPINE ON VARIOUS ASPECTS OF

5    THE SITE'S HYDROLOGY.

6        WE ARE COGNIZANT OF WHAT MR. SMOCK IS REFERRING TO.

7    HOWEVER, WE'RE IN A POSITION WHERE WE HAVE TO MAKE SURE THAT

8    THE POTENTIAL UNIVERSE OF EXHIBITS ARE NOTICED PROPERLY FOR

9    THESE EXPERTS BECAUSE IF THEY AREN'T AND WE REALIZE AT SOME

10   POINT WE NEED SOMETHING, THEN WE ARE POTENTIALLY DISADVANTAGED

11   BY THAT.

12       I WILL NOTE, SIR, THAT REGARDING THE EXPERTS IN

13   PARTICULAR, THERE ARE FOUR-, THREE-, AND ONE-DAY NOTICES THAT

14   THE GOVERNMENT IS ABIDING BY.  THE DR. COATS' ONE DAY NOTICE

15   WILL, WHICH THE COURT HAS ASKED THE GOVERNMENT TO PROVIDE

16   BASES FOR ALL OF THE PROPOSED EXHIBITS WILL BE A FOCUSED

17   CHRONOLOGIC DOCUMENT.

18       HOWEVER, WE ARE COMPETING OBVIOUSLY WITH THE TWO -- WE

19   WANT TO BE AS ACCURATE AS WE CAN, BUT WE DON'T WANT TO LEAVE

20   ANYTHING OUT.  SO THIS IS NOT TACTICAL, SIR.  THIS IS NOT

21   STRATEGIC.  WE ARE TRYING TO NOT LEAVE ANYTHING OUT IN THESE

22   INITIAL DISCLOSURES.

23           **THE COURT:**  THEY ARE NOT INITIAL AT THIS POINT.  WE

24   ARE GETTING AMENDED EXHIBIT LISTS, WE'RE GETTING AMENDED

25   WITNESS LISTS, WE ARE CHANGING WHAT IS COMING IN THROUGH WHO.

1        I VERY MUCH TAKE THE POINT THAT NO ONE'S TIME IS WELL

2    SERVED IF THERE'S SOME SORT OF OVERINCLUSIVE LIST THAT

3    EVERYONE SPENDS TIME DEALING WITH IF IT'S NOT SOMETHING YOU

4    ACTUALLY INTEND.  I THINK YOU REALLY NEED TO HONE IT DOWN TO

5    WHAT YOU INTEND.

6        **MR. KEARNEY:**  IN REGARD TO DR. COATS, I'M HAPPY TO

7    MEET AND CONFER, MAYBE AS EARLY AS TONIGHT WITH COUNSEL AND

8    TALK ABOUT THE -- WHAT WE BELIEVE TO BE THE EXHIBITS WE KNOW

9    WILL BE COMING IN THROUGH HIM.

10       BUT, AGAIN, SIR, WE ARE TRYING TO BE -- WE DON'T WANT TO

11   WASTE ANYONE'S TIME.  WE ARE TRYING TO BE CAUTIOUS IN OUR

12   APPROACH.

13       **THE COURT:**  UNDERSTOOD.  BUT IT SEEMS TO ME THAT BY

14   NOW YOU OUGHT TO BE ABLE TO BALANCE THOSE TWO THINGS IN A WAY

15   THAT REALISTICALLY MAPS THE WITNESS TO THE PARTICULAR EXHIBITS

16   THAT ARE OF INTEREST.  SO, THAT'S WHAT I WOULD SAY ABOUT THAT.

17       ONE POINT THAT WAS MADE IN THE DEFENSE FILING, TOO, THAT

18   IS A POINT THAT I DO TAKE, IS I DO THINK THEY'RE RIGHT THAT WE

19   CAN'T BULK ADMIT STACKS OF PHOTOS BECAUSE THERE'S NO

20   FOUNDATION ESSENTIALLY FOR ANYONE TO SAY WHAT THEY ACTUALLY

21   ARE LATER.

22       SO, ON THE ONE HAND, AGAIN, GIVEN THE NUMBER OF

23   PHOTOGRAPHS POTENTIALLY AT ISSUE IN THIS CASE, I DON'T HAVE

24   ANY PARTICULAR INTEREST IN SLOGGING THROUGH HUNDREDS OF THEM

25   ONE BY ONE.  ON THE OTHER HAND, IT SEEMS TO ME THAT IF THEY

```
1    ARE ONES THAT ARE IMPORTANT ENOUGH THAT YOU CARE ABOUT IT,

2    HONE IT TO THOSE.  BUT THEN AS TO THOSE, I THINK THERE'S GOT

3    TO BE SOME FOUNDATION AS TO WHAT IT ACTUALLY IS SO THAT THAT

4    IS IN EVIDENCE FOR THE JURY'S CONSIDERATION.

5              MR. KEARNEY:  ALL RIGHT.  THANK YOU, SIR.

6              THE COURT:  ALL RIGHT.  ANYTHING ELSE FOR RIGHT NOW?

7              MS. HANSEN:  YOUR HONOR, WE WILL BE FILING THE

8    RESPONSE TO KELLY HARDWICKE'S OFFER OF PROOF THIS MORNING,

9    PROBABLY AROUND 9:30 WHEN THE STAFF GETS IN.  I FINISHED IT

10   LAST NIGHT.

11        IN IT I DO ADDRESS THE EXHIBIT ISSUE.  I UNDERSTAND THE

12   GOVERNMENT WILL FILE TONIGHT THEIR EXHIBITS.  I THOUGHT THAT

13   THE FILING ITSELF NEEDED TO ADDRESS THE EXHIBITS BECAUSE IT

14   REALLY GOES HAND IN HAND WITH THE COURT'S ANALYSIS AS TO THE

15   OFFER OF PROOF.  AND I ALSO DIDN'T RECALL THE ONE-DAY RULE

16   WITH RESPECT TO EXHIBITS FOR EXPERTS.

17        SO OUR FILING INCLUDES OUR OBJECTIONS TO THE EXHIBITS FOR

18   MS. HARDWICKE.

19              THE COURT:  ALL RIGHT.  THAT'S FINE.

20        I THINK THE OTHER POINT THAT IS WORTH MAKING AT THIS POINT

21   IS OBVIOUSLY ON THE ONE HAND THE DEFENSE THINKS THAT THE

22   GOVERNMENT IS TRYING TO AVOID DR. HUFFMAN.  MAYBE THAT'S TRUE,

23   MAYBE THAT'S NOT.  I AM NOT SURE THAT THAT IN ITSELF IS A

24   BASIS FOR EXCLUSION OR OMISSION OF ANYTHING.

25        IN OTHER WORDS, IF THERE ARE OTHER PEOPLE THAT CAN
```

1    AUTHENTICATE AND OFFER ITS TESTIMONY, THEN THEY CAN.  SO I

2    TAKE YOUR POINT THAT IN YOUR VIEW IT'S UNSEEMLY, BUT I DON'T

3    KNOW THAT IT IS AN INDEPENDENT BASIS FOR AN EVIDENTIARY RULING

4    ON ANYTHING.

5          **MS. HANSEN:**  UNDERSTOOD, YOUR HONOR.  I THINK OUR

6    FILING WILL MAKE CLEAR THAT THAT'S NOT THE BASIS FOR OUR

7    OBJECTION.  IT COLORS IT, BUT OUR OBJECTIONS ARE HONED IN TO

8    THE NOTICE THAT WAS PROVIDED.

9          **THE COURT:**  ALL RIGHT.  FAIR ENOUGH.

10     OKAY.  WE'LL START UP AT 8:30 OR MAYBE A LITTLE BIT SOONER

11   IF THE JURORS ARE ALL HERE.

12          **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

13          **MS. HANSEN:**  THANK YOU, YOUR HONOR.

14      (RECESS TAKEN AT 8:18 A.M.; RESUMED AT 8:27 A.M.)

15          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

16   COURT IS BACK IN SESSION.

17     ARE YOU READY FOR THEM, JUDGE?

18          **THE COURT:**  YES.

19      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

20             (PAUSE IN THE PROCEEDINGS.)

21          **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

22   WELCOME BACK.  I HOPE YOU HAD A RESTFUL WEEKEND.

23     AT THIS TIME WE WILL CONTINUE WITH THE PRESENTATION OF THE

24   GOVERNMENT'S CASE.  AND THE UNITED STATES MAY CALL ITS NEXT

25   WITNESS.

1      **MR. KEARNEY:**  THANK YOU, YOUR HONOR.  WE WILL CALL

2   MR. JOHN SOBRATO TO THE STAND.

3      **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

4      (**JOHN SOBRATO,** CALLED AS A WITNESS FOR THE GOVERNMENT,

5   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

6      **THE WITNESS:**  YES, I DO.

7      **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED WOULD

8   YOU PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE

9   RECORD, PLEASE.

10      **THE WITNESS:**  YES.  MY NAME IS JOHN SOBRATO, AND THAT

11   IS SPELLED J-O-H-N, S-O-B-R-A-T-O.

12      **THE CLERK:**  THANK YOU.  AND THERE IS WATER IN THE

13   PITCHER.

14      **THE WITNESS:**  THANK YOU.

15      **THE COURT:**  YOU MAY PROCEED, MR. KEARNEY.

16      **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

17                    <u>**DIRECT EXAMINATION**</u>

18   BY MR. KEARNEY:

19   **Q.**  MR. SOBRATO, GOOD MORNING, SIR.

20   **A.**  GOOD MORNING.

21   **Q.**  COULD YOU PLEASE TELL US WHAT YOUR OCCUPATION IS.

22   **A.**  I AM THE CEO OF THE SOBRATO ORGANIZATION.  WE ARE A REAL

23   ESTATE DEVELOPMENT AND MANAGEMENT FIRM, FAMILY OWNED.

24   **Q.**  WHERE ARE YOUR CORPORATE OFFICES, IF I MAY ASK?

25   **A.**  THEY ARE AT 10600 NORTH DE ANZA BOULEVARD IN CUPERTINO,

SOBRATO – DIRECT / KEARNEY

1   CALIFORNIA.

2   **Q.**  MR. SOBRATO, WHEN YOU SAY THAT THE ORGANIZATION IS "FAMILY

3   OWNED," HOW MANY MEMBERS OF THE SOBRATO FAMILY RUN THE

4   CORPORATION, IF YOU CAN TELL US?

5   **A.**  MY FATHER IS STILL INVOLVED AS CHAIRMAN AND THEN I AM

6   THERE AS CEO, AND MY SON JEFF JUST STARTED ABOUT A YEAR AND A

7   HALF AGO.

8   **Q.**  OKAY.  CAN YOU GIVE US A SENSE OF HOW BIG THE SOBRATO

9   CORPORATION IS, SIR?

10  **A.**  WE OWN APPROXIMATELY 15 MILLION SQUARE FEET OF REAL ESTATE

11  CONSISTING OF COMMERCIAL OFFICE BUILDINGS, MULTIFAMILY

12  APARTMENT PROJECTS, AND RAW LAND HELD FOR DEVELOPMENT.

13  **Q.**  HOW MANY -- HOW LONG HAVE YOU BEEN IN BUSINESS?

14  **A.**  SINCE -- DEPENDING ON HOW EXACTLY YOU COUNT THE FOUNDING

15  OF THE COMPANY, SINCE THE EARLY 1960S.

16  **Q.**  SO ON THE ORDER OF 50 YEARS.  IS THAT A FAIR STATEMENT?

17  **A.**  50 YEARS PLUS, YES.

18  **Q.**  SIR, I WANT TO ASK YOU ABOUT NEWARK AREA 4 IN NEWARK,

19  CALIFORNIA, IF I MAY.  IN 2014 WAS THE SOBRATO ORGANIZATION

20  PART OF A PARTNERSHIP THAT OWNED THE NEWARK AREA 4?

21  **A.**  YES.

22  **Q.**  I WONDER IF YOU CAN JUST, FIRST OF ALL, TELL US WHO THE

23  OTHER PARTNERS WERE THAT OWNED NEWARK AREA 4 WITH YOU AT THAT

24  TIME.

25  **A.**  OKAY.  IT WAS A 50/50 PARTNERSHIP BETWEEN ONE OF THE

1    FAMILY-OWNED ENTITIES AND ANOTHER REAL ESTATE DEVELOPMENT FIRM

2    BY THE NAME OF PEERY ARRILLAGA.

3    **Q.**  I WONDER IF YOU CAN JUST VERY BRIEFLY TELL US HOW IT WAS

4    THAT THE NEWARK PARTNERS ACTUALLY CAME INTO EXISTENCE?

5    **A.**  WE WERE WHAT YOU MIGHT CALL FRIENDLY COMPETITORS WITH THE

6    PEERY ARRILLAGA FIRM.  THEY OWNED WHAT WE REFER TO AS NEWARK

7    AREA 4, AND WE OWNED ANOTHER PARCEL IN THE SAME GENERAL AREA

8    CALLED -- WHICH WE CALLED NEWARK AREA 3.

9       WE WERE BOTH WORKING ON GETTING OUR RESPECTIVE PROPERTIES

10   ENTITLED FOR RESIDENTIAL DEVELOPMENT, AND WE DECIDED WE WOULD

11   BE LIKELY MORE SUCCESSFUL OR BETTER OFF BY JOINING FORCES.  SO

12   WE CONTRIBUTED OUR AREA 3 TO THE PARTNERSHIP, THEY CONTRIBUTED

13   THEIR AREA 4, AND THEN WE TOGETHER WORKED WITH THE CITY OF

14   NEWARK ON ENTITLING IT FOR RESIDENTIAL DEVELOPMENT.

15           **MR. KEARNEY:**  YOUR HONOR, MAY WE PULL UP AN EXHIBIT

16   THAT WAS PREVIOUSLY ADMITTED, THIS IS EXHIBIT 3, KIND OF AN

17   OVERVIEW OF THE SITE?

18           **THE COURT:**  YES.

19               (DISPLAYED ON SCREEN.)

20   **BY MR. KEARNEY:**

21   **Q.**  MR. SOBRATO, I WONDER IF YOU CAN TAKE A LOOK AT THE

22   SCREEN, THE ONE IN FRONT OF YOU OR THE ONE TO THE SIDE.

23   **A.**  YES.

24   **Q.**  THERE IS ALSO A LASER POINTER IN FRONT OF YOU.

25       YOU SAID THAT THE SOBRATO ORGANIZATION OWNED NEWARK AREA 3

1    ORIGINALLY, AND THEN YOU MERGED WITH OTHER PEOPLE TO FORM THE

2    NEWARK AREA PARTNERS.  IS THAT A FAIR STATEMENT?

3    **A.**  YES.

4    **Q.**  I WONDER IF YOU CAN SHOW US WHERE NEWARK AREA 3 IS, IF IT

5    IS SHOWN ON THIS DIAGRAM.

6    **A.**  OKAY.  THAT IS -- NEWARK AREA 3 IS THIS, I GUESS THAT'S A

7    TRAPEZOID SHAPED PIECE THERE, AND THEN THIS BIG IRREGULARLY

8    SHAPED PIECE IS WHAT WE REFERRED TO AS NEWARK AREA 4.

9         **MR. KEARNEY:**  YOUR HONOR, FOR THE RECORD, THE NEWARK

10   AREA 3 PIECE THAT MR. SOBRATO POINTED OUT IS ON EXHIBIT 3 OFF

11   TO THE RIGHT IN THE UPPER PORTION OF THE EXHIBIT CLOSER TO THE

12   EASTBOUND DIRECTION.

13   **BY MR. KEARNEY:**

14   **Q.**  WHEN DID THE NEWARK PARTNERS COME INTO EXISTENCE, SIR, IF

15   YOU CAN TELL US A GENERAL TIME FRAME, IF YOU KNOW?

16   **A.**  NOT OFF THE TOP OF MY HEAD EXACTLY WHEN IT WAS FORMED.  I

17   WOULD SAY IT -- SINCE THIS MATTER IS FOCUSED, AS I RECALL, IN

18   2014, IT WAS SEVERAL YEARS BEFORE THAT.

19   **Q.**  REGARDING THE NEWARK AREA 4, MR. SOBRATO, WERE YOU EVER

20   INVOLVED IN THE DAY-TO-DAY OPERATIONS OF THAT PROPERTY?

21   **A.**  NO.

22   **Q.**  HAVE YOU EVER ACTUALLY BEEN ON THAT PROPERTY?

23   **A.**  ON AREA 4?  NO.

24   **Q.**  DID YOUR DEVELOPMENT PLANS OF THIS PROPERTY, SIR, TAKE

25   INTO ACCOUNT THE UNITED STATES ARMY CORPS OF ENGINEERS?

SOBRATO – DIRECT / KEARNEY

1    **A.**   YES.

2    **Q.**   PLEASE TELL US ABOUT THAT.

3    **A.**   WELL, AREA 3 HAD NO WETLANDS ON IT, BUT AREA 4 HAD

4    WETLANDS THAT THEY WEREN'T CONSOLIDATED THAT SORT OF MEANDERED

5    THROUGH THE SITE.

6         AND SO THE PRIMARY DAY-TO-DAY PERSON IN MY OFFICE THAT WAS

7    HANDLING -- WAS CALLED THE PROJECT MANAGER WAS TIM STEELE.

8    AND HE WORKED WITH THE -- OUR CIVIL ENGINEERS, THE CORPS OF

9    ENGINEERS THAT DETERMINES WHAT PROPERTY IS WETLANDS AND WHAT

10   ISN'T, TO WORK OUT A DEVELOPMENT PLAN THAT WOULD ALLOW FOR

11   DEVELOPMENT ON THE DRY OR NON-WETLAND PORTIONS, PRESERVING THE

12   EXISTING WETLANDS AS THEY EXISTED OR EXIST TODAY.

13   **Q.**   ALL RIGHT.

14        SIR, I WOULD LIKE TO ASK YOU, DO YOU KNOW THE DEFENDANT,

15   MR. JAMES LUCERO, WHO IS SEATED AT COUNSEL TABLE, THE THIRD

16   FROM THE LEFT AS YOU LOOK IN THAT DIRECTION?

17   **A.**   IN THE GRAY SWEATER?

18   **Q.**   YES, SIR, THE GRAY SWEATER.

19   **A.**   NO.

20   **Q.**   DID YOU EVER GIVE HIM PERMISSION TO DUMP ON YOUR PROPERTY

21   IN NEWARK, CALIFORNIA?

22   **A.**   NO.

23        **MR. KEARNEY:**   YOUR HONOR, IF I MAY, MAY WE DRAW UP

24   EXHIBIT 35?  THIS IS A NOTE.

25        ACTUALLY, MAY I APPROACH?

SOBRATO – DIRECT / KEARNEY

1      **THE COURT:**  YOU MAY.

2                 (EXHIBIT HANDED TO WITNESS.)

3      **BY MR. KEARNEY:**

4      **Q.**  MR. SOBRATO, PLEASE TAKE A LOOK AT THAT HAND-DRAWN

5      DOCUMENT AND TELL US IF YOU AUTHORED IT.

6      **A.**  I DID NOT.

7            **MR. KEARNEY:**  YOUR HONOR, MAY WE –– I WOULD LIKE TO

8      ADMIT THIS DOCUMENT INTO EVIDENCE AT THIS TIME.

9            **THE COURT:**  ANY OBJECTION?

10           **MR. SMOCK:**  NO OBJECTION.  WE WOULD ASK FOR THE

11     LIMITING INSTRUCTION AS WELL AT THIS TIME.

12           **THE COURT:**  ALL RIGHT.  SO EXHIBIT 35 IS ADMITTED.

13           (GOVERNMENT'S EXHIBIT 35 RECEIVED IN EVIDENCE)

14        AND, LADIES AND GENTLEMEN, AS A GENERAL PRINCIPLE

15     THROUGHOUT THIS TRIAL YOU ARE HERE ONLY TO DETERMINE WHETHER

16     THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE CHARGES IN THE

17     INDICTMENT.  THE DEFENDANT IS NOT ON TRIAL FOR ANY CONDUCT OR

18     OFFENSE NOT CHARGED IN THE INDICTMENT.

19        YOU MAY PROCEED, MR. KEARNEY.

20           **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

21        AGENT SU, I WONDER IF WE CAN ENLARGE THE TEXT ON THAT.

22     THANK YOU.

23     **BY MR. KEARNEY:**

24     **Q.**  SIR, THE FIRST LINE OF THIS NOTE SAYS:  I, MICHAEL

25     SOBRATO, GIVE PERMISSION TO YOU, JIM LUCERO, TO PUT CLEAN

1  FILL.

2      AND IT GOES ON FROM THERE.  IS THERE A MICHAEL SOBRATO?

3  **A.**  NO.  MY MIDDLE NAME IS MICHAEL.  MY FULL NAME IS JOHN

4  MICHAEL SOBRATO.

5  **Q.**  AND DO YOU EVER GO BY MICHAEL SOBRATO?

6  **A.**  NO.

7  **Q.**  DOES ANYONE IN YOUR FAMILY GO BY THE NAME MICHAEL SOBRATO?

8  **A.**  NO.  I'M OCCASIONALLY REFERRED TO AS JOHN MICHAEL BECAUSE

9  I HAVE A FATHER WHO IS ALSO NAMED JOHN, WHO IS JOHN ALBERT,

10  FOR THE RECORD, BUT -- SO I AM SOMETIMES DISTINGUISHED THAT

11  WAY.  BUT, NO, IN BUSINESS I JUST GO BY JOHN SOBRATO.

12  **Q.**  THERE IS A SIGNATURE, MR. SOBRATO, ON THE -- IT'S THE

13  SECOND SIGNATURE FROM THE BOTTOM ON THIS DOCUMENT.  IS THAT

14  YOUR SIGNATURE?

15  **A.**  IT IS NOT.

16  **Q.**  DO YOU SIGN -- DOES YOUR SIGNATURE RESEMBLE THAT, SIR?

17  **A.**  NO.

18  **Q.**  DO YOU WRITE OUT YOUR FULL NAME WHEN YOU USE YOUR

19  SIGNATURE ON A DOCUMENT?

20  **A.**  NO.

21      **MR. KEARNEY:**  MAY WE PULL UP EXHIBIT 46?

22  **BY MR. KEARNEY:**

23  **Q.**  DURING THE COURSE OF THIS INVESTIGATION DID YOU PROVIDE

24  LAW ENFORCEMENT A SIGNATURE CARD WITH YOUR ACTUAL SIGNATURE ON

25  IT?

SOBRATO – DIRECT / KEARNEY

1    **A.** YES.

2          **MR. KEARNEY:** MAY WE PULL UP EXHIBIT 46, YOUR HONOR?

3    I WOULD ACTUALLY LIKE TO -- MAY I APPROACH?

4          **THE COURT:** YOU MAY.

5                (EXHIBIT HANDED TO WITNESS.)

6    **BY MR. KEARNEY:**

7    **Q.** MR. SOBRATO, IS THAT A COPY OF THE SIGNATURE CARD THAT YOU

8    PROVIDED TO LAW ENFORCEMENT DURING THIS INVESTIGATION?

9    **A.** YES.

10          **MR. KEARNEY:** YOUR HONOR, I WOULD LIKE TO ADMIT THAT

11   DOCUMENT, IF I MAY.

12          **THE COURT:** ANY OBJECTION?

13          **MR. SMOCK:** NO, YOUR HONOR.

14          **THE COURT:** EXHIBIT 46 IS ADMITTED.

15          (GOVERNMENT'S EXHIBIT 46 RECEIVED IN EVIDENCE)

16   **BY MR. KEARNEY:**

17   **Q.** SIR, IS THAT A VIEW OF YOUR -- OR IS THAT WHAT YOUR REAL

18   SIGNATURE LOOKS LIKE?

19   **A.** YES.

20   **Q.** WHAT ARE WE LOOKING AT THERE, SIR?  ARE THOSE INITIALS?

21   IS THAT A CONDENSED FULL NAME WRITING?

22      TELL US WHAT YOU ARE SEEING THERE.

23   **A.** WELL, THAT IS HOW I SIGN MY NAME.  IT IS J.M. AND THEN S

24   AND THEN SORT OF A LINE OUT FOR SOBRATO.  SO THAT IS THE

25   SIGNATURE I USE CONSISTENTLY.

1        **MR. KEARNEY:**  ALL RIGHT.  CAN WE GO BACK TO THE NOTE,

2    SIR, EXHIBIT 35?

3                    (DISPLAYED ON SCREEN.)

4    **BY MR. KEARNEY:**

5    **Q.**  MR. SOBRATO, IS THIS THE WAY THAT THE SOBRATO CORPORATION

6    ENTERS INTO CONTRACTS ON A DOCUMENT SUCH AS THIS, IF YOU KNOW?

7    **A.**  NO.

8    **Q.**  WHY NOT?

9    **A.**  WELL, IF WE WERE GOING TO GIVE SOMEONE PERMISSION TO PLACE

10   FILL ON OUR PROPERTY, IT WOULD HAVE BEEN IN A VERY DETAILED

11   TYPEWRITTEN -- COMPUTER-GENERATED BUT TYPEWRITTEN DOCUMENT

12   SPECIFYING EXACTLY WHAT THE OTHER PARTY WAS PERMITTED TO DO;

13   PRECISELY SPECIFYING EXACTLY WHAT THE OTHER PARTY WAS

14   PERMITTED TO DO.

15   **Q.**  DOES THE SOBRATO CORPORATION HAVE ITS OWN STATIONERY?

16   **A.**  AND IT WOULD HAVE BEEN ON LETTERHEAD, YES.  WE DO HAVE OUR

17   OWN STATIONERY, IN ANSWER TO YOUR QUESTION.

18   **Q.**  AND DOES THE SOBRATO CORPORATION ENTER INTO CONTRACTS THAT

19   ARE WRITTEN IN LONGHAND, SIR?

20   **A.**  NO.

21   **Q.**  BASED ON YOUR KNOWLEDGE OF THE DEVELOPMENT PLANS THERE IN

22   2014, DID YOU, SIR, HAVE PERMISSION TO GIVE ANYONE ABILITY TO

23   DUMP ON NEWARK AREA 4?

24   **A.**  NO.

25   **Q.**  WHY NOT?

1    **A.**  WELL, BECAUSE -- AND, AGAIN, TIM WOULD BE BETTER QUALIFIED

2    THAN I TO ANSWER THAT, BUT BECAUSE WE WERE AWARE THAT THE

3    PROPERTY CONTAINED FEDERALLY PROTECTED WETLANDS WHICH COULD

4    NOT BE FILLED IN ANY WAY WITHOUT THE PERMISSION OF, I BELIEVE

5    IT'S THE ARMY CORPS OF ENGINEERS THAT REGULATES WETLAND AREAS

6    IN THE UNITED STATES.

7    **Q.**  ALL RIGHT.  AND LASTLY, SIR, DO YOU OWN A WHITE PICKUP

8    TRUCK?

9    **A.**  NO.

10           **MR. KEARNEY:**  THANK YOU.  NO FURTHER QUESTIONS, YOUR

11   HONOR.

12           **THE COURT:**  ANY CROSS-EXAMINATION?

13           **MR. SMOCK:**  NO QUESTIONS, THANK YOU.

14           **THE COURT:**  THANK YOU, MR. SOBRATO.  YOU'RE EXCUSED.

15     AND THE UNITED STATES MAY CALL ITS NEXT WITNESS.

16           **MR. KEARNEY:**  THANK YOU.  WE CALL MR. TIM STEELE AT

17   THIS TIME.

18           **THE CLERK:**  YOU CAN COME UP TO THE WITNESS STAND.

19   ACTUALLY GO ON UP AND RAISE YOUR RIGHT HAND FOR ME, PLEASE.

20     (**TIMOTHY STEELE,** CALLED AS A WITNESS FOR THE GOVERNMENT,

21   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

22           **THE WITNESS:**  I DO.

23           **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED I AM

24   GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

25   LAST NAME FOR THE RECORD.

1    **THE WITNESS:**  TIMOTHY STEELE, T-I-M-O-T-H-Y,

2    S-T-E-E-L-E.

3    **THE CLERK:**  THANK YOU.  AND THERE IS WATER IN THE

4    PITCHER.

5    **THE WITNESS:**  THANK YOU.

6    **THE COURT:**  YOU MAY PROCEED WHENEVER YOU ARE READY,

7    MR. KEARNEY.

8    **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

9                    **DIRECT EXAMINATION**

10   BY MR. KEARNEY:

11   **Q.**  MR. STEELE, GOOD MORNING.

12   **A.**  GOOD MORNING.

13   **Q.**  SIR, WHAT IS YOUR OCCUPATION, PLEASE?

14   **A.**  I AM SENIOR VICE PRESIDENT OF REAL ESTATE DEVELOPMENT FOR

15   THE SOBRATO ORGANIZATION.

16   **Q.**  WE HAVE JUST HEARD A LITTLE BIT ABOUT WHAT THE SOBRATO

17   ORGANIZATION IS.  AS THE SENIOR VP FOR REAL ESTATE

18   DEVELOPMENT, WHAT ARE YOUR PRIMARY ROLES WITHIN THAT

19   ORGANIZATION?

20   **A.**  I'M INVOLVED IN THE LIFE CYCLE OF A DESIGN OF A BUILDING,

21   DEVELOPMENT OF A BUILDING FROM ACQUISITION.  WE'LL IDENTIFY A

22   PROPERTY THEY WANT TO ACQUIRE.  I'LL WORK WITH THE CITIES TO

23   IDENTIFY WHAT IS AN ALLOWABLE USE.  I WILL GO THROUGH THE

24   PROCESS OF DEVELOPING MY OWN TEAM OF ARCHITECTS AND ENGINEERS,

25   DESIGNING A PROJECT TO SUBMIT THROUGH THE PROCESS OF GETTING

1    IT APPROVED TO DEVELOP IN THAT MANNER.

2    **Q.**  IS ENVIRONMENTAL COMPLIANCE ONE OF THE TASKS WITHIN THE

3    SOBRATO ORGANIZATION THAT YOU ARE GIVEN?

4    **A.**  YES.  IT'S PART OF THE ENTITLEMENT PROCESS.

5        CALIFORNIA ENVIRONMENTAL QUALITY ACT, WHICH IS A STATE

6    STATUTE, AND IT REQUIRES AN ANALYSIS OF ENVIRONMENTAL IMPACTS

7    POTENTIAL OF A PROJECT, FROM TRAFFIC IMPACTS TO ARCHEOLOGICAL,

8    GREENHOUSE GAS TYPES OF THINGS THAT ARE ANALYZED THAT YOU

9    MIGHT HAVE AS AN IMPACT.  AND THEN THEY GRADE THEM.  AND THEN

10   PART OF THAT IS THEN APPROVED BY THE CITY, WHETHER THOSE

11   IMPACTS ARE ALLOWABLE OR NOT.

12   **Q.**  THE CALIFORNIA ENVIRONMENTAL QUALITY ACT, IT IS ALSO

13   COMMONLY REFERRED TO AS CEQA.  IS THAT A FAIR STATEMENT?

14   **A.**  YES.

15   **Q.**  SIR, YOU MENTIONED SOMETHING THAT I WANT TO DEFINE BEFORE

16   WE MOVE ON, THE ENTITLEMENT PROCESS.

17       I WONDER IF YOU COULD TELL US WHAT THAT MEANS.  WHAT IS

18   THE ENTITLEMENT PROCESS FOR A PROJECT?

19   **A.**  SURE.

20       CITIES GENERALLY HAVE A VERY LARGE CONCEPT -- GENERAL

21   CONCEPT PLAN CALLED THE GENERAL PLAN, AND THEN UNDER THE

22   GENERAL PLAN THEY HAVE A ZONING ORDINANCE THAT IS MORE PRECISE

23   THAN THE GENERAL PLAN.  AND THEN THERE IS FURTHER AND FURTHER

24   DETAILED PERMITS AND STUFF ASSOCIATED WITH THOSE TYPES OF LAND

25   USE DESIGNATIONS.

1        WHATEVER YOU WANT TO DO ON YOUR PROPERTY WILL HAVE TO

2   ALIGN ITSELF WITH THE GENERAL PLAN, THE ZONING, AND OTHER

3   REQUIREMENTS UNDER THAT.  AND SO THE PROCESS OF THEM GETTING

4   ENTITLEMENTS IS WHATEVER PERMITS ARE NECESSARY, WHATEVER

5   CHANGES IF -- TO THE GENERAL PLAN OR THE ZONING PLAN,

6   DEVELOPMENT PERMIT, WHATEVER IT IS, THAT WHOLE KIND OF BOX OF

7   GOODS ARE ENTITLEMENTS.

8   **Q.**  SO GETTING A PERMIT TO BUILD SOMETHING IS PART OF THE

9   ENTITLEMENT PROCESS.  IS THAT A FAIR STATEMENT?

10  **A.**  CORRECT.

11  **Q.**  THE CEQA COMPLIANCE -- THAT'S C-E-Q-A, MADAM REPORTER --

12  WELL, FIRST OF ALL, I WANT TO ASK YOU, HOW LONG HAVE YOU BEEN

13  WORKING WITH THE SOBRATO CORPORATION?

14  **A.**  I STARTED JANUARY 15, 2001, SO 17 YEARS.

15  **Q.**  AND IS THE CEQA COMPLIANCE, THIS ENVIRONMENTAL COMPLIANCE

16  THAT YOU JUST OUTLINED FOR US, IS THAT SOMETHING THAT YOU'VE

17  ENGAGED IN BEFORE?

18  **A.**  EVERY PROJECT HAS ONE LEVEL OR ANOTHER OF A CEQA ANALYSIS,

19  YES.

20  **Q.**  HOW MANY PROJECTS HAVE YOU CONDUCTED FOR THE SOBRATO

21  ORGANIZATION THAT HAD SOME KIND OF A CEQA COMPLIANCE COMPONENT

22  TO IT?

23  **A.**  I'D SAY 25 OR MORE.

24  **Q.**  MR. STEELE, I WANT TO GET INTO, JUST VERY BRIEFLY, YOUR

25  EDUCATION EXPERIENCE.  CAN YOU PLEASE TELL US WHERE YOU WERE

1   EDUCATED?

2   **A.**  I HAVE AN UNDERGRADUATE DEGREE FROM MOREHEAD STATE

3   UNIVERSITY IN KENTUCKY, AND THERE I GOT A MAJOR IN COMMERCIAL

4   ART PHOTOGRAPHY AND A MAJOR IN PHOTO JOURNALISM, ADVERTISING.

5   **Q.**  DID YOU GET AN ADVANCED DEGREE AFTER YOUR BACHELOR'S, SIR?

6   **A.**  CORRECT.  I GOT AN MBA FROM GOLDEN GATE UNIVERSITY HERE IN

7   THE BAY AREA, PROBABLY ABOUT 20 YEARS AGO NOW.

8   **Q.**  I HATE TO ASK YOU THIS QUESTION, BUT WHAT YEAR DID YOU GET

9   YOUR UNDERGRADUATE DEGREE?

10  **A.**  I GRADUATED IN 1981.

11  **Q.**  AND HOW LONG AFTER GETTING YOUR DEGREE, SIR, DID YOU ENTER

12  INTO THE COMMERCIAL REAL ESTATE BUSINESS?

13  **A.**  TWO-AND-A-HALF, THREE YEARS AFTER THAT.

14  **Q.**  SO HAVE YOU BEEN WORKING CONTINUOUSLY IN COMMERCIAL REAL

15  ESTATE, REAL ESTATE DEVELOPMENT, SINCE THE MID-'80S?

16  **A.**  SINCE '83.

17  **Q.**  AT SOME POINT IN YOUR CAREER DID YOU ACTUALLY WORK FOR

18  MUNICIPALITIES IN REAL ESTATE DEVELOPMENT?

19  **A.**  YEAH, THE TEN YEARS PRIOR TO WORKING FOR SOBRATO, FIRST I

20  HAD SIX YEARS WITH THE CITY OF HAYWARD AS THE REDEVELOPMENT

21  PROGRAM MANAGER, PROJECT MANAGER.  DID THAT FOR SIX, AND THEN

22  MOVED TO THE CITY OF SAN JOSE IN THE OFFICE OF ECONOMIC

23  DEVELOPMENT.  AND I WAS, FOR ALL INTENT AND PURPOSES, THE

24  OMBUDSMAN FOR REAL ESTATE DEVELOPMENT.  I WORKED WITH THE CITY

25  MANAGER AND THE MAYOR TO HELP FACILITATE LARGE DEVELOPMENTS

1    FOR COMPANIES LIKE HP, CISCO, AND AGILENT.

2    **Q.**  AS THE OMBUDSMAN WITH THOSE TITLES OR THOSE ROLES FOR THE

3    CITY OF SAN JOSE, WHAT WAS YOUR JOB?

4    **A.**  IF, AS AN EXAMPLE, CISCO WAS LOOKING AT BUILDING IN SOUTH

5    SAN JOSE A LARGE CAMPUS, 6.6 MILLION SQUARE FEET, I WOULD WORK

6    WITH THEIR TEAM AND THE CITY TEAM TO TRY TO FACILITATE, OFTEN

7    THERE'S A LOT OF DIFFERENCE IN NOMENCLATURE AND TIMELINES AND

8    DESIRES AND THINGS, AND TRY TO KEEP THAT AS EFFICIENT AND

9    QUICK AS POSSIBLE YET MEET ALL OF THE REQUIREMENTS THE CITY

10   MIGHT HAVE.

11   **Q.**  DURING YOUR YEARS WITH THE CITY OF HAYWARD AND THE CITY OF

12   SAN JOSE, MR. STEELE, DID YOU -- WAS ENVIRONMENTAL COMPLIANCE

13   PART OF YOUR PORTFOLIO OF RESPONSIBILITIES?

14   **A.**  HELPING -- WHEN I WAS WITH THE CITY OF SAN JOSE, I WAS

15   HELPING NAVIGATE THAT AS PART OF THE PROCESS.  IT IS OFTEN THE

16   MOST LABORIOUS AND TIME-CONSUMING COMPONENT OF AN ENTITLEMENT

17   AND VERY HARD TO UNDERSTAND IF YOU ARE NOT DOING IT VERY

18   OFTEN.  SO, YES, VERY MUCH SO.  AND IN HAYWARD ACQUIRING

19   PROPERTIES AND DOING DEVELOPMENT, REDEVELOPMENT, EVERY PROJECT

20   STILL HAS TO GO THROUGH THE CEQA PROCESS.

21   **Q.**  ALL RIGHT.  NOW I WANT TO GET TO NEWARK AREA 4, IF I MAY.

22       WAS THAT PLANNED DEVELOPMENT ONE OF THE PROJECTS THAT YOU

23   WERE IN CHARGE OF FOR THE SOBRATO ORGANIZATION?

24   **A.**  YES.

25       **MR. KEARNEY:**  I WOULD LIKE TO DRAW UP EXHIBIT 3

1   AGAIN, YOUR HONOR, WHICH HAS BEEN PREVIOUSLY ADMITTED, IF I

2   MAY?

3        **THE COURT:**  YOU MAY.

4                 (DISPLAYED ON SCREEN.)

5   **BY MR. KEARNEY:**

6   **Q.**  MR. STEELE, YOU RECOGNIZE THIS MAP, I PRESUME; IS THAT

7   CORRECT?

8   **A.**  I DO.

9   **Q.**  WHEN DID YOU FIRST SEE THIS MAP, SIR?

10  **A.**  WELL, THIS PARTICULAR MAP IS DONE BY H.T. HARVEY

11  REPRESENTING THE WETLAND DELINEATION WORK THAT I HAD THEM DO.

12  **Q.**  AND WHEN YOU SAY YOU "HAD THEM DO" THAT DELINEATION WORK,

13  DID YOU ACTUALLY HIRE AND PAY THE H.T. HARVEY ECOLOGICAL

14  CONSULTING FIRM TO DELINEATE WHERE THE WETLANDS WERE ON NEWARK

15  AREA 4?

16  **A.**  ABSOLUTELY DID.

17  **Q.**  SO IN EFFECT YOU PAID, SIR, FOR THE DEVELOPMENT OF THIS

18  MAP WE ARE LOOKING AT?

19  **A.**  CORRECT.

20  **Q.**  CAN YOU TELL US JUST ROUGHLY IN ROUND NUMBERS HOW MUCH THE

21  SOBRATO CORPORATION PAID TO HARVEY TO DO THE WETLAND

22  DELINEATION OF NEWARK AREA 4?

23        **MR. SMOCK:**  OBJECTION.  RELEVANCE.

24        **THE COURT:**  OVERRULED.

25        **THE WITNESS:**  BECAUSE IT'S ITERATIVE OVER A PERIOD OF

```
 1    TIME, I AM GUESSING IN THE NEIGHBORHOOD OF A HUNDRED THOUSAND
 2    DOLLARS TO PRODUCE THIS WORK AND THE VARIOUS LEVELS BEFORE WE
 3    ACTUALLY SUBMITTED IT TO AND GOT IT APPROVED BY THE CORPS OF
 4    ENGINEERS.
 5    BY MR. KEARNEY:
 6    Q.  AND WHY DID YOU HIRE AN OUTSIDE ECOLOGICAL CONSULTING FIRM
 7    TO PRODUCE A WETLAND DELINEATION OF YOUR PROPERTY?
 8    A.  WELL, FIRST, I'M NOT A BIOLOGIST BUT I DO KNOW THAT BY
 9    LOOKING AT SOME OF THE GENERAL CHARACTER OUT THERE THAT IT HAD
10    POTENTIAL TO HAVE SOME WETLANDS ON IT, BUT I KNOW THERE ARE A
11    LOT OF SUBTLETIES IN DETERMINING WHAT IS AND ISN'T WETLANDS.
12    WE DO NEED TO KNOW BECAUSE IF, IN FACT, THERE IS WETLANDS,
13    THEN THAT JURISDICTIONAL IS CONTROLLED BY THE CORPS OF
14    ENGINEERS, AND YOU NEED ANOTHER PERMIT OUTSIDE A MUNICIPAL
15    PERMIT TO DO ANY DEVELOPMENT WITHIN WETLANDS.
16    Q.  SO YOU NEEDED TO KNOW WHERE THE WETLANDS WERE BEFORE YOU
17    COULD FIGURE OUT YOUR DEVELOPMENT?
18    A.  CORRECT.
19    Q.  AT SOME POINT DURING YOUR CAREER AT SOBRATO, MR. STEELE,
20    DID YOU UNDERTAKE THE PROCESS TO LEGALLY DEVELOP NEWARK
21    AREA 4?
22    A.  I DID.  IN THIS MAP, THE SMALLER YELLOW UP ALONG STEVENSON
23    UP TO THE UPPER RIGHT-HAND CORNER WAS LAND THAT WE, SOBRATO
24    ORGANIZATION, OWNED.
25    Q.  MR. STEELE, THERE IS A LASER POINTER THERE IF YOU WANT TO
```

1   SHOW US WHAT YOU ARE REFERRING TO ON THE LARGE SCREEN THERE.

2   **A.**  THIS LAND RIGHT HERE (INDICATING) WAS THE PIECE THAT WE

3   OWNED BEFORE WE ACQUIRED ANYTHING IN AREA 4.  THIS IS REFERRED

4   TO IN THE CITY'S PLANNING VERNACULAR AS AREA 3.

5      AND THEN THIS WHOLE AREA WAS IN THEIR GENERAL PLAN AS

6   AREA 4.  WE OWNED THIS.  WE ACTUALLY OWNED THE PIECE OVER HERE

7   (INDICATING) AT ONE TIME.  SOLD THIS PIECE OVER HERE TO SUN

8   MICROSYSTEMS, AND WE WERE THINKING WE WOULD DRAFT OFF WITH

9   THEM WITH AN R & D OFFICE PARK HERE.

10     AND THEN SUN MICROSYSTEMS WENT OUT OF BUSINESS.  THEY SOLD

11  THAT TO OHLONE COLLEGE, AND THEY BUILT A SECOND CAMPUS THERE

12  WHICH IS THERE NOW.  BUT THAT TOOK AWAY OUR OPPORTUNITY TO

13  REALLY DRAFT OFF AND BUILD AN INDUSTRIAL R & D PARK.

14  **Q.**  LET ME JUST DESCRIBE WHAT YOU WERE TALKING ABOUT THERE,

15  SIR.

16          **MR. KEARNEY:**  YOUR HONOR, THERE IS A RED ARROW ON

17  THE –– THAT SAME TRAPEZOIDAL AREA TO THE UPPER RIGHT IN

18  EXHIBIT 3.

19  **BY MR. KEARNEY:**

20  **Q.**  AND THEN NEWARK AREA 4 IS THE LARGER PIECE TO THE LOWER

21  LEFT IN THAT DIAGRAM; IS THAT RIGHT?

22  **A.**  CORRECT.

23  **Q.**  THANK YOU.

24  **A.**  LASER POINTER IS DYING.

25  **Q.**  MR. STEELE, WHEN DID YOU FIRST –– HAVE YOU BEEN TO NEWARK

1 AREA 4 BEFORE?

2 **A.** NUMEROUS TIMES, YES.

3 **Q.** WHEN YOU SAY "NUMEROUS"?

4 **A.** HUNDREDS.

5 **Q.** AND WHEN WAS THE FIRST TIME YOU ACTUALLY WENT TO NEWARK

6 AREA 4 EVER?

7 **A.** PROBABLY 2002, '3.

8 **Q.** ALL RIGHT.  AND HAVE YOUR VISITS TO THE PROPERTY THE

9 HUNDREDS OF TIMES YOU MENTIONED BEEN CONTINUOUS FROM THEN

10 UNTIL TODAY?

11 **A.** CORRECT.

12 **Q.** I WANT TO GO OVER, SIR, JUST A VERY BRIEF TIMELINE OF YOUR

13 EFFORTS TO PROCEED THROUGH THE ENTITLEMENT PROCESS FOR NEWARK

14 AREA 4, AND I WANT TO START IN 2005.  DID YOU CONDUCT OR DID

15 YOU HIRE A FIRM TO CONDUCT AERIAL FLYOVERS OF THIS PROPERTY IN

16 2005?

17 **A.** CORRECT.  MORE PRECISELY, WE HIRED OUR CIVIL ENGINEER TO

18 PRODUCE A TOPOGRAPHY MAP AND AN ALTA SURVEY.  THE TOPOGRAPHY

19 MAP LOOKS AT ALL OF THE VARIOUS ELEVATIONS ON A SITE, AND THE

20 NEWER TECHNOLOGY IS HAVING A PLANE FLY OVER, TAKE PHOTOGRAPHS,

21 MAPPING THAT AGAINST THE GPS AND SATELLITE IMAGES, AND THEY

22 USE THAT TO WORK OFF OF TO GO OUT AND DO FIELD VERIFICATION.

23 **Q.** AND WHY DID YOU NEED THAT DONE, SIR?

24 **A.** MUCH LIKE THE WETLAND MAP, WE NEED TO UNDERSTAND THE

25 DYNAMICS OF THE SITE, WHERE ARE THE LOW SPOTS, HIGH SPOTS.  AS

1    AN EXAMPLE, TO BUILD A SINGLE-FAMILY HOME, THE BUILDING CODE

2    REQUIRES IT TO BE A CERTAIN ELEVATION ABOVE MEAN SEA LEVEL,

3    AND SO YOU HAVE TO KNOW HOW MUCH SOIL YOU WOULD NEED TO FILL

4    THE SITE TO GET TO THAT LEVEL AND SO FORTH.

5    **Q.**   THEREAFTER IN 2006 DID YOU ENGAGE H.T. HARVEY TO DO WHAT

6    IS CALLED A BIOTIC CONSTRAINTS ANALYSIS?

7    **A.**   YES, WE DID.

8    **Q.**   PLEASE TELL US WHAT THAT IS.

9    **A.**   MUCH LIKE ALL THE OTHER THINGS, YOU'RE TRYING TO FIGURE

10   OUT WHAT AFFECT THE PROPERTY.  THE CONSTRAINTS ANALYSIS IS

11   LOOKING AT WHETHER THERE'S ANY HABITAT ON-SITE, ANY KIND OF

12   PROTECTED HABITAT, FEDERAL OR STATE, AS WELL AS ANY WETLAND

13   RELATIONSHIPS TO THAT.

14   **Q.**   IN 2006 DID YOU HIRE AN ENVIRONMENTAL FIRM TO DO WORK ON

15   THE SITE NAMED PES?

16   **A.**   AGAIN, ALONG WITH OUR DUE DILIGENCE, HAZMAT IS ONE OF THE

17   THINGS CEQA IS GOING TO BE LOOKING AT, AS WELL AS IT IS A

18   POTENTIAL LIABILITY IF YOU BUY SOMETHING AND FIND OUT IT HAS

19   HAZMAT, BEING ANYTHING FROM PESTICIDES TO PETROLEUM PRODUCTS.

20       BEFORE YOU PUT A RESIDENT ON THERE OR AN OFFICE BUILDING,

21   OR WHATEVER YOU ARE LOOKING AT DOING, THERE ARE SCREENING

22   LEVELS THAT THE PROPERTY HAS TO MEET OR BE UNDER.  AND SO

23   HAZMAT TESTING WITH PES IS LOOKING AT WHETHER THERE IS THOSE

24   KINDS OF EXISTING CONDITIONS THAT WOULD NEED TO BE DEALT WITH.

25   **Q.**   IN 2007 DID YOU ENTER INTO A MEMORANDUM OF UNDERSTANDING

1   WITH THE CITY OF NEWARK REGARDING YOUR PROPOSED DEVELOPMENT?

2   **A.**  YES, WE DID.  A MEMORANDUM OF UNDERSTANDING WAS TO OUTLINE

3   THE PROCESS THAT WE WOULD MOVE FORWARD TOGETHER WITH IN

4   DEVELOPING A SPECIFIC PLAN AND -- WHICH WAS CALLED FOR IN THE

5   GENERAL PLAN AS SOMETHING THAT WOULD NEED TO BE DONE HERE

6   BEFORE YOU CAN MOVE FORWARD WITH DEVELOPMENT.

7   **Q.**  ALSO IN 2007, WE'VE JUST TALKED ABOUT THIS MAP THAT WAS

8   CREATED BY H.T. HARVEY; IS THAT CORRECT?

9   **A.**  THAT'S RIGHT.

10  **Q.**  AND THEN AT SOME POINT IN 2007 DID YOU ACTUALLY CONTACT

11  THE U.S. ARMY CORPS OF ENGINEERS?

12  **A.**  H.T. HARVEY PRODUCED THE MAP THAT YOU'RE LOOKING AT.  AS A

13  DRAFT, WE REVIEWED THE DRAFT.  IT HAS QUITE A BIT OF BACKUP

14  DOCUMENTATION HE HAS TO PROVIDE.  SO WE WENT THROUGH ALL OF

15  THAT, AND THAT WAS ALL SUBMITTED TO THE CORPS OF ENGINEERS TO

16  APPROVE OUR SUBMITTED DELINEATION.

17  **Q.**  THEREAFTER IN 2009 DID YOU COMMISSION A DRAFT

18  ENVIRONMENTAL IMPACT REPORT WITH THE CITY OF NEWARK?

19  **A.**  YES, CONSISTENT WITH THE SPECIFIC PLAN PROCESS IT'S

20  REQUIRED TO HAVE A CEQA DOCUMENT FOR THAT, AND, YES, DAVID

21  POWERS' OFFICE WAS THE ONE THAT WAS HIRED TO DO THE CEQA

22  ANALYSIS AND ALL THE BACKUP REPORTS.

23  **Q.**  AFTER THE DRAFT ENVIRONMENTAL IMPACT REPORT WAS THERE A

24  FINAL ENVIRONMENTAL IMPACT REPORT IN 2010?

25  **A.**  YES.  THE PROCESS WITH A DRAFT IS, ONCE THE DRAFT IS

1   READY, IT IS DISTRIBUTED AND CIRCULATED IN THE PUBLIC FOR A

2   COMMENT PERIOD.  THEN THE COMMENTS ARE COLLECTED AND RESPONDED

3   TO.  AND THEN THE DRAFT DOCUMENT, WHICH HAS ALL THE REPORTS,

4   AND THE FINAL DOCUMENT, WHICH HAS ALL OF THE COMMENT LETTERS

5   AND RESPONSES, ARE THEN TAKEN TO THE PLANNING COMMISSION AND

6   COUNCIL ALONG WITH THE ENTITLEMENTS THAT YOU ARE PURSUING.

7   **Q.**  AND, MR. STEELE, ARE YOU SHEPHERDING THESE DOCUMENTS

8   THROUGH THE PROCESS ALL THIS TIME?

9   **A.**  CORRECT.

10  **Q.**  AFTER THE -- THE FINAL EIR WAS ARRIVED AT IN 2010, WAS IT

11  CHALLENGED?

12  **A.**  YES.  THERE IS A STATUTE PERIOD OF TIME THAT YOU CAN

13  APPEAL.  CCCR, THE CITIZENS COMMITTEE TO COMPLETE THE REFUGE,

14  CAME TO US AND WAS GOING TO CHALLENGE IT.  WE AGREED TO TOLL

15  THE STATUTE PERIOD WHILE WE TRIED TO NEGOTIATE A SETTLEMENT.

16  THE CURRENT MARKET IN 2010 FOR HOUSING WAS DISMAL, AND SO

17  THERE WASN'T A SENSE OF URGENCY TO PUT OUR PROPERTY TO THE

18  MARKET TO DEVELOP, SO WE SPENT ALMOST TWO YEARS TRYING TO

19  NEGOTIATE A SETTLEMENT WITH THEM.

20      OUR MEDIATOR TOLD US THEY DIDN'T THINK WE WERE GOING TO BE

21  ABLE TO SETTLE, AND WITH THAT WE MOVED TO GO AHEAD TO TRIAL,

22  AND ANOTHER TWO YEARS IN TRIAL.  SO IT AROUND '14 THAT WE

23  FINALLY GOT A RESOLUTION, A RULING FROM THE COURTS.

24  **Q.**  SO IN 2014 DID THE CHALLENGE TO THE EIR AND THE LAWSUIT

25  WITH CCCR EFFECTIVELY COME TO A CONCLUSION?

1    **A.**  YES.  THE COURT RULINGS WERE FAIRLY MINOR AND MORE TEXTUAL

2    SO WE CAN MAKE TEXT CHANGES TO THE EIR THAT WE HAD COMPLETED.

3    WE SETTLED OUT WITH CCCR NOT TO APPEAL THE RULING, AND WITH

4    THAT THE CITY THEN MADE THE TEXT CHANGES TO THE EIR,

5    RECIRCULATED IT AND RECERTIFIED IT, WHICH THEN APPROVED ALL OF

6    OUR ENTITLEMENTS FINALLY, AND THERE WERE NO APPEALS AT THAT

7    TIME SO THAT THEY BECAME VESTED.

8    **Q.**  SO YOU WERE AFTER THE -- AFTER THE APPROXIMATE DECADE OF

9    WORK OR MAYBE LONGER, IN 2014 YOU ACTUALLY HAD COME TO THE

10   CONCLUSION OF THE ENTITLEMENT PROCESS IN YOUR MIND.  IS THAT A

11   FAIR STATEMENT?

12   **A.**  YES.

13   **Q.**  WHICH BRINGS US TO SEPTEMBER THE 8TH OF 2014.

14   **A.**  COINCIDENTALLY WAS OUR LAST -- I BELIEVE OUR LAST HEARING

15   IN FRONT OF THE JUDGE.  I WAS IN OAKLAND FOR THAT HEARING, AND

16   OUTSIDE IN THE ANTEROOM BEFORE -- IN FRONT OF THE COURTROOM WE

17   WERE ALL WAITING, INCLUDING CCCR FOLKS, AND ONE OF THEM HAD --

18   I DON'T REMEMBER WHICH, IT MIGHT BE CARIN, BUT ONE OF THEM

19   MENTIONED TO ME -- OR ASKED ME HAD I GOTTEN A GRADING PERMIT

20   BECAUSE THEY HAD SEEN A LOT OF TRUCKING ACTIVITY ON OUR SITE.

21   **Q.**  LET ME STOP YOU THERE FOR A MOMENT.  WHEN YOU SAY "CARIN,"

22   ARE YOU REFERRING TO CARIN HIGH, WHO WAS THE THEN HEAD OF THE

23   CCCR?

24   **A.**  CORRECT.

25   **Q.**  OKAY.  SO MS. HIGH TOLD YOU SOMETHING ABOUT GRADING ON THE

1    PROPERTY; IS THAT RIGHT?

2    **A.**   YEAH.  AND I THOUGHT SHE WAS JUST -- BECAUSE IT'S SUCH A

3    LARGE AREA AND THERE'S OTHER PROPERTIES IN THAT GENERAL

4    VICINITY, SHE HAD TO BE REFERRING TO SOMEBODY ELSE'S BECAUSE

5    WE HAD NOT PURSUED ANY TYPE OF PERMITS TO DO ANYTHING ON OUR

6    SITE.  THERE WAS NO NEED TO.  AND WHERE WE ARE IN OUR

7    ENTITLEMENT PROCESS, WE COULDN'T GET A PERMIT IF WE WANTED TO.

8    SO I WAS JUST KIND OF DOUBTFUL THAT IT WAS VALID.

9        BUT BECAUSE THAT COURT HEARING WAS IN OAKLAND, AND OUR

10   OFFICES ARE IN CUPERTINO, I HAD TO DRIVE BY THE PROPERTY

11   ANYWAY GENERALLY, SO WE SWUNG OVER ON OUR WAY HOME TO TAKE A

12   LOOK.

13   **Q.**   ANY IDEA, MR. STEELE, WHAT TIME IT WAS WHEN YOU ACTUALLY

14   SWUNG BY THE PROPERTY ON SEPTEMBER 8TH, 2014?

15   **A.**   IT WAS MID, LATE AFTERNOON, MAYBE 3:00.

16   **Q.**   ALL RIGHT.  AND WHICH PARTS --

17           **MR. KEARNEY:**   I WONDER IF WE CAN PULL UP EXHIBIT 3

18   AGAIN, YOUR HONOR.

19                   (DISPLAYED ON SCREEN.)

20   **BY MR. KEARNEY:**

21   **Q.**   AND, AGAIN, I ENCOURAGE YOU IF YOU WANT, MR. STEELE, TO

22   USE THE LASER POINTER.

23        SO ON SEPTEMBER 8TH, 2014, WHEN YOU WENT TO CHECK OUT THIS

24   REPORT FROM MS. HIGH, WHAT PART OF THE PROPERTY DID YOU GO TO

25   FIRST?

1    **A.**  FIRST LOCATION, THIS IS MOWRY RIGHT HERE (INDICATING).

2    AND WE CAME DOWN MOWRY AND DROVE DOWN THROUGH HERE AND DIDN'T

3    SEE ANY ACTIVITY HERE.  BUT AS WE WERE PARKED BACK IN THIS

4    AREA (INDICATING), ON THE HORIZON WE SAW SOME TRUCKS OVER HERE

5    (INDICATING).  SO WE WENT BACK OUT TO STEVENSON AND AROUND

6    STEVENSON -- IT'S NOT WORKING.

7       WENT DOWN CHERRY, BACK DOWN TO WHERE THE ARROW IS ON THE

8    RIGHT-HAND SIDE, AND THERE THERE WERE SEVERAL DUMP TRUCKS ON

9    STEVENSON ON THE EAST SIDE OF THE RAILROAD TRACKS.  THE GATE

10   WAS OPEN.  THERE WAS A COUPLE OF DUMP TRUCKS INSIDE THE GATE.

11   I DON'T KNOW IF THIS IS GOING TO WORK AGAIN, I'LL TRY IT.

12      RIGHT IN THIS AREA HERE WERE THREE OR FOUR TRUCKS, DUMP

13   TRUCKS, AND THEN THERE WAS A PICKUP TRUCK AND SOMEBODY

14   STANDING HERE TAKING SOMETHING FROM THE TRUCK DRIVERS

15   (INDICATING).

16   **Q.**  LET ME STOP YOU THERE AND CATCH UP FOR THE RECORD.

17      YOU INDICATED THAT AS YOU DROVE OVER TO THE STEVENSON SIDE

18   OF THE PROPERTY, DID YOU ACTUALLY GO THROUGH THE GATE, SIR, AT

19   THAT POINT?

20   **A.**  I DID.

21   **Q.**  WHAT WAS THE CONDITION OF THE GATE?  WAS IT OPEN OR CLOSED

22   AT THAT TIME?

23   **A.**  IT IS A DOUBLE STEEL GATE.  IT WAS WIDE OPEN.  BOTH SIDES

24   WERE OPEN.

25   **Q.**  WAS THAT FACT ITSELF A CAUSE FOR CONCERN?

1    **A.**   YEAH.  BECAUSE WE HAVE A PADLOCK ON THAT GATE, AND THE

2    ONLY FOLKS ARE OUR COMPANY'S PROPERTY MANAGEMENT FOLKS, WHICH

3    THEY DON'T GO OUT THERE FOR VERY MUCH.  AND THEN PG&E HAS A

4    POLE SO THEY HAVE A KEY TO IT AS WELL.

5    **Q.**   DID YOU LATER INSPECT THE LOCK AND CHAIN --

6    **A.**   YEAH.

7    **Q.**   -- ON THAT GATE?

8    **A.**   YES.  THE WAY THE LOCKS ARE PUT ON THE CHAIN ARE CALLED A

9    DAISY CHAIN, SO THEY ARE ALL INTERLOCKED SO YOU CAN TAKE ONE

10   OFF AND UNLOCK WITHOUT NEEDING THE OTHER LOCKS TO BE UNLOCKED.

11   OUR LOCK HAD BEEN CUT AND WAS LAYING ON THE GROUND.

12   **Q.**   YOU INDICATED THAT -- AND THE CONDITION OF THE GATE

13   TYPICALLY WAS CLOSED, SIR.  IS THAT A FAIR STATEMENT?

14   **A.**   ALWAYS.

15   **Q.**   ALL RIGHT.  YOU INDICATED THAT THERE WERE ACTUALLY TRUCKS

16   ON STEVENSON BEFORE YOU GOT ON THE PROPERTY; IS THAT RIGHT?

17   **A.**   YEAH, THEY WERE TEED UP TO GO ON TO OUR PROPERTY.

18   **Q.**   HOW MANY -- THEY WERE -- THAT'S MY NEXT QUESTION, THEY

19   WERE FACING IN WHICH DIRECTION, EITHER TOWARDS YOUR PROPERTY

20   ON STEVENSON OR AWAY FROM YOUR PROPERTY ON STEVENSON?

21   **A.**   THEY WERE DEFINITELY IN QUEUE TO GO ON TO OUR PROPERTY.

22   THERE WAS THREE OR FOUR OF THEM, THEY WERE ALL BUMPER TO

23   BUMPER AND WAITING.  AND THE GUY INSIDE -- THERE WAS A COUPLE

24   INSIDE, AND THEY WERE CALLING THEM OVER AS THEY HAD ROOM TO

25   PULL THEM ACROSS.

STEELE – DIRECT / KEARNEY

1    **Q.**  WE HAVE SEEN A LOT OF PICTURES OF TRUCKS IN THIS CASE

2    ALREADY BUT JUST ORALLY DESCRIBE THE BASIC SIZE OF THE TRUCKS,

3    IF YOU COULD, THAT YOU SAW OUT ON STEVENSON THAT DAY.

4    **A.**  THEY'RE THE -- THEY'RE A DUMP TYPE OF TRUCK.  THEY'RE A

5    LONG TRAILER SIZE VERSUS THE SMALL COMPACT DUMP TRUCK.  THEY

6    ARE WHAT ARE CALLED BACK LOADERS OR END LOADERS SO THEY LIFT

7    UP AND SLIDE EVERYTHING OFF THE BACK END OF THEM.

8    **Q.**  THESE ARE INDUSTRIAL SIZE TRUCKS, SIR?

9    **A.**  ABSOLUTELY.  RIGHT.

10   **Q.**  SO YOU PASSED THEM ON STEVENSON AND THEN YOU DROVE THROUGH

11   THE GATE; IS THAT RIGHT?

12   **A.**  I DID.

13   **Q.**  WHAT KIND OF VEHICLE ARE YOU DRIVING AT THAT TIME?

14   **A.**  I HAVE A SMALL PORSCHE -- DID AT THE TIME 911 THAT IS NOT

15   FOUR-WHEEL DRIVE.  IT WAS A BUMPY RIDE.

16   **Q.**  AND WHY DID YOU DRIVE YOUR SPORTS CAR ON TO THE DIRT

17   ENVIRONMENT OF THE PROPERTY?

18   **A.**  WELL, FIRST, I WAS GETTING EMOTIONALLY UPSET ABOUT ANYBODY

19   COMING ON MY PROPERTY TO DO SOME -- COINCIDENTALLY ON THE DAY

20   THAT I FINALLY GET MY ENTITLEMENTS REAPPROVED ESSENTIALLY, BUT

21   I REALLY WAS TRYING TO FIND WHO WAS THERE THAT WAS RESPONSIBLE

22   FOR WHAT WAS GOING ON ON MY PROPERTY.

23   **Q.**  NOW, YOU SAID THAT AS YOU -- WE'VE HEARD TESTIMONY THAT AS

24   YOU DRIVE THROUGH THE STEVENSON GATE, YOU BEAR RIGHT WHEN YOU

25   GO INSIDE THE GATE; IS THAT CORRECT?

1    **A.**  YOU GO THROUGH THE GATE -- THIS SIZE SCALE, YOU GO DOWN

2    PROBABLY A HUNDRED YARDS AND THEN IT THEN JOGS TO THE RIGHT.

3          **MR. KEARNEY:**  AGENT SU, CAN WE BLOW UP THAT KIND OF

4    CENTER BAND OF THIS EXHIBIT, PLEASE?

5          **THE WITNESS:**  SO HERE -- AGAIN I'LL TRY THIS.  THE

6    ROAD IS COMING DOWN HERE, THE GATE IS RIGHT HERE, THEN YOU

7    COME TO THERE AND YOU MAKE THIS TURN HERE (INDICATING).  AND

8    THERE WAS A BARN RIGHT HERE.  I CAN'T REMEMBER.  I THINK WE

9    MIGHT HAVE REMOVED IT SINCE THEN.

10   **BY MR. KEARNEY:**

11   **Q.**  MR. STEELE, YOU SAID THAT ON YOUR WAY IN TO STEVENSON YOU

12   PASSED TRUCKS THAT WERE QUEUED UP.  WERE THERE MORE TRUCKS IN

13   THIS AREA OF THE PROPERTY AFTER YOU TOOK THAT INITIAL RIGHT

14   TURN AFTER ENTERING THE STEVENSON GATE?

15   **A.**  I WAS SEEING -- AS WE'RE LOOKING DOWN, I SAW ONE OR TWO

16   HERE, AND THEN AS I COME AROUND THE CORNER THERE WAS A COUPLE

17   UP IN HERE.  AND THEN SOMEBODY WAS STANDING SOMEWHERE LIKE

18   RIGHT HERE (INDICATING), AND THE TRUCK DRIVERS WERE TALKING TO

19   'EM AND EXCHANGING PAPERWORK.

20   **Q.**  IN ADDITION TO THE TRUCKS THAT WERE OUT ON STEVENSON, AS

21   YOU DROVE ON TO THE PROPERTY THAT DAY, SEPTEMBER 8TH, HOW MANY

22   MORE TRUCKS WERE QUEUED UP ON THE PROPERTY?

23   **A.**  I'D SAY FIVE MAYBE.  FIVE OR SIX TOTAL.

24   **Q.**  WERE THESE THE SAME INDUSTRIAL SIZED TYPE OF TRUCK THAT

25   YOU --

STEELE – DIRECT / KEARNEY

1  **A.**  THEY WERE ALL GENERALLY THE SAME, YES.

2  **Q.**  YOU INDICATED THAT THERE WAS A -- WHICH DIRECTION WERE THE

3  TRUCKS POINTED?  WERE THEY POINTED IN TOWARDS THE LAND OR OUT

4  TOWARDS STEVENSON?

5  **A.**  THEY WERE ALL GOING THIS WAY, FACING THAT WAY

6  (INDICATING).

7  **Q.**  YOU JUST INDICATED --

8  **A.**  TO THE LEFT.

9  **Q.**  -- RIGHT TO LEFT ON EXHIBIT 3?

10  **A.**  (NODS HEAD.)

11  **Q.**  YOU SAID THERE WAS AN INDIVIDUAL OUT THERE.  WAS THIS

12  PERSON ON THE ROAD, OR WHERE WAS THIS PERSON THAT YOU SAW?

13  **A.**  JUST TO THE LEFT OF THE ROAD AREA.  SO THE TRUCKS WOULD

14  PULL UP ON THE ROAD, AND HE WOULD BE TO THE LEFT.

15  **Q.**  AND WHAT DID YOU SEE HIM DOING, SIR, AT THAT TIME?

16  **A.**  THEY WERE EXCHANGING A CLIPBOARD AND PAPERWORK BETWEEN THE

17  TWO OF THEM.

18  **Q.**  BETWEEN --

19  **A.**  THE TRUCK DRIVER AND THE GENTLEMAN THAT WAS ON THE GROUND.

20  **Q.**  OKAY.  HOW ARE YOU FEELING AT THIS TIME, MR. STEELE?

21  **A.**  AGITATED, YOU KNOW, NOT VERY HAPPY ABOUT THIS WHOLE THING

22  CUZ THIS IS TOTALLY COUNTER TO ANY APPROVALS I WOULD HAVE.

23  AND WITH THE SENSITIVITY TO THE HABITAT AND THE PROCESS THAT

24  WE JUST HAD GONE THROUGH, IT IS A PUBLIC PROCESS, PUBLIC

25  AGENCIES, I DIDN'T SEE THIS AS BEING A GOOD THING TO DEAL

STEELE - DIRECT / KEARNEY

```
1    WITH.

2    Q.  ALL RIGHT.  WHAT DID YOU DO THEN, MR. STEELE?

3    A.  I APPROACHED THE GENTLEMAN THAT WAS TAKING THE PAPERWORK.

4    HE WAS A YOUNG GUY, PROBABLY LATE TEENS, EARLY TWENTIES, AND

5    WAS ASKING HIM MORE OR LESS WHAT HE WAS DOING THERE.

6    Q.  AND DO YOU REMEMBER EXACTLY WHAT YOU SAID AT THE TIME?

7    A.  NOT -- WELL, I DON'T KNOW IF IT'S -- I THINK IT WAS FAIRLY

8    LOCKER-ROOM-ISH CONVERSATION ABOUT WHAT THE HECK YOU'RE DOING

9    HERE.

10   Q.  WHAT TONE --

11   A.  IN CERTAIN WORDS --

12   Q.  WHEN YOU SAY "LOCKER-ROOM-ISH," CAN YOU JUST DESCRIBE IT

13   FOR US A LITTLE FURTHER?

14   A.  MORE LIKE, WHAT THE FUCK ARE YOU DOING ON MY PROPERTY,

15   SOMETHING ALONG THAT WAY.  EXCUSE ME.

16   Q.  WHAT WAS THE TONE OF VOICE THAT YOU SAID THOSE WORDS IN TO

17   THIS YOUNG MAN?

18   A.  JUST LIKE THAT.

19   Q.  OKAY.

20   A.  WITH A LITTLE BIT OF VINEGAR ON IT, YES.

21       BUT I DIDN'T WANT TO APPROACH HIM IN A VERY BUSINESSLIKE

22   MANNER SINCE I KNEW HE WASN'T SUPPOSED TO BE THERE AND HE WAS

23   DOING SOMETHING ILLEGAL, BUT AT THE SAME TIME I NEEDED TO HAVE

24   A CONVERSATION WITH HIM, FIND OUT WHAT WAS GOING ON.

25   Q.  WHAT HAPPENED THEN, SIR?
```

1    **A.**  HE KIND OF SHIED OFF.  HE DIDN'T KNOW WHO I WAS AND DIDN'T

2    EXPECT ANYBODY TO ACCOST HIM LIKE I WAS.  HE SAID HE WAS

3    THERE, IF I RECALL, SOMETHING ALONG THE LINE OF, WORKING FOR

4    MY DAD, OR SOMETHING ALONG THAT WAY.  AND I THEN ASKED HIM,

5    DID HE HAVE ANY IDEA WHAT HE WAS DOING, BECAUSE HE PUTTING

6    DIRT INTO WETLANDS AND THAT IS A FEDERAL OFFENSE.

7    **Q.**  WHAT -- WITHOUT TELLING US WHAT HE SAID, WHAT DID YOU SEE

8    HIM DO NEXT?

9    **A.**  I BELIEVE HE WENT AND LOOKED FOR HIS CELL PHONE, I THINK

10   HE HAD A PICKUP TRUCK OR A LITTLE 4RUNNER OR SOMETHING, RAN

11   OVER TO THE TRUCK TO MAKE A PHONE CALL.

12   **Q.**  SO AFTER YOU SAW HIM GO OFF TO MAKE A PHONE CALL, WHAT DID

13   YOU DO, MR. STEELE?

14   **A.**  I BELIEVE THEN IT MIGHT HAVE BEEN ABOUT THAT TIME -- WE

15   WERE RIGHT IN THIS GENERAL AREA AND A TRUCK HAD JUST -- THAT

16   HE HAD JUST TAKEN A TAG FROM HAD TAKEN OFF AND MOVED AROUND

17   THIS WAY (INDICATING).  SO I GOT IN MY CAR AND WE CAME OVER

18   HERE TO SEE WHAT WAS GOING ON OVER HERE (INDICATING).

19            **MR. KEARNEY:**  YOUR HONOR, THE WITNESS HAS JUST

20   INDICATED WITH HIS LASER POINTER, AND, MR. STEELE, CORRECT ME

21   IF I GET THIS WRONG, BUT YOU SAW THE TRUCK CONTINUE IN KIND OF

22   A WESTBOUND DIRECTION ON THAT ROAD AND TAKE A RIGHT TURN?

23            **THE WITNESS:**  TURN RIGHT THERE (INDICATING).  RIGHT

24   HERE THERE IS A CHAIN ACROSS A LITTLE OPENING, AND SO WE KEEP

25   THAT CHAIN ACROSS THERE TO TRY TO DISCOURAGE KIDS TO GO OUT

1    THERE WITH MOTORCYCLES AND STUFF, AND KIND OF SEPARATING THE

2    PROPERTY.  BUT THAT CHAIN WAS DOWN AND THEY WERE DRIVING

3    THROUGH AND OUT INTO THIS AREA HERE.

4    **BY MR. KEARNEY:**

5    **Q.**  IN BLUE WE JUST MARKED THE AREA WHERE THAT CHAIN WAS

6    SUPPOSED TO BE, BETWEEN THE AREA OF -- THE SOUTH FIELD AREA

7    THAT WE DISCUSSED ALREADY IN THIS CASE WITH THE CROSS-HATCHING

8    AND THEN THE ENTRY ROAD?

9    **A.**  UH-HUH.

10   **Q.**  THE CHAIN WAS DOWN WHEN YOU GOT THERE, SIR?

11   **A.**  YES, IT WAS.

12   **Q.**  OKAY.  DID YOU ACTUALLY DRIVE ON TO THE FIELD THAT IS

13   MARKED THERE IN RED?

14   **A.**  I DID.

15   **Q.**  PLEASE TELL US WHAT YOU SAW.

16   **A.**  CLEARLY THERE WAS UNNATURAL DIRT THERE.  NONNATIVE I GUESS

17   IS THE RIGHT WAY TO CALL IT.  THAT AREA HAD BEEN DISKED BUT

18   NOTHING MORE THAN DISKING SO IT HAS GENERALLY GOT A LOT OF

19   ORGANIC MATERIAL IN IT, AND IT IS VERY CLAY-ISH SO IT IS A

20   VERY DARK BROWN.

21       YOU COULD TELL THERE HAD BEEN A LOT OF FILL BROUGHT ON TO

22   THE SITE BECAUSE IT IS VERY LIGHT COLORED, VERY LIGHT BEIGE,

23   VERY DRY.  IT HAD CONSTRUCTION MATERIAL IN IT.  THERE WAS

24   SMALL PIECES OF CONCRETE AND PLASTIC PIPE HANGING OUT HERE AND

25   THERE.  SO IT CLEARLY WAS NOT ITS NATURAL STATE.

STEELE – DIRECT / KEARNEY

1        AND THERE WAS A BULLDOZER WITH A -- THEY CALL IT A RIPPER,

2    WHICH IS A BIG FINGER OFF THE BACK OF IT THAT THEY USE TO TEAR

3    UP PROPERTY AND KIND OF TURN IT OVER.  AND YOU COULD TELL THAT

4    THE BULLDOZER HAD BEEN PUSHING THE DIRT AROUND TRYING TO

5    SPREAD IT OUT.

6    **Q.**  LET ME ASK YOU, THE -- WHEN WAS THE LAST TIME YOU HAD BEEN

7    ON THE LAND BEFORE THIS VISIT ON SEPTEMBER 8TH?

8    **A.**  MAYBE A MONTH, SIX WEEKS.

9    **Q.**  AND DO YOU REMEMBER THE LAST TIME YOU HAD BEEN THERE

10   SEEING -- HAD YOU BEEN TO THIS SOUTHERN PART OF THE PROPERTY

11   OFF OF STEVENSON?

12   **A.**  YEAH, TYPICALLY I WILL GO IN THE STEVENSON GATE WHEN I AM

13   DOING A SITE INSPECTION.

14   **Q.**  OKAY.  AND ON THAT VISIT TO THE SOUTHERN PART OF THE

15   PROPERTY, WHENEVER IT WAS, I THINK YOU SAID SIX WEEKS OR

16   SOMETHING EARLIER?

17   **A.**  WEEKS, YEAH.

18   **Q.**  DID YOU GET A CHANCE TO LOOK AT THE SAME FIELD?

19   **A.**  I DON'T HAVE REASON TO GO EVERYWHERE ON THE PROPERTY WHEN

20   I DO A SITE VISIT.  WE HAVE A PUMP AT THE BACK.  I WILL DRIVE

21   WHERE THE RED ARROW IS, I WILL DRIVE OFF AND THROUGH THE GATE

22   AND STRAIGHT OUT TO THE SLOUGH.  I MAKE SURE THAT THE CHAIN IS

23   STILL LOCKED IN THE PLACES THAT WE HAVE CHAINS UP WHERE THE

24   GATES ARE.  BUT I DON'T RECALL DRIVING THROUGH THAT CHAIN AND

25   LOOKING PRECISELY AT THAT AREA.

STEELE – DIRECT / KEARNEY

1    **Q.**  ALL RIGHT.  IN ANY EVENT, YOU HAVE SEEN THAT FIELD IN THE

2    PAST, SIR --

3    **A.**  ABSOLUTELY, YES, SIR.

4    **Q.**  IS THERE NORMALLY CONCRETE AND RUBBLE AND PLASTIC PIPE --

5    **A.**  NEVER HAS BEEN.

6    **Q.**  DID YOU TAKE ANY STEPS TO CONTACT AUTHORITIES AT THAT

7    TIME, SIR?

8    **A.**  YES.  NEWARK IS A SMALL TOWN SO I -- I'VE WORKED CLOSELY

9    WITH THE CITY MANAGEMENT, CITY MANAGER, ASSISTANT CITY

10   MANAGER, COMMUNITY DEVELOPMENT DIRECTOR.  SO I CALLED THE

11   ASSISTANT CITY MANAGER FIRST, THEN I -- AND ASKED -- I WAS

12   TRYING TO GET AHOLD OF HIM BECAUSE I THOUGHT I COULD GET

13   SOMEBODY OUT RATHER THAN GOING THROUGH THE MAIN SWITCHBOARD OF

14   THE POLICE.

15       I COULDN'T GET HIM RIGHT AWAY AND SO THEN I GOT THROUGH

16   THE SWITCHBOARD FOR THE POLICE DEPARTMENT.

17   **Q.**  AND DID THE POLICE EVENTUALLY RESPOND TO THE SITE?

18   **A.**  YES, THEY DID.

19   **Q.**  HOW MUCH LATER WAS IT THAT THEY GOT THERE AFTER YOU MADE

20   THAT PHONE CALL?

21   **A.**  OH, GEEZ, MAYBE 20 MINUTES, 25 MINUTES.

22   **Q.**  DURING THAT TIME PERIOD DID YOU DO ANYTHING ON THE LAND AT

23   THE TIME?  DID YOU CONDUCT ANY INVESTIGATION, OR DID YOU DO

24   ANYTHING, SIR?

25   **A.**  I DID GO BACK AND TOLD -- I THINK I WENT BACK AND TOLD THE

STEELE - DIRECT / KEARNEY

1    KID THAT I HAD TALKED TO EARLIER THAT IF HE LET ANOTHER FOOT

2    OF DIRT FALL ON THE PROPERTY, I DON'T EXACTLY REMEMBER WHAT I

3    THREATENED HIM WITH BUT IT WASN'T NICE.

4    **Q.**  AFTER THE POLICE ARRIVED, DID ANYONE IN AUTHORITY OR

5    APPARENT AUTHORITY OVER THE DUMPING ACTIVITY ARRIVE AT THE

6    SCENE?

7    **A.**  YES.  THERE WAS A GENTLEMAN IN A LIFTED PICKUP TRUCK, IF I

8    RECALL.

9    **Q.**  AND DID YOU COME TO LEARN HIS NAME, SIR?

10   **A.**  I BELIEVE IT WAS KEVIN.

11   **Q.**  ALL RIGHT.  AND DID YOU HAVE A DISCUSSION WITH HIM?

12   **A.**  I DID.  HE SAID HE WAS HIRED AND RESPONSIBLE FOR THE

13   OPERATION BY MR. LUCERO, AND THAT HE WAS -- JUST HAD A

14   LEGITIMATE OPERATION GOING ON, AND WHAT WAS MY PROBLEM.

15   **Q.**  WHAT DID YOU TELL HIM?

16   **A.**  I SAID THERE IS NO WAY IN HELL THAT ANYONE WOULD HAVE

17   GIVEN HIM PERMISSION TO COME ON OUR PROPERTY TO DO WHAT HE IS

18   DOING RIGHT NOW.

19   **Q.**  DID YOU DURING THAT CONVERSATION MAKE PLANS TO MEET HE AND

20   MR. LUCERO AGAIN -- OR TO MEET HE AND THIS MR. LUCERO THAT HE

21   HAD MENTIONED?

22   **A.**  YEAH, WE MADE PLANS THAT THE TWO OF THEM WOULD COME TO MY

23   OFFICE IN CUPERTINO THE FOLLOWING DAY.

24   **Q.**  THAT FIRST DAY THAT YOU DISCOVERED THIS FIELD ACTIVITY,

25   SEPTEMBER 8TH, DID MR. LUCERO EVER COME ON-SITE?

STEELE - DIRECT / KEARNEY

1    **A.**  I DON'T RECALL THAT IT WAS JIM THAT I SAW ON-SITE.  I

2    BELIEVE IT WAS JUST HIS SON AND KEVIN.

3    **Q.**  DID YOU KNOW MR. LUCERO AT THE TIME?

4    **A.**  I HAD NEVER MET HIM BEFORE.

5    **Q.**  OKAY.  THE... IN ADDITION TO CONTACTING AUTHORITIES,

6    MAKING PLANS TO MEET WITH MR. OLIVERO AND MR. LUCERO THE NEXT

7    DAY AT YOUR OFFICE, DID YOU CONTACT ANYONE ELSE THAT DAY TO

8    CONDUCT AN ASSESSMENT OF THE DUMPING ACTIVITY?

9    **A.**  YES.  H.T. HARVEY, WHO HAD PRODUCED THIS MAP, HAD -- IN

10   THE PRODUCTION OF THIS MAP TOOK VERY PRECISE READINGS OF ITS

11   ELEVATIONS AND ITS CHARACTER, AND THAT WAS THE FIRST ONE I

12   THOUGHT WOULD KNOW NOT JUST WHAT IS WET BUT WHAT IS UPLANDS.

13   AND SO I ASKED HIM TO GO OUT AND PRODUCE A MAP OF THE AREAS

14   THAT WERE AFFECTED BY THIS UNDOCUMENTED FILL.

15   **Q.**  WHO AT -- DID YOU EVENTUALLY GET A HOLD OF SOMEONE AT

16   HARVEY TO DO THAT?

17   **A.**  I BELIEVE PATRICK BOURSIER GOT ON THE PHONE AND HE MADE

18   ARRANGEMENTS TO COME OUT THE NEXT DAY.

19   **Q.**  AND THAT WOULD BE SEPTEMBER 9TH, 2014?

20   **A.**  I BELIEVE SO.

21   **Q.**  SO THE NEXT DAY, ON SEPTEMBER 9TH 2014, DID YOU ACTUALLY

22   MEET MR. BOURSIER ON THE PROPERTY?

23   **A.**  I DID.  AND WE TALKED ABOUT WHERE WE THOUGHT IT WAS AND

24   WASN'T DUMPED ON AND WE LEFT AFTER THAT, AND HE PROCEEDED TO

25   DO A SURVEY VERIFICATION.

1    **Q.**  ALL RIGHT.  WHICH PRODUCED THESE RED PERIMETER AREAS ON

2    EXHIBIT 3.  IS THAT A FAIR STATEMENT?

3    **A.**  THAT'S RIGHT.  IN THE COURSE OF THE WETLAND MAP, LIKE I

4    SAID, THEY CAN TELL YOU TO ALMOST THE INCH WHAT THE ELEVATION

5    IS JUST ABOUT ANYWHERE ON THAT PROPERTY IT WAS SO WELL MAPPED.

6    SO I THOUGHT WE COULD GET TWO THINGS OUT OF HIS MAPPING; ONE

7    IS THE -- TO THE EXTENT OF WHERE THAT FILL PERIMETER IS AND

8    ALSO THE DEPTH OF THAT BECAUSE THEY JUST GO TO THE TOP AND

9    COMPARE IT AGAINST THEIR BASE MAP.

10   **Q.**  WE HAVE BEEN TALKING ALMOST EXCLUSIVELY, MR. STEELE, ABOUT

11   THE -- WHAT WE ARE REFERRING TO AS THE SOUTHERN FILL AREA --

12   **A.**  YEAH.

13   **Q.**  -- ON EXHIBIT 3.

14       DID YOU, AFTER YOU DISCOVERED THE DUMPING THERE, DID YOU

15   EVER GO TO THE NORTHERN AREA ABOVE THE ALAMEDA COUNTY DRAINAGE

16   CHANNEL ON THAT DIAGRAM?

17   **A.**  YES.

18       IN THE COURSE OF THESE DISCUSSIONS WE WERE TOLD THAT THEY

19   ORIGINALLY STARTED THIS FILL OFF OF MOWRY, AND WE WENT UP AND

20   TALKED -- THERE IS A COUPLE -- IT IS HARD TO SEE ON THIS MAP

21   PARTICULARLY, BUT RIGHT IN THERE (INDICATING), ALL OF THIS

22   AREA HERE IS A COUPLE DIFFERENT AUTO DISMANTLERS, AND WE WERE

23   TOLD THAT HE WAS ORIGINALLY ACCESSING IT THROUGH THIS

24   GENTLEMAN'S PROPERTY HERE, WHERE HE WAS DRIVING THROUGH, AND

25   THEN IN THE BACK HERE WAS DRIVING OUT AND DUMPING THERE

```
 1    (INDICATING).  AND THEN THIS GATE LOCK, WHICH WE OWNED, HAD

 2    BEEN CUT AND HE WAS -- THEN STARTED COMING IN HERE BECAUSE IT

 3    WAS MUCH EASIER TO GET ACCESS TO THIS AREA.

 4              MR. SMOCK:  OBJECTION.  HEARSAY.

 5              THE COURT:  SUSTAINED.

 6    BY MR. KEARNEY:

 7    Q.  YOU INDICATED THAT AT SOME POINT YOU WENT OVER TO THE

 8    MOWRY SIDE; IS THAT RIGHT?

 9    A.  THAT'S CORRECT.

10    Q.  YOU SAID YOU NOTICED A LOCK HAD BEEN CUT THERE AS WELL?

11    A.  YES, A LOCK ON THIS GATE WAS CUT.

12    Q.  AND THE GATE YOU ARE REFERRING TO IS KIND OF IN THE UPPER

13    PORTION OF THE NORTHERN FILL AREA OF EXHIBIT 3 RIGHT ON MOWRY

14    AVENUE; IS THAT RIGHT?

15    A.  RIGHT THERE (INDICATING).

16    Q.  SO I JUST WANT TO ASK YOU ABOUT THE -- HOW DID THIS

17    NORTHERN FILL AREA LOOK TO YOU WHEN YOU WENT TO SEE IT?

18        WAS IT THE SAME DAY, SEPTEMBER 8TH, OR THE NEXT DAY,

19    SEPTEMBER 9TH, IF YOU REMEMBER?

20    A.  THE 9TH, DRIVING AROUND.

21    Q.  AND HOW DID IT LOOK TO YOU WHEN YOU -- WHEN YOU SAW IT ON

22    SEPTEMBER THE 9TH?

23    A.  MUCH LIKE THE SOUTHERN PORTION DID.  THE SOUTHERN PORTION

24    IS -- IT'S LIKE GROWTH WITHIN THAT -- ORGANIC GROWTH WITHIN

25    THE WETLAND AREAS.  HERE (INDICATING), THOUGH, WHERE YOU SEE
```

1    THE BLUE, BECAUSE IT'S SO WET SO OFTEN, THE VEGETATION THERE

2    IS VERY DISTINCT AND DIFFERENT, AND THERE WAS NONE BECAUSE IT

3    WAS COVERED IN DIRT.  AND THERE WAS DEFINITELY NO STANDING

4    WATER THERE, AND THE CHARACTER HAD CHANGED SIGNIFICANTLY.

5    **Q.**  AND YOU ARE TALKING ABOUT THE AREA YOU JUST POINTED WITH

6    YOUR LASER POINTER?

7    **A.**  RIGHT IN HERE (INDICATING).

8         **MR. KEARNEY:**  THE NORTHERN FILL AREA, YOUR HONOR,

9    JUST OFF THE PICK 'N PULL YARD ENTERING THE FIELD FROM THERE.

10         **THE WITNESS:**  UH-HUH.

11   **BY MR. KEARNEY:**

12   **Q.**  YOU SAID THAT THE STATE OF VEGETATION WAS DIFFERENT WHEN

13   YOU SAW IT ON SEPTEMBER THE 9TH, 2014?

14   **A.**  I AM SORRY?

15   **Q.**  THE STATE OF VEGETATION IN THAT AREA WAS DIFFERENT THAN

16   WHEN YOU HAD LAST SEEN IT?

17   **A.**  THAT'S RIGHT.  IT IS DISTINCTLY DIFFERENT BECAUSE IT IS

18   VERY WET CATTAIL-ISH KIND OF VEGETATION, AND ALL OF THAT WAS

19   UNDER DIRT, IF YOU WILL, IT HAD ALL BEEN MASHED DOWN.  WE

20   OFTEN DISK EVERY YEAR, AND SO THE VEGETATION GENERALLY GETS

21   KNOCKED DOWN, EXCEPT FOR WHEN IT'S REALLY WET LIKE THAT

22   PARTICULAR AREAS AND THE CATTAILS TAKE OVER.  BUT YOU DON'T

23   DISK IN THE CATTAILS AREAS PRIMARILY BECAUSE IT IS SO WET.  SO

24   WHEN THE CATTAILS ARE MISSING, IT IS VERY DISTINCT AND

25   DIFFERENT.

1   **Q.** ALL RIGHT.  SO YOU RESPOND SEPTEMBER 8TH.  YOU GO BACK TO

2   THE PROPERTY WITH MR. BOURSIER SEPTEMBER 9TH.  DID THE PLANNED

3   MEETING WITH MR. OLIVERO AND MR. LUCERO ACTUALLY TAKE PLACE ON

4   SEPTEMBER 9TH?

5   **A.** YES, IT DID.

6   **Q.** GENERALLY THAT DAY DID YOU -- WHEN DID YOU MEET

7   MR. BOURSIER ON THE PROPERTY?  WAS IT A.M., P.M.?

8       CAN YOU TELL US ANYTHING ABOUT THAT?

9   **A.** I BELIEVE I MET HIM IN THE MORNING.  I CAN'T -- IT HAS

10  BEEN A WHILE, BUT I MET HIM PROBABLY FOR AN HOUR OUT AT THE

11  SITE.

12  **Q.** DO YOU HAVE ANY RECOLLECTION, MR. STEELE, OF WHEN YOU HAD

13  THE MEETING WITH MR. LUCERO AND MR. OLIVERO?  WAS IT A.M.,

14  P.M.?

15  **A.** I THINK IT WAS LATE MORNING.

16  **Q.** THE -- IN PREPARATION FOR THAT MEETING WITH THOSE TWO

17  GENTLEMEN, DID YOU TAKE ANY SECURITY PRECAUTIONS?

18  **A.** YES.  WE HAVE A SECURITY COMPANY THAT WORKS FOR THE FIRM.

19  WE HAVE MANY PROPERTIES, SOMETIMES THEY ARE VACANT FOR A

20  PERIOD OF TIME SO WE TRY TO KEEP A SECURITY COMPANY ON TO KEEP

21  AN EYE ON OUR BUILDINGS, MAKE SURE THEY ARE SAFE.  THERE IS A

22  LOT OF BREAK-INS WITH EMPTY BUILDINGS AND STUFF, SO WE HAVE

23  ACCESS TO A SECURITY COMPANY.

24      WE ASKED -- WE CALLED -- WE EXPLAINED WHAT WAS GOING ON,

25  AND WE EXPLAINED THAT THEY WERE COMING TO OUR OFFICE AND WHAT

1    SHOULD WE DO.  AND THEY OFFERED TO TAIL THEM AND FOLLOW THEM

2    BACK TO WHERE THEY WERE GOING, GIVE US A REPORT WHERE THEY

3    LIVE.

4    **Q.**  AND WHERE WAS SECURITY THAT DAY BEFORE THE ARRIVAL OF

5    MR. LUCERO AND MR. OLIVERO?  WHERE ON YOUR PROPERTY WERE THEY?

6    **A.**  THEY WERE IN THE PARKING LOT.

7    **Q.**  OKAY.  SO DESCRIBE FOR US THE MEETING ITSELF.  WHERE DID

8    IT TAKE PLACE?

9    **A.**  IT WAS IN ONE OF THE CONFERENCE ROOMS IN MY OFFICE.

10   **Q.**  AND DID YOU SEE -- DID MR. OLIVERO AND MR. LUCERO WALK IN

11   TO ONE OF THE CONFERENCE ROOMS?

12   **A.**  YEAH, THEY CAME IN TO THE LOBBY AND I INVITED THEM TO THE

13   CONFERENCE ROOM.

14   **Q.**  THE GENTLEMAN -- DID YOU -- IS ONE OF THE GENTLEMEN WHO

15   WAS AT THAT MEETING, DO YOU RECOGNIZE HIM AS HERE IN COURT

16   TODAY?

17   **A.**  YES.  MR. LUCERO, SITTING WITH THE SWEATER ON.

18        **MR. KEARNEY:**  YOUR HONOR, MAY THE RECORD REFLECT THE

19   IDENTIFICATION OF THE DEFENDANT?

20        **MR. SMOCK:**  SO STIPULATED.

21        **THE COURT:**  IT WILL.

22   **BY MR. KEARNEY:**

23   **Q.**  DID YOU -- WHAT WAS YOUR DEMEANOR DURING THIS MEETING,

24   MR. STEELE?

25        YOU TOLD US THAT IT WAS -- YOU WERE A LITTLE AGITATED ON

STEELE – DIRECT / KEARNEY

1   THE PROPERTY THE DAY BEFORE.  WHAT WAS YOUR GENERAL DEMEANOR,

2   IF YOU CAN TELL US, DURING THIS MEETING?

3   **A.**  MUCH BETTER IN CONTROL.  I WAS INTERESTED IN HEARING HIS

4   STORY.

5   **Q.**  AND DID YOU DISCUSS WITH MR. LUCERO HOW HE CAME TO BE ON

6   THE PROPERTY?

7   **A.**  I DID.  I TOLD HIM I WAS A LITTLE SURPRISED BY HIS

8   ACTIVITY AND WOULD LIKE TO UNDERSTAND HOW HE CAME ABOUT

9   PUTTING DIRT ON OUR PROPERTY.  HE HAD SUGGESTED THAT MICHAEL

10  SOBRATO -- WHICH IS THE FIRST THING THAT SURPRISED ME BECAUSE

11  JOHN MICHAEL SOBRATO NEVER GOES BY MICHAEL, BUT HE SAID

12  MICHAEL SOBRATO HAD CALLED HIM AND SAID HE HAD PROPERTY

13  THAT -- THAT HE HAD THAT HE NEEDED SOME FILL ON.  AND THAT HE

14  MET HIM OUT ON THE SITE IN A WHITE PICKUP TRUCK AND PROCEEDED

15  TO TAKE HIM ON THE PROPERTY AND POINT TO WHERE HE NEEDED THE

16  FILL TO BE DROPPED.

17  **Q.**  SO AS YOU ARE LISTENING TO THIS, MR. STEELE, WHAT WAS

18  GOING THROUGH YOUR MIND AT THE TIME?

19  **A.**  NOT TO BE TOO HARSH BUT IT WAS A BIG LIE.  AND I KNEW JOHN

20  MICHAEL NEVER WENT BY MICHAEL.  I KNEW JOHN MICHAEL DOESN'T

21  HAVE A WHITE PICKUP, OR I HAD NEVER SEEN HIM DRIVE A WHITE

22  PICKUP TRUCK.

23      THIRD IS, AS SMART AS JOHN MICHAEL IS, THE AREA 4 PROPERTY

24  WHERE THE FILL IS WASN'T ORIGINALLY OWNED BY JOHN, AND IT WAS

25  OWNED MORE BY PEERY ARRILLAGA IN FUTURE ACQUISITIONS, I REALLY

1    DOUBTED THAT JOHN MICHAEL COULD POINT TO THE PROPERTY LET

2    ALONE HAVE THE COMBO TO THE GATE.

3        SO THE STORY JUST -- AT ALL LEVELS JUST DIDN'T FEEL

4    SINCERELY LEGITIMATE.

5    **Q.**  WHEN YOU SAY "THE COMBO TO THE GATE," WAS THERE A

6    COMBINATION ON THE LOCK THAT ALLOWED YOU TO ACCESS THE GATE?

7    **A.**  YES.

8    **Q.**  AND --

9    **A.**  FOUR DIGIT COMBO.

10   **Q.**  TO YOUR KNOWLEDGE, DID MR. SOBRATO KNOW THAT COMBINATION?

11   **A.**  I DON'T THINK HE WOULD.

12   **Q.**  OKAY.  OKAY.  DID YOU INQUIRE FURTHER ABOUT THIS

13   PERMISSION THAT MICHAEL SOBRATO HAD GIVEN MR. LUCERO?

14   **A.**  YES.  AS WE DISCUSSED EARLY IN THE TESTIMONY, THERE'S

15   QUITE A BIT OF PROCESS TO GETTING ANY KIND OF ENTITLEMENT OR

16   PERMIT.  AN AREA LIKE THIS THAT HAS SENSITIVE HABITAT AND SO

17   FORTH, YOU WOULD NEED A CEQA CLEARANCE, BUT YOU WOULD ALSO

18   NEED A GRADING PERMIT OR MASS GRADING PERMIT, OR SOME KIND OF

19   PERMIT TO ALLOW YOU TO GO OUT AND DO THIS KIND OF ACTIVITY.

20       SO I ASKED HIM, DID YOU HAVE -- WHO DID YOU HAVE

21   PERMISSION FROM?  HE TOLD ME, JOHN MICHAEL.  I SAID, WHERE DID

22   YOU GET YOUR PERMIT FROM?  BECAUSE I WASN'T AWARE THAT THE

23   CITY OF NEWARK HAD ISSUED ONE.

24       HE SAID, NO, I DON'T NEED ONE.  IT IS AGRICULTURAL

25   PROPERTY, WHICH ALSO DIDN'T ALIGN WITH MY UNDERSTANDING OF

1    PERMITTING IN THE CITY OF NEWARK.

2    **Q.**  SO DID YOU DISCUSS WHETHER THERE WAS ANYTHING IN WRITING

3    FROM MR. -- FROM MR. MICHAEL SOBRATO TO MR. LUCERO AUTHORIZING

4    THIS FILL?

5    **A.**  WELL, AT FIRST HE SAID IT WAS JUST -- I KIND OF CHASTISED

6    HIM AND SAID, SO HE JUST GAVE YOU VERBAL PERMISSION AND YOU

7    WENT OUT THERE AND JUST PUT DIRT OUT THERE WITHOUT A PERMIT OR

8    ANYTHING ELSE?

9        AND HE SAID, YEAH, I -- JUST A HANDSHAKE.

10       AND THEN SHORTLY AFTER HE LEFT THE OFFICE, I WENT BACK TO

11   MY OFFICE.  IT WAS ON THE THIRD FLOOR.  AND I OVERLOOK THE

12   PARKING LOT.  AND I SEE HIM AND KEVIN IN THE PARKING LOT.  AND

13   HE GETS HIS CELL PHONE AND HE CALLS ME.

14       THIS IS FUNNY, HE'S CALLING ME.  AND HE SAID, OH, I

15   FORGOT, I DO HAVE A --

16   **Q.**  CAN I STOP YOU JUST FOR ONE MOMENT.

17       SO YOU ARE WATCHING MR. LUCERO LEAVE FROM THE MEETING OUT

18   OF A WINDOW OF YOUR OFFICE.  IS THAT A FAIR STATEMENT?

19   **A.**  CORRECT.

20   **Q.**  WHAT FLOOR OF YOUR OFFICE BUILDING ARE YOU ON?

21   **A.**  I'M ON THE THIRD FLOOR OVERLOOKING THE PARKING LOT.

22   **Q.**  SO YOU'RE LOOKING DOWN ON THE PARKING LOT FROM THE THIRD

23   FLOOR AND YOU SEE MR. LUCERO.

24       IS HE WITH MR. OLIVERO AT THE TIME OR NOT?

25   **A.**  I BELIEVE THEY WERE TOGETHER, YEAH.

STEELE – DIRECT / KEARNEY

1  **Q.**  AND YOU PHYSICALLY SAW MR. LUCERO USE A PHONE?

2  **A.**  YEAH.  HE CALLED ME.

3  **Q.**  OKAY.  AND DID YOU HAVE A CONVERSATION WITH HIM THEN?

4  **A.**  I DID.

5     HE SUGGESTED HE -- HE FORGOT WHEN WE WERE MEETING, BUT

6  JOHN -- EXCUSE ME, MICHAEL HAD GIVEN HIM A HANDWRITTEN

7  PERMISSION SLIP.

8     AND I ASKED FOR A COPY OF IT.  AND HE SAID HE WOULD FAX ME

9  ONE WHEN HE GOT BACK TO HIS HOUSE.

10 **Q.**  DID THAT HAPPEN, SIR?  DID HE EVENTUALLY FAX YOU A NOTE?

11 **A.**  I BELIEVE IT WAS THE NEXT DAY THAT I GOT A COPY OF IT.

12     **MR. KEARNEY:**  MAY WE PULL UP EXHIBIT 35, WHICH HAS

13 PREVIOUSLY BEEN ADMITTED INTO EVIDENCE YOUR HONOR?

14     **THE COURT:**  YOU MAY.

15          (DISPLAYED ON SCREEN.)

16 BY MR. KEARNEY:

17 **Q.**  IS THIS THE NOTE, MR. STEELE, THAT YOU RECEIVED FROM

18 MR. LUCERO?

19 **A.**  YES, IT IS.

20 **Q.**  ALL RIGHT.  AND THERE'S A FAX COVER -- WAS THERE A FAX

21 COVER TO THE NOTE, SIR?

22 **A.**  I BELIEVE SO.

23     **MR. KEARNEY:**  AGENT SU, CAN WE DRAW THAT UP?

24 BY MR. KEARNEY:

25 **Q.**  THIS COVER, ATTENTION TIM STEELE, ESTIMATED LOAD COUNT 680

1    LOADS, CLEAN SOIL.  DO YOU REMEMBER THAT BEING THE FAX COVER

2    SHEET THAT WAS --

3    **A.**  YEAH, I BELIEVE SO.  HE -- IN OUR CONVERSATION I HAD ASKED

4    HIM FOR WHAT AMOUNT OF SOIL HE PUT ON THE PROPERTY, WHERE IT

5    WAS COMING FROM.  NORMALLY WHEN AN OFF-SITE IS SENDING DIRT

6    AWAY FROM THAT SITE, THEY HAVE SOME DOCUMENTATION THAT GOES

7    WITH THAT LOAD OF DIRT SO YOU KNOW IT IS CLEAN AND WHAT THE

8    SOURCE SITE IS.

9    **Q.**  ALL RIGHT.

10   **A.**  AND I HAD ASKED HIM FOR ANY OF THAT KIND OF DOCUMENTATION,

11   AND SO THIS WAS HIS INITIAL RESPONSE TO THAT.

12   **Q.**  OKAY.  DID YOU ALSO HAVE A DISCUSSION WITH HIM ABOUT PULL

13   TAGS?

14   **A.**  THAT'S THE DOCUMENTATION -- TYPICALLY THERE IS SOME FORM

15   OF PULL TAG OR DOCUMENT THAT GOES WITH A LOAD, AND THEN THE

16   RECEIVING SITE GETS A COPY OF WHAT THAT IS.

17   **Q.**  WERE YOU INTERESTED YOURSELF OR CONCERNED TO LOOK AT THE

18   PULL TAGS FOR THIS DUMPING?

19   **A.**  YEAH.  FOR A COUPLE OF DIFFERENT REASONS.

20       ONE, I WAS TRYING TO GET A SENSE OF TOTAL VOLUME OF DIRT.

21   BUT SECOND IS, THEY SHOULD BE INDICATING WHERE THEY ARE COMING

22   FROM AND WHAT CONDITION THE PROPERTY IS.  TYPICALLY A

23   RECEIVING SITE REQUIRES HAZMAT VERIFICATION THAT IT DOESN'T

24   HAVE PETROLEUM PRODUCTS, OR THOSE KINDS OF THINGS.  I WAS

25   LOOKING FOR ANY KIND OF DOCUMENTATION FROM HIM TO GET A SENSE

1    OF OTHERS.

2         ALSO, IF IT'S A SOURCE SITE THAT IS PUSHING ALL THE

3    SITE -- DIRT TO MY SITE, THERE MIGHT BE AN AVENUE OF LIABILITY

4    THAT WENT WITH IT THAT I MIGHT PURSUE TO HELP ME CLEAN IT UP.

5    **Q.**  ALL RIGHT.

6         SO WHEN YOU INQUIRED OF MR. LUCERO ABOUT PULL TAGS FOR THE

7    DUMPING, WHAT DID HE SAY, SIR?

8    **A.**  HE SAID HE WOULD GET ME THE COPIES OF HIS PULL TAGS.

9    **Q.**  AND DID THAT EVENTUALLY HAPPEN?  DID HE PRODUCE PULL TAGS

10   FOR THE DUMPING?

11   **A.**  I GOT -- HE BROUGHT SOME OVER IN A PAPER BAG AND IT DIDN'T

12   MEET THE VOLUME OF WHAT HE SUGGESTED HE HAD.  BUT THEY WERE

13   ALSO -- THEY DIDN'T APPEAR TO HAVE ALL OF THE APPROPRIATE

14   DOCUMENTATION WITH 'EM, TOO.  SO I THINK I QUESTIONED HIM ON

15   IT, AND IT WAS SUGGESTED I WOULD BE GETTING MORE BUT I NEVER

16   DID.

17   **Q.**  THE PULL TAGS THAT YOU RECEIVED FROM HIM, DID YOU

18   EVENTUALLY PROVIDE THOSE TO LAW ENFORCEMENT DURING THIS

19   INVESTIGATION?

20   **A.**  I DID.  I MADE A COPY FOR THEM AND GAVE THEM A FULL SET.

21        **MR. KEARNEY:**  I WOULD LIKE TO APPROACH YOU WITH

22   EXHIBIT 38, IF I MAY?

23                   (BINDER HANDED TO WITNESS.)

24   **BY MR. KEARNEY:**

25   **Q.**  MR. STEELE, PLEASE TAKE A LOOK -- THIS IS --

1   **A.**  YES.

2   **Q.**  -- SEVERAL HUNDRED DOCUMENTS THERE AS PART OF EXHIBIT 38.

3   DO YOU RECOGNIZE THOSE AS COPIES OF THE PULL TAGS PROVIDED TO

4   YOU BY MR. LUCERO?

5   **A.**  YES.

6   **Q.**  HOW DO YOU KNOW, SIR?

7   **A.**  I RECOGNIZE THE HANDWRITING ON THEM AND THEN IT HAS OUR

8   ADDRESS ON THEM, 7210 STEVENSON.

9   **Q.**  AND DID YOU EVER ACTUALLY COUNT THE NUMBER OF PULL TAGS

10  YOU RECEIVED FROM MR. LUCERO THAT DAY?

11  **A.**  MY ASSOCIATE DID.  I DON'T RECALL THE EXACT NUMBER,

12  THOUGH.

13  **Q.**  MAYBE YOU CAN, FOR THE RECORD, JUST GIVE US A SENSE OF HOW

14  MANY THERE ARE?  ARE THEY 10, 20, 100, 200, 500?

15  **A.**  THERE'S PROBABLY 400 OR 500 OF THEM IN HERE.

16          **MR. KEARNEY:**  ALL RIGHT.  YOUR HONOR, I WONDER IF WE

17  CAN PUBLISH THE FIRST PAGE OF EXHIBIT 38?

18          **THE CLERK:**  I DON'T HAVE 38 ADMITTED.

19          **THE COURT:**  IS IT BEING OFFERED FOR ADMISSION?

20          **MR. KEARNEY:**  I'M SORRY, YES, I WOULD MOVE TO ADMIT

21  38 INTO EVIDENCE.

22          **THE COURT:**  ANY OBJECTION?

23          **MR. SMOCK:**  YOUR HONOR, WE HAVE NO OBJECTION EXCEPT

24  THAT BETWEEN PAGES 234 AND 237, IT MAY BE THAT THOSE ARE IN

25  ERROR.

1    THERE'S A FAIR AMOUNT OF HEARSAY.  THEY DON'T APPEAR TO

2    ACTUALLY BE PULL TAGS.

3         **MR. KEARNEY:**  WE CAN MEET AND CONFER AND REMOVE THAT

4    DOCUMENT FROM THE EXHIBIT, YOUR HONOR, AT A BREAK POTENTIALLY.

5         **THE COURT:**  THAT SOUNDS FINE.  WHY DON'T WE ADMIT

6    EXHIBIT 38 SUBJECT TO THAT CORRECTION.  WE NEED TO MAKE SURE

7    IT GETS MADE.

8         (GOVERNMENT'S EXHIBIT 38 RECEIVED IN EVIDENCE)

9         **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

10   **BY MR. KEARNEY:**

11   **Q.**  SO THIS IS THE -- AN EXAMPLE OF ONE OF THE DOCUMENTS GIVEN

12   TO YOU BY MR. LUCERO AFTER YOUR MEETING ON SEPTEMBER THE 9TH,

13   2014; IS THAT RIGHT?

14   **A.**  IT LOOKS LIKE SO, YES.

15   **Q.**  MR. STEELE, AFTER THE DISCOVERY OF THIS DUMPING ON THE

16   PROPERTY, DID YOU TAKE ANY STEPS TO CHANGE THE SECURITY OF THE

17   NEWARK AREA 4 PROPERTY?

18   **A.**  YES.  USING THE SAME SECURITY BY DESIGN, WHICH IS OUR

19   SECURITY CONSULTANT, WE HAVE SINCE INSTALLED A WIRELESS MOTION

20   DETECTING CAMERA THAT WHEN ACTIVATED WILL SEND A NOTIFICATION

21   TO THEM AS WELL AS A PICTURE OR TWO WITH A SHORT VIDEO OF WHAT

22   ACTIVITY IS GOING ON IN FRONT OF THE GATE.

23   **Q.**  AND HOW SOON AFTER -- WHERE WAS THAT DEVICE INSTALLED,

24   SIR?  WAS IT ON STEVENSON, ON MOWRY, BOTH?

25   **A.**  THAT ONE IS ON STEVENSON.

1   **Q.**  HOW LONG AFTER THE DISCOVERY OF THE DUMPING WAS THE DEVICE

2   ACTUALLY INSTALLED?

3   **A.**  IT PROBABLY WAS A FEW WEEKS AFTER BY THE TIME WE GOT IT

4   ACTIVATED, LOOKED AT OUR OPTIONS AND CHOSE ONE.

5   **Q.**  ARE YOU AWARE OF ANY MORE DUMPING OR ANY OTHER DUMPING

6   THAT OCCURRED AFTER -- OR UNPERMITTED DUMPING, I SHOULD SAY,

7   AFTER SEPTEMBER 8TH, 2014 ON THE PROPERTY?

8   **A.**  NOT THAT I AM AWARE OF, NO, SIR.

9   **Q.**  MR. STEELE, I WANT TO TALK TO YOU, IF I MAY, ABOUT THE

10  BASIC PHYSICAL CHARACTERISTICS OF THE SITE FOR A MINUTE

11  INCLUDING ITS HYDROLOGY.

12          **MR. KEARNEY:**  YOUR HONOR, THIS IS -- WE'RE ENTERING A

13  NEW BLOCK HERE.  WE ARE HAPPY TO KEEP GOING.  DOES THE COURT

14  WANT TO TAKE A MORNING BREAK?

15          **THE COURT:**  HOW MUCH LONGER DO YOU ANTICIPATE IT WILL

16  GO?

17          **MR. KEARNEY:**  WITH THIS WITNESS PROBABLY HALF AN

18  HOUR.

19          **THE COURT:**  ALL RIGHT.  WHY DON'T WE GO TO 10:00 AND

20  THEN TAKE OUR BREAK.

21          **MR. KEARNEY:**  THANK YOU.

22  **BY MR. KEARNEY:**

23  **Q.**  SIR, YOU SAID THAT FROM THE EARLY 2000'S, WHATEVER IT WAS,

24  YOU HAD BEEN ON THE NEWARK AREA 4 PROPERTY HUNDREDS OF TIMES;

25  IS THAT RIGHT?

1    **A.**  CORRECT.

2    **Q.**  IS IT FAIR TO SAY THAT ONE OF YOUR JOBS OVER THE TIME

3    PERIOD WAS TRYING TO KEEP THE LAND DRY?

4    **A.**  YES.

5    **Q.**  PLEASE TELL US ABOUT THAT.

6    **A.**  THE LAND DRAINS, IT HAS NATURAL FLOW OF WATER COMING ON,

7    EITHER FRESH WATER OR SALT WATER, FROM DIFFERENT SOURCES AS

8    WELL AS THE BASE OF THE LAND IS MORE OR LESS AT MEAN SEA

9    LEVEL.  THERE IS A LEVEE ALONG THE WESTERN EDGE AND THEN THE

10   SLOUGH TO THE WEST OF THAT, ABUTTING THAT IS A -- TIDAL SO IT

11   HAS DIFFERENT WATER DYNAMICS DEPENDING ON THE TIDES AS WELL.

12   **Q.**  LET ME STOP YOU THERE FOR A MOMENT, IF I MAY.

13          **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO DRAW BACK

14   UP NOW EXHIBIT 3, IF I COULD?

15          **THE CLERK:**  I AM SORRY, EXHIBIT 3?

16          **MR. KEARNEY:**  EXHIBIT 3, YES.  THANK YOU.

17                  (DISPLAYED ON SCREEN.)

18   **BY MR. KEARNEY:**

19   **Q.**  YOU SAID THAT THERE ARE PORTIONS OF THE PROPERTY THAT ARE

20   AT MEAN SEA LEVEL, MR. STEELE; IS THAT CORRECT?

21   **A.**  YES.  GENERALLY THE BASIN AREA IN HERE IS MORE OR LESS

22   ANYWHERE FROM MEAN SEA LEVEL TO MAYBE 6 OR 8 FEET ABOVE, AND

23   THE HIGHEST POINT BEING KIND OF UP IN THIS CORNER, THE LOWER

24   POINTS BEING HERE, AND THEN THE ABSOLUTE LOWEST IS RIGHT IN

25   HERE OBVIOUSLY WHERE THE WATER IS (INDICATING).

1    **Q.**  YOU -- WE'LL START LAST FIRST.  YOU SAID THE PLACE THAT

2    WAS THE ABSOLUTE LOWEST WAS THE PONDED AREA --

3    **A.**  IT IS KIND OF THIS BASIN RIGHT HERE.

4         **MR. SMOCK:**  I WILL OBJECT ON FOUNDATION GROUNDS.

5         **THE COURT:**  OVERRULED.

6    **BY MR. KEARNEY:**

7    **Q.**  THE -- SO THE -- BASED ON YOUR EXPERIENCE, MR. STEELE, THE

8    LOWEST AREA, I THINK YOU CIRCLED THE DUCK POND AREA; IS THAT

9    RIGHT?

10   **A.**  RIGHT.  THIS POND AREA HERE, AND THE DUCK POND WAS RIGHT

11   IN THIS AREA, CORNER OF IT.

12        **MR. KEARNEY:**  ALL RIGHT.  YOUR HONOR, HE JUST WAS

13   CIRCLING THE BLUE AREA ON THE APPROXIMATE LEFT SIDE OF THE

14   EXHIBIT.

15   **BY MR. KEARNEY:**

16   **Q.**  YOU SAID THAT THERE WAS A HIGHER ELEVATION ELSEWHERE ON

17   THE PROPERTY; IS THAT RIGHT?

18   **A.**  YEAH, THE HIGHEST ELEVATION IS RIGHT IN THIS AREA

19   (INDICATING), WHICH IS ABOUT 8 FEET ABOVE MEAN SEA LEVEL.

20   **Q.**  AND YOU JUST CIRCLED A -- KIND OF A YELLOW AREA ON THIS

21   EXHIBIT UP BY THE RAILROAD TRACKS.  IS THAT A FAIR STATEMENT?

22   **A.**  CORRECT.

23   **Q.**  WHAT IS THE GENERAL SLOPE, MR. STEELE, OF THIS LAND?

24   WHERE DOES IT GO --

25   **A.**  THIS WHOLE -- THE TOPOGRAPHY OF THIS PART OF THE BAY AREA

1    IS THE -- THERE IS AN EASTERN FOOTHILLS RIGHT IN HERE

2    (INDICATING), AND FROM THERE EVERYTHING FLOWS TOWARDS THE BAY.

3    THIS IS THE BAY ESSENTIALLY BECAUSE IT IS A TIDAL SLOUGH RIGHT

4    THROUGH HERE.

5    **Q.**  YOU'RE TALKING ABOUT MOWRY SLOUGH ON THE LEFT SIDE?

6    **A.**  THAT IS THE MOWRY SLOUGH AND THEN RIGHT ABOUT HERE IT GOES

7    ALL THE WAY OUT TO THE BAY (INDICATING).

8    **Q.**  THE PROPERTY SLOPES DOWN TO MOWRY SLOUGH.  IS THAT A FAIR

9    STATEMENT?

10   **A.**  YEAH.

11   **Q.**  THE PONDED AREA IN BLUE BELOW THE DRAINAGE CHANNEL ON

12   EXHIBIT 3, IS THAT A -- HOW OFTEN IS THAT POND THERE, SIR?

13   **A.**  THERE IS WATER THERE ALL YEAR LONG BUT IT CHANGES ITS

14   CHARACTER DEPENDING ON THE TIME OF YEAR.  INTERESTING ENOUGH

15   IS, THERE IS MORE FRESH WATER IN THE SUMMER PARTIALLY BECAUSE

16   OF RECHARGING THAT THE WATER DISTRICT DOES.

17            **MR. SMOCK:**  OBJECTION.  FOUNDATION.

18            **THE COURT:**  SUSTAINED.  WHY DON'T WE LAY THE

19   FOUNDATION FOR THE OBSERVATIONS.

20            **MR. KEARNEY:**  ALL RIGHT.

21   **BY MR. KEARNEY:**

22   **Q.**  SO YOU ARE SAYING THAT -- ARE WE TALKING NOW ABOUT THE

23   DUCK POND AREA IN THE CENTER OF EXHIBIT 3?

24   **A.**  NO, I'M JUST TALKING IN GENERAL HOW EVERYTHING FLOWS FROM

25   HERE DOWN TOWARDS THE BAY (INDICATING).

1   **Q.**  AND YOU SAID THERE'S MORE FRESH WATER DURING THE SUMMER.

2   DID I GET THAT CORRECT?

3   **A.**  CORRECT.

4   **Q.**  PLEASE TELL US WHAT YOU BASE THAT ON, SIR.

5   **A.**  H.T. HARVEY IS OUR BIOLOGIST --

6           **MR. SMOCK:**  OBJECTION.  HEARSAY.

7           **THE COURT:**  SUSTAINED.

8           **MR. KEARNEY:**  ALL RIGHT.

9           **THE WITNESS:**  H.T. HARVEY IS OUR BIOLOGIST --

10          **MR. KEARNEY:**  MR. STEELE, HOLD ON.  THERE IS A

11  SUSTAINED OBJECTION.

12  **BY MR. KEARNEY:**

13  **Q.**  LET ME ASK YOU THIS.  THE PONDED AREA THAT WE HAVE BEEN

14  TALKING ABOUT IS -- YOU SAID IT'S THERE ALL YEAR LONG; IS THAT

15  RIGHT?

16  **A.**  CORRECT.

17  **Q.**  YOU INDICATED THAT PART OF YOUR -- ONE OF YOUR JOBS IS TO

18  KEEP THE LAND DRY.  IS THAT A FAIR STATEMENT?

19  **A.**  CORRECT.

20  **Q.**  HOW DOES WATER, IN YOUR EXPERIENCE, GET OFF OF THIS

21  PROPERTY?

22  **A.**  WATER GENERALLY FLOWS -- RIGHT AT THE BASE OF THIS LEVEE

23  IS A DITCH, THAT FLOWS ALL THE WAY OVER TO HERE (INDICATING),

24  AND RIGHT IN THIS AREA WE HAVE A DETENTION AREA THAT COLLECTS

25  ALL OF THE WATER OFF THE SITE, IT ALL FLOWS DOWN TO THAT POINT

1    (INDICATING).

2       AND THEN THERE IS A FLOATING PUMP THAT SITS IN THERE THAT

3    HAS -- MUCH LIKE A TOILET, IT HAS A FLOAT.  WHEN THE WATER

4    GETS TO A CERTAIN ELEVATION, THAT PUMP TURNS ON, AND IT HAS A

5    DIRECT CONNECTION INTO THE LEVEE AND TAKES THE FRESH WATER OFF

6    OUR SITE AND PUTS IT INTO THE LEVEE.

7          **MR. KEARNEY:**  AND, YOUR HONOR, THE WITNESS HAS

8    INDICATED THE PUMP BEING AT THE EXTREME BOTTOM EDGE OF

9    EXHIBIT 3 AT KIND OF THE CONFLUENCE OF SOME WATERS DOWN THERE.

10   **BY MR. KEARNEY:**

11   **Q.**  SO THE SOUTHERN PART OF THIS PROPERTY DRAINS TO THAT

12   POINT, SIR.  IS THAT A FAIR STATEMENT?

13   **A.**  CORRECT.

14   **Q.**  AND HOW IS THAT PUMP CHARGED?  IS IT A GASOLINE POWER?  IS

15   IT ELECTRICAL POWER?  HOW IS THAT ENERGIZED?

16   **A.**  PG&E HAS A POWER POLE RIGHT OUT ON THE TOP OF THE LEVEE

17   THERE THAT ACTIVATES THE -- OR ENERGIZES THE PUMP.

18   **Q.**  IS THAT ELECTRICAL OR GAS, SIR?

19   **A.**  IT'S A FULL GAS -- EXCUSE ME, FUEL ELECTRICAL.

20   **Q.**  DO YOU GET BILLS FROM PG&E FOR ELECTRICITY TO RUN THAT?

21   **A.**  IT IS METERED, IT HAS A METER ON IT, AND THE METER GIVES

22   US -- THROUGH PG&E WE GET A MONTHLY BILL FOR POWER

23   CONSUMPTION.

24   **Q.**  HOW OFTEN DOES THE PUMP GO ON, SIR, IN YOUR EXPERIENCE

25   OVER THE YEARS?

STEELE – DIRECT / KEARNEY

1   **A.**  IT HAS GONE ON EVERY –– MORE IN THE WINTER WHEN IT IS

2   RAINING BUT IT IS GOING ON 365 DAYS A YEAR PRACTICALLY WITH

3   SOME WATER THAT IT'S COLLECTING.

4   **Q.**  SO THAT'S THE SOUTHERN PART OF THE PROPERTY.  I WANT TO

5   TALK TO YOU NOW ABOUT THE NORTHERN PART OF THE PROPERTY, IF WE

6   MAY.  HOW DOES WATER DRAIN FROM THE NORTHERN PART OF THE

7   PROPERTY?

8   **A.**  THIS WHOLE AREA FLOWS DOWN, THERE'S A LITTLE PINCH POINT

9   RIGHT HERE (INDICATING) AND THEN IT GOES THROUGH THE PINCH

10  POINT AND COLLECTS RIGHT THERE (INDICATING), AND AT THE LEVEE

11  RIGHT HERE IS WHAT THEY CALL A DUCKBILL VALVE.  IT'S JUST A

12  CULVERT THROUGH THE WALL OF THE LEVEE.  AND ON THE LEVEE SIDE,

13  THE WATER SIDE, MUCH LIKE A PARTY FAVOR THAT BLOWS OUT, YOU

14  KNOW, WHEN YOU ARE BLOWING AIR, AND THEN ROLLS BACK UP, IT

15  WORKS THE SAME WAY.

16      WHEN THE LEVEE IS DOWN, THE TIDAL IS DOWN, AND THE WATER

17  PRESSURE IS GONE FROM THE LEVEE SIDE, THE DUCKBILL OPENS UP

18  AND ALLOWS THE WATER TO FLOW OFF OF OUR PROPERTY.  AND THEN

19  THE –– WHEN THE LEVEE RISES WITH THE TIDE, THE DUCKBILL ROLLS

20  BACK UP AND IT IS SUPPOSED TO SEAL, KEEPING THE LEVEE WATER ––

21  THE SLOUGH WATER FROM COMING INTO OUR PROPERTY.

22  **Q.**  WE ARE GOING TO TALK ABOUT THAT IN A MOMENT.  BUT I JUST

23  WANT TO ASK YOU AS A BASE LEVEL, HAVE YOU EVER ACTUALLY SEEN

24  THIS PROCESS WORK?  HAVE YOU SEEN WATER DRAINING FROM THE

25  NORTHERN PART OF YOUR LAND OUT THROUGH THAT DUCKBILL INTO THE

1  SLOUGH?

2  **A.**  YES.

3  **Q.**  HOW MANY TIMES, SIR?

4  **A.**  I'VE BEEN WORKING ON THIS FOR TEN YEARS.  I'VE PROBABLY

5  SEEN THAT AT LEAST A DOZEN TIMES A YEAR.

6  **Q.**  ALL RIGHT.

7  **A.**  AS PART OF THE TIME WE GO OUT TO LOOK AT THE MAINTENANCE

8  OF THE PROPERTY, DEPENDING ON THE TIDE, YOU KNOW, IT'S EXPOSED

9  WHEN YOU SEE WHAT KIND OF CONDITION IT'S IN.

10  **Q.**  SO IF YOU -- IF YOU HAD SEEN THAT DUCKBILL GETTING WATER

11  OFF THE NORTHERN SECTION OF THE PROPERTY A DOZEN TIMES A YEAR,

12  TIMES HOW MANY YEARS WOULD YOU SAY?

13  **A.**  AT LEAST TEN YEARS.

14  **Q.**  SO WE ARE TALKING APPROXIMATELY 120 TIMES YOU'VE SEEN THAT

15  OPERATE?

16  **A.**  YES.

17  **Q.**  IS THAT THE -- TO YOUR KNOWLEDGE, SIR, IS THAT THE PURPOSE

18  OF THAT CULVERT -- BY THE WAY, YOU MENTIONED THE DUCKBILL

19  FLANGE OR -- I DON'T WANT TO SAY PARTY FAVOR, BUT THE

20  EXTENDING PART OF THE DUCKBILL IS ON THE END OF THE CULVERT

21  YOU TALKED ABOUT; IS THAT RIGHT?

22  **A.**  CORRECT.

23  **Q.**  AND A CULVERT IS JUST A PIPE; IS THAT CORRECT?

24  **A.**  THAT'S ALL.

25  **Q.**  AND THE PIPE RUNS THROUGH THE LEVEE FROM YOUR LAND TOWARDS

1  THE SLOUGH?

2  **A.**  CORRECT.

3  **Q.**  WHAT IS THE PURPOSE OF THAT CULVERT?  IS IT A -- WHICH

4  DIRECTION IS IT BUILT TO ALLOW FLUID TO RUN?

5  **A.**  IT'S DESIGNED TO DRAIN WATER OFF OF OUR SITE INTO THE

6  LEVEE.

7  **Q.**  OKAY.  AND --

8  **A.**  OR SLOUGH.

9  **Q.**  AND YOU HAVE SEEN THAT HAPPEN 120 TIMES OR SO?  DOES IT

10  ALWAYS WORK?

11  **A.**  NO.  THE BILL DOESN'T NECESSARILY SEAL VERY WELL.  WE'VE

12  BROUGHT THIS TO THE ATTENTION OF ALAMEDA COUNTY FLOOD CONTROL

13  DISTRICT MULTIPLE TIMES, WHICH BY IT NOT SEALING WHEN THE

14  LEVEE OR THE SLOUGH TIDE RISES, IT DOESN'T OFTEN KEEP THE

15  WATER FROM FLOWING BACK ON TO OUR PROPERTY.

16  **Q.**  SO THE -- YOU HAVE TWO BODIES OF WATER, YOU HAVE THE

17  SLOUGH, WHICH GOES UP AND DOWN TIDALLY, AND THE WATER ON YOUR

18  LAND.  WHEN THE SLOUGH TIDE GOES DOWN, THE WATER FROM YOUR

19  LAND IS SUPPOSED TO GO OUT; IS THAT RIGHT?

20  **A.**  CORRECT.

21  **Q.**  WHEN THE TIDE IN THE SLOUGH GOES UP, THAT FLANGE IS

22  SUPPOSED TO PREVENT THAT WATER FROM GOING ON YOUR LAND?

23  **A.**  CORRECT.

24  **Q.**  THAT IS HOW IT IS DESIGNED?

25  **A.**  CORRECT.

1    **Q.**  DOES IT ALWAYS WORK THAT WAY?

2    **A.**  NO.

3    **Q.**  TELL US ABOUT THAT.

4    **A.**  THE -- I DON'T BELIEVE IT IS MAINTAINED PROPERLY BY THE

5    ALAMEDA COUNTY FLOOD CONTROL DISTRICT, WHO OWNS IT AND IS

6    RESPONSIBLE FOR IT.  IT GETS SILT IN IT AND THE RUBBER GETS

7    OLD AND NOT AS FLEXIBLE AS IT WAS WHEN IT WAS ORIGINALLY

8    DESIGNED, AND BY THOSE TWO IT IS NOT ALLOWING IT TO SEAL BACK

9    UP WITH THE WATER PRESSURE WHEN THE LEVEE OR THE SLOUGH RISES.

10   **Q.**  HAVE YOU SEEN SLOUGH WATER, TIDAL WATER, GO THROUGH --

11   BACKWARDS THROUGH THE CULVERT ON TO YOUR LAND?

12   **A.**  ABSOLUTELY.

13   **Q.**  HOW MANY TIMES HAVE YOU SEEN THAT?

14   **A.**  MANY TIMES.

15   **Q.**  AND HOW DO YOU FEEL ABOUT THAT?

16           **MR. SMOCK:**  OBJECTION.  RELEVANCE.

17           **THE COURT:**  SUSTAINED.

18   **BY MR. KEARNEY:**

19   **Q.**  ONE OF THE THINGS YOU TOLD US YOU ARE TRYING TO DO IS TO

20   KEEP YOUR LAND DRY; IS THAT RIGHT?

21   **A.**  THAT'S RIGHT.  THAT WATER -- WATER COMING BACK ON TO OUR

22   PROPERTY CAN EXASPERATE MULTIPLE HABITAT ISSUES.

23   **Q.**  PLEASE EXPLAIN THAT FOR US.

24   **A.**  IN DEFINING WETLANDS, HOW MUCH MOISTURE SOIL HOLDS FOR A

25   PERIOD OF TIME --

1           **MR. SMOCK:**  OBJECTION.  THIS IS GETTING INTO OPINION

2    TESTIMONY AND BEYOND ANY ESTABLISHED EXPERTISE.

3           **MR. KEARNEY:**  WELL, HE DOES HAVE A BASE LEVEL

4    KNOWLEDGE OF THIS PROPERTY, YOUR HONOR, FROM A DECADE OF

5    EXPERIENCE, SO I THINK THIS IS WITHIN HIS AREA OF KNOWLEDGE.

6           **THE COURT:**  OVERRULED.

7           **THE WITNESS:**  SO THE AMOUNT OF WATER THAT A SOIL

8    HOLDS FOR A PERIOD OF TIME IS ONE OF THE DELINEATION FACTORS

9    OF WETLANDS.  BUT ALSO --

10           **MR. SMOCK:**  OBJECTION.  FOUNDATION.

11           **THE WITNESS:**  -- THE MOISTURE AND TYPES --

12           **THE COURT:**  HOLD ON.  WHAT IS THE OBJECTION?

13           **MR. SMOCK:**  FOUNDATION.  LACK OF EXPERTISE ASKING THE

14    DELINEATION OF WETLANDS.  AND HEARSAY.

15           **THE COURT:**  ALL RIGHT.  WE'VE HIT 9:55, SO, LADIES

16    AND GENTLEMEN, LET'S GO AHEAD AND TAKE OUR MORNING RECESS.

17    WE'LL BE BACK HERE AT 10:10.

18        AND JUST CONTINUE TO REMEMBER ALL OF YOUR ADMONITIONS.  NO

19    DISCUSSION ABOUT THE CASE WITH ANYONE IN ANY FORMAT, ORAL, OR

20    WRITTEN, OR ELECTRONIC.  NO MEDIA OR OTHER REPORTS ABOUT THE

21    CASE.  NO RESEARCH ABOUT ANY OF THE ISSUES INVOLVED IN THE

22    CASE OR THE PARTIES.  NO INVESTIGATION OF ANY SORT ABOUT THE

23    ISSUES INVOLVED IN THE CASE.  NO CONTACT WITH THE PARTIES OR

24    THE ATTORNEYS.

25        AND DO REMEMBER TO CONTINUE TO KEEP AN OPEN MIND

1    THROUGHOUT THE PRESENTATION OF THE EVIDENCE UNTIL YOU'VE

2    GOTTEN THE CASE, YOU'VE HEARD MY INSTRUCTIONS, AND THE

3    ARGUMENTS OF COUNSEL, AND YOU'VE HEARD YOUR -- THE VIEWS OF

4    YOUR FELLOW JURORS.

5         SO WITH THAT, LET'S TAKE OUR RECESS, AND WE WILL SEE YOU

6    BACK AT 10:10.

7              **MR. KEARNEY:**  YOUR HONOR, IF I MAY BE HEARD FOR JUST

8    ONE MOMENT OUTSIDE THE PRESENCE OF THE JURY?

9         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

10             **THE COURT:**  SO, MR. STEELE, YOU CAN GO AHEAD AND STEP

11   DOWN AND STEP OUT OF THE COURTROOM.

12             **THE CLERK:**  YOU MAY BE SEATED.

13             **MR. KEARNEY:**  YOUR HONOR, I JUST WANTED TO BRING

14   SOMETHING TO THE COURT'S ATTENTION, AN OBSERVATION I HAD

15   DURING THE DIRECT TESTIMONY OF MR. STEELE.

16        THE SECOND JUROR FROM THE LEFT IN THE BACK ROW, I THINK IT

17   IS MR. RALLY; IS THAT CORRECT?

18             **THE COURT:**  IT IS MR. RALLY.

19             **MR. KEARNEY:**  HE APPEARS TO BE CHECKING HIS PHONE AND

20   REVIEWING TEXT OR SOMETHING.  I DON'T KNOW IF ANYONE ELSE HAS

21   SEEN THIS.  IT'S VERY NOTICEABLE TO ME.  HE HAS GOT HIS RIGHT

22   ARM EXTENDED BEHIND THE CHAIR OF THE JUROR TO HIS RIGHT, AND

23   HE WAS LOOKING AT WHAT I PRESUMED TO BE A PHONE.

24             **THE COURT:**  ALTHOUGH IT WAS -- WE WERE KEEPING AN EYE

25   ON HIM AS WELL.  IT LOOKS LIKE HIS NOTE PAD IS BACK THERE,

1    TOO.

2           **MR. KEARNEY:**  THAT'S FINE.  THAT'S GREAT, SIR.  I

3    JUST WANTED TO BRING IT TO THE COURT'S ATTENTION --

4           **THE COURT:**  DID YOU ACTUALLY SEE A PHONE?  I HAVEN'T

5    SEEN A PHONE IN HIS HAND.

6           **MR. KEARNEY:**  I JUST SAW HIM LOOKING AT SOMETHING

7    HELD IN ONE HAND.

8           **THE CLERK:**  HE'S A BIG GUY, SO WE THINK HE IS TAKING

9    NOTES BEHIND HIM BECAUSE HE COMES OUT WITH HIS PAD.  HIS PAD

10   IS NOT BEING PLACED ON THE FLOOR.  IT IS BEING PLACED BEHIND

11   THE OTHER JUROR.

12          **MR. KEARNEY:**  PERHAPS WE CAN KEEP AN EYE ON HIM.

13          **THE COURT:**  AGREED, WE HAVE BEEN, BUT MY -- HE'S COME

14   OUT WITH HIS PAD, AND I'VE SEEN THE PAD SITTING BACK THERE

15   SO -- BUT I HAVE NOT SEEN THE PHONE IN HIS HAND.

16          **MR. KEARNEY:**  THAT'S FINE, SIR.

17          **THE CLERK:**  EVEN WHEN I'VE GONE TO THE SIDE WHEN THEY

18   STAND UP, I DON'T SEE A PHONE.  HE DOESN'T COME OUT WITH A

19   PHONE.

20          **MR. KEARNEY:**  THANK YOU.

21          **THE COURT:**  SO WITH REGARD TO THE OBJECTION, IT DOES

22   SEEM TO ME WE ARE BORDERING ON TRYING TO DO TOO MUCH WITH THIS

23   WITNESS.  CLEARLY HE CAN TESTIFY OF HIS OWN OBSERVATIONS AND

24   HAS AT SOME LENGTH BUT TESTIFYING TO THE CHARACTERISTICS OF A

25   WETLAND DOES SEEM TO BE BEYOND THE SCOPE OF HIS PERSONAL

STEELE – DIRECT / KEARNEY

1    KNOWLEDGE AND WOULD CONSTITUTE EXPERT TESTIMONY.

2              **MR. KEARNEY:**  THAT'S FINE.

3         (RECESS TAKEN AT 9:58 A.M.; RESUMED 10:13 A.M.)

4      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

6    COURT IS BACK IN SESSION.  REMAIN SEATED.

7             **THE COURT:**  READY TO BRING THE JURY BACK IN?

8           **MS. HANSEN:**  YES, YOUR HONOR.

9       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

10          **THE CLERK:**  YOU MAY BE SEATED.

11         **THE COURT:**  YOU MAY CONTINUE, MR. KEARNEY.

12          **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

13   **BY MR. KEARNEY:**

14   **Q.**  MR. STEELE, WHEN WE LEFT OFF, WE WERE TALKING ABOUT WATER

15   FROM THE SLOUGH GOING BACK THROUGH THE CULVERT ON TO THE LAND.

16   I WANT TO ASK YOU, SIR, IF THAT -- THAT ACTIVITY OR THAT FLOW,

17   REVERSE FLOW, IF YOU WILL, OVER THE YEARS HAS INCREASED,

18   DECREASED, STAYED THE SAME?

19        DO YOU HAVE ANY -- CAN YOU TELL US ANYTHING ABOUT THAT?

20   **A.**  YOU ARE REFERRING TO THE WATER FROM THE SLOUGH COMING INTO

21   THE PROPERTY?

22   **Q.**  YES.

23   **A.**  IT HAS INCREASED.

24   **Q.**  UP UNTIL WHAT TIME, SIR?  CURRENT DAY OR --

25   **A.**  YEAH, AS OF NOW IT'S STILL -- THE FLAP IS NOT TOTALLY

1   SEALING, AND DEPENDING ON THE TIDES THE WATER CAN AND DOES

2   COME INTO OUR PROPERTY.

3   **Q.**  HAS THAT -- DOES THAT FLOW, THE REVERSE FLOW, IF YOU WILL,

4   IS IT SEASONAL?

5       IS IT -- IS THERE -- CAN YOU TELL US ANYTHING ABOUT THAT?

6   WHEN DOES IT HAPPEN?

7   **A.**  THE REVERSE FLOW COMING FROM THE SLOUGH ON TO OUR PROPERTY

8   IS JUST PURELY BASED ON TIDE.  WHEN THE TIDE IS HIGH ENOUGH TO

9   COVER THE DUCKBILL THAT'S NOT SEALING, THEN THE WATER FLOWS ON

10  TO OUR PROPERTY.

11  **Q.**  HAS THAT INCREASE OVER TIME OF WATER RUSHING BACK ON TO

12  THE LAND HAD ANY IMPACT ON THE LAND THAT YOU HAVE OBSERVED

13  YOURSELF?

14  **A.**  YES.  IT IS DEFINITELY IN -- IN THE LOWER PORTIONS OF THE

15  NORTH PARCELS HAS MADE THAT WETTER, AND THE VEGETATION THERE

16  IS NOTICEABLY MORE OF A WETTER TYPE OF CHARACTERISTIC.

17          **MR. KEARNEY:**  AGENT SU, I WONDER IF WE CAN ENLARGE

18  THAT NORTHERN AREA, PLEASE.

19  **BY MR. KEARNEY:**

20  **Q.**  THE AREA THAT YOU SAY IS NOW WETTER OR GETTING WETTER AS

21  TIME GOES ON DUE TO THIS ACTIVITY, IS THAT VISIBLE IN THIS

22  ENLARGED PORTION OF EXHIBIT 3?

23  **A.**  YES.  THIS AREA RIGHT DOWN IN HERE FOR SURE.  THEN THERE

24  IS A PINCH POINT HERE BECAUSE THIS LAND ON THIS SIDE HAS BEEN

25  LIFTED WITH ADDITIONAL FILL OVER THE YEARS (INDICATING), BUT

1  THE LAND HERE FLOWS DOWN TO THIS POINT THROUGH THERE AND INTO

2  THIS AREA.  THE DUCKBILL CULVERT IS RIGHT ABOUT HERE

3  INDICATING).  THIS AREA ALL THE WAY UP INTO THIS LIKE THAT HAS

4  ALL BEEN WETTER AND WETTER OVER THE YEARS.

5  **Q.**  AND YOU SAID IT HAD SOME KIND OF IMPACT ON VEGETATION AS

6  WELL?

7  **A.**  THE TYPE OF VEGETATION THAT GROWS WITHIN A VERY WET SOIL

8  IS MUCH DIFFERENT THAN THE UPLAND AREAS WHICH IS MOSTLY

9  GRASSES.

10  **Q.**  ALL RIGHT.  SO THE VEGETATION IS SMALLER, GREATER, OR THE

11  SAME AS IT -- OVER TIME?

12  **A.**  THE MORE WETLAND TYPE OF VEGETATION HAS INCREASED

13  SIGNIFICANTLY.

14        **MR. SMOCK:**  OBJECTION.

15  **BY MR. KEARNEY:**

16  **Q.**  THANK YOU.  I WANT TO FOLLOW UP NOW ON A STATEMENT YOU

17  MADE EARLIER ABOUT DISKING.

18        **THE COURT:**  I AM SORRY, WAS THERE AN OBJECTION?

19        **MR. SMOCK:**  THERE WAS TO TESTIMONY ABOUT WHAT TYPE OF

20  WETLAND TYPE VEGETATION.

21        **THE COURT:**  OVERRULED.

22  **BY MR. KEARNEY:**

23  **Q.**  YOU MENTIONED EARLIER THAT THERE WAS PERIODIC DISKING THAT

24  TAKES PLACE ON THE PROPERTY; IS THAT RIGHT?

25  **A.**  THAT'S RIGHT.  THE PROPERTY IS IN THE CITY LIMITS, AND THE

STEELE - DIRECT / KEARNEY

1    FIRE DEPARTMENT HAS AN ORDINANCE TO PROTECT AGAINST FIRES.  SO

2    IN THE SPRING WHEN WE GET A LOT OF VEGETATION AND IT STARTS TO

3    DRY OUT, WE'RE REQUIRED TO DISK THE PROPERTY TO PREVENT OR,

4    YOU KNOW, REDUCE THE POTENTIAL FOR FIRE.

5    **Q.**  SO THE DISKING IS -- I DON'T WANT TO PUT WORDS IN YOUR

6    MOUTH, BUT ARE YOU CUTTING THE GRASS THAT GROWS OUT THERE?

7    **A.**  DEPENDING ON HOW WIDE IT IS, WE TYPICALLY DISK WITH A DISK

8    MACHINE THAT TURNS THE SOIL OVER SO IT HELPS AERATE THE

9    PROPERTY AT THE SAME TIME AS IT BREAKS UP ALL THE VEGETATION.

10   **Q.**  AND THE PURPOSE OF THE DISKING IS TO DO WHAT?

11   **A.**  PRIMARILY TO MEET THE CITY'S CODE FOR FIRE PREVENTION ON

12   THE ONE HAND AND TO MAINTAIN THE GROWTH ON THE SECOND.

13   **Q.**  AND ARE THERE ANY NO-GO AREAS FOR DISKING ON THE PROPERTY?

14   **A.**  YES.  WE'VE IDENTIFIED A PARTICULAR PLANT CALLED THE

15   PICKLEWEED WHICH IS A NATURAL HABITAT FOR AN ENDANGERED

16   SPECIES CALLED THE SALT WATER HARVEST MOUSE.  H.T. HARVEY HAS

17   IDENTIFIED AN AREA ON THE PROPERTY THAT HAS PICKLEWEED.

18           **MR. SMOCK:**  OBJECTION.  HEARSAY.

19           **THE COURT:**  OVERRULED.  I ASSUME THIS IS NOT BEING

20   INTRODUCED FOR ITS TRUTH?

21           **MR. KEARNEY:**  NO, JUST TO EXPLAIN WHERE THE DISKING

22   TAKES PLACE.

23           **THE COURT:**  SO OVERRULED.  AND, LADIES AND GENTLEMEN,

24   THIS IS NOT BEING OFFERED FOR ITS TRUTH BUT RATHER SIMPLY IS

25   THE BASIS FOR MR. STEELE'S UNDERSTANDING OF WHERE THE DISKING

1   GETS DONE.

2          **THE WITNESS:**  WITH OUR SENSITIVITY TO THAT PARTICULAR

3   PLANT AND HABITAT, I ASKED THEM TO FENCE IT WITH AN ORANGE

4   CONSTRUCTION FENCE, WHICH RUNS APPROXIMATELY ALONG THIS LINE

5   HERE (INDICATING).  SO PICKLEWEED IS KNOWN TO BE ON THIS SIDE,

6   AND THIS SIDE HERE IS FREE FOR THE FARMER TO DISK.

7   **BY MR. KEARNEY:**

8   **Q.**  YOU ARE CIRCLING AN AREA MARKED IN GREEN ON EXHIBIT 3

9   SOUTH OF THE DRAINAGE CHANNEL.  IS THAT A FAIR STATEMENT?

10  **A.**  YES.

11  **Q.**  ALL RIGHT.  AND ANYWHERE IN THE NORTH, SIR?

12  **A.**  IN THE NORTH IT'S TOO WET TO GET DOWN TO THE AREAS THAT WE

13  WOULD BE CONCERNED ABOUT SO HE CAN'T GET HIS TRACTOR DOWN

14  THERE.

15  **Q.**  I WANT TO TALK TO YOU ABOUT FARMING ACTIVITY, IF I MAY,

16  JUST FOR A MOMENT.  WE HAVE HEARD SOME TESTIMONY IN THIS CASE

17  ABOUT FARMING.  WHEN HAVE YOU -- WHEN DID YOU TAKE OVER ACTIVE

18  MANAGEMENT OF THIS SITE, MR. STEELE, ON BEHALF OF THE NEWARK

19  AREA PARTNERS OR SOBRATO OR BOTH?

20  **A.**  AROUND 2003 WHEN WE STARTED ACQUIRING PROPERTIES OUT HERE.

21  **Q.**  I WONDER IF YOU CAN DESCRIBE THE FARMING ACTIVITIES SINCE

22  THEN, SINCE 2003, ON THIS LAND.

23  **A.**  FARMING FOR MONEY VERY -- NONE THAT I AM AWARE.  WE WOULD

24  CUT THE HAY, CUT THE STRAW, CUT THE GRASS, AND BALE IT WHEN IT

25  MADE SENSE.

STEELE – DIRECT / KEARNEY

1    BUT OVER TIME THE COST OF FUEL MADE IT EVEN LESS WORTH

2   DOING SO.  WE JUST MOVED FROM PULLING THE HAY OFF TO JUST

3   DISKING IT.

4   **Q.**  SO HOW ABOUT FARMING FOR VEGETABLES OR COMMERCIAL

5   PRODUCTS?  HAS THAT TAKEN PLACE SINCE YOU HAVE BEEN MANAGING

6   THE LAND?

7   **A.**  NOT SINCE I HAVE BEEN MANAGING THE LAND, NO.

8   **Q.**  THAT WAS IN 2003?

9   **A.**  CORRECT.

10  **Q.**  HOW ABOUT THE FARMING FOR CUTTING DOWN THE HAY, AT SOME

11  POINT DID THAT COME TO AN END?

12  **A.**  I AM GUESSING IT WAS AROUND 2008, 2009 WHEN IT STARTED --

13  WE STARTED CHANGING FARMERS.  FUEL COSTS, DIESEL FUEL

14  ESPECIALLY WENT THROUGH THE ROOF, SO WE COULDN'T GET THE

15  FARMER TO DO IT AND BREAK EVEN.

16         **MR. KEARNEY:**  THANK YOU, SIR.

17     NO FURTHER QUESTIONS, YOUR HONOR.

18         **THE COURT:**  ANY CROSS-EXAMINATION?

19         **MR. SMOCK:**  NO QUESTIONS, YOUR HONOR.  THANK YOU.

20         **THE COURT:**  THANK YOU, MR. STEELE, YOU ARE EXCUSED.

21     THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

22         **MS. LEE:**  THE GOVERNMENT CALLS RYAN AMAYA.

23              (PAUSE IN THE PROCEEDINGS.)

24         **THE CLERK:**  ARE YOU MY WITNESS?

25         **THE WITNESS:**  YES.

1      **THE CLERK:**  COME UP TO THE WITNESS STAND, PLEASE.

2  RAISE YOUR RIGHT HAND FOR ME, PLEASE.

3      (**RYAN AMAYA**, CALLED AS A WITNESS FOR THE GOVERNMENT,

4  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

5      **THE WITNESS:**  YES.

6      **THE CLERK:**  YOU MAY BE SEATED AND ONCE SEATED I AM

7  GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

8  LAST NAME FOR THE RECORD.

9      **THE WITNESS:**  MY NAME IS RYAN AMAYA, SPELLED R-Y-A-N,

10  A-M-A-Y-A.

11      **THE CLERK:**  THANK YOU.  THERE IS WATER IN THE

12  PITCHER.

13      **THE WITNESS:**  OKAY.

14                    **DIRECT EXAMINATION**

15  **BY MS. LEE:**

16  **Q.**  GOOD MORNING, MR. AMAYA.

17  **A.**  GOOD MORNING.

18  **Q.**  WHAT COMPANY DO YOU WORK FOR?

19  **A.**  I WORK FOR KIER & WRIGHT CIVIL ENGINEERS & SURVEYORS.

20  **Q.**  WHAT TYPE OF WORK DO YOU DO?

21  **A.**  I DO LAND SURVEYING AND CIVIL ENGINEERING.  I'M A LAND

22  SURVEYOR, THOUGH.  SO I'M A PRINCIPAL IN CHARGE OF THE LAND

23  SURVEYING DEPARTMENT.

24  **Q.**  HOW LONG HAVE YOU WORKED AT KIER & WRIGHT?

25  **A.**  SINCE '99.

AMAYA – DIRECT / LEE

1   **Q.**   AND WHAT DID YOU DO BEFORE THAT?

2   **A.**   I DID -- I WORKED FOR SOME CONSTRUCTION COMPANIES DOING

3   CONSTRUCTION LAYOUT AND LAND SURVEYING.  THAT IS HOW I KIND OF

4   GOT INTO THE PRACTICE OF LAND SURVEYING.

5   **Q.**   WHAT IS LAND SURVEYING?

6   **A.**   LAND SURVEYING IS -- IT'S A PROFESSION THAT MEASURES

7   POSITIONS OR POINTS ON THE EARTH'S SURFACE BASICALLY IS WHAT

8   WE DO.  WE ARE MEASURERS.  WE MEASURE BOUNDARIES.  WE MEASURE

9   BOTH VERTICAL ASPECTS AND -- HORIZONTAL AND VERTICAL ASPECTS

10  TO PROPERTIES OR THE EARTH.

11  **Q.**   WOULD IT BE FAIR TO SAY THAT YOUR WORK INVOLVES

12  DETERMINING THE BOUNDARY LINES OF A PARTICULAR PROPERTY?

13  **A.**   YES, WE DO THAT.

14  **Q.**   WOULD IT ALSO BE FAIR TO SAY YOUR WORK INVOLVES

15  DETERMINING ELEVATION POINTS ON A PARTICULAR PROPERTY?

16  **A.**   YES.

17  **Q.**   AND WOULD IT BE FAIR TO SAY THAT YOUR WORK INVOLVES

18  DETERMINING THE SLOPE OR GRADE AT A PARTICULAR PROPERTY?

19  **A.**   YES.

20  **Q.**   CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND?

21  **A.**   I WENT TO A COMMUNITY COLLEGE FOR CIVIL ENGINEERING AND

22  GRADUATED FROM THAT, AND THEN GOT INTO THE SURVEYING INDUSTRY

23  AND, YOU KNOW, GOT MOST OF MY EXPERIENCE THERE, AND THAT'S

24  WHERE I BECAME A LAND SURVEYOR; STUDIED, PASSED THE STATE

25  TEST, AND BEEN A LICENSED LAND SURVEYOR SINCE 2006.

1    **Q.** YOU MENTIONED THAT YOU PASSED A STATE TEST.  DO YOU HOLD

2    ANY PROFESSIONAL LICENSE IN SURVEYING OF LAND?

3    **A.** YES, CALIFORNIA STATE LICENSE.

4    **Q.** HOW MANY NUMBER OF YEARS HAVE YOU BEEN DOING WORK IN LAND

5    SURVEYING AND CONDUCTING ANALYSIS ON SLOPE, GRADING, AND

6    ELEVATION OF A PROPERTY?

7    **A.** FOR OVER 20 YEARS.

8    **Q.** ARE YOU FAMILIAR WITH THE SOBRATO ORGANIZATION?

9    **A.** YES.

10   **Q.** HOW?

11   **A.** THEY ARE ONE OF MY COMPANIES -- MOST IMPORTANT CLIENTS, I

12   GUESS YOU COULD SAY.  WE HAVE BEEN WORKING WITH THEM SINCE

13   '72, SO WE DO MOST OF THEIR CIVIL ENGINEERING AND SURVEYING.

14   **Q.** ARE YOUR CLIENTS TYPICALLY REAL ESTATE DEVELOPERS?

15   **A.** YES, REAL ESTATE DEVELOPERS IS WHERE WE DO MOST OF OUR

16   BUSINESS.

17   **Q.** HOW MANY PROJECTS HAVE YOU WORKED ON FOR YOUR CLIENT

18   SOBRATO ORGANIZATION?

19   **A.** OH, PROBABLY SOMEWHERE IN THE RANGE OF 500 TO A THOUSAND.

20   A LOT.  IT'S HARD FOR ME TO STATE THAT.

21   **Q.** WHAT TYPE OF WORK DO YOU DO FOR SOBRATO ORGANIZATION?

22   **A.** I DO DUE DILIGENCE WHEN THEY ARE LOOKING AT ACQUIRING A

23   PROPERTY.  WE DO ALTA SURVEYS FOR THEM.  WE DO TOPOGRAPHIC

24   SURVEYS FOR THEM.  AND WE, YOU KNOW, CONFIRM THE BOUNDARY

25   LINES OF THE PROPERTY THEY ARE BUYING, LOOK FOR ENCROACHMENTS.

1    JUST MAKE SURE THAT THE PROPERTY IS, YOU KNOW, USABLE FOR

2    THEIR INTENT OF DEVELOPMENT.

3    **Q.**   THEY HAVE YOU LOOK AT A PROPERTY BEFORE THEY PURCHASE IT

4    TO SEE HOW THEY COULD POTENTIALLY DEVELOP IT.  IS THAT FAIR?

5    **A.**   THAT'S FAIR.

6    **Q.**   YOU MENTIONED THAT YOU DO QUITE A BIT OF DUE DILIGENCE AND

7    IT INVOLVED A VARIETY OF SURVEYING WORK.  I WOULD LIKE TO JUST

8    ASK YOU ABOUT WHAT THEY ARE.  WHAT IS AN ALTA SURVEY?

9    **A.**   AN ALTA SURVEY IS A LAND TITLE SURVEY.  IT'S A SURVEY THAT

10   HAS SET PARAMETERS THROUGHOUT THE UNITED STATES FOR BOTH

11   LENDING -- FOR THE LENDING PRACTICES AND ALSO FOR TITLE

12   INSURANCE.  SO IT IS USED FOR TITLE INSURANCE AND IT'S USED

13   FOR LENDING PURPOSES.  IT'S A GOOD REPRESENTATION OF WHAT IS

14   ON THE PROPERTY SO YOU'LL KNOW IF THERE IS ENCUMBRANCES OR IF

15   THERE -- THE BUILDING IS ON THE RIGHT PROPERTY AND WHERE THE

16   PROPERTY LINES ARE AND EASEMENTS THAT AFFECT THE PROPERTY.

17   **Q.**   DID YOU DO AN ALTA SURVEY FOR NEWARK AREA 4 IN NEWARK,

18   CALIFORNIA, FOR THE SOBRATO ORGANIZATION?

19   **A.**   NOT AREA 4.  IN THIS PARTICULAR JOB WE DID A TOPOGRAPHIC

20   SURVEY AND WE ALSO DID A BOUNDARY SURVEY AND FILED THAT WITH

21   THE COUNTY TO ESTABLISH ALL THE PROPERTY LINES FOR NEWARK

22   AREA 4.

23   **Q.**   WHAT IS A TOPOGRAPHIC SURVEY?

24   **A.**   A TOPOGRAPHIC SURVEY IS A MAP THAT WE PREPARE THAT SHOWS

25   BOTH NATURAL AND MANMADE FEATURES ALONG WITH THE SLOPE OF THE

AMAYA – DIRECT / LEE

1  GROUND, SLOPE OF THE EARTH'S SURFACE.

2  **Q.**  DID YOU -- AND YOU CONDUCTED A TOPOGRAPHIC SURVEY FOR

3  SOBRATO ORGANIZATION FOR NEWARK AREA 4?

4  **A.**  CORRECT.

5  **Q.**  AND YOU ALSO CONDUCTED A BOUNDARY LINES DETERMINATION FOR

6  NEWARK AREA 4?

7  **A.**  CORRECT.

8  **Q.**  I WOULD LIKE TO TALK ABOUT EACH IN TURN.  HOW DO YOU GO

9  ABOUT CREATING THE BOUNDARY LINES?

10  **A.**  SO BOUNDARY LINES ARE DETERMINED BASED ON DEEDS OF RECORD,

11  MAPS -- PREVIOUS MAPS THAT HAVE BEEN FILED IN THE AREA.  SO WE

12  DO A LOT OF RESEARCH TO DETERMINE, YOU KNOW, WHAT EXISTS, AND

13  THEN FROM THAT RESEARCH WE USE THAT TO GO LOOK FOR PROPERTY

14  CORNERS AND MONUMENTATION, STREET MONUMENTATION, TO DETERMINE

15  WHERE THE BOUNDARY LINES ARE BASED ON DEED AND EXISTING MAPS.

16  **Q.**  AND WITH RESPECT TO THE TOPOGRAPHIC SURVEY THAT YOU DID

17  FOR NEWARK AREA 4, CAN YOU WALK US THROUGH HOW YOU MAKE THAT

18  SURVEY?

19     DOES IT ULTIMATELY COME OUT IN THE FORM OF A MAP?

20  **A.**  YES, A TOPOGRAPHIC SURVEY, YEAH, IT IS A MAP.  WE -- THIS

21  PARTICULAR SITE WE USED BOTH CONVENTIONAL SURVEYING AND

22  PHOTOGRAMMETRY TO DETERMINE -- TO CREATE THE CONTOURS AND TO

23  CREATE THE BASE MAP FOR THIS PARTICULAR SITE.

24     SO PHOTOGRAMMETRY IS THE SCIENCE OF USING PHOTOS TO

25  CREATE -- TO GET MEASUREMENTS FOR BOTH 2D AND 3D.  SO THAT'S

AMAYA – DIRECT / LEE

1    WHAT WE USED IN THIS CASE BECAUSE IT'S SUCH A BIG AREA.

2        FROM THAT WE -- WE TIED THE ELEVATIONS TO CITY OF NEWARK

3    BENCHMARK DATUM, WHICH IS NGVD29 ALSO KNOWN AS --

4            **THE REPORTER:**  I'M SORRY, WHICH IS WHAT?

5            **THE WITNESS:**  NGVD, NATIONAL GEODETIC VERTICAL DATUM

6    OF 1929.  I'M SORRY.

7        SO WE TIED IT TO THAT WHICH IS ALSO KNOWN AS SEA LEVEL

8    DATUM.  AND FROM THERE WE RAN LEVELS TO CONTROL AND WE SET

9    MARKERS ON THE GROUND.

10       AFTER THE MARKERS WERE SET, WE HIRED A COMPANY TO COME OUT

11   AND FLY THE SITES, TAKE THE PICTURES.  AND FROM THE PICTURES,

12   THEY USED THE PICTURES TO CREATE THE THREE-DIMENSIONAL AND

13   ALSO DRAW IN, YOU KNOW, THE EARTH'S FEATURES, AND THAT SORT OF

14   STUFF.

15       WHEN WE GET THE MAP BACK, WE TAKE THAT MAP AND WE DO

16   CONVENTIONAL SURVEYING TO VERIFY THAT THE PHOTOGRAMMETRY IS

17   CORRECT AND ALSO DO FIELD VERIFICATION TO MAKE SURE THAT IT

18   LOOKS THE WAY -- SEE WHAT, YOU KNOW, PHOTOGRAMMETRIST HAS SEEN

19   FROM THE AIR, AND MAKE SURE THAT EVERYTHING IS SHOWN ON THE

20   TOPOGRAPHIC MAP.

21   **BY MR. SMOCK:**

22   **Q.**  SO WOULD IT BE FAIR TO SAY THAT IN CREATING A TOPOGRAPHIC

23   MAP, YOU START ON THE GROUND OF THE PROPERTY AND YOU CREATE

24   CONTROL POINTS ON THE GROUND SHOWING DIFFERENT HORIZONTAL AND

25   VERTICAL ELEVATION POINTS ON THE LAND?

AMAYA – DIRECT / LEE

1     **A.**  CORRECT.

2     **Q.**  AND THOSE MARKINGS, ARE THEY DONE WITH SPRAY PAINT ON THE

3     LAND?  HOW DO YOU DO IT?

4     **A.**  IT DEPENDS.  WE USE BOTH SPRAY PAINT FOR AREAS OF LIKE

5     PAVEMENT.  I DON'T KNOW IF YOU HAVE EVER SEEN ANY, BUT THEY

6     USE THEM IN ROADS.  AREAS THAT ARE NOT A HARD SURFACE, SUCH AS

7     ASPHALT, WE USE WHAT ARE CALLED FLIGHT MARKERS, WHICH IS A

8     CLOTH PANEL THAT WE SET DOWN AND TIE THAT OUT ALONG WITH, YOU

9     KNOW, CREATING -- ESTABLISHING A HORIZONTAL AND VERTICAL

10    COMPONENT TO IT.

11    **Q.**  AND YOU DID THAT FOR NEWARK AREA 4, RIGHT?

12    **A.**  YES.

13    **Q.**  AND THEN WOULD IT BE FAIR THAT YOUR NEXT STEP WOULD BE TO

14    DO FLYOVERS BY PLANE TO TAKE AERIAL PHOTOGRAPHY OF THE LAND

15    SHOWCASING THE DIFFERENT ON-THE-GROUND MARKINGS THAT YOU HAD

16    CREATED?

17    **A.**  CORRECT.

18    **Q.**  AND BASED OFF OF THOSE AERIAL PHOTOGRAPHIES IS A 3D MODEL

19    OF THE CONTOURS OF THIS LAND?

20    **A.**  YES, THAT IS HOW THE CONTOURS ARE CREATED THROUGH A 3D

21    MODEL.

22    **Q.**  AND CONTOURS ARE WHAT AGAIN?

23    **A.**  CONTOURS ARE -- THEY ARE LINES DRAWN ON A MAP CONJOINING

24    POINTS OF, YOU KNOW, THE SAME HEIGHT OF ELEVATION ABOVE SEA

25    LEVEL.  SO IF YOU HAVE TWO POINTS ON A MAP THAT ARE AT AN

AMAYA – DIRECT / LEE

1    ELEVATION 5, YOU WOULD DRAW A LINE BETWEEN THOSE TWO POINTS

2    AND CREATE THE CONTOURS THAT WAY.

3        AN EASY WAY TO THINK OF CONTOURS IS KIND OF LIKE WHEN THE

4    LAKES DROP, YOU SEE THE LINES OF THE WATER -- YOU KNOW, WHERE

5    THE WATER WAS PREVIOUSLY AS THE LAKE IS DROPPING.  THOSE CAN

6    KIND OF BE CONSIDERED LIKE CONTOUR LINES.  IT IS KIND OF A

7    VISUAL ASPECT OF IT, BECAUSE THAT LINE IS LEVEL BECAUSE THAT

8    IS WHERE THE WATER WAS, AND IT FOLLOWS THE EARTH'S SURFACE,

9    YOU KNOW, THE MOUNTAINS AND THE RANGES AND THE VALLEYS.  SO

10   THAT KIND OF IS A GOOD REPRESENTATION OF WHAT A CONTOUR LINE

11   IS.

12   **Q.**  AFTER A 3D MODEL WAS MADE OF NEWARK AREA 4, DID KIER &

13   WRIGHT GO BACK DOWN ON TO THE GROUND OF THE PROPERTY TO

14   CONFIRM THAT THE 3D MODEL WAS ACCURATE?

15   **A.**  YES, WE DID.

16   **Q.**  AND BASED OFF OF ALL OF THAT WORK, DID KIER & WRIGHT

17   CREATE A TOPOGRAPHIC SURVEY MAP?

18   **A.**  YES.

19   **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 172.

20               (EXHIBIT HANDED TO WITNESS.)

21   **BY MS. LEE:**

22   **Q.**  MR. AMAYA, WHAT IS THAT?

23   **A.**  THIS IS AN EXHIBIT THAT WAS PREPARED THAT SHOWS THE

24   CONTOURS AND THE SPOT ELEVATIONS OF THE GROUND.

25   **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT THE TOPOGRAPHY OF

AMAYA – DIRECT / LEE

1    NEWARK AREA 4?

2    **A.**  YES, IT DOES.

3         **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

4    EXHIBIT 172 INTO EVIDENCE.

5         **MR. SMOCK:**  NO OBJECTION.

6         **THE COURT:**  172 IS ADMITTED.

7         (GOVERNMENT'S EXHIBIT 172 RECEIVED IN EVIDENCE)

8         **MS. LEE:**  IF WE COULD JUST HIGHLIGHT THE NORTHERN

9    FILL AREA SO THAT WE ARE ABLE TO SEE THE TOPOGRAPHIC CONTOUR

10   LINES A LITTLE MORE CLEARLY.

11   **BY MS. LEE:**

12   **Q.**  OKAY.  MR. AMAYA, CAN YOU DESCRIBE WHAT THESE DIFFERENT

13   LINES ARE?  IT LOOKS TO BE DIFFERENT COLORED SQUIGGLY LINES

14   ACROSS THE MAP.

15   **A.**  YEAH.  WE HAVE TWO DIFFERENT CONTOURS.  WE HAVE WHAT ARE

16   CALLED MAJOR CONTOURS AND MINOR CONTOURS.  THE MAJOR CONTOURS

17   ARE ALSO KNOWN AS INDEX CONTOURS, WHICH SHOWS THE ELEVATION.

18   IN THIS PARTICULAR TOPO WE DID MAJOR CONTOURS EVERY 5 FEET AND

19   MINOR CONTOURS ARE EVERY FOOT.  IN BETWEEN THOSE, ALL THE

20   LITTLE BLUE DOTS ARE ACTUAL SPOT GROUND ELEVATIONS THAT WERE

21   USED TO CREATE THE CONTOURS.

22   **Q.**  THOSE ARE THE X MARKINGS THAT YOU GUYS PUT ON THE GROUND?

23   **A.**  NO, THOSE ARE NOT THE X MARKINGS.  THOSE ARE ACTUALLY

24   POINTS THAT ARE PICKED TO GET THE ELEVATION OF THE GROUND AT

25   THOSE LOCATIONS.

AMAYA – DIRECT / LEE

1    **Q.**  IN DOING THE TOPOGRAPHIC MAP, AND WE WILL JUST FOCUS ON

2    THIS NORTHERN FILL AREA, YOU MENTIONED 5 FOOT AND 1 FOOT

3    CONTOURS.  IS THAT 5 FEET ABOVE MEAN SEA LEVEL AND 1 FOOT

4    ABOVE MEAN SEA LEVEL?

5    **A.**  AT THE LOCATION OF WHERE A 5 FOOT CONTOUR IS, THAT WOULD

6    BE 5 FEET ABOVE SEA LEVEL.  THIS PARTICULAR SITE IN THE NORTH

7    FILL AREA IT SLOPES, I THINK, FROM 13 FEET DOWN TO LIKE 1 OR

8    2 FEET.

9            **MS. LEE:**  IF WE CAN JUST GO BACK TO THE FULL SLIDE.

10   **BY MS. LEE:**

11   **Q.**  COULD YOU SHOW US WHERE THE CONTOUR LINE INDICATES THAT

12   THE ELEVATION OF THE PROPERTY IS 13 FEET ABOVE SEA LEVEL?

13   **A.**  IT WOULD BE IN THE -- IF YOU ARE LOOKING AT THE MAP, THE

14   UPPER LEFT CORNER ALONG THE YELLOW LINE RIGHT IN THAT AREA.

15   **Q.**  YOU ACTUALLY HAVE A RED POINTER RIGHT IN FRONT OF YOU, IF

16   YOU WANT TO USE THE -- THAT PEN.

17   **A.**  OKAY.

18   **Q.**  THERE SHOULD BE A BUTTON.

19   **A.**  THERE YOU GO (INDICATING).  SO RIGHT UP IN THIS AREA IS

20   WHERE -- IT IS KIND OF THE HIGH POINT OF THE SITE.  FROM THERE

21   EVERYTHING DRAINS DOWN IN THIS -- THIS IS A LEVEE, SO THIS

22   KEEPS THE WATER FROM DRAINING THROUGH, BUT IT SLOPES DOWN INTO

23   THIS AREA RIGHT HERE, WHICH GOES DOWN INTO A BASIN AND INTO

24   THE SLOUGH (INDICATING).

25   **Q.**  MR. AMAYA, I WILL STOP YOU THERE.  SO IT'S 13 FEET ABOVE

AMAYA – DIRECT / LEE

1   SEA LEVEL AT THE UPPER LEFT-HAND CORNER OF THE NORTHERN FILL

2   AREA?

3   **A.**  CORRECT.

4   **Q.**  WHAT IS THE ELEVATION AS YOU GET CLOSE TO WHAT YOU CALL

5   THE BASIN?

6   **A.**  IN THIS AREA WHEN WE DID THE SURVEY, IT WAS ELEVATION 1.2

7   I BELIEVE.  WE WOULD HAVE TO ZOOM IN TO SEE.  AND THEN AS

8   IT -- IT'S PRETTY FLAT THROUGH THIS AREA (INDICATING).  SO

9   THIS IS ABOUT A HALF A PERCENT SLOPE COMING DOWN AND THEN IT

10  FLATTENS OUT EVEN MORE DOWN INTO WHERE THE BASIN IS.  I THINK

11  WHEN WE DID THE SURVEY, THERE WAS A WATER LEVEL THERE AT

12  .75 FEET, WHICH IS ABOUT 9 INCHES -- IT IS 9 INCHES ABOVE SEA

13  LEVEL IS WHERE THE WATER WAS AT THAT POINT.

14  **Q.**  JUST FOR THE RECORD, AND CORRECT ME IF I'M WRONG,

15  MR. AMAYA, AT THE BASIN IS WHERE YOU'RE REFERENCING WHERE THE

16  CONCRETE PAD MEETS THAT NORTHERN FILL AREA, THAT TRIANGULAR

17  PORTION.  AND YOU SAID THAT WAS APPROXIMATELY HOW MANY FEET

18  ABOVE SEA LEVEL?

19  **A.**  IT IS APPROXIMATELY 1.5.  1.2 TO 1.5.

20  **Q.**  1.2 TO 1.5 FEET ABOVE SEA LEVEL?

21  **A.**  CORRECT.

22  **Q.**  AND AS IT PINCHES DOWN TOWARD MOWRY SLOUGH, ARE YOU AWARE

23  OF HOW THE WATER ESCAPES FROM THE SITE?

24  **A.**  YES, IT GOES INTO -- I BELIEVE THERE IS A CULVERT RIGHT

25  HERE (INDICATING) THAT GOES INTO THE SLOUGH.

AMAYA – DIRECT / LEE

1    **Q.**  AND WHAT IS THE ELEVATION POINT RIGHT BY THAT CULVERT?

2    **A.**  RIGHT BY THE CULVERT, LIKE I SAID, THE WATER LEVEL -- YOU

3    CAN BARELY SEE THE TOP OF THE CULVERT BUT THE WATER LEVEL

4    THERE AT THAT POINT WAS 9 INCHES ABOVE SEA LEVEL AT THE TIME

5    OF THE SURVEY.

6    **Q.**  SO BY THE CULVERT THERE WAS A PONDED AREA OF WATER; IS

7    THAT CORRECT?

8    **A.**  CORRECT.

9    **Q.**  AND AT THE TOP OF THAT WATER LEVEL THAT WAS ABOUT

10   .75 INCHES ABOVE MEAN SEA LEVEL?

11   **A.**  CORRECT.

12   **Q.**  AND WERE YOU ABLE TO SEE THE BOTTOM GROUND ELEVATION

13   UNDERNEATH THAT WATER?

14   **A.**  I DON'T REMEMBER AT THE TIME.  I MEAN, IT WAS -- I THINK

15   IT WAS MURKY BECAUSE IT -- ALL THAT WATER IS PRETTY MURKY OUT

16   THERE, SO....

17   **Q.**  AND YOU MENTIONED AT THAT TIME; WHAT YEAR DID YOU DO THIS

18   WORK FOR THE SOBRATO ORGANIZATION?

19   **A.**  THE PHOTOGRAMMETRY WAS DONE IN OCTOBER OF 2005.

20   **Q.**  AND THE TOPOGRAPHIC SURVEY MAP?

21   **A.**  THE TOPOGRAPHIC SURVEY MAP WE WORKED ON IT THROUGH 2006

22   AND 2007 OFF AND ON.  I MEAN, IT WAS -- IT WAS A BIG EFFORT.

23   AS WE WERE TRYING TO DEVELOP THIS PROPERTY, WE WOULD GO BACK

24   OUT AND GET ADDITIONAL INFORMATION THAT THE ENGINEERS WOULD

25   NEED.  SO THE OVERALL DURATION OF THE SURVEY WAS FROM 2006 TO

1    2008, BUT, YOU KNOW, EACH PHASE WAS COMPLETED IN DIFFERENT

2    SECTIONS.  AND AS WE NEEDED MORE WORK, WE WOULD GO GET IT.

3    **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 171.

4                      (EXHIBIT HANDED TO WITNESS.)

5        MR. AMAYA, WHAT IS THAT?

6    **A.**  THIS IS, AGAIN, A PORTION OF THE TOPOGRAPHIC SURVEY THAT

7    WAS -- SHOWS THE NORTH FILL AREA.

8    **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT THE TOPOGRAPHIC

9    SURVEY WORK OF THIS NORTHERN FILL AREA?

10   **A.**  IT DOES.

11           **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

12   EXHIBIT 171 INTO EVIDENCE.

13           **MR. SMOCK:**  NO OBJECTION.

14           **THE COURT:**  ADMITTED.

15       (GOVERNMENT'S EXHIBIT 171 RECEIVED IN EVIDENCE)

16   **BY MS. LEE:**

17   **Q.**  MR. AMAYA, IS THIS JUST A CLOSER UP IMAGE FOCUSED ON THE

18   NORTHERN AREA COMPARED TO THE LAST EXHIBIT WE WERE LOOKING AT?

19   **A.**  IT IS.

20   **Q.**  WOULD IT BE FAIR TO SAY THAT IN THIS NORTHERN AREA IT GOES

21   FROM A 13 FOOT ELEVATION DOWN TO A .75 -- .75 FEET ELEVATION

22   ABOVE MEAN SEA LEVEL?

23   **A.**  YES.

24   **Q.**  AND YOU MENTIONED THAT THERE WAS A GENERAL SLOPE AND YOU

25   GAVE A PERCENTAGE TO THAT.  WHAT WAS IT?

AMAYA – DIRECT / LEE

1  **A.**  IT WAS ABOUT A HALF A PERCENT, SO IT IS ABOUT A HALF A

2  PERCENT SLOPE FROM HERE (INDICATING) DOWN TO WHERE THIS PINCH

3  POINT IS, SOMEWHERE RIGHT IN HERE (INDICATING).

4  **Q.**  AND HOW DOES THAT AFFECT HOW WATER DRAINS FROM THIS

5  NORTHERN FILL AREA?

6  **A.**  WELL, WATER GOES DOWNHILL OR DOWN SO IT WOULD BE –– THE

7  CORNER OF THE SITE IS AT ELEVATION 13 AND AT THE PINCH POINT

8  IT IS ELEVATION 1.5 APPROXIMATELY, SO IT'S DROPPING, YOU KNOW,

9  12 AND A HALF FEET IN THAT AREA, 11, 12 AND A HALF FEET, SO.

10  **Q.**  WOULD IT BE FAIR TO SAY THAT WATER DRAINS IN THE DIRECTION

11  FROM EAST TO WEST TOWARD THE SLOUGH?

12  **A.**  CORRECT.

13  **Q.**  OKAY.  I WOULD LIKE TO SHOW YOU EXHIBIT NO. 173.

14  (EXHIBIT HANDED TO WITNESS.)

15  MR. AMAYA, WHAT IS THAT?

16  **A.**  THIS IS AN IMAGE OF THE SOUTH FILL AREA.

17  **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT THE TOPOGRAPHY AS

18  YOUR COMPANY ASSESSED IT IN THE SOUTHERN FILL AREA OF NEWARK

19  AREA 4?

20  **A.**  IT IS.

21  **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBIT 173 INTO

22  EVIDENCE.

23  **MR. SMOCK:**  NO OBJECTION.

24  **THE COURT:**  ADMITTED.

25  (GOVERNMENT'S EXHIBIT 173 RECEIVED IN EVIDENCE)

AMAYA – DIRECT / LEE

**BY MR. KEARNEY:**

**Q.**  MR. AMAYA, CAN YOU DESCRIBE FOR US THE GENERAL TOPOGRAPHY
OF THE SOUTHERN FILL AREA INCLUDING ITS SLOPE AND ELEVATION?

**A.**  YES.  SO THIS IS A BLOWUP OF THE ORIGINAL ONE THAT YOU
SHOWED, WHICH IS THE OVERALL EXHIBIT, BUT YOU CAN'T SEE IT UP
HERE.  THE HIGH POINT HERE ON THE SIDE IS UP IN THIS CORNER.
IT'S ELEVATION 8, AND IT DRAINS DOWN (INDICATING), AND THERE
IS AREAS IN HERE, THIS AREA RIGHT IN HERE IS AT ELEVATION --
IT IS ACTUALLY BELOW SEA LEVEL.  SO THIS IS CONTOUR ZERO AND
THEN IT GOES INTO -- BASICALLY WHERE IT GOES BELOW SEA LEVEL.

**Q.**  WHAT DIRECTION DOES WATER DRAIN ON THE SOUTHERN FILL AREA?

**A.**  SO THE WATER IS DRAINING FROM THIS UPPER PORTION DOWN
TOWARDS THE SLOUGH TOWARDS THIS CORNER HERE (INDICATING).

**Q.**  AND DO YOU KNOW -- DO YOU KNOW HOW THE WATER FLOWS OFF OF
THIS PROPERTY AND WHERE IT GOINGS INTO?

**A.**  WELL, ACCORDING TO THE CONTOURS IT FLOWS THIS WAY
(INDICATING) FROM THE -- WHAT ARE THE RAILROAD TRACKS UP HERE
DOWN TOWARDS, LIKE I SAID, THIS CORNER HERE (INDICATING).

**Q.**  OKAY.  ARE YOU AWARE OF ANY TYPE OF DRAINAGE OR DITCH THAT
A WATER COULD FLOW THROUGH?

**A.**  YES.  SO AS YOU SEE HERE, THE WATER FLOWS TOWARDS THIS
AREA RIGHT HERE, AND THERE IS A DRAINAGE DITCH THAT FLOWS ALL
THE WAY DOWN, RUNS ALONG THIS -- I THINK THERE IS A ROAD
THERE, AND IT DRAINS DOWN INTO THE CORNER HERE WHICH GOES INTO
A CULVERT THAT GOES UNDER THIS ROAD AND KEEPS GOING DOWN A

1    DRAINAGE DITCH TO A PUMP, I BELIEVE, THAT PUMPS IT OUT TO THE

2    SLOUGH.

3    **Q.**  I WOULD LIKE TO SHOW YOU --

4         **MS. LEE:**  YOUR HONOR, THIS IS EXHIBIT 1138, AND I

5    BELIEVE THE DEFENSE HAS NO OBJECTION TO IT COMING IN.

6         **MR. SMOCK:**  NO OBJECTION.

7         **THE COURT:**  1138, SO IT IS THE BLOWUP ITSELF?

8         **MS. LEE:**  YES.

9         **THE COURT:**  1138 IS ADMITTED.

10        (GOVERNMENT'S EXHIBIT 1138 RECEIVED IN EVIDENCE)

11                  (PAUSE IN THE PROCEEDINGS.)

12                  (EXHIBIT DISPLAYED ON EASEL.)

13   **BY MS. LEE:**

14   **Q.**  MR. AMAYA, CAN YOU TELL US WHAT WE ARE LOOKING AT IN

15   EXHIBIT 1138?

16   **A.**  IT'S A MAP THAT -- IT SHOWS CONTOURS ON IT.

17   **Q.**  OKAY.  COULD YOU SHOW US ON THIS KIND OF LARGER SCALE MAP

18   OF THE NEWARK AREA 4 PROPERTY WHERE IS THE 13 FOOT ELEVATION?

19        **THE COURT:**  CAN THE JURORS SEE THIS FROM WHERE YOU

20   ARE SITTING?

21        **MS. LEE:**  HOW ABOUT NOW?

22      MR. AMAYA, MAYBE WITH THE COURT'S PERMISSION, I WILL HAVE

23   YOU STEP DOWN?

24        **THE COURT:**  YOU MAY.

25   **BY MS. LEE:**

1   **Q.**  MR. AMAYA, WHERE IS THE 13 FOOT ELEVATION?

2   **A.**  SO THE 13 FOOT ELEVATION WOULD BE UP IN THIS AREA.

3   (INDICATING).  SO THE 13 FOOT ELEVATION -- MY POINTER JUST

4   WENT OUT -- IS HERE IN THIS CORNER HERE.  SO THIS IS, LIKE YOU

5   SAID, THE HIGH POINT OF THE SITE WHICH DRAINS THIS WAY INTO

6   THE CULVERT HERE AND THEN DRAINS INTO THIS SLOUGH HERE

7   (INDICATING).  THIS IS SEPARATED BY LEVEES, SO THIS IS A LEVEE

8   SYSTEM.

9       AND THEN THIS IS KIND OF LIKE ANOTHER SECTION OF THE

10  PROPERTY WHICH DRAINS DOWN INTO THIS AREA, THIS CORNER HERE

11  INTO A DRAINAGE DITCH THAT RUNS ALL THE WAY ALONG THROUGH HERE

12  AND FOLLOWS IT ALL THE WAY OUT TO A PUMP THAT IS DOWN HERE

13  (INDICATING).

14      SO THE PROPERTY SLOPES THIS WAY, AND, AGAIN, THIS IS

15  ANOTHER LITTLE BIT OF A LEVEE SECTION, THERE IS A ROAD THAT IS

16  IN THIS AREA SO IT IS A LITTLE HIGHER, BUT THEN IT CONTINUES

17  TO DRAIN.  THIS CONTOUR HERE IS AT ELEVATION ZERO, THAT IS

18  BELOW SEA LEVEL, AND SO A LOT OF THIS IN THIS AREA IS BELOW

19  SEA LEVEL, DRAINING DOWN TO THIS CORNER HERE, WHICH IS KIND OF

20  THE LOW POINT OF THE OVERALL ENTIRE SITE.

21          **MS. LEE:**  MR. AMAYA, JUST FOR THE RECORD, I WILL

22  EXPLAIN WHAT YOU SAID, AND CORRECT ME IF I'M WRONG.  MR. AMAYA

23  STATED THAT -- IN THE NORTHERN AREA -- ON THE UPPER LEFT-HAND

24  SIDE OF THE NORTHERN AREA BY MOWRY AVENUE IT'S ABOUT A 13 FOOT

25  ELEVATION THAT DRAINS TO THE PINCH POINT BY THE CONCRETE PAD

1    OUT THROUGH THE CULVERT PIPE INTO THE SLOUGH.  IN THE SOUTHERN

2    SECTION, MR. AMAYA INDICTED --

3         **MR. SMOCK:**  YOUR HONOR, I WOULD OBJECT TO COUNSEL'S

4    NARRATIVE.

5         **THE COURT:**  SUSTAINED.  HE SAID IT.

6    **BY MS. LEE:**

7    **Q.**  I WOULD LIKE TO DRAW YOUR ATTENTION, MR. AMAYA, TO THE

8    SOUTHERN SECTION, SPECIFICALLY TOWARD THE RIGHT-HAND SIDE OF

9    THE SOUTHERN SECTION WHERE YOU SEE GREEN AND THEN A STRIP OF

10   YELLOW RIGHT IN BETWEEN.

11   **A.**  OKAY.

12   **Q.**  COULD YOU DESCRIBE WHAT WE'RE LOOKING AT THERE IN TERMS OF

13   ELEVATION?

14   **A.**  IN TERMS OF ELEVATION, IN THIS PARTICULAR AREA, SO, AGAIN,

15   IT SLOPES THIS WAY (INDICATING), THERE IS A HIGHER POINT, SO

16   THIS PIECE THROUGH HERE IS A LITTLE HIGHER.  FOR INSTANCE, IF

17   YOU WERE TO TAKE THESE CONTOURS HERE AND RUN THEM STRAIGHT

18   ACROSS, YOU KNOW, THIS WOULD BE MORE OF A GENERAL SLOPE.

19        BUT IN THIS AREA, THIS IS HIGHER (INDICATING), SO THIS

20   IS -- I BELIEVE THIS IS CONTOUR 2.  SO THIS IS, YOU KNOW,

21   PROBABLY TWO AND A HALF FEET HIGHER HERE BECAUSE THE ELEVATION

22   OF THIS 2 COMES DOWN HERE.  AND THIS IS ACTUALLY ELEVATION 3.

23   SO IF YOU ARE DRAWING STRAIGHT ACROSS HERE, YOU WOULD

24   INTERPOLATE, WHAT IS CALLED INTERPOLATING CONTOURS, YOU WOULD

25   DETERMINE THAT THAT'S PROBABLY ABOUT TWO AND A HALF FEET.

AMAYA – CROSS / SMOCK

1   **Q.**  WOULD IT BE FAIR TO SAY THAT THAT YELLOW STRIP THAT IS IN

2   BETWEEN THE TWO GREEN PORTIONS, THAT THE TOPOGRAPHY OF THAT

3   LAND IS HIGHER GEOGRAPHICALLY THAN THE SURROUNDING GREEN AREA

4   IMMEDIATELY TO ITS RIGHT AND LEFT?

5   **A.**  YES.

6        **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR THIS

7   WITNESS.

8        **THE COURT:**  ANY CROSS-EXAMINATION?

9        **MR. SMOCK:**  YES, YOUR HONOR.  THANK YOU.

10                  **CROSS-EXAMINATION**

11  **BY MR. SMOCK:**

12  **Q.**  GOOD MORNING, MR. AMAYA.

13  **A.**  GOOD MORNING.

14  **Q.**  MY NAME IS NED SMOCK.

15     I WOULD LIKE TO START BY GOING OVER THIS AREA WITH YOU A

16  LITTLE BIT RELYING ON PHOTOGRAPHS THAT KIER & WRIGHT, YOUR

17  COMPANY, PRODUCED.

18     FIRST OF ALL, I WANT TO SHOW YOU DEFENSE EXHIBIT 2102,

19  WHICH FOR THE GOVERNMENT'S INFORMATION IS THE SAME AS

20  GOVERNMENT 170.

21             (EXHIBIT HANDED TO WITNESS.)

22     DO YOU RECOGNIZE THAT TO BE AN OVERVIEW OF THE SITE USED

23  BY KIER & WRIGHT?

24  **A.**  CORRECT.

25        **MR. SMOCK:**  I WOULD ASK THAT THAT BE ENTERED INTO

1      EVIDENCE AS DEFENSE EXHIBIT 2102.

2             **MS. LEE:**  NO OBJECTION, YOUR HONOR.

3             **THE COURT:**  2102 IS ADMITTED.

4         (DEFENDANT'S EXHIBIT 2101 RECEIVED IN EVIDENCE)

5             **MR. SMOCK:**  MR. WANZALA, CAN YOU PUT THAT ON THE

6      SCREEN?

7                        (DISPLAYED ON SCREEN.)

8      **BY MR. SMOCK:**

9      **Q.**  SO THIS SHOWS THE GENERAL MAP OF THE AREA IN AND AROUND

10     AREA 4, CORRECT?

11     **A.**  CORRECT.

12     **Q.**  NOW I WANT TO SHOW YOU WHAT HAS BEEN IDENTIFIED –– MARKED

13     FOR IDENTIFICATION AS DEFENSE EXHIBIT 2103.

14            **MR. SMOCK:**  AND FOR THE GOVERNMENT'S REFERENCE, THIS

15     IS GOVERNMENT EXHIBIT 169.

16                    (EXHIBIT HANDED TO WITNESS.)

17     **BY MR. SMOCK:**

18     **Q.**  DO YOU RECOGNIZE THAT TO BE A CLOSER UP SHOT SHOWING

19     AREA 4 IN MORE DETAIL?

20     **A.**  YES.

21            **MR. SMOCK:**  MR. WANZALA, I WOULD –– I WOULD ASK TO

22     INTRODUCE DEFENSE EXHIBIT 2103.

23            **MS. LEE:**  NO OBJECTION.

24            **THE COURT:**  2103 IS ADMITTED.

25         (DEFENDANT'S EXHIBIT 2103 RECEIVED IN EVIDENCE)

1        **MR. SMOCK:**  MR. WANZALA –– THANK YOU.

2        **THE CLERK:**  AS SOON AS I HEAR "ADMIT," I AM THE ONE

3   WHO PUBLISHES IT, I WILL HIT IT.

4        **MR. SMOCK:**  PERFECT.  THANK YOU.

5   **BY MR. SMOCK:**

6   **Q.**  I WOULD NOW LIKE TO SHOW YOU DEFENSE EXHIBIT 2104, WHICH

7   FOR THE GOVERNMENT'S INFORMATION IS THE SAME AS GOVERNMENT

8   1086.

9        (EXHIBIT HANDED TO WITNESS.)

10       THIS WAS ALSO PRODUCED TO US BY KIER & WRIGHT.  DO YOU

11  RECOGNIZE THAT TO BE A LARGER OVERVIEW OF THE SITE THAT WAS

12  PART OF YOUR STUDY?

13  **A.**  CORRECT.

14       **MR. SMOCK:**  I WOULD MOVE TO ADMIT DEFENSE

15  EXHIBIT 2104 INTO EVIDENCE.

16       **MS. LEE:**  NO OBJECTION.

17       **THE COURT:**  2104 IS ADMITTED.

18       (DEFENDANT'S EXHIBIT 2104 RECEIVED IN EVIDENCE)

19                  (DISPLAYED ON SCREEN.)

20       **MR. SMOCK:**  MR. WANZALA, CAN YOU ZOOM IN ON THE

21  NORTHERN AREA OF THIS DOCUMENT?

22  **BY MR. SMOCK:**

23  **Q.**  SO WHAT WE SEE HERE IS THE NORTHERN AREA; AM I RIGHT?

24  **A.**  YES.

25  **Q.**  AND THIS IS THE WAY IT LOOKED IN 2005 WHEN YOU AND YOUR

1    COMPANY WERE DOING MAPPING, CORRECT?

2    **A.**  WE WOULD HAVE TO LOOK TO SEE WHERE THESE PHOTOS -- WE FLEW

3    THE SITE A FEW DIFFERENT TIMES, SO IT WAS EITHER END OF 2005

4    OR BEGINNING OF 2006, BUT, YES.

5    **Q.**  AND YOU WENT TO THE SITE AT THAT TIME, CORRECT?

6    **A.**  YES.

7            **MR. SMOCK:**  OKAY.  MR. WANZALA, CAN YOU PULL BACK

8    FROM THAT AND ISOLATE ON THE SOUTHERN AREA.

9    **BY MR. SMOCK:**

10   **Q.**  MR. AMAYA, IS THIS CONSISTENT WITH THE WAY THAT THE SITE

11   LOOKED WHEN YOU WERE AT IT BACK IN 2005 AND 2006?

12   **A.**  I DID NOT WALK THE ENTIRE PROPERTY.  I TOOK OUR CREWS OUT

13   THERE AND MET WITH THEM OVER BY THE PICK 'N PULL AREA.  THAT

14   IS WHERE I WAS FAMILIAR WITH THE PROPERTY.

15   **Q.**  OKAY.  BUT YOU'RE AWARE THAT THIS WAS A PHOTOGRAPH USED BY

16   KIER & WRIGHT?

17   **A.**  YES.  UH-HUH.

18   **Q.**  WHEN YOU WENT TO THE SITE, DID YOU YOURSELF TAKE ANY

19   PHOTOGRAPHS OF THE SITE FROM THE GROUND?

20   **A.**  ME PERSONALLY, NO.

21   **Q.**  AND YOU ALSO WENT OUT TO AREA 4 WITH THESE PROSECUTORS IN

22   FEBRUARY OF LAST YEAR; IS THAT RIGHT?

23   **A.**  CORRECT.

24           **MR. SMOCK:**  SO, MR. WANZALA, I'M GOING TO ASK YOU TO

25   PUT UP GOVERNMENT EXHIBIT 171, WHICH HAS ALREADY BEEN

1    ADMITTED.

2                    (DISPLAYED ON SCREEN.)

3    **BY MR. SMOCK:**

4    **Q.**  I WANT TO JUST GET A LITTLE BIT MORE BACKGROUND ABOUT

5    TOPOGRAPHICAL MAPPING.  I AM NOT AN EXPERT IN THE AREA.

6        YOU TALKED ABOUT CONTOUR LINES, CORRECT?

7    **A.**  CORRECT.

8    **Q.**  NOW, THE CONTOUR LINES ON THIS MAP ARE THE RED LINES THAT

9    WE CAN SEE THROUGHOUT, CORRECT?

10   **A.**  CORRECT.

11   **Q.**  NOW, THOSE CONTOUR LINES IN ANY GIVEN TOPOGRAPHICAL MAP

12   CAN BE DONE AT ANY -- SOME -- ANY LEVEL OF DETAIL; IS THAT

13   RIGHT?  LET ME REPHRASE.  THAT IS AN ENTIRELY UNCLEAR

14   QUESTION.

15       CONTOUR LINES CAN BE DONE AT MEASUREMENTS OF 5 OR 10 FEET

16   APART; AM I RIGHT?

17   **A.**  YES.  THOSE ARE CALLED INTERVALS, SO, YES.

18   **Q.**  BUT INTERVALS CAN BE -- SO INTERVALS CAN BE AS MUCH AS 20

19   OR MORE FEET APART, CORRECT?

20   **A.**  CORRECT.

21   **Q.**  IN THIS MAP THE INTERVALS ARE -- REFLECTED IN THESE

22   CONTOUR LINES IS 1 FOOT APART?

23   **A.**  CORRECT.

24   **Q.**  YOU ALSO TALKED ABOUT THE BLUE MEASUREMENTS WHICH ARE

25   SCATTERED THROUGHOUT THIS ENTIRE MAP.  AND REMIND ME WHAT YOU

1  CALLED THOSE.

2  **A.**  WE CALL THOSE SPOT ELEVATIONS, SO THAT IS THE ELEVATION OF

3  THE GROUND AT THAT PARTICULAR LOCATION.

4  **Q.**  AND SO ON THIS MAP THOSE SPOT ELEVATIONS ARE DOWN TO THE

5  TENTH OF A FOOT, CORRECT?

6  **A.**  CORRECT.

7  **Q.**  SO THIS IS A VERY EXACT TOPOGRAPHICAL MAP, RIGHT?

8  **A.**  CORRECT.

9  **Q.**  NOW, WHEN YOU TALK ABOUT THE CONTOUR LINES, THOSE CONTOUR

10  LINES ARE GENERATED BY A COMPUTER PROGRAM; IS THAT RIGHT?

11  **A.**  THAT IS CORRECT.  FROM ALL THE SPOT ELEVATIONS.

12  **Q.**  OKAY.  SO WHAT THE COMPUTER DOES IS IT LOOKS AT THE SPOT

13  ELEVATIONS, LOOKS AT, I ASSUME, THE PHOTOGRAMMETRY; AM I

14  RIGHT?

15  **A.**  YES.  SO, AGAIN, PHOTOGRAMMETRY IS THE SCIENCE BEHIND

16  TAKING THE MEASUREMENTS, YES.

17  **Q.**  AND SO IT LOOKS AT ALL THAT INFORMATION AND THEN GENERATES

18  THESE CONTOUR LINES BASED ON ITS ESTIMATION OF WHERE A

19  PARTICULAR ELEVATION IS CONSISTENT?

20  **A.**  CORRECT.

21       **MR. SMOCK:**  I WOULD LIKE TO ASK MR. WANZALA TO FOCUS

22  ON THE CORNER OF -- WHAT MR. AMAYA HAS REFERRED TO AS THE

23  PINCH POINT, THE CORNER OF THAT CEMENT BLOT.

24       WHAT I AM GOING TO DO, IN HOPES THAT THIS IS MORE HELPFUL

25  AND VIEWABLE BY THE JURY, IS MOVE OVER HERE AND TRY TO KEEP MY

1    VOICE UP.

2    **BY MR. SMOCK:**

3    **Q.**  MR. AMAYA, ARE YOU AWARE THAT THE GOVERNMENT'S EXPERT,

4    DR. TERRY HUFFMAN, SAYS THAT THERE IS SOMETHING THAT HE CALLS

5    A TRIBUTARY WHICH STARTS HERE (INDICATING) NEXT TO THE METAL

6    FENCE OF THE PICK 'N PULL AND GOES ALONG THIS METAL FENCE AND

7    CONVERGES WITH ANOTHER PORTION OF THE TRIBUTARY WHICH HE SAYS

8    STARTS HERE ALONG THIS ELEVATED BERM, CONVERGES AT WHAT YOU

9    REFER TO AS THE PINCH POINT, AND THEN WINDS ALONG HERE,

10   ULTIMATELY ENDING UP AT THE CULVERT?

11       ARE YOU AWARE OF THAT?

12   **A.**  NO.

13           **MR. SMOCK:**  YOUR HONOR, WHAT I WOULD LIKE TO DO IS

14   SHOW MR. AMAYA AS A DEMONSTRATIVE SO THAT WE ARE –– ALL HAVE A

15   POINT OF REFERENCE, A COPY OF DR. HUFFMAN'S MAP WHICH SHOWS

16   WHERE THAT ALLEGED TRIBUTARY IS.  IT IS GOVERNMENT

17   EXHIBIT 542, AND I'M ONLY ASKING TO SHOW IT AS A

18   DEMONSTRATIVE.

19           **THE COURT:**  ANY OBJECTION?

20           **MS. LEE:**  CAN WE HAVE IT PULLED UP ON OUR SCREEN SO I

21   CAN SEE WHAT ––

22           **THE CLERK:**  CAN I HAVE THE NUMBER AGAIN, PLEASE?

23       **MR. SMOCK:**  542.

24       **MS. LEE:**  NO OBJECTION.

25           **THE COURT:**  ALL RIGHT.  SO ––

1    **MR. SMOCK:**  THANK YOU.

2          **THE COURT:**  -- EXHIBIT 542, LADIES AND GENTLEMEN, IS

3    BEING SHOWN TO YOU TO HELP ILLUSTRATE THE WITNESS'S TESTIMONY

4    BUT IS NOT BEING OFFERED OR INTRODUCED IN EVIDENCE.

5              (DISPLAYED ON SCREEN.)

6          **MR. SMOCK:**  SO, MR. AMAYA, I'M GOING TO ASK MY

7    FRIEND, MR. WANZALA, HERE TO FOCUS ON THE AREA -- THE SAME

8    AREA AROUND THE CORNER OF THAT PICK 'N PULL LOT.

9    **BY MR. SMOCK:**

10   **Q.**  SO WHAT WE SEE HERE IS THE GOVERNMENT'S EXPERT,

11   DR. HUFFMAN, WITH THE BLUE LINES SHOWING WHAT HE SAYS IS A

12   TRIBUTARY IN THE AREAS SHOWN IN BLUE ON THIS MAP.  DO YOU SEE

13   THAT?

14   **A.**  YES.

15   **Q.**  NOW, A TRIBUTARY CARRIES WATER, RIGHT?

16   **A.**  YES.

17   **Q.**  AND TRIBUTARIES BY THEIR NATURE ARE CHANNELS, RIGHT,

18   BECAUSE THEY CARRY WATER?

19   **A.**  I SUPPOSE SO.

20   **Q.**  AND BECAUSE WATER, AS YOU SAID, GOES TO THE LOWEST POINT,

21   A TRIBUTARY NECESSARILY WOULD BE A DEPRESSION IN THE GROUND

22   THAT IS A CHANNEL THAT'S LOWER THAN THE AREAS AROUND IT,

23   CORRECT?

24          **MS. LEE:**  OBJECTION.  FOUNDATION.  OUTSIDE THE SCOPE

25   OF THIS WITNESS'S KNOWLEDGE.

1          **MR. SMOCK:**  THIS WITNESS IS A TOPOGRAPHER.

2          **THE COURT:**  SUSTAINED.

3     **BY MR. SMOCK:**

4     **Q.**  YOU WOULD AGREE THAT WATER TRAVELS TO THE LOWEST POINT,

5     CORRECT?  YOU TESTIFIED TO THAT?

6     **A.**  CORRECT.

7          **MR. SMOCK:**  MR. WANZALA, CAN YOU PULL UP GOVERNMENT

8     EXHIBIT 171 AGAIN.

9                    (DISPLAYED ON SCREEN.)

10         NOW, MR. WANZALA, CAN YOU PULL UP THE AREA ABOVE THE

11    CORNER OF THAT PICK 'N PULL LOT.

12         ACTUALLY I TAKE THAT BACK, MR. WANZALA, CAN YOU DO BOTH

13    ABOVE AND BELOW FIRST?  SORRY.

14    **BY MR. SMOCK:**

15    **Q.**  SO HERE WE SEE YOUR TOPOGRAPHICAL MAPPING OF THE AREA

16    AROUND WHERE YOU REFERRED TO AS THE PINCH POINT, CORRECT?

17    **A.**  CORRECT.

18    **Q.**  DOES THIS PULL-OUT FAIRLY AND ACCURATELY REPRESENT YOUR

19    TOPOGRAPHICAL MAPPING OF THIS AREA?

20    **A.**  YES.

21    **Q.**  SO THE RECORD IS CLEAR, I WOULD LIKE TO INTRODUCE A COPY

22    OF THIS AS AN EXHIBIT, AND I'M GOING TO SHOW YOU WHAT'S BEEN

23    MARKED AS EXHIBIT 2046 FOR IDENTIFICATION.

24                    (EXHIBIT HANDED TO WITNESS.)

25         DOES THAT PHOTOGRAPH, AGAIN, FAIRLY AND ACCURATELY

1   REPRESENT THAT PARTICULAR AREA NEAR WHAT YOU REFER TO AS THE

2   PINCH POINT?

3   **A.**  IT DOES.

4           **MR. SMOCK:**  I MOVE TO ADMIT DEFENSE EXHIBIT 2046.

5           **THE COURT:**  ANY OBJECTION?

6           **MS. LEE:**  NO OBJECTION.

7           **THE COURT:**  EXHIBIT 2046 IS ADMITTED.

8       (DEFENDANT'S EXHIBIT 2046 RECEIVED IN EVIDENCE)

9               (DISPLAYED ON SCREEN.)

10          **MR. SMOCK:**  NOW, MR. WANZALA, CAN YOU PLEASE NOW ZOOM

11  IN ON THE NORTHERN -- THE AREA ABOVE THAT PINCH POINT?

12  **BY MR. SMOCK:**

13  **Q.**  AND I AM GOING TO SHOW YOU WHAT IS MARKED AS DEFENSE

14  EXHIBIT 2047 FOR IDENTIFICATION.

15              (EXHIBIT HANDED TO WITNESS.)

16     DOES THAT PHOTOGRAPH FAIRLY AND ACCURATELY REPRESENT THE

17  SPECIFIC AREA OF YOUR TOPOGRAPHICAL MAP ABOVE THE CORNER OF

18  THAT PICK 'N PULL LOT?

19  **A.**  YES.

20          **MR. SMOCK:**  I MOVE TO ADMIT DEFENSE EXHIBIT 2047.

21          **THE COURT:**  ANY OBJECTION?

22          **MS. LEE:**  NO OBJECTION.

23          **THE COURT:**  ADMITTED.

24      (DEFENDANT'S EXHIBIT 2047 RECEIVED IN EVIDENCE)

25  **BY MR. SMOCK:**

1    **Q.**  SO LET'S LOOK AT THIS MORE CAREFULLY.  AND YOU WILL

2    RECALL, MR. AMAYA, THAT WE TALKED ABOUT THE FACT THAT

3    DR. HUFFMAN SAID THAT THERE IS A TRIBUTARY THAT TRAVELS FROM

4    THIS LINE NEXT TO THE FENCE OF THE PICK 'N PULL AND THIS LINE

5    NEXT TO THE BERM (INDICATING) AND CONVERGES HERE AT WHAT YOU

6    HAVE REFERRED TO AS THE PINCH POINT, CORRECT?

7    **A.**  CORRECT.

8    **Q.**  AND WE TALKED ABOUT THE FACT THAT TOPOGRAPHICAL MAPS WOULD

9    SHOW EXACT ELEVATIONS BASED ON THE MEASUREMENTS THAT YOU AND

10    KIER & WRIGHT DID, CORRECT?

11    **A.**  CORRECT.

12    **Q.**  THIS LINE HERE, WHICH IS THE SORT OF ROUNDED LINE

13    (INDICATING) ABOVE THE CORNER OF THIS LOT REFLECTS THE

14    EXISTENCE OF THE -- A 2 FOOT LINE; IS THAT RIGHT?

15    **A.**  CORRECT.  THAT WOULD BE THE 2 FOOT CONTOUR.

16    **Q.**  OKAY.  THERE IS NO CONTOUR LINE ON THIS MAP REFLECTING A

17    DEPRESSION -- AN EXTENDED DEPRESSION OR CHANNEL ALONG THIS

18    PICK 'N PULL LOT; AM I RIGHT?

19    **A.**  NO, I DO NOT SEE A DRAINAGE DITCH.

20    **Q.**  LIKEWISE, WITH RESPECT TO THE AREA NEXT TO THIS ELEVATED

21    BERM, THERE IS NO TOPOGRAPHICAL MAPPING REFLECTING THE

22    EXISTENCE OF A CONTINUOUS CHANNEL ALONG THAT LINE EITHER, IS

23    THERE?

24    **A.**  THERE IS A LITTLE BIT OF ONE ALONG THAT LINE WHERE YOUR

25    2 FOOT CONTOUR COMES INTO WHERE THE FENCE IS THERE.

1    **Q.**  SO JUST SO WE ARE CLEAR, LOOKING AT THIS AREA ABOVE THE

2    ROUNDED LINE, CORRECT?

3    **A.**  UH-HUH.

4    **Q.**  EVERYTHING IN THIS AREA IS BETWEEN 1 -- I AM SORRY,

5    BETWEEN 2 AND 3 FEET, CORRECT?

6    **A.**  CORRECT.

7    **Q.**  AND THAT AREA EXTENDS ALONG THE BERM TOWARDS WHAT YOU

8    REFERRED TO AS THE PINCH POINT, CORRECT?

9    **A.**  CORRECT.

10    **Q.**  SO EVERYTHING HERE ALONG THIS LINE IS ACTUALLY BETWEEN 2

11    AND 3 FEET, CORRECT?

12    **A.**  YES, SO YOU HAVE A 2 FOOT AND THEN IT GOES UP TO A 3 FOOT

13    CONTOUR.

14    **Q.**  CORRECT.

15        SO THERE IS NO INDICATION OF A DEPRESSION ON THIS LINE, IN

16    FACT, WHAT YOU SEE IS ACTUALLY AN INCREASE IN ELEVATION AS IT

17    APPROACHES THE BERM, CORRECT?

18    **A.**  CORRECT.

19    **Q.**  AND SO WE'RE CLEAR, ALL THESE RED LINES HERE ALONG THIS

20    LINE REFLECT THE INCREASE IN ELEVATION, THAT IS THE ELEVATED

21    BERM?

22    **A.**  CORRECT.

23        **MR. SMOCK:**  MR. WANZALA, CAN YOU PULL OUT THE AREA

24    BELOW WHAT MR. AMAYA HAS REFERRED TO AS THE PINCH POINT?

25    **BY MR. SMOCK:**

1   **Q.**  MR. AMAYA, I'M GOING TO SHOW YOU WHAT HAS BEEN PREMARKED

2   AS DEFENSE EXHIBIT 2048 FOR IDENTIFICATION.

3                  (EXHIBIT HANDED TO WITNESS.)

4      DOES THAT IMAGE THAT I'VE HANDED TO YOU FAIRLY AND

5   ACCURATELY REPRESENT THE SPECIFIC TOPOGRAPHICAL MAPPING DONE

6   BY KIER & WRIGHT WITH RESPECT TO THE AREA BETWEEN THE CORNER

7   OF THE CEMENT LOT AND THE LEVEE?

8   **A.**  CORRECT.

9           **MR. SMOCK:**  I WOULD MOVE TO ADMIT DEFENSE

10  EXHIBIT 2048.

11          **MS. LEE:**  NO OBJECTION.

12          **THE COURT:**  2048 IS ADMITTED.

13      (DEFENDANT'S EXHIBIT 2048 RECEIVED IN EVIDENCE)

14  **BY MR. SMOCK:**

15  **Q.**  SO LET'S LOOK AT THIS AREA MORE CLEARLY.

16      YOU WILL RECALL THAT THIS IS AN AREA WHERE DR. HUFFMAN

17  SAID THERE IS A TRIBUTARY GOING FROM THIS CORNER AND SNAKING

18  ALONG TO THE CULVERT HERE.  DO YOU RECALL THAT, SEEING THAT ON

19  HIS MAP?

20  **A.**  YES.

21  **Q.**  HERE WE SEE THE INDICATION OF WHAT YOU REFERRED TO AS A

22  PLACE WHERE YOU SAW WATER, I THINK, HERE IN THIS CIRCLE, WHICH

23  HAS LOWER ELEVATION THAN THE AREA AROUND IT, CORRECT?

24  **A.**  CORRECT.

25  **Q.**  WE DO NOT SEE ANY MEASUREMENTS REFLECTING THE EXISTENCE OF

1    A CONTINUOUS CHANNEL GOING FROM THE PINCH POINT TO THE

2    CULVERT, CORRECT?

3    **A.**  CORRECT.

4              **MR. SMOCK:**  NOW I WOULD LIKE TO LOOK AT THE SOUTHERN

5    AREA.  MR. WANZALA, WOULD YOU PLEASE PUT UP GOVERNMENT

6    EXHIBIT 173, WHICH IS ALREADY ADMITTED INTO EVIDENCE.

7                        (DISPLAYED ON SCREEN.)

8    **BY MR. SMOCK:**

9    **Q.**  NOW, MR. AMAYA, ARE YOU AWARE THAT THE GOVERNMENT'S

10   EXPERT, TERRY HUFFMAN, SAYS THAT THERE IS SOMETHING THAT HE

11   HAS REFERRED TO AS TRIBUTARY A WHICH HE HAS SAID RUNS ALONG

12   THIS ELEVATED BERM AND GOES TO THE BOTTOM OF THE PICTURE HERE?

13   ARE YOU AWARE OF THAT?

14   **A.**  NO, I WAS NOT.

15             **MR. SMOCK:**  YOUR HONOR, I'D HERE, AGAIN, LIKE TO SHOW

16   MR. AMAYA FOR REFERENCE DR. HUFFMAN'S MAP, WHICH IS GOVERNMENT

17   EXHIBIT 543, FOR DEMONSTRATIVE PURPOSES.

18             **THE COURT:**  ANY OBJECTION?

19             **MS. LEE:**  NO OBJECTION.

20             **THE COURT:**  LADIES AND GENTLEMEN, AGAIN, EXHIBIT 543

21   WILL BE USED TO ILLUSTRATE TESTIMONY BUT IT IS NOT BEING

22   OFFERED OR ADMITTED AS A PIECE OF EVIDENCE.

23                        (DISPLAYED ON SCREEN.)

24   **BY MR. SMOCK:**

25   **Q.**  SO, MR. AMAYA --

1          **MR. SMOCK:**  ACTUALLY, MR. WANZALA, CAN YOU PULL UP

2      THE AREA AROUND THAT YELLOW LINE?

3      **BY MR. SMOCK:**

4      **Q.**  SO, MR. AMAYA, FOR YOUR INFORMATION, DR. HUFFMAN HAS

5      INDICATED THAT THERE IS WHAT HE REFERS TO AS A TRIBUTARY ALONG

6      THIS LINE.  AND SO YOU'RE GROUNDED HERE, THIS IS THE SAME LINE

7      AS THE RED ELEVATED BERM THAT WE SAW IN THE PREVIOUS PICTURE.

8      DOES THAT MAKE SENSE?

9      **A.**  I THINK THAT'S A DIFFERENT BERM.

10     **Q.**  WELL, LET'S PULL OUT SO YOU CAN GET YOUR BEARINGS.  THERE

11     MAY BE A CONFUSION FOR YOU BECAUSE THIS MAP IS AT A DIFFERENT

12     ANGLE.

13          **MR. SMOCK:**  MR. WANZALA, WOULD YOU PLEASE TAKE THAT

14     OUT, PUT UP THE SAME MAP BUT WITHOUT THE PULL-OUT.

15                    (DISPLAYED ON SCREEN.)

16     **BY MR. SMOCK:**

17     **Q.**  SO YOU GET YOUR BEARINGS HERE, DO YOU SEE THE NORTHERN

18     AREA, WHICH WE ALWAYS SORT OF IDENTIFY BECAUSE THERE IS A

19     PICK 'N PULL PARKING LOT HERE?

20     **A.**  UH-HUH.

21     **Q.**  CAN YOU IDENTIFY THE SOUTHERN AREA HERE BELOW IT?

22     **A.**  CORRECT.

23     **Q.**  AND THEN BELOW THAT STILL IS ANOTHER AREA WHICH WASN'T

24     IMPACTED HERE AND WE HAVEN'T BEEN DISCUSSING.  BUT WOULD YOU

25     TRUST ME IF I TELL YOU THIS IS THE SAME BERM?  I WILL SHOW YOU

1    AGAIN THE PICTURE --

2    **A.**  SAME BERM AS WHAT?

3        **MR. SMOCK:**  LET'S PUT UP GOVERNMENT EXHIBIT 173 AGAIN

4    JUST SO WE KNOW WHERE WE ARE.

5                      (DISPLAYED ON SCREEN.)

6    **BY MR. SMOCK:**

7    **Q.**  SO THIS IS THE SAME BERM THAT I AM SPEAKING OF.

8    **A.**  OKAY.

9    **Q.**  AND, IN FACT, IN YOUR TESTIMONY JUST NOW YOU SPOKE ABOUT A

10   DITCH ALONG THAT BERM, RIGHT?

11   **A.**  CORRECT.

12   **Q.**  NOW, A DITCH IS -- LIKE WE TALKED ABOUT A TRIBUTARY, IT IS

13   A DEPRESSION AND IT'S A CHANNEL ESSENTIALLY, CORRECT?

14   **A.**  CORRECT.

15   **Q.**  AND TO BE A CONTINUOUS DITCH, THAT DEPRESSION MUST BE

16   CONTINUOUS, CORRECT, BELOW THE REST OF THE LAND?

17   **A.**  YES.

18   **Q.**  OKAY.  LET'S GO ALONG THIS ELEVATED BERM.

19       **MR. SMOCK:**  MR. WANZALA, WOULD YOU PLEASE START AT

20   THE BOTTOM HERE AROUND THE DUCK POND.

21   **BY MR. SMOCK:**

22   **Q.**  HERE WE SEE WHAT APPEARS TO BE WATER WHICH APPEARS TO LINK

23   THE DUCK PONDS AND THIS AREA OF PONDED WATER HERE

24   (INDICATING), CORRECT?

25   **A.**  CORRECT.

1    **Q.**  AND YOUR ELEVATIONS REFLECT THE FACT THAT THERE IS A LOWER

2    POINT WHERE THIS WATER IS, RIGHT?

3    **A.**  YES.

4          **MR. SMOCK:**  OKAY.  NOW, MR. WANZALA, CAN YOU SLOWLY

5    MOVE UP THIS LINE, THIS ELEVATED BERM, AND JUST STOPPING HERE,

6    I JUST WANT TO MAKE SURE WE ARE UNDERSTANDING WHAT WE ARE

7    SEEING.

8    **BY MR. SMOCK:**

9    **Q.**  THESE DARKER RED LINES, AGAIN, REFLECT AN ELEVATION -- AN

10   INCREASE IN ELEVATION CONSISTENT WITH THE ELEVATED BERM; AM I

11   RIGHT?

12   **A.**  WELL, THAT LINE I BELIEVE YOU JUST POINTED TO WAS CONTOUR

13   ZERO.

14   **Q.**  I'M POINTING TO THESE DARKER RED LINES ALONG THE ELEVATED

15   BERM.

16   **A.**  RIGHT.  SO THE BRIGHTER RED LINE IS THE INDEX CONTOUR.

17   THE OTHER LINES ARE THE ONE FOR CONTOUR INDEX, YES.

18         **MR. SMOCK:**  SO MOVING ALONG HERE, CAN YOU STOP THERE.

19   **BY MR. SMOCK:**

20   **Q.**  IN THIS LOWER CORNER WITH THE BRIGHT RED LINES, THOSE

21   REFLECT AN AREA THAT IS BELOW SEA LEVEL, CORRECT?  WHICH --

22   WHERE YOU SEE THE LAST BIT OF PONDED WATER?

23   **A.**  CORRECT.

24   **Q.**  AND YOU SEE SOME OF THAT BELOW SEA LEVEL AREA HERE IN THIS

25   SORT OF PACKMAN SHAPED CONTOUR CIRCLE?

AMAYA – CROSS / SMOCK

1    **A.**  CORRECT.  THAT'S KIND OF THE LOW POINT FOR THE AREA.

2    **Q.**  OKAY.  SO IN OTHER WORDS, THIS DEPRESSION THAT CONTAINED

3    WATER AT THE BOTTOM OF THIS PICTURE DOES NOT CONTINUE FURTHER

4    ON ALONG THIS BERM, CORRECT?

5    **A.**  FROM WHAT I AM LOOKING AT HERE, IT DOES NOT.

6    **Q.**  OKAY.  THIS IS YOUR TOPOGRAPHICAL MAP?

7    **A.**  YES.

8         **MR. SMOCK:**  CAN WE MOVE FURTHER ALONG THE BERM.  AND

9    STOP HERE.

10   **BY MR. SMOCK:**

11   **Q.**  AGAIN, THESE DARK RED CONTOUR LINES HERE (INDICATING)

12   REFLECT THE INCREASE IN ELEVATION IN LEVELS OF 1 FOOT AT A

13   TIME REFLECTING THE EXISTENCE OF AN ELEVATED BERM, CORRECT?

14   **A.**  CORRECT.

15        **THE REPORTER:**  I'M SORRY, WOULD YOU RESTATE YOUR

16   QUESTION?

17   **BY MR. SMOCK:**

18   **Q.**  THESE DARK RED LINES REFLECT INCREASES IN INCREMENTS OF 1

19   FOOT CONSISTENT WITH AN INCREASE IN ELEVATION BECAUSE THERE'S

20   AN ELEVATED BERM THERE?

21   **A.**  RIGHT.  BUT THEN IT'S ACTUALLY A LOW POINT, THOUGH.  SO IT

22   GOES -- IT GOES DOWN AND THEN IT GOES BACK UP THE LEVEE.

23   **Q.**  WHERE ON THIS MAP ARE YOU SEEING A LOW POINT?

24   **A.**  SO CAN I?

25        **MR. SMOCK:**  YES.

1      **THE COURT:** YES.

2           **THE WITNESS:** SO THIS ELEVATION HERE (INDICATING) IT

3    DROPS DOWN AND THIS IS -- THIS IS THE LOW POINT, AND THEN IT

4    GOES UP TO THE TOP OF THE BERM. SO THESE ARE -- YOU SEE THE

5    WATER IS FLOWING THIS WAY. THESE ARE --

6    **BY MR. SMOCK:**

7    **Q.** WHERE IS THERE WATER ON THAT IMAGE?

8    **A.** NO, I AM JUST SAYING THE WATER WOULD FLOW THAT WAY BASED

9    ON THE CONTOURS, BECAUSE, AGAIN, THIS IS -- THIS IS A LOWER

10   POINT GOING BACK DOWN THAT WAY (INDICATING).

11   **Q.** SO WALK ME THROUGH THIS ON THIS MAP. YOUR TESTIMONY IS --

12   AND THIS IS A LITTLE BIT AWKWARD. I AM GOING TO HAVE TO STAND

13   BY YOU HERE BECAUSE WE ARE LOOKING AT THE MAP. ALL OF THESE

14   AREAS HERE (INDICATING) BECAUSE WE HAVE SEEN MEASUREMENTS

15   OF --

16   **A.** LESS THAN A FOOT. SO THIS IS ELEVATIONS HERE.

17   **Q.** THIS IS ELEVATION ZERO?

18   **A.** YES.

19   **Q.** THESE ELEVATIONS ARE ALL ZERO TO 1 FOOT?

20   **A.** CORRECT.

21   **Q.** YOUR TESTIMONY IS THAT THIS CONTOUR LINE REFLECTS WHAT?

22   **A.** NO. SO THIS IS -- THIS IS THE 1 FOOT CONTOUR -- I AM

23   SORRY, THIS IS 1 FOOT, 2 FOOT, 3 FOOT, AND GOES UP TO 4 FOOT

24   AT THE HIGH POINT.

25   **Q.** SO YOUR TESTIMONY THEN IS THAT, IN FACT, THESE DO REFLECT

```
1    AN INCREASE IN ELEVATION?

2    A.   CORRECT.

3    Q.   OKAY.  SO YOU WERE MISTAKEN EARLIER?

4    A.   YES.  I LOOKED AT IT WRONG.  I AM SORRY.

5         MR. SMOCK:  MOVING FURTHER ALONG THIS ELEVATED BERM,

6    CAN YOU STOP THERE, MR. WANZALA.

7    BY MR. SMOCK:

8    Q.   I AM GOING TO DIRECT YOUR ATTENTION SPECIFICALLY TO A

9    CONTOUR LINE HERE ALONG THE BERM WITH A MEASUREMENT WITHIN IT

10   OF NEGATIVE 1.2 FEET.  DO YOU SEE THAT?

11   A.   I CAN'T SEE IT ON THE SCREEN I'M LOOKING AT.

12        MR. SMOCK:  HERE WE COME TO A PROBLEM WITH OUR

13   TECHNOLOGY.  MR. WANZALA, CAN YOU PULL THAT OUT A LITTLE BIT,

14   JUST ISOLATE IT ON THAT ONE PLACE?

15              (PAUSE IN THE PROCEEDINGS.)

16   BY MR. SMOCK:

17   Q.   CAN YOU READ THAT NOW?

18   A.   YES.

19   Q.   SO THAT IS A DEPRESSION, IS IT NOT?

20   A.   CORRECT.

21   Q.   THAT'S AN AREA THAT IS 1.2 FEET BELOW SEA LEVEL, RIGHT?

22   A.   CORRECT.

23   Q.   AND THE LINE AROUND IT REFLECTS THE AREA THAT IS 1 FOOT

24   BELOW SEA LEVEL, CORRECT?

25   A.   CORRECT.
```

1  **Q.**  YOU TALKED ABOUT THIS WITH RESPECT TO THE EDGES OF A LAKE,

2  RIGHT?

3  **A.**  RIGHT.

4  **Q.**  THAT THAT WOULD REFLECT THE EXISTENCE OF THE BOUNDARIES OF

5  THE LAKE, RIGHT?

6  **A.**  YES.

7  **Q.**  NOW, ONE LINE AWAY FROM THAT IS THE SEA LEVEL LINE,

8  CORRECT?

9  **A.**  CORRECT.

10 **Q.**  SO THAT REFLECTS AN AREA THAT -- WITHIN THIS DEPRESSION

11 THAT IS 0 FEET, CORRECT?

12 **A.**  CORRECT.

13       **MR. SMOCK:**  OKAY.  SO NOW THAT WE HAVE GOT OUR

14 BEARINGS WITH THAT, I AM GOING TO ASK MR. WANZALA TO PULL OUT

15 AND GO BACK TO SORT OF THE SAME AREA ALONG THE BERM THAT WE

16 WERE LOOKING AT BEFORE.

17       OKAY.  THANK YOU.

18 **BY MR. SMOCK:**

19 **Q.**  NOW, SO DO YOU SEE HERE AGAIN WHERE THE NEGATIVE 1.2

20 DEPRESSION IS, THE HOLE THERE?

21 **A.**  YES.

22 **Q.**  AND NOW WE TALKED ABOUT THE FACT THAT THAT NEGATIVE 1 LINE

23 COMES TO AN END BETWEEN THESE TWO POINTS ON THE MAP, CORRECT?

24 **A.**  CORRECT.

25 **Q.**  THEN WE ALSO SEE THAT THERE IS A -- THE BRIGHTER RED LINE

AMAYA – CROSS / SMOCK

1    IS THE SEA LEVEL LINE, CORRECT?

2    **A.**   CORRECT.

3    **Q.**   AND WE SEE HERE ON THE MAP THAT THAT ZERO PLACE, THE

4    DEPRESSION THERE AT ZERO COMES TO AN END HERE ALONG THE BERM,

5    (INDICATING), CORRECT?

6    **A.**   CORRECT.

7            **MR. SMOCK:**   AND WE'VE SEEN PHOTOGRAPHS OF WATER IN

8    THIS HOLE.  I AM GOING TO MOVE YOU FURTHER ALONG THIS ELEVATED

9    BERM, AND CAN YOU STOP HERE.

10   **BY MR. SMOCK:**

11   **Q.**   HERE WE SEE THE TOP OF THE HOLE THAT HAS A NEGATIVE 1

12   LEVEL, AND THEN THE CONTINUATION OF AN AREA THAT HAS ZERO,

13   CORRECT?

14   **A.**   CORRECT.

15   **Q.**   AND THAT CARRIES ALONG FURTHER ALONG THIS BERM, CORRECT?

16   **A.**   CORRECT.

17           **MR. SMOCK:**   MR. WANZALA, CAN YOU GO BACK DOWN THE

18   BERM AGAIN.

19       KEEP GOING A LITTLE FURTHER.  STOP.

20   **BY MR. SMOCK:**

21   **Q.**   SO HERE AGAIN WE SEE THE POINT ON THE BERM WHERE THIS

22   DEPRESSION COMES TO AN END, CORRECT, AT WHERE MY FINGER IS

23   POINTING?

24   **A.**   CORRECT.

25   **Q.**   THERE'S NO TOPOGRAPHICAL EVIDENCE OF A CONTINUOUS

1    DEPRESSION ALONG THIS BERM THAT GOES FURTHER DOWN THE LINE TO

2    CONNECT WITH ANOTHER AREA, CORRECT?

3    **A.**  CORRECT.

4         **MR. SMOCK:**  MR. WANZALA, WOULD YOU PLEASE PULL OUT

5    THE MIDDLE AREA ALONG THAT BERM.  AND BEAR WITH ME, I AM GOING

6    TO SEE WHETHER WE CAN ACTUALLY SEE THE ELEVATIONS HERE.

7    **BY MR. SMOCK:**

8    **Q.**  ARE YOU ABLE TO SEE THE BLUE DATA POINTS ALONG HERE?

9    **A.**  NOT VERY WELL.

10        **MR. SMOCK:**  MR. WANZALA, MAYBE IF YOU MADE IT A

11   SMALLER IMAGE.

12   **BY MR. SMOCK:**

13   **Q.**  DOES THAT HELP AT ALL?

14   **A.**  YES.

15   **Q.**  AND I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS DEFENSE

16   EXHIBIT 2049 FOR IDENTIFICATION.

17             (EXHIBIT HANDED TO THE WITNESS)

18     DOES THAT FAIRLY REPRESENT THE AREA ALONG THE BERM IN THE

19   MIDDLE AREA THAT WE ARE -- WERE JUST SHOWING YOU?

20   **A.**  CORRECT.

21        **MR. SMOCK:**  I WOULD ASK TO INTRODUCE DEFENSE

22   EXHIBIT 2049 INTO EVIDENCE.

23        **MS. LEE:**  NO OBJECTION.

24        **THE COURT:**  IT'S ADMITTED.

25     (DEFENDANT'S EXHIBIT 2049 RECEIVED IN EVIDENCE)

```
 1    BY MR. SMOCK:
 2    Q.  SO LOOKING AT THE SPOT ELEVATIONS ON THIS MAP -- AND,
 3    AGAIN, SO WE HAVE OUR BEARINGS, THIS IS THE ELEVATED BERM IN
 4    THIS CORNER, CORRECT?
 5    A.  CORRECT.
 6    Q.  AND SO WE ARE LOOKING AT A SPECIFIC AREA NEXT TO THE
 7    ELEVATED BERM HERE, SO WE HAVE OUR BEARINGS.
 8        YOU WOULD AGREE LOOKING AT THESE SPOT ELEVATIONS THAT THE
 9    ELEVATIONS IN THIS AREA ARE VARIABLE, RIGHT?
10    A.  YES.
11    Q.  IN FACT, IF WE LOOK CAREFULLY, WE SEE THAT SOME ELEVATIONS
12    CLOSER TO THE BERM ARE, IN FACT, HIGHER THAN ELEVATIONS THAT
13    ARE FURTHER FROM THE BERM, CORRECT?
14    A.  YES, THERE ARE SOME.
15    Q.  IN FACT, A NUMBER OF ELEVATIONS HERE (INDICATING) FAR FROM
16    THE BERM ARE .1, .1, .1, .2, CORRECT?
17    A.  CORRECT.
18            MR. SMOCK:  CAN I HAVE ONE MOMENT?
19        NOTHING FURTHER.  THANK YOU.
20            THE COURT:  ANY REDIRECT?
21            MS. LEE:  A FEW QUESTIONS, YOUR HONOR.
22                    REDIRECT EXAMINATION
23    BY MS. LEE:
24    Q.  MR. AMAYA, I WOULD LIKE TO BRING UP EXHIBIT 172.
25                    (DISPLAYED ON SCREEN.)
```

1      THIS IS THE OVERALL TOPOGRAPHIC -- IT'S AN OVERALL EXHIBIT

2    OF THE TOPOGRAPHY OF NEWARK AREA 4; IS THAT CORRECT?

3    **A.**  CORRECT.

4    **Q.**  AND WE JUST SPENT SOME TIME GOING THROUGH ALL OF THE

5    INDIVIDUAL DATA WITH RESPECT TO ELEVATION COMPARED TO MEAN SEA

6    LEVEL; IS THAT RIGHT?

7    **A.**  CORRECT.

8    **Q.**  DOES THAT CHANGE YOUR OPINION IN HOW WATER FLOWS AND

9    DRAINS OFF THIS PROPERTY?

10   **A.**  NO.

11   **Q.**  AND CAN YOU DESCRIBE HOW WATER FLOWS AND DRAINS OFF OF THE

12   NORTHERN PROPERTY AND ALSO THE SOUTHERN PROPERTY?

13          **MR. SMOCK:**  YOUR HONOR, THAT QUESTION WAS ASKED AND

14   ANSWERED ON DIRECT.

15          **THE COURT:**  IT WAS.  SUSTAINED.

16   **BY MS. LEE:**

17   **Q.**  WHAT I WOULD LIKE TO DO IS SHOW YOU WHAT'S ALREADY BEEN

18   PUT INTO EVIDENCE AS EXHIBIT 283.

19               (DISPLAYED ON SCREEN.)

20      DO YOU RECOGNIZE WHAT THAT IS, MR. AMAYA?

21   **A.**  YES, THAT LOOKS LIKE THE SOUTH FILL AREA.

22   **Q.**  IS THAT A PHOTO OF THE DRAINAGE DITCH THAT YOU MENTIONED

23   THAT RUNS ALONG THE ELEVATED BERM?

24   **A.**  YES.  THAT'S THE LOW POINT OF WHERE THE WATER DRAINS

25   TOWARDS THE BERM.

1    **Q.**  AND DOES YOUR TOPOGRAPHIC MAP CAPTURE THAT LOW POINT IN

2    TERMS OF A -- KIND OF A -- WHAT IS IT... LIKE A TROUGH THAT

3    RUNS ALONG THE BERM?

4    **A.**  NOT IN THAT PARTICULAR AREA.  THERE IS A LOT OF

5    VEGETATION, SO WE DIDN'T DO THE DETAIL DESIGN LEVEL

6    TOPOGRAPHIC SURVEY IN THAT AREA FOR THAT DITCH OR FOR THAT LOW

7    POINT.  BUT IF YOU LOOK AT THE OVERALL GENERAL SLOPE OF THE

8    PROPERTY, IT IS DRAINING TOWARDS THE BERM.

9    **Q.**  WOULD IT BE FAIR THAT THE TOPOGRAPHIC -- WOULD IT BE FAIR

10   TO SAY THAT THE TOPOGRAPHIC MAP DID NOT GO TO SUCH FINE DETAIL

11   TO BE ABLE TO DELINEATE THAT TROUGH?

12              **MR. SMOCK:**  OBJECTION.

13              **THE COURT:**  WHAT IS THE OBJECTION?

14              **MR. SMOCK:**  LEADING.

15              **THE COURT:**  OVERRULED.

16              **THE WITNESS:**  YES.  BECAUSE -- BECAUSE OF THE

17   VEGETATION -- AGAIN, A LOT OF THESE CONTOUR LINES WERE TAKEN

18   FROM AN AIRPLANE, SO IN THAT LOCATION IT IS -- THERE COULD BE

19   SOME ADDITIONAL SURVEY THAT WOULD HAVE NEEDED TO HAVE BEEN

20   DONE IF WE WERE STUDYING THAT PARTICULAR DITCH.  BUT ALL IN

21   ALL, AGAIN, WE WERE LOOKING FOR GENERAL SLOPE OF THE PROPERTY,

22   WHICH WAS -- IT IS ALL DRAINING TOWARDS THE BERM.

23   **BY MS. LEE:**

24   **Q.**  OKAY.  I WOULD ALSO LIKE TO SHOW YOU WHAT IS ALREADY IN

25   EVIDENCE, WHICH IS EXHIBIT 263.

1           (DISPLAYED ON SCREEN.)

2      DO YOU RECOGNIZE THIS PHOTO, MR. AMAYA?

3  **A.**  I DO NOT.

4  **Q.**  OKAY.  THEN I WOULD LIKE TO SHOW YOU EXHIBIT 261.

5           (DISPLAYED ON SCREEN.)

6           **THE CLERK:**  I DON'T HAVE MY LIST UP.  IS THAT ALREADY

7  IN?

8           **MS. LEE:**  THAT IS ALREADY ADMITTED INTO EVIDENCE.

9  **BY MS. LEE:**

10  **Q.**  YOU WILL NOTICE THE CONCRETE PAD AND SOME OF THE TRUCKING

11  CONTAINERS UP ON TO -- ON THE BACKGROUND OF THE PICTURE?

12  **A.**  OKAY.

13  **Q.**  DOES THAT HELP GIVE YOU AN ALIGNMENT AS TO WHERE WE ARE ON

14  THE PROPERTY?

15  **A.**  IT APPEARS THAT WE'RE STANDING ON THE BERM LOOKING TOWARDS

16  THE PICK 'N PULL.

17  **Q.**  AND THE WATER THAT YOU SEE IN THIS PHOTO, IS THAT

18  COMPARABLE TO THE WATER THAT YOU SAW BACK IN '07 WHEN YOU WERE

19  VISITING THE SITE FOR TOPOGRAPHIC PURPOSES?

20  **A.**  NO.  AT THAT TIME THERE WAS VERY LITTLE WATER.

21  **Q.**  OKAY.  DID YOU GO ON TO THE SITE IN 2007?

22  **A.**  NOT IN THIS LOCATION.

23  **Q.**  OKAY.  WHEN DID YOU GO ON TO THE SITE?

24  **A.**  WENT ON TO THE SITE, LIKE I SAID, TO DISPATCH THE CREWS.

25  AND THE FIRST SCOPE OF WORK WAS ACTUALLY A PIECE OF PROPERTY

1    THAT IS ADJACENT TO THIS AREA THAT WE ARE TALKING ABOUT NOW,

2    AND THAT'S WHERE I HAD DISPATCHED THE CREWS FROM, AND THEN THE

3    JOB KIND OF GREW FROM THERE.  BUT I NEVER -- I HAD NEVER WENT

4    BACK TO THE SITE UNTIL WE WENT, I BELIEVE IT WAS LAST YEAR.

5    **Q.**  AND WHEN WE WENT LAST YEAR, WERE YOU ABLE TO SEE HOW THE

6    WATER DRAINED FROM THE NORTHERN SECTION OF THE PROPERTY, THE

7    NORTHERN FILL AREA?

8    **A.**  I BELIEVE AT THAT TIME AS WELL THERE WAS NO WATER IN THIS

9    LOCATION.

10   **Q.**  BUT DO YOU KNOW HOW WATER DRAINS --

11   **A.**  OH, YES.

12   **Q.**  -- FROM THE NORTHERN SECTION?

13   **A.**  I MEAN, BASED ON OUR TOPO, IT DRAINS TO THAT PINCH POINT

14   AND THEN AROUND TO THAT CULVERT.  THAT IS THE ONLY WAY FOR

15   WATER TO GET OUT OF THAT AREA.

16          **MS. LEE:**  I WOULD LIKE TO SHOW MR. AMAYA GOVERNMENT'S

17   865A AS A DEMONSTRATIVE, NOT TO MOVE IT INTO EVIDENCE AT THIS

18   POINT BUT AS A DEMONSTRATIVE OF SHOWING THE WATER COMING OUT

19   OF THAT CULVERT PIPE.

20          **THE COURT:**  ANY OBJECTION?

21          **MR. SMOCK:**  NO.

22          **THE COURT:**  ALL RIGHT.  SO 865A MAY BE USED AS A

23   DEMONSTRATIVE EXHIBIT.

24                  (DISPLAYED ON SCREEN.)

25   **BY MS. LEE:**

AMAYA – REDIRECT / LEE

1    **Q.**  DO YOU RECOGNIZE THAT, MR. AMAYA?

2    **A.**  THAT APPEARS TO BE, I BELIEVE, ON THE MOWRY SLOUGH SIDE OF

3    THE PROPERTY –– OF THE LEVEE THERE.

4    **Q.**  OKAY.  IS THAT WATER DRAINING OFF OF THAT PROPERTY INTO

5    THE SLOUGH?

6    **A.**  YES.

7    **Q.**  WOULD THAT BE CONSISTENT WITH WHAT YOU TESTIFIED AS TO THE

8    GENERAL WAY WATER GOES FROM THE EASTERN SIDE OF THE PROPERTY

9    DOWN OUT TOWARD THE WESTERN SIDE INTO THE SLOUGH?

10   **A.**  YES, IT DRAINS FROM WHERE I SAID THE ELEVATION WAS

11   ELEVATION 13 TO WHERE I SAID THAT THE WATER WAS AT LEVEL .75.

12          **MS. LEE:**  OKAY.  I WOULD ALSO LIKE TO SHOW AS A

13   DEMONSTRATIVE GOVERNMENT'S 865C, WHICH IS A DEMONSTRATIVE

14   VIDEO OF THAT DRAINAGE DITCH –– OF WHAT YOU HAD TESTIFIED

15   EARLIER THAT DRAINAGE DITCH GOING UNDER THAT CULVERT OUT TO

16   THE –– THE OTHER DITCH THAT GETS PUMPED OUT.

17          **MR. SMOCK:**  YOUR HONOR, I AM GOING TO OBJECT ON

18   FOUNDATION GROUNDS.  THIS MAY BE ABLE TO COME IN THROUGH

19   ANOTHER WITNESS, BUT THIS WITNESS HAS TESTIFIED THAT HE HASN'T

20   SEEN THIS, HASN'T BEEN TO THE SITE RECENTLY, OR OBSERVED THESE

21   THINGS.

22          **THE COURT:**  SUSTAINED.

23          **MS. LEE:**  PERHAPS, YOUR HONOR, I CAN TRY TO LAY THE

24   FOUNDATION OR NO?

25          **THE COURT:**  BASED ON WHAT HE HAS SAID ALREADY,

1    SUSTAINED.

2         **MS. LEE:**  THANK YOU.  I HAVE NO FURTHER QUESTIONS FOR

3    THIS WITNESS.

4         **THE COURT:**  ANY RECROSS?

5         **MR. SMOCK:**  YES, JUST BRIEFLY.

6                        **RECROSS-EXAMINATION**

7    BY MR. SMOCK:

8    **Q.**  MR. AMAYA, THE GOVERNMENT SHOWED YOU GOVERNMENT

9    EXHIBIT 283.

10        **MR. SMOCK:**  AND I AM GOING TO ASK THAT MR. WANZALA

11   PUT THAT PHOTOGRAPH UP.

12                        (DISPLAYED ON SCREEN.)

13   BY MR. SMOCK:

14   **Q.**  THAT PHOTOGRAPH SHOWS WATER AT A POINT ALONG THE ELEVATED

15   BERM IN THE SOUTHERN AREA.  IS THAT WHAT YOU BELIEVE THAT

16   SHOWS?

17   **A.**  I BELIEVE SO.

18   **Q.**  THAT WATER, MR. AMAYA, IS THE HOLE THAT WE SAW IN THE

19   TOPOGRAPHICAL MAP, CORRECT?

20   **A.**  IT COULD BE.

21   **Q.**  I AM GOING TO SHOW YOU DEFENSE EXHIBIT -- GOVERNMENT

22   EXHIBIT 173 AGAIN.

23                        (DISPLAYED ON SCREEN.)

24        **MR. SMOCK:**  AND ASK MR. WANZALA TO ZOOM IN ON THAT

25   HOLE ALONG THE BERM.  MOVE UP ALONG... STOP.

AMAYA – RECROSS / SMOCK

```
 1    BY MR. SMOCK:
 2    Q.  SO HERE WE SEE THE SAME DEPRESSION WHICH COMES TO AN END
 3    ALONG THE BERM, THAT WE WERE TALKING ABOUT BEFORE, CORRECT?
 4    A.  CORRECT.
 5    Q.  AND THAT PHOTOGRAPH SHOWS WATER IN THAT HOLE WHICH COMES
 6    TO AN END ALONG THE BERM, DOES IT NOT?
 7    A.  IT DOES.
 8             MR. SMOCK:  THANK YOU.
 9             THE COURT:  MAY MR. AMAYA BE EXCUSED?
10             MS. LEE:  YES.
11             THE COURT:  THANK YOU, MR. AMAYA.  YOU ARE EXCUSED AT
12    THIS TIME.
13             THE WITNESS:  THANK YOU.
14             THE COURT:  AND IT IS 11:35, SO WHY DON'T WE TAKE OUR
15    SECOND MORNING RECESS, LADIES AND GENTLEMEN.  JUST REMEMBER
16    ALL OF YOUR RULES TO LIVE BY, AND WE WILL SEE YOU BACK HERE AT
17    TEN MINUTES TO NOON.
18         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)
19             THE CLERK:  YOU MAY BE SEATED.
20             THE COURT:  MR. KEARNEY, WHO IS UP NEXT?
21             MR. KEARNEY:  KEVIN OLIVERO.
22             THE COURT:  ALL RIGHT.
23         (RECESS TAKEN AT 11:37 A.M.; RESUMED AT 11:50 A.M.)
24             THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS
25    COURT IS BACK IN SESSION.
```

1    READY FOR THEM?

2         **THE COURT:**  YES.

3         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

4         **THE CLERK:**  YOU MAY BE SEATED.

5         **THE COURT:**  THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

6         **MR. KEARNEY:**  THE GOVERNMENT CALLS MR. KEVIN OLIVERO

7    TO THE STAND.

8         **THE CLERK:**  COME UP TO THE WITNESS STAND FOR ME,

9    PLEASE.  RAISE YOUR RIGHT HAND -- STAND AND RAISE YOUR RIGHT

10   HAND FOR ME PLEASE.

11       (**KEVIN OLIVERO**, CALLED AS A WITNESS FOR THE GOVERNMENT,

12   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

13       **THE WITNESS:**  I DO.

14       **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, I AM

15   GOING TO NEED YOU TO PLEASE STATE AND SPELL YOUR FIRST AND

16   LAST NAME FOR THE RECORD, PLEASE.

17       **THE WITNESS:**  KEVIN RONALD OLIVERO.

18       **THE CLERK:**  SPELL YOUR FIRST AND LAST NAME FOR THE

19   RECORD, PLEASE.

20       **THE WITNESS:**  KEVIN OLIVERO.

21       **MR. KEARNEY:**  CAN YOU SPELL --

22       **THE CLERK:**  THAT IS NOT SPELLING.  THAT'S STATING.

23       **THE WITNESS:**  K-E-V-I-N, O-L-I-V-E-R-O.

24       **THE CLERK:**  THANK YOU.

25       **THE COURT:**  YOU MAY PROCEED.

OLIVERO – DIRECT / KEARNEY

1        **MR. KEARNEY:**  THANK YOU.

2                          **DIRECT EXAMINATION**

3   **BY MR. KEARNEY:**

4   **Q.**  MR. OLIVERO, GOOD MORNING.

5   **A.**  GOOD MORNING.

6   **Q.**  PLEASE TELL US WHAT YOUR OCCUPATION IS, SIR.

7   **A.**  I RUN BAY AREA CONCRETE RECYCLING, RECYCLING OPERATION

8   PLANT.

9   **Q.**  WHAT DO YOU RECYCLE, SIR?

10  **A.**  CONCRETE AND ASPHALT.

11  **Q.**  HOW LONG HAVE YOU BEEN IN THE CONSTRUCTION BUSINESS?

12  **A.**  PRETTY MUCH ALL MY LIFE.

13  **Q.**  STARTING WHEN, SIR?

14  **A.**  SINCE I WAS 20, 21 YEARS OLD.

15  **Q.**  I PRESUME THAT'S DECADES BY NOW; IS THAT RIGHT?

16  **A.**  CORRECT.

17  **Q.**  THE -- I WANT TO BRIEFLY -- IF YOU CAN JUST DESCRIBE FOR

18  US YOUR PAST EXPERIENCE WITHIN THE CONSTRUCTION BUSINESS.

19  **A.**  I WAS IN UNDERGROUND CONSTRUCTION IN SAN FRANCISCO, AND

20  THEN I OWNED THREE DIFFERENT RECYCLING YARDS IN THE BAY AREA

21  FOR CONSTRUCTION DEBRIS RECYCLING.

22  **Q.**  WHAT DOES THAT MEAN, MR. OLIVERO, CONSTRUCTION DEBRIS

23  RECYCLING?

24  **A.**  WOOD, SHEETROCK, METAL, CONCRETE ASPHALT, STUFF ON

25  DEMOLITION JOBS.

OLIVERO – DIRECT / KEARNEY

1   **Q.**  OKAY.  WHEN YOU RECEIVE THAT VOLUNTARILY IN, WHAT DO YOU

2   DO WITH IT?

3   **A.**  YOU SEPARATE IT OUT AND RECYCLE IT AND TAKE IT TO THE

4   APPROPRIATE RECYCLERS.

5   **Q.**  SIR, IN 2014, DID YOU OWN A COMPANY?

6   **A.**  I DID.

7   **Q.**  WHICH COMPANY WAS THAT?

8   **A.**  DOUBLE O SITE SERVICES.

9   **Q.**  AND WHAT WAS THE BUSINESS OF DOUBLE O SITE SERVICES?

10  **A.**  CONSTRUCTION DEBRIS RECYCLING.

11  **Q.**  NOW ALSO IN 2014, DID YOU OWN ANOTHER COMPANY CALLED

12  GOLDEN GATE EQUIPMENT RENTAL?

13  **A.**  CORRECT.

14  **Q.**  WHAT WAS THAT?

15  **A.**  HEAVY EQUIPMENT RENTAL BUSINESS.

16  **Q.**  OKAY.

17      BACK IN 2014, MR. OLIVERO, DID YOU KNOW THE DEFENDANT,

18  JAMES LUCERO?

19  **A.**  YES.

20  **Q.**  I WONDER IF YOU CAN TELL US WHAT HE IS WEARING TODAY AND

21  POINT HIM OUT?

22  **A.**  STRIPED SHIRT AND GRAY SWEATER.

23      **MR. KEARNEY:**  YOUR HONOR, MAY THE RECORD REFLECT THE

24  IDENTIFICATION OF MR. LUCERO?

25      **THE COURT:**  YES.

1    **BY MR. KEARNEY:**

2    **Q.**  SO YOU KNEW HIM IN 2014.

3        WHEN DID YOU FIRST MEET MR. LUCERO, MR. OLIVERO?

4    **A.**  I BELIEVE IT WAS IN 2013 AT MY YARD IN SOUTH SAN

5    FRANCISCO.

6    **Q.**  AND TELL US HOW THAT MEETING TOOK PLACE?

7    **A.**  I WAS INTRODUCED TO HIM BY JIMMY LOPEZ OF DOMINGUEZ

8    TRUCKING.

9    **Q.**  AND WHAT WAS MR. LUCERO DOING AT THE TIME YOU FIRST MET

10   HIM?

11   **A.**  I BELIEVE HIS PURPOSE AT THAT TIME WAS TO BROKER OUR WASTE

12   TO THE LANDFILL.

13   **Q.**  WHAT DOES THAT MEAN BROKERING WASTE TO A LANDFILL?

14   **A.**  HE WOULD GET A BETTER DEAL THAN WE DID, SO IT WOULD GO ON

15   HIS ACCOUNT.  HE'D WOULD MAKE A PERCENTAGE OF IT.

16   **Q.**  SO HOW DOES THAT WORK?  A LANDFILL IS A DUMP; IS THAT

17   RIGHT?

18   **A.**  CORRECT.

19   **Q.**  OKAY.  SO IF YOU WOULD -- IF YOU WOULD BRING MATERIAL TO A

20   LANDFILL, WOULD YOU PAY ONE RATE AND THEN MR. LUCERO WOULD GET

21   A DIFFERENT RATE, OR SOMETHING?  HOW DID THAT WORK?

22   **A.**  SO MY COST --

23           **MS. HANSEN:**  OBJECTION LEADING AND RELEVANCE, 401,

24   403.

25           **MR. KEARNEY:**  IT'S FOUNDATIONAL, YOUR HONOR.

OLIVERO – DIRECT / KEARNEY

1          **THE COURT:** OVERRULED.

2          **THE WITNESS:** SO I MAY HAVE ONE RATE OF $70 A TON AND

3     JIMMY WOULD HAVE A RATE OF 25 A TON.  SO IT WOULD BE CHEAPER

4     TO USE HIS RATE, TO GO WITH HIM, AND THEN HE CAN MAKE A

5     PERCENTAGE OF IT.

6     **BY MR. KEARNEY:**

7     **Q.** WHEN YOU FIRST MET MR. LUCERO IN 2013, DID YOU WORK WITH

8     OR FOR EACH OTHER?

9     **A.** WE WORKED TOGETHER AS HE BROKERED OUR GARBAGE.

10    **Q.** ALL RIGHT.

11         AT SOME POINT IN 2014, CALENDAR YEAR 2014, DID YOU MEET

12    MR. LUCERO AT A SITE IN NEWARK, CALIFORNIA?

13    **A.** YES.

14    **Q.** PLEASE TELL US FIRST WHERE YOU MET HIM AND THEN HOW THAT

15    MEETING CAME TO BE, PLEASE.

16    **A.** WE MET -- I MET HIM ON CHERRY AVENUE, I BELIEVE, IT WAS --

17    MOWRY AVENUE, I'M SORRY, BY THE RAILROAD TRACKS NEXT TO AN

18    EMPTY LOT.

19    **Q.** AND HOW DID YOU COME TO MEET MR. LUCERO ON MOWRY AVENUE IN

20    NEWARK, CALIFORNIA?

21    **A.** HE HAD CALLED ME AND SAID THAT HE HAD A PLACE TO TAKE

22    CLEAN FILL MATERIAL.

23    **Q.** AND GIVE US A TIME FRAME, MR. OLIVERO, IF YOU COULD,

24    PLEASE.

25         WHAT'S -- WHEN IN 2014 WAS THIS THAT YOU --

OLIVERO – DIRECT / KEARNEY

1  **A.**  I WANT TO SAY TOWARDS THE END OF MAY.

2  **Q.**  SO YOU RECEIVED A PHONE CALL FROM MR. LUCERO AND HE TOLD

3  YOU WHAT, SIR?

4  **A.**  THAT HE HAD SOME PROPERTY OUT THAT HE HAD PERMISSION TO

5  DUMP MATERIAL ON.

6  **Q.**  AND WHY WAS HE CALLING YOU TO TELL YOU THAT, SIR, IF YOU

7  KNOW?

8  **A.**  I BELIEVE HE WANTED ME TO MANAGE THE SITE FOR HIM.

9  **Q.**  OKAY.

10  AND AFTER RECEIVING THAT CALL FROM MR. LUCERO, DID YOU --

11  YOU SAID YOU MET HIM OUT ON MOWRY AVENUE; IS THAT RIGHT?

12  **A.**  CORRECT.

13  **Q.**  YOU SAID YOU GOT THE FIRST CALL FROM HIM END OF MAY TIME

14  FRAME IN 2014.  WHEN WAS IT THAT YOU MET HIM OUT ON MOWRY

15  AVENUE?

16  **A.**  IT WAS RIGHT AROUND THE SAME TIME, A COUPLE OF DAYS LATER.

17  **Q.**  OKAY.

18  PLEASE DESCRIBE THAT MEETING, SIR, IF YOU WOULD ON MOWRY.

19  WHAT HAPPENED AND WHAT DID YOU DO DURING THE MEETING?

20  **A.**  WE BASICALLY JUST... WE MET ON THE SIDE OF THE ROAD THERE

21  BY THE RAILROAD TRACKS.  AND HE SHOWED ME THE PARCEL, AND HE

22  HAD SOME MAPS OF THE PROPERTY.  THEY WEREN'T HANDWRITTEN MAPS,

23  THEY WERE ACTUALLY DETAILED, LIKE ACCESSORS' (SIC) MAPS SAYING

24  THAT THAT WAS OWNED -- HE HAD PERMISSION FROM THE SOBRATO

25  FAMILY TO BE ABLE TO BRING IN CLEAN FILL AND EVENTUALLY DRY

1    FARM IT.

2              MR. KEARNEY:  YOUR HONOR AND MADAME CLERK, MAY WE

3    PULL UP EXHIBIT 3 PLEASE?

4                        (DISPLAYED ON SCREEN.)

5    BY MR. KEARNEY:

6    Q.  MR. OLIVERO, THERE SHOULD BE A LASER POINTER IN FRONT OF

7    YOU.

8              MR. KEARNEY:  I WONDER IF WE COULD PULL UP THE KIND

9    OF TOP HALF, AGENT SU, OF THAT EXHIBIT.

10   BY MR. KEARNEY:

11   Q.  MR. OLIVERO, DO YOU RECOGNIZE ON THIS EXHIBIT, THIS PART

12   OF THE EXHIBIT THE GENERAL AREA WHERE YOU MET MR. LUCERO BACK

13   IN THE END OF MAY OF 2014 ON MOWRY AVENUE?

14   A.  WHERE IS MOWRY ON THIS?

15             MR. KEARNEY:  IF I CAN APPROACH, YOUR HONOR?

16             THE COURT:  YES.

17   BY MR. KEARNEY:

18   Q.  IT HAS BEEN DESCRIBED AS THIS LINE RIGHT HERE

19   (INDICATING).

20   A.  SO WE MET RIGHT IN THIS AREA HERE (INDICATING).

21   Q.  ALL RIGHT.

22      YOU INDICATED THAT AT THAT POINT, AT THE TIME YOU

23   DISCUSSED, MR. LUCERO TOLD YOU THAT HE HAD PERMISSION FROM THE

24   SOBRATO FAMILY TO DUMP; IS THAT RIGHT?

25   A.  CORRECT.

1    **Q.**  DID HE CONCURRENTLY WAS SAYING THAT, DID HE SHOW YOU

2    SOMETHING?

3    **A.**  JUST THE PARCEL'S MAP.

4    **Q.**  WHAT HAPPENED THEN, SIR?

5    **A.**  THEN WE PROCEEDED TO WALK THE PROPERTY.

6         AND IN THIS AREA SOMEBODY HAD ALREADY STARTED TO DUMP DIRT

7    RIGHT IN HERE, (INDICATING), AND THERE WAS A WATER TRUCK AND,

8    I BELIEVE, A 963 LOADER ALREADY ON-SITE.

9    **Q.**  AND DID MR. LUCERO MAKE ANY STATEMENTS ABOUT WHO WAS

10   DUMPING THERE OR WHOSE TRUCK THAT WAS ANYTHING LIKE THAT?

11   **A.**  IT WAS ALVISO ROCK.

12   **Q.**  AND WAS THAT -- WHAT IS ALVISO ROCK; IS THAT A COMPANY YOU

13   ARE FAMILIAR WITH?

14   **A.**  IT'S A TRUCKING COMPANY.

15   **Q.**  AND DID MR. LUCERO TELL YOU WHY THEY WERE THERE?

16   **A.**  NO.

17   **Q.**  AND HOW WAS IT THAT ALVISO CAME TO BE DUMPING ON THIS

18   LAND?

19   **A.**  THAT I DON'T KNOW.

20   **Q.**  IS THIS SOMETHING MR. LUCERO HAD SET UP?

21   **A.**  I BELIEVE SO.

22   **Q.**  ALL RIGHT.

23        HOW MUCH MATERIAL HAD BEEN DUMPED BY THE TIME YOU FIRST

24   SAW THE SITE IN THE END OF MAY 2014?

25   **A.**  IT WAS HARD TO TELL THE QUANTITY, BUT IT WAS... I MEAN, IT

OLIVERO – DIRECT / KEARNEY

1    WAS DUMPED ON THE ROADWAY ALL IN THIS AREA (INDICATING).

2    **Q.**  YOU'RE INDICATING --

3    **A.**  I WOULD GUESSTIMATE... ON THE LOADS, I COULDN'T BE

4    ACCURATE ON THAT.

5    **Q.**  HOW MANY LOADS?

6    **A.**  I COULDN'T GUESSTIMATE ON IT.

7           **MR. KEARNEY:**  IN ANY EVENT, YOUR HONOR, THE WITNESS

8    WAS LASING THE UPPER LEFT PORTION OF THE FILL AREA ON

9    EXHIBIT 3 JUST DOWN FROM MOWRY.

10   **BY MR. KEARNEY:**

11   **Q.**  IS THAT A FAIR STATEMENT, SIR?

12   **A.**  CORRECT.

13   **Q.**  OKAY.

14       YOU SAID THAT YOU, YOU WALKED THE LAND WITH MR. LUCERO AT

15   THAT TIME; IS THAT RIGHT?

16   **A.**  CORRECT.  SO WE WALKED DOWN THE RAILROAD TRACKS TO ABOUT

17   HERE (INDICATING) AND WE WALKED IN THIS AREA (INDICATING).

18   **Q.**  AND YOU'RE -- YOU WERE JUST LASING THE AREA OF WHERE THE

19   RAILROAD TRACKS MEET MOWRY GENERALLY SPEAKING IN THE TOP

20   PORTION OF EXHIBIT 3; IS THAT A FAIR STATEMENT?

21   **A.**  CORRECT.

22   **Q.**  OKAY.  DURING THIS INITIAL MEETING, DID YOU WORK OUT ANY

23   TERMS OR ANY LOGISTICS WITH MR. LUCERO REGARDING YOUR WORK AT

24   THAT SITE?

25   **A.**  I DON'T THINK WE DISCUSSED IT ACTUALLY THAT DAY, BUT IT

OLIVERO – DIRECT / KEARNEY

1     WAS A FEW DAYS LATER WHEN WE DID DISCUSS IT.

2     **Q.**  PLEASE TELL US ABOUT THAT.

3     **A.**  I GET PAID SO MUCH PER LOAD, SUPPLY A BULLDOZER, AND DO

4     ALL THE BILLING.

5     **Q.**  AND WHAT WAS YOUR FEE TO BE PER LOAD, SIR?

6     **A.**  IT VARIED FROM 15 TO 10 DEPENDING ON THE CLIENT.

7     **Q.**  AND WHO SUGGESTED THAT PRICE THAT YOU WOULD GET 10 TO $15

8     PER LOAD FOR MANAGING THE SITE?

9     **A.**  I BELIEVE WE JUST AGREED UPON IT.

10    **Q.**  YOU SAY "WE", YOU'RE TALKING ABOUT --

11    **A.**  JIM.

12    **Q.**  ALL RIGHT.

13        SO WHAT WAS YOUR UNDERSTANDING BASED ON YOUR CONVERSATION

14    WITH MR. LUCERO OF YOUR WORK RESPONSIBILITY ON THE SITE?

15    **A.**  TO SUPPLY THE DOZER AND DO ALL THE BILLING AND THEN BRING

16    IN CUSTOMERS TO THE SITE.

17    **Q.**  AND AFTER HAVING THAT CONVERSATION WITH MR. LUCERO, DID

18    YOU ACTUALLY START DOING THAT?

19    **A.**  I DID.

20    **Q.**  DO YOU REMEMBER, SIR, AS YOU SIT HERE TODAY, DID YOU

21    ACTUALLY TAKE STEPS TO RENT A BULLDOZER?

22    **A.**  I DID.

23    **Q.**  TELL US ABOUT THAT.  WHAT DID YOU DO?

24    **A.**  I CALLED MY BUDDY AT ROAD MACHINERY AND JUST RENTED A D6

25    DOZER AND THEY DELIVERED IT OUT TO THE SITE.

1   **Q.**  DO YOU REMEMBER WHAT DATE IT WAS THAT YOU RENTED THAT

2   BULLDOZER?

3   **A.**  I WANT TO SAY THE FIRST WEEK IN JUNE.

4   **Q.**  OKAY.

5   **A.**  THAT IS A GUESSTIMATE.

6   **Q.**  IF YOU SAW YOUR RENTAL APPLICATION, WOULD THAT HELP YOU

7   REFRESH YOUR MEMORY?

8   **A.**  YES.

9       **MR. KEARNEY:**  YOUR HONOR, I'M GOING TO, WITH THE

10  COURT'S PERMISSION, SHOW THE WITNESS 1092-0031-0032.

11      I HAVE GIVEN A COPY TO DEFENSE AS WELL.

12      MAY I APPROACH?

13      **THE COURT:**  YOU MAY.

14              (EXHIBIT HANDED TO WITNESS.)

15  **BY MR. KEARNEY:**

16  **Q.**  MR. OLIVERO, DO YOU RECOGNIZE THAT DOCUMENT?

17  **A.**  YES.

18  **Q.**  WHAT IS IT, SIR?

19  **A.**  IT'S AN APPLICATION FOR CREDIT.

20  **Q.**  ALL RIGHT.  AND IN WHAT REGARD?

21  **A.**  FOR RENTING OF A BULLDOZER.  TO OPEN UP AN ACCOUNT.

22  **Q.**  ALL RIGHT.  DID YOU FILL THIS OUT?

23  **A.**  I DID.

24  **Q.**  AND WHAT DATE DID YOU FILL THAT OUT ON?

25  **A.**  JUNE 18TH.

1    **Q.**  JUNE 18TH OF 2014?

2    **A.**  CORRECT.

3    **Q.**  AND DID YOU MAKE THIS APPLICATION FOR CREDIT TO RENT THE

4    BULLDOZER BEFORE OR AFTER YOU BEGAN WORK ON THE SITE?

5    **A.**  I DON'T REMEMBER, BUT I BELIEVE THAT THE DOZER WAS

6    DELIVERED BEFORE THAT BECAUSE I HAD A RELATIONSHIP WITH THE

7    SALES GUY.  SO THEY JUST KIND OF -- I BELIEVE THEY DELIVERED

8    IT EARLIER THAN THAT.

9    **Q.**  ALL RIGHT.

10        SO BY JUNE 18TH OF 2014, YOU WERE WORKING ON THE SITE; IS

11   THAT A FAIR STATEMENT?

12   **A.**  CORRECT.

13   **Q.**  OKAY.

14        WAS THERE -- FROM THE TIME, MR. OLIVERO, THAT YOU FIRST

15   MET MR. LUCERO ON MOWRY TO THE TIME WHEN YOU WENT BACK AND

16   STARTED WORKING, WAS THERE A -- WAS THERE A LAG IN THERE?  WAS

17   THERE A PERIOD OF DAYS, WEEKS?

18        PLEASE DESCRIBE THAT FOR US.

19   **A.**  I WANT TO SAY IT WAS TWO WEEKS.  RIGHT AROUND THERE.

20   **Q.**  YOU WOULD HAVE GOTTEN BACK TO THE SITE, THAT TWO WEEKS

21   WOULD HAVE LAPSED BEFORE THE 18TH OF JUNE WHEN YOU FILLED OUT

22   THAT RENTAL APPLICATION?

23   **A.**  RIGHT.

24   **Q.**  OKAY.

25        AND IN THAT TWO WEEKS, MR. OLIVERO, FROM WHEN YOU WERE

1    FIRST OUT THERE TO WHEN YOU WENT BACK, HAD THE CONDITION OF

2    THE SITE CHANGED DURING THAT PERIOD OF TIME?

3    **A.**   THERE WAS DIRT BEING DUMPED ON THE SITE.

4    **Q.**   ALL RIGHT.

5    **A.**   CORRECT.

6    **Q.**   PLEASE TELL US ABOUT THAT.

7            **MR. KEARNEY:**   MADAME CLERK, IF WE CAN PULL EXHIBIT 3

8    UP AGAIN?

9                        (DISPLAYED ON SCREEN.)

10           **THE WITNESS:**   YOU CAN TELL THEY HAD BEEN DUMPING.

11           **MR. KEARNEY:**   AND, AGENT SU, IF WE CAN BLOW UP THE

12   TOP HALF OF THAT EXHIBIT.

13   **BY MR. KEARNEY:**

14   **Q.**   SO, SIR, YOU SAID THAT WHEN YOU GOT BACK TO THE SITE TWO

15   WEEKS AFTER YOUR INITIAL VISIT, YOU SAID THAT IT WAS CLEAR TO

16   YOU THAT THEY HAD BEEN DUMPING; IS THAT RIGHT?

17   **A.**   CORRECT.  IN THIS AREA (INDICATING).

18   **Q.**   AGAIN YOU'RE REFERRING TO THAT KIND OF LONG THIN PART OF

19   THE FILL AREA DOWN FROM MOWRY; IS THAT RIGHT?

20   **A.**   CORRECT.

21   **Q.**   OKAY.  WAS THERE -- WAS IT THE SAME LOCATION YOU HAD SEEN

22   ALVISO ROCK DUMPING BEFORE OR WAS IT A DIFFERENT LOCATION?

23   **A.**   SAME LOCATION.

24   **Q.**   ALL RIGHT.

25           WHEN YOU WENT BACK OUT TO BEGIN YOUR WORK, HAD THE

```
1    BULLDOZER ALREADY BEEN DELIVERED OR WAS THERE A PERIOD OF DAYS

2    THAT IT TOOK TO GET THERE?  PLEASE TELL US ABOUT THAT.

3    A.  I BELIEVE IT WAS DELIVERED ACTUALLY NEXT DOOR TO RUI

4    RECYCLING AND WE HAD DRIVEN IT OVER FROM THERE.

5    Q.  ALL RIGHT.

6    A.  I DON'T HAVE THE EXACT DATE.

7    Q.  OKAY.  I WANT TO SHOW YOU A PREVIOUSLY MARKED EXHIBIT.

8    THIS IS EXHIBIT 40.

9              MR. KEARNEY:  MADAME CLERK, MAY WE BRING THAT UP?

10             THE CLERK:  PREVIOUSLY ADMITTED?

11             MR. KEARNEY:  YES.

12                  (DISPLAYED ON SCREEN.)

13   BY MR. KEARNEY:

14   Q.  MR. LUCERO (SIC) PLEASE TAKE A LOOK AT THAT.  THERE IS A

15   COPY OF THE IMAGE IN FRONT OF YOU, SIR.

16       DOES THAT LOOK LIKE THE TRACTOR YOU RENTED FROM THE ROAD

17   MACHINERY COMPANY?

18   A.  CORRECT.

19   Q.  PLEASE TELLS US -- DESCRIBE THAT FOR US AND TELL US HOW IT

20   WAS OUTFITTED.

21       WHAT KIND OF ATTACHMENTS WERE ON THAT BULLDOZER?

22   A.  IT HAD A RIPPER AND 6-WAY ADJUSTABLE BLADE FOR GRADING AND

23   GPS.

24   Q.  I WONDER IF YOU WOULD EXPLAIN THE RIPPER AND THE BLADE

25   OPTIONS.  WHAT ARE THOSE?
```

OLIVERO – DIRECT / KEARNEY

1    **A.**   THE RIPPER IS ON THE BACK OF THE MACHINE AND IT LOOKS LIKE

2    BIG TEETH SO YOU CAN HYDRAULICALLY STICK THAT INTO THE GROUND

3    AND RIP THE DIRT SO YOU CAN TURN IT.

4         THE DOZER IS MADE FOR PUSHING DOWN STOCKPILES AND ALSO

5    DOING FINE GRADING.

6    **Q.**   ALL RIGHT.  THANK YOU.

7         WHEN YOU GOT BACK OUT TO BEGIN WORK ON THE SITE, HOW DID

8    YOU -- THIS IS IN THE NORTHERN AREA OFF OF MOWRY; IS THAT

9    RIGHT?

10   **A.**   CORRECT.

11   **Q.**   HOW DID YOU ACTUALLY PHYSICALLY ACCESS THE SITE?

12        HOW DID YOU GET ONTO THE SITE?

13   **A.**  SO THERE WAS A --

14             **MR. KEARNEY:**  MADAME CLERK, IF WE CAN HAVE EXHIBIT 3

15   BACK UP, AGAIN.

16             **THE CLERK:**  I'M NOT RUNNING WHAT ACTUALLY EXHIBIT IT

17   IS.  I ONLY RUN THE PUBLISHED.

18             **MR. KEARNEY:**  ALL RIGHT.  GREAT.

19                       (DISPLAYED ON SCREEN.)

20        CAN WE HAVE THE TOP, AGENT SU, BLOWN UP PLEASE?

21   **BY MR. KEARNEY:**

22   **Q.**  SO, MR. OLIVERO, PLEASE DESCRIBE HOW YOU PHYSICALLY GOT ON

23   THE SITE WHEN YOU WENT BACK TO START WORK.

24   **A.**  SO IT WAS THROUGH THE SAME ENTRANCE HERE (INDICATING).  SO

25   THERE WAS A DITCH HERE TO KEEP PEOPLE FROM DRIVING OFF IN

1    THERE AND THEN THERE WAS ANOTHER -- RIGHT NEXT TO THE DITCH IT

2    HAD BEEN FILLED IN WHERE THE TRUCKS HAD BEEN ENTERING PRIOR

3    AND DUMPING.

4    **Q.**   OKAY.

5    **A.**   THAT'S HOW WE ENTERED THE SITE.

6    **Q.**   OKAY.  SO WHEN YOU STARTED WORK, WHAT DID YOU DO?

7    **A.**   I WAITED FOR TRUCKS TO BRING ME DIRT, AND THEN I WOULD

8    KNOCK THE PILES DOWN AND FILL OUT A TRUCK TAG AND THEN BILL

9    IT.

10   **Q.**   WHEN YOU SAY YOU WOULD KNOCK THE PILES DOWN, TELL US ABOUT

11   THAT.  WHAT WOULD YOU DO?

12   **A.**   SO THE TRUCK WOULD COME IN AND DUMP HIS LOAD, GET A FILL

13   TAG OR A PULL TAG WITH THE CUSTOMER'S NAME, TYPE OF TRUCK, AND

14   THEN WE WOULD TAKE THE BULLDOZER, KNOCK THE PILE DOWN, AND

15   GRADE IT.  KEEP IT RELATIVELY FLAT.

16   **Q.**   WHY WAS THAT, SIR?

17   **A.**   IT'S JUST THE WAY YOU DO A GRADING JOB.  YOU DON'T LEAVE

18   PILES ALL OVER THE PLACE.  YOU KNOCK THEM DOWN AND GRADE THEM.

19   **Q.**   ALL RIGHT.  WERE YOU, DURING THIS PERIOD OF TIME,

20   OPERATING THE BULLDOZER YOURSELF?

21   **A.**   I WAS.

22   **Q.**   DID THAT CHANGE AT ANY TIME, SIR?

23      DID YOU EVER -- DID ANOTHER BULLDOZER OPERATOR EVER COME

24   ON BOARD?

25   **A.**   HE DID.

OLIVERO – DIRECT / KEARNEY

1    **Q.**  PLEASE TELL US ABOUT THAT.

2    **A.**  JIM HAD HIRED ERIC MARTINEZ, I BELIEVE HIS LAST NAME WAS

3    FROM NEXT DOOR, FROM RUI RECYCLER.  HIS FATHER HAD WORKED FOR

4    BERT, THE GUY WHO OWNED THE COMPANY.  SO HE CAME OVER TO

5    ACTUALLY TAKE MY POSITION.

6    **Q.**  HOW LONG... HOW LONG AFTER YOU STARTED WORKING DID

7    MR. MARTINEZ COME TO RELIEVE YOU FROM THE DRIVING

8    RESPONSIBILITIES?

9    **A.**  I WANT TO SAY ROUGHLY THREE WEEKS TO A MONTH, SOMETHING

10   LIKE THAT.

11   **Q.**  OKAY.

12       NOW IN ADDITION TO RENTING THE BULLDOZER, WERE YOU ALSO IN

13   CHARGE OF BILLING ON THE SITE?

14   **A.**  CORRECT.

15   **Q.**  JUST TELL US BRIEFLY HOW THAT WORKED.

16   **A.**  SO BASICALLY THE CUSTOMERS COME IN, DUMP A LOAD OF DIRT.

17   THEY WOULD GET A PULL TAG.  THOSE TAGS WOULD BE COLLECTED AND

18   THEN GIVEN TO MY WIFE, AND MY WIFE WOULD BILL IT THROUGH A

19   QUICKBOOK SOFTWARE, AND THEN EMAIL THE INVOICES OUT TO THE

20   CLIENTS.

21   **Q.**  WE WILL TALK MORE ABOUT THAT IN A MOMENT.

22       REGARDING THE CLIENTS, DID YOU ACTUALLY ACTIVELY CONTACT

23   POTENTIAL CLIENTS OR MARKET THE SITE?

24       WHAT DID YOU DO IN THAT REGARD, IF ANYTHING?

25   **A.**  I DID.  I CALLED PEOPLE I KNEW THAT HAVE BEEN INVOLVED IN

OLIVERO – DIRECT / KEARNEY

1   CONSTRUCTION THAT HAD TRUCKS AND MOVED DIRT, AND SAID WE HAD A

2   PLACE FOR THEM TO TAKE THEIR FILL.

3   **Q.**   AND DID PEOPLE TAKE YOU UP ON YOUR OFFER?

4   **A.**   RIGHT AWAY.

5   **Q.**   OKAY.

6       DURING THIS PERIOD OF TIME, SIR, HOW OFTEN WOULD YOU SEE

7   MR. LUCERO?

8       HOW OFTEN WOULD HE COME BY THE SITE?

9   **A.**   NOT VERY OFTEN.

10  **Q.**   ALL RIGHT.  PLEASE TELL US ABOUT THAT.

11  **A.**   HE JUST DIDN'T COME BY THE SITE THAT OFTEN.  I THINK I'VE

12  SEEN HIM OUT THERE MAYBE FOUR TIMES THE WHOLE TIME.

13  **Q.**   ALL RIGHT.  YOU INDICATED THAT YOU WOULD BILL TRUCKERS.

14  YOUR WIFE WOULD SEND OUT INVOICES?

15  **A.**   CORRECT.

16  **Q.**   WOULD THEY PAY YOU BACK?

17  **A.**   CORRECT.  AND THEY WOULD PAY GOLDEN GATE EQUIPMENT AND

18  THEN I WOULD TAKE MY FEES OUT AND THEN PAY JIM.

19  **Q.**   OKAY.

20  **A.**   OR ECONOMY WASTE.

21  **Q.**   WE WILL TALK ABOUT THAT IN A MOMENT.

22      SO DID YOU, AFTER YOU BEGAN WORKING ON THE SITE, START TO

23  MOVE TO DIFFERENT LOCATIONS ON THIS NEWARK AREA PROPERTY?

24  **A.**   YES.

25  **Q.**   OKAY.  AND DID YOU DRAW A MAP OF THAT PROGRESSION OF THE

OLIVERO – DIRECT / KEARNEY

1   DIFFERENT LOCATIONS ON THE PROPERTY?

2   **A.**  YES.

3          **MR. KEARNEY:**  I WOULD LIKE TO APPROACH THE WITNESS,

4   YOUR HONOR, WITH EXHIBIT 53?

5               (EXHIBIT HANDED TO WITNESS.)

6   **BY MR. KEARNEY:**

7   **Q.**  MR. OLIVERO, DO YOU RECOGNIZE THAT MAP?

8   **A.**  I DO.

9   **Q.**  PLEASE TELL US ABOUT IT.

10  **A.**  WELL, WE SEGREGATED THIS OUT INTO THREE DIFFERENT AREAS.

11  AREA 1, AREA 2, AND AREA 3.

12  **Q.**  DID YOU, YOURSELF, ACTUALLY DRAW ON THIS MAP TO INDICATE

13  THE THREE FILL AREAS OR THREE STAGES OF FILLING THAT YOU

14  CONDUCTED ON THE SITE?

15  **A.**  I DID.

16  **Q.**  DOES IT ACCURATELY DEPICT THOSE THREE STAGES OF DUMPING?

17  **A.**  YES.

18         **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO HAVE THIS

19  EXHIBIT MOVED INTO EVIDENCE, IF WE MAY, PLEASE.

20         **MS. HANSEN:**  NO OBJECTION.

21         **THE COURT:**  EXHIBIT 53 IS ADMITTED.

22      (GOVERNMENT'S EXHIBIT 53 RECEIVED IN EVIDENCE)

23         **MR. KEARNEY:**  MAY WE PUBLISH IT TO THE JURY?

24         **THE COURT:**  YES.

25               (DISPLAYED ON SCREEN.)

1            **MR. KEARNEY:**  I WONDER, AGENT SU, IF WE CAN BLOW UP

2      THE KIND OF TOP PORTION OF THAT.

3      **BY MR. KEARNEY:**

4      **Q.**  MR. OLIVERO, THERE ARE SOME RED MARKINGS ON THIS EXHIBIT

5      WHICH ARE -- MAY REQUIRE LITTLE BIT OF EXPLANATION.

6            THE RED LINES ON THERE WERE DRAWN BY YOU; IS THAT A FAIR

7      STATEMENT?

8      **A.**  CORRECT.

9      **Q.**  DO YOU KNOW WHEN YOU DREW THIS MAP?

10     **A.**  EXACT DATE?  NO.

11     **Q.**  WHY DON'T YOU LOOK ON THE DIAGRAM ITSELF, AND SEE IF THAT

12     REFRESHES YOUR MEMORY.

13     **A.**  8/21/2015.

14     **Q.**  DO YOU REMEMBER WHERE YOU WERE WHEN YOU DREW THIS MAP?

15     **A.**  I BELIEVE I WAS IN YOUR OFFICE.

16     **Q.**  AND AT THAT TIME WHEN YOU DREW THAT MAP, WHO WAS PRESENT

17     BESIDES MYSELF?

18     **A.**  MY LAWYER.

19     **Q.**  AND WERE THERE ANY AGENTS OR ANY LAW ENFORCEMENT

20     PERSONNEL?

21     **A.**  I BELIEVE THERE WAS TWO AGENTS.

22     **Q.**  DID YOU PROVIDE THAT MAP IN THAT INTERVIEW PURSUANT TO

23     WHAT'S CALLED A PROFFER AGREEMENT?

24     **A.**  CORRECT.

25            **MR. KEARNEY:**  YOUR HONOR, I HAVE IN MY HAND A

OLIVERO − DIRECT / KEARNEY

1    TWO−PAGE DOCUMENT THAT SAYS EXHIBIT 52.  MAY I APPROACH?

2         **THE COURT:**  YOU MAY.

3              (EXHIBIT HANDED TO WITNESS.)

4    **BY MR. KEARNEY:**

5    **Q.**  SIR, WHEN YOU WERE BEING INTERVIEWED BACK IN 2015 WHEN YOU

6    DREW THIS MAP, DID YOU SIGN THIS DOCUMENT FIRST, SIR, THE

7    PROFFER AGREEMENT DOCUMENT?

8    **A.**  I DID.

9    **Q.**  WHAT WAS YOUR UNDERSTANDING OF WHAT YOU WERE AGREEING TO

10   WHEN YOU SIGNED THIS?

11   **A.**  JUST TO BASICALLY TELL THE TRUTH.

12   **Q.**  ALL RIGHT.  IS THIS A FAIR AND ACCURATE DEPICTION OF THE

13   DOCUMENT YOU SIGNED BACK IN 2015?

14   **A.**  YES.

15        **MR. KEARNEY:**  I WOULD LIKE TO MOVE IT INTO EVIDENCE,

16   IF WE MAY.

17        **MS. HANSEN:**  OBJECTION, YOUR HONOR, HEARSAY, 401,

18   403.

19        **THE COURT:**  OVERRULED.  IT HAS INDEPENDENT LEGAL

20   SIGNIFICANCE.  SO EXHIBIT 52 IS ADMITTED.

21        (GOVERNMENT'S EXHIBIT 52 RECEIVED IN EVIDENCE)

22        **MR. KEARNEY:**  THANK YOU.

23              (DISPLAYED ON SCREEN.)

24      AND WE CAN SHOW THE SECOND PAGE OF THAT PLEASE, IF WE MAY.

25

1   **BY MR. KEARNEY:**

2   **Q.** THE SIGNATURES ON THERE, SIR, THERE IS MINE ON TOP; WHO

3   ARE THE OTHER TWO IF YOU KNOW?

4   **A.** THAT WOULD BE MINE AND KC MAXWELL, MY ATTORNEY.

5   **Q.** ALL RIGHT.  THANK YOU.

6           **MR. KEARNEY:**  CAN WE GO BACK TO THE MAP NOW.  THIS IS

7   EXHIBIT 53, IF WE MAY.

8                   (DISPLAYED ON SCREEN.)

9       IF WE CAN BLOW UP THE UPPER PORTION.

10  **BY MR. KEARNEY:**

11  **Q.** SO WHAT WERE YOU INTENDING TO PORTRAY WHEN YOU WERE

12  DRAWING THESE RED LINES ON THIS MAP, MR. OLIVERO?

13  **A.** JUST BASICALLY TO SHOW WHERE THE MATERIAL WAS BEING DUMPED

14  AND SPREAD.

15  **Q.** SO THE -- THERE APPEARS TO BE A RED LINE RUNNING KIND OF

16  LEFT TO RIGHT LATERALLY FROM MOWRY AVENUE ONTO THE PROPERTY?

17  **A.** UH-HUH.

18  **Q.** WHAT STAGE OF THE DUMPING WAS THAT?

19  **A.** THIS STAGE HERE OR THIS ONE (INDICATING)?

20  **Q.** YOU TELL ME.  WHAT ARE YOU PORTRAYING THERE?

21  **A.** THIS IS AREA 1.  THIS IS AREA 2.

22  **Q.** OKAY.

23  **A.** THE OTHER SIDE WAS AREA 3.

24  **Q.** SO WHEN YOU ARE REFERRING TO AREA 1 AND AREA 2, IS THAT A

25  CHRONOLOGIC REFERENCE?  IS IT SOMETHING ELSE?

1    WHAT ARE YOU TELLING US THERE?

2    **A.**  THIS IS WHERE THE DIRT FIRST CAME IN AND THEN THE DUMPING

3    MOVED OVER HERE (INDICATING) AND STARTED HERE.

4    **Q.**  SO PLEASE TELL US ABOUT THE FIRST STAGE OF DUMPING, THE

5    ONE WITH THE –– ON THE UPPER PORTION OF THIS EXHIBIT, OF

6    EXHIBIT 53.

7    YOU TOLD US ALREADY THAT'S WHERE THE DUMPING BEGAN RIGHT

8    OFF OF MOWRY; IS THAT RIGHT?

9    **A.**  RIGHT.

10   **Q.**  HOW LONG WERE YOU DUMPING IN THAT POSITION WHERE IT'S

11   INDICATED WITH A NO. 1 THERE?

12   **A.**  I WANT TO SAY IT WAS ROUGHLY ABOUT A MONTH.

13   **Q.**  THAT LINE EXTENDS ALMOST THROUGHOUT THE LENGTH OR WIDTH OF

14   THAT WHOLE NORTHERN FILL AREA THERE, THAT FIELD.

15   DID YOU INTEND TO PORTRAY THAT DEEP OF A LINE, SIR, WHEN

16   YOU DREW IT?

17   **A.**  CORRECT.

18   **Q.**  SO –– AND THEN THERE IS SOME (INDICATING) SOME LINES THAT

19   RUN DOWNWARD OFF OF THAT MAIN SOMEWHAT HORIZONTAL OR DIAGONAL

20   LINE.

21   WHAT WERE THOSE INTENDED TO REPRESENT?

22   **A.**  MATERIAL WAS ALSO –– SO BASICALLY MATERIAL IS DUMPED ALONG

23   HERE AND THEN GRADED AND PUSHED ALL IN THIS AREA (INDICATING).

24   **Q.**  AND THE AREA WHERE IT WAS GRADED AND PUSHED, CAN YOU

25   DESCRIBE THAT FOR US, PLEASE?

1  **A.**  IT WAS JUST AN EMPTY DIRT FIELD WITH SOME WEEDS IN IT.

2  **Q.**  OKAY.  YOU WERE PUSHING IT DOWN IN WHAT DIRECTION?

3  **A.**  TOWARDS THE BACK OF PICK 'N PART OR PICK 'N PULL.

4  **Q.**  ALL RIGHT.

5     YOU SAID THAT THAT -- THE DUMPING IN THAT FIRST DUMP AREA

6  LASTED ABOUT A MONTH; IS THAT RIGHT?

7  **A.**  CORRECT.

8  **Q.**  HOW MANY LOADS, MR. OLIVERO, WERE DUMPED DURING THAT FIRST

9  MONTH IN THAT GENERAL LOCATION?

10  **A.**  MAYBE 300.  300.  THAT'S A GUESSTIMATE.

11  **Q.**  OKAY.  WHEN YOU SAY 300 LOADS, YOU'RE TALKING ABOUT

12  300 TRUCKLOADS; IS THAT RIGHT?

13  **A.**  CORRECT.

14  **Q.**  WHAT TYPES OF TRUCKS WERE DEPOSITING THESE LOADS?

15  **A.**  THEY WERE END DUMPS, SUPER DUMPS, TEN WHEELERS, AND

16  TRANSFERS.

17  **Q.**  WHAT WERE THE CAPACITIES OF THOSE TRUCKS?

18  **A.**  ANYWHERE FROM 10 TO 12 YARDS.

19  **Q.**  WHAT IS A YARD?

20  **A.**  ROUGHLY 3 FEET BY 3 FEET BY 3 FEET.

21  **Q.**  WHAT DOES A YARD WEIGH?

22  **A.**  LITTLE OVER A TON.

23  **Q.**  HOW MANY POUNDS ARE IN A TON?

24  **A.**  2000.

25  **Q.**  SO 300 LOADS IN THIS AREA GENERALLY, EACH ONE 10 TO

1    12 YARDS, AND EACH ONE OF THOSE YARDS WAS 2,000, ROUGHLY

2    2,000 POUNDS; IS THAT A --

3    **A.**  CORRECT.

4    **Q.**  YOU INDICATED -- DURING THIS PERIOD OF TIME WERE YOU

5    ON-SITE EVERY DAY, MR. OLIVERO?

6    **A.**  FIRST COUPLE OF WEEKS I WAS, BUT THEN I JUST STARTED

7    LEAVING.  AND BEFORE WE HIRED ERIC, WE WOULD JUST LEAVE THE

8    TICKET BUCKET IN THE CAB.  THE TRUCKS WOULD COME OUT THERE

9    BECAUSE I KNEW THEM ALL THEY WOULD DUMP THEIR LOADS AND FILL

10   OUT THEIR OWN TICKETS.  SO I DIDN'T NEED TO BE THERE ON A

11   FULL-TIME BASIS AT THAT TIME.

12   **Q.**  HOW OFTEN WOULD YOU GO TO THE SITE?

13   **A.**  EVERY MORNING TO PICK THE TICKETS UP FROM THE FOLLOWING

14   DAY AND THEN GET THEM BILLED.

15   **Q.**  SO YOU WERE -- IS IT FAIR TO SAY YOU WERE NO LONGER

16   WORKING EVERY DAY, BUT YOU'D SWING BY AND GRAB TAGS?

17   **A.**  CORRECT.

18   **Q.**  AND IN YOUR ABSENCE, MR. MARTINEZ WAS DRIVING THE TRACTOR;

19   IS THAT FAIR?

20   **A.**  CORRECT.

21   **Q.**  WHAT WAS THE REASON FOR MOVING FROM THAT FIRST STAGE AREA

22   OR FILL AREA WHERE YOU MARKED WITH A 1, THE ONE THAT EXTENDED

23   FROM MOWRY TO THE SECOND ONE DOWN BY THE PINCH POINT BY THE

24   PICK 'N PULL?

25   **A.**  SO I HAD LEFT, WENT ON VACATION.  AND I BELIEVE JIM HAD

1    STARTED TO DUMP OFF THE SIDE OF THIS.  THIS WAS ALL A CONCRETE

2    DRIVEWAY HERE (INDICATING) SO YOU CAN ACTUALLY ENTER OFF OF

3    MOWRY AND DRIVE ON THE CONCRETE SLAB.

4        WHEN I WAS GONE ON VACATION, THIS AREA HAD STARTED TO GET

5    FILLED UP (INDICATING).

6    **Q.**  YOU INDICATED THAT WORK STARTED -- THE TRACTOR RENTAL IS

7    JUNE 18TH --

8    **A.**  UH-HUH.

9    **Q.**  -- 2014.  YOU STARTED A COUPLE -- SOME PERIOD OF TIME

10   BEFORE THAT, SOME FEW SMALL PERIOD OF TIME BEFORE THAT.  YOU

11   WERE IN THAT FIRST DUMPING AREA FOR ABOUT A MONTH?

12   **A.**  CORRECT.

13   **Q.**  SO, AGAIN, CORRECT ME IF I'M WRONG, NOW WE ARE IN JULY

14   SOME POINT, MID-ISH JULY, MAYBE.

15       WHEN DID YOU GO ON VACATION, DO YOU REMEMBER?

16   **A.**  I DON'T.

17   **Q.**  DO YOU KNOW WHERE YOU WENT?

18   **A.**  WE WENT TO SANTA BARBARA.

19   **Q.**  OKAY.

20   **A.**  I THINK I WAS GONE ABOUT A WEEK.

21   **Q.**  AND DID YOU HAVE ANY CONVERSATIONS WITH MR. LUCERO BEFORE

22   YOU LEFT ON YOUR VACATION ABOUT, HEY, I'M LEAVING?

23   **A.**  YEAH.  HE SAID HE WOULD COVER ME ON THE DOZER.

24   **Q.**  OKAY.

25       SO WHEN YOU CAME BACK FROM YOUR VACATION, DID YOU SEE ANY

```
1    EVIDENCE OF NEW DUMPING THAT HAD HAPPENED DURING YOUR ABSENCE?
2    A.   YES.  OFF THE END OF THE CONCRETE THERE.
3         RIGHT HERE (INDICATING).
4              MR. KEARNEY:  THIS IS DOWN BY THE END OF THE PICK 'N
5    PULL, YOUR HONOR, WHAT WE HAVE BEEN REFERRING TO AS THE PINCH
6    POINT, IF YOU WILL.
7    BY MR. KEARNEY:
8    Q.   SO WHEN YOU GOT BACK, WHAT DID YOU SEE?
9    A.   A MESS.
10   Q.   PLEASE DESCRIBE THAT FOR US.
11   A.   IT WAS JUST A LOT OF DIRT THAT HAD BEEN STOCKED UP INSTEAD
12   OF GRADED.  IT WAS MORE PILED UP HERE INSTEAD OF BEING PUSHED
13   OUT (INDICATING).
14   Q.   WHEN YOU SAY THERE WAS A LOT OF DIRT, HOW MANY LOADS ARE
15   WE TALKING ABOUT?
16   A.   QUITE A FEW.
17   Q.   CAN YOU DO -- CAN YOU MAKE --
18   A.   ESTIMATE?
19   Q.   EDUCATED GUESS BASED ON YOUR OWN BACKGROUND?
20   A.   200 LOADS MAYBE.
21   Q.   YOU INDICATED THAT THERE WAS A BIT OF A MESS.  DID YOU
22   COME TO LEARN WHY?
23   A.   I BELIEVE JIM WAS RUNNING THE BULLDOZER AT THAT TIME.
24              MS. HANSEN:  OBJECTION.
25              THE COURT:  HOLD ON.  WHAT'S THE OBJECTION?
```

OLIVERO – DIRECT / KEARNEY

1     **MS. HANSEN:**  SPECULATION, HEARSAY, FOUNDATION.

2     **THE COURT:**  OVERRULED, BUT LET'S BE SURE THE WITNESS

3   ANSWERS BASED ON HIS OWN PERSONAL KNOWLEDGE.

4   **BY MR. KEARNEY:**

5   **Q.**  DO YOU HAVE THE QUESTION IN MIND, SIR?

6        WHEN YOU SAY THAT THERE WAS A MESS OUT THERE... FIRST OF

7   ALL, DESCRIBE WHAT YOU MEAN BY "A MESS".

8   **A.**  WELL, THE DIRT WASN'T GRADED.  IT WAS JUST DUMPED THERE IN

9   PILES AND IT JUST GOT CONTINUED ON AND ON AND ON.  SO IT WAS

10  ELEVATED BASICALLY.

11  **Q.**  HOW FAR -- HAD YOU SEEN THE ELEVATION OF THAT SITE BY THE

12  PINCH POINT BEFORE YOU LEFT?

13  **A.**  YEAH.  I WANT TO SAY IT IS ROUGHLY 10 FEET ROUGHLY, 9,

14  10 FEET.

15  **Q.**  SO WHEN YOU SAY "9 TO 10 FEET", WHAT DO YOU MEAN BY THAT?

16  WAS THERE A --

17  **A.**  THERE WAS A DROP OFF.

18  **Q.**  OF 9 TO 10 FEET?

19  **A.**  CORRECT.

20  **Q.**  THAT WAS THERE BEFORE YOU LEFT ON VACATION?

21  **A.**  CORRECT.

22       SO WHERE THIS CONCRETE PAD WAS, THIS WAS A CUT-OFF HERE TO

23  THIS FIELD.  AND THERE WAS A PRETTY BIG ELEVATION CHANGE FROM

24  THESE TWO AREAS.

25  **Q.**  SO, SIR, WHEN YOU SAY "9 TO 10 FEET", I WONDER IF YOU CAN

1    ESTIMATE THE -- BEFORE YOU LEFT, THE DROPOFF INTO THAT PINCH

2    POINT AREA FROM THE CONCRETE PAD, IF YOU CAN PIT A POINT ON

3    THE WALL MAYBE AND TELL US EXACTLY WHAT 9 TO 10 FEET LOOKS

4    LIKE?

5    **A.**  HERE (INDICATING).

6         **MR. KEARNEY:**  YOUR HONOR, THE WITNESS HAS JUST LASED

7    THE POINT ON THE WALL BEHIND THE SCREEN ABOVE THE DOORWAY

8    LEADING INTO THE JURY ROOM.

9    **BY MR. KEARNEY:**

10   **Q.**  DID I GET THAT RIGHT, MR. OLIVERO?

11   **A.**  CORRECT.

12   **Q.**  SO BEFORE YOU LEFT FOR SANTA BARBARA, THERE WAS THAT BIG

13   OF AN ELEVATION DROP FROM THE CONCRETE PAD DOWN INTO THE LAND?

14   **A.**  CORRECT.

15   **Q.**  WHAT WAS THE -- WHEN YOU GOT BACK, WHAT HAD HAPPENED, IF

16   ANYTHING, TO THAT ELEVATION DROP?

17   **A.**  THERE HAD BEEN MATERIAL DUMPED IN THERE.

18   **Q.**  HOW MUCH?

19   **A.**  ROUGHLY 200 LOADS I WOULD -- IT'S A GUESSTIMATE.

20   **Q.**  ALL RIGHT.  SO WAS THERE STILL A DROPOFF WHEN YOU GOT

21   BACK?  WAS IT --

22   **A.**  NO, IT WAS MORE OF A RAMP.

23   **Q.**  SO THE MATERIAL THAT HAD BEEN FILLED IN YOUR ABSENCE

24   FILLED UP THAT WHOLE --

25   **A.**  CORRECT.

1    **Q.**   -- 9 TO 10 FEET?

2    **A.**   CORRECT.

3    **Q.**   DID YOU TALK WITH MR. LUCERO ABOUT WHAT HAD HAPPENED IN

4    YOUR ABSENCE?

5    **A.**   NOT REALLY.  NO.

6    **Q.**   AND WHEN YOU SAID EARLIER, DO YOU HAVE ANY WAY OF KNOWING

7    WHETHER HE ACTUALLY DID DRIVE THE BULLDOZER IN YOUR ABSENCE?

8    **A.**   I DID NOT SEE HIM DRIVE THE BULLDOZER.

9    **Q.**   BEFORE YOU LEFT, DID HE MAKE A STATEMENT ABOUT OPERATING

10   THE BULLDOZER TO YOU?

11   **A.**   THAT HE WOULD COVER ME, CORRECT, ON THE DOZER.

12   **Q.**   ALL RIGHT.  AND WHAT DID YOU TAKE THAT TO MEAN WHEN HE

13   SAID HE WOULD COVER YOU ON THE DOZER, WHAT YOU DID YOU TAKE

14   THAT TO MEAN?

15   **A.**   THAT HE WOULD BE THERE TO RUN THE DOZER AND KNOCK THE DIRT

16   DOWN.

17   **Q.**   WHERE WAS MR. MARTINEZ AT THIS TIME?

18   **A.**   I BELIEVE ERIC WAS STILL WORKING FOR RUI, I BELIEVE.

19   **Q.**   ALL RIGHT.  ARE YOU SURE ABOUT THAT?

20   **A.**   NO, I'M NOT.

21   **Q.**   OKAY.

22        I WANT TO TALK FOR A MOMENT, IF WE MAY, ABOUT FREQUENCY.

23   WE'LL START OFF IN THE FIRST, THE FIRST AREA.

24        SO THE APPROXIMATE MONTH YOU WERE DUMPING IN THAT FIRST

25   AREA, WHAT WAS THE FREQUENCY OF TRUCKS THAT WERE DUMPING

```
1    ON-SITE?
2        WAS IT ONE PER DAY, TWO PER DAY, TEN PER DAY?
3    A.  IT WAS HIT AND MISS.  SOME DAYS WOULD BE -- IT WAS VERY
4    LIGHT IN AREA 1, IN AREA 2.  BUSIEST DAY MAYBE 15 LOADS MAYBE,
5    20 LOADS ON THAT SIDE.
6    Q.  IN AREA 1?
7    A.  IN AREA 1.
8        AREA 2, I BELIEVE THAT IS WHEN POLLACK STARTED DUMPING OUT
9    THERE.  BUSINESS HAD INCREASED SO IT HAD GOTTEN BUSY IN
10   AREA 2.
11   Q.  LET ME ASK YOU THIS:  WHEN YOU CAME BACK AFTER YOUR WEEK'S
12   VACATION AND THAT DEPRESSION HAD BEEN FILLED IN, DID DUMPING
13   CONTINUE IN THAT LOCATION FOR A PERIOD OF TIME?
14   A.  IT DID.  VERY SHORT-LIVED.  THE OWNER OF THE CONCRETE AREA
15   WANTED THE TRUCKS NOT GOING THROUGH HIS PROPERTY ANYMORE.  SO
16   THEN THAT'S WHEN IT WOULD SHIFTED OVER TO AREA 3.
17   Q.  AND WE'LL GET THERE IN A MOMENT.
18       SO WAS THERE A PERIOD OF TIME, MR. OLIVERO, WHEN YOU WERE
19   WORKING IN AREA 2 YOURSELF?
20   A.  YES.
21   Q.  PLEASE TELL US ABOUT THAT.
22   A.  TRUCKS WOULD COME IN, COME DOWN OFF THE RAMP AND DUMP.
23   THEN I WOULD KNOCK THE DIRT DOWN.
24   Q.  WHERE WOULD THE TRUCKS ACTUALLY DUMP?
25       SHOW US HOW THEY DROVE DOWN THAT RAMP.
```

1    **A.**   THEY WOULD COME IN, DRIVE DOWN HERE (INDICATING), DRIVE

2    OFF AND DUMP IN THIS AREA (INDICATING).

3         **MR. KEARNEY:**   IF YOU CAN PUT A RED CIRCLE THERE WHERE

4    THE DUMPING OCCURRED.

5    **BY MR. KEARNEY:**

6    **Q.**   IS THAT RED CIRCLE ABOUT RIGHT, SIR, OR SHOULD WE MOVE IT?

7    **A.**   NOTHING WAS DUMPED -- EVERYTHING WAS DUMPED TO THIS SIDE

8    OF THIS LEVEE.

9              (PAUSE IN THE PROCEEDINGS.)

10   **Q.**   OKAY.

11        IS THAT A LITTLE MORE ACCURATE?

12   **A.**   YEAH.

13   **Q.**   SO THE TRUCKS WOULD DRIVE DOWN MOWRY, TAKE A LEFT ONTO THE

14   CONCRETE PAD, DRIVE IT TO THE END OF THE PAD?

15   **A.**   CORRECT.

16   **Q.**   AND WOULD THEY ACTUALLY DRIVE OUT ONTO THE FIELD FROM

17   THERE OR HOW WOULD THAT WORK?

18   **A.**   THEY WOULD DRIVE OFF THE RAMP, DRIVE OUT INTO THE FIELD,

19   DUMP, AND THEN COME BACK ON AND EXIT THE PROPERTY.

20   **Q.**   ALL RIGHT.   THE PERIOD OF TIME WHERE YOU WERE WITNESSING

21   THIS YOURSELF, HOW MANY TRUCKS PER DAY WERE DUMPING IN THAT

22   AREA?

23   **A.**   LIKE I SAID, IT WAS DIFFERENT EVERY DAY.

24   **Q.**   ALL RIGHT.

25        BEFORE YOU MOVED ON FROM THAT AREA, HOW MANY TOTAL LOADS

1    WOULD YOU SAY WERE DUMPED IN THIS SECOND FILL AREA?

2    **A.**  MAYBE 500.  THAT'S A GUESSTIMATE.

3    **Q.**  ALL RIGHT.  COULD IT HAVE BEEN LESS, SIR?

4    **A.**  COULD HAVE BEEN LESS.

5    **Q.**  ALL RIGHT.

6       WHY WAS IT THAT YOU LEFT THE SECOND FIELD LOCATION TO MOVE

7    SOMEWHERE ELSE, MR. OLIVERO?

8    **A.**  THE OWNER OF RUI, THIS CONCRETE PAD DRIVEWAY HERE, THEY

9    WANTED US TO GET OFF BECAUSE HE WAS GOING THROUGH A PERMITTING

10   PROCESS WITH THE CITY AND... WHICH CAUSED HIM A LITTLE

11   AGGRAVATION WITH ALL THESE TRUCKS RUNNING THROUGH HIS

12   PROPERTY, SO THAT'S WHEN EVERYTHING WAS MOVED OVER.

13   **Q.**  THE NAME OF THIS GENTLEMAN WHO --

14   **A.**  BURT VALDEZ.

15   **Q.**  SO MR. VALDEZ ASKED YOU TO MOVE YOUR DUMPING OPERATION; IS

16   THAT FAIR?

17   **A.**  CORRECT.

18   **Q.**  AND HOW DID YOU DECIDE ON GOING OVER TO THE STEVENSON

19   SIDE?

20   **A.**  THAT WAS PART OF SOBRATO'S PROPERTY ALSO.

21   **Q.**  WHO MADE THAT DECISION TO MOVE FROM THE SECOND FILL AREA

22   TO THE THIRD FILL AREA?

23   **A.**  JIM.

24   **Q.**  WHAT DID HE SAY IN THAT REGARD?

25   **A.**  HE SAID WE'D JUST MOVE OVER TO THE AREA ON THE OTHER SIDE

1    OF THE CANAL.

2    **Q.**  DID YOU NOTICE ANYTHING DUMPED IN THIS SECOND FILL AREA

3    BESIDES DIRT, SIR?

4    **A.**  THERE WAS SOME CONCRETE AND I BELIEVE SOME ASPHALT DUMPED

5    IN HERE.

6           **MR. KEARNEY:**  MADAME CLERK, MAY WE SHOW THIS WITNESS

7    EXHIBIT 1141, PLEASE.

8           **THE CLERK:**  ALREADY IN EVIDENCE?

9           **MR. KEARNEY:**  IT IS.  IT'S 1141-0089.

10                  (DISPLAYED ON SCREEN.)

11   **BY MR. KEARNEY:**

12   **Q.**  PLEASE TAKE A LOOK AT THIS SHOT, MR. OLIVERO.  THIS IS

13   A -- TELL US WHAT WE ARE LOOKING AT, SIR.

14   **A.**  CONCRETE.

15   **Q.**  DO YOU RECOGNIZE THAT PILE OF CONCRETE?

16   **A.**  I DO.

17   **Q.**  WHAT WAS IT OR WHAT IS IT?

18   **A.**  IT'S JUST CONCRETE OFF A DEMOLITION SITE OR CONSTRUCTION

19   SITE.

20   **Q.**  WAS THIS DUMPED ON THE LAND DURING YOUR ACTIVITIES?

21   **A.**  I BELIEVE SO, YES.

22   **Q.**  ALL RIGHT.  HOW BIG ARE THOSE CHUNKS, SIR?

23   **A.**  12 INCHES TO 18 INCHES BIG.

24   **Q.**  DO YOU REMEMBER SEEING THIS PILE YOURSELF?

25   **A.**  I BELIEVE SO, YES.

OLIVERO - DIRECT / KEARNEY

1    **Q.**  OKAY.

2        NOW DURING THE DUMPING, MR. OLIVERO, DID YOU HAVE A

3    MEETING WITH REPRESENTATIVES FROM A TRUCKING COMPANY CALLED

4    ECONOMY TRUCKING?

5    **A.**  YES.

6    **Q.**  I WONDER HOW YOU -- IF YOU CAN TELL US HOW THAT MEETING

7    CAME ABOUT.

8    **A.**  I RECEIVED A CALL FROM SABRINA WHO WAS THE BUSINESS

9    DEVELOPMENT PERSON AT ECONOMY TRUCKING.  AND WE WENT TO LUNCH

10   AT A RESTAURANT OFF OF MOWRY.

11   **Q.**  HAD YOU -- YOU MENTIONED SABRINA.  DO YOU KNOW HER FULL

12   NAME?

13   **A.**  SABRINA MASOUDA HAMIDI I BELIEVE IS HER LAST NAME.  IT'S

14   VERY HARD TO PRONOUNCE.

15   **Q.**  IN ANY EVENT, YOU SAID YOU GOT A PHONE CALL FROM HER; IS

16   THAT RIGHT?

17   **A.**  CORRECT.

18   **Q.**  WHAT WAS THE GIST OF THE CONVERSATION; IF YOU CAN TELL US.

19   **A.**  SHE BASICALLY WANTED TO TRY TO DO AN EXCLUSIVE TO OPERATE

20   THE DUMP SITE AND MANAGE THE SITE AND JUST ONLY ALLOW THEIR

21   TRUCKS TO COME IN.

22   **Q.**  NOW HAD YOU DONE BUSINESS IN THE PAST WITH ECONOMY

23   TRUCKING?

24   **A.**  NO.

25   **Q.**  HOW WAS IT THAT YOU -- HAD YOU EVER MET SABRINA BEFORE?

1    **A.**   NO.

2    **Q.**   SO YOU GOT A CALL FROM THIS WOMAN AND SHE SAID SHE WANTED

3    TO DUMP ON THE SITE; IS THAT RIGHT?

4    **A.**   CORRECT.

5    **Q.**   SO YOU HAD LUNCH WITH HER?

6    **A.**   CORRECT.

7    **Q.**   DO YOU REMEMBER WHAT TIME FRAME THIS WAS?

8    **A.**   END OF JULY, I BELIEVE.  MIDDLE OF JULY.

9    **Q.**   ALL RIGHT.  2014?

10   **A.**   CORRECT.

11   **Q.**   SO AT THE LUNCH, THIS FIRST LUNCH THAT YOU HAD WITH HER,

12   DID YOU DISCUSS POTENTIAL -- WHAT SHE WANTED IN TERMS OF

13   DUMPING ON THE SITE?

14   **A.**   WE DIDN'T.  I TOLD HER THAT SHE HAD TO ARRANGE -- I WOULD

15   ARRANGE LUNCH WITH JIM, AND HE WAS THE ONE THAT WOULD HAVE TO

16   MAKE THAT CALL.

17   **Q.**   ABOUT GRANTING HER EXCLUSIVE RIGHTS TO DUMP?

18   **A.**   CORRECT.

19   **Q.**   AND WAS THAT SECOND LUNCH SET UP WITH MR. LUCERO?

20   **A.**   IT WAS.

21   **Q.**   PLEASE TELL US ABOUT THAT.

22   **A.**   IT WAS KEVIN SINGH FROM ECONOMY TRUCKING AND MYSELF, JIM,

23   AND SABRINA.

24   **Q.**   WHERE WAS THIS?  WHERE DID THIS MEETING TAKE PLACE BETWEEN

25   THE FOUR OF YOU?

OLIVERO – DIRECT / KEARNEY

1    **A.**   SCOTT'S SEAFOOD IN OAKLAND.

2    **Q.**   TELL US WHAT WAS DISCUSSED DURING THAT MEETING, IF YOU

3    WOULD SIR.

4    **A.**   SABRINA PRETTY MUCH DID ALL THE TALKING WITH JIM ABOUT

5    COORDINATING AN EXCLUSIVE, GUARANTEEING HIM BASICALLY SO MANY

6    LOADS, BUT THEY DIDN'T WANT ANYBODY ELSE TO HAVE ACCESS TO THE

7    SITE.

8    **Q.**   IS THAT A TERM THAT YOU HAD HEARD BEFORE IN THE TRUCKING

9    BUSINESS "EXCLUSIVE"?

10   **A.**   YEAH.

11   **Q.**   AND I IMAGINE IT MEANS WHAT IT SAYS.  IT'S ONE PERSON GETS

12   TO DUMP?

13   **A.**   CORRECT.

14   **Q.**   ONE COMPANY WOULD GET TO DUMP?

15   **A.**   CORRECT.

16   **Q.**   WAS THERE A DISCUSSION AT ALL OF PRICE, SIR, DURING THAT

17   LUNCH MEETING?

18   **A.**   I BELIEVE THERE WAS PRICING BROUGHT UP.  I DON'T REMEMBER

19   THE EXACT CONVERSATION, BUT, YES, I BELIEVE PRICING WAS TALKED

20   ABOUT.

21   **Q.**   WHAT WAS THE -- WERE YOU AWARE OF THE... THE PRICING FOR

22   THE COMPANIES THAT WERE DUMPING ON-SITE LIKE WHAT THEY WERE

23   BEING CHARGED?

24   **A.**   YES.

25   **Q.**   PLEASE TELL US ABOUT THAT.

OLIVERO – DIRECT / KEARNEY

1    **A.**   IT VARIED BY CUSTOMER DEPENDING ON THE NUMBER OF LOADS

2    THAT WERE BROUGHT IN.  SOME CUSTOMERS WERE CHARGED 80, SOME

3    CUSTOMERS CHARGED 75, 70, 50.  IT JUST DEPENDED ON THE VOLUME

4    AND ACTUALLY HOW WELL THEY PAID.  RIGHT?  IF THEY PAID THEIR

5    INVOICES QUICKLY, OR THEY WERE A 30-DAY CUSTOMER, 45-DAY

6    CUSTOMER.  IT VARIED.

7    **Q.**   TRUCKING COMPANIES WOULD PAY YOU?

8    **A.**   CORRECT.

9    **Q.**   BETWEEN 50 AND $80 PER LOAD FOR THE RIGHT TO DUMP THEIR

10   FILL ON THIS PROPERTY?

11   **A.**   CORRECT.

12   **Q.**   AND YOU TOLD US BEFORE, MR. OLIVERO, THAT YOUR FEE PER

13   LOAD WAS?

14   **A.**   ANYWHERE FROM 15 TO 10, IN THAT AREA.

15   **Q.**   AND AFTER EXPENSES, THE BALANCE WENT TO MR. LUCERO; IS

16   THAT RIGHT?

17   **A.**   CORRECT.

18   **Q.**   DURING THIS LUNCH CONVERSATION WITH SABRINA, WAS THERE ANY

19   DISCUSSION OF PERMISSION HAD DURING THE MEETING?

20   **A.**   YEAH.  JIM SAID HE HAD PERMISSION FROM THE SOBRATO FAMILY

21   TO TAKE THE DIRT.  HE HAD THE ACTUAL PARCEL MAPS WITH HIM TO

22   SHOW THE PROPERTY LINES AND WHERE WE COULD DUMP.

23   **Q.**   DO YOU KNOW WHAT PRICE -- WELL, STRIKE THAT.

24        DID MR. LUCERO -- DID YOU HEAR ANY DISCUSSION ABOUT THAT

25   EXCLUSIVITY THAT SABRINA WANTED?

OLIVERO – DIRECT / KEARNEY

1    **A.**  IT WAS BROUGHT UP AND THEN JIM SAID THAT HE DIDN'T WANT TO

2    DO AN EXCLUSIVE.  THERE WAS NO POINT.

3    **Q.**  AND WERE YOU AWARE OF A PRICE THAT WAS ARRANGED BETWEEN

4    SABRINA AND MR. LUCERO?

5    **A.**  I BELIEVE IT WAS 50, $50 A LOAD.

6    **Q.**  AFTER THAT LUNCH MEETING, DID ECONOMY TRUCKS START DUMPING

7    ON THE LAND?

8    **A.**  VERY MUCH SO.

9    **Q.**  PLEASE TELL US ABOUT THAT.

10   **A.**  IT WAS WITHIN A COUPLE OF DAYS THEY CAME IN.  60, 80,

11   HUNDRED LOADS A DAY.

12   **Q.**  SO THE -- WHAT HAPPENED TO THE PACE?  DID IT -- GENERAL

13   PACE OF DUMPING?

14   **A.**  IT INCREASED SUBSTANTIALLY.

15   **Q.**  SO, SIR, YOU SAID A HUNDRED LOADS PER DAY FROM THIS ONE

16   COMPANY?

17   **A.**  CORRECT.

18   **Q.**  ARE YOU --

19   **A.**  I'M AM NOT EXAGGERATING.  IT WAS A HUNDRED LOADS, 80 TO A

20   HUNDRED LOADS A DAY.

21   **Q.**  AND WHERE, AGAIN, WE'RE JUST -- THESE ARE THE END DUMPS,

22   TRANSFER TRUCKS, SUPER DUMPS YOU MENTIONED EARLIER?

23   **A.**  CORRECT.

24   **Q.**  WHERE ON THE PROPERTY DID ECONOMY START DUMPING?  WAS

25   IT --

1    **A.**  AREA 3.

2         **MR. KEARNEY:**  MADAME CLERK, I WONDER IF WE CAN GO

3    BACK TO THE MAP, EXHIBIT 53.

4              (DISPLAYED ON SCREEN.)

5       AND AGENT SU, I WONDER IF WE CAN BLOW UP MIDDLE TO LOWER

6    PORTION NOW.  MAYBE WE CAN RAISE IT A LITTLE BIT.

7       PERFECT, THANK YOU.

8    **BY MR. KEARNEY:**

9    **Q.**  THE AREA NO. 3, THIS THIRD STAGE OF THE DUMPING ACTIVITY

10   ON THE NEWARK LAND, IS THAT PICTURED IN THIS PORTION OF YOUR

11   MAP, SIR?

12   **A.**  CORRECT.

13   **Q.**  PLEASE SHOW US WITH THE LASER POINTER WHERE YOU ARE

14   INDICATING.

15   **A.**  IN HERE (INDICATING).

16   **Q.**  AND YOU HAVE RED LINES; IS THERE AN ARROW THERE THAT I

17   SEE?

18   **A.**  YES.

19   **Q.**  JUST WONDER IF YOU CAN EXPLAIN IT FOR US.

20   **A.**  TRUCKS WOULD ENTER THE SITE, COME ACROSS THE RAILROAD

21   TRACKS, AND DRIVE AROUND, AND DUMP INTO THIS AREA

22   (INDICATING).

23   **Q.**  OKAY.  SO THE DAY THAT ECONOMY DUMPED 100 LOADS, WAS IT IN

24   THIS SECTION OR A DIFFERENT SECTION OF YOUR DUMPING ACTIVITY?

25   **A.**  IT WOULD HAVE BEEN THIS SECTION (INDICATING).

OLIVERO – DIRECT / KEARNEY

1    **Q.**  HOW DID YOU... HOW DID YOU PHYSICALLY ACCESS THIS PORTION

2    OF THE PROPERTY, SIR?

3    **A.**  THROUGH THE GATE OVER ON THE STEVENSON SIDE.

4    **Q.**  WHEN YOU GOT TO THE GATE, WAS IT OPEN, WAS IT CLOSED,

5    LOCKED, UNLOCKED?

6    **A.**  IT WAS LOCKED.

7    **Q.**  HOW DID YOU GET IN?

8    **A.**  GEORGE FROM ALVISO ROCK HAD A KEY.

9    **Q.**  AND DO YOU KNOW ANYTHING ABOUT HOW HE HAD A KEY?

10   **A.**  I DO NOT.

11   **Q.**  AND DID, TO YOUR KNOWLEDGE, BASED ON THE ACTIVITIES OUT

12   THERE, DID MR. -- GEORGE FROM ALVISO ROCK HAVE A RELATIONSHIP

13   WITH MR. LUCERO?

14   **A.**  I BELIEVE SO, YES.

15   **Q.**  WHAT DO YOU BASE THAT ON, SIR?

16   **A.**  THE DIRT THAT WAS DUMPED ON AREA 1 WAS FROM ALVISO ROCK.

17   AND EVENTUALLY IN AREA 3, ALVISO ROCK CAME OUT AND ALSO

18   STARTED DUMPING MORE MATERIAL IN AREA 3, AND I WAS TOLD NOT TO

19   BILL HIM.

20   **Q.**  YOU TOLD BY WHOM NOT TO BILL HIM?

21   **A.**  BY JIM.

22   **Q.**  WAS THERE A PRIVATE NEGOTIATION WORKED OUT BETWEEN

23   THOSE --

24   **A.**  AS FAR AS I -- YEAH, I WOULD IMAGINE.

25   **Q.**  OKAY.

OLIVERO – DIRECT / KEARNEY

1    THIS DUMPING INTO AREA 3, HOW LONG DID THAT CONTINUE, SIR?

2    DO YOU KNOW IN TERMS OF TIME FRAME WHEN IT MIGHT HAVE

3    STARTED, MIGHT HAVE ENDED?

4    **A.**   SAY AUGUST UNTIL THE CAVALRY SHOWED UP.

5    **Q.**   WE'VE HEARD ABOUT THAT ALREADY.   THAT WOULD BE SEPTEMBER

6    THE 8TH OF 2014?

7    **A.**   CORRECT.

8    **Q.**   I GUESS WE MIGHT AS WELL GET TO THAT DAY.

9    BEFORE WE DO, THOUGH, ANY IDEA, MR. OLIVERO, OF THE

10   NUMBER, THE TOTAL NUMBER OF LOADS THAT WENT INTO THIS THIRD

11   FILL AREA?

12   **A.**   SIX TO 800 MAYBE.   MAYBE MORE.

13   **Q.**   ALL RIGHT.

14   ON AVERAGE DAYS OUT THERE, YOU SAID THAT THERE WAS SOME

15   DAYS ECONOMY DUMPED A HUNDRED LOADS.   BUT BASED ON YOUR OWN

16   EXPERIENCE SEEING THAT -- THE ACTIVITY, WHAT WAS AN AVERAGE

17   DAY OF DUMPING ON THAT --

18   **A.**   30 TO 55 LOADS, IN BETWEEN THERE.   SOMETHING LIKE THAT.

19   **Q.**   THAT WOULD BE FOR APPROXIMATELY HOW LONG?   HOW MANY WEEKS?

20   **A.**   FIVE TO SIX WEEKS.

21   **Q.**   OKAY.

22   SO SEPTEMBER THE 8TH OF 2014, I'LL USE YOUR WORDS, WHEN

23   THE CAVALRY SHOWED UP --

24   **A.**   YEAH.

25   **Q.**   -- WERE YOU WORKING ON THE SITE THAT DAY?

 1    **A.**  I WAS NOT.  I WAS AT MY SON'S SCHOOL.

 2    **Q.**  PLEASE TELL US HOW YOU BECAME AWARE OF LAW ENFORCEMENT

 3    SHOWING UP.

 4    **A.**  I RECEIVED A PHONE CALL FROM AUSTIN LUCERO, JIM'S SON.

 5    AND HE SAID THERE WAS A GENTLEMAN THERE BY THE NAME OF TIM

 6    STEELE THAT WAS THE REPRESENTATIVE FOR THE SOBRATO

 7    ORGANIZATION.

 8    **Q.**  NOW, MR. LUCERO'S SON, AUSTIN, HAD HE BEEN WORKING ON THE

 9    SITE -- ON THE SITE?

10    **A.**  HE DID.  HE HELPED WITH TAGS.  WE TRIED PUTTING HIM ON A

11    MACHINE AND THAT DIDN'T WORK OUT SO WELL SO WE HAD HIM DO TAGS

12    FOR A WHILE.

13    **Q.**  IN TERMS OF THE FILL AREAS, MR. OLIVERO, WHEN DID HE COME

14    ON BOARD IF YOU KNOW?

15    **A.**  AREA 3.

16    **Q.**  SO --

17    **A.**  TOWARDS THE END.

18    **Q.**  SO YOU SAID HE WAS IN CHARGE OF WHAT?

19    **A.**  DOING TAGS.  HANDWRITING THE TAGS.

20    **Q.**  ALL RIGHT.

21        AND DESCRIBE THAT PROCESS AS TRUCKS WOULD ENTER THIS THIRD

22    FILL AREA SITE, WHERE WAS HE PHYSICALLY?

23    **A.**  HE WOULD BE STANDING ALONG THE ROADWAY AS YOU TURN IN TO

24    DUMP IN AREA 3.  HE WOULD ASK THE COMPANY'S NAME AND TYPE OF

25    TRUCK.

OLIVERO − DIRECT / KEARNEY

1    **Q.**  WOULD THIS BE THE ROADWAY OUTSIDE THE GATE ON STEVENSON OR

2    INSIDE THE PROPERTY?

3    **A.**  INSIDE.

4    **Q.**  ALL RIGHT.  SO YOU GOT A CALL FROM AUSTIN, WE WILL CALL

5    HIM?

6    **A.**  CORRECT.

7    **Q.**  SAYING THAT HE HAD MET THIS PERSON NAMED TIM, TIM STEELE.

8    WHAT HAPPENED THEN, SIR?

9    **A.**  I TOLD HIM TO CALL HIS FATHER.  AND HE SAID HE COULDN'T

10   GET AHOLD OF HIM SO I DROVE OUT TO THE SITE.

11   **Q.**  HOW WERE YOU FEELING AT THIS TIME?

12   **A.**  NOT GOOD.

13        **MS. HANSEN:**  OBJECTION, RELEVANCE.

14        **THE COURT:**  OVERRULED.

15   **BY MR. KEARNEY:**

16   **Q.**  YOU CAN ANSWER.

17   **A.**  NOT GOOD.

18   **Q.**  WHY NOT?

19   **A.**  BECAUSE I HAD A FEELING SOMETHING WAS WRONG.

20   **Q.**  SO DESCRIBE THE SCENE AS YOU GOT OUT THERE ON SEPTEMBER

21   THE 8TH, 2014.

22   **A.**  IT WAS ROUGHLY PROBABLY TEN POLICE CARS, AND TIM STEELE,

23   AND HE HAD AN ASSOCIATE WITH HIM FROM THE SOBRATO

24   ORGANIZATION.

25   **Q.**  AND DID YOU HAVE A DISCUSSION THAT DAY WITH MR. STEELE?

1    **A.**   I DID.

2    **Q.**   AND DID YOU AGREE TO HAVE A SECOND MEETING WITH HIM?

3    **A.**   CORRECT.

4    **Q.**   PLEASE TELL US ABOUT THAT.

5    **A.**   I BELIEVE IT WAS THE FOLLOWING DAY ACTUALLY.  AND HE

6    WANTED MYSELF AND JIM TO BE PRESENT IN HIS OFFICE.

7    **Q.**   YOU SAID THAT ON SEPTEMBER THE 8TH WHEN YOU GOT THE CALL

8    FROM AUSTIN, YOU ACTUALLY PHYSICALLY DROVE TO THE PROPERTY; IS

9    THAT RIGHT?

10   **A.**   CORRECT.

11   **Q.**   DID MR. LUCERO COME OUT THAT DAY AS WELL?

12   **A.**   HE DID NOT.

13   **Q.**   SO THAT WAS SEPTEMBER THE 8TH.  SEPTEMBER THE 9TH, DID YOU

14   ACTUALLY MEET WITH MR. STEELE --

15   **A.**   I BELIEVE IT WAS THE NEXT DAY, YEAH.

16   **Q.**   PLEASE TELL US ABOUT THAT.

17   **A.**   WE MET THEM IN CUPERTINO AT THEIR OFFICE.  AND HE STARTED

18   ASKING JIM QUESTIONS ABOUT WHAT DOES MICHAEL SOBRATO LOOK

19   LIKE?  WHY WERE YOU DUMPING THE DIRT ON THE PROPERTY?  JIM

20   SAID HE HAD PERMISSION.  AND TIM STEELE WAS JUST TRYING TO GET

21   INFORMATION OUT OF HIM ABOUT WHAT WAS GOING ON.

22        AND HE REALLY DIDN'T ASK ME TOO MANY QUESTIONS AT ALL.

23   **Q.**   THE -- AT SOME POINT DID -- WAS THERE A DISCUSSION THAT

24   DAY OR SOON THEREAFTER ABOUT A PERMISSION NOTE THAT YOU ARE

25   AWARE OF?

OLIVERO – DIRECT / KEARNEY

1    **A.**   SO, YEAH.   AFTER THE CAVALRY CAME, ECONOMY TRUCKING WANTED

2    TO SEE A COPY OF THE PERMISSION LETTER.   SABRINA.   THAT'S WHEN

3    I RECEIVED AN EMAIL FROM, I DON'T REMEMBER IF IT WAS JIM'S

4    EX-WIFE OR HIS GIRLFRIEND OR JIM, BUT THEY SENT ME A

5    PERMISSION LETTER.

6    **Q.**   HOW LONG, MR. OLIVERO, AFTER THE MEETING WITH MR. STEELE

7    DID YOU RECEIVE THIS --

8    **A.**   LIKE A DAY OR TWO, I BELIEVE.

9    **Q.**   YOU RECEIVED A COPY OF THE PERMISSION NOTE VIA EMAIL?

10   **A.**   CORRECT.

11   **Q.**   THAT WAS FROM WHOM, SIR?

12   **A.**   THAT WAS FROM JIM.

13        **MR. KEARNEY:**   MADAME CLERK, MAY WE DRAW UP

14   EXHIBIT 35, PLEASE?

15        **THE CLERK:**   PREVIOUSLY ADMITTED?

16        **MR. KEARNEY:**   YES.

17        **MS. HANSEN:**   YOUR HONOR, WE WOULD REQUEST THE

18   LIMITING INSTRUCTION AGAIN.

19        **THE COURT:**   LADIES AND GENTLEMEN, AGAIN, YOU ARE HERE

20   ONLY TO DETERMINE WHETHER THE DEFENDANT IS GUILTY OR NOT

21   GUILTY OF THE CHARGES IN THE INDICTMENT.   THE DEFENDANT IS NOT

22   ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT CHARGED IN THE

23   INDICTMENT.

24                 (DISPLAYED ON SCREEN.)

25        **MR. KEARNEY:**   AGENT SU, CAN WE BLOW UP THE WRITING OF

OLIVERO – DIRECT / KEARNEY

```
1    THIS?

2    BY MR. KEARNEY:

3    Q.  SO DO YOU RECOGNIZE THIS NOTE HERE, MR. OLIVERO?

4    A.  I DO.

5    Q.  PLEASE TELL US ABOUT IT.

6    A.  THIS WAS THE LETTER THAT WAS EMAILED TO ME.

7    Q.  AND HAD YOU SEEN THIS NOTE BEFORE?

8    A.  I HAVE NOT.

9    Q.  WHAT WERE YOUR THOUGHTS, SIR, ON RECEIVING IT?

10   A.  AFTER I SAW IT, IT DIDN'T LOOK VERY AUTHENTIC.

11   Q.  THERE'S A LOWER SIGNATURE ON THIS DOCUMENT.

12       SCROLL DOWN, IF WE MAY.

13       DO YOU RECOGNIZE THE LOWER SIGNATURE THERE?

14   A.  I DO.

15   Q.  WHOSE SIGNATURE IS THAT?

16   A.  JIM LUCERO.

17   Q.  HOW DO YOU KNOW?

18   A.  BECAUSE IT'S THE SAME -- IT'S HIS SIGNATURE.  HE SIGNED MY

19   AGREEMENT THE SAME WAY.

20   Q.  DURING YOUR CONVERSATION WITH MR. STEELE ON SEPTEMBER THE

21   9TH, 2014, WAS THERE A DISCUSSION OF PULL TAGS?

22   A.  YES.

23   Q.  PLEASE TELL US ABOUT THAT.

24   A.  HE SAID HE WANTED COPIES OF ALL THE LOADS DUMPED OUT

25   THERE.
```

1   **Q.**  DID YOU TAKE ANY ACTION IN THAT REGARD IN RESPONSE TO THAT

2   REQUEST?

3   **A.**  I DID.

4   **Q.**  PLEASE TELL US ABOUT THAT.

5   **A.**  I HAD BOXED THEM ALL UP AND GAVE THEM TO JIM BECAUSE JIM

6   WAS GOING TO MEET WITH HIM AGAIN.

7   **Q.**  OKAY.  I WOULD LIKE TO SHOW YOU EXHIBIT 38, IF I MAY.

8           **MR. KEARNEY:**  MAY I APPROACH, YOUR HONOR?

9           **THE COURT:**  YOU MAY.

10              (EXHIBIT BINDER HANDED TO WITNESS.)

11  **BY MR. KEARNEY:**

12  **Q.**  MR. OLIVERO, PLEASE TAKE A LOOK THROUGH EXHIBIT 38.  IT IS

13  A THICK STACK.

14      ARE THOSE CONSISTENT WITH THE PULL TAGS THAT YOU ISSUED

15  AND COLLECTED DURING THE DUMPING ACTIVITY IN THE NEWARK AREA 4

16  PROPERTY?

17  **A.**  YES.

18  **Q.**  HOW DO YOU KNOW, SIR?

19  **A.**  I CAN TELL BY THE HANDWRITING, THE COMPANIES, AND THE

20  DATES.

21  **Q.**  ALL RIGHT.  THANK YOU.

22          **MR. KEARNEY:**  MADAME CLERK, I BELIEVE THIS WAS

23  PREVIOUSLY ADMITTED; IS THAT CORRECT?

24          **THE CLERK:**  WHICH EXHIBIT?

25          **THE COURT:**  IT WAS.

OLIVERO – DIRECT / KEARNEY

1        **MR. KEARNEY:**  IT WAS.

2        **THE COURT:**  38.

3        **MR. KEARNEY:**  THANK YOU, SIR.

4     ONE MOMENT, SIR.

5                    (PAUSE IN THE PROCEEDINGS.)

6  **BY MR. KEARNEY:**

7  **Q.**  I KIND OF WANT TO GET INTO NOW A LITTLE MORE IN DEPTH TO

8  THE BILLING AND PAYMENT PROCESS, IF I MAY, MR. OLIVERO?

9  **A.**  OKAY.

10 **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 986.

11       **MR. KEARNEY:**  ACTUALLY, WE FOUND THE EXHIBIT WE WERE

12 LOOKING FOR, YOUR HONOR.

13    MAY I APPROACH THE WITNESS?

14       **THE COURT:**  YOU MAY.

15                 (EXHIBIT HANDED TO THE WITNESS.)

16 **BY MR. KEARNEY:**

17 **Q.**  MR. OLIVERO, DO YOU RECOGNIZE EXHIBIT 59?

18 **A.**  YES.

19 **Q.**  WHAT IS IT?

20 **A.**  IT'S A PULL TAG FOR GILROY CONSTRUCTION.

21 **Q.**  AND DO YOU RECOGNIZE THE HANDWRITING ON IT?

22 **A.**  YES.

23 **Q.**  IS THAT YOURS?

24 **A.**  CORRECT.

25       **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO ADMIT THIS

```
 1       PLEASE INTO EVIDENCE.

 2                MS. HANSEN:  NO OBJECTION.

 3                THE COURT:  EXHIBIT 59 IS ADMITTED.

 4            (GOVERNMENT'S EXHIBIT 59 RECEIVED IN EVIDENCE)

 5                MR. KEARNEY:  MAY WE PUBLISH IT TO THE JURY?

 6                    (DISPLAYED ON SCREEN.)

 7       BY MR. KEARNEY:

 8       Q.   THIS IS A PULL TAG YOU FILLED OUT, MR. OLIVERO?

 9       A.   CORRECT.

10       Q.   PLEASE EXPLAIN WHAT WE ARE LOOKING AT THERE.

11            WHAT IS THE INFORMATION THAT WAS FILLED IN?

12       A.   SO YOU HAVE THE DATE, THE COMPANY NAME, AND THE LOCATION

13       OF WHERE THE MATERIAL CAME FROM.

14       Q.   SO THE DATE OF THIS PARTICULAR DUMP WAS WHEN?

15       A.   AUGUST 27TH IT LOOKS LIKE.

16       Q.   THESE ARE ALL 2014; IS THAT RIGHT?

17       A.   CORRECT.

18       Q.   AND WHAT IS -- I SEE THE NAME GCI.  WHAT DOES THAT STAND

19       FOR, IF YOU KNOW?

20       A.   GILROY CONSTRUCTION INCORPORATED.

21       Q.   WERE THEY ONE OF THE COMPANIES THAT WAS DUMPING OUT THERE?

22       A.   YES, THEY WERE.

23       Q.   THERE'S A CITY, STATE?

24       A.   MILPITAS IS WHERE THE MATERIAL CAME FROM.

25            AND THEN BELOW THAT IS A TRANSFER.  SO THAT'S THE TYPE OF
```

```
 1    TRUCK THAT WAS BROUGHT IN.
 2    Q.   AND I THINK IF WE SCROLL DOWN ON THIS DOCUMENT THERE'S A
 3    SIGNATURE.
 4         SO THAT DATA WE JUST WENT THROUGH, TRANSFER TRUCK,
 5    MILPITAS, GCI, THE DATE, THAT'S ALL YOUR HANDWRITING; IS THAT
 6    RIGHT?
 7    A.   CORRECT.
 8    Q.   AND --
 9    A.   THAT'S THE DRIVER'S HANDWRITING.
10    Q.   ALL RIGHT.  DO YOU EVEN KNOW WHO THAT IS, SIR?
11    A.   I DO NOT.
12    Q.   OKAY.  THANK YOU.
13         NOW YOU INDICATED THAT WHEN YOU COLLECTED PULL TAGS ON A
14    DAILY BASIS OR WHATEVER FREQUENCY YOU COLLECTED THEM ON, YOU
15    BROUGHT THEM HOME; IS THAT RIGHT?
16    A.   CORRECT.
17    Q.   AND WHO DID YOU GIVE THEM TO THEN?
18    A.   MY WIFE.
19    Q.   WHAT DOES SHE DO, SIR?
20    A.   AND THEN SHE WOULD BILL THEM AND THEN EMAIL THE INVOICE
21    OUT.
22    Q.   PREPARING AN INVOICE TO THE TRUCKING COMPANIES?
23    A.   CORRECT.
24    Q.   AND WHAT WOULD HAPPEN THEREAFTER?
25    A.   THEN THEY WOULD MAIL A CHECK IN FOR PAYMENT.
```

1    **Q.**  ALL RIGHT.  AND THE CHECK WOULD BE MADE OUT TO WHOM?

2    **A.**  GOLDEN GATE EQUIPMENT RENTAL.

3    **Q.**  THAT WAS YOUR COMPANY?

4    **A.**  CORRECT.

5    **Q.**  THE CORPORATE ACCOUNT OF YOUR COMPANY, GOLDEN GATE

6    EQUIPMENT RENTAL, WAS HELD BY WHOM?  WHAT BANK DID YOU GO TO?

7    **A.**  CHASE.

8    **Q.**  DO YOU KNOW THE LAST FOUR OF GOLDEN GATE'S CHASE CORPORATE

9    BANK ACCOUNT, THE ACCOUNT NUMBER?

10   **A.**  I DON'T HAVE IT MEMORIZED, NO.

11   **Q.**  IF I TOLD YOU 3070, DOES THAT RING A BELL?

12   **A.**  SOUNDS ABOUT RIGHT.

13         **MR. KEARNEY:**  YOUR HONOR, IF I MAY APPROACH THE

14   WITNESS WITH EXHIBIT 986.

15              (BINDER HANDED TO WITNESS.)

16   **BY MR. KEARNEY:**

17   **Q.**  SO 986, SIR, CONTINUES INTO THE NEXT BINDER.

18   **A.**  OKAY.

19   **Q.**  BUT DO YOU RECOGNIZE THAT EXHIBIT?

20   **A.**  YES.

21   **Q.**  WHAT IS IT?

22   **A.**  THIS IS MY BANK ACCOUNT INFORMATION.

23   **Q.**  THE -- DID ALL THE BILLING FOR THE NEWARK AREA ACTIVITY

24   GET RUN THROUGH YOUR CHASE BANK ACCOUNT IN THE NAME OF GOLDEN

25   GATE EQUIPMENT RENTAL?

OLIVERO – DIRECT / KEARNEY

1   **A.**  CORRECT.

2   **Q.**  FROM THAT ACCOUNT, DID YOU MAKE CHECK PAYMENTS TO

3   MR. LUCERO?

4   **A.**  ECONOMY WASTE, YES.

5   **Q.**  SO WHEN -- YOU INDICATED THAT TRUCKERS WOULD PAY PER LOAD,

6   SAY $50 PER LOAD, YOU WOULD TAKE YOUR 10 OR 15 OUT; IS THAT

7   RIGHT?

8   **A.**  CORRECT.

9   **Q.**  SO NOW JUST ROUND THE NUMBER, SAY WE ARE AT $35 LEFT.

10  WOULD YOU PAY ANY EXPENSES FROM THAT REMAINING MONEY?

11  **A.**  SOMETIMES I WOULD GET PULL TAG BOOKS.  BUT BASICALLY, NO,

12  THE REST OF THAT MONEY WENT TO JIM.

13  **Q.**  ALL RIGHT.  YOU DID HAVE EXPENSES, THOUGH, SIR?

14       YOU HAD TO PAY FOR THE BULLDOZER; IS THAT RIGHT?

15  **A.**  CORRECT.

16  **Q.**  DID YOU PAY FOR THAT OUT OF THE RECEIPTS FROM THE

17  TRUCKERS?

18  **A.**  THE MONEY WAS GIVEN TO JIM FIRST, AND THEN HE'D DECIDE

19  WHEN TO PAY THE DOZER RENTAL BILL IS BASICALLY HOW IT WORKED.

20  **Q.**  ALL RIGHT.  THE PAYMENTS THAT WENT TO MR. LUCERO, WERE

21  THEY IN CHECK, BY CASH, BOTH?  TELL US ABOUT THAT, PLEASE.

22  **A.**  CHECK, AND I BELIEVE THERE WAS FOUR OR FIVE TRANSACTIONS

23  WITH CASH.

24  **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 54.

25                  (EXHIBIT HANDED TO WITNESS.)

1        DO YOU RECOGNIZE THAT DOCUMENT, MR. OLIVERO?

2   **A.**   YES.

3   **Q.**   WHAT IS IT?

4   **A.**   THAT'S A CHECK FROM GOLDEN GATE TO ECONOMY WASTE.

5   **Q.**   IS IT -- DO YOU RECOGNIZE THE SIGNATURE AT THE BOTTOM?

6   **A.**   THAT'S MY SIGNATURE.

7        **MR. KEARNEY:**  MAY WE ADMIT EXHIBIT 54, PLEASE?

8        **MS. HANSEN:**  NO OBJECTION, YOUR HONOR, EXCEPT PERHAPS

9   THE COURT RECORD WILL HAVE A REDACTED ACCOUNT NUMBER BECAUSE

10  IT CONTAINS PERSONAL IDENTIFYING INFORMATION.

11       **THE COURT:**  I THINK THAT'S A GOOD POINT.

12       **MR. KEARNEY:**  ALL RIGHT.

13       **THE COURT:**  ADMITTED SUBJECT TO THAT PROVISO.

14     (GOVERNMENT'S EXHIBIT 54 RECEIVED IN EVIDENCE)

15       **MR. KEARNEY:**  THANK YOU.

16     MAY WE PUBLISH IT AND MAY WE BLOW THAT UP.

17                (DISPLAYED ON SCREEN.)

18     CAN WE BLOW UP THE TOP OF IT.

19     THAT'S AS CLOSE AS WE ARE GOING TO GET.

20  **BY MR. KEARNEY:**

21  **Q.**   WHAT ARE WE LOOKING AT HERE, MR. OLIVERO, IF YOU CAN TELL

22  US PLEASE.

23  **A.**   THAT IS ONE OF MY BUSINESS CHECKS.

24  **Q.**   AND THIS IS -- YOU ALREADY TOLD US YOUR SIGNATURE IS ON

25  THE BOTTOM; IS THAT RIGHT?

OLIVERO – DIRECT / KEARNEY

1    **A.**   CORRECT.

2    **Q.**   WHO ARE YOU WRITING THE CHECK TO?

3    **A.**   ECONOMY WASTE SOLUTIONS.

4    **Q.**   IS THAT IN EFFECT --

5    **A.**   JIM LUCERO'S COMPANY.

6    **Q.**   THIS CHECK IS IN WHAT AMOUNT?

7    **A.**   8900.

8    **Q.**   IT WAS WRITTEN ON WHAT DATE, SIR?

9    **A.**   AUGUST 26TH.

10   **Q.**   IS THIS ONE OF THE CHECKS THAT YOU WERE PAYING BACK TO

11   MR. LUCERO FROM THE DUMPING IN THE NEWARK AREA 4 PROPERTY?

12   **A.**   CORRECT.

13   **Q.**   DO YOU HAVE ANY IDEA OF THE TOTAL AMOUNT OF MONEY YOU SENT

14   BACK TO MR. LUCERO FROM THE DUMPING?

15   **A.**   I DON'T.

16   **Q.**   COULD YOU TELL US ROUND NUMBERS?  IF YOU DON'T KNOW, DON'T

17   GUESS.

18   **A.**   I COULDN'T TELL YOU.

19   **Q.**   OKAY.

20       DO YOU KNOW HOW MANY CHECKS OR CASH PAYMENTS YOU ACTUALLY

21   MADE TO MR. LUCERO FROM THE DUMPING ACTIVITY?

22   **A.**   I BELIEVE THERE WERE FOUR CHECKS AND FOUR CASH -- FOUR OR

23   FIVE CASH DEPOSITS.

24   **Q.**   DO YOU KNOW AS YOU SIT HERE TODAY?

25   **A.**   I'M SORRY?

1   **Q.**  DO YOU KNOW AS YOU SIT HERE TODAY?

2   **A.**  NO.

3   **Q.**  ALL RIGHT.

4       LET ME ASK YOU THIS:  DURING CALENDAR YEAR 2014, DID YOU

5   MAKE ANY PAYMENTS TO MR. LUCERO THAT WERE NOT RELATED TO THIS

6   DUMPING AT THE NEWARK SITE?

7   **A.**  NO.

8   **Q.**  OKAY.

9       I WANT TO MOVE ON NOW, IF I MAY.  BY THE WAY, THE

10  INVOICING THAT YOUR WIFE CREATED FOR THE DUMPS WE'RE TALKING

11  ABOUT, THE ONES THAT WENT TO THE TRUCKING COMPANIES, DID YOU

12  GIVE THOSE TO LAW ENFORCEMENT DURING THIS INVESTIGATION?

13  **A.**  YES.

14  **Q.**  OKAY.  I WANT TO TALK ABOUT THE TRUCKING COMPANIES, IF I

15  MAY, NOW.

16      HOW MANY TRUCKING COMPANIES DUMPED ON THIS SITE IN THE

17  SUMMER OF 2014 DURING THIS ACTIVITY YOU HAVE BEEN TELLING US

18  ABOUT?

19  **A.**  I WANT TO SAY 12 TO 15 MAYBE.

20  **Q.**  I AM GOING TO GO THROUGH A LIST WITH A NAME, AND PLEASE

21  CONFIRM OR DENY IF THIS IS A COMPANY THAT DUMPED ON THIS SITE.

22      OKAY?

23  **A.**  OKAY.

24  **Q.**  PACIFIC SANITATION?

25  **A.**  YES.

1   **Q.**  FA PULLING TRUCKING?

2   **A.**  YES.

3   **Q.**  FAST AGGREGATE?

4   **A.**  YES.

5   **Q.**  CITYWIDE DEBRIS BOX?

6   **A.**  YES.

7   **Q.**  GARY POLLACK CONSTRUCTION & EXCAVATION?

8   **A.**  YES.

9   **Q.**  GREG'S TRUCKING SERVICE?

10  **A.**  YES.

11  **Q.**  O. NELSON & SON?

12  **A.**  YES.

13  **Q.**  GILROY CONSTRUCTION?

14  **A.**  YES.

15  **Q.**  MAT KELLY TRUCKING?

16  **A.**  YES.

17  **Q.**  BAKER BROTHERS DEBRIS BOX AND RECYCLING SERVICES?

18  **A.**  YES.

19  **Q.**  ECONOMY TRUCKING SERVICES?

20  **A.**  YES.

21  **Q.**  ALVISO ROCK?

22  **A.**  YES.

23  **Q.**  AND DRYCO CONSTRUCTION INCORPORATED?

24  **A.**  YES.

25  **Q.**  MR. OLIVERO, DID YOU ENTER INTO AN EMPLOYMENT CONTRACT

OLIVERO – DIRECT / KEARNEY

1   WITH MR. LUCERO REGARDING THE NEWARK AREA 4 SITE?

2   **A.**  I DID.

3          **MR. KEARNEY:**  EXHIBIT 58.  I WOULD LIKE TO APPROACH

4   WITH EXHIBIT 58, IF I MAY.

5          **THE COURT:**  YES.

6                  (EXHIBIT HANDED TO WITNESS.)

7   **BY MR. KEARNEY:**

8   **Q.**  DO YOU RECOGNIZE THAT DOCUMENT, SIR?

9   **A.**  I DO.

10  **Q.**  WHAT IS IT?

11  **A.**  IT'S THE CONTRACT THAT MYSELF AND JIM HAD SIGNED.

12         **MR. KEARNEY:**  MAY WE ADMIT THIS IN EVIDENCE, YOUR

13  HONOR?

14         **MS. HANSEN:**  ONE MOMENT, YOUR HONOR.

15     NO OBJECTION.

16         **THE COURT:**  EXHIBIT 58 IS ADMITTED.

17     (GOVERNMENT'S EXHIBIT 58 RECEIVED IN EVIDENCE)

18         **MR. KEARNEY:**  MAY WE PUBLISH, YOUR HONOR?

19         **THE COURT:**  YES.

20                  (DISPLAYED ON SCREEN.)

21         **MR. KEARNEY:**  AGENT SU, BLOW UP THE CENTER PORTION OF

22  THAT.  THAT WOULD BE GREAT, OR ACTUALLY THE WRITING.

23  **BY MR. KEARNEY:**

24  **Q.**  DOES THIS EMPLOYMENT CONTRACT SPELL OUT, MR. OLIVERO, WHO

25  THE EMPLOYER IS AND WHO THE EMPLOYEE IS?

1   **A.**  YES.

2   **Q.**  PLEASE TELL US ABOUT THAT.

3   **A.**  SO GOLDEN GATE EQUIPMENT WAS WORKING FOR JIM LUCERO.  THIS

4   IS A CONTRACT WITH JIM.

5   **Q.**  AND DOES IT DISCUSS THE TERMS THAT YOU ARE EMPLOYING FOR

6   HIM UNDER?

7   **A.**  IT DOES.

8   **Q.**  PLEASE TELL US ABOUT THAT AS WELL.

9   **A.**  IT HAS THE MONTHLY RENTAL RATE FOR THE DOZER.

10   **Q.**  WHICH WAS WHAT?

11   **A.**  $6,780.

12       IT HAS FUEL AND LABOR AND BILLING SERVICES.

13   **Q.**  THE LABOR AND BILLING SERVICES THERE, IT SAYS $15 PER

14   LOAD; IS THAT RIGHT?

15   **A.**  CORRECT.

16   **Q.**  THAT IS WHAT YOU RECEIVED?

17   **A.**  CORRECT.

18   **Q.**  WHEN WAS THIS EMPLOYMENT CONTRACT ENTERED INTO, SIR?

19   **A.**  I WANT TO SAY SEPTEMBER 11TH.

20   **Q.**  SO THAT WAS AFTER LAW ENFORCEMENT SHOWED UP AND AFTER YOUR

21   MEETING WITH MR. STEELE?

22   **A.**  CORRECT.

23   **Q.**  WHY DID YOU ENTER INTO THIS CONTRACT SO LATE WITH

24   MR. LUCERO?

25   **A.**  BECAUSE I WANTED SOMETHING TO PROTECT MYSELF BECAUSE I

```
 1    DIDN'T SIGN UP TO DO ANY ILLEGAL ACTIVITIES OUT THERE AT THAT
 2    SITE.
 3    Q.  ALL RIGHT.  THANK YOU.
 4         MR. KEARNEY:  NO FURTHER QUESTIONS, YOUR HONOR.
 5         THE COURT:  WE'RE AT 1:07.
 6         MS. HANSEN:  I WILL BE MAYBE TWO QUESTIONS?
 7         THE COURT:  ALL RIGHT.
 8                   CROSS-EXAMINATION
 9    BY MS. HANSEN:
10    Q.  HI, MR. OLIVERO.
11    A.  HOW ARE YOU?
12    Q.  I'M ANGELA HANSEN.  I REPRESENT MR. LUCERO.
13    A.  NICE TO MEET YOU.
14    Q.  NICE TO MEET YOU.  I HAVE JUST A FEW VERY BRIEF QUESTIONS
15    FOR YOU.
16    A.  YEAH.
17    Q.  THE PICK 'N PULL AREA WHERE THE FILL WAS PLACED?
18    A.  YES.
19    Q.  YOU TESTIFIED ABOUT THAT TODAY, CORRECT?
20    A.  CORRECT.
21    Q.  AND RIGHT BELOW THE PICK 'N PULL AREA YOU TESTIFIED THAT
22    THERE WAS A 9-FOOT DEPRESSION, CORRECT?
23    A.  CORRECT.
24    Q.  YOU'RE AWARE THAT EXPERTS IN THIS CASE HAVE ANALYZED HOW
25    MUCH FILL MATERIAL WAS PLACED AT THAT AREA, CORRECT?
```

1    **A.**   I WOULD ASSUME.

2    **Q.**   AND THEY ONLY FOUND 1 TO 2 FEET OF FILL, NOT 9 FEET.

3    **A.**   OKAY.

4           **MR. KEARNEY:**   I BELIEVE THAT MISSTATES THE TESTIMONY

5    OR THE ANTICIPATED TESTIMONY.

6           **THE COURT:**   OVERRULED.

7    **BY MS. HANSEN:**

8    **Q.**   AND WHEN YOU BEGAN PUTTING FILL MATERIAL OFF THE MOWRY

9    SITE, IT APPEARED TO BE A DRY EMPTY FIELD WITH WEEDS, CORRECT?

10   **A.**   CORRECT.

11          **MS. HANSEN:**   NO FURTHER QUESTIONS.   THANK YOU.

12          **THE COURT:**   ANY REDIRECT?

13          **MR. KEARNEY:**   NO, YOUR HONOR.   WE SIMPLY MOVE IN 986

14   IF I DIDN'T DO THAT ALREADY.

15          **THE CLERK:**   YOU DID NOT.

16          **MS. HANSEN:**   YOUR HONOR, 986 IS THE BANK RECORDS?

17          **THE COURT:**   IT IS.

18          **MS. HANSEN:**   WE DO HAVE ACCOUNT NUMBERS, PERSONAL

19   IDENTIFICATION INFORMATION THROUGHOUT.   THERE WILL BE NO

20   OBJECTION SUBJECT TO A REDACTION.

21          **THE COURT:**   ALL RIGHT.   I DID SEE THE ONE CHECK WAS

22   REDACTED ALREADY.   IS THE REMAINDER REDACTED IN THE SAME WAY?

23          **MR. KEARNEY:**   I DON'T KNOW THAT, SIR.   I WILL HAVE TO

24   TAKE A LOOK.

25          **THE COURT:**   AT ANY RATE, WHAT NUMBER IS THAT?   986 IS

1    ADMITTED SUBJECT TO ANY NECESSARY REDACTIONS OF PERSONAL

2    IDENTIFYING INFORMATION.

3          (GOVERNMENT'S EXHIBIT 986 RECEIVED IN EVIDENCE)

4          MR. OLIVERO, THANK YOU.  YOU ARE EXCUSED AT THIS TIME.

5          **THE WITNESS:**  OKAY.

6          **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN, SO

7    WE'VE HIT THE END OF OUR DAY AND SO WE WILL BREAK AT THIS

8    TIME.

9          JUST REMEMBER BETWEEN NOW AND TOMORROW MORNING TO CONTINUE

10   TO OBSERVE ALL OF YOUR ADMONITIONS.  NO DISCUSSION OF THE CASE

11   WITH ANYONE, INCLUDING YOUR FELLOW JURORS, MEMBERS OF YOUR

12   FAMILY, PEOPLE INVOLVED IN THE TRIAL OR ANYONE ELSE, EITHER IN

13   PERSON OR VIA ANY SORT OF ELECTRONIC MEANS, ORALLY OR WRITING,

14   NO SOCIAL MEDIA OR ANY OTHER COMMUNICATION REGARDING THE CASE

15   THROUGH OTHER ELECTRONIC MEANS.  DO NOT WATCH, READ, OR LISTEN

16   TO ANY NEWS REPORTS OR OTHER INFORMATION ABOUT THE CASE.

17   DON'T DO ANY RESEARCH ABOUT THE CASE OR THE ISSUES OR PEOPLE

18   INVOLVED IN IT.  AND, FINALLY, AS ALWAYS, REMEMBER TO KEEP AN

19   OPEN MIND UNTIL ALL OF THE EVIDENCE HAS BEEN PRESENTED AND

20   YOU'VE HEARD THE ARGUMENTS OF COUNSEL, MY INSTRUCTIONS, AND

21   THE INPUT OF YOUR FELLOW JURORS.

22         SO WITH THAT, LADIES AND GENTLEMEN, WE WILL BREAK.  HAVE A

23   GOOD EVENING AND WE WILL SEE YOU TOMORROW TO START AT 8:30.

24         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

25         **THE CLERK:**  YOU MAY BE SEATED.

1          **THE COURT:**  ANYTHING WE NEED TO TAKE UP THIS

2   AFTERNOON?

3          **MS. HANSEN:**  YOUR HONOR, THE WITNESS KELLY HARDWICKE

4   WILL BE TESTIFYING TOMORROW.  I JUST WANTED TO LET THE COURT

5   KNOW.

6          **THE COURT:**  ALL RIGHT.  I SAW YOUR FILING AND I'LL

7   TAKE A LOOK AT IT.  IF WE NEED TO, WE CAN TAKE IT UP TOMORROW

8   MORNING.

9          **MS. HANSEN:**  THANK YOU, YOUR HONOR.

10          **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

11          (PROCEEDINGS ADJOURNED AT 1:12 P.M.)

12

13                  **CERTIFICATE OF REPORTER**

14          I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

15   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

16   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

17   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19                    *Diane E. Skillman*

20          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

21             MONDAY, FEBRUARY 12, 2018

22

23

24

25