VOLUME 1

PAGES 1 - 169

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

UNITED STATES OF AMERICA,    )
                             )
            PLAINTIFF,       )    NO. CR-16-00107 HSG
                             )
  VS.                        )    WEDNESDAY, FEBRUARY 7, 2018
                             )
JAMES PHILIP LUCERO,         )    OAKLAND, CALIFORNIA
                             )
            DEFENDANT.       )    JURY TRIAL
_____ )

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          ALEX G. TSE, ESQUIRE
                           ACTING UNITED STATES ATTORNEY
                           450 GOLDEN GATE AVENUE, 11TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94102
                    BY:    PHILIP J. KEARNEY,
                           SHIAO C. LEE,
                           ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**         FEDERAL PUBLIC DEFENDER'S OFFICE
                           1301 CLAY STREET, SUITE 1350N
                           OAKLAND, CALIFORNIA 94612
                    BY:    ANGELA M. HANSEN,
                           NED SMOCK,
                           ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           OFFICIAL COURT REPORTER


        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                         I N D E X

 2   OPENING STATEMENT BY MR. KEARNEY              33    1

 3   OPENING STATEMENT BY MR. SMOCK                62    1

 4   GOVERNMENT'S WITNESSES:                      PAGE   VOL.

 5   HIGH, CARIN

 6   DIRECT EXAMINATION BY MS. LEE                 89    1

 7   CROSS-EXAMINATION BY MS. HANSEN              134    1

 8   REDIRECT EXAMINATION BY MS. LEE             145    1

 9   MILLER, DANIEL

10   DIRECT EXAMINATION BY MS. LEE               149    1

11

12   GOVERNMENT'S EXHIBITS:       WITHDRAWN   ID.   EVD.   VOL.

13        2                                          99    1

14      157                                         101    1

15      158                                         101    1

16      160                                         154    1

17      555-0001                                    105    1

18   1141-0028                                       98    1

19   1141-0036                                      110    1

20   1141-0057 - 0099                               117    1

21

22

23

24

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

```
 1    WEDNESDAY, FEBRUARY 7, 2018                    8:07 A.M.

 2                      P R O C E E D I N G S

 3       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

 4            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS

 5    COURT IS IN SESSION, THE HONORABLE HAYWOOD S. GILLIAM, JUNIOR,

 6    PRESIDING.  WE ARE CALLING CR16-00107, UNITED STATES OF

 7    AMERICA VERSUS JAMES PHILIP LUCERO.  PLEASE STEP FORWARD AND

 8    STATE YOUR APPEARANCES FOR THE RECORD, PLEASE.

 9            MR. KEARNEY:  YOUR HONOR, GOOD MORNING.  PHILIP

10    KEARNEY AND SHIAO LEE FOR THE UNITED STATES.

11            THE COURT:  GOOD MORNING, MR. KEARNEY.

12            MS. HANSEN:  GOOD MORNING, YOUR HONOR.  ANGELA HANSEN

13    ON BEHALF OF MR. LUCERO, WHO IS PRESENT.

14            MR. SMOCK:  GOOD MORNING, YOUR HONOR.  NED SMOCK ON

15    BEHALF OF MR. LUCERO AS WELL.

16            THE COURT:  GOOD MORNING, COUNSEL.

17       ALL RIGHT.  THE ISSUE I THINK WE NEED TO TAKE UP THIS

18    MORNING IS, THE GOVERNMENT LAST NIGHT FILED AN OFFER OF PROOF

19    REGARDING CARIN HIGH.  I ASSUME MS. HIGH IS NOT IN THE

20    COURTROOM?

21            MR. KEARNEY:  NO.

22            THE COURT:  THAT'S DOCKET 143.  AND THE DEFENSE FILED

23    A RESPONSE WHICH IS DOCKET 144.  I'VE REVIEWED THE MATERIALS

24    AND WILL LET YOU BE HEARD, BUT MY IMPRESSION IS THAT THE

25    ATTEMPT TO EXPAND THE SCOPE OF MS. HIGH'S TESTIMONY IS
```

1    INCONSISTENT WITH THE REQUIREMENTS OF RULE 16.

2        AND JUST IN REVIEWING THE RECORD, ON OCTOBER 16TH, THE

3    GOVERNMENT FILED ITS OPPOSITION TO THE DEFENSE'S *DAUBERT*

4    MOTION.  AND AT PAGE 9, THE GOVERNMENT MADE THE FOLLOWING

5    REPRESENTATION:  ALL OF THE GOVERNMENT'S EXPERTS WHO ANALYZED

6    THE SITE FOR THE PRESENCE OF WETLANDS, AND THEN LISTED FIVE

7    PEOPLE, BOURSIER, GALACATOS, HARDWICKE, HUFFMAN, AND MARTEL,

8    BASED THEIR ANALYSES EITHER ON THE WETLANDS MANUAL OR THE

9    MANUAL IN COMBINATION WITH THE REGIONAL SUPPLEMENT TO THE

10   MANUAL.

11       THE EXPERT DISCLOSURE FROM JULY OF 2017 LISTED PARTICULAR

12   TOPICS FOR MS. HIGH AND ESSENTIALLY THEY WERE FACT BASED,

13   BASED ON HER OBSERVATION AT THE SITE AND THE PRESENCE OF

14   CERTAIN TYPES OF VEGETATION AND A SPECIES OF MOUSE ON THE

15   PROPERTY.  AND THOSE REPRESENTATIONS TO THAT POINT WERE THE

16   BASIS FOR THE *DAUBERT* LITIGATION THAT OCCURRED HERE.

17       IT'S NOW BEEN SUBMITTED WITH THE GOVERNMENT'S OFFER OF

18   PROOF A 302 MEMO FROM NOVEMBER, WHICH IS AFTER THE *DAUBERT*

19   BRIEFING WAS COMPLETE.  IT CONTAINS A NUMBER OF CONCLUSIONS BY

20   MS. HIGH REGARDING THE PROPERTY BASED APPARENTLY ON HER REVIEW

21   OF A MAP, BUT I TEND TO AGREE WITH THE DEFENSE'S ARGUMENT THAT

22   THAT DID NOT PROVIDE ANY DESCRIPTION OF THE BASES FOR THE --

23   AND REASONS FOR THE OPINIONS AS REQUIRED BY RULE 16, WHEN, IN

24   FACT, THE GOVERNMENT HAD REPRESENTED THAT THERE WERE FIVE

25   PEOPLE WHO ANALYZED THE SITE FOR THE PRESENCE OF WETLANDS AND

1     USED THE METHODOLOGY SET OUT IN SPECIFIED MANUALS.

2         AS TO THE CHART, THE -- I DON'T FIND THAT THAT IS

3     SUFFICIENT OR RELEVANT TO PROVIDE RULE 16 NOTICE EITHER.  THE

4     SHORTHAND CHART JUST IS NOT THE SORT OF NOTICE THAT IS

5     CONTEMPLATED BY THE RULE IN MY VIEW.

6         AND SO MY STRONG LIKELY CONCLUSION IS THAT MS. HIGH SHOULD

7     BE LIMITED TO THE OPINIONS THAT WERE DISCLOSED IN THE JULY

8     LETTER.  AND IF THERE ARE OTHERS, AND THE GOVERNMENT HAS SAID

9     THERE ARE OTHERS WHO DID ANALYSIS, THEN THOSE ARE THE PEOPLE

10    WHO SHOULD TESTIFY TO THAT ANALYSIS.

11         **MS. LEE:**  THE GOVERNMENT UNDERSTANDS.

12         WHAT WE ANTICIPATE MS. HIGH TO SAY IS WHAT LED HER TO DO

13    THE THINGS THAT SHE DID.  FOR INSTANCE, AFTER SHE VISITED THE

14    SITE, SHE MADE A DETERMINATION TO WRITE A LETTER TO VARIOUS

15    GOVERNMENT REGULATORY AGENCIES, AND THE REASON SHE WROTE THAT

16    LETTER IS BASED OFF OF HER BELIEF THAT UNLAWFUL DISCHARGE OF

17    FILL MATERIAL HAD BEEN PLACED IN AN AREA THAT IS

18    JURISDICTIONAL; THUS, MAKING IT RELEVANT FOR AGENCIES LIKE THE

19    ARMY CORPS OF ENGINEER, EPA, AND FISH AND WILDLIFE TO GET

20    INVOLVED.

21         I DON'T ANTICIPATE THAT I WILL BE GOING INTO ANY QUESTIONS

22    ABOUT ANALYSIS THAT SHE DID ON THE SITE BECAUSE, FRANKLY, SHE

23    DIDN'T DO ANY.  SHE DIDN'T TAKE ANY SOIL PITS.  SHE DIDN'T GO

24    AND DIG INTO THE LAND.  BUT SHE TOOK ACTIONS BASED OFF OF HER

25    UNDERSTANDING THAT THIS WAS JURISDICTIONAL WATERS FROM HER

1    KNOWLEDGE OF THE SITE AND REPORTS THAT SHE'S REVIEWED AND

2    MAPPING THAT SHE'S SEEN.

3        AND SO, YOUR HONOR, WE WOULD ASK FOR THE COURT'S

4    INDULGENCE IN BEING ABLE TO EXPLAIN -- ASKING HER TO EXPLAIN

5    WHY SHE TOOK THE STEPS THAT SHE TOOK.  IT IS NOT NECESSARILY

6    FOR THE TRUTH OF THE MATTER ASSERTED, BUT IT EXPLAINS WHY THIS

7    LAND, WHY WOULD YOU GO AND THEN NOTIFY ALL OF THESE AGENCIES,

8    AS OPPOSED TO IF THE UNLAWFUL DISCHARGE WAS IN A BACKYARD IN

9    THE MIDDLE OF LAFAYETTE, OR SOMETHING LIKE THAT.

10       AND I THINK THAT IS MORE JUST A FACTUAL QUESTION, WHY DID

11   YOU DO WHAT YOU DID?  WHY DID YOU SEND IT TO PERSON A, TO

12   PERSON B, TO PERSON C?  IS IT BECAUSE OF YOUR UNDERSTANDING

13   THAT THIS WAS IN A WATER OF THE UNITED STATES?  AND THEN I CAN

14   ALWAYS CLARIFY, WHY DO YOU BELIEVE THAT?  IT IS NOT BECAUSE OF

15   YOUR WORK.  YOU HAVEN'T ANALYZED THE SITE.  IT IS BASED OFF OF

16   YOUR KNOWLEDGE OF THE SITE FROM YOUR BACKGROUND AT WORKING AT

17   CCCR.

18           **THE COURT:**  LET'S JUST BREAK IT DOWN.  IN THE

19   DEFENDANT'S OPPOSITION THEY SAID AT PAGE 3:  MR. LUCERO WOULD

20   NOT OBJECT TO MS. HIGH CLAIMING SHE BELIEVES THERE ARE

21   WETLANDS DELINEATED ON THE SITE BUT SHE CANNOT GO FURTHER THAN

22   THIS.

23       IT SEEMS TO ME THAT ALL THAT IS NEEDED TO EXPLAIN HER

24   COURSE OF ACTIONS IS TO SAY, THIS IS WHAT I BELIEVED, AND I

25   DON'T THINK WE CAN DRILL DOWN INTO IT FURTHER.  AND I CAN GIVE

1   A LIMITING INSTRUCTION THAT SAYS IT IS NOT FOR TRUTH BUT ONLY

2   TO EXPLAIN WHY SHE WROTE THE LETTER THAT WILL BE COMING IN.

3   BUT IT SEEMS TO ME THAT IS A ONE-SENTENCE THING.  THAT IS NOT

4   AN EXTENDED, TELL US MORE ABOUT WHY YOU BELIEVE THAT.  I THINK

5   THAT RUNS A REAL RISK OF TREADING INTO SORT OF OPINION THAT I

6   AM CONCLUDING HAS NOT BEEN DISCLOSED PREVIOUSLY.

7          **MS. LEE:**  I UNDERSTAND.  I WOULD ALSO LIKE TO DRAW TO

8   THE JUDGE'S ATTENTION THAT ACCOMPANYING HER LETTER WAS NINE

9   FIGURES.  WHEN SHE WROTE THE LETTER TO A BUNCH OF AGENCIES,

10  SHE ATTACHED TO HER LETTER THINGS THAT SUPPORTED HER OPINION

11  THAT THERE HAD BEEN AN UNLAWFUL DISCHARGE INTO A WATER OF THE

12  UNITED STATES.

13      IT INCLUDED THINGS LIKE -- IT IS ALL PART OF THE SAME

14  PACKAGE THAT SHE SENT TO THE AGENCY.  IT INCLUDED A MAP OF THE

15  AREA.  IT INCLUDED GOOGLE EARTH PHOTOS THAT SHE GOT AND SHE

16  PUT HER KIND OF MARKINGS ON IT.  IT INCLUDED A MAP THAT SHE

17  GOT OF THE PROPERTY THAT SHE SENT TO THE REPORTER WHO REPORTED

18  ABOUT THE UNLAWFUL DISCHARGE, AND HE -- AND KIND OF CIRCLES

19  THE AREA WHERE THE DISCHARGE WAS.  THOSE WERE ALL ATTACHMENTS,

20  PART OF HER LETTER.

21         **THE COURT:**  WHAT EXHIBIT IS THIS?

22         **MS. LEE:**  IT'S EXHIBIT 11 -- LET ME GRAB IT.  IT'S

23  EXHIBIT 1141.  AND THAT'S A LARGE EXHIBIT.  WE ARE ONLY

24  PLANNING TO USE SOME OF THE PAGES.  AND THE PAGES WOULD BE

25  1141-0026 TO 0036.  THAT'S THE FINAL LETTER SHE WROTE TO THE

1   AGENCIES ATTACHING NINE FIGURES THAT FOR HER FORMED THE BASIS

2   OF WHY SHE WROTE THE LETTER.

3          **MS. HANSEN:**  YOUR HONOR, MAY I HAVE A MOMENT TO FIND

4   THE EXHIBIT?

5          **THE COURT:**  YES.

6          **MS. HANSEN:**  THANK YOU.

7          **THE COURT:**  WAS THIS NOT ONE OF THE EXHIBITS WE

8   DISCUSSED YESTERDAY?

9          **MS. LEE:**  NO.

10         **MS. HANSEN:**  THIS IS SOMETHING WE OBJECTED TO IN THE

11  PRETRIAL MOTIONS, AND THE GOVERNMENT TOLD THE COURT THAT IT

12  UNDERSTANDS THE HEARSAY RULE AND THEY WOULD COMPLY.  WE HAVE

13  BEEN OBJECTING TO THIS EXHIBIT FOR A WHILE.  I JUST WANT TO

14  MAKE SURE I HAVE THE RIGHT ONE.  IT IS EXHIBIT 1141?

15         **MS. LEE:**  IT'S 1141-0026 TO 0036.  AND, YOUR HONOR,

16  THE GOVERNMENT --

17         **THE COURT:**  WHY ISN'T THIS HEARSAY?

18         **MS. LEE:**  WELL, WE WOULD SEEK TO ADMIT IT AS A

19  BUSINESS RECORD.  WHEN -- AS A -- SHE'S AN EXECUTIVE DIRECTOR

20  OF CCCR.  WHEN THEY ARE INVESTIGATING ALLEGATIONS OF AN

21  UNLAWFUL DISCHARGE, THEY ARE UNDER A BUSINESS DUTY TO MAINTAIN

22  THEIR RECORDS.  THIS IS A STANDARD LETTER THAT SHE WOULD SEND

23  TO THE AGENCIES TO REPORT UNLAWFUL DISCHARGES.  IT'S HER DUTY

24  TO MAINTAIN THOSE RECORDS, TO BE ACCURATE, TO MAINTAIN THEM AT

25  OR ABOUT THE TIME WHEN SHE NOTICES THE DISCHARGE.

1        IT EXPLAINS WHAT PROMPTED HER TO DO WHAT SHE DID NEXT, TO

2   INFORM THE GOVERNMENT AGENCIES.  IT FORMS THE BASIS OF HER

3   ACTIONS, AND IT GOES TO -- IT GOES TO THE WEIGHT, NOT THE

4   ADMISSIBILITY.  SO WE WOULD SEEK TO ENTER IT AS BUSINESS

5   RECORDS AND TO KIND OF SHOW WHY SHE DID WHAT SHE DID NEXT.

6        **THE COURT:**  MS. HANSEN.

7        **MS. HANSEN:**  YOUR HONOR, A LETTER THAT IS SENT TO

8   REGULATORY AGENCIES IS NOT A BUSINESS RECORD.  A BUSINESS

9   RECORD IS SOMETHING THAT IS INVESTIGATED AND GATHERED PURSUANT

10  TO YOUR DUTIES IN YOUR CAPACITY AS THAT OFFICER.  AND YOU

11  WOULD KEEP IN YOUR FILES, FOR EXAMPLE, IF YOU HAVE BANK

12  RECORDS AND YOU MAINTAIN THEM AND COLLECT THEM, IF YOU HAVE

13  RECORDS OF GPS DATA THAT YOU KEEP AND MAINTAIN.  THESE ARE

14  CLEAR HEARSAY STATEMENTS.

15       A LOT OF THE STATEMENTS IN THE LETTER, TOO, YOUR HONOR,

16  THERE ARE 403 ISSUES WITH RESPECT TO HER CONCLUSIONS IN THE

17  LETTER.  THE FACT THAT SHE NOTIFIED THE EPA THE GOVERNMENT CAN

18  GET OUT.  SHE CAN TESTIFY OF THE STEPS SHE TOOK, THAT SHE

19  WROTE A LETTER, WHO SHE SENT IT TO, BUT THE LETTER ITSELF IS

20  CLASSIC HEARSAY.

21       THE ATTACHMENTS ARE TROUBLING IN PART BECAUSE THEY CONTAIN

22  GOOGLE IMAGES THAT HAVE NOT BEEN AUTHENTICATED, HAVE HEARSAY

23  MARKINGS ON THEM.  AND, IN FACT, THE GOVERNMENT TELLS THE

24  COURT THAT SHE OBTAINED THEM HERSELF, BUT IT SEEMS THAT SHE

25  ACTUALLY OBTAINED THEM FROM A DIFFERENT WITNESS, AND WE ARE

1    STILL TRYING TO FIGURE THAT OUT.

2        THE COURT RECENTLY ALLOWED THE TESTIMONY OF MR. MILLER,

3    WHO WAS DISCLOSED AFTER THE DISCOVERY CUTOFF, AND WE ARE STILL

4    TRYING TO INVESTIGATE WHAT HE ACTUALLY PROVIDED TO MS. MILL --

5    MS. HIGH.  SO WE ARE NOT EVEN SURE THOSE CAN BE AUTHENTICATED

6    OR A FOUNDATION CAN BE LAID.

7        SO THE LETTER ITSELF SHOULD BE EXCLUDED.  THERE ARE OTHER

8    PARTS OF THIS LETTER THAT CAN COME IN THROUGH OTHER WITNESSES.

9    FOR EXAMPLE, THE SPECIFIC PLAN MAP, THAT IS PAGE 29, WILL

10   LIKELY COME IN THROUGH A WITNESS WHO CAN AUTHENTICATE THAT

11   MAP, WHO IS FAMILIAR WITH THAT MAP, MR. STEELE.

12       THE MAP AT THE END BY DR. BOURSIER AND THE H.T. HARVEY,

13   THAT, TOO, IS COMING IN THROUGH A DIFFERENT WITNESS.  THIS

14   WITNESS CAN'T AUTHENTICATE THOSE DOCUMENTS THAT SHE PULLED AND

15   PROVIDED TO THE ARMY CORPS AND THE EPA ON SEPTEMBER 8TH.

16           **THE COURT:**  SO JUST CLOSING THE LOOP ON THE TESTIMONY

17   FIRST, I READ YOUR TAKE FROM YOUR BRIEF LAST NIGHT.  ARE YOU

18   IN AGREEMENT THAT WITH A LIMITING INSTRUCTION THAT TELLS THE

19   JURY IT IS NOT FOR TRUTH, MS. HIGH CAN BE QUESTIONED ABOUT

20   WHAT LED HER TO REACH OUT TO THE GOVERNMENT?

21           **MS. HANSEN:**  ONLY IF HER STATEMENT OF WHY SHE REACHED

22   OUT IS BASED ON HER BELIEF THAT IT WAS A WETLAND, NOT A WOTUS.

23   THE GOVERNMENT --

24           **MS. LEE:**  YOUR HONOR, THAT IS NOT HER BELIEF.  HER

25   BELIEF IS THAT IT IS A WETLAND AS A WATER OF THE UNITED

```
1    STATES.  THAT IS THE ONLY WAY A WETLAND WOULD GO INTO THE

2    JURISDICTION OF THE ARMY CORPS OF ENGINEERS.

3         MS. HANSEN:  YOUR HONOR, WE DISAGREE.  THE

4    GOVERNMENT'S NOTICE PROVIDED NOTICE THAT SHE RECOGNIZED

5    PICKLEWEED.  PICKLEWEED IS THE HABITAT OF THE SALT MARSH MOUSE

6    THAT SHE IS VERY CONCERNED ABOUT, AND THAT IS WETLAND

7    VEGETATION.  SO THAT IS WHAT SHE WAS CONCERNED ABOUT AS

8    ACCORDING TO THE GOVERNMENT'S NOTICE.  BY HAVING IT GO FURTHER

9    TO SAY SHE BELIEVES IT IS A WOTUS WOULD BE GOING BEYOND THE

10   SCOPE AND WOULD BE USING THIS NEW THEORY TO TRY TO GET IN AN

11   EXPERT OPINION INAPPROPRIATELY.

12        AGAIN, WHAT I PUT IN THE FILING IS THAT WE WOULDN'T HAVE A

13   PROBLEM WITH HER OPINING THAT SHE BELIEVED THE NORTHERN AREA

14   WAS A WETLAND BASED ON HER OBSERVATIONS OF PICKLEWEED AND HER

15   GOOGLE EARTH SEARCHES.  BUT TO THE EXTENT THAT SHE IS GOING TO

16   SAY IT IS A WOTUS AND THAT IS WHY SHE REPORTED IT, WE WOULD

17   HAVE PROBLEMS WITH THE GOVERNMENT'S NOTICE, AND THE BASIS FOR

18   THAT OPINION WOULD NEED TO BE IMPEACHED AND THE LIMITING

19   INSTRUCTION WOULD NOT CURE THAT.

20        BUT WE DO APPRECIATE THE COURT'S LIMITING INSTRUCTION AND

21   WOULD REQUEST IT WITH RESPECT TO ANY FINDINGS SHE MAKES THAT

22   THIS WAS A WETLAND BECAUSE WHETHER IT WAS A WETLAND, YOUR

23   HONOR, IN THAT NORTHERN AREA IS DISPUTED.

24        MS. LEE:  YOUR HONOR, ESPECIALLY IF IT IS NOT COMING

25   IN FOR THE TRUTH OF THE MATTER ASSERTED, I THINK EVERY -- I
```

THINK THE GOVERNMENT IS ENTITLED TO ASK QUESTIONS ON WHAT

PROMPTED HER TO DO WHAT SHE DID.  IF IT'S A WETLAND IN THE

MIDDLE OF, I DON'T KNOW, THE EAST BAY THAT HAS NO CONNECTION

TO A NAVIGABLE WATER, SHE DOESN'T NEED TO NOTIFY THE EPA OR

THE ARMY CORPS OF ENGINEERS.  SHE NOTIFIES THEM BECAUSE OF HER

BELIEF THAT IT IS JURISDICTIONAL WETLANDS.

       AND WITH RESPECT TO BUSINESS RECORDS, LET THE WITNESS

ATTEMPT TO LAY THE FOUNDATION.  AS OPPOSED TO MS. HANSEN

SAYING IT IS NOT A BUSINESS RECORD, THE TRUTH OF THE MATTER

IS, MS. HIGH WILL SAY THESE LETTERS ARE MAINTAINED IN THE

ORDINARY COURSE OF HER BUSINESS.  AND WE BELIEVE THE LETTER

SHOULD COME IN AS A BUSINESS RECORD.  THE WITNESS IS HERE TO

TESTIFY.  SHE CAN BE CROSS-EXAMINED ON THE LETTER.

       AND WITH RESPECT TO THE ATTACHMENTS, SEE IF SHE CAN LAY

THE PROPER FOUNDATION.  DOES SHE RECOGNIZE THAT THE MAP IS A

FAIR AND ACCURATE DEPICTION OF NEWARK IN RELATION TO FREMONT

AND REDWOOD CITY?  DOES SHE RECOGNIZE THAT THIS PARTICULAR MAP

IS OF THE SITE?

       AND WITH RESPECT TO THE GOOGLE EARTH PHOTOS, SHE CAN LAY

THE FOUNDATION FOR HER ACTIONS.  IF THESE AREN'T HER GOOGLE

EARTH PHOTOS, THEN SHE WON'T KNOW ANYTHING ABOUT IT.  BUT IF

SHE SAYS, I WENT, I PULLED THIS.  I TYPICALLY DO THAT WHEN I'M

INVESTIGATING AN UNAUTHORIZED DISCHARGE.  THOSE ARE MY

MARKINGS ON THEM.  AND I ATTACHED IT TO THIS LETTER AND SENT

IT TO THE AGENCIES.  AND I DO THIS IN THE ORDINARY COURSE OF

```
1    MY WORK AS AN EXECUTIVE DIRECTOR OF AN ENVIRONMENTAL WATCHDOG

2    GROUP.

3         THE COURT:  EVEN ASSUMING AND -- BUT -- NOT ASSUMING,

4    BUT EVEN IF THE FOUNDATION COULD BE LAID FOR THIS AS A

5    BUSINESS RECORD, WHAT IS THE PROBATIVE VALUE OF THIS DOCUMENT?

6         MS. LEE:  WELL, I THINK THIS DOCUMENT IS PROBATIVE

7    BECAUSE IT IS WHAT GOT THE WHOLE BALL ROLLING TO BASICALLY WHY

8    WE ARE HERE TODAY.  BECAUSE OF HER LETTER, THAT'S HOW

9    INVESTIGATORS KNEW.  AND IT IS NOT JUST THAT SHE SENT IT TO

10   THE ARMY CORPS OF ENGINEERS, SHE SENT IT TO EPA, FISH AND

11   WILDLIFE, SHE TALKED ABOUT, YOU KNOW, THE UNLAWFUL DISCHARGE,

12   SHE COPIED THE LANDOWNERS.  IT'S ESSENTIALLY THE DOCUMENT THAT

13   BROUGHT US YEARS LATER TO COURT TODAY.  HAD IT NOT BEEN FOR

14   MR. MILLER AND MS. HIGH, THIS DISCHARGE COULD HAVE BEEN GOING

15   ON, I DON'T KNOW, INDEFINITELY UNTIL SOMEONE KNEW.

16        MS. HANSEN:  THEY ARE BOTH HERE TO TESTIFY ABOUT

17   THAT, AND THAT IS WHAT THE HEARSAY RULE PROTECTS FROM IS

18   OUT-OF-COURT STATEMENTS SUCH AS THIS BEING USED FOR THE TRUTH.

19       AND I DO WANT TO NOTE FOR THE COURT THAT THE GOOGLE EARTH

20   IMAGES YOUR HONOR HAS ALREADY EXCLUDED THOSE FOR NOT BEING

21   AUTHENTICATED.  SO TO TRY TO GET AN END RUN AROUND THEM

22   THROUGH A BUSINESS RECORD EXCEPTION SEEMS PROBLEMATIC.  WE

23   DIDN'T HAVE AN OPPORTUNITY TO AUTHENTICATE THEM BASED ON LATE

24   DISCLOSURES.

25        MS. LEE:  YOUR HONOR, I THINK THE GOOGLE EARTH
```

```
1    PHOTOS, WHAT YOU HAD SAID -- AND I APOLOGIZE IF I
2    MISINTERPRETED, WAS THAT ALL GOOGLE EARTH PHOTOS AFTER THE
3    CUTOFF DATE ARE EXCLUDED.  BUT THE ONES THAT WERE PRODUCED
4    BEFOREHAND, IF THE GOVERNMENT CAN LAY THE FOUNDATION, THEN
5    THOSE ARE FAIR GAME.
6        WITH RESPECT TO THE GOOGLE EARTH PHOTOS, SHE CAN SAY WHAT
7    SHE DID.  IN TERMS OF WHETHER THEY CAN COME IN, I THINK IT
8    GOES TO THE WEIGHT OF THOSE PHOTOS, NOT TO THEIR
9    ADMISSIBILITY.  SHE SAYS HOW SHE GOT THEM, WHERE SHE GOT THEM,
10   WHAT MARKINGS SHE GOT ON THEM.
11       MS. HANSEN:  YOUR HONOR, THE STATE OF THE PROPERTY IS
12   AT ISSUE AND WHAT'S ON THE PROPERTY IS AT ISSUE.  AND WE HAVE
13   EXPERTS WHO ARE GOING TO BE TESTIFYING TO THAT.  THE 403
14   BALANCING WOULD OUTWEIGH ANY PROBATIVE VALUE OF ALLOWING THESE
15   IMAGES TO COME IN THROUGH THIS EXPERT -- EXCUSE ME, THIS
16   EXPERT, THIS FACT WITNESS WHO WOULD THEN USE THESE GOOGLE
17   EARTH IMAGES TO OPINE AS TO WHY SHE BELIEVES THESE ARE
18   WETLANDS AND NOT AQUATIC.  WE DON'T KNOW FROM GOOGLE WHEN
19   THOSE IMAGES -- SHE MIGHT BE ABLE TO TESTIFY WHEN SHE
20   DOWNLOADED THEM, THAT DOESN'T MEAN THAT IS WHEN GOOGLE PUT
21   THEM UP THERE.
22       MS. LEE:  I THINK THOSE IMAGES REALLY GO TO SHOWING
23   WHERE SHE IS SAYING THE DUMP OF THE FILL MATERIAL HAPPENED.
24       MS. HANSEN:  AND WE HAVE A THOUSAND MAPS, YOUR HONOR,
25   SHE CAN USE TO DO THAT.  THE GOVERNMENT DOES NOT NEED THIS
```

1    LETTER TO DO THAT.

2              **MS. LEE:**  UM --

3              **MS. HANSEN:**  AND I WOULD ALSO LIKE TO GO BACK TO THE

4    WOTUS ISSUE.  AGAIN, YOUR HONOR, SHE HAS NEVER PROVIDED A

5    BASIS FOR THAT OPINION, AND SO FOR HER TO SAY THAT THAT'S WHY

6    SHE NOTIFIED -- THE REASON SHE NOTIFIED, YOUR HONOR, IS

7    BECAUSE SHE IS VERY CONCERNED WITH THE MOUSE.  THE MOUSE LIVES

8    IN PICKLEWEED.  PICKLEWEED IS A WETLAND VEGETATION.  THAT IS

9    WHAT WAS NOTICED TO US.  THAT SHOULD BE SUFFICIENT TO EXPLAIN

10   HER SUBSEQUENT ACTIONS.

11             **THE COURT:**  OKAY.  HERE IS THE RULING.  WITH REGARD

12   TO THE TESTIMONY, WHAT WAS NOTICED WAS ALL WETLANDS, AND WOTUS

13   APPEARED NOWHERE IN ANYTHING THAT WAS NOTICED.  IN A SENTENCE

14   TO EXPLAIN HER SUBSEQUENT CONDUCT THE GOVERNMENT CAN ASK HER

15   WHY SHE REACHED OUT TO THE AUTHORITIES.  AND THE NOTICED

16   ANSWER TO THAT IS THAT THERE WAS A CONCERN IT WAS A WETLAND,

17   AND IT WON'T BE PERMITTED TO GO BEYOND THAT.  AND I WILL GIVE

18   A LIMITING INSTRUCTION THAT SAYS THAT THAT IS NOT FOR TRUTH

19   BUT ONLY TO EXPLAIN HER SUBSEQUENT CONDUCT.

20        WITH REGARD TO THE LETTER AND THE ATTACHMENTS, I WILL

21   ALLOW YOU TO TRY TO LAY A FOUNDATION FOR THAT AS A BUSINESS

22   RECORD, AND WE'LL EVALUATE IT.  I DO THINK THERE'S A

23   SUBSTANTIAL RULE 403 QUESTION THAT HAS TO BE ADDRESSED EVEN IF

24   YOU GET OVER THE HUMP, BECAUSE REALLY THESE ARE A BUNCH OF

25   ASSERTIONS ABOUT JURISDICTION AND ABOUT THE STATUS OF THE

1    PROPERTY, AND WE'VE JUST -- I'VE JUST SAID THAT SHE WASN'T

2    DISCLOSED TO DO THAT.

3        AND SO THERE'S A REAL RISK THAT THIS IS -- THIS PUTS

4    SOMETHING BEFORE THE JURY, AN OUT-OF-COURT STATEMENT THAT

5    TENDS TO TRY TO MAKE THE SAME SORT OF POINT.  SO -- BUT I'LL

6    LET YOU TRY TO LAY THE FOUNDATION, AND THEN I AM ASSUMING

7    THERE WILL BE AN OBJECTION AND I WILL RULE ON THE OBJECTION.

8        AND I WILL -- DO YOU HAVE A -- CAN SOMEONE GIVE ME A

9    PRINTED COPY OF THIS PROPOSED EXHIBIT SO I CAN LOOK AT IT?  I

10   THINK WHAT WE WILL DO LIKELY IS HAVE OPENINGS AND THEN TAKE A

11   SHORT BREAK AFTER THAT.

12       HOW LONG DO THE PARTIES ANTICIPATE THEIR OPENINGS WILL GO?

13           **MR. KEARNEY:**  THE GOVERNMENT WILL BE ABOUT 45

14   MINUTES, YOUR HONOR.  MAYBE AN HOUR.  RIGHT AROUND THERE.

15           **THE COURT:**  ALL RIGHT.

16           **MR. SMOCK:**  ABOUT A HALF AN HOUR.

17           **THE COURT:**  SO I THINK WE WILL NEED TO TAKE A BREAK

18   IN ANY EVENT AFTER THE OPENINGS.  AND I WILL HAVE A CHANCE TO

19   LOOK AT THE EXHIBIT IN SOME MORE DETAIL SO THAT I WILL BE

20   READY FOR THE DISPUTE ABOUT ADMISSIBILITY THAT WILL BE FRAMED

21   ONCE THE WITNESS ATTEMPTS TO LAY THE FOUNDATION.

22           **MS. LEE:**  OKAY.

23           **MR. KEARNEY:**  YOUR HONOR, REGARDING OPENINGS, JUST A

24   LOGISTICAL QUESTION TO THE COURT.  OBVIOUSLY THIS IS A

25   MAP-DRIVEN ENDEAVOR AND A PHOTOGRAPH-DRIVEN ENDEAVOR.

1          DOES THE COURT WANT THE PARTIES TO STAY AT THE PODIUM?

2     FOR INSTANCE, IF THERE'S SOMETHING THAT NEEDS TO BE DISCUSSED

3     ON THE SCREEN, CAN THE PARTIES HAVE LATITUDE TO MOVE OVER

4     THERE?  WHAT IS THE COURT'S FEELINGS IN THAT CIRCUMSTANCE?

5          **THE COURT:**  I THINK IT IS FINE FOR YOU TO -- IF YOU

6     ARE DISCUSSING SOMETHING IN PARTICULAR, TO GO THERE, BUT THAT

7     YOU THEN BE AT THE PODIUM OTHER THAN WHEN YOU ARE DOING THAT.

8          **MR. KEARNEY:**  ALL RIGHT.  THANK YOU.

9          **MS. LEE:**  YOUR HONOR, HERE IS A HARD COPY.

10         **THE COURT:**  ALL RIGHT.  THANK YOU.

11         **MS. LEE:**  AND ONE OTHER MATTER ACTUALLY.  WHEN I WAS

12    COMING UP THE ELEVATOR TODAY, THERE WAS A JUROR IN THE

13    ELEVATOR.  IT WAS THE ASIAN WOMAN.  I DON'T RECALL HER NAME

14    OFF THE TOP OF MY HEAD.

15         **THE CLERK:**  MS. WU?

16         **MS. LEE:**  NO, IT WAS NOT MS. WU.  IT WAS THE ONE --

17    SHE LIVES IN NEWARK.

18         **THE COURT:**  MS. HUANG?

19         **MS. LEE:**  YES.  AND SHE SMILED AND SAID GOOD MORNING,

20    AND I TRIED NOT TO REALLY SAY ANYTHING AT ALL, FELT INCREDIBLY

21    AWKWARD, AND AT SOME POINT I THINK IT WAS A NATURAL REACTION,

22    I SAID GOOD MORNING.  IT FELT RUDE NOT TO.  BUT I JUST WANTED

23    TO LET THE COURT KNOW THAT, THAT WAS THE EXTENT OF THAT

24    COMMUNICATION.

25         **THE COURT:**  ALL RIGHT.  THANK YOU FOR LETTING ME

```
 1   KNOW.  I'LL REMIND THEM AGAIN THAT THEY JUST -- ONE, THAT THEY
 2   SHOULDN'T HAVE ANY CONTACT, BUT THAT THE RESPONSE FROM THE
 3   ATTORNEYS OR PARTIES WILL BE A LACK OF ACKNOWLEDGMENT, THAT IS
 4   NOT OUT OF RUDENESS BUT OUT OF CONCERN FOR COMMUNICATION
 5   OUTSIDE OF COURT.
 6        MS. LEE:  AND THE THIRD THING I WANTED TO BRING TO
 7   YOUR ATTENTION, YESTERDAY -- FEBRUARY 5TH WE RECEIVED
 8   DISCOVERY FROM THE DEFENSE, AND WE WOULD JUST LIKE TO NOTE --
 9   AND OUR REQUEST WOULD BE FOR THESE TO BE EXCLUDED.  THE COURT
10   DID SET A DISCOVERY CUTOFF DATE FOR THE GOVERNMENT AND HAS
11   HELD US ACCOUNTABLE TO THAT DISCOVERY CUTOFF DATE.
12        THE GOVERNMENT HAS REPEATEDLY, I THINK FOR THE COURSE OF,
13   I WOULD SAY MORE THAN A YEAR BEEN ASKING FOR RECIPROCAL
14   DISCOVERY.  IT HAS BEEN PUT INTO DIFFERENT MOTIONS.  AND TO
15   RECEIVE DISCOVERY THAT THE DEFENSE MAY INTEND TO USE ON THE
16   DAY OF JURY SELECTION, WE WOULD JUST ASK THAT THE DEFENSE BE
17   HELD ACCOUNTABLE AS WELL TO THEIR OBLIGATIONS UNDER RULE 16(B)
18   FOR RECIPROCAL DISCOVERY.
19        AND THAT THE GOVERNMENT IS NOT EXACTLY IN A POSITION, NOW
20   THAT WE HAVE ALREADY PREPPED ALL OF OUR EXPERTS, TO ASK THEM
21   TO LOOK AT THE THINGS THAT THE DEFENSE HAS PROVIDED US IN
22   TERMS OF WHAT IS THEIR RESPONSE TO THAT.  SO WE WOULD ASK IN
23   LIGHT OF KIND OF THE HISTORY OF HOW DISCOVERY HAS BEEN DEALT
24   WITH IN THIS CASE, FOR THE DEFENSE TO BE HELD TO THE SAME
25   STANDARD IN TERMS OF COMPLIANCE WITH THEIR DISCOVERY
```

1    OBLIGATIONS AS WELL.

2          **MS. HANSEN:**  YOUR HONOR, I WOULD LIKE TO NOTE FOR THE

3    RECORD -- IF GOVERNMENT COUNSEL CAN HOLD UP THE PRODUCTION SO

4    WE CAN SEE HOW BIG IT IS.

5          **MS. LEE:**  SURE (INDICATING).

6          **MS. HANSEN:**  AND THE ONLY THING SUBSTANTIVE IN IT WAS

7    PREVIOUSLY PRODUCED TO THE GOVERNMENT IN FILINGS.  IT IS A

8    DROUGHT MAP, YOUR HONOR, THAT IS CERTIFIED, AND IT'S NOT

9    CONTROVERSIAL IN THAT IT IS BASED ON DATA THAT IS GOVERNMENT

10   DATA, THAT WE HAVE A CERTIFICATION FOR.  IT WILL COME IN AS A

11   PUBLIC RECORD.  THAT IS THE ONLY SUBSTANTIVE THING THERE.

12        THERE IS A PICTURE OF A PLOW.  I'M NOT SO SURE HOW A

13   PICTURE OF A DISKER WOULD PREJUDICE THE GOVERNMENT.  THESE ARE

14   IMPEACHMENT DOCUMENTS.  I WISH THE GOVERNMENT WOULD EXPRESS

15   WHICH DOCUMENT CAUSES THEM PREJUDICE.

16        THERE'S ALSO A MAP, YOUR HONOR, THAT I REPRODUCED TO THEM

17   THAT THEY HAD PREVIOUSLY PROVIDED THAT DOESN'T HAVE MARKINGS

18   ON IT.  SO IT IS FROM THEIR PRODUCTION BUT IT IS A CLEAN COPY.

19   SO PERHAPS THE GOVERNMENT COULD GO THROUGH ITEM BY ITEM OF THE

20   SMALL PRODUCTION AND DESCRIBE FOR THE COURT WHERE THOSE

21   CONCERNS LIE.

22        **THE COURT:**  IS THIS SOMETHING THAT YOU WERE GOING TO

23   TRY TO INTRODUCE WITH THE FIRST WITNESS TODAY?

24        **MS. HANSEN:**  WE ARE USING THE DROUGHT MAPS IN OUR

25   OPENING.  WE HAVE A GOOD-FAITH BASIS TO BELIEVE THEY WILL BE

1   ADMITTED INTO EVIDENCE.  THEY ARE BASED ON SCIENCE.  THEY ARE

2   COMING IN THROUGH THE GOVERNMENT'S EXPERTS.

3          **THE COURT:**  BUT HOW DID YOUR PRODUCTION OF THIS AT

4   THIS POINT COMPLY WITH YOUR RECIPROCAL DISCOVERY OBLIGATION?

5          **MS. HANSEN:**  BECAUSE IT IS IMPEACHMENT, YOUR HONOR,

6   THAT WE ARE GOING TO USE AGAINST THE -- WE DON'T EVEN HAVE TO

7   DISCLOSE IMPEACHMENT EVIDENCE.  WE DISCLOSED IT OUT OF AN

8   ABUNDANCE OF CAUTION BECAUSE MR. SMOCK PLANNED TO USE IT IN

9   HIS OPENING.

10          **MS. LEE:**  I DON'T KNOW HOW IT CAN BE IMPEACHMENT

11   EVIDENCE WHEN I'M NOT SURE ANYTHING MS. HIGH SAID -- WAS

12   TALKING ABOUT HAS ANYTHING TO DO WITH THE DROUGHT.

13          **MS. HANSEN:**  YOUR HONOR, IT IS DR. HUFFMAN, WE WERE

14   DISCUSSING HOW HIS FINDINGS IN 2017 OCCURRED DURING A MAJOR

15   WEATHER EVENT, THE FLOODS AND THE MASSIVE RAIN.  AND THEN

16   THERE'S GOING TO BE EVIDENCE THAT IN 2014, WHEN THE FILL

17   ACTIVITY OCCURRED, THERE WAS A MAJOR DROUGHT.  THESE ARE

18   UNCONTESTED WEATHER EVENTS SO WE ARE CROSS-EXAMINING THOSE

19   EXPERTS ABOUT THESE CONDITIONS WHICH AFFECT THEIR STUDIES AND

20   FINDINGS ABOUT THE PROPERTY.  BUT I DON'T THINK THERE IS

21   ANYTHING ELSE, OTHER THAN THAT, THAT THE GOVERNMENT COULD

22   OBJECT TO IN THAT SMALL PRODUCTION.

23          **MS. LEE:**  YOUR HONOR, THE ONLY THING THE GOVERNMENT

24   WOULD SAY IS JUST THAT IT'S INTERESTING THAT THE REASONS THAT

25   MS. HANSEN PURPORTS THAT THESE ARE OKAY ARE THE SIMILAR

1    REASONS THE GOVERNMENT RECENTLY ARGUED WERE OKAY BUT THAT THE

2    COURT RULED SHOULD NOT COME IN.  FOR INSTANCE, THE GOVERNMENT

3    ARGUED IT'S THE SAME UNDERLYING IMAGE JUST WITHOUT THE

4    MARKINGS, OR THAT IT'S PUBLIC RECORD AND WE JUST WANTED TO GET

5    IT CERTIFIED.

6        THESE ARE ARGUMENTS THAT YOUR HONOR HAS HEARD BEFORE COME

7    FROM THE GOVERNMENT COUNSEL, AND IT'S THE SAME ARGUMENTS TO A

8    CERTAIN EXTENT FROM THE DEFENSE COUNSEL, AND JUST BEING GIVEN

9    THIS DISCOVERY YESTERDAY WE BELIEVE THAT IT'S INCREDIBLY LATE.

10        **MS. HANSEN:**  YOUR HONOR, THE MARKINGS -- MR. KEARNEY

11    MADE A COMMENT ABOUT HAVING A NEW DOCUMENT WITH NO MARKINGS ON

12    IT, AND I TURNED TO HIM ON MONDAY AND SAID, THAT IS NO

13    PROBLEM.  SO I THINK COUNSEL JUST INACCURATELY STATED THE

14    ARGUMENTS I'VE MADE IN THIS CASE.  AND THIS WAS PRODUCED ON

15    MONDAY, AND IT WAS PREVIOUSLY DISCLOSED IN FILINGS, YOUR

16    HONOR, WE ATTACHED THE SAME MAPS IN MOTION LITIGATION.

17        AND THE OTHER DOCUMENTS THAT WERE PRODUCED ARE FROM THE

18    GOVERNMENT'S PRODUCTION AS WELL.  THERE ARE THREE MAPS THAT

19    ARE FROM SHAPEFILES THAT THE GOVERNMENT GAVE TO US.  SO ONE,

20    TWO, THREE... YES, THAT'S RIGHT, YOUR HONOR.

21        AND THE MAP OF THE DEBRIS WE PROVIDED IS WHAT WE USED WHEN

22    WE DID THE MOTION IN LIMINE, YOUR HONOR, SO THAT WAS

23    PREVIOUSLY PRODUCED TO THE GOVERNMENT.  SO THERE'S ONLY ONE

24    PHOTO AND THEN THE DROUGHT MAPS THAT THE GOVERNMENT HAS THAT'S

25    NEW.  EVERYTHING ELSE THEY'VE HAD.  SO THERE ARE THREE -- TWO

```
 1   DROUGHT MAPS AND ONE PHOTO OF A PLOW.

 2         MS. LEE:  I THINK THE POINT, HOWEVER, IS THAT WE ARE

 3   NOT IN A POSITION TO EVEN BE ABLE TO SAY IF WE AGREE OR

 4   DISAGREE WITH WHAT MS. HANSEN JUST SAID BECAUSE WE DON'T -- WE

 5   DIDN'T HAVE THE TIME TO FIGURE OUT WHERE THESE CAME FROM,

 6   WHERE THEIR SOURCE, WHETHER THEY HAVE BEEN PREVIOUSLY

 7   DISCLOSED.  WE DON'T EVEN KNOW -- WE DIDN'T HAVE THE TIME TO

 8   BE ABLE TO RESPOND TO WHAT MS. HANSEN IS SAYING THAT THEY WERE

 9   PREVIOUSLY DISCLOSED.  WERE THEY DISCLOSED WITH AN UNDERLYING

10   IMAGE WITHOUT THE MARKINGS ON TOP, WITH THE MARKINGS ON TOP?

11      AND WITH RESPECT TO THE DROUGHT TABLES, DROUGHT AND

12   PRECIPITATION AND WHAT THE CONDITIONS WERE LIKE IN 2014 I

13   ANTICIPATE IS GOING TO BE A HIGHLY CONTESTED AND CRUCIAL ISSUE

14   IN THIS CASE.

15         THE COURT:  UNDERSTOOD.  LET'S JUST GET TO THE CHASE.

16   IS THERE ANY DISAGREEMENT THIS IS IMPEACHMENT MATERIAL?  IN

17   OTHER WORDS, THE RECIPROCAL DISCOVERY OBLIGATION PERTAINS TO

18   MATERIAL THE DEFENDANT INTENDS TO USE IN ITS CASE-IN-CHIEF,

19   CORRECT?

20         MS. LEE:  THAT'S CORRECT.

21         THE COURT:  ALL RIGHT.  AND SO THEY ARE SAYING THIS

22   ISN'T MATERIAL THEY ARE GOING TO USE IN THEIR CASE-IN-CHIEF.

23   THEY ARE SAYING IT IS IMPEACHMENT MATERIAL.  WHAT REQUIREMENT,

24   IF ANY, IS THERE TO PRODUCE IMPEACHMENT MATERIAL?

25         MS. LEE:  WELL, I THINK IMPEACHMENT MATERIAL --
```

1   OFTENTIMES IT CAN BE CLOAKED AS IMPEACHMENT MATERIAL AND USED

2   IN CROSS-EXAMINATION WHEN IN REALITY IT'S AN EXHIBIT THAT

3   SUPPORTS THEIR THEORY OF THE CASE.

4         **THE COURT:**  OKAY.

5         **MS. LEE:**  SO IT IS CASE-IN-CHIEF EVIDENCE USED

6   THROUGH CROSS-EXAMINATION.

7         **THE COURT:**  HERE IS WHAT WE WILL DO.  IT DOES SEEM TO

8   ME THAT FOR PURPOSES OF THE CURRENT DISPUTE, WHICH IS WHETHER

9   THIS CAN BE REFERENCED IN OPENING, AGAIN, THERE IS A

10   GOOD-FAITH BASIS TO BELIEVE AT THIS POINT THAT THIS IS

11   MATERIAL THAT WILL BE PRESENTED IN EVIDENCE.  AS OF RIGHT NOW,

12   THE DEFENSE HAS A GOOD-FAITH BASIS TO BELIEVE THAT THIS WILL

13   BE USED TO IMPEACH DR. HUFFMAN.

14     THE GOVERNMENT CAN BRIEF THE -- YOUR EXCLUSION REQUEST

15   TONIGHT, AND WE'RE NOT ACTUALLY GETTING TO THE POINT WHERE THE

16   MATERIAL IS ADMITTED.  AND IF IT IS EXCLUDED, IT WILL BE

17   EXCLUDED.  THE OPENING IS NOT EVIDENCE.  THE -- THIS DOCUMENT

18   DISCUSSED ISN'T IN EVIDENCE, BUT YOU CAN, MAYBE YOU CAN MAKE A

19   MOTION TO EXCLUDE IT BEFORE IT'S ACTUALLY ADMITTED OR USED

20   WITH THE WITNESS.

21         **MS. LEE:**  AND JUST TO CLARIFY, MS. HANSEN INTENDS TO

22   USE THESE FOR DR. HUFFMAN?

23         **THE COURT:**  I THINK THAT'S WHAT THEY SAID.

24         **MS. HANSEN:**  YES, YOUR HONOR.  IF DR. HUFFMAN IS NOT

25   CALLED, I MIGHT USE IT WITH DR. BOURSIER.  IT JUST SORT OF

```
 1   DEPENDS.
 2           THE COURT:  ALL RIGHT.  YOU HAVE YOUR -- YOU SHOULD
 3   FILE A MOTION TO EXCLUDE THE EVIDENCE, AND WE'LL RULE ON THAT
 4   ONCE IT IS BRIEFED.  ALL RIGHT.  ANYTHING ELSE FOR THIS
 5   MORNING?
 6           MS. LEE:  NO, YOUR HONOR.
 7           MS. HANSEN:  THANK YOU, YOUR HONOR.
 8           THE COURT:  ALL RIGHT.  SO THE MARCHING ORDERS FOR
 9   THE MORNING WILL BE, I WILL GIVE THE REMAINDER OF THE
10   PRELIMINARY INSTRUCTIONS.  I ALREADY GAVE THEM THE INSTRUCTION
11   ON CONDUCT AS JURORS OUTSIDE THE COURT.  I WILL GIVE THEM THE
12   OTHERS, WHICH WILL TAKE FIVE OR TEN MINUTES, AND THEN WE WILL
13   PROCEED TO OPENINGS.  AND I THINK PROBABLY GIVEN THE PARTIES'
14   ESTIMATE OF THE TIMING WE WILL TAKE OUR MORNING BREAK AFTER
15   THE OPENING STATEMENTS.
16           MR. KEARNEY:  YOUR HONOR, CAN WE HAVE A QUICK
17   COUPLE-MINUTE BREAK RIGHT NOW BEFORE THE COURT STARTS?
18           THE COURT:  YEAH, LET'S TAKE FIVE MINUTES.
19           MR. KEARNEY:  THANK YOU.
20           MR. SMOCK:  YOUR HONOR, I'LL LEAVE THIS UP TO YOU.
21   IF THE GOVERNMENT'S OPENING IS GOING TO BE AN HOUR, I WONDER
22   WHETHER -- I DON'T KNOW THAT WE NEED TO TAKE A BREAK, BUT
23   PERHAPS SUGGESTING THAT THE JURY STAND UP FOR A MOMENT.  I MAY
24   NEED A SECOND, TOO, AND I DON'T WANT THEM TO FALL ASLEEP AS
25   THEY MIGHT ALREADY DO DURING MY OPENING.
```

1          **THE COURT:** MAKES SENE.

2          **MS. HANSEN:** AND, YOUR HONOR, MAY WE HAVE MS. RILEY'S

3   PERMISSION TO MOVE THE TV OVER SLIGHTLY WHEN WE START OUR

4   OPENING, SO THAT WE CAN PUT THE BOARD UP NEXT TO IT?

5          **THE CLERK:** YOU DON'T NEED MY PERMISSION --

6          **THE COURT:** YOU ARE ASKING THE RIGHT PERSON.

7          **MS. HANSEN:** THANK YOU, YOUR HONOR.

8       (RECESS TAKEN AT 8:42 A.M.; RESUMED AT 8:55 A.M.)

9          **THE CLERK:** REMAIN SEATED.  COME TO ORDER.  THIS

10   COURT IS BACK IN SESSION.  ALL PARTIES PREVIOUSLY IDENTIFIED

11   ARE BACK IN COURT, YOUR HONOR.

12          **THE COURT:** ARE WE READY TO BRING THE JURORS IN?

13          **THE CLERK:** ARE WE READY, JUDGE?

14          **THE COURT:** EVERYONE READY?

15          **MR. KEARNEY:** YES, YOUR HONOR.

16          **MS. HANSEN:** YES, YOUR HONOR.

17       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

18          **THE CLERK:** YOU MAY BE SEATED.

19          **THE COURT:** GOOD MORNING, LADIES AND GENTLEMEN, AND

20   WELCOME BACK.  AND -- GOOD MORNING.

21       SO WE ARE PREPARED AT THIS TIME TO BEGIN WITH THE TRIAL,

22   AND I WILL START BY GIVING YOU SOME PRELIMINARY INSTRUCTIONS

23   SO THAT YOU HAVE CONTEXT FOR THE PROCESS, AND THEN THE PARTIES

24   HAVE THE OPPORTUNITY TO PRESENT AN OPENING STATEMENT.  EACH

25   PARTY HAS THE OPPORTUNITY TO PRESENT AN OPENING STATEMENT.

1   AND THEN WE'LL PROCEED WITH THE PRESENTATION OF EVIDENCE.  SO

2   THANK YOU AGAIN FOR BEING PROMPT THIS MORNING.  THANK YOU FOR

3   YOUR ATTENTION.  AND WE WILL COMMENCE AT THIS TIME.

4       AND JUST AS ONE PLANNING NOTE, WE WILL BE BREAKING EACH

5   DAY AT 1:15, SO THAT IS A LITTLE BIT EARLIER THAN I DISCUSSED

6   WHEN WE TALKED ABOUT 1:30.  BUT WE WILL BE BREAKING EACH DAY

7   AT 1:15 SO YOU CAN TAKE THAT INTO ACCOUNT IN YOUR PLANNING.

8       SO, LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS

9   CASE, AND I WANT TO TAKE A FEW MINUTES TO TELL YOU SOMETHING

10  ABOUT YOUR DUTIES AS JURORS AND TO GIVE YOU SOME PRELIMINARY

11  INSTRUCTIONS.  AT THE END OF THE TRIAL I WILL GIVE YOU MORE

12  DETAILED WRITTEN INSTRUCTIONS THAT WILL CONTROL YOUR

13  DELIBERATIONS.  WHEN YOU DELIBERATE, IT WILL BE YOUR DUTY TO

14  WEIGH AND TO EVALUATE ALL OF THE EVIDENCE RECEIVED IN THE CASE

15  AND IN THAT PROCESS TO DECIDE THE FACTS.

16      TO THE FACTS AS YOU FIND THEM YOU WILL APPLY THE LAW AS I

17  GIVE IT TO YOU WHETHER YOU AGREE WITH THE LAW OR NOT.  YOU

18  MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE LAW BEFORE

19  YOU AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

20  DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.  PLEASE DO NOT

21  TAKE ANYTHING I MAY SAY OR DO DURING THE TRIAL AS INDICATING

22  WHAT I THINK OF THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

23  THAT IS ENTIRELY UP TO YOU.

24      THIS IS A CRIMINAL CASE BROUGHT BY THE UNITED STATES

25  GOVERNMENT.  THE GOVERNMENT CHARGES THE DEFENDANT WITH

VIOLATION OF SECTIONS 1311(A) AND 1319(C)(2)(A) OF TITLE 33 OF
THE UNITED STATES CODE, UNPERMITTED DISCHARGE OF A POLLUTANT
FROM A POINT SOURCE INTO "WATERS OF THE UNITED STATES."

THE CHARGES AGAINST THE DEFENDANT ARE CONTAINED IN THE
SUPERSEDING INDICTMENT.  AND "WATERS OF THE UNITED STATES" IS
IN QUOTATION MARKS, BY THE WAY, AND YOU WILL BE INSTRUCTED AS
TO WHAT THAT PHRASE MEANS.  THE CHARGES AGAINST THE DEFENDANT
ARE CONTAINED IN THE SUPERSEDING INDICTMENT.  THE SUPERSEDING
INDICTMENT SIMPLY DESCRIBES THE CHARGES THE GOVERNMENT BRINGS
AGAINST THE DEFENDANT.  THE SUPERSEDING INDICTMENT IS NOT
EVIDENCE AND DOES NOT PROVE ANYTHING.

THE DEFENDANT HAS PLEADED NOT GUILTY TO THE CHARGES AND IS
PRESUMED INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE
DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.  IN ADDITION, THE
DEFENDANT HAS THE RIGHT TO REMAIN SILENT AND NEVER HAS TO
PROVE INNOCENCE OR PRESENT ANY EVIDENCE.

THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE
FACTS ARE CONSISTS OF:  ONE, THE SWORN TESTIMONY OF ANY
WITNESS; TWO, THE EXHIBITS WHICH ARE RECEIVED IN EVIDENCE;
AND, THREE, ANY FACTS TO WHICH THE PARTIES AGREE.

THE FOLLOWING THINGS ARE NOT EVIDENCE AND YOU MUST NOT
CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THIS CASE:
ONE, STATEMENTS AND ARGUMENTS OF THE ATTORNEYS; TWO, QUESTIONS
AND OBJECTIONS OF THE ATTORNEYS; THREE, TESTIMONY THAT I
INSTRUCT YOU TO DISREGARD; AND, FOUR, ANYTHING YOU MAY SEE OR

1    HEAR WHEN THE COURT IS NOT IN SESSION EVEN IF WHAT YOU SEE OR

2    HEAR IS DONE OR SAID BY ONE OF THE PARTIES OR BY ONE OF THE

3    WITNESSES.

4        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

5    IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT

6    WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

7    CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE; THAT IS, IT IS

8    PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

9    FACT.

10       YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

11   EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.  THE LAW

12   MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER

13   DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE

14   HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

15       THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

16   RECEIVED IN EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR OFFERS

17   AN EXHIBIT IN EVIDENCE AND THE LAWYER ON THE OTHER SIDE THINKS

18   THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER

19   MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE

20   ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE OBJECTION,

21   THE QUESTION CANNOT BE ANSWERED OR THE EXHIBIT CANNOT BE

22   RECEIVED.

23       WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

24   IGNORE THAT QUESTION AND MUST NOT GUESS WHAT THE ANSWER WOULD

25   HAVE BEEN.  SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN

FROM THE RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE. THAT MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT CONSIDER THE EVIDENCE I TOLD YOU TO DISREGARD.

IN DECIDING THE FACTS OF THIS CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE. YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR NONE OF IT.

IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE INTO ACCOUNT:  ONE, THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO; TWO, THE WITNESS'S MEMORY; THREE, THE WITNESS'S MANNER WHILE TESTIFYING; FOUR, THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY; FIVE, THE WITNESS'S BIAS OR PREJUDICE, IF ANY; SIX, WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY; SEVEN, THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF ALL THE EVIDENCE; AND, EIGHT, ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFIED ABOUT IT.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

ALL RIGHT.  I'M GOING TO GIVE YOU THE INSTRUCTION THAT I GAVE BEFORE YOU LEFT YESTERDAY BECAUSE IT IS SUCH AN IMPORTANT ONE TO KEEP IN MIND, AND THESE ARE CONCEPTS THAT I'LL REMIND YOU ABOUT AS WE PROCEED THROUGH THE TRIAL.

1    FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT

2    DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

3    JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

4    CASE.

5    SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

6    THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

7    THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

8    INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

9    THE COURSE OF YOUR JURY DUTY.

10   THUS, UNTIL THE END OF THE CASE OR UNLESS I TELL YOU

11   OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO

12   NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE

13   MERITS OF THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES

14   DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE OR

15   ELECTRONIC MEANS, VIA EMAIL, VIA TEXT MESSAGING, OR ANY

16   INTERNET CHAT ROOM, BLOG, WEBSITE, OR APPLICATION INCLUDING,

17   BUT NOT LIMITED TO, FACEBOOK, YOUTUBE, TWITTER, INSTAGRAM,

18   LINKEDIN, SNAPCHAT, OR ANY OTHER FORMS OF SOCIAL MEDIA.

19   AGAIN, IF YOU KNOW OF ONE THAT IS SO HOT THAT IT WASN'T ON

20   THAT LIST, INCLUDE THAT, TOO.

21   THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS

22   UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

23   COMMUNICATING WITH EVERYONE ELSE INCLUDING YOUR FAMILY

24   MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, AND THE PEOPLE

25   INVOLVED IN THE TRIAL.  ALTHOUGH YOU MAY NOTIFY YOUR FAMILY

1    AND YOUR EMPLOYER THAT YOU HAVE BEEN SEATED AS A JUROR IN THE

2    CASE AND HOW LONG YOU EXPECT THE TRIAL TO LAST.

3        BUT IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR

4    JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND

5    THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO

6    REPORT THE CONTACT TO THE COURT.

7        BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

8    INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT, DO

9    NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

10   COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.

11       DO NOT DO ANY RESEARCH SUCH AS CONSULTING DICTIONARIES,

12   SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS,

13   AND DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO

14   LEARN ABOUT THE CASE ON YOUR OWN.  DO NOT VISIT OR VIEW ANY

15   PLACE DISCUSSED IN THIS CASE, AND DO NOT USE INTERNET PROGRAMS

16   OR OTHER DEVICES TO SEARCH FOR OR VIEW ANY PLACE DISCUSSED

17   DURING THE TRIAL.  ALSO, DO NOT DO ANY RESEARCH ABOUT THIS

18   CASE, THE LAW, OR THE PEOPLE INVOLVED INCLUDING THE PARTIES,

19   THE WITNESSES, OR THE LAWYERS UNTIL YOU'VE BEEN EXCUSED AS

20   JURORS.

21       IF YOU HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THIS

22   CASE IN THE MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS

23   POSSIBLE.  THESE RULES PROTECT EACH PARTY'S RIGHT TO HAVE THIS

24   CASE DECIDED ONLY ON EVIDENCE THAT HAS BEEN PRESENTED HERE IN

25   COURT.

1    WITNESSES HERE IN COURT TAKE AN OATH TO TELL THE TRUTH,

2    AND THE ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE

3    TRIAL PROCESS.  IF YOU DO ANY RESEARCH OR INVESTIGATION

4    OUTSIDE THE COURTROOM OR GAIN ANY INFORMATION THROUGH IMPROPER

5    COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED BY

6    INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS NOT

7    BEEN TESTED BY THE TRIAL PROCESS.

8    EACH OF THE PARTIES IS ENTITLED TO A FAIR TRIAL BY AN

9    IMPARTIAL JURY.  AND IF YOU DECIDE THE CASE BASED ON

10   INFORMATION NOT PRESENTED IN COURT, YOU WILL HAVE DENIED THE

11   PARTIES A FAIR TRIAL.  REMEMBER, YOU HAVE TAKEN AN OATH TO

12   FOLLOW THE RULES, AND IT IS VERY IMPORTANT THAT YOU FOLLOW

13   THESE RULES.  A JUROR WHO VIOLATES THESE RESTRICTIONS

14   JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS.  IF ANY JUROR

15   IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY THE COURT

16   IMMEDIATELY.

17   AT THE END OF THE TRIAL YOU WILL HAVE TO MAKE A

18   DECISION -- YOU'LL HAVE TO MAKE YOUR DECISION BASED ON WHAT

19   YOU RECALL OF THE EVIDENCE.  YOU WILL NOT HAVE A WRITTEN

20   TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY CLOSE ATTENTION TO

21   THE TESTIMONY AS IT IS GIVEN.

22   IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

23   EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

24   UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

25   THE CASE.  DO NOT LET NOTE TAKING DISTRACT YOU FROM BEING

1    ATTENTIVE.  WHEN YOU LEAVE COURT FOR RECESSES, YOUR NOTES

2    SHOULD BE LEFT IN THE JURY ROOM.  NO ONE WILL READ YOUR NOTES.

3        WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

4    MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

5    YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

6    YOUR FELLOW JURORS.

7        SO, LADIES AND GENTLEMEN, AT THIS TIME THE NEXT PHASE OF

8    THE TRIAL WILL BEGIN, AND I WILL GIVE YOU A LITTLE BIT OF A

9    ROADMAP OF THE PROCESS.  AS I SAID, FIRST EACH SIDE MAY MAKE

10   AN OPENING STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE.

11   IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT THE

12   PARTY -- WHAT THAT PARTY EXPECTS THE EVIDENCE WILL SHOW.  A

13   PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

14       THE GOVERNMENT WILL THEN PRESENT EVIDENCE, AND COUNSEL FOR

15   THE DEFENDANT MAY CROSS-EXAMINE.  THEN IF THE DEFENDANT

16   CHOOSES TO OFFER EVIDENCE, COUNSEL FOR THE GOVERNMENT MAY

17   CROSS-EXAMINE.  AFTER THE EVIDENCE HAS BEEN PRESENTED, THE

18   ATTORNEYS WILL MAKE CLOSING ARGUMENTS, AND I WILL INSTRUCT YOU

19   ON THE LAW THAT APPLIES TO THE CASE.  AFTER THAT, YOU WILL GO

20   TO THE JURY ROOM TO DELIBERATE ON YOUR VERDICT.

21       SO AT THIS TIME, MR. KEARNEY OR MS. LEE, IS THE UNITED

22   STATES PREPARED TO OFFER AN OPENING STATEMENT?

23           **MR. KEARNEY:**  WE ARE, SIR.

24                   **OPENING STATEMENT**

25           **MR. KEARNEY:**  LADIES AND GENTLEMEN, GOOD MORNING.

OPENING STATEMENT / KEARNEY

```
1        WE ARE HERE BECAUSE OVER AN APPROXIMATE 90-DAY PERIOD IN
2    MID-2014, ABOUT THREE-AND-A-HALF YEARS AGO, THIS MAN, JAMES
3    LUCERO, BARGED IN TO PRIVATE PROPERTY ON THE LITERAL EDGE OF
4    SAN FRANCISCO BAY AND DUMPED WITHOUT PERMISSION MORE THAN A
5    THOUSAND INDUSTRIAL-SIZED DUMP TRUCK LOADS OF CONSTRUCTION
6    DEBRIS, FILL MATERIAL, ROCK, ON UNDEVELOPED LAND INCLUDING
7    FEDERAL WETLAND IN THE WATERS OF THE UNITED STATES.  THE
8    PRIVATE PROPERTY THAT HE WENT IN TO WAS LOCKED AND GATED.  HE
9    HAD NO PERMISSION TO GO ON THAT LAND.
10       THE SCALE OF THE CRIME IS SOMEWHAT DIFFICULT TO DESCRIBE
11   BUT 22 ACRES OF THAT LAND AFTER THE ILLEGAL DUMPING WERE
12   COMPLETELY COVERED WITH THIS CONSTRUCTION DEBRIS AND FILL
13   MATERIAL.
14       I ALWAYS REFRAIN FROM USING SPORTS ANALOGIES BUT SOMETIMES
15   THE CONCEPT OF AN ACRE MAY NOT BE EASY FOR SOME OF US.  AN
16   ACRE IS APPROXIMATELY A FOOTBALL FIELD.  WHEN THIS DUMPING WAS
17   FINISHED, 22 FOOTBALL FIELDS WERE COMPLETELY COVERED WITH THIS
18   DEBRIS, IN SOME AREAS UP TO MULTIPLE FEET.
19       THE MOTIVATION FOR THE CRIME?  AMONG THE MOST
20   STRAIGHTFORWARD IN HUMAN EXPERIENCE, MONEY.  THE DEFENDANT
21   CHARGED TRUCKERS PER LOAD TO DUMP ON LAND THAT WAS NOT HIS.
22       THIS IS WHAT ONE WETLAND LOOKED LIKE AFTER HE WAS DONE.
23                   (DISPLAYED ON SCREEN.)
24       YOU WILL NOTICE, LADIES AND GENTLEMEN, WHEN YOU LOOK AT
25   THIS, THERE ARE STRIATIONS AND DRAG MARKS WITH LIGHTER FILL
```

OPENING STATEMENT / KEARNEY

1   MATERIAL OVER THE LAND, OVER THE VEGETATION THAT WAS EXISTING

2   THERE.  THOSE ARE MARKINGS FROM A BULLDOZER THAT WAS OPERATED

3   IN THIS REGION ON SOME DAYS BY THE DEFENDANT HIMSELF.

4       THE BULLDOZER -- SO MUCH FILL MATERIAL WAS BEING DUMPED ON

5   THIS LAND -- THE NUMBER IS 10,000 YARDS APPROXIMATELY OR EVEN

6   MORE THAN THAT.  SO MUCH FILL MATERIAL WAS BEING DUMPED ON THE

7   LAND THAT IT REQUIRED A BULLDOZER TO SPREAD IT OUT EVENLY, AND

8   THAT IS WHAT YOU SEE IN THE AFTERMATH.

9       AND THESE TRUCKS WE'RE TALKING ABOUT?  THESE THOUSAND OR

10  MORE DUMP LOADS, THESE WERE NOT PICKUP TRUCKS.  THESE WERE

11  MULTI-AXLE --

12                  (DISPLAYED ON SCREEN.)

13      -- INDUSTRIAL-SIZED DUMP TRUCK LOADS.  SUPER DUMPS, END

14  DUMPS, TRANSFER TRUCKS, ALL THINGS YOU ARE GOING TO BECOME

15  FAMILIAR WITH DURING THIS TRIAL.  OVER A THOUSAND OF THOSE

16  LOADS.

17      TO BE EFFECTIVE JURORS IN THIS CASE, YOU'RE GOING TO HAVE

18  TO LEARN A LOT.  YOU'RE GOING TO HAVE TO LEARN ABOUT HYDROLOGY

19  AND BOTANY, WETLAND VEGETATION.  BUT FIRST LET'S TALK ABOUT

20  GEOGRAPHY, SOMETHING SIMPLE.  THIS LAND --

21                  (DISPLAYED ON SCREEN.)

22      -- IF EVERYBODY CAN SEE IT HERE, IS DOWN ON THE VERY

23  SOUTHEAST CORNER OF SAN FRANCISCO BAY.  IT'S IN THE CITY OF

24  NEWARK, CALIFORNIA, WHICH IS NOT QUITE BIG ENOUGH TO MAKE IT

25  ON THIS MAP, SOMEWHAT SOUTHWEST -- OR SOMEWHAT WEST OF

1    HIGHWAY 880.  A LITTLE CLOSER VIEW LETS US SEE THE AREA OF

2    DUMPING ITSELF.  IT'S IN ORANGE ON THIS DIAGRAM.

3        YOU ARE GOING TO HEAR THIS LAND REFERRED TO AS NEWARK

4    AREA 4, FROM A PAST DEVELOPMENT PLAN.  WE WILL BE USING THAT

5    WORD A LOT.  NEWARK AREA 4, YOU SHOULD CONSIDER TO BE

6    SYNONYMOUS WITH THE LAND WE ARE TALKING ABOUT.

7        YOU WILL SEE ON THIS MAP HERE, THIS --

8                    (DISPLAYED ON SCREEN.)

9        -- KIND OF CURVED SNAKE-LOOKING LINE RUNNING FROM A STUDY

10   AREA DIRECTLY TO SAN FRANCISCO BAY.  THAT CURVED SQUIGGLY LINE

11   IS CALLED MOWRY SLOUGH.  IT IS A TITLE SLOUGH OR INLET FROM

12   SAN FRANCISCO BAY.  IT RISES AS MUCH AS 6, 7, 8 FEET PER DAY

13   DEPENDING ON THE PHASE OF THE MOON AND ALL THAT STUFF.  BUT IT

14   HAS A SIGNIFICANT UP AND DOWN MOVEMENT TO IT.  IT RUNS

15   DIRECTLY ON THE LEFT SIDE OF THE PROPERTY, SEPARATED FROM THE

16   PROPERTY WITH A LEVEE.

17                   (DISPLAYED ON SCREEN.)

18       FOR THOSE OF US WHO ARE NOT ALL THAT CONVERSANT WITH MAPS

19   WHO LIKE PICTURES BETTER, THIS IS A VIEW -- AN AERIAL VIEW,

20   OBVIOUSLY, OF THE LAND LOOKING IN A BASIC SOUTHERLY DIRECTION.

21   YOU WILL SEE OVER HERE (INDICATING) THIS IS THE END OF MOWRY

22   SLOUGH.  AS WE JUST TALKED ABOUT, IT KIND OF CURVES AROUND

23   THIS WAY AND GOES OUT TO THE BAY.  THE LAND WE ARE TALKING

24   ABOUT IS RIGHT OVER HERE (INDICATING).

25       AND YOU WILL SEE THAT THIS LAND IS QUITE LITERALLY THE

1    LAST DRY SPOT BEFORE YOU HIT WATER.  IT IS SURROUNDED BY

2    CARGILL SALT PONDS, THE DON EDWARDS NATIONAL WILDLIFE REFUGE,

3    WHICH WE WILL TALK ABOUT IN A MOMENT, AND IT IS AT THE

4    LITERAL, ALSO, END OF THE ROAD IN NEWARK, CALIFORNIA.

5        THERE IS TWO ROADS THAT GO FROM BASICALLY 880 WEST FROM

6    NEWARK CALLED MOWRY.  BY THE WAY, HERE IS A PICTURE OF MOWRY

7    SLOUGH.  THIS IS WITH THE TIDE UP.  YOU WILL SEE A BOAT THERE

8    IN THE BACK WITH A MOTOR.  IT IS NAVIGABLE BY BOAT, WHICH WE

9    WILL REFER TO LATER ON AS A SIGNIFICANT FACT THAT YOU WILL

10   HAVE TO ASSESS IN YOUR JURISDICTIONAL DETERMINATION LATER ON.

11       MOVING ON.  SO THIS MAP, LADIES AND GENTLEMEN --

12                   (DISPLAYED ON SCREEN.)

13       -- IS ONE THAT I THINK YOU WILL BECOME CONVERSANT WITH

14   DURING THE COURSE OF THIS TRIAL.  THIS IS A MAP THAT WAS

15   CREATED IN 2007 BY WETLAND -- A WETLAND ECOLOGY FIRM CALLED

16   H.T. HARVEY & ASSOCIATES.  I PUT IT UP AT THIS STAGE JUST TO

17   SHOW YOU WHERE THE RELEVANT STREETS ARE ON THIS DIAGRAM.

18       YOUR HONOR, WITH THE COURT'S PERMISSION, I AM GOING TO

19   WALK OVER HERE JUST FOR A MOMENT?

20           **THE COURT:**  YOU MAY.

21        **MR. KEARNEY:**  AT THE TOP OF THE DIAGRAM IS MOWRY

22   AVENUE RIGHT HERE (INDICATING) THAT DEAD ENDS IN THE SALT

23   PONDS.  AND THEN OVER HERE (INDICATING) IS A ROAD CALLED

24   STEVENSON ROAD.  IT LITERALLY DEAD ENDS INTO THE PROPERTY.

25       THIS LAND, I DON'T WANT TO BE TOO LIGHTHEARTED, BUT IT IS

```
1    ON THE WRONG SIDE OF THE TRACKS LITERALLY.  THIS DIAGONAL LINE
2    RUNNING FROM NORTHWEST TO SOUTHEAST ARE THE UNION PACIFIC
3    RAILROAD TRACKS IN NEWARK.  THIS LAND IS OVER THE TRACKS.
4    THERE IS NOTHING OUT HERE.  THERE'S AN AUTO DISMANTLER OVER
5    THERE.  THERE IS THE CARGILL SALT PONDS.  THERE ARE NO
6    RESTAURANTS.  THERE ARE NO STORES.  THERE ARE NO DWELLINGS.
7    IT IS REMOTE.
8        AS YOU WOULD EXPECT FROM A SITE SO CLOSE TO THE BAY, THE
9    SITE WAS CLASSICALLY PART OF WHAT THEY CALL THE SAN FRANCISCO
10   BAY MARGIN.  WHAT THAT MEANS IS, IF THE LEVEES WEREN'T
11   CREATED, THIS WOULD BE -- THE TIDE WOULD FLOW ON THIS LAND AND
12   OFF IT EVERY DAY.  SOME PARTS OF THIS LAND ARE BELOW SEA
13   LEVEL.  SO THAT IS THE SITE.
14       NOW, WHY ARE WE HERE?  HOW DID WE LEARN OF THIS CRIME?  WE
15   LEARNED OF THIS CRIME BECAUSE OF A WATCHDOG GROUP, AN
16   ENVIRONMENTAL WATCHDOG GROUP THAT PERFORMS WHAT THEY CALL
17   WETLAND ADVOCACY.  THAT GROUP IS CALLED THE CITIZENS COMMITTEE
18   TO COMPLETE THE REFUGE.  WE ARE GOING TO CALL IT CCCR DURING
19   THIS TRIAL.
20       THE CCCR HAS AS A MISSION STATEMENT THE PROTECTION OF BAY
21   WETLANDS, THE PROTECTION OF THE QUALITIES THEY PROVIDE THE
22   BAY, POLLUTANT FILTRATION, SEDIMENT BLOCKAGE, FLOOD STORAGE.
23   CCCR HAS HAD THEIR EYE ON THIS PIECE OF PROPERTY FOR A LONG
24   TIME.
25                      (DISPLAYED ON SCREEN.)
```

1      THE GREEN ON THIS DIAGRAM IS THE DON EDWARDS NATIONAL

2    WILDLIFE SANCTUARY.  THE ORANGE IS WHERE OUR LAND IS.  AND THE

3    RED THERE IS MOWRY SLOUGH, AS IT SNAKES RIGHT TO THE BAY.

4      BACK IN 2014, WHEN THIS CRIME OCCURRED, THE PRESIDENT OF

5    THE CCCR WAS A WOMAN BY THE NAME OF CARIN HIGH, WHO YOU WILL

6    MEET TODAY PROBABLY.  MS. HIGH HAD A LIFETIME IN THE

7    PROTECTION OF THE ENVIRONMENT.  SHE WAS A -- SHE GOT BACHELOR

8    DEGREE IN MARINE ECOLOGY.  SHE GOT A MASTER'S THEREAFTER IN

9    MARINE ECOLOGY.  AFTER SCHOOL SHE WENT TO WORK FOR THE U.S.

10   ARMY CORPS OF ENGINEERS, WHICH IS THE GROUP, AS YOU WILL HEAR,

11   YOU'LL HEAR A LOT ABOUT THEM DURING THIS TRIAL, THE U.S. ARMY

12   CORPS OF ENGINEERS, WE MAY HAVE VAGUE IMAGES OF WORLD WAR II

13   OR SOMETHING.  ONE OF THEIR MAIN JOBS, ONE OF THEIR MAIN

14   GOALS, IS THEY ARE THE MAIN FEDERAL REGULATORY AGENCY THAT

15   PROTECTS "WATERS OF THE UNITED STATES", INCLUDING WETLANDS AND

16   TRIBUTARIES OF THOSE.

17     SO SHE WORKED THERE.  SHE LEARNED ABOUT BOTANY, WETLAND

18   VEGETATION, HYDROLOGY, AND THEN SHE EVENTUALLY MOVED ON TO BE

19   THE PRESIDENT OF THE CCCR.

20     AS THE PRESIDENT OF AN ENVIRONMENTAL WATCHDOG GROUP, YOU

21   ARE CONSTANTLY MONITORING FOR EVENTS.  SHE'S A MEMBER OF

22   SEVERAL USER GROUPS.

23     ONE OF HER USER GROUPS, IN THE FIRST WEEK OF SEPTEMBER OF

24   2014, ON IT WAS POSTINGS THAT REALLY DISTURBED MS. HIGH.  SHE

25   WAS VERY MUCH AWARE OF THIS LAND.  SHE KNEW THERE WAS NATIVE

1    STANDS OF PICKLEWEED THERE, WHICH IS A VERY IMPORTANT FOR

2    SEVERAL ENDANGERED SPECIES.

3        SHE SAW IMAGES OF THIS ILLEGAL DUMPING, THIS MASSIVE

4    GRADING ON THIS LAND.  IT TURNS OUT THAT THOSE POSTINGS WERE

5    MADE BY A MAN LATER IDENTIFIED AS DANIEL MILLER, WHO YOU WILL

6    ALSO MEET IN THIS TRIAL.

7        MR. MILLER IS A LIFETIME COMMITTED ENVIRONMENTALIST AS

8    WELL.  HE USED TO STROLL OUT ON THE LEVEES IN THESE WETLANDS

9    JUST FOR SOLITUDE.  HE ENJOYED THE PONDS AND THE SHORE BIRDS

10   AND THE QUIET.

11       ON SEPTEMBER 1ST, 2014, MR. MILLER WENT OUT FOR A STROLL,

12   AS HE OFTEN DID, IN NEWARK AREA 4.  WHEN HE GOT THERE -- NOW,

13   THIS IS A FULL WEEK BEFORE LAW ENFORCEMENT ARRIVES.

14       WHEN HE GOT THERE THAT DAY, HE NOTICED SOMETHING TERRIBLY

15   WRONG.  WHAT USUALLY WAS A PEACEFUL TRANQUIL EXPERIENCE FOR

16   HIM WAS GONE.  HE WAS, AS HE WALKED ALONG THE LEVEES, HE HEARD

17   MACHINERY CHURNING AND TRUCKS.  HE WASN'T QUITE SURE WHAT WAS

18   GOING ON, BUT HE HEARD THIS BIG CACOPHONY THAT HE DIDN'T KNOW

19   WHAT TO MAKE OF.

20       EVENTUALLY HE WANDERED OVER TO A PORTION OF THE SITE WE

21   WILL REFER TO DURING THIS TRIAL AS KIND OF THE NORTHERN AREA.

22   AND HE SAW EVIDENCE OF MASSIVE GRADING AND DUMPING ON THE

23   LAND.

24                    (DISPLAYED ON SCREEN.)

25       HE SNAPPED PHOTOGRAPHS FROM A LEVEE.  THIS WAS IN THE

1    FOREGROUND, YOU WILL SEE WETLAND VEGETATION, GREEN, HEALTHY,

2    AND THEN COVERED OVER GROUND WITH DEBRIS.

3        ANOTHER PHOTOGRAPH.

4                    (DISPLAYED ON SCREEN.)

5        AND ONE MORE.

6                    (DISPLAYED ON SCREEN.)

7        THIS IS AN AREA NEAR AN AUTO DISMANTLER YARD CALLED THE

8    PICK 'N PULL.  THE WETLAND VEGETATION YOU SEE IS PICKLEWEED.

9    PICKLEWEED IS IMPORTANT IN THIS CASE BECAUSE IT'S CALLED AN

10   OBLIGATE SPECIES.  OVER 99 PERCENT OF THE TIME IF YOU HAVE

11   PICKLEWEED, YOU HAVE A WETLAND.

12       MR. MILLER, AMATEUR PHOTOGRAPHER THAT HE WAS, TOOK THESE

13   IMAGES OF FILL MATERIAL DUMPED ON PICKLEWEED.  AND HE POSTED

14   THEM ON ONE OF HIS USER GROUPS WHICH CARIN HIGH SAW A FEW DAYS

15   LATER.

16       MS. HIGH WAS SO CONCERNED THAT SHE WENT OUT THERE HERSELF.

17   SHE GOT THERE ON SEPTEMBER 7TH, 2014.  SHE GOT THERE AND SHE

18   CONFIRMED FOR HERSELF THAT THIS LAND HAD BEEN DUMPED ON IN A

19   MASSIVE WAY.  AND SHE TOOK HER OWN PHOTOGRAPHS INCLUDING THIS

20   ONE.

21                   (DISPLAYED ON SCREEN.)

22       AGAIN OF VEGETATION WITH CONSTRUCTION DEBRIS DUMPED ON.

23   IT THIS IS A CONCRETE PILE OF RUBBLE.  SO SHE TOOK THIS

24   PHOTOGRAPH, AND SHE WENT HOME.

25       NOW, MS. HIGH HAD BEEN ENGAGED IN LITIGATION AT THAT STAGE

1    WITH A DEVELOPER WHO WAS TRYING TO DEVELOP THIS LAND.

2    MAINTAIN WETLAND HABITAT, BUT ALSO PUT IN HOMES, GOLF COURSE,

3    WHO KNOWS.  IT'S A MASSIVE SITE.

4        SHE WAS FURIOUS.  SHE HAD SUED THE DEVELOPER.  THERE WAS

5    AN ENVIRONMENTAL IMPACT REPORT.  THEY WERE LITIGATING.  IT WAS

6    MESSY.  IT WAS IN COURT, AND ALL OF A SUDDEN THIS HAPPENS IN

7    WETLAND.

8        SO SHE GOT HOME AND SHE WROTE A MEMORANDUM ON CCCR

9    LETTERHEAD TO EVERYBODY, U.S. ARMY CORPS OF ENGINEERS, FISH

10   AND WILDLIFE, THE ENVIRONMENTAL PROTECTION AGENCY, CITY OF

11   NEWARK, AND SHE CC'D DOZENS OF PEOPLE, OR MAYBE A DOZEN

12   PEOPLE.

13       ONE OF THE PEOPLE SHE CC'D IS ANOTHER MAN YOU ARE GOING TO

14   MEET, TIM STEELE.  HE WAS THE SENIOR VP FOR DEVELOPMENT FOR

15   THE COMPANY WHO WAS TRYING TO WORK OUT SOME SAVING THE HABITAT

16   BUT ALSO DEVELOP THE SITE CALLED THE SOBRATO ORGANIZATION.

17   VERY, VERY BIG FAMILY DEVELOPMENT CORPORATION.

18       AS LUCK WOULD HAVE IT, THE VERY NEXT DAY SHE AND MR. --

19   CARIN AND MR. STEELE WERE IN COURT HERE IN ALAMEDA COUNTY

20   LITIGATING PARTS OF THE EIR.  THE PROCESS WAS ALMOST COMING TO

21   AN END.  SHE TELLS MR. STEELE, MR. STEELE LEARNS FROM ONE OF

22   THE CCCR MEMBERS, HEY, WHAT'S GOING ON AT NEWARK AREA 4?

23   LOOKS LIKE THERE'S MASSIVE GRADING GOING ON UP THERE.

24       MR. STEELE, WHO BY THAT TIME IN HIS CAREER HAD BEEN A REAL

25   ESTATE DEVELOPMENT PROFESSIONAL FOR DECADES.  HE WAS USED TO

1    DOING THINGS RIGHT, GETTING PERMITS, ALL THAT STUFF.

2        HE'S LIKE, NO, THERE'S NOT.  IF ANYBODY WOULD KNOW, I

3    WOULD KNOW.  THERE'S NOTHING GOING ON OUT THERE.

4        I SAW IT WITH MY OWN EYES YESTERDAY.

5        MR. STEELE, WHO HAD BEEN WORKING TO DEVELOP THIS SITE FOR

6    YEARS -- HERE'S A TIMELINE OF THE WORK HE PUT INTO THIS SITE.

7        START IN 2005 WITH FLYOVERS, MAPPING.  THEY FOUND A

8    PARTNERSHIP TO DEVELOP THE SITE.  HE ORDERED A BIOTIC

9    CONSTRAINTS ANALYSIS FROM H.T. HARVEY.  BIO CONSTRAINTS MEANS

10   THAT YOU CAN'T BUILD HERE BECAUSE THERE'S WETLAND, YOU CAN'T

11   BUILD HERE BECAUSE THERE'S SENSITIVE HABITAT.

12       ENVIRONMENTAL STUDIES 2006.  A MEMORANDUM OF UNDERSTANDING

13   WITH THE CITY OF NEWARK TO DEVELOP THE SITE.

14       2007, THE HARVEY DELINEATION, THAT MAP WE SHOWED YOU OF

15   WHERE THE WETLANDS WERE.

16       2007, 2007 HE CONTACTED THE U.S. ARMY CORPS OF ENGINEERS I

17   SAYING, HEY, I WANT TO DEVELOP PARTS OF THIS SITE.  CAN YOU

18   GIVE ME A JURISDICTIONAL DETERMINATION OF WHERE U.S. WATERS

19   ARE?  GOT A RESPONSE BACK TO THE CORPS CONFIRMING, YES, THERE

20   ARE "WATERS OF THE UNITED STATES" ON THIS LAND, FEDERAL

21   WETLAND.

22       HE WORKED WITH THE CITY OF NEWARK ON A DRAFT ENVIRONMENTAL

23   IMPACT REPORT.

24       2010 HE GOT A FINAL IMPACT REPORT.

25       IN 2014 HE GOT ANOTHER MEMORANDUM FROM THE U.S. ARMY CORPS

1    OF ENGINEERS.

2        THIS IS A MAN WHO HAD BEEN WORKING TO DEVELOP THIS SITE

3    LEGALLY FOR ALMOST A DECADE.  SO HE WAS TROUBLED WHEN HE HEARD

4    ABOUT THE DUMPING.

5        AS SOON AS HE LEFT COURT HERE IN OAKLAND, HE DROVE

6    IMMEDIATELY SOUTH TO THE PROPERTY, RIGHT DOWN 880 ABOUT

7    30 MILES TO NEWARK.

8        HE WAS WITH ONE OF HIS -- ANOTHER SOBRATO EMPLOYEE, ROBERT

9    TERSINI.  WHEN THEY DROVE TO THE SITE THAT DAY -- NOW THIS IS

10   SEPTEMBER 8TH, KIND OF A BIG DAY IN THIS TRIAL, SEPTEMBER 8TH,

11   2014 -- WHEN HE GOT TO THE SITE, HE DROVE TO THE MOWRY SIDE,

12   KIND OF THE NORTHERN SIDE, AND HE DIDN'T SEE ANY ACTIVITY.

13   BUT THEN HE COULD LOOK ACROSS IN THE FAR DISTANCE TO THE

14   STEVENSON ENTRY POINT INTO THE PROPERTY, AND HE LOOKS OVER

15   THERE AND HE'S GOING, OH, MY GOD, THAT'S A DUMP TRUCK.

16       SO AS VERY QUICKLY HE DRIVES FROM THE MOWRY SIDE AROUND TO

17   STEVENSON.  AND WHEN HE DRIVES TO STEVENSON HE SEES A LINE OF

18   THESE HUGE DUMP TRUCKS OUTSIDE ON STEVENSON BOULEVARD.

19       HEART SINKS.  HE DRIVES UP TO THE STEVENSON GATE.  THIS IS

20   WHAT THE GATE ON THE STEVENSON ENTRY TO THIS LAND LOOKS LIKE

21   USUALLY.

22                    (DISPLAYED ON SCREEN.)

23       GATED, SIGNS, STAY OUT, LOCKED WITH A CHAIN.

24       REMEMBER, THIS IS WHERE STEVENSON DEAD ENDS INTO THE

25   PROPERTY.  THERE'S NO CROSS TRAFFIC, THERE'S NO INTERSECTIONS,

```
1    NO REASON TO BE OUT THERE UNLESS YOU ARE GOING TO THIS

2    PROPERTY.

3        WHEN HE GOT TO THIS GATE THAT DAY, IT WAS WIDE OPEN.  HE

4    WAS THE PERSON WHO KNEW THE CODE FOR THE LOCK.  HE'S LIKE, OH,

5    BOY, THIS IS NOT GOOD.  HE LATER FOUND THAT THE CHAIN HAD BEEN

6    CUT.

7        HE DROVE ONTO THE PROPERTY, PASSED THE TRUCKS WHO WERE

8    QUEUED UP, AND HE SAW A KID THERE WITH A CLIPBOARD KIND OF

9    DIRECTING TRAFFIC AS TRUCKS WOULD DRIVE ONTO THE LAND.  THE

10   KID HE LATER LEARNED WAS THE SON OF MR. LUCERO.  HIS NAME IS

11   AUSTIN LUCERO.

12       MR. STEELE AT THIS POINT IS FURIOUS.  HE GOES UP TO THIS

13   KID AND GOES -- WE ARE SANITIZING THE LANGUAGE FOR COURT --

14   WHAT ARE YOU DOING?  THIS IS FEDERAL PROPERTY.  THERE'S

15   FEDERAL WETLAND WHERE YOU'RE DUMPING OVER THERE.  WHAT ARE YOU

16   DOING?

17       AND HE THREATENS HIM.  HE SAYS, IF THERE'S ONE MORE LOAD

18   COMES OFF ANY ONE OF THESE TRUCKS, I'M GOING TO KICK YOUR ASS.

19   THAT'S HOW MR. STEELE FELT ABOUT IT AT THE TIME AFTER ALL THE

20   ALMOST DECADE OF HIS HARD WORK THAT HE WAS SEEING GOING UP IN

21   THIN AIR.

22       THE YOUNG MAN, MR. LUCERO'S SON, WAS SCARED.  HE GOT ON

23   THE PHONE.  MR. STEELE SAW HIM GET ON THE PHONE.  HE HEARD

24   HIM.  WHAT'S GOING ON?  THIS IS FEDERAL LAND.  WHAT DID YOU

25   GET ME INTO?
```

1        MR. STEELE STARTS TAKING DOWN LICENSE NUMBERS OF TRUCKS.

2    ANOTHER TRUCK DRIVES ONTO THE PROPERTY RIGHT IN FRONT OF HIM

3    IN HIS SPORTS CAR, HE WAS FOUR WHEELING TO TRY AND STOP IT.

4        AS -- IN THIS TIME PERIOD, HE CALLS THE CITY OF NEWARK

5    CITY MANAGER.  SAYS GET THE COPS OUT HERE.  THAT HAPPENS.

6        THE NEWARK POLICE DEPARTMENT THE NPD RESPONDED TO THAT

7    CALL, AND THEY DETAIN SEVERAL OF THE TRUCKS THAT WERE QUEUED

8    UP ON STEVENSON.

9        LIEUTENANT VINCE KIMBROUGH, ONE OF THE RESPONDING OFFICERS

10   WHO'S IN CHARGE, WHO IS THE SENIOR MOST RESPONDING OFFICER AT

11   THE TIME, WENT ON TO THE LAND HIMSELF.  HE HAD BEEN THERE

12   BEFORE.  IT'S PART OF HIS BEAT.  AND HE WENT ON TO THE AREA

13   WHERE THEY HAD BEEN DUMPING THE SOUTHERN FILL AREA WHICH YOU

14   WILL LEARN MORE ABOUT DURING THIS TRIAL.

15       I'M GOING TO WALK BACK OVER HERE, IF I MAY, YOUR HONOR.

16       SO WE SAID STEVENSON COMES INTO THE PROPERTY HERE

17   (INDICATING).  THE TRUCKS HAD BEEN DRIVING AND THEY WERE

18   DUMPING IN THE SOUTHERN FILL AREA AS OPPOSED TO THE NORTHERN

19   FILL AREA.  THESE RED AREAS ARE THE COMBINED 22 ACRES, 22

20   FOOTBALL FIELDS OF LAND THAT HAD BEEN COVERED.

21       LIEUTENANT KIMBROUGH DROVE ON TO THE SOUTHERN FILL AREA

22   AND HE SAW -- THIS IS A FIELD HE HAD BEEN ON BEFORE.  USUALLY

23   GREEN, VEGETATED, CLEAN, NICE.  IT WAS NOT -- IT DID NOT LOOK

24   NICE THAT DAY.

25                        (DISPLAYED ON SCREEN.)

1       HE SAW A TRACTOR ON THE LAND THAT HAD BEEN SPREADING FILL.

2    THAT'S LIEUTENANT KIMBROUGH TO THE RIGHT OF THE TRACTOR.  AS

3    YOU LOOK AT THE IMAGE, LADIES AND GENTLEMEN, IT LOOKS LIKE

4    THERE'S SOMEBODY IN THERE, LOOKS LIKE A DRIVER.  BUT THAT'S

5    JUST A HIGH SEAT.  THE DRIVER HAD ABANDONED.  THE TRACTOR TOOK

6    OFF.  YOU WILL HEAR FROM THAT DRIVER IN THIS TRIAL.

7       HE SAW NOT ONLY THIS BROAD FIELD -- THIS SECTION OF THE

8    PROPERTY IS ABOUT EIGHT ACRES THAT WAS FILLED.  HE SAW THAT

9    THE SCALE AGAIN WAS HUGE.

10                    (DISPLAYED ON SCREEN.)

11      HE ALSO SAW THESE BIG NEW PILES OF FILL.  IT WAS LIGHTER

12   COLORED THAN THE DARK WETLAND SOIL.  HE SAW IN THE SOUTHERN

13   SECTION, JUST LIKE IN THE NORTHERN SECTION, WE HEARD EARLIER

14   ABOUT MS. HIGH, HE SAW... HE SAW FILL MATERIAL DUMPED ON THE

15   NATIVE VEGETATION PICKLEWEED.

16                    (DISPLAYED ON SCREEN.)

17      THERE'S ANOTHER SIDE OF THE FIELD WHICH HAD BEEN PLACED

18   AND THEN DRAGGED OUT INTO FURROWS WITH THE TRACTOR.

19      WHILE HE'S ON THE PROPERTY TRYING TO ASSESS THIS, HE CALLS

20   MR. BOURSIER, THE ENGINEER WHO HAD DONE THE WETLAND

21   DELINEATION ORIGINALLY.  HE SAID, YOU HAVE TO GET OUT HERE.

22   WE HAVE TO SEE HOW BAD THIS IS.  YOU HAVE TO MAP THIS THING

23   BECAUSE THERE'S A LOT OF ILLEGAL DUMPING GOING ON.

24      HE ALSO HUNG AROUND AS THE NEWARK POLICE DEPARTMENT BEGAN

25   THEIR INVESTIGATION INTERVIEWING DRIVERS, ALL THAT KIND OF

1    STUFF.  DURING THE INTERVIEW PROCESS, THEY LEARNED THAT THE

2    FOREMAN WHO WAS RUNNING THIS THING WAS THIS GUY NAMED KEVIN

3    OLIVERO.

4        MR. STEELE THAT DAY ENDED UP TALKING TO HIM ON THE PHONE

5    AND GOES, OKAY, WHAT ARE YOU DOING?  WELL, I'M WORKING FOR JIM

6    LUCERO.

7        WHO GAVE YOU PERMISSION TO DO THIS?  YOU NEED TO BE IN MY

8    OFFICE TOMORROW.  WE NEED TO TALK ABOUT THIS.

9        SO THE MEN MADE A DATE TO MEET THE FOLLOWING DAY,

10   SEPTEMBER 9TH AT THE SOBRATO CORPORATION'S OFFICE IN SANTA

11   CLARA.

12       SO THE NEXT MORNING BEFORE THE MEETING WITH MR. LUCERO AND

13   MR. OLIVERO, MR. STEELE MET THE WETLANDS ENGINEER OUT THERE,

14   PAT BOURSIER, AND THEY MAPPED THE FILL SITE AND THEY CAME UP

15   WITH 22 ACRES OF RECENT FILL.

16       IT'S PRETTY EASY TO SEE, LADIES AND GENTLEMEN.  YOU SEE

17   LIGHTER COLORED ROCKY SOIL, THERE'S CHUNKS OF CONCRETE IN IT,

18   CONSTRUCTION DEBRIS, DIRTY, DIRTY STUFF.

19       SO THE MORNING OF SEPTEMBER 9TH, MR. STEELE LEARNED JUST

20   HOW BROAD THIS DUMPING WAS.  HE WENT BACK DOWN TO HIS OFFICE

21   FOR THE MEETING WITH MR. LUCERO.

22       MR. STEELE IS A... NOT OLDER MAN, BUT HE'S A MAN WITH

23   EXPERIENCE.  HE WAS PREPARED FOR THIS MEETING.  HE CALLED A

24   SECURITY FIRM THAT HE USED SOMETIMES TO HAVE SOMEONE IN THE

25   PARKING LOT.  HE WANTED TO MAKE SURE THEY CAN IDENTIFY WHO

```
1   THESE PEOPLE WERE, MAYBE GET LICENSE NUMBERS, THAT KIND OF

2   STUFF.

3       SO MR. LUCERO AND MR. OLIVERO ARRIVED AT HIS OFFICES THAT

4   NEXT DAY AFTER THE FILL.  SO THEY HAD A MEETING WITH

5   MR. STEELE, MR. TERSINI FROM THE SOBRATO CORPORATION, AND THE

6   DEFENDANT AND MR. OLIVERO.  MR. STEELE'S PLAN GOING IN WAS TO

7   BE NOT A COMBATIVE, SOFT SPOKEN, LET THE OTHER GUY TALK.

8       SO TELL ME WHY YOU THINK YOU HAD PERMISSION TO DO THIS?

9       MR. LUCERO TELLS HIM, OH, MICHAEL SOBRATO GAVE ME

10  PERMISSION.

11      SO THERE ARE TWO SOBRATOS WHO RUN -- AND ONLY TWO WHO RUN

12  THAT ORGANIZATION.  JOHN SOBRATO AND JOHN M. SOBRATO, JOHN

13  MICHAEL SOBRATO.  NEITHER ONE GOES BY MICHAEL.

14      SO MR. STEELE IS LISTENING.  OKAY, THAT WAS JUST AN ABJECT

15  LIE.  NOT ONLY DOES NOBODY GO BY MICHAEL SOBRATO, BUT THEY

16  WOULD NEVER GIVE PERMISSION TO DO THIS IN THE MIDDLE OF ALL

17  THIS LITIGATION, FEDERAL, STATE AND LOCAL.

18      HE SAID GO AHEAD AND DUMP, UH?

19      YEAH, YEAH.  HE MET ME OUT THERE AND SHOWED ME WHERE TO

20  DUMP.

21      MR. STEELE FLAT OUT KNEW THAT WAS NOT TRUE.  ANOTHER LIE.

22  MR. SOBRATO, THIS IS AN ORGANIZATION, LADIES AND GENTLEMEN,

23  WITH HUNDREDS OF PROPERTIES.  MR. STEELE WAS SKEPTICAL THAT

24  MR. SOBRATO COULD ACTUALLY FIND THE PROPERTY.  HE DIDN'T KNOW

25  THE CODE TO GET ON IT.
```

OPENING STATEMENT / KEARNEY

1    SO HE MET YOU OUT THERE, UH?

2    OH, YEAH.  HE SHOWED ME WHERE NOT TO DUMP, WHERE TO DUMP.

3    WHERE WAS THE SENSITIVE HABITAT WAS, ALL THAT STUFF.

4    OKAY.

5    YEAH, HE CAME OUT IN HIS WHITE PICKUP TRUCK.

6    MR. STEELE GOES, OKAY.  I'VE BEEN WORKING WITH THIS

7    CORPORATION FOR OVER A DECADE, RIGHT DOWN THE HALL FROM THESE

8    GUYS, THEY DON'T DRIVE -- NOBODY'S GOT A WHITE PICKUP TRUCK.

9    OKAY.  ALL RIGHT.

10    SO MR. STEELE'S PATIENCE IS STARTING TO RUN A LITTLE THIN.

11    OKAY.  DID YOU GET ANYTHING IN WRITING FROM MR. SOBRATO TO

12    DO THIS DUMPING, WHICH EVERYBODY KNOWS WITHIN THE CORPORATION

13    IS ILLEGAL BECAUSE IT'S CORPS OF ENGINEER LAND.  IT'S FEDERAL

14    LAND.  YOU HAVE TO HAVE A PERMIT FROM THE ARMY CORPS OF

15    ENGINEERS TO DO ANYTHING OUT THERE.

16    NO.

17    NOTHING IN WRITING?

18    NO.

19    OKAY.  WELL, DID MR. SOBRATO GIVE YOU HIS PHONE NUMBER

20    WHEN YOU TALKED TO HIM?

21    NO.

22    MR. STEELE GOES, YOU'RE A DIRT BROKER.  YOU DID THIS LEVEL

23    OF DUMPING ON SOMEBODY ELSE'S LAND ON A HANDSHAKE?  NOTHING IN

24    WRITING?  WITH NO WAY TO CONTACT THE OWNER OF THE LAND?

25    YEAH.

1       OKAY.  WELL, I NEED PULL TAGS.

2       PULL TAGS ARE RECEIPTS WHEN YOU DUMP.  IT'S KIND OF A VERY

3   NORMAL THING IN THE INDUSTRY WHEN YOU DUMP A LOAD OF DIRT, YOU

4   GET A RECEIPT.  IT'S KIND OF A WAY TO GET PAID BY EVERYBODY.

5       INCIDENTALLY THE DEFENDANT WAS CHARGING BETWEEN 50 AND $80

6   A LOAD FOR OVER A THOUSAND LOADS.  ACTUALLY A LITTLE MORE THAN

7   THAT.

8       MR. STEELE SAYS, I NEED THOSE DUMP -- THOSE PULL TAGS.  I

9   NEED TO KNOW WHERE THIS STUFF IS COMING FROM.  IF IT NEEDS

10  ANALYTICS TO SEE IF THERE'S CHEMICALS IN IT.  IF IT'S --

11      MR. LUCERO SAYS, YEAH, YEAH, YEAH.  WE WILL GET YOU THAT

12  STUFF.

13      SO HE LEAVES.  AS MR. LUCERO LEAVES, MR. STEELE WALKS OVER

14  TO THE WINDOW IN ONE OF THE UPPER FLOORS OF HIS OFFICES, AND

15  LOOKS DOWN.  AND HE SEES MR. LUCERO WALKING BACK TO HIS CAR.

16  HE SEES MR. LUCERO PICK UP HIS PHONE AND MAKE A PHONE CALL.

17  ALL OF A SUDDEN MR. STEELE'S PHONE RINGS.

18      HELLO?  IT WAS MR. LUCERO.

19      OH, I JUST REMEMBERED.  I DID GET PERMISSION NOTE FROM

20  MR. SOBRATO.

21      OH, OKAY.  THAT'S A GOOD FACT.  CAN I SEE IT?

22      YEAH, YEAH, YEAH.  I'LL GET IT TO YOU.

23      ALL RIGHT.

24      SO A DAY OR TWO LATER, MR. LUCERO FAXES A PERMISSION NOTE

25  TO MR. STEELE.  AND HERE'S THE FAX COVER.

1          (DISPLAYED ON SCREEN.)

2      ATTENTION:  TIM STEELE.  ESTIMATED LOAD COUNT 680 LOADS OF

3  CLEAN FILL, CLEAN SOIL.

4      OKAY.  HERE'S THE PURPORTED PERMISSION NOTE ITSELF.

5          (DISPLAYED ON SCREEN.)

6      I, MICHAEL SOBRATO, GIVE PERMISSION TO YOU, JIM LUCERO,

7  AND THEN IT GOES ON FROM THERE.  SIGNED MICHAEL SOBRATO.  AND

8  THERE'S JIM LUCERO'S SIGNATURE AS WELL ON THE BOTTOM THERE.

9      THIS IS A COMPLETE FORGERY.  MICHAEL SOBRATO HAS NEVER

10  SEEN THIS NOTE.  IT IS NOT HIS SIGNATURE.

11          (DISPLAYED ON SCREEN.)

12      THERE IS THE REAL SIGNATURE OF MR. SOBRATO.  THERE IS A

13  SCRIBBLE THAT WAS FORGED ON THE PERMISSION NOTE.  THE NOTE

14  ITSELF IS NOT ON SOBRATO STATIONERY.  THERE'S NO DETAILS ABOUT

15  DATES, COSTS, DURATION, ALL THE THINGS IF IT WAS A REAL

16  PERMISSION NOTE THAT YOU WOULD EXPECT TO BE THERE.  FORGETTING

17  THE FACT THAT NOBODY COULD GIVE PERMISSION TO DUMP EXCEPT THE

18  U.S. ARMY CORPS OF ENGINEERS.

19      ANYWAY, THE NOTE WAS A COMPLETE FRAUD, COMPLETE FORGERY

20  SENT BY THE DEFENDANT TO THE SOBRATO CORPORATION.  THESE ARE

21  SERIOUS PEOPLE, THE SOBRATO.  THEY KNEW RIGHT AWAY THAT THIS

22  WAS JUST A COMPLETE LIE.  ANOTHER ONE.

23      SO THE INVESTIGATION BEGAN.  THE FIRST STEP IN IT WAS

24  PHOTO DOCUMENTING THE DAMAGE.  THE INVESTIGATION WHICH HAD

25  BEGUN BY THE NPD WAS TURNED OVER FAIRLY QUICKLY TO THE ALAMEDA

 1    COUNTY D.A.'S OFFICE ENVIRONMENTAL UNIT AND THE ENVIRONMENTAL

 2    PROTECTION AGENCY AND THE FBI.  THE FIRST STEP IN THAT WAS

 3    DOCUMENTING THE DAMAGE.

 4              (DISPLAYED ON SCREEN.)

 5        TO PROPERLY DOCUMENT, THEY HAD TO GET A HELICOPTER IT WAS

 6    SO BIG.  THERE'S THE NORTHERN FIELD THAT WAS DUMPED ON.  YOU

 7    CAN SEE BEYOND IT A THRIVING DUCK POND THERE.  THAT'S A

 8    PERMANENT WATER THAT'S FED BY AN UNDERGROUND AQUIFER WHICH

 9    WE'LL TALK ABOUT MORE LATER ON.

10        ANOTHER SHOT OF THE DUMPING THERE.

11              (DISPLAYED ON SCREEN.)

12        THESE SHOTS WERE TAKEN IN OCTOBER WHEN THE LAND -- THE

13    NORTHERN AREA GOT GREEN AFTER SOME RAIN LATER IN THE YEAR.

14    YOU CAN START TO SEE ALL THE CONSTRUCTION DEBRIS POP OUT.

15    THIS IS A SHOT OF THAT.

16              (DISPLAYED ON SCREEN.)

17        THERE'S AN UPCLOSE SHOT OF THE SOUTHERN AREA AGAIN THAT

18    WAS PHOTO DOCUMENTED DURING THE INVESTIGATION.  YOU CAN SEE A

19    BIG CHUNK OF PLYWOOD STICKING STRAIGHT UP IN THE AIR THERE AS

20    WELL AS A BUNCH OF ROCKS OF CONCRETE AND ASPHALT.

21        DURING THE INVESTIGATION, THE INVESTIGATORS -- BY THE WAY,

22    MR. LUCERO DID DROP OFF A BIG BUNCH OF PULL TAGS TO

23    MR. STEELE.  THE INVESTIGATORS STARTED CALLING THE TRUCKING

24    COMPANIES AND THIS IS A LIST OF TRUCKING COMPANIES THAT DUMPED

25    ON THE LAND.

1                    (DISPLAYED ON SCREEN.)

2       WE TALKED ABOUT THE FACT THAT THIS WAS A CRIME MOTIVATED

3   BY MONEY.  THE FBI DID A FORENSIC AUDIT OF THE CHASE BANK

4   ACCOUNT OF BOTH MR. LUCERO AND MR. OLIVERO, THE FOREMAN.  THE

5   WAY THE BILLING WORKED, MR. OLIVERO WOULD BILL THE TRUCKING

6   COMPANIES AND THEN GIVE CHECKS OR CASH TO MR. LUCERO.  THAT IS

7   THE FBI'S ESTIMATE OF HOW MUCH MONEY WENT TO THE DEFENDANT FOR

8   ABOUT 90 DAYS' WORK WORTH OF WORK.  OKAY.

9       SO THE SECOND PART OF THIS OFFENSE IS THE DUMPING HAD TO

10  OCCUR IN "WATERS OF THE UNITED STATES".

11                   (DISPLAYED ON SCREEN.)

12      THE INITIAL MAPPING BY H.T. HARVEY, WHICH IS RIGHT HERE

13  (INDICATING), SHOWED 247 ACRES OF WETLAND ON THIS PROPERTY.

14  IT'S SHADED THERE IN GREEN.  AND YOU CAN SEE, WHEN YOU

15  SUPERIMPOSE THE RED ONTO THE WETLAND THERE ARE MANY PARTS OF

16  THE WETLAND THAT WERE DUMPED ON.

17                   (DISPLAYED ON SCREEN.)

18      TO ASSESS WHETHER SOMETHING IS A "WATER OF THE UNITED

19  STATES" OR JURISDICTIONAL WETLAND, YOU LOOK AT HYDROLOGY WHICH

20  WE TALKED ABOUT, VEGETATION, SOILS.  BUT HYDROLOGY IS JUST THE

21  MOVEMENT -- THE STUDY OF WATER, HOW WATER MOVES AROUND A SITE.

22      HARVEY IDENTIFIED THESE WAYS THAT WATER MOVES AROUND THE

23  SITE.  THERE'S GROUNDWATER, SURFACE PRECIPITATION, AND SEEP.

24  SOME OF THE WATER ALONG THIS LAND IS -- YOU CAN SEE IT ON TOP

25  OF THE WATER LIKE WE SAW, THE DUCK POND THERE, BUT A LOT OF

1   ACTION, THE HYDROLOGIC ACTION OF THE SITE IS BELOW GROUND.

2                        (DISPLAYED ON SCREEN.)

3       THIS IS A SCHEMATIC OF THE AQUIFER UNDERNEATH NEWARK,

4   UNDERNEATH THE LAND IN QUESTION.  THIS AQUIFER IS A PLACE

5   WHERE SALT WATER FROM THE BAY, THE DARKER COLORED PURPLE HERE

6   MEETS FRESH WATER FROM THE HILLS -- THAT COMES DOWN FROM THE

7   EAST BAY HILLS.  AND THEY KIND OF COLLIDE.

8       AND OF NOTE HERE, THERE'S A SHALLOW WATER ZONE NEAR THE

9   SURFACE.  AND THAT SHALLOW WATER ZONE FEEDS ARTESIAN WELLING

10  UP, ARTESIAN SPRINGS.  ARTESIAN SPRINGS IS JUST LIKE LITERALLY

11  WATER GUSHING OUT OF THE GROUND.  THAT'S HOW CLOSE TO THE BAY

12  THIS IS.

13      IT ALSO FEEDS SEEPS WHICH ARE MORE GRADUAL.  HOW DO WE

14  KNOW WE HAVE AN ARTESIAN SPRING?  YOU WILL SEE IT.  YOU WILL

15  HEAR MORE ABOUT IT.

16                        (DISPLAYED ON SCREEN.)

17      WE HAVE THIS.  THIS IS A PERMANENT DUCK POND.  WE CALL IT

18  DUCK POND, BUT A PERMANENT POND THAT'S FED VIRTUALLY ENTIRELY

19  BY AN UNDERGROUND ARTESIAN SPRING ON THE PROPERTY.

20                        (DISPLAYED ON SCREEN.)

21      DURING THIS CASE YOU ARE GOING TO MEET A GENTLEMAN NAMED

22  MIKE SIRI.  MR. SIRI, I THINK, IS APPROACHING THE AGE OF 70.

23  BUT HIS FAMILY HAS OWNED A PORTION OF THIS LAND SINCE THE

24  '50S.  HE REMEMBERS GOING OUT THERE AS A KID IN THE '50S.

25  HE'S BEEN ON THIS LAND PROBABLY MORE THAN ANYBODY ALIVE.

1    HUNDREDS OF TIMES CERTAINLY.

2        HE DREW THIS MAP OF SEEPS THAT HE KNOWS OF ON THIS

3    PROPERTY FROM EXPERIENCE.

4        I'M GOING TO WALK OVER HERE.

5        HE DREW SEEPS HERE (INDICATING) IN THE SOUTHERN AREA.  HE

6    DREW ANOTHER MAP OF THE SEEPS IN THE NORTHERN AREA, WHICH WE

7    WILL TALK ABOUT.  THESE ARE ALL FROM THE SHALLOW WATER BEARING

8    ZONE WHICH IS A TOP LAYER OF THE AQUIFER THAT WE TALKED ABOUT.

9    RIGHT?

10       HERE'S A PICTURE OF A SEEP COMING TO THE SURFACE OF THIS

11   LAND.

12                       (DISPLAYED ON SCREEN.)

13       PART OF THE SAME SEEP.

14                       (DISPLAYED ON SCREEN.)

15       THIS GREEN VEGETATION IS EVIDENCE OF A SEEP IN THE

16   NORTHERN FILL AREA.

17                       (DISPLAYED ON SCREEN.)

18       NOW, WE'RE TALKING ABOUT WAYS WATER GETS ON THE LAND.  SO

19   WE HAVE THE UNDERGROUND AQUIFER, WE HAVE SEEPS, WE HAVE

20   PRECIPITATION.  YOU ARE GOING TO HEAR A LOT ABOUT

21   PRECIPITATION.  DURING THE SUMMER OF 2014 IT WAS A DRY YEAR.

22   BUT THERE WAS RAIN.  WE'LL TALK ABOUT THAT.  SO THAT'S HOW

23   WATER GETS ON THE LAND.

24       AS PART OF YOUR HYDROLOGIC ASSESSMENT OF THIS LAND, YOU

25   NEED TO KNOW HOW WATER GETS OFF THE LAND AS WELL.  THIS IS A

1    MAP OF THAT.

2                      (DISPLAYED ON SCREEN.)

3        IF I MAY, YOUR HONOR.

4        THE... THIS YELLOW LINE IS TRIBUTARY A, THE BLUE LINE IS

5    TRIBUTARY B, AND THIS LITTLE LINE UP HERE IS TRIBUTARY 1

6    (INDICATING).  WE ARE GOING TO TALK ABOUT THOSE.

7        THIS MAP WAS CREATED BY DR. TERRY HUFFMAN WHO HAS BEEN IN

8    WETLAND SCIENCES FOR 42 YEARS.  HE STARTED HIS CAREER OFF AT

9    U.S. ARMY CORPS OF ENGINEERS BEFORE HE BECAME A CHIEF OF

10   WETLAND SCIENTIST.  HE LITERALLY WROTE THE DEFINITION OF WHAT

11   A WETLAND IS THAT IS STILL USED BY THE EPA AND THE CORPS.

12       THERE IS A THING IN THE WORLD CALLED THE U.S. ARMY CORPS

13   OF ENGINEER'S WETLANDS DELINEATION MANUAL.  IT'S REALLY THE

14   BIBLE OF THIS SCIENCE.  IT'S BASED ON A THREE-PARAMETER

15   APPROACH THAT DR. HUFFMAN INVENTED.  THAT WAS VETTED AND

16   APPROVED BY NATIONAL ACADEMY OF SCIENCES.  HE HAS HAD A LONG

17   LOFTY CAREER AS A WETLAND SCIENTIST.

18       HE ALSO WAS CONVICTED BY MY OFFICE OF A TAX CRIME 20 YEARS

19   AGO.  HE PLED GUILTY.  THAT HAD BEEN HIS MISTAKE, AND WENT ON

20   TO HAVE A VERY PRODUCTIVE CAREER.  I AM SURE YOU'LL HEAR MORE

21   ABOUT THAT.

22       SO DR. HUFFMAN CREATED THIS MAP OF HOW THE WATER MOVES OFF

23   THE LAND.  I WANT TO TALK ABOUT TRIBUTARY 1, IF I MAY.

24                      (DISPLAYED ON SCREEN.)

25       TRIBUTARY 1 GOES FROM THE KIND OF NORTHERN FILL AREA DOWN

OPENING STATEMENT / KEARNEY

1    AROUND THE PICK 'N PULL YARD TOWARDS MOWRY SLOUGH.  THERE'S

2    THE UPPER MOST PORTION, MIDDLE PORTION, LOWER PORTION.

3                    (DISPLAYED ON SCREEN.)

4      AND THE FINAL PORTION WHERE IT GOES INTO THE CULVERT.  YOU

5    CAN SEE THE CULVERT THERE AND INTO MOWRY SLOUGH.  THAT IS ONE

6    WAY THE LAND DRAINS INTO MOWRY SLOUGH THROUGH THAT CULVERT

7    THERE.

8                    (DISPLAYED ON SCREEN.)

9      THIS IS A PICTURE OF THE CULVERT WHICH TAKES WATER OFF THE

10   LAND AND PUTS IT INTO THE SLOUGH.

11       MR. SIRI WILL TELL CAN THAT IN HIS LIFETIME, IN THE SIX OR

12   SEVEN, SIX AND A HALF DECADES HE'S BEEN OUT THERE, IT HAS BEEN

13   A CONTINUAL STRUGGLE TO KEEP THIS LAND DRY, TO GET WATER OFF

14   THE LAND, TRYING TO KEEP THE OCEAN BACK, KEEP THE TIDE BACK.

15   IT'S VERY LOW.  IT INUNDATES VERY QUICKLY.

16       OVER THE YEARS, MR. SIRI TRIED TO FARM THE LAND.  THERE'S

17   BEEN EFFORTS TO FARM THE LAND OVER TIME.  AND IN THAT REGARD,

18   HE ONCE DRILLED A WELL TO FEED THE FARMING.  AND THE WELL, THE

19   AQUIFER WAS SO CHARGED IT ENDED UP OVERFLOWING.  HE HAD TO CAP

20   IT.

21       SO THAT'S HOW WATER GETS OFF THE LAND IN THE NORTHERN

22   AREA.

23                    (DISPLAYED ON SCREEN.)

24       AND THIS IS SOMETHING THAT IS CALLED A TIDEFLEX VALVE.

25   REALLY EVERYBODY CALLS IT A DUCK BILL.  WHEN THE WATER FROM

1    THE NORTHERN SECTION GOES INTO THE SLOUGH, IT GOES FROM THAT

2    CULVERT PIPE THAT WE SAW INTO THIS DUCK BILL INTO THE SLOUGH.

3    I DON'T THINK WE NEED TO PLAY THE WHOLE THING.  SO THAT'S KIND

4    OF HOW THE NORTHERN PART DRAINS INTO THE SLOUGH.

5        THE SOUTHERN PART IS A LITTLE MORE OF A STEP PROCESS.  YOU

6    HAVE THE YELLOW LINE TRIBUTARY A DRAINING INTO TRIBUTARY B AND

7    IT GOES DOWN TO A PUMP.

8        CAN WE SEE THAT PROCESS?

9                    (DISPLAYED ON SCREEN.)

10       YOU WANT A SHOT OF WHAT THE SOUTHERN FILL LOOKED LIKE

11   BEFORE THE ILLEGAL DUMPING?  HERE IT IS.  TRIBUTARY A GOES

12   INTO TRIBUTARY B WHICH RUNS ALONG THE LEVEE.  THIS LEVEE THAT

13   SEPARATES MOWRY SLOUGH FROM THE LAND WAS MANMADE.  AND IT ENDS

14   AT THAT PIPE -- THAT PUMP WHICH THROWS WATER SOMETIMES AT THE

15   RATE OF 3200 GALLONS A MINUTE INTO MOWRY SLOUGH.

16       THERE IS THE OUTFLOW PIPE.  AND NOT AN EASY THING TO

17   PHOTOGRAPH, BUT HERE'S THE OUTFLOW PIPE RUNNING.  THERE'S A

18   HYDROLOGIST THERE NAMED DR. COATS, I THINK, IN THE PHOTOGRAPH

19   WHO IS GOING TO TRY NOT TO FALL INTO THE SLOUGH.

20       I THINK THAT'S GOOD.

21       SO THAT IS THE BASIC HYDROLOGY.  THE -- YOU WILL LEARN A

22   LOT ABOUT WETLANDS DURING THIS CASE, BUT YOU ARE ALSO GOING TO

23   LEARN THAT HERE IN THE WEST, WHICH IS CALLED THE ARID WEST BY

24   THE CORPS, THEY ARE SEASONAL.  THEY POND UP LIKE HERE IN THE

25   WINTERTIME AND THEY'RE DRY IN THE SUMMERTIME.  THEY DON'T

OPENING STATEMENT / KEARNEY

1    DISAPPEAR BECAUSE OF THE DRYNESS.  THEY ARE PERENNIAL, THEY

2    ARE THERE FOR DECADES.  THEY CAN GO DORMANT, THEY CAN GET

3    RECHARGED WITH A LITTLE WATER, AND COME BACK AGAIN.

4        THE LAST THING I WANT TO TALK ABOUT, LADIES AND GENTLEMEN,

5    BEFORE I SIT DOWN, IS THE CONNECTION OF THIS LAND TO MOWRY

6    SLOUGH.  WHAT WE CALL HERE, A SIGNIFICANT NEXUS OR SIGNIFICANT

7    CONNECTION.

8        PART OF YOUR ANALYSIS, YOU ARE GOING TO HAVE TO DECIDE,

9    DOES THE WETLAND AND THE TRIBUTARY IN THE NORTH THERE

10   CONTRIBUTE OR AFFECT SIGNIFICANTLY THE CHEMICAL, BIOLOGICAL,

11   OR PHYSICAL INTEGRITY OF MOWRY SLOUGH.  THAT'S ONE OF THE

12   THINGS YOU'LL DECIDE.  AND THE ANSWER IS IT DOES.

13       PHYSICALLY WETLANDS, AS WE TALKED ABOUT, THEY TRAP FLOOD

14   WATERS, TRAP SEDIMENTATION.  CHEMICALLY THEY FILTER OUT

15   IMPURITIES BEFORE THEY GET TO THE BAY.  THE WETLAND VEGETATION

16   PERFORMS A FILTERING PROCESS.

17       BIOLOGICALLY, THE DECAYING WETLAND VEGETATION SENDS CARBON

18   INTO THE SLOUGH, WHICH AS WE ARE ALL CARBON BEINGS, REALLY

19   SUPPORTS THE AQUATIC LIFE, THE AQUATIC FOOD CHAIN.  ALL LIVING

20   ORGANISMS NEED IT.

21       AND ANOTHER PIECE OF BIOLOGY IS BIRDS.

22                (DISPLAYED ON SCREEN.)

23       BIRDS -- INCIDENTALLY THIS IS -- I TALKED ABOUT THE FACT

24   THAT WETLANDS ARE SEASONAL.  WHEN THE DUMPING OCCURRED, IT WAS

25   IN A DRYER PORTION.  133 DAYS LATER THIS IS WHAT THE NORTHERN

1    FILL AREA LOOKED LIKE IN JANUARY, 2015.  RIGHT HERE THERE'S --

2    OBVIOUSLY IT WAS A LOT HIGHER THAN NORMAL AND SOME OF THE

3    VEGETATION WAS DESTROYED, BUT THERE ARE DUCKS STILL SWIMMING

4    ON THE LAND FOUR MONTHS LATER.

5        ANYWAY, THE -- AND FOUR MONTHS LATER THIS IS WHAT THE

6    CULVERT LOOKED LIKE, THE LAND DRAINING INTO THE SLOUGH.  AND

7    THIS IS WHAT TRIBUTARY A LOOKED LIKE AS IT WENT INTO TRIBUTARY

8    B.  AND YOU CAN SEE A LITTLE BIT OF THE SOUTHERN FILL AREA

9    THERE WITH WATER PONDING ON IT.

10       YOU WILL LEARN ABOUT BIRD HABITAT AND WETLANDS, THE

11   BIOLOGY THAT THESE WETLANDS PERFORMED THAT AFFECTS THE SLOUGH.

12   YOU WILL LEARN THAT SHORE BIRDS KIND OF HAVE A -- THEY DODGE

13   BACK AND FORTH.  WHEN THE TIDE IS HIGH IN THE SLOUGH, THEY FLY

14   OVER TO THE LAND.

15                    (DISPLAYED ON SCREEN.)

16       THIS IS A BUNCH OF DOWITCHERS AND AVOCETS IN THE DUCK POND

17   IN THE SOUTHERN SECTION OF THE PROPERTY.  WHEN THE TIDE GOES

18   DOWN AND THE MUDFLATS ARE EXPOSED IN MOWRY SLOUGH AND ALL THAT

19   GREAT INVERTEBRATE MATTER THAT THEY CAN GO FEED ON IS EXPOSED,

20   THE BIRDS FLY BACK OVER; DIRECT BIOLOGICAL IMPACT ON THE

21   SLOUGH.

22       SO THAT'S THE CASE WE ARE GOING TO PRESENT TO YOU.  BASED

23   ON THAT CONDUCT, WE CHARGE THE DEFENDANT WITH THREE VIOLATIONS

24   OF THE CLEAN WATER ACT FOR DUMPING IN THE WETLAND IN THE

25   NORTH, WETLAND IN THE SOUTH, AND THE TRIBUTARY AREA IN THE

OPENING STATEMENT - SMOCK

1     NORTH AS WELL.

2         AT THE CONCLUSION OF THIS CASE, WE'RE GOING TO ASK THAT

3     YOU RETURN VERDICTS OF GUILTY ON ALL THOSE CRIMES.

4         THANKS VERY MUCH.

5              **THE COURT:**  ALL RIGHT.

6         MR. SMOCK AND MS. HANSEN, DOES THE DEFENSE WISH TO PRESENT

7     AN OPENING STATEMENT?

8              **MR. SMOCK:**  YES, YOUR HONOR.  THANK YOU.

9              **THE COURT:**  SO, LADIES AND GENTLEMEN, IT WILL TAKE A

10    FEW MINUTES TO SET UP.  WHY DON'T WE LET EVERYONE STAND UP TO

11    STRETCH AT THIS POINT.

12                   (PAUSE IN THE PROCEEDINGS.)

13             **THE COURT:**  YOU MAY PROCEED, MR. SMOCK, WHENEVER

14    YOU'RE READY.

15             **MR. SMOCK:**  THANK YOU.

16                      **OPENING STATEMENT**

17             **MR. SMOCK:**  THE GOVERNMENT SAYS THAT THE

18    PRIVATELY-OWNED LAND WHERE MR. LUCERO DEPOSITED FILL IN 2014

19    IS ACTUALLY A "WATER OF THE UNITED STATES".  THIS IS A CASE OF

20    OVERREACHING BY THESE FEDERAL PROSECUTORS.

21        TO MAKE THAT LEAP TO SAY THAT THIS LAND IS ACTUALLY A

22    "WATER OF THE UNITED STATES" REQUIRES THEM TO CHANGE

23    DETERMINATIONS ABOUT THIS SITE THAT HAD BEEN MADE BY EXPERTS

24    OVER MORE THAN A DECADE.  IT REQUIRES THEM TO RELY ON THE

25    TESTIMONY OF A PAID WITNESS WITH A HISTORY OF DISHONESTY.  HE

1    WENT TO THAT SITE MORE THAN TWO YEARS AFTER THE CONDUCT IN

2    THIS CASE, AT A TIME WHEN THE CONDITIONS WERE MUCH DIFFERENT.

3    AND HE CAME UP WITH WHOLE NEW WAYS OF DESCRIBING THIS AREA TO

4    FIT THE GOVERNMENT'S CASE.

5        BUT THE EVIDENCE WILL SHOW THAT THE GOVERNMENT CAN'T

6    REWRITE HISTORY.  THEY CAN'T CHANGE THE WAY THIS PROPERTY WAS

7    IN THE SUMMER OF 2014.  AND THEY CAN'T CONVINCE YOU BEYOND A

8    REASONABLE DOUBT THAT WHAT MIGHT BE A TRESPASSING CASE IS

9    ACTUALLY A FELONY FEDERAL CLEAN WATER ACT VIOLATION.

10       MY NAME IS NED SMOCK, AND TOGETHER WITH ANGELA HANSEN AND

11   JOE WANZALA WE REPRESENT JAMES LUCERO.

12       I WANT TO START THIS MORNING BY GIVING YOU A LITTLE BIT

13   MORE OF AN OVERVIEW OF THE AREA THAT WE ARE GOING TO BE

14   TALKING ABOUT DURING THIS TRIAL.  YOU HEARD THAT IT'S IN

15   NEWARK, WHICH IS ABOUT 25 MILES OR SO SOUTH OF HERE.  I AM

16   GOING TO SHOW YOU A PICTURE OF AN OVERVIEW OF THE SITE, IF MY

17   TECHNOLOGY WORKS.

18                      (PAUSE IN THE PROCEEDINGS.)

19       BEAR WITH ME.

20                      (DISPLAYED ON SCREEN.)

21       THERE WE GO.  SORRY ABOUT THAT.

22       SO WHAT WE HAVE HERE IS AN OVERVIEW OF THE SITE.  AND I

23   WANT TO GIVE YOU A SENSE OF IT.  AREA 4, WHICH IS WHAT WE'VE

24   TALKED ABOUT, IS OUTLINED IN YELLOW ON THE SCREEN.

25       AREA 4 IS SEPARATED FROM THE SAN FRANCISCO BAY BY THOSE

1    RED SALT WATER EVAPORATION PONDS THAT ARE OWNED BY THE CARGILL

2    SALT COMPANY.  YOU'LL SEE -- YOU'VE HEARD REFERENCE TO MOWRY

3    SLOUGH.  MOWRY SLOUGH WINDS PASSED THOSE SALT WATER

4    EVAPORATION PONDS, WHICH ARE RED.  YOU WILL RECOGNIZE THEM

5    BECAUSE YOU SEE THEM WHEN YOU MAYBE CROSSING THE DUMBARTON

6    BRIDGE OR FLYING INTO THE SAN FRANCISCO BAY AREA.

7        MOWRY SLOUGH WINDS THROUGH THOSE, AND ULTIMATELY ENDS NEXT

8    TO AREA 4 WHEN IT RUNS INTO MOWRY AVENUE WHICH YOU ALSO SEE ON

9    THAT MAP.

10       ZOOMING IN NOW ON AREA 4, I WANT TO GIVE YOU MORE OF THE

11   LAY OF THE LAND OF THE AREA WE ARE TALKING ABOUT HERE.

12       I PUT A RED DOT ON THE GENERAL AREA WHERE FILL WAS PLACED.

13   NOW, I DON'T HAVE FANCY PLOTTING SOFTWARE AND I WANT TO GIVE

14   YOU A SENSE, AS MR. KEARNEY DID, OF WHERE THIS FILL WAS, SO I

15   AM GOING TO PUT THIS MAP UP WHICH PLOTS EXACTLY WHERE IT WAS.

16       I PUT THE RED DOTS THERE JUST TO GIVE YOU A SENSE SO

17   YOU'RE CALIBRATING SO TO SPEAK.

18       TO THE LEFT HERE IS A PICK 'N PULL.  WHAT THAT IS, IS AN

19   AUTO DISMANTLING LOT.  IT'S A VAST CONCRETE PARKING LOT FILLED

20   WITH DISCARDED CARS THAT ARE BEING SOLD FOR SALVAGE.

21       BELOW IT IS ANOTHER CONCRETE LOT THAT HOUSES A BUSINESS

22   THAT'S REFERRED TO INVARIABLY AS A WOOD DEBRIS LOT OR A WOOD

23   RECYCLING LOT.

24       BELOW IT AND ACROSS MOWRY SLOUGH IS SOMETHING THAT'S

25   REFERRED TO AS A RECYCLING AREA OWNED BY THE ALAMEDA COUNTY

1   FLOOD CONTROL DISTRICT WHERE THEY DEPOSIT SEDIMENT AND SILT

2   THAT'S BEEN DREDGED AND DRIED.

3       TO THE RIGHT HERE IS A LANDFILL OWNED BY A WASTE

4   MANAGEMENT COMPANY.

5       ABOVE AND TO THE WEST OF AREA 4 IS AN INDUSTRIAL PARK.

6       RUNNING THROUGH THE PROPERTY OF AREA 4 IS WHAT'S REFERRED

7   TO AS A FLOOD CONTROL CHANNEL.  THAT'S A CHANNEL THAT BRINGS

8   RUNOFF WATER FROM NEWARK ITSELF PASSED AREA 4 AND DIRECTLY

9   INTO MOWRY SLOUGH.

10      THAT FLOOD CONTROL CHANNEL WAS SEPARATED OR IS SEPARATED

11  FROM EITHER SIDE OF AREA 4 BY LEVEES ON EACH SIDE.  MR. LUCERO

12  DID NOT DEPOSIT FILL INTO THIS FLOOD CONTROL CHANNEL.

13      HERE YOU SEE THE DUCK PONDS THAT MR. KEARNEY REFERENCED.

14  IT'S AN AREA THAT HAD BEEN RECONTOURED MANY YEARS AGO AND WAS

15  USED BY DUCK CLUBS.

16      FINALLY YOU SEE THE END OF MOWRY SLOUGH HERE, COMING

17  PASSED THE PROPERTY AND ENDING AT MOWRY AVENUE WHICH IS A

18  PUBLIC ROAD.

19      YOU'RE GOING TO HEAR IN THIS CASE THIS IS A VERY

20  COMPLICATED SITE.  IT'S COMPLICATED FOR A NUMBER OF REASONS.

21  ONE OF THEM IS THAT PRECIPITATION IS VARIABLE.  ANOTHER IS

22  THAT THERE HAVE BEEN A TREMENDOUS NUMBER OF MAN MADE CHANGES

23  TO THIS SITE.  THERE ARE LEVEES, THERE ARE CULVERTS, THERE'S A

24  PUMP THAT YOU SAW A PICTURE OF ALREADY.

25      YOU'LL ALSO HEAR THAT MUCH OF THIS LAND HAS BEEN FARMED

OPENING STATEMENT - SMOCK

1    FOR OVER A HUNDRED YEARS.  IT'S BEEN TILLED AND IT'S BEEN

2    DISKED OVER MORE THAN A HUNDRED YEARS.  PLANTS AND OTHER

3    THINGS HAVE BEEN HARVEST OFF OF IT.

4        THIS LAND -- MUCH OF THIS LAND LOOKS LIKE FARM LAND

5    BECAUSE THAT'S, IN FACT, WHAT IT'S BEEN USED FOR OVER THE

6    YEARS.

7        NO ONE CLAIMS THAT THIS ENTIRE PROPERTY IS PROTECTED BY

8    THE CLEAN WATER ACT.  EVEN THE GOVERNMENT ACKNOWLEDGES THAT

9    PARTS OF THIS PROPERTY ARE NOT PROTECTED BY THE CLEAN WATER

10   ACT.

11       YOU'LL HEAR EVIDENCE IN THIS CASE THAT FROM JULY THROUGH

12   SEPTEMBER OF 2014, MR. LUCERO AND THE TRUCKERS THAT HE

13   COORDINATED DID DEPOSIT FILL ON BOTH OF THESE AREAS.  THEY

14   DUMPED IT AND THEY SPREAD IT USING A BULLDOZER.

15                    (DISPLAYED ON SCREEN.)

16       THIS IS A PICTURE OF THE FILL THAT HE IS RESPONSIBLE FOR

17   PUTTING IN THE NORTH AREA OF THE PROPERTY.  TO GIVE YOU A

18   SENSE OF IT, THIS IS AN AERIAL PHOTO TAKEN IN THIS DIRECTION

19   (INDICATING) LOOKING AT WHAT I IMAGINE IS NORTH BASED ON THIS

20   KEY.

21                    (DISPLAYED ON SCREEN.)

22       THIS IS TAKEN FROM THE SAME DIRECTION BUT A LITTLE BIT

23   CLOSER TO THE MOWRY SLOUGH.  I WANT TO POINT OUT A FEW THINGS

24   ABOUT THIS PICTURE.

25       THIS ARROW POINTS TO THE EDGE OF WHERE THE FILL WAS

1    DEPOSITED (INDICATING).  THIS PILE OF DEBRIS IS UNRELATED TO

2    ANYTHING MR. LUCERO IS ALLEGED TO HAVE DONE.  THAT'S RELATED

3    TO THE WOOD AND DEBRIS RECYCLING LOT THAT I DESCRIBED.

4        THIS ARROW POINTS TO THE PLACE THAT YOU WILL HEAR THE

5    GOVERNMENT SAY IS WHAT THEY CALL TRIBUTARY 1 THAT THEY SAY

6    BRINGS WATER DOWN INTO MOWRY SLOUGH THROUGH A CULVERT HERE.

7    THAT'S TRIBUTARY 1.

8        THIS IS WHERE THE FLOOD WATER CONTROL CHANNEL THAT I

9    MENTIONED GOES DIRECTLY INTO MOWRY SLOUGH UNDER A BRIDGE.

10                    (DISPLAYED ON SCREEN.)

11       THIS IS ANOTHER PICTURE OF THE NORTHERN AREA, AND THIS IS,

12   AGAIN, THIS IS LOOKING IN THIS DIRECTION (INDICATING) WEST

13   TOWARDS THE PICK 'N PULL.  THIS IS A MORE CLOSE-UP VERSION

14   LOOKING IN THIS DIRECTION (INDICATING) AND I WANT TO POINT OUT

15   A FEW THINGS ABOUT THIS PICTURE.

16       THIS IS THE EDGE OF THE FILL DEPOSITED BY MR. LUCERO.

17   THIS IS WHAT AMOUNTS TO REALLY A CORRUGATED METAL FENCE IN

18   BETWEEN THE AUTO DISMANTLING YARD AND THE AREA THAT WE ARE

19   TALKING ABOUT HERE.  THIS IS WHAT WE ARE REFERRING TO AS A

20   RAIN WATER DETENTION POND ASSOCIATED WITH THE PICK 'N PULL NOT

21   COVERED BY THE CLEAN WATER ACT.

22       AGAIN, THIS IS THE REFUSE PILES THAT ARE UNRELATED TO

23   MR. LUCERO.

24                    (DISPLAYED ON SCREEN.)

25       THIS IS A PICTURE OF THE SOUTHERN AREA WHERE DIRT WAS

OPENING STATEMENT - SMOCK

1    DEPOSITED -- WHERE FILL WAS DEPOSITED.  THIS PICTURE IS

2    LOOKING IN THIS DIRECTION (INDICATING) TOWARDS AN ELEVATED

3    BERM WHICH GOES ACROSS THE SOUTHERN AREA.

4        THIS PICTURE INDICATES THE BEGINNING OF THE FILL AREA JUST

5    ABOUT HERE (INDICATING).

6        I WANT TO MAKE SOMETHING ABSOLUTELY CLEAR TO YOU.  WE ARE

7    NOT DENYING THAT MR. LUCERO IS RESPONSIBLE FOR DEPOSITING THIS

8    FILL.  WE ARE NOT CLAIMING THAT HE HAD PERMISSION TO DO IT.

9    WE ARE NOT SAYING IT WAS OKAY TO DO IT EITHER.

10       WE ARE HERE TO TELL YOU THAT THE GOVERNMENT CANNOT PROVE

11   THAT WHAT THAT AMOUNTED TO WAS ACTUALLY A VIOLATION OF THE

12   CLEAN WATER ACT.  THAT'S WHY WE ARE HERE.

13       I FORGOT TO ADD SOMETHING ABOUT THIS PICTURE.  THIS ARROW

14   IS POINTING TO WHAT THE GOVERNMENT REFERS TO AS TRIBUTARY A.

15   THE GOVERNMENT'S CASE IS BASED ON AN ARGUMENT THAT THERE IS

16   WHAT THEY REFER TO AS A TRIBUTARY THAT BRINGS WATER FROM

17   BEHIND THE AREA WHERE FILL WAS DEPOSITED ALONG THIS ELEVATED

18   BERM TO ANOTHER TRIBUTARY THAT THEY CALL TRIBUTARY B, AND THAT

19   THAT'S A BASIS FOR THEIR CHARGES IN THIS CASE.

20       SO WHAT WILL THE GOVERNMENT HAVE TO PROVE TO PROVE A CASE

21   OF THE CLEAN WATER ACT VIOLATION IN THIS CASE?  WELL, THE

22   GOVERNMENT IS GOING TO HAVE TO PROVE THAT MR. LUCERO

23   DISCHARGED FILL INTO A "WATER OF THE UNITED STATES".  AND THEY

24   HAVE CHARGED THREE SEPARATE FELONIES BASED ON HIS PLACEMENT OF

25   FILL ON THESE TWO AREAS.

1      NOW YOU'RE GOING TO HEAR THAT AREA 4 MAKES UP ABOUT

2   634 ACRES.  MR. KEARNEY REFERRED TO SOMETHING LIKE 22 ACRES

3   HAVING FILL ON THEM.

4      THE CHARGES ARE THAT 13 OF THOSE ACRES ARE WHAT THEY SAY

5   WERE JURISDICTIONAL OR AREAS THAT WERE, IN FACT, COVERED BY

6   THE CLEAN WATER ACT IN THIS CASE.  AND WHAT YOU'RE GOING TO BE

7   ASKED TO DECIDE IS WHETHER THE GOVERNMENT CAN PROVE TO YOU

8   BEYOND A REASONABLE DOUBT THAT, IN FACT, THOSE AREAS WERE

9   "WATERS OF THE UNITED STATES".  WE SUBMIT THAT THEY WILL NOT

10  BE ABLE TO DO THAT.

11     NOW, THE GOVERNMENT'S THEORY ABOUT WHY THIS LAND WAS

12  COVERED BY THE CLEAN WATER ACT RESTS ON A MAN NAMED TERRY

13  HUFFMAN WHO THE GOVERNMENT HIRED LAST YEAR.  THEY'LL ARGUE

14  THAT THIS LAND IS ACTUALLY A "WATER OF THE UNITED STATES"

15  BASED ON THESE TRIBUTARIES THAT YOU'VE HEARD ABOUT THAT

16  DR. HUFFMAN HAS SAID EXIST ON THIS PROPERTY.

17     THIS IS THE MAP THAT DR. HUFFMAN PRODUCED FOR THE

18  GOVERNMENT IN THIS CASE.

19                 (DISPLAYED ON SCREEN.)

20     YOU SAW IT A MOMENT AGO.  YOU HEARD THAT WHAT DR. HUFFMAN

21  SAYS IS THAT THERE IS A TRIBUTARY HERE IN THE NORTHERN AREA

22  WHICH BEGINS IN TWO PLACES PASSED THE CONCRETE LOT THAT I'VE

23  DESCRIBED AND CONVERGES AT THE TIP OF THIS CONCRETE LOT, AND

24  GOES TO MOWRY SLOUGH.

25     YOU'LL HEAR THAT DR. HUFFMAN SAYS THAT THERE'S ANOTHER

OPENING STATEMENT - SMOCK

1   TRIBUTARY THAT I SHOWED YOU ALONG A BERM THAT HE CALLS

2   TRIBUTARY A, WHICH HE'S ESSENTIALLY DRAWN ON THIS MAP WITH A

3   HIGHLIGHTER THAT HE SAYS JOINS UP WITH SOMETHING HE CALLS

4   TRIBUTARY B AND GOES INTO MOWRY SLOUGH.

5       NOW YOU'RE GOING TO LEARN A LOT ABOUT THIS PROPERTY IN THE

6   COMING WEEKS.  ONE OF THE THINGS THAT YOU ARE GOING TO LEARN

7   IS THAT THERE'S A PROPERTY DEVELOPMENT COMPANY CALLED THE

8   NEWARK GROUP WHICH IS PLANNING TO BUILD A RESIDENTIAL

9   COMMUNITY AND A GOLF COURSE ON THIS VERY PROPERTY.

10      AND YOU WILL HEAR THAT PART OF THEIR PLAN IS TO ELEVATE,

11  RAISE THE ELEVATION OF THIS SITE BY SEVERAL FEET BY DEPOSITING

12  FILL.  AND YOU'LL HEAR THAT PART OF THEIR PLAN INVOLVES

13  GETTING PERMITS.  AND PART OF THEIR PLAN INVOLVES GOING AND

14  SPEAKING TO EXPERTS ABOUT THE NATURE OF THIS PROPERTY.

15      AND WHAT THAT MEANS IS THAT THIS PROPERTY HAS BEEN STUDIED

16  HEAVILY OVER THE LAST DECADE.  YOU WILL HEAR THAT THERE IS A

17  COMPANY CALLED H.T. HARVEY WHICH HAS PREPARED REPORTS ABOUT

18  THIS PROPERTY AND STUDIED IT.

19      DR. BOURSIER IS A WITNESS WHO YOU WILL HEAR FROM WHO SPENT

20  DAYS AND DAYS AT THIS SITE AND HUNDREDS OF HOURS STUDYING IT.

21  YOU WILL HEAR THAT AFTER ALL OF THAT STUDYING H.T. HARVEY CAME

22  UP WITH A MAP OF THIS PROPERTY BACK IN 2007.  HERE IT IS.

23                      (DISPLAYED ON SCREEN.)

24      THIS IS VERY IMPORTANT TO THE GOVERNMENT'S CASE, AND I

25  WANT TO POINT IT OUT HERE.

1    AFTER ALL THAT STUDY, H.T. HARVEY LOOKED AT THAT NORTH

2    AREA AND SAID THAT'S AN AQUATIC AREA.  THEY DIDN'T IDENTIFY

3    ANYTHING CALLED TRIBUTARY 1 IN THAT AREA.  THE SOUTHERN AREA,

4    H.T. HARVEY DOESN'T IDENTIFY ANY TRIBUTARY IN THE AREA THAT

5    DR. HUFFMAN SAYS IS TRIBUTARY A.

6    YOU WILL ALSO LEARN THAT THE ARMY CORPS OF ENGINEERS WENT

7    TO THIS SITE.  THEY LOOKED AT THE H.T. HARVEY STUDY, AND THEY

8    ADOPTED IT WITH ONLY MINOR CHANGES.  THEY PRODUCED WHAT'S

9    REFERRED TO AS A JURISDICTIONAL MAP.  HERE IT IS.

10                   (DISPLAYED ON SCREEN.)

11   AND YOU WILL SEE IT THROUGHOUT THIS TRIAL.

12   IT HAS THE SEAL OF THE ARMY CORPS OF ENGINEERS ON IT.

13   YOU WILL HEAR THAT IN THE 2013 AND 2014, THE ARMY CORPS OF

14   ENGINEERS WENT BACK TO THE SITE AND LOOKED AT IT AND

15   RE-VERIFIED THIS MAP.  THIS MAP WAS THE OPERATIVE MAP AT THE

16   TIME OF THE CONDUCT IN THIS CASE.

17   AND YOU'LL SEE THAT THEY DIDN'T FIND A TRIBUTARY 1 OR

18   TRIBUTARY A, UNLIKE DR. HUFFMAN.

19   2014, H.T. HARVEY WENT TO THE SITE AGAIN AFTER THE FILL

20   AND PRODUCED ANOTHER MAP.

21                   (DISPLAYED ON SCREEN.)

22   NO TRIBUTARY 1.  NO TRIBUTARY A.

23   2016, THEY GO BACK TO THE SITE.  ANOTHER MAP IS PRODUCED.

24                   (DISPLAYED ON SCREEN.)

25   NO TRIBUTARY 1.  NO TRIBUTARY A.

OPENING STATEMENT - SMOCK

1        SO WHY DOES THIS ALL MATTER?  THIS ALL MATTERS, THESE
2    TRIBUTARIES MATTER BECAUSE THIS PREVIOUS MAPPING, THESE
3    PREVIOUS FINDINGS BY PEOPLE WHO WEREN'T PAID BY THE GOVERNMENT
4    UNDERMINE THE GOVERNMENT'S CASE.
5        WHAT THAT EVIDENCE WILL SHOW IS THAT IF THERE'S NO
6    TRIBUTARY 1 IN THE NORTHERN AREA, THE GOVERNMENT WILL NOT BE
7    ABLE TO PROVE ITS CASE AS TO COUNT ONE AND COUNT TWO.
8        THE EVIDENCE WILL ALSO SHOW THAT IF THE GOVERNMENT IS NOT
9    ABLE TO PROVE THAT THIS SO-CALLED TRIBUTARY A EXISTS IN THE
10   SOUTHERN AREA, THEY WON'T BE ABLE TO PROVE COUNT THREE EITHER.
11       YOU WILL ALSO SEE AS THIS TRIAL PROGRESSES THAT BECAUSE OF
12   THIS PROBLEM THEY HAVE ABOUT DIFFERING OPINIONS, THAT THE
13   GOVERNMENT HAS BROUGHT IN THESE PEOPLE WHO EVALUATED THE
14   PROPERTY IN THE PAST AND TRIED TO GET THEM TO CHANGE THEIR
15   OPINIONS TO FALL IN LINE WITH DR. HUFFMAN TO BOLSTER THEIR
16   CASE.
17       SO WHO IS TERRY HUFFMAN?  WHO IS THIS MAN WHO THE
18   GOVERNMENT HAS HIRED TO CHANGE ESTABLISHED MAPPING AND TO
19   PROVE THEIR CASE?
20       YOU ARE GOING TO LEARN A LOT ABOUT TERRY HUFFMAN IN THIS
21   CASE.  THE FIRST THING YOU'RE GOING TO LEARN ABOUT TERRY
22   HUFFMAN IS THAT HE AND HIS FIRM HAVE BILLED THE GOVERNMENT
23   MORE THAN A HUNDRED AND FIFTY THOUSAND DOLLARS FOR THEIR WORK.
24   MORE THAN 11,000 OF THAT IS FOR WORK DONE BY MR. HUFFMAN'S OWN
25   SON WHO HAS NO RELEVANT EXPERIENCE IN THIS FIELD AND NO

OPENING STATEMENT - SMOCK

1    RELEVANT EDUCATION.

2        AND WE'LL ASK YOU AT THE CLOSE OF EVIDENCE WHETHER THAT

3    MAKES MR. HUFFMAN A CREDIBLE, RELIABLE WITNESS WHO IS

4    UNBIASED.

5        YOU HEARD MR. KEARNEY REFERENCE THIS, AND IT'S VERY

6    IMPORTANT.  THE SECOND THING YOU'RE GOING TO LEARN IS THAT THE

7    GOVERNMENT IS PAYING THIS MAN SO HANDSOMELY DESPITE THE FACT

8    THAT HE'S BEEN CONVICTED OF A CRIME OF DISHONESTY IN THIS VERY

9    DISTRICT.  MR. HUFFMAN PLED GUILTY TO CHEATING ON HIS TAXES

10   AND HE PLED GUILTY ON BEHALF OF HIS OWN COMPANY TO A FELONY

11   INVOLVING CHEATING ON TAXES.  AND YOU HEARD WHO PROSECUTED HIM

12   IN THAT CASE; THIS UNITED STATES ATTORNEY'S OFFICE DID.

13   YOU'LL LEARN MORE ABOUT THAT.

14       YOU'RE LEARN THAT AT THE END OF LAST YEAR AND EARLY -- AT

15   THE END OF 2016 AND EARLY 2017, THE U.S. ATTORNEY'S OFFICE MET

16   WITH DR. HUFFMAN TO DECIDE WHETHER OR NOT THEY WERE GOING TO

17   HIRE HIM.  ANY REASONABLE PERSON KNOWS THAT WHEN THERE'S A

18   DECISION BEING MADE ABOUT WHETHER A PERSON IS GOING TO BE

19   HIRED TO TESTIFY ON BEHALF OF THE UNITED STATES GOVERNMENT AND

20   THEIR CREDIBILITY WILL BE IN QUESTION, THEIR HONESTY WILL BE

21   IN QUESTION, WHETHER THEY HAVE A CONVICTION INVOLVING

22   DISHONESTY SHOULD COME UP.  HE SHOULD TELL THEM ABOUT THAT.

23       AND WHAT THE EVIDENCE WILL SHOW IS THAT DURING THAT

24   MEETING IN WHICH IT WAS BEING DECIDED THAT HE WOULD BECOME

25   THEIR ESSENTIALLY EMPLOYEE IN THIS CASE, HE DIDN'T TELL THEM

1    ABOUT THAT CONVICTION.  AND WHAT WE'LL ASK YOU AS THIS

2    EVIDENCE COMES IN IS WHETHER THAT MAKES HIM A TRUSTWORTHY,

3    HONEST WITNESS UPON WHOM YOU CAN RELY.

4        THERE'S MORE.  THE EVIDENCE WILL ALSO SHOW THAT

5    DR. HUFFMAN ULTIMATELY DID DISCLOSE TO THEM THAT CONVICTION.

6    THE EVIDENCE WILL SHOW THAT ABOUT THREE MONTHS LATER,

7    DR. HUFFMAN SPOKE TO THE GOVERNMENT AND TOLD THEM, OH, YEAH, I

8    SHOULD PROBABLY TELL YOU I DO HAVE THIS CONVICTION.

9        AND WHAT YOU WILL SEE IS THE GOVERNMENT HAS CARRIED ON

10   WITH DR. HUFFMAN AFTER THAT.  THEY CONTINUE TO PAY DR. HUFFMAN

11   TAXPAYER MONEY DESPITE THE FACT THAT THEY KNOW THAT THEIR OWN

12   OFFICE PROSECUTED AND CONVICTED HIM FOR CHEATING ON HIS OWN

13   TAXES.  AND WE'LL ASK YOU AT THE CLOSE OF EVIDENCE WHAT THAT

14   SAYS ABOUT THE STRENGTH AND RELIABILITY OF THE GOVERNMENT'S

15   CASE.

16       THE THIRD THING YOU ARE GOING TO LEARN ABOUT DR. HUFFMAN

17   IS THAT HE WENT TO THIS PROPERTY TO DO HIS STUDIES OF IT MORE

18   THAN TWO YEARS AFTER THE CONDUCT IN THIS CASE.  AND REMEMBER,

19   THE QUESTION FOR YOU IN THIS CASE IS GOING TO BE WHETHER THESE

20   13 ACRES QUALIFIED AS "WATERS OF THE UNITED STATES" IN THE

21   SUMMER OF 2014 WHEN THIS CONDUCT OCCURRED.  AND THE TIMING OF

22   HIS VISITS AND HIS STUDY OF THIS PROPERTY IS IMPORTANT BECAUSE

23   WE KNOW ABOUT THE DIFFERENCES AND WHAT WAS GOING ON AND WHAT

24   THE ENVIRONMENT WAS LIKE IN THESE TWO DIFFERENT TIMES.

25       IN THE SUMMER OF 2014, WE WERE IN A SERIOUS DROUGHT.  WE

OPENING STATEMENT - SMOCK

1    ALL REMEMBER WE WERE BEING ASKED TO NOT SHOWER AS LONG, NOT

2    WATER OUR LAWNS.  WE REMEMBER PICTURES OF RESERVOIRS DRYING

3    OUT.  IN FACT, WHAT YOU WILL HEAR IS THAT THE AREA INVOLVED

4    HERE WAS UNDER A CONDITION REFERRED TO AS EXCEPTIONAL DROUGHT.

5    AND YOU WILL HEAR THAT THE FACT OF THAT DROUGHT AND THE LACK

6    OF PRECIPITATION IMPACTED THIS PROPERTY IN THE WAY THAT IT

7    ACTED AND THE WAY THAT IT LOOKED.

8        NOW, LET'S TALK ABOUT WHEN DR. HUFFMAN DID HIS STUDIES AND

9    WHEN YOU WILL SEE MUCH OF THE PHOTOS THAT YOU HAVE BEEN SHOWN

10   AND CONTINUE TO BE SHOWN IN THIS CASE.

11       WINTER OF 2017 WAS JUST ABOUT THE OPPOSITE.  WE REMEMBER;

12   ALL OF A SUDDEN RAINFALL WAY ABOVE NORMAL.  RESERVOIRS THAT

13   HAD BEEN DRYING OUT SUDDENLY WE'RE SEEING OVERTOPPING.  THE

14   OROVILLE DAM ALMOST COLLAPSED.  SUDDENLY WE ARE GOING FROM

15   EXCEPTIONAL DROUGHT IN NEWARK TO NO DROUGHT AT ALL.  YOU WILL

16   SEE AND HEAR THAT THIS PROPERTY LOOKED AND BEHAVED MUCH

17   DIFFERENTLY AS A RESULT OF THAT CHANGE.

18       AND AS YOU'RE SEEING PICTURES AND VIDEOS AND HEARING

19   EVIDENCE IN THIS CASE, I ALWAYS WANT YOU TO HAVE IN THE BACK

20   OF YOUR MIND; WHEN WAS THIS TAKEN?  WHEN WERE THESE PICTURES

21   AND VIDEOS TAKEN?  WERE THEY TAKEN CLOSE TO THE TIME OF THE

22   CONDUCT IN THIS CASE OR WERE THEY TAKEN AT A TIME WHEN

23   RAINFALL AMOUNTS WERE WAY ABOVE NORMAL?

24       SO WITH ALL THIS, THE PAYMENTS TO DR. HUFFMAN, HIS HISTORY

25   OF DISHONESTY, THE DIFFERENT TIME THAT HE WENT TO THE SITE

OPENING STATEMENT - SMOCK

1  UNDER DIFFERENT CIRCUMSTANCES, IT SHOULD COME AS NO SURPRISE

2  TO YOU THAT HIS CONCLUSIONS BACK THE GOVERNMENT'S CASE AND ARE

3  INCONSISTENT IN KEY WAYS WITH PREVIOUS SCIENTISTS.

4      YOU'RE GOING TO HAVE TO DETERMINE IF THAT'S A WITNESS THAT

5  YOU CAN RELY UPON TO BASE A FINDING OF GUILT BEYOND A

6  REASONABLE DOUBT.

7      AND THE GOVERNMENT'S BURDEN IN THIS CASE IS VERY HIGH.  WE

8  TALKED ABOUT THAT DURING JURY SELECTION.  THIS IS NO DOUBT AN

9  UNUSUAL CASE.  AND I KNOW THAT WHEN YOU CAME IN HERE YOU

10  WEREN'T EXPECTING TO HEAR A CASE LIKE THIS.  THERE'S NO GUNS,

11  THERE'S NO DRUGS.  I CAN TELL YOU THAT I HAVE NEVER HAD A CASE

12  LIKE THIS.  I CAN GUESS MS. HANSEN HASN'T EITHER.

13      NOW, THE FACT THAT THIS CASE INVOLVES SCIENCE AND

14  HYDROLOGY AND YOU ARE GOING TO HEAR ABOUT PICKLEWEED AND

15  TRIBUTARIES AND ORDINARY HIGH WATERMARKS AND THERE ARE

16  COMPLICATED LEGAL THEORIES TO DISTRACT YOU FROM WHAT'S REALLY

17  HAPPENING HERE.  AND WHAT WE ARE ASKING YOU IS TO KEEP THAT IN

18  MIND.

19      JIM LUCERO IS A 61-YEAR-OLD MAN.  HE IS A FATHER OF TWO

20  SONS.  HE'S A GRANDFATHER T TWO GRANDDAUGHTERS.  THE UNITED

21  STATES GOVERNMENT IS CHARGING MR. LUCERO WITH VERY SERIOUS

22  CRIMES.  WE'RE ASKING YOU TO NEVER FORGET THAT FACT AS THIS

23  CASE PROGRESSES.

24      THIS ISN'T A CIVIL CASE INVOLVING A PROPERTY DISPUTE

25  BETWEEN LANDOWNERS.  THEY ARE NOT HERE BECAUSE THEY ARE ASKING

1   HIM TO PAY A FINE.  THEY ARE NOT ASKING HIM TO REMEDY THE

2   SITUATION.  THIS IS A CRIMINAL CASE.  AND THAT'S NOT ONLY

3   RELEVANT BECAUSE THE CONSEQUENCES TO MR. LUCERO ARE

4   POTENTIALLY SO SERIOUS, IT'S ALSO RELEVANT BECAUSE OF THE

5   BURDEN IN THIS CASE.  AND WE TALKED ABOUT THAT.

6       THIS ISN'T A CASE WHERE AT THE END OF THE EVIDENCE YOU ARE

7   GOING TO BE ASKED WHICH SIDE YOU BELIEVE.  THIS IS A CASE IN

8   WHICH THE ONLY QUESTION FOR YOU IS GOING TO BE WHETHER THE

9   GOVERNMENT, AND THE GOVERNMENT ALONE, MET THEIR BURDEN OF

10  PROOF BEYOND A REASONABLE DOUBT.

11      AND I WANT TO EMPHASIZE THAT.  THIS BURDEN OF PROOF THAT

12  YOU'VE HEARD ABOUT, BEYOND A REASONABLE DOUBT IS A BEDROCK

13  PRINCIPLE IN OUR COUNTRY.  WHEN THE GOVERNMENT OF THE UNITED

14  STATES BRINGS ALL ITS POWER TO BEAR IN CHARGING AN INDIVIDUAL

15  WITH A CRIME, THE GOVERNMENT, AND THE GOVERNMENT ALONE, HAS

16  THE BURDEN OF PROOF.  THE DEFENSE DOESN'T HAVE TO PROVE

17  ANYTHING IN THIS CASE.  WE DON'T EVEN HAVE TO MAKE AN OPENING

18  STATEMENT.

19      AND I'LL TELL YOU RIGHT NOW, WE'RE NOT GOING TO BE CALLING

20  ANY PAID WITNESSES IN THIS CASE.  THAT'S TRUE BECAUSE, NUMBER

21  ONE, WE HAVE NO BURDEN.  AND NUMBER TWO, WE DON'T NEED PAID

22  WITNESSES TO SHOW YOU THAT THIS PROPERTY IS NOT COVERED BY THE

23  CLEAN WATER ACT.

24      WHAT YOU'RE GOING TO SEE OVER THE COMING DAYS IS THAT NO

25  MATTER HOW MANY PHOTOGRAPHS THEY SHOW YOU, NO MATTER HOW MANY

1    WITNESSES THEY PUT ON, NO MATTER HOW MUCH THIS PAID WITNESS

2    TELLS YOU, THEY'RE NOT GOING TO BE ABLE TO CONVINCE YOU BEYOND

3    A REASONABLE DOUBT THAT THESE 13 ACRES WERE COVERED BY THE

4    CLEAN WATER ACT.

5        MR. LUCERO IS NOT GUILTY OF THESE CRIMES.  HE IS NOT

6    GUILTY.  AND WHEN THE EVIDENCE COMES TO A CLOSE, MS. HANSEN

7    WILL COME BACK BEFORE YOU, SUMMARIZE THE EVIDENCE, AND SHE'LL

8    ASK YOU TO RETURN A VERDICT OF NOT GUILTY ON ALL THREE COUNTS.

9        THANK YOU.

10           **THE COURT:**  ALL RIGHT.

11       LADIES AND GENTLEMEN, SO IT'S ABOUT 10:30, AND THIS IS A

12   GOOD TIME TO TAKE OUR FIRST MORNING RECESS OF 15 MINUTES.  AND

13   YOU'LL... BY THE END OF THE TRIAL, YOU WILL BE ABLE TO RECITE

14   THIS BACK TO ME.  I WILL GIVE YOU THESE ADMONITIONS WHEN YOU

15   HEAD OUT BECAUSE THEY ARE SO IMPORTANT TO KEEP IN MIND.

16       SO, REMEMBER, UNTIL THE TRIAL IS OVER, DO NOT DISCUSS THIS

17   CASE WITH ANYONE, INCLUDING YOUR FELLOW JURORS, MEMBERS OF

18   YOUR FAMILY, PEOPLE INVOLVED IN THE TRIAL OR ANYONE ELSE, AND

19   DO NOT ALLOW OTHERS TO DISCUSS THE CASE WITH YOU, INCLUDING

20   DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE OR

21   ELECTRONIC MEANS, VIA EMAIL TEXT MESSAGING, CHAT ROOM, BLOG,

22   WEBSITE, OR APPLICATION.  YOU KNOW THE SUSPECTS, FACEBOOK,

23   YOUTUBE, TWITTER, INSTAGRAM, LINKEDIN, SNAPCHAT, ANY OTHER

24   FORM OF SOCIAL MEDIA.  IF ANYONE TRIES TO COMMUNICATE WITH YOU

25   ABOUT THE CASE, PLEASE LET ME KNOW ABOUT IT IMMEDIATELY.

```
1          DO NOT READ, WATCH, LISTEN TO ANY NEWS REPORTS OR OTHER

2     ACCOUNTS ABOUT THE TRIAL OR ANYONE ASSOCIATED WITH IT,

3     INCLUDING ANY ONLINE INFORMATION.  DO NOT DO ANY RESEARCH SUCH

4     AS CONSULTING DICTIONARIES, SEARCHING THE INTERNET, OR USING

5     OTHER REFERENCE MATERIALS.  AND DO NOT MAKE ANY INVESTIGATION

6     ABOUT THE CASE ON YOUR OWN.

7          FINALLY, KEEP AN OPEN MIND UNTIL ALL THE EVIDENCE HAS BEEN

8     PRESENTED AND YOU'VE HEARD THE ARGUMENTS OF COUNSEL, MY

9     INSTRUCTIONS ON THE LAW, AND THE VIEWS OF YOUR FELLOW JURORS.

10         AND I WOULD ADD JUST TO BE SURE NOT TO HAVE ANY CONTACT OF

11    ANY KIND WITH ANY OF THE PARTIES, OR LAWYERS, OR WITNESSES.

12    IF THEY SEE YOU COMING, THEY WILL TURN THE OTHER WAY.  YOU

13    SHOULD TURN THE OTHER WAY, AND DON'T TAKE THAT AS ANYTHING

14    PERSONAL.  IT'S JUST THAT THEY WANT TO BE SURE TO AVOID ANY

15    POTENTIAL PROBLEM IN THAT REGARD.

16         AND THEN FINALLY, IF YOU EVER NEED TO SPEAK WITH ME ABOUT

17    ANYTHING, YOU CAN ALWAYS GIVE A NOTE TO MS. RILEY AND SHE'LL

18    FORWARD THAT TO ME.

19         ALL RIGHT.  WITH THAT, IT'S NOW 10:33.  LET'S TAKE OUR

20    15-MINUTE RECESS AND LET'S PLAN TO BE BACK HERE AT TEN MINUTES

21    TO 11.

22         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

23         THE COURT:  WE WILL BE BACK IN 15 MINUTES.

24         MS. HANSEN:  YES, YOUR HONOR.

25         (RECESS TAKEN AT 10:35 A.M.; RESUMED AT 10:50 A.M.)
```

1          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

2          **THE COURT:**  OKAY.  BEFORE THE JURORS COME BACK IN, AS

3     TO THE QUESTION OF EXHIBIT 1141, I'VE HAD MY STAFF LOOK AT IT

4     AND I'VE LOOKED AT IT, AND HERE'S MY IMPRESSION.

5          FIRST, IT STRIKES ME IF THE GOVERNMENT IS GOING TO TRY TO

6     INTRODUCE THIS, THE FOUNDATION OUGHT TO BE LAID OUTSIDE THE

7     JURY'S PRESENCE SO THAT THE DEFENSE CAN VOIR DIRE.

8          FIRST, ARE YOU STILL PLANNING TO INTRODUCE THIS?

9          **MS. LEE:**  YES.

10         **THE COURT:**  ALL RIGHT.

11         SECOND, IT SEEMS TO ME THAT THERE ARE MULTIPLE PROBLEMS

12    FROM A HEARSAY PERSPECTIVE AND AN EVIDENTIARY PERSPECTIVE

13    OTHERWISE WITH REGARD TO THE LETTER.

14         THE FIRST IS THAT BASED ON THE FACE OF THE LETTER,

15    MS. HIGH IS REPORTING THAT SHE IS PASSING ON A REPORT OF

16    UNAUTHORIZED ACTIVITY THAT SHE RECEIVED FROM A MEMBER OF THE

17    PUBLIC.  THE LETTER SAYS THAT SHE DIDN'T KNOW WHEN THE

18    ACTIVITY TOOK PLACE OR BY WHOM BUT BELIEVE THE ACTIVITY IS

19    FAIRLY RECENT.

20         AND IT SEEMS TO ME THAT THERE IS A DOUBLE HEARSAY ISSUE.

21    EVEN IF YOU COULD ESTABLISH THAT THIS IS A BUSINESS RECORD,

22    AND I'VE GOT SKEPTICISM AS TO THAT, THE SECOND LEVEL OF

23    HEARSAY, IT STRIKES ME THERE IS NO EXCEPTION THAT APPLIES AND

24    THIS SEEMS TO ME TO BE THE EQUIVALENT OF A POLICE DISPATCHER'S

25    REPORT OF SOMETHING THAT SOMEONE SAID.

1        THERE'S A CASE CALLED *PIZSINT*, *U.S. VERSUS PIZSINT* 703

2   F.2D 420 FROM THE NINTH CIRCUIT IN 1983 THAT DEALS WITH THE

3   SITUATION THAT TO ME SEEMS VERY ANALOGOUS TO THIS ONE.  SO I

4   THINK THAT DOUBLE HEARSAY ISSUE IS A SIGNIFICANT ISSUE.

5        SECOND, I -- WE CAN SEE WHAT THE FOUNDATION ATTEMPT IS,

6   BUT IT DOESN'T SEEM TO ME THAT THIS IS A LETTER THAT WAS A

7   BUSINESS RECORD KEPT IN THE COURSE OF THE COMMITTEE'S

8   REGULARLY CONDUCTED ACTIVITY.

9        AND ESSENTIALLY THE WAY THAT THAT'S BEEN DESCRIBED IS THAT

10  THE PERSON FURNISHING THE INFORMATION TO BE RECORDED IS ACTING

11  ROUTINELY UNDER A DUTY OF ACCURACY WITH EMPLOYER RELIANCE ON

12  THE RESULTS OR IN SHORT, IN THE REGULAR COURSE OF BUSINESS.

13       HERE, WHAT WE APPEAR TO HAVE IS A ONE-OFF LETTER THAT'S

14  BEING SENT EXTERNALLY.  IN OTHER WORDS, I'M NOT SURE, SUBJECT

15  TO YOUR ATTEMPT TO LAY THE FOUNDATION, THIS IS REALLY A

16  BUSINESS RECORD AT ALL.

17       AND THEN, THIRD, EVEN IF YOU CAN GET OVER THOSE HURDLES,

18  IT SEEMS TO ME THAT UNDER RULE 403 REALLY ALL YOU WANT THIS

19  FOR IS TO EXPLAIN WHY MS. HIGH TOOK ACTION AND WHAT SHE DID.

20  AND IT STRIKES ME THAT IT'S NOT NECESSARY TO PUT THE LETTER IN

21  TO ESTABLISH THAT.  SHE CAN SAY IT.  I REACHED OUT.  I WROTE A

22  LETTER.  I REACHED OUT.  I DO THINK, TO THE POINT THAT WE WERE

23  TALKING ABOUT BEFORE, THAT SHE OUGHT TO BE ABLE TO SAY THAT

24  THE -- CORPS OF ENGINEERS WAS ONE OF THE RECIPIENTS OF THE

25  LETTER, CORRECT?

```
1          MS. LEE:  YES.

2          THE COURT:  SO I THINK SHE COULD SAY, I INCLUDED THEM

3    BECAUSE I THOUGHT THIS LAND WAS WITHIN THEIR JURISDICTION.

4    SOMETHING LIKE THAT.  AND THAT SEEMS FINE.  AND THEN WE MOVE

5    ON.

6          BUT IT JUST SEEMS TO ME THAT EVEN IF YOU COULD OVERCOME

7    THESE HEARSAY HURDLES, THE PURPOSE FOR WHICH YOU WANT IT IS

8    NOT VERY WEIGHTY, AND THE RISK OF PUTTING IN HEARSAY REPORTS,

9    EVEN A DOUBLE-HEARSAY REPORT POSES A SUBSTANTIAL RULE 403

10   PROBLEM THAT WOULD LEAD ME VERY LIKELY TO EXCLUDE IT FOR THAT

11   REASON TOO.

12         MS. LEE:  OKAY, YOUR HONOR, THE GOVERNMENT HEARS YOU.

13         I THINK WE WILL CALL MS. HIGH WITHOUT PUTTING IN THE FULL

14   EXHIBIT INTO EVIDENCE.  HOWEVER, THERE ARE SOME MAPS CONTAINED

15   THEREIN, AND WE WOULD JUST SAY IF SHE'S ABLE TO LAY A

16   FOUNDATION THAT THESE MAPS ACCURATELY REFLECT THE AREAS THAT

17   SHE KNOWS THEM, WE WOULD MOVE THOSE IN AS WE WOULD ANY OTHER

18   TYPE OF MAP.

19         THE COURT:  THAT SEEMS CORRECT.

20         MR. SMOCK:  YOUR HONOR, THE NINTH CIRCUIT HAS SAID

21   THAT WITH RESPECT TO GOOGLE EARTH MAPS, THE GOVERNMENT HAS AN

22   OBLIGATION TO PRODUCE CERTIFICATIONS INDICATING WHEN THESE

23   THINGS WERE TAKEN, WHEN THE SHOTS WERE TAKEN.  THEY HAVE

24   CERTIFICATIONS WITH RESPECT TO SOME.  I DON'T KNOW OFFHAND

25   WHETHER THEY HAVE THEM WITH RESPECT TO THESE.
```

1          THE ISSUE IS THERE ARE QUESTIONS ABOUT WHAT THIS PROPERTY

2     LOOKED LIKE AT PARTICULAR AND TIMES OF YEAR AND YEARS.  IT'S

3     NOT AT ALL CLEAR AND, IN FACT, I DON'T THINK MS. HIGH CAN

4     TESTIFY CREDIBLY AS TO, NUMBER ONE, WHEN THESE PICTURES WERE

5     TAKEN.  AND SHE CERTAINLY CAN'T CERTIFY THEM AS IS REQUIRED.

6          SO -- AND THE IDEA OF SAYING, WELL, THESE BASICALLY SHOW

7     THE AREA, THE POINT OF THESE PICTURES, YOUR HONOR, IS TO GET

8     IN PHOTOGRAPHS OF CONDITIONS AT THE SITE AT DIFFERENT TIMES OF

9     YEAR.  IT'S NOT SIMPLY TO SAY, OH, THIS IS WHERE DIRT WAS

10    DISCHARGED.  AND THAT'S THE PROBLEM.

11         THIS WITNESS CAN'T GET IN GOOGLE EARTH PHOTOS WHEN WE

12    DON'T KNOW WHEN THE PICTURES WERE TAKEN.  IT'S ALSO TRUE THAT

13    THESE WERE PRODUCED AFTER THE DISCOVERY CUTOFF.

14         **THE COURT:**  ALL RIGHT.  AS TAKING THOSE IN TURN, AS I

15    READ THAT GOOGLE EARTH CASE, IT WASN'T REALLY ABOUT JUST THE

16    PHOTOGRAPHS.  IT WAS ABOUT THE ADDITIONAL INFORMATION.

17         SO, FOR EXAMPLE, GPS COORDINATES, YOU NEED TO HAVE SOMEONE

18    FROM GOOGLE SAY HERE'S HOW THESE GPS COORDINATES GOT IN THE

19    PHOTO.

20         WHY AREN'T THESE JUST PHOTOS?  AND IF SHE CAN SAY THAT

21    THIS REFLECTS THE APPEARANCE OF THE PROPERTY AND SHE'S

22    PERSONALLY FAMILIAR WITH IT AT THE RELEVANT TIME, IT SEEMS TO

23    ME THIS IS JUST A PHOTOGRAPH RATHER THAN A GOOGLE

24    AUTHENTICATION ISSUE.  IF SHE CAN.

25         WITH REGARD TO THE DISCOVERY CUTOFF ISSUE, WHAT'S THE

1    ANSWER THERE?

2         **MS. LEE:**  YOUR HONOR, THESE WERE PRODUCED WELL BEFORE

3    THE DISCOVERY CUTOFF.

4         **MS. HANSEN:**  YOUR HONOR, THESE ARE FROM THE

5    COLLECTION THAT CAME FROM THE ATTORNEY THAT THEY OBTAINED IN

6    NOVEMBER.  THIS LETTER WAS -- AND THIS PARTICULAR EXHIBIT IS

7    DIFFERENT FROM THE VERSION THAT WAS PRODUCED BEFORE.

8      WE HAVE AN EXAMPLE OF THAT IN THE GOVERNMENT'S EXHIBITS,

9    18 VERSUS 1141.  AND YOUR HONOR OVERRULED OUR OBJECTION AS TO

10   THE CARIN HIGH MATERIALS, BUT THEN DID GRANT OUR OBJECTION T

11   ALL GOOGLE EARTH IMAGES, NOAA IMAGES, AND U.S.G.S. IMAGES.

12        **THE COURT:**  ALL RIGHT.  BUT THIS WAS THE SUBJECT OF A

13   PARTICULAR MOTION AS TO HIGH, AND I OVERRULED THE OBJECTION.

14        **MS. HANSEN:**  ON A MASSIVE AMOUNT OF HER DOCUMENTS

15   THAT SHE PRODUCED AFTER THE DISCOVERY CUTOFF, YES.  BUT YOU

16   ALSO RULED ON OUR GOOGLE EARTH OBJECTION WHICH WAS GRANTED.

17        **THE COURT:**  WAS THIS PART OF THE MATERIALS THAT WERE

18   THE SUBJECT OF THE HIGH SPECIFIC OBJECTION?

19        **MS. HANSEN:**  YES, IT WAS PART OF THE HIGH SPECIFIC

20   OBJECTION.  THEN WE ALSO OBJECTED IN THE SAME FILING TO,

21   SPECIFICALLY TO GOOGLE EARTH PHOTOS.

22        **MS. LEE:**  YOUR HONOR, JUST TO CLARIFY THE RECORD

23   BECAUSE I DID JUST SPEAK TO THE CASE AGENT WHO INFORMED ME THE

24   GOOGLE EARTH PHOTOS, THESE SIX IMAGES, WERE PRODUCED WELL

25   BEFORE THE DISCOVERY CUTOFF DATE.  THESE IMAGES, SIX,

1    CONTAINED WITHIN THE LETTER, WERE THE ONES THAT MS. HIGH'S

2    ATTORNEY PROVIDED TO US IN NOVEMBER AND THAT WAS THE SUBJECT

3    MATTER OF A PRIOR MOTION IN LIMINE.

4         **THE COURT:**  IS THERE ANY REASON THAT MS. HIGH AS

5    OPPOSED TO SOMEONE ELSE NEEDS TO PUT THESE IN?  DO YOU HAVE

6    ANOTHER WITNESS THAT YOU COULD USE TO ADMIT THESE PHOTOS?

7         **MS. HANSEN:**  YOUR HONOR, THEY ACTUALLY HAVE A NUMBER

8    OF AERIAL HELICOPTER VIDEOS, PHOTOGRAPHS FROM THE AIR THAT ARE

9    COMING IN.  THIS IS ALSO CUMULATIVE.  AND THE RELEVANCE IS SO

10   LOW ESPECIALLY FOR THIS WITNESS, THAT I THINK THERE'S ALSO A

11   403 PROBLEM.

12        **THE COURT:**  OKAY.  RECORD MADE ON THAT.

13      IS THERE SOMEONE WHO'S GOING TO BE TALKING, ONE OF YOUR

14   EXPERTS, FOR EXAMPLE, ABOUT THESE PHOTOS THAT IT WOULD MAKE

15   SENSE TO TAKE IT UP THEN?

16        **MS. LEE:**  WELL, YOUR HONOR, SHE WOULDN'T BE ABLE TO

17   SAY SHE WENT ONTO THE PROPERTY AT THE TIME THAT THESE PHOTOS

18   WERE TAKEN AND THAT IT'S A FAIR AND ACCURATE DEPICTION OF THE

19   PROPERTY IN LET'S SAY JULY 2002.  SHE WASN'T THERE.

20      WHAT SHE WOULD SAY IS SHE WENT ON TO GOOGLE EARTH AND

21   OBTAINED THESE IMAGES FROM DIFFERENT PERIODS OF TIMES.  SHE

22   WOULD ATTACH IT TO THE LETTER THAT SHE SENT TO THE AGENCIES

23   AND IT INFORMED HER, INFORMED HER DECISION-MAKING AS TO WHAT

24   STEPS TO TAKE ONCE THE UNAUTHORIZED FILL WAS DISCHARGED.

25        **THE COURT:**  WHY CAN'T SHE TESTIFY THAT I WROTE A

```
1    LETTER, I PUT TOGETHER SOME PHOTOS AND MAPS, AND I SENT IT

2    WITH THE LETTER?

3         MS. LEE:  SHE ABSOLUTELY COULD.  I PLAN TO HAVE HER

4    SAY -- TO ASK THOSE QUESTIONS, WHICH I ANTICIPATE WILL ELICIT

5    THOSE ANSWERS, BUT THAT THESE PHOTOS WOULD BE THE ONES THAT

6    ACTUALLY SHE FOUND AND, YOU KNOW, WAS A COMPONENT OF HER

7    DECISION-MAKING.

8         THE COURT:  IT JUST DOESN'T SOUND LIKE SHE CAN

9    AUTHENTICATE THE PHOTOS.

10        MS. LEE:  SHE CANNOT AUTHENTICATE THAT ON THIS DAY

11   THAT'S WHAT THE IMAGE LOOKED LIKE.  SHE CAN ONLY SAY I WENT ON

12   TO GOOGLE EARTH AND TOOK ALL THE IMAGES THAT WERE AVAILABLE

13   FROM GOOGLE EARTH, AND THESE WERE THE SIX IMAGES.  THAT'S WHAT

14   SHE WOULD BE ABLE TO SAY.

15      SHE WAS NOT PERSONALLY THERE TO SAY ON THIS PARTICULAR

16   YEAR, THAT'S WHAT THIS IMAGE LOOKED LIKE.  SHE IS RELYING ON

17   GOOGLE EARTH'S PHOTOS FROM THAT YEAR.  THAT'S TRUE.

18        MR. SMOCK:  YOUR HONOR, THAT PROFFER MAKES CRYSTAL

19   CLEAR THAT THESE ARE NOT ADMISSIBLE.

20      LIZARRAGA-TIRADO, YOU'RE CORRECT, TALKS ABOUT OTHER PARTS

21   OF GOOGLE ALERT, BUT IT SPEAKS TOO IF YOU ARE USING

22   PHOTOGRAPHS ALONE, THE GOVERNMENT STILL -- A PARTY WHO'S

23   TRYING TO INTRODUCE THEM STILL HAS TO ESTABLISH THEIR

24   RELIABILITY AND ACCURACY.  THEY COULD PUT IN THE TESTIMONY OF

25   A GOOGLE EARTH PROGRAMMER OR A WITNESS WHO FREQUENTLY WORKS
```

```
1    WITH AND RELIES ON THE PROGRAM, ET CETERA.

2        SO, NUMBER ONE, WE DON'T HAVE CERTIFICATION FROM GOOGLE

3    EARTH.  NUMBER TWO, WE JUST HEARD THAT THE WITNESS CAN'T

4    AUTHENTICATE THAT THIS IS WHAT IT LOOKED LIKE AT THE TIME.  SO

5    THERE'S NO QUESTION THIS IS INADMISSIBLE.

6            THE COURT:  ALL RIGHT.  THE OBJECTION IS SUSTAINED.

7            MS. LEE:  OKAY.

8        YOUR HONOR, ALONG THE SAME VEIN, YOUR HONOR HAS MADE

9    RULINGS WITH RESPECT TO NOAA AND U.S.G.S. IMAGES, WHICH THE

10   GOVERNMENT OBVIOUSLY FULLY INTENDS TO ABIDE BY.

11       HOWEVER, IN THE DEFENSE OPENING, UNLESS WE'RE MISTAKEN, IT

12   APPEARED THAT THERE WAS A NOAA, U.S.G.S. IMAGE.  IF IT'S NOT,

13   THAT'S FINE AND YOU GUYS CAN TELL US THAT, BUT WE WOULD JUST

14   LIKE TO MAKE THE RECORD CLEAR THESE ARE NOT AVAILABLE TO THE

15   GOVERNMENT.  THEY SHOULD NOT THEN BE ABLE TO BE USED AS A

16   SWORD BY THE DEFENSE.

17           THE COURT:  WHY DON'T YOU ALL MEET AND CONFER AND SEE

18   IF THERE'S AN ISSUE.

19           MS. HANSEN:  YOUR HONOR, IT'S NOT.  IT'S A KIER &

20   WRIGHT DIAGRAM AND WE'LL PROVIDE THEM WITH A BATES NUMBER.

21           THE COURT:  ALL RIGHT.

22           MR. SMOCK:  THEY WERE GOVERNMENT EXHIBITS IN THIS

23   CASE.

24           THE COURT:  ALL RIGHT.

25           MR. KEARNEY:  WE DON'T NEED TO TALK ABOUT THIS NOW.
```

1    I WOULD LIKE TO HAVE FIVE MINUTES WHEN YOU DISMISS THE JURY

2    TODAY TO ADDRESS THE COURT BASED ON SOME COMMENTS THAT WERE

3    MADE IN OPENING STATEMENT.

4           **THE COURT:**  ALL RIGHT.  THAT'S FINE.  LET'S --

5    REMEMBER, WE WILL NEED TO -- I'LL NEED TO HAVE THEM OUT BY

6    1:15 SO THEN WE CAN TALK RIGHT AFTER THAT.

7       ALSO, MS. RILEY SHOWED YOU THE NOTE.  MR. BARRANCO HAD

8    MENTIONED IN JURY SELECTION THAT HIS SON'S WEDDING IS

9    TOMORROW.  HE SAYS THAT HE WOULD NEED TO LEAVE BY 12:45.

10   AGAIN, GIVEN WHAT THEY ARE GIVING UP TO BE HERE FOR THREE

11   WEEKS, I WOULD ATTEMPT TO ACCOMMODATE THAT.

12          **MS. HANSEN:**  YES, YOUR HONOR.

13          **MS. LEE:**  YES, YOUR HONOR.

14          **THE COURT:**  ALL RIGHT.

15          **THE CLERK:**  READY FOR THE JURY?

16          **THE COURT:**  YES.

17      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

18          **THE CLERK:**  YOU MAY BE SEATED.

19          **THE COURT:**  YOU'LL BE DOING THAT IN YOUR SLEEP BY

20   TOMORROW.

21      ALL RIGHT.  WELCOME BACK, LADIES AND GENTLEMEN.  AT THIS

22   TIME THE UNITED STATES WILL PROCEED WITH ITS CASE.  AND,

23   MR. KEARNEY OR MS. LEE, ARE YOU PREPARED TO CALL YOUR FIRST

24   WITNESS?

25          **MS. LEE:**  YES, WE ARE.  THE GOVERNMENT CALLS

1   MS. CARIN HIGH.

2           **THE CLERK:**  PLEASE COME UP TO THE WITNESS STAND AND

3   RAISE YOUR RIGHT HAND FOR ME.

4       (**CARIN HIGH,** CALLED AS A WITNESS FOR THE GOVERNMENT,

5   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

6           **THE WITNESS:**  I DO.

7           **THE CLERK:**  YOU MAY BE SEATED.  AND THEN ONCE SEATED

8   I NEED YOU TO PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME

9   FOR THE RECORD.

10          **THE WITNESS:**  MY NAME IS CARIN HIGH, C-A-R-I-N, LAST

11  NAME IS H-I-G-H.

12          **THE CLERK:**  THANK YOU.  AND THERE IS WATER IN THE

13  PITCHER.

14          **THE WITNESS:**  THANK YOU.

15                      <u>**DIRECT EXAMINATION**</u>

16  **BY MS. LEE:**

17  **Q.**  GOOD MORNING, MS. HIGH.

18  **A.**  GOOD MORNING.

19  **Q.**  WHERE DO YOU CURRENTLY WORK?

20  **A.**  I AM A VOLUNTEER FOR THE CITIZENS COMMITTEE TO COMPLETE

21  THE REFUGE.

22  **Q.**  DO YOU VOLUNTEER FULL TIME OR PART TIME?

23  **A.**  IT IS ALMOST A FULL-TIME JOB.

24  **Q.**  AND WHAT IS CITIZENS COMMITTEE TO COMPLETE THE REFUGE?

25  **A.**  CITIZENS COMMITTEE TO COMPLETE THE REFUGE IS A SECOND

1    ITERATION OF AN ENVIRONMENTAL GROUP THAT HAS BEEN WORKING

2    SINCE THE LATE '60S TO ESTABLISH -- FIRST ESTABLISH THE DON

3    EDWARDS SAN FRANCISCO BAY NATIONAL WILDLIFE REFUGE AND THEN

4    LATER TO EXPAND ITS BOUNDARIES.

5    **Q.**  AND IS CITIZENS COMMITTEE TO COMPLETE THE REFUGE COMMONLY

6    REFERRED TO AS CCCR?

7    **A.**  AS CCCR, YES.

8    **Q.**  IS IT A NONPROFIT ORGANIZATION?

9    **A.**  WE ARE COMPLETELY NONPROFIT, ALL VOLUNTEER GRASSROOTS,

10   YES.

11   **Q.**  AND WHAT WOULD YOU SAY ITS MISSION IS?

12   **A.**  OUR MISSION IS TO PROTECT THE BAY'S REMAINING WETLANDS,

13   AND WE DO THIS THROUGH TRYING TO ACQUIRE LANDS -- NOT DIRECTLY

14   BUT THROUGH OTHER PARTIES ACQUIRE OR RECEIVE DONATIONS OF

15   LANDS WITHIN THE BOUNDARIES THAT WERE APPROVED BY CONGRESS.

16        AND ALSO WE WORK ON PUBLIC OUTREACH TO EDUCATE THE PUBLIC

17   ABOUT THE VALUE OF WETLANDS, WHY THEY ARE SO IMPORTANT TO OUR

18   QUALITY OF LIFE, WHAT BENEFITS THEY PROVIDE SOCIETY.  AND THEN

19   WE DO A LOT OF INTERACTION WITH LOCAL GOVERNMENT AGENCIES,

20   WITH REGULATORY AGENCIES, WHENEVER THERE ARE ISSUES WHERE

21   PEOPLE WANT TO PLACE FILL IN WETLANDS.

22   **Q.**  WHY IS THAT WORK SIGNIFICANT TO YOU?

23   **A.**  IT IS SIGNIFICANT TO US --

24            **MS. HANSEN:**  OBJECTION.  RELEVANCE.

25            **THE COURT:**  OVERRULED.  THIS IS IN THE NATURE OF

HIGH - DIRECT / LEE

1  BACKGROUND.

2  **THE WITNESS:**  IT IS SIGNIFICANT TO US BECAUSE THE BAY

3  HAS LOST BETWEEN 80 TO 90 PERCENT OF ITS WETLANDS, DEPENDING

4  ON WHO YOU -- WHICH EXPERT YOU ASK, AND WETLANDS PROVIDE A --

5  VITAL FUNCTIONS TO SOCIETY.  THEY PROVIDE FLOOD PROTECTION.

6  THEY PROVIDE WATER QUALITY BENEFITS BY FILTERING OUT

7  POLLUTANTS AND FILTERING OUT SEDIMENTS BEFORE THEY GET INTO

8  THE BAY.  THEY PROVIDE INCREDIBLE HABITAT DIVERSITY THAT

9  SUPPORTS FISHERIES AND MIGRATORY MIGRATORY BIRDS IN THE TENS

10  OF THOUSANDS.

11      AND SO FOR US, ANY LOSS OF THIS HABITAT IS A SEVERE BLOW

12  TO THE LONG-TERM QUALITY OF THE SAN FRANCISCO BAY AND TO

13  SOCIETY BECAUSE AS SEA LEVEL RISES, IT IS REALLY IMPORTANT TO

14  HAVE THESE WETLANDS TO PROTECT FROM FLOODING.

15  **BY MS. LEE:**

16  **Q.**  HOW LONG HAVE YOU VOLUNTEERED WITH CCCR?

17  **A.**  I'VE VOLUNTEERED SINCE '94 SO OVER 20 YEARS.

18  **Q.**  WHAT IS YOUR CURRENT POSITION THERE?

19  **A.**  MY CURRENT POSITION IS THAT I HAVE KIND OF STEPPED INTO

20  THE ROLE OF CO-CHAIR, WHICH MEANS THAT I DO EVERYTHING FROM

21  KIND OF ADMINISTRATIVE THINGS WHERE WE TRY AND GET MEETINGS

22  ORGANIZED OR INTERACT WITH THE PUBLIC TO TELL THEM ABOUT WHAT

23  CCCR DOES, OR I KIND OF FIELD CALLS OF PEOPLE WHO CONTACT US

24  REGARDING ISSUES WHERE PEOPLE ARE PROPOSING TO FILL IN

25  WETLANDS OR IF THEY HAVE CONCERNS THAT WETLANDS ARE BEING

1    FILLED AND THEY MAY NOT HAVE GONE THROUGH THE CLEAN WATER ACT

2    PROCESS OF GETTING THE PERMITS.

3        SO I DO A VARIETY OF THINGS, EVERYTHING FROM RESEARCHING

4    DOCUMENTS TO ATTENDING PUBLIC MEETINGS TO DOING EDUCATIONAL

5    OUTREACH, JUST THE KIND OF FUNCTIONS OF RUNNING THE

6    ORGANIZATION TO GETTING INVOLVED IN REPORTING UNAUTHORIZED

7    ACTIVITIES TO THE AGENCIES.

8    **Q.**  BEFORE GOING INTO KIND OF THE LAST THING THAT YOU TALKED

9    ABOUT OF UNAUTHORIZED ACTIVITIES, I WOULD LIKE TO ASK YOU A

10   LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND.  COULD YOU

11   DESCRIBE THAT, WHAT YOUR EDUCATIONAL BACKGROUND IS?

12   **A.**  I HAVE A BS, A BACHELOR'S OF SCIENCE, IN ECOLOGY AND THEN

13   A MASTER'S OF SCIENCE IN MARINE ECOLOGY, BUT I ALSO DID A LOT

14   OF COURSEWORK IN ESTUARINE ECOLOGY, WHICH IS BASICALLY THE SAN

15   FRANCISCO BAY BECAUSE ESTUARIES ARE WHERE FRESH WATER MEETS

16   THE SEA WATER FROM THE OCEAN.

17   **Q.**  WHERE DID YOU WORK AFTER YOU COMPLETED YOUR BACHELOR'S AND

18   MASTER'S DEGREE?

19   **A.**  I HAD A JOB FOR FOUR YEARS WITH THE SAN FRANCISCO DISTRICT

20   ARMY CORPS OF ENGINEERS IN THE REGULATORY BRANCH, AND THERE

21   WAS ADDITIONAL COURSEWORK THAT I HAD TO TAKE WHILE I WAS

22   THERE.

23   **Q.**  WHEN DID YOU WORK FOR THE ARMY CORPS OF ENGINEERS?

24   **A.**  FROM 1990 TO 1994.

25   **Q.**  AND THEN FROM 1994 YOU MOVED INTO YOUR ROLE AT CCCR?

HIGH - DIRECT / LEE

1    **A.**  I HAD A LITTLE HIATUS, AND THEN, YES, I BECAME INVOLVED

2    IN -- WITH CITIZENS COMMITTEE.

3    **Q.**  WHAT IS THE ARMY CORPS OF ENGINEERS?

4    **A.**  ARMY CORPS OF ENGINEERS IS ACTUALLY SEVERAL DIFFERENT

5    ENTITIES.  THERE'S KIND OF THE ENTITY THAT PEOPLE ARE FAMILIAR

6    WITH WHERE THEY BUILD FLIGHT CONTROL PROJECTS, THEY BUILD

7    INFRASTRUCTURE, AND THEN THERE IS THIS COMPLETELY DIFFERENT

8    BRANCH OR DIVISION THAT ADMINISTERS THE CLEAN WATER ACT

9    RESPONSIBILITIES, AND THAT'S THE SECTION I WORKED IN.  WE WERE

10   TASKED -- MY DIVISION -- MY BRANCH CHIEF AT THE TIME I WAS

11   WORKING THERE SAID IT WAS THE RESPONSIBILITY OF OUR GROUP TO

12   BALANCE THE NEEDS OF DEVELOPMENT WITH WETLANDS PROTECTION.

13   **Q.**  YOU MENTIONED THAT YOU WORKED IN THE REGULATORY DIVISION

14   OF THE ARMY CORPS OF ENGINEERS.  WHAT WERE YOUR

15   RESPONSIBILITIES IN THE REGULATORY DIVISION?

16   **A.**  MY RESPONSIBILITIES WERE FOR ALAMEDA AND SOLANO COUNTIES.

17   I WAS RESPONSIBLE FOR BEING KIND OF THE INITIAL POINT OF

18   CONTACT WITH THE REGULATORY BRANCH.  THAT MEANT IF PEOPLE HAD

19   QUESTIONS ABOUT THE NEED FOR CORPS PERMITS TO FILL IN

20   WETLANDS, IF THEY HAD QUESTIONS ABOUT WHETHER OR NOT THEY HAD

21   WETLANDS ON THEIR PROPERTY OR NOT, I WOULD DO WETLAND

22   DELINEATIONS.  I WOULD GO OUT AND VISIT SITES.  I DID

23   NATIONWIDE PERMITS.

24        AND THEN EQUALLY IMPORTANT, I DID COMPLIANCE SO THAT I

25   ENSURED THAT PEOPLE WERE ADHERING TO THE REQUIREMENTS OF

HIGH - DIRECT / LEE

1    WHATEVER PERMITS THEY RECEIVED, AND I DID ENFORCEMENT AS WELL.

2    SO IF I RECEIVED A CONTACT FROM THE PUBLIC OR FROM ANOTHER

3    AGENCY SAYING THAT THERE'S FILL IN WETLANDS, I WOULD HAVE TO

4    RESEARCH THAT.

5    **Q.**  DURING YOUR TIME AT THE CORPS DID YOU BECOME FAMILIAR WITH

6    THE PROPERTY KNOWN AS NEWARK AREA 4 IN THE CITY OF NEWARK IN

7    THE NORTHERN DISTRICT OF CALIFORNIA?

8    **A.**  YES, I DID.  THERE WAS AT THAT TIME QUESTIONS ABOUT

9    UNAUTHORIZED FILL AND -- BUT I HAD -- I DID NOT GO OUT ON THE

10   PROPERTY UNDER MY CAPACITY WITH THE CORPS BECAUSE WE NEEDED

11   ESCORTS TO GET OUT THERE FROM THE FEDERAL GOVERNMENT.

12   **Q.**  BUT YOU WERE FAMILIAR WITH THE AREA?

13   **A.**  YES, I WAS, VERY FAMILIAR.

14   **Q.**  AFTER YOU LEFT THE ARMY CORPS OF ENGINEERS IN 1994, DID

15   YOU BECOME EVEN MORE FAMILIAR WITH THE AREA?

16   **A.**  I DID THROUGH MY INVOLVEMENT WITH CITIZENS COMMITTEE.  IT

17   TURNS OUT THAT THAT AREA WAS ONE OF THE AREAS THAT LOCAL

18   ENVIRONMENTAL GROUPS HAD BEEN FOLLOWING SINCE THE MID-'80S,

19   ACTUALLY SOME OF OUR ORIGINAL MEMBERS BEFORE THAT.  IN THE

20   '60S AND '70S THERE WERE ACTUALLY DUCK HUNTERS ON THE

21   PROPERTY, SO THEY WERE OUT ON WHISTLING WINGS AND PINTAIL DUCK

22   CLUBS HUNTING.

23       AND SO THEIR KNOWLEDGE OF THE SITE AND WHAT THEY DESCRIBED

24   AS ITS INCREDIBLE WEALTH OF BIRDS AND BEAUTY WAS SOMETHING

25   THAT CITIZENS COMMITTEE IN THE -- AFTER THE REFUGE WAS

HIGH - DIRECT / LEE

1   ESTABLISHED THE FIRST TIME, THEN THE COMMITTEE BECAME INVOLVED

2   IN EXPANDING THE BOUNDARIES BECAUSE PLACES LIKE WHISTLING

3   WINGS AND PINTAIL DUCK CLUBS WEREN'T ORIGINALLY WITHIN THE

4   BOUNDARIES OF THE REFUGE, OR THEY WEREN'T WITHIN THE BOUNDARY

5   THAT WE COULD ACCEPT DONATIONS OR ACQUISITIONS OF LAND.

6       AND SO IN THE MID-'80S THE GROUP, BECAUSE OF PLACES LIKE

7   WHISTLING WINGS AND PINTAIL AND THE FACT THAT THE ORIGINAL

8   BOUNDARIES HAD ONLY HAD ABOUT 200 ACRES OF SEASONAL WETLANDS,

9   THIS AREA WAS INCREDIBLY IMPORTANT TO THIS GROUP AND TO OTHER

10  GROUPS LIKE THE SIERRA CLUB AND AUDUBON SOCIETY.

11      AND SO I BECAME FAMILIAR WITH IT BECAUSE OF THAT.  AND

12  THEN LATER IN THE 2000S WHEN THE STATE HAD A SPECIFIC AREA

13  PLAN, THERE WAS A WHOLE ENVIRONMENTAL REVIEW PROCESS THAT WE

14  WERE INVOLVED IN EXTENSIVELY, AND I BECAME EVEN MORE AWARE OF

15  THE RESOURCES ON THE SITE.

16  **Q.**  YOU MENTIONED WHISTLING WINGS AND PIN --

17  **A.**  PINTAIL DUCK CLUBS.

18  **Q.**  IS THAT WHAT YOU REFER TO AS NEWARK AREA 4?

19  **A.**  WE REFER TO IT STILL AS THE DUCK CLUBS BECAUSE WE THINK

20  THAT THAT IS MORE INDICATIVE OF WHAT THE LAND REALLY

21  REPRESENTS.  AREA 4 SOUNDS SO STERILIZED.  BUT THE CITY DURING

22  ITS SPECIFIC AREA PLAN PROCESS, THEY NAMED IT AREA 4 FOR

23  CONVENIENCE.

24  **Q.**  BUT JUST FOR CLARITY, THEY REFER TO THE SAME THING?

25  **A.**  YES, THEY DO.

HIGH – DIRECT / LEE

1    **Q.**  DID THERE COME A TIME WHEN YOU VISITED NEWARK AREA 4 WHILE

2    AS A VOLUNTEER FOR CCCR?

3    **A.**  YES, WE WERE FORTUNATE ENOUGH TO BE TAKEN OUT ON A TOUR IN

4    FEBRUARY OF 2008.  WE WENT OUT WITH REPRESENTATIVES OF THE

5    CITY OF NEWARK, A REPRESENTATIVE OF THE LANDOWNERS AND I THINK

6    ONE OF THEIR ATTORNEYS, AND A NUMBER OF LOCAL ENVIRONMENTAL

7    PEOPLE WENT OUT.

8    **Q.**  AND WHY DID YOU GO OUT THEN IN 2008?

9    **A.**  WE -- IT WAS AN OPPORTUNITY TO SEE THE LAND AND TO DISCUSS

10   OUR CONCERNS ABOUT DEVELOPMENT PROPOSALS THAT WERE BEING

11   PURSUED AT THAT TIME ON THE PROPERTY, AND SO WE WANTED TO BE

12   ABLE TO JUST GET A SENSE OF WHERE THE PROPOSED DEVELOPMENT WAS

13   OCCURRING, WHERE THE WETLANDS WERE, AND TO -- IT WAS AN

14   OPPORTUNITY FOR US TO INTERACT WITH THE LANDOWNER AND EXPLAIN

15   WHY WE THOUGHT THE LANDS WERE SO IMPORTANT.

16   **Q.**  I WOULD LIKE TO ASK YOU SOME GEOGRAPHICAL QUESTIONS NOW.

17   I WOULD LIKE FOR YOU TO GO TO WHAT HAS BEEN MARKED AS

18   GOVERNMENT'S EXHIBIT 1141-0028.  IS THERE A BINDER THERE

19   AVAILABLE FOR YOUR REVIEW?

20   **A.**  NO.

21   **Q.**  OKAY.  I WILL PROVIDE THAT TO YOU.

22            **MS. LEE:**  YOUR HONOR, THOSE DOCUMENTS WERE PROVIDED

23   TO THE COURT EARLIER IN HARD COPY?  WOULD IT BE POSSIBLE TO --

24            **THE COURT:**  IS THAT THE ONLY COPY?

25            **MS. LEE:**  WE PROVIDED IT FROM OUR GOVERNMENT EXHIBIT

HIGH - DIRECT / LEE

1    BINDERS.

2            **THE CLERK:**  NORMALLY THE WAY IT WORKS, YOU PROVIDE

3    THE JUDGE WITH HIS COPIES THAT HE HOLDS ON TO.  HE DOESN'T

4    PASS HIS COPIES AROUND TO THE WITNESSES.

5            **MS. LEE:**  RIGHT.

6            **THE CLERK:**  OKAY.

7            **MS. LEE:**  WHAT I WILL DO, YOUR HONOR, IS PROVIDE

8    MS. HIGH WITH MY OWN COPY.  MAY I APPROACH, YOUR HONOR?

9            **THE COURT:**  YOU MAY.

10           (EXHIBIT HANDED TO WITNESS.)

11   **BY MS. LEE:**

12   **Q.**  MS. HIGH, WHAT IS THAT, GOVERNMENT'S EXHIBIT 1141-0028?

13   **A.**  IT'S A VICINITY MAP OF WHERE AREA 4 IS LOCATED WITH

14   RESPECT TO THE REST OF THE SOUTH BAY.  IT WAS SOMETHING THAT

15   WE PROVIDED IN A LETTER TO THE CORPS.

16   **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT NEWARK AREA 4 IN

17   RELATION TO THE SITE IN RELATION TO THE CITY OF NEWARK,

18   FREMONT, AND THE BAY AREA?

19   **A.**  YES, IT DOES.

20           **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

21   GOVERNMENT'S EXHIBIT 1141-0028 INTO EVIDENCE AND HAVE IT

22   PUBLISHED FOR THE JURY.

23           **MS. HANSEN:**  NO OBJECTION.

24           **THE COURT:**  SO THIS IS JUST BATES NO. 28?

25           **MS. LEE:**  YES.

HIGH - DIRECT / LEE

1      **THE COURT:**  SO THAT EXHIBIT IS ADMITTED.  WE'LL HAVE

2   TO FIGURE OUT A WAY TO ISOLATE IT FROM THE BROADER EXHIBIT.

3      (GOVERNMENT'S EXHIBIT 1141-0028 RECEIVED IN EVIDENCE)

4      **THE CLERK:**  LET ME KNOW WHEN YOU HAVE IT UP, AND I'LL

5   PUBLISH IT.

6                  (DISPLAYED ON SCREEN.)

7   BY MS. LEE:

8   **Q.**  MS. HIGH, WHAT DOES THE STAR INDICATE TO YOU?

9   **A.**  THE STAR IS WHERE AREA 4 -- AN APPROXIMATE LOCATION FOR

10  WHERE AREA 4 IS WITH RESPECT TO THE REST OF THE SOUTH BAY.

11  **Q.**  OKAY.  I WOULD ALSO LIKE TO SHOW YOU WHAT HAS BEEN

12  PREMARKED AS GOVERNMENT'S EXHIBIT NO. 2.

13  **A.**  OKAY.

14                  (EXHIBIT BINDER HANDED TO WITNESS.)

15  **Q.**  IF YOU COULD PLEASE TURN TO THE SECOND TAB THERE.

16  **A.**  YES.

17  **Q.**  WHAT IS THIS?

18  **A.**  THIS IS A MAP OF THE SOUTH BAY THAT DEPICTS SALT PONDS AND

19  THE LOCATION OF THE STUDY AREA.  ALSO ON THE MAP ARE THE DON

20  EDWARDS SAN FRANCISCO BAY NATIONAL WILDLIFE REFUGE, A PORTION

21  OF IT, A SMALL PORTION OF IT.  AND THE CITIES OF NEWARK AND

22  FREMONT.

23  **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT WHAT YOU JUST

24  DESCRIBED?

25  **A.**  YES.  AND IT ALSO SHOWS MOWRY SLOUGH AND ITS RELATION TO

HIGH – DIRECT / LEE

```
1    THE SITE.
2              MS. LEE:  YOUR HONOR, I WOULD LIKE TO MOVE
3    GOVERNMENT'S EXHIBIT 2 INTO EVIDENCE AND HAVE IT PUBLISHED FOR
4    THE JURY.
5              MS. HANSEN:  NO OBJECTION.
6              THE COURT:  EXHIBIT 2 IS ADMITTED.
7         (GOVERNMENT'S EXHIBIT 2 RECEIVED IN EVIDENCE)
8                   (DISPLAYED ON SCREEN.)
9    BY MS. LEE:
10   Q.  MS. HIGH, CAN YOU EXPLAIN THIS MAP AND WHAT WE ARE SEEING
11   HERE?
12   A.  YOU ARE SEEING IN ORANGE WHAT IS LABELED AS THE STUDY AREA
13   ARE THE BOUNDARIES THAT THE CITY OF NEWARK ASSIGNED TO WHAT WE
14   ARE CALLING AREA 4, AND THE UPPER EDGE OF THAT REPRESENTS A
15   RAILROAD BERM THAT RUNS ALONG THE EASTERN SIDE OF THE
16   PROPERTY.  ON THE WESTERN SIDE OF THE PROPERTY THAT KIND OF
17   INVERTED S IS MOWRY SLOUGH, THAT GOES -- IS A TRADITIONAL
18   NAVIGABLE WATER AND GOES OUT TO SAN FRANCISCO BAY.
19        THERE IS A GREEN AREA THAT IS DENOTED THERE THAT INDICATES
20   THAT THAT IS THE NATIONAL WILDLIFE REFUGE.  IT IS ACTUALLY
21   MUCH MORE EXPANSIVE THAN THAT.  THAT GREEN AREA IS JUST THE
22   LOCATION OF THE EDUCATIONAL CENTER.  A LOT OF THE SALT PONDS
23   THAT ARE DEPICTED ON THIS MAP ARE ALSO PART OF THE REFUGE.
24   Q.  SO THE YELLOW AREA DEMARCATED AS STUDY AREA IS NEWARK
25   AREA 4?
```

1    **A.**  YES, IT IS.

2    **Q.**  I WOULD NOW LIKE TO SHOW YOU WHAT HAS BEEN PREMARKED AS

3    GOVERNMENT'S EXHIBIT 157 AND 158, AND I WILL PROVIDE THOSE TO

4    YOU.

5                  (EXHIBIT BINDER HANDED TO WITNESS.)

6        MS. HIGH, WHAT ARE WE LOOKING AT THERE?

7                    (EXHIBITS HANDED TO WITNESS.)

8        MS. HIGH, WHAT DOES GOVERNMENT'S EXHIBIT 157 AND 158

9    DEPICT?

10   **A.**  THEY ARE OBLIQUE AERIAL PHOTOGRAPHY DEPICTING AREA 4.  IT

11   IS FOR THE -- WELL, THE NORTHERNMOST PORTION OF AREA 4 AND ITS

12   RELATIONSHIP TO LINE D, WHICH IS AN ALAMEDA COUNTY FLIGHT

13   CONTROL CHANNEL, AND OUT TOWARDS THE TOP RIGHT OF THE PHOTO IS

14   MOWRY SLOUGH.  YOU CAN SEE PONDED WATERS IN THE PICTURE THAT

15   ARE PART OF AREA 4, AND YOU CAN SEE THE AREA IN HERE WHERE WE

16   RECEIVED A REPORT OF AN UNAUTHORIZED ACTIVITY.

17   **Q.**  SO WITH RESPECT TO GOVERNMENT'S 157 AND 158, WOULD IT BE

18   FAIR TO SAY THAT THEY ARE AERIAL IMAGERIES OF THE NEWARK

19   AREA 4 PROPERTY IN RELATION TO OTHER WATERS AND LANDS NEAR

20   THAT AREA?

21   **A.**  YES.  AND, IN FACT, ON 158 IT ALSO SHOWS THE SALT PONDS A

22   LITTLE MORE -- IN A LITTLE MORE DETAIL.  IT'S -- 157 IS A MUCH

23   CLOSER VIEW.  THE -- 158 IS A BETTER VIEW OF HOW AREA 4 IS

24   SITUATED IN RELATIONSHIP TO OTHER WATER BODIES.

25   **Q.**  DO THEY FAIRLY AND ACCURATELY DEPICT THAT NEWARK AREA 4

1    FROM KIND OF A HELICOPTER AERIAL IMAGERY --

2    **A.**  YES.

3    **Q.**  -- AND THE SURROUNDING LANDS AND WATERS?

4    **A.**  YES.

5         **MS. LEE:**  YOUR HONOR, THE GOVERNMENT WOULD MOVE

6    GOVERNMENT'S EXHIBIT 157 AND 158 INTO EVIDENCE.

7         **MS. HANSEN:**  NO OBJECTION.

8         **THE COURT:**  EXHIBITS 157 AND 158 ARE ADMITTED.

9         (GOVERNMENT'S EXHIBITS 157 AND 158 RECEIVED IN EVIDENCE)

10        **MS. LEE:**  AND IF 157 COULD BE PUBLISHED.

11             (DISPLAYED ON SCREEN.)

12   **BY MS. LEE:**

13   **Q.**  MS. HIGH, WHAT ARE WE LOOKING AT HERE?

14   **A.**  THIS IS A VIEW OF -- THERE'S KIND OF AN AUTO DISMANTLERS

15   ON THE RIGHT AND THEN THERE'S A LARGE LINEAR CONCRETE PAD, AND

16   AT THAT CORNER WHERE THE PAD COMES IN THERE'S A FENCE LINE

17   THAT SHOWS THE BOUNDARY WITH AREA 4 AND THE UNDEVELOPED AREAS

18   OF AREA 4.

19        AREA 4 IS ACTUALLY ON BOTH SIDES OF THIS KIND OF WEDGE

20   SHAPE -- CAN I?  I CAN'T POINT ON THERE.  BUT THIS WEDGE SHAPE

21   WHERE THERE IS MORE DEVELOPMENT IS THE UNDEVELOPED AREA OF

22   AREA 4, AND THEN YOU HAVE WHAT WE CONSIDER WETLANDS ON EITHER

23   SIDE OF IT.  THERE IS A FLOOD CONTROL CHANNEL CALLED LINE D

24   THAT RUNS AT AN ANGLE -- DIAGONAL SEPARATING AREA 4.

25   **Q.**  MS. HIGH, I BELIEVE THAT IF YOU WERE TO TOUCH THE SCREEN,

```
 1    YOU WOULD BE ABLE TO MAKE MARKINGS.

 2              THE CLERK:  NO.  THE FEATURE DOESN'T WORK.  WE WENT

 3    OVER THAT IN THE TUTORIAL.

 4              MS. LEE:  SO WHAT I WILL DO IS HAVE YOU -- YOUR

 5    HONOR, MAY THE WITNESS GET UP FROM THE WITNESS STAND AND

 6    IDENTIFY USING A POINTER?

 7              THE COURT:  YES.  ON THE BIG SCREEN?

 8              MS. LEE:  YES.

 9              THE COURT:  OKAY.

10              THE WITNESS:  SO -- SO THIS IS WHAT WE CONSIDER THE

11    DEVELOPED AREA OF AREA 4.  THIS IS --

12              THE REPORTER:  I'M SORRY?

13              THE WITNESS:  NOW I CAN'T SEE.

14         THIS IS MOWRY SLOUGH RIGHT HERE (INDICATING).  THIS IS

15    WHAT I WAS CALLING LINE D, WHICH IS A FLOOD CONTROL CHANNEL.

16    AND THERE ARE DIFFERENT AREAS OF -- THERE'S AN AREA OF PONDING

17    HERE ON AREA 4.  THIS IS AREA 4 HERE (INDICATING).  THIS IS

18    THE AREA ROUGHLY WHERE WE WERE RECEIVING THE REPORT OF AN

19    UNAUTHORIZED FILL.  THIS IS ALSO AREA 4 RIGHT HERE.

20              MS. LEE:  IF WE CAN PUBLISH GOVERNMENT'S EXHIBIT 158.

21                   (DISPLAYED ON SCREEN.)

22    BY MS. LEE:

23    Q.  MS. HIGH, WHAT ARE WE LOOKING AT HERE?

24    A.  AGAIN, THIS IS THE DEVELOPED AREA OF AREA 4, LINE D.

25    MOWRY SLOUGH THAT SNAKES AROUND IS A NAVIGABLE WATER, GOES OUT
```

HIGH - DIRECT / LEE

1    TO SAN FRANCISCO BAY.  AND THEN AREA 4 IS INSIDE OF THE MARKER

2    THAT I'VE PUT HERE.  SO THIS IS AREA 4, THIS IS AREA 4, THIS

3    IS AREA 4 (INDICATING).  THIS IS THE AREA WHERE WE SAW --

4    RECEIVED THE REPORT OF UNAUTHORIZED FILL.  THESE ARE SALT

5    PONDS OUT HERE (INDICATING).

6    **Q.**  THANK YOU.  AND YOU CAN TAKE A SEAT.

7                    (WITNESS RETURNS TO WITNESS STAND.)

8         MS. HIGH, YOU MENTIONED PREVIOUSLY THAT ONE OF CCCR'S

9    MISSION IS TO COMPLETE THE REFUGE, THE DON EDWARDS SAN

10   FRANCISCO BAY NATIONAL WILDLIFE REFUGE; IS THAT CORRECT?

11   **A.**  YES, IT IS.

12   **Q.**  WHAT IS -- I WILL JUST CALL IT "THE REFUGE."  IT IS A LONG

13   TITLE.  WHAT IS THE REFUGE?

14               **MS. HANSEN:**  OBJECTION.  RELEVANCE.

15               **THE COURT:**  OVERRULED.

16               **THE WITNESS:**  THE REFUGE IS A NATIONAL WILDLIFE

17   REFUGE.  THOSE CAN BE ADMINISTERED -- ADMINISTRATIVELY CREATED

18   BY THE U.S. FISH AND WILDLIFE SERVICE.  BUT OUR PARTICULAR

19   REFUGE, BECAUSE IT WAS IN AN URBAN AREA, WAS ACTUALLY BROUGHT

20   INTO BEING IN 1972 BY ACT OF CONGRESS AS PUBLIC LAW TO

21   ESTABLISH A NATIONAL WILDLIFE REFUGE.  WE SAY IT'S THE FIRST

22   NATIONAL WILDLIFE REFUGE IN AN URBAN AREA, AND THAT INITIAL

23   ACREAGE THAT WAS APPROVED FOR ULTIMATE ACQUISITION OR DONATION

24   WAS 23,000 ACRES.

25        AND THE PURPOSE OF A NATIONAL WILDLIFE REFUGE IS TO,

1    NUMBER 1, PROTECT ENDANGERED SPECIES, RARE SPECIES, SPECIES

2    BIODIVERSITY, AND ALL OF THE HABITATS THAT ARE NEEDED TO

3    SUPPORT THOSE SPECIES.  OUR PARTICULAR REFUGE, BECAUSE IT WAS

4    IN AN URBAN AREA, HAS THE ADDITIONAL MISSIONS OF PUBLIC

5    EDUCATION AND OUTREACH AND ALSO WILDLIFE COMPATIBLE

6    RECREATIONAL USE.

7         IN THE MID-'80S, AS I WAS SAYING EARLIER --

8              **MS. HANSEN:**  OBJECTION.  NARRATIVE, YOUR HONOR.

9              **THE COURT:**  SUSTAINED.

10   **BY MS. LEE:**

11   **Q.**  MS. HIGH, I WOULD LIKE -- THANK YOU FOR YOUR DESCRIPTION

12   ABOUT THE REFUGE, BUT JUST TO STOP YOU RIGHT THERE FOR A

13   SECOND, I WOULD LIKE TO SHOW YOU WHAT IS MARKED AS

14   GOVERNMENT'S EXHIBIT 555-0001.

15             **THE CLERK:**  MAY I HAVE THE DASH PART ONE MORE TIME?

16             **MS. LEE:**  -0001.

17             **THE CLERK:**  THANK YOU.

18                  (EXHIBIT HANDED TO WITNESS.)

19             **THE WITNESS:**  YES.

20   **BY MS. LEE:**

21   **Q.**  MS. HIGH, WHAT IS THAT?

22   **A.**  IT'S A MAP THAT SHOWS IN GREEN THE AREAS THAT ARE

23   CURRENTLY OWNED IN FEE TITLE BY THE REFUGE.  IT ALSO SHOWS THE

24   SITE AREA 4 DENOTED IN ORANGE.  AND THERE'S A RED LINE ON

25   HERE, SQUIGGLY LINE, THAT SHOWS MOWRY SLOUGH, WHICH IS A

1    TRADITIONAL NAVIGABLE WATER.  WHAT IT DOES NOT SHOW IS THE

2    REFUGE POTENTIAL ADDITIONS BOUNDARY, WHICH WAS ESTABLISHED IN

3    1988.

4    **Q.**  DOES THAT MAP FAIRLY AND ACCURATELY SHOW WHAT PORTIONS OF

5    THE BAY AREA ARE PART OF THE REFUGE IN RELATION TO WHERE

6    NEWARK AREA 4 IS?

7    **A.**  YES, IT DOES.

8              **MS. LEE:**  YOUR HONOR, I WOULD ASK TO MOVE

9    GOVERNMENT'S EXHIBIT 555-0001 INTO EVIDENCE.

10             **MS. HANSEN:**  I WOULD OBJECT ON RELEVANCE, YOUR HONOR.

11            **THE COURT:**  OVERRULED.  555 IS ADMITTED.

12            **THE CLERK:**  THANK YOU.

13        (GOVERNMENT'S EXHIBIT 555-0001 RECEIVED IN EVIDENCE)

14            **MS. LEE:**  IF THAT CAN BE PUBLISHED TO THE JURY.

15        THANK YOU.

16   **BY MS. LEE:**

17   **Q.**  MS. HIGH, LOOKING AT YOUR EXHIBIT, WHAT DOES THE GREEN

18   DENOTE?

19   **A.**  THE GREEN DENOTES THE AREAS THAT ARE CURRENTLY OWNED IN

20   FEE TITLE BY THE DON EDWARDS SAN FRANCISCO BAY NATIONAL

21   WILDLIFE REFUGE.

22   **Q.**  AND WHAT DOES THE YELLOW SHOW?

23   **A.**  THE YELLOW SHOWS THE SITE AREA 4 AND ITS LOCATION -- AND

24   ITS RELATIONSHIP TO THE EXISTING OWNED LANDS BY THE REFUGE.

25   IT ALSO SHOWS IN THAT RED SQUIGGLY LINE I MENTIONED THE

1    LOCATION OF MOWRY SLOUGH, WHICH A TRADITIONAL NAVIGABLE WATER.

2    **Q.**  AND YOU MENTIONED IT DOESN'T SHOW THE POTENTIAL

3    ACQUISITION BOUNDARIES OF THE REFUGE; IS THAT CORRECT?

4    **A.**  RIGHT.  AND THAT IS REALLY CRITICAL TO A GROUP LIKE

5    CITIZENS COMMITTEE BECAUSE, AGAIN, OUR MISSION IS TO COMPLETE

6    THE REFUGE.

7         THE REFUGE IS CURRENTLY ABOUT 30,000 ACRES BUT A CRITICAL

8    COMPONENT THAT'S MISSING IS THE SEASONAL WETLANDS AND THE

9    UPLAND BOUNDARY EDGE.  AND IF YOU HAD THE POTENTIAL ADDITIONS

10   BOUNDARY ON HERE, THE LINE, IT WOULD GIVE YOU -- GIVE PEOPLE

11   SOME SENSE OF WHY AREA 4 IS SO IMPORTANT TO US BECAUSE A LARGE

12   PORTION OF AREA 4 IS WITHIN THAT ADDITIONS BOUNDARY.

13   **Q.**  OKAY.  WHY IS AREA 4 WITHIN THE ACQUISITIONS BOUNDARY?

14   **A.**  THAT'S A GOOD QUESTION.  AND AS I SAID, IN THE MID-'80S,

15   CITIZENS COMMITTEE AND A LOT OF OTHER LOCAL ENVIRONMENTAL

16   GROUPS BECAME AWARE THAT IN THE FIRST ITERATION OF THE REFUGE

17   WE WERE MISSING SIGNIFICANT HABITATS, SEASONAL WETLANDS,

18   UPLAND BOUNDARIES, WHICH ARE CRITICAL TO MAINTAINING

19   BIODIVERSITY AND MAINTAINING THE HEALTH OF THE BAY, ESPECIALLY

20   AS SEA LEVEL RISES BECAUSE WE ARE LOSING OUR BIODIVERSITY AS

21   THE EDGES OF THE WATER ADVANCE UPWARD TOWARDS THE LAND.

22        AND IF YOU LOOK AT THE SOUTH BAY, YOU CAN SEE, IF YOU LOOK

23   AT SOMETHING LIKE GOOGLE EARTH, DEVELOPMENT IS RIGHT AT THE

24   EDGE OF THOSE SALT PONDS, AND SO THAT LEAVES VERY LIMITED

25   AREAS WHERE YOU CAN GET THINGS LIKE SEASONAL WETLANDS OR THE

1    UPLAND BOUNDARY AREAS, BUFFER AREAS.

2        AND SEASONAL WETLANDS ARE REALLY DIVERSE AREAS, I MEAN, IN

3    TERMS OF HABITAT, IN TERMS OF THEIR IMPORTANCE OF WATER

4    QUALITY FUNCTIONS.  IF WE DON'T HAVE THESE AREAS IN THE SOUTH

5    BAY, WE'RE GOING TO END UP -- IF SEA LEVEL RISES QUICKER THAN

6    TIDAL MARSHES CAN KEEP UP WITH SEA LEVEL RISE, WE ARE GOING TO

7    END UP WITH BASICALLY --

8            **MS. HANSEN:**  OBJECTION.

9            **THE WITNESS:**  -- LIKE A SWIMMING POOL.

10           **MS. HANSEN:**  SPECULATION.  RELEVANCE.

11           **THE COURT:**  SUSTAINED.

12           **MS. HANSEN:**  MOVE TO STRIKE.

13           **THE COURT:**  MOTION TO STRIKE IS GRANTED.

14       SO, LADIES AND GENTLEMEN, THAT LAST ANSWER IS STRICKEN AND

15   YOU ARE NOT -- YOU ARE TO DISREGARD IT.

16           **MS. LEE:**  YOUR HONOR, WITH RESPECT TO THE LAST PART

17   OF THAT ANSWER; IS THAT CORRECT?

18       WITH RESPECT TO THE -- WHEN SHE STARTS MENTIONING ABOUT

19   SEA LEVEL RISE AND ITS EFFECT ON THE BAY?

20           **THE COURT:**  THAT'S CORRECT.

21   **BY MS. LEE:**

22   **Q.**  MS. HIGH, DID THERE COME A TIME WHEN YOU LEARNED ABOUT

23   POSSIBLE DUMPING OF CONSTRUCTION DEBRIS AND DIRT ON THE NEWARK

24   AREA 4 PROPERTY?

25   **A.**  YES.

HIGH - DIRECT / LEE

1    **Q.**   WHEN WAS THAT?

2    **A.**   SEPTEMBER 6TH, THROUGH AN EMAIL.

3    **Q.**   SEPTEMBER 6TH OF WHAT YEAR?

4    **A.**   I AM SORRY, 2014.

5    **Q.**   HOW DID YOU COME TO LEARN ABOUT THIS DIRT AND CONSTRUCTION

6    DEBRIS ON THIS NEWARK AREA 4 PROPERTY?

7    **A.**   I HAD BRIEFLY MENTIONED THAT THERE HAD BEEN A LONG

8    ENVIRONMENTAL REVIEW PROCESS BECAUSE OF A SPECIFIC AREA PLAN

9    THAT THE CITY OF NEWARK HAD PUT FORTH, AND THERE WAS

10   ENVIRONMENTAL REVIEW OF THE IMPACTS THAT WOULD OCCUR AND

11   IDENTIFICATION OF WHAT WAS IMPORTANT ON THE SITE.

12       AND BECAUSE OF THAT LONG PROCESS, THERE WERE A LOT OF

13   LOCAL ENVIRONMENTAL GROUPS THAT WERE AWARE THAT THINGS WERE

14   PROPOSED FOR AREA 4.  THERE WAS ONE GROUP, FRIENDS OF COYOTE

15   HILLS, THAT WAS INVOLVED IN THAT PROCESS, AND SOMEBODY SENT

16   OUT AN EMAIL, SAYING THAT THEY HAD OBSERVED DUMPING IN A

17   PICKLEWEED FOREST ON AREA 4, TO THAT GROUP AND I'M A MEMBER OF

18   THAT EMAIL GROUP.

19   **Q.**   THAT'S WHAT NOTIFIED YOU OF POSSIBLE UNAUTHORIZED DUMPING

20   ON NEWARK AREA 4 PROPERTY?

21   **A.**   YES.

22   **Q.**   WHO POSTED THAT --

23   **A.**   DAN --

24   **Q.**   -- POSTING?

25   **A.**   DAN MILLER.  HE'S A MEMBER OF FRIENDS OF COYOTE HILLS.

1    **Q.**  IN THAT POSTING, DID MR. MILLER ALSO INCLUDE PHOTOS OF

2    WHERE THE DUMPING HAD OCCURRED?

3    **A.**  YES.  HE HAD TAKEN A GOOGLE EARTH IMAGE AND PUT IN WHITE

4    LINES TO DENOTE THE AREA THAT HE HAD OBSERVED THE ACTIVITIES

5    OCCURRING IN.

6    **Q.**  AND WAS THAT THE AREA THAT YOU HAD DESCRIBED PREVIOUSLY

7    WHEN THE AERIAL IMAGERY WAS UP?

8    **A.**  YES.

9    **Q.**  AND YOU HAD INDICATED THAT NORTHERN TRIANGULAR AREA?

10   **A.**  YES.

11   **Q.**  HOW DID YOU RESPOND WHEN YOU READ THIS POSTING?

12   **A.**  BECAUSE I HAD NOT INITIALLY BEEN ABLE TO REVIEW HIS MAP, I

13   JUST QUESTIONED IF HE HAD PROVIDED A MAP, BECAUSE I HAD LOOKED

14   AT IT ON MY CELL PHONE, AND THEN, YOU KNOW, IF HE HAD ANY

15   OTHER INFORMATION.  SO I SENT THAT QUESTION OFF.  I SENT HIM A

16   MAP THAT HAD COME FROM THE ENVIRONMENTAL REVIEW PROCESS THAT

17   THE CITY HAD CONDUCTED AND CIRCLED THE AREA AND ASKED IF I WAS

18   CORRECT THAT THAT WAS THE PLACE HE WAS DESCRIBING.

19   **Q.**  I WOULD LIKE FOR YOU -- I WOULD LIKE TO SHOW YOU WHAT HAS

20   BEEN PREMARKED AS GOVERNMENT'S EXHIBIT 1141-0036.

21                  (EXHIBIT HANDED TO WITNESS.)

22       MS. HIGH, WHAT IS IT THAT YOU ARE LOOKING AT?

23   **A.**  I AM LOOKING AT A MAP FROM AN ENVIRONMENTAL REVIEW

24   DOCUMENT THAT WAS PRODUCED FOR THE CITY OF NEWARK AND IT SHOWS

25   DIFFERENT BIOLOGICAL HABITATS WITHIN AREA 4.  THERE IS A LOT

1    OF WETLANDS INTERSPERSED.  THERE ARE SOME UPLAND AREAS.  IN

2    THE VICINITY OF THE DARK RED NORTH OF LINE D, THERE'S A BLUE

3    SPOT, AND I PUT A CIRCLE AROUND IT BECAUSE THAT WAS AS CLOSE

4    AS I COULD DETERMINE TO BE FROM MR. MILLER'S DESCRIPTION THE

5    AREA OF CONCERN.

6    **Q.**  DOES THAT MAP WITH THAT RED CIRCLE THAT YOU CREATED, DOES

7    THAT FAIRLY AND ACCURATELY DEPICT THE PROPERTY IN TERMS OF THE

8    MAPPING OF THE PROPERTY AND THE CIRCLE THAT YOU MADE ON THE

9    PROPERTY?

10   **A.**  YES, IT DOES.

11          **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

12   GOVERNMENT'S EXHIBIT 1141-0036 INTO EVIDENCE.

13          **MS. HANSEN:**  YOUR HONOR, I WILL HAVE NO OBJECTION FOR

14   THIS PAGE ONLY OF THIS EXHIBIT BASED ON OUR PREVIOUS

15   DISCUSSION.

16          **THE COURT:**  ALL THAT IS BEING OFFERED IS THIS PAGE,

17   CORRECT?

18          **MS. LEE:**  YES.

19          **THE COURT:**  SO 1141-0036 IS ADMITTED.  AND, AGAIN, WE

20   WILL HAVE TO FIGURE OUT HOW TO SEGREGATE IT OUT.

21          **MS. LEE:**  WILL DO.

22       (GOVERNMENT'S EXHIBIT 1141-0036 RECEIVED IN EVIDENCE)

23                 (DISPLAYED ON SCREEN.)

24   **BY MS. LEE:**

25   **Q.**  MS. HIGH, IS THIS THE MAP THAT SHOWS NEWARK AREA 4?

HIGH - DIRECT / LEE

1  **A.**  YES, IT IS.

2  **Q.**  AND THAT SQUIGGLY LINE ON THE LEFT-HAND SIDE OF THE MAP,

3  IS THAT MOWRY SLOUGH?

4  **A.**  YES, IT IS.

5  **Q.**  AND CAN YOU INDICATE, WHERE IS THE RED CIRCLE THAT YOU

6  MENTIONED?

7  **A.**  DO YOU WANT ME TO GET UP AND POINT TO IT?

8  **Q.**  IF YOU COULD JUST DESCRIBE.

9  **A.**  IF YOU LOOK TO THE LEFT OF LINE D ON THE MAP, THERE IS

10  SOMETHING DESCRIBED AS THE AUTO WRECKING YARD.  IT COMES DOWN

11  TO A TRIANGULAR POINT.  TO THE RIGHT OF THAT TRIANGULAR POINT

12  IS A BLUE TRIANGLE AND THERE'S A RED KIND OF OVAL SHAPE MARK

13  AROUND THAT BLUE TRIANGLE.

14  **Q.**  AND THIS IS BASED OFF OF AN ENVIRONMENTAL IMPACT REPORT

15  THAT HAD BEEN DONE ON THE SITE?

16  **A.**  YES, IT IS.

17  **Q.**  AND YOU MADE THAT MARKING OF THAT CIRCLE IN ORDER TO

18  CONFIRM WITH MR. MILLER AS TO WHERE HE SAW THE DIRT AND

19  CONSTRUCTION DEBRIS DUMPED?

20  **A.**  RIGHT.  I JUST WANTED TO MAKE SURE I UNDERSTOOD

21  APPROXIMATELY WHERE HE THOUGHT THIS WAS OCCURRING.

22  **Q.**  OKAY.  DID HE CONFIRM THAT THAT WAS THE --

23  **A.**  YES.

24  **Q.**  -- THE PLACE?

25  SO WHAT DID YOU DO NEXT?

HIGH - DIRECT / LEE

1    **A.**   WE ASKED IF HE COULD TAKE US OUT SO WE COULD LOOK AT THE

2    SITE.

3    **Q.**   AND WHEN -- AND I WANT TO BACK UP.   WHEN DID THIS POSTING

4    COME TO YOU?

5    **A.**   THE EMAIL?

6    **Q.**   YES.

7    **A.**   SEPTEMBER 6TH, 2014.

8         AND, ACTUALLY, I SHOULD BACK UP BECAUSE BEFORE WE WENT

9    OUT, I DID DO A LITTLE REVIEW OF AERIAL PHOTOGRAPHY THAT IS

10   AVAILABLE THROUGH GOOGLE EARTH JUST TO GET A SENSE OF WHAT THE

11   LAND LOOKED LIKE.

12   **Q.**   SO YOU GET THIS EMAIL ON SEPTEMBER 6TH, 2014 INFORMING YOU

13   OF THIS POSSIBLE ILLEGAL DISCHARGE ON THIS PROPERTY.   WHEN DO

14   YOU GO OUT ON TO THE LAND YOURSELF TO VERIFY?

15   **A.**   WE WENT OUT ON THE NEXT DAY, SEPTEMBER 7TH.

16   **Q.**   OF 2014?

17   **A.**   OF 2014.

18   **Q.**   WHO DID YOU GO WITH?

19   **A.**   I WENT WITH DAN MILLER, MARGARET LEWIS, WHO'S A MEMBER OF

20   CITIZENS COMMITTEE TO COMPLETE THE REFUGE, AND MY HUSBAND,

21   HOWARD HIGH.

22   **Q.**   HOW DID YOU GET ON TO THE PROPERTY?

23   **A.**   SO IF YOU LOOK AT THE MAP, RIGHT AT THE UPPER CORNER WHERE

24   IT SAYS, SALT POND CRYSTALLIZERS, IF YOU LOOK --

25   **Q.**   MS. HIGH, I THINK WHAT I WILL DO IS GIVE YOU THE POINTER.

1    ONE SECOND.

2            **MS. LEE:**  YOUR HONOR, MAY THE WITNESS COME OFF THE

3    WITNESS STAND TO POINT?

4            **THE COURT:**  SHE MAY.  AND SHE SHOULD, AGAIN, BE THERE

5    AT THE MIC SO WE CAN HEAR YOU.

6            **MS. LEE:**  I --

7            **THE CLERK:**  I GAVE HER THE WIRELESS MIC SO SHE COULD

8    STAND AT THE --

9            **THE WITNESS:**  I DON'T KNOW IF I CAN DO TWO THINGS AT

10   ONCE.  OKAY.

11           **MS. LEE:**  YOU CAN GO CLOSER.

12           **THE WITNESS:**  OKAY.  BECAUSE I CAN'T SEE.

13       SO NOW CAN YOU SEE?

14       THIS IS SILLIMAN CENTER HERE.  THEY HAVE A PARKING LOT

15   BACK HERE BECAUSE THERE ARE PLAYING FIELDS.  WE PARKED HERE,

16   AND THIS DASHED LINE IS A RAILROAD BERM, THE UNION PACIFIC

17   RAILROAD.

18       SO WE WALKED ALONG THE RAILROAD TRACK BERM.  AND THEN HERE

19   IS AN ALAMEDA COUNTY FLOOD CONTROL LEVEE, AND WE WALKED OUT ON

20   THE FLOOD CONTROL LEVEE, WHICH ACTUALLY HAS KIND OF A GRAVEL

21   ROAD.

22   **BY MS. LEE:**

23   **Q.**  DID YOU GO ON TO THE PROPERTY?

24   **A.**  NO.

25   **Q.**  YOU REMAINED ON THE LEVEE?

1    **A.**  WE REMAINED ON THE RAILROAD BERM AND ON THE LEVEE.

2    **Q.**  WHY DID YOU NOT GO ON TO THE PROPERTY?

3    **A.**  BECAUSE WE WERE VERY COGNIZANT THAT THE PROPERTY AREA

4    WAS PRIVATE PROPERTY.  WE WANTED TO MAKE SURE WE STAYED ON THE

5    LEVEE.

6    **Q.**  WHAT DID YOU SEE -- JUST TO CLARIFY, SO YOU WALKED ALONG

7    THE RAILROAD?

8    **A.**  WE WALKED ALONG THE RAILROAD.

9    **Q.**  YOU MADE A RIGHT ONTO THAT BERM?

10   **A.**  YES.

11   **Q.**  AND YOU KIND OF GOT TO THAT NORTHERN SECTION TRIANGULAR

12   AREA; IS THAT RIGHT?

13   **A.**  WELL, ACTUALLY, BEFORE WE GOT TO THE NORTHERN SECTION

14   TRIANGULAR AREA WE WERE SEEING WHAT APPEARED TO BE MOUNDS OF

15   FILL ALONG THE BOUNDARY OF THE LEVEE AND THE PRIVATE PROPERTY

16   AND THE WETLANDS.

17   **Q.**  AND DID YOU -- SO IS IT YOUR TESTIMONY THAT YOU SAW MOUNDS

18   OF FILL BEYOND JUST THE RED CIRCLE?

19   **A.**  YES.

20   **Q.**  WHERE DID YOU SEE THE MOUNDS OF FILL?

21   **A.**  YOU KNOW, THIS IS SO BLOWN OUT, BUT I THINK IT STARTED

22   SOMEWHERE IN THIS AREA (INDICATING).

23   **Q.**  AND IT EXTENDED BEYOND THE CIRCLE INTO THE RED PORTION?

24   **A.**  YES.

25   **Q.**  THAT RED PORTION ON THAT MAP, WHAT IS IT CALLED?

1    **A.**   IT'S CALLED AQUATIC HABITAT.   CAN I -- THAT'S TOO SMALL.

2    **Q.**   HERE WE ARE.   HERE'S THE LEGEND, RIGHT, FOR YOU.   WHAT IS

3    THE RED PORTION?

4    **A.**   THE RED PORTION IS MUTED TIDAL SALT MARSH.

5            **MS. LEE:**   IF WE CAN GO BACK TO THAT BIGGER MAP.

6                    (DISPLAYED ON SCREEN.)

7    **BY MS. LEE:**

8    **Q.**   AND THERE'S QUITE A FEW COLORS ON THIS MAP; IS THAT RIGHT?

9    **A.**   YES.   BECAUSE THERE'S QUITE A VARIETY OF HABITATS.

10   **Q.**   OKAY.   MUTED SALT HAR --

11   **A.**   SALT MARSH.

12   **Q.**   SALT MARSH.

13   **A.**   TIDAL SALT MARSH.

14   **Q.**   IS THAT A TYPE OF WETLAND?

15   **A.**   YES, IT IS.

16   **Q.**   ARE SOME OF THE OTHER COLORS DENOTED ON THIS MAP ALSO

17   TYPES OF WETLANDS?

18   **A.**   YES.   THERE'S -- LIKE I SAID, THERE'S A NUMBER OF WETLAND

19   TYPES.   THERE'S THE DARK GREEN.   THEY ARE CALLING THE DARK

20   GREEN AGRICULTURAL FIELD SEASONAL WETLAND SALINE TO BRACKISH.

21   AND THEN THERE'S A LIGHTER GREEN THAT'S CALLED SEASONAL

22   WETLAND BRACKISH TO FRESH.   AND THAT'S BECAUSE THERE'S A

23   NUMBER OF DIFFERENT MEANS OF GETTING WATER ONTO THE SITE.

24   **Q.**   BUT ALL THOSE COLORS, LIGHT GREEN, GREEN, THAT KIND OF

25   DARKER, BURGUNDY, THOSE ARE ALL JUST DIFFERENT TYPES OF

1    WETLANDS; IS THAT CORRECT?

2    **A.**   YES.

3    **Q.**   BUT ALL ENTER THE CATEGORY OF WETLANDS?

4    **A.**   YES.

5    **Q.**   AND THAT BLUE AREA IN THE MAP, WHAT IS THAT CALLED?

6    **A.**   IT'S CALLED AQUATIC.  WHEN WE SAW IT, IT WAS WETLAND.  IT

7    HAD WETLAND VEGETATION.

8    **Q.**   HAD WETLAND VEGETATION.  OKAY.

9        SO WHEN YOU GOT THERE ON SEPTEMBER 7TH, 2014, AND YOU ARE

10   STANDING ON THAT LEVEE AND YOU SEE THE FILL MATERIAL, I JUST

11   WANT TO CONFIRM, DID YOU SEE FILL MATERIAL IN BOTH THE BLUE,

12   RED, AND THE DARKER GREEN PORTIONS?

13   **A.**   I BELIEVE SO, BUT, AGAIN, THE SCALE ON THIS MAP IS HARD TO

14   ACCURATELY PINPOINT.  DEFINITELY WITHIN THE RED AND THE BLUE.

15   **Q.**   OKAY.  AND DID YOU TAKE PHOTOS THAT DAY WHEN YOU WENT ON

16   SEPTEMBER 7TH?

17   **A.**   YES, WE DID.

18   **Q.**   HOW MANY PHOTOS DID YOU TAKE?

19   **A.**   I THINK I TOOK OVER 40.

20   **Q.**   OKAY.  I WOULD LIKE TO SHOW YOU WHAT'S BEEN MARKED AS

21   GOVERNMENT'S EXHIBIT 1141-0057 TO 0099.

22                (EXHIBITS HANDED TO WITNESS.)

23           **THE CLERK:**  I'M SORRY, I NEED THE NUMBERS AGAIN.

24           **MS. LEE:**  0057 TO 0099.  AND, AGAIN, THESE ARE ALL

25   UNDER GOVERNMENT'S EXHIBIT 1141.  AND IF ADMITTED, WE WILL

1    PARSE OUT THE ONES THAT HAVE BEEN ADMITTED.

2          **THE CLERK:**  THANKS.

3    **BY MS. LEE:**

4    **Q.**  MS. HIGH, ARE THESE THE PHOTOS THAT YOU TOOK FROM THAT

5    LEVEE ON SEPTEMBER 7TH, 2014?

6    **A.**  JUST GOING THROUGH.  YES, THEY ARE.

7    **Q.**  DO THEY FAIRLY AND ACCURATELY DEPICT NOT JUST THE PHOTOS

8    THAT YOU TOOK BUT WHAT THE SITE LOOKED LIKE WHEN YOU WENT

9    THERE?

10   **A.**  ABSOLUTELY, YES.

11         **MS. LEE:**  I WOULD LIKE TO MOVE ALL 42 OF THE PHOTOS

12   THAT YOU TOOK INTO EVIDENCE.

13         **MS. HANSEN:**  YOUR HONOR, I AM SORRY, I NEED TO SEE

14   THEM FIRST.  I DID NOT REALIZE THE GOVERNMENT WAS USING THE

15   LARGER EXHIBIT.  SO IF I CAN HAVE A MOMENT?

16         **THE COURT:**  CERTAINLY.

17              (PAUSE IN THE PROCEEDINGS.)

18         **MS. HANSEN:**  NO OBJECTION, YOUR HONOR.

19         **THE COURT:**  ALL RIGHT.  SO EXHIBIT 1141 BATES

20   NO. 0057 THROUGH 0099 ARE ADMITTED.

21     (GOVERNMENT'S EXHIBITS 1141-0057 TO 0099 RECEIVED IN

22   EVIDENCE)

23         **MS. LEE:**  I WOULD LIKE TO GO THROUGH THESE VERY

24   QUICKLY ONE BY ONE.

25     CAN WE HAVE 0057 UP ON THE SCREEN?

1              (DISPLAYED ON SCREEN.)

2    **BY MS. LEE:**

3    **Q.**  MS. HIGH, I'M GOING TO HAVE YOU GO THROUGH THESE FAIRLY

4    QUICKLY BECAUSE THERE IS QUITE A NUMBER OF THEM.  COULD YOU

5    JUST DESCRIBE VERY BRIEFLY WHAT IT IS THAT WE ARE LOOKING AT?

6    **A.**  THIS IS AS WE ARE APPROACHING THAT TRIANGLE TOWARDS THE --

7    TOWARDS THE WEST.  SO WE ARE WALKING ALONG THE FLOOD CONTROL

8    LEVEE FROM THE RAILROAD BERM TOWARDS THE POINT --

9    **Q.**  MS. HIGH, I'M NOT SO MUCH TALKING ABOUT THE LOCATION

10   BECAUSE I THINK YOU HAVE BEEN CLEAR AS TO WHERE YOU SAW THE

11   DUMPING, BUT WHAT SIGNIFICANCE DOES THIS PHOTO HAVE TO YOU?

12   **A.**  WELL, IT -- FROM THE LEVEE IT IS DIFFICULT TO TELL BUT IT

13   APPEARS THAT THERE IS SOME DISTURBANCE OF THE SOIL SO I TOOK A

14   PHOTO.  I WASN'T SURE BECAUSE I COULDN'T GET ON TO THE

15   PROPERTY BUT I WANTED TO MAKE SURE THAT I DOCUMENTED THAT WE

16   SAW SOME DISTURBANCE.  AND IN THE DISTANCE THERE WERE AREAS

17   WHERE THE SOIL COLOR HAS CHANGED, AND I BELIEVE THAT THOSE

18   WERE AREAS WHERE THERE WAS NOT FILL -- NOT SOIL FROM THE SITE.

19          **MS. LEE:**  AND I WON'T GO THROUGH EVERY ONE, BUT CAN

20   WE GO TO 59?

21              (DISPLAYED ON SCREEN.)

22          **THE WITNESS:**  YES.

23   **BY MS. LEE:**

24   **Q.**  AND WHAT, IF ANY, SIGNIFICANCE DOES THIS PHOTO HAVE TO

25   YOU?

1    **A.**   TO ME THIS DEFINITELY SHOWS THAT THERE HAS BEEN

2    DISTURBANCE.  IT DOESN'T SHOW UP AS GOOD ON THE PHOTO BUT

3    THERE WERE KIND OF MOUNDS AND AREAS WHERE SOIL HAD BEEN PUSHED

4    OUT AND INTO WHAT WOULD HAVE BEEN WETLAND HABITAT.

5         **MS. LEE:**  AND I WOULD LIKE FOR YOU TO GO TO

6    EXHIBIT 61.

7                   (DISPLAYED ON SCREEN.)

8         **THE WITNESS:**  61 SHOWS, YOU KNOW, SOME OF THE STUFF

9    THAT WE SAW.  IT APPEARED FROM WHAT WE COULD TELL THAT PILES

10   HAD BEEN DUMPED IN THAT KIND OF CONCRETE POINT AREA AND THEN

11   JUST KIND OF BULLDOZED OUT OVER WETLAND HABITAT.

12        **MS. LEE:**  AND 0062.

13                  (DISPLAYED ON SCREEN.)

14        **THE WITNESS:**  AGAIN, MORE OF THE SAME.  YOU CAN SEE

15   THE DIFFERENT COLORS OF SOIL.  YOU CAN SEE THAT THERE'S NO

16   VEGETATION.  THERE'S JUST, YOU KNOW, LITTLE BITS OF VEGETATION

17   POPPING UP.  AND YOU CAN SEE THAT IT'S GOT, LIKE, FURROWS IN

18   IT.  SO TO ME THAT, AGAIN, DENOTES THAT THE SOIL HAS BEEN

19   DISTURBED BECAUSE IT IS NOT FLAT.

20        **MS. LEE:**  0064.

21                  (DISPLAYED ON SCREEN.)

22        **THE WITNESS:**  I THINK THIS SHOWS -- OH, THAT IS 63.

23   I'M SORRY.  64 SHOWS ACTUAL MOUNDS OF FILL.  AND ON THE --

24   TOWARDS THE LEFT SIDE WHERE YOU SEE A FENCE LINE, YOU SEE

25   FENCE POSTS, THAT IS PILED UP ON TOP OF WETLAND VEGETATION.

1    **BY MS. LEE:**

2    **Q.**  DID YOU SEE THAT THE FILL HAD BEEN PILED ON TOP OF WETLAND

3    VEGETATION?

4    **A.**  YES.  AND I THINK LATER IN THE PHOTOS THERE IS ACTUALLY

5    CLOSE-UP VIEWS OF THAT THAT I TOOK WITH MY ZOOM FROM THE

6    LEVEE.

7            **MS. LEE:**  I WOULD LIKE TO SHOW YOU 0065.

8                    (DISPLAYED ON SCREEN.)

9            **THE WITNESS:**  YEP.

10   **BY MS. LEE:**

11   **Q.**  WHAT IS THIS?

12   **A.**  THIS, AGAIN, IS DISRUPTED WETLAND VEGETATION.  YOU CAN SEE

13   STRANDS OF PICKLEWEED THAT MAY HAVE BEEN JUST KIND OF

14   BULLDOZED AS THEY WERE MOVING FILL MATERIAL AROUND, SO IT MAY

15   HAVE BEEN SCRAPED.  AND YOU CAN ALSO SEE THAT THERE IS

16   MATERIAL THAT'S BEEN DUMPED AND DISRUPTED.  AND IF IT WAS

17   UNDISTURBED, THAT WOULD JUST BE FLAT.  THERE COULD BE SOME

18   CRACKS IN THE SOIL BECAUSE OF CLAY SOILS BUT IT WOULDN'T HAVE

19   ALL OF THIS UP-AND-DOWN DISTURBED APPEARANCE.

20   **Q.**  AND DID YOU SEE DIFFERENT COLORED SOILS THAT DAY?

21   **A.**  YES.  AND YOU CAN ACTUALLY SEE IT AT THE TOP OF THE PHOTO.

22   IN CLAY SOILS FROM THIS AREA YOU'D EXPECT WHEN THEY DRY OUT,

23   THAT THEY WOULD BE KIND OF A GRAYISH COLOR --

24           **MS. HANSEN:**  OBJECTION.  BEYOND THE SCOPE OF THE

25   WITNESS'S EXPERTISE.

HIGH - DIRECT / LEE

1              MS. LEE:  I WILL REPHRASE, YOUR HONOR.

2              THE COURT:  ALL RIGHT.

3       BY MS. LEE:

4       Q.   YOU MENTIONED YOU HAD BEEN AT THE SITE IN 2008; IS THAT

5       CORRECT?

6       A.   YES.

7       Q.   AND THAT WAS BEFORE ANY REPORTING OF UNAUTHORIZED

8       DISCHARGE OF FILL MATERIAL ON THE PROPERTY?

9       A.   RIGHT.

10      Q.   DID YOU HAVE AN OPPORTUNITY TO SEE THIS NORTHERN SECTION

11      OF THAT NEWARK AREA 4 IN AN UNDISTURBED FORMAT?

12      A.   YEAH, IT WAS VEGETATED.

13      Q.   AND WHAT COLOR WAS THE SOIL?

14      A.   I HAVE TO BE HONEST, I COULDN'T REALLY SEE -- IT WOULD BE

15      DIFFERENT BECAUSE THERE WAS WATER IN THE AREA AND SO IT WOULD

16      HAVE APPEARED DARK.  BUT CLAY SOILS, WHEN THEY DRY OUT, THEY

17      ARE GRAY, SO.

18      Q.   SO THERE WAS VEGETATION THERE BACK IN 2008?

19      A.   YES.

20      Q.   AND NOW, WHEN YOU WENT, YOU SAW DIFFERENT COLORED SOILS

21      THERE?

22      A.   YES, AND THAT'S NOT SOMETHING THAT YOU WOULD -- FIRST OF

23      ALL, IT WAS UNVEGETATED.  IT WAS JUST SOIL, DISTURBED SOILS

24      THAT HAD BEEN MOVED AROUND.

25           AND YOU WOULDN'T SEE THESE VARIETY OF COLORS LIKE THE

1    LIGHT BROWN, AND THERE ARE SOME THAT APPEAR YELLOW, AND THEN

2    YOU HAVE THE GRAY SOILS.  SO YOU WOULD NOT SEE THAT NORMALLY

3    OCCURRING.  IT WOULD JUST BE -- YOU WOULDN'T SEE LOOSE SOIL

4    LIKE THIS ON THE SURFACE.

5    **Q.**   AND THAT IS WHAT DENOTED TO YOU THAT THERE HAD BEEN FILL

6    MATERIAL PLACED ON HERE?

7    **A.**   THAT AND THE FACT THAT WE HAD ACTUALLY SEEN PILES OF FILL.

8    **Q.**   WE HAVE BEEN TALKING ABOUT DIFFERENT COLORS OF SOILS BUT

9    DID YOU ALSO SEE DEBRIS CONTAINED WITHIN --

10   **A.**   THERE WAS CONCRETE RUBBLE.  THERE WAS VEGETATION THAT HAD

11   BEEN CHOPPED UP AND IT WAS MIXED IN WITH DIRT AND RUBBLE, AND

12   I THINK I HAVE THAT IN PHOTOS FURTHER ON.

13   **Q.**   OKAY.  AND DID YOU SEE IF THIS FILL MATERIAL, THIS DIRT,

14   THESE DIFFERENT COLORS DIRT, THE CONCRETE RUBBLE, DID YOU SEE

15   IF IT HAD COVERED PICKLEWEED?

16   **A.**   I TRIED TO TAKE PHOTOS OF THAT, YES.

17   **Q.**   WHAT IS THE SIGNIFICANCE OF PICKLEWEED?

18   **A.**   PICKLEWEED IS -- WELL, IT HAS TWO SIGNIFICANCES FOR THIS

19   SITE.  PICKLEWEED IS -- TYPICALLY IS ALWAYS, IN MY VIEW,

20   ASSOCIATED WITH WETLAND HABITAT, VERY WET SITES.  AND MORE

21   IMPORTANTLY TO US, BECAUSE WE KNOW OF TRAPPING THAT HAS

22   OCCURRED ON THIS SITE, IT DENOTES ENDANGERED SPECIES HABITAT

23   BECAUSE THAT IS PREFERRED HABITAT FOR THE FEDERALLY LISTED

24   ENDANGERED SALT MARSH HARVEST MOUSE.

25   **Q.**   SO PICKLEWEED IS AN INDICATOR OF WETLANDS?

1   **A.**   WETLANDS AND ENDANGERED SPECIES HABITAT, YES.

2   **Q.**   AND YOU HAD SEEN FILL MATERIAL PLACED ON TOP OF

3   PICKLEWEED?

4   **A.**   YES.

5          **MS. LEE:**  I WOULD LIKE TO SHOW YOU EXHIBIT -- THAT'S

6   0066.

7          **THE WITNESS:**  YES.

8                  (DISPLAYED ON SCREEN.)

9   **BY MS. LEE:**

10  **Q.**   WHAT ARE WE LOOKING AT HERE?

11  **A.**   WE ARE LOOKING AT THE FILL MATERIAL.  WE ARE LOOKING AT

12  DISTURBED VEGETATION.  AND I MIGHT -- CAN I SHOW YOU WITH A

13  POINTER THE PICKLEWEED IN THERE?  DO YOU WANT TO SEE THAT?

14         **MS. LEE:**  WITH THE COURT'S PERMISSION, IF SHE CAN

15  INDICATE WHERE THE PICKLEWEED IS?

16         **THE COURT:**  SHE MAY.

17             (WITNESS STEPS DOWN TO MONITOR.)

18         **THE WITNESS:**  SO PICKLEWEED HERE (INDICATING),

19  PICKLEWEED HERE (INDICATING), AND WHAT LOOKS LIKE DISTURBED

20  PICKLEWEED, WHEN IT'S DEAD, IT'S THIS BROWNISH COLOR.  SO

21  PILES OF FILL (INDICATING), DIFFERENT COLORS OF DIRT.  AGAIN,

22  THIS MOUNDED DISTURBED AREA, AND THEN PICKLEWEED RIGHT IN

23  HERE, RIGHT IN THE MIDST OF VERY DISTURBED SOILS.

24         **MS. LEE:**  MS. HIGH, PLEASE TAKE A SEAT.  THANK YOU.

25    AND IF 0068 COULD BE PUBLISHED TO THE JURY.

1          (DISPLAYED ON SCREEN.)

2    BY MS. LEE:

3    Q.   WHAT IS HERE?

4    A.   THIS ONE SHOWS CONCRETE RUBBLE PILED RIGHT UP ON TOP OF

5    WHAT APPEARS TO BE DYING PICKLEWEED.  PICKLEWEED DOES GO

6    INTO -- CAN GO INTO A DORMANT PERIOD BUT THAT IS USUALLY IN

7    THE FALL AND -- LATER IN THE FALL.  AND SO YOU CAN SEE THAT

8    THERE ARE SOME SPRIGS OF PICKLEWEED THAT ARE TRYING TO COME

9    BACK, BUT A LOT OF THIS IS JUST DISRUPTED VEGETATION AND IT'S

10   GOT SOME SORT OF RUBBLE IN IT.

11          MS. LEE:  AND 0069.

12               (DISPLAYED ON SCREEN.)

13          THE WITNESS:  SAME THING, ONLY THIS ONE HAS -- I

14   DON'T KNOW WHAT THAT IS.  SOME SORT OF ROOT MASSES LIKE THEY

15   HAD DUG THINGS UP, AND YOU CAN SEE THAT THERE ARE GIANT CLUMPS

16   OF DIRT THAT HAVE BEEN DISTURBED.  YOU CAN SEE WOOD DEBRIS.

17   YOU CAN SEE ROCK OR CONCRETE.  AND AT THE TOP OF THE PICTURE

18   YOU CAN SEE MORE DIRT AND CONCRETE RUBBLE MIXED TOGETHER.

19          MS. LEE:  AND 0072.

20               (DISPLAYED ON SCREEN.)

21          THE WITNESS:  IN THE BACK OF THIS ONE YOU CAN SEE A

22   PILE, A LARGE PILE OF CONCRETE RUBBLE, DISTURBED VEGETATION,

23   LOOKS LIKE THERE MIGHT HAVE BEEN CATTAILS BACK THERE THAT HAVE

24   BEEN MOVED AROUND.  AND IN THE FOREGROUND MORE CLUMPS OF DIRT

25   THAT HAVE BEEN DUMPED OR CHURNED UP AND WOOD AND DIFFERENT

1    COLORED SOILS.

2                **MS. LEE:**  AND 0073.

3                        (DISPLAYED ON SCREEN.)

4                **THE WITNESS:**  THIS ONE LOOKS -- THIS IS WHAT MADE US

5    THINK THAT THEY WERE PROBABLY PUTTING DOWN PILES OF DIRT AND

6    THEN JUST PUSHING IT OUT INTO THE WETLAND AREA.

7    **BY MS. LEE:**

8    **Q.**  WHY?

9    **A.**  WELL, BECAUSE YOU SEE A LOT OF VEHICLE TREADS ON THERE,

10   AND YOU CAN SEE THAT THINGS HAVE BEEN -- THERE IS NO

11   VEGETATION BECAUSE THE VEGETATION WOULD HAVE BEEN CONSISTENT

12   WITH THE VEGETATION IN THE BACKGROUND SO, YOU KNOW, UP OFF THE

13   GROUND.  AND THERE'S NO VEGETATION.  YOU JUST SEE THESE LINES

14   OF TIRE MARKS, MANY TIRE MARKS THAT JUST LOOK LIKE THINGS HAVE

15   JUST BEEN PUSHED OUT.

16   **Q.**  SO THE VEGETATION IN THE BACK WHERE WE SEE GREEN AND THOSE

17   TALL GRASSES, THAT WAS WHERE THERE WAS NO FILL MATERIAL ON

18   THOSE?

19   **A.**  RIGHT.

20                **MS. LEE:**  AND 0076.

21                        (DISPLAYED ON SCREEN.)

22   **BY MS. LEE:**

23   **Q.**  IS THAT ANOTHER TIRE MARK?

24   **A.**  TIRE MARK, RUBBLE, DISTURBED VEGETATION, LOOKS LIKE, YOU

25   KNOW, THINGS HAVE BEEN JUST KIND OF CHURNED AROUND AS THE

1    TRUCKS WERE DRIVING THROUGH AND SCRAPING MATERIAL.

2          **MS. LEE:**  AND 0078.

3                 (DISPLAYED ON SCREEN.)

4          **THE WITNESS:**  MORE OF THE SAME.  THERE I WAS TRYING

5    TO DEPICT THAT IT WAS DEFINITELY IN WETLAND VEGETATION.  THAT

6    IS PICKLEWEED AND MAYBE FRANKINIA IN THERE, BOTH SPECIES THAT

7    YOU ASSOCIATE WITH WETLANDS, PLANT SPECIES.

8          **MS. LEE:**  AND 0081.

9                 (DISPLAYED ON SCREEN.)

10         **THE WITNESS:**  THIS IS DUMPED RIGHT ON TOP OF

11   PICKLEWEED.  THERE'S FAT HEN IN THERE, WHICH IS ANOTHER

12   WETLAND SPECIES, AND THAT IS A GIANT -- IT LOOKS ALMOST LIKE A

13   2 X 4, 4 X 4 OF WOOD THAT'S BEEN BROKEN.  THERE IS DISTURBED

14   VEGETATION AND A MOUND OF SOIL.

15         **MS. LEE:**  AND 0083.

16                (DISPLAYED ON SCREEN.)

17   **BY MS. LEE:**

18   **Q.**  WHAT IS THIS?

19   **A.**  THIS NOW IS, IF YOU GO BEYOND -- IF YOU WALK ON THE LEVEE

20   BEYOND WHERE THAT AREA OF DISTURBANCE OCCURRED, THIS IS

21   HABITAT THAT YOU WOULD HAVE SEEN ON THE OTHER SIDE BEFORE THE

22   DISTURBANCE.

23         **MS. HANSEN:**  OBJECTION.  SPECULATION.

24         **THE COURT:**  SUSTAINED.

25   **BY MS. LEE:**

```
1    Q.  AND WHAT I WOULD --

2              MS. HANSEN:  MOVE TO STRIKE.

3              THE COURT:  YES.  THE MOTION TO STRIKE IS GRANTED AS

4    TO THAT.  THAT CHARACTERIZATION OF WHAT IT WOULD HAVE LOOKED

5    LIKE BEFORE THE DISTURBANCE, LADIES AND GENTLEMEN, PLEASE

6    DISREGARD THAT ANSWER.

7    BY MS. LEE:

8    Q.  I WOULD LIKE FOR YOU TO TAKE A LOOK AT 0083, THIS

9    PARTICULAR PHOTO, RIGHT?

10                   (DISPLAYED ON SCREEN.)

11   A.  UH-HUH.

12   Q.  AND THEN I WOULD LIKE FOR YOU TO TAKE A LOOK AT 0084.

13   A.  YES.

14   Q.  0084.  AND 0085.

15   A.  RIGHT.

16   Q.  THESE PHOTOS, ARE THEY DEPICTING PICKLEWEED?

17   A.  YES.

18   Q.  WHICH IS A WETLAND SPECIES?

19   A.  YES, IT IS.

20   Q.  AND THEN WHAT I WOULD LIKE TO DO IS BRING UP THE MAP

21   AGAIN, EXHIBIT 1141-0036.

22                   (DISPLAYED ON SCREEN.)

23      COULD YOU SHOW US WHERE THOSE PHOTOS OF ALL OF THAT DENSE

24   PICKLEWEED, WHERE THAT WAS ON THIS MAP IN RELATION TO WHERE

25   YOU SAW THE FILL MATERIAL?
```

 1            **MS. LEE:**  AND WITH THE COURT'S PERMISSION, CAN SHE

 2    USE THE POINTER?

 3            **THE COURT:**  YES.

 4                (WITNESS STEPS DOWN TO MONITOR.)

 5            **THE WITNESS:**  SO THIS IS THE AREA WHERE WE SAW ALL

 6    THE SCRAPING (INDICATING).  THERE'S A LITTLE JUNCTURE BETWEEN

 7    THE TWO, AND THE OTHER PHOTOS THAT YOU MENTIONED ARE ALL ALONG

 8    THIS PART OF THE LEVEE HERE (INDICATING), LOOKING ALONG THIS

 9    PART OF THE LEVEE TOWARDS THIS END OF THE PROPERTY.

10    **BY MS. LEE:**

11    **Q.**  SO THAT WOULD BE RIGHT NEXT TO WHERE THE DUMPING OCCURRED,

12    JUST A LITTLE TO THE WEST?

13    **A.**  YES.

14    **Q.**  SO JUST A LITTLE TO THE WEST OF WHERE THE DUMPING OCCURRED

15    WERE DENSE PICKLEWEED?

16    **A.**  YES.

17    **Q.**  AND WHERE YOU SAW FILL MATERIAL EXTENDED BEYOND THE BLUE

18    AREA?

19    **A.**  YES.

20    **Q.**  INTO THE RED AREA?

21    **A.**  YES.

22    **Q.**  AND YOU'RE NOT SURE ABOUT THE DARK GREEN AREA?

23    **A.**  NOT SURE.  I CAN -- WELL, CAN I --

24    **Q.**  I DON'T WANT YOU TO SPECULATE, BUT IT -- WOULD IT BE FAIR

25    TO SAY THAT IT EXTENDED BEYOND THE CIRCLE?

HIGH - DIRECT / LEE

1    **A.**  YES, IT DID.

2    **Q.**  AND ON THOSE PHOTOS THAT WE SHOWED YOU, IN THE UNDISTURBED

3    PARTS OF THAT NORTHERN AREA, THAT RED CIRCLE AND BEYOND, WAS

4    THERE PICKLEWEED FRINGING THE FILL MATERIAL?

5    **A.**  YES, IT WAS ALONG THE LEVEE, SO ALONG HERE (INDICATING).

6    **Q.**  OKAY.  AND ALONG THE OTHER SIDE AS WELL?

7    **A.**  YOU MEAN OVER HERE (INDICATING)?

8    **Q.**  NO.

9    **A.**  OVER HERE (INDICATING)?

10   **Q.**  YES.

11   **A.**  IT APPEARS TO BE.  AGAIN, WE DID NOT GET OFF THE LEVEE, SO

12   THAT'S A DISTANCE.  BUT THE GENERAL COLOR AND THE WAY THE

13   VEGETATION LOOKED, LOOKED LIKE IT WAS PICKLEWEED TO ME.

14   **Q.**  WOULD IT BE FAIR TO SAY THAT THE AREAS SURROUNDING THE

15   FILL HAD PICKLEWEED?

16   **A.**  YES.

17   **Q.**  AND WOULD IT BE FAIR TO SAY THAT YOU SAW THE FILL MATERIAL

18   ON TOP OF PICKLEWEED?

19   **A.**  ABSOLUTELY.

20   **Q.**  AND THAT YOU SAW THAT THE FILL MATERIAL EXTENDED BEYOND

21   THAT RED CIRCLE?

22   **A.**  ABSOLUTELY.

23   **Q.**  IF YOU CAN JUST TAKE A SEAT.  THANK YOU.

24              (WITNESS RETURNS TO WITNESS STAND.)

25       MS. HIGH, AFTER YOU WENT ON THIS VISIT AND YOU TOOK THESE

1   PHOTOS, WHAT STEPS DID YOU TAKE NEXT?

2   **A.**  I PUT TOGETHER A COLLECTION OF -- WHEN WE GET -- WHEN

3   CITIZENS COMMITTEE GETS A REPORT OF A POTENTIAL UNAUTHORIZED

4   ACTIVITY, WE GO OUT, WE VERIFY THAT WE DO BELIEVE IT IS AN

5   UNAUTHORIZED ACTIVITY, THAT WE DON'T BELIEVE THAT THERE HAVE

6   BEEN ANY PERMITS GRANTED.  SO WE HAVE THIS PROCESS THAT WE TRY

7   AND SUPPLY AGENCIES WITH THE INFORMATION THAT THEY WILL NEED

8   TO KNOW TO MAKE A DETERMINATION WHETHER THEY SHOULD GO OUT AND

9   INVESTIGATE OR NOT.  BECAUSE WE REALIZE THAT THERE'S SUCH A

10  HUGE WORKLOAD FOR AGENCIES.

11      SO I WENT BACK, I PUT TOGETHER THE SITE MAP THAT YOU

12  SHOWED EARLIER SO WE COULD SHOW THE GENERAL VICINITY, AND THEN

13  I PUT TOGETHER THE HABITAT MAP WITH THE MARK, AND I HAD GONE

14  ON TO GOOGLE EARTH AND PUT TOGETHER A SERIES OF IMAGES OVER

15  THE TIME SO THAT THE AGENCIES COULD SEE WHAT THE SITE LOOKED

16  LIKE OVER TIME.

17      PUT TOGETHER A NOTIFICATION LETTER TO THE AGENCIES, WHICH

18  IS STANDARD, AND WE -- WHEN WE HAVE AN UNAUTHORIZED -- WHAT WE

19  THINK IS AN UNAUTHORIZED ACTIVITY, THERE'S A SET OF AGENCIES

20  THAT WE NOTIFY BECAUSE WE BELIEVE -- BECAUSE WE KNOW THAT THEY

21  HAVE REGULATORY AUTHORITY AND PERMITS -- THEY HAVE TO ISSUE

22  PERMITS FOR FILL TO BE PLACED.

23  **Q.**  SO --

24  **A.**  SO I CONTACTED THE LETTER -- I WROTE THE LETTER STATING

25  THAT WE HAD OBSERVED WHAT WE BELIEVED TO BE UNAUTHORIZED FILL,

1    THAT IT WAS PLACED, IN OUR OPINION, IN WETLANDS, AND THAT WE

2    GAVE THEM AN ESTIMATE OF APPROXIMATELY AN ACRE BUT THAT WAS

3    JUST AN ESTIMATE.

4        AND THEN NOTIFIED THE ARMY CORPS OF ENGINEERS AND EPA,

5    BECAUSE THEY BOTH HAVE REGULATORY AUTHORITY BY LAW OVER

6    WETLANDS, AND PUT THE PLACEMENT OF FILL ON WETLANDS.

7        WE CONTACTED THE U.S. FISH AND WILDLIFE SERVICE BECAUSE OF

8    CONCERNS ABOUT ENDANGERED SPECIES HABITAT BEING DESTROYED.

9        WE CONTACTED THE REGIONAL WATER QUALITY CONTROL BOARD

10   BECAUSE THEY ALSO HAVE TO ISSUE PERMITS IF FILL IS TO BE

11   PLACED IN A WATER OF THE STATE.

12   **Q.**  DID YOU ALSO NOTIFY THE LANDOWNERS?

13   **A.**  WE NOTIFIED THEM BEFORE WE SENT OUT THE NOTICE.  WE

14   HAPPENED TO BE IN COURT WITH THEM, AND WE TOLD THEM RIGHT --

15   YOU KNOW, BEFORE WE SENT OUT, WE TOLD THEM WE ARE GIVING YOU A

16   COURTESY NOTICE THAT WE HAVE OBSERVED THIS ACTIVITY, WANT YOU

17   TO BE AWARE OF IT, YEAH.

18   **Q.**  DO YOU KNOW WHO THE LANDOWNERS ARE OF THIS PROPERTY?

19   **A.**  WELL, WE HAD BEEN DEALING THROUGH THE ENVIRONMENTAL REVIEW

20   PROCESS WITH SOBRATO, BUT MY UNDERSTANDING IS THAT NEWARK

21   PARTNERS, WHO IS -- WHO ARE LISTED AS THE OWNERS, CONSIST OF

22   PEERY, AARRILLAGA, AND SOBRATO.

23   **Q.**  WHEN YOU INFORMED THE LANDOWNERS, WHAT WAS THEIR REACTION?

24   **A.**  VISIBLY SHOCKED.

25           **MS. HANSEN:**  OBJECTION, RELEVANCE.

1          **THE COURT:**  SUSTAINED.

2     **BY MS. LEE:**

3     **Q.**  YOU MENTIONED THAT YOU WROTE A LETTER TO DIFFERENT

4     AGENCIES, THE ARMY CORPS OF ENGINEERS, THE EPA, FISH AND

5     WILDLIFE, THE WATER QUALITY CONTROL BOARD.  WHEN DID YOU WRITE

6     THIS LETTER?

7     **A.**  THE DAY AFTER WE WENT OUT, SO THAT WOULD BE SEPTEMBER 8TH,

8     2014.

9     **Q.**  WHAT WAS THE PURPOSE OF WRITING THAT LETTER?

10    **A.**  WE STATED IN OUR LETTER WE WANTED TO INFORM THE AGENCIES

11    THAT WE THOUGHT THIS WAS AN UNAUTHORIZED ACTIVITY, THAT WE

12    WOULD LIKE THEM TO ISSUE AN IMMEDIATE CEASE AND DESIST ORDER

13    BECAUSE WE DIDN'T WANT TO SEE FURTHER WETLANDS DESTRUCTION AND

14    JUST TO BE ON RECORD THAT THIS ACTIVITY WAS GOING ON WITHOUT

15    PERMITS.

16    **Q.**  LOOKING AT THAT MAP THAT IS CURRENTLY DISPLAYED, THIS IS

17    EXHIBIT 1141-0036 --

18          **MS. LEE:**  COULD THE FULL MAP BE SHOWN?

19               (DISPLAYED ON SCREEN.)

20    **BY MS. LEE:**

21    **Q.**  WHEN YOU WERE STANDING ON THAT LEVEE THAT YOU HAD

22    PREVIOUSLY DESCRIBED, WHERE WAS YOUR ATTENTION FOCUSED?

23    **A.**  OUR ATTENTION WAS FOCUSED ON THAT RED OVAL THAT WE HAD

24    DEPICTED, THE BLUE AND THE DARK RED.

25    **Q.**  SO THE NORTHERN AREA OF NEWARK AREA 4?

1    **A.**  RIGHT, THE NORTH SIDE.

2    **Q.**  DID YOU TURN TO LOOK AT THE SOUTHERN AREA OF NEWARK

3    AREA 4?

4    **A.**  WE DID BUT, YOU KNOW, WE -- THE SOUTHERN AREA IS VAST AND

5    THERE'S TOPOGRAPHIC CHANGES, IT WAS -- WE DIDN'T SEE ANYTHING

6    ELSE.  SO WE DID LOOK BUT WE DIDN'T SEE ANYTHING.

7    **Q.**  YOU WERE LOOKING FROM THAT LEVEE; IS THAT CORRECT?

8    **A.**  YES, IT IS.

9    **Q.**  AND IS IT A FAIR DISTANCE BETWEEN THAT LEVEE DOWN TO THE

10   SOUTHERN SECTION OF THE WETLAND?

11   **A.**  YES, VERY.

12   **Q.**  WOULD ANYTHING DRAW YOUR ATTENTION THERE, ANY REPORTS OR

13   ANY POSTINGS OR EMAILS OF FILL ACTIVITY THERE?

14   **A.**  WE DIDN'T RECEIVE ANY NOTIFICATION TO THAT EFFECT.  AND

15   ACTUALLY, YOU KNOW, BECAUSE IT IS PRIVATE PROPERTY AND YOU ARE

16   RESTRICTED TO THE RAILROAD BERM AND THE FLOOD CONTROL LEVEE,

17   NOT THAT MANY PEOPLE ARE AWARE OF WHAT HAPPENS OUT THERE,

18   WHICH WAS ANOTHER REASON TO NOTIFY THE AGENCIES BECAUSE IT IS

19   NOT READILY IN THE PUBLIC VIEW.  WE HAVE OTHER SITES WHERE

20   PEOPLE DRIVE BY ALL THE TIME, BUT THIS ONE IS A LITTLE HARDER

21   TO ACCESS.

22   **Q.**  SO THERE IS NO WAY FOR YOU TO ACCESS THAT SOUTHERN

23   SECTION?

24   **A.**  NOT THAT WE -- I MEAN, IT WOULD HAVE BEEN A LONG TRIP

25   ALONG THE RAILROAD BERM, AND YOU DON'T WANT TO BE ON THERE TOO

1  LONG WITH THE TRAINS GOING BACK AND FORTH.

2  **Q.**  AND SO WOULD IT BE FAIR TO SAY THAT YOUR FOCUS ON THAT

3  DAY, WHEN YOU WENT ON SEPTEMBER 7TH, WAS TO LOOK AT THAT

4  NORTHERN SECTION?

5  **A.**  YES.

6  **Q.**  WERE YOU ABLE TO MAKE ANY DETERMINATIONS AT ALL AS TO

7  WHETHER OR NOT THERE WAS ANY DISCHARGE IN THE SOUTHERN

8  SECTION, OR WAS THAT NOT WHAT YOU WERE LOOKING AT?

9  **A.**  WE WEREN'T LOOKING AT THAT, AND, YOU KNOW, IT'S REALLY,

10  LIKE I SAID, HARD TO SEE THE SOUTHERN AREAS OF THE SITE.

11  WE --

12  **Q.**  FROM WHERE YOU WERE STANDING?

13  **A.**  FROM WHERE WE WERE STANDING, YEAH.

14      **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR THIS

15  WITNESS.

16      **THE COURT:**  ALL RIGHT.  ANY CROSS-EXAMINATION?

17      **MS. HANSEN:**  YES, YOUR HONOR.

18      **THE COURT:**  JUST FOR PLANNING PURPOSES, WE WILL TAKE

19  OUR SECOND RECESS IN ABOUT 15 MINUTES.

20                **CROSS-EXAMINATION**

21  **BY MS. HANSEN:**

22  **Q.**  GOOD AFTERNOON, MS. HIGH.

23  **A.**  GOOD AFTERNOON.

24  **Q.**  MY NAME IS ANGELA HANSEN, AND I REPRESENT MR. LUCERO.

25      WE HAVE NEVER MET BEFORE, CORRECT?

HIGH - CROSS / HANSEN

```
1    A.  THAT'S CORRECT, YES.

2    Q.  I WANTED TO TALK TO YOU A LITTLE BIT ABOUT NEWARK AREA 4

3    AND THE DEVELOPMENT THAT'S PLANNED FOR NEWARK AREA 4.  IS IT

4    YOUR UNDERSTANDING THAT THE NEWARK PLAN IS FOR THE AREA BY THE

5    PICK 'N PULL TO -- POSSIBLY ONE OF THE PLANS IS TO BECOME A

6    GOLF COURSE?

7    A.  THAT WAS SOMETHING THAT WAS FLOATED TOWARDS THE END OF THE

8    PROCESS BY THE CITY OF NEWARK, BUT IT WAS -- IT WAS ONE OF

9    THOSE THINGS WHERE WE ASKED REPEATEDLY IF THERE WOULD BE

10   ADDITIONAL ENVIRONMENTAL REVIEW.  SO IT WASN'T ANYTHING THAT

11   WE -- IT'S NOT ANYTHING THAT WE CONSIDER IMMINENT.

12   Q.  BUT -- IT IS A FUTURE PLAN BUT IT HAS BEEN PAUSED RIGHT

13   NOW; IS THAT RIGHT?

14   A.  WE QUESTION HOW VIABLE THAT PLAN IS BECAUSE IT WOULD

15   INVOLVE BUYING OTHER PROPERTIES, SO WE DON'T AT THIS POINT IN

16   TIME CONSIDER THAT TO BE A THREAT TO AREA 4.

17   Q.  I UNDERSTAND THAT'S NOT WHAT YOU WANT TO HAPPEN TO AREA 4,

18   BUT YOUR UNDERSTANDING IS THE NEWARK PARTNERS AND THE CITY OF

19   NEWARK, WHAT THEY WANT TO HAPPEN TO AREA 4 BY THE PICK 'N PULL

20   IS TO TURN IT INTO A GOLF COURSE, CORRECT?

21   A.  WELL, YOU KNOW, DURING THE ENVIRONMENTAL REVIEW PROCESS,

22   THEY HAD TALKED ABOUT USING THAT AREA AND PART OF THE SOUTHERN

23   AREA FOR A GOLF COURSE, BUT THEN TOWARDS THE END OF THE

24   PROCESS WE WERE HEARING FROM THE CITY STAFF THAT THE ACTUAL

25   FOOTPRINT OF THE GOLF COURSE MIGHT CHANGE AND IT MIGHT
```

1   ENCOMPASS OTHER PROPERTIES.  SO NOT SURE.

2   **Q.**  SO WE'RE NOT SURE EXACTLY WHERE ON AREA 4 THERE'S GOING TO

3   BE A GOLF COURSE.

4   **A.**  OR IF THERE WILL BE.

5   **Q.**  OR IF THERE WILL BE?

6   **A.**  YEAH, RIGHT.

7   **Q.**  BUT THAT'S THE NEWARK PLAN CONSIDERATION SOMEWHERE ON AREA

8   4?

9   **A.**  SOMEWHERE, YES.

10  **Q.**  THERE'S ALSO A POTENTIAL PLAN THAT I UNDERSTAND YOU DON'T

11  WANT TO GO THROUGH FOR THE LANDOWNERS TO BUILD HOUSING --

12  **A.**  YES.

13  **Q.**  -- SOMEWHERE ON AREA 4?

14  **A.**  THAT'S TRUE.

15  **Q.**  AND A LOT OF THESE AREAS, AS YOU TESTIFIED --

16        **MS. HANSEN:**  MR. WANZALA, IF I COULD HAVE GOVERNMENT

17  EXHIBIT 1141-36, PLEASE.

18  **BY MS. HANSEN:**

19  **Q.**  AND A LOT OF THESE AREAS --

20        **MS. HANSEN:**  I UNDERSTAND WE HAVE TO SWITCH,

21  MS. RILEY.  MY APOLOGIES.

22        **THE CLERK:**  I'M JUST WAITING FOR IT TO COME UP AND

23  THEN I WILL PUBLISH IT.  IS THIS IT?

24              (PAUSE IN THE PROCEEDINGS.)

25        **THE WITNESS:**  I THOUGHT I SAW IT.

HIGH - CROSS / HANSEN

```
 1                    (PAUSE IN THE PROCEEDINGS.)

 2                     (DISPLAYED ON SCREEN.)

 3     BY MS. HANSEN:

 4     Q.  SO AREA 4, AND WE'RE LOOKING AT GOVERNMENT EXHIBIT

 5     1141-36, CONTAINS WETLANDS; IS THAT RIGHT?

 6     A.  YES.

 7     Q.  IT CONTAINS UPLANDS?

 8     A.  YES.

 9     Q.  AND THE MUTED TIDAL SALT MARSH YOU TESTIFIED IS A NAME FOR

10     A WETLAND?

11     A.  YES.

12     Q.  IT ALSO CONTAINS AQUATIC AREAS, CORRECT?

13     A.  YES.

14     Q.  AND PONDS?

15     A.  YES.

16     Q.  AND PONDS ARE NOT WETLANDS, CORRECT?

17     A.  NO, BUT THEY ARE REGULATED BY THE CLEAN WATER ACT.

18     Q.  WELL, NOT ALL PONDS ARE REGULATED BY THE CLEAN WATER ACT,

19     CORRECT?

20     A.  IN MY OPINION, ALL PONDS ARE REGULATED BY CLEAN WATER ACT.

21     Q.  YOUR COMMITTEE HAD A LAWSUIT AGAINST CARGILL, THE SALT

22     PONDS, CORRECT?

23     A.  YES.

24     Q.  AND THEY HAD A SALT POND ON A PROPERTY RIGHT NEXT TO THE

25     MOWRY SLOUGH, CORRECT, A POND?
```

1    **A.**  YES.

2    **Q.**  AND THE COURT IN THAT CASE HELD THAT THAT POND WAS NOT

3    JURISDICTIONAL, CORRECT?

4              **MS. LEE:**  OBJECTION, YOUR HONOR, AS TO RELEVANCE AS

5    IT GOES INTO JURISDICTIONAL DETERMINATIONS.

6              **THE COURT:**  IT CALLS FOR A LEGAL CONCLUSION, SO

7    SUSTAINED.

8    **BY MS. HANSEN:**

9    **Q.**  YOUR COMMITTEE LOST THAT LAWSUIT, CORRECT?

10   **A.**  YES.

11             **MS. LEE:**  OBJECTION AS TO RELEVANCE.

12             **THE COURT:**  OVERRULED.

13   **BY MS. HANSEN:**

14   **Q.**  SO I WANT TO TALK TO YOU A LITTLE BIT MORE ABOUT THE

15   DELINEATIONS ON THIS MAP AND YOUR FINDINGS ABOUT IT.  WHEN

16   THIS MAP WAS MADE --

17             **MS. HANSEN:**  AND, MR. WANZALA, CAN WE DO THE FULL

18   MAP, OR IS THERE A PROBLEM WITH OUR EQUIPMENT?

19             **MR. WANZALA:**  THERE IS A PROBLEM.

20             **MS. HANSEN:**  SORRY.  I'LL DO MY BEST WITH PART OF THE

21   MAP.

22                        (DISPLAYED ON SCREEN.)

23   **BY MS. HANSEN:**

24   **Q.**  THIS AREA WAS STUDIED EXTENSIVELY BY THE PEOPLE WHO OWN

25   THE LAND; IS THAT RIGHT?

1    **A.**  YES.

2    **Q.**  AND THAT'S NOT THE REFUGE, CORRECT?

3    **A.**  NO.

4    **Q.**  THIS IS PRIVATE PROPERTY, RIGHT?

5    **A.**  YES.

6    **Q.**  AND THEY HIRED H.T. HARVEY TO DO A NUMBER OF STUDIES,

7    CORRECT?

8    **A.**  YES, THEY DID.

9    **Q.**  AND ARE YOU AWARE THAT THOSE STUDIES TOOK A NUMBER OF

10   YEARS TO COMPLETE?

11           **MS. LEE:**  OBJECTION.

12           **THE COURT:**  OVERRULED.

13           **THE WITNESS:**  YES.

14   **BY MS. HANSEN:**

15   **Q.**  AND ARE YOU AWARE THAT H.T. HARVEY WENT OUT TO THE SITE

16   AND ACTUALLY DID SAMPLING WHEN THEY CAME UP WITH THESE?

17   **A.**  YES.

18   **Q.**  AND ARE YOU AWARE THAT THEY WENT OUT AND MEASURED FOR THE

19   ORDINARY HIGH WATER MARK?

20   **A.**  I WOULD ASSUME THEY WOULD.  IT IS PART OF THEIR PROCESS.

21   **Q.**  AND AFTER THAT EXTENSIVE STUDY THIS MAP THAT WE ARE

22   LOOKING AT, THAT IS GOVERNMENT EXHIBIT 1141-36, IT WAS

23   CONTAINED WITHIN SOMETHING CALLED THE ENVIRONMENTAL IMPACT

24   REPORT, CORRECT?

25   **A.**  THAT'S CORRECT.

1    **Q.**   AND THE ENVIRONMENTAL IMPACT REPORT WAS AN IMPORTANT

2    DOCUMENT FOR A LOT OF PEOPLE; IS THAT RIGHT?

3    **A.**   YES.

4    **Q.**   INCLUDING YOUR ORGANIZATION?

5    **A.**   YES.

6    **Q.**   BECAUSE YOU NEEDED TO KNOW WHAT WAS DELINEATED ON THIS MAP

7    SO THAT YOU COULD POTENTIALLY MAKE OBJECTIONS ABOUT IT,

8    CORRECT?

9    **A.**   WELL, WE KNEW THAT THERE WERE WETLANDS ON THE SITE, YES,

10   AND SO WE WERE CONCERNED ABOUT IMPACTS, TOO.

11   **Q.**   AND DURING THAT LITIGATION YOU NEVER SAID THAT THE AQUATIC

12   AREA --

13            **MS. HANSEN:**   MR. WANZALA, IF YOU CAN BLOW UP THE --

14   CULL OUT THE AREA BY THE PICK 'N PULL.

15                 (PAUSE IN THE PROCEEDINGS.)

16            **MS. HANSEN:**   YOUR HONOR, I REALLY APOLOGIZE.  WHAT

17   HAPPENED IS, WE WEREN'T AWARE THAT THE GOVERNMENT WAS GOING TO

18   USE THE GROUP EXHIBIT TODAY, AND SO WE WEREN'T PREPARED TO

19   HAVE IT IN ORDER.  WE WILL CONFER WITH THE GOVERNMENT AND MAKE

20   THAT HAPPEN.

21            **THE COURT:**   ALL RIGHT.

22   **BY MS. HANSEN:**

23   **Q.**   SO THE -- DURING YOUR LITIGATION YOU NEVER OBJECTED TO THE

24   DESIGNATIONS THAT WERE ON THIS MAP, SPECIFICALLY THE AQUATIC

25   AREA THAT IS OUTLINED HERE, THE POND WHERE YOU CIRCLED; IS

HIGH - CROSS / HANSEN

1    THAT RIGHT?

2    **A.**   THAT'S CORRECT.

3    **Q.**   AND, IN FACT, WHEN YOU REPORTED THE FILL ACTIVITY, WHICH

4    WE DISCUSSED WITH THE GOVERNMENT COUNSEL FROM EXHIBIT 1141,

5    ISN'T IT TRUE THAT YOU INDICATED IN YOUR LETTER THAT THE AREA

6    WHERE IT WAS IMPACTED WAS AQUATIC AND MUTED TIDAL SALT MARSH,

7    CORRECT?

8    **A.**   WE WERE USING THEIR MAP, YES.

9    **Q.**   YES.  AND YOU DID NOT INDICATE THAT YOU DISAGREED WITH

10   THAT DESIGNATION AT THAT TIME, CORRECT?

11   **A.**   NO, WE DIDN'T.

12   **Q.**   AND YOUR EXPERIENCE WITH THE CORPS WAS 23 YEARS AGO; IS

13   THAT RIGHT?

14   **A.**   YES.

15   **Q.**   AND WHEN YOU WORKED FOR THE CORPS, THERE HAVE BEEN SOME

16   CHANGES SINCE THEN; IS THAT RIGHT?

17   **A.**   THERE HAVE BEEN.

18   **Q.**   YOU PROBABLY USED THE 1987 GUIDELINE MANUAL FOR WETLAND

19   DELINEATION, CORRECT?

20        **MS. LEE:**  OBJECTION, YOUR HONOR, AS TO GOING AGAIN

21   INTO DELINEATIONS OF WETLANDS AND JURISDICTIONAL

22   DETERMINATIONS AS OUTSIDE THE SCOPE OF WHAT THIS WITNESS IS

23   TESTIFYING TO.

24        **MS. HANSEN:**  SHE IDENTIFIED THESE AS WETLANDS, YOUR

25   HONOR.  I WOULD LIKE TO IMPEACH HER KNOWLEDGE AND ABILITY TO

1    MAKE THAT FINDING.

2              **MS. LEE:**  YOUR HONOR, SHE IDENTIFIED THEM BASED ON

3    THE LEGEND OF THE MAP, NOT HER OWN WORK OF THE SITE.

4              **THE COURT:**  OBJECTION SUSTAINED.

5    **BY MS. HANSEN:**

6    **Q.**  BUT THE REGULATIONS AND GUIDANCE MANUALS HAVE CHANGED

7    SINCE YOU WERE AT THE CORPS; IS THAT RIGHT?

8    **A.**  THAT'S TRUE.

9    **Q.**  AND YOU WOULD AGREE THAT YOU HAVE TO DO STUDIES AT THE

10   SITE TO MAKE DELINEATIONS; IS THAT RIGHT?

11   **A.**  YES.

12   **Q.**  AND YOU CONDUCTED NO FIELD STUDIES AT THE AREA IN THE TWO

13   TIMES THAT YOU WERE THERE; IS THAT RIGHT?

14   **A.**  THAT'S CORRECT.

15   **Q.**  YOU DID NOT STUDY THE HYDROLOGY OF THE SITE?

16   **A.**  NO.  WE OBSERVED HYDROLOGY ON THE SITE BUT WE HAVE NOT

17   DONE A JURISDICTIONAL ANALYSIS, NO.

18   **Q.**  AND YOU DID NOT COMPLETE ANY DATA SHEETS THAT THE CORPS

19   WOULD REQUIRE YOU TO COMPLETE?

20   **A.**  NO, AGAIN, WE ARE MEMBERS OF THE PUBLIC THAT WERE ALLOWED

21   ON THE SITE FOR TWO -- FOR ONE VISIT.

22   **Q.**  AND I WANT TO TALK TO YOU A LITTLE BIT ABOUT THE SALT

23   MARSH HARVEST MOUSE.

24         LET ME BACK UP FIRST.  WHEN YOU WERE ON THE SITE IN 2014,

25   AND WE TALKED ABOUT THE PICTURES YOU IDENTIFIED?

HIGH – CROSS / HANSEN

```
 1    A.   UH-HUH.
 2    Q.   NOW, WHEN YOU WERE THERE AND YOU HAD OBSERVATIONS, YOU DID
 3    NOT ACTUALLY CREATE A REPORT DOCUMENTING HOW MUCH OF THE
 4    PICKLEWEED YOU SAW; IS THAT RIGHT?
 5    A.   IT WAS IMPOSSIBLE TO DO FROM THE LEVEE.
 6    Q.   AND YOU DIDN'T DOCUMENT THE QUANTITY OF THE WETLAND
 7    VEGETATION, CORRECT?
 8    A.   NO, WE DID NOT.
 9         IF I MAY, BUT WE DID LOOK AT AERIAL PHOTOGRAPHY.
10    Q.   I UNDERSTAND, THE GOOGLE EARTH THAT WE ALL CAN ACCESS,
11    CORRECT?
12    A.   RIGHT.
13    Q.   AND I'M READY FOR THE MOUSE NOW.
14         THE PICKLEWEED IS THE HABITAT FOR THE SALT MARSH HARVEST
15    MOUSE, CORRECT?
16    A.   YES.
17    Q.   AND ARE YOU AWARE OF THE DISKING ACTIVITIES AND MOWING
18    ACTIVITIES THAT TAKE PLACE ON AREA 4?
19    A.   YES.  THEY ARE SUPPOSED TO BE RESTRICTED TO THE AREAS
20    WHERE THEY HAVE EGG PRODUCTION, AND NOT IN AREAS THAT HAVE
21    BEEN DELINEATED WITH PICKLEWEED OR, YOU KNOW, HAVE WETLAND
22    CHARACTER.
23    Q.   ARE YOU AWARE OF ANY DISKING AND MOWING IN AREAS THAT HAD
24    WETLAND DELINEATIONS ON AREA 4?
25    A.   I AM NOT PERSONALLY, NO.
```

HIGH - CROSS / HANSEN

1    **Q.**  AND THE SALT MARSH HARVEST MOUSE WOULD NOT SURVIVE DISKING

2    AND MOWING AND AGRICULTURAL WORK ON THE PROPERTY, CORRECT?

3    **A.**  I WOULDN'T SAY THEY COULD NOT SURVIVE.  THEY ARE PRETTY

4    AGILE ANIMALS.  THEY CAN EVEN SWIM IF THEIR HABITAT GETS

5    INUNDATED, SO THEY CAN MOVE OUT OF HARM'S WAY.

6    **Q.**  BUT THEIR HABITAT WOULD BE GONE IF THEY WERE -- IF THE

7    PICKLEWEED WERE MOWED DOWN AND DISKED INTO THE LAND, CORRECT?

8              **MS. LEE:**  OBJECTION.  CALLS FOR SPECULATION.

9              **THE COURT:**  OVERRULED.

10             **THE WITNESS:**  IF IT WAS TOTALLY ELIMINATED, YES.

11   **BY MS. HANSEN:**

12   **Q.**  THROUGH DISKING AND MOWING ACTIVITIES?

13   **A.**  YES.  BUT I HAVE TO SAY THAT THE -- WHEN WE HAD BEEN

14   DISCUSSING THE ENVIRONMENTAL CONCERNS, THE LANDOWNERS WERE

15   PARTICULARLY AWARE OF PICKLEWEED AND ITS SIGNIFICANCE AND

16   ASSURED US THEY WERE NOT DISKING IN THOSE AREAS.

17   **Q.**  AND DIDN'T THEY PUT A FENCE UP FOR A SMALL AREA WHERE

18   THERE WAS PICKLEWEED AND A MOUSE DISCOVERED?

19   **A.**  I AM NOT SURE.  I DON'T KNOW.  I KNOW THAT IN THE MID-'80S

20   THAT THERE WAS A DIFFERENT LANDOWNER THAT HAD DONE SOME

21   DISKING, AND U.S. FISH AND WILDLIFE SERVICE HAD INVESTIGATED,

22   BUT IT WAS A DIFFERENT OWNER.

23             **MS. HANSEN:**  THANK YOU.

24       NO FURTHER QUESTIONS, YOUR HONOR.

25             **THE COURT:**  ANY REDIRECT?

1          **MS. LEE:**  YES, YOUR HONOR.

2                    **REDIRECT EXAMINATION**

3     BY MS. LEE:

4     **Q.**  MS. HIGH, YOU DIDN'T GO OUT TO THIS PROPERTY TO CREATE A

5     WETLAND DETERMINATION, CORRECT?

6     **A.**  ABSOLUTELY NOT.  YOU KNOW, WHAT -- WHETHER IT'S A PONDED

7     AREA OR A WETLAND, THAT'S NOT FOR US AS MEMBERS OF THE PUBLIC

8     TO ASCERTAIN.  WE USED MAPPING THAT WAS AVAILABLE TO US THAT

9     WE COULD DEMONSTRATE THERE WAS SOME SORT OF HABITAT THERE.

10    AND IT WAS JUST FOR KIND OF GETTING TO THE TOP OF THE CORPS'

11    BUSY WORKLOAD THAT AREAS HAD BEEN INDICATED AS ONE FORM OR

12    ANOTHER OF CLEAN WATER ACT JURISDICTION.

13    **Q.**  YOUR UNDERSTANDING THAT IT WAS A WETLAND WAS GUIDED IN

14    PART BY LOOKING AT REPORTS DONE BY THE LANDOWNERS' OWN

15    CONSULTANTS H.T. HARVEY; IS THAT CORRECT?

16    **A.**  THAT'S CORRECT.

17    **Q.**  AND BASED ON THOSE REPORTS --

18          **MS. HANSEN:**  OBJECTION.

19          **THE COURT:**  WHAT WAS THE OBJECTION?

20          **MS. HANSEN:**  LEADING.

21          **THE COURT:**  SUSTAINED.

22    BY MS. LEE:

23    **Q.**  AS MENTIONED BY MS. HANSEN ON CROSS-EXAMINATION, SHE ASKED

24    YOU ABOUT H.T. HARVEY'S WETLAND DETERMINATION REPORT, MAPPING.

25    **A.**  YES.

1    **Q.**  DO YOU KNOW WHETHER H.T. HARVEY FOUND THERE TO BE

2    POTENTIAL "WATERS OF THE UNITED STATES" ON NEWARK AREA 4

3    PROPERTY?

4    **A.**  YES.

5    **Q.**  DO YOU KNOW IF H.T. HARVEY, THE LANDOWNERS' OWN ECOLOGICAL

6    CONSULTANTS FOUND THERE TO BE WETLANDS ON THE NEWARK AREA 4

7    PROPERTY?

8    **A.**  YES, THAT CONFIRMED OUR CONCERNS THAT HALF THE SITE WAS --

9    APPROXIMATELY HALF THE SITE WAS DESIGNATED AS WETLANDS.

10   **Q.**  DO YOU KNOW IF H.T. HARVEY FOUND THAT THE AREAS WHERE THE

11   DUMPING OCCURRED IN THAT NORTHERN SECTION THAT YOU WERE

12   FOCUSED ON WERE POTENTIAL "WATERS OF THE UNITED STATES"?

13          **MS. HANSEN:**  OBJECTION, FOUNDATION, SPECULATION AND

14   THE OBJECTION WE DISCUSSED EARLIER TODAY.

15          **MS. LEE:**  IT'S FOLLOWING UP ON THE CROSS-EXAMINATION

16   QUESTIONS INTO H.T. HARVEY'S AND THIS WITNESS'S KNOWLEDGE OF

17   THEIR WORK IN MAPPING AND JURISDICTIONAL.

18          **THE COURT:**  SUSTAINED.

19   **BY MS. LEE:**

20   **Q.**  YOU ALSO... YOU WORKED AT THE ARMY CORPS OF ENGINEERS IN

21   THE REGULATORY DIVISION, CORRECT?

22   **A.**  YES, I DID.

23   **Q.**  IN YOUR CAPACITY AS WORKING THERE AND ALSO WITH YOUR

24   EDUCATIONAL BACKGROUND, ARE YOU FAMILIAR WITH WETLAND

25   VEGETATION?

HIGH - REDIRECT / LEE

1    **A.**  YES, I AM.

2    **Q.**  AND YOU MENTIONED PREVIOUSLY THAT YOU SAW PICKLEWEED.

3    **A.**  YES.

4    **Q.**  SURROUNDING THE FILL, WEST OF THE FILL, BURIED UNDER THE

5    FILL.  WHAT SIGNIFICANCE DOES THAT HAVE TO YOU?

6    **A.**  TO ME THAT INDICATES THAT THERE WERE IMPACTS TO WETLAND

7    HABITAT.  YOU KNOW, AND ONE OF THE DIFFICULTIES IS THAT --

8              **MS. HANSEN:**  OBJECTION, NARRATIVE.

9              **THE COURT:**  SUSTAINED.

10   **BY MS. LEE:**

11   **Q.**  IS IT YOUR OPINION THAT THE FILL MATERIAL PLACED ON THAT

12   NORTHERN AREA OF THAT SITE IN 2014 WAS DUMPED ON WETLANDS?

13   **A.**  YES.

14             **MS. HANSEN:**  OBJECTION, LEADING.

15             **THE COURT:**  SUSTAINED.

16             **MS. HANSEN:**  MOVE TO STRIKE.

17             **THE COURT:**  GRANTED.  THAT ANSWER IS STRICKEN.

18   **BY MS. LEE:**

19   **Q.**  WHAT, IF ANY, OPINIONS DID YOU COME TO BASED ON YOUR VISIT

20   IN 2014 OF THE SITE?

21   **A.**  BASED ON MY VISIT, I BELIEVED THAT THERE HAD BEEN AT LEAST

22   AN ACRE OF FILL PLACED IN WETLANDS AND THAT'S BASED ON THE

23   FACT THAT THERE WAS OBVIOUS DUMPING OF MATERIAL ONTO WETLAND

24   VEGETATION; THAT THERE WAS AN ABRUPT CHANGE FROM AREAS THAT

25   HAD BEEN SCRAPED; THAT THERE WAS WETLAND VEGETATION THAT

1    APPEARED TO BE OVERTURNED WHEN THE AREA WAS SCRAPED; THAT

2    THERE WAS WETLAND VEGETATION PRESENT AND UNDISTURBED AREAS AT

3    THE SAME TOPOGRAPHIC POSITION.

4    **Q.**   WAS THAT FROM YOUR VANTAGE POINT STANDING ON THE LEVEE?

5    **A.**   YES.

6    **Q.**   HAD YOU GONE ONTO THE PROPERTY?

7    **A.**   WE HAVE NOT GONE ONTO THE PROPERTY.  AND EVEN WHEN WE WENT

8    OUT WITH THE LANDOWNERS' REPRESENTATIVE IN 2008, IT WAS FROM

9    THE LEVEES.

10           **MS. LEE:**  OKAY.  I HAVE NO FURTHER QUESTIONS.

11           **THE COURT:**  ANY RECROSS?

12           **MS. HANSEN:**  NO, YOUR HONOR.

13           **THE COURT:**  ALL RIGHT.  MS. HIGH, I THINK YOU ARE

14   EXCUSED AT THIS TIME.

15       ALL RIGHT.  LADIES AND GENTLEMEN, IT'S JUST A LITTLE BIT

16   AFTER 12:30.  LET'S TAKE OUR SECOND RECESS AND LET'S BE BACK

17   HERE PROMPTLY AT 12:45, AND THEN WE WILL BE ABLE TO GO FROM

18   12:45 TO 1:15 AND THEN BREAK FOR THE DAY.

19       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

20           **THE CLERK:**  YOU MAY BE SEATED.

21           **THE COURT:**  WHO'S UP NEXT?

22           **MS. LEE:**  CRISTINA HARBISON WITH THE ALAMEDA COUNTY

23   D.A.'S OFFICE.

24           **THE COURT:**  ALL RIGHT.

25       (RECESS TAKEN AT 12:32 P.M.; RESUMED AT 12:48 P.M.)

```
 1              (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

 2              THE CLERK:  REMAIN SEATED.  COURT IS BACK IN SESSION.

 3   THE HONORABLE HAYWOOD S. GILLIAM, JR. PRESIDING.

 4              THE COURT:  OKAY.  IS THE UNITED STATES PREPARED TO

 5   CALL ITS NEXT WITNESS?

 6              MS. LEE:  YES.  THE GOVERNMENT CALLS DANIEL MILLER.

 7              THE CLERK:  MR. MILLER, COME UP TO THE WITNESS STAND

 8   FOR ME AND RAISE YOUR RIGHT HAND.

 9              (DANIEL MILLER, CALLED AS A WITNESS FOR THE GOVERNMENT,

10   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

11              THE WITNESS:  YES, I DO.

12              THE CLERK:  YOU MAY BE SEATED.  ONCE SEATED, I AM

13   GOING TO NEED YOU TO STATE AND SPELL YOUR FIRST AND LAST NAME

14   FOR THE RECORD, PLEASE.

15              THE WITNESS:  MY NAME IS DANIEL MILLER.  D-A-N-I-E-L,

16   M-I-L-L-E-R.

17              THE CLERK:  THANK YOU.  AND THERE IS WATER IN THE

18   PITCHER.

19                         DIRECT EXAMINATION

20   BY MS. LEE:

21   Q.  MR. MILLER, WHERE DO YOU LIVE?

22   A.  I LIVE IN FREMONT, CALIFORNIA.

23   Q.  HOW LONG HAVE YOU LIVED IN FREMONT?

24   A.  ABOUT 20 YEARS, LITTLE OVER 20 YEARS NOW.

25   Q.  WHAT DO YOU DO FOR WORK?
```

MILLER - DIRECT / LEE

1   **A.**   I'M A SOFTWARE ENGINEER.  I WORK FOR A COMPANY THAT MAKES

2   SURGICAL EQUIPMENT, MEDICAL EQUIPMENT.

3   **Q.**   AND WHAT DO YOU DO FOR PLEASURE?

4   **A.**   LARGELY HIKING AND PHOTOGRAPHY.

5   **Q.**   ARE YOU FAMILIAR WITH THE CITIZENS COMMITTEE TO COMPLETE

6   THE REFUGE?

7   **A.**   YES, I AM.

8   **Q.**   HOW?

9   **A.**   I HAVE BEEN INVOLVED WITH THEM THROUGH AN ENVIRONMENTAL

10  ORGANIZATION THAT I HAD PAST EXPERIENCE WITH.

11  **Q.**   WHAT IS THIS ENVIRONMENTAL --

12  **A.**   THERE'S A GROUP CALLED FRIENDS OF COYOTE HILLS IN FREMONT.

13  THAT'S CHF THAT WAS INVOLVED BACK IN 2006 IN TRYING TO PREVENT

14  DEVELOPMENT IN A PART OF FREMONT.  AND THEY STILL HAVE THEIR

15  YAHOO GROUP AND WE SOMETIMES COMMUNICATE.  AND THERE'S A

16  VARIETY OF PEOPLE FROM CCCR THAT ARE ACTIVE ON THAT FORUM AS

17  WELL.

18  **Q.**   ARE YOU FAMILIAR WITH AN AREA KNOWN AS NEWARK AREA 4 IN

19  THE CITY OF NEWARK, CALIFORNIA?

20  **A.**   YES, I AM.

21  **Q.**   HOW ARE YOU FAMILIAR?

22  **A.**   I HIKE OUT THERE REGULARLY, ALONG THE LEVEES AND VARIOUS

23  OTHER AREAS OUT THERE.

24  **Q.**   WHEN IS THE FIRST TIME YOU WENT TO THAT PROPERTY, IF YOU

25  CAN RECALL APPROXIMATELY?

MILLER - DIRECT / LEE

1    **A.**  IT WAS AROUND 2008.

2    **Q.**  AND HOW OFTEN --

3    **A.**  ABOUT TEN YEARS AGO.

4    **Q.**  HOW OFTEN WOULD YOU GO APPROXIMATELY?

5    **A.**  A FEW TIMES, MAYBE A DOZEN TIMES A YEAR AT IRREGULAR

6    INTERVALS.  MORE OFTEN IN LATE WINTER AND SPRING WHEN THINGS

7    ARE IN BLOSSOM, BUT I GO REGULARLY.

8    **Q.**  WHY DO YOU GO THERE?

9    **A.**  I LIKE GOING PLACES WHERE I'M UNLIKELY TO ENCOUNTER OTHER

10   PEOPLE AND I CAN BE OUT IN NATURE AND ENJOY THE ENVIRONMENT

11   AND NOT HAVE TO DEAL WITH PEOPLE MUCH.

12   **Q.**  DOES THIS AREA PROVIDE YOU WITH THOSE THINGS THAT YOU

13   ENJOY?

14   **A.**  YES.

15   **Q.**  HOW SO?

16   **A.**  IT'S PRETTY REMOTE.  SOME PEOPLE DO GO OUT THERE.  THE

17   LEVEES LEAD ALONG MOWRY SLOUGH AND VARIOUS AREAS OUT THERE.

18   AND THERE IS A VARIETY OF WETLANDS AND PONDS AND THINGS WITH

19   LOTS OF WILDLIFE THAT I ENJOY, BUT NOT MANY PEOPLE GO OUT

20   THERE.  IT IS A LONG WAYS FROM ANYTHING.

21   **Q.**  I WOULD LIKE TO SHOW YOU WHAT IS ALREADY IN EVIDENCE AND

22   IF IT CAN BE PUBLISHED TO THE JURY ALONG WITH MR. MILLER,

23   GOVERNMENT'S EXHIBIT 158.

24                    (PAUSE IN THE PROCEEDINGS.)

25                      (DISPLAYED ON SCREEN.)

MILLER - DIRECT / LEE

1     MR. MILLER, DO YOU RECOGNIZE WHAT WE ARE LOOKING AT HERE?

2  **A.**  YES, I DO.

3  **Q.**  WHAT IS IT?

4  **A.**  IT IS THE AREA WHERE I HIKE OUT ALONG THE SLOUGHS IN

5  NEWARK AREA 4.

6  **Q.**  WHERE DO YOU TYPICALLY HAVE YOUR SPOT ON NEWARK AREA 4

7  WHEN YOU ARE HIKING AND LOOKING AT THE WILDLIFE?

8  **A.**  THERE'S A TRAIL COMING FROM THE LEFT THROUGH THE MIDDLE OF

9  THE PICTURE.  THAT'S THE LEVEE THAT I WALK ALONG.  AND THEN I

10  GO UP AWAY FROM -- TOWARD THE BACK END OF THE PICTURE, AND

11  THERE'S A CURVE THERE IN THE SLOUGH.  AND I LIKE TO SIT THERE.

12  THERE'S SEVERAL PONDS THERE IN THE AREA, AND A LOT OF BIRDS

13  AND OTHER WILDLIFE HANG OUT THERE AND I LIKE TO SIT THERE AND

14  READ.

15      **MS. LEE:**  YOUR HONOR, MAY THE WITNESS -- CAN WE HAVE

16  THE COURT'S PERMISSION FOR THE WITNESS TO COME OFF THE STAND

17  AND POINT ON THE SCREEN TO WHERE HE TYPICALLY GOES TO WHEN HE

18  GOES TO THE SPOT?

19      **THE COURT:**  HE MAY.

20      (WITNESS STEPS DOWN FROM WITNESS STAND.)

21      **THE WITNESS:**  OKAY.  SO THERE IS A PARKING AREA OVER

22  HERE (INDICATING) AND I WALK OUT ALONG THE RAILROAD TRACKS,

23  WALK ALONG THE LEVEES HERE.  AND THEN I FOLLOW THE LEVEE UP

24  HERE, AND THERE'S JUST A NICE AREA FOR HANGING OUT ON THE

25  OTHER SIDE OF THE SLOUGH UP IN HERE (INDICATING).  THAT'S

1    TYPICALLY WHERE I -- ONE OF THE PLACES THAT I GO OUT IN THAT

2    AREA.

3              (WITNESS RESUMES THE STAND.)

4         **MS. LEE:**  IF WE COULD ALSO PUBLISH -- I WOULD LIKE TO

5    SHOW YOU WHAT HAS BEEN MARKED GOVERNMENT'S EXHIBIT 160.

6         **THE CLERK:**  YOU DON'T HAVE TO NECESSARILY ASK FOR IT

7    TO PUBLISHED.  ONCE HE SAYS ADMITTED, IT IS AUTOMATICALLY

8    PUBLISHED.

9         **MS. LEE:**  THANK YOU, NIKKI -- THANK YOU, MS. RILEY.

10             (DISPLAYED ON SCREEN.)

11   **BY MS. LEE:**

12   **Q.**  LOOKING AT EXHIBIT 160, WHAT IS THAT?

13   **A.**  IT'S A DIFFERENT VIEW OF THE SAME PLACE.

14   **Q.**  IT'S A DIFFERENT VIEW OF NEWARK AREA 4; IS THAT RIGHT?

15   **A.**  YES.

16   **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT THE GEOGRAPHICAL

17   LAYOUT OF NEWARK AREA 4?

18   **A.**  YES.

19   **Q.**  DOES IT DEPICT WHERE YOU TYPICALLY SIT WHEN YOU COME TO

20   NEWARK AREA 4?

21   **A.**  YES, ON THE RIGHT-HAND SIDE WHERE THAT CURVE IN THE -- AT

22   THE STREAM IS.

23   **Q.**  DOES IT SHOW -- WOULD THIS PHOTO SHOW HOW YOU GET TO THAT

24   PART OF WHERE YOU SIT IN NEWARK AREA 4?

25   **A.**  YES.

MILLER - DIRECT / LEE

1    **Q.**  I'D LIKE --

2    **A.**  ON THE LEFT-HAND SIDE IN THE MIDDLE, YOU CAN SEE THE

3    RAILROAD TRACKS COMING IN.  AND THEN I WALK ALONG THAT STRING

4    THERE THAT I HAVE NEVER KNOWN THE NAME OF.

5        AND THEN IT COMES UP HERE AND DEAD ENDS AT MOWRY SLOUGH,

6    AND I GO TO THE RIGHT OVER TO THE CURVE.  THAT CURVE IS WHERE

7    I HANG OUT.

8            **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE GOVERNMENT

9    EXHIBIT 160 INTO EVIDENCE.

10           **MR. SMOCK:**  NO OBJECTION.

11           **THE COURT:**  160 IS ADMITTED.

12       (GOVERNMENT'S EXHIBIT 160 RECEIVED IN EVIDENCE)

13               (DISPLAYED ON SCREEN.)

14   **BY MS. LEE:**

15   **Q.**  IS THERE A LASER POINTER IN FRONT OF YOU?

16   **A.**  POSSIBLY.

17           **MS. LEE:**  WITH THE COURT'S PERMISSION, IF YOU CAN

18   COME AND STEP DOWN AND SPEAK AT THIS MICROPHONE TO SHOW US ON

19   THIS OVERALL AERIAL MAP HOW YOU GET ONTO THE PROPERTY AND

20   WHERE YOU SIT AND ENJOY THE PROPERTY.

21       IF YOU CAN COME TO THIS MICROPHONE.

22           (WITNESS STEPS DOWN FROM WITNESS STAND.)

23           **THE COURT:**  ALL RIGHT.

24           **THE CLERK:**  THERE WAS A WIRELESS MIC.  DO WE NOT KNOW

25   WHAT HAPPENED TO IT?

MILLER - DIRECT / LEE

1    **THE WITNESS:**  I FIGURED IT OUT.

2         SO THERE'S A PARKING AREA THAT'S OVER HERE OFF OF MOWRY,

3    MOWRY BOULEVARD.  AND I WALK OUT -- WELL, I'M NOT VERY STEADY,

4    BUT I WALK OUT ALONG THESE TRACKS, WALK DOWN THIS LEVEE.  THE

5    LEVEE IS ON EITHER SIDE OF THAT STREAM AND THEN FOLLOW THE

6    CURVE OUT, AND I HANG OUT TYPICALLY OUT IN THAT AREA RIGHT

7    THERE (INDICATING).

8    **Q.**  THANK YOU.  IF YOU CAN TAKE YOUR SEAT.

9              (WITNESS RESUMES WITNESS STAND.)

10        I WOULD LIKE TO TAKE YOU TO SEPTEMBER 1ST, 2014.  DO YOU

11   RECALL GOING TO THAT NEWARK AREA 4 PROPERTY ON THAT DAY?

12   **A.**  YES.

13   **Q.**  WHAT DID YOU DO THAT DAY?

14   **A.**  I WALKED OUT THERE AND I SPENT THE AFTERNOON.  I GOT OUT

15   THERE SOMEWHERE AROUND, TYPICALLY AROUND 11 TO 12:00 O'CLOCK.

16   AND I SPENT THE AFTERNOON JUST SITTING THERE BY THOSE PONDS,

17   THOSE LITTLE PONDS, AND JUST ENJOYING THE -- BEING OUT THERE.

18   **Q.**  WHAT DO YOU RECALL HAPPENING THAT DAY?

19   **A.**  THERE WAS IN THAT CEMENT AREA THAT'S OVER HERE, I DON'T

20   KNOW HOW TO DESCRIBE IT, THERE WAS A LOT OF -- THERE WAS A LOT

21   OF EQUIPMENT MOVING AROUND, AND IT WAS MAKING A LOT OF NOISE.

22   **Q.**  WERE YOU HEARING THAT NOISE?

23   **A.**  YEAH.  EVEN ALL THE WAY OVER THERE, I WAS HEARING IT ALL

24   AFTERNOON LONG.

25   **Q.**  AND YOU WERE HEARING IT FROM THAT PLACE THAT YOU EARLIER

1   MENTIONED IS WHERE YOU TYPICALLY SIT AT THE FAR RIGHT BOTTOM

2   PART OF THAT --

3   **A.**   RIGHT.

4   **Q.**   -- PHOTO?

5   **A.**   CORRECT.

6   **Q.**   SO WHAT DID YOU DO?

7   **A.**   LIVED WITH IT.   NOISE HAPPENS SOMETIMES.   THERE'S A

8   WRECKING YARD THERE.   SOMETIMES THE WRECKING YARD -- I DIDN'T

9   THINK TOO MUCH ABOUT IT FOR MOST OF THE AFTERNOON, BUT AT SOME

10   POINT IN THE AFTERNOON, A TRUCK CAME OUT AND WAS DRIVING

11   AROUND AT ON AREA THAT HAD PICKLEWEED AND OTHER WETLAND KINDS

12   OF PLANTS THAT I LIKED THERE, AND SAW IT DRIVING AROUND OUT

13   THERE, AND THAT UPSET ME.

14        AND SO WHEN I WENT -- WHEN I LEFT AT THE END OF THE DAY, I

15   WENT BACK THAT WAY TO SEE WHAT HAD HAPPENED.

16   **Q.**   SO THIS WHOLE TIME YOU ARE STILL AT THAT BOTTOM RIGHT-HAND

17   CORNER --

18   **A.**   CORRECT.

19   **Q.**   -- AT YOUR SPOT?

20   **A.**   CORRECT.

21   **Q.**   COULD YOU USE THIS LASER POINTER TO SHOW WHERE YOU SAW

22   THIS TRUCK DRIVING AROUND THAT UPSET YOU?

23   **A.**   IT WAS IN THAT AREA (INDICATING) -- WELL, IT WOULD HELP IF

24   I HELD THE PEN STILL.

25        IN THE AREA RIGHT THERE WHERE THE FENCE COMES DOWN ALMOST

MILLER - DIRECT / LEE

1    TO THE LEVEE.  AND THERE USED TO BE JUST REALLY DENSE GROWTH

2    OF PICKLEWEED AND OTHER WETLAND TYPE OF SALT MARSH KIND OF

3    PLANTS IN THERE.

4        AND I SAW A LARGE JACKED-UP TRUCK, KIND OF TRUCK THEY CALL

5    A MONSTER TRUCK DRIVING AROUND OUT IN THAT AREA, WHICH I HAD

6    NEVER SEEN BEFORE AND SHOULDN'T HAVE SEEN.

7    **Q.**  YOU MENTIONED PREVIOUSLY YOU'D SEEN A LARGE AMOUNT OF

8    PICKLEWEED AND WHAT DID YOU SAY, SALT --

9    **A.**  SALT MARSH PLANTS.

10   **Q.**  DO YOU HAVE ANY BACKGROUND IN BEING ABLE TO IDENTIFY THAT

11   TYPE OF VEGETATION?

12   **A.**  ONLY AS A HIKER, AS A HIKER AND PHOTOGRAPHER.  I FOLLOW

13   SEVERAL FACEBOOK GROUPS THAT ARE DEDICATED TO IDENTIFYING

14   PLANTS.  CALIFORNIA NATIVE PLANTS SOCIETY HAS A FACEBOOK PAGE

15   AND THERE ARE SEVERAL OTHERS I FOLLOW.  WHEN I SEE SOMETHING

16   THAT I SEE REGULARLY AND I AM CURIOUS ABOUT IT, I WILL TAKE

17   PICTURES AND THEN POST THEM UP THERE AND THEY'LL TELL ME WHAT

18   IT IS. SO I JUST LEARN FROM THAT.

19       I DON'T HAVE ANY TRAINING IN BIOLOGY OR ANYTHING, NO.

20   **Q.**  THAT DAY ON SEPTEMBER 1ST, YOU MENTIONED YOU GOT THERE

21   AROUND 11 OR 12.  HOW LONG DID YOU STAY OUT THERE?

22   **A.**  ALL AFTERNOON UNTIL IT STARTED GETTING COLD, UNTIL THE SUN

23   STARTED GETTING READY TO SET AND I HEADED BACK.

24   **Q.**  DID YOU STAY DOWN THERE BY THE SOUTHERN BOTTOM AREA?

25   **A.**  YES.

MILLER - DIRECT / LEE

1    **Q.**  WHEN YOU STARTED HEADING BACK, IS THAT WHEN YOU WENT TO

2    SEE FOR YOURSELF WHAT WAS HAPPENING IN THAT NORTHERN SECTION?

3    **A.**  YES.  I WENT TO MADE A POINT -- THE TRUCK DREW MY

4    ATTENTION TO IT, SO I WENT TO MAKE A POINT OF SEEING WHAT HAD

5    HAPPENED.

6    **Q.**  SO WHAT DID YOU DO?

7    **A.**  I GOT THERE AND I SAW THAT THAT WHOLE AREA THAT USED TO BE

8    COMPLETELY FILLED WITH VERY MATURE PICKLEWEED AND ETRIPLEX AND

9    OTHER PLANTS THAT GROW IN THAT AREA HAD BEEN COMPLETELY

10   COVERED UP WITH DIRT UP TO SEVERAL FEET THICK.  I DIDN'T

11   MEASURE IT OR ANYTHING BUT SEVERAL FEET THICK.  AND THERE WERE

12   BULLDOZER TRACKS ALL THROUGH IT.

13   **Q.**  AND YOU MENTIONED THAT YOU HAD SEEN THAT THAT AREA HAD

14   BEEN COVERED WITH, YOUR WORDS, PICKLEWEED THICK.

15       WHEN WAS THE LAST TIME YOU WENT AND YOU SAW IT?  YOU

16   MENTIONED YOU WERE GOING REGULARLY TO THE SITE.  CAN YOU GIVE

17   US A TIME FRAME?

18   **A.**  I WOULD HAVE BEEN THERE IN THE PREVIOUS SPRING OR EARLY

19   SUMMER, BEFORE IT STARTED GETTING HOT.

20   **Q.**  SO --

21   **A.**  IT HAD BEEN APRIL, MAY.

22   **Q.**  OF 2014?

23   **A.**  OF 2014.

24   **Q.**  AND WOULD IT BE FAIR TO SAY THAT YOU WOULD GO REGULARLY,

25   YOU SAID, SEVERAL TIMES A YEAR?

MILLER - DIRECT / LEE

1    **A.**   SEVERAL TIMES A YEAR.

2    **Q.**   AND THAT'S EVER SINCE ABOUT 2008?

3    **A.**   YES.

4    **Q.**   HAVING GONE TO THIS SITE ON A RECREATIONAL BASIS OVER THE

5    COURSE OF A NUMBER OF YEARS, CAN YOU DESCRIBE HOW THE SITE HAS

6    CHANGED OVER TIME?  HOW IT LOOKS?

7    **A.**   THE AREAS WHERE THE PICKLEWEED AND STUFF GROWS DON'T TEND

8    TO CHANGE MUCH FROM YEAR TO YEAR.  THE PLANT IS NOT ANNUAL.

9    IT DOESN'T DIE OUT IN WINTER AND THEN GROW BACK IN SPRING.  SO

10   IT STAYS PRETTY MUCH CONSTANT.

11       IT GETS DRYER IN THE HOT MONTHS, BUT THE PLANTS ARE STILL

12   THERE.  AND THEN WHEN YOU GET INTO THE RAINY MONTHS AND IT

13   GETS A LITTLE MORE LUSH.

14       THERE'S OTHER AREAS OUT THERE WHERE THEY PLOW AND DO OTHER

15   STUFF THAT WILL CHANGE FROM YEAR TO YEAR, BUT THAT THOSE --

16   THOSE SALTY AREAS DON'T TEND TO CHANGE MUCH FROM YEAR TO YEAR.

17   **Q.**   SO YOU SEE TYPICAL SEASONAL CHANGES?

18   **A.**   YEAH.

19   **Q.**   HOTTER, DRYER IN THE SUMMER?

20   **A.**   AND THEN ONCE YOU START GETTING RAIN, THEY -- THE PLANTS

21   WAKE UP A LITTLE BIT AND FILL OUT SOME.

22   **Q.**   AND RAINIER AND WETTER IN THE WINTER/SPRING MONTHS?

23   **A.**   WINTER/SPRINGTIME.

24   **Q.**   OKAY.  AND OVER YOUR YEARS OF GOING TO THIS PROPERTY, HAVE

25   THE FEATURES OF THE PROPERTY IN TERMS OF THE APPEARANCE TO YOU

MILLER - DIRECT / LEE

1  LOOKED GENERALLY THE SAME OVER TIME WITH THE SEASONAL CHANGES?

2  **A.**  YEP.

3  **Q.**  WHEN YOU WENT TO THAT NORTHERN SECTION NEAR THE END OF

4  YOUR DAY, WERE THERE STILL ANY TRUCKS THERE OR -- WAS THERE

5  STILL THAT ACTIVITY THAT YOU WERE HEARING?  WERE THEY STILL

6  THERE?

7  **A.**  THEY WERE NO LONGER ACTIVE.  THEY HAD SHUT DOWN A WHILE

8  SOONER.  I DON'T REMEMBER EXACTLY.  ABOUT AN HOUR SOONER.

9     IT WAS LIKE 6:30ISH AS I WAS COMING BACK.  THEY HAD SHUT

10  DOWN SOMETIME EARLIER.  AND I DIDN'T ACTUALLY PAY ATTENTION TO

11  WHAT WAS IN THERE ON THAT DAY.  SO I DON'T KNOW IF THE TRUCKS

12  WERE STILL THERE OR WHAT.  I WAS FOCUSED JUST ON THAT ONE

13  THING.

14  **Q.**  YOU WERE TALKING ABOUT WHAT YOU HEARD, NOISE, MACHINERY.

15  WHAT DID YOU SEE, IF ANYTHING?

16  **A.**  NOT MUCH.  IT'S FAR ENOUGH AWAY -- IT DOESN'T LOOK LIKE

17  IT'S THAT FAR, BUT IT'S A HALF MILE OR MORE.  AND I COULDN'T

18  REALLY SEE ANYTHING FROM THE PLACE WHERE I WAS READING.

19  **Q.**  SO --

20  **A.**  I ACTUALLY TOOK SOME PICTURES WITH A LONG ZOOM LENS DURING

21  THE DAY, AND I ENDED UP DELETING THEM ALL BECAUSE THERE WAS

22  NOTHING OF VALUE TO BE SEEN FROM THEM.  THEY WERE TOO FAR

23  AWAY.

24  **Q.**  WHEN YOU SAY YOU COULDN'T SEE ANYTHING, COULD YOU SEE

25  ANY -- OTHER THAN THAT ONE TRUCK THAT YOU JUST MENTIONED,

MILLER - DIRECT / LEE

1    COULD YOU SEE ANY OTHER TRUCKS ON THAT NORTHERN AREA?  I'M NOT

2    TALKING ABOUT THE CONCRETE PAD, I AM TALKING ABOUT THE

3    NORTHERN AREA WHERE YOU USED TO SEE DENSE PICKLEWEED.  COULD

4    YOU ACTUALLY SEE ANY TRUCKS ON THERE?

5    **A.**  NO.

6    **Q.**  SO YOU'RE BASICALLY GOING OFF WHAT YOU WERE HEARING?

7    **A.**  YES.

8    **Q.**  AND SEEING THAT ONE TRUCK?

9    **A.**  YES.  AND THAT ONE TRUCK THAT I SAW WAS NOT A BULLDOZER OR

10   SOMETHING.  IT WAS A JACKED-UP PICKUP TRUCK THAT SOMEBODY WAS

11   OUT THERE HAVING FUN DRIVING.

12   **Q.**  AND SO THEN YOU WALKED TO THAT AREA NEAR THE END OF THE

13   DAY, AND WHAT DID YOU SEE?

14   **A.**  I SAW THAT THAT WHOLE AREA THAT HAD BEEN PICKLEWEED AND

15   OTHER PLANTS HAD BEEN COMPLETELY COVERED WITH A THICK LAYER OF

16   DIRT.  AND THERE -- IT WAS ALL COVERED WITH BULLDOZER TRACKS.

17   IT WASN'T JUST A PICKUP TRUCK OR SOMETHING THAT HAD DONE THAT.

18   **Q.**  YOU COULD TELL THAT IT WAS BULLDOZER TRACKS.  HOW?

19   **A.**  BECAUSE BULLDOZERS HAVE -- THEY DON'T DRIVE ON WHEELS.

20   THEY DRIVE ON TRACKS.  LIKE A SHEET OF STEAL THAT WRAPS AROUND

21   THE LENGTH OF THE TRUCK, AND SO IT LEAVES LINES IN THE -- IN

22   THE GROUND WHERE THEY TRAVEL.  SO IT'S DISTINCTLY DIFFERENT

23   FROM JUST A REGULAR TRUCK.

24   **Q.**  YOU MENTIONED YOU SAW DIRT.  CAN YOU DESCRIBE WHAT YOU

25   SAW?

MILLER - DIRECT / LEE

```
 1    A.   IT WAS COARSE DIRT WITH CEMENT AND ROCK BROKEN UP IN IT.

 2    BUT MOSTLY DIRT.

 3    Q.   HAD YOU EVER SEEN THAT THERE BEFORE?

 4    A.   NO.

 5    Q.   AND BEFORE YOU HAD SEEN JUST PICKLEWEED THERE?

 6    A.   JUST PLANTS THERE, YEAH.  IT WENT FAR ENOUGH IN THAT WHEN

 7    I WAS STANDING ON THE LEVEE I WOULDN'T BE ABLE TO SEE THE END

 8    OF THE PLANTS.

 9    Q.   THE PICKLEWEED WOULD JUST CONTINUE ONWARDS?

10    A.   IT CONTINUED FOR, I DON'T KNOW 30 OR 50 FEET, SOMETHING.

11    Q.   TO A POINT WHERE YOU COULDN'T SEE BEYOND IT?

12    A.   YEAH.

13    Q.   DID YOU TAKE PHOTOS ON SEPTEMBER 1ST DOCUMENTING WHAT YOU

14    SAW?

15    A.   YES.

16    Q.   WHY DID YOU TAKE PHOTOS?

17    A.   JUST BECAUSE I WAS ANGRY.  AND BECAUSE I ALWAYS HAVE THE

18    CAMERA AND I TAKE PICTURES OF THINGS.

19         I DIDN'T HAVE ANY PLANS FOR SHOWING THEM TO ANYBODY AT

20    THAT TIME.  I DIDN'T REALLY KNOW ANYBODY THAT I COULD CONTACT

21    THAT I COULD SAY ANYTHING ABOUT.  I JUST WAS ANGRY AND I TAKE

22    PICTURES OF THINGS.  SO I TOOK PICTURES OF IT SO THAT I COULD

23    SHOW IT TO SOMEBODY IF OPPORTUNITY PRESENTED ITSELF.

24    Q.   OKAY.

25              THE COURT:  THIS MIGHT BE A GOOD POINT TO BREAK FOR
```

```
1    THE DAY IF YOU ARE AT A BREAKING POINT.

2              MS. LEE:  SURE.

3              THE COURT:  MAKE SURE WE CLOSE OUT BY 1:15.

4              MS. LEE:  OKAY.

5              THE COURT:  ALL RIGHT.  SO MR. MILLER, YOU CAN STEP

6    DOWN AND YOU WILL BE BACK TOMORROW.

7         LADIES AND GENTLEMEN, SO LET'S BREAK FOR THE DAY AT THIS

8    POINT.  WE'LL RECONVENE TOMORROW TO GET STARTED RIGHT AT 8:30.

9    WE WILL AIM TO BE OFF THE BLOCKS RIGHT AT 8:30.

10        AND JUST AS A SCHEDULING MATTER, BECAUSE MR. BARRANCO'S

11   SON IS GETTING MARRIED TOMORROW, CONGRATULATIONS, WE WILL

12   BREAK A LITTLER EARLY TOMORROW AT 12:45 SO HE CAN BE THERE.

13   THAT'S ONE OF THOSE THINGS THAT IS IMPORTANT TO MAKE.  SO THAT

14   WILL BE THE SCHEDULE FOR TOMORROW.

15        SO REMEMBER ALL OF THE ADMONITIONS.  NO DISCUSSIONS ABOUT

16   THE CASE WITH ANYONE, YOUR FELLOW JURORS, FAMILY, OR ANYONE

17   ELSE BY PHONE, IN PERSON, IN WRITING, BY ANY ELECTRONIC MEANS,

18   ON ANY CHAT ROOMS, SOCIAL MEDIA APP OF ANY SORT WHATSOEVER.

19   NO NEWS REPORTS OR OTHER INFORMATION ABOUT THE CASE OR ANY OF

20   THE ISSUES INVOLVED IN IT.  NO RESEARCH OF ANY KIND ABOUT THE

21   CASE, THE ISSUES, THE FACTS OF THE CASE, NONE OF THAT.

22        AND REMEMBER, PLEASE, AT ALL TIMES KEEP AN OPEN MIND UNTIL

23   ALL OF THE EVIDENCE HAS BEEN PRESENTED AND YOU'VE HEARD THE

24   ARGUMENTS OF COUNSEL, MY INSTRUCTIONS ON THE LAW, AND THE

25   VIEWS OF YOUR FELLOW JURORS.
```

1        SO WITH THAT, THANK YOU.  ENJOY THE REST OF YOUR DAY AND

2   WE WILL SEE YOU TOMORROW TO GET STARTED AT 8:30.

3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4           **THE COURT:**  ALL RIGHT.  WE'VE GOTTEN A COUPLE OF

5   NOTES ALREADY.  HAVE THEY GOTTEN COPIES OF THOSE?

6           **THE CLERK:**  NO.

7        THE OTHER WAS JUST HANDED, SO I HAVEN'T HAD A CHANCE TO

8   PHOTOCOPY THAT.

9           **THE COURT:**  SO, ONE, WAS A NOTE FROM MR. CHOY, SAYING

10  HARDSHIP ISSUE, COMPANY ONLY PAYS FOR TWO WEEKS OF JURY DUTY.

11  HR DIRECTOR NOTIFIED ME YESTERDAY THIS IS A RECENT POLICY

12  CHANGE.

13       IN MY VIEW, THERE'S NOTHING TO DO ON THAT ONE RIGHT NOW.

14  IF WE GET TWO WEEKS IN, WE WILL SEE WHAT HAPPENS AT THAT

15  POINT.

16       AND THEN WE RECEIVED A NOTE FROM LOOKS, LIKE

17  MS. BEYLER-NOILY, NO. 7.  I'M JUST READING THIS ONE NOW.

18       1.  CAN YOU DEFINE QUOTE "TRIBUTARY".  AND, 2, ARE ALL

19  WETLANDS PROTECTED BY THE CLEAN WATER ACT?  IS THE POINT TO

20  DECIDE WHETHER OR NOT AREA 4 IS A WETLAND?

21       I DON'T THINK THERE IS ANY INSTRUCTION THAT WE CAN GIVE ON

22  THAT AT THIS POINT EITHER.  I CAN TELL THEM THAT AS I

23  INDICATED AT THE BEGINNING OF THE CASE, THEY WILL BE

24  INSTRUCTED ON THE LAW AT THE CLOSE OF THE EVIDENCE.

25           **MR. KEARNEY:**  YOUR HONOR, ON THE GOVERNMENT'S BEHALF,

1    I THINK THAT'S A REALLY GOOD PLAN JUST TO SAY THAT -- TELL THE

2    JURORS THEY WILL BE INSTRUCTED AT THE END OF THE CASE ON

3    DEFINITIONS.  I THINK THAT MAKES SENSE.

4            **THE COURT:**  ALL RIGHT.  ANY PERSPECTIVE ON THAT FROM

5    THE DEFENSE?

6            **MS. HANSEN:**  AGREED.

7            **THE COURT:**  ALL RIGHT.  I'LL COME UP WITH SOMETHING

8    BRIEF TO THAT EFFECT.

9        ALL RIGHT.  THEN, MR. KEARNEY, THERE WAS AN ISSUE YOU

10   WANTED TO RAISE?

11           **MR. KEARNEY:**  I DID, SIR.  ONE SMALL, ONE BIGGER, I

12   GUESS.

13       FIRST ONE IS DURING OPENINGS, I DIDN'T OBJECT OUT OF

14   PROFESSIONAL COURTESY, BUT THERE WAS AN ABJECT PLEA FOR

15   SYMPATHY MENTIONING OF GRAND KIDS, AGE, SERIOUS CONSEQUENCES,

16   WHICH, ALL OF WHICH GO DIRECTLY AGAINST THE DISCUSSIONS WE HAD

17   ABOUT AVOIDING THOSE EXACT TYPE OF ARGUMENTS.

18       I WOULD ASK -- THE GOVERNMENT WOULD ASK THAT THE JURY BE

19   ADMONISHED TO DISREGARD THOSE THINGS.  THAT SYMPATHY SHOULD

20   NOT INFLUENCE THEIR DECISION-MAKING PROCESS.  I THINK IT'S A

21   FAIRLY -- I THOUGHT IT WAS OBJECTIONABLE AT THE TIME.  I

22   DIDN'T DO IT -- I DIDN'T WANT TO INTERRUPT MR. SMOCK'S

23   PRESENTATION, BUT I THOUGHT IT WAS COMPLETELY INAPPROPRIATE.

24           **MR. SMOCK:**  YOUR HONOR, IT'S ENTIRELY APPROPRIATE.

25   NUMBER ONE, I DON'T KNOW THAT THERE'S ANYTHING OBJECTIONABLE

1    ABOUT SAYING SOMETHING ABOUT A CLIENT AND HIS FAMILY.

2        SECOND OF ALL, IF I RECALL, I THINK I SAID SOMETHING ABOUT

3    THE FACT THAT THIS CASE ISN'T ONLY -- IT'S CRIMINAL, IT'S NOT

4    RELEVANT ONLY BECAUSE OF THE CONSEQUENCES BUT BECAUSE OF THE

5    BURDEN IN THE CASE.

6        I DON'T THINK THERE WAS ANYTHING THAT I SAID THAT WAS

7    OBJECTIONABLE THAT WOULD WARRANT GOING BACK TO THE JURY AND

8    MAKING A STATEMENT TO THEM ABOUT MY OPENING.  I THINK THAT

9    WOULD BE HIGHLY PREJUDICIAL TO THE DEFENSE.

10        **THE COURT:**  MY READ WAS THAT, ONE, THE OPENING IS NOT

11    EVIDENCE AND THEY WERE TOLD THAT.  AND, TWO, I THOUGHT THAT

12    THE WAY THAT IT WAS CHARACTERIZED WAS NOT INAPPROPRIATE.

13        SO THEY OBVIOUSLY WERE INSTRUCTED THAT THE OPENING IS NOT

14    EVIDENCE, BUT I DON'T BELIEVE THAT THERE'S ANYTHING THAT NEEDS

15    TO BE RAISED WITH THEM ON THAT POINT.

16        **MR. KEARNEY:**  YOUR HONOR, THE -- THANK YOU, SIR.

17        THE SECOND POINT HAS TO DO WITH EXPERTS.  DURING THE

18    OPENING, I HEARD THAT THE GOVERNMENT WAS ACCUSED OF TRYING TO

19    GET EXPERTS TO CHANGE THEIR VIEWS TO MATCH THOSE OF

20    MR. HUFFMAN.  THE OTHER EXPERTS ARE INCONSISTENT IN KEY WAYS

21    WITH PREVIOUS SCIENTISTS -- DR. HUFFMAN IS INCONSISTENT IN KEY

22    WAYS WITH PREVIOUS SCIENTISTS.

23        SO WE'RE GETTING TO A STAGE NOW WHERE WE'RE TRYING TO

24    SEPARATE DR. HUFFMAN FROM OTHER SCIENTISTS, AND YET THE

25    GOVERNMENT IN CERTAIN RESPECTS IS PRECLUDED FROM ASKING THE

1    EXPERTS TO GIVE FULL OPINIONS ABOUT, FOR INSTANCE, WHAT WAS

2    GOING ON IN 2014.

3        I JUST -- I AM NOT ASKING FOR A DECISION RIGHT NOW, YOUR

4    HONOR, BUT I JUST SEE ARISING A SITUATION WHERE THE TRUTH IS

5    THAT THE EXPERTS BEYOND MR. HUFFMAN ARE RELATIVELY CONSISTENT

6    WITH DR. HUFFMAN.  THEY ARE BEING PAINTED IN A CORNER WHERE

7    THERE IS AN INCONSISTENCY BEING BUILT, AND I AM WORRIED THAT

8    THE GOVERNMENT IS NOT GOING TO EXPLORE THEIR TRUE VIEWS ON THE

9    STAND.

10       I AM NOT ASKING FOR A RULING RIGHT NOW, BUT I JUST

11   HIGHLIGHT THAT FOR THE COURT BECAUSE I SEE THAT COMING.

12       **THE COURT:**  I HONESTLY DON'T UNDERSTAND THE ISSUE.

13   THAT'S THEIR JOB, AS THE DEFENSE, IS TO HIGHLIGHT ANY

14   POTENTIAL INCONSISTENCIES THAT THEY CAN ARGUE CONSISTENT WITH

15   THE RECORD --

16       **MR. KEARNEY:**  THAT'S TOTALLY FINE, SIR.  I WOULD LIKE

17   TO BE ABLE TO ASK OUR EXPERTS -- I KNOW THE COURT HAS MADE

18   SOME RULINGS ABOUT IF IT WASN'T IN AN EXPERT DISCLOSURE THEN

19   WE CAN'T ASK THE EXPERT TO OPINE ABOUT THAT.

20       I JUST THINK THAT IT'S -- WE ARE GETTING -- WE'RE ENTERING

21   TERRITORY WHERE WE MAY WANT TO ON REDIRECT ASK THEM SOMETHING

22   THAT IS BROUGHT UP ON CROSS THAT MAY GO OUTSIDE THE EXPERT

23   DISCLOSURE BUT IS MADE RELEVANT BY THIS ARGUMENT.

24       **THE COURT:**  THAT SOUNDS LIKE THE DEFINITION OF

25   REDIRECT.

1          **MR. KEARNEY:**  ALL RIGHT.  THANK YOU.

2          **MS. HANSEN:**  YOUR HONOR, WE ARE STILL BRIEFING

3    EXPERTS, CORRECT, THREE DAYS BEFOREHAND?

4          **THE COURT:**  YES.

5          **MS. HANSEN:**  AND THE DEFENSE RESPONSE, WAS IT?

6          **THE COURT:**  ONE DAY, I THINK.

7          **MS. HANSEN:**  ONE DAY BEFORE.

8          **THE COURT:**  EXACTLY.  I WAS TRYING TO GIVE YOU A

9    LITTLE TIME GIVEN THAT WE'RE ALL HERE.  I KNOW YOU ARE WORKING

10   REALLY HARD.  THE SOONER THINGS CAN BE TEED UP THE BETTER.  I

11   SAID THE DAY BEFORE SO THAT WE AT LEAST HAVE IT THEN AND YOU

12   WOULD HAVE A CHANCE TO CONSIDER IT AND RESPOND.

13         **MS. HANSEN:**  THANK YOU, YOUR HONOR.

14     WE ARE STILL GETTING WITNESSES AND EXHIBIT LISTS FOUR DAYS

15   IN ADVANCE.  I THINK THERE WAS A MISCOMMUNICATION TODAY.  WE

16   DIDN'T HAVE CARIN HIGH'S EXHIBIT LIST.  THAT IS WHY WE WERE

17   SLOWED DOWN WITH THE PRESENTATION.  I THINK TO THE EXTENT WE

18   GET THAT NAILED DOWN, WE WILL SPEED THINGS UP.

19         **THE COURT:**  THAT SOUNDS FAIR.

20         **MS. HANSEN:**  WE WERE GOING TO ASK FOR A LIMITING

21   INSTRUCTION AT SOME POINT THAT WE'LL CRAFT AND SUBMIT

22   REGARDING THIS PERMISSION FOR MR. LUCERO TO BE ON THE LAND.

23     IT SEEMS TO BE THE CRUX OF THE OPENING THAT MR. LUCERO

24   DIDN'T HAVE PERMISSION.  AND WE HAVE DISCUSSED THIS IN MOTIONS

25   IN LIMINE AND THE COURT IS ALLOWING THAT IN.  BUT TO THE

```
 1    EXTENT IT'S GOING TO BECOME AS LARGE AS IT SEEMS LIKE IT'S

 2    BECOMING, WE WOULD WANT AN INSTRUCTION FROM THE COURT THAT

 3    IT'S NOT REQUIRED FOR A CLEAN WATER ACT VIOLATION --

 4            THE COURT:  WHY DON'T YOU SUBMIT WHAT YOU THINK WOULD

 5    BE THE APPROPRIATE INSTRUCTION, AND WHEN EVIDENCE TO THAT

 6    EFFECT COMES IN, WE WILL CONSIDER IT.

 7            MS. HANSEN:  THANK YOU, YOUR HONOR.

 8        WE ARE NOT RENEWING OUR MOTIONS IN LIMINE OBJECTIONS, YOUR

 9    HONOR.  I WANT TO MAKE SURE EVERYONE UNDERSTANDS I BELIEVE THE

10    RULES PROVIDE THAT THEY ARE PRESERVED.

11            THE COURT:  THEY ARE.

12            MS. HANSEN:  THANK YOU.

13            THE COURT:  SEE YOU TOMORROW MORNING?

14            MS. LEE:  THANK YOU, YOUR HONOR.

15            MR. KEARNEY:  THANK YOU.

16                (PROCEEDINGS CONCLUDED AT 1:20 P.M.)

17                    CERTIFICATE OF REPORTER

18            I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

19    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

20    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23                    _Diane E. Skillman_

24            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

25                WEDNESDAY, FEBRUARY 7, 2018
```