VOLUME 2

PAGES 170 - 322

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-16-00107 HSG |
| | ) | |
| VS. | ) | THURSDAY, FEBRUARY 8, 2018 |
| | ) | |
| JAMES PHILIP LUCERO, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | JURY TRIAL |
| _____ | ) | |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**FOR PLAINTIFF:**      ALEX G. TSE, ESQUIRE
                      ACTING UNITED STATES ATTORNEY
                      450 GOLDEN GATE AVENUE, 11TH FLOOR
                      SAN FRANCISCO, CALIFORNIA  94102
                BY:   PHILIP J. KEARNEY,
                      SHIAO C. LEE,
                      ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**      FEDERAL PUBLIC DEFENDER'S OFFICE
                      1301 CLAY STREET, SUITE 1350N
                      OAKLAND, CALIFORNIA 94612
                BY:   ANGELA M. HANSEN,
                      NED SMOCK,
                      ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**        DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                      OFFICIAL COURT REPORTER


          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1                    I N D E X

2    GOVERNMENT'S WITNESSES:              PAGE   VOL.

3    MILLER, DANIEL

4    DIRECT EXAMINATION BY MS. LEE (RESUMED)    177    2

5    CROSS-EXAMINATION BY MR. SMOCK             208    2

6    REDIRECT EXAMINATION BY MS. LEE            216    2

7    RECROSS-EXAMINATION BY MR. SMOCK           219    2

8    FURTHER REDIRECT EXAMINATION BY MS. LEE    220    2

9    HARBISON, CRISTINA

10   DIRECT EXAMINATION BY MS. LEE              222    2

11   CROSS-EXAMINATION BY MS. HANSEN            254    2

12   REDIRECT EXAMINATION BY MS. LEE            261    2

13   DIEHL, DAVID

14   DIRECT EXAMINATION BY MS. LEE              263    2

15   CROSS-EXAMINATION BY MS. HANSEN            297    2

16   KIMBROUGH, VINCENT

17   DIRECT EXAMINATION BY MR. KEARNEY          300    2

18

19

20

21

22

23

24

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

```
 1              E X H I B I T   I N D E X

 2   GOVERNMENT'S EXHIBITS:        WITHDRAWN    ID.       EVD.    VOL.

 3       0003                                            303      2

 4       0040-0001                                       315      2

 5        100 - 121                                      243      2

 6        127 - 151                                      234      2

 7        152-0001 - 167-0001                            229      2

 8        905                                            292      2

 9        907A                                           296      2

10        908                                            310      2

11        908 - 918                                      273      2

12        919                                            291      2

13        930                                            291      2

14        937                                            291      2

15        939                                            273      2

16        941                                            273      2

17        945                                            291      2

18        948 - 961                                      273      2

19        962 - 972                                      292      2

20        973 - 979                                      265      2

21        980                                            267      2

22       1058-0001 -0047                                 181      2

23       1058-0031                                       199      2

24

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

```
 1    THURSDAY, FEBRUARY 8, 2018                        8:21 A.M.

 2                        P R O C E E D I N G S

 3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

 4            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS

 5    IN SESSION.  WE ARE CALLING CR-16-00107, UNITED STATES OF

 6    AMERICA VERSUS JAMES PHILIP LUCERO.  PLEASE STEP FORWARD AND

 7    STATE YOUR APPEARANCES FOR THE RECORD, PLEASE.

 8            MR. KEARNEY:  YOUR HONOR, GOOD MORNING.  PHILIP

 9    KEARNEY AND SHIAO LEE FOR THE UNITED STATES.

10            THE COURT:  GOOD MORNING, MR. KEARNEY.

11            MS. HANSEN:  GOOD MORNING, YOUR HONOR.  ANGELA HANSEN

12    ON BEHALF OF MR. LUCERO.

13            MR. SMOCK:  GOOD MORNING, YOUR HONOR.  NED SMOCK FOR

14    MR. LUCERO AS WELL.

15            THE COURT:  GOOD MORNING.

16        OKAY.  THE ONLY ISSUE THAT WAS TEED UP FROM LAST NIGHT IS

17    THE LIMITING INSTRUCTION.  THE DEFENSE SUBMITTED A PROPOSED

18    INSTRUCTION.  THE GOVERNMENT RESPONDED.  IN REVIEWING IT, I AM

19    OF THE MIND THAT NINTH CIRCUIT MODEL 3.10 IS ADEQUATE.  REALLY

20    HERE WE DON'T HAVE A 404(B) SITUATION.  WE HAVE AN

21    INEXTRICABLY INTERTWINED SITUATION IN WHICH THE EVIDENCE

22    THAT'S COMING IN IS SIMPLY PART OF THE CONTEXT NECESSARY TO

23    TELL A COHERENT STORY.

24        SO I THINK 3.10 ADEQUATELY COVERS THE CONCEPT.  IT WILL BE

25    GIVEN OBVIOUSLY AT THE END OF THE CASE.  I AM WILLING TO GIVE
```

1    IT AT WHATEVER POINT THE ISSUE IS TEED UP WITH REGARD TO THE

2    TRESPASSING AND THEN THE, QUOTE/UNQUOTE, FORGERY, BUT THAT IN

3    MY VIEW IS SUFFICIENT.

4           **MS. HANSEN:**  I'LL SUBMIT.

5           **THE COURT:**  ALL RIGHT.  THEN THE QUESTION IS, DO YOU

6    WANT TO PROMPT ME TO DO IT, OR DO YOU --

7           **MS. HANSEN:**  I WOULD BE HAPPY TO DO THAT, YOUR HONOR.

8           **THE COURT:**  I THINK THAT IS PROBABLY THE BEST BET, IF

9    YOU ARE LOOKING FOR A LIMITING INSTRUCTION, TO LET ME KNOW

10   THAT, RATHER THAN HAVE ME TRY TO INTUIT WHETHER YOU WANT ME TO

11   DO IT.

12          **MS. HANSEN:**  AGREED.

13          **MR. KEARNEY:**  IS THAT PROMPTING GOING TO OCCUR IN

14   OPEN COURT, YOUR HONOR, OR AT A SIDEBAR?

15          **THE COURT:**  I THINK THAT POINT WOULD JUST BE,

16   OBJECTION.

17          **MS. HANSEN:**  LIMITING INSTRUCTION.

18          **THE COURT:**  EXACTLY.

19          **MR. KEARNEY:**  ALL RIGHT.  THANK YOU.

20          **THE COURT:**  AND THEN JUST ONE PROCEDURE MATTER.  ON

21   OBJECTIONS, AND I THINK YOU GENERALLY BOTH WERE DOING THIS

22   MOST OF THE TIME, BUT JUST RAISE THE OBJECTION AND THE

23   EVIDENTIARY BASIS WITHOUT ANY ARGUMENT UNLESS I ASK FOR IT.

24          **MS. LEE:**  YES, YOUR HONOR.

25          **THE COURT:**  AND THEN, AS I SAID YESTERDAY, WE GOT THE

1    NOTE FROM JUROR NO. 7 ESSENTIALLY ASKING A COUPLE OF LEGAL

2    QUESTIONS, AND I INTEND TO JUST GIVE THE FOLLOWING RESPONSE

3    WHEN THEY COME IN, SOMETHING TO THE EFFECT OF:  AS I HAVE

4    MENTIONED, I WILL INSTRUCT YOU ON THE LAW THAT APPLIES TO THE

5    CASE AFTER THE EVIDENCE HAS BEEN PRESENTED AND THE ATTORNEYS

6    MAKE THEIR CLOSING ARGUMENTS.  THOSE INSTRUCTIONS WILL BE IN

7    THE FORM OF DETAILED WRITTEN INSTRUCTIONS THAT WILL CONTROL

8    YOUR DELIBERATIONS.  TO THE FACTS AS YOU FIND THEM, YOU WILL

9    THEN APPLY THE LAW AS I GIVE IT TO YOU.

10       IT'S REALLY, I'VE JUST TAKEN FROM THE INSTRUCTION THAT

11   WILL BE GIVEN TOWARD THE END OF THE CASE.  AND ACTUALLY IT'S A

12   MODIFICATION OF THE INSTRUCTION I HAVE ALREADY GIVEN THEM ON

13   THAT POINT.

14            **MS. HANSEN:**  AGREED.

15            **THE COURT:**  ALL RIGHT.  AND THEN I UNDERSTAND THERE

16   WAS ONE OTHER ISSUE?

17            **MS. HANSEN:**  YES, YOUR HONOR.  DEPUTY U.S. MARSHAL

18   SCOTT FIEGELSON IS HERE FOR OUR SUBPOENA FOR A GOVERNMENT

19   WITNESS DAN MARTEL.

20       THE WITNESS IS AVOIDING SERVICE.  SO DEPUTY MARSHAL IS

21   HERE.  WE HAVE TO TRY TO FIGURE OUT A SOLUTION TO THIS.  THEY

22   HAVE MADE -- OUR OFFICE MADE SOME EXTRAORDINARY EFFORTS.  NOW

23   THE U.S. MARSHAL HAS DONE THE SAME.  HE COULD BE BROUGHT IN IN

24   CUSTODY, OR PERHAPS THE GOVERNMENT COULD LET HIM KNOW THAT HE

25   SHOULD STOP AVOIDING SERVICE.

```
 1              THE COURT:  IS THIS ONE OF THE EXPERTS?

 2           MS. HANSEN:  YOUR HONOR, YES, HE IS.  DAN MARTEL,

 3   HE'S A FORMER MEMBER OF THE CORPS FROM 2007 TO 2012.  HE'S NOW

 4   IN PRIVATE PRACTICE.  HE'S NO LONGER WITH THE GOVERNMENT SO

 5   HE'S NOT A GOVERNMENT EMPLOYEE.

 6      AND HE'S A NOTICED GOVERNMENT EXPERT, AND WE NEED HIM

 7   POSSIBLY FOR PERFECTING IMPEACHMENT.  WE ALSO NEED HIM IN THE

 8   EVENT -- WHAT WE QUESTION HIM IS BEYOND THE SCOPE, AND ALSO IN

 9   THE EVENT THE GOVERNMENT DOESN'T CALL HIM.  SO WE'VE ASKED THE

10   COURT FOR THE ORDER, YOUR HONOR SIGNED, TO HAVE THE MARSHAL

11   SERVE HIM BECAUSE HE WAS AVOIDING SERVICE FROM OUR

12   INVESTIGATOR.

13           MR. KEARNEY:  YOUR HONOR, WE ARE HAPPY TO HELP THE

14   MARSHALS GET THAT DONE.  I DON'T THINK IT'S GOING TO BE A

15   PROBLEM.

16              THE COURT:  WHY DON'T WE DO THAT.

17           DEPUTY MARSHAL FIEGELSON:  THANK YOU, YOUR HONOR.

18              THE COURT:  ALL RIGHT.  THANK YOU.

19      SO WE WILL START AS SOON AS -- I UNDERSTAND WE HAVE GOT A

20   COUPLE MORE JURORS WHO ARE ON THEIR WAY IN, BUT AS SOON AS

21   THEY GET HERE, WE WILL START SINCE WE ARE BREAKING AT 12:45.

22           MS. LEE:  OKAY.

23      (RECESS TAKEN AT 8:28 A.M.; RESUMED AT 8:33 A.M.)

24      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

25           THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS
```

1    COURT IS BACK IN SESSION.

2          **THE COURT:**  ALL RIGHT.  GOOD MORNING, LADIES AND

3    GENTLEMEN.  WELCOME BACK.

4        AT THIS TIME WE WILL CONTINUE WITH THE TESTIMONY OF

5    MR. MILLER.  BEFORE I DO THAT, THERE WAS ONE QUESTION THAT I

6    RECEIVED, AND HERE'S THE ANSWER THAT I CAN GIVE YOU:

7        AS I'VE MENTIONED, I WILL INSTRUCT YOU ON THE LAW THAT

8    APPLIES TO THE CASE AFTER THE EVIDENCE HAS BEEN PRESENTED AND

9    THE ATTORNEYS MAKE THEIR CLOSING ARGUMENTS.  THOSE

10   INSTRUCTIONS WILL BE IN THE FORM OF DETAILED WRITTEN

11   INSTRUCTIONS THAT WILL CONTROL YOUR DELIBERATIONS.  TO THE

12   FACTS AS YOU FIND THEM, YOU WILL APPLY THE LAW AS I GIVE IT TO

13   YOU.

14       ALL RIGHT?  SO WITH THAT, MS. LEE, ARE YOU PREPARED TO

15   PROCEED WITH MR. MILLER'S DIRECT?

16          **MS. LEE:**  YES, YOUR HONOR.

17                    **DIRECT EXAMINATION**

18   **BY MS. LEE:**

19   **Q.**  GOOD MORNING, MR. MILLER.

20   **A.**  GOOD MORNING.

21   **Q.**  I THINK WE LEFT OFF YESTERDAY WITH YOU SAYING THAT WHAT

22   YOU SAW MADE YOU ANGRY.

23   **A.**  YES.

24   **Q.**  WHY DID IT MAKE YOU ANGRY?

25          **MR. SMOCK:**  OBJECTION, YOUR HONOR.  RELEVANCE.

```
1           THE COURT:  SUSTAINED.

2    BY MS. LEE:

3    Q.  AFTER SEEING WHAT YOU SAW, DID YOU MOVE FORWARD -- DID YOU

4    TAKE ANY PHOTOS?

5    A.  YES, I DID.

6    Q.  I WOULD LIKE TO SHOW YOU GOVERNMENT'S EXHIBIT 1058-0001 TO

7    1058-0047.

8           MS. LEE:  YOUR HONOR, MAY I APPROACH THE WITNESS?

9           THE COURT:  YOU MAY.

10               (BINDER HANDED TO WITNESS.)

11   BY MS. LEE:

12   Q.  IF YOU COULD TAKE A QUICK LOOK THROUGH THEM, AND WHEN

13   YOU'RE DONE, CAN YOU TELL US WHAT THEY ARE?

14   A.  THEY ARE PICTURES THAT I TOOK ON SEPTEMBER 1ST OF 2014 OF

15   THE AREA WHERE I WAS HIKING OUT, OUT ALONG THE LEVEES OF MOWRY

16   SLOUGH.

17   Q.  ARE THEY PHOTOS THAT YOU TOOK FROM THAT SPOT THAT YOU LIKE

18   CLOSER TO THE SOUTHERN SECTION OF NEWARK AREA 4?

19   A.  THEY WERE TAKEN ALL ALONG MY WALK IN -- ALONG THE VARIOUS

20   LEVEES.  THERE IS A LARGE POND AREA THAT IS SOUTH OF THE

21   LEVEE, AND I TOOK A LOT OF PICTURES ALL THE WAY THROUGH ON MY

22   ROUTE AROUND.

23   Q.  OKAY.

24   A.  AND THESE ARE PICTURES OF THE WHOLE AREA THERE.

25   Q.  WHAT I WOULD LIKE TO DO IS PULL UP WHAT HAS ALREADY BEEN
```

```
1    ADMITTED INTO EVIDENCE, WHICH IS GOVERNMENT'S

2    EXHIBIT 1141-0036, SO THAT YOU CAN SHOW ON THIS MAP YOUR ROUTE

3    AND WHERE YOU TOOK PHOTOS OF.

4                   (DISPLAYED ON SCREEN.)

5       AND, MR. MILLER, I GUESS WHAT I'LL HAVE YOU DO IS JUST

6    COME BACK DOWN AGAIN.

7              (WITNESS STEPS DOWN FROM WITNESS STAND.)

8          THE WITNESS:  OKAY.  OKAY.  SO SHOW WHAT?

9          MS. LEE:  COULD YOU SHOW HOW YOU CAME IN THE -- KIND

10   OF THE ROUTE YOU TOOK AS YOU'RE TAKING PHOTOS SO THE JURORS

11   KNOW WHERE YOU ARE TAKING PHOTOS OF.

12         THE WITNESS:  LET ME STAND A LITTLE CLOSER FOR A

13   MINUTE.

14         MS. LEE:  WE ARE GOING TO BLOW THAT UP FOR YOU,

15   MR. MILLER.

16         THE WITNESS:  YES, I KNOW.

17      SO THE AREA THAT I PARK -- THAT WORKS.  THE AREA THAT I

18   PARK IS BACK UP -- THERE WAS... IT'S NOT COMPLETELY -- NOT

19   VISIBLE ON THERE.  THERE WE GO.

20      SO THE AREA THAT I PARK IS UP IN THERE (INDICATING) BY

21   WHAT'S CALLED SILLIMAN CENTER.  IT'S A -- JUST A RECREATIONAL

22   FACILITY FOR NEWARK AND FREMONT.  AND I WALK ALONG THE TRACKS

23   HERE AND COME UP THE LEVEE HERE.  THERE'S THIS LARGE PONDING

24   AREA HERE.  THAT'S ALWAYS BEEN THERE.  AND THEN I COME DOWN

25   THE -- GOD DAMMIT.
```

1          **MS. LEE:**  WE ARE GOING TO ZOOM OUT, MR. MILLER.

2     DON'T WORRY ABOUT YOUR -- LIKE YOUR HAND.  IT'S OKAY.  JUST

3     TAKE YOUR TIME.

4          **THE WITNESS:**  AND THEN I COME DOWN THE LEVEE, AS I

5     SHOWED YESTERDAY, ALONG THE PONDING SITE AND GO TO MY NESTING

6     SITE THAT IS RIGHT AROUND HERE SOMEWHERE.  A LITTLE MORE

7     STEADY THAN MY HAND IS.

8          AND THAT LARGE POND THERE I WAS -- THESE PICTURES ARE ALL

9     ALONG THE LEVEE ROUTE AS I WAS WALKING DOWN THERE.

10    **BY MS. LEE:**

11    **Q.**  DO THOSE PICTURES REFLECT THE PHOTOS YOU TOOK AROUND THE

12    PONDING AREA AND A LITTLE SOUTH OF THAT?

13    **A.**  CORRECT.

14    **Q.**  DO THE PHOTOS ALSO DEPICT THE NORTHERN AREA WHEN YOU WENT

15    TO GO LOOK AT WHERE THE NOISE WAS COMING THERE?

16    **A.**  YES.  AFTER -- ON MY WAY BACK I TOOK PICTURES ON THE OTHER

17    SIDE THERE OF THAT CIRCLED AREA THAT'S THERE.

18    **Q.**  OKAY.  IF YOU COULD GRAB A SEAT, THAT WOULD BE GREAT.

19              (WITNESS RESUMES WITNESS STAND.)

20         **THE CLERK:**  I WILL TAKE THE MIC BACK.

21    **BY MS. LEE:**

22    **Q.**  DO THOSE PICTURES FAIRLY AND ACCURATELY DEPICT THE PHOTOS

23    THAT YOU TOOK OF THE SITE AND WHAT THAT SITE LOOKED LIKE ON

24    SEPTEMBER 1ST, 2014?

25    **A.**  YES.

1      **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

2   GOVERNMENT'S EXHIBIT 1058-0001 TO 1058-0047 INTO EVIDENCE.

3      **MR. SMOCK:**  NO OBJECTION.

4      **THE COURT:**  SO EXHIBIT 1058-0001 THROUGH 0047 ARE

5   ADMITTED.

6      (GOVERNMENT'S EXHIBITS 1058-0001 TO 1058-0047 RECEIVED IN

7   EVIDENCE)

8      **THE CLERK:**  MAKE SURE YOU HAVE THE RIGHT AMOUNT OF

9   ZEROS.  THE FIRST TIME YOU GAVE IT MORE, AND THIS TIME YOU ARE

10  GIVING IT NOT AS MANY.

11     **MS. LEE:**  LET ME –– IT'S 1058-0001 TO 1058-0047, FOUR

12  DIGITS AFTER THE EXHIBIT NUMBER.

13  **BY MS. LEE:**

14  **Q.**  I'M NOT GOING TO TAKE YOU THROUGH ALL OF THESE BUT I WOULD

15  LIKE TO HIGHLIGHT A FEW.  CAN YOU PLEASE GO TO 1058-0004?

16                 (DISPLAYED ON SCREEN.)

17  **A.**  04, YES.

18  **Q.**  WHAT ARE WE LOOKING AT HERE?

19  **A.**  WELL, WE ARE LOOKING AT AN AREA OF WHAT I CALL SALT MARSH

20  WETLAND, COMPRISED OF PICKLEWEED AND OTHER RELATED PLANTS.

21  THIS IS SOUTH OF THE LEVEE THAT I FIRST WALK IN ON.

22  **Q.**  IS IT DIRECTLY OPPOSITE FROM THE AREA WHERE THE RED CIRCLE

23  WAS?

24  **A.**  YES.

25  **Q.**  JUST ON THE OTHER SIDE OF THE LEVEE TO THE SOUTH?

1  **A.**  THIS IS TO THE SOUTH.  THAT OTHER AREA WAS JUST TO THE

2  NORTH.  AND THIS IS AT THE SAME RELATIVE LOCATION ALONG THE --

3        **MR. SMOCK:**  YOUR HONOR, CAN I JUST SUGGEST, SO THAT

4  THIS IS CLEAR, THE MAP BE USED?  IT'S NOT ENTIRELY CLEAR WHERE

5  WE ARE AT THIS POINT EVEN WITH THE EXPLANATION.

6  **BY MS. LEE:**

7  **Q.**  I GUESS WHAT WE COULD DO IS GO BACK AND FORTH BETWEEN THE

8  PHOTO AND THE MAP SO THAT YOU'RE ABLE TO EXPLAIN THIS PHOTO IS

9  WHERE ON THAT LARGER MAP.

10  **A.**  WE CAN DO THAT.

11  **Q.**  SO LOOKING AT 1058-0004, THIS PHOTO THAT YOU JUST

12  DESCRIBED --

13        **MS. LEE:**  CAN WE GO BACK TO THAT MAP?

14              (DISPLAYED ON SCREEN.)

15      AND WHAT -- YOUR HONOR, MAY I ACTUALLY TILT THE SCREEN

16  CLOSER IN THE DIRECTION OF MR. MILLER SO MAYBE HE DOESN'T HAVE

17  TO GET ON AND OFF EACH TIME?

18        **THE COURT:**  I THINK THAT WOULD MAKE SENSE AS LONG AS

19  IT IS SET UP SO THE JURORS CAN SEE AS WELL.

20        **MS. LEE:**  THE JURORS CAN STILL SEE AS WELL.

21        **THE WITNESS:**  I CAN STEP DOWN THERE AND JUST POINT.

22        **THE COURT:**  WELL, LET'S TRY TO KEEP IT CRISP.  IF YOU

23  CAN TURN IT SO THAT EVERYONE CAN SEE IT BUT HE DOESN'T HAVE TO

24  MOVE, THAT WOULD BE IDEAL.

25             (PAUSE IN THE PROCEEDINGS.)

 1          **THE COURT:**  THE JURORS ARE SHAKING THEIR HEADS THAT

 2   NOW THEY CAN'T SEE IT.  BUT YOU CAN SEE IT ON YOUR --

 3          **MS. LEE:**  YOU CANNOT SEE IT ANYMORE?

 4          **THE COURT:**  IS IT ON YOUR SCREENS?

 5          **A JUROR:**  WELL, IT IS JUST WHEN THEY POINT, WE CAN'T

 6   SEE WHERE THE POINTER IS BECAUSE THERE ARE SIX HEADS AHEAD OF

 7   US.

 8          **THE COURT:**  FAIR POINT.

 9          **MS. LEE:**  GOOD POINT.  POTENTIALLY WHAT I WILL ASK

10   MR. MILLER TO DO IS POINT ON THIS SCREEN AND THEN

11   SIMULTANEOUSLY TURN TO BE ABLE TO POINT ON THE TV SCREEN IN

12   THE BACK OF THE COURTROOM, AND PERHAPS THAT WILL BE -- ABLE TO

13   ADDRESS THE JURORS TO THE FRONT AND THE BACK.

14          **THE WITNESS:**  YOU'RE GOING TO TRY TO MOVE THE

15   POINTER?  BECAUSE THIS ISN'T GOING TO BE VISIBLE.

16      YES, IT IS, WHICH WOULD BE USEFUL.  OKAY.

17   **BY MS. LEE:**

18   **Q.**  ALL RIGHT.

19      SO WITH RESPECT TO THE PHOTO THAT YOU JUST DESCRIBED, I'M

20   GOING TO ASK, COULD YOU USE YOUR POINTER TO DESCRIBE WHERE IT

21   IS ON THAT TELEVISION SCREEN, PLEASE?

22   **A.**  ON THIS ONE?

23   **Q.**  YES.

24   **A.**  SO IT'S IN THIS REGION HERE (INDICATING).

25   **Q.**  AND THEN WHAT I WILL DO IS HAVE AGENT SU DRAW AN ARROW TO

MILLER – DIRECT / LEE

1   WHERE YOUR RED POINTED DOT IS.

2   **A.**   HERE.

3   **Q.**   AND HOPEFULLY THAT WILL MAKE IT CRYSTAL CLEAR.

4   **A.**   THIS AREA.

5   **Q.**   THANK YOU.  AND IF YOU DON'T MIND, WE WILL DO THIS FOR

6   EACH PHOTO SO THE PHOTO CAN BE PLACED IN CONTEXT WITH THE

7   SITE.

8       OKAY.  SO THAT IS WHERE THAT VEGETATION PHOTO WAS?

9   **A.**   RIGHT.

10  **Q.**   I WOULD LIKE TO TAKE YOU TO 1058-0021.

11                      (DISPLAYED ON SCREEN.)

12  **A.**   THE PATHWAYS, YES.

13  **Q.**   WHAT IS THIS AND -- WHAT IS THIS?

14  **A.**   THOSE ARE WOODEN PATHWAYS THAT LEAD OUT TO THESE POWER

15  TOWERS.  AND THERE'S TWO OF THEM, THIS LONG ONE THAT GOES WAY

16  OUT THERE AND THEN A SHORTER ONE THAT'S TO THE LEFT IN THIS

17  PICTURE.

18  **Q.**   WHY DID YOU TAKE THIS PHOTO?  WHAT SIGNIFICANCE DOES IT

19  HAVE TO YOU?

20  **A.**   I'VE ALWAYS BEEN INTRIGUED BY THOSE PATH -- THAT PATH AND

21  WANTED TO WALK OUT THERE AND EXPLORE THE WETLANDS THAT ARE ON

22  THE OTHER SIDE, BUT I'VE NEVER QUITE HAD THE NERVE TO WALK OUT

23  ON THAT PATH, AND SO I ALWAYS LOOK AT IT.

24      ALSO THOSE ISLANDS THERE OFTEN ARE COVERED WITH WILDLIFE,

25  BIRDS THAT HANG OUT IN THE AREA, ALTHOUGH THERE'S NOTHING IN

MILLER – DIRECT / LEE

1    THIS PICTURE.

2              **MS. LEE:**  WELL, ACTUALLY, AGENT SU, I AM GOING TO ASK

3    YOU TO ZOOM IN, PLEASE, TO THOSE LITTLE ISLAND AREAS TO SEE

4    IF, IN FACT, IF THERE ARE ANY ANIMALS OR SPECIES THERE.

5    **BY MS. LEE:**

6    **Q.**  ARE THERE, MR. MILLER?

7    **A.**  THERE ARE SOME THERE.  THERE ARE SOME NEAR THEM.

8    **Q.**  WHAT ABOUT THE OTHER ISLANDS?

9    **A.**  THERE'S A FEW THERE.  A LOT OF TIMES PELICANS HANG OUT ON

10   THOSE FOR DAYS AT A TIME.  OTHER LARGE BIRDS WILL HANG OUT

11   THERE.

12   **Q.**  OKAY.

13   **A.**  SO I WAS LOOKING AT THEM.  I JUST -- I LOVE THAT POND.  I

14   STILL TAKE PICTURES OF IT.

15   **Q.**  IF WE CAN GO BACK TO THAT MAP AND YOU CAN POINT OUT WHERE

16   THIS IS ON THAT SITE.

17   **A.**  UNFORTUNATELY... THIS MAP DOES NOT SHOW THE PATHS.  THEY

18   ARE ROUGHLY... THEY ARE ROUGHLY EXTENDING -- THE LARGE ONE IS

19   EXTENDING STRAIGHT OUT THROUGH THE MIDDLE OF THE PATH AND

20   LEADING OUT INTO THE GREEN AREA OVER THERE ROUGHLY.

21   **Q.**  IS THIS ARROW THAT AGENT SU HAS DRAWN, IS THAT ACCURATE TO

22   WHERE YOU ARE SAYING THAT PHOTO WAS?

23   **A.**  THE LOWER LEFT ONE NEEDS TO MOVE UP ABOUT HALFWAY TO THE

24   MIDDLE OF THE LAKE.

25        YES, THAT'S MORE LIKE IT.

MILLER – DIRECT / LEE

1    **Q.**   THAT'S ACCURATE?

2    **A.**   THAT'S ROUGHLY WHERE MY END -- THE ACCESSIBLE END OF THAT

3    PATH IS.  AND THEN IT LAYS STRAIGHT ACROSS THE LAKE.

4    **Q.**   I WOULD LIKE FOR YOU TO LOOK AT EXHIBIT 1058-0024.

5                       (DISPLAYED ON SCREEN.)

6    **A.**   OKAY.

7    **Q.**   WHAT IS THE SIGNIFICANCE OF THIS PHOTO TO YOU?

8    **A.**   THIS IS NEXT TO WHERE I -- I LIKE TO SIT AND READ OUT

9    THERE.  THAT POND OFTEN IS LOADED WITH MIGRATORY BIRDS, WITH

10   EGRETS AND HERONS AND ALL KINDS OF THINGS, AND I SOMETIMES SEE

11   JACKRABBITS OUT IN THE FIELD BEYOND IT.  AND I CAN'T REALLY

12   WALK OUT THERE, IT IS VERY MARSHY, BUT I LOVE TO SIT THERE AND

13   JUST BE NEAR IT AND WATCH THE WILDLIFE AND READ.  THIS IS THE

14   PLACE WHERE I WOULD SIT.

15   **Q.**   THIS IS YOUR SPOT?

16   **A.**   THIS IS MY SPOT.

17   **Q.**   IF YOU CAN SHOW US ON THE MAP.

18   **A.**   IT IS RIGHT AT THE CORNER OF THAT (INDICATING).

19   **Q.**   DOES THAT RIGHT ARROW ACCURATELY DEPICT --

20   **A.**   RIGHT.  THAT IS THE POINT.

21   **Q.**   THANK YOU.

22      I WOULD LIKE FOR YOU TO GO TO EXHIBIT 1058-0029.

23      CAN YOU TELL US WHAT WE ARE LOOKING AT HERE AND WHY YOU

24   TOOK THIS PHOTO?

25                       (DISPLAYED ON SCREEN.)

MILLER – DIRECT / LEE

1    **A.**   THIS IS LOOKING BEHIND ME FROM MY READING SPOT.   AND THAT

2    IS MOWRY SLOUGH ON THE LEFT.   IT IS SORT OF IN THE MIDDLE OF

3    ITS FILL AND EMPTY CYCLE.   IT'S TIDAL.   IT RISES AND FALLS

4    WITH THE TIDES.   AND IT IS ABOUT MIDWAY THROUGH THAT CYCLE AT

5    THIS POINT.   AND IT IS ALSO LOOKING BACK TOWARD THE --

6            **MR. SMOCK:**   OBJECTION, YOUR HONOR.   NARRATIVE AND

7    BEYOND THE SCOPE.   LACKS FOUNDATION.

8            **THE COURT:**   WHY DON'T YOU DO IT BY QUESTION AND

9    ANSWER.

10           **MS. LEE:**   OKAY.

11   **BY MS. LEE:**

12   **Q.**   YOU MENTIONED THAT THIS PHOTO IS BEHIND -- THIS IS BEHIND

13   YOUR SPOT?

14   **A.**   YEP.

15   **Q.**   ON THE OTHER SIDE OF THE LEVEE?

16   **A.**   YEP.

17   **Q.**   AND THAT WATER BODY IS MOWRY SLOUGH; IS THAT CORRECT?

18   **A.**   YES.

19   **Q.**   YOU MENTIONED THAT YOU BELIEVE MOWRY SLOUGH TO BE TIDAL;

20   IS THAT RIGHT?

21   **A.**   YES.

22   **Q.**   WHY?

23   **A.**   I'VE SEEN IT --

24           **MR. SMOCK:**   OBJECTION.   LACKS FOUNDATION.

25           **THE COURT:**   SUSTAINED.

MILLER – DIRECT / LEE

```
 1   BY MS. LEE:

 2   Q.  WELL, HOW DO YOU KNOW?

 3          MR. SMOCK:  OBJECTION --

 4          THE COURT:  SUSTAINED.

 5   BY MS. LEE:

 6   Q.  COULD -- AND JUST TO CLARIFY, I DON'T THINK WE NEED TO GO

 7   BACK TO -- ON THE MAP ON THIS, THIS IS JUST ON THE OPPOSITE

 8   SIDE OF WHERE YOU SIT?

 9   A.  YES.

10   Q.  OKAY.  I WOULD LIKE FOR YOU TO GO TO EXHIBIT 1058-0032.

11              (DISPLAYED ON SCREEN.)

