VOLUME 6

PAGES 854 – 1048

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-16-00107 HSG |
| | ) | |
| VS. | ) | WEDNESDAY, FEBRUARY 14, 2018 |
| | ) | |
| JAMES PHILIP LUCERO, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | JURY TRIAL |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**            ALEX G. TSE, ESQUIRE
                     ACTING UNITED STATES ATTORNEY
                     450 GOLDEN GATE AVENUE, 11TH FLOOR
                     SAN FRANCISCO, CALIFORNIA  94102
              BY:  PHILIP J. KEARNEY,
                     SHIAO C. LEE,
                     ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**            FEDERAL PUBLIC DEFENDER'S OFFICE
                     1301 CLAY STREET, SUITE 1350N
                     OAKLAND, CALIFORNIA 94612
              BY:  ANGELA M. HANSEN,
                     NED SMOCK,
                     ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                     OFFICIAL COURT REPORTER


TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1                        I N D E X

2    GOVERNMENT'S WITNESSES:                    PAGE    VOL.

3    HARDWICKE, KELLY

4    DIRECT EXAMINATION BY MR. KEARNEY (RESUMED)  865     6

5    CROSS-EXAMINATION BY MS. HANSEN              903     6

6    REDIRECT EXAMINATION BY MR. KEARNEY          971     6

7    KNUDSEN, DUNCAN

8    DIRECT EXAMINATION BY MS. LEE                979     6

9    CROSS-EXAMINATION BY MR. SMOCK               985     6

10   RYDELIUS, ANGELA

11   DIRECT EXAMINATION BY MS. LEE                989     6

12   DEGHI, GARY

13   DIRECT EXAMINATION BY MR. KEARNEY            999     6

14   CROSS-EXAMINATION BY MR. SMOCK              1023     6

15   BOURSIER, PATRICK

16   DIRECT EXAMINATION BY MS. LEE               1025

17

18

19

20

21

22

23

24

25
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

```
                    E X H I B I T   I N D E X
```

| GOVERNMENT'S EXHIBITS: | WITHDRAWN | ID. | EVD. | VOL. |
|---|---|---|---|---|
| 606 | | | 981 | 6 |
| 637 | | | 879 | 6 |
| 639 | | | 881 | 6 |
| 894-003 – 4 | | | 1015 | 6 |
| 897 | | | 991 | 6 |
| **DEFENDANT'S EXHIBITS:** | | | | |
| 2001B | | | 922 | 6 |
| 2002D | | | 949 | 6 |
| 2003 | | | 951 | 6 |
| 2004 | | | 953 | 6 |
| 2006 | | | 961 | 6 |

```
 1    WEDNESDAY, FEBRUARY 14, 2018                    8:21 A.M.

 2                        P R O C E E D I N G S

 3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

 4            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THE

 5    HONORABLE HAYWOOD S. GILLIAM, JUNIOR, PRESIDING.

 6        WE ARE CALLING CR-16-00107, UNITED STATES OF AMERICA

 7    VERSUS JAMES PHILIP LUCERO.

 8        PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR THE

 9    RECORD, PLEASE.

10            MS. LEE:  SHIAO LEE AND PHILIP KEARNEY ON BEHALF OF

11    THE UNITED STATES.  GOOD MORNING, YOUR HONOR.

12            MR. KEARNEY:  GOOD MORNING.

13            MS. HANSEN:  GOOD MORNING.  ANGELA HANSEN ON BEHALF

14    OF MR. LUCERO, WHO IS PRESENT.

15            THE COURT:  GOOD MORNING.

16            MR. SMOCK:  GOOD MORNING, YOUR HONOR.  NED SMOCK ALSO

17    FOR MR. LUCERO.

18            THE COURT:  ALL RIGHT.  GOOD MORNING.

19        ALL RIGHT.  IT STRUCK ME THAT THE MAIN ISSUE ON FOR THIS

20    MORNING IS THE BOURSIER AND DEGHI ISSUES; IS THAT RIGHT?

21            MS. LEE:  YES.

22            MR. KEARNEY:  YES.

23            THE COURT:  AGAIN, I HAVE REVIEWED THE OFFER OF PROOF

24    SUBMITTED BY THE GOVERNMENT FOR EACH OF THOSE WITNESSES AND

25    THE DEFENDANT'S RESPONSE.  AND MY -- AGAIN, WITH DEGHI IT'S --
```

1    IT REALLY DEPENDS ON WHAT HE IS PLANNING TO DO.  IF IT IS BIRD

2    COUNTING, I DON'T THINK THERE IS ANY DISPUTE.  IF THERE IS

3    SOMETHING ELSE, THEN MAYBE THERE IS A DISPUTE.  SO WITH REGARD

4    TO HIM, WHICH IS IT?

5            **MR. KEARNEY:**  YOUR HONOR, IT IS BIRD COUNTING AND IT

6    IS NOT VERY COMPLICATED.  THE BIRDS -- HE WILL TELL US THE

7    BIRDS GO FROM THE WETLAND TO THE SLOUGH AND BACK AGAIN

8    DEPENDING ON TIDE LEVELS, AND THAT ESTABLISHES A BIOLOGICAL

9    CONNECTION BETWEEN THE WETLAND AND THE SLOUGH.

10           **MR. SMOCK:**  SO, YOU KNOW, OBVIOUSLY, LIKE WE STATED

11   IN OUR BRIEF, WE HAVE NO OBJECTION TO HIM TESTIFYING ALONG THE

12   LINES OF WHAT HE OBSERVED FOR THOSE FOUR HOURS.  THE ONLY SORT

13   OF GRAY AREA THERE IS WHAT THE GOVERNMENT INTENDS TO HAVE HIM

14   SAY BEYOND THAT.

15       AND OUR POSITION IS, HE SHOULD TESTIFY WITH RESPECT TO HIS

16   OBSERVATIONS.  AND TO THE EXTENT HE HAS ANY OBSERVATIONS BASED

17   ON HIS EXPERTISE ABOUT WHAT A BIRD GOING FROM ONE PLACE TO

18   ANOTHER SUGGESTS OR WHY THEY ARE DOING IT, I THINK THAT IS

19   APPROPRIATE AND THAT IS CONSISTENT WITH THE NOTICE, BUT

20   ANYTHING BEYOND THAT ABOUT BIOLOGICAL INTEGRITY OR ANYTHING

21   LIKE THAT GOES BEYOND THE NOTICE.

22       AND OF COURSE THE GOVERNMENT IN CLOSING CAN ARGUE BASED ON

23   WHAT DEGHI OBSERVED RELYING ON THE LEGAL STANDARD IN THE JURY

24   INSTRUCTIONS.  BUT HAVING THE EXPERT TESTIFY ABOUT ANYTHING

25   WITH RESPECT TO THE LEGAL STANDARD IS BEYOND THE NOTICE AND

1    WOULD BE IMPROPER.

2         **THE COURT:**  ALL RIGHT.  SO AS DESCRIBED, IT APPEARS

3    TO ME THAT THE TESTIMONY IS WITHIN THE SCOPE OF THE NOTICE

4    UNDER RULE 16 AND IS PERMISSIBLE.  OBVIOUSLY IF IT GOES WAY

5    AFIELD, I WILL EVALUATE IT AT THE TIME.

6         WITH REGARD TO PATRICK BOURSIER, THE SAME OBJECTION HAS

7    BEEN LODGED.  AND, AGAIN, LOOKING AT THE PAPERS THAT HAVE BEEN

8    FILED AS TO THAT WITNESS, IT DOES APPEAR THAT THE PROFFERED

9    TESTIMONY WAS ADEQUATELY DISCLOSED WITHIN THE MEANING OF

10   RULE 16, SUBJECT TO EVALUATING IT AS IT COMES IN.  BUT AT

11   LEAST AS PROFFERED IT STRUCK ME AS FAIRLY WITHIN THE NOTICE.

12        **MS. LEE:**  YOUR HONOR, YOU'LL NOTICE WITH DR. BOURSIER

13   IN THE LAST SECTION THAT TALKS ABOUT HIS -- WHAT WE ANTICIPATE

14   HIS STATED OPINION IS, WE DO NOT INCLUDE THAT HE WILL OPINE ON

15   THE TERM "SIGNIFICANT NEXUS."

16        HE WILL TALK CERTAINLY ABOUT HIS MORE THAN TWO DECADES OF

17   REVIEWING THE SITE, THE HYDROLOGICAL CONNECTION THAT HE KNOWS

18   ON THE SITE, WHY HE BELIEVES THE SITE CONTAINS "WATERS OF THE

19   UNITED STATES."  HE, HOWEVER, HAS NOT PERFORMED THE

20   SIGNIFICANT NEXUS TEST BEFORE, SO WE WILL LIMIT HIS TESTIMONY,

21   WHEN WE CALL HIM, TO WHY HE BELIEVES THE SITE CONTAINS "WATERS

22   OF THE UNITED STATES" INDEPENDENT OF USING THE TERM

23   "SIGNIFICANT NEXUS."

24        **THE COURT:**  ALL RIGHT.

25        **MR. SMOCK:**  YOUR HONOR, I GUESS THE ONLY THING, MY --

1    THIS IS NEW TO US, BUT MY IMMEDIATE REACTION TO THAT IS,

2    DETERMINING THAT SOMETHING IS A "WATER OF THE UNITED STATES"

3    NECESSARILY INVOLVES CONSIDERING WHETHER THERE IS A

4    SIGNIFICANT NEXUS.  SO HOW THEY CAN DO THAT DANCE WITHOUT

5    CONSIDERING SIGNIFICANT NEXUS IS A LITTLE BEYOND ME.  PERHAPS

6    THE GOVERNMENT COULD EXPLAIN THAT.

7         **THE COURT:**  IT SOUNDS LIKE THEY WOULD DO WHAT YOU

8    WERE JUST TALKING ABOUT, WHICH IS SAY, HERE ARE THE FACTS AND

9    YOU HEARD DR. BOURSIER AND THESE OTHER WITNESSES, AND THAT

10   ESTABLISHES THAT THERE IS A SIGNIFICANT NEXUS WITHIN THE

11   MEANING OF THE INSTRUCTION.

12        **MR. SMOCK:**  WELL, THAT IS TRUE.  I MEAN, ASSUMING --

13   YOU'RE ASSUMING THAT THAT IS HAPPENING IN CLOSING AND THAT IS

14   TOTALLY FINE.  BUT I THINK WHAT I JUST HEARD MS. LEE SAY IS,

15   HE IS NOT GOING TO SAY THE WORD "SIGNIFICANT NEXUS," BUT HE IS

16   GOING TO EXPLAIN WHY HE THINKS IT IS A "WATER OF THE UNITED

17   STATES."

18        **MS. LEE:**  SO THAT EXHIBIT 3, WHICH -- AND ACTUALLY

19   ALSO THE OVERSIZED EXHIBIT 6, THAT'S THE MAPPING THAT HARVEY

20   DID THAT SHOWED WHERE THEY BELIEVED POTENTIAL "WATERS OF THE

21   UNITED STATES" TO BE, THE AQUATIC AREAS AND THE GREEN WETLAND

22   AREAS.  I AM GOING TO ASK HIM WHY HE BELIEVED THOSE WERE

23   JURISDICTIONAL WETLANDS, WHY THEY WERE JURISDICTIONAL AQUATIC

24   AREAS, BECAUSE THAT IS WHAT HE PLACED ON THAT MAP.

25        **MR. SMOCK:**  SO I GUESS, IF WE COULD GET A PROFFER

1    ABOUT WHAT THE ANSWER WOULD BE, WE COULD EVALUATE WHETHER THAT

2    IS APPROPRIATE OR NOT.

3         **MS. LEE:**  IT IS EVERYTHING LISTED IN THE OFFER OF

4    PROOF UNDER THE SECTION DR. BOURSIER'S OPINIONS.  HE WILL TALK

5    ABOUT HOW THE WETLANDS ARE ADJACENT TO A TRADITIONAL NAVIGABLE

6    WATER.  HE HAS EXPERTISE ON THE BIOTIC HABITATS OF THE LAND.

7    HE UNDERSTANDS THE HYDROLOGICAL CONNECTIONS OF HOW WATER FLOWS

8    OFF OF THE PROPERTY INTO THE SLOUGH.  AND HE WILL TALK ABOUT

9    THE PROXIMITY, THE CONNECTIONS BETWEEN THE WETLAND AND THE

10   SLOUGH, AND WHY HE BELIEVED AND HE MAPPED IT AS POTENTIAL

11   "WATERS OF THE UNITED STATES."

12       BUT HE -- AT THE TIME WHEN HE DID THAT MAPPING, HE WASN'T

13   IN THE HABIT OF DOING A SIGNIFICANT NEXUS ANALYSIS, AND, IN

14   FACT, HE HAS NOT DONE ONE BEFORE TO DATE.  AND SO HE IS NOT

15   COMFORTABLE OPINING ON THAT TERM, AND WE CERTAINLY WANT TO

16   CONTAIN HIM TO AREAS THAT HE'S COMFORTABLE GIVING AN OPINION

17   ON.

18        **MS. HANSEN:**  FAIR ENOUGH, YOUR HONOR.  WE WILL DEAL

19   WITH THAT IN CLOSING.

20        **THE COURT:**  ALL RIGHT.  EXACTLY.  IT SOUNDS LIKE

21   THERE ARE TWO TIERS TO THIS ISSUE, LIKE ALL OF THESE ISSUES.

22   ONE IS THE DISCLOSURE, AND I FIND THAT THE DISCLOSURE IS

23   ADEQUATE WITHIN THE MEANING OF RULE 16 AS TO THE OPINIONS THAT

24   ARE BEING PROFFERED.  AS TO THE ACTUAL WEIGHT OR

25   IMPEACHABILITY OF THE TESTIMONY, I DON'T NEED TO GET THERE

1   RIGHT NOW.

2          **MS. HANSEN:**  RIGHT.  AND IF, TO THE EXTENT THAT IT

3   CHANGES THE INDICTMENT, WE WILL FILE THE APPROPRIATE PAPERS.

4   SO UNDERSTOOD.

5          **THE COURT:**  EXACTLY.

6       ALL RIGHT.  AND THEN THE ONLY OTHER THING WAS -- SO I

7   DID -- I ASKED YOU TO FOLLOW UP ON THIS QUESTION OF THE

8   IMPEACHMENT ISSUE, AND YOU DID THE HOMEWORK.

9       AND I SUPPOSE MY READ IS, IT'S -- THERE'S NOTHING REALLY

10  CONCLUSIVE ON IT, AND SO I'LL JUST SEE HOW IT COMES IN AND HOW

11  IT'S USED.

12      I DO TAKE THE POINT, AND THIS IS SOMETHING THAT I HAD

13  THOUGHT OF, AT LEAST AS TO THE EXPERTS, IT SEEMS UNDISPUTED

14  THAT THEY WERE PROVIDED AT LEAST SOME OF DR. HUFFMAN'S

15  MATERIALS, THIS MAP THAT WE ARE SEEING AND OTHERS.  AND GIVEN

16  THAT, IT DOES SEEM LIKE THERE IS AT LEAST A BASIS TO TAKE THIS

17  OUT OF THE *HANFORD* TERRITORY, BUT I SUPPOSE I WILL JUST NEED

18  TO SEE HOW IT PLAYS FOR EACH WITNESS.

19         **MR. KEARNEY:**  WE UNDERSTAND THAT, SIR, AND THAT IS

20  FINE WITH THE GOVERNMENT.  IN RESPONSE, THOUGH, WE WOULD JUST

21  SAY THAT ASKING THEM TO COMMENT ON A MAP AND WHETHER IT IS

22  ACCURATE OR NOT IS DIFFERENT THAN TAKING QUOTES FROM AN --

23  ANOTHER EXPERT'S REPORT OR TAKING CONCLUSIONS FROM ANOTHER

24  EXPERT'S REPORT AND CONFRONTING THESE TESTIFYING EXPERTS WITH

25  THEM.  I JUST THINK THOSE ARE TWO SEPARATE THINGS.

1        WE CAN PROCEED ON AN OBJECTION BASIS AS WE GET THROUGH THE

2    TESTIMONY, BUT I WOULD JUST MAKE THE COURT AWARE THAT'S OUR

3    VIEW OF A DIFFERENCE BETWEEN LOOKING AT A DOCUMENT AND

4    CONFRONTING SOMEONE WITH AN OPINION THAT THEY HAVE NOT RELIED

5    ON.

6        **THE COURT:**  YEAH.  IT WOULD HAVE BEEN HELPFUL IF

7    ANYONE COULD HAVE FOUND CASES APPLYING THIS PRINCIPLE IN

8    CRIMINAL CASES.  I ASSUME NO ONE FOUND IT.  WE DIDN'T.  SO

9    THAT'S SOMETHING I HAVE TO KEEP IN MIND.

10        **MR. KEARNEY:**  THANK YOU.

11        **MS. HANSEN:**  YOUR HONOR, ONE HOUSEKEEPING MATTER.  I

12   RECEIVED SOME NEW DISCOVERY THIS MORNING, SOME PHOTOGRAPHS

13   FROM -- APPARENTLY THEY WERE TAKEN YESTERDAY.  I AM HOPING

14   THAT THE COURT WOULD AGREE AND THE GOVERNMENT THAT THOSE ARE

15   NOT TO BE USED IN THIS TRIAL AS BEYOND THE DISCOVERY CUTOFF.

16        **MS. LEE:**  YOUR HONOR, WE MET WITH DR. BOURSIER

17   YESTERDAY, AND HE NOTIFIED ME IN MY OFFICE, OH, I WENT TO THE

18   SITE AND I TOOK PHOTOS TODAY.  THAT WAS YESTERDAY.  I

19   IMMEDIATELY GOT THEM.  WE IMMEDIATELY SENT THEM OVER TO THE

20   DEFENSE.  WE DON'T INTEND TO USE THEM.  BUT WE JUST WANTED TO

21   COMPLY WITH DISCOVERY AND SHOOT IT OVER AS SOON AS POSSIBLE.

22        **THE COURT:**  SOUNDS LIKE A GOOD DECISION.

23        OH, AND THEN THE OTHER JUST MECHANICAL ISSUE, AT SOME

24   POINT I NEED TO TELL THE JURY THAT WE WILL BE OFF ON MONDAY

25   BECAUSE IT IS A HOLIDAY, BUT I MAY WAIT A DAY OR TWO TO DO

THAT.

THE CLERK:  WELL, I KIND OF ALREADY DID BECAUSE THEY

ASKED -- ONE OF THEM ASKED ABOUT BABYSITTING ISSUES, DID SHE

HAVE TO FIND A BABYSITTER FOR MONDAY.  AND I WAS LIKE, I'M NOT

GOING TO BE HERE.  THE JUDGE IS NOT GOING TO BE HERE.  YOU ARE

WELCOME TO COME AND FIND A BABYSITTER, OR YOU CAN STAY HOME.

SO THEY KNOW.

THE COURT:  MAYBE ON FRIDAY I'LL GIVE THEM THAT

REMINDER, IF WE ARE STILL PLUGGING FORWARD.

THEN JUST ONE THING FOR THE GOVERNMENT, AND I -- THIS IS

JUST SOLELY IN THE NATURE OF TRYING TO PLAN AND OBVIOUSLY

THINK ABOUT WHEN WE NEED TO FIRE UP THE JURY INSTRUCTION

MACHINE, AND DO THOSE TYPES OF THINGS, IT SEEMS LIKE THERE ARE

SOME WITNESSES WHO ARE IN THE CATEGORIES THAT I WOULD THINK

THE GOVERNMENT MAY BE THINKING ABOUT WHETHER WE NEED TO CALL

THEM.  I AM THINKING ABOUT SORT OF THESE ADDITIONAL TRUCK

DRIVER TYPES, JOHN ARRILLAGA AND RICHARD PEERY, GIVEN WHAT

THEY WOULD BE TESTIFYING TO AND WHAT WE HAVE ALREADY HEARD,

ARE SOME OF THESE PEOPLE FALLING AWAY?

MR. KEARNEY:  YES.

MS. LEE:  YES.

THE COURT:  ALL RIGHT.

MS. LEE:  IN FACT, ALL THE PEOPLE THAT YOU LISTED.

THERE IS GOING TO BE NO MORE TRUCK DRIVERS.  NEITHER WILL

MR. PEERY OR MR. ARRILLAGA BE TESTIFYING.

1        **THE COURT:**  ALL RIGHT.  THAT IS HELPFUL.  THANKS.

2    WHY DON'T WE COME BACK IN TWO MINUTES.

3        **THE CLERK:**  THANK YOU.  OKAY.

4        (RECESS TAKEN AT 8:34 A.M.; RESUMED AT 8:36 A.M.)

5        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

6        **THE CLERK:**  YOU MAY BE SEATED.  REMAIN SEATED.  COME

7    TO ORDER.  THIS COURT IS IN SESSION.

8        **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

9    WELCOME BACK.  AT THIS TIME WE WILL CONTINUE WITH THE

10   PRESENTATION OF THE GOVERNMENT'S CASE, AND YOU MAY PROCEED,

11   MR. KEARNEY.

12       **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

13              **DIRECT EXAMINATION (RESUMED)**

14   BY MR. KEARNEY:

15   **Q.**  DR. HARDWICKE, GOOD MORNING.

16   **A.**  GOOD MORNING.

17   **Q.**  DR. HARDWICKE, WHEN WE ENDED YESTERDAY, WE HAD FINISHED

18   TALKING ABOUT THE NORTHERN FILL AREA.  WE ARE GOING TO MOVE TO

19   THE SOUTH.

20       **MR. KEARNEY:**  I WANT TO BRING UP EXHIBIT 3 FOR A

21   MOMENT, IF I MAY.  IF WE CAN BLOW UP THE UPPER PORTION OF

22   THAT, AGENT SU, THAT WOULD BE GREAT.

23              (DISPLAYED ON SCREEN.)

24   BY MR. KEARNEY:

25   **Q.**  SO, DR. HARDWICKE, WE ARE MOVING FROM THE NORTHERN FILL

1    AREA TO THE SOUTHERN NOW.  I WANT TO ASK YOU JUST GENERALLY,

2    DO THESE -- DO THE PERIMETERS OF THE DUMPING, THE FILL

3    ACTIVITY IN 2014, AS SHOWN ON THIS DIAGRAM, FIT WITH YOUR

4    OBSERVATIONS OF THE SCENE IN PERSON AND IN YOUR REVIEW OF THE

5    PHOTOGRAPHS IN THIS CASE?

6    **A.**  YES, IT DOES.  WHEN I WAS OUT THERE IN FEBRUARY OF 2017,

7    THIS APPEARED TO BE THE APPROXIMATE SHAPE OF THE FILL

8    POLYGONS.  AND ALSO, A COUPLE OF THE AERIAL PHOTOGRAPHS THAT

9    I'VE SEEN, I CAN SEE, YOU KNOW, DISTINCT FEATURES ON OUR

10   MAPPING THAT SHOW UP ON THE AERIAL PHOTOGRAPHS.

11   **Q.**  ALL RIGHT.  THANK YOU.

12       SO LET'S GO OVER TO THE SOUTHERN FILL AREA NOW, IF WE MAY.

13   I WOULD LIKE TO SHOW YOU A PREVIOUSLY ADMITTED EXHIBIT.  THIS

14   IS 138.

15                       (DISPLAYED ON SCREEN.)

16       DO YOU RECOGNIZE THE AREA DEPICTED IN THIS PHOTOGRAPH?

17   **A.**  YES.  THIS IS THE WESTERN END OF THE SOUTHERN FILL AREA.

18           **MR. KEARNEY:**  I'M GOING TO, WITH THE COURT'S

19   PERMISSION, APPROACH THE WITNESS TO -- HOW ARE WE DOING ON

20   THIS TODAY, OKAY?

21           **THE COURT:**  YOU MAY.

22   **BY MR. KEARNEY:**

23   **Q.**  WITH THE LASER, I WONDER IF YOU COULD WALK US THROUGH,

24   DR. HARDWICKE, WHAT YOU SEE AS SIGNIFICANCE REGARDING THE

25   DUMPING ACTIVITY IN THIS PHOTOGRAPH.

HARDWICKE – DIRECT / KEARNEY

1  **A.**  YES.  SO I CAN SEE THE --

2  **Q.**  THIS WAS WORKING FOR ME.  ARE YOU PRESSING IT?  THERE WE

3  GO.

4  **A.**  SO I CAN SEE WHERE THE FIELD HAS BEEN DISKED.  THIS IS THE

5  NORMAL DISKING PATTERN WHERE THEY BRING A TRACTOR UP AND THEN

6  THEY TURN IT AROUND.  SO YOU CAN SEE THAT HERE AS WELL

7  (INDICATING).

8      THIS IS THE TYPICAL COLOR OF THE SOILS IN THIS FIELD, A

9  SORT OF MEDIUM DARK BUT VERY GRAY COLOR OF SOIL.  AND THEN YOU

10  CAN SEE THIS LIGHTER-COLORED, MORE YELLOW SOIL APPLIED OVER

11  THE TOP OF IT.  IT KIND OF PUSHED OUT THIS WAY (INDICATING),

12  IT PUSHED THIS WAY (INDICATING), AND BASICALLY INTERCEPTING

13  VEGETATION UP HERE.

14  **Q.**  DO YOU SEE WETLAND VEGETATION IN THIS PHOTOGRAPH?

15  **A.**  I DO.

16  **Q.**  WHEREABOUTS?

17  **A.**  HERE IS SOME WETLAND VEGETATION (INDICATING), AND THIS

18  WILL ALSO -- ALTHOUGH NOT AFFECTED BY THE FILL, THAT IS

19  WETLAND VEGETATION AS WELL (INDICATING).

20  **Q.**  THAT IS PICKLEWEED THERE ON THE LEFT?

21  **A.**  YES.

22      **MR. KEARNEY:**  SO, YOUR HONOR, FOR THE RECORD, THE

23  WITNESS HAS JUST IDENTIFIED A GREEN AREA OF WETLAND VEGETATION

24  TOWARDS THE UPPER PORTION OF THIS EXHIBIT AND THEN A -- KIND

25  OF A WALL OF PICKLEWEED ON THE LEFT PORTION OF THIS EXHIBIT.

1    **BY MR. KEARNEY:**

2    **Q.**   DOCTOR, THERE HAS BEEN -- AND THE FILL EXTENDS KIND OF TO

3    A PEAK ON THE LEFT PART OF THAT PHOTOGRAPH; IS THAT RIGHT?

4    **A.**   THAT'S RIGHT.

5    **Q.**   OKAY.  YOUR EXPERIENCE -- YOU HAVE HAD A LOT OF EXPERIENCE

6    WITH THIS FIELD; IS THAT RIGHT?

7    **A.**   YES.

8    **Q.**   AND TYPICALLY IS THERE WETLAND VEGETATION THROUGHOUT THIS

9    FIELD?

10   **A.**   YES, THERE IS.  THE EASTERN PORTION OF THE FIELD IS THE

11   DRIEST PORTION.  HOWEVER, ON THE SOUTHERN BOUNDARY OF THE

12   FIELD THE EASTERN AREA HAS A SEEP, SO THAT HAS WETTED UP THE

13   SOUTHEASTERN CORNER OF THE FIELD.

14       AS YOU PROCEED WEST ACROSS THE FIELD, IT BECOMES WETTER

15   AND WETTER, AND APPROXIMATELY WHERE YOU SEE THE SHARP LINE

16   (INDICATING) THERE PICKLEWEED BEGINS, A VERY THICK, LUSH STAND

17   OF PICKLEWEED.  THAT IS KNOWN TO SUPPORT SALT MARSH HARVEST

18   MOUSE, SO WE HAVE ACTUALLY INSTALLED, MY FIRM, A CONSTRUCTION

19   FENCE TO KEEP THE TRACTOR AND DISKING ACTIVITIES OUT OF THAT

20   HABITAT.

21   **Q.**   ALL RIGHT.  I WOULD LIKE TO SHOW YOU NOW A SECOND AERIAL

22   PHOTOGRAPH, THESE WERE TAKEN ON OCTOBER THE 8TH OF 2014, ABOUT

23   A MONTH AFTER THE FILL WAS DISCOVERED.  AND THIS IS

24   EXHIBIT 162.

25                    (DISPLAYED ON SCREEN.)

1      IS THAT A DIFFERENT VIEW OF THE SOUTHERN FILL AREA,

2  DOCTOR?

3  **A.**  YES.  IT LOOKS LIKE THE PLANE OR HELICOPTER HAS BASICALLY

4  TRAVELED A LITTLE BIT TO THE WEST AND TURNED TO TAKE A MORE

5  EASTERN VIEW OF THE FILL PLACEMENT SITE.  WHEREAS BEFORE WE

6  WERE LOOKING AT IT FROM THE SOUTH A LITTLE BIT.

7      SO, AGAIN -- I AM HAVING A HARD TIME WITH THIS.

8                    (PAUSE IN THE PROCEEDINGS.)

9  **Q.**  DOCTOR, I AM SORRY ABOUT THE POINTER.  WE WILL HAVE TO FIX

10  THAT.  IF YOU WOULDN'T MIND WALKING DOWN, IF IT IS EASIER FOR

11  YOU.

12  **A.**  NO PROBLEM AT ALL.

13          **MR. KEARNEY:**  CAN I -- CAN WE GET THE MICROPHONE,

14  MADAME CLERK?

15          **THE CLERK:**  UH-HUH.

16          **MR. KEARNEY:**  THANK YOU.

17          **THE WITNESS:**  SO, AGAIN, HERE'S THAT KIND OF SHARP

18  EDGE THAT I WAS TALKING ABOUT.  YOU CAN ACTUALLY SEE A LITTLE

19  BIT OF ORANGE HERE.  THAT'S THE CONSTRUCTION FENCE THAT I WAS

20  DISCUSSING THAT WE PUT UP TO KEEP THE TRACTOR AND THE DISKING

21  OUT OF THE SALT MARSH HARVEST MOUSE HABITAT.

22      THIS IS ALSO WETLAND VEGETATION.  IT JUST ISN'T SALT MARSH

23  HARVEST MOUSE HIGH-QUALITY HABITAT FOR THEM.  THIS AREA IS THE

24  SEEP THAT I WAS TALKING ABOUT THAT OCCUPIES THE SOUTHEASTERN

25  CORNER OF THE FIELD.  YOU CAN SEE THE SORT OF PATCHY

HARDWICKE – DIRECT / KEARNEY

1   SIGNATURES, ALL OF THAT IS WETLAND VEGETATION.

2       AND THEN THIS THE -- THIS IS THE DITCH THAT WE HAVE BEEN

3   TALKING ABOUT THAT THE WATER DRAINS TO FROM THE SEEP AND FROM

4   SOME OF THESE OTHER WETLANDS, TOO.  YOU CAN SEE SOME STANDING

5   WATER IN THE DITCH RIGHT THERE.  AND THE DITCH GOES ALL THE

6   WAY TO THE WEST TO DISCHARGE TO THAT CULVERT WE HAD BEEN

7   DISCUSSING.

8   **Q.**  LET ME CATCH UP WITH YOU, FOR THE RECORD, IF I CAN,

9   DOCTOR, JUST FOR A MOMENT.  YOU -- WE HAVE MARKED AN AREA

10  TOWARDS THE TOP OF 162, MAYBE A LITTLE BIT OFF OF CENTER TO

11  THE RIGHT, WHERE YOU INDICATED THE SEEP WAS LOCATED; IS THAT

12  RIGHT?

13  **A.**  THAT'S RIGHT.

14  **Q.**  AND YOU DREW WITH YOUR HAND THAT THE SEEP WATER MOVED FROM

15  THAT LOCATION DOWNWARD TOWARDS THE DITCH.  IS THAT A FAIR

16  STATEMENT?

17  **A.**  THAT'S RIGHT.

18  **Q.**  AND THEN YOU WERE TALKING ABOUT THAT DITCH RUNNING

19  DIAGONALLY ON THE RIGHT SIDE OF THE -- OF EXHIBIT 162; IS THAT

20  CORRECT?

21  **A.**  YES, THAT'S CORRECT.  THIS IS A LEVEE THAT ENCLOSES THIS

22  OTHER FIELD TO THE SOUTH.  SO THIS IS ONE OF THE AREAS THAT

23  YOU CAN DRIVE ALONG THE SITE AND KIND OF DRIVE PARALLEL TO

24  THAT DITCH BASICALLY.

25  **Q.**  BEFORE WE HAVE YOU SIT DOWN AGAIN, DOCTOR, THERE'S A

1    PORTION OF KIND OF LIGHTER MATERIAL IN THE SOUTHERN FILL AREA

2    THERE IN THE -- JUST TO THE LEFT OF THE DITCH.

3        CAN YOU TELL US WHAT THAT IS, PLEASE?

4    **A.**  YES.  THIS IS EXTRANEOUS MATERIAL.  IT'S VERY LIGHT

5    COLORED, VERY REDDISH IN COLOR.  AND WHEN I SAW IT IN FEBRUARY

6    OF 2017, THAT MATERIAL HAD A LOT OF ROCK ASSOCIATED WITH IT.

7    THESE SOILS ON THE SITE, THE NATIVE SOILS HAVE ALMOST NO

8    ROCKS; PARTIALLY AS A CONSEQUENCE OF BEING HISTORIC BAY MUD

9    AND PARTIALLY BECAUSE IT HAS BEEN FARMED FOR DECADES AND

10   DECADES AND THEY REMOVE ROCKS WHEN THEY FIND THEM, SO.

11   **Q.**  SO THAT IS EXTRANEOUS FILL MATERIAL?

12   **A.**  YES.

13   **Q.**  DO YOU ALSO SEE RIGHT ALONG THE DITCH A LINE OF VEGETATION

14   IN THIS PHOTOGRAPH?

15   **A.**  YES.  SO THERE IS A LITTLE BIT OF A GREEN THAT YOU CAN

16   SEE, ESPECIALLY RIGHT HERE NEXT TO WHERE THE STANDING WATER IS

17   MOST VISIBLE, THAT IS ALL PICKLEWEED.

18   **Q.**  THANK YOU.  YOU CAN PULL UP THE CHAIR AGAIN.

19       I WOULD LIKE TO SHOW YOU A THIRD AERIAL PHOTOGRAPH, 139,

20   PLEASE, OF THIS SOUTHERN FILL AREA.

21          **MR. KEARNEY:**  PREVIOUSLY ADMITTED, YOUR HONOR.

22              (DISPLAYED ON SCREEN.)

23   **BY MR. KEARNEY:**

24   **Q.**  THAT IS THE EXTREME WESTERN EDGE OF THE SOUTHERN FILL

25   AREA; IS THAT RIGHT?

1    **A.**  THAT'S CORRECT.

2    **Q.**  I PUT THIS UP.  WHAT IS THE BLUE OBJECT IN THE EXTREME

3    LEFT CORNER OF THAT PHOTOGRAPH?

4    **A.**  I BELIEVE YOU'RE TALKING ABOUT THE DUCK POND.  THAT'S THE

5    OPEN WATER OF THE DUCK POND.

6    **Q.**  OKAY.  THANK YOU.

7        AND THEN 163, PLEASE, PREVIOUSLY ADMITTED AS WELL.

8            **THE CLERK:**  163?

9            **MR. KEARNEY:**  163.

10            **THE CLERK:**  THANKS.

11                    (DISPLAYED ON SCREEN.)

12   **BY MR. KEARNEY:**

13   **Q.**  AND JUST ONE MORE VIEW OF THE ENTIRETY OF THAT SOUTHERN

14   FILL AREA.  THAT STAND OF PICKLEWEED YOU TALKED ABOUT IN THE

15   DITCH, CAN YOU SEE -- OR ON THE FILL SIDE OF THE DITCH, CAN

16   YOU SEE THAT, DR. HARDWICKE, IN THIS PHOTOGRAPH?

17   **A.**  YES, I CAN.

18   **Q.**  AND WHERE DOES IT RUN IN THIS PHOTOGRAPH, IF YOU CAN TELL

19   US, PLEASE?

20   **A.**  IT RUNS ALONG ADJACENT TO THE DITCH.  SO -- AND IT DOES

21   LOOK THAT SOME OF IT HAS BEEN DISTURBED.

22   **Q.**  ALL RIGHT.  WE WILL TALK ABOUT THAT IN A MOMENT.

23       HOW FAR UP DOES IT GO ON THAT PHOTOGRAPH?

24   **A.**  THE PICKLEWEED GOES ALL THE WAY ALONG THE DITCH, ALL THE

25   WAY UNTIL IT MEETS THE LARGER STAND OF PICKLEWEED IN THE

1    EXTREME LOWER LEFT-HAND CORNER OF THE PHOTO.

2    **Q.**   HOW ABOUT IN THE OTHER EXTREME TO THE RIGHT ON THIS

3    EXHIBIT?

4    **A.**   IT GOES ALL THE WAY TO WHERE THE ROAD COMES IN.   SO

5    THERE'S A ROAD ENTRANCE OFF OF STEVENSON THAT ALLOWS YOU TO

6    ACCESS THIS CORNER OF THE FIELD, AND THE PICKLEWEED GOES UNTIL

7    ESSENTIALLY THE DISTURBANCE FROM THE ROAD TAKES IT OUT.

8    **Q.**   THE ROAD THAT GOES ON TO THIS FIELD THAT LINKS WITH

9    STEVENSON, AS YOU LOOK AT EXHIBIT 16 -- 141, EXCUSE ME, IT IS

10   ON THE VERY EXTREME RIGHT CORNER OF THAT EXHIBIT.   IS THAT A

11   FAIR STATEMENT?

12   **A.**   THAT'S RIGHT.

13   **Q.**   SO PICKLEWEED EXTENDS ALL THE WAY DOWN TO THAT LOCATION?

14   **A.**   YES.

15        **MR. KEARNEY:**   ONE LAST AREA, 142, YOUR HONOR.

16             (DISPLAYED ON SCREEN.)

17   **BY MR. KEARNEY:**

18   **Q.**   ONE MORE SITE OF THIS LIGHT-COLORED FILL MATERIAL THAT WE

19   SAW EARLIER; IS THAT CORRECT?

20   **A.**   RIGHT.   IT ALMOST LOOKS LIKE TWO DIFFERENT TYPES OF

21   EXTRANEOUS MATERIAL.   I SEE A MORE REDDISH, YOU KNOW, KIND OF

22   DARKER TYPE OF FILL MATERIAL THAT IS SORT OF PUSHED TO THE

23   NORTH, AND THEN THERE'S THIS SORT OF LIGHTER COLOR LOAD THAT

24   IS CLOSER TO THE SOUTH.

25   **Q.**   I WANT TO DIRECT YOUR ATTENTION -- THANK YOU, DOCTOR.   I

1    WANT TO DIRECT YOUR ATTENTION TO THE PICKLEWEED STAND THAT IS

2    RUNNING ALONG THE DITCH THERE.  IT IS VISIBLE.  DO YOU SEE IT

3    IN THIS PHOTOGRAPH?

4    **A.**  YES, I DO.

5    **Q.**  HOW FAR UNDER NORMAL CIRCUMSTANCES WOULD THAT PICKLEWEED

6    HAVE EXTENDED OUT INTO THE FIELD, BASED ON YOUR EXPERIENCE?

7    **A.**  IT WOULD HAVE EXTENDED OUT SEVERAL FEET, PROBABLY ABOUT

8    20 FEET, 15 FEET IN SOME AREAS.  SO THEY KNEW THAT THEY

9    WEREN'T SUPPOSED TO DISK INTO PICKLEWEED SO THEY WOULD PRETTY

10   MUCH CUT OFF THEIR DISKING AS CLOSE AS THEY COULD WITHOUT

11   GETTING INTO TOO MUCH PICKLEWEED.

12   **Q.**  WHEN YOU SAY THE PICKLEWEED WOULD HAVE EXTENDED OUT, WHAT

13   WAS THE FINAL NUMBER YOU CAME -- YOU SAID 15 TO 20 --

14   **A.**  15 TO 20.  IT WAS A LITTLE VARIABLE.  AND IT WAS A LITTLE

15   BIT AFFECTED BY THE DISKING.  I THINK PICKLEWEED MIGHT HAVE

16   GONE OUT A LITTLE FARTHER IN A SPARSE FASHION IF THEY HADN'T

17   DISKED SOME OF THAT AREA.

18   **Q.**  DR. HARDWICKE, JUST SO WE CAN UNDERSTAND WHAT 15 TO

19   20 FEET IS, HOW FAR ARE YOU AND I STANDING AWAY FROM EACH

20   OTHER RIGHT NOW?

21   **A.**  PROBABLY ABOUT 20 FEET.

22   **Q.**  OKAY.

23   **A.**  YEAH, 25 MAYBE.

24   **Q.**  SO IS IT FAIR TO SAY THE PICKLEWEED WOULD HAVE EXTENDED

25   INTO THE FIELD FROM THE EDGE --

1   **A.**  YES.

2   **Q.**  -- OF THE DITCH ABOUT AS FAR AS YOU AND I ARE APART?

3   **A.**  YES.

4        **MR. KEARNEY:**  YOUR HONOR, I AM STANDING AT THE PODIUM

5   HERE, JUST FOR THE RECORD.

6   **BY MR. KEARNEY:**

7   **Q.**  I WOULD LIKE TO MOVE ON NOW TO SOME GROUND LEVEL SHOTS

8   THAT WERE TAKEN OCTOBER 17TH, 2014.  THESE ARE ALL PREVIOUSLY

9   ADMITTED.  SO NOW WE ARE TALKING ABOUT FIVE WEEKS AFTER THE

10  FILL WAS DISCOVERED.  OKAY?

11  **A.**  UH-HUH.

12       **MR. KEARNEY:**  MAY WE SHOW THE WITNESS EXHIBIT 1118,

13  1118, PLEASE.

14      I AM SORRY, YOUR HONOR, THAT'S ONE TOO MANY 1'S.  118,

15  PLEASE.

16                  (DISPLAYED ON SCREEN.)

17  **BY MR. KEARNEY:**

18  **Q.**  DO YOU RECOGNIZE WHAT IS DEPICTED IN THIS PHOTOGRAPH?

19  **A.**  YES.  THIS IS CLOSE TO THE EASTERN END OF THE DITCH.  YOU

20  CAN SEE PICKLEWEED ON THE -- BOTH THE RIGHT AND LEFT SIDES OF

21  THE DITCH.  IT'S SORT OF THAT FLUFFY SHRUBBY VEGETATION THAT

22  IS A COMBINATION OF REDDISH AND GREENISH.  AND THEN THERE IS A

23  FAIRLY LARGE PILE OF LOOSE ROCKY MATERIAL THAT HAS BEEN

24  DEPOSITED SO THAT IT IS ENCROACHING OVER THE PICKLEWEED.

25  **Q.**  ALL RIGHT.  THIS LOOSE ROCKY MATERIAL, IS THAT CONSISTENT

1   WITH THE FILL MATERIAL THAT YOU OBSERVED ON THE SITE WHEN YOU

2   WENT OUT?

3   **A.**  YES.

4   **Q.**  THE PICKLEWEED IN THIS PHOTOGRAPH, DR. HARDWICKE, I WANT

5   TO ASK YOU SOME OF THE SAME QUESTIONS ABOUT THIS STAND OF

6   PICKLEWEED THAT WE TALKED ABOUT YESTERDAY.

7       FIRST OF ALL, IN TERMS OF ITS MATURITY, CAN YOU MAKE ANY

8   STATEMENTS ABOUT THE MATURITY OF THIS PARTICULAR STAND OF

9   PICKLEWEED?

10  **A.**  YES.  I WOULD SAY THIS IS AT LEAST A COUPLE OF YEARS OLD,

11  IF NOT OLDER.  IT IS THICK.  IT'S LUSH.  IT HAS WOODY GROWTH

12  ALONG THE BASE.  YOU CAN SEE THE LITTLE GRAY STEMS THAT ARE

13  KIND OF INTERMIXED, YEAH, THAT IS OLD GROWTH.  AND THEN THE

14  GREENER AREAS WILL BE THE NEW GROWTH.

15  **Q.**  AND IS IT ALIVE?

16  **A.**  YES.

17  **Q.**  OKAY.

18  **A.**  YEAH.

19  **Q.**  BASED ON YOUR OBSERVATION OF THIS PHOTOGRAPH AND YOUR

20  KNOWLEDGE OF THE SITE, WAS -- IS THIS A PHOTOGRAPH OF -- OR IS

21  THIS EVIDENCE OF FILL MATERIAL BEING DUMPED ON PICKLEWEED?

22  **A.**  YES.

23  **Q.**  AND BY EXTENSION IS THIS A PHOTOGRAPH OF FILL MATERIAL

24  BEING DUMPED ON WETLAND?

25  **A.**  YES.

1     **MR. KEARNEY:**  I WOULD LIKE TO SHOW THE WITNESS

2     EXHIBIT 121.

3                    (DISPLAYED ON SCREEN.)

4     **BY MR. KEARNEY:**

5     **Q.**  THIS IS A SLIGHTLY DIFFERENT VIEW OF THE SAME SITE; IS

6     THAT CORRECT, DOCTOR?

7     **A.**  YES, THAT'S RIGHT.

8     **Q.**  WHAT DO YOU SEE HERE OF SIGNIFICANCE?

9     **A.**  YOU CAN SEE THE BOTTOM OF THE DITCH A LITTLE BIT BETTER

10    AND HOW IT'S, YOU KNOW, WETTED UP EVEN ON THIS EASTERN END.

11         YOU CAN SEE THE WAY THAT THE PICKLEWEED GROWS UP ALONG

12    BOTH BANKS OF THE DITCH, AND HOW IT KIND OF GROWS UP AND OVER

13    THE TOP OF BANK TO EXTEND OUT INTO THE LEVEE ON ONE SIDE AND

14    THEN TO THE FIELD ON THE OTHER SIDE.

15         AND THEN YOU CAN SEE THE ROCKY MATERIAL THAT HAS BEEN

16    PLACED OVER THE PICKLEWEED ON THE RIGHT-HAND SIDE OF THE

17    DITCH.

18    **Q.**  I WANT TO DIRECT YOUR ATTENTION TO THE EDGE.

19                    **MR. KEARNEY:**  IF I MAY, YOUR HONOR?

20    **BY MR. KEARNEY:**

21    **Q.**  (INDICATING) THIS EDGE HERE, THE LEFT-MOST EDGE OF THE

22    FILL, IS THERE ANYTHING SIGNIFICANT TO YOU ABOUT THAT?  IS

23    THERE -- IN TERMS OF ITS COVERAGE OF THE PICKLEWEED?

24    **A.**  YOU KNOW, JUST THAT YOU CAN SEE THAT THE PICKLEWEED WOULD

25    HAVE EXTENDED FARTHER AND THAT IT HAS BEEN PLACED ON TOP OF

HARDWICKE – DIRECT / KEARNEY

1    IT.  THERE ARE SOME BROKEN STEMS ALONG THE AREA WHERE THE FILL

2    BASICALLY FALLS OVER THE PICKLEWEED.

3    **Q.**  THANK YOU, DOCTOR.

4       I WANT TO MOVE ON NOW FROM THESE PHOTOGRAPHS.  I WANT TO

5    ASK YOU IF YOU VISITED THE SITE YOURSELF ON FEBRUARY 15TH,

6    2017?

7    **A.**  I DID.

8    **Q.**  AND DID YOU TAKE PHOTOGRAPHS WHILE YOU WERE OUT THERE?

9    **A.**  YES, I DID.

10   **Q.**  I WANT TO SHOW YOU EXHIBIT 637, IF I MAY.

11         **MR. KEARNEY:**  ACTUALLY I DON'T THINK IT IS IN

12   EVIDENCE SO LET ME APPROACH THE WITNESS.

13         **THE CLERK:**  IT'S NOT.

14         **THE WITNESS:**  THANK YOU.

15             (EXHIBIT HANDED TO WITNESS.)

16   **BY MR. KEARNEY:**

17   **Q.**  DOCTOR, DO YOU RECOGNIZE THE VIEW AS BEING SHOWN IN THAT

18   EXHIBIT?

19   **A.**  YES, I DO.

20   **Q.**  WHAT IS IT?

21   **A.**  THIS IS THE NORTHERN FILL AREA, AND IT LOOKS LIKE IT WAS

22   TAKEN FROM THE LEVEE TO THE ALAMEDA FLOOD CONTROL CHANNEL.

23   **Q.**  DOES -- DID YOU TAKE THIS PHOTOGRAPH, OR DID SOMEONE ELSE

24   TAKE IT?

25   **A.**  I DON'T KNOW.  MY PHOTOGRAPHS DON'T NORMALLY SHOW UP WITH

1    A TIME STAMP SO THAT MAKES ME THINK MAYBE THIS WAS SOMEBODY

2    ELSE'S PHOTOGRAPH, BUT IT LOOKS LIKE IT LOOKED WHEN I WAS

3    THERE.

4    Q.  SO DOES THAT PHOTOGRAPH GIVE A FAIR AND ACCURATE DEPICTION

5    OF THAT NORTHERN AREA -- CULVERT AREA, IF YOU WILL, ON THE DAY

6    YOU WERE THERE, FEBRUARY 15TH OF 2017?

7    A.  YES.

8            MR. KEARNEY:  YOUR HONOR, MAY WE ADMIT THIS

9    PHOTOGRAPH INTO EVIDENCE?

10           MS. HANSEN:  NO OBJECTION.

11           THE COURT:  637 IS ADMITTED.

12        (GOVERNMENT'S EXHIBIT 637 RECEIVED IN EVIDENCE)

13   BY MR. KEARNEY:

14   Q.  DR. HARDWICKE, WHAT WAS THE BASIC CONDITION OF THE SITE

15   WHEN YOU VISITED IT IN FEBRUARY OF 2017?

16   A.  IT WAS HEAVILY WETTED UP BECAUSE WE HAD A WET WINTER UP TO

17   THAT POINT SO AREAS WERE PONDED.  I CAN'T REALLY SAY THAT

18   AREAS WERE PONDED, YOU KNOW, SO MUCH GREATER THAN I HAD SEEN

19   THEM IN THE PAST IN 2006 AND 2007.  THE SITE JUST LOOKED LIKE

20   IT WAS IN A WET STATE BUT NOT EXCESSIVELY SO.

21   Q.  WHEN YOU WENT BACK TO THE NORTHERN AREA, THIS IS A

22   REPRESENTATIVE VIEW THAT YOU HAD OF WHERE THE WATER COMING OFF

23   OF THE NORTHERN FILL ENTERED THE CULVERT.  IS THAT A FAIR

24   STATEMENT?

25   A.  YES, THAT'S RIGHT.  YEAH.  SO THIS IS KIND AT LIKE THE --

1    THE END OF THE FLOOD CONTROL CHANNEL LEVEE WHERE IT MEETS THE

2    LEVEE TO MOWRY SLOUGH.  YOU CAN'T SEE THE ENTRANCE TO THE

3    CULVERT IN THIS PICTURE, BUT IT IS BASICALLY A LITTLE BIT TO

4    THE RIGHT, I THINK, OF WHERE THE PERSON IS STANDING HERE.

5             MR. KEARNEY:  I'M GOING TO APPROACH THE SCREEN, YOUR

6    HONOR, IF I MAY.

7    BY MR. KEARNEY:

8    Q.  THERE IS A -- THERE IS WHAT APPEARS TO BE WATER UP HERE

9    ABOVE THE -- THE PONDED WATER NEAR THE CULVERT.  AM I SEEING

10   THAT PHOTOGRAPH CORRECTLY?

11   A.  YES.  AND, YOU KNOW, BASED -- OR AT LEAST COMPARED TO 2006

12   AND 2007, THERE'S A LOT MORE PICKLEWEED IN SORT OF THE

13   BACKGROUND PORTION OF THIS FIELD THAN WHAT I WAS USED TO, BUT

14   YOU CAN STILL SEE THAT THE WATER IS COMING FROM AROUND THAT

15   CORNER WHERE THE JUNKYARD COMES CLOSEST TO THE LEVEE AND IS

16   FLOWING TOWARDS THE PHOTOGRAPHER AS THEY ARE STANDING ON THE

17   LEVEE.

18   Q.  IS THIS EVIDENCE THAT THE NORTHERN FILL AREA CONTRIBUTES

19   FLOW INTO MOWRY SLOUGH?

20   A.  YES.

21   Q.  WAS THE OUTFLOW OF THE CULVERT OPERATIONAL IN FEBRUARY OF

22   2017, AS FAR AS YOU COULD SEE, DOCTOR?

23   A.  ABSOLUTELY.  I TOOK A VIDEO OF IT.  IT WAS DISCHARGING AT

24   SEVERAL CUBIC FEET PER SECOND, I WOULD SAY.

25   Q.  I WOULD LIKE TO SHOW YOU ANOTHER PHOTOGRAPH TAKEN ON THAT

HARDWICKE – DIRECT / KEARNEY

1    SAME DAY, IF I MAY.  THIS IS 639.

2                    EXHIBIT HANDED TO WITNESS.)

3    **BY MR. KEARNEY:**

4    **Q.**  DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT PHOTOGRAPH,

5    DOCTOR?

6    **A.**  YES.  THIS IS A LITTLE BIT TO THE EAST OF WHERE WE WERE

7    BEFORE.  WE ARE NOW LOOKING TOWARDS THE JUNKYARD, AND WE ARE

8    TO THE EAST OF THAT CONSTRICTION POINT WHERE THE JUNKYARD

9    COMES CLOSEST TO THE LEVEE.

10   **Q.**  IS THAT AN ACCURATE VIEW OF THAT SAME SCENE THAT YOU HAD

11   BACK ON FEBRUARY 15TH, 2017?

12   **A.**  YES.

13          **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO ADMIT THIS,

14   IF WE MAY.

15          **MS. HANSEN:**  NO OBJECTION.

16          **THE COURT:**  639 IS ADMITTED.

17        (GOVERNMENT'S EXHIBIT 639 RECEIVED IN EVIDENCE)

18          **MR. KEARNEY:**  PUBLISHED IF POSSIBLE.

19                    (DISPLAYED ON SCREEN.)

20   **BY MR. KEARNEY:**

21   **Q.**  SO, DOCTOR, PLEASE TELL US WHAT YOU SEE OF SIGNIFICANCE IN

22   THIS VIEW.  THIS IS THE NORTHERN FILL AREA LOOKING TOWARDS THE

23   PICK 'N PULL IN THE BACKGROUND; IS THAT RIGHT?

24   **A.**  YES.  SO, YOU KNOW, THIS IS SEVERAL YEARS AFTER THE FILL

25   HAD BEEN PLACED, AND I SEE AN AREA THAT STILL HAS NOT

1    RECOVERED FULLY FROM THAT PLACEMENT.  WETLAND VEGETATION

2    HASN'T RECOLONIZED THE AREA OF FILL.  IT IS STILL BARREN.  IT

3    IS PONDING BECAUSE THERE IS A LOT OF WATER RUNNING OVER IT,

4    BUT, AGAIN, THE PICKLEWEED IS KIND OF RELEGATED TO THE EDGES

5    OF THE FILL, IT LOOKS LIKE TO ME.

6    **Q.**  OKAY.  DO YOU SEE ANY -- AS YOU LOOK AT THIS -- THIS SHOT

7    OF THE NORTHERN FILL AREA, DO YOU SEE ANY WETLAND VEGETATION?

8    **A.**  YES, I DO.  I SEE PICKLEWEED CLOSE TO THE FOREGROUND OF

9    THE PHOTO, AND THEN I SEE SOME WETLAND GRASSES, MAYBE

10   PHRAGMITES OR SOMETHING, IN THE BACK KIND OF UP AGAINST THE

11   SHEET METAL WALL.

12   **Q.**  I WONDER IF YOU CAN GRAB THE MICROPHONE, DOCTOR, AND SHOW

13   US THAT, PLEASE.

14   **A.**  SO THIS IS WETLAND VEGETATION HERE (INDICATING).  SOME OF

15   THIS STUFF BEHIND IT MAY BE AN UPLAND WEEDY GRASS BUT THE

16   STUFF CLOSER IS A GIANT REED TYPE OF PLANT.

17   **Q.**  SO THE -- YOU'RE TALKING ABOUT A STAND OF VEGETATION

18   BASICALLY ALONG THE PERIMETER FENCE OF THE PICK 'N PULL; IS

19   THAT RIGHT?

20   **A.**  THAT'S RIGHT.

21   **Q.**  WHAT IS THAT VEGETATION?

22   **A.**  I THINK IT IS PHRAGMITES, WHICH IS -- SORRY, I'M A

23   BOTANIST, I DON'T ALWAYS REMEMBER THE EXACT COMMON NAME BUT IT

24   IS A TYPE OF GIANT REED GRASS.

25   **Q.**  IS IT OBLIGATE?  IS IT FACULTATIVE?  WHAT IS THAT?

1    **A.**  IT IS OBLIGATE.

2    **Q.**  OBLIGATE MEANS?

3    **A.**  IT MEANS THAT 99 OR MORE PERCENT OF THE TIME THAT YOU FIND

4    IT, IT IS IN A WETLAND.

5    **Q.**  OKAY.  SO IT'S -- IF YOU SEE OBLIGATE SPECIES, OVER

6    99 PERCENT OF THE TIME YOU HAVE A WETLAND; IS THAT RIGHT?

7    **A.**  THAT'S RIGHT.

8    **Q.**  YOU SAID YOU SAW WETLAND GRASSES I BELIEVE IN THE FIELD,

9    IF I'M QUOTING YOU CORRECTLY?

10   **A.**  YEAH.  SO HERE (INDICATING) THE SORT OF LIGHT KIND OF

11   BRIGHT GREEN THAT LOOKS SHORT STATURED AND IT DOESN'T LOOK ALL

12   SHRUBBY LIKE THE PICKLEWEED DID, THOSE ARE LIKELY TO BE ANNUAL

13   WETLAND GRASSES LIKE MEDITERRANEAN BARLEY AND THOSE TYPES OF

14   GRASSES.

15        AND THOSE WERE COMMON.  THEY WOULD COME IN AT THE WETLAND

16   TRANSITION AREAS WHERE THEY WERE STILL TRYING TO FARM.  IT WAS

17   WET.  YOU WOULD GET -- A LOT OF GRASSES THAT THEY DIDN'T TRY

18   TO PLANT WOULD GROW UP BECAUSE THE GRASSES THAT THEY DID TRY

19   TO PLANT WOULDN'T DO VERY WELL.  SO THAT IS PRETTY TYPICAL OF

20   THE DISTURBED WETLAND TRANSITION IN THE FARMING AREA.

21        AGAIN HERE, IN 2006 AND 2007, THIS WAS NOT COVERED IN

22   PICKLEWEED, THIS EXACT AREA, BECAUSE IT WAS PONDED UNDER A LOT

23   OF WATER.

24        NOW, EVEN THOUGH THIS WAS A MUCH WETTER YEAR, I DON'T SEE

25   NEARLY AS MUCH WATER PONDED.  PARTIALLY IT'S GOING TO BE

HARDWICKE – DIRECT / KEARNEY

1    BECAUSE THEY HAVE THAT NEW CULVERT THAT WORKS BETTER THAN THE

2    ONE THAT DID BEFORE, BUT IT ALSO APPEARS THAT THE AREA HAS

3    BEEN RAISED SO IT'S NOT GOING TO POND AS MUCH WATER.  AND THE

4    PICKLEWEED HASN'T BEEN ABLE TO COLONIZE THIS MATERIAL.

5    **Q.**  EVEN WITH THE FILL, ARE THERE PARTS OF THIS NORTHERN AREA,

6    BASED ON YOUR ASSESSMENT IN 2017, THAT WERE STILL WETLANDS?

7    **A.**  YES.

8    **Q.**  WHEREABOUTS?

9    **A.**  SO ALL OF THIS IS GOING TO BE WETLAND (INDICATING).  YOU

10   CAN SEE THIS LARGE AREA OF PONDING BACK THERE, ALL OF THAT IS

11   GOING TO BE A WETLAND.  EVEN IF IT DOESN'T HAVE WETLAND

12   VEGETATION GROWING IN IT RIGHT AT THAT POINT, IT IS GOING TO

13   COME IN IN THE SPRING AS THE AREA DRIES DOWN.  THIS IS WETLAND

14   RIGHT HERE, AND THEN ALL UP AGAINST THE LEVEE IS WETLAND

15   VEGETATION.

16   **Q.**  ARE THERE PARTS OF THE NORTHERN FILL AREA THAT WERE HIT BY

17   FILL IN 2014 THAT BY 2017 WERE WETLAND AGAIN?

18   **A.**  YES.

19   **Q.**  THANK YOU.  YOU CAN SIT DOWN, PLEASE.  THANK YOU.

20       I WANT TO FOLLOW UP ON THAT LAST STATEMENT, DR. HARDWICKE.

21       SO YOUR FIRST PHYSICAL TIME SETTING FOOT ON THIS LAND WAS

22   2006; IS THAT CORRECT?

23   **A.**  THAT'S RIGHT.

24   **Q.**  SO FROM 2006 THROUGH 2017 DID THE WETLANDS OR AT LEAST A

25   PORTION OF THE WETLANDS COVERED IN THE FILL IN THE NORTHERN

1    AND SOUTHERN AREA, WERE THEY WETLANDS THROUGHOUT THE ENTIRE

2    PERIOD?

3    **A.**  YES.

4    **Q.**  I WANTED TO ASK YOU ABOUT SOME GENERAL OPINIONS OF THE

5    SITE, IF I MAY.

6         WE'VE TALKED ABOUT MOWRY SLOUGH.  MOWRY SLOUGH IS A TIDAL

7    SLOUGH OF SAN FRANCISCO BAY; IS THAT RIGHT?

8    **A.**  THAT'S RIGHT.

9    **Q.**  WERE THERE WETLANDS BOTH IN THE NORTHERN AND SOUTHERN

10   AREAS IN THE SUMMER OF 2014 WHEN THE FILL MATERIAL WAS PLACED

11   ON THEM?

12   **A.**  I DIDN'T VISIT THE SITE AT THAT TIME BUT BASED ON THE

13   PICTURES THAT MY SUPERVISOR, WHO DID GO OUT TO HANDLE, YOU

14   KNOW –– IT WAS ESSENTIALLY AN EMERGENCY CALL, SOMEBODY HAS

15   PLACED FILL ON THE NEWARK SITE, SOMEBODY HAS TO GO OUT THERE.

16   SO I DEFINITELY KNEW THAT IT WAS HAPPENING.  MY SUPERVISOR

17   WENT OUT TO BASICALLY MAP THE FILL AND FIGURE OUT WHAT WAS

18   GOING ON.  AND WHEN HE CAME BACK, WE HAD A MEETING WHERE I

19   LOOKED AT ALL THE PICTURES THAT HE HAD TAKEN SO THAT WE COULD

20   DISCUSS IT BECAUSE OBVIOUSLY IT WAS A BIG HAPPENING.

21   **Q.**  AND WE TALKED ABOUT –– WE'VE SEEN A LOT OF PICTURES TAKEN

22   FROM THAT YEAR YESTERDAY, BUT WERE WETLANDS PRESENT IN BOTH

23   THE NORTHERN AND SOUTHERN FILL AREAS WHEN THE FILL WAS PLACED

24   IN 2014?

25   **A.**  ABSOLUTELY.  AND I KNOW THAT BOTH FROM LOOKING AT THE

HARDWICKE – DIRECT / KEARNEY

1  PICTURES THAT MY SUPERVISOR BROUGHT BACK AS WELL AS TALKING TO

2  HIM AND ASKING HIM QUESTIONS ABOUT, WHERE DID THEY PUT IT?

3  WHERE DID IT GO?  THAT TYPE OF THING.

4  **Q.**  LET ME ASK YOU GENERALLY, DOCTOR, DO WETLANDS DISAPPEAR

5  BECAUSE OF A DROUGHT?

6  **A.**  NO, THEY DON'T.  SO ONE OF THE PIECES OF GUIDANCE THAT YOU

7  HAVE IN THE ARMY CORPS REGIONAL SUPPLEMENT FOR THE ARID WEST

8  SPECIFICALLY TALKS ABOUT THIS AND SAYS THAT CERTAIN TYPES OF

9  WETLAND, WHEN YOU HAVE DROUGHT YEARS IN THE ARID WEST, THEY

10  MAY NOT WET UP IN GIVEN YEARS OR EVEN FOR A COUPLE OF YEARS IN

11  A ROW.

12      AND THAT AS LONG AS YOU HAVE A WETLAND THAT IS WETTING UP

13  AT LEAST HALF OF THE TIME, I THINK IS WHAT THEY SAY, YOU

14  SHOULD STILL CONSIDER IT A WETLAND.  THEY DO RECOGNIZE THAT

15  THERE ARE TIMES THAT YOU HAVE DROUGHTS AND YOU JUST DON'T HAVE

16  AS MUCH WATER.

17  **Q.**  DOES THE -- DID THE DROUGHT THAT EXTENDED INTO 2014 CAUSE

18  THE WETLANDS IN THE NORTH AND THE SOUTHERN FILL AREAS TO

19  DISAPPEAR?

20  **A.**  NO.  UNLIKE OTHER SITES WHERE THAT GUIDANCE WOULD BE MORE

21  A LITTLE BIT MORE APPLICABLE, THESE SITES WERE STILL WET IN

22  2014.  THEY STILL HAD WETLAND VEGETATION.  THEY HAD INDICATOR

23  THAT THEY HAD BEEN RECENTLY SATURATED.  SO THEY WERE STILL

24  ACTIVE -- ACTIVELY ACTING LIKE WETLANDS AT THAT TIME.

25  **Q.**  DOES THE GROUND WATER TABLE UNDERNEATH THIS LAND HAVE

HARDWICKE – DIRECT / KEARNEY

1    SOMETHING TO DO WITH THAT, DOCTOR, BASED ON YOUR KNOWLEDGE OF

2    THE LAND?

3    **A.**   IT DOES.  SO THE GROUND WATER TABLE FOR THE SANTA CLARA

4    VALLEY AND SURROUNDING AREAS DID FALL DURING THE DROUGHT BUT

5    THIS SITE ISN'T JUST INFLUENCED BY THE FRESH WATER GROUND

6    WATER TABLE, WHICH IS THE ONE THAT FELL DURING THE DROUGHT.

7    IT IS ALSO INFLUENCED BY THE GROUND WATER TABLE FROM THE SAN

8    FRANCISCO BAY, AND THAT WAS CONSISTENT.  THE BAY STAYED AT THE

9    SAME LEVEL EVEN DURING THE DROUGHT.

10   **Q.**   SO UNDERNEATH THE WATER WE TALK -- UNDERNEATH THE GROUND

11   WE TALKED ABOUT, THERE IS KIND OF A PUSH/PULL GOING ON BETWEEN

12   FRESH WATER IN THE AQUIFER AND SALT WATER; IS THAT RIGHT?

13   **A.**   THAT IS RIGHT.

14   **Q.**   IF YOU HAVE -- IF THE FRESH WATER MAYBE BECAUSE OF LACK OF

15   RAIN OR SOMETHING IS DECREASING, THE SALT WATER UNDER THE LAND

16   WOULD TEND TO INCREASE FROM THE BAY.  IS THAT A FAIR

17   STATEMENT?

18   **A.**   YES, THAT'S RIGHT.

19   **Q.**   AND CONVERSELY, OR AS AN EXTENSION OF THAT, IF YOU HAVE

20   MORE SALT WATER UNDER THE LAND, SALT-LOVING VEGETATION, LIKE

21   WETLAND VEGETATION, WOULD BE OKAY WITH THAT?

22   **A.**   YEAH.  AND THESE SOILS ARE ALL SALTY, TOO.  SO, YOU KNOW,

23   THE SITE IS PRETTY SALTY.  THE WATER SALINITY DOES ACTUALLY

24   FLUCTUATE OVER THE SITE BOTH OVER TIME AND DEPENDING ON WHAT

25   LOCATION THAT YOU'RE AT BECAUSE IT IS JUST WHERE EXACTLY YOU

1    ARE HAVING THE DIFFERENT GROUND WATER TABLES MIXING AND TO

2    WHAT DEGREE.

3    **Q.**  SO PERIODIC DROUGHT YEARS DO NOT CAUSE WETLANDS TO

4    DISAPPEAR?

5    **A.**  NO.

6    **Q.**  I WANT TO DIRECT YOUR ATTENTION TO A PORTION OF THE

7    REGIONAL SUPPLEMENT.

8              **MR. KEARNEY:**  YOUR HONOR, THIS IS EXHIBIT 227.  IT'S

9    MARKED ONLY AS A DEMONSTRATIVE FOR REFERENCE.

10       I AM GOING TO REFER TO A PAGE IN THIS, COUNSEL, PAGE 102,

11   THIS IS 227-0114.

12       I WOULD LIKE TO APPROACH THE WITNESS, YOUR HONOR, IF I

13   MAY?

14             **THE COURT:**  YOU MAY.

15                 (EXHIBIT HANDED TO WITNESS.)

16   **BY MR. KEARNEY:**

17   **Q.**  DR. HARDWICKE, DO YOU RECOGNIZE THIS PORTION OF THE ARID

18   WEST REGIONAL SUPPLEMENT?

19   **A.**  YES, I DO.  IT'S A SECTION THAT'S TALKING ABOUT

20   PROBLEMATIC SITUATIONS OR SITUATIONS THAT AREN'T ALWAYS

21   EXACTLY NORMAL.

22   **Q.**  THE TITLE OF THIS SECTION OF THE ARID WEST REGIONAL

23   SUPPLEMENT -- AND JUST BY WAY OF A -- JUST KIND OF A REFRESHER

24   FROM YESTERDAY, THIS IS A DOCUMENT PREPARED BY THE U.S. ARMY

25   CORPS OF ENGINEERS TO -- THAT SERVES AS KIND OF A GUIDELINE OR

HARDWICKE – DIRECT / KEARNEY

1    BIBLE, IF YOU WILL, FOR PRACTITIONERS LIKE YOURSELF ON HOW TO

2    DELINEATE WETLANDS.  IS THAT A FAIR STATEMENT?

3    **A.**  THAT IS RIGHT, AND IT IS SPECIFICALLY TARGETED FOR WETLAND

4    DELINEATION IN THE ARID WEST REGION.

5    **Q.**  AND THE TITLE OF THIS SECTION OF THE SUPPLEMENT SAYS:

6    WETLANDS THAT PERIODICALLY LACK INDICATORS OF WETLAND

7    HYDROLOGY.

8        AM I READING THAT CORRECTLY?

9    **A.**  UH-HUH, YES.

10   **Q.**  AT THE END OF THAT FIRST PARAGRAPH THERE IS A SENTENCE I

11   WANT TO READ.  I WANT TO ASK YOU FIRST AM I READING IT

12   ACCURATELY AND SECOND IF YOU AGREE WITH IT.

13        **MS. HANSEN:**  YOUR HONOR, CAN I GET A PAGE NUMBER,

14   PLEASE?

15        **MR. KEARNEY:**  YES, I SAID IT EARLIER, COUNSEL, IT IS

16   102 AND IN TERMS OF THE BATES NUMBER IT IS 227-0114.

17        **MS. HANSEN:**  THANK YOU.

18        **MR. KEARNEY:**  DO YOU HAVE THAT?

19        **MS. HANSEN:**  OKAY.

20   **BY MR. KEARNEY:**

21   **Q.**  THE LAST SENTENCE OF THAT FIRST PARAGRAPH SAYS, QUOTING:

22   HOWEVER, MANY WETLANDS IN THE ARID WEST DO NOT BECOME

23   INUNDATED OR SATURATED IN SOME YEARS, AND DURING DROUGHT

24   CYCLES MAY NOT INUNDATE OR SATURATE FOR SEVERAL YEARS IN A

25   ROW.

HARDWICKE – DIRECT / KEARNEY

1    DOCTOR, FIRST OF ALL, AM I READING THAT ACCURATELY?

2    **A.**  YES, YOU ARE.

3    **Q.**  DO YOU AGREE WITH THIS STATEMENT FROM THE U.S. ARMY CORPS

4    OF ENGINEERS GUIDANCE MANUAL FOR THIS REGION?

5    **A.**  YES, I DO.

6    **Q.**  SO IT SAYS, WETLANDS:  MANY WETLANDS IN THE ARID WEST MAY

7    NOT INUNDATE OR SATURATE FOR SEVERAL YEARS IN A ROW BUT STILL

8    REMAIN WETLANDS.

9    IS THAT FAIR?

10   **A.**  YES, THAT'S RIGHT.

11   **Q.**  AND DOES THAT FIT WITH YOUR OWN EXPERIENCE IN CONDUCTING

12   WETLAND DELINEATION?

13   **A.**  IT DOES.  WE HAD A DIFFERENT SITE THAT WE HAD DELINEATED

14   BACK IN THE 2000'S, AND IT WAS ANOTHER FARMED SITE AND IT HAS

15   SEVERAL AREAS OF SIGNIFICANT WETLANDS.  SOMEBODY DIFFERENT

16   PURCHASED THE SITE AND THEN THEY HIRED A DIFFERENT FIRM TO

17   CONDUCT A DELINEATION ON THAT SITE.  AND IT WAS DURING THIS

18   DROUGHT PERIOD FROM ABOUT 2012 TO 2014, AND THEY SAID, WE'VE

19   NEVER SEEN ANYTHING POND UP ON HERE.  THERE IS BARELY ANY

20   WETLANDS ON THE SITE AT ALL.  THE WHOLE THING SHOULD BE ABLE

21   TO BE DEVELOPED.

22   THE ARMY CORPS REJECTED THEIR DELINEATION.  WE WERE

23   BROUGHT ON TO RE-DELINQUENT THE SITE, AND THEN IN 2017

24   EVERYTHING COMPLETELY FILLED UP AGAIN AND BECAME JUST AS WE

25   HAD SEEN IT BEFORE, FULLY WETLAND.  SO I'VE SEEN THAT HAPPEN.

HARDWICKE – DIRECT / KEARNEY

1    AND ON THIS SITE I WOULDN'T SAY THAT EXACTLY THAT SITUATION

2    HAPPENED BECAUSE IT STAYED WET THE WHOLE TIME.

3    **Q.**  ARE THERE -- THERE CIRCUMSTANCES IN DROUGHT CYCLES WHERE

4    YOU -- WE TALKED ABOUT THE THREE PARAMETERS OF ASSESSING

5    WHETHER SOMETHING IS A WETLAND OR NOT, THE SOILS, THE

6    HYDROLOGY, AND THE VEGETATION.

7        DO THOSE PARAMETERS -- CAN THEY CHANGE SOMETIMES DURING A

8    DROUGHT CYCLE?  CAN YOU TELL US ABOUT THAT.

9    **A.**  YES, THE PARAMETERS SHOULDN'T CHANGE THEMSELVES, BUT

10   INDICATORS OR EVIDENCE OF THOSE PARAMETERS CAN CHANGE OVER

11   TIME.

12       SO IF A SITE HASN'T WETTED UP FOR A COUPLE OF YEARS, IT

13   MAY BE HARD TO SEE THE INDICATORS OF WETLAND HYDROLOGY BECAUSE

14   IT HAS BEEN A COUPLE OF YEARS SINCE THE CONDITIONS EXISTED

15   THAT, YOU KNOW, MAKE THOSE INDICATORS VISIBLE TO YOU LIKE SOIL

16   CRACKING OR SALT CRUST THAT CAN ALL GET KIND OF LIKE MASHED

17   BACK INTO THE SOIL OVER A COUPLE OF YEARS OF JUST NORMAL

18   EROSION AND ACTIVITY AND THOSE SORTS OF THINGS.

19       BUT WHAT YOU ARE SUPPOSED TO DO, ACCORDING TO THE

20   GUIDANCE, THEN IS REALLY TAKE INTO ACCOUNT WHAT THE LONG-TERM

21   WEATHER CYCLES HAVE BEEN WHEN YOU ARE LOOKING AT A SITE, AND

22   YOU ALSO THEN NEED TO LOOK AT THE OTHER TWO PARAMETERS.  IF

23   YOU ARE SEEING WETLAND VEGETATION AND EVIDENCE OF HYDRIC SOILS

24   AND YOU ARE NOT FINDING EVIDENCE OF WETLAND HYDROLOGY BUT IT

25   HAS BEEN A DROUGHT, THEN THAT IS A GOOD REASON TO THINK THAT

HARDWICKE – DIRECT / KEARNEY

1    WE MAY NOT BE SEEING THIS JUST BECAUSE IT'S BEEN TOO LONG

2    SINCE IT WETTED UP.

3    **Q.**  IT WOULD STILL BE A WETLAND DURING THAT PERIOD; IS THAT

4    RIGHT?

5    **A.**  IT WOULD STILL BE A WETLAND, YEAH.

6    **Q.**  IN THIS PARTICULAR CASE, AS WE TALKED ABOUT YESTERDAY AT

7    LENGTH, WE KNOW THAT BASED ON THE MATURITY OF -- AND TODAY WE

8    TALKED ABOUT THIS AS WELL, BUT BASED ON THE MATURITY OF THE

9    PICKLEWEED IN BOTH THE NORTHERN AND SOUTHERN FILL AREAS, WE

10   KNOW THAT THAT OBLIGATE SPECIES INDICATING A WETLAND

11   CONTINUED, WAS ALIVE AND THRIVING EVEN IN SEPTEMBER OF 2014

12   WHEN THIS -- AND OCTOBER OF 2014 WHEN THIS CONDUCT WAS

13   DISCOVERED?

14   **A.**  THAT'S RIGHT.

15   **Q.**  I WOULD LIKE TO TALK TO YOU ABOUT THE CONCEPT OF

16   ADJACENCY.

17            **MR. KEARNEY:**  CAN WE PULL UP, PLEASE, EXHIBIT 3

18   AGAIN?

19                     (DISPLAYED ON SCREEN.)

20      MAYBE WE COULD BLOW UP THE UPPER HALF WITH BOTH FILL AREAS

21   AND THE SLOUGH, AGENT SU.

22   **BY MR. KEARNEY:**

23   **Q.**  DOCTOR, I WANT TO ASK YOU IF THE WETLANDS IN THE NORTHERN

24   FILL AREA AND THE SOUTHERN FILL AREA WERE AND ARE ADJACENT TO

25   MOWRY SLOUGH?

1    **A.**  IN MY OPINION, YES, THEY ARE.

2    **Q.**  CAN YOU PLEASE EXPLAIN TO US WHAT THE TERM "ADJACENCY"

3    MEANS?

4    **A.**  ADJACENCY IS ESSENTIALLY, YOU KNOW, BASICALLY WHAT IT

5    SOUNDS LIKE.  WHEN YOU HAVE WETLANDS THAT ARE ADJACENT TO A

6    TRIBUTARY OR TO A TRADITIONAL NAVIGABLE WATER, THE

7    PRESUPPOSITION IS THAT THEY ARE GOING TO AFFECT BIOLOGICAL,

8    CHEMICAL, AND PHYSICAL PROCESSES IN THAT TRIBUTARY OR

9    TRADITIONAL NAVIGABLE WATER.

10   **Q.**  THE CONCEPT OF ADJACENCY HAS TO DO WITH WHETHER A WETLAND

11   IS BORDERING, CONTIGUOUS, OR NEIGHBORING TO A TRADITIONAL

12   NAVIGABLE WATER, IN THIS CASE MOWRY SLOUGH; IS THAT RIGHT?

13   **A.**  THAT'S RIGHT.

14   **Q.**  AND JUST IN LAY TERMS, DO THE -- THE WETLANDS IN THIS CASE

15   RUN DOWN TO THE LEVEE NEXT TO THE SLOUGH?

16   **A.**  THAT'S RIGHT.  THEY GO ALL THE WAY TO THE LEVEE.  IN SOME,

17   YOU KNOW -- DEPENDING ON HOW YOU MAP IT, THERE MAY BE OPEN

18   WATER BETWEEN THE WETLAND VEGETATION AREAS AND WHERE THE WATER

19   SPILLS INTO CULVERTS THAT THEN LEAVE THE SITE AND GO INTO THE

20   SLOUGH.  BUT THE WETLANDS ARE CONTIGUOUS ALL THE WAY TO WHERE

21   THAT OPEN WATER STARTS.

22       AND WHERE THAT OCCURS, THERE IS ACTUALLY WATER WITHIN THE

23   WETLAND VEGETATION.  YOU JUST DON'T SEE IT AS WELL.  BUT THERE

24   IS STANDING WATER AND SATURATED SOILS, ALL THAT WATER IS THE

25   SAME WATER GOING INTO THE OPEN WATER AREAS THAT THEN GOES OUT

```
1   INTO THE SLOUGH.

2   Q.  SO THE WATER IN THIS CASE DOESN'T CUT OFF THE ADJACENCY OF

3   THE WETLANDS.  IS THAT A FAIR STATEMENT?

4   A.  THAT IS RIGHT.

5   Q.  AND WOULD YOU CONSIDER ALL OF THE FILLED WETLAND IN THIS

6   CASE TO BE ADJACENT TO THE SLOUGH?

7   A.  YES, I WOULD.

8   Q.  HOW ABOUT THE FACT, DOCTOR, THERE IS A LEVEE THAT IS

9   RUNNING ALONG THE LAND SEPARATING THE LAND FROM THE SLOUGH?

10  DOES THE EXISTENCE OF A MANMADE LEVEE CUT OFF ADJACENCY?

11  A.  MY UNDERSTANDING OF THE GUIDANCE IS THAT ABSOLUTELY NOT.

12  IN FACT, YOU'RE NOT SUPPOSED TO TAKE INTO ACCOUNT THE

13  EXISTENCE OF MANMADE LEVEES WHEN YOU ARE DETERMINING

14  ADJACENCY.

15      NO, WE DON'T NORMALLY DETERMINE THAT BECAUSE THAT IS

16  WHAT -- THE ARMY CORPS OF ENGINEERS IS SUPPOSED TO TAKE OUR

17  DATA AND OUR FINDINGS AND DETERMINE FOR THEMSELVES.  BUT IT'S

18  UP AGAINST THE LEVEE.  THERE'S THE WETLANDS AND THE OPEN

19  WATER, THEN THERE'S THE LEVEE AND THEN THERE'S THE SLOUGH, AND

20  THE CODE SAYS THAT YOU'RE NOT SUPPOSED TO TAKE INTO ACCOUNT

21  LEVEES.

22  Q.  I WANT TO TALK TO YOU FOR A MOMENT ABOUT A TERM CALLED

23  "SIGNIFICANT NEXUS," IF I MAY.  ARE YOU FAMILIAR WITH THIS

24  CONCEPT IN WETLAND DELINEATION?

25  A.  YES, I AM.
```

1  **Q.**  DOES -- THE TERM "SIGNIFICANT NEXUS," COULD THAT ALSO BE

2  REFERRED TO AS "SIGNIFICANT CONNECTION"?

3  **A.**  YES.

4  **Q.**  IS THIS CONCEPT -- IN THIS CASE, DR. HARDWICKE, IS THE

5  CONCEPT OF SIGNIFICANT NEXUS OR SIGNIFICANT CONNECTION

6  PROPERLY DESCRIBED AS WHETHER, AND I AM GOING TO QUOTE NOW,

7  THE WETLANDS IN BOTH THE NORTHERN AND SOUTHERN FILL AREAS

8  EITHER ALONE OR IN COMBINATION WITH OTHER SIMILARLY SITUATED

9  WATER BODIES IN THE REGION SIGNIFICANTLY AFFECT THE CHEMICAL,

10  PHYSICAL, OR BIOLOGICAL INTEGRITY OF MOWRY SLOUGH.

11  WHEN YOU'RE LOOKING AT THIS SIGNIFICANT NEXUS BETWEEN

12  WETLANDS AND A SLOUGH, OR IN THIS CASE MOWRY SLOUGH,

13  SIGNIFICANT CONNECTION, ARE YOU LOOKING AT THE -- IF THERE IS

14  A SIGNIFICANT EFFECT ON THE CHEMICAL, PHYSICAL, AND BIOLOGICAL

15  INTEGRITY OF THE SLOUGH?

16  **A.**  MY UNDERSTANDING THAT THAT'S EXACTLY WHAT THE ARMY CORPS

17  DOES WHEN THEY ARE DOING THEIR SIGNIFICANT NEXUS

18  DETERMINATIONS.

19  AGAIN, WE DON'T FILL OUT THAT PAPERWORK.  IN FACT, WE WERE

20  INSTRUCTED BY THE ARMY CORPS, YOU KNOW, WE DO THAT.  YOU GUYS

21  PROVIDE US WITH THE DELINEATION.

22  BUT WHAT WE DO DO IS COLLECT THE INFORMATION THAT WE THINK

23  THEY WOULD NEED TO USE TO FILL OUT THOSE SIGNIFICANT NEXUS

24  DETERMINATIONS; FOR EXAMPLE, HOW THE WATER FLOWS, WHERE IT

25  COMES FROM, WHERE IT GOES, HOW IT ENTERS TRADITIONAL NAVIGABLE

1   WATERS, THROUGH A SERIES OF TRIBUTARIES OR ELSE JUST DIRECTLY

2   INTO THE TRADITIONAL NAVIGABLE WATER, AND ALSO OBSERVATIONS

3   ABOUT SPECIES THAT MAY BE IN BOTH AREAS.

4   **Q.**  DR. HARDWICKE, HOW DO YOU ANSWER THAT QUESTION IN THIS

5   CASE?  DO THE NORTHERN AND SOUTHERN WETLANDS THAT WERE FILLED

6   IN THIS CASE, DO THEY HAVE A SIGNIFICANT NEXUS TO MOWRY

7   SLOUGH?

8   **A.**  IN MY OPINION, YES.

9   **Q.**  DO BOTH THOSE AREAS, WE TALKED ABOUT THIS, DUMP INTO MOWRY

10  SLOUGH?

11  **A.**  YES, THEY DO.

12  **Q.**  FOR CLEAN WATER ACT JURISDICTIONAL PURPOSES DOES IT MATTER

13  WHETHER THAT WATER DUMPING INTO MOWRY SLOUGH FROM THIS LAND

14  GOES THROUGH MANMADE PIPES OR PUMPS?

15  **A.**  NO, IT DOESN'T.

16  **Q.**  THE FIRST LEG OR THE FIRST -- ONE OF THE FIRST CONSTRUCTS

17  OF THE ANALYSIS OF WHETHER A -- THE LAND IN THIS CASE

18  SIGNIFICANTLY AFFECTS MOWRY SLOUGH IS A PHYSICAL -- JUST A

19  PHYSICAL COMPONENT.  THE QUESTION IS, DOES THE SLOUGH AFFECT

20  THE PHYSICAL, CHEMICAL, OR BIOLOGICAL INTEGRITY OF MOWRY

21  SLOUGH -- OR DOES THE LAND AFFECT THE PHYSICAL, BIOLOGICAL, OR

22  CHEMICAL INTEGRITY OF MOWRY SLOUGH OR NOT; IS THAT CORRECT?

23  **A.**  YES.

24  **Q.**  I WANT TO TALK ABOUT THE PHYSICAL CONNECTION.  DOES DIRECT

25  WATER FLOW FROM THE LAND TO THE SLOUGH CONSTITUTE A DIRECT

1    PHYSICAL CONNECTION?

2    **A.**  IT DOES.

3    **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 864F.

4           **MR. KEARNEY:**  THIS IS A VIDEO, YOUR HONOR, THAT IS IN

5    EVIDENCE.

6           **MS. HANSEN:**  YOUR HONOR, CAN WE HAVE A YEAR?

7           **MR. KEARNEY:**  THIS WAS JANUARY 9TH OF 2017.

8           **MS. HANSEN:**  IS THE WITNESS'S OPINION LIMITED TO THAT

9    YEAR OR IS THIS --

10          **THE COURT:**  WHAT IS THE OBJECTION?

11          **MS. HANSEN:**  OBJECTION.  FOUNDATION.

12          **THE COURT:**  OVERRULED.  LET'S SEE WHAT THE QUESTIONS

13   ARE.

14                          (VIDEO PLAYED.)

15          **MR. KEARNEY:**  WE CAN PROBABLY STOP IT THERE, AGENT

16   SU.

17   **BY MR. KEARNEY:**

18   **Q.**  IS THAT EVIDENCE, IN YOUR MIND, DR. HARDWICKE, OF A DIRECT

19   PHYSICAL CONNECTION BETWEEN IN THIS CASE THE SOUTHERN FILL

20   AREA AND MOWRY SLOUGH?

21   **A.**  YES, THIS IS WHERE THE PUMP DISCHARGES INTO THE SLOUGH,

22   AND THIS IS PRETTY TYPICAL FOR WHEN THE PUMP IS IN GOOD

23   WORKING ORDER AND DISCHARGING, YOU KNOW, A SOLID AMOUNT OF

24   WATER.

25   **Q.**  ALL RIGHT.  I WANT TO SHOW YOU ONE MORE VIDEO, AND THEN

HARDWICKE – DIRECT / KEARNEY

```
1    WE'LL HAVE SOME GENERAL QUESTIONS.  MAY WE HAVE 865A.  THIS IS
2    THE DUCKBILL ON FEBRUARY 15TH OF 2017, PREVIOUSLY ADMITTED.
3                     (VIDEO PLAYED.)
4        SAME QUESTION, DOCTOR.  DOES THIS OUTFLOW OF WATER THROUGH
5    THE DUCKBILL FROM THE LAND INTO THE SLOUGH CONSTITUTE A
6    SIGNIFICANT PHYSICAL EFFECT OF THE LAND ON THE SLOUGH?
7    A.  MY OPINION WOULD BE, YES.  SO, YOU KNOW, RIGHT NOW THE
8    WATER IS COMING OUT KIND OF ATTENUATED THROUGH THAT DUCKBILL.
9    IF IT WAS ALLOWED TO JUST COME OUT WITHOUT A DUCKBILL BEING
10   THERE, YOU MIGHT HAVE A DIFFERENT SORT OF SHAPE OF THE SLOUGH
11   CHANNEL IN THAT AREA THAN WHAT YOU HAVE THERE.  SO THERE IS A
12   DIRECT PHYSICAL EFFECT.
13   Q.  SO THERE IS A -- IN ANY EVENT, THERE IS A DIRECT PHYSICAL
14   CONNECTION OF THESE WETLANDS TO THE SLOUGH.  IS THAT A FAIR
15   STATEMENT?
16   A.  YES.
17   Q.  AND DOES IT -- WHEN YOU MAKE THIS ASSESSMENT OF WHETHER
18   LAND HAS A PHYSICAL CONNECTION TO THE SLOUGH, DO YOU ONLY DO
19   IT ON ONE DAY IN PARTICULAR, OR IS IT JUST THE GENERAL
20   CONNECTION OF THE SLOUGH TO THE LAND?
21   A.  I'M NOT SURE HOW THE CORPS SCORES IT, BUT WHEN WE DO IT
22   FOR WETLAND DELINEATION, WE DO TRY TO DETERMINE WHETHER THAT
23   SORT OF ACTIVE FLOW, IF IT IS A SEASONAL FLOW, IF IT IS
24   AFFECTED BY TIDES IN A SYSTEM LIKE THIS, SO WE WILL PROVIDE
25   INFORMATION ON ALL OF THAT.
```

HARDWICKE – DIRECT / KEARNEY

1    **Q.**  BUT IF THE DUCKBILL IS NOT FLOWING ON A PARTICULAR DAY,

2    DOES THAT MEAN THERE IS NO PHYSICAL CONNECTION BETWEEN THE

3    LAND AND THE SLOUGH?

4    **A.**  OH, NOT NECESSARILY AT ALL.  SO IF THE DUCKBILL NEVER

5    FLOWED, YOU KNOW, THAT'S MORE WHAT WE WOULD BE WORRIED ABOUT

6    OR -- IN TERMS OF DETERMINING THAT WE DIDN'T THINK THAT THERE

7    WAS A CONNECTION AND PUTTING THAT INFORMATION INTO OUR REPORT.

8    **Q.**  ALL RIGHT.  I WANT TO MOVE ON TO THE CHEMICAL EFFECTS ON

9    THE SLOUGH.  IN YOUR OPINION, DO THE ADJACENT WETLANDS IN THIS

10   CASE HAVE A SIGNIFICANT EFFECT ON THE CHEMISTRY OF MOWRY

11   SLOUGH?

12   **A.**  YES, I WOULD THINK THAT THEY WOULD BECAUSE YOU ARE TALKING

13   ABOUT SEVERAL HUNDRED ACRES OF WETLANDS, THAT IS A LOT OF AREA

14   TO BASICALLY CONTRIBUTE TO WATER QUALITY EFFECTS.

15   **Q.**  HOW DO WETLANDS AFFECT THE WATER QUALITY IN A SLOUGH SUCH

16   AS THIS?

17   **A.**  IT CAN BE EITHER BENEFICIAL OR NEGATIVE.  TYPICALLY

18   WELL-FUNCTIONING WETLANDS ARE QUITE BENEFICIAL FOR WATER

19   QUALITY.  THEY CLEAN UP A LOT OF EXCESS NUTRIENTS AND

20   SEQUESTER EXCESS NITRATES, AND THINGS LIKE THAT.  THAT WOULD

21   BE ESPECIALLY RELEVANT ON A SITE LIKE THIS BECAUSE, YOU KNOW,

22   IT'S ACTIVELY FARMED, AND THERE MAY BE EXCESS NUTRIENTS FROM

23   THE FARMING PROCESS.

24       THEY ALSO CONTRIBUTE A LOT OF ORGANIC MATTER SO THERE IS A

25   LOT OF THINGS GROWING AND DYING IN A WETLAND, AND THAT

1   BASICALLY TURNS INTO CARBON THAT THEN IS, YOU KNOW, PUT INTO

2   THE WATER.

3   **Q.** AND WHAT EFFECT DOES -- AS CARBON GOES INTO THE WATER OF

4   THE SLOUGH, WHAT EFFECT DOES THAT HAVE?

5   **A.** IT BASICALLY CAN SERVE AS FOOD FOR OTHER -- OTHER

6   ORGANISMS THAT WOULD LIVE IN THE SLOUGH, IN THE WATER COLUMN.

7   **Q.** NOT THAT I PRETEND TO KNOW ANYTHING ABOUT THIS BUT I THINK

8   MOST LIVING THINGS ON THIS PLANET ARE CARBON BASED; IS THAT

9   CORRECT?

10  **A.** THAT'S RIGHT.

11  **Q.** DOES THAT INCLUDE ORGANISMS WITHIN THE MARINE FOOD CHAIN?

12  **A.** YES.

13  **Q.** SO THIS CARBON BEING INJECTED INTO THE SLOUGH, DOES IT

14  PROVIDE FOOD OR FUEL FOR THOSE TYPES OF ORGANISMS?

15  **A.** YEAH. A LOT OF ORGANISMS IN THE MARINE WATER COLUMN FEED

16  ON WHAT WE CALL DETRITUS, WHICH IS BASICALLY JUST CHUNKS OF

17  CARBON-BASED LIFE TRASH, LIKE LITTLE BITS OF LEAVES AND THINGS

18  LIKE THAT. YEAH.

19  **Q.** AND THEN LASTLY, BIOLOGY, IS THERE A BIOLOGICAL IMPACT OF

20  THESE WETLANDS ON THE SLOUGH BASED ON YOUR OWN OBSERVATION AND

21  EXPERIENCE?

22  **A.** YES. THE SLOUGH IS TIGHTLY CONFINED AT THIS POINT. THE

23  NATURAL SYSTEM OF THE BAY LANDS HAS BEEN ALTERED OVER THE PAST

24  COUPLE HUNDRED YEARS. A LOT OF THESE SLOUGHS ARE NOW CONFINED

25  SO INSTEAD OF HAVING BIG MARSHY WETLANDS SURROUNDING THEM,

HARDWICKE – DIRECT / KEARNEY

1   THEY HAVE STUFF LIKE SALT PONDS, THE CARGO SALT PONDS

2   SURROUNDING THEM, THAT DON'T SUPPLY A LOT OF THE SAME TYPES OF

3   HABITAT FUNCTIONS THAT BIG MARSHLANDS WOULD.

4       AND IN THIS CASE YOU HAVE AN AREA THAT EVEN THOUGH IT'S

5   NOT TOTALLY TIDAL BAY MARSH, YOU HAVE THESE LARGE HUNDREDS OF

6   ACRES OF WETLANDS THAT ANIMALS LIKE SALT MARSH HARVEST MOUSE

7   AND SHORE BIRDS AND THINGS LIKE THAT CAN UTILIZE.  THEY CAN GO

8   UP OVER THE LEVEE AND ENTER THESE AREAS.  THEY ARE NOT IN THE

9   SLOUGH ENVIRONMENT ANYMORE.  THEY ARE KIND OF IN AN ADJACENT

10  WETLAND ENVIRONMENT.

11  **Q.**  SO THERE IS A BIOLOGICAL IMPACT ON THE SLOUGH OF THESE

12  LANDS PROVIDING HABITAT FOR CREATURES THAT USE BOTH SIDES OF

13  THE LEVEE.  IS THAT A FAIR STATEMENT?

14  **A.**  THAT'S RIGHT.  MY GUESS WOULD BE THAT THE SLOUGH IS ABLE

15  TO SUPPORT A LOT MORE LIFE BECAUSE IT HAS THESE WETLANDS

16  ADJACENT TO IT.  BECAUSE IF IT WAS JUST THE SLOUGH SURROUNDED

17  BY SALT PONDS, I MEAN, YOU'D JUST HAVE A VERY THIN STRIP OF

18  WETLANDS ALONG EACH SIDE OF THE SLOUGH.

19  **Q.**  REGARDING THE PHYSICAL EFFECT THAT THESE WETLANDS HAVE ON

20  THE SLOUGH, WE TALKED ABOUT THE ACTUAL OUTPOURING FROM THE

21  TWO -- THE PUMP AND THE DUCKBILL THAT WE HAVE BEEN TALKING

22  ABOUT AT QUITE LENGTH, BUT DO THE WETLANDS ALSO SERVE OTHER

23  PHYSICAL PURPOSES LIKE FLOOD CONTROL, SEDIMENTATION, THAT KIND

24  OF THING?

25  **A.**  YES, THEY DO HELP TO CREATE SEDIMENTATION.  IN THIS AREA

HARDWICKE – DIRECT / KEARNEY

1    PROBABLY NOT AS MUCH AS, YOU KNOW, THEY WOULD IF THEY WERE

2    FULLY TIDAL.  SO IN TIDAL AREAS SEDIMENT IS BASICALLY TRAPPED

3    BY WETLANDS, SO WETLANDS RAISE AREAS IN TIDAL HABITATS.  LIKE

4    THE LONGER YOU HAVE PLANTS THERE, THE TALLER THOSE AREAS GET,

5    WHICH PROVIDES FLOOD CONTROL FOR THE LAND SIDE.  IN THIS CASE

6    THESE AREAS HAVE ALL BEEN DIKED, SO.

7    **Q.**  IN A SIGNIFICANT NEXUS ANALYSIS, DOCTOR, YOU ALSO LOOK AT

8    THE WETLANDS WE STUDY IN COMBINATION WITH EACH OTHER AND IN

9    COMBINATION WITH OTHER SIMILARLY SITUATED WETLANDS IN THE

10   REGION.  IS THAT A FAIR STATEMENT?

11   **A.**  UH-HUH.

12   **Q.**  IS THAT A YES?

13   **A.**  YES, THAT'S A YES.

14   **Q.**  OKAY.  ARE YOU AWARE OF OTHER WETLANDS IN THE REGION THAT

15   AFFECT TRADITIONAL NAVIGABLE WATERS LIKE MOWRY SLOUGH?

16   **A.**  YES, THERE ARE SEVERAL REMNANT BAYSIDE WETLANDS.  THEY ARE

17   MOSTLY RELEGATED TO LITTLE STRIPS, YOU KNOW, BEHIND DIKED

18   AREAS IN A LOT OF CASES.  THERE'S SOME AREAS OF MORE

19   SUBSTANTIAL TIDAL WETLANDS SORT OF ON THE OTHER SIDE OF THE

20   BAY.

21       BUT ON THIS SIDE OF THE BAY, YOU KNOW, I WOULD SAY THAT

22   THESE WETLANDS ARE SIMILARLY SITUATED TO LITTLE STRIPS OF OLD

23   HISTORIC TIDAL MARSH THAT HAS BEEN DIKED OFF.  IT USUALLY

24   OCCURS IN MUCH, MUCH SMALLER PATCHES THAN WHAT YOU SEE AT THIS

25   SITE AT NEWARK 4.

1   **Q.**  BUT IF YOU CONSIDER ALL THOSE SMALL LITTLE DIKED MARSHES

2   TOGETHER WITH OUR LAND, DO THEY IN COMBINATION HAVE A

3   SIGNIFICANT EFFECT ON TRADITIONAL NAVIGABLE WATERS LIKE MOWRY

4   SLOUGH?

5   **A.**  YES.

6          **MR. KEARNEY:**  THANK YOU.  NO FURTHER QUESTIONS, YOUR

7   HONOR.

8          **THE COURT:**  ANY CROSS-EXAMINATION?

9          **MS. HANSEN:**  YES, YOUR HONOR.  MAY I HAVE A MOMENT TO

10  SET UP?

11         **THE COURT:**  ABSOLUTELY.

12         **MS. HANSEN:**  THANK YOU.

13              (PAUSE IN THE PROCEEDINGS.)

14                  **CROSS-EXAMINATION**

15  **BY MS. HANSEN:**

16  **Q.**  GOOD MORNING, DR. HARDWICKE.

17  **A.**  GOOD MORNING.

18  **Q.**  I WANTED TO ASK YOU SOME QUESTIONS ABOUT THE AREA IMPACTED

19  TODAY AND WHAT MATTERS.

20  **A.**  OKAY.

21  **Q.**  AND THAT'S 2014.

22  **A.**  UH-HUH.

23  **Q.**  BEFORE WE GET THERE, THOUGH, I WANTED TO MAKE SURE THAT WE

24  ARE CLEAR ABOUT SOMETHING.  WHEN WE TALK TODAY, PLEASE CORRECT

25  ME IF I CONFUSE TWO DIFFERENT THINGS.

HARDWICKE – CROSS / HANSEN

1          I WANT TO TALK ABOUT WETLAND DELINEATIONS VERSUS

2    JURISDICTIONAL DETERMINATIONS.  IS THAT OKAY?

3    **A.**   OKAY.

4    **Q.**   AND YOU WOULD AGREE THAT THOSE ARE TWO SEPARATE STEPS OF

5    THE ANALYSIS, RIGHT?

6    **A.**   YES.

7    **Q.**   NOW, YOU STARTED AT H.T. HARVEY, THE FIRM, IN OCTOBER OF

8    2006, RIGHT?

9    **A.**   RIGHT.

10   **Q.**   AND NEWARK AREA 4 WAS YOUR FIRST SITE?

11   **A.**   IT WASN'T MY VERY FIRST PROJECT SITE BUT IT WAS ONE OF THE

12   EARLY ONES THAT I WAS ASSIGNED.

13   **Q.**   SO IT WAS ONE OF THE EARLY SITES IN YOUR CAREER?

14   **A.**   UH-HUH.  THAT'S RIGHT.

15   **Q.**   AND YOU WORKED WITH DR. BOURSIER AT THAT SITE, CORRECT?

16   **A.**   THAT'S RIGHT.

17   **Q.**   AND I'M GOING TO TALK TO YOU A LITTLE BIT ABOUT

18   DR. BOURSIER.  HE IS CURRENTLY RETIRED FROM H.T. HARVEY?

19   **A.**   YES, HE IS.

20   **Q.**   DO YOU KNOW WHEN HE RETIRED?

21   **A.**   HE RETIRED LAST YEAR, FEBRUARY OF 2017.

22   **Q.**   AND HE WAS IN CHARGE OF THE AREA 4 PROJECT AT THE TIME THE

23   FILL ACTIVITY TOOK PLACE IN THIS CASE IN 2014?

24   **A.**   THAT'S RIGHT.

25   **Q.**   AND HE WAS THE PRINCIPAL AND THE HEAD OF H.T. HARVEY'S

1    PLANT ECOLOGY GROUP, CORRECT?

2    **A.**   THAT'S RIGHT.

3    **Q.**   AND HE PROVIDED DIRECTION AND TRAINING FOR OTHER

4    ASSOCIATES?

5    **A.**   THAT'S RIGHT.

6    **Q.**   AND HE TRAINED YOU?

7    **A.**   YES, HE DID.

8    **Q.**   AND YOU WORKED TOGETHER FOR A NUMBER OF YEARS?

9    **A.**   UH-HUH.

10   **Q.**   HE CAREFULLY FOLLOWS THE ARMY CORPS OF ENGINEERS WETLAND

11   DELINEATION MANUALS?

12   **A.**   YES.

13   **Q.**   HE ALSO FOLLOWS THE JURISDICTIONAL MANUALS?

14   **A.**   YES.

15   **Q.**   H.T. HARVEY HAS DONE EXTENSIVE FIELD STUDIES AND MAPPING

16   OF AREA 4?

17   **A.**   THAT'S RIGHT.

18   **Q.**   AND YOU WERE WORKING THERE FOR DR. BOURSIER'S CLIENT; IS

19   THAT RIGHT?

20   **A.**   THAT'S RIGHT.

21   **Q.**   AND THAT IS THE SOBRATO ORGANIZATION?

22   **A.**   UH-HUH.

23   **Q.**   AND THAT ORGANIZATION AND NEWARK PARTNERS, THE GROUP THAT

24   ALL OWNS AREA 4 TOGETHER, THEY PLANNED TO DEVELOP THE LAND?

25   **A.**   THAT'S RIGHT.

HARDWICKE – CROSS / HANSEN

1   **Q.**  SO THAT'S WHY YOU ALL WERE OUT THERE?

2   **A.**  YES.

3   **Q.**  AND THEY ARE DEVELOPING THE LAND TO ASSESS -- EXCUSE ME.

4        FOR THIS DEVELOPMENT PROJECT THEY HIRED YOUR FIRM TO

5   ASSESS THE LAND AND TO IDENTIFY AND TO DELINEATE WHERE THE

6   WETLANDS EXISTED; IS THAT RIGHT?

7   **A.**  YES.

8   **Q.**  AND IT WAS IMPORTANT TO THE SOBRATO ORGANIZATION THAT H.T.

9   HARVEY GOT THOSE MAPS, RIGHT?

10  **A.**  YES.

11  **Q.**  I THINK YOU TESTIFIED YESTERDAY THAT YOU TOLD THEM THAT

12  THEY WOULD NEED TO SPEND EXTRA MONEY TO GET AN ACCURATE MAP?

13  **A.**  YES.  BECAUSE IT IS SUCH A HIGHLY MANIPULATED SYSTEM,

14  THERE WAS A RISK THAT -- A SIGNIFICANT RISK THAT THE CORPS

15  WOULD COME OUT TO THE SITE AND CONSIDER MUCH OF IT TO BE

16  WETLANDS THAT DON'T CURRENTLY ACT AS WETLANDS.

17  **Q.**  AND THERE ARE SOME AREAS OF THE SITE THAT AREN'T WETLANDS?

18  **A.**  THAT'S RIGHT.

19  **Q.**  AND THEY NEEDED TO DO THIS RIGHT BECAUSE THEY WANTED TO BE

20  ABLE TO MAXIMIZE THE DEVELOPMENT AREA?

21  **A.**  THAT'S RIGHT.

22  **Q.**  AND SO THE MAPPING THAT H.T. HARVEY DID THROUGH THE YEARS

23  WAS RELIED UPON BY YOUR CLIENT?

24  **A.**  YES.

25  **Q.**  THE SOBRATO ORGANIZATION?

HARDWICKE – CROSS / HANSEN

```
 1    A.   UH-HUH.

 2    Q.   AND IT WOULD BE RELIED UPON BY THE ARMY CORPS OF

 3    ENGINEERS, CORRECT?

 4    A.   YES.

 5    Q.   AND FOR THE DEVELOPMENT PROJECT IT WOULD ALSO BE RELIED

 6    UPON BY THE CITY OF NEWARK?

 7    A.   YES.

 8    Q.   CITIZENS OF NEWARK?

 9    A.   UH-HUH.

10    Q.   COMMUNITY GROUPS OF NEWARK?

11    A.   YEP.

12    Q.   AND IF ANYONE CHALLENGED THE DEVELOPMENT, YOUR MAPS WOULD

13    NEED TO BE SCRUTINIZED IN COURT; IS THAT RIGHT?

14    A.   THAT'S RIGHT.

15    Q.   AND IN A CIVIL CASE LIKE THAT IT WOULD BE SCRUTINIZED AT A

16    LOWER STANDARD THAN HERE IN A CRIMINAL CASE; IS THAT RIGHT?

17    A.   I ASSUME SO, YEAH.

18    Q.   NOW, WE TALKED A LITTLE BIT ABOUT THE TWO DIFFERENT TYPES

19    OF DETERMINATIONS, AND I WANT TO KEEP THOSE SEPARATE TODAY.

20        SO THE FIRST STEP OF DELINEATING ON THE PROPERTY, YOU

21    WOULD IDENTIFY DIFFERENT FEATURES, CORRECT?

22    A.   YES.

23    Q.   SUCH AS UPLANDS, RIGHT?

24    A.   YES.

25    Q.   AND WHAT ARE UPLANDS?
```

HARDWICKE – CROSS / HANSEN

1    **A.**   UPLANDS ARE AREAS THAT ESSENTIALLY THEY -- THEY DO NOT

2    HAVE ONE OF THE THREE PARAMETERS OR POSSIBLY THEY DON'T HAVE

3    ALL THREE OF THEM, SO THEY DON'T HAVE WETLAND VEGETATION

4    AND/OR THEY DON'T HAVE WETLAND SOILS AND/OR THEY DON'T HAVE

5    WETLAND HYDROLOGY.

6    **Q.**   AND YOU WOULD AGREE THAT UPLANDS ARE NOT COVERED UNDER THE

7    CLEAN WATER ACT?

8    **A.**   THAT'S RIGHT.

9    **Q.**   THAT IS THE JURISDICTIONAL STEP?

10   **A.**   UH-HUH.

11   **Q.**   YOU WOULD ALSO DELINEATE AREAS, THAT YOU DISCUSSED AT

12   LENGTH IN YOUR DIRECT TESTIMONY, THAT ARE WETLANDS ON A SITE?

13   **A.**   RIGHT.

14   **Q.**   AND YOU WOULD ALSO DELINEATE TRIBUTARIES, RIGHT?

15   **A.**   YES.  ALTHOUGH WE DIDN'T CALL THEM TRIBUTARIES.  WE JUST

16   CALLED THEM AQUATIC HABITAT OR OTHER WATERS.

17   **Q.**   AND THEN YOU WOULD ALSO IDENTIFY PONDS, CORRECT?

18   **A.**   YES.

19   **Q.**   AND TO DO THIS, THIS OFTEN REQUIRES SOME EXTENSIVE FIELD

20   WORK; IS THAT RIGHT?

21   **A.**   THAT'S RIGHT.

22   **Q.**   YOU DO SAMPLING, SURVEYS, AND STUDIES?

23   **A.**   YES.  MONITORING AS WELL.

24   **Q.**   WHAT IS THAT?

25   **A.**   MONITORING AS WELL.

1    **Q.**  LONGER TERM MONITORING, CORRECT?

2    **A.**  UH-HUH.

3    **Q.**  LIKE YOU DID FOR THAT POND UP IN THE NORTH AREA UNDER THE

4    PICK 'N PULL, RIGHT?

5    **A.**  RIGHT.

6    **Q.**  YOU TALKED A LITTLE BIT WITH MR. KEARNEY ABOUT THE WETLAND

7    DELINEATION MANUAL AND THE 2008 ARID WEST REGIONAL SUPPLEMENT

8    TO THAT MANUAL?

9    **A.**  UH-HUH.

10   **Q.**  AND THOSE ARE ARMY CORPS GUIDANCE FOR YOU; IS THAT RIGHT?

11   **A.**  THAT'S RIGHT.

12   **Q.**  AND THERE ARE ALSO, THOUGH, OTHER MANUALS THAT YOU DID NOT

13   TALK ABOUT; IS THAT RIGHT?

14   **A.**  YES, THERE IS AN ORDINARY HIGH MANUAL.  THERE'S OTHER

15   REGIONAL MANUALS.  THERE ARE MAPPING STANDARDS.  THAT TYPE OF

16   THING.

17   **Q.**  SO THERE'S A MAY 2007 JURISDICTIONAL DETERMINATION FORM

18   AND INSTRUCTIONAL GUIDEBOOK, CORRECT?

19   **A.**  YES.

20   **Q.**  AND THAT'S USED FOR DETERMINING IF AREAS YOU DELINEATE AS

21   WETLANDS ARE ACTUALLY JURISDICTIONAL, RIGHT?

22   **A.**  THAT'S RIGHT.

23   **Q.**  AND THAT GUIDEBOOK HAS AN EIGHT-PAGE SINGLE-SPACED FORM TO

24   BE USED IN MAKING THE LEGAL JURISDICTIONAL DETERMINATION,

25   CORRECT?

HARDWICKE – CROSS / HANSEN

1    **A.**  YES, THAT'S RIGHT.  AND AT THAT TIME, AGAIN, WE HAD BEEN

2    ASKED BY THE CORPS NOT TO FILL OUT THOSE FORMS, THAT THEY

3    WOULD FILL OUT THOSE FORMS.

4    **Q.**  BUT WHEN YOU ARE MAKING A SIGNIFICANT NEXUS ANALYSIS, THEY

5    RECOMMEND YOU ACTUALLY FILL OUT THOSE FORMS, CORRECT?

6    **A.**  NOT THE SAN FRANCISCO DISTRICT AT THIS TIME.

7    **Q.**  WELL, THE CORPS PROVIDES YOUR FIRM WITH THESE FORMS,

8    CORRECT?

9    **A.**  THEY ARE AVAILABLE.  UH-HUH.

10   **Q.**  AND THERE IS NO REASON YOU COULDN'T USE THEM; IS THAT

11   RIGHT?

12   **A.**  MY UNDERSTANDING FROM PAT IS THAT HE HAD TRIED TO FILL OUT

13   THE FORMS AT TIMES BEFORE, AND THEY HAD NOT USED WHAT HE HAD

14   FILLED OUT, AND THEY TOLD HIM, DON'T EVEN TRY THIS ANYMORE.

15   WE WILL BE FILLING OUT THESE FORMS.

16   **Q.**  OKAY.  SO I JUST WANT TO BE CLEAR, TOO, BY THE

17   JURISDICTIONAL QUESTION WHAT WE ARE ANSWERING IS WHETHER THE

18   FEATURE ON THE PROPERTY IS ACTUALLY COVERED UNDER THE CLEAN

19   WATER ACT, RIGHT?

20   **A.**  RIGHT.

21   **Q.**  SO JURISDICTIONAL MEANS IT IS SOMETHING THAT THE FEDERAL

22   GOVERNMENT CAN REGULATE EVEN IF IT IS PRIVATE PROPERTY?

23   **A.**  THAT'S RIGHT.

24   **Q.**  NOW, IN ADDITION TO THE JURISDICTIONAL DETERMINATION FORM

25   AND INSTRUCTIONAL GUIDEBOOK, THERE IS ALSO A RAPANOS GUIDANCE

1    LEGAL MEMO; IS THAT RIGHT?

2    **A.**  YES.

3    **Q.**  CAN YOU TELL US ABOUT THAT LEGAL MEMO?

4    **A.**  YES.  THAT MEMO CAME OUT AFTER --

5          **MR. KEARNEY:**  OBJECTION.  RELEVANCE, YOUR HONOR.

6          **THE COURT:**  OVERRULED.

7          **THE WITNESS:**  THAT MEMO CAME OUT AFTER THE RAPANOS

8    COURT CASE, ESSENTIALLY TRYING TO HELP CONSULTANTS AND OTHER

9    WETLAND DELINEATION PRACTITIONERS UNDERSTAND HOW TO APPLY THE

10   RULING IN TERMS OF HOW AND WHEN YOU FOUND STUFF

11   JURISDICTIONAL.

12   **BY MS. HANSEN:**

13   **Q.**  RIGHT.  AND IT DISCUSSES THE SIGNIFICANT NEXUS ANALYSIS?

14   **A.**  THAT'S RIGHT.

15   **Q.**  AND IT IS A 2006 MANUAL, CORRECT?

16   **A.**  YES.

17   **Q.**  AND THAT WAS BEFORE THIS SITE WAS DELINEATED BY H.T.

18   HARVEY IN 2007 FOR THE FIRST TIME?

19   **A.**  THAT'S RIGHT.

20   **Q.**  BEFORE WE BEGIN TALKING ABOUT AREA 4 SPECIFICALLY --

21   EXCUSE ME, SORRY.

22       AND I ALSO WANTED TO MENTION -- YOU SAID THERE WERE OTHER

23   MANUALS LIKE THE ORDINARY HIGH WATER MARK MANUAL, CORRECT?

24   **A.**  UH-HUH.

25   **Q.**  AND THERE'S A REGULATORY GUIDANCE LETTER FOR THE ORDINARY

1    HIGH WATER MARK FROM 2005, CORRECT?

2    **A.**   YES.

3    **Q.**   AND THEN YOU HAVE THE ARMY CORPS FIELD GUIDE TO

4    IDENTIFICATION OF THE ORDINARY HIGH WATER MARK?

5    **A.**   YES.

6    **Q.**   AND THAT WAS FROM 2008?

7    **A.**   YES.

8    **Q.**   AND THOSE ARE GOING TO BECOME IMPORTANT LATER WHEN WE TALK

9    ABOUT HOW YOU IDENTIFIED THE AQUATIC AREAS AT THE SITE?

10   **A.**   RIGHT.

11   **Q.**   SO BEFORE -- LET'S CLARIFY WHEN YOU WERE ACTUALLY AT THE

12   SITE.  2006 YOU WERE THERE?

13   **A.**   I WAS.

14   **Q.**   AND YOU SPENT A LOT OF TIME IN 2006 AT THE PROPERTY?

15   **A.**   YES.

16   **Q.**   2007?

17   **A.**   YES.

18   **Q.**   2008?

19   **A.**   2008 I WAS THERE TWO TIMES?  YES, TWO TIMES.

20   **Q.**   AND 2009?

21   **A.**   I WAS NOT THERE IN 2009.

22   **Q.**   HOW ABOUT 2010?

23   **A.**   NOPE.

24   **Q.**   2011?

25   **A.**   NOPE.

HARDWICKE – CROSS / HANSEN

1    **Q.**  2012?

2    **A.**  NO.

3    **Q.**  SO YOU WEREN'T PART OF THE TEAM THAT WENT BACK OUT IN 2012

4    TO REDO THE FIELD WORK THAT WAS DONE IN 2007?

5    **A.**  NO, I WASN'T ACTUALLY.  PAT WAS HANDLING IT AT THAT POINT.

6    **Q.**  WHO HANDLED THAT WITH PAT IN 2012?

7    **A.**  I BELIEVE OUR COLLEAGUE AND COWORKER BRIAN CLEARY WAS

8    HELPING HIM OUT WITH THAT.  PAT WOULD HAVE A BETTER IDEA.  I

9    HAD A COUPLE OF OTHER VERY LARGE PROJECTS THAT I WAS HANDLING

10   SO HE WAS FOCUSED ON NEWARK.

11   **Q.**  BY "PAT" YOU MEAN DR. BOURSIER, CORRECT?

12   **A.**  DR. BOURSIER, YES.

13   **Q.**  I WANTED TO SAY THAT NOT BECAUSE YOU HAVE TO CALL HIM

14   DR. BOURSIER, BUT I REFERRED TO HIM AS THAT EARLIER, AND OF

15   COURSE YOU CALL HIM PAT.  I WANT TO BE SURE WE ARE CLEAR ON

16   THE RECORD WHO WE ARE SPEAKING ABOUT.

17   **A.**  SURE.

18   **Q.**  SO YOU WEREN'T THERE IN 2012.  AND THEN I THINK WHAT I

19   HEARD WAS, YOU WERE NOT THERE IN 2013, RIGHT?

20   **A.**  THAT'S CORRECT.

21   **Q.**  '14?

22   **A.**  THAT'S CORRECT.

23   **Q.**  '15?

24   **A.**  WAS NOT THERE.

25   **Q.**  '16?

HARDWICKE – CROSS / HANSEN

1    **A.**  DIDN'T GO.

2    **Q.**  FIRST TIME YOU WENT BACK WAS IN FEBRUARY OF 2017?

3    **A.**  THAT'S CORRECT.

4    **Q.**  YOU WENT BACK WITH THESE PROSECUTORS; IS THAT CORRECT?

5    **A.**  YES, I DID.

6    **Q.**  AND THE ATTORNEY FROM THE EPA, MR. BERNINGER, WAS THERE AS

7    WELL, RIGHT?

8    **A.**  UH-HUH.

9    **Q.**  DR. HUFFMAN WAS THERE?

10   **A.**  DR. HUFFMAN AND I THINK HIS SON WAS THERE.  ALSO DAN

11   MARTEL, FROM THE U.S. ARMY CORPS OF ENGINEERS, WHO HAD DONE

12   THE ORIGINAL JURISDICTIONAL DETERMINATION.

13   **Q.**  DAN MARTEL DID THE DETERMINATION IN 2007, CORRECT?

14   **A.**  THAT'S RIGHT.

15   **Q.**  AND WAS DR. GALACATOS THERE FROM THE ARMY CORPS OF

16   ENGINEERS?

17   **A.**  YOU KNOW WHAT, I DON'T ACTUALLY REMEMBER DR. GALACATOS

18   BEING THERE.

19   **Q.**  SO YOU AND ALL OF THE EXPERTS TESTIFYING FOR THE

20   GOVERNMENT TODAY MET IN FEBRUARY OF 2007 AT THE PROPERTY,

21   CORRECT?

22   **A.**  THAT'S RIGHT.

23   **Q.**  WHEN YOU WERE THERE AT THAT POINT, YOU WEREN'T ACTUALLY

24   THERE TO DO FIELD WORK; IS THAT RIGHT?

25   **A.**  NO, WE WERE THERE TO BASICALLY LOOK AT THE SITE AND BECOME

HARDWICKE – CROSS / HANSEN

1  REACQUAINTED WITH THE SITE BECAUSE, YOU KNOW, IT HAD BEEN AT

2  THAT POINT NINE YEARS SINCE I HAD BEEN ON THE SITE AND -- AND

3  TO TAKE A LOOK AT THE FILL FIRSTHAND BECAUSE I HAD NEVER SEEN

4  IT.

5  **Q.**  SO YOU WERE NOT ON THE SITE FOR NINE YEARS AND THEN YOU

6  WENT BACK IN FEBRUARY OF 2017?

7  **A.**  THAT'S CORRECT.

8  **Q.**  SO YOUR LAST VISIT WAS IN 2008?

9  **A.**  THAT'S CORRECT.

10  **Q.**  LET'S -- I'M NOT GOING TO TALK TO YOU THEN ABOUT -- YOU

11  STARTED IN 2006?

12  **A.**  UH-HUH.

13  **Q.**  DR. BOURSIER DID STUDIES OF THE AREA BEFORE 2006, CORRECT?

14  **A.**  THAT IS RIGHT.

15  **Q.**  SO I'M NOT GOING TO GO OVER THOSE WITH YOU.  I WILL DO

16  THAT WITH DR. BOURSIER.

17      I WANT TO DRAW YOUR ATTENTION TO H.T. HARVEY'S 2007

18  PRELIMINARY DELINEATION OF WETLANDS AND THE DELINEATION REPORT

19  FOR AREA 4.  OKAY?

20  **A.**  UH-HUH.

21  **Q.**  FOR THIS REPORT IN 2007 YOUR FIRM VISITED THE SITE NO LESS

22  THAN 50 SEPARATE TIMES?

23  **A.**  THAT'S RIGHT.

24  **Q.**  OR POSSIBLY MORE?

25  **A.**  RIGHT.  AND THAT WOULD EXTEND ALL THE WAY BACK INTO 2005

HARDWICKE – CROSS / HANSEN

1    AND THE PRIOR WORK THAT HAD BEEN DONE.

2    **Q.**   AND YOUR TEAM STUDIED THE SITE FOR A YEAR AND A HALF?

3    **A.**   YES.

4    **Q.**   OVER MULTIPLE SEASONS, CORRECT?

5    **A.**   RIGHT.

6    **Q.**   NOT JUST ONE VISIT?

7    **A.**   RIGHT.

8    **Q.**   ON ONE DAY, RIGHT?

9    **A.**   OH, YEAH, NO, MANY VISITS.

10   **Q.**   IT TAKES A LONGER PERIOD OF TIME TO DO A PROPER

11   DELINEATION, CORRECT?

12   **A.**   ESPECIALLY ON A SITE LIKE THIS, YES.

13   **Q.**   IT IS A COMPLICATED SITE, CORRECT?

14   **A.**   ABSOLUTELY.

15   **Q.**   AND IN THE WINTER OF 2006 AND 2007, IS IT CORRECT THAT YOU

16   WERE AT THE SITE EVERY OTHER WEEK?

17   **A.**   YES.

18   **Q.**   AND YOU SPENT UP TO FOUR TO FIVE DAYS A WEEK ON THE

19   PROPERTY AT TIMES?

20   **A.**   YES.  NOT ALL THE TIME BECAUSE I THINK THAT MY TOTAL

21   NUMBER OF SITE VISITS IN THAT SIX MONTHS WAS 22, SO I DIDN'T

22   SPEND, YOU KNOW, THE ENTIRE TIME OUT THERE WEEK AFTER WEEK.

23   BUT WE HAD CERTAIN TIMES WHERE OUR MAIN EFFORT WAS JUST

24   MONITORING, AND SO THAT WAS ONCE EVERY TWO WEEKS.

25        AND THEN OTHER TIMES WHERE OUR MAIN EFFORT WAS, GET THE

HARDWICKE – CROSS / HANSEN

1   CREW OUT ON TO THE SITE.  YOU WILL BE OUT THERE FOR SEVERAL

2   DAYS.  WE ARE MAPPING.  WE'RE DIGGING PITS.  WE'RE DRAWING

3   LINES ON THE GROUND.

4   **Q.**  SO IT SOUNDS LIKE YOUR TEAM DID SOME THOROUGH WORK ON THE

5   SITE?

6   **A.**  YES, I THINK SO.

7   **Q.**  AND COMPLETE WORK ON THE SITE?

8   **A.**  YES.

9   **Q.**  AND ACCURATE WORK ON THE SITE?

10  **A.**  YES.

11  **Q.**  AND NOW, LET'S BE CLEAR THAT THAT REPORT WAS FOCUSED

12  MAINLY ON THE FIRST STEP WE WERE TALKING ABOUT, WETLAND

13  DELINEATION, RIGHT?  NOT THE JURISDICTIONAL QUESTION, CORRECT?

14  **A.**  THAT'S RIGHT.  IN FACT, WE HAVE A PARAGRAPH FROM OUR

15  REPORT --

16  **Q.**  I WAS JUST GETTING THERE.  EXACTLY.  IS THAT THE

17  DISCLAIMER?

18  **A.**  YES.

19  **Q.**  PLEASE TELL US ABOUT THE DISCLAIMER.

20  **A.**  SO AT THIS TIME GUIDANCE FOR THE ARMY CORPS WAS CHANGING

21  RAPIDLY DUE TO A COUPLE OF DIFFERENT COURT DECISIONS THAT HAD

22  RULED AGAINST THE ARMY CORPS OF ENGINEERS, AND SO A LOT OF

23  GUIDANCE LETTERS HAD BEEN ISSUED.

24     A LOT OF CONSULTING FIRMS WERE BASICALLY GOING OUT AND

25  SAYING, NONE OF THIS IS JURISDICTIONAL NOW.  EVERYTHING WOULD

1    HAVE BEEN CONSIDERED "WATERS OF THE U.S." LAST YEAR, AND WE

2    ARE GOING TO SAY ACCORDING TO THESE NEW COURT DECISIONS IT'S

3    ALL THE -- THE SLANG USED AT THE TIME WAS CALLED SWANCC-A-FIED

4    BECAUSE IT HAS TO DO WITH A COURT CASE CALLED *SWANCC* AT THE

5    TIME.

6         SO WHAT WE DECIDED TO DO IS THAT -- WE FELT THAT THINGS

7    WERE CHANGING RAPIDLY, WE COULD ALREADY SEE THAT THE ARMY

8    CORPS WAS STARTING TO PUSH BACK ON A LOT OF THIS KIND OF WILD

9    WEST ATTITUDE OF EVERYTHING IS DISCLAIMED NOW, AND SO WE SAID,

10   WE ARE NOT MAKING A DETERMINATION ABOUT WHETHER ANY OF THESE

11   WETLANDS ARE CONSIDERED NON-JURISDICTIONAL DUE TO THESE

12   DIFFERENT TYPES OF COURT CASES.  WE CONSIDER THAT UP TO THE

13   CORPS TO MAKE THAT DETERMINATION.

14   **Q.**  SO THE COURT CASES WE ARE TALKING ABOUT ARE FROM THE

15   SUPREME COURT OF THE UNITED STATES, CORRECT?

16   **A.**  THAT'S RIGHT.

17   **Q.**  AND THE *SWANCC* CASE, I THINK YOU REFERRED TO IS --

18        **MR. KEARNEY:**  YOUR HONOR, I AM SORRY, I THINK THIS

19   GOES BEYOND THIS WITNESS'S COMMENTS, TALKING ABOUT EFFECTS OF

20   COURT DECISIONS AND WHAT WAS RULED IN THEM.

21        **THE COURT:**  SUSTAINED.  IT SEEMS LIKE IT INHERENTLY

22   CALLS FOR A LEGAL CONCLUSION.

23        **MS. HANSEN:**  YOUR HONOR, CAN I AT LEAST CLARIFY THE

24   TITLE OF THE CASE FOR THE RECORD SO THAT WE KNOW WHAT WE ARE

25   TALKING ABOUT?

1     **THE COURT:** YES.

2   **BY MS. HANSEN:**

3   **Q.** THE *SWANCC* CASE IS THE SOLID WASTE AGENCY OF NORTHERN COOK

4   COUNTY, CORRECT?

5   **A.** THAT'S RIGHT.

6   **Q.** AND THEN RAPANOS IS THE OTHER CASE THAT WAS DISCLAIMED IN

7   YOUR REPORT, THAT YOU DID NOT DO AN ANALYSIS UNDER RAPANOS?

8   **A.** THAT'S EXACTLY RIGHT.

9   **Q.** AND RAPANOS IS THE SIGNIFICANT NEXUS TEST?

10  **A.** YES.

11  **Q.** THAT IS WHERE IT ORIGINATED?

12  **A.** YES.

13  **Q.** YOU DID NOT DO THE RAPANOS SIGNIFICANT NEXUS TEST?

14  **A.** NO, WE DID NOT DO IT AND WE DID NOT CLAIM TO DO IT.  WE

15  DID PROVIDE INFORMATION SO THAT THEY CAN THEN DO THAT TEST

16  THEMSELVES.

17  **Q.** WHEN YOU SAY "THEY," YOU MEAN THE ARMY --

18  **A.** THE ARMY CORPS, YEAH.

19  **Q.** I'M SORRY, I THINK I NEED TO BE CAREFUL NOT TALKING OVER

20  YOU AND YOU NOT ME SO THAT OUR COURT REPORTER CAN GET THIS

21  DOWN.

22  **A.** YES.

23  **Q.** I NOTED THAT SHE WAS MAYBE FRUSTRATED WITH ME.  SORRY.

24      I WANT TO SHOW YOU GOVERNMENT EXHIBIT ALREADY ADMITTED

25  1138 BUT I WANT TO SHOW YOU NOT ON THE SCREEN, LET'S LOOK

1    FIRST AT THE POSTER.  OKAY?

2    **A.**  OKAY.

3        **MS. HANSEN:**  THANKS, MR. SMOCK.

4    **BY MS. HANSEN:**

5    **Q.**  SO THIS IS GOVERNMENT EXHIBIT 1138, CORRECT?

6    **A.**  YES.

7    **Q.**  AND THERE ARE A BUNCH OF FOLD LINES ON IT, RIGHT?

8    **A.**  YES.

9    **Q.**  BECAUSE THIS WAS AN OVERSIZED MAP THAT YOU SUBMITTED TO

10   THE ARMY CORPS OF ENGINEERS, CORRECT?

11   **A.**  YES.

12   **Q.**  IS THIS THE ORIGINAL MAP?

13   **A.**  I -- I ACTUALLY DON'T KNOW THAT FOR SURE BUT IT WAS ONE OF

14   THE COPIES THAT WAS BEING USED DURING THE PROCESS.

15   **Q.**  SO THIS MAP DR. BOURSIER PROVIDED TO THE GOVERNMENT,

16   CORRECT?

17   **A.**  YES.

18   **Q.**  AND BECAUSE THIS MAP HAS FOLD LINES ON IT, I DON'T WANT TO

19   USE THE PICTURE OF IT ON THE SCREEN BECAUSE I THINK IT

20   DISTORTS IT A LITTLE BIT.  SO I AM GOING TO HAND YOU WHAT HAS

21   BEEN PREMARKED FOR IDENTIFICATION AS DEFENSE EXHIBIT 2001B.

22       **THE CLERK:**  I AM SORRY, LET ME HAVE THE NUMBER AGAIN.

23       **MS. HANSEN:**  YES, MA'AM, 2001B.

24   COPY FOR THE GOVERNMENT.

25   **BY MS. HANSEN:**

HARDWICKE – CROSS / HANSEN

1   **Q.**  DR. HARDWICKE, CAN YOU TAKE A LOOK AT DEFENSE

2   EXHIBIT 2001B AND CONFIRM THAT IT'S A FAIR AND ACCURATE

3   DEPICTION OF GOVERNMENT EXHIBIT 1138?

4   **A.**  YES, I BELIEVE SO.

5   **Q.**  AND IT SAYS AT THE TOP DRAFT WETLAND MAPPING, BUT YOU

6   WOULD AGREE THAT THIS IS NOT THE DRAFT, CORRECT?

7   **A.**  I'M NOT ACTUALLY SURE WHEN THIS DRAFT WETLAND MAPPING WAS

8   PUT ON THIS PARTICULAR COPY.  SO THIS WAS PULLED OFF OF OUR

9   SERVER, AGAIN, THESE FILES ARE ALL TEN YEARS OLD.  WE WERE

10  LOOKING FOR A PARTICULAR COPY OF A MAP THAT HAD PROBABLY 40

11  DIFFERENT VERSIONS MADE IN 2007.  THIS WAS THE ONE THAT I

12  COULD FIND WITH THE CORRECT DATE, THE MAPPING AS WE ENDED UP

13  WITH, AND IT HAD THIS BASICALLY DISCLAIMER ON THE TOP THAT

14  SAYS DRAFT WETLAND MAPPING.

15  **Q.**  WOULD YOU SAY THAT THIS IS THE SAME MAP THAT IS DEPICTED

16  IN GOVERNMENT EXHIBIT 1138?

17  **A.**  I THINK IT IS.  IF YOU WANT ME TO COME UP TO BE SURE, I

18  CAN.

19  **Q.**  SURE.  THAT WOULD BE GREAT.

20  **A.**  YES, THIS LOOKS LIKE THE SAME VERSION.

21  **Q.**  SAME VERSION.  GREAT.

22          **MS. HANSEN:**  YOUR HONOR, I MOVE TO ADMIT DEFENSE

23  EXHIBIT 2001B.

24          **MR. KEARNEY:**  NO OBJECTION.

25          **THE COURT:**  2001B ADMITTED.

1            (DEFENDANT'S EXHIBIT 2001B RECEIVED IN EVIDENCE)

2              **MS. HANSEN:**  PERMISSION TO PUBLISH?

3              **THE COURT:**  YES.

4                       (DISPLAYED ON SCREEN.)

5    **BY MS. HANSEN:**

6    **Q.**  SO THIS IS THE MAP THAT WAS SUBMITTED TO THE ARMY CORPS OF

7    ENGINEERS IN 2007, CORRECT?

8    **A.**  YES.

9    **Q.**  LET'S START WITH THE LEGEND.

10             **MS. HANSEN:**  IF WE CAN HAVE THAT CALLED OUT.  THANK

11   YOU, MR. WANZALA.

12   **BY MS. HANSEN:**

13   **Q.**  THE AREAS THAT ARE DESIGNATED IN BLUE WERE CALLED OTHER

14   WATERS; IS THAT RIGHT?

15   **A.**  YES.

16   **Q.**  THE UPLANDS WERE DISTINGUISHED IN YELLOW?

17   **A.**  YES.

18   **Q.**  THE WETLANDS IN GREEN?

19   **A.**  YES.

20   **Q.**  AND THEN THERE IS THIS OTHER CATEGORY CALLED AREAS WITH A

21   WETLAND CHARACTERISTICS NOT DETERMINED TO BE JURISDICTIONAL,

22   CORRECT?

23   **A.**  THAT'S RIGHT.

24   **Q.**  LET'S LOOK AT THE RED ON THIS MAP.

25             **MS. HANSEN:**  WE WILL CALL THAT OUT.

HARDWICKE – CROSS / HANSEN

1    **BY MS. HANSEN:**

2    **Q.**  SO THAT'S THE AREA -- DO YOU SEE THE RED ON THE MAP,

3    DR. HARDWICKE?

4    **A.**  YES.

5    **Q.**  THAT'S THE AREA ADJACENT TO THE FENCE LINE OR WITHIN THE

6    FENCE LINE OF THE AUTO DISMANTLER JUNKYARD, CORRECT?

7    **A.**  THAT'S RIGHT.

8    **Q.**  SO LET'S ANSWER AN IMPORTANT QUESTION BEFORE WE BEGIN.

9    YOU TESTIFIED ON DIRECT EXAMINATION THAT THERE'S NO FILLING OF

10   WETLANDS WITHOUT A PERMIT, BUT THAT IS NOT QUITE RIGHT.  THERE

11   IS NO FILLING OF JURISDICTIONAL WETLANDS --

12          **MR. KEARNEY:**  OBJECTION.  SORRY, I BELIEVE THAT

13   MISSTATES HER TESTIMONY, YOUR HONOR.

14          **THE COURT:**  OVERRULED.  SHE CAN CLARIFY IT IF IT

15   DOES.

16   **BY MS. HANSEN:**

17   **Q.**  THERE IS NO UNPERMITTED FILLING OF JURISDICTIONAL

18   WETLANDS, CORRECT?

19   **A.**  YES, THERE IS NO FILLING OF WATERS OR WETLANDS OF THE U.S.

20   WITHOUT A PERMIT FROM THE ARMY CORPS OF ENGINEERS.  OTHER

21   AGENCIES MAY BE REQUIRED TO ISSUE PERMITS.

22   **Q.**  WE ARE NOT CONCERNED ABOUT OTHER AGENCIES TODAY.

23   **A.**  GOT IT.

24   **Q.**  IT HAS NOTHING TO DO WITH OUR CASE.

25   **A.**  OKAY.

HARDWICKE – CROSS / HANSEN

1   **Q.**   WE ARE JUST TALKING ABOUT FEDERAL JURISDICTION IN THIS

2   CASE.

3   **A.**   THAT'S RIGHT.

4   **Q.**   SO LET'S BE CLEAR.  I WANT TO ANSWER THIS VERY IMPORTANT

5   QUESTION.  NOT ALL WETLANDS ARE JURISDICTIONAL, CORRECT?

6   **A.**   THAT'S RIGHT.

7   **Q.**   THERE ARE ISOLATED WETLANDS, FOR EXAMPLE?

8   **A.**   YEP.

9   **Q.**   AND THERE ARE WETLANDS LIKE -- OR AREAS LIKE ON THIS SITE

10  THAT HAVE WETLAND FEATURES THAT ARE NON-JURISDICTIONAL,

11  CORRECT?

12  **A.**   THAT'S RIGHT.

13  **Q.**   NOW, ON THAT RED AREA THERE WAS PICKLEWEED THERE, CORRECT?

14  **A.**   THERE WAS.

15  **Q.**   AND THAT WAS NOT A JURISDICTIONAL WETLAND, CORRECT?

16  **A.**   THAT WAS DR. BOURSIER'S OPINION, AND HE WAS UTILIZING THE

17  ARGUMENT THAT THIS HYDROLOGY WAS NOT WETLAND HYDROLOGY.  THAT

18  WAS A POND ADJACENT TO THE JUNKYARD THAT HAD BEEN ESSENTIALLY

19  CREATED FROM NUISANCE WATER FROM SPRAYING OFF -- STUFF OFF OF

20  THE JUNKYARD.  SO THAT WAS WHAT HE PROPOSED TO THE ARMY CORPS.

21  **Q.**   AT THE TIME YOU WERE WORKING UNDER HIM IN 2007 WHEN HE

22  MADE THAT DETERMINATION CORRECT?

23  **A.**   YES, UH-HUH.

24  **Q.**   PICKLEWEED CAN ALSO GROW UP THE SIDE OF A LEVEE; IS THAT

25  RIGHT?

HARDWICKE – CROSS / HANSEN

1    **A.**  YES, IT USUALLY DOESN'T GO VERY FAR UP THE SIDE OF A LEVEE

2    IF THERE ISN'T HYDROLOGY TO SUPPORT IT.

3    **Q.**  AND THAT MEANS THAT IT WOULDN'T BE WETLAND, CORRECT, IF

4    THERE IS NO HYDROLOGY TO SUPPORT IT?

5    **A.**  THAT'S RIGHT.

6    **Q.**  SO PICKLEWEED CAN BE IN PLACES WHERE THERE IS NO WETLAND,

7    CORRECT?

8    **A.**  YES, I WOULD SAY A VERY SMALL PROPORTION OF THE TIME.

9    **Q.**  NOW, YESTERDAY THE GOVERNMENT SHOWED YOU A SERIES OF

10   PICTURES FROM 2014 AFTER THE FILL WAS PLACED; IS THAT RIGHT?

11   **A.**  YES.

12   **Q.**  AND YOU WERE NOT AT THE SITE IN 2014, CORRECT?

13   **A.**  I WAS NOT.

14   **Q.**  SO TO THE EXTENT YOU WERE DESCRIBING AREAS NOT PREVIOUSLY

15   DELINEATED AS WETLANDS --

16   **A.**  UH-HUH.

17   **Q.**  -- NOT WETLANDS, YOU DID NOT CONFIRM THE WETLAND HYDROLOGY

18   BY LOOKING AT PICTURES, CORRECT?

19   **A.**  NO, I DID NOT DIRECTLY CONFIRM THE WETLAND HYDROLOGY.

20   **Q.**  AND YOU DID NOT CONFIRM WETLAND SOILS IN THE AREAS NOT

21   PREVIOUSLY DESIGNATED AS WETLANDS, CORRECT?

22         **MR. KEARNEY:**  YOUR HONOR, I AM GOING TO OBJECT AS TO

23   VAGUE AS TO THE TERM "AREAS."  CAN WE PROCEED ON AN

24   AREA-BY-AREA BASIS?  IT IS AN OVERBROAD QUESTION.

25         **THE COURT:**  OVERRULED.  IT PROBABLY MAKES SENSE TO DO

HARDWICKE – CROSS / HANSEN

1    IT THAT WAY.

2              **MS. HANSEN:**  LET'S LOOK AT EXHIBIT 3.  I WAS JUST

3    ABOUT TO DO THAT.

4         MR. WANZALA, CAN YOU PULL OUT THE AREA UNDERNEATH THE

5    PICK 'N PULL, PLEASE.

6                   (DISPLAYED ON SCREEN.)

7         COULD YOU PUT AN ARROW BY THE BLUE WITH THE SLASH MARKS.

8    **BY MS. HANSEN:**

9    **Q.**  SO, DR. HARDWICKE, THE GREEN ABOVE THE BLUE WITH THE SLASH

10   MARKS IS PREVIOUSLY DELINEATED AS WETLAND, CORRECT?

11   **A.**  THAT'S RIGHT.

12   **Q.**  MR. LUCERO HAS NO DISPUTE THAT THERE WAS FILL MATERIAL

13   PLACED IN THAT AREA, AND THAT IS WHAT YOUR FIRM DETERMINED,

14   CORRECT, THE GREEN PART?

15   **A.**  THAT'S RIGHT.

16   **Q.**  AND SO TO THE EXTENT YESTERDAY YOU WERE DISCUSSING AREAS,

17   BECAUSE IT WASN'T CLEAR, NOT PREVIOUSLY DELINEATED WETLANDS

18   AND I'M TALKING RIGHT NOW ABOUT THE BLUE AREA.

19   **A.**  UH-HUH.

20   **Q.**  YOU ONLY LOOKED AT PHOTOGRAPHS, CORRECT?

21   **A.**  THAT'S RIGHT.  THAT'S RIGHT.

22   **Q.**  AND THERE ARE THREE PARAMETERS TO DETERMINE WHETHER AN

23   AREA IS A WETLAND, CORRECT?

24   **A.**  YES.

25   **Q.**  AND YOU COULD ONLY LOOK AT THE PHOTOS FOR THE VEGETATION,

1   CORRECT?

2   **A.**  THAT'S RIGHT.  ALTHOUGH ON THIS SITE ALL OF THE SOILS ARE

3   HYDRIC, THEY ARE HISTORICALLY HYDRIC, AND THEY WOULDN'T CHANGE

4   FROM A COUPLE OF YEARS.

5   **Q.**  BUT THAT SITE PREVIOUSLY, THE BLUE AREA, WAS DESIGNATED

6   NOT AS A WETLAND, CORRECT?

7   **A.**  WE DESIGNATED IT AS OTHER WATERS DUE TO THE LACK OF

8   VEGETATION AT THE TIME THAT WE DID OUR SURVEYS.

9   **Q.**  IN 2007, CORRECT?

10  **A.**  THAT'S RIGHT.

11  **Q.**  AND THIS MAP WAS REAPPROVED IN 2014, CORRECT?

12  **A.**  THAT'S MY UNDERSTANDING.

13  **Q.**  NOW, THIS BLUE SHADED AREA UNDER THE PICK 'N PULL -- AND

14  WE COULD STAY ON THIS MAP INSTEAD OF GOING BACK TO THE

15  ORIGINAL MAP.  THE MAP AT EXHIBIT 3 IS THE MAP THAT WAS

16  CORRECTED AFTER THE ARMY CORPS MADE CHANGES TO YOUR

17  EXHIBIT 1138, CORRECT?

18  **A.**  THAT'S RIGHT.

19  **Q.**  SO WE ARE AT EXHIBIT 3.  LET'S GO BACK.  WE'RE BACK TO THE

20  PICK 'N PULL HERE.

21      SO H.T. HARVEY IDENTIFIED THE AREA --

22          **MS. HANSEN:**  MR. WANZALA, CAN YOU PUT THE AREA BACK?

23  **BY MS. HANSEN:**

24  **Q.**  WHERE FILL WAS PLACED AS "OTHER WATERS", AND THAT'S THE

25  BLUE; IS THAT RIGHT?

1    **A.**   THAT'S RIGHT.

2    **Q.**   AND THESE ARE OVAL OR KIND OF LARGER SHAPED AREAS,

3    CORRECT?

4    **A.**   YES.

5    **Q.**   IN LATER MAPS -- IN THIS MAP IN PARTICULAR, LET'S LOOK AT

6    THE LEGEND.  IT'S CALLED AQUATIC THIS TIME; ISN'T THAT RIGHT?

7    **A.**   YES.

8    **Q.**   IN THE PREVIOUS MAP WE LOOKED AT IT WAS CALLED OTHER

9    WATER, CORRECT?

10   **A.**   YES.

11   **Q.**   AND THOSE ARE ACTUALLY DISTINCT TERMS, CORRECT?

12   **A.**   YES, AQUATIC I WOULD SAY IS MORE DESCRIPTIVE OF A HABITAT

13   TYPE, WHEREAS OTHER WATERS HAS MORE OF A JURISDICTIONAL KIND

14   OF LEANING.

15   **Q.**   RIGHT.  SO WE'LL GET BACK TO THAT IN A MINUTE, BUT I JUST

16   WANTED TO POINT THAT OUT.  BECAUSE WE ARE ON THE 2014 MAP

17   RIGHT NOW, CORRECT?

18   **A.**   YES, THIS WAS THE MAP USED TO BE A BASE TO DEPICT THE

19   FILL.

20   **Q.**   CORRECT.

21          **MS. HANSEN:**   MR. WANZALA, CAN WE GO BACK OUT, PLEASE.

22   **BY MS. HANSEN:**

23   **Q.**   NOW, LET'S LOOK AT THE AREA UNDER THE DUCK PONDS.  SO I AM

24   TALKING ABOUT HOW YOU DELINEATED ALL OF THIS, YOU WERE PART OF

25   THAT PROCESS.  THE DUCK PONDS THERE, THOSE ARE AQUATIC OR

1    OTHER WATERS, CORRECT?

2    **A.**  THAT'S RIGHT.

3    **Q.**  AND UNDER THE DUCK PONDS THERE IS SOME SMALLER PONDING,

4    CORRECT?

5    **A.**  YES.

6    **Q.**  AND ALONG THE BOTTOM LEVEE BY THE BERM THERE IS ADDITIONAL

7    PONDING, CORRECT?

8    **A.**  THAT'S RIGHT.

9    **Q.**  AND IT IS IN ABOUT A HORIZONTAL-ISH TYPE OF LINE, CORRECT?

10   **A.**  RIGHT.

11   **Q.**  DO YOU SEE WHERE IT ENDS ON THIS MAP, THE PONDING?

12   **A.**  YES.

13   **Q.**  YOU WOULD AGREE THAT TO THE RIGHT --

14          **MS. HANSEN:**  MR. WANZALA, COULD YOU PUT AN ARROW

15   WHERE IT ENDS.

16   **BY MS. HANSEN:**

17   **Q.**  DR. HARDWICKE, IS THAT WHERE THE PONDING ON THIS MAP ENDS

18   ON THAT HORIZONTAL BERM?

19   **A.**  THAT'S WHAT -- THE END OF WHAT WE MAPPED AS OTHER WATERS

20   OR AQUATIC HABITAT.  THE PONDING WITHIN THE DITCH ACTUALLY

21   EXTENDED TO THE EAST.

22   **Q.**  YOU DIDN'T MAP THAT, CORRECT?

23   **A.**  THAT'S RIGHT.  WE DIDN'T MAP IT AS OTHER WATERS BECAUSE IT

24   BECAME NARROWER AND NARROWER AS IT WENT TO THE EAST, AND SO WE

25   JUST LUMPED IT ALL IN AS WETLANDS.

1   **Q.**  WE WILL GET BACK TO THAT IN A MINUTE.  I WANT TO LOOK AT

2   THE LINE --

3          **MS. HANSEN:**  WE CAN TAKE THE ARROWS OFF.  THERE IS A

4   THIN -- MAYBE WE CAN BLOW THAT UP.

5   **BY MS. HANSEN:**

6   **Q.**  UNDER THE DUCK PONDS THERE IS AN UPLAND I WANT TO SHOW

7   YOU.  THAT IS AN UPLAND, CORRECT?

8   **A.**  THAT'S RIGHT.

9   **Q.**  AND IT IS IN YELLOW, CORRECT?

10  **A.**  THAT'S RIGHT.

11  **Q.**  AND THEN BELOW THAT UPLAND GOES INTO THE BOTTOM OF THE

12  BERM AND THAT, TOO, IS IDENTIFIED AS YELLOW, CORRECT?

13  **A.**  YES.

14  **Q.**  NOT BLUE --

15  **A.**  YES.

16  **Q.**  -- CORRECT?

17         **MS. HANSEN:**  AND LET'S GO BACK TO DEFENSE

18  EXHIBIT 2001B.  THIS MAP --

19                    (DISPLAYED ON SCREEN.)

20     2001B, LET'S BLOW THAT UP.  LET'S DO UNDER THE DUCK PONDS

21  BY THE SOUTHERN BERM.

22  **BY MS. HANSEN:**

23  **Q.**  SO YOU SEE THE RED AND PURPLE-ISH CONTOUR LINES ON THIS

24  MAP, CORRECT?

25  **A.**  YES.

HARDWICKE – CROSS / HANSEN

```
1          MS. HANSEN:  MR. WANZALA, COULD YOU PUT AN ARROW DOWN
2    BY THAT SOUTHERN BERM TO SHOW DR. HARDWICKE WHERE I AM
3    REFERRING TO AND THE JURY.
4    BY MS. HANSEN:
5    Q.  SO THOSE ARE CONTOUR LINES, CORRECT?
6    A.  UH-HUH.
7    Q.  AND THOSE ARE LINES THAT WERE CREATED BY AN ENGINEERING
8    FIRM, CORRECT?
9    A.  YEAH, KIER & WRIGHT I BELIEVE DID THOSE.
10   Q.  KIER & WRIGHT DID THE WORK FOR H.T. HARVEY TO DETERMINE
11   THE ELEVATION AND DEPRESSIONS ON THE LAND, CORRECT?
12   A.  YES.  AS PART OF A TEAM EFFORT WE INFORMED SOBRATO THAT
13   THE DELINEATION WOULD BE GREATLY HELPED BY PROJECT SPECIFIC
14   TOPO THAT WAS BETTER THAN THE U.S.G.S. TOPO MAPS.
15   Q.  SO THIS WAS PRIVATELY COMMISSIONED WORK THAT WAS DONE BY
16   AN ENGINEERING FIRM FOR THE SOBRATO ORGANIZATION, CORRECT?
17   A.  THAT'S RIGHT.
18   Q.  AND YOUR MAPS RELIED ON THEIR TOPOGRAPHICAL MAPPING,
19   CORRECT?
20   A.  THAT'S RIGHT.
21   Q.  AND SO YOU OVERLAID THE CONTOUR LINES ON TOP OF YOUR MAP,
22   CORRECT?
23   A.  THAT'S RIGHT.
24   Q.  LET'S LOOK AT SOME OF THE OTHER BLUE AQUATIC MAPPING YOU
25   DID AT THE BOTTOM OF THE MAP.
```

1       THE WAY FAR BOTTOM RIGHT THERE'S A POND, CORRECT?

2  **A.**  YES.

3  **Q.**  AND THAT'S A BLUE AREA, AGAIN, ALMOST LIKE A CIRCLE OR AN

4  OVAL?

5  **A.**  UH-HUH.

6  **Q.**  YOU ALSO MAPPED SOME OTHER BLUE AREAS.  LET'S LOOK AT

7  THOSE.  IT'S HARD TO SEE ON THIS MAP.  MAYBE WE CAN SWITCH

8  BACK TO EXHIBIT 3, WHICH IS THE 2014 MAP, THAT'S THE

9  FOUNDATION FOR THE MAP IN GOVERNMENT EXHIBIT 1138.

10         **MS. HANSEN:**  MR. WANZALA, CAN YOU CALL OUT THE RIGHT

11  BOTTOM SIDE?  WE ARE GOING TO LOOK AT SOME OF THE SMALL BLUE

12  LINES THAT WERE MAPPED.

13  **BY MS. HANSEN:**

14  **Q.**  DR. HARDWICKE, CAN YOU SEE ABOVE –– DO YOU REMEMBER YOU

15  TESTIFIED ABOUT THE OLD HISTORIC SLOUGH LINE THERE THAT IS

16  BLUE?

17  **A.**  UH-HUH.

18  **Q.**  RIGHT ABOVE THAT THERE ARE SOME BLUE LINES.  DO YOU SEE

19  THOSE?

20  **A.**  YES.

21  **Q.**  THOSE ARE SOME THIN BLUE LINES, CORRECT?

22  **A.**  YES.

23  **Q.**  AND THOSE ARE MAPPED HERE, CORRECT?

24  **A.**  CORRECT.

25         **MS. HANSEN:**  LET'S GO TO THE SIDE OF THE LEVEE.

1      I AM SORRY, MR. WANZALA, I MEAN ADJACENT TO THE SLOUGH.

2      LET'S -- EXACTLY.

3  **BY MS. HANSEN:**

4  **Q.**  THERE'S ANOTHER BLUE LINE THAT WAS MAPPED HERE AND THAT'S

5  ALONG THE LEVEE BUT IT'S NOT THE SLOUGH, CORRECT?

6  **A.**  YES.  THAT'S WHAT THEY CALL THE BORROW PIT, AND IT'S ON

7  THE LAND SIDE OF THE LEVEE AND WAS USED TO DIG BASICALLY THE

8  MATERIAL TO BUILD THAT LEVEE.

9  **Q.**  SO THAT WAS A DITCH THAT WAS TURNED INTO A TRIBUTARY,

10 CORRECT?

11 **A.**  THAT'S RIGHT.

12 **Q.**  AND THAT IS MAPPED HERE, CORRECT?

13 **A.**  YES.

14 **Q.**  THAT IS REFERRED TO BY -- IN SOME MATERIALS YOU SAW BY

15 DR. HUFFMAN AS TRIBUTARY B; IS THAT RIGHT?

16 **A.**  I BELIEVE SO.

17 **Q.**  AND THERE IS NO DISPUTE ABOUT TRIBUTARY B, IT IS ON YOUR

18 MAP, CORRECT?

19 **A.**  UH-HUH.

20      **THE COURT:**  IS THIS A GOOD TIME TO TAKE OUR RECESS?

21      **MS. HANSEN:**  SURE.

22      **THE COURT:**  ALL RIGHT.  SO, LADIES AND GENTLEMEN,

23 IT'S A LITTLE AFTER 10:00.  LET'S TAKE OUR FIRST MORNING

24 RECESS FOR 15 MINUTES AND COME BACK AT 10:15.

25      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

HARDWICKE – CROSS / HANSEN

1        **THE CLERK:**  PLEASE BE SEATED.

2        **THE COURT:**  WE WILL BE BACK AT 10:15.

3        (RECESS TAKEN AT 10:03 A.M.; RESUMED AT 10:18 A.M.)

4        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5        **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

6   BACK IN SESSION.

7        **THE COURT:**  ONE QUICK PRELIMINARY MATTER.  MS. RILEY

8   GAVE US THE NOTE THAT WE GOT FROM JUROR NO. 5 WITH A QUESTION

9   ABOUT SCHEDULING BASED ON A FLIGHT THAT SHE'S GOT ON FRIDAY.

10  IT SOUNDS LIKE SHE CAN ACCOMMODATE AND RESCHEDULE.

11       BUT WHAT I WOULD INTEND TO DO IS JUST AT THE END OF THE

12  DAY, IN THE NATURE OF AN UPDATE ABOUT SCHEDULING, TO LET THEM

13  KNOW THAT AT THIS POINT I ANTICIPATE WE WILL BE IN SESSION

14  THROUGH AT LEAST THROUGH FRIDAY AND NOT BE MORE SPECIFIC THAN

15  THAT.  AND THEN AT THE SAME TIME REMIND THEM ABOUT THE

16  PRESIDENT'S DAY HOLIDAY ON MONDAY.

17       **MR. KEARNEY:**  DEPENDING ON IF SHE CAN WORK A FEW

18  HOURS ON FRIDAY, YOUR HONOR, DOES THE COURT -- IS THE COURT

19  CONSIDERING LETTING HER GO ON THIS FLIGHT?

20       **THE COURT:**  NO.  MY IMPRESSION IS THAT SHE WOULD BE

21  ABLE TO CHANGE.  SHE JUST NEEDS TO KNOW WHETHER SHE NEEDS TO

22  CHANGE.  SO I DON'T ANTICIPATE THAT THIS WOULD BE A PROBLEM IN

23  ANY WAY.  I THINK IT'S JUST THAT SHE NEEDS TO KNOW WHETHER SHE

24  NEEDS TO RESCHEDULE THINGS.

25       **THE CLERK:**  READY?

1        **THE COURT:**  YES.

2        **THE CLERK:**  OKAY.

3        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

4        **THE CLERK:**  YOU MAY BE SEATED.

5        **THE COURT:**  YOU MAY CONTINUE, MS. HANSEN.

6        **MS. HANSEN:**  THANK YOU, YOUR HONOR.

7   BY MS. HANSEN:

8   **Q.**  DR. HARDWICKE, I WOULD LIKE TO CALL OUT ON THE 2014 MAP,

9   EXHIBIT 3, PREVIOUSLY ADMITTED, THE AREA AT THE SOUTHERN FILL.

10  **A.**  YES.

11  **Q.**  WE'LL HAVE THAT.

12                     (DISPLAYED ON SCREEN.)

13        AND I WANT TO CONFIRM, I KNOW WE HAVE DONE THIS ALREADY,

14  BUT MAYBE WE CAN DRAW AN ARROW THERE WHERE THE UPLAND IS.  ON

15  THIS MAP THERE ARE NO BLUE AREAS IDENTIFIED --

16        **MS. HANSEN:**  I AM SORRY, MR. WANZALA, UNDER THE FILL

17  AREA.

18  BY MS. HANSEN:

19  **Q.**  ALONG THE BERM AT THE BOTTOM THERE ARE NO BLUE AREAS

20  MAPPED ON THIS 2014 MAP, CORRECT?

21  **A.**  THAT'S RIGHT.

22  **Q.**  AND THERE WERE NO BLUE AREAS MAPPED ON THE 2007 MAP,

23  CORRECT?

24  **A.**  THAT'S RIGHT.

25  **Q.**  AND THERE WERE NO BLUE AREAS MAPPED ON ANY OTHER MAP

1  PREPARED BY H.T. HARVEY UNDER THE SOUTHERN FILL AREA, CORRECT?

2  **A.**  IN THIS LOCATION THAT'S CORRECT.

3  **Q.**  AND I WANT TO TALK TO YOU ABOUT ONE WAY THAT WE CAN

4  IDENTIFY NON-WETLAND FEATURES, WATER FEATURES ON A SITE LIKE

5  THIS.  AND IT'S AN IMPORTANT WAY.  IT IS THE ORDINARY HIGH

6  WATER MARK WE TALKED ABOUT BEFORE.  OKAY?

7  **A.**  THAT'S RIGHT.

8  **Q.**  THE ARMY CORPS HAS GUIDANCE ON THAT; IS THAT RIGHT?

9  **A.**  THEY DO.

10  **Q.**  AND H.T. HARVEY FOLLOWS IT, CORRECT?

11  **A.**  YES, WE DO.  AND IT HAS EVOLVED SOMEWHAT SINCE THIS

12  DELINEATION.

13  **Q.**  THAT'S RIGHT.  THE FIRST GUIDANCE THAT APPLIED IN THE 2007

14  MAPPING YOU DID WAS THE LETTER; IS THAT CORRECT?

15  **A.**  THAT'S CORRECT.

16  **Q.**  SORRY.  IT'S CALLED AN ARMY CORPS REGULATORY GUIDANCE

17  LETTER THAT WAS ISSUED IN 2005, CORRECT?

18  **A.**  THAT'S RIGHT.

19  **Q.**  AND LET'S GO BACK TO EXHIBIT 3 AGAIN.

20      SO ALL THE BLUE FEATURES ON THIS MAP, THEY WERE IDENTIFIED

21  BY THE PRESENCE OF STANDING OR RUNNING WATER AND A GENERALLY

22  LACK OF VEGETATION, CORRECT?

23  **A.**  THAT'S RIGHT.

24  **Q.**  AND YOUR FIRM USED, AS WE DISCUSSED, THIS ORDINARY HIGH

25  WATER MARK TO DETERMINE THE OUTER EDGES OF THAT BLUE AREA THAT

1    ARE DEPICTED ON THAT MAP, CORRECT?

2    **A.**  THAT'S RIGHT.

3    **Q.**  THAT IS HOW WE KNOW WHAT THE OUTLINE IS OF THE BLUE AREAS,

4    CORRECT?

5    **A.**  UH-HUH.

6    **Q.**  AND THE FIELD GUIDE WE TALKED ABOUT, THE ONE IN 2008 WAS

7    NOT IN EXISTENCE WHEN YOU DID THE ORIGINAL MAPPING IN 2007,

8    CORRECT?

9    **A.**  THAT'S CORRECT.

10   **Q.**  BUT IT WAS IN EXISTENCE IN 2014, CORRECT?

11   **A.**  YES.

12   **Q.**  SO THE 2007 H.T. HARVEY REPORT IDENTIFIED ORDINARY HIGH

13   WATER MARK FEATURES; IS THAT RIGHT?

14   **A.**  YES, WE DID, ALONG SOME FEATURES.

15   **Q.**  I WILL NAME SOME THAT I BELIEVE YOU IDENTIFIED FOR THESE

16   BLUE AREAS.  CLEAR NATURAL IMPRESSED -- LINE IMPRESSED ON THE

17   BANK?

18   **A.**  UH-HUH.

19   **Q.**  SHELVING, CORRECT?

20   **A.**  YES.

21   **Q.**  CHANGES IN CHARACTER OF SOIL?

22   **A.**  YES.

23   **Q.**  DESTRUCTION OF VEGETATION?

24   **A.**  YES.

25   **Q.**  EXPOSED ROOTS ON THE BANK?

1    **A.**   UH-HUH.

2    **Q.**   DEPOSITION OF LEAF LITTER AND OTHER DEBRIS MATERIAL OR

3    LOWER LIMIT OF MOSS GROWTH ON CHANNEL BANKS?

4    **A.**   RIGHT.

5    **Q.**   AND THOSE ARE THE INDICATORS THAT LED DR. BOURSIER AND

6    YOUR TEAM TO MAP THE BLUE AREAS THE WAY YOU DID, CORRECT?

7    **A.**   I WOULD SAY IN THIS CASE WE RELIED MOST HEAVILY FOR THIS

8    SITE ON WHETHER THERE WAS 5 PERCENT OR LESS VEGETATION COVER

9    IN AN AREA AND ALSO PERSISTENT PONDING.

10   **Q.**   BUT THE ORDINARY HIGH WATER MARK WAS USED BY YOUR TEAM AND

11   IT WAS ACTUALLY DISCUSSED IN THE 2007 REPORT?

12   **A.**   YES, UH-HUH.

13       WE DON'T SHOW ANY ORDINARY HIGH WATER MARKS ON OUR MAP.

14   THE WAY THAT THE GUIDANCE IS ISSUED NOW IS THAT YOU HAVE TO

15   SHOW THE ACTUAL LOCATION OF YOUR ORDINARY HIGH WATER MARK WITH

16   A DASHED LINE.  AT THIS TIME THAT GUIDANCE WASN'T IN EFFECT,

17   SO WE DON'T SHOW -- WE DON'T HAVE ON OUR LEGEND OR ANYTHING

18   ORDINARY HIGH WATER MARK.

19   **Q.**   BUT DR. BOURSIER IS THOROUGH, CORRECT?

20   **A.**   YES.

21   **Q.**   SO HE STILL USED THE GUIDANCE MANUAL LETTER --

22   **A.**   YES.

23   **Q.**   -- TO DETERMINE WHERE THE ORDINARY HIGH WATER MARK WAS?

24   **A.**   THAT'S CORRECT.

25   **Q.**   SO HE STILL FOLLOWED THE GUIDANCE EVEN THOUGH IT IS NOT ON

HARDWICKE – CROSS / HANSEN

1    THE MAP HERE, CORRECT?

2    **A.**   THAT'S CORRECT.

3    **Q.**   AND ORDINARY HIGH WATER MARK CAN BE USED TO IDENTIFY

4    TRIBUTARIES, DITCHES, AND CHANNELS, CORRECT?

5    **A.**   YES, IT CAN.

6    **Q.**   NOW, THIS IS A SIDE ISSUE.  THIS IS NOT ABOUT H.T.

7    HARVEY'S ORDINARY HIGH WATER MARK IDENTIFICATION.

8        I WANT TO TALK TO YOU ABOUT WHETHER OR NOT THE GUIDE

9    INCLUDES SEDIMENT LINES TO IDENTIFY ORDINARY HIGH WATER MARK.

10   **A.**   YES, IT DOES.

11   **Q.**   SO THE -- YOU BELIEVE THAT THE 2008 FIELD GUIDE INCLUDES

12   SEDIMENT LINES TO DETERMINE THE EXISTENCE OF AN ORDINARY HIGH

13   WATER MARK?

14   **A.**   IT HAS ESSENTIALLY WHAT ARE CALLED DEPOSITION OF SEDIMENT

15   THAT CAN OCCUR -- IT'S BASICALLY IF YOU LOOK AT AN AREA WHERE

16   THERE IS VEGETATION AND THERE'S AN ORDINARY HIGH WATER MARK

17   THERE, YOU CAN HAVE A LINE OF SEDIMENT ALONG THE ORDINARY

18   HIGH.

19       AND ANOTHER WAY TO LOOK AT IT IS CALLED PARTICLE SORTING.

20   WHEN FLOWS GO THROUGH AN AREA QUICKLY, THE DIFFERENT SIZES OF

21   ROCKS AND SAND AND SEDIMENT WILL ALL GET SORTED OUT INTO

22   DIFFERENT LAYERS.

23   **Q.**   BUT THOSE ARE MORE SPECIFIC WAYS OF DELINEATING THE

24   ORDINARY HIGH WATER MARK, CORRECT, THAN SIMPLY SAYING SEDIMENT

25   LINE?

1    **A.**  THAT'S RIGHT.

2    **Q.**  AND THE WORDS "SEDIMENT LINE" ARE ACTUALLY NOT IN THE

3    ORDINARY HIGH WATER MARK 2008 MANUAL, CORRECT?

4    **A.**  IF YOU SAY THAT, THAT MAY BE THE CASE.  IT DEFINITELY

5    TALKS ABOUT LOOKING FOR SEDIMENT.

6    **Q.**  THERE IS SEDIMENT SORTING, CORRECT?

7    **A.**  YES.

8    **Q.**  BUT NOT SEDIMENT LINES?

9    **A.**  OKAY.

10   **Q.**  WOULD YOU LIKE TO TAKE A LOOK AT IT?

11   **A.**  NO, THAT'S OKAY.

12   **Q.**  NOW I WANT TO TALK TO YOU A LITTLE BIT ABOUT PONDS.  PONDS

13   ARE NOT WETLANDS, CORRECT?

14   **A.**  IF THEY ARE VEGETATED, THEY COULD BE WETLANDS.  BUT IF

15   THEY HAVE LARGE AREAS THAT ARE NOT COVERED BY AT LEAST

16   5 PERCENT VEGETATION, THEN, NO, THEY WOULD BE CONSIDERED OPEN

17   WATER HABITATS.

18   **Q.**  AND THEY WOULD BE MAPPED AS AQUATIC, CORRECT?

19   **A.**  YES.

20   **Q.**  THEY WOULD NOT BE MAPPED AS A WETLAND, CORRECT?

21   **A.**  RIGHT.

22   **Q.**  IN 2007 --

23        **MS. HANSEN:**  MR. WANZALA, CAN WE CALL OUT UNDER THE

24   PICK 'N PULL.

25                      (DISPLAYED ON SCREEN.)

1    **BY MS. HANSEN:**

2    **Q.**  AND THIS IS THE 2014 H.T. HARVEY MAP, EXHIBIT 3.  IN 2007

3    THIS BLUE AREA UNDER THE AUTO DISMANTLER WAS CLEARLY PONDED?

4              **MS. HANSEN:**  I MEAN THE BLUE AREA WHERE THE FILL IS,

5    MR. WANZALA.

6    **BY MS. HANSEN:**

7    **Q.**  THOSE AREAS WERE CLEARLY PONDED, RIGHT?

8    **A.**  IN WHICH YEAR?

9    **Q.**  2007.

10   **A.**  THAT'S RIGHT.

11   **Q.**  YOU SPENT A LOT OF TIME ON THE SITE TO VERIFY THAT THESE

12   AQUATIC AREAS WERE PONDED, CORRECT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  BUT PONDS CAN BE SEASONAL; ISN'T THAT RIGHT?

15   **A.**  YES.

16   **Q.**  AND THEY CAN BE DRY MOST OF THE YEAR?

17   **A.**  THAT'S TRUE.

18   **Q.**  AND THEY WILL STILL -- IF THAT IS THE CASE, CAN STILL

19   QUALIFY AS PONDS?

20   **A.**  THAT'S CORRECT.

21   **Q.**  AND SO A POND DOES NOT HAVE TO HAVE WATER IN IT ALL

22   YEAR-ROUND, CORRECT?

23   **A.**  THAT'S TRUE.

24   **Q.**  TO BE A NON-WETLAND POND IT CAN BE WET IN THE WINTER BUT

25   DRY MOST OF THE YEAR?

HARDWICKE – CROSS / HANSEN

1   **A.**  UH-HUH.

2   **Q.**  DR. BOURSIER AND DR. GALACATOS WENT BACK OUT TO THE SITE

3   IN 2013 AND 2014; ISN'T THAT RIGHT?

4   **A.**  YES.

5   **Q.**  AND AT THAT TIME WE WERE DEALING WITH A LONG-TERM DROUGHT,

6   CORRECT?

7   **A.**  WE WERE.

8   **Q.**  AND YOU TESTIFIED ON DIRECT A LITTLE BIT ABOUT THE

9   CIRCUMSTANCES OF A DROUGHT, RIGHT?

10  **A.**  UH-HUH.

11  **Q.**  THAT IS NOT CONSIDERED A NORMAL CIRCUMSTANCE; ISN'T THAT

12  RIGHT?

13  **A.**  THAT'S CORRECT.

14  **Q.**  AND THE GUIDANCE MANUALS, INCLUDING THE 2014 CORPS OF

15  ENGINEERS PUBLIC NOTICE ON DELINEATIONS IN DROUGHT CONDITIONS,

16  ADVISED THAT:  DIRECT OBSERVATIONS OF PLANTS AND HYDROLOGY

17  INDICATORS MAY BE MISLEADING OR PROBLEMATIC SO OTHER METHODS

18  OF MAKING WETLAND DECISIONS MAY BE APPROPRIATE IN A DROUGHT.

19  **A.**  CORRECT.

20  **Q.**  SO DR. GALACATOS AND DR. BOURSIER DID NOT CHANGE YOUR POND

21  DETERMINATION FROM 2007 WHEN THEY WENT BACK TO THE PROPERTY IN

22  2013 AND 2014?

23  **A.**  THAT'S CORRECT.

24  **Q.**  NOW, DURING DROUGHT CONDITIONS THE PONDING COULD BE

25  REDUCED SUBSTANTIALLY; IS THAT RIGHT?

HARDWICKE - CROSS / HANSEN

1    **A.**  YES.

2    **Q.**  AND DID YOU REVIEW DR. GALACATOS' 2014 MEMORANDUM

3    REVERIFYING THE PROPERTY?

4    **A.**  I LOOKED AT IT BRIEFLY.  BUT, AGAIN, AS DR. BOURSIER WAS

5    HANDLING THAT EFFORT, HE WAS THE ONE IN CHARGE OF MAKING SURE

6    THAT WE AGREED WITH EVERYTHING IN THE LETTER AND THAT IT

7    ACCURATELY DEPICTED WHAT THEY THOUGHT HAD HAPPENED ON THE

8    SITE.

9    **Q.**  DID YOU RELY UPON IT IN OFFERING YOUR TESTIMONY TODAY ON

10   WHAT WAS A WETLAND OR NOT IN THIS NORTHERN AREA?

11   **A.**  NO, I MORE BASICALLY AM TALKING ABOUT THE EFFORT THAT I

12   CONDUCTED IN 2006 AND 2007 AND THEN THE SUBSEQUENT

13   OBSERVATIONS THAT I'VE SEEN.

14   **Q.**  AND THE OBSERVATIONS YOU'VE SEEN SUBSEQUENT WE CAN AGREE

15   WERE JUST FROM PHOTOGRAPHS, CORRECT?

16   **A.**  THEY WERE FROM PHOTOGRAPHS, DISCUSSION, GOOGLE EARTH,

17   AERIAL MAP PHOTOGRAPHS, AND GOING OUT TO THE SITE AGAIN IN

18   2017.

19   **Q.**  BUT NOT A SITE VISIT IN 2013 AND '14 --

20   **A.**  NO.

21   **Q.**  -- WHEN DR. GALACATOS WAS THERE, CORRECT?

22   **A.**  THAT'S CORRECT.

23   **Q.**  BUT YOU DID READ HER MEMORANDUM, CORRECT?

24   **A.**  YES.

25   **Q.**  AND SHE AGREED WITH YOUR 2007 ASSESSMENT THAT EVEN IN A

1   DROUGHT CONDITION, WHICH IS NOT A NORMAL CIRCUMSTANCE --

2   **A.**  UH-HUH.

3   **Q.**  -- THAT AREA WAS STILL DESIGNATED AS A POND, CORRECT?

4   **A.**  YES.

5   **Q.**  AND SHE WORKS FOR THE ARMY CORPS OF ENGINEERS, CORRECT?

6   **A.**  SHE DOES.

7   **Q.**  AND SO HER MAP THAT SHE REVERIFIED WOULD BE THE OFFICIAL

8   GOVERNMENT MAP DELINEATING WHAT IS WHAT ON THIS PROPERTY; IS

9   THAT RIGHT?

10  **A.**  THAT'S CORRECT.  DELINEATION MAPS ARE USUALLY ONLY GOOD --

11  THEIR VERIFICATION IS ONLY GOOD FOR USUALLY FIVE YEARS.  SO IF

12  YOU HAVE A PROJECT THAT GOES ON FOR LONGER THAT THAN, THAN YOU

13  BRING THE CORPS BACK OUT TO DO WHAT THEY CALL IS RESTAMPING

14  THE MAP.

15  **Q.**  DR. GALACATOS WENT BACK OUT IN 2013 FOR THAT EXACT

16  PURPOSE, CORRECT?

17  **A.**  THAT'S CORRECT.

18  **Q.**  AND ALTHOUGH SHE REVERIFIED YOUR DELINEATIONS, INCLUDING

19  YOUR POND DELINEATION, SHE DID NOT REPRODUCE A NEW STAMPED

20  MAP, CORRECT?

21  **A.**  I DON'T THINK SO.  WE PRODUCED A COUPLE OF DIFFERENT

22  VERSIONS FOR HER.  AT THE TIME THE ARMY CORPS AT THE SOUTH

23  SECTION IN SAN FRANCISCO WAS REQUESTING ALL MAPS BE IN BLACK

24  AND WHITE, SO WE PRODUCED A COUPLE OF DIFFERENT BLACK AND

25  WHITE VERSIONS WHICH WERE, IN MY OPINION, NOT VERY READABLE

1    BUT THAT IS WHAT THEY WERE ASKING FOR.  BUT I DIDN'T SEE ONE

2    THAT HAS THE STAMP ON IT.

3    **Q.**  BUT, NEVERTHELESS, YOU ARE AWARE THAT DR. GALACATOS

4    REVERIFIED THE OUTLINES OF WHAT IS A WETLAND AND WHAT IS NOT A

5    WETLAND ON THIS 2014 MAP OF H.T. HARVEY, CORRECT?

6    **A.**  AS FAR AS I'M AWARE, UH-HUH.

7    **Q.**  I'M GOING TO LOOK AT SOME OF THE PICTURES IN THIS CASE.

8    LET'S LOOK AT GOVERNMENT EXHIBIT 261, WHICH HAS BEEN

9    PREVIOUSLY ADMITTED INTO EVIDENCE.

10                   (DISPLAYED ON SCREEN.)

11    AND THAT IS THE PONDED AREA BY THE -- FROM 2007 BY THE

12    AUTO DISMANTLER JUNKYARD, CORRECT?

13    **A.**  YES.

14    **Q.**  LET'S LOOK AT GOVERNMENT EXHIBIT 262.

15                   (DISPLAYED ON SCREEN.)

16    AND, DR. GALACATOS (SIC), YOU SEE SOME VEGETATION AROUND

17    THAT POND IN EXHIBIT 262 CORRECT?

18    **A.**  I DO.

19    **Q.**  AND DR. GALA -- I AM SORRY.  DR. HARDWICKE, I AM SORRY.

20    EXCUSE ME.

21    **A.**  OKAY.

22    **Q.**  I DID THAT A LOT IN PRACTICE, TOO.

23    DR. HARDWICKE, WE ARE, AGAIN, LOOKING AT EXHIBIT 162

24    (SIC), ALREADY ADMITTED, THAT IS THE PONDED AREA BY THE AUTO

25    DISMANTLER, CORRECT?

1    **A.**  THAT'S CORRECT.

2            **THE COURT:**  I'M SORRY, JUST FOR THE RECORD, IS IT 162

3    OR 262?

4            **MS. HANSEN:**  I AM SORRY, EXCUSE ME, 262.

5       AND I NOW WOULD LIKE TO LOOK AT GOVERNMENT EXHIBIT 263,

6    WHICH ALSO I BELIEVE HAS ALREADY BEEN ADMITTED INTO EVIDENCE.

7            **THE CLERK:**  LET ME CHECK.  263 IS IN.

8                    (DISPLAYED ON SCREEN.)

9    **BY MS. HANSEN:**

10   **Q.**  NOW, AGAIN, DR. HARDWICKE, THE POND HAS SOME VEGETATION

11   AROUND IT, CORRECT?

12   **A.**  IT DOES.

13   **Q.**  AND ADJACENT TO THE POND, TO THE -- I GUESS BEYOND IT,

14   THERE ARE SOME GREEN AREAS, CORRECT?

15   **A.**  YES.

16   **Q.**  THAT IS THE WETLAND AREA THAT'S BEYOND THE POND, CORRECT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  AND THAT AREA WAS IMPACTED BY THE FILL, CORRECT?

19   **A.**  YES.

20   **Q.**  THAT'S THE WETLAND AREA THAT IS IDENTIFIED IN THE 2014

21   H.T. HARVEY MAP, CORRECT?

22   **A.**  CORRECT.

23   **Q.**  AND LET'S LOOK FOR A MINUTE, GO BACK TO GOVERNMENT

24   EXHIBIT 3, AND JUST IDENTIFY WHAT WE ARE TALKING ABOUT, THE

25   GREEN AREA.

1               (DISPLAYED ON SCREEN.)

2          **MS. HANSEN:**  IF WE CAN CALL OUT THE PICK 'N PULL

3    AREA.

4    **BY MS. HANSEN:**

5    **Q.**  SO IT'S THE GREEN CRISSCROSS WITHIN THE RED FILL OUTLINE,

6    CORRECT?

7    **A.**  YES.

8    **Q.**  THAT IS THE AREA WE WERE JUST SEEING IN THAT PICTURE?

9    **A.**  YES.

10   **Q.**  NOW IF WE CAN GO BACK TO THE EXHIBIT 263.

11              (DISPLAYED ON SCREEN.)

12        DR. HARDWICKE, YOUR CLIENTS, THE SOBRATO ORGANIZATION,

13   WERE FARMING THAT WETLAND BEYOND THE POND; IS THAT RIGHT?

14   **A.**  THEY WERE.

15   **Q.**  BUT THEY WEREN'T ACTUALLY GROWING ANY CROPS, CORRECT?

16   **A.**  THEY HAD PLANTED A MIX OF WHEAT AND OATS AND I BELIEVE

17   BARLEY AS A COVER CROP, BUT THEY WEREN'T HARVESTING THAT FOR

18   HAY OR ANYTHING.

19   **Q.**  I UNDERSTAND.

20        SO THEY WERE GROWING CROPS BUT IT WASN'T FOR ANY

21   HARVESTING PURPOSE; IS THAT RIGHT?

22   **A.**  THAT'S RIGHT.  THEY KEEP THE AREA IN COVER CROPS

23   ESSENTIALLY TO KEEP IT FROM BECOMING VERY WEEDY AND ALSO TO

24   KEEP BASICALLY RESOURCES LIKE BURROWING OWLS FROM COLONIZING

25   THE ENTIRE SITE.

1   **Q.**  AND SO TO DO THAT FARMING WORK THEY HAVE TO MOW AND DISK

2   THE WETLAND; IS THAT CORRECT?

3   **A.**  THEY DO.  UH-HUH.

4   **Q.**  AND THEY CAN DO THAT WITHOUT PERMISSION; ISN'T THAT RIGHT?

5   **A.**  THAT'S CORRECT.  THE ONGOING FARMING ACTIVITIES ARE EXEMPT

6   FROM ACQUIRING PERMITS.

7   **Q.**  AND THEY -- THAT'S RIGHT, THEY DON'T NEED A PERMIT,

8   CORRECT.

9       LET'S GO TO GOVERNMENT -- I AM SORRY, LET ME DOUBLE-CHECK.

10  I'D LIKE TO REFER YOU TO GOVERNMENT EXHIBIT 198.  I JUST NEED

11  TO CONFIRM IT HAS BEEN ADMITTED WITH MS. RILEY?

12          **THE CLERK:**  198, NO.

13          **MS. HANSEN:**  NO.  OKAY.

14      I HAVE WHAT HAS BEEN PREMARKED AS DEFENSE EXHIBIT 2002D.

15  IT'S ALSO GOVERNMENT EXHIBIT 198.  COPY TO COUNSEL.

16              (EXHIBIT HANDED TO WITNESS.)

17  **BY MS. HANSEN:**

18  **Q.**  CAN YOU TAKE A MOMENT TO LOOK AT THIS EXHIBIT, DEFENSE

19  EXHIBIT 2001D (SIC)?

20          **MR. KEARNEY:**  2002D?

21          **MS. HANSEN:**  I'M SORRY, 2002D.  THANK YOU.

22  **BY MS. HANSEN:**

23  **Q.**  THAT IS FROM 2007, MARCH OF 2007.  IS THAT A FAIR AND

24  ACCURATE DEPICTION OF HOW THE PONDED AREA MAY HAVE LOOKED IN

25  THAT TIME FRAME IN 2007?

1  **A.**  YES.  THIS WOULD BE SORT OF THE OUTER EDGE OF THE PONDED

2  AREA.  THE VIEW THAT WE HAD FROM BEFORE WAS LOOKING TO THE

3  EAST, AND NOW WE ARE LOOKING TO THE WEST.

4  **Q.**  PERFECT.

5      **MS. HANSEN:**  YOUR HONOR, I MOVE TO ADMIT DEFENSE

6  EXHIBIT 2002D.

7      **MR. KEARNEY:**  NO OBJECTION.

8      **MS. HANSEN:**  PERMISSION --

9      **THE COURT:**  2002D IS ADMITTED.

10      (DEFENDANT'S EXHIBIT 2002D RECEIVED IN EVIDENCE)

11      **MS. HANSEN:**  PERMISSION TO PUBLISH?

12      **THE CLERK:**  GIVE ME A MINUTE.  I WILL PUBLISH IT.

13  THANK YOU.

14      (DISPLAYED ON SCREEN.)

15  **BY MS. HANSEN:**

16  **Q.**  SO THIS IS AN EXAMPLE OF THE PONDED AREA UNDER THE PICK 'N

17  PULL WITHOUT MUCH WATER IN, CORRECT?

18  **A.**  YES.  THERE IS MORE WATER THAT'S OFF THE PICTURE TO THE

19  LEFT, BUT, YES, IT LOOKS LOWER THAN THE PREVIOUS PICTURE WE

20  JUST LOOKED AT.

21  **Q.**  AND THAT DOESN'T MEAN IT IS NOT A POND, CORRECT?

22  **A.**  THAT'S CORRECT.

23  **Q.**  I WANT TO MOVE FORWARD A LITTLE BIT FROM 2007 TO 2009.  IN

24  2009 H.T. HARVEY PREPARED A BIOLOGICAL RESOURCES REPORT FOR A

25  DRAFT EIR FOR THE NEWARK AREAS 3 AND 4 SPECIFIC PLAN, CORRECT?

1    **A.**  THAT'S CORRECT.

2    **Q.**  AND THE EIR IS AN ENVIRONMENTAL IMPACT REPORT; IS THAT

3    RIGHT?

4    **A.**  YES.

5    **Q.**  AND THAT WAS FOR THE PLANNING AND DEVELOPMENT OF THE GOLF

6    COURSE AND RESIDENTIAL HOUSING ON THAT AREA 4; IS THAT RIGHT?

7    **A.**  THAT WAS THE PROPOSED PROJECT.

8    **Q.**  I'M GOING TO SHOW YOU WHAT HAS BEEN PREMARKED AS DEFENSE

9    EXHIBIT 2003.

10            **THE CLERK:**  3?  2003?

11            **MS. HANSEN:**  YES.

12                  (EXHIBIT HANDED TO WITNESS.)

13    **BY MS. HANSEN:**

14    **Q.**  DR. HARDWICKE, CAN YOU TAKE A MOMENT TO LOOK AT DEFENSE

15    EXHIBIT 2003?

16       IS THAT FIGURE 2 FROM H.T. HARVEY'S BIOLOGICAL RESOURCES

17    REPORT?

18    **A.**  YES, IT IS.

19    **Q.**  IS THAT A FAIR AND ACCURATE DEPICTION OF FIGURE 2 FROM

20    THAT REPORT?

21    **A.**  AS FAR AS I KNOW, YES.

22            **MS. HANSEN:**  YOUR HONOR, I MOVE TO ADMIT DEFENSE

23    EXHIBIT 2003.

24            **MR. KEARNEY:**  NO OBJECTION.

25            **THE COURT:**  2003 IS ADMITTED.

1           (DEFENDANT'S EXHIBIT 2003 RECEIVED IN EVIDENCE)

2               **MS. HANSEN:**  MAY I HAVE PERMISSION TO PUBLISH?

3               **THE CLERK:**  YOU DON'T HAVE TO ASK.

4                       (DISPLAYED ON SCREEN.)

5               **MS. HANSEN:**  THERE WE HAVE IT.  THANK YOU.

6   **BY MS. HANSEN:**

7   **Q.**  AND SO THIS IS A -- FROM THE DRAFT EIR; IS THAT RIGHT?

8   **A.**  YES.

9   **Q.**  SO THESE WERE THE FIRST PRELIMINARY PLANS BASED ON H.T.

10  HARVEY'S MAPPING; IS THAT RIGHT?

11  **A.**  YES.

12  **Q.**  AND SO THE DEVELOPMENT PROJECT ENCOMPASSED MUCH OF AREA 4;

13  ISN'T THAT RIGHT?

14  **A.**  YES, IT DOES.

15  **Q.**  AND THAT AREA DOES INCLUDE WETLANDS, CORRECT?

16  **A.**  YES.

17  **Q.**  IT INCLUDES JURISDICTIONAL WETLANDS?

18  **A.**  UH-HUH.

19  **Q.**  IT INCLUDES NON-JURISDICTIONAL WETLANDS, CORRECT?

20  **A.**  YES.

21  **Q.**  AND IT INCLUDES NON-JURISDICTIONAL UPLANDS, CORRECT?

22  **A.**  CORRECT.

23  **Q.**  AND BY "NON-JURISDICTIONAL" I MEAN -- THAT MEANS IT'S NOT

24  COVERED BY THE CLEAN WATER ACT IF IT'S NON-JURISDICTIONAL,

25  RIGHT?

1    **A.**  CORRECT.

2    **Q.**  AND IT APPEARS FROM THIS PICTURE THAT THE AUTO DISMANTLER

3    WOULD BE COMPLETELY REMOVED; IS THAT RIGHT?

4    **A.**  THAT WAS THE PLAN, YES.

5    **Q.**  AND YOUR CLIENTS, THE SOBRATO ORGANIZATION, RELIED ON H.T.

6    HARVEY'S MAPPING AND STUDIES TO COME UP WITH THIS DEVELOPMENT

7    PLAN; IS THAT RIGHT?

8    **A.**  YES, THEY DID.

9    **Q.**  I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS DEFENSE

10   EXHIBIT 2004.

11          **MS. HANSEN:**  COPY FOR COUNSEL.

12              (EXHIBIT HANDED TO WITNESS.)

13   **BY MS. HANSEN:**

14   **Q.**  DR. HARDWICKE, CAN YOU TAKE A MOMENT TO LOOK AT DEFENSE

15   EXHIBIT 2004?

16   **A.**  YES.

17   **Q.**  NOW, 2004 -- EXHIBIT 2004 IS A FIGURE FROM YOUR FIRM'S

18   2009 BIOLOGICAL RESOURCES REPORT.  IT IS FIGURE 4; IS THAT

19   RIGHT?

20   **A.**  THAT'S CORRECT.

21   **Q.**  IS THIS A FAIR AND ACCURATE DEPICTION OF FIGURE 4 FROM

22   YOUR 2009 REPORT?

23   **A.**  YES, AS FAR AS I'M AWARE, THIS IS WHAT IT LOOKED LIKE.

24          **MS. HANSEN:**  I MOVE TO ADMIT DEFENSE EXHIBIT 2004.

25          **THE COURT:**  ANY OBJECTION?

1          **MR. KEARNEY:**  NO.

2          **THE COURT:**  EXHIBIT 2004 IS ADMITTED.

3      (DEFENDANT'S EXHIBIT 2004 RECEIVED IN EVIDENCE)

4              (DISPLAYED ON SCREEN.)

5   **BY MS. HANSEN:**

6   **Q.**  DR. HARDWICKE, CAN WE LOOK AT THE LEGEND ON 2004.

7      IT'S HARD TO SEE.  THE LEGEND HERE IDENTIFIES BLUE AREAS

8   AS AQUATIC; IS THAT RIGHT?

9   **A.**  THAT'S CORRECT.

10  **Q.**  AND THE RED AREA, AT LEAST THE PART NEAR THE -- WE'LL GET

11  TO THAT.

12      THE RED AREA IS MUTED TIDAL/SALT MARSH WHICH IS ALSO A

13  TERM FOR A WETLAND, CORRECT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  LET'S LOOK UNDER THE PICK 'N PULL AGAIN.

16      IN 2009, H.T. HARVEY CONSISTENTLY MAPPED THIS AREA UNDER

17  THE PICK 'N PULL AS BLUE AQUATIC, CORRECT?

18  **A.**  YES.

19  **Q.**  AND LET'S LOOK AT THE SOUTHERN AREA OF THIS MAP IN 2009 BY

20  THE AREA WHERE THE FILL WAS PLACED IN 2014.

21      AND THERE IS NO BLUE INDICATED UNDERNEATH WHERE THE UPLAND

22  IS; IS THAT CORRECT?

23  **A.**  THAT'S CORRECT.  INSTEAD THERE IS AN ORANGE LINE THAT SAYS

24  BRACKISH MARSH.

25  **Q.**  BUT THERE IS NO BLUE LINE, CORRECT?

1    **A.**   THAT'S CORRECT.

2    **Q.**   AND THE FIRST TIME WE SEE BLUE IS UNDERNEATH THE DUCK

3    PONDS, CORRECT?

4    **A.**   YES.

5    **Q.**   AND --

6              **MS. HANSEN:**   MAYBE MR. WANZALA CAN -- YES, EXACTLY.

7    **BY MS. HANSEN:**

8    **Q.**   THAT'S THE LINE ALONG THE BERM, CORRECT?

9    **A.**   THAT'S CORRECT.

10   **Q.**   AND WE SEE WHERE THAT BLUE DELINEATION ENDS AT THE CORNER

11   THERE, CORRECT?

12   **A.**   CORRECT.

13   **Q.**   AND IT ENDS BEFORE THE YELLOW UPLAND LINE.

14             **MS. HANSEN:**   PERHAPS, MR. WANZALA, WE CAN ENLARGE

15   UNDER THE DUCK PONDS TO SEE THE YELLOW UPLAND LINE.

16   **BY MS. HANSEN:**

17   **Q.**   THAT YELLOW LINE THERE IS AN UPLAND, CORRECT?

18   **A.**   YES.

19   **Q.**   AND IT LEADS DOWN INTO THE YELLOW AREA THAT'S ALSO AN

20   UPLAND AT THE BOTTOM ALONG THE BERM, CORRECT?

21   **A.**   THE... ALONG THE BERM IT TURNS SORT OF A LIME GREEN.  I

22   DON'T KNOW IF PEOPLE CAN SEE THAT.  THAT SAYS "AGRICULTURAL

23   FIELD SEASONAL WETLAND BRACKISH TO FRESH."

24   **Q.**   BUT THE BERM CONNECTS WITH THE UPLAND THAT WE JUST LOOKED

25   AT, CORRECT, THE YELLOW UPLAND?

1   **A.**  YEAH.  THERE'S A BASICALLY NORTH/SOUTH YELLOW UPLAND THAT

2   EXTENDS DOWN AND THEN MEETS UP WITH THAT LIME GREEN.

3   **Q.**  AND THERE IS NO AQUATIC BLUE MARKED ON THIS MAP AFTER THAT

4   YELLOW UPLAND, CORRECT?

5   **A.**  THAT'S CORRECT.

6   **Q.**  AND LIKE THE OTHER MAPS, H.T. HARVEY DID IDENTIFY OTHER

7   AQUATIC AREAS, CORRECT?

8   **A.**  YES.

9       **MS. HANSEN:**  MR. WANZALA, LET'S LOOK AT THE FULL

10  SOUTHERN PORTION.

11      AGAIN WE HAVE SOME THIN BLUE LINES.  PERHAPS WE CAN PULL

12  THAT OUT.  ON THE RIGHT THERE'S SOME BLUE LINES, THIN ONES.

13  **BY MS. HANSEN:**

14  **Q.**  YOU SEE THAT ALL OVER THE BOTTOM OF THE SOUTHERN AREA

15  CORRECT, DR. HARDWICKE?

16  **A.**  YES, I DO.

17  **Q.**  SO H.T. HARVEY DID MAP THIN BLUE LINES ON THIS MAP HERE,

18  CORRECT?

19  **A.**  YES.

20  **Q.**  WE TALKED ABOUT HOW NOT ALL WETLANDS ARE NOT

21  JURISDICTIONAL, RIGHT?  WE'VE ALREADY DONE THAT.

22      BUT NOT ALL AQUATIC AREAS ARE JURISDICTIONAL EITHER,

23  CORRECT?

24  **A.**  THAT'S CORRECT.

25  **Q.**  AND AGAIN, BY JURISDICTIONAL, I'M TALKING ABOUT THE SECOND

HARDWICKE – CROSS / HANSEN

```
 1    STEP OF THE ANALYSIS?

 2    A.   AND SPECIFICALLY UNDER THE CLEAN WATER ACT.

 3    Q.   EXACTLY.

 4         NOW, ON THE AREA UNDER THE PICK 'N PULL ON THIS LEGEND, IT

 5    IS NOT IDENTIFIED AS OTHER WATERS; IS THAT RIGHT?  IT'S

 6    IDENTIFIED AS AQUATIC?

 7    A.   THAT'S CORRECT.

 8    Q.   AND H.T. HARVEY CHANGED THE LANGUAGE IT USED IN 2007 FROM

 9    "OTHER WATERS" TO AQUATIC; IS THAT RIGHT?

10    A.   YES, THAT'S CORRECT.  AND THAT'S BECAUSE WE WERE ENTERING

11    THE EIR PHASE WHERE WE WERE NO LONGER JUST CONCERNED WITH

12    CLEAN WATER ACT, BUT WE WERE NOW LOOKING AT ALL OF THE

13    APPLICABLE LAWS AND REGULATIONS.

14         SO THE ENDANGERED SPECIES ACT, BOTH FEDERAL AND STATE.  WE

15    WERE LOOKING AT THE STATE PORTER COLOGNE ACT.  WE WERE LOOKING

16    AT AREAS THAT WOULD BE PROTECTED BY STATE FISH AND GAME CODE.

17         SO WE MOVED TO A HABITAT-BASED MAPPING FOR THIS PARTICULAR

18    MAP.  AND INSTEAD OF FOCUSING ON CLEAN WATER ACT

19    JURISDICTIONAL ASSESSMENTS, WE WERE, YOU KNOW -- THE REASON

20    WHY THERE ARE SO MANY DIFFERENCES BETWEEN DIFFERENT WETLAND

21    TYPE SHOWN ON THIS MAP BECAUSE THEY HAVE DIFFERENT AMOUNTS OF

22    HABITAT SUITABILITY FOR SPECIAL STATUS SPECIES, FOR EXAMPLE.

23    Q.   THIS IS IMPORTANT BECAUSE THE FISH AND WILDLIFE ACTUALLY

24    IDENTIFIES WETLAND DIFFERENTLY THAN THE ARMY CORPS OF

25    ENGINEERS, CORRECT?
```

HARDWICKE – CROSS / HANSEN

```
1    A.   U.S. FISH AND WILDLIFE?

2    Q.   YES.

3    A.   YES, THEY DO.

4    Q.   SO THERE ARE DIFFERENT DEFINITIONS THAT MIGHT APPLY TO

5    THIS MAP THAT DO NOT APPLY FOR ASSESSING WHETHER SOMETHING IS

6    A VIOLATION OF THE CLEAN WATER ACT, CORRECT?

7    A.   THAT'S CORRECT.  YES.

8    Q.   AND I WANT TO TALK TO YOU ABOUT THE TERM "OTHER WATERS".

9         THAT IS A TERM THAT'S USED UNDER THE REGULATIONS; IS THAT

10   RIGHT?

11   A.   THAT'S RIGHT.

12   Q.   AND YOU'VE LOOKED AT AND STUDIED THE REGULATIONS THAT

13   APPLY IN DETERMINING JURISDICTION; IS THAT RIGHT?

14   A.   YES.

15   Q.   AND YOU WOULD AGREE THAT "OTHER WATERS", IF THEY MEET THE

16   LEGAL DEFINITION, THEY WOULD THEN BE WOTUS; IS THAT RIGHT?

17   A.   YES.

18   Q.   AND WOTUS MEANS "WATERS OF THE UNITED STATES"?

19   A.   YES.

20   Q.   AND I SOMETIMES USE THAT ACRONYM INSTEAD BECAUSE IT'S

21   EASIER.

22        NOW I WANT TO TALK TO YOU ABOUT "OTHER WATERS".

23        DO YOU AGREE THAT THE PONDS UNDERNEATH THE PICK 'N PULL

24   THAT YOU MAPPED IN 2007 -- PERHAPS WE CAN CALL THOSE OUT --

25   PERFECT, THOSE CANNOT BE USED IN INTERSTATE OR FOREIGN --
```

HARDWICKE – CROSS / HANSEN

1    EXCUSE ME –– CANNOT BE USED BY INTERSTATE OR FOREIGN TRAVELERS

2    FOR RECREATIONAL OR OTHER PURPOSES?

3    **A.**  I THINK... I'M NOT REALLY COMFORTABLE MAKING THAT

4    DETERMINATION.  I THINK THAT'S UP TO THE ARMY CORPS AND THEIR

5    GUIDANCE.

6        IT'S NOT NAVIGABLE.

7    **Q.**  IT'S NOT NAVIGABLE.  SO IT'S NOT LIKE THE MOWRY SLOUGH,

8    CORRECT?

9    **A.**  NO.

10   **Q.**  YOU WOULD AGREE, THOUGH, JUST FROM OBSERVING IT THAT THERE

11   IS NO FISH OR SHELLFISH WITHIN IT, CORRECT?

12   **A.**  NO FISH, NO SHELLFISH, ALTHOUGH, YOU KNOW, I DIDN'T SURVEY

13   FOR SHELLFISH, SO... BUT I WOULDN'T EXPECT THERE TO BE ANY

14   THERE.  JUST SHOREBIRDS.

15   **Q.**  AND YOU NEVER SAW IT USED FOR INDUSTRIAL PURPOSES,

16   CORRECT?

17   **A.**  I NEVER DID.

18   **Q.**  AND YOU ACTUALLY NEVER SAW ANY INTERSTATE OR FOREIGN

19   TRAVELERS USING IT FOR RECREATIONAL PURPOSES, CORRECT?

20   **A.**  THAT'S CORRECT.

21   **Q.**  SO WE WERE SAYING THAT NOT ALL WATERS ARE JURISDICTIONAL.

22   **A.**  UH-HUH.

23   **Q.**  SO I WANT TO TALK TO YOU AGAIN ABOUT PONDS.

24       NOT ALL PONDS ARE JURISDICTIONAL, CORRECT?

25   **A.**  THAT'S CORRECT.

1   **Q.**  A POND THAT'S ADJACENT TO A TRADITIONAL NAVIGABLE WATER

2   LIKE THE SLOUGH IS NOT JURISDICTIONAL, CORRECT?

3   **A.**  I THINK IT DEPENDS ON THE CONNECTION WITH THAT TRADITIONAL

4   NAVIGABLE WATER.

5   **Q.**  ARE YOU FAMILIAR WITH THE *CARGILL* CASE FROM THE NINTH

6   CIRCUIT?

7   **A.**  YES.

8         **MR. KEARNEY:**  OBJECTION, YOUR HONOR.  THIS CALLS FOR

9   GETTING INTO LEGAL CONCLUSION AGAIN AND LEGAL RULING.

10        **THE COURT:**  SUSTAINED.

11  **BY MS. HANSEN:**

12  **Q.**  THE CLEAN WATER ACT ONLY COVERS WETLANDS THAT ARE ADJACENT

13  TO A TRADITIONAL NAVIGABLE WATER, CORRECT?

14  **A.**  YES.

15  **Q.**  I WANT TO LOOK AT AGAIN EXHIBIT 3.

16                    (DISPLAYED ON SCREEN.)

17      IF WE CAN CALL OUT THE AREA UNDER THE PICK 'N PULL.

18      NOW THE WETLAND IMPACTED BY THE FILL OUTLINE, WE CAN AGREE

19  IS ABUTTING THE POND THAT YOU IDENTIFIED ON THIS MAP, CORRECT?

20  **A.**  YES, I WOULD SAY IT IS RIGHT NEXT TO IT.

21  **Q.**  IT'S DIRECT ABUTTING, CORRECT?

22      AND THE POND IS WHAT'S ABUTTING THE MOWRY SLOUGH, CORRECT?

23  **A.**  YES.  AND FLOWING INTO IT.

24  **Q.**  WELL, WE'LL TALK ABOUT FLOW IN A MINUTE.  WE'LL GET TO

25  THAT.  I'M NOT SO SURE -- WELL, WE'LL GET TO THAT.

HARDWICKE – CROSS / HANSEN

1      WHAT I AM TALKING ABOUT IS JUST WHERE THE FEATURES ARE.

2      AND THE WETLAND THAT THE FILL WAS PLACED IN, IS ALSO

3  ABUTTING THE PICK 'N PULL, CORRECT?

4  **A.**  YES.

5  **Q.**  AND WE DON'T HAVE TO GO TO IT, BUT THE WETLAND IN THE

6  SOUTH IS NOT DIRECTLY ABUTTING THE LEVEE OR THE SLOUGH,

7  CORRECT?

8  **A.**  THE WETLAND IN THE SOUTH?  DO YOU MEAN THE FILLED WETLAND?

9  **Q.**  EXACTLY.  THE WETLAND IMPACTED BY THE FILL IN THE SOUTH IS

10  NOT DIRECTLY ABUTTING THE SLOUGH OR THE LEVEE, CORRECT?

11  **A.**  IT IS NOT DIRECTLY NEXT TO THE LEVEE, NO.

12  **Q.**  AND BETWEEN THOSE WETLANDS AND THE SLOUGH, WE DID DISCUSS

13  THE UPLAND THAT WE NOTICED; IS THAT RIGHT?

14  **A.**  YES.

15  **Q.**  AND THERE'S A PUMP ON THIS PROPERTY, CORRECT?

16  **A.**  YES.

17  **Q.**  AT THE SOUTH END OF THE LEVEE SEPARATING THE PROPERTY FROM

18  THE SLOUGH?

19  **A.**  YES.

20  **Q.**  THAT PUMP, WOULD YOU AGREE, IS A WATER CONTROL DEVICE?

21  **A.**  IT IS.

22  **Q.**  AND IT IS AN ARTIFICIAL MAN-MADE DEVICE USED TO KEEP WATER

23  OFF THE LAND?

24  **A.**  YES.

25  **Q.**  NOW, AS RECENTLY AS OCTOBER 2006 –– 2016, H.T. HARVEY AND

1    ASSOCIATES PREPARED ANOTHER MAP; IS THAT RIGHT?

2    **A.**   I BELIEVE SO.

3    **Q.**   I WOULD LIKE TO SHOW YOU WHAT HAS BEEN PREMARKED DEFENSE

4    EXHIBIT 2006.

5        I HAVE A COPY FOR COUNSEL.

6                    (EXHIBIT HANDED TO WITNESS.)

7        DR. HARDWICKE, WOULD YOU TAKE A MOMENT TO LOOK AT DEFENSE

8    EXHIBIT 2006?

9    **A.**   YES.

10   **Q.**   IS THIS A FAIR AND ACCURATE COPY OF AN OCTOBER 2016 MAP

11   PREPARED BY H.T. HARVEY DESCRIBED AS POTENTIAL DEVELOPMENT

12   ENVELOPE FOR NEWARK AREAS 3 AND 4 SPECIFIC PLAN?

13   **A.**   IT LOOKS LIKE IT, YES.

14           **MS. HANSEN:**   YOUR HONOR, I WOULD MOVE TO ADMIT

15   DEFENSE EXHIBIT 2006.

16           **MR. KEARNEY:**   NO OBJECTION.

17           **THE COURT:**   IT'S ADMITTED.

18       (DEFENDANT'S EXHIBIT 2006 RECEIVED IN EVIDENCE)

19           **MS. HANSEN:**   LET'S CALL OUT THE RELEVANT AREA WITH

20   THE PICK 'N PULL AND THE SOUTHERN FILL AREA TOGETHER.

21   **BY MS. HANSEN:**

22   **Q.**   SO THIS MAP FROM 2016 IDENTIFIES THE FILL IMPACTS; IS THAT

23   RIGHT?

24   **A.**   YES.

25   **Q.**   AND THIS DOCUMENT WAS PREPARED FOR THE NEWARK'S

1    DEVELOPMENT PLANS FOR AREA 4, CORRECT?

2    **A.**   IT WAS.

3    **Q.**   AND THIS MAP, NONE OF THE DESIGNATIONS WE DISCUSSED IN THE

4    SOUTHERN AREA -- DELINEATIONS RATHER, AND NONE OF THE

5    DELINEATIONS IN THE NORTHERN AREA CHANGED ON THIS MAP; IS THAT

6    RIGHT?

7    **A.**   THAT'S CORRECT.

8    **Q.**   AND SO THAT WAS ONLY 16 MONTHS AGO, CORRECT?

9    **A.**   UH-HUH.

10   **Q.**   NOW LET'S GO BACK TO FEBRUARY 15TH, 2017.  SO THIS IS A

11   LITTLE OVER A YEAR AFTER THIS LAST MAP.

12       YOU WENT TO THE SITE WITH THE PROSECUTORS, AND AGENT SU

13   WAS THERE, TOO; IS THAT RIGHT?

14   **A.**   YES, THAT'S TRUE.

15   **Q.**   WE DISCUSSED HOW ALL THE EXPERTS WERE THERE AS WELL; IS

16   THAT RIGHT?

17   **A.**   YES.

18   **Q.**   BUT DR. GALACATOS WAS NOT THERE?

19   **A.**   YES.  I DON'T REMEMBER HER BEING THERE.

20   **Q.**   AND YOU TESTIFIED TODAY ABOUT SOME OPINIONS AND I WANT TO

21   TALK ABOUT THOSE.

22       FIRST OF ALL, LET'S CALL OUT THE NORTHERN FILL AREA.  YOU

23   WOULD AGREE THAT YOU CANNOT SAY WITH ANY DEGREE OF SCIENTIFIC

24   CERTAINTY THAT THE 2014 DELINEATION OF WETLANDS BY

25   DR. BOURSIER AS REFLECTED ON GOVERNMENT EXHIBIT 3 OR ON THIS

1    EXHIBIT ARE INACCURATE; IS THAT RIGHT?

2            **MR. KEARNEY:**  SORRY, 2014?

3            **MS. HANSEN:**  2014.

4            **THE WITNESS:**  I WAS NOT AT THE SITE AT THAT TIME.

5    SO, NO, I WOULD HAVE TO GO WITH DR. BOURSIER AND DR.

6    GALACATOS' DETERMINATION.

7    **BY MS. HANSEN:**

8    **Q.**  SO YOU WOULD NOT BE ABLE TO SAY THAT THESE DELINEATIONS

9    ARE INACCURATE --

10           **MR. KEARNEY:**  OBJECTION VAGUE --

11   **BY MS. HANSEN:**

12   **Q.**  -- THAT'S CORRECT?

13           **MR. KEARNEY:**  WHICH DELINEATIONS ARE WE TALKING

14   ABOUT, COUNSEL.

15           **MS. HANSEN:**  SURE.

16   **BY MS. HANSEN:**

17   **Q.**  THE 2014 DELINEATIONS BY DR. BOURSIER AND DR. GALACATOS,

18   YOU CANNOT SAY WITH ANY DEGREE OF SCIENTIFIC CERTAINTY THAT

19   THE AREA DESIGNATED AS POND WAS NOT A POND.

20   **A.**  I WOULD SAY THAT IF I HAD BEEN SHOWN THE TYPE OF PICTURES

21   THAT WOULD SHOW FULL WETLAND VEGETATION IN THE AREAS, THEN I

22   COULD SAY THIS DOESN'T LOOK LIKE OPEN WATER ANYMORE.  THAT

23   INTERACTION NEVER OCCURRED.

24   **Q.**  YOU HAD ACCESS TO THE SITE, DIDN'T YOU?

25   **A.**  YES, I HAD ACCESS TO THE SITE.

HARDWICKE – CROSS / HANSEN

1  **Q.**  YOU DIDN'T GO THERE, CORRECT?

2  **A.**  I DID NOT GO THERE.

3  **Q.**  BUT YOU LOOKED AT THE PHOTOGRAPHS FROM 2012, CORRECT?

4  **A.**  UH-HUH.

5  **Q.**  YOU TALKED TO DR. BOURSIER ABOUT IT WHEN HE RETURNED FROM

6  THE SITE?

7  **A.**  I DID.

8  **Q.**  AND DR. BOURSIER WAS THERE, RIGHT?

9  **A.**  YES.

10  **Q.**  HE WAS PRESENT?

11  **A.**  YES.

12  **Q.**  HE WAS DOING FIELD WORK IN 2012 TO REASSESS THE PROPERTY,

13  CORRECT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  AND YOUR TESTIMONY IS BASED ON PHOTOGRAPHS THE GOVERNMENT

16  SHOWED YOU ABOUT THE NORTHERN FILL AREA IN 2015, CORRECT?

17  **A.**  THAT'S CORRECT.

18  **Q.**  I WOULD LIKE TO TALK TO YOU ABOUT YOUR OPINION TODAY ABOUT

19  SIGNIFICANT NEXUS.

20  YOUR FIRM DID NOT MAKE A SIGNIFICANT NEXUS DETERMINATION

21  IN 2007, CORRECT?

22  **A.**  THAT'S CORRECT.

23  **Q.**  AND YOUR FIRM DID NOT MAKE A SIGNIFICANT NEXUS

24  DETERMINATION IN 2014, CORRECT?

25  **A.**  THAT'S CORRECT.

HARDWICKE – CROSS / HANSEN

1   **Q.**  AND WHEN YOU WENT OUT TO THE LEVEE ON FEBRUARY 2017, YOU

2   AND YOUR FIRM DID NOT MAKE A SIGNIFICANT NEXUS DETERMINATION,

3   CORRECT?

4   **A.**  THAT'S CORRECT.  AS A RULE WE DO NOT MAKE SIGNIFICANT

5   NEXUS DETERMINATIONS.

6   **Q.**  IN TRUTH, THAT IS NOT SOMETHING THAT YOU CAN DO ON THE

7   FLY; ISN'T THAT RIGHT?

8   **A.**  YOU NEED A LOT OF INFORMATION.

9   **Q.**  A LOT OF INFORMATION.  WE ARE GOING TO TALK ABOUT THAT.

10      I WANT TO DRAW YOUR ATTENTION TO THE GUIDANCE MANUALS FOR

11   SIGNIFICANT NEXUS DETERMINATION THAT YOU TALKED ABOUT TODAY.

12      AND I'M CONCERNED NOT WITH 2017.  WE ARE CONCERNED ABOUT

13   2014.  SO WHENEVER I TALK TO YOU ABOUT THE SIGNIFICANT NEXUS

14   CONNECTION FOR MY FOLLOW-UP QUESTIONS, THEY ARE ALL GOING TO

15   BE IN REFERENCE TO 2014.  OKAY?

16   **A.**  OKAY.

17   **Q.**  I WANT TO CONFIRM ONE MORE TIME, YOU WERE NOT ON THE SITE

18   AFTER 2009; IS THAT RIGHT?

19   **A.**  THAT'S CORRECT.

20   **Q.**  UNTIL 2017, CORRECT?

21   **A.**  THAT'S CORRECT.

22   **Q.**  AND WE TALKED A LITTLE BIT ABOUT THE ARMY CORPS

23   JURISDICTIONAL FORM INSTRUCTIONAL GUIDEBOOK, CORRECT?

24   **A.**  YES.

25   **Q.**  THAT GUIDEBOOK IS FOR THE SECOND PART OF THE ANALYSIS, THE

HARDWICKE – CROSS / HANSEN

1    JURISDICTIONAL STEP, RIGHT?

2    **A.**  YES.

3    **Q.**  WE TALKED ABOUT *RAPANOS*, THE SUPREME COURT CASE?

4    **A.**  UH-HUH.

5    **Q.**  THAT'S WHERE THE SIGNIFICANT NEXUS TERM CAME FROM,

6    CORRECT?

7    **A.**  YES.

8    **Q.**  ARMY CORPS OF ENGINEERS PROVIDED GUIDANCE FOR HOW TO

9    DETERMINE SIGNIFICANT NEXUS, CORRECT?

10   **A.**  YES.

11   **Q.**  AND AS A DEMONSTRATIVE, I WOULD LIKE TO PUT UP PAGE 15 OF

12   THE ARMY CORPS JURISDICTIONAL FORM INSTRUCTIONAL GUIDEBOOK.

13       DOES COUNSEL NEED A COPY?

14           **MR. KEARNEY:**  YES, PLEASE.

15       IT'S THE RAPANOS GUIDANCE?

16           **MS. HANSEN:**  NO.  THIS IS THE JURISDICTIONAL

17   GUIDEBOOK, PAGE 15.

18       YOUR HONOR, MAY I HAVE THE COURT'S PERMISSION TO USE A

19   DEMONSTRATIVE WITH DR. HARDWICKE?

20           **THE COURT:**  WAS IT PREMARKED?

21           **MS. HANSEN:**  I DIDN'T PRE-MARK IT.  I CAN IF THE

22   COURT WOULD LIKE.

23           **THE COURT:**  I WAS JUST TRYING TO FIGURE OUT IF I CAN

24   LOOK AT IT AS WELL.

25           **MS. HANSEN:**  YES.  I HAVE IT IN HERE.

1        YOUR HONOR, THAT'S THE COURT'S COPY I FORGOT TO PROVIDE.

2   I AM SORRY.

3                    (PAUSE IN THE PROCEEDINGS.)

4           **THE COURT:**  IS THERE ANY OBJECTION TO ITS USE AS A

5   DEMONSTRATIVE?

6           **MR. KEARNEY:**  NO.

7           **THE COURT:**  SO, LADIES AND GENTLEMEN, THIS MATERIAL

8   THAT YOU ARE BEING SHOWN IS TO ILLUSTRATE THE WITNESS'S

9   TESTIMONY BUT IS NOT BEING OFFERED OR ADMITTED IN EVIDENCE.

10                    (DISPLAYED ON SCREEN.)

11  **BY MS. HANSEN:**

12  **Q.**  SO YOUR TESTIMONY ABOUT SIGNIFICANT NEXUS RELATED TO FLOW

13  IN THE NORTHERN AREA INTO THE SLOUGH, CORRECT?

14  **A.**  YES.

15  **Q.**  AND FLOW FROM THE SOUTHERN AREA INTO THE SLOUGH, CORRECT?

16  **A.**  THAT'S CORRECT.

17  **Q.**  AND IN –– ON NOVEMBER 1ST, 2017 ––

18  **A.**  UH-HUH.

19  **Q.**  –– THE GOVERNMENT INTERVIEWED YOU, CORRECT?

20  **A.**  YES.

21  **Q.**  AND BEFORE THEY INTERVIEWED YOU, THEY PROVIDED YOU WITH A

22  MAP.

23  **A.**  THAT'S RIGHT.

24  **Q.**  IS THAT RIGHT?

25  **A.**  UH-HUH.

1  **Q.**  AND THAT MAP WAS DR. HUFFMAN'S MAP, WASN'T IT?

2  **A.**  YES.

3  **Q.**  AND DR. HUFFMAN'S MAP HAD ON IT IN THE NORTHERN AREA A

4  TRIBUTARY MARKED TRIBUTARY 1, CORRECT?

5  **A.**  YES.

6  **Q.**  AND IN THE SOUTHERN AREA UNDER WHERE THE FILL WAS, HE

7  MARKED TRIBUTARY A?

8  **A.**  CORRECT.

9  **Q.**  AND YOUR TEAM HAD NOT PREVIOUSLY MARKED OR IDENTIFIED

10  TRIBUTARIES IN THOSE AREAS, CORRECT?

11  **A.**  YES, WE DIDN'T IDENTIFY ANYTHING AS A TRIBUTARY, JUST

12  OTHER WATERS OR LATER AQUATIC.

13  **Q.**  BUT YOU DID MAP, AND WE LOOKED AT THIN BLUE LINES ON YOUR

14  MAPPING, CORRECT?

15  **A.**  THAT'S TRUE, YEAH.

16  **Q.**  SO DOING A SIGNIFICANT NEXUS ANALYSIS --

17         **MS. HANSEN:**  LET'S CALL OUT THE MIDDLE OF THE PAGE,

18  MR. WANZALA.

19  **BY MS. HANSEN:**

20  **Q.**  THE SIGNIFICANT NEXUS EVALUATION INCLUDES -- IF WE CAN

21  HIGHLIGHT THE "ASSESSMENT OF FLOW" PARAGRAPH.

22     IT INCLUDES AN ASSESSMENT OF THE FLOW CHARACTERISTICS --

23         **MR. KEARNEY:**  YOUR HONOR, I'M SORRY.  I THINK THIS

24  EXHIBIT IS PROPERLY SHOWN TO THE WITNESS FROM THE BEGINNING OF

25  THIS PAGE.  THIS IS THE SECOND STEP, WHICH IS NOT NECESSARY IF

1    THE FIRST STEP IS COMPLETED.

2        I WOULD ASK THAT THE WITNESS BE REFERRED TO THE FIRST

3    SECTION FIRST, IF WE MAY, YOUR HONOR.

4            **THE COURT:**  WELL, OVERRULED.  BUT THAT SOUNDS LIKE A

5    PROPER TOPIC FOR REDIRECT.

6    **BY MS. HANSEN:**

7    **Q.**  WHEN YOU ARE DOING -- YOU DETERMINED THAT THESE --

8    DR. HUFFMAN'S TRIBUTARIES HAD A SIGNIFICANT NEXUS, CORRECT,

9    WHEN YOU TESTIFIED TODAY?

10   **A.**  YES, THAT'S CORRECT.

11   **Q.**  BUT LET'S JUST BE CLEAR.  YOU DID NOT DETERMINE WHETHER OR

12   NOT THESE TRIBUTARIES, WHAT HYDROLOGIC FACTORS THEY HAD SUCH

13   AS VOLUME, DURATION, OR FREQUENCY OF FLOW, CORRECT?

14   **A.**  I WOULD SAY WE DIDN'T HAVE ANY MEASUREMENTS ON VOLUME THAT

15   WERE SPECIFIC, BUT WE CERTAINLY, THROUGH OUR HYDROLOGIC

16   MONITORING THROUGHOUT THAT YEAR, WE OBSERVED DURATION,

17   FREQUENCY OF FLOW.

18   **Q.**  WHAT YEAR ARE YOU TALKING ABOUT?

19   **A.**  2006 AND 2007.  BUT IN 2014?

20   **Q.**  YES.  EXACTLY.

21   **A.**  NO.

22   **Q.**  IN 2014, YOUR FIRM DID NOT DO ANY ANALYSIS OF VOLUME OF

23   THE FLOW IN EITHER OF THESE ALLEGED TRIBUTARIES, CORRECT?

24   **A.**  THAT'S CORRECT.

25   **Q.**  YOU DID NOT DO ANY ANALYSIS OF THE DURATION, CORRECT?

1    **A.**  THAT'S CORRECT.

2    **Q.**  AND YOU DID NOT DO ANY ANALYSIS OF THE FREQUENCY OF THE

3    FLOW; IS THAT RIGHT?

4    **A.**  THAT'S CORRECT.

5    **Q.**  AND IN 2017, YOU DIDN'T DO ANY OF THAT ANALYSIS EITHER,

6    CORRECT?

7    **A.**  NO.  WE NEVER DO THIS SPECIFIC SORT OF WORKSHEET, BUT I

8    DID TAKE A LOOK AND SEE WHAT THE PUMP WAS DOING AND WHAT THE

9    CULVERT WAS DOING.

10   **Q.**  SO YOU LOOKED AT IT, BUT YOU DIDN'T DO THE ANALYSIS THAT

11   THE GUIDANCE REQUIRES FOR A SIGNIFICANT NEXUS DETERMINATION?

12   **A.**  THAT'S CORRECT.  WE NEVER DO.

13          **MS. HANSEN:**  MAY I HAVE A MOMENT, YOUR HONOR?

14          **THE COURT:**  YES.

15                  (PAUSE IN THE PROCEEDINGS.)

16          **MS. HANSEN:**  JUST A FEW MORE QUESTIONS,

17   DR. HARDWICKE.

18   **BY MS. HANSEN:**

19   **Q.**  YOUR TESTIMONY TODAY --

20          **MS. HANSEN:**  ACTUALLY, STRIKE THAT.  NO FURTHER

21   QUESTIONS.

22          **THE WITNESS:**  THANK YOU.

23          **THE COURT:**  ANY REDIRECT?

24          **MR. KEARNEY:**  YES.

25

1                **REDIRECT EXAMINATION**

2   **BY MR. KEARNEY:**

3   **Q.**  DR. HARDWICKE, DID ANYTHING THAT WAS BROUGHT UP ON CROSS

4   CHANGE ANY OF THE OPINIONS THAT YOU PROVIDED TO US EARLIER?

5   **A.**  NO.

6           **MR. KEARNEY:**  CAN WE BRING UP EXHIBIT 3, PLEASE.

7                (DISPLAYED ON SCREEN.)

8     AND CAN WE GO BACK TO TRIBUTARY A.

9   **BY MR. KEARNEY:**

10   **Q.**  DOCTOR, I FEEL LIKE WE HAVE TALKED ABOUT THIS BEFORE, BUT

11   I WANT TO CLARIFY IT, IF I MAY.

12     YOU DIDN'T MARK THIS DITCH AS A TRIBUTARY ON YOUR MAP; IS

13   THAT RIGHT?

14   **A.**  THAT'S CORRECT.

15   **Q.**  DOES IT EXIST IN REAL LIFE?

16   **A.**  IT DOES EXIST IN REAL LIFE.

17   **Q.**  WHAT IS A TRIBUTARY?

18   **A.**  A TRIBUTARY FLOWS INTO A TRADITIONAL NAVIGABLE WATER.

19   **Q.**  IT'S A BODY OF WATER THAT CONTRIBUTES FLOW TO A BIGGER

20   BODY OF WATER; IS THAT RIGHT?

21   **A.**  YES.

22   **Q.**  DOES THAT DITCH DO THAT?

23   **A.**  IT DOES.

24     ONE THING I'LL POINT OUT IS THAT THERE'S A LITTLE AREA OF

25   LAND THAT WE WERE TALKING ABOUT BEFORE.  THE DITCH ACTUALLY IS

1    CULVERTED UNDERNEATH THAT LITTLE BERM OF LAND, SO IT DOES

2    CONNECT ALL THE WAY THROUGH.

3    **Q.**  ALL RIGHT.

4       DOES ANYTHING ABOUT THE -- I'M GOING TO APPROACH AGAIN,

5    YOUR HONOR, BECAUSE IT IS EASIER.

6       DOES THIS LEGAL BERM OF LAND HERE (INDICATING) THAT WAS

7    DISCUSSED, THIS YELLOW BERM RUNNING DOWN TO THE POND, DOES

8    THAT CUT OFF ADJACENCY?

9       DOES THAT MEAN WE DON'T HAVE A WETLAND THAT GOES DOWN TO

10   THE LEVEE?

11   **A.**  IN MY OPINION, NO.

12   **Q.**  DOES THE CLEAN WATER ACT COVER THE WETLANDS IN THIS CASE?

13   **A.**  IN MY OPINION, THEY DO.

14          **MR. KEARNEY:**  CAN WE SEE THE LEGEND ON THIS DIAGRAM,

15   PLEASE?

16   **BY MR. KEARNEY:**

17   **Q.**  AS PART OF HARVEY'S WORK IN 2007, YOU IDENTIFY "WATERS OF

18   THE UNITED STATES ON THIS LAND; IS THAT RIGHT?

19   **A.**  THAT'S CORRECT.

20   **Q.**  ARE THOSE CONTAINED AND IDENTIFIED IN THIS LEGEND?

21   **A.**  YES.

22   **Q.**  PLEASE TELL US ABOUT THAT.

23   **A.**  SO IN OUR REPORT, THE WAY THAT WE TITLE THIS SECTION IS

24   AREAS DETERMINED TO HAVE CHARACTERISTICS OF "WATERS OF THE

25   UNITED STATES".

1        WE STILL LEAVE IT UP TO THE CORPS TO DETERMINE WHETHER

2   THEY AGREE AND FEEL THAT THEY SHOULD BE CONSIDERED "WATERS OF

3   THE UNITED STATES".  SO ON THIS SITE THIS WAS THE AMOUNT THAT

4   WE DETERMINED.

5   **Q.**  AND THE CORPS ENDED UP AGREEING WITH YOU; IS THAT CORRECT?

6   **A.**  YES.  THEY ACTUALLY WANTED THE ADDITION OF APPROXIMATELY

7   FOUR ACRES OF ADDITIONAL WETLAND, WHICH WE THOUGHT WAS A

8   PRETTY GOOD RESULT GIVEN THAT WE HAD ALMOST 300 ACRES OF

9   JURISDICTION THAT WE MAPPED.

10  **Q.**  THESE WETLANDS ARE ON THE ORDER OF 20 OR 30 FEET AWAY IN

11  SOME AREAS, AT LEAST JUST OVER THE LEVEE FROM A TRADITIONAL

12  NAVIGABLE WATER; IS THAT RIGHT?

13  **A.**  THAT'S CORRECT.

14  **Q.**  THOSE ARE CATEGORICALLY "WATERS OF THE UNITED STATES"; IS

15  THAT TRUE?

16  **A.**  THAT'S CORRECT.

17        **MR. KEARNEY:**  CAN WE HAVE A BROADER VIEW, AGENT SU,

18  OF THIS MAP AGAIN PLEASE?

19  **BY MR. KEARNEY:**

20  **Q.**  YOU WERE ASKED MANY, MANY QUESTIONS ABOUT THE PONDED AREA

21  BY THE PICK 'N PULL.

22  **A.**  YES.

23  **Q.**  IN 2007, BEFORE THE CULVERT WAS REPAIRED, THERE WAS MORE

24  PONDED WATER IN THAT AREA THAN THERE IS NOW; IS THAT A FAIR

25  STATEMENT?

1    **A.** YES. AND ESPECIALLY WHEN WE LOOKED AT IT IN 2017, I THINK

2    ALSO BECAUSE PART OF THAT AREA HAS BEEN RAISED, IT DOESN'T

3    POND AS MUCH.

4            **MR. KEARNEY:** CAN WE PULL UP EXHIBIT 1058-0041.

5    1058-0041.

6                    (DISPLAYED ON SCREEN.)

7    **BY MR. KEARNEY:**

8    **Q.** THIS IS THE SHOT THAT WAS TAKEN ON SEPTEMBER THE 1ST OR

9    THE FIRST WEEK OF SEPTEMBER RIGHT BEFORE THE AUTHORITIES

10   DISCOVERED THE FILL IN 2014.

11       WE'VE TALK ABOUT THIS BEFORE. DO YOU RECOGNIZE IT,

12   DOCTOR?

13   **A.** I DO.

14           **MR. KEARNEY:** I'M GOING TO APPROACH, YOUR HONOR, IF I

15   MAY.

16   **BY MR. KEARNEY:**

17   **Q.** THIS STAND OF PICKLEWEED RIGHT HERE (INDICATING)?

18   **A.** YES.

19   **Q.** THAT YOU TESTIFIED EARLIER USED TO EXTEND UPWARDS TOWARDS

20   THE FILL AREA; WHERE DOES IT GO IN THIS DIRECTION TO THE LEFT

21   (INDICATING)?

22   **A.** IT PROCEEDS TO THE LEFT TOWARDS THE CULVERT OUT TO MOWRY

23   SLOUGH.

24       AND THEN IN 2017, THE AREA OF OPEN WATER ADJACENT TO THAT

25   CULVERT ARE FLOWING INTO THAT CULVERT WAS MORE NARROW AND

1  BASICALLY SMALLER THAN WHAT WE HAVE ON OUR MAP HERE.

2  **Q.**  SO AT THE TIME OF THE FILL, THE WETLAND THAT IT WAS -- IT

3  EXTENDED INTO THE NORTHERN FILL AREA RAN ALL THE WAY TO THE

4  LEVEE; IS THAT A FAIR STATEMENT?

5  **A.**  YES.

6          **MS. HANSEN:**  OBJECTION, YOUR HONOR, NO FOUNDATION.

7  SHE WASN'T AT THE SITE.

8  **BY MR. KEARNEY:**

9  **Q.**  BASED ON THIS PHOTOGRAPH.

10          **THE COURT:**  OVERRULED.

11          **THE WITNESS:**  BASED ON THIS --

12  **BY MR. KEARNEY:**

13  **Q.**  YOU CAN ANSWER.

14  **A.**  BASED ON THIS PHOTOGRAPH, I WOULD AGREE.

15  **Q.**  HOWEVER, SEASONALLY WATER DOES RUN THROUGH THIS AREA TO

16  GET OUT OF THE CULVERT; IS THAT A FAIR STATEMENT?

17  **A.**  YES.

18  **Q.**  HOW DO YOU KNOW THAT?

19  **A.**  FROM MY PRIOR OBSERVATIONS OF THE SITE.

20      AND THEN THERE WAS AN ADDITIONAL SITE VISIT THAT

21  DR. BOURSIER WENT ON A FEW MONTHS AFTER THIS.  SO IT WAS

22  APPROXIMATELY JANUARY, I BELIEVE, AND YOU COULD SEE WATER IN

23  THOSE PICTURES AGAIN.

24  **Q.**  AND A TRIBUTARY, AGAIN, IS SOMETHING THAT CONTRIBUTES FLOW

25  TO A TNW OR A LARGER BODY OF WATER; IS THAT RIGHT?

1    **A.**  YES.

2    **Q.**  THE WATER GOING THROUGH THERE SEASONALLY, DOES IT

3    CONTRIBUTE FLOW TO MOWRY SLOUGH?

4    **A.**  IT DOES.

5    **Q.**  WE TALKED A LOT ABOUT PONDS ON THE LAND AS WELL.

6        DO ANY OF THE PONDS ON THIS PROPERTY CUT OFF ADJACENCY

7    MAKING THESE WETLANDS SOMEHOW ISOLATED FROM MOWRY SLOUGH?

8    **A.**  BECAUSE THE WETLANDS CONTRIBUTE WATERSHED TO THE PONDS, MY

9    OPINION IS NO.

10   **Q.**  THERE ARE THINGS CALLED ISOLATED WETLANDS IN THE WORLD; IS

11   THAT RIGHT?

12   **A.**  YES.

13   **Q.**  PLEASE TELL US, WHAT IS A TRUE ISOLATED WETLAND?

14       WHAT DOES THAT MEAN?

15   **A.**  SO A TRUE ISOLATED WETLAND DOES NOT CONTRIBUTE ANY REGULAR

16   FLOW TO ANY TRIBUTARIES THAT DRAIN INTO TRADITIONAL NAVIGABLE

17   WATERS.

18       IT'S -- AGAIN, THIS IS ONE OF THE AREAS THAT WE REALLY

19   LIKE THE CORPS TO SET THE TONE IN TERMS OF WHAT THEY ARE

20   COMFORTABLE TAKING.

21       A YEAR AFTER OUR DELINEATION WORK HERE IN 2008, I WENT TO

22   THE -- I WENT TO A SITE WITH THE ARMY CORPS TO VERIFY A

23   DELINEATION.  I HAD WHAT I THOUGHT WERE ISOLATED WETLANDS.

24   THEY WERE LOCATED OVER A MILE AWAY FROM THE NEAREST CREEK.

25   AND THEY WERE JUST IN THE MIDDLE OF A PLOWED FIELD.

1    THE ARMY CORPS SAID THESE WERE ADJACENT.  THEY WERE OVER A

2  MILE AWAY, AND THERE WAS NO INDICATION THAT THERE WAS ANY FLOW

3  BETWEEN THE WETLAND AND THE CREEK.

4    SO THAT'S NOT A DETERMINATION I PERSONALLY WOULD HAVE

5  MADE, BUT THAT'S WHAT THE CORPS DECIDED, AND THEY ARE THE ONES

6  WHO DETERMINE.

7  **Q.**  THESE WETLANDS ARE THE FURTHEST THING AWAY FROM BEING

8  ISOLATED; ISN'T THAT A FAIR STATEMENT?

9  **A.**  EXACTLY, YES.

10  **Q.**  THEY ARE ON THE SLOUGH?

11  **A.**  YES.

12  **Q.**  YOU WERE ASKED ABOUT THE RAPANOS GUIDANCE, THE CORPS'

13  GUIDANCE AFTER THE SUPREME COURT DECISION.

14    THAT GUIDANCE EXPLICITLY SAYS THAT ADJACENT WETLANDS,

15  WETLANDS ADJACENT TO A TNW LIKE WE HAVE HERE, ARE

16  JURISDICTIONAL "WATERS OF THE UNITED STATES"; ISN'T THAT TRUE?

17  **A.**  YES.

18  **Q.**  EVEN THOUGH YOU DIDN'T MAKE A FORMAL SIGNIFICANT NEXUS

19  EVALUATION AS PART OF YOUR REPORT, DOES IT CHANGE YOUR OPINION

20  THAT THIS LAND HAS A SIGNIFICANT NEXUS WITH THE SLOUGH?

21  **A.**  IT DOES NOT.

22    **MR. KEARNEY:**  THANK YOU.  NO FURTHER QUESTIONS.

23    **THE COURT:**  ANY RECROSS?

24    **MS. HANSEN:**  ONE MOMENT, YOUR HONOR.

25    (PAUSE IN THE PROCEEDINGS.)

```
1              MS. HANSEN:  NO QUESTIONS, YOUR HONOR.

2              THE COURT:  ALL RIGHT.  THANK YOU, DR. HARDWICKE.

3     YOU ARE EXCUSED.

4         BEFORE WE CALL BEFORE THE GOVERNMENT CALLS THE NEXT

5     WITNESS, LADIES AND GENTLEMEN, I WILL GIVE YOU AN INSTRUCTION.

6     AND I'M DOING THIS NOW BECAUSE DR. HARDWICKE IS THE FIRST

7     WITNESS YOU'VE HEARD FROM WHO HAS OFFERED OPINION TESTIMONY.

8     SO I'LL GIVE YOU SOME INSTRUCTION ABOUT HOW TO CONSIDER THAT

9     SORT OF TESTIMONY.  I'LL GIVE YOU THIS AGAIN AT THE END OF THE

10    CASE AS PART OF THE OVERALL INSTRUCTIONS.  AND IT WILL APPLY

11    TO ALL WITNESSES.  THIS IS NOT JUST SPECIFIC TO DR. HARDWICKE,

12    BUT IT'S AN INSTRUCTION FOR YOU TO KEEP IN MIND IN ASSESSING

13    THIS TYPE OF TESTIMONY BECAUSE WE WILL HEAR MORE OF IT.

14        YOU'VE HEARD TESTIMONY FROM DR. HARDWICKE WHO TESTIFIED AS

15    TO OPINIONS AND THE REASONS FOR HER OPINIONS.  THIS OPINION

16    TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR EXPERIENCE OF

17    THIS WITNESS.  SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE

18    ANY OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE

19    IT AS MUCH WEIGHT AS YOU THINK IT DESERVES CONSIDERING THE

20    WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE

21    OPINION, AND ALL THE OTHER EVIDENCE IN THIS CASE.

22        SO THAT WILL APPLY TO ANY WITNESS WHO IS PRESENTING

23    OPINION TESTIMONY OF THE SORT THAT WAS PART OF DR. HARDWICKE'S

24    TESTIMONY.

25        WITH THAT, THE UNITED STATES MAY CALL ITS NEXT WITNESS.
```

1              **MS. LEE:**  THE UNITED STATES CALLS DUNCAN KNUDSEN.

2              **THE CLERK:**  COME UP TO THE WITNESS STAND, PLEASE.

3          COME UP TO THE WITNESS STAND, PLEASE.  RAISE YOUR RIGHT

4     HAND FOR ME, PLEASE .

5          (**DUNCAN KNUDSEN,** CALLED AS A WITNESS FOR THE GOVERNMENT,

6     HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

7              **THE WITNESS:**  I DO.

8              **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED, I AM

9     GOING TO ASK THAT YOU STATE AND SPELL YOUR FIRST AND LAST NAME

10    FOR THE RECORD, PLEASE.

11             **THE WITNESS:**  MY NAME IS DUNCAN KNUDSEN.

12    D-U-N-C-A-N, K-N-U-D-S-E-N.

13             **THE CLERK:**  THANK YOU.  THERE'S WATER IN THE PITCHER.

14                         **DIRECT EXAMINATION**

15    BY MS. LEE:

16    **Q.**  WHERE DO YOU WORK, MR. KNUDSEN?

17    **A.**  I WORK AT AQUIFER SCIENCES.

18    **Q.**  WHAT IS THAT?

19    **A.**  IT'S AN ENVIRONMENTAL CONSULTING FIRM IN LAFAYETTE,

20    CALIFORNIA.

21    **Q.**  WHAT DO YOU DO FOR THEM?

22    **A.**  I AM THE SENIOR STAFF GEOLOGIST FOR THE COMPANY.

23    **Q.**  WHAT DO YOU DO AS A SENIOR STAFF GEOLOGIST?

24    **A.**  WE DO ENVIRONMENTAL CONSULTING FOR ENVIRONMENTAL CASE OF

25    ALL SORTS.  SAMPLING FOR GROUND WATER, SOIL, ANYTHING THAT

KNUDSEN – DIRECT / LEE

1    RELATES TO ENVIRONMENTAL ISSUES WITH CONTAMINATION.

2    **Q.**  DID THERE COME A TIME WHEN YOU WENT TO A PROPERTY KNOWN AS

3    NEWARK AREA 4 IN NEWARK, CALIFORNIA?

4    **A.**  YES.

5    **Q.**  WHEN DID YOU GO?

6    **A.**  THAT WAS JANUARY 9TH OF LAST YEAR.

7    **Q.**  2017?

8    **A.**  YES.

9    **Q.**  WHAT WAS YOUR PURPOSE IN GOING?

10   **A.**  I WAS -- WE WERE CALLED BY A CLIENT TO SAMPLE FOUR

11   LOCATIONS IN TRIPLICATE IN THE SLOUGH.

12   **Q.**  WHO WAS YOUR CLIENT?

13   **A.**  HUFFMAN-BROADWAY, TERRY HUFFMAN.

14   **Q.**  SO YOU WENT TO NEWARK AREA 4 AND YOU TOOK HOW MANY SAMPLES

15   OF WHAT FROM THE SLOUGH?

16   **A.**  WE TOOK FOUR -- WE TOOK 12 TOTAL SAMPLES FROM FOUR

17   LOCATIONS, AND EACH SAMPLE WAS TAKEN IN TRIPLICATE.

18   **Q.**  WHAT WERE YOU SAMPLING?

19   **A.**  WE WERE SAMPLING DIFFERENT AREAS OF WATER THROUGHOUT THE

20   SLOUGH.

21   **Q.**  HOW DID YOU DECIDE WHERE TO SAMPLE?

22   **A.**  TERRY HUFFMAN DECIDED THE SAMPLING LOCATIONS AND JUST TOLD

23   ME WHERE TO SAMPLE.

24   **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 606.

25                    (EXHIBIT HANDED TO WITNESS.)

KNUDSEN – DIRECT / LEE

1      WHAT IS THAT, MR. KNUDSEN?

2  **A.**  THIS IS THE MAP THAT TERRY PUT TOGETHER OF THE SAMPLE

3  LOCATIONS THAT WE TOOK.

4  **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT THE PLACES WHERE YOU

5  SAMPLED WATER FROM MOWRY SLOUGH?

6  **A.**  YES.

7          **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBIT 606 INTO

8  EVIDENCE.

9          **MR. SMOCK:**  NO OBJECTION.

10         **THE COURT:**  606 IS ADMITTED.

11      (GOVERNMENT'S EXHIBIT 606 RECEIVED IN EVIDENCE)

12         **MS. LEE:**  IF WE CAN BLOW UP THE SAMPLING POINTS,

13  PERHAPS START AT THE TOP IN THE NORTHERN FILL SECTIONS.

14      THANK YOU, AGENT SU.

15              (DISPLAYED ON SCREEN.)

16  **BY MS. LEE:**

17  **Q.**  LOOKING AT THE PART THAT SAYS L2A-1, A-2 AND A-3, WHERE IS

18  THAT?

19  **A.**  L2A-1 WAS SAMPLED IN A POOLED AREA OF WATER ON THE OTHER

20  SIDE OF THE SLOUGH.

21  **Q.**  IS THAT THE POOL OF WATER THAT WAS EAST OF THE SLOUGH ON

22  THE PROPERTY?

23  **A.**  THIS MAP IS IN -- NORTH IS UP?  THEN YES -- YEAH.

24      I AM SORRY, REPEAT THE QUESTION.

25  **Q.**  IF I CAN JUST HELP YOU.

1          NORTH IS GOING IN THIS DIRECTION (INDICATING).

2     **A.**  YES.

3     **Q.**  THE SLOUGH IS TO THE WEST.

4     **A.**  YES.

5     **Q.**  THE PROPERTY GOING TOWARD THE RAILROAD IS THE EAST?

6     **A.**  YES.

7     **Q.**  AND DOWN TO THE PUMP IS SOUTH.

8     **A.**  YES.

9     **Q.**  SO WHERE IS L2A-1, A-2 AND A-3?

10    **A.**  L2A-1 IS EAST OF THE SLOUGH AND -- YEAH.

11    **Q.**  IS IT ON THE WATER TAKEN FROM THE PROPERTY LEADING OUT

12    THROUGH A CULVERT PIPE INTO THE SLOUGH?

13    **A.**  YES.

14    **Q.**  SO IT'S ON THE PROPERTY SIDE?

15    **A.**  YES.

16    **Q.**  AND BECAUSE THERE'S A-1, A-2, A-3, IS THAT AN EXAMPLE OF A

17    SAMPLE BEING TAKEN IN TRIPLICATE?

18    **A.**  YES.

19    **Q.**  DIRECTLY TO THE LEFT OF THAT SPOT, YOU'LL SEE A SIGN THAT

20    SAYS L2B-1, B-2, B-3.

21         WHERE WERE THOSE WATER SAMPLES TAKEN?

22    **A.**  THOSE ARE SAMPLES TAKEN IN THE SLOUGH ITSELF.

23    **Q.**  WOULD IT BE JUST ON THE OPPOSITE SIDE OF THE PIPE LEADING

24    OUT INTO THE SLOUGH THROUGH THE DUCKBILL?

25    **A.**  YES.

1   **Q.**  SO YOU TOOK WATER SAMPLES FROM INSIDE THE PROPERTY AND

2   RIGHT OUTSIDE INTO THE SLOUGH?

3   **A.**  YES.

4   **Q.**  AND IF YOU GO A LITTLE BIT FURTHER DOWN, YOU WILL SEE A

5   PART THAT SAYS L1B-1, B-2, B-3.

6       WHERE DID YOU TAKE WATER SAMPLING THERE?

7   **A.**  THAT ONE WAS A SMALL CREEK WHERE THE YELLOW LINE IS SHOWN.

8   THERE WAS A WATER FLOWING TOWARDS THE SLOUGH.  AND WE TOOK IT

9   FROM A LITTLE AREA WHERE THE WATER WAS FLOWING IN THAT

10  DIRECTION.

11  **Q.**  THAT WAS EAST OF THE SLOUGH AS WELL?

12  **A.**  YES.

13  **Q.**  ON THE SIDE OF THE PROPERTY?

14  **A.**  YES.

15  **Q.**  AND IF WE COULD GO BACK, THERE IS SOME SAMPLING THAT YOU

16  DID DOWN BY THE PUMP?

17  **A.**  YES.

18  **Q.**  WHERE DID YOU TAKE WATER SAMPLING THERE?  WAS IT ON THE

19  INLAND SIDE OR ON THE SLOUGH SIDE?

20  **A.**  THAT WAS ON THE SLOUGH SIDE.

21  **Q.**  IT'S WHERE THE PUMP OUTFALL WENT INTO THE SLOUGH?

22  **A.**  YES.

23  **Q.**  THIS WAS DONE ON JANUARY 9TH, 2017; IS THAT CORRECT?

24  **A.**  THAT'S CORRECT.

25  **Q.**  WHAT DID YOU DO WITH THE WATER SAMPLES THAT YOU TOOK?

1    **A.**  SO IN WHICH STEP?  I MEAN, HOW DID I COLLECT THEM OR WHERE

2    DID I TAKE THEM?

3    **Q.**  WHY DON'T WE START WITH HOW DID YOU COLLECT THEM?

4    **A.**  SO WE RECEIVED SAMPLE BOTTLES FROM THE LAB THAT WERE

5    PARTICULAR TO EACH ANALYSIS THAT WE WERE RUNNING.  ALL THE

6    BOTTLES WERE CLEAN AND STERILIZED.  AND WE BROUGHT THEM TO

7    EACH SITE AND LABELED THEM DEPENDING ON WHERE WE WERE.  AND WE

8    USED RUBBER GLOVES TO COLLECT EACH SAMPLE FROM THE SAMPLING

9    LOCATIONS.  AND THEN ONCE THE SAMPLES ARE COLLECTED, THEY ARE

10   SEALED AND PUT INTO COOLERS WITH ICE.

11       ONCE WE HAD SAMPLED ALL LOCATIONS, ALL THE COOLERS AND ICE

12   WERE LOADED INTO MY TRUCK AND I DROVE DIRECTLY TO OUR LAB AND

13   DROPPED THEM OFF TO THE LAB UNDER CHAIN OF CUSTODY PROTOCOL.

14   **Q.**  THOSE STEPS THAT YOU TOOK SEALING THEM, MAINTAINING THEM

15   ON ICE, ARE THOSE STEPS THAT YOU TAKE TO ENSURE THE INTEGRITY

16   THE WATER REMAINS THE SAME AS WHEN YOU COLLECTED IT?

17   **A.**  YES.

18   **Q.**  DID YOU DROP IT OFF AT THE LAB THE SAME DAY?

19   **A.**  YES.

20   **Q.**  IN FACT, WITHIN THREE HOURS OF FINISHING COLLECTING?

21   **A.**  YEAH.  WE FINISHED AT THE END OF THE DAY AND I DROVE

22   STRAIGHT THERE.  DIDN'T EVEN STOP.

23   **Q.**  AND IS THE LAB MCCAMPBELL ANALYTICAL INCORPORATED?

24   **A.**  YES.

25   **Q.**  AND THAT LAB THEN DOES THE TESTING OF THE WATER SAMPLES

1    YOU COLLECTED; IS THAT CORRECT?

2    **A.**  YES.

3    **Q.**  HAS THIS BEEN THE ONLY TIME YOU'VE BEEN ON THE PROPERTY?

4    **A.**  YEP, JUST THAT DAY.

5    **Q.**  WHAT I'VE ASKED YOU QUESTIONS OF, DOES THAT REFLECT THE

6    EXTENT OF YOUR KNOWLEDGE OF THE SITE, THE WATER SAMPLES YOU

7    TOOK, AS WELL AS YOUR KNOWLEDGE OF ANY RESULTS OF THOSE WATER

8    SAMPLES?

9    **A.**  YES.

10   **Q.**  BECAUSE YOU DID NOT PERSONALLY ANALYZE THE RESULTS OF THE

11   WATER SAMPLES, SOMEONE ELSE DID; IS THAT RIGHT?

12   **A.**  YES.

13           **MS. LEE:**  I HAVE NO FURTHER QUESTIONS OF THIS

14   WITNESS.

15           **THE COURT:**  ANY CROSS-EXAMINATION?

16           **MR. SMOCK:**  JUST VERY BRIEFLY JUST SO I UNDERSTAND.

17

18           **MR. SMOCK:**  MR. WANZALA, CAN YOU PUT UP EXHIBIT 606

19   WHICH I BELIEVE IS THE ONE WE WERE LOOKING AT.

20       CAN YOU PULL OUT THE AREA BY THE PICK 'N PULL WHERE THE

21   SAMPLES WERE TAKEN SO I UNDERSTAND.

22                    **CROSS-EXAMINATION**

23   **BY MR. SMOCK:**

24   **Q.**  JUST SO I UNDERSTAND, WHEN WE TALK ABOUT L2B-1, B-2 AND

25   B-3, THOSE ARE THE SAMPLES THAT WERE TAKEN IN THE SLOUGH

1    ITSELF; AM I RIGHT?

2    **A.**  YEAH.

3    **Q.**  AND WE'VE TALKED ABOUT THE SLOUGH BEING TIDAL.  IN OTHER

4    WORDS, IT'S SOMETIMES GOING IN ONE DIRECTION AND SOMETIMES

5    GOING IN THE OTHER DIRECTION, RIGHT?

6        DID YOU OBSERVE THAT?

7    **A.**  I DID NOT OBSERVE THAT WHEN I WAS THERE.

8    **Q.**  OKAY.

9        WHERE IN REFERENCE TO THE DUCKBILL WERE YOUR SAMPLES

10   TAKEN?  IN OTHER WORDS, WERE THEY ABOVE IT CLOSER TO MOWRY

11   AVENUE, OR WERE THEY BELOW IT CLOSER GOING WHATEVER THIS

12   DIRECTION IS, DOWNWARD IN THIS IMAGE?

13       DO YOU UNDERSTAND?

14   **A.**  REPEAT THE QUESTION?

15   **Q.**  SORRY.

16       SO WE HAVE ESTABLISHED THAT THE SAMPLES WERE TAKEN ON THE

17   MOWRY SLOUGH SIDE -- IN MOWRY SLOUGH?

18   **A.**  YES, AT THAT X.

19   **Q.**  SO MY QUESTION IS, IN REFERENCE TO THE DUCKBILL, WERE YOUR

20   SAMPLES TAKEN ON THE MOWRY SLOUGH -- MOWRY AVENUE SIDE OF THAT

21   DUCKBILL OR WERE THEY TAKEN ON THE OTHER SIDE GOING SOUTH FROM

22   THE DUCKBILL?

23   **A.**  THE SAMPLES ARE COLLECTED EXACTLY WHERE THAT X IS ON THE

24   MAP.

25   **Q.**  OKAY.  DO YOU RECALL SEEING A DUCKBILL THERE?

1    **A.**  NO.

2    **Q.**  SO YOU DON'T KNOW, AS YOU SIT HERE, WHETHER THEY WERE

3    COLLECTED ON ONE SIDE OF THE DUCKBILL OR THE OTHER SIDE OF THE

4    DUCKBILL?

5    **A.**  HONESTLY I DON'T EVEN KNOW WHAT A DUCKBILL IS.

6    **Q.**  OKAY.

7         SO YOU DON'T KNOW, IN OTHER WORDS, AS YOU SIT HERE,

8    WHETHER THEY WERE UPSTREAM OR DOWNSTREAM OF A DUCKBILL?

9    **A.**  I KNOW THAT WE TOOK THE SAMPLES AT THE X, WHICH WE GPS'D

10   THE LOCATION.

11   **Q.**  OKAY.  FAIR ENOUGH.

12        CAN WE –– LET'S JUST SEE WHETHER YOU HAVE ANY RECOLLECTION

13   OF THE LOCATION OF THE SAMPLE IN THE SOUTHERN AREA.

14             **MR. SMOCK:**  CAN YOU PULL UP THE BOTTOM, VERY BOTTOM

15   SAMPLES?  THOSE.

16                  (DISPLAYED ON SCREEN.)

17   **BY MR. SMOCK:**

18   **Q.**  THOSE AGAIN, L1A-1, L1A-2 AND L1A-3 WERE SAMPLES THAT WERE

19   TAKEN ON THE –– IN MOWRY SLOUGH, RIGHT?

20   **A.**  L1A-1 OKAY.  YES.

21   **Q.**  AND THERE WAS –– THERE'S A PIPE WITH AN OUTFALL THERE.  DO

22   YOU RECALL THAT?

23   **A.**  I DON'T RECALL IT, NO.

24   **Q.**  SO AS YOU SIT HERE, YOU CAN'T TELL US WHERE THIS SAMPLE

25   WAS ON THE SLOUGH AND WHETHER IT WAS NORTH OR SOUTH OF AN

1    OUTFALL BECAUSE YOU DON'T RECALL WHERE THE OUTFALL WAS?

2    **A.**  I CAN TELL YOU THE GPS LOCATION OF THE SAMPLE POINT IS

3    REPRESENTED ON THE MAP, AND THAT'S WHERE THE SAMPLE WAS

4    COLLECTED.

5    **Q.**  AND THAT'S ALL YOU CAN REMEMBER ABOUT THIS?

6    **A.**  YES.

7              **MR. SMOCK:**  NO FURTHER QUESTIONS.

8              **THE COURT:**  ANY REDIRECT?

9         **MS. LEE:**  NO.  NO FURTHER QUESTIONS.

10             **THE COURT:**  THANK YOU, MR. KNUDSEN.  YOU ARE EXCUSED.

11       THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

12             **MS. LEE:**  THE GOVERNMENT CALLS ANGELA RYDELIUS.

13             **THE CLERK:**  I'LL HAVE YOU COME UP TO THE WITNESS

14   STAND FOR ME PLEASE.  STAND AND RAISE YOUR RIGHT HAND FOR ME,

15   PLEASE.

16       (**ANGELA RYDELIUS**, CALLED AS A WITNESS FOR THE GOVERNMENT,

17   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

18             **THE WITNESS:**  I DO.

19             **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED, I'M

20   GOING TO ASK IF YOU WOULD PLEASE STATE AND SPELL YOUR FIRST

21   AND LAST NAME FOR THE RECORD, PLEASE.

22             **THE WITNESS:**  YES.  IT'S ANGELA RYDELIUS.

23   R-Y-D-E-L-I-U-S.

24             **THE CLERK:**  SPELL YOUR FIRST NAME AS WELL.

25             **THE WITNESS:**  A-N-G-E-L-A.

1      **THE CLERK:**  THANK YOU.

2                    **DIRECT EXAMINATION**

3    **BY MS. LEE:**

4    **Q.**  MS. RYDELIUS, CAN YOU TELL US WHERE YOU WORK?

5    **A.**  YES.  I WORK AT MCCAMPBELL ANALYTICAL.

6    **Q.**  WHAT DO YOU DO FOR MCCAMPBELL ANALYTICAL?

7    **A.**  I'M A LAB MANAGER AT MCCAMPBELL ANALYTICAL.

8    **Q.**  WHAT DO YOU DO AS A LAB MANAGER?

9    **A.**  I OVERSEE THE DAILY OPERATIONS OF OUR LABORATORY AS WELL

10   AS REVIEW REPORTS.

11   **Q.**  WHAT TYPES OF ANALYTICAL REPORTS DOES MCCAMPBELL

12   ANALYTICAL PERFORM?

13   **A.**  WE DO ANALYTICAL WORK ON SOIL, WATER, AND AIR.

14   **Q.**  DID THERE COME A TIME WHEN YOU RAN TESTS ON WATER SAMPLES

15   BROUGHT TO YOUR COMPANY BY MR. DUNCAN KNUDSEN ON

16   JANUARY 9TH --

17   **A.**  YES.

18   **Q.**  -- 2017?

19   **A.**  YES.

20   **Q.**  AND WERE TESTS RUN?

21   **A.**  YES.

22   **Q.**  AND WAS A REPORT GENERATED?

23   **A.**  YES.

24   **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 897.

25        THIS IS A... THIS IS MULTIPLE NUMBERS.  I AM GOING TO SAY

1    EXHIBIT 897-0001 ALL THE WAY UNTIL 897-0136.

2        (EXHIBIT HANDED TO WITNESS.)

3        MS. RYDELIUS, WHAT IS THAT?

4    **A.**   THIS IS ONE OF OUR ANALYTICAL REPORTS THAT OUR LAB

5    GENERATED.

6    **Q.**   CAN YOU BE MORE SPECIFIC ABOUT THIS PARTICULAR REPORT?

7    **A.**   WE RAN A NUMBER OF DIFFERENT TESTS ON THE SAMPLES THAT

8    AQUIFER SCIENCES BROUGHT TO OUR LABORATORY.

9    **Q.**   SO THIS IS THE REPORT RUN ON THE SAMPLES THAT MR. KNUDSEN

10   BROUGHT TO YOUR LABORATORY ON JANUARY 9TH, 2017?

11   **A.**   THAT IS CORRECT.

12   **Q.**   DO YOU KNOW WHERE THESE SAMPLES COME FROM?

13   **A.**   I KNOW WHAT ON THE CHAIN OF CUSTODY IS DOCUMENTATION THAT

14   WE USE TO GET ALL THAT INFORMATION, WHICH IS -- I'M NOT SURE

15   WHICH PAGE IT'S ON HERE.

16   **Q.**   IT WOULD BE THE LAST THREE TO FOUR PAGES.

17   **A.**   YEAH.

18        SO STARTING ON YOUR EXHIBIT 0133, THAT'S THE FIRST PART OF

19   THE CHAIN OF CUSTODY.  THERE ARE THREE CHAINS OF CUSTODY ON

20   THIS PARTICULAR REPORT COVERING 12 SAMPLES THAT HE BROUGHT TO

21   OUR LABORATORY.

22   **Q.**   DO YOU KNOW WHERE THE WATER SAMPLES WERE TAKEN FROM?

23   **A.**   I DO NOT.

24   **Q.**   IS THIS A FAIR AND ACCURATE REPORT OF THE ANALYSIS RUN ON

25   THE SAMPLES BROUGHT TO YOU BY MR. KNUDSEN?

1    **A.**  YES, IT IS.

2    **Q.**  IN FACT, IS THIS REPORT KEPT AS A BUSINESS RECORD FOR YOUR

3    COMPANY?

4    **A.**  YES, IT IS.

5         **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

6    EXHIBIT 897 IN ITS ENTIRETY INTO EVIDENCE.

7         **MR. SMOCK:**  NO OBJECTION.

8         **THE COURT:**  EXHIBIT 897 IS ADMITTED.

9         (GOVERNMENT'S EXHIBIT 897 RECEIVED IN EVIDENCE)

10   **BY MS. LEE:**

11   **Q.**  MS. RYDELIUS, CAN YOU PLEASE EXPLAIN YOUR ROLE?

12        CAN YOU PLEASE EXPLAIN YOUR ROLE IN THE ANALYSIS OF WATER

13   SPECIFICALLY WHAT I AM REFERENCING IS, YOU DID NOT RETRIEVE

14   THE WATER SAMPLE; THAT WAS MR. KNUDSEN.

15        DO YOU ANALYZE THE RESULTS OF THIS REPORT?

16   **A.**  OUR LABORATORY DOES DO ALL OF THE ANALYSIS OF THE WATER --

17   WE DID ALL OF THE REQUESTED ANALYTICAL FOR THE SAMPLES THAT

18   AQUIFER SCIENCES BROUGHT TO OUR LABORATORY.

19   **Q.**  I WOULD LIKE TO SPECIFICALLY BRING YOU TO THE CHAIN OF

20   CUSTODY FORMS.

21        AND IF YOU TURN TO YOUR PACKET IN FRONT OF YOU, IT'S

22   897-0133.

23   **A.**  YES.

24   **Q.**  CAN YOU PLEASE DESCRIBE WHAT WE ARE LOOKING AT --

25   **A.**  YES.

1    **Q.**  -- IN THE CHAIN OF CUSTODY WITH RESPECT TO THE WATER

2    SAMPLES YOU RECEIVED?

3    **A.**  YES.

4       HE BROUGHT US THREE CHAINS OF CUSTODY THAT OUTLINE THE

5    SAMPLING -- THE SAMPLE I.D.'S, WHICH IS ON THE LEFT-HAND

6    COLUMN.  THERE WAS 12 OF THEM IN TOTAL.

7       HE ALSO INDICATED THE DATE AND TIME OF SAMPLING, HOW MANY

8    CONTAINERS HE BROUGHT TO US, AND FOR WHAT ANALYSES.

9    **Q.**  ALL RIGHT.

10           **MS. LEE:**  IF I CAN HAVE EXHIBIT 897-0133 PUBLISHED

11   FOR THE JURY?

12           **THE COURT:**  YOU MAY.

13               (PAUSE IN THE PROCEEDINGS.)

14           **THE CLERK:**  I AM SORRY.  I APOLOGIZE.

15               (DISPLAYED ON SCREEN.)

16   **BY MS. LEE:**

17   **Q.**  MS. RYDELIUS, WHAT ARE WE LOOKING AT HERE?

18   **A.**  THAT'S A CHAIN OF CUSTODY THAT WAS BROUGHT TO US FROM

19   AQUIFER.

20   **Q.**  CAN WE JUST GO DOWN ROW BY ROW.  WHAT IS THE COLUMN ON THE

21   LEFT?

22   **A.**  THAT'S THE SAMPLE IDENTIFICATION THAT WAS GIVEN TO THAT

23   PARTICULAR SAMPLE.

24   **Q.**  AND THE NEXT COLUMN, THE DATE THE SAMPLES WERE TAKEN?

25   **A.**  THAT'S THE DATE THE SAMPLES WERE TAKEN.

KNUDSEN – LEE / CROSS

1       THE NEXT IS THE TIME THE SAMPLES WERE TAKEN.  THE NEXT

2    SAMPLE TYPE IS H2O OR WATER.  THESE WERE WATER SAMPLES THAT

3    WERE BROUGHT TO US.

4       AND THE NEXT ARRAY OF BOXES ARE THE TYPE OF PRESERVATION

5    THAT WAS DONE ON THOSE -- FOR EACH CONTAINER THAT WAS BROUGHT

6    TO US.  EVERY TEST REQUIRES A DIFFERENT CONTAINER.  SO THAT'S

7    WHY THERE ARE SEVERAL PER SAMPLE.

8    **Q.**  AND WHAT STEPS WERE TAKEN TO PRESERVE THE QUALITY OF THAT

9    WATER?

10   **A.**  ALL SAMPLES, ONCE THEY ARE RECEIVED IN OUR LABORATORY,

11   EITHER GO DIRECTLY TO THE LAB FOR ANALYSIS OR THEY'RE STORED

12   IN THE REFRIGERATOR AT PROPER TEMPERATURE.

13   **Q.**  AND WAS THAT DONE IN THIS PARTICULAR CASE?

14   **A.**  YES, IT WAS.

15   **Q.**  WITH RESPECT TO ALL THE SAMPLES THAT WERE PROVIDED TO YOU

16   BY MR. KNUDSEN?

17   **A.**  YES, ALL THE SAMPLES.

18   **Q.**  ON THE BOTTOM HERE, WHAT DO THESE SIGNATURES SHOW US?

19   **A.**  YES.  THE SIGNATURES ARE SHOWING THAT THE SAMPLES WERE

20   RELINQUISHED TO OUR LABORATORY.  THAT'S THE FIRST BOX.  AND

21   THE DATE AND TIME THAT THEY WERE RELINQUISHED.  THE RECEIVED

22   BY IS FROM OUR SAMPLER RECEPTION STAFF AND THE DATE AND TIME

23   THAT THEY RECEIVED THE SAMPLES.

24   **Q.**  SO THIS SHOWS THE CHAIN OF CUSTODY BETWEEN MR. KNUDSEN TO

25   WHEN IT WAS RECEIVED BY YOUR LABORATORY?

KNUDSEN – LEE / CROSS

1  **A.**  THAT'S CORRECT.

2  **Q.**  WHAT THINGS WERE TESTED FOR IN THE WATER SAMPLES YOU

3  RECEIVED?

4  **A.**  WE HAD SEVERAL ANALYSES AS LISTED ON THE CHAIN OF CUSTODY

5  ON ALL THREE PAGES.

6  STARTING FROM WHERE IT SAYS "DIESEL" IN THE FIRST COLUMN,

7  DIESEL MOTOR OIL, GASOLINE.  I'M JUST READING OVER.

8  EPA 8081 PESTICIDES WERE TESTED FOR.  METALS WERE ALSO

9  TEST FOR.  WE CALL IT CAM 17, 17 HEAVY METALS.  TOTAL COLIFORM

10  AND E.COLI WERE TESTED.  B-O-D, BIOLOGICAL OXYGEN DEMAND WAS

11  TESTED.  TSS, TOTAL SUSPENDED SOLIDS.  CHLOROPHYLL A AND B

12  WERE ALSO TESTED FOR.  AND 200.7 IS ALKALI METALS THAT WERE

13  TESTED FOR.  AND SALINITY.

14  **Q.**  ARE YOU GOING TO THE SECOND PAGE?

15  **A.**  NOW I AM GOING TO THE SECOND PAGE.

16  **MS. LEE:**  PUBLISH THE SECOND PAGE, 897-0134.

17  **BY MS. LEE:**

18  **Q.**  ARE WE LOOKING AT PRETTY MUCH THE SAME THING WITH THE

19  EXCEPTION OF ADDITIONAL TESTS THAT WERE DONE ON THE WATER?

20  **A.**  THAT IS CORRECT.

21  **Q.**  WHAT ADDITIONAL TESTS WERE DONE?

22  **A.**  TOTAL PHOSPHORUS, TKN, AMMONIA AS NITROGEN, T-D-S, WHICH

23  IS TOTAL DISSOLVED SOLIDS, SPECIFIC CONDUCTIVITY, AND PH.

24  **Q.**  IS THERE ANY MORE ON THE THIRD PAGE?

25  **A.**  THERE IS A THIRD PAGE.

```
 1            MS. LEE:  PUBLISH THE THIRD PAGE AS WELL.

 2            THE WITNESS:  MORE TESTS.  WE TESTED FOR INORGANIC

 3   ANIONS, EPA METHOD 300.1, T-O-C, TOTAL ORGANIC CARBON, AND

 4   LAST IS TOTAL NITROGEN.

 5   BY MS. LEE:

 6   Q.  WHO DETERMINED WHAT THINGS TO TEST FOR IN THESE WATER

 7   SAMPLES?

 8   A.  THAT WAS NOT MY DETERMINATION.

 9   Q.  DO YOU KNOW WHO MADE THAT DETERMINATION?

10   A.  AQUIFER SCIENCES, I WOULD ASSUME.

11   Q.  SO YOU DON'T KNOW?

12   A.  I DO NOT KNOW.

13   Q.  YOU WERE JUST TOLD WHAT TESTS TO RUN AND THOSE ARE THE

14   TESTS THAT WERE RUN?

15   A.  THAT'S CORRECT.

16   Q.  AND THE RESULTS OF THOSE TESTS ARE LAID OUT IN WHAT PART

17   OF THIS REPORT?

18   A.  THE ANALYTICAL REPORTS STARTS -- WELL, FROM THE COVER

19   PAGE, 0001 PAGE.  BUT THE ANALYTICAL RESULTS THEMSELVES START

20   ON YOUR EXHIBIT NO. 0005, WHERE IT SAYS "INORGANIC ANIONS BY

21   IC".

22   Q.  SO THIS IS -- WOULD YOU DESCRIBE HOW THIS REPORT IS LAID

23   OUT MEANING IS IT PER SAMPLE, PER TEST?

24   A.  IT'S PER ANALYSIS AND THEN PER SAMPLE FROM THERE.

25   Q.  CAN YOU DESCRIBE?
```

KNUDSEN - LEE / CROSS

1    **A.** SURE.

2        THE FIRST -- THE FIRST PAGE OF ANALYTICAL DATA FOR

3    INORGANIC ANIONS HAS A TOTAL OF THREE SAMPLES RESULTS LISTED

4    FOR NITRATE AS N AND ALSO IS NITRATE AS NO3.

5        IF YOU GO FURTHER ON FURTHER SUBSEQUENT PAGES, THAT

6    CARRIES ON BY THE SAME -- FOR THE SAME ANALYSIS BUT MORE

7    SAMPLES.

8        SO THERE'S A TOTAL OF 12 SAMPLES THAT WERE ANALYZED FOR

9    ALL THOSE TESTS THAT I MENTIONED EARLIER.

10   **Q.** OKAY.

11   **A.** AND AS YOU READ THROUGH, YOU'LL GO THROUGH THE INORGANIC

12   ANION PAGE, AND THEN YOU'LL END UP -- THE NEXT PAGE WILL BE

13   THE ORGANOCHLORINE PESTICIDES AND THAT'S WHERE THAT DATA

14   STARTS.  AND THAT'S ONE SAMPLE PER PAGE.

15   **Q.** SO THERE ARE 12 SAMPLES THAT WERE ANALYZED?

16   **A.** CORRECT.

17   **Q.** AND THEY WERE ANALYZED FOR EACH OF THOSE TESTS THAT YOU

18   MENTIONED?

19   **A.** THAT'S CORRECT.

20   **Q.** AND WOULD YOU SAY JUST A STATISTICAL NUMBER IS GENERATED?

21   **A.** WE ANALYZE FOR ALL THE COMPOUNDS THAT ARE LISTED AND WE

22   PROVIDE THAT ANALYTICAL DATA ON THE REPORT.

23   **Q.** AND WHO ANALYZES THE ANALYTICAL DATA?

24   **A.** OUR LAB STAFF.

25   **Q.** SO IF WE WERE TO JUST TAKE ONE FOR AN EXAMPLE, LET'S TAKE

KNUDSEN – LEE / CROSS

1    THE FIRST PAGE, WHICH IS EXHIBIT 897-0005, CAN YOU JUST WALK

2    US THROUGH THE RESULTS?

3    **A.**   SURE.

4        SO IT STARTS WITH A CLIENT I.D.   L1A-1 IS THE FIRST I.D.

5    WE TESTED, IN THIS CASE, FOR NITRATE AS N AND NITRATE AS NO3.

6    IF YOU READ OVER FURTHER THAT'S THE RESULT OF NONDETECT.

7        RL STANDS FOR REPORTING LIMIT.   THAT'S THE REPORTING

8    LIMIT.   SINCE THE STATE IS ND, IT'S ND AT OR ABOVE THE

9    REPORTING LIMIT.

10       THE DF STANDS FOR DILUTION FACTOR.   THAT'S AN INDICATION

11   WE HAD TO DILUTE THE SAMPLE.

12       AND THE DATE ANALYZED IS IN THE FAR RIGHT-HAND COLUMN.

13   **Q.**   THIS SEEMS ALL HIGHLY TECHNICAL.   AND YOU'RE NOT A

14   HYDROLOGIST; IS THAT CORRECT?

15   **A.**   I AM NOT.

16   **Q.**   YOU WERE NOT -- YOUR ROLE HERE WAS NOT TO DETERMINE WHERE

17   THE WATER SAMPLE CAME FROM AND WHAT AFFECT THIS WATER HAD FROM

18   WHERE IT WAS TAKEN; IS THAT CORRECT?

19   **A.**   CORRECT.

20   **Q.**   IT'S PURELY TO ANALYZE SCIENTIFICALLY IN A LAB SETTING

21   WHETHER THOSE TESTS OF DIFFERENT ELEMENTS WERE FOUND IN THOSE

22   WATER SAMPLES?

23   **A.**   THAT'S CORRECT.

24   **Q.**   DID ANYTHING OF SIGNIFICANCE STRIKE YOU IN ANALYZING THESE

25   TESTS WITH RESPECT TO THE WATER SAMPLES, OR IS THAT A

1    DIFFICULT QUESTION TO ANSWER BECAUSE YOU DON'T KNOW WHAT YOU

2    ARE LOOKING FOR NECESSARILY?

3    **A.**   WE DON'T GIVE OPINIONS ABOUT DATA.  WE LET THE DATA SPEAK

4    BECAUSE YOU MIGHT BE USING A DIFFERENT YARDSTICK DEPENDING ON

5    WHAT YOU'RE LOOKING FOR.  SO WE PROVIDE THE DATA BUT DON'T

6    GIVE AN INTERPRETATION OF THE DATA.

7    **Q.**   IS THAT SOMETHING A HYDROLOGIST WOULD DO?

8    **A.**   CORRECT.

9         **MS. LEE:**  THANK YOU.  I HAVE NO FURTHER QUESTIONS FOR

10   THIS WITNESS.

11        **THE COURT:**  ANY CROSS-EXAMINATION?

12        **MR. SMOCK:**  NO QUESTIONS.  THANK YOU.

13        **THE COURT:**  THANK YOU, MS. RYDELIUS.  YOU ARE

14   EXCUSED.

15      THIS IS PROBABLY A GOOD TIME TO TAKE OUR SECOND RECESS.

16   IT'S 11:40 SINCE WE HAVE A BREAK.

17      LADIES AND GENTLEMEN, COME BACK AT FIVE MINUTES TO NOON

18   AND JUST CONTINUE TO KEEP IN MIND AND ABIDE BY ALL OF YOUR

19   DIRECTIONS FOR YOUR CONDUCT AS JURORS.

20      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

21        **THE CLERK:**  YOU MAY BE SEATED.

22      (RECESS TAKEN AT 11:42 A.M.; RESUMED 11:55 A.M.)

23        **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

24   COURT IS BACK IN SESSION.

25      ARE YOU READY, JUDGE?

1    **THE COURT:**  WE ARE.

2    (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

3    **THE CLERK:**  YOU MAY BE SEATED.

4    **THE COURT:**  MR. KEARNEY, ARE YOU PREPARED TO CALL

5    YOUR NEXT WITNESS?

6    **MR. KEARNEY:**  WE ARE, SIR.  WE CALL MR. GARY DEGHI TO

7    THE STAND.

8    **THE CLERK:**  GO UP TO THE WITNESS STAND FOR ME,

9    PLEASE, AND RAISE YOUR RIGHT HAND.

10    (**GARY DEGHI**, CALLED AS A WITNESS FOR THE GOVERNMENT,

11    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

12    **THE WITNESS:**  I DO.

13    **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED I AM

14    GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

15    LAST NAME FOR THE RECORD, PLEASE.

16    **THE WITNESS:**  FIRST NAME GARY, G-A-R-Y.  LAST NAME

17    DEGHI, D-E-G-H-I.

18    **THE CLERK:**  THANK YOU.  THERE IS WATER IN THE

19    PITCHER.

20    **THE WITNESS:**  THANK YOU.

21                    **<u>DIRECT EXAMINATION</u>**

22    BY MR. KEARNEY:

23    **Q.**  MR. DEGHI, I AM GOING TO SAY GOOD MORNING TO YOU.  IT'S

24    ACCURATE FOR ABOUT 30 SECONDS.

25    SIR, PLEASE TELL US WHAT YOUR OCCUPATION IS.

DEGHI – DIRECT / KEARNEY

1    **A.**  I AM THE VICE PRESIDENT AND SENIOR ENVIRONMENTAL SCIENTIST

2    WITH THE HUFFMAN-BROADWAY GROUP.

3    **Q.**  ALL RIGHT.  AND WE HAVE HEARD ABOUT THAT GROUP BEFORE,

4    SIR.

5        DO YOU HAVE AN AREA OF EMPHASIS WITHIN YOUR COMPANY?

6    **A.**  I'M THE -- WELL, AS THE VICE PRESIDENT, I -- I WORK A LOT

7    WITH BUSINESS DEVELOPMENT AND ADMINISTRATION, AND THINGS LIKE

8    THAT.

9        BUT AS A TECHNICAL EXPERT, I'M THE WILDLIFE BIOLOGIST AND

10   WETLAND -- WETLAND ECOLOGIST AND WILDLIFE BIOLOGIST, AND ALSO

11   AS AN EXPERT -- SERVE AS AN EXPERT ON ENVIRONMENTAL REVIEW

12   REQUIREMENTS FOR BOTH STATE AND FEDERAL LAW.

13   **Q.**  ALL RIGHT.  I WANT TO FOCUS, IF WE MAY, ON YOUR WILDLIFE

14   BIOLOGY WORK.

15       TELL US WHAT THAT IS, FIRST OF ALL.  WHAT IS WILDLIFE

16   BIOLOGY?

17   **A.**  WILDLIFE BIOLOGY, IT'S THE STUDY OF... OF BOTH THE STUDY

18   OF WILDLIFE.  AND IN OUR PARTICULAR CASE, IT INVOLVES, YOU

19   KNOW, THE HABITATS FOR WILDLIFE IN MIGRATORY QUARTERS AND

20   THINGS OF THAT NATURE.  ALSO... YEAH....

21   **Q.**  THAT'S FINE.

22       AND WITHIN THE CATEGORY OF WILDLIFE, YOU HAVE A PARTICULAR

23   EMPHASIS ON BIRDS; IS THAT A FAIR STATEMENT?

24   **A.**  IT... YES, IT IS A FAIR STATEMENT.

25   **Q.**  OKAY.

1    **A.**   THAT -- MY -- MY COLLEGE DEGREES, MAYBE WE WILL GET INTO

2    THAT OR MORE GENERAL WILDLIFE BIOLOGY, BUT I HAVE A LONG

3    HISTORY OF EXPERTISE IN WORKING WITH BIRDS.

4    **Q.**   OKAY.  LET'S TALK ABOUT SOME OF YOUR EXPERTISE, IF WE MAY.

5       HOW LONG HAVE YOU WORKED IN THE FIELD OF ENVIRONMENTAL

6    CONSULTING, SIR?

7    **A.**   FORTY YEARS.

8    **Q.**   HAVE YOU, DURING THAT 40-YEAR PERIOD, MANAGED THINGS LIE

9    ENVIRONMENTAL IMPACT REPORTS AND CEQA, WHICH WE'VE HEARD A LOT

10   ABOUT ALREADY, CALIFORNIA ENVIRONMENTAL QUALITY ACT ANALYSES?

11   **A.**   I HAVE.  MY CAREER REALLY HAS HAD TWO... TWO PORTIONS TO

12   IT.  EARLY IN MY CAREER, I WAS THE SENIOR VICE PRESIDENT OF AN

13   ENVIRONMENTAL CONSULTING FIRM CALLED EARTH METRICS THAT WAS

14   PRIMARILY A FIRM THAT WROTE DOCUMENTS, EIR'S UNDER CEQA,

15   CALIFORNIA ENVIRONMENTAL QUALITY ACT, ENVIRONMENTAL IMPACT

16   STATEMENTS UNDER NEPA.  AND I WORKED THERE FOR THE GOOD PART

17   OF A DECADE.  AND DURING THAT TIME MANAGED THE PREPARATION OF

18   OVER 200 ENVIRONMENTAL IMPACT REPORTS AND ENVIRONMENTAL IMPACT

19   STATEMENTS AND OTHER ENVIRONMENTAL ASSESSMENTS ACCORDING TO

20   BOTH CEQA AND NAPA.

21   **Q.**   IN THE 200 EIR'S YOU'VE CONDUCTED, SIR, OR WORKED ON, HAD

22   BIRD STUDIES BEEN RELEVANT IN ANY OF THOSE?

23   **A.**   BIOLOGICAL ANALYSES ARE RELEVANT TO THOSE, AND MANY OF

24   THOSE REQUIRE AN ANALYSIS OF AVIAN POPULATION.

25      WHEN WE GET INTO CEQA AND NEPA DOCUMENTS, THE MAJOR FACTOR

1  THAT WE WANT TO LOOK AT ARE SENSITIVE HABITATS, THINGS LIKE

2  WETLANDS AND ENDANGERED -- WETLANDS AND RIPARIAN QUARTERS, AND

3  THAT SORT OF THING.  ALSO THEN ALSO ENDANGERED SPECIES.

4      SO THE -- THE ASPECTS OF WILDLIFE BIOLOGY THAT ARE GERMANE

5  TO WHAT IS PROTECTED ACCORDING TO STATE AND FEDERAL LAW

6  BECOMES THE MATERIAL THAT IS... IS OFTEN DISCUSSED IN THESE

7  DOCUMENTS.

8  **Q.**  ALL RIGHT.

9      LET'S TALK ABOUT YOUR EDUCATION, IF WE MAY, SIR.

10     WHERE DID YOU GET YOUR UNDERGRADUATE DEGREE?

11 **A.**  I HAVE A BACHELOR'S OF SCIENCES DEGREE IN BIOLOGICAL

12 SCIENCES FROM UC DAVIS.

13 **Q.**  AND WHEN YOU SAY "BIOLOGICAL SCIENCES", DID YOU HAVE A --

14 TELL US WHAT THAT IS AND IF YOU HAD ANY AREA OF EMPHASIS

15 WITHIN IT, PLEASE.

16 **A.**  THIS IS GENERAL LIFE SCIENCES DEGREE.  IT'S BASICALLY A

17 BIOLOGICAL SCIENCE DEGREE THAT REQUIRED THAT I TAKE COURSE

18 WORK IN A VARIETY OF DISCIPLINES HAVING TO DO WITH THE LIFE

19 SCIENCES, NOT JUST WILDLIFE AND ECOLOGY, BUT BOTANY AND

20 ZOOLOGY AND MICROBIOLOGY, GENETICS AND PHYSICS AND CHEMISTRY

21 AND, YOU KNOW, PHYSIOLOGY, A VARIETY OF DIFFERENT BIOLOGICAL

22 TOPICS.

23 **Q.**  ALL RIGHT.

24     DID YOU TAKE WILDLIFE COURSES WHILE YOU WERE AT UC DAVIS?

25 **A.**  I DID.  AMONG THOSE COURSES THERE WAS AN ANIMAL ECOLOGY

1    CLASS.  THERE WAS ALSO A WILDLIFE AND FISHERIES BIOLOGY CLASS

2    THAT I TOOK.

3    **Q.**  ALL RIGHT.  DID YOU GET AN ADVANCE DEGREE, SIR, AFTER YOUR

4    UNDERGRADUATE WORK AT --

5    **A.**  I HAVE A MASTER'S DEGREE IN WILDLIFE BIOLOGY FROM THE

6    UNIVERSITY OF FLORIDA IN GAINESVILLE.

7    **Q.**  CAN YOU DESCRIBE FOR US, PLEASE, YOUR AREA OF MASTER'S

8    STUDY AT GAINESVILLE?

9    **A.**  EVEN THOUGH I WAS IN THE WILDLIFE BIOLOGY DEPARTMENT

10   THERE, I'M IN A RELATIVELY UNIQUE SITUATION.  TO THIS DAY, I

11   BELIEVE, I'M PROBABLY THE ONLY GRADUATE STUDENT WHO HAS A

12   MASTER'S FROM THE WILDLIFE BIOLOGY DEPARTMENT THERE WHO

13   ACTUALLY DID A THESIS HAVING NOTHING TO DO WITH AN ANIMAL.

14       MY MAJOR PROFESSOR WAS WORKING ON A PROJECT LOOKING AT

15   RECYCLING SECONDARILY-TREATED SEWAGE THROUGH CYPRESS WETLANDS.

16   AND THERE WAS A RESEARCH ASSISTANTSHIP AVAILABLE FOR SOMEBODY

17   TO BECOME THE PHOSPHORUS EXPERT.  AND I SAW THAT AS A WAY TO

18   DO MY RESEARCH AND HAVE IT PAID FOR WHILE I WAS A GRADUATE

19   STUDENT.  AND I BECAME THE PHOSPHORUS EXPERT ON THAT PROJECT.

20   **Q.**  OKAY.  THANK YOU.

21       DID YOU, WHILE YOU WERE AT THE UNIVERSITY OF FLORIDA

22   GETTING YOUR MASTER'S, MR. DEGHI, DID YOU TAKE ANY WATERFOWL

23   ECOLOGY CLASSES?

24   **A.**  I DID.  I TOOK A VARIETY OF -- IT WAS A WILDLIFE BIOLOGY

25   MAJOR, EVEN THOUGH THE THESIS WAS NOT SPECIFICALLY RELATED TO

DEGHI – DIRECT / KEARNEY

1    THAT.  I DID TAKE A VARIETY OF WILDLIFE BIOLOGY COURSES,

2    INCLUDING A WATERFOWL ECOLOGY CLASS.

3    **Q.**  AND AS FAR AS THE WATERFOWL ECOLOGY CLASS, WAS THERE A

4    CERTAIN AMOUNT OF WATERFOWL IDENTIFICATION GOING ON?

5    **A.**  THERE WAS.

6    **Q.**  ALL RIGHT.

7    **A.**  WEEKEND FIELD TRIPS TO WILDLIFE REFUGEES AND DOING I.D.

8    WITH THE... WITH THE CLASS.

9    **Q.**  ALL RIGHT.  AND BEYOND YOUR FORMAL STUDIES, SIR, HAVE YOU

10   ENGAGED IN OR DO YOU HAVE EXPERIENCE IN WATERFOWL AND BIRD

11   IDENTIFICATION?

12   **A.**  YOU KNOW, WHEN I FIRST STARTED WORKING IN ENVIRONMENTAL

13   CONSULTING AS AN ENTRY-LEVEL BIOLOGIST, I WAS TOLD, GO OUT AND

14   IDENTIFY ALL THE WILDLIFE THAT'S ON THIS PROPERTY.  I REALIZED

15   I HAD A HARD TIME DOING THAT.

16        IT WAS AT THAT POINT, ALMOST 40 YEARS AGO, WHERE I GOT A

17   FIELD GUIDE AND I SAID I NEED TO LEARN THE BIRDS.  AND TO A

18   CERTAIN EXTENT THE WORK THAT I DO IN ORNITHOLOGY IS SOMEWHAT

19   SELF-TAUGHT.  AND SINCE THEN, IT ONLY TOOK A FEW YEARS BEFORE

20   I WAS LEADING BIRDING TRIPS FOR A LOCAL AUDUBON SOCIETY

21   CHAPTERS BEFORE I WAS... BEFORE I WAS CONSIDERED ONE OF THE

22   EXPERTS AT THE WILD -- AT THE WESTERN FIELD ORNITHOLOGIST

23   CONVENTION.  AND WHEN WE HAD THE CONVENTION LOCALLY, I WAS

24   TAPPED TO LEAD ORNITHOLOGISTS OUT IN THE FIELD TO EXPLORE OUR

25   LOCAL ENVIRONMENTS.

DEGHI - DIRECT / KEARNEY

1    I WOULD ALSO POINT OUT THAT I PERSONALLY HAVE... HAVE

2    IDENTIFIED OVER 20 PERCENT OF THE WORLD'S BIRDS WHILE EITHER

3    WORKING OR TRAVELING IN 30 DIFFERENT COUNTRIES ON FIVE

4    CONTINENTS.

5    **Q.**  ARE YOU -- AND THE GENERAL STUDY IS CALLED ORNITHOLOGY; IS

6    THAT RIGHT?

7    **A.**  GENERAL STUDY OF AVIAN SCIENCES IS ORNITHOLOGY.

8    **Q.**  DO YOU BELONG TO ANY PROFESSIONAL ORGANIZATIONS FOR

9    ORNITHOLOGY?

10   **A.**  THE WESTERN FIELD OF ORNITHOLOGISTS.

11   **Q.**  OKAY.  HOW MANY TIMES, MR. DEGHI, HAVE YOU ENGAGED IN BIRD

12   STUDY?

13   **A.**  WELL, AN EXACT NUMBER WOULD BE IMPOSSIBLE TO TELL YOU.

14   IT'S... IT'S SOMETHING THAT IS DONE ON A ROUTINE BASIS.

15   PROFESSIONALLY, WE'RE INVOLVED IN AVIAN-RELATED ENDANGERED

16   SPECIES SURVEYS, IN BIRD CENSUS STUDIES OF ONE KIND OR

17   ANOTHER, BIRD NESTING SURVEYS TO MAKE SURE THERE IS NO NESTING

18   BIRDS IN THE WAY OF A CONSTRUCTION PROJECT WHERE THE DEVELOPER

19   MAY BE IN VIOLATION OF THE MIGRATORY BIRD TREATY ACT.  THERE'S

20   A STUDY LIKE THIS AT WORK WOULD COME UP ONCE EVERY WEEK OR

21   TWO.

22   BUT THE BIRDING HAS BECOME A HOBBY.  I MEAN, I'M ONE OF

23   THOSE THAT I... I DO IT WHEN I'M ON VACATION.  AND I TAKE

24   VACATIONS TO PLACES WHERE I CAN GO BIRDING.  AND I MIGHT -- I

25   MIGHT EVEN STOP FOR FIVE OR TEN MINUTES AT A HABITAT PATCH AND

1    LOOK AT BIRDS ON MY WAY TO WORK.  IT'S VERY ROUTINE.

2    **Q.**  OKAY.

3        SO IF I SAID THOUSANDS OF TIMES YOU'VE ENGAGED IN BIRD

4    AND/OR WATERFOWL IDENTIFICATION, IS THAT A CONSERVATIVE

5    ESTIMATE, SIR?

6    **A.**  VERY CONSERVATIVE?

7            **MR. KEARNEY:**  YOUR HONOR, I WOULD OFFER MR. DEGHI AS

8    AN EXPERT IN WILDLIFE BIOLOGY WITH A FOCUS ON BIRD

9    IDENTIFICATION.

10           **MR. SMOCK:**  NO OBJECTION.

11           **THE COURT:**  ALL RIGHT.  SO MR. DEGHI WILL BE

12   PERMITTED TO OFFER OPINIONS AND THE REASONS FOR HIS OPINIONS

13   REGARDING WILDLIFE BIOLOGY WITH A FOCUS ON BIRD

14   IDENTIFICATION.

15           **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

16   **BY MR. KEARNEY:**

17   **Q.**  MR. DEGHI, I WANT TO DIRECT YOUR ATTENTION TO APRIL 6TH OF

18   2017.  I WANT TO ASK YOU IF ON THAT DATE YOU WENT TO THE

19   PROPERTY WE'VE BEEN CALLING THE NEWARK AREA 4 PROPERTY IN

20   NEWARK, CALIFORNIA?

21   **A.**  I DID.

22   **Q.**  AND DID YOU ENGAGE IN BIRD IDENTIFICATION WHILE YOU WERE

23   THERE, SIR?

24   **A.**  I DID.

25   **Q.**  DID YOU PREPARE A MAP SHOWING THE LOCATIONS WHERE YOU

1    ENGAGED IN BIRD IDENTIFICATION?

2    **A.**  YES.

3    **Q.**  OKAY.

4    **A.**  THE LEAD SCIENTIST AND I PREPARED A MAP TOGETHER.

5         **MR. KEARNEY:**  YOUR HONOR, I AM HOLDING A MAP.  THIS

6    IS EXHIBIT NO. 0895-0014.

7       MAY I APPROACH THE WITNESS?

8         **THE COURT:**  YOU MAY.

9              (EXHIBIT HANDED TO WITNESS.)

10   **BY MR. KEARNEY:**

11   **Q.**  MR. DEGHI, PLEASE TAKE A LOOK AT THAT MAP AND TELL US IF

12   YOU RECOGNIZE IT.

13   **A.**  I DO.

14   **Q.**  IS THAT A COPY OF THE MAP YOU PREPARED TO DOCUMENT YOUR

15   WORK ON APRIL THE 6TH, 2017 --

16   **A.**  NOT REALLY, BUT IT IS A SUITABLE MAP TO BE ABLE TO TELL

17   WHAT I DID.

18   **Q.**  AND ARE THERE X'S ON THAT MAP THAT KIND OF LINK UP WITH

19   WHERE YOU MADE SIGHTINGS ON THAT DAY?

20   **A.**  THE X'S ON THE MAP ARE LINKED TO WORK THAT WAS DONE AS

21   PART OF WETLAND EVALUATIONS.

22   **Q.**  DO I HAVE THE WRONG MAP IN FRONT OF YOU?

23   **A.**  I DON'T THINK -- MAYBE... YES, YOU DO, I THINK.

24   **Q.**  THAT'S MY MISTAKE.  GIVE ME ONE MOMENT, SIR.

25              (PAUSE IN THE PROCEEDINGS.)

1              **MR. KEARNEY:**  YOUR HONOR, MAY I APPROACH FOR ONE

2    MOMENT, PLEASE?

3              **THE COURT:**  YOU MAY.

4    BY MR. KEARNEY:

5    **Q.**  MR. DEGHI, I'M GOING TO HAND YOU FOUR SHEETS HERE, AND

6    JUST ASK YOU WHAT IS THE MAP THAT WE SHOULD BE TALKING ABOUT

7    IN RELATION TO YOUR WORK?

8         DO YOU SEE IT THERE IN FRONT OF YOU?

9    **A.**  I DO.

10   **Q.**  ALL RIGHT.  CAN YOU PASS IT TO ME?

11   **A.**  THERE'S ANOTHER MAP SHOWING THE AREA THAT DOESN'T HAVE THE

12   SAMPLE POINTS?

13   **Q.**  DOES THIS MAP WORK (INDICATING)?

14   **A.**  ACTUALLY, IF YOU WANT ME TO SHOW WHERE WE DID OUR SAMPLE

15   POINTS, EVEN THE OTHER -- SOMETHING THAT HAS IT ALL ON ONE

16   PAGE WOULD PROBABLY BE SUITABLE.

17   **Q.**  OKAY.

18              **MR. KEARNEY:**  AND I THINK, YOUR HONOR, I CAN'T FIND

19   THAT MAP.

20   BY MR. KEARNEY:

21   **Q.**  MR. DEGHI, IT'S NOT AT MY DISPOSAL NOW, SO WE MAY JUST

22   HAVE TO USE A DEMONSTRATIVE MAP AT THIS TIME, AND YOU CAN JUST

23   KIND OF WALK US THROUGH IT IF THAT'S OKAY.

24   **A.**  MAYBE THAT FIRST MAP THAT YOU HAD.  GO BACK TO IT.

25   **Q.**  THIS IS 895-0014.

1        DOES THAT MAP OF THE SITE INCLUDE WHERE YOU MADE YOUR BIRD

2   IDENTIFICATIONS?

3   **A.**  IT DOES.

4   **Q.**  DOES IT ACCURATELY DEPICT THE SITE AS YOU ENCOUNTERED IT

5   BACK IN APRIL OF 2017?

6   **A.**  YES.

7           **MR. KEARNEY:**  YOUR HONOR, I ASK THIS MAP BE ADMITTED

8   AT THIS TIME.

9           **MR. SMOCK:**  NO OBJECTION.  I THINK, JUST SO THE

10   RECORD IS CLEAR, WE ESTABLISHED THAT THESE X'S HAVE NO

11   RELEVANCE TO MR. DEGHI'S WORK; IS THAT RIGHT?

12           **THE COURT:**  NOT SURE ABOUT THAT.

13           **THE WITNESS:**  IT'S RIGHT, BUT IT'S ONLY A PIECE OF

14   THE MAP.

15           **MR. KEARNEY:**  OKAY.  ALL RIGHT.

16       SO WITH THAT PROVISO, MAY WE ADMIT THE MAP?

17           **MR. SMOCK:**  WOULD IT BE OKAY TO USE IT AS A

18   DEMONSTRATIVE?  I HAVE NO OBJECTION IT BEING SHOWN AS PART OF

19   THE TESTIMONY.

20           **MR. KEARNEY:**  THAT'S FINE.

21           **THE COURT:**  S WHY DON'T WE USE, THIS IS 895-0014 AS A

22   MECHANISM FOR ILLUSTRATING THE WITNESS'S TESTIMONY, LADIES AND

23   GENTLEMEN, BUT AT THIS TIME IT'S NOT BEING OFFERED OR ADMITTED

24   INTO EVIDENCE ITSELF.

25

1  **BY MR. KEARNEY:**

2  **Q.**  ALL RIGHT.  AND WE'LL GET TO THE MAP IN A MOMENT.

3  MR. DEGHI, WHEN YOU WENT TO THE SITE ON APRIL THE 6TH,

4  2017, DID YOU HAVE A PLAN THAT YOU WERE GOING TO USE TO -- DID

5  YOU TIME YOUR VISIT?

6  DID YOU -- WHAT DID YOU DO BEFOREHAND IN PREPARATION FOR

7  YOUR TRIP TO THE SITE?

8  **A.**  WELL, OUR OBJECTIVE IN DOING THIS STUDY IN THE FIRST PLACE

9  WAS THE LEAD SCIENTIST CAME TO ME AND ASKED ME IF I WOULD HELP

10  HIM DO A BIRD CENSUS, AN AVIAN COUNT ON THERE.

11  AND THE THOUGHT WAS IF IT COULD BE DEMONSTRATED THAT THE

12  SAME SPECIES OF BIRDS WERE USING THE LANDS ON THE NEWARK

13  PROPERTY THAT WERE USING THE NAVIGABLE WATERWAY ALONG MOWRY

14  SLOUGH, THAT THAT WOULD ESTABLISH SOME SORT OF A BIOLOGICAL

15  CONNECTION THERE.

16  SO ONE THING THAT WE WANTED TO BE VERY CLEAR ABOUT AS WE

17  DESIGNED A PROTOCOL FOR HOW TO COUNT THESE BIRDS IS TO TAKE

18  INTO CONSIDERATION THE... THE DAILY MOVEMENTS OF BIRDS AS IT

19  RELATES TO TIDAL REGIMES.

20  **Q.**  PLEASE TELL US ABOUT THAT.

21  **A.**  YEAH, OKAY.

22  WHAT HAPPENS DURING HIGH TIDE ON THE BAY, THE BIRDS WHO,

23  LIKE SHOREBIRD -- LET'S SAY LOW TIDE.  LET'S START WITH LOW

24  SIDE.

25  LOW TIDE ON THE BIRD OR RECEDING TIDE, THERE'S BIRDS LIKE

1    SHOREBIRDS, FOR INSTANCE.  THOSE ARE BIRDS YOU'VE ALL SEEN IF

2    YOU DRIVE ACROSS THE BAY BRIDGE WITH THE LARGE BILLS STICKING

3    IN THE MUD AND THEY'RE LOOKING FOR WHAT WE CALL BENTHIC

4    INVERTEBRATES, BUT, YOU KNOW, CREEPIE CRAWLERS, WORMS, AND

5    THAT SORT OF THING.

6    **Q.**  I'M GOING TO STOP YOU THERE.  THE WORD BEFORE

7    "INVERTEBRATES", IF YOU CAN SPELL IT FOR US, PLEASE?  THAT

8    WOULD BE GREAT.

9    **A.**  BENTHIC, B-E-N-T-H-I-C.

10   **Q.**  ALL RIGHT.

11   **A.**  THE BENTHOS IS THE BOTTOM SEDIMENTS OF THE BAY.

12   **Q.**  ALL RIGHT.

13   **A.**  SO ON A LOW TIDE OR AN OUTGOING TIDE, THESE SHOREBIRDS

14   WHICH FEED ON EXPOSED MUDFLATS AND ON THE MUD ALONG TIDAL

15   CHANNELS AND THINGS ARE FEEDING ON... ARE FEEDING ON THE BAY.

16       AS THE TIDE RISES AND THE MUDFLATS ARE INUNDATED AND

17   COVERED WITH WATER OR THE TIDAL CHANNELS FILL WITH WATER,

18   THESE BIRDS THEN MOVE TO HIGHER GROUND, AND THEY'LL -- LIKE

19   DIKE BAYLANDS AND OTHER PLACES IN SEARCH OF SEASONAL WETLANDS

20   OR OTHER AREAS, TO REST OR TO CONTINUE WITH THEIR FORAGING.

21       SO AS WE WERE DESIGNING A PROTOCOL FOR HOW WE COUNTED OUR

22   BIRD HERE, WE WANTED TO BE SURE THAT WE ACCOUNTED FOR THE FACT

23   THAT THE BIRDS ARE GOING TO BE MOVING BACK AND FORTH FROM ONE

24   AREA TO ANOTHER.

25       SO WE DID TWO SETS OF COUNTS AT EACH OF EIGHT DIFFERENT

1   SITES.  SIX OF THEM WERE INLAND SITES, TWO OF THEM WERE ALONG

2   MOWRY SLOUGH.  WE CAN GET INTO THAT.

3       BUT THE FIRST SET OF... OF DATA, FIRST ROUND TO ALL EIGHT

4   SITES WAS DONE APPROXIMATELY AN HOUR ON EITHER SIDE OF THE

5   HIGH TIDE THAT DAY, WHICH WAS AT 9:50 A.M.  SO WE SHOULD

6   EXPECT DURING THE FIRST RUN THAT THERE WOULD BE FEWER BIRDS IN

7   THE TIDAL CHANNEL AND MORE BIRDS IN THE DIKE BAYLANDS AREA.

8   **Q.**  LET ME STOP YOU THERE FOR A MOMENT, SIR.

9       SO YOU'RE --

10  **A.**  AND VICE VERSA DURING THE SECOND ROUND WHERE THERE WOULD

11  BE....

12  **Q.**  IN GOING TO THE SITE, YOU HAD A CERTAIN KNOWLEDGE THAT

13  WITH LOW TIDE IN THE BAY, BIRDS WOULD BE THERE.  AND AS THE

14  BAY WATER ROSE, IT WOULD GO TO SOMEWHERE TO ESCAPE THE HIGH

15  TIDE.

16      IS THAT A FAIR STATEMENT?

17  **A.**  YEAH, THAT'S A FAIR STATEMENT EXCEPT I WASN'T NECESSARILY

18  THINKING IN TERMS OF THE BAY.  WE WERE THINKING IN TERMS OF

19  THE TIDAL CHANNEL --

20  **Q.**  ALL RIGHT.

21  **A.**  -- MOWRY SLOUGH.  THE EXPOSED MUD ON THE TIDAL CHANNEL IS

22  A MUDFLAT AS WELL.

23      SO DURING THE HIGH TIDE, WE WOULDN'T EXPECT TO SEE THE

24  SHOREBIRDS FORAGING SO MUCH IN MOWRY SLOUGH; MORE SO IN THE

25  INLAND AREA.

DEGHI – DIRECT / KEARNEY

1       ON THE SECOND ROUND, IT WASN'T DURING THE LOW TIDE, IT

2   WAS, YOU KNOW, A COUPLE HOURS LATER, BUT IT WAS A RECEDING

3   TIDE AT MOWRY SLOUGH AND WE WOULD EXPECT MORE OF THE BIRDS TO

4   BE IN... IN THE SLOUGH CHANNEL FORAGING THERE RATHER THAN IN

5   THE LANDS ON THE NEWARK PROPERTY.

6   **Q.**  ALL RIGHT.

7       SO YOU DESIGNED YOUR PROTOCOL TO DO WHAT FIRST?  WERE YOU

8   GOING TO GO LOOK AT THE SLOUGH FIRST OR THE LAND FIRST?

9       HOW DID YOU DO IT, SIR?

10  **A.**  WE JUST ASCERTAINED THAT AS WE GOT TO THE SITE.  WHERE DO

11  YOU WANT TO START?

12      WE JUST FIGURED THE FIRST SET OF READINGS, THE FIRST EIGHT

13  COUNTS, THE EIGHT SITES, WOULD BE DONE SURROUNDING THE HIGH

14  TIDE.  AND THEN THE NEXT COUPLE OF -- SEVERAL HOURS LATER THE

15  NEXT ROUND OF COUNTS WOULD BE DONE DURING THE RECEDING TIDE.

16  **Q.**  OKAY.

17      THERE'S A LASER POINTER THERE, WHICH IS A LITTLE -- WORKS,

18  IT DOESN'T WORK SOMETIMES.

19      CAN YOU SHOW US GENERALLY SPEAKING WHERE YOU MADE YOUR

20  FIRST SET OF COUNTS ON APRIL THE 6TH, 2017?

21  **A.**  WE STARTED OUT HERE (INDICATING) THEN WORKED OUR WAY

22  AROUND.  THE COUNTS THAT WE DID WERE SIX ON THE NEWARK

23  PROPERTY, ONE AT THE NORTH FILL AREA, ONE ALONG TRIBUTARY 1,

24  ONE AT THE SOUTH FILL AREA, ONE AT THE EAST END OF TRIBUTARY

25  A, ONE AT THE WEST END OF TRIBUTARY A, AND ONE ALONG THE

```
 1    LENGTH OF TRIBUTARY B, WHICH IS ON THE OTHER SIDE OF THE LEVEE

 2    FROM MOWRY SLOUGH.  AND THEN TWO READINGS AT MOWRY SLOUGH.

 3    ONE BETWEEN TRIBUTARY 1 AND TRIBUTARY A AND THEN ANOTHER ONE

 4    FROM TRIBUTARY A DOWN TO THE END OF THE PROPERTY.

 5        SO THOSE WERE OUR EIGHT COUNTS.

 6    Q.  OKAY.  AND DID YOU GO TO THOSE EIGHT LOCATIONS AND MAKE

 7    OBSERVATIONS?

 8    A.  YES.

 9    Q.  AND DID YOU RECORD THOSE OBSERVATIONS ON A SUMMARY CHART,

10    SIR?

11    A.  I RECORDED THEM IN A NOTEBOOK AND TRANSFERRED THEM TO A

12    CHART, YES.

13    Q.  FAIR ENOUGH.

14            MR. KEARNEY:  YOUR HONOR, I HAVE IN MY HAND

15    EXHIBIT 894-0003.  IT'S TWO PAGES.  ENDS -004.

16        MAY I APPROACH THE WITNESS?

17            THE COURT:  YOU MAY.

18                (EXHIBIT HANDED TO WITNESS.)

19    BY MR. KEARNEY:

20    Q.  MR. DEGHI, IS THAT A COPY OF THE SUMMARY CHART YOU

21    PREPARED OF YOUR BIRD SIGHTINGS ON THE DAY IN QUESTION?

22    A.  IT IS.

23    Q.  AND YOU PREPARED THIS YOURSELF, SIR; IS THAT RIGHT?

24    A.  I DID.

25            MR. KEARNEY:  MAY WE ADMIT THIS EXHIBIT INTO EVIDENCE
```

```
 1    AT THIS TIME?

 2              MR. SMOCK:  NO OBJECTION.

 3              THE COURT:  894-003 TO -4 IS ADMITTED.

 4         (GOVERNMENT'S EXHIBIT 894-003 TO 4 RECEIVED IN EVIDENCE)

 5              MR. KEARNEY:  MAY WE PUBLISH THIS?

 6              THE COURT:  YOU MAY.

 7                   (DISPLAYED ON SCREEN.)

 8              MR. KEARNEY:  I WONDER IF WE CAN LOOK AT THE UPPER

 9    HORIZONTAL AXIS FOR A MOMENT, AGENT SU, IF WE MAY.

10    BY MR. KEARNEY:

11    Q.  CAN YOU SEE THAT HORIZONTAL UPPER AXIS SHADED ORANGE ON

12    YOUR DIAGRAM, SIR, OR ON THE SCREEN?

13    A.  YES.

14    Q.  I WONDER IF YOU CAN WALK US THROUGH, MAYBE LEFT TO RIGHT,

15    WHAT WE ARE LOOKING AT THERE.

16    A.  WELL, HERE IS ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN,

17    EIGHT.  THE EIGHT SITES WHERE WE COUNTED BIRDS.

18         THE NORTH FILL AREA, TRIBUTARY 1, SOUTHERN FILL AREA, THE

19    EAST AND WEST ENDS OF TRIBUTARY A, TRIBUTARY B.  THOSE ARE THE

20    INLAND SITES AND THEN THE TWO SITES -- THE TWO REACHES OF

21    MOWRY SLOUGH THAT I MENTIONED, ONE HERE AND ONE HERE

22    (INDICATING).

23    Q.  ALL RIGHT.  SO THE -- I AM SORRY, DO YOU WANT --

24                   (SIMULTANEOUS COLLOQUY.)

25    A.  THOSE ARE THE EIGHT SITES THAT WE LOOKED AT.  UNDER EACH
```

DEGHI – DIRECT / KEARNEY

```
1    ONE OF THOSE ARE TWO READINGS.

2        AND THE LEFT-HAND COLUMN WOULD BE THE FIRST ROUND OF

3    VISITS THAT WE DID TO THE EIGHT SITES, THE COUNTS FROM THE

4    FIRST ROUND, AND THEN THE SECOND COLUMN UNDER EACH ENTRY IS

5    THE BIRD COUNT FOR THE SECOND ROUND.

6        SO THE FIRST COLUMN WOULD BE INDICATIVE OF THE... OF WHAT

7    WE SAW DURING THE HIGH TIDE AT MOWRY SLOUGH AND THE SECOND

8    COLUMN WOULD BE WHAT WE SAW HERE, FOR INSTANCE, AT THE

9    NORTHERN FILL AREA ON THE RECEDING TIDE AT MOWRY SLOUGH.

10   Q.  SO THAT'S THE HORIZONTAL AXIS, MR. DEGHI.  HOW ABOUT THE

11   VERTICAL AXIS OF --

12   A.  THE VERTICAL AXIS RUNNING ONTO THE SECOND PAGE IS... A

13   LIST OF ALL THE BIRDS THAT WE PLOT DURING OUR APPROXIMATELY

14   SIX HOURS OUT THEIR COUNTING BIRDS.

15   Q.  AND I KNOW YOU'VE COUNTED THESE.  HOW MANY DIFFERENT TYPES

16   OF BIRD DID YOU IDENTIFY DURING YOUR -- HOW MANY HOURS WERE

17   YOU THERE, SIR?

18   A.  WELL, WE WERE THERE EARLY IN THE MORNING UNTIL -- PROBABLY

19   SIX HOURS.

20   Q.  HOW MANY SPECIES, DIFFERENT SPECIES OF BIRDS DID YOU

21   IDENTIFY DURING THAT TIME PERIOD?

22   A.  THIRTY-THREE.

23   Q.  DOES THAT STRIKE YOU AS A LOT, A LITTLE?

24       IS THAT A HEALTHY NUMBER?

25       HOW WOULD YOU CHARACTERIZE THAT?
```

DEGHI - DIRECT / KEARNEY

1   **A.**  NOTHING UNUSUAL.  A KNOWLEDGEABLE OBSERVER SHOULD BE ABLE

2   TO GO ANYWHERE AROUND THE BAY AND BE ABLE TO SEE THAT MANY

3   BIRDS OVER THE COURSE OF THAT PERIOD OF TIME.

4   **Q.**  OKAY.

5   **A.**  IN A... IN A BAYLAND SETTING.

6   **Q.**  ALL RIGHT.

7   WERE THERE BROAD CATEGORIES, SIR, OF BIRDS AMONG THESE 33

8   SPECIES THAT YOU IDENTIFIED?

9   CAN THEY BE SEPARATED INTO BROAD CATEGORIES?

10  **A.**  THEY CAN.  I WOULD START WITH THE... WITH THE BIRDS THAT

11  ARE MORE OR LESS ADAPTED TO AQUATIC HABITATS.  SOME OF THOSE

12  ARE, FOR INSTANCE, WATERFOWL.  WATERFOWL ARE DUCKS AND GEESE

13  AND SWANS.  THEY DON'T HAVE SWANS HERE.

14  BUT THERE ARE DUCKS AND GEESE THAT WERE ENCOUNTERED DURING

15  OUR STUDY.  CANADA GOOSE.  AND THEN DUCKS, SUCH AS THE

16  GADWALL, AMERICAN WIGEON, MALLARD, GREEN-WINGED TEAL, RUDDY

17  DUCK.

18  SO THERE WERE WATERFOWL.  THERE WAS ALSO SHOREBIRDS.  I

19  MENTIONED SHOREBIRDS EARLIER.  THEY'RE THE ONES WITH THE LONG

20  BILLS EATING STUFF OUT OF THE MUD.  AND THE SHOREBIRDS HERE

21  INCLUDED BIRDS LIKE BLACK-NECKED STILT, AMERICAN AVOCET,

22  KILLDEER, LEAST SANDPIPER, LONG-BILLED DOWITCHER AND GREATER

23  YELLOWLEGS.

24  THOSE OTHER BIRDS THAT WE WOULD CALL WATER BIRDS, BIRDS

25  THAT ARE JUST ADAPTED TO AQUATIC HABITATS.  AND THEY ARE LIKE

DEGHI - DIRECT / KEARNEY

```
 1    EGRETS AND HERONS, AND THINGS OF -- RAILS, THINGS OF THAT
 2    NATURE.
 3         AND WE HAD SOME OF THOSE.  ON THIS LIST THERE'S GREAT
 4    EGRET, THERE'S SNOWY EGRET, THERE'S AMERICAN COOT, THERE'S
 5    PIED-BILLED GREBE.  THERE'S, YOU KNOW, A NUMBER OF WATER
 6    BIRDS.
 7         AND THEN THE OTHER CATEGORY OF BIRDS THAT ARE ADAPTED TO
 8    SORT OF AQUATIC AREAS AND AQUATIC VEGETATION ARE A GROUP OF
 9    PASSERINES.  NOW, PASSERINES ARE BIRDS THAT MOST PEOPLE THINK
10    OF AS BEING SONGBIRDS:  FINCHES, WARBLERS, SPARROWS, ROBINS,
11    THINGS OF THAT NATURE.
12         AND THERE WERE SEVERAL PASSERINES THAT WERE PRETTY MUCH
13    TIED TO THE... TO THE AQUATIC VEGETATION, AND THOSE WERE
14    COMMON YELLOWTHROAT AND SONG SPARROW AND MARSH WREN.
15         NOW, THERE WERE OTHER BIRDS THAT WE ENCOUNTERED TOO THAT
16    AREN'T NECESSARILY ALIGNED WITH AQUATIC AREAS.  WE -- THERE
17    WERE RAPTORS.  THOSE ARE BIRDS OF PREY.  AND WE HAD A
18    SHARP-SHINNED HAWK AND A NORTHERN HARRIER AND A TURKEY VULTURE
19    WHEN WE WERE THERE.
20         THERE'S... AND THEN THERE'S OTHER... OTHER PASSERINES THAT
21    AREN'T ADAPTED TO AQUATIC AREAS.  BIRDS THAT I SEE ON THE LIST
22    HERE LIKE MORNING DOVE AND ANNA'S HUMMINGBIRD AND SAVANNAH
23    SPARROW AND RED-WINGED BLACKBIRD, AND THINGS OF THAT NATURE.
24         SO THESE ARE THE KIND OF BROAD CATEGORIES.
25    Q.   OKAY.  THANK YOU, MR. DEGHI.
```

```
1        YOU SAID THAT GOING IN YOU HAD THE THOUGHT THAT BIRDS

2    TYPICALLY GO FROM A SLOUGH TO LAND WHEN TIDAL -- WHEN THERE

3    ARE TIDAL CHANGES AND MAYBE BACK AGAIN.

4        DID YOU NOTICE DURING YOUR STUDY OF THE NEWARK SITE ANY OF

5    THAT TYPE OF CONNECTIVITY BETWEEN THE LAND AND THE SLOUGH?

6    A.  WELL, FIRST OF ALL, I SHOULD TELL YOU THAT BOTH THE AREAS

7    NEAR THE FILL AREAS ON THE... ON THE NEWARK PROPERTY AND THE

8    AREA WITHIN MOWRY SLOUGH HAVE THE FOOD SOURCES FOR... FOR

9    THESE SPECIES OF BIRDS.

10       SOME OF THEM, THE BENTHIC INVERTEBRATES FOR THE

11   SHOREBIRDS, THE SEEDS AND AQUATIC PLANTS FOR WATERFOWL,

12   INSECTS FOR THE -- FOR MANY OF THE PASSERINES.  AND SO THE

13   FOOD SOURCES ARE THERE IN BOTH LOCATIONS FOR MANY OF THESE...

14   OF THESE SPECIES.

15       YOU WANT -- SAY AGAIN WHAT YOU --

16   Q.  I JUST WANT TO ASK YOU ABOUT CONNECTIVITY.  WAS THERE --

17   A.  RIGHT.

18       SO THE FOOD SOURCES ARE THERE.  AND WE ACTUALLY DID SEE

19   SOME SPECIES THAT OCCURRED IN BOTH AREAS.  THERE WERE

20   WATERFOWL OCCURRING BOTH IN MOWRY SLOUGH AND ON THE... THE

21   NEWARK PROPERTY.  THOSE INCLUDED CANADA GOOSE AND AMERICAN

22   WIGEON AND MALLARD.  THERE WERE SHOREBIRDS.  THESE INCLUDED

23   LEAST SANDPIPER, BLACK-NECKED STILT, AND GREATER YELLOWLEGS.

24       THERE WERE THE MARSH PASSERINES.  THE YELLOWTHROAT --

25   COMMON YELLOWTHROAT, THE SONG SPARROW, AND THE MARSH WREN.
```

1    AND ONE OF THE WATER BIRDS, AN AMERICAN COAT.  ALL OF THESE

2    SPECIES WERE FOUND IN... IN BOTH AREAS.

3        AND IF YOU ARE ASKING ME ABOUT CONNECTIVITY, IT'S NOT JUST

4    THE NATURE THAT THE SPECIES OCCUR IN BOTH AREAS, BUT THERE ARE

5    OTHER SORT OF ECOLOGICAL PARAMETERS THAT WE CAN LOOK AT THAT

6    SORT OF REINFORCE THIS CONNECTIVITY.

7        FOR INSTANCE, A DUCK IN OWN AREA EATING AN AQUATIC PLANT

8    OR EATING THE SEEDS, SAY ON THE NEWARK PROPERTY, MOVES TO

9    THE... TO MOWRY SLOUGH AND DEFECATES AND DEPOSITS THAT SEED

10   OVER THERE.  SO NOW THERE'S A GENUINE CONNECTION THERE WHERE

11   THESE... THESE BIRDS ARE CONTRIBUTING TO THE ECOLOGY OF BOTH

12   AREAS.

13   **Q.**  ALL RIGHT.

14       DID YOU NOTICE -- I JUST -- THE NUMBER THAT JUMPS OUT HERE

15   ON THIS TABLE IS THE LEAST SANDPIPER.  IT'S ABOUT TWO-THIRDS

16   DOWN IN THE VERTICAL COLUMN.  I SEE KIND OF BIG NUMBERS THERE,

17   60, 22.

18       WHAT ARE WE -- WHAT ARE THOSE NUMBERS REPRESENTING, SIR,

19   IF YOU CAN TELL US.

20   **A.**  WELL, ON THE... ON THE FIRST RUN THROUGH DURING THE HIGH

21   TIDE AT MOWRY SLOUGH, THERE WERE 60 LEAST SANDPIPERS NEAR THE

22   NORTH FILL AREA.  AND THEN LATER, WHEN WE CAME BACK DURING THE

23   RECEDING TIDE AT MOWRY SLOUGH AND ON THE BAY, THE NUMBER

24   DROPPED FROM 60 TO 22.

25       THIS IS EXACTLY WHAT YOU WOULD EXPECT.  THIS IS INDICATIVE

1  OF, YOU KNOW, THE BIRDS ROOSTING AT MORE INLAND LOCATIONS

2  ADJACENT TO THE BAY WHEN IT'S HIGH TIDE IN THE BAY AND IN THE

3  SLOUGH CHANNELS AND THEN LEAVING THAT AREA.

4      NOW, YOU MIGHT NOTICE THEY DIDN'T -- THEY DIDN'T SHOW UP

5  LATER IN MOWRY SLOUGH, BUT THEY OBVIOUSLY DID GO ELSEWHERE.

6  THEY WENT OUT ON THE BAY SOMEPLACE AND FOUND A MUDFLAT TO

7  FORAGE.

8  **Q.**  SO THEY WERE AFFECTED, IN YOUR ESTIMATION, BY TIDAL

9  CHANGES IN MOWRY SLOUGH; IS THAT A FAIR STATEMENT?

10  **A.**  BY TIDAL EXCHANGE -- TIDAL CHANGES ON MOWRY SLOUGH AND THE

11  BAY, YEAH.

12  **Q.**  AND THAT SWITCHING OF POSITIONS WITH -- BETWEEN TIDAL

13  CHANGES IS EXACTLY WHAT YOU HAVE WITNESSED DURING YOUR CAREER

14  WITH THIS TYPE OF SHOREBIRD; IS THAT A FAIR STATEMENT?

15  **A.**  IT'S A FAIR STATEMENT.  I WOULD JUST EXTRAPOLATE THAT YOU

16  SEE THE SAME THING WITH THE GREATER YELLOWLEGS.  THERE WERE

17  FIVE AND THEN LATER THERE WAS ONLY ONE.

18      AS FAR AS SEEING THE SORT OF PHENOMENON OCCUR IN MY

19  CAREER, IT'S THE IDEA THAT THE BIRDS MOVE FROM THE MUDFLATS AT

20  RECEDING TIDES OR LOW TIDES TO INLAND AREAS DURING... DURING

21  HIGH TIDES IS A WELL-DOCUMENTED AND WELL-STUDIED PHENOMENON

22  THAT IS WRITTEN ABOUT IN THE LITERATURE.  AND EVEN THE CASUAL

23  OBSERVER CAN PROBABLY OBSERVE.

24      YES, I WITNESSED THIS MANY TIMES.  JUST THINKING ABOUT

25  THIS, I RECALL ONE TIME A FEW YEARS AGO WORKING ON A PROPERTY

```
 1    NOT TOO FAR FROM HERE AT DAMON SLOUGH OVER BY THE OAKLAND
 2    COLISEUM WHERE I WAS WORKING AT AN INLAND SORT OF DIKED
 3    BAYLANDS SITE THAT THERE WERE LITERALLY THOUSANDS OF
 4    SHOREBIRDS WHEN I WAS THERE DURING THE HIGH TIDE ON THE BAY.
 5    AND A FEW HOURS LATER THERE WAS HARDLY ANY BIRDS.  YOU CAN
 6    WITNESS THIS.
 7    Q.  SO THE -- WHAT YOU SAW ON YOUR ANALYSIS AT THE NEWARK AREA
 8    SITE WAS CONSISTENT WITH YOUR VAST EXPERIENCE AND YOUR
 9    EXPECTATION; IS THAT A FAIR STATEMENT?
10    A.  ABSOLUTELY.
11    Q.  ALL RIGHT.
12        I DO WANT TO ASK YOU ONE THING.  DID YOU ACTUALLY WATCH
13    MOWRY SLOUGH GO DOWN?
14    A.  NO, I DIDN'T STAND THERE AND WATCH THE TIDE RECEDING, BUT
15    I DID NOTICE FROM THE FIRST -- YOU KNOW, WE WERE AT MOWRY
16    SLOUGH FIRST AROUND TEN IN THE MORNING AND THEN LATER, ALMOST
17    AFTERNOON, AND THERE WERE OBSERVABLE DIFFERENCES IN TIDAL
18    REGIME.
19    Q.  I WANT TO ASK YOU, SIR, AT THE LOWER REACHES OF THE MOWRY
20    SLOUGH WHEN IT WENT DOWN, WERE THERE MUDFLATS EXPOSED LIKE THE
21    ONES YOU'RE TALKING ABOUT THAT SHOREBIRDS FEED ON AT LOW TIDE?
22    A.  YES.
23    Q.  OKAY.
24    A.  YEAH.
25    Q.  ALL RIGHT.
```

1   **A.**  ALONG THE SIDES OF THE TIDAL CHANNEL.

2   **Q.**  IN YOUR ESTIMATION, DOES WHAT YOU OBSERVED THERE ON

3   APRIL 6, 2017 ESTABLISH A BIOLOGICAL CONNECTION BETWEEN THE

4   NEWARK PROPERTY AND THE SLOUGH?

5   **A.**  I BELIEVE IT DOES.  THE... MANY OF THE SAME SPECIES WERE

6   OCCURRING IN BOTH LOCATIONS.  THE FOOD SOURCES FOR THE SPECIES

7   OCCUR AT BOTH LOCATIONS.  AND THERE ARE THESE OTHER ECOLOGICAL

8   PARAMETERS THAT ARE AFFECTED BY THE BIRDS MOVING BACK AND

9   FORTH BETWEEN THE TWO AREAS.

10  **Q.**  WHAT ARE THOSE ECOLOGICAL PARAMETERS?

11  **A.**  THE EXAMPLE I GAVE WAS THE DEFECATING DUCK DEPOSITING THE

12  SEED THAT HE PICKED UP ONE PLACE AND DEPOSITING IT SOMEPLACE

13  ELSE.

14  **Q.**  ALL RIGHT.  SOUNDS GOOD, SIR.

15       **MR. KEARNEY:**  THANK YOU, YOUR HONOR.  NO FURTHER

16  QUESTIONS.

17       **THE COURT:**  ANY CROSS-EXAMINATION?

18                    **CROSS-EXAMINATION**

19  BY MR. SMOCK:

20  **Q.**  GOOD AFTERNOON, MR. DEGHI.

21       JUST TO BE CLEAR, ON THAT CHART THERE WAS REFERENCE TO

22  SOMETHING THAT WAS REFERRED TO AS TRIBUTARY 1 AND TRIBUTARY A

23  AND TRIBUTARY B?

24  **A.**  YEAH.

25  **Q.**  THOSE ARE NAMES GIVEN TO AREAS ON THIS PROPERTY THAT WERE

1   CREATED BY TERRY HUFFMAN, CORRECT?

2   **A.**  OKAY.  I... I DON'T KNOW SPECIFICALLY THE ANSWER TO THAT,

3   BUT IT MAY BE TRUE.

4   **Q.**  OKAY.

5       SO YOU'RE AWARE THEN THAT NO OTHER SCIENTIST BEFORE HIM

6   HAS EVER USED THOSE WORDS TO DESCRIBE --

7           **MR. KEARNEY:**  OBJECTION, YOUR HONOR.  THIS IS

8   HEARSAY.  IMPROPER INADMISSIBLE HEARSAY FOR THIS WITNESS.

9           **MR. SMOCK:**  I WILL WITHDRAW THE QUESTION.

10          **THE COURT:**  SUSTAINED.

11          **MR. SMOCK:**  THANK YOU.

12          **THE COURT:**  ANY REDIRECT?

13          **MR. KEARNEY:**  NO, YOUR HONOR.  THANK YOU.

14          **THE COURT:**  THANK YOU, MR. DEGHI.  YOU ARE EXCUSED.

15      UNITED STATES MAY CALL ITS NEXT WITNESS.

16          **MS. LEE:**  UNITED STATES CALLS DR. PATRICK BOURSIER.

17   HE'S ON HIS WAY.

18                  (PAUSE IN THE PROCEEDINGS.)

19          **THE COURT:**  MS. LEE, IS SOMEONE ACTUALLY RETRIEVING

20   HIM?

21          **MS. LEE:**  YES, SOMEONE IS RETRIEVING HIM.

22          **THE COURT:**  ALL RIGHT.

23          **THE CLERK:**  IF YOU CAN COME UP TO THE WITNESS STAND,

24   PLEASE, AND RAISE YOUR RIGHT HAND.

25      STAND AND RAISE YOUR RIGHT HAND.

1    (**PATRICK BOURSIER,** CALLED AS A WITNESS FOR THE GOVERNMENT,

2  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

3         **THE WITNESS:** I DO.

4         **THE CLERK:** YOU MAY BE SEATED, AND ONCE SEATED, I'M

5  GOING TO ASK YOU THAT YOU STATE AND SPELL YOUR FIRST AND LAST

6  NAME FOR THE RECORD, PLEASE.

7         **THE WITNESS:** ALL RIGHT. PATRICK --

8         **THE CLERK:** YOU CAN HAVE A SEAT.

9         **THE WITNESS:** PARDON? TOO MANY DIRECTIONS.

10     PATRICK BOURSIER, P-A-T-R-I-C-K. LAST NAME B- AS IN BOY,

11  O-U-R-S-I-E-R.

12         **THE CLERK:** THANK YOU.

13                    **DIRECT EXAMINATION**

14  **BY MS. LEE:**

15  **Q.** GOOD MORNING (SIC), DR. BOURSIER.

16  **A.** GOOD MORNING (SIC).

17  **Q.** WHAT DO YOU CURRENTLY DO FOR A LIVING?

18  **A.** PARDON?

19  **Q.** WHAT DO YOU CURRENTLY DO FOR A LIVING?

20  **A.** I'M RETIRED.

21  **Q.** WHEN DID YOU RETIRE?

22  **A.** APPROXIMATELY A YEAR AGO. END OF FEBRUARY 2017.

23  **Q.** WHERE WERE YOU WORKING PRIOR TO RETIREMENT?

24  **A.** AT THE FIRM, A PRIVATE FIRM BY THE NAME OF H.T. HARVEY AND

25  ASSOCIATES. THEY ARE LOCATED IN, THE MAIN OFFICE, IN SAN

BOURSIER - DIRECT / LEE

1    JOSE.

2    **Q.**  WHAT TYPE OF WORK DOES H.T. HARVEY AND ASSOCIATES DO?

3    **A.**  IT'S A ECOLOGICAL CONSULTING FIRM COMPRISED OF WILDLIFE

4    BIOLOGISTS, PLANT BIOLOGISTS, SUCH AS MYSELF, RESTORATION

5    BIOLOGISTS, AND HYDROLOGISTS.

6    **Q.**  WHAT WAS --

7    **A.**  I SHOULD SAY LANDSCAPE ARCHITECTS.

8    **Q.**  ALSO LANDSCAPE ARCHITECTS?

9    **A.**  UH-HUH.

10   **Q.**  WHAT WAS YOUR POSITION THERE WHEN YOU LEFT?

11   **A.**  WHEN I LEFT I WAS A PRINCIPAL AND DIVISION HEAD,

12   BASICALLY, OF THE PLANT SCIENCES GROUP AT HARVEY'S.

13   **Q.**  HOW LONG HAD YOU WORKED AT HARVEY?

14   **A.**  APPROXIMATELY 26 YEARS.

15   **Q.**  AS AN EMPLOYEE OF HARVEY, AND I GUESS ULTIMATELY A

16   PRINCIPAL THERE, WHAT WERE YOUR DUTIES AND RESPONSIBILITIES?

17   **A.**  PRIMARILY TRAINING, HIRING AND TRAINING NEW STAFF.

18       AND I WAS IN THE PLANT SCIENCES GROUP, AND THE PRIMARY

19   DUTIES OF THAT GROUP WERE DOING THINGS LIKE ENVIRONMENTAL

20   IMPACT REPORTS, ENVIRONMENTAL IMPACT STATEMENTS, WETLAND

21   ASSESSMENTS, WETLAND DELINEATIONS.  AND THEN FUN STUFF, RUN

22   PLANT SURVEYS, FEASIBILITY FOR RESTORATION, AND A LOT OF

23   PERMITTING, PERMIT PROCESSING AND APPLICATION PREPARATION FOR

24   VARIOUS STATE AND FEDERAL AGENCIES.

25   **Q.**  APPROXIMATELY HOW MANY WETLAND DELINEATIONS DID YOU

1   PERFORM OR OVERSEE DURING YOUR TIME AT H.T. HARVEY?

2   **A.**  OVER A HUNDRED CONSERVATIVELY.  AT LEAST A HUNDRED, 130,

3   IN THAT NEIGHBORHOOD.

4   **Q.**  ARE YOU FAMILIAR WITH THE CLEAN WATER ACT?

5   **A.**  YES.

6   **Q.**  ARE YOU FAMILIAR WITH THE PHRASE "WATERS OF THE UNITED

7   STATES"?

8   **A.**  YES, I AM.

9   **Q.**  AS PART OF YOUR ROLE AT H.T. HARVEY, WAS IT PART OF YOUR

10  JOB TO MAKE PRELIMINARY JURISDICTIONAL DETERMINATIONS TO

11  SUBMIT TO THE ARMY CORPS OF ENGINEERS ON A PROPERTY THAT YOU

12  DETERMINED TO CONTAIN POTENTIAL "WATERS OF THE UNITED STATES"?

13  **A.**  YES, IT DID.

14  **Q.**  SO WOULD IT BE FAIR TO SAY THAT IN ADDITION TO PERFORMING

15  WETLAND DELINEATIONS THAT, IN FACT, THESE DELINEATIONS

16  SHOWCASED H.T. HARVEY'S WORK ON WHAT WERE POTENTIAL

17  JURISDICTIONAL WETLANDS?

18  **A.**  UH-HUH.  CORRECT.

19  **Q.**  OKAY.

20      IN YOUR PAST DELINEATIONS, WHAT TYPE OF LANDS AND WATERS

21  HAVE YOU DETERMINED TO CONTAIN POTENTIAL "WATERS OF THE UNITED

22  STATES"?

23  **A.**  WOULD YOU CLARIFY WHAT SORT OF LAND?

24  **Q.**  IN YOUR PAST DELINEATIONS, YOU MENTIONED YOU'VE DONE MORE

25  THAN A HUNDRED.  WHAT TYPES OF LANDS AND WATER BODIES HAVE YOU

1   DETERMINED TO CONTAIN POTENTIAL "WATERS OF THE UNITED STATES"?

2   **A.**  WELL, MOST OF OUR WORK, IF I UNDERSTAND YOUR QUESTION, THE

3   PROJECTS WERE WITHIN THE SAN FRANCISCO BAY REGION, ALTHOUGH

4   WE'VE HAD NUMEROUS IN THE CENTRAL VALLEY AND IN CENTRAL AND

5   SOUTHERN CALIFORNIA AS WELL.

6       AND THEY SPAN FROM HABITAT TYPES THAT MOST PEOPLE ARE

7   FAMILIAR WITH LIKE THE TIDAL MARSHES OF THE SAN FRANCISCO BAY,

8   CATTAIL MARSHES, THINGS THAT ARE VERY OBVIOUS, BUT ALSO OTHER

9   HABITAT TYPES OF JURISDICTIONAL WATERS LIKE, THINGS LIKE

10  VERNAL POOLS WHICH ARE SORT OF TOPOGRAPHIC DEPRESSIONS, VERY

11  EPHEMERAL, VERY SEASONAL.  AND A NUMBER OF OTHER HABITAT TYPES

12  SCATTERED THROUGHOUT THE CENTRAL VALLEY AND SOUTHERN

13  CALIFORNIA.

14  **Q.**  WOULD THEY INCLUDE JURISDICTIONAL WETLANDS?

15  **A.**  PARDON?

16  **Q.**  IN TERMS OF YOUR PAST DELINEATIONS OF TYPES OF PROPERTY

17  THAT CONTAIN "WATERS OF THE UNITED STATES", DID THEY INCLUDE--

18  JURISDICTIONAL WETLANDS?

19  **A.**  YES, DEFINITELY.

20  **Q.**  JURISDICTIONAL TRIBUTARIES?

21  **A.**  UH-HUH.

22  **Q.**  IF YOU CAN ANSWER WITH "YES" OR "NO".

23      YES, RIGHT?

24  **A.**  YES.  I'M SORRY ABOUT THAT.

25      I SHOULD ALSO CLARIFY THAT THOSE ARE -- THE WETLANDS WERE

BOURSIER – DIRECT / LEE

1   OF A SEASONAL TYPE OR PERENNIAL TYPE.  THEY WEREN'T JUST ONE

2   CATEGORY.

3   **Q.**  CAN SEASONAL WETLANDS BE CONSIDERED "WATERS OF THE UNITED

4   STATES"?

5   **A.**  OH, YES.

6   **Q.**  WHAT ABOUT SEASONAL TRIBUTARIES?  COULD THEY BE CONSIDERED

7   "WATERS OF THE UNITED STATES"?

8   **A.**  YES.

9   **Q.**  AND WHAT DOES SEASONAL MEAN?

10  **A.**  A SEASON REFERS SPECIFICALLY TO THE HYDROLOGY.  IT JUST

11  SIMPLY MEANS WATER ON THE SURFACE OR FLOWING WATER WITHIN

12  DRAINAGES THAT ISN'T PERENNIAL.  IT'S THERE FOR, AS AN

13  EXAMPLE, TWO MONTHS OR THREE MONTHS, GENERALLY DURING THE

14  RAINFALL SEASON, AND THEN THAT SAME FEATURE MIGHT DRY UP.

15      THIS IS THE MEDITERRANEAN CLIMATE.  IT FOLLOWS A

16  DISTRIBUTION OF RAINFALL EVENTS IN THIS STATE WHICH ARE

17  GENERALLY, MAYBE OCTOBER OR NOVEMBER WHEN THE RAINFALL SEASON

18  STARTS, UNTIL THAT DRIES MAYBE APRIL OR MAY.

19  **Q.**  SO THE RAINY SEASON IN THIS MEDITERRANEAN CLIMATE, WHAT

20  MONTHS DO THOSE COVER?

21  **A.**  THE ONE I MENTIONED ARE GENERALLY... GENERALLY WE GET

22  RAINS IN NOVEMBER.  IF YOU LOOK BACK AT AVERAGE RAINFALL

23  EVENTS ON THE SITE, AND THEY DISAPPEAR.  YOU MIGHT GET

24  RAINFALL IN APRIL, I THINK IN MOST YEARS POSSIBLY MAY.

25  **Q.**  SO THE RAIN -- WOULD IT BE FAIR TO SAY THE RAINY SEASON IS

1    ABOUT FROM NOVEMBER TO APRIL OR MAY?

2    **A.**   YES.

3    **Q.**   AND THEN THE DRY SEASON KICKS IN AROUND MAY TO OCTOBER?

4    **A.**   DEFINITELY.

5    **Q.**   DOES THAT MEAN THAT THE SEASONAL WETLANDS DURING THE DRY

6    MONTHS OR NO LONGER "WATERS OF THE UNITED STATES" DURING THE

7    DRY MONTHS?

8    **A.**   NO.  NO, THEY ARE STILL REGULATED AND THEY'RE STILL

9    JURISDICTIONAL WATERS REGARDLESS.

10   **Q.**   WHAT ABOUT WITH RESPECT TO SEASONAL TRIBUTARIES THAT MAY

11   BE RUNNING FROM THOSE MONTHS, NOVEMBER TO APRIL, BUT DRY UP IN

12   MAY TO OCTOBER; WOULD THOSE TRIBUTARIES THAT WOULD BE RUNNING

13   DRY DURING DRY MONTHS NO LONGER BE CONSIDERED "WATERS OF THE

14   UNITED STATES" IN YOUR OPINION?

15   **A.**   NO, THEY WOULD STILL BE CONSIDERED JURISDICTIONAL WATERS.

16   **Q.**   AND WE ARE GOING TO COME BACK TO THAT LATER SO YOU CAN

17   EXPLAIN FURTHER WHY YOU SAY THAT, BUT BEFORE GETTING TO THAT,

18   I WOULD LIKE TO ASK YOU A LITTLE BIT ABOUT YOUR EDUCATIONAL

19   BACKGROUND.

20       CAN YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR THE JURY?

21   **A.**   SURE.

22       I STAYED AT UC DAVIS FOR THREE DEGREES.  FIRST DEGREE IN

23   BIOLOGICAL SCIENCES, WHICH IS A GENERAL BIOLOGICAL DEGREE.

24       AND THE NEXT DEGREE WAS A MASTER OF SCIENCE IN AGRONOMY

25   AND RAIN SCIENCE.  RIGHT AFTER MY -- I GOT MY BACHELOR'S, I

BOURSIER – DIRECT / LEE

1   WORKED FOR THREE YEARS FOR THE BUREAU OF LAND MANAGEMENT.  AND

2   THAT'S A FEDERAL AGENCY THAT IS TASKED WITH PROVIDING PUBLIC

3   LANDS FOR MULTIPLE USES, NOT ONLY MINING AND FORESTRY, BUT

4   ALSO RECREATIONAL PURPOSES.  AND SO THERE I WORKED AND BECAME

5   FAMILIAR AND INTERESTED IN MANAGING PUBLIC LANDS FOR THE

6   PUBLIC GOOD.

7       SO I WENT BACK AND GOT MY MASTER'S IN AGRONOMY AND RAIN

8   SCIENCE.  AND THE AGRONOMY COMPONENT OF THAT SIMPLY REFERS

9   TO -- REFERS TO CEREAL GRAINS IN GENERAL.  IT COULD BE BARLEY

10  OR WHEAT, BUT ALSO ALFALFA.

11      THOSE TWO AREAS, THOSE TWO BIOLOGICAL AREAS ARE SORT OF

12  CLOSELY TIED, IF YOU WILL.  A LOT OF RANGE LANDS ARE USED ALSO

13  FOR PROVIDING GROWING CROPS FOR PRODUCTION OF... FOR BEEF.  SO

14  THAT'S WHY MY DEGREE -- THAT MASTER'S DEGREE IS IN THOSE TWO

15  CATEGORIES.

16      I THEN STAYED ON AND GOT A PH.D. IN PLANT PHYSIOLOGY AND

17  WITH THE STRONG EMPHASIS IN SOIL SCIENCE.  THE PARTICULAR

18  DIVISION OR DEPARTMENT AT UC DAVIS I WAS IN IS CALLED THE

19  LAND, AIR, WATER RESOURCES DEPARTMENT.

20      AND BECAUSE I WAS IN THAT DEPARTMENT, YOU WERE REQUIRED TO

21  TAKE A LOT OF SOIL MORPHOLOGIES, SOIL CHEMISTRY CLASSES, AND

22  THOSE SORTS OF THINGS.

23      AFTER I GRADUATED IN '87, I DID A TWO-YEAR POST-DOCTORAL

24  STUDY DOING PLANT SCIENCE RESEARCH AT THE OREGON STATE

25  UNIVERSITY AT THE LAB FOR NITROGEN FIXATION RESEARCH.

BOURSIER – DIRECT / LEE

1    AND THAT WAS FOLLOWED UP BY ANOTHER TWO-YEAR POST-DOCTORAL

2    STUDY WHERE I WORKED DOING PLANT SCIENCE RESEARCH AT THE

3    UNIVERSITY OF SUSSEX IN BRIGHTON, ENGLAND, CAME BACK, AND THEN

4    STARTED -- CAME BACK IN '91, AND STARTED AT H.T. HARVEY RIGHT

5    AFTER THAT.

6    **Q.**   AND YOU WERE AT H.T. HARVEY FROM 1991 TO ABOUT 2017?

7    **A.**   UH-HUH.

8    **Q.**   DURING YOUR TIME THERE, YOU HAD DONE MORE THAN A HUNDRED

9    WETLAND DELINEATIONS?

10   **A.**   RIGHT.

11       **MS. LEE:**   YOUR HONOR, AT THIS TIME I WOULD LIKE TO

12   QUALIFY DR. BOURSIER AS AN EXPERT IN WETLAND DELINEATION AS

13   WELL AS PLANT ECOLOGY.

14       **THE COURT:**   ANY OBJECTION?

15       **MS. HANSEN:**   NO OBJECTION.

16       **THE COURT:**   ALL RIGHT.  SO, LADIES AND GENTLEMEN,

17   DR. BOURSIER WILL BE PERMITTED TO OFFER TESTIMONY AS TO HIS

18   OPINIONS AND THE REASONS FOR HIS OPINIONS IN THOSE AREAS.

19   **BY MS. LEE:**

20   **Q.**   DR. BOURSIER IS H.T. HARVEY AND ASSOCIATES A PRIVATE

21   COMPANY?

22   **A.**   YES.  IT HAS BEEN A PRIVATE COMPANY.

23       JUST A LITTLE BIT OF BACKGROUND HISTORY.  IT WAS FORMED BY

24   FOUR PROFESSORS FROM SAN JOSE STATE.  IT WAS MORE OR LESS A

25   HOBBY AND THEN DEVELOPED.  THAT WAS IN THE EARLY '70S AND IT

1    SORT OF EVOLVED INTO A PRIVATE BUSINESS AFTER THAT.

2        WE ARE HIRED, "WE" MEANING HARVEY AND ASSOCIATES -- I'M

3    STILL AN ASSOCIATE THERE EVEN THOUGH I'M RETIRED AND I'M

4    PULLED IN OCCASIONALLY ON PROJECTS.  BUT WE, AT THE FIRM, THEY

5    DO APPROXIMATELY OVER MY TENURE THERE MAYBE 50 PERCENT OF OUR

6    PROJECTS WERE FOR PUBLIC AGENCIES AND 50 PERCENT WERE FOR

7    PRIVATE.

8        SO PUBLIC AGENCIES CAN BE LIKE THE ALAMEDA FLOOD CONTROL

9    DISTRICT OR SANTA CLARA VALLEY WATER DISTRICT.  PRIVATE

10   DEVELOPERS, I HAVE DONE A LOT OF WORK ON PROPOSED GOLF COURSES

11   OR RESIDENTIAL DEVELOPMENTS OR COMMERCIAL DEVELOPMENTS.

12       AND WITHIN THE LAST FIVE YEARS A LOT OF WORK FOR CALTRANS

13   ON WIDENING THE MUCH NEEDED INTERCHANGE AT 680, 80, 12, AND

14   HIGHWAY 880 WIDENING.  SO THOSE SORTS OF PROJECTS.

15   **Q.**  IS H.T. HARVEY ASSOCIATED AT ALL WITH THE GOVERNMENT?

16   **A.**  WHAT?

17   **Q.**  IS H.T. HARVEY AND ASSOCIATES AFFILIATED OR ASSOCIATED

18   WITH THE GOVERNMENT?

19   **A.**  NO, NOT AT ALL.  IT'S A PRIVATE ENTITY COMPLETELY SEPARATE

20   FROM ANY STATE OR FEDERAL AGENCY.

21   **Q.**  LET'S TALK ABOUT WITH RESPECT TO THE 50 PERCENT OF WORK

22   THAT YOU DO FOR PRIVATE ENTITIES.

23   **A.**  UH-HUH.

24   **Q.**  WOULD IT BE FAIR TO SAY THAT OF THOSE PRIVATE ENTITIES,

25   THEY INCLUDE REAL ESTATE DEVELOPERS WHO HIRE YOUR FIRM TO HELP

1    THEM DETERMINE THE BOUNDARIES OF A PROPERTY, AND WHETHER THERE

2    ARE JURISDICTIONAL WATERS ON THAT PROPERTY TO SEE WHERE THEY

3    CAN AND CANNOT DEVELOP?

4    **A.**   RIGHT.   THAT'S COMMONLY IN THE INDUSTRY.   IT'S COMMONLY

5    REFERRED TO AS A DUE DILIGENCE PERIOD.

6        SAY IF SOMEBODY WANTS TO -- HAS AN OPTION TO BUY A HUNDRED

7    ACRES.   THEY HIRE US.   THEY ALSO HIRE, YOU KNOW, TOXICOLOGISTS

8    AND GEOLOGISTS AND WHOMEVER ELSE.   WHAT WE WOULD BE LOOKING

9    FOR ARE WHAT WE CALL SENSITIVE HABITATS, LIKE WETLANDS OR

10   RIPARIAN HABITATS.   YOU KNOW, SUCH HABITATS THAT ARE REGULATED

11   BY STATE AND FEDERAL AGENCIES.

12       BUT WE ALSO LOOK FOR ENDANGERED SPECIES HABITAT, AND OUR

13   WILDLIFE GROUP IS WELL-VERSED IN LOOKING FOR A WIDE VARIETY OF

14   SPECIES.   IT COULD BE AVIAN SPECIES OR BAT SPECIES OR OTHER

15   SPECIES.   I THINK THOSE ARE THE MAIN -- I WAS GOING TO SAY, SO

16   WHAT WE DO IS WE GO OUT AND MAP THOSE SENSITIVE HABITATS AND

17   PROVIDE THAT TO THIS PROSPECTIVE PURCHASER OF THE PROPERTY.

18       AND WE USUALLY GENERATE A CONSTRAINTS AND OPPORTUNITIES

19   REPORT.   AND THAT SAYS, AS AN EXAMPLE, IN OUR HUNDRED ACRE

20   EXAMPLE HERE, WE WILL SAY THERE'S 25 ACRES OF WETLANDS

21   DISTRIBUTED THROUGHOUT THE SITE.   THEREFORE, IF YOU WERE TO

22   MOVE FORWARD, YOU WOULD NEED TO OBTAIN THESE PERMITS.   AND

23   THESE PERMITS WILL TAKE YOU THIS LONG AND THE MITIGATION

24   OBLIGATION BURDEN MAY COST YOU THIS MUCH.

25       SO IT ADVISES THEM AS TO WHETHER OR NOT -- AND A LOT OF

BOURSIER – DIRECT / LEE

1   THE PROJECTS SIMPLY WOULDN'T BE FEASIBLE AT ALL BECAUSE OF THE
2   COST OF MITIGATION OR WHATEVER.  THEY CAN TAKE THAT
3   INFORMATION ALONG WITH THEIR GEOLOGY AND SOILS AND TOXICOLOGY
4   REPORTS AND DETERMINE I WAS THINKING OF BUYING THIS LAND AND
5   DEVELOP IT, OR NOT.
6   **Q.**  WOULD IT BE FAIR TO SAY THAT IF YOU'RE CREATING SUCH A
7   JURISDICTIONAL DELINEATION FOR THEM TO LET THESE POTENTIAL
8   LAND PURCHASERS KNOW THESE ARE FEDERALLY PROTECTED WETLANDS.
9   YOU MAY NOT BE ABLE TO DEVELOP ON HERE UNLESS YOU GET THE
10  REQUIRED PERMIT, WHICH YOU MAY OR MAY NOT GET.
11      WOULD IT BE FAIR TO SAY THAT THE MORE JURISDICTION LAND
12  THAT YOU FIND ON THAT PROPERTY, THE MORE RESTRICTIVE THE LAND
13  OWNERS ARE IN HOW TO DEVELOP?
14  **A.**  YES.  ABSOLUTELY TRUE.
15  **Q.**  WOULD IT BE FAIR TO SAY THE MORE JURISDICTIONAL FINDINGS
16  YOU HAVE ON A PROPERTY OF JURISDICTIONAL WETLANDS OR
17  JURISDICTIONAL WATERS OR TRIBUTARIES, THE MORE EXPENSIVE IT
18  WOULD BE FOR YOUR CLIENT TO DEVELOP ON THIS LAND?
19  **A.**  YEAH.  THE MORE EXPENSIVE -- JUST BRIEFLY.
20      IF YOU -- THERE'S A WHOLE BUNCH -- THERE'S TWO MAIN
21  CATEGORIES, I SHOULD SAY, OF ARMY CORPS PERMITS.  ONE CATEGORY
22  IS CALLED NATIONWIDE PERMITS.  AND THERE'S SOME 60 OF THEM.
23  YOU CAN GET A NATIONWIDE PERMIT FOR A LOT OF THINGS.
24  CRANBERRY PRODUCTION AS AN FOR EXAMPLE, WHICH YOU WOULDN'T USE
25  IN THIS STATE, BUT THERE ARE A LOT OF OTHER ONES.  AND THOSE

1   GENERALLY LIMIT YOU TO FILLING LESS THAN HALF AN ACRE,

2   GENERALLY.  NOT ALL OF THEM.

3       THE OTHER CATEGORY CALLED AN INDIVIDUAL PERMIT.  THE

4   REASON I BRING THIS UP IS, IF WHY YOU WANT TO, FOR EXAMPLE,

5   ONE ACRE, YOU WOULD NEED AN INDIVIDUAL PERMIT, AND THAT PERMIT

6   REQUIRES YOU DO AN ALTERNATIVE ANALYSIS WHICH -- WHAT'S

7   INVOLVED THERE IS YOU ARE TO LOOK AT ALTERNATIVE SITE PLANS,

8   ALTERNATIVE PROPERTIES THAT YOU DON'T HOLD.

9       SO IF I HAD THIS HUNDRED-ACRE PARCEL AND THERE WERE

10  WETLANDS, WE WOULD DO AN ALTERNATIVES ANALYSIS, AND REGIONALLY

11  WE WOULD HAVE TO LOOK AND SEE, IS THERE ANOTHER HUNDRED-ACRE

12  PARCEL FOR SALE I DON'T OWN YET THAT HAS NO WETLANDS OR FEWER.

13      A LOT OF PROJECTS JUST END RIGHT THERE BECAUSE THERE

14  ARE -- THERE WERE A LOT OF PARCELS OR ALTERNATIVE SITES WITHIN

15  THE REGION FOR SALE, BUT YOU WOULDN'T SURVIVE.  I GUESS MY

16  POINT IS, A LOT OF PROJECTS DON'T SURVIVE THE ALTERNATIVES

17  ANALYSIS FOR THAT PERMIT.

18  **Q.**  SO WHAT I WOULD LIKE TO SHOW YOU IS GOVERNMENT'S

19  EXHIBIT 1138.

20      ARE YOU FAMILIAR WITH THIS MAP?

21  **A.**  YES.

22  **Q.**  IT'S ALSO ON THE SCREEN IN FRONT OF YOU.

23  **A.**  RIGHT.

24              (DISPLAYED ON SCREEN.)

25  **Q.**  IS THIS A MAP THAT YOUR COMPANY GENERATED THAT DEPICTS

BOURSIER – DIRECT / LEE

1    POTENTIAL JURISDICTIONAL WETLANDS AND WATERS ON THIS PROPERTY?

2    **A.**  YES.

3        I BELIEVE THE DATE OF THAT IS JUNE 2007.  THAT'S THE SAME

4    MAP THAT WAS SUBMITTED TO THE ARMY CORPS FOR THEIR

5    CONCURRENCE.

6    **Q.**  RIGHT.

7        AND THE LEGEND DOES INDICATE ON THE BOTTOM IT'S JUNE OF

8    2007, CORRECT?

9    **A.**  UH-HUH.

10   **Q.**  WOULD IT BE FAIR TO SAY -- IF WE CAN BLOW OUT -- THANK

11   YOU.

12       WOULD IT BE FAIR TO SAY THE GREEN PARTS ON THIS MAP WERE

13   AREAS THAT YOUR CONSULTING COMPANY DETERMINED TO CONTAIN

14   JURISDICTIONAL WETLANDS THAT ARE SUBJECT TO THE CLEAN WATER

15   ACT?

16   **A.**  RIGHT.  CORRECT.

17   **Q.**  AND THE BLUE PARTS ARE AREAS THAT YOUR FIRM DETERMINED TO

18   CONTAIN JURISDICTIONAL WATER, OTHER WATERS AQUATIC AREA --

19   **A.**  YES.

20   **Q.**  -- THAT ARE SUBJECT TO THE CLEAN WATER ACT?

21   **A.**  YES.

22   **Q.**  DID THE -- DID THE ARMY CORPS OF ENGINEERS AGREE, FOR THE

23   MOST PART, WITH YOUR JURISDICTIONAL DETERMINATION?

24   **A.**  FOR THE MOST PART THEY DID.  YES.

25   **Q.**  DID THEY ADD A FEW MORE ACRES OF WETLAND?

BOURSIER – DIRECT / LEE

1    **A.**  YES, THEY DID.

2    **Q.**  APPROXIMATELY HOW MANY?

3    **A.**  I BELIEVE FIVE.

4        I SHOULD SAY THAT WE FINALIZED OUR REPORT IN JUNE OF '07.

5    THEY CAME OUT IN AUGUST.  SO THERE WAS APPROXIMATELY A MONTH

6    AND A HALF, TWO MONTHS BETWEEN WHEN IT WAS SUBMITTED AND WHEN

7    THEY CAME OUT.

8    **Q.**  YOU CONDUCTED THIS ANALYSIS ON BEHALF OF THE LANDOWNERS

9    WHO ARE REAL ESTATE DEVELOPERS, CORRECT?

10   **A.**  CORRECT.

11   **Q.**  ON BEHALF OF THE SOBRATO ORGANIZATION?

12   **A.**  RIGHT.

13   **Q.**  DID THOSE LANDOWNERS EVER CONTEST YOUR FINDINGS OF

14   JURISDICTIONAL "WATERS OF THE UNITED STATES ON THE PROPERTY

15   THAT THEY OWN?

16   **A.**  NO, THEY DID NOT.

17   **Q.**  AND DID YOU, THE ECOLOGICAL CONSULTING FIRM HIRED BY THEM

18   TO CONDUCT THIS PRELIMINARY DETERMINATION, EVER CONTEST THIS

19   WITH THE ARMY CORPS OF ENGINEERS?

20   **A.**  WE HAD CONVERSATIONS DURING THE FIELD VISIT ABOUT THE

21   POTENTIAL DISCLAIMER.

22       THERE ARE SOME FEATURES, LIKE THERE'S SOME STORM WATER

23   BASINS ON THERE.  AND THERE'S A LARGE -- NOT LARGE, IT'S A

24   LINEAR WETLAND THAT WAS SUPPORTED BY LEAKING -- NOT LEAKING,

25   BUT OVER IRRIGATION OF TREES ALONG STEVENSON.  THERE'S A LOT

1    OF GRASS AND TREES IN THAT AREA, AND THEY JUST SIMPLY TURN ON

2    THE WATER OR AT THAT TIME OVER IRRIGATED EVERY NIGHT.  AND

3    THAT WATER FLOWED DOWN THE BACK SIDE OF A BERM AND PUDDLED.

4        SO EVEN THOUGH THAT MAY HAVE MET THE TECHNICAL CRITERIA,

5    WE CONSIDERED THAT -- WE ASKED THE CORPS TO CONSIDER

6    DISCLAIMING THAT BECAUSE IT WAS ARTIFICIAL HYDROLOGY, AND THEY

7    AGREED WITH THAT.

8    **Q.**  THEY AGREED WITH THAT?

9        SO JUST TO BE CLEAR, YOUR FINDING OF -- YOUR PRELIMINARY

10   CONCLUSION THAT THERE ARE JURISDICTIONAL WATERS ON THE UNITED

11   STATES, DOES THAT RESTRICT THE LANDOWNERS IN DEVELOPMENT AND

12   MAKE IT MORE EXPENSIVE TO DEVELOP ON THE SITE?

13   **A.**  IT VERY MUCH SO.

14   **Q.**  THEY HAVE NEVER CONTESTED THAT FINDING; IS THAT CORRECT?

15   **A.**  THAT'S CORRECT.

16   **Q.**  WE'VE BEEN SPEAKING A LITTLE BIT ABOUT THE ARMY CORPS OF

17   ENGINEERS.  WHAT IS THE RELATIONSHIP BETWEEN H.T. HARVEY AND

18   THE ARMY CORPS OF ENGINEERS?

19       HOW ARE YOU GUYS DIFFERENT AND WHAT IS THE ROLES YOU GUYS

20   PLAY?

21   **A.**  AS I MENTIONED EARLIER, WE ARE A PRIVATE FIRM WORKING FOR

22   CLIENTS AND THEY ARE REGULATORY AND PERMITTING AGENCIES.

23       THE RELATIONSHIP ON SUCH THINGS AS WETLAND DELINEATIONS,

24   WE SUBMIT WHAT WE CALL PRELIMINARY WETLAND DELINEATION.  THE

25   PROCESS IS YOU SUBMIT THAT ALONG WITH THE REPORT AND DATA

1    FORMS -- VERY EXCITING READING -- AND THEY COME OUT INTO THE

2    FIELD AND CONDUCT THEIR OWN FIELD SURVEYS.  THEY DIG THEIR OWN

3    HOLES, TEST PITS, SOIL TEST PITS, AND WALK AND DRIVE THE

4    ENTIRE PROPERTY, AND THEN IN THE FIELD, THEY GENERALLY WILL,

5    IF THEY DISAGREE, WE WILL TALK ABOUT THAT AND THEY WILL ADD OR

6    DELETE CERTAIN AREAS.

7    **Q.**  OKAY.  I WOULD LIKE TO TALK TO YOU A LITTLE BIT MORE

8    SPECIFICALLY ABOUT YOUR HISTORY WITH THIS PARTICULAR PROPERTY,

9    NEWARK AREA 4.

10   CAN YOU GIVE THE JURORS AN OVERVIEW OF HOW YOU GOT

11   INVOLVED WITH THIS PROPERTY AND THE LENGTH OF TIME THAT YOU

12   HAVE WORKED ON AND STUDIED THIS PROPERTY.

13   **A.**  SURE.

14   I WAS FIRST CONTACTED -- THERE'S A... THE POINTER.  HERE

15   IT IS.  I WILL TRY AND POINT IT OUT HERE.

16   I INITIALLY WORKED ON A PARCEL -- IS IT OKAY IF I GO POINT

17   AT THAT?

18           **THE COURT:**  YOU MAY.

19   DO WE HAVE THE MICROPHONE?

20           **THE WITNESS:**  THERE IS A SEPARATE PARCEL RIGHT HERE

21   DOWN BY THE RAILROAD TRACKS.  AND I WAS CONTACTED IN THE '90S

22   BY THE LANDOWNERS.  I BELIEVE IT WAS THE O'CONNOR FAMILY, AND

23   THEY WANTED ME TO CONDUCT A WETLAND DELINEATION BECAUSE THEY

24   WERE PROPOSING TO DO SOME FORM OF A DEVELOPMENT THERE.  SO

25   THAT WAS AROUND 1999, I BELIEVE.

1        AFTER THAT OUR FIRM WAS HIRED TO DO WHAT I DESCRIBED

2    EARLIER AS A CONSTRAINTS AND OPPORTUNITIES ANALYSIS.  AND THAT

3    STARTED IN 2001.

4        SO I WAS NOT A PRINCIPAL AT THAT TIME.  I WAS DOING MORE

5    FIELD WORK.  I DID A LOT OF THE FIELD WORK ON THE ENTIRE

6    PROPERTY, THAT IS, SOUTH OF THE RAILROAD TRACKS.

7        AND THAT INCLUDED MAPPING, HABITAT TYPES, INCLUDING

8    WETLANDS, BUT OTHER THINGS.  AND OUR WILDLIFE DIVISION WENT

9    OUT AND SURVEYED FOR HABITAT AND TRAP SPECIES, SENSITIVE

10   SPECIAL, SPECIES THAT MAY BE STATE OR FEDERALLY LISTED THAT

11   WOULD REQUIRE A PERMIT IF YOU WERE TO DEVELOPMENT THAT.

12       SO THAT REPORT RANKED THE PROPERTY, SEPARATE LOCATIONS OF

13   THE PROPERTY IN TERMS OF THE FEASIBILITY OF DEVELOPING, WHAT

14   YOU MIGHT BE ABLE TO MOVE FORWARD WITH.  AND THAT REPORT CAME

15   OUT IN 2002.

16   **Q.**  I'M GOING TO STOP YOU THERE FOR A SECOND.

17       DR. BOURSIER, THAT REPORT IN 2002, DID IT ALSO FIND

18   WETLANDS THROUGHOUT THE SITE?

19   **A.**  YES.  WE DIDN'T -- THE WORK THAT'S SHOWN ON THE MAP THERE

20   WAS FAR MORE EXTENSIVE, BUT WE WENT OUT IN 2001 AND '02 AND

21   MAPPED HABITATS.  AGAIN, AT A LOWER LEVEL OF EFFORT, BUT WE

22   FOUND -- WE MAPPED MORE WETLANDS THAN IS SHOWN ON THE MAP THAT

23   WAS ON THE STAND THERE.  SO IT DID INCLUDE A LOT OF -- A LOT

24   MORE WETLANDS THAN ARE CURRENTLY ON SITE.

25   **Q.**  DO THE AREAS CURRENTLY MARKED IN GREEN WHICH INDICATES

1    WHAT YOUR COMPANY BELIEVES CONTAIN POTENTIAL JURISDICTIONAL

2    WETLANDS, WERE THOSE ALSO DETERMINED TO BE WETLANDS BACK IN

3    YOUR ANALYSIS IN 2002 WHEN YOU DID THE BIOTIC CONSTRAINTS

4    WORK?

5    **A.**   RIGHT.  BUT, AGAIN, THEY WEREN'T AREAS THAT THE LEVEL OF

6    EFFORT IS GREATER.  YOU CAN REFINE BOUNDARIES AND YOU HAVE TO

7    PUT IN ALL SORTS OF TEST PITS WHEN YOU DO AN ACTUALLY

8    DELINEATION.

9        SO WE WENT OUT AND WE USED THE SAME SORT OF APPROACH WHERE

10   WE LOOKED AT VEGETATION AND SOILS AND HYDROLOGY, AND MAPPED

11   WETLAND HABITATS.  BUT, AGAIN, THE BOUNDARIES MAY HAVE BEEN A

12   LITTLE BROADER AT THAT TIME BECAUSE OF THE LEVEL OF EFFORT WAS

13   LESS.

14   **Q.**   IT WAS FAR MORE -- FAR MORE EFFORT CAME INTO MAPPING THIS

15   IN '07?

16   **A.**   UH-HUH.

17   **Q.**   IN FACT, HOW MANY YEARS OF EFFORT WENT INTO MAPPING THIS

18   IN '07?

19   **A.**   WE MONITORED -- WE WERE HIRED BY THE POTENTIAL DEVELOPERS

20   IN 2005 AND ENDED OUR FIELD WORK IN 2007.

21       ONE OF THE REASONS -- THIS ISN'T ALWAYS NECESSARY.  ONE OF

22   THE REASONS WE SORT OF PRIDE OURSELVES IN FULLY DOCUMENTING IT

23   AND FOLLOWING CORPS GUIDANCE WHICH SAYS THAT THESE

24   DELINEATIONS SHOULD BE DONE DURING A PERIOD OF AVERAGE

25   RAINFALL DISTRIBUTION AND AMOUNT.

BOURSIER – DIRECT / LEE

1    AND THAT YEAR, 2005 AND '06, WAS SLIGHTLY ABOVE AVERAGE

2    RAINFALL EVENT.  AND THAT CAN FUZZ THE BOUNDARIES OR MAKE THE

3    BOUNDARIES BETWEEN UPLAND AND WETLAND MORE COMPLICATED OR LOOK

4    LARGER THAN MAYBE THEY ARE.

5    SO WE WENT AND MONITORED THE SUBSEQUENT YEAR 2006 AND --

6    2006 AND 2007, WHICH EVEN THOUGH IT HAD LESS RAIN, WE

7    MONITORED THAT AND DID OUR FINAL MAPPING IN EARLY 2007, IN THE

8    SPRING OF 2007.

9    **Q.**  SO WOULD IT BE FAIR TO SAY THAT YOU EXTENDED YOUR

10   MONITORING AN ADDITIONAL YEAR TO BE ABLE TO SEE WHAT THE SITE

11   WOULD BE LIKE UNDER NORMAL CONDITIONS?

12   **A.**  RIGHT.  OR -- RIGHT.

13   **Q.**  OR WHAT?

14   **A.**  OR CLOSER TO NORMAL.  I BELIEVE THE RAINFALL IN '05 AND

15   '06 WAS MAYBE 17, 18 INCHES.  NOT THE RAINFALL PERIOD, BUT SAY

16   THAT'S THE CALENDAR YEAR, IF YOU WILL.

17   AND IT MIGHT HAVE BEEN A LITTLE -- IT WAS CLOSER TO HALF

18   THAT OR 60 PERCENT OF THAT THE FOLLOWING YEAR.

19   **Q.**  ABOUT 8 OR 9 INCHES THE FOLLOWING YEAR?

20   **A.**  CORRECT.

21   **Q.**  WHAT ABOUT DURING THE YEAR FROM 2013 TO 2014?

22   WHAT I WOULD LIKE TO DO IS FOCUS ON -- YOU MENTIONED WE

23   ARE IN A MEDITERRANEAN CLIMATE.  SO THERE'S RAINY SEASONS AND

24   THERE ARE DRY SEASONS.  THE RAINY SEASON GOES FROM NOVEMBER TO

25   APRIL OR MAY.  THE DRY SEASON GOES FROM MAY, JUNE TO OCTOBER.

BOURSIER – DIRECT / LEE

1      WERE YOU ABLE TO, IN YOUR STUDY OF THE SITE AND -- WERE

2  YOU ABLE TO DETERMINE WHAT THE PRECIPITATION WAS LIKE DURING

3  THE RAINY SEASON FROM '06 TO '07 COMPARED TO THE RAINY SEASON

4  FROM 2013 LEADING INTO 2014?

5  **A.**  WELL, IT ISN'T IN THE WETLAND DELINEATION REPORT, BUT I

6  SHOULD -- ONE OF THE -- I GUESS TO INDIRECTLY ANSWER YOUR

7  QUESTION, WE HAVE A WHAT'S CALLED AN APPROACH, ASSUMPTIONS,

8  AND RATIONALES PART -- A CHAPTER IN OUR WETLAND REPORT.  AND

9  IT LETS THE CORPS KNOW THIS IS WHAT WE DID, THIS WAS OUR

10  THOUGHT PROCESSES INVOLVED.  AND ONE OF THE BULLET ITEMS WE

11  PUT IN THAT REPORT IS THAT WE FOUND THAT THE BOUNDARIES

12  BETWEEN THOSE TWO '05 AND '06 AND '06 AND '07, THE BOUNDARIES

13  OF WETLANDS DIDN'T CHANGE ALL THAT MUCH.

14      THE REASON IS THAT THERE'S MORE THAN JUST SEASONAL

15  PRECIPITATION HITTING THIS SITE.  THERE ARE OTHER FORMS.

16  THERE'S GROUND WATER AND SEEPS CONTRIBUTING HYDROLOGY, MEANING

17  WATER, TO THE SITE.

18      SO WE DIDN'T DO, OBVIOUSLY, A DELINEATION DURING '13 AND

19  '14.  THERE WAS -- I OBSERVED IT DURING THAT TIME PERIOD AND

20  WAS, YOU KNOW, MY OBSERVATION WAS THAT IT WAS VERY SIMILAR,

21  THE PATTERNS ON THE GROUND WERE VERY SIMPLY.

22      MAYBE I SHOULD JUMP BACK AND FINISH UP MY EXPERIENCE ON

23  THE SITE?

24  **Q.**  WE WILL GO BACK TO THAT.

25  **A.**  OKAY.

BOURSIER – DIRECT / LEE

1    **Q.**   BUT I WANT TO FOLLOW UP WITH WHAT YOU SAID.

2         YOU INDICATED THAT THERE WAS A LOT OF RAINFALL -- WELL, I

3    WON'T -- LET ME REPHRASE.

4         THAT THERE WAS APPROXIMATELY HOW MANY INCHES IN '05 TO

5    '06?

6    **A.**   I BELIEVE AROUND 18.  COULD BE 17.  AROUND THEN, AND THAT

7    WAS A CALENDAR-YEAR BASIS.

8    **Q.**   AND THERE WAS HALF HAS MUCH THE FOLLOWING YEAR?

9    **A.**   APPROXIMATELY, RIGHT.

10   **Q.**   AND YOU EXTENDED THIS STUDY FOR AN ADDITIONAL YEAR TO SEE

11   WHAT THE PROPERTY WOULD BE LIKE IN A YEAR THAT HAD HALF AS

12   MUCH RAINFALL?

13   **A.**   RIGHT.

14        THIS FOLLOWS THE OVERALL PHILOSOPHY I STARTED WHEN I WAS

15   HIRED AT THE FIRM IN '91.  I SAW IT VERY MUCH LIKE THIS

16   PROCESS WHERE WE, AS PRIVATE CONSULTANTS, GATHER ALL THE

17   EVIDENCE FROM THE FIELD, WE CREATE A MAP.  WE PUT TOGETHER A

18   REPORT INCLUDING DATA FORMS, AND THEN WE PRESENT THAT TO THE

19   ARMY CORPS.

20        TO ME IT'S LIKE A TRIAL.  HERE'S THE EVIDENCE.  HERE'S OUR

21   INTERPRETATION.  ARMY CORPS, WHAT DO YOU THINK?

22        AND THAT CAN TAKE -- IT'S DISCUSSED IN THE FIELD DURING

23   THE -- WHEN THE CORPS COMES OUT.  VERY OFTEN I CONTACT THE

24   CORPS BEFORE WE DO FIELD WORK JUST TO MAKE SURE WE ARE ON THE

25   SAME PAGE ABOUT THE APPROACH OF WHAT THEY ARE LOOKING FOR IN

1    TERMS OF DOCUMENTATION.

2        SO MY GOAL, AND I BELIEVE DR. HARDWICKE, WHO TOOK OVER MY

3    POSITION, SHE'S MAINTAINING THE PHILOSOPHY THAT WE DON'T

4    WANT -- WE WANT TO DOCUMENT THE PIECE OF OUR WORK, THE EXTENT

5    OF WETLANDS ON THE PROPERTY SO THERE AREN'T A LOT OF CHANGES,

6    THAT IT'S OBVIOUS TO THE PERMITTING AGENCIES THAT WE HAVE DONE

7    OUR WORK, OUR BEST WORK, AND THERE WOULDN'T BE CHANGES TO THE

8    MAP NECESSARILY.

9    **Q.**  BUT WOULD IT BE FAIR TO SAY THAT EVEN WITH A SUBSEQUENT

10   YEAR WHERE RAINFALL WAS HALF AS MUCH, THAT THE BORDERS -- THE

11   AREAS THAT WERE DETERMINED TO BE WETLANDS DID NOT SHIFT?

12   **A.**  NOT THAT MUCH.  AND THE REASONS ARE, AS I INDICATED,

13   THERE'S REALLY THREE SOURCES OF WATER HERE.

14       IF IT WAS ONLY SEASONAL WETLAND, YOU WOULD EXPECT THOSE TO

15   MAYBE DRY DOWN AND SHIFT A LITTLE BIT MORE.  BUT THIS IS A LOT

16   LIKE A LEAKING SPRINKLER ON YOUR FRONT LAWN.  SEASONALLY YOU

17   IRRIGATE IT, THINGS STAY THE SAME.  BUT IF THERE IS A LEAKING

18   SPRINKLER HEAD IN THE MIDDLE OF THE LAWN, THAT'S A LOT LIKE

19   THE GROUND WATER CONTRIBUTION THAT'S ON-SITE.

20       SO YOU'LL SEE OTHER SORTS OF WETLAND PLANTS, THE ANNUAL

21   RYE GRASS, THAT'S A REAL WETLAND PLANT, WHICH IS YOUR LAWN, IT

22   CAN BE TAKEN OVER IN THAT LEAKING SPRINKLER HEAD BY PLANTS

23   THAT AREN'T NECESSARILY ANNUAL, BUT ARE PERENNIAL.  USUALLY

24   THEY ARE NON-NATIVES AROUND THIS PART OF CALIFORNIA.

25   **Q.**  DR. BOURSIER, WOULD IT BE FAIR TO SAY THAT THE OUTER

1    BOUNDARIES OF WHERE THE WETLANDS WERE DID NOT SHIFT THAT MUCH

2    BECAUSE HYDROLOGY ON THE SITE IS AFFECTED BY MORE THAN JUST

3    RAIN?

4    **A.**   THAT'S CORRECT.

5    **Q.**   AND IT'S AFFECTED BY GROUND WATER AS WELL AS SEEPS; IS

6    THAT CORRECT?

7    **A.**   CORRECT.

8        THOSE, I SHOULD POINT OUT, THAT THOSE SEEPS ARE THERE

9    PERENNIALLY.  THEY'RE -- EVEN IF THE SEASONAL BOUNDARIES SHIFT

10   AND WHILE AROUND A LITTLE BIT, THE PERENNIAL SOURCE OF THE

11   WATER -- AND THERE'S A LOT THAT COMES ACROSS THE PROPERTY ARE

12   THERE ALL YEAR.  MORE THAN ONE OF US, INCLUDING ME, HAS BURIED

13   THEIR FRONT END OF A FOUR-WHEEL DRIVE TRUCK DRIVING ACROSS

14   THAT PROPERTY BECAUSE WE ENCOUNTERED ONE OF THESE SEEPS

15   THAT -- IN AUGUST WHEN WE THOUGHT THAT'S GOING TO BE DRY.

16       SO THAT'S THE EXTRA COMPLICATING FACTOR HERE.

17           **THE COURT:**  WHY DON'T WE BREAK THERE FOR THE DAY

18   SINCE WE HAVE HIT OUR TIME.

19       SO, LADIES AND GENTLEMEN, WE'LL BREAK NOW FOR THE DAY.

20   JUST FOR PLANNING PURPOSES, IN TERMS OF THE ESTIMATE, I THINK

21   WE CONTINUE TO BE ON TRACK AT THIS POINT.

22       WHAT I CAN TELL YOU, SO THAT YOU CAN PLAN IS A COUPLE OF

23   THINGS.  ONE, I EXPECT US TO BE IN SESSION AT LEAST THROUGH

24   FRIDAY.  AND AS MS. RILEY, I BELIEVE, TOLD YOU, MONDAY IS

25   PRESIDENT'S DAY WHICH IS A FEDERAL HOLIDAY.  SO WE WILL BE

1    DARK ON THAT DAY.

2        BUT I HOPE THAT THAT GIVES YOU A SENSE.  AS WE CONTINUE TO

3    PROGRESS THROUGH THE WEEK, WE WILL KEEP YOU AS UPDATED AS WE

4    CAN WITH REGARD TO THE ESTIMATE.

5        SO, WE'LL BREAK AT THIS TIME.  AGAIN, REMEMBER YOUR RULES:

6    NO DISCUSSION OF THE CASE IN ANY FORMAT, NO INFORMATION ABOUT

7    THE CASE, NO RESEARCH ABOUT THE CASE, OR THE ISSUES INVOLVED

8    IN IT IN ANY FORMAT.  NO MEDIA ABOUT THE CASE, NO RESEARCH OF

9    ANY SORT.  AND, AGAIN, CONTINUE TO KEEP AN OPEN MIND UNTIL ALL

10   THE EVIDENCE HAS BEEN PRESENTED, I'VE GIVEN YOU MY

11   INSTRUCTIONS, AND YOU'VE HEARD THE ARGUMENTS OF COUNSEL, AND

12   THE VIEWS OF YOUR FELLOW JURORS.

13       SO WITH THAT, ENJOY THE REST OF YOUR AFTERNOON AND WE'LL

14   SEE YOU TOMORROW MORNING TO GET STARTED AT 8:30.

15       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

16           **THE CLERK:**  YOU MAY BE SEATED.

17           **THE COURT:**  SEE YOU TOMORROW MORNING.

18           (PROCEEDINGS ADJOURNED AT 1:14 WITH P.M.)

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3          I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

4    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

5    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                        *Diane E. Skillman*

9            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

10              WEDNESDAY, FEBRUARY 14, 2018

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25