12       WHAT ARE WE LOOKING AT HERE, AND WHY DID YOU TAKE THIS

13   PHOTO?

14   A.  I -- WHAT WE ARE LOOKING AT IS THAT SAME PATH THAT WE

15   LOOKED AT EARLIER THAT LEADS ACROSS THE -- THAT PONDING THING

16   TO ACCESS THE ANTENNAE TOWERS, AND I TOOK IT JUST BECAUSE IT'S

17   A PRETTY PLACE AND I LOVE TAKING PICTURES OF THE POND.

18   Q.  OKAY.  DO YOU RECOGNIZE THAT VEGETATION IN THIS PHOTO?

19   A.  IN THE FOREGROUND NEAR THE WATER IS THAT TYPICAL WHAT I

20   CALL SALT MARSH PLANT --

21          MR. SMOCK:  OBJECTION.  FOUNDATION.

22          THE COURT:  OVERRULED.

23          THE WITNESS:  THE SAME PICKLEWEED AND OTHER SALT

24   MARSH PLANTS THAT GROW THROUGHOUT THE AREA.  IT'S THE SAME

25   THINGS AS WE SAW IN THE FIRST PICTURE BUT IT IS SPARSER HERE.
```

1    **BY MS. LEE:**

2    **Q.**  AND IN THE BACKGROUND OF THAT PHOTO, IF WE COULD JUST

3    HIGHLIGHT, ARE THOSE BIRDS OR DUCKS?

4    **A.**  OH, THERE?

5    **Q.**  YES.  WHAT ARE THOSE THAT YOU TOOK?

6    **A.**  THE LARGE ONES IN THE DISTANCE ARE PELICANS.  YOU CAN TELL

7    BY THE LONG BEAK.  THE FOREGROUND ONES ARE SOME KIND OF SHORE

8    BIRDS.  I DON'T KNOW THE SHORE BIRDS VERY WELL.

9    **Q.**  IF WE CAN GO BACK TO THE MAP SO YOU CAN POINT OUT WHERE

10   THIS PHOTO IS ON THE SITE.

11                   (DISPLAYED ON SCREEN.)

12   **A.**  OKAY.  SO, AGAIN, I WAS SITTING AT THAT CORNER RIGHT THERE

13   (INDICATING) AND THE -- WE'RE LOOKING AT THE WALKWAY THAT GOES

14   THROUGH THE MIDDLE OF THE... OF THE POND THERE.

15   **Q.**  SO IT IS A PHOTO THROUGH THE MIDDLE OF THE POND; IS THAT

16   RIGHT?

17   **A.**  CORRECT.

18   **Q.**  OKAY.  I WOULD LIKE FOR YOU TO TAKE A LOOK AT

19   EXHIBIT 1058-0036.

20                   (DISPLAYED ON SCREEN.)

21     WHAT IS THIS PHOTO?

22   **A.**  THIS IS LOOKING OUT ACROSS THE FIELD AWAY FROM THE --

23   SOUTH OF THE POND, AND IT'S LOOKING OUT ACROSS THAT WHOLE AREA

24   OF NEWARK AREA 4 AND THE RAILROAD TRACKS IN THE DISTANCE.

25   **Q.**  AND IF WE CAN ZOOM IN ON THAT LITTLE YELLOW DOT THERE.

1    AND WHAT IS THAT?

2    **A.**  IT IS SOME KIND OF A BULLDOZER OR EARTH-MOVING PIECE OF

3    EQUIPMENT.  I CAUGHT IT ACCIDENTALLY IN THE PICTURE WHEN I WAS

4    SHOOTING.  THIS WAS PART OF A PANORAMA, ABOUT A SEVEN-SHOT

5    PANORAMA THAT I SHOT, AND IT WAS JUST OUT THERE.  I DON'T KNOW

6    WHAT IT WAS DOING.

7    **Q.**  AND THIS WAS ON SEPTEMBER 1ST OF 2014?

8    **A.**  YEP.

9    **Q.**  OKAY.  AND IF WE CAN GO BACK TO THE MAP SO YOU CAN SHOW

10   WHERE THE FIELD AND THE BULLDOZER IS, FROM THIS PHOTO THAT YOU

11   TOOK.

12   **A.**  OKAY.  SO I WOULD HAVE BEEN SITTING -- ACTUALLY WHEN I WAS

13   SHOOTING THE PANORAMA, I WASN'T SITTING YET.  I WAS JUST A

14   LITTLE NORTH OF THAT, SOMEWHERE RIGHT ABOUT HERE (INDICATING)

15   AND I WAS FACING -- I WAS LOOKING EAST.  SO I WAS THERE AND I

16   WAS JUST LOOKING EAST.  IT WAS SOMEWHERE OUT IN HERE.

17   **Q.**  SOMEWHERE OUT IN --

18   **A.**  FURTHER OUT.

19   **Q.**  OKAY.

20   **A.**  ABOUT WHERE THE GREEN AND THE YELLOW TRANSITION ARE THERE

21   (INDICATING).  SOMETHING LIKE THAT.  IT'S HARD TO TELL MORE

22   SPECIFICALLY FROM THIS, BUT IT WAS ROUGHLY THAT.

23   **Q.**  ALL RIGHT.  THE SECOND ARROW THAT WAS JUST DRAWN, IS THAT

24   WHERE YOU WERE SHOOTING --

25   **A.**  IT IS ROUGHLY WHERE, YES.

1    **Q.**   OKAY.  I WOULD LIKE TO TAKE YOU TO EXHIBIT 1058-0041.

2                        (DISPLAYED ON SCREEN.)

3        WHAT ARE WE LOOKING AT HERE?

4    **A.**   HERE WE ARE LOOKING AT THE AREA WHERE I HAD SEEN THE TRUCK

5    DRIVING AROUND, WHICH USED TO BE FILLED WITH THAT SAME

6    PICKLEWEED AND SALT MARSH PLANT COMMUNITY AS WE SAW SO MUCH IN

7    THAT FIRST PICTURE.  IT USED TO COMPLETELY FILL THAT WHOLE

8    AREA THERE.  AND TODAY WHEN I HAD GONE OUT -- THAT DAY WHEN I

9    HAD GONE BACK AFTER I HAD SEEN THE TRUCK AND IT DREW MY

10   ATTENTION TO THE PLACE, I WALKED BACK ON MY WAY OUT AND I SAW

11   THAT AND TOOK PICTURES OF IT.

12   **Q.**   IS THIS WHAT YOU SAW THAT MADE YOU ANGRY?

13   **A.**   YEAH.

14   **Q.**   CAN WE GO BACK TO THE MAP SO THAT WE CAN SHOW WHERE THIS

15   IS?

16                        (DISPLAYED ON SCREEN.)

17       IF YOU COULD JUST POINT TO THE GENERAL AREA OF THAT PHOTO.

18   **A.**   IT IS -- THERE'S A FENCE LINE, THAT LINE THERE IS A FENCE,

19   AND IT'S IN THAT AREA THAT'S MARKED AS BLUE THERE.  IT'S THAT

20   WHOLE AREA THERE.  I WAS STANDING RIGHT ABOUT AT THE CORNER

21   WHERE THE FENCE COMES CLOSEST TO THE LEVEE WHEN I TOOK THAT

22   PICTURE (INDICATING).

23           **MS. LEE:**  JUST FOR THE RECORD, THE WITNESS IS

24   INDICATING THE BLUE AREA NORTH OF THE LEVEE BY THE CONCRETE

25   PAD.

**BY MS. LEE:**

**Q.**  MR. MILLER, I WOULD LIKE TO TAKE YOU TO THE NEXT EXHIBIT,
1058-0042.

(DISPLAYED ON SCREEN.)

WHAT IS THIS, AND WHY DID YOU TAKE THAT PHOTO?

**A.**  THAT IS PART OF THE AREA THAT USED TO BE SALT MARSH
PICKLEWEED COMMUNITY AND HAS BEEN COMPLETELY COVERED WITH A
THICK LAYER OF DIRT AND GRAVEL.  YOU CAN SEE THERE IS A LOT OF
ROCK AND MATERIAL BROKEN UP IN IT.

AND IT HAS BEEN BULLDOZED.  THAT -- THOSE SLASHED LINES
THERE THAT YOU SEE, YOU CAN SEE MOVING IN PARALLEL THERE,
THOSE ARE DISTINCTIVE OF TRACTOR TREAD BECAUSE IT'S A RIBBON
OF STEEL WITH METAL EDGES IN IT, AND IT'S DISTINCTLY DIFFERENT
FROM WHAT TRUCK TIRES LEAVE.  SO THAT IS A TRACTOR OR
BULLDOZER TRACK THERE, AND IT'S THE TRACKS OF THE VEHICLE THAT
WAS PUSHING THAT DIRT AROUND AND PILING IT UP THERE.

**Q.**  WHAT ABOUT THE TRACK ON THE LEFT-HAND SIDE OF THAT PHOTO
THAT LOOKS A LITTLE DIFFERENT?

**A.**  THAT'S A TRUCK.  THAT'S A REGULAR VEHICLE TIRE.  IT IS
PROBABLY THAT LARGE VEHICLE TRUCK THAT WAS DRIVING AROUND BACK
THERE --

**MR. SMOCK:**  OBJECTION.  LACKS FOUNDATION.

**THE COURT:**  IT DOES.  SUSTAINED.

**BY MS. LEE:**

**Q.**  SO DOES THIS PHOTO SHOW TWO DIFFERENT TYPES OF TRACKS TO

1   YOU?

2   **A.** YES, IT DOES.

3   **Q.** DO YOU RECOGNIZE -- DO YOU KNOW -- IF WE CAN BLOW UP THAT

4   VEGETATION IN THE BACKGROUND. DO YOU KNOW OR HAVE AN OPINION

5   AS TO WHAT THOSE -- THAT VEGETATION IS?

6   **A.** YES.

7   **Q.** IF YOU KNOW?

8   **A.** THE GREEN PLANTS ON THE GROUND ARE SALT MARSH COMMUNITY,

9   THE PICKLEWEED, ATRIPLEX AND THINGS --

10          **MR. SMOCK:** OBJECTION.

11          **THE WITNESS:** THERE'S ALSO --

12          **THE COURT:** STOP. OVERRULED.

13      HOW DO YOU KNOW THAT? WHAT IS THE BASIS FOR YOUR BELIEF

14   THAT THAT IS WHAT THAT IS?

15          **THE WITNESS:** BECAUSE I KNOW THE AREA VERY WELL AND

16   I'VE HIKED OUT INTO IT.

17          **THE COURT:** ALL RIGHT. YOU MAY PROCEED.

18          **MS. LEE:** OKAY.

19   **BY MS. LEE:**

20   **Q.** I WOULD LIKE TO SHOW YOU TO EXHIBIT 1058-0043.

21   **A.** REPEAT THE NUMBER.

22   **Q.** IT IS THE NEXT EXHIBIT, 1058-0043.

23   **A.** OKAY.

24   **Q.** WHAT DOES THIS PHOTO SHOW?

25   **A.** THIS IS THE SAME PLACE BUT A LITTLE FURTHER TO MY RIGHT AS

1    I'M STANDING ON THE LEVEE AND LOOKING AT IT, AND IT SHOWS MORE

2    OF THE DIRT SPREAD OUT THERE, COVERING UP THE AREA, AND SHOWS

3    THE TRACTOR TREAD IN IT, THE TRACTOR MATERIAL.

4    **Q.**  AND STEPPING BACK A LITTLE BIT FROM THIS PHOTO, DO YOU

5    RECALL WHAT YOU SAW ON THAT SITE IN TERMS OF THE FILL

6    MATERIAL, WHAT IT COMPRISED OF?

7    **A.**  IT WAS -- YOU CAN SEE IT THERE.  IT IS MOSTLY DIRT BUT

8    THERE WERE CHUNKS OF -- THE PREVIOUS PHOTO SHOWED MORE OF THE

9    CHUNKS OF CEMENT AND OTHER MATERIAL BROKEN UP IN IT.  SO IT

10   HAD LARGE -- A LOT OF CHUNKS OF EITHER ROCK OR CEMENT.  I

11   COULDN'T TELL.  I DIDN'T LOOK THAT CLOSELY.  ALONG WITH --

12   MIXED IN WITH THE DIRT THAT HAD BEEN SPREAD OUT THERE.

13   **Q.**  CAN YOU GO TO THE NEXT EXHIBIT, 1058-0044.

14                   (DISPLAYED ON SCREEN.)

15       WHAT ARE WE LOOKING AT HERE?

16   **A.**  HERE WE'RE LOOKING AT THE FILL AREA, THE DIRT THAT HAD

17   BEEN SPREAD, BUT I WAS SHOOTING FURTHER TO THE LEFT DOWN THE

18   LEVEE AND YOU STILL SEE THE UNDAMAGED -- THE UPPER LEFT PART,

19   YOU STILL SEE THE UNBURIED PICKLEWEED AND OTHER PLANTS THAT

20   USED TO FILL THAT WHOLE AREA --

21   **Q.**  IF WE CAN GO BACK TO THE --

22   **A.**  -- THAT DIDN'T GET BURIED.

23   **Q.**  IF YOU COULD SAY THAT ONE MORE TIME, SORRY I INTERRUPTED.

24   **A.**  THAT AREA DIDN'T GET BURIED BY THE FILL, AND SO THAT'S --

25   WHAT YOU SEE ON THE LEFT IS WHAT THE WHOLE AREA LOOKED LIKE

1    BEFORE.

2    **Q.**  CAN WE GO BACK TO THE MAP SO YOU CAN IDENTIFY WHERE THAT

3    IS?

4    **A.**  IT IS ALONG -- THE FENCE LINE GOES IN HERE.  IF WE CAN

5    ZOOM IN ON THIS MAYBE SO THE FENCE LINE IS VISIBLE.

6       YEAH, THERE WE ARE.  SO THERE'S THE FENCE LINE, AND IT'S

7    ALONG THE LEFT EDGE OF THE FENCE, PARALLELING THE -- RIGHT

8    AGAINST THE FENCE IS WHAT THAT IS.

9    **Q.**  OKAY.  AND I WOULD LIKE -- WE DON'T HAVE TOO MANY MORE

10   PHOTOS TO GO THROUGH, JUST TWO MORE.  EXHIBIT 1058-0045, IT IS

11   THE IMMEDIATE NEXT ONE.

12                  (DISPLAYED ON SCREEN.)

13       WHAT ARE WE LOOKING AT HERE?

14   **A.**  THE SAME AREA, A DIFFERENT -- A DIFFERENT AREA SHOOTING

15   FURTHER OUT, IT SHOWS FILL DIRT THERE.  I'M NOT SO CERTAIN OF

16   WHAT KIND OF TRACKS I'M SEEING IN THIS PARTICULAR -- THAT

17   MIGHT BE -- IT HAS THE LOOK --

18          **MR. SMOCK:**  OBJECTION.  SPECULATION.

19          **THE COURT:**  SUSTAINED.

20          **THE WITNESS:**  OKAY.

21   **BY MS. LEE:**

22   **Q.**  MR. MILLER, I JUST ASK FOR YOU TO RESPOND WITH WHAT YOU

23   KNOW.

24       COULD WE -- LOOKING AT THIS, COULD WE GO BACK TO THE MAP

25   SO YOU CAN IDENTIFY WHERE THIS IS ON THE MAP?

MILLER – DIRECT / LEE

1     (DISPLAYED ON SCREEN.)

2   **A.**   OKAY.  I'M A LITTLE UNCERTAIN EXACTLY WHERE IT IS BUT IT

3   IS FURTHER AWAY FROM ME.  I WAS SHOOTING LONGER ZOOM IN THAT

4   PICTURE, AND IT WAS SOMEWHAT FURTHER UP.  YOU CAN STILL SEE

5   THE FENCE LINE IN THE PICTURE, SO IT WAS NEAR THE FENCE LINE

6   BUT IT WAS FURTHER UP IN HERE SOMEWHERE.  I'M NOT SURE HOW

7   FAR.

8   **Q.**   AND THE LAST PHOTO HERE, CAN YOU TAKE A LOOK AT 1058-0046.

9     (DISPLAYED ON SCREEN.)

10  **A.**   OKAY.

11  **Q.**   AND WHAT ARE WE LOOKING AT HERE?

12  **A.**   THE SAME THING.  I WAS SHOOTING FROM THE LEVEE.  THE WHITE

13  BUILDINGS IN THE BACKGROUND ARE WAY OFF IN THE DISTANCE, THE

14  OTHER SIDE OF THE RAILROAD TRACKS.  AND THAT IS DIRT FILL

15  AREA, LESS EVIDENT TO ME WHAT KIND OF VEHICLES WERE DOING

16  THAT.  YOU CAN SEE MY SHADOW STRETCHING UP THROUGH THE MIDDLE

17  OF THE PICTURE THERE.  AND IT'S MORE OF THE FILL AREA BUT

18  FURTHER AWAY.

19  **Q.**   COULD WE GO BACK TO THE MAP SO YOU CAN SHOW WHERE THAT IS?

20    (DISPLAYED ON SCREEN.)

21  **A.**   WE ARE SEEING THESE BUILDINGS IN THE BACKGROUND AND I WAS

22  STANDING ON THE LEVEE SO I WAS ROUGHLY SHOOTING THIS DIRECTION

23  (INDICATING).

24  **Q.**   AND SO WOULD IT BE FAIR TO SAY, JUST FOR THE RECORD, YOU

25  WERE STANDING ON THE LEVEE AND YOU WERE SHOOTING IN THE

1    DIRECTION OF THE RAILROAD TRACKS IN THE NORTHERN AREA OF

2    AREA 4?

3    **A.**   YES.

4    **Q.**   IS THE RED ARROW, DOES THAT ACCURATELY DEPICT THE GENERAL

5    AREA OF WHERE YOU WERE -- WHERE THE FILL MATERIAL WAS?

6    **A.**   IT'S PROBABLY TOO FAR AWAY, BUT I CANNOT TELL FOR CERTAIN.

7    **Q.**   OKAY.

8    **A.**   I DON'T HAVE ANY SENSE OF THE SCALE OF THE BLUE OR RED

9    AREAS THERE.  SO I'M NOT SURE.  AND I WAS SHOOTING THIS ON

10   LONGER ZOOM.  THIS IS FURTHER AWAY FROM ME.

11   **Q.**   OKAY.  I ACTUALLY DO HAVE ONE MORE PHOTO,

12   EXHIBIT 1058-0031.

13   **A.**   31.

14                    (DISPLAYED ON SCREEN.)

15   **Q.**   WAS THIS THE PANORAMA SHOT THAT YOU WERE TALKING ABOUT

16   THAT YOU HAD TAKEN?

17   **A.**   THIS WAS PROBABLY ONE OF THE PIECES OF THE PANORAMA SHOT.

18   **Q.**   CAN WE ZOOM IN A LITTLE BIT --

19   **A.**   OH.  I AM SORRY.  YOU SAID 31 I THOUGHT.  WHAT NUMBER DID

20   YOU SAY?  I DON'T HAVE THE PANORAMA --

21   **Q.**   I SAID 1058-0031.

22   **A.**   OKAY.  LET'S GO BACK TO -- YES, THIS IS THE PANORAMA THAT

23   I WAS TALKING ABOUT.  I DON'T HAVE IT HERE.  I WAS TRYING IT

24   ON HERE.

25        I'M SORRY, YES, THIS IS THE PANORAMA THAT I SHOT.  IT WAS

1    COMPRISED OF TEN SHOTS.

2           **MS. LEE:**  AGENT SU, IF YOU CAN TAKE THAT OFF THE

3    SCREEN FOR A SECOND.

4    **BY MS. LEE:**

5    **Q.**  MR. MILLER, THAT WAS NOT -- I ACTUALLY JUST LOOKED AT MY

6    OWN PILE.  THAT WAS NOT WITHIN THE PHOTOS THAT WE PROVIDED

7    YOU, AND THOSE HAVE NOT BEEN ADMITTED INTO EVIDENCE YET.

8        SO WHAT I WILL SAY IS THAT -- THAT ONE IS NOT ADMITTED

9    INTO EVIDENCE SO I WILL NOT ASK YOU TO DESCRIBE ABOUT IT.

10          **MS. LEE:**  SO TO CLARIFY THE RECORD, WHAT HAS BEEN

11   ADMITTED INTO EVIDENCE IS 1058-0001 ALL THE WAY TO 1058-0030.

12   AND THEN ACTUALLY 0031 WAS MISSING FROM WHAT HE LOOKED AT SO

13   THAT 0031 WAS NOT ADMITTED.  BUT 0032 TO THE END, 0047, WAS

14   ADMITTED.

15          **THE CLERK:**  YOU ASKED FOR THE GROUP OF 1058-0001

16   THROUGH 0047.  THAT IS WHAT YOU ASKED FOR.  THAT IS WHAT THE

17   COURT ADMITTED.

18          **THE COURT:**  ARE YOU SEEKING ADMISSION OF 0031?

19          **THE CLERK:**  BUT IT WILL BE IN....

20   **BY MS. LEE:**

21   **Q.**  MR. MILLER -- LET ME TRY TO RECTIFY THAT.

22       MR. MILLER, THAT PANORAMIC SHOT THAT YOU SAW ON YOUR

23   SCREEN, IS THAT A PHOTO THAT YOU TOOK THAT DAY?

24   **A.**  THAT IS A SET OF PHOTOS THAT I TOOK THAT DAY AND STITCHED

25   TOGETHER LATER ON.

1    **Q.**  AND DOES IT FAIRLY AND ACCURATELY DEPICT THE SET OF PHOTOS

2    DEPICTING THAT AREA THAT YOU COMPILED INTO A PANORAMIC?

3    **A.**  YES.

4           **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

5    EXHIBIT 1058-0031 INTO EVIDENCE SO THAT THE WHOLE COLLECTION

6    CAN BE COMPLETE.

7           **THE COURT:**  ANY OBJECTION?

8           **MR. SMOCK:**  NO, YOUR HONOR.

9           **THE COURT:**  SO 1031 (SIC) IS ADMITTED.

10   (GOVERNMENT'S EXHIBIT 1058-0031 RECEIVED IN EVIDENCE)

11   **BY MS. LEE:**

12   **Q.**  UPON TAKING THOSE PHOTOS, MR. MILLER, WHAT DID YOU DO

13   NEXT?

14   **A.**  I CONTINUED BACK UP THE LEVEE TO THE RAILROAD TRACKS,

15   WALKED DOWN THE RAILROAD TRACKS, AND MY CAR WAS PARKED IN --

16   AT THE EDGE OF THE FIELD -- OF A FIELD NEXT TO THE RAILROAD

17   TRACKS UP BY MOWRY AVENUE, AND I HEADED HOME.

18   **Q.**  NOT IMMEDIATELY NEXT, I MEAN, WHAT DID YOU DO NEXT?  NOW

19   THAT YOU'VE SEEN WHAT YOU SAW, YOU FELT ANGRY, YOU TOOK

20   PHOTOS, WHAT DID YOU DO WITH THOSE PHOTOS?

21   **A.**  AT THAT TIME I TOOK THEM HOME, I UPLOADED SOME OF THEM TO

22   MY FLICKR SITE.  I DIDN'T HAVE ANY IDEA HOW TO PROCEED WITH

23   IT.  I DIDN'T KNOW -- I DIDN'T AT THAT POINT HAVE ANY CONCRETE

24   PLANS FOR WHAT I WAS GOING TO DO ABOUT BEING ANGRY, BUT I WAS

25   VERY UPSET.

MILLER – DIRECT / LEE

1    **Q.**  WHAT DID YOU DO NEXT?

2    **A.**  FOR THE NEXT FEW DAYS I DID NOTHING.  ARE WE TALKING ABOUT

3    WHAT I DID ON ANOTHER DAY OR THAT DAY?  THAT DAY I WENT HOME,

4    UPLOADED SOME OF THEM TO FLICKR, AND WENT ON WITH MY LIFE.

5    **Q.**  SO I WOULD LIKE TO TAKE YOU TO SEPTEMBER 5TH OF 2014.

6    WHAT DID YOU DO THAT DAY?

7    **A.**  ON SEPTEMBER 5TH I WALKED BACK OUT THERE TO TAKE A CLOSER

8    LOOK AT IT, SEE IF IT WAS STILL GOING ON, THE ACTIVITY, AND

9    JUST TO LOOK AT IT AND THINK ABOUT THINGS.

10        I WENT BACK OUT THERE.  THE TRUCK ACTIVITY WAS STILL GOING

11   ON.  I TOOK -- I SPENT SOME AMOUNT OF TIME WATCHING THE

12   VEHICLES WORK.  I APPARENTLY DID NOT TAKE ANY MORE PICTURES,

13   SO I NEVER TOOK ANY PICTURES OF THE EQUIPMENT WORKING BUT I

14   OBSERVED FOR A WHILE.  AND I DON'T REMEMBER AFTER THAT.  I

15   DON'T REMEMBER IF I WENT OUT TO MY READING SPOT OR IF I JUST

16   TURNED AROUND -- I DON'T REMEMBER WHAT I DID OTHER THAN

17   WATCHING THE VEHICLES FOR A WHILE.

18   **Q.**  WERE YOU ON THE LEVEE AGAIN THAT DAY?

19   **A.**  YES.

20   **Q.**  WAS IT AT YOUR SPOT OR IN THE NORTHERN AREA?

21   **A.**  IT WAS CLOSEST TO THE -- I WENT UP TO WHERE THE FENCE

22   COMES CLOSEST TO THE LEVEE, AND THEY HAD TORN OUT A SECTION OF

23   THE FENCE SO THE TRUCKS COULD GET OUT, AND I JUST WATCHED FOR

24   A WHILE.  ALL I REMEMBER IS THAT I WATCHED FOR A WHILE.

25   **Q.**  WHAT DID YOU SEE?

 1    **A.**  I SAW A -- PRETTY MUCH CONTINUOUS STREAM OF DUMP TRUCKS

 2    COMING IN AND LINING UP, AND THEN EACH ONE OF THEM WOULD DUMP

 3    THEIR LOAD OUT INTO A BIG PILE AND DRIVE AWAY, AND THEN THERE

 4    WERE SEVERAL BULLDOZER VEHICLES THERE THAT WERE SHOVELING THAT

 5    MATERIAL INTO VARIOUS PILES.

 6    **Q.**  I JUST WANT TO CLARIFY, WAS THIS ON THE NORTHERN FILL

 7    AREA, OR WAS THIS ON THE CONCRETE PAD?

 8    **A.**  ON THE CONCRETE PAD.  I NEVER SAW ANY VEHICLE ON THE FILL

 9    SPACE EXCEPT THAT ONE PICKUP TRUCK ON THE 1ST.

10    **Q.**  ON SEPTEMBER THE 1ST?

11    **A.**  YEAH, I NEVER SAW ANY MOVING EQUIPMENT OUT THERE.

12    **Q.**  SO EVERYTHING THAT YOU JUST DESCRIBED IS WITH RESPECT TO

13    MOVEMENT ON THE CONCRETE PAD --

14    **A.**  ON THE CONCRETE PAD --

15    **Q.**  -- AND NOT ON THE NORTHERN --

16              **THE REPORTER:**  EXCUSE ME.

17              **THE COURT:**  BOTH OF YOU NEED TO BE SURE NOT TO TALK

18    OVER EACH OTHER BECAUSE OUR COURT REPORTER IS TAKING

19    EVERYTHING DOWN.  AND SO LET'S JUST MAKE SURE THAT WE FINISH

20    THE QUESTION BEFORE THE ANSWER STARTS.  THANKS.

21              **MS. LEE:**  I'LL REPHRASE.

22    **BY MS. LEE:**

23    **Q.**  EVERYTHING THAT YOU JUST DESCRIBED THAT YOU SAW WAS ON THE

24    CONCRETE PAD, NOT ON THAT FILL AREA IN THAT NORTHERN SECTION?

25    **A.**  THAT IS TRUE.

1    **Q.**  DID THERE COME A TIME WHEN YOU HAD COMMUNICATIONS WITH

2    CITIZENS COMMITTEE TO COMPLETE THE REFUGE ABOUT THE FILL

3    MATERIAL THAT YOU SAW IN THAT NORTHERN AREA?

4    **A.**  THERE DID.

5    **Q.**  AND BASED ON THOSE COMMUNICATIONS DID YOU GO BACK OUT ON

6    TO THE PROPERTY AGAIN WITH SOMEONE FROM THE CITIZENS COMMITTEE

7    TO COMPLETE THE REFUGE?

8    **A.**  YES.

9    **Q.**  AND WHAT DID YOU DO THEN?

10   **A.**  WE WENT BACK OUT.  I WALKED THEM UP THERE TO THE SPOT

11   NEAREST WHERE THE HOLE HAD BEEN BROKEN IN THE FENCE, AND WE

12   OBSERVED WHAT HAD HAPPENED TO THE AREA THERE.

13   **Q.**  DO YOU RECALL WHEN THIS WAS?

14   **A.**  IT WAS ON SUNDAY.  IT WAS THAT SUNDAY.

15   **Q.**  SEPTEMBER 7TH, 2014?

16   **A.**  YES.

17   **Q.**  DID YOU TAKE ANY PHOTOS EITHER ON SEPTEMBER 5TH OR

18   SEPTEMBER 7TH?

19   **A.**  NO.

20   **Q.**  DID YOU SEE -- WHO DID YOU GO OUT WITH ON SEPTEMBER 7TH?

21   **A.**  WENT WITH SEVERAL PEOPLE AND THE ONLY ONE WHOSE NAME I

22   REMEMBER IS CARIN HIGH.

23   **Q.**  DID YOU SEE IF MS. HIGH TOOK PHOTOS?

24   **A.**  I AM SORRY?

25   **Q.**  DID YOU SEE IF MS. HIGH TOOK ANY PHOTOS?

1    **A.**   MS. HIGH TOOK SOME PICTURES, YES.

2    **Q.**   I HAVE A QUESTION ABOUT ONE SPECIFIC AREA IN THE NORTHERN

3    FILL AREA.  AND SO IF I COULD -- IF I COULD PULL UP

4    EXHIBIT 1058-0041.

5                   (DISPLAYED ON SCREEN.)

6    **A.**   I HAVE IT HERE.

7    **Q.**   ARE YOU FAMILIAR WITH HOW THAT AREA JUST OFF THE CONCRETE

8    PAD -- AS YOU ARE ENTERING THAT TRIANGULAR PART OF THE

9    NORTHERN FILL AREA, ARE YOU FAMILIAR WITH THE DEPTH OF THAT

10   AREA BEFORE YOU SAW THIS FILL?

11   **A.**   THE ONLY THING I COULD SAY IS IT WAS LOWER THAN THAT.

12           **MR. SMOCK:**  OBJECTION.  LACKS FOUNDATION.

13   SPECULATION.

14           **THE COURT:**  OVERRULED.

15   **BY MS. LEE:**

16   **Q.**   IT WAS LOWER THAN THAT?

17   **A.**   IT WAS LOWER THAN THAT BECAUSE DIRT HAS BEEN PUT IN THERE.

18   IT WAS LOWER BEFORE THE DIRT WAS PUT IN THERE.

19   **Q.**   NOW THAT THE DIRT HAS BEEN PUT IN THERE, BASED OFF OF WHAT

20   YOU SAW, WAS IT NOW LEVEL TO THE CONCRETE PAD?

21   **A.**   I BELIEVE SO.

22   **Q.**   OKAY.

23   **A.**   IT WAS ESSENTIALLY LEVEL.  IT MAY NOT HAVE BEEN EXACTLY

24   LEVEL, BUT IT WAS ESSENTIALLY LEVEL.

25   **Q.**   OKAY.  DO YOU SEE --

1        **MS. LEE:**  IF WE CAN ZOOM BACK OUT AGAIN, AGENT SU.

2   THANK YOU.

3   **BY MS. LEE:**

4   **Q.**  DO YOU SEE THE VEGETATION ON THE LEFT-HAND SIDE OF THE

5   PHOTO GOING AWAY FROM THAT NORTHERN FILL AREA?

6   **A.**  ARE YOU TALKING IN THE FOREGROUND OR IN THE DISTANCE?

7   **Q.**  IN THE FOREGROUND.

8   **A.**  IN THE FOREGROUND, YES, THAT'S THE SURVIVING REMAINS OF

9   THAT AREA THAT USED TO BE THERE.

10  **Q.**  DID YOU SEE HOW FAR THAT VEGETATION EXTENDED TO THE WEST,

11  GOING FURTHER LEFT IN THAT PHOTO?

12  **A.**  OH, IT WENT ALL THE WAY TO THE LEVEE, TO THE CROSS LEVEE.

13  I WAS STANDING ON THIS LEVEE THAT'S ON A STREAM, WHOSE NAME

14  I'VE NEVER KNOWN, AND IT GOES OUT AND DEAD ENDS AT MOWRY

15  SLOUGH.

16      AND THAT GREEN AREA, THAT PICKLEWEED AREA, GOES ALL THE

17  WAY OUT TO MOWRY SWAMP -- TO MOWRY SLOUGH RATHER.

18  **Q.**  WOULD YOU BE ABLE TO USE YOUR RED POINTER TO EXPLAIN

19  WHERE?

20  **A.**  BASICALLY EVERYTHING YOU SEE BLUE HERE IS PICKLEWEED

21  FOREST (INDICATING).

22  **Q.**  AND YOU SAW THE PICKLEWEED GO ALL THE WAY TO THE SLOUGH?

23  **A.**  YES.  ALL THE WAY TO THE LINE D THING THAT IS THERE.

24  **Q.**  COULD YOU USE YOUR RED POINTER AND EXPLAIN WHERE IS MOWRY

25  SLOUGH?

MILLER – DIRECT / LEE

1    **A.**  MOWRY SLOUGH IS THIS STREAM THAT RUNS DOWN THROUGH HERE.

2    **Q.**  AND YOU'VE BEEN ON TO THIS PROPERTY NUMEROUS TIMES; IS

3    THAT RIGHT?

4    **A.**  YES.

5    **Q.**  HAVE YOU SEEN THE WATER IN THE SLOUGH BE HIGH AND LOW?

6    HAS IT CHANGED ITS HEIGHT?

7    **A.**  YES.  YES.  IT IS TIDAL.  IT --

8    **Q.**  WELL, I DON'T WANT TO ASK -- I'M NOT ASKING ABOUT WHETHER

9    OR NOT IT'S TIDAL OR NOT.

10   **A.**  IT DOES RISE AND FALL.

11   **Q.**  YOU'VE SEEN THAT?

12   **A.**  YES.

13   **Q.**  DOES IT RISE AND FALL ON A DAILY BASIS WHEN YOU GO?

14   **A.**  YEP, TWICE A DAY.

15   **Q.**  IT IS DIFFERENT IN THE MORNING VERSUS THE EVENING?

16   **A.**  YES.

17   **Q.**  AND YOU'VE SEEN THAT?

18   **A.**  YES.

19   **Q.**  OKAY.  DURING THE TIMES THAT YOU'VE BEEN ON THIS PROPERTY,

20   HAVE YOU SEEN DIFFERENT SPECIES OF ANIMALS USE NEWARK AREA 4'S

21   PROPERTY?

22   **A.**  THE MOST COMMON MAMMAL I SEE ARE JACKRABBITS.  THEY ARE

23   EVERYWHERE.  I HAVE OCCASIONALLY SEEN OTHER MAMMALS OUT THERE.

24   I'VE SEEN -- I STEPPED -- KICKED A SKUNK ONCE IN TALL GRASS

25   NEAR THERE AND PAID FOR IT.  I'VE SEEN A RED FOX OUT THERE.

MILLER – DIRECT / LEE

1    I'VE SEEN A COUPLE OTHER ANIMALS THAT I DIDN'T GET A GOOD LOOK

2    AT.  BUT THE ONLY COMMON MAMMAL OUT THERE IS JACKRABBITS.

3    **Q.**  I THINK IT IS PROBABLY BECAUSE THE WORD I USED WAS

4    "ANIMALS."  WHAT ABOUT BIRDS?  HAVE YOU SEEN --

5    **A.**  TONS OF BIRDS.  TONS OF BIRDS.  IT IS A WONDERFUL PLACE TO

6    WATCH BIRDS.

7    **Q.**  HAVE YOU SEEN WHETHER THOSE BIRDS USE BOTH THE NEWARK

8    AREA 4 PROPERTY AS WELL AS MOWRY SLOUGH?

9    **A.**  YES.

10   **Q.**  HOW SO?

11   **A.**  I'VE SEEN BIRDS IN ALL THOSE PLACES.  THE PELICANS LIKE

12   THE DEEPER WATER OF THE BIG POND.  A VARIETY OF SHORE BIRDS

13   WILL HANG OUT IN MOWRY SLOUGH WHEN IT'S HIGH, HIGH ENOUGH.

14   **Q.**  AND WHERE DO THEY GO WHEN MOWRY SLOUGH IS LOW?

15   **A.**  ACTUALLY THE WADING BIRDS WILL STILL -- I DON'T KNOW ANY

16   OF THEM BY REAL NAMES, BUT THE WADING BIRDS WILL HANG OUT IN

17   MOWRY SLOUGH EVEN WHEN IT IS LOW.

18   **Q.**  HAVE YOU EVER SEEN BIRDS KIND OF HOP BACK AND FORTH

19   BETWEEN THE SLOUGH AND THE LAND?

20   **A.**  NOT THAT I'VE NOTICED.

21   **Q.**  LET ME REPHRASE.

22       HAVE YOU SEEN SHORE BIRDS USE BOTH THE SLOUGH AND THE

23   LAND?  I DON'T MEAN LITERALLY SEEING THEM HOP IN THAT MOMENT.

24   **A.**  OH, WELL, YES, I'VE SEEN THEM IN BOTH AREAS.

25   **Q.**  OKAY.  YOU MENTIONED YESTERDAY THAT YOU'VE BEEN GOING TO

 1    THIS PROPERTY SINCE 2008?

 2    **A.**   CORRECT.

 3    **Q.**   AND HOW OFTEN DO YOU GO AGAIN?

 4    **A.**   ROUGHLY A DOZEN TIMES A YEAR.  IT IS NOT REGULAR.  IT IS

 5    IRREGULAR, WHEN I FEEL LIKE GOING OUT THERE.  MORE COMMON IN

 6    LATE WINTER AND SPRING.

 7    **Q.**   HAVE YOU SEEN THIS PROPERTY THROUGH DIFFERENT SEASONAL

 8    CHANGES?

 9    **A.**   YES.

10    **Q.**   IS THE PROPERTY DRIER DURING THE SUMMER?

11    **A.**   YES.

12    **Q.**   IS IT WETTER -- MORE WET DURING THE WINTER/SPRING?

13    **A.**   YES.

14    **Q.**   OVER THE YEARS THAT YOU'VE BEEN FROM '08 TO -- I GUESS,

15    WHEN IS THE MOST -- THE TIME THAT YOU'VE BEEN MOST RECENTLY?

16    **A.**   MY WIFE AND I WENT OUT THERE A COUPLE OF MONTHS AGO,

17    COUPLE OF -- THREE OR FOUR MONTHS AGO.  WE RODE THE BIKES OUT

18    THERE AND WENT TO MY READING SPOT.

19    **Q.**   SO OVER THIS ALMOST A DECADE PERIOD OF TIME, AND TAKING

20    INTO ACCOUNT SEASONAL CHANGES TO THIS AREA, HAS THE AREA AND

21    ITS VEGETATION AND THE WATER PONDING THERE, HAS IT GENERALLY

22    REMAINED THE SAME?

23    **A.**   IT'S REMAINED THE SAME.  THE SIZE OF THE POND VARIES FROM

24    YEAR TO YEAR, BUT -- THAT LARGE POND AREA.  OTHER THAN THAT,

25    IT'S PRETTY MUCH CONSTANT.

1           **MS. LEE:**  OKAY.  I HAVE NO FURTHER QUESTIONS FOR

2    MR. MILLER.

3           **THE COURT:**  ANY CROSS-EXAMINATION?

4           **MR. SMOCK:**  YES.  THANK YOU.

5                       **CROSS-EXAMINATION**

6    BY MR. SMOCK:

7    **Q.**  GOOD MORNING, MR. MILLER.

8    **A.**  GOOD MORNING.

9    **Q.**  MY NAME IS NED SMOCK.

10          YOU JUST REMINDED US THAT YOU'VE BEEN GOING TO THIS AREA

11   FOR ABOUT TEN YEARS, SINCE 2008; IS THAT RIGHT?

12   **A.**  CORRECT.

13   **Q.**  AND DURING THAT TIME ONE OF THE THINGS YOU'VE NOTICED IS

14   THAT THE PEOPLE WHO OWN THIS PROPERTY HAVE BEEN TAKING STEPS

15   TO ELIMINATE WETLANDS ON THIS LAND; IS THAT RIGHT?

16          **MS. LEE:**  OBJECTION.

17          **THE COURT:**  OVERRULED.

18          **THE WITNESS:**  YOU MEAN OUTSIDE OF THE ISSUE THAT

19   WE'RE DISCUSSING TODAY?

20   BY MR. SMOCK:

21   **Q.**  CORRECT.  PREVIOUS TO THIS CONDUCT.

22   **A.**  I'M NOT -- I CANNOT SAY THAT THAT IS TRUE.  THEY'VE

23   REMOVED BUILDINGS IN PARTS OF NEWARK AREA 4, AND THERE'S AREAS

24   THAT THEY PLOWED OR -- I PRE -- WELL, I DON'T WANT TO PRESUME

25   WHY.

MILLER – CROSS / SMOCK

1          THERE'S AREAS THAT THEY PLOW EVERY YEAR BUT THEY DON'T

2     TEND TO BOTHER THE PLACES THAT ARE YEAR-ROUND PICKLEWEED AND

3     OTHER MARSH PLANTS.

4     **Q.**  MR. MILLER, YOU WROTE AN EMAIL ON SEPTEMBER 6TH OF 2014,

5     WHICH YOU'VE DESCRIBED, IN WHICH YOU NOTIFIED FOLKS OF WHAT

6     YOU HAD SEEN; IS THAT RIGHT?

7     **A.**  YES.

8     **Q.**  ISN'T IT TRUE THAT IN THAT EMAIL YOU WROTE THE FOLLOWING

9     SENTENCE:  THE FOLKS THAT HAVE CONTROL OVER THAT AREA ARE

10    CONTINUING THEIR POLICIES OF GRADUALLY DESTROYING ALL EXISTING

11    WETLANDS OUT THERE.

12         DID YOU WRITE THAT?

13    **A.**  YES, I DID.

14    **Q.**  I WANT TO SPEND SOME TIME LOOKING AT THE PHOTOGRAPHS WITH

15    YOU.

16         **MR. SMOCK:**  MR. WANZALA, CAN YOU PUT UP GOVERNMENT

17    EXHIBIT 157?

18                    (DISPLAYED ON SCREEN.)

19    **BY MR. SMOCK:**

20    **Q.**  SO THIS IS A PHOTOGRAPH LOOKING OVER THE FILL AREA IN THE

21    DIRECTION OF THE SALT PONDS; IS THAT RIGHT?

22    **A.**  CORRECT.

23    **Q.**  GENERALLY.

24         I WANT TO JUST POINT OUT AND TALK TO YOU ABOUT A FEW

25    THINGS.

1           WHAT --

2                MR. SMOCK:  CAN I APPROACH, YOUR HONOR?

3                THE COURT:  YOU MAY.

4                MR. SMOCK:  THANK YOU.

5      BY MR. SMOCK:

6      Q.   THESE ARE THE DUCK PONDS THAT WE'VE SPOKEN OF?

7      A.   YEP.

8      Q.   I'M TRYING TO BE SENSITIVE TO THE JURORS HERE AS WELL.

9           WHEN YOU TALKED ABOUT THE PLACE THAT YOU WALK, IT IS ALONG

10     THIS LEVEE HERE (INDICATING) AND THEN OVER IN THIS DIRECTION

11     TOWARDS WHAT YOU REFER TO AS YOUR SPOT (INDICATING)?

12     A.   CORRECT.

13     Q.   NOW, MANY OF THE PICTURES THAT YOU HAVE JUST GONE OVER

14     WITH US ARE PHOTOGRAPHS IN THIS SOUTHERN AREA LOOKING FROM

15     THIS LEVEE TOWARDS THE DUCK POND AND IN THIS AREA

16     (INDICATING), CORRECT?

17     A.   (NO RESPONSE.)

18     Q.   NOW --

19                THE COURT:  I DON'T THINK WE GOT AN ANSWER ACTUALLY.

20     BY MR. SMOCK:

21     Q.   I AM SORRY, DID YOU SAY CORRECT?

22     A.   I SAID CORRECT.

23                THE COURT:  OH, I'M SORRY.  I DIDN'T THINK WE --

24                THE WITNESS:  I WILL SPEAK UP, TRY AND SPEAK UP.

25     BY MR. SMOCK:

MILLER – CROSS / SMOCK

1   **Q.**   NOW, THE LEVEE THAT YOU WALK ALONG SEPARATES THE FLOOD

2   CONTROL CHANNEL FROM THE MOWRY SLOUGH; IS THAT -- I AM SORRY,

3   THE FLOOD CONTROL CHANNEL FROM EITHER SIDE OF AREA 4?

4   **A.**   CORRECT.

5   **Q.**   IN FACT, THERE IS A LEVEE ON EITHER SIDE OF THE FLOOD

6   CONTROL CHANNEL?

7   **A.**   CORRECT.

8   **Q.**   SO THESE PHOTOGRAPHS THAT YOU'VE TAKEN OF THE SOUTHERN

9   AREA ARE SEPARATED FROM THIS FILL AREA IN THE NORTHERN AREA BY

10  TWO SEPARATE LEVEES, CORRECT?

11  **A.**   YES.

12  **Q.**   I ALSO WANT TO TALK TO YOU A LITTLE BIT ABOUT THE AREA.

13  HERE ON THE TOP RIGHT OF THE IMAGE WE SEE A WHOLE NUMBER OF

14  TRUCKS AND CONTAINERS; IS THAT RIGHT?

15  **A.**   YES.

16          **MR. SMOCK:**  MR. WANZALA, CAN YOU ZOOM IN ON THAT

17  AREA?

18  **BY MR. SMOCK:**

19  **Q.**   THAT'S AN AREA THAT IS BETWEEN AREA 4 AND THE SALT

20  EVAPORATION PONDS AND EVEN BEYOND THAT IS THE SAN FRANCISCO

21  BAY, CORRECT?

22  **A.**   CORRECT.

23  **Q.**   ARE YOU AWARE OF WHAT ALL THESE CONTAINERS AND TRUCKS ARE?

24  **A.**   NO.  I HAVE NO IDEA.

25          **MR. SMOCK:**  YOU CAN PULL THAT DOWN.

**BY MR. SMOCK:**

**Q.** LOOKING BACK AT THIS AREA THAT YOU REFER TO AS YOUR SPOT WHERE YOU GO TO READ, I THOUGHT YOU SPOKE OF A STREAM THAT YOU SIT BY; IS THAT RIGHT?  I THOUGHT THAT YOU SAID YESTERDAY YOU SAT BY AN AREA THAT HAD WATER THAT YOU REFERRED TO AS A STREAM.  I COULD BE --

**A.** IF I SAID "STREAM," I WAS REFERRING TO MOWRY SWAMP, WHICH ISN'T REALLY A STREAM.

**Q.** OKAY.  SOME OF THE PICTURES THAT YOU'VE SHOWN US SHOW THIS WATER (INDICATING), CORRECT?

**A.** YES.

**Q.** WHICH IS A PART OF WATER THAT IS GOING FROM THE DUCK PONDS IN THIS DIRECTION, CORRECT?

**A.** YES.

**Q.** OKAY.  THAT'S NOT MOWRY SLOUGH?

**A.** THAT IS NOT MOWRY SLOUGH.

**Q.** BECAUSE MOWRY SLOUGH IS ON THE OTHER SIDE --

**A.** OTHER SIDE.

**Q.** -- OF THE LEVEE.  AND I'LL TALK TO YOU ABOUT THAT MORE IN A MOMENT.

THIS -- YOU SPOKE OF GOING TO THE SITE AGAIN ON, I THINK ABOUT -- MAYBE YOU CAN REMIND ME, THE SECOND TIME YOU WENT BACK OUT?

**A.** YEAH.

**Q.** YOU TOLD US THAT YOU SAW A GREAT DEAL OF EQUIPMENT MOVING

1    AROUND ON WHAT YOU REFER TO AS THIS CONCRETE PAD HERE, RIGHT?

2    **A.**  CORRECT.

3    **Q.**  DOES THIS PICTURE DEPICT SOME OF THE TYPES OF PILES OF

4    DIRT THAT YOU WERE REFERRING TO?

5    **A.**  IT COULD.

6    **Q.**  AND, AGAIN, YOU SAID THAT YOU DID NOT SEE ANY EQUIPMENT ON

7    ACTUAL AREA 4 --

8    **A.**  THAT IS TRUE, I NEVER DID.

9            **MR. SMOCK:**  MR. WANZALA, CAN YOU PUT UP GOVERNMENT

10   EXHIBIT 158, PLEASE?

11                    (DISPLAYED ON SCREEN.)

12   **BY MR. SMOCK:**

13   **Q.**  LOOKING AT EXHIBIT 158 NOW, THESE DIFFERENTLY COLORED

14   AREAS OF WATER HERE GOING UP AROUND THE LAND HERE ARE SALT

15   EVAPORATION PONDS OWNED BY CARGILL SALT PONDS, CORRECT?

16           **THE REPORTER:**  I'M SORRY.  EXCUSE ME.  I DIDN'T GET A

17   RESPONSE.

18           **THE WITNESS:**  YES, IT IS.

19           **THE COURT:**  IT IS JUST IMPORTANT, MR. MILLER, TO

20   RESPOND AUDIBLY.

21           **THE WITNESS:**  AUDIBLY?

22   **BY MR. SMOCK:**

23   **Q.**  HERE AGAIN WE SEE THE TRUCKS AND CONTAINERS NEXT TO THE

24   SALT PONDS?

25   **A.**  YES, I'VE NEVER KNOWN WHAT IS GOING ON OVER THERE.

MILLER – CROSS / SMOCK

1   **Q.**  AND THEN THIS BROWN AREA OF LAND HERE GOING UP TO THE

2   CORNER OF THE CONCRETE PAD IS PART OF WHAT'S BEEN REFERRED TO

3   AS AREA 4, CORRECT?

4   **A.**  IN TRUTH, I DON'T KNOW IF THAT IS CONSIDERED TO BE PART OF

5   NEWARK AREA 4.

6   **Q.**  UNDERSTOOD.  I APPRECIATE YOU SAYING THAT.

7       MY QUESTION FOR YOU IS, YOU DIDN'T SEE ANY ACTIVITY OR

8   FILL BEING DEPOSITED IN THIS AREA (INDICATING) NEXT TO THE

9   CONCRETE PAD?

10  **A.**  I DID NOT.  I DON'T PAY MUCH ATTENTION TO THAT.  IT IS NOT

11  REALLY VERY ACCESSIBLE.  WHEN I'VE HIKED OUT THERE, I NEVER

12  PAID MUCH ATTENTION TO IT.

13  **Q.**  BUT YOU DIDN'T SEE ANY --

14  **A.**  I DIDN'T SEE EQUIPMENT OUT THERE AT ALL.

15  **Q.**  THE ONLY OTHER THING I WANTED TO POINT OUT HERE, I AM

16  SORRY, THIS CONCRETE LINE GOING BETWEEN THE SALT EVAPORATION

17  PONDS AND THE PICK 'N PULL PAST THIS BROWN AREA IS THE ENDING

18  OF MOWRY AVENUE; IS THAT RIGHT?

19  **A.**  THAT IS CORRECT.

20          **MR. SMOCK:**  MR. WANZALA, CAN YOU SHOW US GOVERNMENT

21  EXHIBIT 160, PLEASE?

22                  (DISPLAYED ON SCREEN.)

23  **BY MR. SMOCK:**

24  **Q.**  THIS IS LOOKING AT -- MAINLY FOCUSED ON THE SOUTHERN AREA

25  OF AREA 4; AM I RIGHT?

1   **A.**  YES.

2   **Q.**  AND I'M GOING TO POINT AND PERHAPS THE JURORS COULD MURMUR

3   THEIR DISPLEASURE IF THEY CAN'T SEE THIS, AND I WILL FIGURE

4   OUT A WAY TO DO IT, AM I RIGHT IN POINTING OUT THAT YOUR --

5   WHAT YOU REFER TO AS YOUR SPOT IS ABOUT IN THIS AREA?

6   **A.**  RIGHT.

7        **MR. SMOCK:**  MAYBE IF I MOVE OVER TO THIS.

8   MR. WANZALA HAS HELPED ME.

9   **BY MR. SMOCK:**

10  **Q.**  DOES THAT ARROW POINT TO THE GENERAL AREA?

11  **A.**  YES, THAT POINTS ROUGHLY TO.

12  **Q.**  AND IF WE LOOK CAREFULLY AT THAT PICTURE, WE SEE WATER

13  GOING FROM THE DUCK POND CONNECTING TO AN AREA OVER HERE

14  (INDICATING) AGAINST THE BERM; AM I RIGHT?

15  **A.**  THAT ONE CLOSEST TO THE LEVEE?

16  **Q.**  CORRECT.  TO THE BERM.

17  **A.**  IT ACTUALLY -- IT ENDS RIGHT ABOUT WHERE THAT ARROW IS.

18  **Q.**  OKAY.

19  **A.**  YOU CAN SEE IN ONE OF THE PICTURES THAT I TOOK THAT THERE

20  IS A SIGN THERE WITH THE -- THERE'S A FENCE THING THERE WITH A

21  WARNING SIGN ON IT, LONG, ILLEGIBLE, AND THAT IS THE END OF

22  THAT WATER.  THAT WATER -- THAT STREAM DOES NOT CONTINUE

23  THROUGH.

24        **MR. SMOCK:**  MR. WANZALA, CAN YOU TAKE THAT YELLOW

25  AREA OFF?

1    **BY MR. SMOCK:**

2    **Q.** NOW, WITH RESPECT TO THE EMAIL THAT YOU DESCRIBED, YOU

3    INDICATED THAT -- ACTUALLY, LET ME JUST CLOSE THE LOOP ON THE

4    ONE THING THAT YOU TALKED ABOUT WITH RESPECT TO THE CONCRETE

5    AREA.

6    YOU AGREE, DO YOU NOT, THAT THE SECOND TIME THAT YOU WENT

7    TO THE SITE YOU DIDN'T SEE ANY TRUCKS GO ON TO AREA 4,

8    CORRECT?

9    **A.** THAT IS CORRECT.

10   **MR. SMOCK:** CAN I HAVE ONE MOMENT?

11   (PAUSE IN THE PROCEEDINGS.)

12   **MR. SMOCK:** NOTHING FURTHER.  THANK YOU.

13   **THE COURT:** ANY RECROSS?

14   **MS. LEE:** YES.

15   **THE COURT:** I AM SORRY, REDIRECT.

16   **<u>REDIRECT EXAMINATION</u>**

17   **BY MS. LEE:**

18   **Q.** MR. MILLER, MR. SMOCK DREW YOUR ATTENTION TO THE EMAIL

19   THAT YOU WROTE.

20   **A.** YES.

21   **Q.** AND WHAT YOU SAID IS, THE FOLKS -- IN WHICH YOU WROTE, THE

22   FOLKS THAT HAVE CONTROL OVER THAT AREA ARE CONTINUING THEIR

23   POLICIES OF GRADUALLY DESTROYING ALL EXISTING WETLANDS OUT

24   THERE.

25   MY QUESTION IS, AT THE TIME YOU WROTE THAT DID YOU KNOW

1  WHO HAD DUMPED THE FILL MATERIAL THERE?

2  **A.**  NO.  AND IF IT IS OKAY FOR ME TO COMMENT ON THAT, I WOULD

3  LIKE TO.

4  **Q.**  GO AHEAD.

5      **THE COURT:**  WHY DON'T WE PROCEED BY QUESTION AND

6  ANSWER.

7      **MS. LEE:**  PLEASE, ONE SECOND.

8  **BY MS. LEE:**

9  **Q.**  WHEN YOU WROTE THAT, WHAT WERE YOU THINKING?

10  **A.**  I WAS UPSET --

11      **MR. SMOCK:**  OBJECTION.  RELEVANCE.

12      **THE COURT:**  OVERRULED.

13      **THE WITNESS:**  AND I MADE AN ASSUMPTION WITH NO BOUNDS

14  TO BASE IT ON THAT THE PEOPLE THAT OWNED THE PROPERTY WERE

15  TRYING TO DAMAGE WETLANDS.  I HAD NO INFORMATION TO BASE THAT

16  ON.  I SHOULDN'T HAVE SAID IT.  I WAS JUST ANGRY.  I HAD

17  DECIDED ON SATURDAY TO POST THAT MESSAGE TO FCHF AND I WAS

18  SPEAKING IN ANGER, AND I SAID THINGS THAT I KNEW NOTHING

19  ABOUT.

20  **BY MS. LEE:**

21  **Q.**  YOU HAD ASSUMED THE OWNERS HAD DONE THE DUMPING?

22  **A.**  I HAD ASSUMED THE OWNERS HAD DONE THE DUMPING.

23  **Q.**  AND YOU SAID FCHF, FRIENDS OF COYOTE HILLS OF FREMONT?

24  **A.**  YES.

25  **Q.**  IN FACT, IN THAT SAME EMAIL YOU SAID, I HUNG OUT THERE A

```
 1   LOT IN THE PAST.

 2            MR. SMOCK:  OBJECTION.  HEARSAY.

 3            THE COURT:  SUSTAINED.

 4   BY MS. LEE:

 5   Q.  I WOULD LIKE TO SHOW YOU -- PULL UP THE SAME EXHIBIT

 6   MR. SMOCK ASKED YOU TO PULL UP, WHICH IS EXHIBIT 160-0001.

 7                    (DISPLAYED ON SCREEN.)

 8            MS. LEE:  COULD WE BLOW UP THE....

 9   BY MS. LEE:

10   Q.  THAT ORANGE AREA, WHAT IS THAT?

11   A.  PARDON ME?  THE ORANGE AREA THAT CURVES ALONG THE PATHS

12   THERE?

13   Q.  (INDICATING) THIS AREA, DO YOU RECOGNIZE WHAT THIS IS FROM

14   ALL YOUR TIMES ON THE PROPERTY?

15   A.  YES.

16   Q.  WHAT IS IT?

17   A.  IT IS MORE OF THAT PICKLEWEED SALT MARSH WETLAND THERE.  I

18   COULD MAKE A HYPOTHESIS ABOUT WHY IT IS RED BUT I WON'T.

19   Q.  I WON'T ASK YOU TO MAKE ANY HYPOTHESIS.

20       DO YOU SEE THIS SQUIGGLY LINE THAT RUNS ALONG THIS PHOTO

21   (INDICATING)?

22   A.  YES.

23   Q.  DO YOU KNOW WHAT THAT IS?

24            MR. SMOCK:  OBJECTION.

25            THE WITNESS:  I WOULD HAVE TO HYPOTHESIZE.
```

1          **THE COURT:**  OVERRULED -- I'M SORRY, SUSTAINED.

2          **MS. LEE:**  I HAVE NO FURTHER QUESTIONS.

3          **THE COURT:**  ANY RECROSS?

4          **MR. SMOCK:**  JUST VERY BRIEFLY.

5                      **RECROSS-EXAMINATION**

6    BY MR. SMOCK:

7    **Q.**  MR. MILLER, THE EMAIL YOU WROTE SAID, THE FOLKS THAT HAVE

8    CONTROL OVER THAT AREA ARE CONTINUING THEIR POLICIES OF

9    GRADUALLY DESTROYING ALL WETLANDS OUT THERE.

10       CORRECT?

11   **A.**  I SAID THAT.

12   **Q.**  THIS WAS AT A TIME WHEN YOU WERE WRITING ABOUT CONDUCT

13   THAT YOU HAD JUST SEEN, CORRECT?

14   **A.**  YES.

15          **MR. SMOCK:**  MR. WANZALA, CAN YOU SHOW US GOVERNMENT

16   EXHIBIT 160?

17                      (DISPLAYED ON SCREEN.)

18       CAN YOU PULL OUT THE LEFT-HAND SIDE OF THE SCREEN SHOWING

19   THE NORTHERN AREA?

20       THANK YOU.

21   BY MR. SMOCK:

22   **Q.**  YOU TALKED ABOUT WHAT YOU REFER TO AS PICKLEWEED IN THIS

23   AREA BETWEEN THE CORNER OF THE CONCRETE PAD AND MOWRY SLOUGH,

24   CORRECT?

25   **A.**  YES.

1    **Q.**  YOU WOULD AGREE THAT THAT IS BROWN IN COLOR, CORRECT?

2    **A.**  CORRECT.

3    **Q.**  WE ALSO SEE SOME VEGETATION UP HERE (INDICATING) IN THE

4    AREA HIGHER IN THE IMAGE AGAINST THE LEVEE, CORRECT?

5    **A.**  CORRECT.

6    **Q.**  YOU WOULD AGREE THAT THAT IS GREEN IN COLOR, CORRECT?

7    **A.**  CORRECT.

8              **MR. SMOCK:**  THANK YOU.  NOTHING FURTHER.

9              **THE COURT:**  MAY MR. MILLER BE EXCUSED?

10             **MS. LEE:**  JUST ONE QUESTION, YOUR HONOR, FOLLOWING UP

11   ON RECROSS.

12                    **FURTHER REDIRECT EXAMINATION**

13   **BY MS. LEE:**

14   **Q.**  MR. SMOCK BROUGHT YOUR ATTENTION TO THAT EMAIL AGAIN?

15   **A.**  CORRECT.

16   **Q.**  WITHOUT REFERENCING WHAT YOU SAID IN THE EMAIL, BUT DID

17   YOU ALSO COMMENT IN THE SAME EMAIL ABOUT THE STATE OF THE

18   WETLAND BEFORE YOU SAW THE FILL?

19             **MR. SMOCK:**  OBJECTION.  LEADING.

20             **THE COURT:**  OVERRULED.

21             **MR. SMOCK:**  AND HEARSAY.

22             **THE COURT:**  OVERRULED.

23   **BY MS. LEE:**

24   **Q.**  DID YOU --

25   **A.**  DID I COMMENT OTHERWISE ABOUT THE STATE OF THE WETLAND?

1    **Q.** DID YOU ALSO COMMENT IN THAT EMAIL ABOUT THE STATE OF THE

2    WETLAND BEFORE THE FILL?

3    **A.** I DO NOT RECALL.

4    **Q.** I'M GOING TO SHOW YOU --

5    **A.** IF YOU CAN SHOW ME THE EMAIL, I WOULD BE HAPPY TO....

6          **MS. LEE:** EXHIBIT 162-0001, ONLY FOR PURPOSES OF

7    IDENTIFICATION AT THIS TIME.

8    **BY MS. LEE:**

9    **Q.** IF YOU CAN TAKE A MOMENT TO READ YOUR EMAIL, AND WHEN YOU

10   ARE DONE, IF YOU COULD JUST PUT IT DOWN.

11   **A.** OKAY.

12   **Q.** HAVING READ THAT -- YOUR EMAIL, DID IT REFRESH YOUR

13   RECOLLECTION AS TO WHETHER YOU COMMENTED IN THE EMAIL ABOUT

14   THE STATE OF THE WETLAND BEFORE YOU SAW THE FILL MATERIAL

15   THERE?

16   **A.** I COMMENTED ON WHAT WAS IN THAT AREA BEFORE, AND I

17   COMMENTED ON A SNAPSHOT -- A CLIP THAT I HAD TAKEN FROM A

18   GOOGLE EARTH IMAGE, GOOGLE EARTH SATELLITE IMAGE OF WHAT HAD

19   BEEN THERE A FEW MONTHS BEFORE.

20   **Q.** MR. MILLER, I --

21   **A.** THAT IS THE ONLY COMMENT I MADE.

22         **MS. LEE:** I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

23         **THE COURT:** ANYTHING FURTHER?

24         **MR. SMOCK:** NO, THANK YOU.

25         **THE COURT:** THANK YOU, MR. MILLER.  YOU ARE EXCUSED.

1      AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

2           **MS. LEE:**  THE GOVERNMENT CALLS CRISTINA HARBISON.

3           **THE CLERK:**  PLEASE COME UP TO THE WITNESS STAND AND

4    THEN RAISE YOUR RIGHT HAND.  GO UP AND THEN RAISE YOUR RIGHT

5    HAND.

6         (**CRISTINA HARBISON,** CALLED AS A WITNESS FOR THE

7    GOVERNMENT, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

8           **THE WITNESS:**  I DO.

9           **THE CLERK:**  PLEASE BE SEATED AND ONCE SEATED I AM

10   GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

11   LAST NAME FOR THE RECORD, PLEASE.

12          **THE WITNESS:**  CRISTINA HARBISON, C-R-I-S-T-I-N-A,

13   H-A-R-B-I-S-O-N.

14          **THE CLERK:**  THANK YOU.

15                       <u>**DIRECT EXAMINATION**</u>

16   **BY MS. LEE:**

17   **Q.**  SHALL I ADDRESS YOU AS -- IS IT OFFICER HARBISON OR

18   MS. HARBISON?

19   **A.**  MS. HARBISON OR INSPECTOR HARBISON.

20   **Q.**  INSPECTOR HARBISON, WHERE DO YOU WORK?

21   **A.**  I WORK FOR THE ALAMEDA COUNTY DISTRICT ATTORNEY'S OFFICE.

22   **Q.**  AND YOUR POSITION IS AS AN INSPECTOR; IS THAT CORRECT?

23   **A.**  CORRECT.

24   **Q.**  HOW LONG HAVE YOU BEEN AN INSPECTOR WITH THE ALAMEDA

25   COUNTY D.A.'S OFFICE?

HARBISON – DIRECT / LEE

1   **A.**   SINCE OCTOBER OF 2010.

2   **Q.**   WHAT ARE YOUR DUTIES AND RESPONSIBILITIES AS AN INSPECTOR?

3   **A.**   CURRENTLY I'M A SUPERVISOR OF SEVERAL OF OUR UNITS THAT

4   ARE HELD WITHIN THE ALAMEDA COUNTY CONSUMER AND ENVIRONMENTAL

5   PROTECTION DIVISION.

6   **Q.**   AND WHAT WAS YOUR POSITION PRIOR TO BECOMING AN INSPECTOR,

7   YOUR WORK BACKGROUND?

8   **A.**   I WAS A POLICE OFFICER.

9   **Q.**   FOR HOW MANY YEARS?

10  **A.**   WELL, I WENT THROUGH THE POLICE ACADEMY IN 1993, AND I

11  WORKED FOR A TIME AT BART POLICE DEPARTMENT.  I LEFT THAT JOB

12  FOR FAMILY REASONS AND SUBSEQUENTLY RETURNED TO LAW

13  ENFORCEMENT AND WORKED FOR THE PLEASANT HILL POLICE

14  DEPARTMENT.  I LEFT THAT POSITION ALSO TO CONTINUE RAISING MY

15  FAMILY AND THEN RETURNED IN 2005 TO THE WALNUT CREEK POLICE

16  DEPARTMENT, WHERE I WORKED UNTIL I ACCEPTED THE POSITION WITH

17  THE ALAMEDA COUNTY DISTRICT ATTORNEY'S OFFICE IN 2010.

18  **Q.**   ARE THERE PARTICULAR AREAS OF CRIME THAT YOU FOCUS ON

19  INVESTIGATING?

20  **A.**   ALL.  HOWEVER, AS I AM ASSIGNED TO THIS SPECIFIC DIVISION,

21  I TEND TO FOCUS MORE ON CASES PERTAINING TO ENVIRONMENTAL

22  CRIMES AS A SUPERVISOR, WORKERS' COMP AND OTHER THINGS, BUT

23  THAT -- INITIALLY WHEN I WAS TRANSFERRED TO THIS UNIT IN 2012

24  AS A LINE LEVEL INSPECTOR, I WAS PRIMARILY ASSIGNED TO

25  ENVIRONMENTAL CRIMES.

HARBISON – DIRECT / LEE

1    **Q.**  ARE YOU FAMILIAR WITH THE PROPERTY KNOWN AS NEWARK AREA 4?

2    **A.**  YES, I AM.

3    **Q.**  HOW ARE YOU FAMILIAR WITH IT?

4    **A.**  IT RELATES TO AN INVESTIGATION THAT I TOOK PART IN IN

5    2014, SEPTEMBER OF 2014.

6    **Q.**  WHERE IS NEWARK AREA 4 LOCATED?

7    **A.**  NEWARK AREA 4 IS IN NEWARK.  IT IS A PORTION OF LAND THAT

8    IS DELINEATED BY MOWRY AVENUE ON THE SORT OF NORTH SIDE,

9    STEVENSON BOULEVARD ON THE SOUTH SIDE, AND ROUGHLY THE UNION

10   PACIFIC RAILROAD TRACKS BUT I SUPPOSE CHERRY STREET WOULD BE

11   THE PERPENDICULAR ALMOST EAST SIDE DELINEATION.

12   **Q.**  AND WHAT ABOUT ON THE WEST?

13   **A.**  THERE IS A LOT OF SLOUGH AREA, SO THERE IS NOT REALLY A

14   STREET PER SE BUT IT SORT OF RUNS TO WATER.

15   **Q.**  OKAY.  WHEN DID YOU FIRST LEARN OF THIS PROPERTY NEWARK

16   AREA 4?

17   **A.**  I BELIEVE APPROXIMATELY SEPTEMBER 22ND, 2014.

18   **Q.**  HOW DID YOU LEARN ABOUT IT?

19   **A.**  I RECEIVED A CALL FROM SANTA CLARA COUNTY DISTRICT

20   ATTORNEY ENVIRONMENTAL INVESTIGATOR GREG KORVER, AND HE

21   EXPLAINED TO ME THAT HE WAS CONTACTED BY A COLLEAGUE, A FORMER

22   POLICE OFFICER FROM SAN JOSE POLICE DEPARTMENT CHUCK WALL, WHO

23   REPORTED TO KORVER THAT THERE WAS AN ILLEGAL DUMPING AND

24   TRESPASS ON SOME LAND RELATED TO FEDERAL WETLAND POTENTIALLY.

25   **Q.**  AND THAT'S WHAT STARTED YOUR INVESTIGATION?

1    **A.**  YES.

2    **Q.**  UPON LEARNING THAT INFORMATION FROM SANTA CLARA POLICE

3    DEPARTMENT?

4    **A.**  COUNTY DISTRICT ATTORNEY'S INSPECTORS DIVISION.

5    **Q.**  UPON LEARNING FROM THEM WHAT STEPS DID YOU TAKE IN THE

6    COURSE OF YOUR INVESTIGATION FROM THERE?

7    **A.**  I FOLLOWED UP BY CONTACTING CHUCK WALL, WHO KORVER HAD

8    PROVIDED CONTACT FOR.  CHUCK WALL IS OR WAS THE CEO OF A

9    SECURITY COMPANY THAT WAS EMPLOYED BY THE SOBRATO

10    ORGANIZATION, THE VICTIM COMPANY, AND I SPOKE WITH HIM TO GET

11    ADDITIONAL INFORMATION ABOUT WHAT HAD OCCURRED PREVIOUS TO

12    SEPTEMBER 22ND.

13    **Q.**  DID YOU ALSO HAVE AN OPPORTUNITY TO SPEAK WITH TIM STEELE?

14    **A.**  YES, I DID.

15    **Q.**  AND WHO IS THAT?

16    **A.**  TIM STEELE I BELIEVE IS THE SENIOR DEVELOPER FOR REAL

17    ESTATE, I BELIEVE, EMPLOYED BY THE SOBRATO ORGANIZATION.

18    **Q.**  AND WHAT WAS THE PURPOSE OF SPEAKING WITH HIM?

19    **A.**  I SPOKE WITH TIM STEELE SUBSEQUENT TO MY CONVERSATION WITH

20    CHUCK WALL BECAUSE CHUCK WALL EXPLAINED TO ME THAT TIM STEELE

21    ACTUALLY RESPONDED TO THE CRIME SCENE WHEN IT WAS FIRST

22    DISCOVERED BY THE SOBRATO ORGANIZATION ON SEPTEMBER 8TH, AND

23    SO I WANTED TO GET INFORMATION FROM TIM STEELE ABOUT WHAT HE

24    WITNESSED AND WHAT HE KNEW.

25    **Q.**  WHAT, IF ANY, EVIDENCE DID YOU OBTAIN FROM MEETING WITH

1    MR. STEELE?

2    **A.**   WELL --

3    **Q.**   AND I AM SPEAKING ABOUT PHYSICAL EVIDENCE.

4    **A.**   OKAY.  HE PROVIDED VARIOUS DOCUMENTS, MAPS AND COPIES OF

5    DIFFERENT EMAILS PERTAINING TO THIS SITUATION.  HE ALSO

6    ULTIMATELY PROVIDED COPIES OF APPROXIMATELY 600 PULL TAGS THAT

7    WERE PROVIDED TO HIM BY THE PERSON WHO ILLEGALLY DUMPED AND

8    TRESPASSED AND --

9          **MS. HANSEN:**  OBJECTION, YOUR HONOR.  CALLS FOR A

10   LEGAL CONCLUSION.  MOVE TO STRIKE.

11         **THE COURT:**  I DON'T THINK THE QUESTION CALLED FOR IT

12   BUT WHY DON'T WE ASK A Q AND A.

13   **BY MS. LEE:**

14   **Q.**   INSPECTOR HARBISON, DID YOU TAKE INTO YOUR PHYSICAL

15   CUSTODY ANY PHYSICAL EVIDENCE FROM MR. STEELE?

16   **A.**   YES.

17   **Q.**   WHAT WERE THOSE PHYSICAL PIECES?

18   **A.**   DOCUMENTS, A PADLOCK AND CUT CHAIN LINK, AND COPIES OF

19   PULL TAGS.

20   **Q.**   OKAY.  AFTER SPEAKING WITH MR. STEELE, DID YOU GO TO VISIT

21   NEWARK AREA 4 SITE YOURSELF?

22   **A.**   YES, I DID.

23   **Q.**   WHEN DID YOU GO?

24   **A.**   I WENT TO THE PROPERTY ON OCTOBER 17TH.  AND PREVIOUS TO

25   THAT I WAS ACTUALLY ABOVE THE PROPERTY ON OCTOBER 8TH IN A

HARBISON - DIRECT / LEE

1   HELICOPTER.  SO... BOTH THOSE DATES I WAS IN THE AREA.

2   **Q.**  SO YOU WENT TO THE NEWARK AREA 4 ABOVE THE PROPERTY IN A

3   HELICOPTER ON OCTOBER 8TH OF 2014?

4   **A.**  CORRECT.

5   **Q.**  AND THEN YOU WENT BACK ON THE GROUND TO NEWARK AREA 4 ON

6   OCTOBER 17TH, 2014?

7   **A.**  YES.

8   **Q.**  OKAY.  WHEN YOU WENT ON OCTOBER 8TH, WHAT WAS YOUR PURPOSE

9   OF THAT VISIT?

10  **A.**  TO TAKE AERIAL PHOTOGRAPHS OF THE CRIME SCENE.

11  **Q.**  AND WAS IT TO TAKE AERIAL PHOTOGRAPHS FROM THE HELICOPTER

12  OF THE REPORT THAT YOU RECEIVED OF AN UNAUTHORIZED DISCHARGE

13  IN NEWARK AREA 4?

14  **A.**  AN UNAUTHORIZED DUMPING AND FILL, YES.

15  **Q.**  DID YOU TAKE PHOTOS FROM THAT HELICOPTER?

16  **A.**  YES, I DID.

17  **Q.**  AND WHO WAS WITH YOU THAT DAY?

18  **A.**  U.S. EPA AGENT WENDY SU AND THE PILOT EAST BAY REGIONAL

19  PARK POLICE OFFICER JACK LEE.

20  **Q.**  ON OCTOBER 7TH -- WITHDRAWN.

21      DID YOU COME TO LEARN WHAT DAY THE DUMPING ON THIS

22  PROPERTY WAS STOPPED BY LAW ENFORCEMENT?

23  **A.**  YES, I DID.

24  **Q.**  WHAT DAY WAS THAT?

25  **A.**  I BELIEVE IT WAS SEPTEMBER 8TH OF 2014.

1   **Q.**  SO WHEN YOU WENT BACK ON OCTOBER 8TH, WOULD IT BE FAIR TO

2   SAY IT WAS A MONTH LATER?

3   **A.**  YES.

4   **Q.**  AND THESE ARE PHOTOGRAPHS FROM A HELICOPTER OF WHAT THE

5   PROPERTY LOOKED LIKE ONE MONTH AFTER LAW ENFORCEMENT STOPPED

6   THE OPERATION?

7   **A.**  YES.

8   **Q.**  I WOULD LIKE TO SHOW YOU EXHIBITS 152-0001 TO 167-0001.

9                 (EXHIBITS HANDED TO WITNESS.)

10      ARE THESE THE PHOTOS THAT YOU TOOK ON OCTOBER 8TH, 2014?

11  **A.**  THESE MAY BE AGENTT SU'S PHOTOS, SOME OF THESE AERIAL

12  PHOTOS.

13  **Q.**  DO THOSE PHOTOS ACCURATELY DEPICT THE PROPERTY FROM A

14  HELICOPTER VIEW FROM THE DATE OF OCTOBER 8TH, 2014?

15  **A.**  YES, THEY DO.

16           **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBITS 152-0001 TO

17  167-0001 INTO EVIDENCE.

18           **MS. HANSEN:**  YOUR HONOR, WE WOULD LIKE TO HAVE MORE

19  OF A FOUNDATION LAID FOR EACH PHOTO.  GIVEN THAT THE WITNESS

20  JUST SAID THAT SOME OF THESE WERE FROM AGENT SU, I WANT TO

21  MAKE SURE WE HAVE THE PROPER FOUNDATION.

22           **THE COURT:**  THAT'S FAIR.

23  BY MS. LEE:

24  **Q.**  INSPECTOR HARBISON, WHEN YOU WENT UP TO THE HELICOPTER

25  THAT DAY, WAS AGENT SU WITH YOU AS WELL?

1    **A.**  YES, SHE WAS.

2    **Q.**  DID YOU BOTH TAKE PHOTOS THAT DAY?

3    **A.**  YES, WE DID.

4    **Q.**  DID YOU HAVE THE OPPORTUNITY TO REVIEW BOTH YOUR PHOTOS

5    AND AGENT SU'S PHOTOS?

6    **A.**  YES, I DID.

7    **Q.**  AND THIS IS -- I AM SAYING PRIOR TO COMING TO TESTIFY

8    TODAY, YOU HAD THE OPPORTUNITY TO VIEW BOTH OF THOSE PHOTOS?

9    **A.**  YES.

10   **Q.**  AND DID THOSE PHOTOS FAIRLY AND ACCURATELY DEPICT WHAT YOU

11   SAW ON THE GROUND FROM THAT AERIAL VANTAGE POINT ON THAT DAY

12   IN QUESTION, OCTOBER 8TH, 2014?

13   **A.**  YES.

14          **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE THOSE

15   EXHIBITS INTO EVIDENCE.

16          **MS. HANSEN:**  YOUR HONOR, NO OBJECTION EXCEPT FOR

17   EXHIBIT 113.

18          **THE COURT:**  I THINK WHAT WAS OFFERED IS 152 THROUGH

19   167, CORRECT?

20          **MS. HANSEN:**  I AM SORRY, YOUR HONOR, YES.  I AM

21   CONFUSING THE RANGE WITH THE EXHIBITS.

22       YES, NO OBJECTION.

23          **THE COURT:**  EXHIBITS 152-0001 THROUGH 167-0001 ARE

24   ADMITTED.

25          **MS. LEE:**  OKAY.

1          (GOVERNMENT'S EXHIBITS 152-0001 TO 167-0001 RECEIVED IN

2    EVIDENCE)

3    **BY MS. LEE:**

4    **Q.**   I WOULD LIKE TO SHOW YOU EXHIBIT 165-0001.

5                         (DISPLAYED ON SCREEN.)

6          WHY -- DO YOU RECALL IF YOU TOOK THESE PHOTOS?

7    **A.**   I BELIEVE THIS IS AGENT SU'S PHOTOS -- ONE OF HER PHOTOS.

8    **Q.**   IF YOU DON'T KNOW, THAT'S FINE.

9    **A.**   THERE -- OUR PHOTOS WERE QUITE SIMILAR --

10   **Q.**   OKAY.

11   **A.**   -- FOR THE OVERALL AREAS BUT THIS APPEARS TO BE ONE THAT I

12   RECALL AS BEING AGENT SU'S PHOTO.

13   **Q.**   WHAT IS THIS A PHOTO OF?

14   **A.**   THAT PHOTO IS THE NORTH PORTION OF AREA 4, AND JUST FOR

15   CLARIFICATION, IT'S ORIENTED OPPOSITE OF HOW IT ACTUALLY

16   EXISTS IN REALITY.  SO THE TOP OF THE PHOTO IS ACTUALLY SOUTH,

17   IS -- I BELIEVE THAT'S DUE SOUTH.

18   **Q.**   AND I WOULD LIKE TO SHOW YOU EXHIBIT 152.

19                         (DISPLAYED ON SCREEN.)

20         AND THIS IS JUST OF THE NORTHERN AREA OF AREA 4; IS THAT

21   CORRECT?

22   **A.**   CORRECT.

23   **Q.**   AND 154.

24                         (DISPLAYED ON SCREEN.)

25         ANOTHER PHOTO OF THE NORTHERN AREA; IS THAT RIGHT?

HARBISON - DIRECT / LEE

1     **A.**   THAT'S RIGHT.

2     **Q.**   AND 157.

3                         (DISPLAYED ON SCREEN.)

4          IS THIS A LARGER AREA OF THE PANORAMA OF THIS NEWARK

5     AREA 4 PROPERTY?

6     **A.**   YES, IT IS.

7     **Q.**   AND THIS IS TAKEN ONE MONTH AFTER THE LAW ENFORCEMENT HAD

8     STOPPED WHAT WAS HAPPENING IN NEWARK AREA 4?

9     **A.**   YES.

10    **Q.**   AND 166.

11                        (DISPLAYED ON SCREEN.)

12         IS THIS A CLOSE-UP OF THAT NORTHERN AREA WHERE THE FILL

13    OCCURRED?

14    **A.**   YES.

15    **Q.**   158.

16                        (DISPLAYED ON SCREEN.)

17         DOES THIS SHOW THE SITE OF NEWARK AREA 4 IN RELATION TO

18    THE SALT PONDS AND THE WATERS OF THE BAY?

19    **A.**   YES, IT DOES.

20    **Q.**   AND 160.

21                        (DISPLAYED ON SCREEN.)

22         DOES THIS SHOW THE SOUTHERN SECTION OF NEWARK AREA 4?

23    **A.**   YES.  AND IT ALSO SHOWS THE NORTHERN SECTION.

24    **Q.**   OKAY.  AND 163.

25                        (DISPLAYED ON SCREEN.)

HARBISON – DIRECT / LEE

1   WHAT DOES THIS SHOW?

2   **A.**   THIS SHOWS THE SOUTHERN SECTION OF AREA 4 AND THE ILLEGAL

3   FILL.

4   **Q.**   OKAY.  AFTER GOING WITH AGENT SU UP IN THE HELICOPTER AND

5   TAKING THESE PHOTOS, WHAT DID YOU DO NEXT?  WHAT INVESTIGATIVE

6   STEPS DID YOU TAKE NEXT?

7   **A.**   MANY.

8   **Q.**   IF YOU COULD BRIEFLY SUMMARIZE?

9   **A.**   OKAY.  WE CONTINUED TO PURSUE LEADS WITH VARIOUS WITNESSES

10  AND TRIED TO DETERMINE VARIOUS ENVIRONMENTAL RAMIFICATIONS OF

11  WHAT HAD OCCURRED.  WE PREPARED TO CONDUCT SAMPLING FROM THE

12  AREA.  I CAN EXPLAIN MONTHS AND MONTHS OF CONTINUING

13  INVESTIGATION.  I'M NOT SURE IF THERE IS A SPECIFIC THING YOU

14  ARE INTERESTED IN ME SPEAKING ABOUT.

15        **THE COURT:**  MAYBE THIS IS A GOOD POINT TO TAKE OUR

16  BREAK, OUR FIRST MORNING RECESS.  ALL RIGHT.  LADIES AND

17  GENTLEMEN, WE WILL TAKE OUR FIRST 15-MINUTE BREAK AT THIS

18  POINT.  IT'S ABOUT 9:55.  LET'S PLAN TO BE BACK HERE AT 10:10.

19        REMEMBER ALL OF YOUR ADMONITIONS.  NO DISCUSSION ABOUT THE

20  CASE OF ANY SORT IN ANY FORM.  NO RESEARCH OF ANY SORT ABOUT

21  THE CASE OR THE ISSUES INVOLVED IN IT.  NO EXPOSURE TO NEWS

22  REPORTS OR ANY OTHER SORT OF INFORMATION ABOUT THE CASE.  AND

23  CONTINUE TO, AS AT ALL TIMES, KEEP AN OPEN MIND ABOUT THE

24  ISSUES UNTIL YOU HAVE HEARD ALL THE EVIDENCE AND THE ARGUMENT

25  OF COUNSEL AND YOU'VE GOTTEN MY INSTRUCTIONS AND THEN SENT

```
 1    BACK TO DELIBERATE.
 2        SO THE BREAK WILL GIVE YOU A CHANCE TO TAKE CARE OF ANY
 3    ISSUES, ANY BUSINESS THAT YOU HAVE, AND THEN EVERYONE CAN COME
 4    BACK AND GIVE YOUR FULL ATTENTION TO THE CASE.  SO THANK YOU.
 5        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)
 6            THE CLERK:  YOU MAY BE SEATED.
 7            THE COURT:  ALL RIGHT.  BE BACK AT 10:10.
 8            MR. KEARNEY:  YES, SIR.
 9            MS. LEE:  YES, SIR.
10        (RECESS TAKEN AT 9:56 A.M.; RESUMED AT 10:10 A.M.)
11            (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)
12                    (PAUSE IN THE PROCEEDINGS.)
13            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS
14    COURT IS BACK IN SESSION.
15            THE COURT:  YOU MAY CONTINUE, MS. LEE.
16    BY MS. LEE:
17    Q.  INSPECTOR HARBISON, WHEN YOU GOT THE PULL TAGS AND PADLOCK
18    AND DOCUMENTS FROM MR. STEELE, WHO DID YOU PROVIDE THEM TO?
19    A.  I PROVIDED THEM -- WELL, I RETAINED THE PADLOCK IN MY
20    EVIDENCE -- MY EVIDENCE AREA.  THE DOCUMENTS AND PULL TAGS
21    ULTIMATELY WERE PROVIDED TO AGENT SU.
22    Q.  AND WITH RESPECT TO THE PADLOCK, WAS THAT ULTIMATELY
23    PROVIDED TO AGENT SUSAN SIVOK WITH THE FBI?
24    A.  THAT'S CORRECT.
25    Q.  I WOULD LIKE TO SHOW YOU EXHIBITS 127 TO 151.
```

1               (EXHIBITS HANDED TO WITNESS.)

2       ARE THESE ALSO THE AERIAL PHOTOS TAKEN FROM THAT

3   OCTOBER 8TH, 2014 VISIT?

4   **A.**  SO FAR.  I JUST WANT TO GO THROUGH ALL OF THEM REAL QUICK.

5       THANKS FOR WAITING.  YES, THEY ARE.

6   **Q.**  DO THEY FAIRLY AND ACCURATELY DEPICT THE PROPERTY ON THAT

7   DAY, OCTOBER 8TH, 2014?

8   **A.**  YES, THEY DO.

9   **Q.**  ARE THESE CLOSER UP SHOTS OF THE PROPERTY THAN THE ONES

10  THAT WE HAD JUST SEEN?

11  **A.**  YES.

12          **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE EXHIBITS

13  127 TO 151 INTO EVIDENCE.

14          **MS. HANSEN:**  NO OBJECTION.

15          **THE COURT:**  127 THROUGH 151 ARE ADMITTED.

16  (GOVERNMENT'S EXHIBITS 127 THROUGH 151 RECEIVED IN EVIDENCE)

17  **BY MS. LEE:**

18  **Q.**  I WOULD ONLY LIKE TO TAKE YOU THROUGH SOME OF THESE.  127,

19  PLEASE.

20              (DISPLAYED ON SCREEN.)

21      THIS IS A PHOTO OF THE NORTHERN FILL AREA?

22  **A.**  YES, IT IS.

23  **Q.**  128.

24              (DISPLAYED ON SCREEN.)

25      IS THAT A CLOSER UP IMAGE OF THE FILL IN THE NORTHERN

HARBISON - DIRECT / LEE

1    AREA?

2    **A.**  YES, IT IS.

3    **Q.**  DO THEY HAVE ANY -- WHAT ELSE DO YOU SEE IN THIS PHOTO?

4    **A.**  I'M NOT SURE I UNDERSTAND YOUR QUESTION.

5    **Q.**  DOES THIS PHOTO ALSO DISPLAY KIND OF MARKINGS OF --

6    SCRAPING MARKINGS OVER THE FILL?

7    **A.**  YES.

8    **Q.**  WITH SOME GREEN VEGETATION UNDER IT AND AROUND IT?

9         **MS. HANSEN:**  OBJECTION.  LEADING.

10        **THE COURT:**  IT IS.  SUSTAINED.

11   **BY MS. LEE:**

12   **Q.**  WHAT, IF ANY, VEGETATION DO YOU SEE IN THIS PHOTO?

13   **A.**  I DON'T KNOW SPECIFICALLY THE CLASSIFICATION OF WHAT THAT

14   TRULY IS, BUT FROM MY --

15        **MS. HANSEN:**  OBJECTION.  CALLS FOR SPECULATION.  ALSO

16   FOUNDATION, WE DON'T KNOW WHERE THIS PHOTO IS TAKEN FROM,

17   WHICH PERSPECTIVE.

18        **THE COURT:**  SUSTAINED.  WHY DON'T WE SEE IF THE

19   WITNESS HAS A FOUNDATION.

20   **BY MS. LEE:**

21   **Q.**  WHERE ON THE PROPERTY IS THIS PHOTO DEPICTING?

22   **A.**  THIS APPEARS TO BE IN THE AREA OF THE SOUTH END OF A

23   NEARBY BUSINESS, PICK 'N PULL, WHICH IS ADJACENT TO THE AREA

24   OF AREA 4 IN THE NORTH THAT WAS ILLEGALLY FILLED.

25        **MS. HANSEN:**  OBJECTION TO THE USE OF THE LEGAL TERM

HARBISON – DIRECT / LEE

1    "ILLEGAL," YOUR HONOR, AND ARGUMENTATIVE AS WELL.  AND MOVE TO

2    STRIKE.

3             **THE COURT:**  SUSTAINED.  AND I DON'T THINK THERE WAS

4    ANY ILL INTENT, BUT IT'S IMPORTANT NOT TO MAKE ANY

5    CHARACTERIZATION AT THIS STAGE.  SO I JUST SUSTAIN.  AND THE

6    CHARACTERIZATION ABOUT ILLEGAL FILLING IS STRICKEN, LADIES AND

7    GENTLEMEN.

8    **BY MS. LEE:**

9    **Q.**  I WOULD LIKE TO TAKE YOU TO EXHIBIT 132.

10                      (DISPLAYED ON SCREEN.)

11      WHAT DOES THAT SHOW?

12   **A.**  THAT SHOWS THE SOUTH PORTION OF THE FILL THAT'S LOCATED AT

13   THE NORTH AFFECTED AREA OF AREA 4.

14   **Q.**  AND 133.  WHAT ARE WE LOOKING AT HERE?

15            **MS. HANSEN:**  WHAT EXHIBIT ARE WE AT?

16            **MS. LEE:**  133.

17                      (DISPLAYED ON SCREEN.)

18            **THE WITNESS:**  OKAY.  SO THIS APPEARS TO BE AN AREA

19   WEST OF THE FILL AT THE SOUTH PORTION OF THE NORTH FILL OF

20   AREA 4.

21   **BY MS. LEE:**

22   **Q.**  THIS IS WEST OF THE FILL IN THE NORTHERN AREA OF AREA 4?

23   **A.**  CORRECT.  WEST OF IT.

24   **Q.**  GOT IT.  ANY FURTHER WEST, WHAT WOULD BE THERE?

25   **A.**  WATER AREAS.

1    **Q.**  OKAY.  134, PLEASE.

2                     (DISPLAYED ON SCREEN.)

3       WHAT ARE WE LOOKING AT HERE?

4    **A.**  THIS IS A PORTION OF THE FILL LOCATED AT THE NORTH

5    AFFECTED AREA OF AREA 4, AND WITHIN THAT DESCRIPTION I JUST

6    PROVIDED, THIS IS ACTUALLY FOCUSED ON THE SOUTH PORTION OF

7    THAT NORTH FILL; JUST DEPICTS THE SOUTH PART OF THE NORTH FILL

8    AREA.

9    **Q.**  IS IT AT THE END OF THE PICK 'N PULL?

10   **A.**  YES.

11   **Q.**  LOOKING AT THIS PHOTO, WHICH IS EXHIBIT 134, LOOKING AT

12   THE GEOGRAPHY OF THIS PHOTO, I'M GOING TO HAVE YOU LOOK AT A

13   MAP THAT IS ALREADY IN EVIDENCE, WHICH IS 1141-0036.

14      IF WE BLOW UP THAT NORTHERN AREA OF AREA 4, DO YOU SEE THE

15   AUTO WRECKING YARD SIGN?

16   **A.**  YES, I DO.

17   **Q.**  THAT LAST PHOTO THAT WE JUST SAW, WHICH IS EXHIBIT 134,

18   WHERE ON THIS MAP IS THAT?

19   **A.**  IT'S APPROXIMATELY IN THE VICINITY OF THAT RED OVAL CIRCLE

20   AROUND THE BLUE-COLORED PORTION AND ALSO INCLUDING SOME OF THE

21   RED-COLORED PORTION ADJACENT TO THE BLUE-COLORED PORTION.

22   **Q.**  IS IT TOWARD THE NORTH PART OF THE AUTO WRECKING YARD?

23   **A.**  YOU KNOW, IT'S DIFFICULT TO SAY NORTH AND SOUTH HERE, JUST

24   TO KIND OF CLARIFY, BECAUSE IT'S NOT A HARD-AND-FAST NORTH AND

25   SOUTH.  NORTH OF THE AUTO WRECKING YARD WOULD KIND OF BE UP --

HARBISON – DIRECT / LEE

1    THE WAY IT IS SORT OF ORIENTED, IT WOULD BE SORT OF UP TOWARD

2    THE TOP.  THAT WOULD BE MORE TOWARD NORTH.  SO THE AUTO

3    WRECKING YARD, THAT'S CLOSEST TO THIS OVAL CIRCLE, I BELIEVE

4    IS REALLY MORE CLOSELY DESCRIBED AS SOUTH OF THE AUTO WRECKING

5    YARD, THE SOUTH PORTION OF THE AUTO WRECKING YARD.

6    **Q.**  I WOULD LIKE TO JUST DIRECT YOUR ATTENTION TO THIS

7    PERPENDICULAR SECTION OF THE AUTO WRECKING YARD (INDICATING).

8    **A.**  UH-HUH.

9    **Q.**  IF WE CAN GO BACK TO EXHIBIT 134.  IS THAT KIND OF THE

10   SAME CORNER OF THAT MAP WHERE IT SHOWED THE AUTO WRECKING

11   YARD?

12   **A.**  IT'S IN THE VICINITY, YES.

13   **Q.**  SO THIS PART OF THE FILL HAS EXTENDED --

14            **MS. LEE:**  IF WE CAN GO BACK TO THAT MAP, PLEASE.

15                      (DISPLAYED ON SCREEN.)

16       IF WE CAN BLOW UP THE NORTHERN SECTION AGAIN.

17   **BY MS. LEE:**

18   **Q.**  SO DOES THAT PHOTO, EXHIBIT 134, SHOW THE FILL MATERIAL

19   THAT WAS PLACED FURTHER INTO THE RED PORTION AND BEYOND?

20   **A.**  IT APPEARS TO.  IT'S KIND OF CHALLENGING TO MATCH THESE

21   TWO AND ORIENT THEM EXACTLY SIDE BY SIDE IN THIS MANNER THAT

22   WE'RE DOING, BUT IT'S IN THIS GENERAL VICINITY, THE FILL LINE

23   EXTENDS QUITE A BIT AND THEN JOGS OVER TO THE DIRECTION WHERE

24   THE ARROW IS POINTING.

25   **Q.**  OKAY.  AND EXHIBIT 145, PLEASE.

1                        (DISPLAYED ON SCREEN.)

2          DO YOU KNOW WHAT THIS PHOTO DEPICTS, WHAT AREA OF THE SITE

3     THIS DEPICTS, IF YOU KNOW?

4     **A.**  APPROXIMATELY -- YES, I BELIEVE I DO.  IT WOULD HELP TO

5     HAVE A BIGGER SCALE, BUT I BELIEVE -- YES, I DO BELIEVE I KNOW

6     WHAT IT DEPICTS.

7     **Q.**  WHAT IS THAT?

8     **A.**  SO IT DEPICTS THE AREA WEST OF THE SOUTH FILL AREA OF

9     AREA 4, I BELIEVE.

10    **Q.**  AND 147, PLEASE.

11                       (DISPLAYED ON SCREEN.)

12         SAME KIND OF AREA HERE?

13    **A.**  YES, IT APPEARS TO.  IT'S -- AGAIN, IT'S DIFFICULT TO

14    ORIENT THIS EXACTLY TO THE FILL AREA FROM THIS ANGLE.

15    **Q.**  INSPECTOR HARBISON, DO YOU SEE THIS WATER HERE

16    (INDICATING)?

17    **A.**  YES, I DO.

18    **Q.**  AND DO YOU KNOW WHAT THIS WATER IS HERE, THIS LARGER

19    SQUIGGLY LINE?

20    **A.**  I BELIEVE THAT'S SOMEWHAT OF A STREAM THAT FEEDS INTO THE

21    DON EDWARDS --

22              **MS. HANSEN:**  OBJECTION.  LACKS FOUNDATION AS TO

23    WHETHER THE STREAM FLOWS OR WHERE IT FLOWS.

24              **THE COURT:**  WHY DON'T WE LAY THE FOUNDATION.

25    **BY MS. LEE:**

1    **Q.**  DO YOU KNOW WHAT THAT WATER BODY IS CALLED?

2    **A.**  I BELIEVE IT'S A STREAM.  YOU MEAN THE STREAM, WHAT --

3    THAT WATER BODY OR ALL THE OTHER WATER BODIES THERE?

4    **Q.**  WITH RESPECT TO THIS WATER BODY (INDICATING) THAT

5    SQUIGGLES AROUND, DO YOU KNOW THE NAME OF THAT?

6    **A.**  I DON'T.

7    **Q.**  AND I WOULD LIKE TO SHOW 149.

8                    (DISPLAYED ON SCREEN.)

9        AND WHAT ARE WE LOOKING AT HERE?

10   **A.**  THIS IS THE VERY SOUTHWEST PORTION OF THE NORTH FILL IN

11   AREA 4.

12   **Q.**  IT'S ENTERING THE NORTHERN FILL AREA FROM THE CONCRETE

13   PAD; IS THAT RIGHT?

14   **A.**  YES, THAT'S RIGHT.

15   **Q.**  SO JUST TO CLARIFY, BECAUSE YOU SEEM UNCERTAIN THERE, THIS

16   IS THE CONCRETE PAD IN THE NORTHERN SECTION OF AREA 4; IS THAT

17   RIGHT?

18            **MS. HANSEN:**  OBJECTION.  LEADING.

19            **THE COURT:**  SUSTAINED.

20   **BY MS. LEE:**

21   **Q.**  WHAT IS THIS?

22   **A.**  THAT IS THE SOUTH END OF A BUSINESS THAT IS ADJACENT TO

23   THE FILL LOCATION AT THE NORTH PORTION OF AREA 4.

24   **Q.**  AND 150.

25                    (DISPLAYED ON SCREEN.)

HARBISON – DIRECT / LEE

1    WHAT IS THIS?  WHAT -- DOES THIS PHOTO HAVE ANY

2    SIGNIFICANCE TO YOU?

3    **A.**  YES.  IT -- YES, IT DOES.

4    **Q.**  WHAT, IF ANY, SIGNIFICANCE DOES THIS PHOTO HAVE TO YOU?

5    **A.**  THIS IS DEPICTING, AGAIN, A PORTION OF THE ADJACENT

6    BUSINESS.  THE CONCRETE PORTION AT THE TOP RIGHT OF THIS

7    PICTURE IS THE SOUTH END OF A WOOD CHIPPING BUSINESS.  AND

8    WHERE THAT TOP RIGHT CORNER OF THE PAD HITS A DARKER LINE,

9    THAT BEGINS TO DELINEATE A PORTION OF THE FILL AREA AT THE

10   SOUTH EDGE OF THE NORTH AFFECTED AREA OF AREA 4.

11   **Q.**  THIS IS IN THE NORTHERN AREA OF AREA 4?

12   **A.**  YES.

13   **Q.**  YOU MENTIONED YOU WENT BACK TO THE SITE ON OCTOBER 17TH,

14   2014.  WHO DID YOU GO WITH?

15   **A.**  I WENT WITH MEMBERS OF THE CALIFORNIA DEPARTMENT OF TOXIC

16   SUBSTANCES CONTROL AS WELL AS AGENT SU.

17   **Q.**  HOW DID YOU GET ON TO THE PROPERTY THAT DAY?

18   **A.**  WE DROVE ON WITH PERMISSION FROM TIM STEELE, OF THE

19   SOBRATO ORGANIZATION.

20   **Q.**  AND WHAT DID YOU DO THAT DAY?

21   **A.**  WE COLLECTED SAMPLES OF VARIOUS AREAS OF BOTH THE NORTH

22   AREA 4 FILL AND THE SOUTH AREA 4 FILL.

23   **Q.**  DID THE SITE LOOK LARGELY THE SAME TO YOU AS WHEN YOU WENT

24   TEN DAYS PRIOR, OR IS IT DIFFICULT TO SAY FROM THE DIFFERENT

25   VANTAGE POINT?

HARBISON – DIRECT / LEE

1  **A.**  IT LOOKED PREDOMINANTLY THE SAME AS WHEN WE FLEW OVER.  IT

2  WAS UNDERSTANDABLY FAR MORE DETAILED BECAUSE WE WERE A FEW

3  FEET FROM THE GROUND RATHER THAN MANY.

4  **Q.**  OKAY.  I AM SHOWING YOU EXHIBITS 100-0001 TO 121-0001.

5        **THE CLERK:**  I AM SORRY, LET ME HAVE THE NUMBERS

6  AGAIN.

7        **MS. LEE:**  EXHIBITS 100 TO 121.

8        **THE CLERK:**  THANK YOU.

9            (EXHIBITS HANDED TO WITNESS.)

10  **BY MS. LEE:**

11  **Q.**  COULD YOU TAKE A MOMENT TO LOOK THROUGH THEM, AND WHEN

12  YOU'RE DONE, JUST LET ME KNOW.

13  **A.**  I'M DONE.

14  **Q.**  ARE THOSE PHOTOS THAT YOU TOOK FROM OCTOBER 17TH, 2014?

15  **A.**  YES, THEY ARE.

16  **Q.**  DO THEY FAIRLY AND ACCURATELY DEPICT THE NORTHERN AND

17  SOUTHERN PORTION OF NEWARK AREA 4 ON THAT DATE?

18  **A.**  I BELIEVE THESE ARE MOSTLY THE SOUTHERN PORTION OF AREA 4

19  ON THAT DATE.

20  **Q.**  THANK YOU.

21      DO THEY FAIRLY AND ACCURATELY DEPICT THE SOUTHERN PORTION

22  ON THAT DATE?

23  **A.**  YES.

24        **MS. LEE:**  YOUR HONOR, THE GOVERNMENT WISHES TO MOVE

25  EXHIBITS 100 THROUGH 121 INTO EVIDENCE.

1      **MS. HANSEN:**  NO OBJECTION, YOUR HONOR.

2      **THE COURT:**  EXHIBITS 100 THROUGH 121 ARE ADMITTED.

3   (GOVERNMENT'S EXHIBITS 100 THROUGH 121 RECEIVED IN EVIDENCE)

4   **BY MS. LEE:**

5   **Q.**  JUST TO CONFIRM, OCTOBER 17TH, THIS IS PROBABLY ABOUT --

6   IS THIS ABOUT FIVE WEEKS AFTER THE OPERATION WAS STOPPED?

7   **A.**  APPROXIMATELY SEPTEMBER 8TH TO OCTOBER 17TH, SO, YES.

8   **Q.**  I WOULD LIKE TO HIGHLIGHT JUST A FEW OF THESE PHOTOS THAT

9   YOU TOOK.  CAN WE SEE EXHIBIT 100?

10                  (DISPLAYED ON SCREEN.)

11      WHAT IS THIS?

12   **A.**  THAT IS A VANTAGE POINT FACING NORTH FROM THE VERY SOUTH

13   END OF THE AFFECTED FILL AREA OF AREA 4.

14      **MS. LEE:**  COULD WE PULL UP THE MAP OF -- WHICH IS

15   EXHIBIT 1141-0036.

16                  (DISPLAYED ON SCREEN.)

17      IF WE CAN BLOW UP THE SOUTHERN PORTION OF NEWARK AREA 4.

18   **BY MS. LEE:**

19   **Q.**  THAT LAST PHOTO WE JUST SAW, EXHIBIT 100, WHERE IS THAT ON

20   THIS MAP?

21   **A.**  APPROXIMATELY -- IF ONE WERE TO FOLLOW THE SOMEWHAT

22   HORIZONTAL AND CURVING THIN TURQUOISE BLUE LINE TOWARD THE

23   BOTTOM RIGHT OF THE PAGE, AND WHERE YOU SEE THAT LINE ENDING,

24   IN THAT VICINITY IF ONE WERE TO TURN AND FACE NORTH ON THAT

25   PHOTO, THAT WOULD APPROXIMATELY BE THE VANTAGE POINT.

HARBISON – DIRECT / LEE

1    **Q.**  DOES THAT RED ARROW DEPICT WHAT YOU JUST DESCRIBED?

2    **A.**  YES.

3    **Q.**  IS THAT TURQUOISE BLUE LINE, THAT SQUIGGLY BLUE LINE

4    LEADING UP TO WHERE THAT RED ARROW IS POINTING?

5    **A.**  I'M SORRY, COULD YOU PLEASE REPEAT THAT?

6    **Q.**  I'LL WITHDRAW THAT QUESTION.

7        SO THAT PHOTO SHOWS WHERE THIS RED ARROW IS POINTING; IS

8    THAT RIGHT?

9    **A.**  APPROXIMATELY, YES.

10   **Q.**  AND THE REMAINDER OF THE PHOTOS THAT WE WILL BE LOOKING AT

11   THAT YOU HAVE BEFORE YOU, EXHIBITS 100 TO 121, WHAT PORTION OF

12   THE SITE DO THEY DEPICT GENERALLY?  I BELIEVE THERE IS A

13   POINTER, A RED POINTER THAT YOU CAN USE.

14   **A.**  GREAT.  APPROXIMATELY THIS AREA IN HERE (INDICATING).

15   **Q.**  AND DID YOU TAKE ANY PHOTOS FURTHER OUT PAST THE WHITE

16   STRIP INTO THE OTHER GREEN AREA, OR IS IT HARD FOR YOU TO

17   TELL?

18   **A.**  WE DIDN'T TRAVERSE THAT AREA.  IT IS POSSIBLE THAT SOME OF

19   THE VERY FAR BACKGROUND OF SOME OF THE PHOTOS I TOOK IN THIS

20   AREA THAT I HIGHLIGHTED ALREADY WILL INCLUDE SOME OF THOSE

21   AREAS THAT YOU JUST REFERENCED.

22   **Q.**  HOW DID YOU GET TO THAT RED ARROW PLACE?  HOW DID YOU

23   DRIVE ON TO THE PROPERTY?

24   **A.**  SO, AGAIN, IT'S DIFFICULT TO ORIENT FROM THIS MAP.  I

25   BELIEVE THIS IS STEVENSON (INDICATING).

1          **MS. LEE:**  PERHAPS WE CAN ZOOM OUT, AGENT SU, SO

2    INSPECTOR HARBISON CAN SEE THE FULL MAP.

3          **THE WITNESS:**  OKAY.  YES.  SO I BELIEVE THIS IS

4    STEVENSON.

5    **BY MS. LEE:**

6    **Q.**  OKAY.

7    **A.**  AND IT'S SOMEWHAT INDUSTRIAL HERE AS YOU COME DOWN, AND

8    THEN YOU HIT THE UNION PACIFIC RAILROAD TRACKS.  SO WHAT WE

9    DID WAS, WE DROVE OUR VEHICLES OVER THOSE TRACKS AND AT THAT

10   AREA THERE IS ACTUALLY SORT OF AN ASPHALT, I GUESS, RAMP SO

11   THAT VEHICLES WOULD POTENTIALLY BE ABLE TO CROSS OVER THOSE

12   TRACKS WITHOUT GETTING STUCK ON THE TRACKS.

13         AND ONCE THAT IS CLEARED, THEN THERE'S A GATE, A METAL

14   GATE LIKE A BIG OLD FARM GATE TYPE GATE, AND WE HAD THE LOCK

15   COMBINATION PROVIDED BY TIM STEELE.  WE OPENED THE GATE AND WE

16   DROVE DOWN A VERY -- KIND OF DIRT ROAD THAT THEN JOGGED A

17   LITTLE BIT TO THE RIGHT, AND THEN SORT OF CAME UP INTO THAT

18   VIEW THAT I SHOWED WHEN THIS WAS ENLARGED.

19   **Q.**  AND WHERE WERE YOU POSITIONED WHEN YOU TOOK THE PHOTOS OF

20   THIS SOUTHERN AREA OF NEWARK AREA 4?

21   **A.**  I WAS OUTSIDE MY VEHICLE JUST ON THE -- IN THE VICINITY OF

22   THE FILL AREA AND THE DIRT ROAD SORT OF AIMING IN THIS

23   DIRECTION (INDICATING).

24   **Q.**  OKAY.  SO I WOULD LIKE TO SHOW YOU SOME OF THE PHOTOS YOU

25   TOOK IN THE SOUTHERN AREA.  CAN WE SEE 100 AGAIN?

HARBISON – DIRECT / LEE

```
 1              (DISPLAYED ON SCREEN.)
 2       IS THIS THE ROAD THAT YOU WERE TALKING ABOUT LEADING ON TO
 3    THE SOUTHERN AREA?
 4    A.  WELL, THE ROAD WOULD SORT OF BE BEHIND ME.  I HAVE ALREADY
 5    TRAVERSED THAT LITTLE ROAD I DESCRIBED, AND THEN PULLED OVER
 6    AND GOT OUT AND TOOK THE PHOTO FACING I GUESS SOMEWHAT NORTH.
 7    Q.  AND 108.
 8              (DISPLAYED ON SCREEN.)
 9       WHAT ARE WE LOOKING AT HERE?
10    A.  THAT IS GENERALLY IF I WERE TO FACE WEST FROM THE AREA WE
11    WERE SORT OF PREVIOUSLY LOOKING AT, THIS RIGHT HERE
12    (INDICATING) IS LIKE A -- THIS PORTION HERE RUNS ROUGHLY
13    EAST/WEST, IT'S LIKE A LITTLE WATER LANE HERE, SO I CAN TELL
14    THAT THAT'S THE SORT OF SOUTH END OF THIS FILL AREA.
15    Q.  WHAT DO YOU MEAN, THERE'S A WATER LANE THERE?  WHAT IS
16    THAT?  WHAT ARE YOU REFERENCING?
17    A.  SO WHERE THIS VEGETATION KIND OF EMERGES HERE.
18    Q.  UH-HUH.
19    A.  I RECALL THAT BEING SORT OF A SOUTH EDGE DELINEATING AREA
20    OF THE FILL AREA, AND THAT IS SORT OF WHERE THE FILL STOPPED
21    OR KIND OF BUTTED UP AGAINST, AND RIGHT THERE IT WAS LIKE A
22    WET LITTLE WATER STREAM.
23    Q.  I WILL SHOW YOU 120.
24              (DISPLAYED ON SCREEN.)
25       IS THAT THE STREAM YOU'RE REFERENCING?
```

1  **A.**  YES.

2  **Q.**  AND THAT IS KIND OF ABUTTING THAT EDGE THAT YOU JUST

3  DESCRIBED?

4            **MS. HANSEN:**  OBJECTION.  LEADING.

5            **THE COURT:**  SUSTAINED.

6  **BY MS. LEE:**

7  **Q.**  I'LL LOOK AT EXHIBIT 121.

8                        (DISPLAYED ON SCREEN.)

9       WHAT IS THAT?

10  **A.**  THAT IS THE WATER STREAM THAT I WAS REFERENCING, AND AS

11  YOU CAN SEE THIS -- IN THE PREVIOUS PHOTOS WHEN I WAS

12  DESCRIBING THE WATER BEFORE YOU ACTUALLY PRESENTED THIS

13  PICTURE, I BELIEVE THIS IS SORT OF THAT AREA THAT WE COULD SEE

14  AT THE FAR END OF THE PHOTO WE WERE LOOKING AT PREVIOUSLY, AND

15  THEN THIS IS THE FILL, THE SOUTH PART OF ALL THE FILL RIGHT UP

16  TO THIS AREA.

17  **Q.**  AND 118.

18                        (DISPLAYED ON SCREEN.)

19       WHAT ARE WE LOOKING AT HERE?

20  **A.**  THAT'S ANOTHER VANTAGE POINT.  AND, AGAIN, IT'S VERY

21  SIMILAR TO WHERE WE WERE JUST OBSERVING.  IT IS FACING RATHER

22  WEST TOWARD THE WATER FURTHER AWAY, AND THE STREAM SORT OF

23  RUNS EAST/WEST.  AND THIS, AGAIN, IS MORE OF THE DUMPED

24  MATERIAL ALONG THE SOUTH PORTION OF THE SOUTH FILL IN AREA 4.

25  **Q.**  DO YOU KNOW WHAT THE VEGETATION IS NEXT TO THE FILL

HARBISON – DIRECT / LEE

```
1    MATERIAL?
2              MS. HANSEN:  OBJECTION.  SPECULATION.  FOUNDATION.
3              THE COURT:  OVERRULED AT THIS POINT.
4              THE WITNESS:  I RECALL LEARNING THAT THERE WAS SOME
5    PICKLEWEED IN THIS AREA.
6              MS. HANSEN:  OBJECTION.  MOVE TO STRIKE.
7              THE COURT:  SUSTAINED.  AND THAT ANSWER IS STRICKEN,
8    LADIES AND GENTLEMEN.
9    BY MS. LEE:
10   Q.  AND IF YOU DON'T KNOW, IT IS FINE TO JUST SAY YOU DON'T
11   KNOW.
12   A.  I UNDERSTAND.
13   Q.  116, PLEASE.
14                   (DISPLAYED ON SCREEN.)
15       AND WHAT DOES THIS SHOW?
16   A.  THAT'S ADDITIONAL VANTAGE POINTS OF VERY SIMILAR AREA.
17   AGAIN, YOU CAN KIND OF USE THIS MARKER AS THE SOUTH EDGE
18   DELINEATOR, AND THIS HORIZON AREA IS SOMEWHAT FACING WEST.
19   AND THIS IS ADDITIONAL AREAS OF FILL, A VARIETY OF DUMPED
20   MATERIAL.
21   Q.  AND 115.
22                   (DISPLAYED ON SCREEN.)
23       WHAT ARE WE LOOKING AT HERE?
24   A.  SO THAT'S A SIMILAR -- SIMILAR AREA.  AS YOU CAN SEE,
25   REALLY A HODGEPODGE MIXTURE OF ALL KINDS OF DIFFERENT ROCKS
```

HARBISON - DIRECT / LEE

1   AND CONCRETE AND THINGS MIXED IN WITH THE FILL AND DEBRIS.

2   AND HERE IS THIS SORT OF SOUTH EDGE AGAIN I BELIEVE.

3   **Q.**   WHAT IS THAT PIECE THAT IS STICKING UP FROM THE SOIL?

4   MAYBE WE WILL BLOW IT UP FOR YOU.

5   **A.**   SO I CAN'T REALLY TELL.  THAT MAY HAVE BEEN -- I REMEMBER

6   THERE BEING BITS OF, LIKE, CONSTRUCTION WOOD, 2 X 4 PLYWOOD

7   TYPE MATERIAL.  THERE WERE ALSO PORTIONS OF SORT OF

8   CEMENTITIOUS DIRT, WATER, DRY MATERIAL THAT ALSO HAD A SIMILAR

9   APPEARANCE.  I CAN'T COMPLETELY TELL ON THIS ONE WHICH OF

10  THOSE IT WAS.

11      THERE WAS JUST A VARIETY OF DIFFERENT DEBRIS MATERIALS

12  MIXED INTO ALL OF THESE DIFFERENT MOUNDS AND AREAS OF FILL.

13  **Q.**   AND 113.

14                  (DISPLAYED ON SCREEN.)

15      WHAT IS THIS?

16  **A.**   THAT WAS PARTICULARLY NOTEWORTHY TO ME AT THE TIME

17  BECAUSE, AGAIN, IT WAS SOME SORT OF DEBRIS PIECE.  I DON'T

18  KNOW IF IT WAS LIKE A -- I DON'T KNOW WHAT IT WAS BUT THAT WAS

19  OUT THERE AMONGST THE FILL AS WELL.

20  **Q.**   AND EXHIBIT 119.

21                  (DISPLAYED ON SCREEN.)

22      WHAT ABOUT THAT?

23  **A.**   SO THERE, AGAIN, IT'S A RUSTED PIECE -- WHAT APPEARS TO ME

24  TO HAVE BEEN A RUSTED PIECE OF LIKE COPPER --

25          **MS. HANSEN:**  OBJECTION.  WE HAVE NO FOUNDATION FOR

1    WHERE THIS PHOTOGRAPH WAS TAKEN.

2             **THE COURT:**  FAIR ENOUGH.  WHY DON'T WE CLARIFY THAT.

3    **BY MS. LEE:**

4    **Q.**  WHERE IS THIS PHOTOGRAPH TAKEN?

5    **A.**  THIS IS ALSO THE SOUTHERN FILL AREA OF AREA 4.

6    **Q.**  WHAT IS IT?  WHAT IS THIS PHOTO SHOWING?

7    **A.**  IT SHOWS VEGETATION, AND IT ALSO SHOWS THIS SORT OF RUSTED

8    PIPE.  AND THIS AREA HERE (INDICATING), AS I RECALL, IS THE --

9    SORT OF THAT WET STREAM AREA FURTHER TO THE RIGHT AND -- THAT

10   WOULD BE FURTHER WEST ACTUALLY IS WHERE THAT WET STREAM AREA

11   WE SAW PREVIOUSLY CONTINUES ON.

12   **Q.**  AND 111, PLEASE.

13                    (DISPLAYED ON SCREEN.)

14       WHY DID YOU TAKE THAT PHOTO, AND WHAT IS IT?

15   **A.**  SO THIS IS IN THE SOUTH FILL AREA OF AREA 4, AND THIS IS

16   TO ME -- WELL, THIS IS AN INDICATION, AGAIN, OF TIRE TRACK OR

17   SOME HEAVY EQUIPMENT TRACK AND A CLOSE-UP OF THE WAY THIS FILL

18   MATERIAL APPEARED TO HAVE BEEN COMMINGLED IN WITH LIKE

19   EXISTING TOPOGRAPHY.

20   **Q.**  AND EXHIBIT 110.

21                    (DISPLAYED ON SCREEN.)

22       WHAT IS THIS PHOTO, AND WHY DID YOU TAKE IT?

23   **A.**  I BELIEVE THIS IS, AGAIN, SIMILAR TO THE VERY FIRST PHOTOS

24   WE WERE LOOKING AT WHERE IT'S THE SOUTH PORTION OF THE FILL IN

25   AREA 4 AND IT'S ORIENTED A LITTLE BIT TO THE EAST AFTER COMING

1   THROUGH THE DIRT ROAD TO LEAD ON TO THE FILL AREA.

2   **Q.**   AND WHAT MARKINGS ARE IN THE DIRT THERE?

3   **A.**   TIRE TRACKS, VARIETY OF TIRE TRACKS AND STRIATIONS AND

4   GROOVES.

5   **Q.**   AND EXHIBIT 108.

6                    (DISPLAYED ON SCREEN.)

7       WHAT ARE WE LOOKING AT HERE?

8   **A.**   THAT'S THE SOUTH PORTION OF AREA 4 FILL, AGAIN, LOOKING

9   WEST.  AND THIS AREA HERE IS THE SOUTH EDGE (INDICATING), AND

10  THIS PHOTO SOMEWHAT DEPICTS WHAT I SAW THAT DAY AND THAT THERE

11  WERE JUST A VARIETY OF DIFFERENT COLORS OF SOIL AND DIRT AND

12  MATERIAL CHUNKY ITEMS, OBVIOUS -- WELL, TO ME OBVIOUS

13  APPEARANCE OF BEING DISTURBED AND WORKED IN THE GROOVES OF THE

14  EQUIPMENT.

15  **Q.**   COULD YOU SEE WHERE THE FILL MATERIAL ENDED IN TERMS OF

16  YOUR LINE OF SIGHT HERE?

17  **A.**   IN THIS PICTURE IT IS NOT EXTREMELY CLEAR BUT IT RAN OUT

18  PRETTY FAR.

19  **Q.**   DID YOU WALK OUT AS FAR AS IT RAN OUT, OR DID YOU STAY

20  KIND OF IN -- WHERE YOU WERE PLACED TAKING THE PHOTOS?

21  **A.**   I BELIEVE WE WALKED OUT -- I WALKED OUT QUITE A BIT TO THE

22  WEST.  I DON'T KNOW IF I WALKED -- I DON'T RECALL WALKING

23  REALLY FAR BEYOND WHERE I NOTICED THIS MULTICOLORED FILL

24  MATERIAL (INDICATING).

25  **Q.**   OKAY.  HOW DID THIS MULTICOLORED FILL MATERIAL LOOK

HARBISON – DIRECT / LEE

1    DIFFERENT FROM AREAS THAT WERE NOT FILLED, IF YOU KNOW OR IF

2    YOU RECALL?

3    **A.**  SO THE AREAS -- THERE WERE OTHER AREAS THAT APPEARED

4    RELATIVELY UNDISTURBED.  THE BRUSH OR PLANT MATERIAL JUST DID

5    NOT REALLY SEEM TO BE VERY DISTURBED, AND THE SOIL AND GROUND

6    FROM WHICH THE UNDISTURBED, IF YOU WILL, PLANT MATERIAL GREW

7    OUT OF, THAT SOIL SEEMED RELATIVELY UNDISTURBED.  AND THEN

8    ADJACENT AREAS OF FILL --

9            **MS. HANSEN:**  OBJECTION.  NARRATIVE.

10           **THE COURT:**  OVERRULED.

11           **THE WITNESS:**  -- ADJACENT AREAS OF FILL, THEY WERE

12   VERY NOTICEABLY DISTURBED, AS THIS PICTURE DEPICTS.

13   **BY MS. LEE:**

14   **Q.**  DURING THE COURSE OF YOUR INVESTIGATION, DID IT CULMINATE

15   IN ANY ACTION ON MARCH 21ST, 2016?

16   **A.**  YES.

17   **Q.**  AND WHAT WAS THAT?

18   **A.**  THE ARREST OF JAMES LUCERO.

19           **MS. HANSEN:**  OBJECTION, YOUR HONOR.

20           **THE COURT:**  SUSTAINED.

21           **MS. LEE:**  I AM JUST INQUIRING AS INSPECTOR HARBISON

22   ARRESTED MR. LUCERO, SO I AM JUST DRAWING THAT OUT AS HER

23   CONDUCT THAT SHE PERFORMED NEXT IN HER INVESTIGATIVE STEPS.

24           **THE COURT:**  WHAT IS THE -- WHY DON'T -- FOR NOW WHY

25   DON'T WE MOVE ON, AND WE CAN CIRCLE BACK IF NEEDED.

HARBISON – DIRECT / LEE

1          **MS. LEE:**  NO PROBLEM.

2     **BY MS. LEE:**

3     **Q.**  AFTER OCTOBER 17TH, 2014 DID YOU EVER GO BACK TO THE

4     PROPERTY AGAIN?

5     **A.**  YES, I DID.

6     **Q.**  WHEN WAS THAT?

7     **A.**  I WENT BACK ON NOVEMBER 5TH.

8     **Q.**  AND WHAT DID YOU DO THAT DAY?

9     **A.**  I MET WITH HUMBERTO VALDEZ.

10    **Q.**  WHO IS THAT?

11    **A.**  HE WORKED AT THE BUSINESS THAT -- I REFERENCED THERE WAS A

12    BUSINESS WITH A -- SORT OF A LONG PAD THAT BUTTED UP AGAINST

13    THE SOUTHWEST PORTION OF THE NORTH FILL AREA OF AREA 4.

14    **Q.**  I'M TRYING TO SHOW YOU A PHOTO THAT MAY HELP YOU.  IF WE

15    CAN PULL UP EXHIBIT 158.

16                    (DISPLAYED ON SCREEN.)

17         WHAT BUSINESS ARE YOU REFERENCING?

18    **A.**  SO THIS PORTION, THIS STRIP RIGHT HERE (INDICATING), THIS

19    IS MOWRY AVENUE, THIS STRIP RIGHT HERE HAD A WOOD CHIPPING, I

20    GUESS, BUSINESS.  AND I WENT ON NOVEMBER 5TH WITH AGENT SU AND

21    WE MET WITH THE PERSON WHOSE BUSINESS IT IS, HUMBERTO VALDEZ.

22    **Q.**  OKAY.  WHAT WAS THE PURPOSE OF YOUR VISIT THAT DAY?

23    **A.**  TO INTERVIEW HUMBERTO VALDEZ.

24    **Q.**  DID YOU GO BACK ON TO THE PROPERTY -- NOT -- ON TO THE --

25    NOT THE CONCRETE PAD OR THE PICK 'N PULL BUT ON TO THE LAND AT

HARBISON – DIRECT / LEE

1    THE NORTHERN SECTION OR SOUTHERN SECTION OF NEWARK AREA 4?

2    **A.**  YES, I DID.  I WENT RIGHT ABOUT THIS AREA (INDICATING) SO

3    IT'S FROM WHERE HIS BUSINESS ENDS AND THEN THIS IS THE PORTION

4    OF -- PART OF THE PORTION OF THE FILL.

5    **Q.**  OKAY.  AFTER THAT WHAT, IF ANY, OTHER INVESTIGATIVE STEPS

6    DID YOU TAKE IN THE COURSE OF INVESTIGATING THIS FILL MATERIAL

7    ON THIS NEWARK AREA 4 SITE?

8    **A.**  COULD YOU CLARIFY IF YOU MEAN NOVEMBER 5TH OR JUST IN

9    GENERAL BEYOND?

10   **Q.**  IN GENERAL.  I WON'T ASK YOU ABOUT NOVEMBER 5TH BUT JUST

11   IN GENERAL, ANY OTHER FOLLOW-UP INVESTIGATION THAT YOU'VE DONE

12   WITH RESPECT TO THIS CASE?

13   **A.**  YES, A LOT.

14   **Q.**  AT SOME POINT DID YOU REFER THIS CASE TO THE ENVIRONMENTAL

15   PROTECTION AGENCY?

16   **A.**  WELL, ACTUALLY MAYBE IT IS SEMANTICS BUT WE WERE ALREADY

17   WORKING TOGETHER ALL ALONG THE WAY.  AGENT SU IS FROM, YOU

18   KNOW, U.S. EPA, THE ENVIRONMENTAL PROTECTION AGENCY, SO SHE

19   AND I WERE INVESTIGATING THIS.  SO IT WAS....

20        **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR INSPECTOR

21   HARBISON.

22        **THE COURT:**  ALL RIGHT.  ANY CROSS-EXAMINATION?

23        **MS. HANSEN:**  YES, YOUR HONOR.

24                  **CROSS-EXAMINATION**

25   **BY MS. HANSEN:**

HARBISON – CROSS / HANSEN

1    **Q.**  HI.  GOOD MORNING.

2    **A.**  GOOD MORNING.

3    **Q.**  JUST A FEW QUESTIONS.  I WANT TO START WITH AN EXHIBIT

4    THAT WAS SHOWN TO YOU.  IT'S A MAP, GOVERNMENT

5    EXHIBIT 1141-0036.

6                          (DISPLAYED ON SCREEN.)

7        AND TODAY WHEN YOU WERE TESTIFYING, YOU WERE TRYING TO

8    IDENTIFY AREAS IN THIS MAP THAT RELATED TO THE AREAS DEPICTED

9    IN THE PHOTOS, CORRECT?

10   **A.**  YES.

11   **Q.**  AND YOU WERE GUESSING TO THE BEST OF YOUR ABILITY,

12   CORRECT?

13   **A.**  I DON'T BELIEVE THAT'S CORRECT.

14   **Q.**  WELL, YOU DID NOT ACTUALLY USE ANY GPS COORDINATES TO MAP

15   OUT WHERE THE FILL ACTIVITY WAS, DID YOU?

16   **A.**  THAT'S NOT ENTIRELY ACCURATE.  I CAN EXPLAIN IF YOU ALLOW

17   ME.

18   **Q.**  DID YOU PREPARE A REPORT IN WHICH YOU PROVIDED AN OUTLINE

19   OF THE FILL MATERIAL OVERLAYING ON THE MAP?

20   **A.**  SPECIFIC TO THE PORTION THAT I WAS SHOWN TODAY?

21   **Q.**  ALL OF THE PHOTOS THAT YOU WERE SHOWN TODAY AND TRIED TO

22   IDENTIFY WHERE ON THE MAP, YOU DID THE BEST YOU COULD BASED ON

23   THE VISION AND WHAT YOU SAW; IS THAT RIGHT?

24   **A.**  YES.

25   **Q.**  IN FACT, YOU'RE NOT AN EXPERT WHO OUTLINED THE FILL

1    MATERIAL ON TOP OF THE MAP; IS THAT RIGHT?

2    **A.**  THAT'S DEFINITELY RIGHT.

3    **Q.**  AND I WANT TO SHOW YOU EXHIBIT 145.

4                    (DISPLAYED ON SCREEN.)

5        AND I WANT TO JUST MAKE SURE WE'RE CLEAR.

6            **MS. HANSEN:**  MR. WANZALA, TO THE RIGHT, LOWER RIGHT

7    CORNER.

8    **BY MS. HANSEN:**

9    **Q.**  INSPECTOR HARBISON --

10            **MS. HANSEN:**  CAN YOU PULL THAT OUT, MR. WANZALA?

11   WAIT.  GO BACK.  SORRY.

12       I AM ACTUALLY SPEAKING OF THE LOWER RIGHT CORNER OF THE

13   PICTURE.  MAYBE PUT AN ARROW THERE.  PERFECT.  THANK YOU.

14   **BY MS. HANSEN:**

15   **Q.**  THAT'S -- THE LOWER RIGHT CORNER OF THAT PHOTOGRAPH,

16   EXHIBIT 145, THAT IS WHERE THE FILL MATERIAL WAS OBSERVED; IS

17   THAT RIGHT?

18   **A.**  CAN YOU BE MORE SPECIFIC WITHIN THIS CORNER BECAUSE

19   IT'S --

20   **Q.**  SURE.  SO YOU TESTIFIED THAT EXHIBIT 145 WAS THE SOUTHERN

21   PORTION OF THE SITE; IS THAT RIGHT?

22   **A.**  I BELIEVE I SAID THAT IT WAS WEST OF THE SOUTHERN PORTION

23   OF THE FILL.

24   **Q.**  WE ARE NOT AT THE PICK 'N PULL AREA, CORRECT?  WOULD YOU

25   LIKE TO SEE THE WHOLE PHOTO?

1   **A.**   SURE.

2   **Q.**   DO YOU SEE THE DUCK PONDS TO THE -- ON THE TOP NEAR THE

3   RIGHT-HAND SIDE OF THE PICTURE?

4   **A.**   YES.

5   **Q.**   AND THEN YOU SEE ON THE LOWER RIGHT CORNER WE WERE JUST

6   REFERRING TO?

7   **A.**   YES.

8   **Q.**   AND SO THE LEVEE OR THE CULVERT -- EXCUSE ME, NOT THE

9   LEVEE, THE BERM, WHICH IS AT THE BOTTOM, YOU WERE TESTIFYING

10  ABOUT THAT, TOO, RIGHT?  ARE YOU ORIENTED NOW?  DO YOU KNOW

11  WHERE WE ARE?  YOU TESTIFIED ABOUT THIS DOCUMENT.

12  **A.**   I DID TESTIFY ABOUT THIS DOCUMENT, YES.

13  **Q.**   SO THIS IS THE SOUTHERN FILL AREA WHICH IS IN THE LOWER

14  RIGHT CORNER OF THIS PHOTO, CORRECT?

15  **A.**   MY RECOLLECTION IS THAT I DID BELIEVE THAT THIS APPEARED

16  TO BE WEST OF THE SOUTHERN FILL AREA, THOUGH I BELIEVE I

17  QUALIFIED THAT BY SAYING THIS IS DIFFICULT TO DETERMINE

18  BECAUSE IT IT'S CLOSE UP AND DOESN'T ORIENT -- HAVE A LOT OF

19  OTHER ORIENTING FEATURES.

20       **MS. HANSEN:**  MR. WANZALA, CAN YOU PLEASE BLOW UP THE

21  MIDDLE OF THE PHOTO WHERE IT IS ALMOST LIKE A GRAYISH COLOR,

22  UNDER THE DUCK PONDS.

23  **BY MS. HANSEN:**

24  **Q.**   THAT IS NOT FILL, CORRECT?

25  **A.**   I DON'T BELIEVE THAT IS FILL.

HARBISON – CROSS / HANSEN

1    **Q.**  THE FILL DIDN'T GO THAT FAR, CORRECT?

2    **A.**  I DON'T BELIEVE IT DID.

3    **Q.**  AND THEN I WOULD LIKE TO SHOW YOU EXHIBIT 147.

4                    (DISPLAYED ON SCREEN.)

5        YOU IDENTIFIED EXHIBIT 147 AS WELL AS THE SOUTHERN FILL

6    AREA, CORRECT?

7    **A.**  I BELIEVE I SAID IT WAS WEST OF THE SOUTHERN FILL AREA, I

8    BELIEVE.

9    **Q.**  FAIR ENOUGH.  IT IS DEPICTING WEST OF THE SOUTHERN FILL

10   AREA; IS THAT RIGHT?

11   **A.**  I BELIEVE SO.

12   **Q.**  AND YOU SEE THE DUCK PONDS TO THE RIGHT IN THE PHOTO?

13   **A.**  I SEE THE WATER TO THE RIGHT OF THE PHOTO, YES.

14   **Q.**  AND THEN BELOW THAT IS THE AREA WE JUST LOOKED AT.

15           **MS. HANSEN:**  MAYBE MR. WANZALA CAN MAKE IT BIGGER.

16   **BY MS. HANSEN:**

17   **Q.**  I JUST WANT TO CONFIRM THAT EXHIBIT 147, THAT THAT IS NOT

18   THE FILL, CORRECT?

19   **A.**  I DON'T BELIEVE THAT IS THE FILL.

20   **Q.**  AND THEN I WOULD LIKE TO SHOW YOU EXHIBIT 121.

21                   (DISPLAYED ON SCREEN.)

22       NOW, INSPECTOR HARBISON, YOU TESTIFIED THAT THIS WAS A,

23   QUOTE/UNQUOTE, STREAM; IS THAT RIGHT?

24   **A.**  YES.

25   **Q.**  WHO GAVE YOU THAT PHRASE?  WHERE DID YOU GET THAT FROM?

1    **A.**   TO ME IT LOOKS LIKE A STREAM.

2    **Q.**   OKAY.  IT APPEARS THAT THE WATER IS STILL IN THAT PHOTO,

3    DOESN'T IT?

4    **A.**   IT'S MORE STILL THAN RAPID MOVING, YES.

5    **Q.**   AND ALSO IT APPEARS THAT THE STREAM ENDS WHEN THE GREEN

6    STARTS.  DO YOU SEE THAT AT THE END OF THE PHOTO?

7    **A.**   I DO SEE WHAT YOU ARE DESCRIBING.

8    **Q.**   SO THAT COULD BE MORE OF A DEPRESSION THAN A STREAM,

9    CORRECT?

10   **A.**   I AM SORRY, WHAT DO YOU MEAN BY A "DEPRESSION"?

11   **Q.**   A DEPRESSION IN THE SOIL --

12          **MS. LEE:**  OBJECTION.

13   **BY MS. HANSEN:**

14   **Q.**   -- IN WHICH WATER COULD BE DEPOSITED.

15          **MS. LEE:**  OBJECTION.  CALLS FOR SPECULATION.

16          **THE COURT:**  OVERRULED.

17          **THE WITNESS:**  TO ME IT APPEARED TO BE A WATER STREAM

18   OF SOME SORT.

19   **BY MS. HANSEN:**

20   **Q.**   BUT YOU AGREE THAT IT WAS NOT APPEARING TO MOVE, CORRECT?

21   **A.**   THERE WAS SLIGHT MOVEMENT WITH WATER.  IT WAS NOT

22   PERFECTLY STILL FROZEN, BUT IT CERTAINLY WAS NOT A RAPID

23   RUSHING WATERWAY.

24   **Q.**   AND YOU ACTUALLY DIDN'T WALK TO SEE WHERE THAT STREAM YOU

25   CALL ENDED, DID YOU?

1    **A.**  NO, I DIDN'T.

2    **Q.**  SO YOU ACTUALLY DON'T KNOW WHAT IT IS, CORRECT?

3    **A.**  I DO BELIEVE IT'S A WATERWAY.

4    **Q.**  A WATERWAY.

5       WITH -- DID YOU GO BACK TO THE PROPERTY AT ANY OTHER TIME

6    TO EXAMINE IF THERE WAS WATER IN THAT AREA?

7    **A.**  NO, I DIDN'T.

8    **Q.**  DID YOU DO ANY -- STUDY ANY TOPOGRAPHICAL MAPPING TO

9    DETERMINE WHETHER THAT WAS A STREAM OR WATER AREA?

10   **A.**  I BELIEVE I DID REVIEW SOME MAPPING THAT INDICATED SOME

11   SORT OF TRIBUTARY OR SOMETHING OF THAT NATURE.

12   **Q.**  AND THAT WAS THE DR. HUFFMAN MAP, WASN'T IT?

13   **A.**  I'M NOT SURE IF IT WAS DR. HUFFMAN.  I KNOW THERE WERE

14   EXTENSIVE ENVIRONMENTAL MAPS, SO I'M NOT EXACTLY SURE WHO

15   CREATED IT.

16   **Q.**  DID YOU REVIEW ANY KIER & WRIGHT ENGINEERING TOPOGRAPHICAL

17   MAPS?

18   **A.**  I DON'T SPECIFICALLY KNOW.  I AM SORRY.

19   **Q.**  AND YOU DID NOT DO ANY TESTING TO DETERMINE IF THIS

20   DEPRESSION HAD AN ORDINARY HIGH WATER MARK, CORRECT?

21          **MS. LEE:**  OBJECTION.  OUTSIDE THE SCOPE OF HER

22   TESTIMONY.

23          **THE COURT:**  OVERRULED.

24          **THE WITNESS:**  NO, I DIDN'T.

25          **MS. HANSEN:**  NO FURTHER QUESTIONS, YOUR HONOR.

1          **THE COURT:**  ANY REDIRECT?

2                    **REDIRECT EXAMINATION**

3     **BY MS. LEE:**

4     **Q.**  INSPECTOR HARBISON, YOU MENTIONED THAT YOU WERE AWARE

5     THERE WERE EXTENSIVE ENVIRONMENTAL REPORTS DONE ON THIS

6     PROPERTY; IS THAT RIGHT?

7     **A.**  YES.

8     **Q.**  WHAT DID THOSE ENTAIL?

9          **MS. HANSEN:**  OBJECTION.  VAGUE.  RELEVANCE.

10    FOUNDATION.

11         **THE COURT:**  WHERE ARE YOU GOING?

12         **MS. LEE:**  JUST FOLLOWING UP ON THE CROSS-EXAMINATION

13    AS TO WHAT SHE DID VERSUS WHAT SHE KNEW.

14         **THE COURT:**  I THINK THE FIRST QUESTION IS, WHY DON'T

15    WE ESTABLISH WHAT, IF ANYTHING, SHE REVIEWED.

16    **BY MS. LEE:**

17    **Q.**  INSPECTOR HARBISON, ARE YOU AN EXPERT IN WETLANDS?

18    **A.**  NO, I'M NOT.

19    **Q.**  ARE YOU AN EXPERT IN JURISDICTIONAL WATERS?

20    **A.**  NO, I AM NOT.

21    **Q.**  ARE YOU -- DO YOU HAVE A BACKGROUND IN HYDROLOGY?

22    **A.**  I DON'T.

23    **Q.**  OR SOIL SAMPLING?

24    **A.**  NO, I DON'T.

25    **Q.**  OKAY.  WOULD IT BE FAIR TO SAY THAT YOUR ROLE IN THE

HARBISON – REDIRECT / LEE

1    INVESTIGATION WAS INVESTIGATING THE FACTS OF THE UNAUTHORIZED

2    DISCHARGE?

3    **A.**  YES.

4    **Q.**  AND YOU TOOK PHOTOS DOCUMENTING THE FILL MATERIAL?

5    **A.**  YES.

6    **Q.**  BUT YOU ARE AWARE THAT THERE ARE OTHERS WHO HAVE DONE

7    EXTENSIVE REVIEW OF THE ENVIRONMENTAL SITE?

8    **A.**  YES.

9    **Q.**  AND THAT'S DR. HUFFMAN --

10           **MS. HANSEN:**  OBJECTION.  LEADING.

11   **BY MS. LEE:**

12   **Q.**  -- AS WELL AS OTHERS?

13           **THE COURT:**  IT IS LEADING.  SUSTAINED.

14   **BY MS. LEE:**

15   **Q.**  ARE YOU AWARE OF WHO HAS DONE EXTENSIVE ENVIRONMENTAL

16   REPORTS ON THIS SITE?

17   **A.**  I AM AWARE OF SOME OF WHO.  I DON'T BELIEVE I KNOW OF ALL

18   WHO HAVE DONE EXTENSIVE ENVIRONMENTAL REPORTS.

19   **Q.**  WHO ARE YOU AWARE OF?

20   **A.**  I RECALL H.T. HARVEY WAS ONE OF THE CONSULTING COMPANIES

21   THAT TIM STEELE REFERENCED.  I BELIEVE PES ENVIRONMENTAL MAY

22   HAVE BEEN ANOTHER OF THE CONSULTING COMPANIES.  ARMY CORPS OF

23   ENGINEERS, I BELIEVE, WAS ANOTHER ONE THAT I WAS AWARE OF.

24           **MS. LEE:**  I HAVE NO FURTHER QUESTIONS.

25           **THE COURT:**  ANY RECROSS?

1          **MS. HANSEN:**  NO, YOUR HONOR.

2          **THE COURT:**  ALL RIGHT.  SO THANK YOU, MS. HARBISON.

3   YOU ARE EXCUSED.

4          **THE WITNESS:**  THANK YOU.

5          **THE COURT:**  THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

6          **MS. LEE:**  THE GOVERNMENT CALLS DAVE DIEHL.

7          **THE CLERK:**  COME UP TO THE WITNESS STAND, PLEASE, AND

8   THEN RAISE YOUR RIGHT HAND.

9        (**DAVID DIEHL,** CALLED AS A WITNESS FOR THE GOVERNMENT,

10  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

11         **THE WITNESS:**  YES.

12         **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED I ASK

13  THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR

14  THE RECORD, PLEASE.

15         **THE WITNESS:**  DAVID DIEHL, D-I-E-H-L.

16                       **DIRECT EXAMINATION**

17  BY MS. LEE:

18  **Q.**  MR. DIEHL, WHERE DO YOU WORK?

19         **THE CLERK:**  SPELL YOUR FIRST NAME.  IT'S FIRST AND

20  LAST.

21         **THE WITNESS:**  DAVID, D-A-V-I-D.

22         **THE CLERK:**  THANK YOU.

23  BY MS. LEE:

24  **Q.**  MR. DIEHL, WHERE DO YOU WORK?

25  **A.**  FEDERAL BUREAU OF INVESTIGATION SAN FRANCISCO.

DIEHL – DIRECT / LEE

1    **Q.**  WHAT DO YOU DO AT THE FBI?

2    **A.**  I'M A PHOTOGRAPHER.

3    **Q.**  HOW LONG HAVE YOU WORKED FOR THE FBI?

4    **A.**  A LITTLE OVER 26 YEARS.

5    **Q.**  HAS IT ALWAYS BEEN IN THE POSITION OF A PHOTOGRAPHER?

6    **A.**  YES.

7    **Q.**  WHAT ARE YOUR DUTIES AND RESPONSIBILITIES WITH THE FBI?

8    **A.**  PHOTOGRAPHY IN ALL FORMS, OCCASIONALLY VIDEO, SOME

9    PHOTOSHOP-RELATED COMPUTER WORK, THAT SORT OF THING.

10   **Q.**  IS IT IN THE COURSE OF ASSISTING AGENTS IN THEIR

11   INVESTIGATIONS?

12   **A.**  YES.

13   **Q.**  DO YOU WORK WITH ANOTHER PHOTOGRAPHER AT FBI BY THE NAME

14   OF ED LEDDA?

15   **A.**  YES.

16   **Q.**  WHO IS ED LEDDA?

17   **A.**  HE IS MY CO-WORKER.  I WORKED WITH HIM, I BELIEVE HE HAS

18   BEEN THERE A LITTLE OVER 30 YEARS.

19   **Q.**  IS HE ALSO -- HE'S A PHOTOGRAPHER AS WELL?

20   **A.**  YES.

21   **Q.**  DID BOTH YOU AND ED LEDDA TAKE PHOTOS AND VIDEOS OF AN

22   AREA KNOWN AS NEWARK AREA 4 AND THE SURROUNDING LANDS AND

23   WATERS?

24   **A.**  YES.

25   **Q.**  WHEN DID ED GO TO TAKE SUCH PHOTOS AND VIDEO?

1    **A.**   DECEMBER 16TH, 2016.

2    **Q.**   HAVE YOU HAD AN OPPORTUNITY TO VIEW THE PHOTOS AND VIDEO

3    THAT HE TOOK?

4    **A.**   YES.

5    **Q.**   I WOULD LIKE TO SHOW YOU EXHIBITS 973 TO 979.

6                   (EXHIBITS HANDED TO WITNESS.)

7        WHAT ARE THESE, MR. DIEHL?

8    **A.**   PHOTOGRAPHS TAKEN FROM A HELICOPTER OF THE SITE.

9    **Q.**   ARE THEY PHOTOGRAPHS FROM ED LEDDA?

10   **A.**   YES.

11   **Q.**   ARE THEY FROM DECEMBER 16TH, 2016?

12   **A.**   YES.

13           **MS. LEE:**  I WOULD LIKE TO MOVE GOVERNMENT'S EXHIBIT

14   973 TO 979, AND I BELIEVE THIS HAS BEEN STIPULATED TO BY THE

15   DEFENSE.

16           **MS. HANSEN:**  YES, YOUR HONOR, NO OBJECTION.

17           **THE COURT:**  SO EXHIBITS 973 THROUGH 979 ARE ADMITTED.

18    (GOVERNMENT'S EXHIBITS 973 THROUGH 979 RECEIVED IN EVIDENCE)

19   **BY MS. LEE:**

20   **Q.**   I WOULD LIKE TO PULL UP 974, PLEASE.

21                   (DISPLAYED ON SCREEN.)

22       WHAT IS THIS, MR. DIEHL?

23           **MS. HANSEN:**  OBJECTION, YOUR HONOR.  THE WITNESS HAS

24   NO FOUNDATION.  ED LEDDA TOOK THESE.  I WOULD OBJECT TO THE

25   WITNESS TESTIFYING WHAT THEY DEPICT.

DIEHL – DIRECT / LEE

1    **THE COURT:**  OVERRULED TO THE EXTENT HE HAS A PERSONAL

2    BASIS FOR SAYING WHAT IT, IN FACT, DEPICTS.

3    **BY MS. LEE:**

4    **Q.**  WHAT IS IT, MR. DIEHL?

5    **A.**  IT'S A VIEW FROM THE HELICOPTER OF THE SLOUGH HEADING

6    TOWARDS SAN FRANCISCO BAY.

7    **Q.**  DO YOU KNOW THE NAME OF THAT SLOUGH?

8    **A.**  NO, I DO NOT.

9    **Q.**  975, PLEASE.

10                    (DISPLAYED ON SCREEN.)

11    IS THIS ALSO A PHOTO TAKEN BY ED LEDDA FROM THE HELICOPTER

12    ON DECEMBER 16TH, 2016?

13    **A.**  YES.

14    **Q.**  DO YOU KNOW WHAT IT IS OF?

15    **A.**  IT APPEARS TO BE THE PICK 'N PULL AREA IN THE -- WHICH IS

16    THE NORTHERN AREA OF THE PROPERTY.

17    **Q.**  AND 978.

18                    (DISPLAYED ON SCREEN.)

19    DO YOU KNOW WHAT THIS IS, MR. DIEHL?

20    **A.**  AERIAL VIEW OF THE NORTHERN AREA WITH THE PUMP SHOWING.

21    **Q.**  IS IT THE NORTHERN AREA WHERE THE PUMP IS OR SOMEWHERE

22    ELSE, IF YOU KNOW?

23    **A.**  I'M NOT SURE FROM THESE PHOTOS.

24    **Q.**  OKAY.  BUT IT DEPICTS THE PUMP; IS THAT RIGHT?

25    **A.**  YES.  YES.

1    **Q.**  OKAY.  I WOULD LIKE TO SHOW YOU EXHIBIT 980.

2                    (EXHIBIT HANDED TO WITNESS.)

3            **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBIT 980 INTO

4    EVIDENCE.  I BELIEVE THERE IS NO OBJECTION BY THE DEFENSE.

5            **MS. HANSEN:**  NO OBJECTION, YOUR HONOR.

6            **THE COURT:**  EXHIBIT 980 IS ADMITTED.

7        (GOVERNMENT'S EXHIBIT 980 RECEIVED IN EVIDENCE)

8    **BY MS. LEE:**

9    **Q.**  IS EXHIBIT 980 THE VIDEO OF THE SITE THAT ED LEDDA TOOK ON

10   DECEMBER 16TH, 2016?

11   **A.**  YES.

12   **Q.**  IF WE CAN JUST PAUSE FOR A SECOND.  I WOULD LIKE TO PLAY

13   THIS VIDEO FROM 0 SECONDS TO 25 SECONDS.  THEN WE ARE GOING

14   TO -- WE'LL START FROM THE BEGINNING, 0 TO 25, AND THEN IF WE

15   COULD PAUSE AT THAT POINT.

16                    (VIDEO PLAYED.)

17       MR. DIEHL, CAN YOU DESCRIBE WHAT WE ARE LOOKING AT HERE ON

18   THE VIDEO?

19   **A.**  IT IS AN AERIAL VIEW OF THE SLOUGH THAT FEEDS INTO THE

20   BAY.

21   **Q.**  AND FROM 25 SECONDS ON TILL ABOUT 2 MINUTES AND 36 SECONDS

22   WE'RE GOING TO JUST SCROLL THROUGH IT.  AND WHAT IS IT THAT

23   WE'RE SEEING KIND OF IN THIS FAST-FORWARD MOTION?

24   **A.**  THE ROUTE OF THE SLOUGH HEADING BACK TOWARDS -- HEADING IN

25   THE EASTERN DIRECTION TOWARDS THE PROPERTY, THE SITE.

1  **Q.**  AND AT 2:36, IF WE CAN STOP AND PLAY FROM THERE.

2  MR. DIEHL, WOULD YOU NARRATE FOR US WHAT WE ARE LOOKING AT?

3                    (VIDEO PLAYED.)

4  **A.**  YOU ARE LOOKING SLIGHTLY EASTWARD FROM THE BAY TOWARDS THE

5  SITE, AND YOU CAN SEE THE SLOUGH WHICH CURVES.

6              **MS. LEE:**  IF YOU CAN PAUSE, AGENT SU.

7                    (VIDEO PAUSED.)

8  **BY MS. LEE:**

9  **Q.**  WHAT ARE WE LOOKING AT HERE?

10  **A.**  THIS IS THE SLOUGH ON THE RIGHT-HAND SIDE OF THE IMAGE.

11  **Q.**  SPECIFICALLY LOOKING IN THIS TRIANGULAR REGION ON THE

12  BOTTOM RIGHT-HAND CORNER OF THE SCREEN, DO YOU KNOW WHAT THAT

13  IS?

14  **A.**  IT'S A PUMP.

15              **MS. LEE:**  IF WE CAN KEEP PRESSING PLAY.

16                    (VIDEO RESUMED.)

17      WHAT ARE WE LOOKING AT HERE, MR. DIEHL?

18  **A.**  CONTINUATION OF THE SLOUGH.

19  **Q.**  ARE WE -- TO THE RIGHT IS THIS NEWARK AREA 4 PROPERTY?

20  **A.**  YES.

21  **Q.**  AND IN WHAT DIRECTION IS THIS HELICOPTER TRAVELING RIGHT

22  NOW?

23  **A.**  THE HELICOPTER IS GOING EASTWARD.

24  **Q.**  AS WELL AS NORTH?

25  **A.**  NOT SURE.

1   **Q.**  WHAT ARE WE LOOKING AT HERE, MR. DIEHL?

2   **A.**  TOWARDS THE END OF THE SLOUGH COMING UP ON TO THE

3   PROPERTY.

4   **Q.**  WHAT PART OF THE PROPERTY?

5   **A.**  THE NORTHERN PART OF THE PROPERTY.  AND THE PICK 'N PULL

6   LOT AGAIN.

7   **Q.**  DID THERE COME A TIME WHEN YOU YOURSELF WENT AND TOOK

8   VIDEOS AND PHOTOS OF NEWARK AREA 4?

9   **A.**  YES.

10  **Q.**  WHEN WAS THAT?

11  **A.**  TWO SEPARATE DAYS, FIRST BEING NOVEMBER 15TH OF 2016, THE

12  SECOND BEING MARCH 3RD OF 2017.

13  **Q.**  WHEN YOU WENT ON NOVEMBER 15TH, 2016, WHAT DID YOU DO?

14  **A.**  WE PHOTOGRAPHED STARTING OFF OF STEVENSON TOWARDS A GATE

15  AND PROCEEDED BEYOND THE GATE TO PHOTOGRAPH SOME DEBRIS IN AN

16  OPEN AREA.

17  **Q.**  WAS THIS AT THE SOUTHERN PORTION --

18  **A.**  YES, THE SOUTHERN PART OF THE PROPERTY.

19  **Q.**  I WOULD LIKE TO SHOW YOU EXHIBITS 908 TO 961.

20          (EXHIBITS HANDED TO WITNESS.)

21      ARE THESE THE PHOTOS YOU TOOK THAT DAY ON NOVEMBER 15TH,

22  2016?

23  **A.**  YES.

24  **Q.**  DO THEY FAIRLY AND ACCURATELY DEPICT THE SITE ON THAT DAY?

25  **A.**  YES.

1           **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE EXHIBITS

2    908 TO 961 INTO EVIDENCE.

3           **MS. HANSEN:**  OBJECTION, YOUR HONOR.

4       MAY I BE HEARD OUTSIDE THE PRESENCE OF THE JURY?

5           **THE COURT:**  YOU MAY.

6       ALL RIGHT.  SO, LADIES AND GENTLEMEN, FROM TIME TO TIME IT

7    MAY BECOME NECESSARY FOR ME TO TAKE UP A LEGAL ISSUE WITH THE

8    ATTORNEYS PRIVATELY.

9       AND PLEASE UNDERSTAND THAT WHILE YOU'RE WAITING, WE'RE

10   WORKING.  THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP ANY

11   RELEVANT INFORMATION FROM YOU BUT TO DECIDE HOW CERTAIN

12   EVIDENCE IS TO BE TREATED UNDER THE RULES OF EVIDENCE AND TO

13   AVOID COMPLICATIONS.

14      SO REST ASSURED THAT WE DO WHAT WE CAN TO MINIMIZE THE

15   AMOUNTS OF TIMES THAT WE DID TO DO THIS.  AND ALSO YOU SHOULD

16   UNDERSTAND THAT I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST

17   FOR A CONFERENCE OUTSIDE YOUR PRESENCE.  AND YOU SHOULD NOT

18   CONSIDER MY GRANTING OR DENYING A REQUEST FOR A CONFERENCE AS

19   ANY INDICATION OF MY OPINION OF THE CASE OR WHAT YOUR VERDICT

20   SHOULD BE.

21      SO WE WILL TAKE A MOMENT AND WE WILL BE BACK TO YOU AS

22   SOON AS WE CAN.

23           (THE FOLLOWING PROCEEDINGS WERE HEARD AT THE

24           SIDEBAR:)

25           **MS. HANSEN:**  THE OBJECTION IS TO 919 TO 938, 940, 942

DIEHL – DIRECT / LEE

1    TO 947.

2          **THE COURT:**  HOLD ON GIVE.  ME THE LIST.

3          **MS. HANSEN:**  919 TO 938, 940, 942 THROUGH 947.

4       JUST TO REORIENT THE COURT, THESE ARE TWO YEARS AFTER THE

5    FACT; THE MYLAR BALLOON SERIES WE DISCUSSED AT THE PRETRIAL

6    CONFERENCE.  THERE ARE A BUNCH OF OTHER EXHIBITS THAT DEPICT

7    PLASTIC, CERAMIC, CRUSHED METAL CONTAINER, BURLAP SACK,

8    BLACKTOP, BROKEN PLASTIC, ITEMS THAT I DON'T THINK COULD HAVE

9    LASTED FOR TWO AND A HALF YEARS ON THE PROPERTY.

10         **THE COURT:**  THE BASIS OF THE OBJECTION IS WHAT?

11         **MS. HANSEN:**  IT WOULD RELEVANCE, 403, 401, AND

12   FOUNDATION.

13      WHAT IS YOUR RESPONSE?

14         **MS. LEE:**  YOUR HONOR, WE ARE NOT SAYING THAT THOSE

15   WERE THERE ON THAT DAY.  WE ARE JUST SAYING THIS IS WHAT THE

16   SITE LOOKED LIKE WHEN HE WENT.  THESE ARE THE PHOTOS THAT HE

17   TOOK.

18         **THE COURT:**  BUT IT DOESN'T HAVE ANYTHING TO DO WITH

19   THE CHARGE OF DISCHARGE.

20      WHY IS IT RELEVANT AT ALL?

21         **MR. KEARNEY:**  YOUR HONOR, CAN I SAY SOMETHING?

22      WE ARE GOING TO BE ABLE TO SHOW THAT ALMOST IMMEDIATELY

23   AFTER THE FILL, THE SECURITY MEASURES REALLY INCREASED.  THIS

24   PROPERTY SET UP CAMERAS, AUDIO ALARMS.  THAT IS WITHIN TWO

25   WEEKS OF THE FILL APPROXIMATELY.

1        WE DON'T THINK -- WE THINK WE CAN SHOW THAT THE SITE

2   REMAINED UNTOUCHED VIRTUALLY BETWEEN NOW AND WHEN THESE

3   PHOTOGRAPHS BETWEEN THE DUMPING AND WHEN THESE PHOTOGRAPHS

4   WERE TAKEN.

5        **THE COURT:**  TWO YEARS LATER?

6        **MR. KEARNEY:**  WELL, THEY ADDED SECURITY OUT THERE.

7   IT WAS LOCKED.  THIS IS NOT A COMMON DUMPING GROUND AT ALL.

8   WE SUGGEST THIS GOES TO MORE WEIGHT THAN ADMISSIBILITY.

9        **THE COURT:**  WHY DON'T YOU DO THIS.  PROCEED WITH THE

10  NONOBJECTED TO EXHIBITS.  WE ARE GOING TO TAKE A BREAK AT

11  ABOUT 11:30 ANYWAY; I CAN LOOK AT THE PHOTOS AND DECIDE.  BUT

12  AS TO THE ONES TO WHICH THERE'S NOT AN OBJECTION, LET'S USE

13  THE JURY'S TIME.

14       **MS. LEE:**  WILL YOU GIVE ME WHAT THEY ARE?

15       **MR. KEARNEY:**  REGARDING SCHEDULING, SIR, OUR NEXT

16  WITNESS IS LIEUTENANT VINCENT KIMBROUGH OF THE NEWARK POLICE

17  DEPARTMENT.  HE WAS HERE ALL DAY YESTERDAY AND THIS MORNING.

18  WE SENT HIM HOME.  HE'S NOW -- I TEXT HIM.  THE COURT PLANS TO

19  BREAK AT 12:15 TODAY; IS THAT RIGHT?

20       **THE COURT:**  12:45.

21       **MR. KEARNEY:**  I WILL TELL HIM TO GET HERE CODE THREE.

22       **THE COURT:**  ALL RIGHT.

23       **MS. LEE:**  CAN I GET --

24       **MR. KEARNEY:**  I WILL CALL HIM RIGHT NOW.

25       (SIDEBAR CONCLUDED; PROCEEDINGS HELD IN OPEN COURT.)

DIEHL – DIRECT / LEE

1      MS. LEE:  THE GOVERNMENT SEEKS TO MOVE EXHIBITS 908

2   TO 918 AND THEN 9 --

3          THE COURT:  LET'S TAKE THEM IN CHUNKS.  SO 908 TO

4   918, ANY OBJECTION?

5          MS. HANSEN:  NO OBJECTION.

6          THE COURT:  SO EXHIBITS 908 THROUGH 918 ARE ADMITTED.

7     (GOVERNMENT'S EXHIBITS 908 TO 918 RECEIVED IN EVIDENCE)

8          MS. LEE:  939.

9          MS. HANSEN:  NO OBJECTION.

10         THE COURT:  ADMITTED.

11       (GOVERNMENT'S EXHIBIT 939 RECEIVED IN EVIDENCE)

12         MS. LEE:  941.

13         MS. HANSEN:  NO OBJECTION.

14         MS. LEE:  948 --

15         THE CLERK:  WAIT FOR ADMIT.  941?  JUDGE IS 941

16   ADMITTED?

17         THE COURT:  YES.

18       (GOVERNMENT'S EXHIBIT 941 RECEIVED IN EVIDENCE.)

19         MS. LEE:  948 TO 961.

20         THE COURT:  ANY OBJECTION?

21         MS. HANSEN:  I AM SORRY, YOUR HONOR.  NO OBJECTION.

22         THE COURT:  SO 948 THROUGH 961 ARE ALSO ADMITTED.

23      (GOVERNMENT'S EXHIBITS 948 TO 961 RECEIVED IN EVIDENCE)

24   BY MS. LEE:

25   Q.  AGENT DIEHL, JUST TO CONFIRM, THESE ARE PHOTOS YOU TOOK ON

1    NOVEMBER 15TH, 2016; IS THAT RIGHT?

2    **A.**   YES.

3    **Q.**   I WOULD LIKE TO JUST HIGHLIGHT A FEW.  908, PLEASE.

4                         (DISPLAYED ON SCREEN.)

5        WHAT IS THIS?

6    **A.**   THIS IS A GATE SLIGHTLY BEYOND THE TRAIN TRACKS OFF OF

7    STEVENSON.

8    **Q.**   WHAT IS BEYOND THE GATE?

9    **A.**   A DIRT ROAD.

10   **Q.**   WHERE DOES THAT DIRT ROAD LEAD?

11   **A.**   LEADS IN TO THE PROPERTY.

12   **Q.**   WHAT PART OF THE PROPERTY?

13   **A.**   THE SOUTHERN AREA.

14   **Q.**   AND 911, PLEASE.

15                        (DISPLAYED ON SCREEN.)

16       WHAT IS THIS?

17   **A.**   THIS IS A CONTINUATION OF THE DIRT ROAD FROM THE GATE.

18   **Q.**   AND 912.

19                        (DISPLAYED ON SCREEN.)

20       WHAT IS THIS?

21   **A.**   THE CONTINUATION OF THE ROAD TOWARDS THE FIELD.

22   **Q.**   I BELIEVE THERE IS A RED POINTER NEAR YOU, A POINTER PEN.

23   COULD YOU SHOW ON THE SCREEN WHERE THE FIELD IS IN RELATION TO

24   THE ROAD THAT YOU JUST DESCRIBED?

25   **A.**   THIS IS THE FIELD (INDICATING).

DIEHL – DIRECT / LEE

1   **Q.**  916, PLEASE.

2                    (DISPLAYED ON SCREEN.)

3        WHAT IS THIS?

4   **A.**  THAT IS A PHOTOGRAPH OF THE FIELD OFF OF THAT ROAD.

5   **Q.**  OFF OF THAT RAMP, THAT LITTLE BUMP IN THE ROAD?

6   **A.**  YES, AT THE END OF THE ROAD THERE IS A SLIGHT BUMP.

7   **Q.**  AND 948, PLEASE.

8                    (DISPLAYED ON SCREEN.)

9        AND WHAT IS THIS?

10  **A.**  THIS IS A PHOTOGRAPH OF THE AREA NEAR THE NORTHERN PART

11  CLOSE TO THE PICK 'N PULL.

12  **Q.**  I WOULD LIKE TO SHOW 917 AS WELL.

13                   (DISPLAYED ON SCREEN.)

14       WHAT ARE WE LOOKING AT HERE, MR. DIEHL?

15  **A.**  THIS IS THE SOUTHERN AREA OF THE PROPERTY WITH THE FIELD

16  ON THE RIGHT-HAND SIDE.

17  **Q.**  OKAY.  AND JUST 916, AGAIN, PLEASE.

18                   (DISPLAYED ON SCREEN.)

19       AND WHERE IS THE FIELD HERE?

20  **A.**  DIRECTLY AHEAD.

21  **Q.**  AND TO THE LEFT WHERE YOU SEE THE GREEN, WHAT IS THAT?

22  **A.**  TO THE LEFT?

23  **Q.**  SO THIS GENERAL PORTION HERE (INDICATING), WHAT ARE WE

24  LOOKING AT THERE?

25  **A.**  OH, THAT'S THE OPEN FIELD.

DIEHL – DIRECT / LEE

1    **Q.**  IF WE CAN GO BACK TO 948.

2                        (DISPLAYED ON SCREEN.)

3        YOU EARLIER MENTIONED THIS WAS THE NORTHERN PART OF AREA

4    4?

5    **A.**  YES.

6    **Q.**  AND THIS IS WHAT IT LOOKED LIKE ON NOVEMBER 15TH, 2016?

7    **A.**  YES.

8    **Q.**  AND EXHIBIT 949.

9                        (DISPLAYED ON SCREEN.)

10       WHAT IS THIS THAT WE ARE LOOKING AT, MR. DIEHL, IF YOU

11   KNOW?

12   **A.**  MORE OR LESS THE SAME AREA, THE NORTHERN PART NEAR THE

13   PICK 'N PULL.

14   **Q.**  AND 950, PLEASE.

15                       (DISPLAYED ON SCREEN.)

16       AND THIS, MR. DIEHL?

17   **A.**  THE SAME GENERAL AREA NEAR THE PICK 'N PULL, NORTHERN

18   SECTION.

19   **Q.**  ON THE LEFT-HAND SIDE OF THE PHOTO WE SEE A -- WHAT LOOKS

20   LIKE A FENCE.  WHAT IS ON THE LEFT-HAND SIDE OF THE PHOTO, THE

21   CONCRETE AREA?

22   **A.**  THE PICK 'N PULL AREA PROPERTY.

23   **Q.**  AND TO THE RIGHT?

24   **A.**  I WOULD CHARACTERIZE THEM AS GRASSY WETLAND AREA.

25   **Q.**  THIS IS THE NORTHERN AREA OF THE PROPERTY?

1    **A.**  YES.

2    **Q.**  952.

3                        (DISPLAYED ON SCREEN.)

4         WHAT IS THIS?

5    **A.**  AGAIN, THAT IS THE NORTHERN AREA WITH THE WET GREEN AREAS

6    IN THE FOREGROUND AND THE PICK 'N PULL PROPERTY IN THE

7    BACKGROUND.

8    **Q.**  AND 954.

9                        (DISPLAYED ON SCREEN.)

10        WHERE IS THIS?

11   **A.**  THAT SAME GENERAL AREA, THE PICK 'N PULL IS IN THE

12   BACKGROUND, AND IN THE FOREGROUND IS AN OPEN AREA, WET AREA.

13   **Q.**  955.

14                       (DISPLAYED ON SCREEN.)

15        WHAT ARE WE LOOKING AT HERE, MR. DIEHL?

16   **A.**  THAT SAME GENERAL VICINITY A LITTLE MORE TO THE RIGHT, A

17   WETLAND AREA.

18            **MS. HANSEN:**  YOUR HONOR, I WOULD LIKE TO OBJECT TO

19   THE USE OF THE WORD "WETLAND."  FOUNDATION.  SPECULATION.

20            **THE COURT:**  FAIR ENOUGH.  SUSTAINED.  AGAIN, I DON'T

21   THINK THERE WAS ANY ILL INTENT BUT LET'S BE SURE NOT TO

22   INCORPORATE A CHARACTERIZATION WITHOUT FOUNDATION.

23   **BY MS. LEE:**

24   **Q.**  956, PLEASE.

25                       (DISPLAYED ON SCREEN.)

DIEHL - DIRECT / LEE

1    WHAT ARE WE LOOKING AT HERE, MR. DIEHL?

2    **A.**  THAT IS IN THAT SAME GENERAL AREA NEAR THE PICK 'N PULL OF

3    AN OPEN SPACE WITH SOME WATER.

4    **Q.**  BASED OFF OF THE IMAGES THAT WE SAW PRIOR, WHERE DOES THIS

5    IMAGE -- WHERE IS THIS IMAGE IN RELATION TO THAT FIELD AREA

6    AND THE PICTURE BEFORE?

7    **MS. LEE:**  WHAT I WILL DO IS, I'LL PULL THE MAP, THE

8    SAME MAP, 1141-0036.

9    (DISPLAYED ON SCREEN.)

10   IF WE CAN JUST BLOW UP THE NORTHERN AREA, AGENT SU.

11   **BY MS. LEE:**

12   **Q.**  SO WHEN YOU WERE REFERENCING PHOTOS BEING TAKEN IN THE

13   NORTHERN AREA NEAR THE PICK 'N PULL, WHERE WERE YOU

14   DESCRIBING?  YOU CAN USE THE POINTER.

15   **A.**  WHERE WAS I, OR WHERE WAS I DESCRIBING?

16   **Q.**  WHERE WERE THOSE PHOTOS IN THE NORTHERN AREA THAT YOU WERE

17   DESCRIBING?

18   **A.**  GENERALLY THIS AREA HERE (INDICATING).

19   **Q.**  AND THEN THAT LAST PHOTO, WHICH WAS 956, WHERE WAS THAT

20   AREA?

21   **A.**  IT WAS IN THIS AREA HERE (INDICATING).

22   **Q.**  OKAY.  TO THE WEST OF THE FIELD AREA; IS THAT RIGHT?

23   **A.**  YES.

24   **Q.**  AND CAN WE GO BACK TO 956.

25   (DISPLAYED ON SCREEN.)

DIEHL – DIRECT / LEE

1      SO THAT IS WEST OF THE NORTHERN FILL AREA?

2   **A.** YES.

3   **Q.** OKAY.  AND 957, PLEASE.

4                  (DISPLAYED ON SCREEN.)

5      SAME GENERAL AREA?

6   **A.** YES.  LOOKING WEST.

7   **Q.** IS THAT WATER IN THE MIDDLE OF THAT PHOTO?

8   **A.** IS THAT WHAT?

9   **Q.** WHY DON'T I POINT.  (INDICATING.)  WHAT ARE WE LOOKING AT

10  HERE?

11  **A.** STANDING WATER.

12  **Q.** WHAT ARE WE LOOKING AT HERE IN THIS BLACK TYPE OF A SHAPE

13  RIGHT THERE?

14  **A.** THAT IS A PIPE.

15  **Q.** 959, PLEASE.

16                  (DISPLAYED ON SCREEN.)

17     WHAT ARE WE LOOKING AT HERE?

18  **A.** YOU ARE LOOKING AT THAT SAME PIPE, THE PERSPECTIVE YOU'RE

19  SEEING IS LOOKING EAST.

20  **Q.** EAST TOWARD THE CONCRETE PAD AND THE PICK 'N PULL?

21  **A.** YES.  MORE OR LESS THAT DIRECTION.

22  **Q.** AND EXHIBIT 958.

23                  (DISPLAYED ON SCREEN.)

24     WHAT IS THIS?

25  **A.** THAT IS A PUMP.

DIEHL – DIRECT / LEE

1   **Q.**  IS THIS THE PUMP THAT WAS IN THAT VIDEO EARLIER THAT WE

2   ZOOMED IN AT AROUND 2 MINUTES AND 36 SECONDS AT?

3   **A.**  YES.

4   **Q.**  AND EXHIBIT 960.

5                    (DISPLAYED ON SCREEN.)

6   WHAT IS THIS?

7   **A.**  THAT IS A PIPE.

8   **Q.**  WHERE IS THAT IN RELATION TO THE PUMP?

9   **A.**  RELATION AS DISTANCE?

10  **Q.**  AS GEOGRAPHIC LOCATION.

11  **A.**  OH, THE SAME AREA.

12  **Q.**  WHAT I MEAN IS -- IF WE CAN PULL UP 958 AGAIN.

13                   (DISPLAYED ON SCREEN.)

14  WHAT IS THIS AGAIN?

15  **A.**  A PUMP.

16  **Q.**  OKAY.  AND WHAT'S IMMEDIATELY WEST OF THE PUMP?

17  **A.**  THE PIPE.

18  **Q.**  SAY IT AGAIN?

19  **A.**  I AM SORRY, WHAT?

20  **Q.**  WHAT IS IMMEDIATELY WEST OF THE PUMP?

21  **A.**  THE PIPE.

22  **Q.**  IF WE GO TO EXHIBIT 960.

23                   (DISPLAYED ON SCREEN.)

24  IS THAT THE PIPE THAT YOU ARE REFERENCING?

25  **A.**  YES.

DIEHL – DIRECT / LEE

1    **Q.**   AND WHAT IS THAT BODY OF WATER ON THE OTHER SIDE OF THAT

2    PIPE?

3    **A.**   IN THE FOREGROUND?  THE CENTER AREA?

4    **Q.**   THE CENTER AREA, EXACTLY.

5    **A.**   THE SLOUGH.

6    **Q.**   THE SLOUGH THAT YOU WERE REFERENCING?

7    **A.**   YES, THAT LEADS TO THE BAY.

8            **THE COURT:**  ARE WE AT A BREAKING POINT THAT WOULD

9    MAKE THIS A GOOD TIME FOR OUR LAST RECESS?

10           **MS. LEE:**  YES.

11           **THE COURT:**  ALL RIGHT.  WHY DON'T WE TAKE OUR LAST

12   RECESS, LADIES AND GENTLEMEN.  WE WILL TAKE 15 MINUTES.  WHY

13   DON'T WE MAKE IT A LITTLE LESS THAN 15.  SO WE CAN BE BACK

14   HERE AT 11:45 SINCE WE ARE BREAKING AT 12:45 HERE TODAY.  WE

15   CAN GET ONE MORE HOUR IN.

16      JUST REMEMBER ALL YOUR ADMONITIONS AND I'LL SEE YOU BACK

17   HERE AT 11:45.

18      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

19           **THE COURT:**  WHY DOESN'T EVERYBODY COME BACK AT 11:40

20   AND I CAN GIVE YOU A RULING ONCE I'VE HAD A CHANCE TO REVIEW

21   THE EXHIBITS THAT HAVE BEEN OBJECTED TO.

22      (RECESS TAKEN AT 11:33 A.M.; RESUMED AT 11:44 A.M.)

23      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

24           **THE CLERK:**  REMAIN SEATED COME TO ORDER.  THIS COURT

25   IS BACK IN SESSION.

1           **THE COURT:**  MR. DIEHL, YOU MAY STEP DOWN.  WE ARE

2     GOING TO TAKE UP A MATTER.

3           **THE WITNESS:**  OKAY.

4           **THE COURT:**  THANKS.

5           **THE CLERK:**  YOU WANT HIM OUT OF THE COURTROOM?

6           **THE COURT:**  HE SHOULD EXIT.

7           **THE CLERK:**  IF YOU CAN SIT OUTSIDE THE DOOR.

8           **THE COURT:**  THANK YOU.

9        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE WITNESS.)

10          **THE COURT:**  AN OBJECTION HAS BEEN LODGED TO

11    EXHIBITS 919 THROUGH 938, 940, AND 942 TO 947, WHICH ARE

12    ADDITIONAL PHOTOS THAT WERE TAKEN IN NOVEMBER OF 2016 BY

13    MR. DIEHL.

14       FROM THE GOVERNMENT, WHAT ARE THESE PHOTOS BEING PROFFERED

15    TO SHOW?

16          **MS. LEE:**  YOUR HONOR, THE PHOTOS ARE BEING PROFFERED

17    TO SHOW WHAT THE SOUTHERN FILL AREA LOOKED LIKE ON

18    NOVEMBER 15TH, 2016.

19       WE ANTICIPATE THAT EXPERTS WILL TESTIFY TO THE FACT THAT

20    WETLANDS ARE RESILIENT.  THEY DO NOT CHANGE BECAUSE SUMMER

21    COMES AROUND.  THEY DO NOT CHANGE BECAUSE THERE'S A DRY YEAR.

22    THEY COME BACK AGAIN, WHICH IS WHAT HAPPENS WITH WETLANDS IN

23    CALIFORNIA, WHICH IS IN THE ARID WEST REGION.

24       AND WE JUST WANT TO SHOW, YOU KNOW WHAT?  EVEN AFTER THE

25    FILL, AND THIS IS, WHAT IS IT, NOVEMBER, ABOUT TWO YEARS

1    LATER, THERE'S VEGETATION THRIVING AGAIN AND IT IS WET.  JUST

2    BECAUSE IT'S DRY IN SOME MONTHS WITHOUT VEGETATION AND THEN

3    THERE'S VEGETATION AND WET IN OTHER MONTHS, IT GOES TO SHOWING

4    THE FACT THAT -- AND EXPERTS WILL OPINE ON THIS LATER -- THAT

5    WETLANDS DON'T CHANGE, COME AND GO FROM ONE YEAR TO ANOTHER,

6    THAT, IN FACT, IT'S THRIVING AGAIN.

7            THE COURT:  HOW DO THESE PROFFERED PHOTOS ADD

8    ANYTHING ON THAT POINT TO THE 25 THAT WERE JUST ADMITTED?  THE

9    SIX THAT WERE ADMITTED FROM -- THAT MR. LEDDA TOOK, THE VIDEO

10   THAT MR. LEDDA TOOK.

11       IN OTHER WORDS, IT DOES SEEM TO ME THERE IS A

12   CUMULATIVENESS ISSUE THAT WE ARE APPROACHING.  I HOPE YOU ALL

13   ARE KEEPING THE PULSE OF THE JURORS.  IT IS JUST A LOT OF

14   PHOTOS THAT SEEM TO REALLY BE DIRECTED TO THE SAME GENERAL

15   POINT.

16       AND SO WHAT DO THESE PHOTOS ADD ON THAT POINT?

17           MS. LEE:  THEY ARE A LITTLE DIFFERENT THAN ED'S

18   PHOTOS BECAUSE THOSE WERE AERIALS NOT QUITE FOCUSED ON THE

19   SOUTHERN SECTION.

20       I THINK POTENTIALLY WHAT THE COURT COULD DO IS JUST ADMIT,

21   YOU KNOW, SOME OF THESE -- SOME OF THESE PHOTOS DON'T HAVE THE

22   TRASH AND DEBRIS THAT MS. HANSEN CLAIMS THAT IT DOES.  AND SO

23   WE'RE THINKING IF WE COULD JUST ADMIT, FOR INSTANCE,

24   EXHIBIT 919 OR EXHIBIT 930, IT JUST GOES TO SHOW A GENERAL

25   OVERALL LOOK FROM THE GROUND ON WHAT THE SOUTHERN SECTION

1    LOOKED LIKE.

2          **THE COURT:**  THAT WOULD SEEM TO BE FINE.  AND IF

3    YOU'RE NOT MAKING A POINT THAT THERE'S DEBRIS IN IT, THAT'S

4    PROBABLY, A, NOT OBJECTIONABLE, AND, B, WOULD SPEED THINGS UP

5    AND GIVE THE JURY WHAT THEY NEED, BUT NOT A LOT THAT THEY

6    PROBABLY DON'T NEED IN TERMS OF DUPLICATIVENESS.

7          **MS. HANSEN:**  YOUR HONOR, I WOULD HAVE NO OBJECTIONS

8    TO 919 AND 930.

9          **MS. LEE:**  AND THE ONLY OTHER ONE WOULD BE 937.  IT

10   DOESN'T SEEM TO HAVE ANY DEBRIS IN THAT.  SAME WITH 945.

11   THERE'S NOT REALLY ANY DEBRIS THERE, BUT IT GOES TO SHOW HOW

12   MARSHY AND WET IT IS, AGAIN, AFTER THE FILL, AFTER A DRYER

13   YEAR.

14      I THINK POTENTIALLY JUST THOSE FOUR PHOTOS.

15         **MS. HANSEN:**  AGAIN PLEASE?

16         **MS. LEE:**  919, 930, 937, 945.

17         **MS. HANSEN:**  THOSE ARE FINE, YOUR HONOR.

18         **THE COURT:**  THOSE SEEM FINE WITH ME, TOO.  ALL RIGHT.

19      WHY DON'T WE BRING THE JURY BACK IN.

20         **MR. SMOCK:**  YOUR HONOR, JUST ONE MORE THING I THINK I

21   SHOULD RAISE TO AVOID A SIDEBAR.

22      I THINK MR. KEARNEY MIGHT LIKE TO BE INVOLVED IN THIS.  I

23   THINK, IT SOUNDS FROM THE GOVERNMENT AS IF THEY WILL CALL ONE

24   OTHER WITNESS, MIKE SIRI.

25         YESTERDAY EVENING THE GOVERNMENT GAVE US NOTICE THAT THEY

1    WOULD LIKE TO TRY TO INTRODUCE A SERIES OF PHOTOGRAPHS THROUGH

2    MR. SIRI, AND I ANTICIPATE OBJECTIONS ARISING.  AND I WILL

3    JUST QUICKLY SUMMARIZE IT.

4        IT SEEMS AS IF WHAT THE GOVERNMENT WOULD LIKE TO DO

5    THROUGH MR. SIRI IS INTRODUCE A NUMBER OF PHOTOGRAPHS TAKEN AT

6    DIFFERENT TIMES AT SPECIFIC POINTS OF THIS PROPERTY BY EITHER

7    H.T. HARVEY FOLKS OR BY MR. HUFFMAN.  THOSE ARE WITNESSES WHO

8    ARE ON THEIR WITNESS LIST AND WOULD BE, IT WOULD SEEM TO ME,

9    PERFECTLY QUALIFIED TO AUTHENTICATE THE PHOTOS.

10       BUT GIVEN THAT WHAT THESE SPECIFIC AREAS OF THE PROPERTY

11   LOOKED LIKE ON PARTICULAR DATES, PARTICULAR SEASONS,

12   PARTICULAR TIMES OF YEAR, MY CONCERN IS THAT USING MR. SIRI TO

13   TRY TO INTRODUCE THESE PHOTOS IS -- THEY ARE NOT GOING TO BE

14   ABLE TO AUTHENTICATE THEM AND IT'S GOING TO BE A REPEATED

15   OBJECTION.  I JUST WANT TO MAKE CLEAR WHY THAT IS.

16       FOR EXAMPLE, PHOTOGRAPHS OF THE NORTHERN AREA ON

17   FEBRUARY 13TH OF 2007 TAKEN BY H.T. HARVEY.

18            **THE COURT:**  SORRY, WHAT'S THE EXHIBIT NUMBER?

19          **MR. SMOCK:**  I'M SORRY.  THAT'S EXHIBIT 263.

20       CERTAINLY IF MR. SIRI CAN SAY I WAS AT THIS POINT ON

21   FEBRUARY 13TH OF 2007 AND THIS IS WHAT THE AREA LOOKED LIKE IN

22   TERMS OF WATER, ET CETERA, THAT MIGHT AUTHENTICATE THE

23   PHOTOGRAPH.  BUT HE CAN'T GET A PHOTOGRAPH IN SIMPLY BY SAYING

24   I'VE BEEN TO THAT AREA; THAT'S GENERALLY WHAT IT LOOKS LIKE.

25       SAME WITH ALL THE OTHER EXHIBITS.  I'M NOT GOING TO GO

1    THROUGH EVERY ONE OF THEM, UNLESS YOUR HONOR WANTS ME TO.  BUT

2    THERE ARE A SERIES OF PHOTOS TAKEN EITHER BY H.T. HARVEY IN

3    2007 OR BY DR. HUFFMAN, I GUESS, IN 2017.

4        MY CONCERN IS, UNLESS HE CAN SAY HE WAS AT THAT POINT ON

5    THAT DATE AND SAW IT IN THAT CONDITION, THEY NEED TO GET IT IN

6    THROUGH THE ACTUAL PERSON WHO TOOK THE PHOTOGRAPH.

7        **MR. KEARNEY:**  AND, YOUR HONOR, IT'S OUR INTENT TO DO

8    THAT.  HOWEVER, WE BELIEVE -- MR. SIRI HAS BEEN GOING TO THE

9    PROPERTY SINCE THE 1950'S.  I THINK HE'S PROBABLY BEEN THERE

10   MORE THAN ANYBODY ELSE ALIVE.  CERTAINLY HUNDREDS OF TIMES.

11   HE KNOWS THE SITE LIKE THE BACK OF HIS HAND.  HE KNOWS --

12   HE'LL BE ABLE TO SAY MANY, MANY TIMES HE HAS SEEN THE SITE

13   LOOK LIKE THIS.

14       I THINK HE IS COMPLETELY QUALIFIED TO LAY A FOUNDATION FOR

15   THESE.  AND... AND IF THE GOVERNMENT CANNOT LAY A FOUNDATION

16   FOR WHEN THEY WERE TAKEN AND BY WHOM LATER ON, WHICH WE

17   ANTICIPATE BEING ABLE TO DO THAT, BUT CERTAINLY HE CAN SAY

18   THAT WHAT HE HAS SEEN IS A FAIR AND ACCURATE DEPICTION OF THE

19   PROPERTY AS HE HAS SEEN IT OVER THE YEARS.

20       **THE COURT:**  I DON'T THINK THAT'S TRUE, THOUGH.  THE

21   POINT IS WHAT IT LIKES LIKE AT A RELEVANT SPECIFIC TIME.  I

22   JUST DON'T KNOW WHAT HIM PROVING UP THE PHOTOS ADDS.

23       AGAIN, TO MY POINT THAT I JUST MADE, WE ARE SLOGGING

24   THROUGH AN ENORMOUS NUMBER OF PHOTOS.  I DON'T KNOW HONESTLY

25   IF THE JURY REALLY UNDERSTANDS WHAT YOU'RE TRYING TO DO WITH

1    THEM AT THIS POINT, HOW IT IS TYING UP.  IT'S JUST THE

2    SUCCESSION OF LOTS AND LOTS OF PHOTOS.

3        I DON'T KNOW THAT IT WOULD ADD ANYTHING TO HIS TESTIMONY

4    TO HAVE HIM DO THAT WITH PHOTOS OTHER PEOPLE TOOK AT A TIME

5    AND IN A MANNER THAT HE DOESN'T KNOW ANYTHING ABOUT.  WHY

6    DOESN'T HE TESTIFY TO WHAT HE KNOWS?

7        **MR. KEARNEY:**  FIRST, HE CAN SAY -- WITH THE

8    TRIBUTARIES, FOR INSTANCE, YOUR HONOR, HE CAN SAY HE'S SEEN

9    THOSE THERE THROUGHOUT HIS ENTIRE LIFETIME OR FOR MANY, MANY,

10   MANY, MANY YEARS.

11       THERE'S -- IT'S HIGHLY CONTENTIOUS, OBVIOUSLY, FROM THE

12   OPENING STATEMENTS ABOUT THE EXISTENCE OF TRIBUTARIES ON THIS

13   PROPERTY AND WATER FLOW.  THERE'S NO ONE BETTER TO

14   CHARACTERIZE THE WATER FLOW ON THE PROPERTY THAN MR. SIRI.

15       AND TO SUGGEST THAT HE CAN'T OPINE ON A PICTURE HE HAS

16   SEEN IF HE DIDN'T TAKE IT, I JUST DON'T AGREE WITH THE DEFENSE

17   IN THAT REGARD, SIR.  I THINK IT'S COMPLETELY FINE THAT HE BE

18   ABLE TO DO THAT.

19       AND, YOUR HONOR, WE'RE TALKING LITERALLY ABOUT HALF A

20   DOZEN TO TEN PICTURES.  THAT'S ALL.  THIS IS NOT GOING TO BE

21   AN EXHAUSTIVE SLOG THROUGH ALL THE EVIDENCE.

22       **THE COURT:**  BUT, WHY, AGAIN, I'M COMING BACK TO WHY

23   DOES HE NEED TO DO THAT?  YOU HAVE A SLEW OF EXPERTS WHO HAVE

24   ACTUALLY DONE ANALYSIS, WHICH MY TAKE ON THE JURY'S QUESTION

25   WAS, THAT'S WHAT THEY ARE LOOKING FOR?  WHAT'S THE POINT?  NOT

DIEHL - DIRECT / LEE

```
1    SORT OF HOW IT APPEARS, NOT HOW IT LOOKS, NOT IF THERE'S WATER
2    THERE, BUT ON THE QUESTION OF IS IT A "WATER OF THE UNITED
3    STATES".
4        AND SO HIS OPINING THAT THIS IS HOW IT LOOKS IS NOT
5    ADDITIVE.
6            MR. KEARNEY:  HE'S GOING TO OPINE, SIR, ON HOW IT
7    ACTS.  HE'S GOING TO SAY THIS IS HOW WATER MOVES ON TO AND OFF
8    OF THE PROPERTY.
9        AND HE IS A CIVILIAN WITH FIRSTHAND EXPERIENCE.  HE'S NOT
10   BEING PAID.  HE'S NOT ON ANYBODY'S PAYROLL.  HE IS A CREDIBLE
11   WITNESS, THE GOVERNMENT BELIEVES, THAT WILL OFFER A COUNTER
12   POINT TO EXPERT TESTIMONY.  I THINK IT'S COMPLETELY
13   APPROPRIATE, AND IT WILL NOT BE A LONG TESTIMONY BY MR. SIRI,
14   BUT IT'S HIGHLY RELEVANT.
15           MR. SMOCK:  YOUR HONOR, WE ARE NOT OBJECTING TO HIM
16   TESTIFYING ABOUT HIS OBSERVATIONS.  OUR SIMPLE OBJECTION IS TO
17   HIM ADMITTING PHOTOS TAKEN BY OTHER WITNESSES WHO CAN
18   AUTHENTICATE THEM WHILE HE CAN'T.  THAT'S ALL.
19           MR. KEARNEY:  THEY WILL BE AUTHENTICATED.
20       FOR INSTANCE, YOUR HONOR, HOW DO I ASK HIM ABOUT A
21   TRIBUTARY IN A CERTAIN PLACE IF I CAN'T SHOW HIM A PICTURE OF
22   IT?  HE'LL SAY, YES, I HAVE SEEN THAT THERE FOR DECADES.
23   THAT'S WHERE THAT IS.  THIS IS HOW THE WATER FLOWS FROM THERE
24   TO THE SLOUGH.  I THINK THAT'S COMPLETELY APPROPRIATE AND
25   IT'S --
```

DIEHL – DIRECT / LEE

1    **THE COURT:**  WHY DON'T YOU HAVE HIM COME BACK AFTER

2    THE PHOTOGRAPHS ARE IN EVIDENCE?

3    **MR. KEARNEY:**  HE IS OUR NEXT WITNESS, SIR.

4    **THE COURT:**  WELL, IT SOUNDS LIKE YOU HAVE AN

5    AUTHENTICATION PROBLEM.  I DON'T KNOW THAT YOU'RE GOING TO BE

6    ABLE TO DO WHAT YOU'RE PROPOSING WITH HIM RIGHT NOW TO ADMIT

7    THE PHOTOS.

8    **MR. KEARNEY:**  YOUR HONOR, THE GOVERNMENT IS GOING TO

9    CALL THE ACTUAL PHOTOGRAPHERS WHO TOOK THESE IMAGES IN THIS

10   TRIAL.  THE AUTHENTICATION FOR THEM WILL BE PRESENTED TO THE

11   COURT DURING TRIAL.

12   **MR. SMOCK:**  I THINK YOUR HONOR'S PROPOSAL IS

13   APPROPRIATE.  I DON'T THINK THIS WITNESS IS GOING TO BE ABLE

14   TO AUTHENTICATE THESE PHOTOGRAPHS AS REPRESENTING THE WAY

15   THESE PLACES LOOKED AT THE TIME THE PHOTOGRAPH WAS TAKEN.  I

16   THINK IT'S AS SIMPLE AS THAT.

17   **MR. KEARNEY:**  I WOULD ASK THAT THEY BE ADMITTED

18   PURSUANT TO 872, LATER AUTHENTICATION, YOUR HONOR.  I THINK

19   IT'S COMPLETELY APPROPRIATE.

20   **THE COURT:**  SO SUBJECT TO A PROVE-UP?

21   **MR. KEARNEY:**  YES.

22   **THE COURT:**  WE WILL DO THIS.  IT CAN BE ADMITTED --

23   I'M SORRY, IT'S NOT 872.  WHAT'S THE PROVISION?

24   **MR. KEARNEY:**  I DON'T HAVE THAT IN FRONT OF ME, SIR.

25   MY APOLOGIES.

1           **THE COURT:**  ALL RIGHT.  I DO THINK THAT THE

2    GOVERNMENT HAS ESTABLISHED A BASIS FOR PROVISIONALLY ADMITTING

3    THE PHOTOS SUBJECT TO AUTHENTICATION.  IF THE AUTHENTICATION

4    DOESN'T COME LATER, IT'S STRICKEN.  IT OBVIOUSLY IS ALSO A

5    BASIS FOR CROSS-EXAMINATION AS TO HOW GENERALIZABLE ANYTHING

6    ABOUT A HANDFUL OF PHOTOS WOULD BE.

7        ALL RIGHT.

8           **MS. LEE:**  YOUR HONOR?

9           **THE COURT:**  YES.

10          **MS. LEE:**  FOR EFFICIENCY, COULD I JUST ASK DEFENSE

11   COUNSEL, IF YOU HAVE NO OBJECTIONS TO CERTAIN EVIDENCE COMING

12   IN, I WON'T HAVE TO SPEND THE TIME LAYING THE FOUNDATION.

13       MY UNDERSTANDING IS YOU ARE OKAY WITH EXHIBIT 905, 907A,

14   THE VIDEOS, AND JUST WONDERING IF YOU WILL STIPULATE TO 962 TO

15   969 -- 962 TO 972 COMING IN?

16       THOSE ARE PHOTOS HE TOOK FROM THE HELICOPTER.

17          **MS. HANSEN:**  ARE WE SUPPOSED TO BE ON THE RECORD,

18   YOUR HONOR?  DO YOU WANT US TO CONFER?

19          **MR. SMOCK:**  I CAN IF THESE TWO WANT TO CONFER, I

20   THINK THERE'S ANOTHER ISSUE.

21               (PAUSE IN THE PROCEEDINGS.)

22          **MR. KEARNEY:**  YOUR HONOR, MAY I BE EXCUSED QUICKLY TO

23   DEAL WITH A WITNESS OUTSIDE?  I'LL BE RIGHT BACK.

24          **THE COURT:**  YES, BUT I DO WANT TO GET BACK ON THE

25   RECORD SINCE WE GOT A BREAK EARLY.  WE'VE ONLY GOT ABOUT 45

DIEHL – DIRECT / LEE

1   MINUTES NOW LEFT IN THE DAY.

2       LET'S TAKE THIS STEP WISE.  WHY DON'T WE –– RIGHT WHEN WE

3   GET BACK ON THE RECORD, YOU CAN OFFER 919, 930, 937, AND 945.

4   I'LL ADMIT THOSE.

5       WITH REGARD TO THE OTHERS, I WOULD ADVISE YOU TO MEET, IF

6   YOU CAN, AND WORK THINGS OUT.  THE THING IS, I DON'T WANT TO

7   TAKE TIME TO DO THAT NOW BECAUSE WE'RE LOSING WHAT WE HAVE

8   LEFT OF THE JURY'S DAY.

9           **MS. LEE:**  I THINK IT WILL TAKE ONE SECOND.  I DON'T

10  ANTICIPATE THE DEFENSE HAVING ––

11          **THE COURT:**  IF YOU CAN DO IT WHILE MS. RILEY IS

12  WALKING TO THE DOOR AND WHILE THEY'RE WALKING IN, I THINK THAT

13  WILL BE FINE.

14          **THE CLERK:**  YOU WANT TO GET YOUR WITNESS BACK ON THE

15  STAND?

16        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

17          **THE CLERK:**  YOU MAY BE SEATED.

18          **THE COURT:**  YOU MAY CONTINUE, MS. LEE.

19          **MS. LEE:**  YOUR HONOR, THE GOVERNMENT MOVES

20  EXHIBITS 919, 930, 937, AND 945 INTO EVIDENCE.

21          **MS. HANSEN:**  NO OBJECTION.

22          **THE COURT:**  THOSE EXHIBITS ARE ADMITTED.

23      (GOVERNMENT'S EXHIBITS 919, 930, 937, AND 945 RECEIVED IN

24  EVIDENCE)

25

1    BY MS. LEE:

2    Q.  MR. DIEHL, CAN YOU TAKE A LOOK AT EXHIBIT 919?  IT'S THE

3    ONLY ONE I WANT TO SHOW YOU FROM THIS DAY.

4                        (DISPLAYED ON SCREEN.)

5        WHEN YOU WENT ON NOVEMBER 15TH, 2016 TO TAKE A PHOTO, IS

6    THIS A PHOTO OF WHAT THE SOUTHERN FILL SECTION OF NEWARK AREA

7    FOUR 4 LOOKED LIKE ON THAT DATE?

8    A.  YES.

9    Q.  DID YOU ALSO GO BACK TO THE SITE ON MARCH 3RD, 2017 TO

10   TAKE AERIAL PHOTOS AND VIDEOS OF WHAT THE SITE LOOKED LIKE IN

11   2017?

12   A.  YES.

13           MS. LEE:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

14   EXHIBITS 962 TO 972 INTO EVIDENCE AS WELL AS EXHIBIT 905.

15           THE CLERK:  I'M SORRY, 962 TO 972 AND 905?

16           MS. LEE:  EXACTLY.

17           THE CLERK:  THANK YOU.

18           MS. HANSEN:  NO OBJECTION.

19           THE COURT:  962 THROUGH 972 AND 905 ARE ADMITTED.

20       (GOVERNMENT'S EXHIBITS 905 AND 962 THROUGH 972 RECEIVED IN

21   EVIDENCE)

22   BY MS. LEE:

23   Q.  I WOULD LIKE TO SHOW YOU EXHIBIT 965.

24                        (DISPLAYED ON SCREEN.)

25       IS THIS AN AERIAL PHOTOGRAPH YOU TOOK ON MARCH 3RD, 2017

DIEHL – DIRECT / LEE

```
1    OF THE PROPERTY?

2    A.  YES.

3    Q.  WHERE IS THE NORTHERN FILL SECTION AT THIS TIME?

4        YOU CAN USE THE POINTER IF YOU WANT.

5    A.  (INDICATING).

6    Q.  IS IT NOT WORKING?

7    A.  NO.  THIS AREA.

8    Q.  AND THE SOUTHERN PORTION WHERE YOU HAD TAKEN PHOTOS OF?

9    A.  (INDICATING) THIS AREA.

10   Q.  AND 969, PLEASE.

11                   (DISPLAYED ON SCREEN.)

12       IS THIS FROM A BROADER VIEW OF NEWARK AREA FOUR 4 ON

13   MARCH 3RD, 2017?

14   A.  YES.

15   Q.  WHERE IS THE NORTHERN FILL AREA THAT YOU TOOK PHOTOS OF?

16   A.  (INDICATING) RIGHT HERE.

17   Q.  DO YOU SEE THE CONCRETE PAD IN THAT PHOTO?

18   A.  YES.

19   Q.  OKAY.  AND DID YOU TAKE PHOTOS TO THE EAST OF THAT?

20   A.  YES.

21   Q.  AND WHERE WOULD THAT BE?

22   A.  (INDICATING).

23   Q.  THEN THE SOUTHERN SECTION?

24   A.  (INDICATING).

25   Q.  AND YOU MENTIONED YOU ALSO TOOK -- YOU TOOK A VIDEO AS
```

DIEHL – DIRECT / LEE

1     WELL THAT DAY; IS THAT RIGHT?

2     **A.**  YES.

3     **Q.**  DID YOU CREATE A COMPILATION OF ALL THE SNIPPETS OF VIDEOS

4     YOU TOOK FROM THE HELICOPTER THAT DAY?

5     **A.**  YES.

6     **Q.**  IS THAT EXHIBIT 905?

7          WE WILL PLAY 905 FOR YOU.

8                         (VIDEO PLAYED)

9          **MS. LEE:**  IF YOU COULD PAUSE ONE SECOND, AGENT SU.

10    **BY MS. LEE:**

11    **Q.**  WHAT DOES THIS WHITE LINE DEPICT (INDICATING)?

12    **A.**  THAT IS THE ROAD THAT IS BEYOND THE GATE OFF OF STEVENSON.

13    **Q.**  IS THAT THE ROAD YOU TOOK TO GET TO THE SOUTHERN FILL

14    AREA?

15    **A.**  YES.

16          **MS. LEE:**  IF WE CAN CONTINUE PLAYING.

17                         (VIDEO RESUMED)

18          IF YOU CAN PAUSE ONE SECOND, AGENT SU.

19    **BY MS. LEE:**

20    **Q.**  FROM WHAT VANTAGE POINT ARE WE LOOKING AT HERE?

21          WOULD YOU LIKE US TO KEEP PLAYING?

22    **A.**  DO YOU WANT ME TO USE THE --

23    **Q.**  OH, SURE.

24    **A.**  STEVENSON ROAD (INDICATING), GATE, AND THIS IS THE DIRT

25    ROAD.  THERE'S THE POST THAT'S IN A LOT OF THE PHOTOS, AND

1   THIS IS THAT DEBRIS AREA.

2            **MS. LEE:**  IF YOU CAN KEEP PRESSING PLAY.

3                    (VIDEO RESUMED)

4      IF YOU COULD PRESS PAUSE A SECOND, AGENT SU.

5   **BY MS. LEE:**

6   **Q.**  WHERE IS THE SLOUGH?

7   **A.**  IT IS THIS AREA (INDICATING).

8            **MS. LEE:**  IF YOU CAN KEEP PRESSING PLAY.

9                    (VIDEO RESUMED)

10      IF YOU COULD PAUSE, AGENT SU.

11  **BY MS. LEE:**

12  **Q.**  WHAT VANTAGE POINT ARE WE LOOKING AT THE PROPERTY FROM

13  HERE?

14  **A.**  YOU CAN SEE THE SLOUGH, THIS DARKER AREA (INDICATING).

15  HERE IS THE DEBRIS FIELD.

16  **Q.**  AND WHICH SECTION, NORTHERN OR SOUTHERN?

17  **A.**  SOUTHERN.

18            **MS. LEE:**  IF YOU CAN CONTINUE TO PRESS PLAY.

19                    (VIDEO RESUMED.)

20      IF YOU COULD PAUSE, AGENT SU.

21      ACTUALLY, IF YOU CAN KEEP GOING.  IT'S FINE.

22                    (VIDEO RESUMES.)

23      IF YOU CAN PAUSE, AGENT SU.

24  **BY MS. LEE:**

25  **Q.**  WHAT ARE YOU ATTEMPTING TO VIDEO AT THIS VANTAGE POINT?

DIEHL – DIRECT / LEE

1   **A.**  SHOWING WHERE THE BAY IS, THE SLOUGH, THE... (INDICATING).

2      IT'S NOT SHOWING THE PICK 'N PULL, BUT I AM TRYING TO SHOW

3   THE RELATIONSHIP OF THESE AREAS TO EACH OTHER.

4   **Q.**  ARE YOU FOLLOWING THE SLOUGH OUT TO THE BAY AT THIS POINT?

5   **A.**  YES.

6      **MS. LEE:**  IF WE CAN CONTINUE PLAYING.

7         (VIDEO RESUMED.)

8   **BY MS. LEE:**

9   **Q.**  ON MARCH 3RD, MR. DIEHL, DID YOU ALSO DRIVE A CAR DOWN

10  STEVENSON BOULEVARD TO SHOW THE ENTRANCE TO THE SOUTHERN

11  PORTION OF THE SITE?

12  **A.**  I DROVE IN A CAR, YES.

13     **MS. LEE:**  THE GOVERNMENT WOULD MOVE EXHIBIT 907A INTO

14  EVIDENCE.

15     **MS. HANSEN:**  NO OBJECTION.

16     **THE COURT:**  907A IS ADMITTED.

17     (GOVERNMENT'S EXHIBIT 907A RECEIVED IN EVIDENCE)

18     **MS. LEE:**  IF WE CAN PLAY 907A.

19            (VIDEO PLAYED.)

20     IF YOU CAN PAUSE, AGENT SU.

21  **BY MS. LEE:**

22  **Q.**  WHAT ROAD ARE YOU ON RIGHT NOW?

23  **A.**  STEVENSON.

24     **MS. LEE:**  AND WE CAN KEEP PRESSING PLAY.

25            (VIDEO RESUMED.)

1    **BY MS. LEE:**

2    **Q.**  AND WHAT DIRECTION ARE YOU DRIVING, MR. DIEHL?

3    **A.**  WEST.

4                               (VIDEO PAUSED.)

5    **Q.**  WHAT IS THAT RIGHT BY THE STOP SIGN?

6    **A.**  SET OF TRAIN TRACKS.

7              **MS. LEE:**  WE CAN PRESS PLAY.

8                               (VIDEO RESUMED.)

9    **BY MS. LEE:**

10   **Q.**  WHAT ARE WE APPROACHING, MR. DIEHL?

11   **A.**  A LOCKED GATE.

12   **Q.**  WHAT'S BEYOND THAT GATE?

13   **A.**  OPEN SPACE.

14   **Q.**  IS THAT THE ROAD THAT LEADS TO THE SOUTHERN SECTION?

15   **A.**  YES.

16             **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR THIS

17   WITNESS.

18             **THE COURT:**  ANY CROSS-EXAMINATION?

19             **MS. HANSEN:**  YES, YOUR HONOR, VERY BRIEFLY.

20                        **CROSS-EXAMINATION**

21   **BY MS. HANSEN:**

22   **Q.**  HI, AGENT DIEHL.

23   **A.**  HELLO.

24   **Q.**  THE LAST VIDEO WE JUST SAW, GOVERNMENT EXHIBIT 907A, THAT

25   WAS TAKEN ON MARCH 3RD, 2017, CORRECT?

DIEHL - CROSS / HANSEN

1          SO THAT GATE AS IT APPEARED IN THAT VIDEO WE JUST SAW,

2     THAT WAS FROM MARCH OF 2017?

3     **A.**  YES.

4     **Q.**  AND ARE YOU AWARE THAT THE FILL ACTIVITY IN THIS CASE TOOK

5     PLACE IN -- IT ENDED IN SEPTEMBER OF 2014?

6     **A.**  NO.  I AM NOT AWARE OF WHEN IT ENDED.

7     **Q.**  AND LET'S TALK ABOUT THE DATES OF THE VIDEOS THAT WE

8     INTRODUCED OR THE GOVERNMENT INTRODUCED THROUGH YOU.

9          EXHIBIT 980, ED LEDDA'S VIDEO, THAT VIDEO WAS TAKEN ON

10    DECEMBER 16TH, 2016, CORRECT?

11    **A.**  YES.

12    **Q.**  AND THEN THE PHOTOS THAT CAME IN THROUGH YOU, THOSE WERE

13    TAKEN ON NOVEMBER 15TH, 2016, CORRECT?

14    **A.**  YES.

15    **Q.**  AND THAT WOULD BE MORE THAN TWO YEARS AFTER

16    SEPTEMBER 2014, CORRECT?

17    **A.**  YES.

18    **Q.**  AND THEN THE LAST VIDEO BEFORE YOU'RE DRIVING, THE VIDEO

19    OF THE AERIAL YOU TOOK OF GOVERNMENT EXHIBIT 905, DO YOU

20    REMEMBER THAT ONE?

21    **A.**  YES.

22    **Q.**  THAT'S WHEN YOU WERE ABOVE IN THE HELICOPTER, CORRECT?

23    **A.**  YES.

24    **Q.**  AND YOU WERE SHOWING US IMAGES OF THE AREA, CORRECT?

25    **A.**  YES.

DIEHL – CROSS / HANSEN

1   **Q.**   THAT WAS MARCH 3RD, 2017, CORRECT?

2   **A.**   YES.

3   **Q.**   THAT WAS JUST ABOUT A YEAR AGO; IS THAT RIGHT?

4   **A.**   MORE OR LESS, YES.

5   **Q.**   DO YOU REMEMBER THAT TIME OF YEAR WHAT THE WEATHER WAS

6   LIKE?

7   **A.**   UH-HUH.

8   **Q.**   IT WAS INCREDIBLY RAINY; ISN'T THAT RIGHT?

9   **A.**   I DON'T KNOW IF IT WAS INCREDIBLY --

10   **Q.**   WELL, WE HAD FLOODING, DIDN'T WE, IN THAT TIME OF YEAR

11   LAST YEAR?

12   **A.**   NOT SURE.

13   **Q.**   DO YOU RECALL THAT WE HAD ABOVE AVERAGE RAIN FALLS IN BOTH

14   FEBRUARY AND MARCH OF THAT YEAR?

15   **A.**   FROM MY RECOLLECTION, WE HAD MORE RAIN LAST WINTER.

16   THAT'S THE EXTENT OF WHAT I KNOW ABOUT THAT.

17        **MS. HANSEN:**  OKAY.  THANK YOU.  NO FURTHER QUESTIONS.

18        **MS. LEE:**  NO QUESTIONS.

19        **THE COURT:**  ALL RIGHT.  THANK YOU, MR. DIEHL.  YOU

20   ARE EXCUSED.

21      AND THE GOVERNMENT MAY CALLS ITS NEXT WITNESS.

22        **MR. KEARNEY:**  MAY WE HAVE A MOMENT, YOUR HONOR,

23   PLEASE?

24        **THE COURT:**  YES.

25             (PAUSE IN THE PROCEEDINGS.)

1     **THE CLERK:** STEP TO THE WITNESS STAND FOR ME AND

2   RAISE YOUR RIGHT HAND.

3       (**VINCE KIMBROUGH,** CALLED AS A WITNESS FOR THE GOVERNMENT,

4   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

5       **THE WITNESS:** YES, MA'AM.

6       **THE CLERK:** PLEASE BE SEATED. STATE AND SPELL BOTH

7   YOUR FIRST AND LAST NAME FOR THE RECORD.

8       **THE WITNESS:** MY FIRST NAME IS VINCENT,

9   V-I-N-C-E-N-T. LAST IS KIMBROUGH, K-I-M-B-R-O-U-G-H.

10      **THE CLERK:** THANK YOU.

11      **THE COURT:** YOU MAY PROCEED.

12      **MR. KEARNEY:** THANK YOU, SIR.

13              **DIRECT EXAMINATION**

14  BY MR. KEARNEY:

15  **Q.** LIEUTENANT, GOOD MORNING -- GOOD AFTERNOON I SHOULD SAY.

16  **A.** GOOD AFTERNOON.

17  **Q.** SIR, I DON'T KNOW IF IT'S OBVIOUS, BUT PLEASE TELL US WHAT

18  YOU DO FOR A LIVING.

19  **A.** I'M A POLICE LIEUTENANT FOR THE CITY OF NEWARK.

20  **Q.** HOW LONG HAVE YOU BEEN WITH THE NEWARK POLICE DEPARTMENT?

21  **A.** A LITTLE OVER -- A LITTLE UNDER SEVEN YEARS NOW WITH THE

22  CITY OF NEWARK.

23  **Q.** SIR, DID YOU HAVE PRIOR LAW ENFORCEMENT EXPERIENCE BEFORE

24  THE CITY OF NEWARK?

25  **A.** YES, SIR, I HAVE.

1    **Q.**  PLEASE TELL US ABOUT THAT.

2    **A.**  I WAS A DEPUTY SHERIFF FOR THE STANISLAS COUNTY SHERIFF'S

3    DEPARTMENT FOR ABOUT 13 YEARS PRIOR TO COMING OVER TO THE CITY

4    OF NEWARK.

5    **Q.**  SO YOU'VE GOT ABOUT TWO DECADES IN LAW ENFORCEMENT; IS

6    THAT A FAIR STATEMENT?

7    **A.**  YES, SIR.

8    **Q.**  LIEUTENANT KIMBROUGH, I WANT TO DIRECT YOUR ATTENTION BACK

9    TO SEPTEMBER THE 14TH -- SEPTEMBER 8 OF 2014.

10       BACK ON THAT DATE, SIR, WERE YOU WORKING WITH THE NEWARK

11   POLICE DEPARTMENT?

12   **A.**  YES, SIR, I WAS.

13   **Q.**  DID YOU HOLD THE RANK OF LIEUTENANT BACK THEN?

14   **A.**  I DID NOT.

15   **Q.**  WHAT WERE YOU, SIR?

16   **A.**  I WAS A SERGEANT.

17   **Q.**  SIR, ON SEPTEMBER 8TH OF 2014, AT SOME POINT DID YOU

18   RESPOND WHILE ON DUTY TO THE END OF STEVENSON BOULEVARD IN THE

19   CITY OF NEWARK?

20   **A.**  YES, SIR, I DID.

21   **Q.**  DO YOU REMEMBER WHAT TIME THAT WAS, FIRST OF ALL?

22   **A.**  IT WAS IN THE LATE AFTERNOON.  I WOULD HAVE TO LOOK AT MY

23   REPORT TO GIVE YOU THE EXACT TIME.  BUT IT WAS IN THE LATE

24   AFTERNOON ON THAT DATE.

25   **Q.**  WHAT BROUGHT YOU TO THAT LOCATION?

1   **A.**   I RECEIVED A DISPATCH CALL THAT THERE WAS AN ISSUE

2   HAPPENING ON A PIECE OF PROPERTY IN REGARDS TO SOME DIRT BEING

3   ON THE PROPERTY.

4       ONE OF MY OFFICERS WAS ON SCENE, AND WE HAD SEVERAL TRUCKS

5   STOPPED TO TRY TO DETERMINE WHAT WAS GOING ON WITH THE PIECE

6   OF PROPERTY.

7   **Q.**   SO WERE THERE -- BY THE TIME YOU GOT TO THE SCENE, YOU

8   WERE A SERGEANT AT THAT TIME, DID YOU HAVE PATROL OFFICERS WHO

9   ACTUALLY WERE ALREADY ON THE SCENE AT THAT TIME?

10  **A.**   YES, SIR, WE DID.

11  **Q.**   ALL RIGHT.

12      I WONDER IF YOU CAN DESCRIBE IT FOR US, PLEASE, JUST THE

13  SCENE AS YOU FIRST ENCOUNTERED IT ON SEPTEMBER 8TH, 2014.

14  **A.**   AS I DROVE UP TO STEVENSON BOULEVARD GOING WESTBOUND,

15  THERE WERE SEVERAL LARGE SEMI TRUCKS, YOU KNOW, LIKE DIESEL

16  TRUCKS WITH TRAILERS APPEAR TO HAUL SOME TYPE OF MATERIAL.

17  THEY WERE ALL STOPPED ON THE SIDE OF THE ROAD.

18      I HAD A COUPLE OF MY PATROL OFFICERS WERE SPEAKING TO SOME

19  GENTLEMEN ON THE SCENE TRYING TO DETERMINE WHERE THESE TRUCKS

20  WERE FROM, WHY THEY WERE ON STEVENSON, AND WHAT WAS REALLY

21  KIND OF GOING ON.

22          **MR. KEARNEY:**   YOUR HONOR, IF I CAN APPROACH THE

23  WITNESS AND SHOW HIM A MAP?

24          **THE COURT:**   YOU MAY.

25          **MR. KEARNEY:**   THIS IS EXHIBIT 0003-0001.

1              (EXHIBIT HANDED TO WITNESS.)

2    BY MR. KEARNEY:

3    Q.   LIEUTENANT KIMBROUGH, DO YOU RECOGNIZE THE GENERAL AREA

4    DEPICTED IN THE DIAGRAM?

5    A.   YES, SIR, I DO.

6    Q.   DOES THIS SHOW THE AREA OF STEVENSON YOU RESPONDED TO ON

7    SEPTEMBER 8TH, 2014 ACCURATELY?

8    A.   YES, SIR, IT DOES.

9              MR. KEARNEY:   YOUR HONOR, I WOULD LIKE TO ADMIT THIS,

10   IF I MAY, AT THIS TIME?

11             MS. HANSEN:   SORRY, YOUR HONOR, TECHNICAL PROBLEMS.

12                  (PAUSE IN THE PROCEEDINGS.)

13      NO OBJECTION.

14             THE COURT:   0003 IS ADMITTED.

15      (GOVERNMENT'S EXHIBIT 0003 RECEIVED IN EVIDENCE)

16                  (DISPLAYED ON SCREEN.)

17             MR. KEARNEY:   I WONDER IF WE CAN BLOW UP, AGENT SU,

18   THE AREA OF STEVENSON WHERE IT DEAD ENDS ON THE PROPERTY,

19   PLEASE.  A LITTLE FURTHER.

20   BY MR. KEARNEY:

21   Q.   LIEUTENANT, IN THE AREA THAT'S DEPICTED THERE THAT'S BLOWN

22   UP, IS THE APPROXIMATE LOCATION WHERE YOU SAW THESE TRUCKS

23   STOPPED SHOWN?

24   A.   IT IS.  IT'S KIND OF COVERED BY YOUR LITTLE MAP.

25   Q.   THE LEGEND?

1   **A.**   YES.   THAT GENERAL AREA ALONG STEVENSON BOULEVARD IS THE

2   AREA WHERE SOME OF THE TRUCKS WERE STOPPED.

3   **Q.**   THERE SHOULD BE A LASER POINTER IN FRONT OF YOU SOMEWHERE.

4   THERE'S ALSO AN ARROW.

5        BUT THE -- YOU SEE THE ARROW ON THIS EXHIBIT OVER HERE ON

6   THE SCREEN?

7   **A.**   YES, SIR, I DO.

8   **Q.**   IS THAT -- IT'S NOT TO SCALE, OBVIOUSLY, WHERE THE TRUCKS

9   WERE STOPPED, GENERALLY SPEAKING, SIR, IS THAT WHERE YOU SAW

10  TRUCKS STOPPED AS YOU RESPONDED TO THE SCENE ON SEPTEMBER 18TH

11  OF 2014?

12  **A.**   THEY WERE ACTUALLY -- YOU CAN SEE THE POND RIGHT IN THIS

13  AREA THERE IS A POND (INDICATING).   THEY WERE JUST A LITTLE

14  BIT AHEAD OF THIS POND WHERE THIS BUILDING IS AT, PARKED ALONG

15  THE ROADWAY FACING EASTBOUND RIGHT IN THIS AREA HERE

16  (INDICATING).

17  **Q.**   AS YOU LOOK AT THIS -- AS YOU'RE LOOKING ON THIS MAP,

18  EASTBOUND IS GENERALLY KIND OF UP TO THE RIGHT FROM THE

19  PROPERTY; IS THAT RIGHT?

20  **A.**   YES, SIR.

21  **Q.**   SO, LIEUTENANT, THE TRUCKS THAT YOU SAW WERE FACING --

22  THEY WERE ON STEVENSON FACING AWAY FROM THE PROPERTY; IS THAT

23  A FAIR STATEMENT?

24  **A.**   THAT WOULD BE A FAIR STATEMENT, YES.

25  **Q.**   I WONDER IF YOU CAN DESCRIBE THOSE TRUCKS FOR US, PLEASE.

1  **A.**  AGAIN, SEMI TRUCKS, LIKE YOU WOULD SEE ON THE FREEWAY WITH

2  VERY LARGE TRAILERS USED TO CARRY, YOU KNOW, MATERIAL.

3  **Q.**  I WOULD LIKE TO SHOW YOU ANOTHER PHOTOGRAPH, IF I MAY.

4  THIS IS EXHIBIT 0042-0001.

5  (EXHIBIT HANDED TO WITNESS.)

6  **BY MR. KEARNEY:**

7  **Q.**  LIEUTENANT, IS THAT AN APPROXIMATION OF THE SIZE AND

8  CONFIGURATION OF THE TRUCKS YOU SAW ON STEVENSON THAT DAY?

9  **A.**  IT'S VERY SIMILAR.  THE ONLY DIFFERENCE IN THE TRUCK

10 TRAILER IS THAT THE TRAILERS THAT I SAW... THAT I RECALL, HAD

11 BOTTOM LOADS WHERE THE LOAD WITH EXPEL OUT OF THE BOTTOM NOT

12 OUT OF THE BACK OF THE TRAILER.  SO THAT WOULD BE THE ONLY

13 DIFFERENCE.

14 **Q.**  THE SCALE IS APPROXIMATELY WHAT YOU SAW THAT DAY; IS THAT

15 RIGHT?

16 **A.**  YES, SIR.

17 **MR. KEARNEY:**  I WOULD LIKE TO ADMIT THIS, IF WE MAY.

18 **MS. HANSEN:**  YOUR HONOR, WE WOULD OBJECT.  IT CAN

19 USED AS A DEMONSTRATIVE SHOWN TO THE JURY, BUT IT SHOULD NOT

20 BE AN ADMITTED EXHIBIT.  IT'S NOT EVIDENCE.

21 **THE COURT:**  THAT'S RIGHT.  SUSTAINED.

22 **MR. KEARNEY:**  ALL RIGHT.  CAN WE SHOW IT THOUGH AT

23 THIS TIME?

24 **THE COURT:**  SO, LADIES AND GENTLEMEN, THIS IS BEING

25 USED SIMPLY TO ILLUSTRATE THE WITNESS'S TESTIMONY, BUT WILL

1  NOT BE ADMITTED IN EVIDENCE.

2                    (DISPLAYED ON SCREEN.)

3  **BY MR. KEARNEY:**

4  **Q.**  LIEUTENANT, WHEN YOU GOT TO THE END OF STEVENSON BOULEVARD

5  ON THE DATE IN QUESTION, YOU SAW TRUCKS LIKE THIS DETAINED BY

6  ONE OF THE OFFICERS -- I HATE TO SAY "YOUR OFFICERS", BUT ONE

7  OF THE OFFICERS WORKING UNDER YOU WITHIN THE NEWARK POLICE

8  DEPARTMENT AT THAT TIME; IS THAT FAIR?

9  **A.**  YES, SIR, THAT'S A FAIR STATEMENT.

10  **Q.**  HOW MANY OF THESE DID YOU SEE LINED UP, SIR?

11  **A.**  THERE WERE SEVERAL.  BETWEEN THREE AND FIVE, MAYBE SIX.  I

12  DON'T RECALL EXACTLY.  MORE THAN THREE, LESS THAN SIX.

13  **Q.**  YOU INDICATED EARLIER THAT THEY WERE HEADING AWAY FROM THE

14  PROPERTY.  DID YOU GET A CHANCE TO LOOK AT WHETHER THEY WERE

15  LOADED OR NOT?

16  **A.**  I DID NOT LOOK TO SEE IF THEY WERE LOADED.  NO, SIR.

17  **Q.**  OKAY.

18      HAD YOU BEEN, SIR, TO THAT VERY END OF STEVENSON BOULEVARD

19  BEFORE DURING THE COURSE OF YOUR SEVEN YEARS WITH NPD?

20  **A.**  YES, SIR, I HAVE.

21  **Q.**  I WONDER IF YOU CAN GENERALLY DESCRIBE IT FOR US, DESCRIBE

22  THAT AREA ESPECIALLY IN TERMS OF COMMERCE AND TRAFFIC, IF YOU

23  WOULD.

24  **A.**  THE AREA IN QUESTION IS -- ARE AN INDUSTRIAL AREA FOR THE

25  CITY.  THE ROAD AT THAT END TURNS INTO JUST A LITTLE TWO-LANE,

1    NOT VERY WELL PAVED ROAD, USED TO GO OUT TO A PIECE OF

2    PROPERTY ON THE OTHER SIDE OF SOME RAILROAD TRACKS.  IT'S NOT

3    FREQUENTLY USED BY NORMAL, REGULAR TRAFFIC.  IT'S JUST A DEAD

4    END.

5        OUR BIGGEST ISSUE WITH IT IS KIDS GOING OUT THERE AT NIGHT

6    AND PARKING AND CREATING A LITTLE MISCHIEF.

7    **Q.**  ALL RIGHT.

8        CERTAINLY THERE'S NO -- ON THAT -- THE TERMINUS OF

9    STEVENSON BOULEVARD THERE, AS IT HITS THE PROPERTY, ARE THERE

10   ANY BUSINESSES, AND INTERSECTIONS, ANY RESTAURANTS, ANY

11   PARTICULAR REASON, BASED ON YOUR EXPERIENCE, FOR PEOPLE TO GO

12   OUT THAT WAY?

13   **A.**  THERE ARE BUSINESSES, BUT THERE'S NO RESTAURANTS, THERE'S

14   NO ENTERTAINMENT AREAS OF THAT NATURE.  THERE ARE SOME

15   INDUSTRIAL BUSINESSES, SOME TECHNOLOGY BUSINESSES IN THAT

16   CORRIDOR.  BUT THERE ARE NO RESTAURANTS.

17   **Q.**  ALL RIGHT.

18        **MR. KEARNEY:**  AGENT SU, I WONDER IF YOU CAN PULL UP

19   EXHIBIT 3 AGAIN, PLEASE.

20                    (DISPLAYED ON SCREEN.)

21   **BY MR. KEARNEY:**

22   **Q.**  NOW, WE JUST ASKED YOU ABOUT STEVENSON, LIEUTENANT.  I

23   WANT TO ASK YOU ABOUT MOWRY AVENUE.

24        THIS IS -- DO YOU SEE -- ARE YOU FAMILIAR WITH THE STREET

25   NAMED MOWRY AVENUE IN NEWARK; IS THAT CORRECT?

1   **A.**   YES, SIR, I AM.

2   **Q.**   DO YOU SEE IT DEPICTED ON THIS DIAGRAM?

3   **A.**   YES, SIR, I DO.

4   **Q.**   I WONDER IF YOU CAN SHOW US WITH THE LASER POINTER.

5   **A.**   THIS WOULD BE MOWRY AVE. THIS ROADWAY RIGHT HERE

6   (INDICATING).

7   **Q.**   NOW, YOU TOLD US THAT STEVENSON DEAD ENDED INTO THIS

8   PROPERTY.  HOW ABOUT MOWRY; IS IT TERMINUS OF MOWRY AVENUE

9   SHOWN ON THIS DIAGRAM?

10  **A.**   THE END OF MOWRY IS NOT SHOWN.  IT'S FURTHER DOWN OFF OF

11  THIS MAP.

12  **Q.**   WHAT IS OUT THERE, SIR, IF YOU CAN TELL US?

13  **A.**   AT THE VERY END OF IT IS AN OLD PETERBILT TEST SITE, USED

14  TO TEST TRUCKS.

15  **Q.**   AND BEYOND THAT TEST SITE, IS THERE ANY OTHER COMMERCE OUT

16  THERE?

17  **A.**   NONE THAT I AM AWARE OF SIR, NO.

18  **Q.**   YOU'RE AWARE THERE'S A -- SOMEWHERE ON MOWRY THERE'S A

19  PICK 'N PULL AUTO DISMANTLER; IS THAT RIGHT?

20  **A.**   YES, SIR.  IT'S BEFORE THE DEAD END.

21  **Q.**   HOW LONG AFTER THE PICK 'N PULL DOES MOWRY DEAD END?

22  **A.**   I WOULD SAY LESS THAN A QUARTER MILE.

23  **Q.**   OKAY.

24        SO, SIR, AFTER YOU FIRST RESPONDED TO THE END OF STEVENSON

25  ON SEPTEMBER 8TH, 2014, YOU SAW THE TRUCKS BEING DETAINED,

1    WHAT DID YOU DO NEXT?

2    **A.**   I JUST TRIED TO TALK TO MY OFFICER WHO WAS ON SCENE TO

3    KIND OF DETERMINE WHAT WAS HAPPENING.  YOU KNOW, WHY ARE ALL

4    THE TRUCKS STOPPED, AND JUST KIND OF -- JUST OVERALL FINDING

5    OUT WHAT WAS THE ORIGINAL CALL, WHAT DO WE HAVE, WHO'S WHO,

6    THOSE KIND OF BASIC GENERAL QUESTIONS.

7    **Q.**   WAS THERE ANY EFFORTS REGARDING INVESTIGATION OF TRUCKS,

8    LIKE TAKING LICENSE PLATE NUMBERS GOING ON, THAT TYPE OF

9    THING?

10   **A.**   YES, SIR, THERE WAS.

11   **Q.**   AFTER YOU SURVEYED THE SCENE, DID YOU ACTUALLY AT SOME

12   POINT DRIVE ONTO THE PROPERTY?

13   **A.**   YES, SIR, WE DID.

14   **Q.**   PLEASE TELL US ABOUT THAT.

15   **A.**   AFTER WE DETERMINED THAT THERE WAS AN ISSUE ON THE

16   PROPERTY, WE WANTED TO SEE KIND OF THE SEVERITY OF THE ISSUE,

17   WHAT HAD ACTUALLY OCCURRED AS I DROVE MY POLICE CAR OVER THE

18   RAILROAD TRACKS, ONTO THE DIRT ROAD, AND OUT TO THE PIECE OF

19   PROPERTY.

20   **Q.**   THERE'S A GATE, SIR, IS THERE NOT, THAT ENDS AT THE END OF

21   STEVENSON BOULEVARD AS YOU GO ONTO THAT PROPERTY; IS THAT

22   RIGHT?

23   **A.**   THERE IS, SIR, ON THE WEST SIDE OF THE RAILROAD TRACKS,

24   THERE'S A GATE.

25   **Q.**   I WOULD LIKE TO SHOW YOU EXHIBIT 0908-0001, IF I MAY.

1          (EXHIBIT HANDED TO WITNESS.)

2      DO YOU RECOGNIZE THAT, LIEUTENANT?

3  **A.**  YES, SIR, I DO.

4  **Q.**  WHAT IS IT?

5  **A.**  THAT'S THE GATE THAT'S AT THE END OF STEVENSON ON THE WEST

6  SIDE OF THE RAILROAD TRACKS.

7          **MR. KEARNEY:**  MAY WE ADMIT THAT PHOTOGRAPH, YOUR

8  HONOR?

9          **THE COURT:**  ANY OBJECTION?

10          **MS. HANSEN:**  NO OBJECTION, YOUR HONOR.

11          **THE COURT:**  908 IS ADMITTED.

12      (GOVERNMENT'S EXHIBIT 908 RECEIVED IN EVIDENCE)

13  **BY MR. KEARNEY:**

14  **Q.**  LIEUTENANT, WHEN YOU DROVE ONTO THE PROPERTY ON THE DATE

15  IN QUESTION, WAS THAT GATE OPEN OR CLOSED?

16  **A.**  THE GATE WAS OPEN.

17  **Q.**  PLEASE TELL US AFTER YOU DROVE THROUGH THAT GATE WHERE DID

18  YOU GO, SIR?

19  **A.**  THROUGH THE GATE, AS YOU CAN SEE, WE CONTINUED WESTBOUND

20  ON THIS PIECE OF DIRT ROAD (INDICATING).  AND IT MEANDERED

21  AROUND TO THE BACK PIECE OF THE PROPERTY.

22  **Q.**  AND AT THIS STAGE, SIR, OF YOUR, I GUESS I'LL CALL IT

23  INVESTIGATION OR RESPONSE OR SOMETHING, HAD YOU RUN INTO

24  ANYBODY WHO WAS CONNECTED TO THE SITE?

25  **A.**  AS IN THE OWNERS OF THE PROPERTY?

1    **Q.**  YES.

2    **A.**  YES, WE HAD, SIR.

3    **Q.**  PLEASE TELL US ABOUT THAT.

4    **A.**  I MET A GENTLEMAN BY THE NAME OF TIM STEELE.

5    **Q.**  AND I WONDER IF YOU CAN DESCRIBE HIS MENTAL STATE WHEN YOU

6    SAW HIM.

7         **MS. HANSEN:**  OBJECTION, RELEVANCE.

8         **THE COURT:**  SUSTAINED.

9    **BY MR. KEARNEY:**

10   **Q.**  WHERE WAS MR. STEELE WHEN YOU RAN INTO HIM?

11   **A.**  HE WAS ON STEVENSON BOULEVARD.  HE WAS PARKED ON THE SIDE,

12   OUT OF HIS VEHICLE.  AND HE WAS COMMUNICATING ORIGINALLY WITH

13   ONE OF MY OFFICERS WHO WAS ON SCENE.

14   **Q.**  ALL RIGHT.  IN ANY EVENT, WHEN YOU DROVE ONTO THE

15   PROPERTY, WERE YOU ALONE, WITH SOMEONE?  TELL US ABOUT THAT,

16   PLEASE.

17   **A.**  I FOLLOWED TIM STEELE AND ONE OF MY OTHER OFFICERS.  WE

18   DROVE OUT TO THE PROPERTY.

19   **Q.**  ALL RIGHT.

20        **MR. KEARNEY:**  AGENT SU, I WONDER IF YOU CAN PULL UP

21   EXHIBIT 3 AGAIN PLEASE.

22                   (DISPLAYED ON SCREEN.)

23       AND I WONDER IF WE CAN FOCUS ON THE CENTER BAND OF THAT,

24   INCLUDING THE SOUTHERN FILL AREA AND THE ENTRANCE.

25

**BY MR. KEARNEY:**

**Q.** IS THE AREA THAT YOU DROVE, LIEUTENANT KIMBROUGH, DEPICTED
IN THIS SECTION OF EXHIBIT 3?

**A.** YES, SIR, IT IS.

**Q.** I WONDER, WITH THE LASER POINTER, YOU CAN SHOW US WHAT YOU
DID WHEN YOU DROVE THROUGH THE GATE ON SEPTEMBER 8TH, 2014?

**A.** WE CLEARED THE GATE, DROVE IN TO THE PIECE OF PROPERTY
THIS WAY ON THE DIRT ROAD THAT'S THERE, AND ONTO THIS PIECE OF
GROUND HERE (INDICATING).

**Q.** LIEUTENANT, IS THIS -- THAT FIELD IN PARTICULAR WE ARE
GOING TO TALK ABOUT IN A MOMENT AND THE PROPERTY ITSELF, IS IT
ONE YOU'D BEEN ON BEFORE, SIR, DURING THE COURSE OF YOUR
CAREER?

**A.** YES, SIR.  I'VE BEEN ON THAT PIECE OF PROPERTY BEFORE.

**Q.** CAN YOU TELL US THE NUMBER OF TIMES, WHAT YEARS, THAT KIND
OF THING.

**A.** QUITE A FEW.  I COULDN'T GIVE YOU AN EXACT NUMBER.  I'VE
BEEN ON THERE QUITE A FEW.  MORE THAN TEN I WOULD SAY.

**Q.** AND THE TIMES YOU'VE BEEN ON THERE, WAS IT PART OF YOUR --
WERE YOU RESPONDING TO SOMETHING, WALKING AROUND, WHAT WERE
YOU DOING, SIR?

**A.** INVESTIGATING.  WE'VE HAD SEVERAL DIFFERENT ISSUES ON AND
AROUND THE AREA.

     **MS. HANSEN:**  OBJECTION, RELEVANCE TO THIS LINE OF
QUESTIONING.

1          **THE COURT:**  OVERRULED FOR NOW.

2          **THE WITNESS:**  JUST GENERAL INVESTIGATIVE PURPOSES.

3    WE HAVE THE PICK 'N PULL QUITE OFTEN GETS BURGLARIZED LATE AT

4    NIGHT.  THEN THEY'LL ENTER THROUGH THE BACK SIDE OF THE

5    PROPERTY, THROW PROPERTY OR PARTS OVER THE FENCE AND THEN

6    CARRY THEM OUT.  SO WE PATROL THAT IN THE EVENINGS QUITE

7    OFTEN.  MOWRY, IT'S PRETTY DARK.  WE ARE IN THE AREA QUITE

8    OFTEN.

9    **BY MR. KEARNEY:**

10   **Q.**  YOU'RE GENERALLY FAMILIAR WITH THE LAYOUT OF THE LAND; IS

11   THAT A FAIR STATEMENT?

12   **A.**  THAT WOULD BE A FAIR STATEMENT, YES.

13   **Q.**  SO WHEN YOU, ON SEPTEMBER 8TH, 2014, WHEN YOU ENTERED

14   INTO -- THERE'S A RED CIRCLED PERIMETER THERE WITH SOME

15   CROSS-HATCHING, DID YOU ACTUALLY ENTER ONTO THAT FIELD AT SOME

16   POINT DURING YOUR RESPONSE ON THE DATE IN QUESTION?

17   **A.**  YES, SIR, I DID.

18   **Q.**  AND WE'LL TALK ABOUT THAT IN A MOMENT.

19        WHEN YOU GOT ON THAT FIELD THAT'S DEPICTED IN RED IN THE

20   CENTER BAND OF EXHIBIT 3, RETURNING TO THE SOUTHERN FILL AREA,

21   DID YOU NOTICE ANYTHING DIFFERENT ABOUT THAT FIELD AS COMPARED

22   TO THE PAST TIMES YOU'D SEEN IT?

23   **A.**  YES, SIR.  IT WAS FULL OF DIRT.

24   **Q.**  OKAY.

25   **A.**  YOU WERE ABLE TO DRIVE THERE.

1    **Q.**  WHAT DO YOU MEAN YOU WERE ABLE TO DRIVE THERE?

2    **A.**  I'VE NEVER BEEN ABLE TO DRIVE MY VEHICLE OTHER THAN TO THE

3    END OF THE DIRT ROAD THAT'S ALREADY ESTABLISHED.  ON THE DAY

4    IN QUESTION, WE WERE ABLE TO DRIVE COMPLETELY ONTO THE AREA.

5    **Q.**  I'M GOING TO, WITH THE COURT'S PERMISSION, APPROACH THE

6    SCREEN.

7        WHEN YOU SAY IN THE PAST YOU'VE NEVER BEEN ABLE TO DRIVE

8    ANYWHERE BUT THE DIRT ROAD, IS THIS THE DIRT ROAD YOU'RE

9    TALKING ABOUT HERE (INDICATING) THAT LEADS TO THAT AREA?

10   **A.**  YES, SIR.  THE DIRT ROAD THAT COMES FROM THE RAILROAD

11   TRACKS, IT USUALLY ENDS IN THIS AREA.  AND RIGHT IN HERE ON

12   THIS PIECE OF PROPERTY.

13   **Q.**  ALL RIGHT.

14   **A.**  I'VE NEVER BEEN ABLE TO DRIVE INTO THIS PIECE OF PROPERTY

15   BEFORE (INDICATING).

16   **Q.**  IS THAT THE ROAD THAT YOU SAID WHEN YOU ENTER THE GATE, IT

17   KIND OF TURNS TOWARDS THE RIGHT?

18   **A.**  YES, SIR.

19   **Q.**  AND WHY WAS IT, SIR, THAT YOU COULDN'T DRIVE ONTO THE

20   SOUTHERN FILL AREA IN THE PAST?

21   **A.**  IT'S A GRASS AND DIRT FIELD.  THE GRASS IS USUALLY PRETTY

22   HIGH.  IT'S DIFFICULT TO SEE AS YOU DRIVE IN THERE.  THE ROAD

23   KIND OF IS -- YOU DON'T KNOW WHAT DEBRIS IS OUT THERE.  IT

24   JUST WOULDN'T BE SAFE TO DRIVE OUT THERE.

25   **Q.**  ALL RIGHT.  YOU SAID ON THIS PARTICULAR DAY YOU COULD

1    DRIVE; IS THAT FAIR?

2    **A.**  YES, SIR.

3    **Q.**  WHY?

4    **A.**  THERE WAS DIRT THAT HAD BEEN COMPACTED AND DRIVEN ON ALL

5    THROUGH THIS AREA.  IT WAS VERY EASY TO DRIVE THE PATROL CARS

6    AND PARK OUT THERE WITHOUT ANY ISSUES.

7    **Q.**  WHEN YOU GOT ON TO THE SOUTHERN FILL AREA OR THIS

8    CROSSHATCHED AREA THAT WE ARE TALKING ABOUT HERE, ON SEPTEMBER

9    THE 8TH, WAS THERE ANY MACHINERY OR EQUIPMENT VISIBLE ON THAT

10   FIELD?

11   **A.**  THERE WAS ONE PIECE OF MACHINERY, EQUIPMENT ON THE FIELD.

12   **Q.**  PLEASE TELL US ABOUT THAT.

13   **A.**  IT WAS A LARGE YELLOW EARTH MOVER, LIKE A BULLDOZER TYPE

14   VEHICLE.

15   **Q.**  I HAVE ANOTHER PHOTOGRAPH.  THIS IS EXHIBIT 0040-0001.

16                    (EXHIBIT HANDED TO WITNESS.)

17        LIEUTENANT, DO YOU RECOGNIZE ANYBODY IN THAT PHOTOGRAPH?

18   **A.**  I DO.  IT'S DARK, BUT THAT'S ME.

19   **Q.**  AND IS THAT AN ACCURATE DEPICTION OF WHEN THAT PHOTOGRAPH

20   WAS TAKEN IN THE SOUTHERN FILL AREA ON SEPTEMBER 8TH OF 2014?

21   **A.**  YES, SIR, IT IS.

22        **MR. KEARNEY:**  YOUR HONOR, MAY WE ADMIT THAT INTO

23   EVIDENCE?

24        **MS. HANSEN:**  NO OBJECTION.

25        **THE COURT:**  0040-0001 IS ADMITTED.

1          (GOVERNMENT'S EXHIBIT 0040-0001 RECEIVED IN EVIDENCE)

2     **BY MR. KEARNEY:**

3     **Q.**  LIEUTENANT, PLEASE TELL US WHAT WE'RE LOOKING AT.  DO YOU

4     HAVE ANY KIND OF A DIRECTIONAL SENSE, SIR?  CAN YOU SHARE THAT

5     WITH US?  THAT WOULD BE GREAT.

6     **A.**  THAT'S ME.  THIS IS THE BULLDOZER IN QUESTION.  IT'S

7     EMPTY.  THIS IS JUST THE SEAT.  IT'S A PRETTY HIGH BACK BLACK

8     SEAT.  IT'S FACING KIND OF WESTBOUND.  AND THIS WOULD BE KIND

9     OF A SOUTHERLY DIRECTION HERE.

10    **Q.**  DID YOU GET ANY SENSE WHETHER THAT HAD BEEN RECENTLY

11    WORKING?

12         DID YOU SEE ANYBODY ASSOCIATED WITH IT?

13         DID YOU GET A SENSE OF... IF IT HAD BEEN RECENTLY TURNED

14    OFF OR ANYTHING IN THAT REGARD?

15    **A.**  I DON'T RECALL IF I CAN HONESTLY ANSWER THAT QUESTION.  IT

16    WAS LIKE IT IS WHEN I GOT THERE.  IT WAS OFF.  THERE WAS NO

17    ONE ELSE AROUND THE AREA.

18         SO WHEN I GOT IN, IT LOOKED JUST LIKE THIS.  I DIDN'T

19    TOUCH IT TO SEE IF IT WAS WARM OR ANY OF THAT.

20    **Q.**  ALL RIGHT.

21         WHAT DO YOU SEE IN THE FOREGROUND, SIR, OF THAT

22    PHOTOGRAPH?

23    **A.**  IF YOU COULD ELABORATE, SIR.

24    **Q.**  THERE'S -- THERE SEEMS TO BE SOME STRIATIONS IN THE DIRT

25    THERE.  I WONDER IF YOU CAN TELL US ABOUT THAT, PLEASE?

1    **A.**   THESE ARE DIFFERENT TIRE TRACKS ALL THROUGH THE AREA.

2    JUST KIND OF WOVEN ALL THROUGH THE DIRT.

3    **Q.**   YOU INDICATED, LIEUTENANT, THAT THE LAST TIME YOU HAD BEEN

4    ON THIS PROPERTY THERE WAS SOME MEASURE OF VEGETATION ON IT;

5    IS THAT TRUE?

6    **A.**   YES, SIR.

7    **Q.**   AND YOU SAID THAT -- DOES THIS PHOTOGRAPH DISPLAY

8    ACCURATELY HOW IT LOOKED TO YOU ON THE DATE IN QUESTION IN

9    TERMS OF THE FILL MATERIAL YOU SAID HAD BEEN COMPACTED?

10   **A.**   IT'S COMPLETELY DIFFERENT THAN WHAT IT LOOKED LIKE PRIOR.

11   **Q.**   OKAY.

12        DID YOU ALSO SEE FILL ACTUALLY ON SOME VEGETATION WHILE

13   YOU WERE OUT THERE THAT DAY?

14   **A.**   YES, SIR.

15        **MR. KEARNEY:**   YOUR HONOR, I WOULD LIKE TO SHOW TWO

16   PHOTOGRAPHS PREVIOUSLY ADMITTED.  THESE ARE EXHIBITS 0117-0001

17   AND EXHIBIT 018 -- I'M SORRY, 0118-0001.

18        **THE COURT:**   YOU MAY.

19        **MR. KEARNEY:**   THANK YOU.

20             (EXHIBITS HANDED TO WITNESS.)

21   **BY MR. KEARNEY:**

22   **Q.**   LIEUTENANT, DO YOU RECOGNIZE WHAT'S DEPICTED IN THOSE

23   IMAGES?

24   **A.**   YES, SIR, I DO.

25   **Q.**   ARE THEY -- DO YOU RECOGNIZE THAT AS THE SOUTHERN FILL

1    AREA?

2    **A.**  YES, SIR, I DO.

3    **Q.**  DOES IT ACCURATELY DEPICT THE SOUTHERN FILL AREA IN YOUR

4    ESTIMATION, SIR?

5    **A.**  AS THE DAY I SAW IT ON THE 8TH?

6    **Q.**  WELL, AS THE CONDITION THAT YOU SAW IT ON THE 8TH.  I

7    DON'T THINK THOSE PHOTOGRAPHS WERE TAKEN ACTUALLY ON THAT

8    DATE.

9    **A.**  YES, SIR.  IT IS A REFLECTION OF WHAT I SAW ON THE 8TH.

10           **MR. KEARNEY:**  I WOULD LIKE -- THEY ARE ALREADY IN

11   EVIDENCE, YOUR HONOR.  MAY WE PUBLISH THOSE AT THIS TIME?

12           **THE COURT:**  YES.

13                 (DISPLAYED ON SCREEN.)

14   **BY MR. KEARNEY:**

15   **Q.**  LIEUTENANT, CAN YOU TELL US WHERE ON THE FIELD WE ARE

16   LOOKING AT RIGHT NOW, IF YOU KNOW?

17   **A.**  I BELIEVE THIS IS TO THE SOUTH OF THE FIELD.

18   **Q.**  ALL RIGHT.

19      THE IMAGE THAT'S DEPICTED THERE, IS THAT CONSISTENT WITH

20   WHAT YOU SAW WHEN YOU ACTUALLY WENT ONTO THE FIELD

21   SEPTEMBER 8TH OF 2014?

22   **A.**  YES, SIR, IT IS.

23   **Q.**  HOW SO?

24   **A.**  IT LOOKS LIKE IT LOOKED WHEN I WAS THERE ON THE 8TH.  THE

25   DIRT WAS LIKE IT IS THERE, UP AGAINST THE EDGE OF THE GRASS

1  AND IN THE FIELD.

2  **Q.**  DID YOU SEE DIRT LIKE THIS PILE ON TOP OF VEGETATION WHILE

3  YOU WERE OUT THERE THAT DAY ON SEPTEMBER 8TH?

4  **A.**  YES, SIR, I DID.

5  **Q.**  DO YOU -- AT THE TIME YOU SAW -- ON SEPTEMBER THE 8TH, DID

6  YOU KNOW THE TYPE OF VEGETATION THAT WAS PILED ON?

7  **A.**  I BELIEVE I KNEW SOME OF THE VEGETATION, YES, SIR.

8  **Q.**  CAN YOU TELL US ABOUT THAT?

9        **MS. HANSEN:**  OBJECTION, YOUR HONOR, FOUNDATION.

10       **THE COURT:**  WHY DON'T WE LAY A FOUNDATION --

11       **MR. KEARNEY:**  SURE.

12       **THE COURT:**  -- AS TO WHETHER HE KNOWS.

13  **BY MR. KEARNEY:**

14  **Q.**  THE VEGETATION THAT YOU SAID YOU KNOW, THE GENUS OF, THE

15  TYPE, HOW DID YOU COME TO KNOW THAT, SIR?

16  **A.**  THIS PARTICULAR PIECE OF PROPERTY WAS SLATED FOR

17  DEVELOPMENT WITH THE CITY OF NEWARK AND AS -- WAS HELD UNDER A

18  COURT ORDER TO DELAY THAT DEVELOPMENT BASED ON SOME WILDLIFE

19  AND WATERWAYS ISSUES, PARTICULARLY A MOUSE, FIELD MOUSE THAT

20  ATE A PLANT CALLED PICKLEWEED.

21       **MS. HANSEN:**  OBJECTION, NARRATIVE, NONRESPONSIVE.

22       **MR. KEARNEY:**  HE IS LAYING A FOUNDATION, SIR.

23       **THE COURT:**  I'LL SUSTAIN THE FOUNDATION OBJECTION.

24  **BY MR. KEARNEY:**

25  **Q.**  SO DID YOU LEARN WHAT THE VEGETATION WAS THAT WAS DUMPED

1    ON IN THIS FIELD?

2    **A.**  YES, I DID.

3           **MS. HANSEN:**  SAME OBJECTION, YOUR HONOR.

4           **THE COURT:**  SUSTAINED.

5           **MR. KEARNEY:**  ALL RIGHT.

6    **BY MR. KEARNEY:**

7    **Q.**  AFTER MAKING ASSESSMENT, LIEUTENANT, OF THE SOUTHERN FILL

8    AREA, DID YOU EVER DRIVE OVER TO THE MOWRY SIDE OF THE

9    PROPERTY?

10   **A.**  YES, SIR.

11   **Q.**  WAS IT THAT DAY?  ANOTHER DAY?  TELL US ABOUT THAT,

12   PLEASE.

13   **A.**  I DON'T BELIEVE IT WAS THAT ORIGINAL DAY.  I BELIEVE IT

14   WAS THE NEXT DAY WE RECEIVED INFORMATION, AND I DROVE OVER

15   THAT NEXT DAY AND TOOK A LOOK.

16   **Q.**  ALL RIGHT.

17       CAN WE PULL UP EXHIBIT 3 AGAIN?

18           **THE CLERK:**  I'M SORRY, WHAT WAS THE NUMBER?

19           **MR. KEARNEY:**  3.

20               (DISPLAYED ON SCREEN.)

21           **MR. KEARNEY:**  MAYBE AGENT SU, CAN YOU PULL UP OR

22   ENLARGE THE MOWRY SECTION?  THE NORTHERN FILL AREA?

23   **BY MR. KEARNEY:**

24   **Q.**  PLEASE TELL US -- THE NEXT DAY, THIS WOULD BE

25   SEPTEMBER THE 9TH, LIEUTENANT; IS THAT RIGHT?

1    **A.**   I BELIEVE SO, YES, SIR.

2    **Q.**   TELL US WHAT YOU OBSERVED, IF ANYTHING, ON THE MOWRY SIDE

3    ON SEPTEMBER THE 9TH, 2014.

4    **A.**   AGAIN, OFF OF MOWRY BOULEVARD AND NOTICED THAT THE SAME

5    TYPE OF DIRT AREA THAT WE ENCOUNTERED THE DAY BEFORE WAS IN

6    THIS FIELD AS WELL (INDICATING).

7    **Q.**   WHEN YOU SAY THE SAME KIND OF DIRT AREA, IS THERE -- DID

8    YOU PERCEIVE A DIFFERENCE IN THE DIRT THAT HAD BEEN DUMPED AS

9    OPPOSED TO THE NATIVE SOIL?

10   **A.**   IT LOOKED TO BE THE DIRT THAT WAS SIMILAR DUMPED IN THE

11   SOUTHERN AREA.

12   **Q.**   HOW SO?

13   **A.**   IT WAS THE SAME COLOR, SAME TEXTURE.

14   **Q.**   DO YOU REMEMBER WHEN THE LAST TIME YOU HAD BEEN ON THE

15   MOWRY SIDE OF THE PROPERTY WAS?

16   **A.**   I DON'T RECALL, SIR.

17   **Q.**   OKAY.  THANK YOU.

18        **MR. KEARNEY:**  NO FURTHER QUESTIONS, YOUR HONOR.

19   THANK YOU.

20        **THE COURT:**  ALL RIGHT.  UNDERSTANDING WE HAVE TO

21   BREAK --

22        **MS. HANSEN:**  YOUR HONOR, NO QUESTIONS.

23        **THE COURT:**  ALL RIGHT.  THANK YOU, LIEUTENANT

24   KIMBROUGH.  YOU ARE EXCUSED.

25        **THE WITNESS:**  THANK YOU.

```
1          THE COURT:  ALL RIGHT.  WE ARE AT 12:40 AND WE NEED

2    TO MAKE SURE THAT WE BREAK BY 12:45.  SO WHY DON'T WE END

3    THERE, LADIES AND GENTLEMEN.  WE'LL SEE YOU BACK HERE TO START

4    PROMPTLY AT 8:30 TOMORROW.

5          KEEP IN MIND ALL OF YOUR RULES FOR JURORING.  NO RESEARCH

6    ABOUT THE CASE, NO DISCUSSIONS ABOUT THE CASE IN ANY FORMAT.

7    NO NEWS, MEDIA REPORTS, OTHER INFORMATION ABOUT THE CASE, NO

8    RESEARCH OF ANY KIND AS TO THE CASE OR THE ISSUES INVOLVED IN

9    IT, AND PLEASE DO AT ALL TIMES REMEMBER TO KEEP AN OPEN MIND

10   UNTIL ALL THE EVIDENCE HAS BEEN PRESENTED, YOU'VE HEARD THE

11   ARGUMENTS OF COUNSEL, MY INSTRUCTIONS, AND YOU'VE BEEN GIVEN

12   THE CASE TO DELIBERATE AND CONSIDER THE VIEWS OF YOUR FELLOW

13   JURORS.

14         SO WITH THAT, TAKE CARE.  HAVE A GOOD REST OF YOUR DAY.

15   MR. BARRANCO, CONGRATULATIONS.  AND WE'LL BE BACK ON AT

16   8:30 TOMORROW.

17         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

18         THE CLERK:  YOU MAY BE SEATED.

19         THE COURT:  SEE YOU TOMORROW?

20         MR. KEARNEY:  YES, YOUR HONOR.  THANK YOU.

21         (PROCEEDINGS ADJOURNED AT 12:41 P.M.)

22

23

24

25
```

1

2

3                       **CERTIFICATE OF REPORTER**

4              I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

7    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9                     *Diane E. Skillman*

10              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

11                 THURSDAY, FEBRUARY 8, 2018

12

13

14

15

16

17

18

19

20

21

22

23

24

25