VOLUME 7

PAGES 1050 - 1225

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-16-00107 HSG |
| | ) | |
| VS. | ) | THURSDAY, FEBRUARY 15, 2018 |
| | ) | |
| JAMES PHILIP LUCERO, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | JURY TRIAL |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          ALEX G. TSE, ESQUIRE
                           ACTING UNITED STATES ATTORNEY
                           450 GOLDEN GATE AVENUE, 11TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94102
                   BY:  PHILIP J. KEARNEY,
                        SHIAO C. LEE,
                        ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**          FEDERAL PUBLIC DEFENDER'S OFFICE
                           1301 CLAY STREET, SUITE 1350N
                           OAKLAND, CALIFORNIA 94612
                   BY:  ANGELA M. HANSEN,
                        NED SMOCK,
                        ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           OFFICIAL COURT REPORTER


TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1                        I N D E X

2    GOVERNMENT'S WITNESSES:              PAGE    VOL.

3    BOURSIER, PATRICK

4    DIRECT EXAMINATION BY MS. LEE (RESUMED)    1066    7

5    CROSS-EXAMINATION BY MS. HANSEN            1141    7

6    REDIRECT EXAMINATION BY MS. LEE            1186    7

7    RECROSS-EXAMINATION BY MS. HANSEN          1199    7

8    MARTEL, DANIEL

9    DIRECT EXAMINATION BY MS. LEE              1205    7
```

| GOVERNMENT EXHIBITS: | WITHDRAWN | ID. | EVD. | VOL. |
|---|---|---|---|---|
| 180 | | | 1218 | 7 |
| 207 | | | 1128 | 7 |
| 208 | | | 1129 | 7 |
| 210 | | | 1129 | 7 |
| 212 | | | 1129 | 7 |
| 214 | | | 1129 | 7 |
| 216 | | | 1129 | 7 |
| 303 | | | 1134 | 7 |
| 306 | | | 1134 | 7 |
| 308 | | | 1137 | 7 |
| 312 | | | 1134 | 7 |

| DEFENDANT'S EXHIBITS: | | | | |
|---|---|---|---|---|
| 2025 | | | 1184 | 7 |
| 2050 | | | 1171 | 7 |
| 2051 | 1171 | | 1153 | 7 |

| | |
|---|---|
| 1 | THURSDAY, FEBRUARY 15, 2018                    8:16 A.M. |
| 2 | P R O C E E D I N G S |
| 3 | (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.) |
| 4 | **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS |
| 5 | IN SESSION. |
| 6 | WE'RE CALLING CR-16-00107, UNITED STATES OF AMERICA VERSUS |
| 7 | JAMES PHILIP LUCERO.  PLEASE COME FORWARD AND STATE YOUR |
| 8 | APPEARANCES FOR THE RECORD. |
| 9 | **MR. KEARNEY:**  YOUR HONOR, GOOD MORNING.  PHIL KEARNEY |
| 10 | AND SHIAO LEE FOR THE UNITED STATES. |
| 11 | **THE COURT:**  GOOD MORNING. |
| 12 | **MS. HANSEN:**  GOOD MORNING, YOUR HONOR.  ANGELA HANSEN |
| 13 | ON BEHALF OF MR. LUCERO, WHO IS PRESENT. |
| 14 | **MR. SMOCK:**  GOOD MORNING, YOUR HONOR.  NED SMOCK ALSO |
| 15 | ON BEHALF OF MR. LUCERO. |
| 16 | **THE COURT:**  GOOD MORNING. |
| 17 | OKAY.  TODAY'S TRIO OF EXPERT DISPUTES IS COATS, MARTEL, |
| 18 | AND GALACATOS.  ON COATS, IT DOES SEEM THAT THE DISCLOSURE WAS |
| 19 | CIRCUMSCRIBED AND LIMITED TO PARTICULAR TOPICS.  WHAT'S THE |
| 20 | BASIS FOR EXPANDING THAT? |
| 21 | **MR. KEARNEY:**  WELL, YOUR HONOR, I DON'T BELIEVE WE |
| 22 | ARE REALLY EXPANDING IT.  WE NOTICED THAT HE WOULD BE |
| 23 | TALKING -- DR. COATS WOULD BE TALKING ABOUT THE ANALYSIS OF |
| 24 | WATER QUALITY, SAMPLING DATA... THE MEANING OF THE DIFFERENCE |
| 25 | IN THE READINGS BETWEEN THE WETLAND AND THE SLOUGH ARE JUST |

1    PART OF THAT.

2         WE ALSO NOTICED THAT HE WILL BE TALKING ABOUT HOW SURFACE

3    WATER MOVED FROM THE AREAS IN THE MOWRY SLOUGH.  MUCH OF THAT

4    SURFACE WATER COMES FROM -- BUBBLES UP FROM THE GROUND.  IT'S

5    PART OF, IN THE GOVERNMENT'S ESTIMATION, THAT TOPIC OF

6    DISCUSSION.  I DON'T THINK HE CAN TALK ABOUT SURFACE WATER

7    WITHOUT TALKING ABOUT WHERE IT COMES FROM.

8         AND THEN THE DATA INCLUDED IN APPENDIX F OF THE

9    HUFFMAN-BROADWAY GROUP IS IN F1 AS WELL, DISCUSSES MUCH OF THE

10   ANTICIPATED TESTIMONY.  AND I THINK, AS THE COURT KNOWS, THE

11   *DAUBERT* FILING EXPAND ON THAT QUITE A BIT AS WELL AS THE

12   GOVERNMENT'S (SIC) ORDER REGARDING THE *DAUBERT* FILING --

13            **THE COURT:**  WELL, WAIT A MINUTE.  MY ORDER IS NOT

14   YOUR DISCLOSURE, CORRECT?

15            **MR. KEARNEY:**  THAT'S CORRECT.

16            **THE COURT:**  SO THE ORDER SEEMS IRRELEVANT TO THE

17   QUESTION.

18            **MR. KEARNEY:**  WELL, THE REASON THAT THE GOVERNMENT

19   BRINGS IT UP, YOUR HONOR, IS BECAUSE OF NOTICE.  I THINK

20   THERE'S -- THE DEFENSE HAS BEEN ON NOTICE FOR QUITE SOME TIME

21   ABOUT WHAT DR. COATS WILL TALK ABOUT.  AND I DON'T THINK

22   THERE'S ANY -- I DON'T THINK THERE'S ANYTHING THAT'S BEING

23   SPRUNG ON ANYONE AT THIS STAGE.  THE DISCOVERY CUTOFF WAS SIX

24   MONTHS AGO.  THE DEFENSE HAS HAD EVERYTHING THAT DR. COATS

25   WILL TALK ABOUT FOR QUITE SOME TIME.

1        **THE COURT:**  WELL, BUT LET ME ASK YOU THIS:  IN YOUR

2   VIEW, WHAT DO YOU PROPOSE TO HAVE HIM TESTIFY ABOUT THAT'S NOT

3   IN THE JULY 18TH, 2017 DISCLOSURE, WHICH IS ALMOST A PAGE

4   LONG?

5        **MR. KEARNEY:**  HE WILL TALK ABOUT THE MEANING OF THE

6   DIFFERENCE BETWEEN THE SAMPLING DATA IN THE SLOUGH AND THE

7   WETLAND AND HOW THAT CONSTITUTES A SIGNIFICANT EFFECT ON MOWRY

8   SLOUGH BY THE LAND.

9        **THE COURT:**  WELL, THAT SEEMS TO ME TO BE WITHIN THE

10  SCOPE OF THE SECOND-TO-LAST PARAGRAPH OF THAT DISCLOSURE:  HE

11  WILL TESTIFY REGARDING HIS ANALYSIS OF WATER QUALITY SAMPLING

12  DATA RELATING TO SAMPLES.

13       **MR. KEARNEY:**  HE WILL TALK ABOUT HIS ANALYSIS OF

14  WATER MOVEMENT ON THE LAND, SIR, INCLUDING WHERE MUCH OF THE

15  WATER THAT MOVES AROUND COMES FROM; NAMELY, UNDER THE SURFACE.

16     HE IS A HYDROLOGIST, SO THAT'S HIS KIND OF NATURAL

17  BAILIWICK.  THAT WILL INCLUDE A DISCUSSION OF TRIBUTARIES THAT

18  HE OBSERVED ON THE LAND.

19     HE WILL TALK ABOUT TIDAL DATUM.

20       **THE COURT:**  SEE, THE PROBLEM I CONTINUE TO HAVE WITH

21  THIS AND THE REASON WE'RE SPENDING A LOT OF TIME GRAPPLING

22  WITH THIS IS, SOME OF WHAT YOU ARE SAYING IS PLAINLY WITHIN

23  THE JULY DISCLOSURE, AND THE DEFENSE ISN'T OBJECTING TO THAT.

24     I NEED YOU TO TELL ME WHAT YOU'RE PROPOSING TO HAVE HIM

25  TESTIFY ABOUT THAT IS NOT IN THE JULY DISCLOSURE AND THE BASIS

1    WHERE THOSE OPINIONS WERE DISCLOSED.

2             MR. KEARNEY:  WELL, HE WILL TALK ABOUT THE

3    CHARACTERISTICS OF WETLANDS AND WHAT THEY DO IN RELATION TO --

4    IN -- TO EXPLAIN THE DIFFERENCE IN THE SAMPLING DATA.  HE WILL

5    TALK ABOUT WHAT WETLANDS DO AND HOW THEY PERFORM, AND HOW THE

6    DATA REGARDING THE CHEMISTRY THAT HE WILL TALK ABOUT IS

7    FOUNDED.

8        HE WILL SAY THAT THE DIFFERENCE IN THE SAMPLING RATES

9    BETWEEN THE SLOUGH AND THE WATER ON THE LAND IS CHARACTERISTIC

10   OF HIS EXPERIENCE AS TO THE FUNCTIONS WETLANDS PERFORM IN

11   GENERAL.

12            THE COURT:  IN YOUR *DAUBERT* OPPOSITION, WHICH WAS

13   OCTOBER 16TH, 2017, PAGE 9 YOU SAID:  ALL OF THE GOVERNMENT'S

14   EXPERTS WHO ANALYZED THE SITE FOR THE PRESENCE OF WETLANDS,

15   AND THEN THERE'S A LIST OF FIVE PEOPLE:  BOURSIER, GALACATOS,

16   HARDWICKE, HUFFMAN, AND MARTEL.

17       WHY CAN'T THOSE FIVE PEOPLE TESTIFY TO THESE SORTS OF

18   WETLAND ISSUES?

19            MR. KEARNEY:  THEY CAN, SIR.

20            THE COURT:  I'M INCLINED TO LIMIT YOU DR. COATS TO

21   WHAT WAS DISCLOSED IN THE JULY 17TH -- JULY 18TH, 2017 MEMO.

22   I THINK THAT'S THE FAIR SCOPE OF WHAT WAS DISCLOSED UNDER RULE

23   16.

24       THERE ARE PLENTY OF OTHER PEOPLE WHO HAVE BEEN ABLE TO

25   TESTIFY MORE BROADLY BASED ON ADEQUATE DISCLOSURE OF THEIR

```
 1   OPINIONS, AND I THINK THAT THERE IS A FAIRNESS ISSUE THAT
 2   WOULD BE IMPLICATED BY EXPANDING DR. COATS' OPINIONS AT THIS
 3   STAGE IN THE CASE.  SO THAT'S THE ORDER.
 4          MR. KEARNEY:  AND JUST SO I'M CLEAR, YOUR HONOR, WE
 5   WOULDN'T HAVE DR. COATS TALK ABOUT HIS OPINIONS AS TO THE
 6   EXISTENCE OF WETLANDS IN 2014 OR 2017.
 7      CAN THE GOVERNMENT HAVE HIM OPINE ON THE SIGNIFICANCE OF
 8   THE DIFFERENCE IN WATER QUALITY VALUES BETWEEN THE LAND AND
 9   THE SLOUGH?
10          THE COURT:  TO ME THAT SEEMS FAIRLY WITHIN THE SCOPE
11   OF THE DISCUSSION ABOUT THE -- HIS TESTIMONY ABOUT THE
12   SAMPLING THAT HE DID.
13          MR. KEARNEY:  ALL RIGHT.  AND THAT'S FINE, SIR.
14      THEN THE LAST ISSUE I WANT TO MAKE SURE I'M CLEAR ABOUT,
15   DOES THE COURT CONSIDER A DISCUSSION OF GROUND WATER TO BE
16   INCLUDED AS TO HOW WATER MOVES AROUND THE SITE?
17          MR. SMOCK:  YOUR HONOR, JUST IF I CAN COMMENT ON
18   THAT.
19      IF YOU LOOK AT THE NOTICE, IT TALKS ABOUT SURFACE WATER
20   EXCLUSIVELY.  NOTHING IN THE NOTICE TALKS ABOUT GROUND WATER
21   AND NOTHING IN ANY REPORT WE'VE RECEIVED FROM DR. COATS REFERS
22   TO GROUND WATER.
23      HE WENT TO THE SITE.  WE'VE SEEN VIDEO OF HIM OVER AND
24   OVER AGAIN MEASURING FLOW OF WATER BETWEEN TRIBUTARY A AND
25   TRIBUTARY B.  THAT'S WHAT HE DID, SURFACE WATER.  AND THAT'S
```

```
1    WHAT THE NOTICE SAID.

2              THE COURT:  I AGREE.

3              MR. KEARNEY:  YOUR HONOR, IF I CAN BE HEARD FOR ONE

4    MOMENT.

5        THE WATER IN TRIBUTARY A COMES FROM GROUND WATER.  AND WE

6    CITED -- THE GOVERNMENT CITED APPENDIX F TO THE

7    HUFFMAN-BROADWAY REPORT.  THERE'S A F1 INCLUDED IN THAT WHICH

8    TALKS ABOUT THIS VERY ISSUE.  WE HAVE NOTICED THIS.

9              THE COURT:  I DON'T HAVE THAT.  MAYBE IT'S SOMEWHERE

10   BURIED IN THE PILES OF PAPER I'VE GOTTEN.  BUT WHY DON'T YOU

11   SHOW ME THAT.  AND IS IT REFERENCED IN HIS ANALYSIS?

12             MR. KEARNEY:  WELL, IT'S REFERENCED IN THE

13   GOVERNMENT'S INITIAL DISCLOSURE ON JULY 18TH.

14       YOUR HONOR, PERHAPS AT A BREAK I CAN GET A COPY OF F AND

15   F1 FOR THE COURT.

16             THE COURT:  SO YOU ARE SAYING THAT DOCUMENT IS ONE OF

17   THOSE LISTED IN HIS SECTION OF THE JULY DISCLOSURE?

18             MR. KEARNEY:  WE SAID DR. COATS MAY ALSO REFERENCE

19   AREA MAPS DATA INCLUDED IN APPENDIX F, HUFFMAN-BROADWAY GROUP

20   STUDY AREA INVESTIGATIVE DATA, FINDINGS, REPORTS, AND

21   ATTACHMENTS, AS WELL AS ADDITIONAL PHOTO AND VIDEOGRAPHIC

22   EVIDENCE REGARDING HIS TESTIMONY.

23             THE COURT:  OKAY.  FAIR ENOUGH.  SO IF APPENDIX F

24   INCLUDES A DISCUSSION OF GROUND WATER, THEN I THINK THAT'S

25   FAIRLY BEEN NOTICED.
```

1        **MR. KEARNEY:**  LET ME -- YOUR HONOR, I'LL, JUST TO

2   MAKE SURE, LET ME GRAB A COPY OF F AND F1 AND I'LL SUBMIT IT

3   TO THE COURT AT A BREAK.

4        **THE COURT:**  ALL RIGHT.

5        **MR. KEARNEY:**  THANK YOU.

6        **MR. SMOCK:**  NOT TO SPLIT HAIRS, THERE IS AN APPENDIX

7   F, WHICH INCLUDES THE HYDROLOGY STUDY, BUT THEN THERE'S AN

8   ENTIRELY SEPARATE F1 WHICH IS, YOU KNOW, A COUPLE OF HUNDRED

9   PAGES LATER THAT INCLUDES OTHER ITEMS.

10       I DON'T KNOW HOW WE CAN -- THAT CONSTITUTES NOTICE GIVEN

11   THE NARRATIVE AND THE SCOPE SET FORTH IN THE NARRATIVE.

12       **MR. KEARNEY:**  WELL, YOUR HONOR, WHEN YOU SAY IN OUR

13   DISCLOSURE, EXHIBIT F AND ATTACHMENTS.  EXHIBIT F IS THE

14   HYDROLOGY STUDY WHICH TALKS ABOUT -- I'LL CONFIRM THAT IT

15   TALKS ABOUT GROUND WATER.  I AM MOST SURE IT DOES, BUT I DON'T

16   WANT TO SAY THAT UNTIL I HAVE HAD A CHANCE TO REVIEW IT.

17       THAT'S SAYING THAT F1 AND ATTACHMENT OF F SHOULD BE

18   EXCLUDED BECAUSE WE ONLY LISTED IT AS AN ATTACHMENT AND NOT AS

19   F1 SEEMS TO THE GOVERNMENT TO BE --

20       **THE COURT:**  IF APPENDIX F MAKES THE REPRESENTATION

21   YOU'RE SAYING, THEN THAT TOPIC IS WITHIN THE SCOPE OF

22   PERMISSIBLE TESTIMONY FOR THE WITNESS.

23       **MR. KEARNEY:**  I'LL CHECK ON THAT, YOUR HONOR, BEFORE

24   I MAKE THAT COMPLETE ASSERTION.  I WILL DO THAT AT THE FIRST

25   BREAK.

1        **MR. SMOCK:**  JUST FOR THE COURT'S INFORMATION,

2   EXHIBIT A TO OUR EXHIBIT IS THAT HYDROLOGY STUDY.  WE PROVIDED

3   IT TO YOU.  THERE IS NO REFERENCE TO GROUND WATER.

4        **THE COURT:**  WHERE IS THE GROUND WATER REFERENCE IN

5   THIS?

6        **MR. KEARNEY:**  SIR, I WANT TO READ THAT MYSELF BEFORE

7   I MAKE ANY ASSERTIONS TO THE COURT.

8        **THE COURT:**  ALL RIGHT.  SO THAT'S THE ORDER PENDING

9   CONFIRMATION ON THAT QUESTION.

10        WITH REGARD TO MARTEL AND GALACATOS, IS THE ISSUE

11   TEMPORAL?  WHY DO THEY BOTH NEED TO TESTIFY ABOUT BOTH TIME

12   PERIODS?  MARTEL CLEARLY CAN TESTIFY ABOUT '07, GALACATOS CAN

13   CLEARLY TESTIFY ABOUT '13.  WHAT MORE -- AND I'M ASSUMING

14   THERE IS NO OBJECTION TO THAT.

15        **MS. HANSEN:**  RIGHT.

16        **THE COURT:**  WHY DO WE NEED TO PUSH IT MORE THAN THAT?

17   WHY DON'T THEY JUST THEM TALK ABOUT WHAT THEY KNOW?

18        **MS. LEE:**  I ANTICIPATE MR. MARTEL WILL FOCUS MOSTLY

19   ON WHAT HE DID IN '07 WHEN HE VERIFIED HARVEY'S WORK.  MARTEL

20   DID NOT GO BACK ONTO THE SITE UNTIL 2017.  SO, YOUR HONOR'S

21   COMPLETELY CORRECT THAT HE WASN'T THERE IN 2013 AND 2014.

22        I THINK THE EXTENT OF WHAT HE WOULD TESTIFY TO OUTSIDE OF

23   THE WORK IN '07 IS WHAT HE SAW ON THE SITE PERSONALLY WHEN HE

24   WENT IN '17 --

25        **THE COURT:**  COMPLETELY FINE.

1        **MS. LEE:** -- AND HIS OPINION GENERALLY OF HIS

2   KNOWLEDGE OF HOW WETLANDS PERSIST THROUGH TIME, ESPECIALLY IN

3   THE ARID WEST REGION WHERE IT NATURALLY GOES THROUGH DROUGHTS

4   AND SEASONAL CHANGES.

5        **THE COURT:**  THE THING IS WE'VE GOTTEN THAT ALREADY

6   FROM AT LEAST ONE WITNESS.  WE ARE PROBABLY GOING TO GET IT

7   FROM THE WITNESS THAT'S ON RIGHT NOW.  THEY HAVE THE BASIS TO

8   DO IT.  WHY DO WE NEED TO DUPLICATE THAT?

9        **MS. LEE:**  BECAUSE MR. MARTEL COMES FROM THE ARMY

10  CORPS OF ENGINEERS, SO IT'S COMING FROM A DIFFERENT

11  PERSPECTIVE FROM A PRIVATE ECOLOGICAL CONSULTING FIRM.  AND

12  MR. MARTEL IS KIND OF LIKE, I DON'T KNOW HOW TO SAY IT MORE

13  COLLOQUIALLY, BUT HE HAS DONE SO MANY WETLAND DELINEATIONS.

14  SOME OF THESE PEOPLE WHO TESTIFIED TALK ABOUT IN THE AREAS OF,

15  YOU KNOW, A HUNDRED, MAYBE 130, MR. MARTEL HAS DONE WETLAND

16  DELINEATIONS ACROSS THE COUNTRY IN THE NUMBERS OF 1200 TO

17  1800.  HE LIVES, BREEDS WETLANDS.  SORRY, THAT SOUNDS WEIRD.

18     MY POINT IS, HE HAS KNOWLEDGE AND INFORMATION BEYOND THE

19  SCOPE OF WHAT DR. BOURSIER AND HARDWICKE HAVE, AND HE IS

20  COMING FROM THE AGENCY THAT ACTUALLY MAKES THE JURISDICTIONAL

21  DETERMINATIONS.

22        **THE COURT:**  HERE'S THE THING.  IT JUST SEEMS TO ME WE

23  ARE FINDING ALL SORTS OF WAYS TO FIGHT ABOUT THIS STUFF IN A

24  WAY THAT SEEMS NEEDLESS.

25     HE CAN CLEARLY TALK ABOUT '07.  I THINK HE CAN CLEARLY

TALK ABOUT '17 AND HE CAN SAY IT STILL HAD THE CHARACTERISTICS

OF WETLAND BASED ON MY OBSERVATIONS.  WHY IS THAT NOT ENOUGH?

I DON'T KNOW THAT HE NEEDS TO SAY AND, THEREFORE, IT WAS A

WETLAND FOR THE ENTIRE INTERVENING TIME.

WHY GO THERE?  YOU ARE GETTING WHAT YOU NEED BASED ON THE

PERIODS OF HIS OWN OBSERVATION.  AND I THINK '17 IS FAIR GAME

BASED ON HIS OBSERVATIONS.

**MS. LEE:**  YOUR HONOR, I WON'T ASK HIM WHETHER HE

THINKS IT WAS A WETLAND IN 2014.  HOWEVER, I WOULD LIKE TO ASK

HIM, BASED ON ALL OF HIS KNOWLEDGE THAT HE HAS HAD FROM 25

YEARS AT THE REGULATORY AGENCY THAT MAKES JURISDICTIONAL

DETERMINATIONS, HIS KNOWLEDGE GENERALLY OF HOW WETLANDS

PERSIST IN THIS REGION, HOW THEY -- WHAT WOULD CAUSE THEM TO

CHANGE, WHAT TIME PERIOD ARE WE LOOKING AT WHERE THERE WOULD

BE A MAJOR CHANGE THAT WOULD WARRANT A CHANGE IN THE

DETERMINATION.

SPECIFICALLY BECAUSE WE ARE IN CALIFORNIA AND THERE ARE

RAINY SEASONS AND THERE ARE DRY SEASONS, AND THERE ARE DRY

YEARS AND THERE ARE TORRENTIAL RAIN POUR YEARS, I ANTICIPATE

THE DEFENSE WILL LARGELY CLOSE IN ARGUMENT SAYING 2014 IS THIS

OUTLIER YEAR.  AND, SURE, IT WAS A WETLAND IN '07, MAYBE IT

WAS A WETLAND AGAIN IN '17, BUT FOR THIS ONE SNIPPET PERIOD OF

TIME IT WAS NOT.

I THINK MR. MARTEL'S EXPERTISE IS THAT HE CAN TALK ABOUT

HOW THESE WETLANDS DON'T JUST EVAPORATE WITH EVERY DROP OF

1  RAIN THAT GOES AWAY; THAT WETLANDS, LIKE MANY ENVIRONMENTAL

2  CHANGES, THEY ARE SLOW.  AND THAT WETLANDS ARE PERSEVERING AND

3  THAT THEY PERSIST.

4        **MS. HANSEN:**  YOUR HONOR, HE WASN'T NOTICE FOR ANY OF

5  THAT.  THE NOTICE IS VERY NARROW.

6        **THE COURT:**  IT'S NOT REALLY, THOUGH.  OKAY.  THAT

7  TOPIC IS ALLOWED.  I FIND THAT THAT TOPIC IS WITHIN THE SCOPE

8  OF THE NOTICE.

9     IT SOUNDS AS THOUGH THE GOVERNMENT IS AGREEING THEY ARE

10  NOT GOING TO TRY TO HAVE ANY PARTICULAR OPINION ABOUT '13,

11  '14, WHEN HE WASN'T THERE.  AND SO WE'VE GOT OBSERVATIONS '07,

12  WE'VE GOT OBSERVATIONS ABOUT '17, AND THEN THE WITNESS CAN

13  EXPLAIN BASED ON HIS OBSERVATIONS WHY THE CHARACTERISTIC OF A

14  WETLAND IS NOT TRANSITORY.

15        **MS. HANSEN:**  WE WANT TO MAKE SURE THE GOVERNMENT IS

16  NOT HAVING DAN MARTEL TESTIFY THAT THE WETLAND CHANGED

17  CHARACTERISTICS IN 2017 BECAUSE THERE IS NO BASIS FOR THAT

18  OPINION.  IN OTHER WORDS, THE AREA IN THE NORTH IS NOT

19  CONVERTED FROM ANOTHER WATER AS HE PREVIOUSLY DESIGNATED TO A

20  WETLAND.

21     THAT'S WHAT WE ARE CONCERNED ABOUT WITH THIS INADEQUATE

22  NOTICE IN 2017.

23        **MS. LEE:**  I THINK MR. MARTEL WILL JUST TALK ABOUT

24  WHAT HE SAW IN 2017.

25        **THE COURT:**  WE WILL SEE HOW THEY TRY TO PUT IT IN.

1         GALACATOS, SAME KIND OF ISSUE.

2              **MS. LEE:**  SHE WON'T OPINE ON THINGS BEFORE HER TIME.

3    SHE IS THE PERSON WHO -- SHE'S DAN MARTEL I GUESS WORKED UNDER

4    HER IN SOME RESPECTS.  WHILE DAN MARTEL DID THE FIELD WORK AND

5    THE ON-THE-GROUND DETERMINATION, THE PERSON THAT ACTUALLY

6    ISSUES THAT FINAL JD LETTER IS KATERINA.

7         SO THE ONLY THING SHE'LL TALK ABOUT '07 IS NOT GOING TO BE

8    A REPEAT OF WHAT DAN MARTEL SAID, BUT JUST THAT BASED OFF OF

9    THAT WORK, I ISSUED A JD.  THEN SHE SKIPS PRETTY MUCH MOVING

10   FORWARD TO WHEN SHE GOES BACK IN 2013, 2014, AND I THINK THE

11   NEXT TIME SHE WENT BACK WAS IN 2017.

12        SO THE GOVERNMENT WILL ENDEAVOR TO NOT BE DUPLICATIVE.

13             **THE COURT:**  ALL RIGHT.  YOUR RECORD IS MADE.

14        ANYTHING ELSE TO ADD?

15             **MS. HANSEN:**  NO.  THANK YOU.

16             **MR. KEARNEY:**  ONE SCHEDULING NOTE.  WE HAVE

17   DRS. BOURSIER, MARTEL, AND GALACATOS HERE TODAY.  THEY WILL BE

18   TESTIFYING.

19        WE HAD, I THINK THAT'S GOING TO BE ENOUGH TO FILL THE DAY

20   UP.  WE ORIGINALLY YESTERDAY HAD THOUGHT WE WOULD HAVE

21   DR. COATS AS A STANDBY IN CASE THEY DIDN'T FILL UP.

22        TURNS OUT HIS WIFE HAS A SERIOUS MEDICAL APPOINTMENT TODAY

23   HE HAS TO TAKE HER TO.  THEY ARE SOMEWHAT OF AN OLDER COUPLE,

24   YOUR HONOR.  I DON'T THINK IT'S GOING TO BE AN ISSUE, BUT WE

25   WON'T HAVE OUR FOURTH WITNESS UNTIL TOMORROW MORNING,

```
1    DR. COATS.
2              THE COURT:  ALL RIGHT.  IS THERE ANYONE ELSE WHO IS
3    ON DECK AFTER DR. COATS?
4              MR. KEARNEY:  POTENTIALLY DR. HUFFMAN, BUT WE ARE NOT
5    SURE.
6              THE COURT:  BUT THAT WOULD BE IT?
7              MR. KEARNEY:  THAT WOULD BE IT.
8              THE COURT:  ALL RIGHT.  OKAY.
9              MR. SMOCK:  YOUR HONOR, CAN I RAISE ONE OTHER THING?
10             THE COURT:  SURE.
11             MR. SMOCK:  THIS IS WITH RESPECT TO EXHIBITS.  AND I
12   AM NOT THRILLED TO BE BRINGING YOUR HONOR INTO THIS.  I KNOW
13   THAT IT'S ANNOYING TO HEAR ISSUES LIKE THIS.
14        FOR DR. COATS AND DR. HUFFMAN, WE DON'T HAVE ANYWHERE --
15   ANYTHING APPROXIMATING A LIST OF EXHIBITS THAT THEY INTEND TO
16   INTRODUCE THROUGH THEM.  WE HAVE MORE THAN 300 EXHIBITS FOR
17   DR. COATS, MOST OF WHICH ARE INADMISSIBLE AND CLEARLY NOW MOST
18   OF WHICH ARE BEYOND THE SCOPE OF HIS TESTIMONY.
19        FOR DR. HUFFMAN, WHAT WE HAVE BEEN GIVEN IS A LIST OF SIX
20   EXHIBITS.  THE GOVERNMENT HAS INDICATED THAT IT INTENDS TO
21   CALL DR. COATS TOMORROW.  AND IF THEY ARE CALLING DR. HUFFMAN,
22   HE WOULD TESTIFY TOMORROW AS WELL.
23        THE DEFENSE CAN'T BE PREPARED TO EFFECTIVELY CROSS-EXAMINE
24   THESE WITNESSES WITHOUT KNOWLEDGE OF WHAT EXHIBITS THEY ARE
25   GOING TO USE.  SAYING THAT DR. HUFFMAN IS GOING TO BE ASKED
```

1    ABOUT HIS REPORT DOESN'T EFFECTIVELY PREPARE US TO LOOK AT

2    EXHIBITS AND TALK ABOUT WHAT'S ADMISSIBLE AND ISN'T, AND

3    LEAVES US DELAYING THE COURT AS HIS TESTIMONY COMES IN

4    SCRAMBLING TRYING TO FIND EXHIBITS.  HIS REPORT IS MORE THAN

5    1200 PAGES LONG AND INCLUDES HUNDREDS OF PICTURES AND CHARTS.

6         THE IDEA THAT THEY WOULDN'T KNOW AT THIS POINT WELL, A

7    YEAR AFTER THEY STARTED WORKING WITH THESE PEOPLE WHAT

8    EXHIBITS THEY ARE GOING TO USE IS BEYOND ME.

9         AND I THINK THEY NEED TO BE REQUIRED TO DISCLOSE THAT TO

10   US IMMEDIATELY SO THAT WE CAN BE PREPARED TO CROSS-EXAMINE

11   THESE WITNESSES.  AT A MINIMUM, I WOULD SAY BY 2:00 O'CLOCK

12   TODAY THAT NEEDS TO BE DISCLOSED IF THEY ARE GOING TO BE

13   TESTIFYING TOMORROW SO THAT WE CAN BE PREPARED.

14           **MR. KEARNEY:**  YOUR HONOR, THIS COURT HAS ALREADY

15   ISSUED A 5:00 P.M. DEADLINE OF TODAY FOR DISCLOSURE OF FINAL

16   EXHIBITS FOR BOTH THESE WITNESSES.  THE GOVERNMENT INTENDS TO

17   COMPLY WITH THAT 5:00 P.M. ORDER.  WE ARE NOT OUTSIDE ANY

18   DICTATES OF THE COURT AT THIS STAGE.  WE WILL GET THAT TO THE

19   DEFENSE BY 5:00 O'CLOCK TODAY PURSUANT TO THE COURT'S ORIGINAL

20   ORDER.

21           **THE COURT:**  ALL RIGHT.  THAT IS FINE.

22           **MR. SMOCK:**  THANK YOU.

23           **THE COURT:**  ALL RIGHT.  LET'S TAKE THREE MINUTES AND

24   THEN WE WILL BRING THE JURY IN.

25           (RECESS TAKEN AT 8:38 A.M.; RESUMED AT 8:41 A.M.)

BOURSIER – DIRECT / LEE

1           **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

2   BACK IN SESSION.

3           **THE COURT:**  ARE WE READY FOR THE JURY?

4           **MS. HANSEN:**  YES, YOUR HONOR.

5           **MR. KEARNEY:**  YES, YOUR HONOR.

6       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

7           **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

8   WELCOME BACK.

9       AT THIS TIME, WE'LL CONTINUE WITH THE PRESENTATION OF THE

10  GOVERNMENT'S CASE.  YOU MAY RECALL THAT WE WERE IN THE MIDDLE

11  OF THE EXAMINATION OF DR. BOURSIER AND WILL CONTINUE WITH THAT

12  AT THIS TIME.

13          **THE CLERK:**  YOU CAN COME BACK UP TO THE WITNESS

14  STAND.

15          **THE COURT:**  YOU MAY PROCEED.

16          **MS. LEE:**  THANK YOU, YOUR HONOR.

17                  **DIRECT EXAMINATION RESUMED**

18  BY MS. LEE:

19  **Q.**  DR. BOURSIER, I WOULD LIKE TO TAKE YOU -- I WOULD LIKE TO

20  ASK YOU SOME QUESTIONS ABOUT THE HISTORY OF WORK YOU'VE DONE

21  ON THE SITE.

22      I THINK THE LAST -- WHEN YOU WERE HERE YESTERDAY WE TALKED

23  ABOUT HOW YOU HAD FAMILIARITY WITH THE SITE SINCE THE 1990'S.

24      COULD YOU WALK US THROUGH THE STUDIES THAT YOU'VE DONE ON

25  THE SITE FROM THE 1990'S UP TO PRESENT?

BOURSIER - DIRECT / LEE

1  **A.**  SURE.

2      AS I MENTIONED YESTERDAY, FIRST WAS THE PARCEL OWNED BY

3  THE O'CONNOR FAMILY WHICH IS LOCATED AT THE END OF STEVENSON

4  RIGHT NEXT TO THE RAILROAD TRACKS.  I DID THE WETLAND

5  DELINEATION FOR THEM AT THAT TIME.

6      MY INVOLVEMENT EXPANDED A BIT ON THAT SITE BECAUSE THERE

7  WAS AN OPEN CEASE AND DESIST ORDER ISSUED BY THE CORPS ON THE

8  PROPERTY.  SO I STARTED HELPING AN ATTORNEY AND WHERE WE

9  INTERACTED WITH THE CORPS PERMITTING GROUP.  SO THAT WAS

10  PRETTY MUCH THE END OF THAT PROPERTY -- OR MY INVOLVEMENT IN

11  STUDIES ON THAT PIECE.

12      STARTING IN 2001, AS I MENTIONED YESTERDAY, AND INTO 2002,

13  I CONDUCTED FIELD SURVEYS OF PRETTY MUCH ENTIRE NEWARK AREA 4

14  WHERE WE -- MY FIRM PUT TOGETHER THAT CONSTRAINTS AND

15  OPPORTUNITIES -- I'M TRYING TO CATCH MY BREATH.  I WAS RUNNING

16  BACK FROM THE BATHROOM.  SORRY.

17      CONSTRAINTS AND OPPORTUNITIES REPORT WHERE WE MAPPED

18  HABITATS, LOOKED FOR RARE PLANTS, WHICH IS ONE OF THE AREAS OF

19  EXPERTISE.  I HAD BEEN RESPONSIBLE FOR AT THE COMPANY, HARVEY

20  AND ASSOCIATES, INCLUDING REGULATED HABITATS.  WE MAPPED ALL

21  OF THOSE.

22      AND THEN WE RANKED THOSE VARIOUS HABITATS.  WHEN I SAY

23  "HABITATS" ARE THINGS LIKE AGRICULTURAL FIELD, PERENNIAL

24  WETLANDS, SEASONAL WETLANDS.  A COLLECTION OF TREES IS ANOTHER

25  HABITAT.

1    SO WE DESCRIBED ALL OF THOSE AND THEN RANKED THEM IN THEIR

2    RELATIVE IMPORTANCE, AND USING DIFFERENT CRITERIA AND THEN

3    ALSO HOW POTENTIAL IMPACTS TO THOSE HABITATS MIGHT CONSTRAIN

4    DEVELOPMENT.  AND IF YOU HAVE SENSITIVE HABITAT FOR A RARE

5    PLANT THAT IS FEDERALLY LISTED, AS AN EXAMPLE, YOU MAY NOT BE

6    ABLE TO PUT HOMES ON THAT SITE.  THINGS LIKE THAT.

7    **Q.**  DR. BOURSIER --

8    **A.**  SO THAT WAS 2001, 2002.

9    **Q.**  IF I COULD JUST INTERRUPT YOU FOR ONE SECOND.

10   DR. BOURSIER, WHEN YOU DID THAT WETLAND DELINEATION IN THE

11   '90S AND THEN YOU WENT AGAIN AND DID THE BIOTIC CONSTRAINTS

12   REPORT IN 2001 AND 2002 LOOKING AT WETLANDS AGAIN, WERE THE

13   PROPERTIES THAT YOU DELINEATED AS WETLANDS IN THAT '07 MAP --

14   AND I WILL JUST SHOW IT TO YOU.

15   **A.**  SURE.  THAT WOULD BE HELPFUL.

16   **Q.**  I AM SHOWING YOU GOVERNMENT'S EXHIBIT 1138.

17              (EXHIBIT HANDED TO WITNESS.)

18   YOU ARE FAMILIAR WITH THIS MAP, RIGHT --

19   **A.**  UH-HUH.

20   **Q.**  -- DR. BOURSIER?

21              (DISPLAYED ON SCREEN.)

22   IN THE 1990'S AND 2001, 2002, DID THE AREAS THAT YOU

23   DETERMINED TO BE JURISDICTIONAL WETLANDS IN '07, WERE THEY

24   ALSO DEEMED TO BE JURISDICTIONAL WETLANDS BACK IN THE 1990'S

25   AND 2002?

1   **A.**  A PORTION.  AND JUST -- WHEN I SAY A "PORTION", JUST THE

2   PROPERTY THAT THE O'CONNOR FAMILY OWNED.  JUST THAT PARCEL.

3       WHEN WE MAPPED -- WHEN WE WORKED ON THAT, THE ENTIRE AREA

4   FOR -- IN '01 AND '02, WE DIDN'T MAKE A JURISDICTIONAL CALL,

5   IT WAS MORE LIKE MAPPING HABITATS.

6       AND WHEN WE MAPPED WETLAND HABITATS, YOU PRETTY MUCH USE

7   THE SAME CRITERIA THAT THE CORPS DIRECTS YOU TO USE.  YOU JUST

8   DON'T -- THE LEVEL OF EFFORT IS SIGNIFICANTLY GREATER TO PUT

9   IN ALL THE TEST PITS AND FILL OUT THE FORMS, AND ALL THAT.  SO

10  WE DIDN'T DO THAT PART.  WE JUST DID WHAT WE CALL A 99 PERCENT

11  CONFIDENCE INTERVAL MAPPING OF HABITAT.

12      SO THEY DIDN'T DIRECTLY OVERLAY.  THERE WERE ACTUALLY MORE

13  WETLANDS MAPPED BY US IN '01 THAN WE CONCLUDED AS SHOWN ON

14  THAT MAP.

15  **Q.**  OKAY.  WHERE WAS THE O'CONNOR PROPERTY?

16  **A.**  IT'S -- I'LL TRY AND DESCRIBE IT, BUT I CAN JUMP UP AND

17  SHOW YOU.

18      IT'S AT THE VERY END OF STEVENSON THERE'S A LARGE

19  TRIANGULAR POND.  AND YOU CAN SEE THAT UP AGAINST THE RAILROAD

20  TRACKS.  IF THAT MAKES SENSE.

21      DID YOU WANT ME TO GO UP --

22  **Q.**  SURE.  IF YOU CAN JUST SHOW US BECAUSE IT SOUNDS LIKE THAT

23  IS WHERE YOUR WORK WAS LIMITED TO; IS THAT RIGHT?

24  **A.**  DO I HAVE TO PUSH A BUTTON?

25  **Q.**  YOU CAN JUST SHOW US IF YOU WANTED TO --

1    **A.**  SURE.

2    **Q.**  -- GET UP OFF THE STAND.

3    **A.**  SO THE PARCEL OR THE PROPERTY OWNED BY THE O'CONNOR FAMILY

4    IS THIS PIECE RIGHT HERE (INDICATING).

5    **Q.**  SO YOUR STUDIES IN THE 1990'S WERE LIMITED TO THAT PIECE?

6    **A.**  YES.  CORRECT.

7    **Q.**  IN 2001 AND 2002, WITH YOUR BIOTIC CONSTRAINTS REPORT, YOU

8    ACTUALLY HAD FOUND MORE WETLANDS THAN THIS JURISDICTIONAL

9    DETERMINATION DEPICTS?

10   **A.**  RIGHT.

11        ACTUALLY, WHILE I'M STANDING HERE, I WORKED ON THIS

12   PROPERTY AS WELL (INDICATING).  AND THAT WAS -- I KNOW IT IS

13   NOT RELEVANT TO YOUR QUESTION, BUT THAT WHOLE PIECE OF

14   PROPERTY I DID THE WORK ON ABOUT 19 -- MID '90S TO LATER '90S

15   AS WELL.

16   **Q.**  THANK YOU.

17        LET'S GO, MOVING FORWARD, PASSED 2002.  WHEN WAS YOUR

18   NEXT....

19   **A.**  WHEN DID I GO BACK ON-SITE?

20        I WAS FINISHING HER QUESTION FOR HER.

21   **Q.**  ONE QUESTION, DR. BOURSIER.

22        WHEN YOU SAID THERE WERE MORE WETLAND IN '01 AND '02,

23   BASED ON OBVIOUSLY A LESS DETAILED STUDY OF THE SITE, I WOULD

24   LIKE TO ASK YOU, WERE THE AREAS THAT WERE FILLED IN THIS CASE

25   IN THE NORTHERN FILL AREA AND THE SOUTHERN FILL AREA, WERE

BOURSIER – DIRECT / LEE

1    THEY DEEMED TO BE WETLANDS BY YOU IN 2001 AND 2002?

2    **A.**  FOR SURE I CAN SAY THE NORTHERN.  I WOULD HAVE TO LOOK AT

3    THE MAP AND DETERMINE IF THE SOUTHERN AREA WAS.  MY BEST

4    GUESSTIMATE IS THAT, YES, THEY HAD BEEN INCLUDED.

5    **Q.**  OKAY.

6        DR. BOURSIER, IF I WERE TO SHOW YOU THE MAPPING YOU HAD

7    DONE IN THE '01 TO '02 TIME PERIOD, WOULD THAT REFRESH YOUR

8    RECOLLECTION IF THE SOUTHERN FILL AREA WAS DEEMED BY YOU BACK

9    THEN TO BE A WETLAND?

10   **A.**  THAT'S MY RECOLLECTION.

11                      (DOCUMENT HANDED TO WITNESS.)

12       RIGHT.  AND SO WHAT THIS MAP SHOWS -- AND THIS IS NOT A

13   REGULATORY HABITAT TYPE, IF YOU WILL, WE DIDN'T CALL IT A

14   WETLANDS OR "OTHER WATERS", BUT THESE ARE MORE LIKE BIOLOGICAL

15   HABITATS.  AND IT LOOKS, IF I CAN READ THE -- THERE'S A LOT OF

16   MULTIPLE COLORS ON THIS MAP.

17       IT LOOKS LIKE WE IDENTIFIED IT AS AGRICULTURAL

18   FIELD/SEASONAL WETLAND AND WITH A MODIFIER THAT IT WAS SALINE

19   TO BRACKISH.  AND THAT WAS BASED ON THE PRESENCE OF PLANTS

20   THAT TOLERATE SALT, SALTY ENVIRONMENTS TO BRACKISH

21   ENVIRONMENTS.

22       AND THE SAME IS TRUE OF THE NORTHERN FILL AREA.

23   **Q.**  OKAY.

24   **A.**  ALTHOUGH A LOT OF THE NORTHERN FILL AREA WE MAPPED AS

25   AQUATIC.

BOURSIER – DIRECT / LEE

1  **Q.**  SO WOULD IT BE FAIR TO SAY THAT YOUR DETERMINATION WAS

2  THAT IN THE NORTHERN AND THE SOUTHERN FILL AREAS THAT YOU HAD

3  DEEMED THEM TO BE EITHER AQUATIC OR WETLANDS IN 2001 AND 2002?

4  **A.**  YES.  CORRECT.

5  **Q.**  OKAY.

6  LET'S MOVE FORWARD TO YOUR WORK ON THIS SITE.  IS THAT THE

7  NEXT TIME YOU DID AN EXTENSIVE -- OR A STUDY ON THE SITE?

8  **A.**  WE STARTED THE FIELD STUDIES IN 2005 AND THOSE WENT

9  THROUGH THE 2005, 2006, RAINFALL SEASON.

10  IT'S IMPORTANT TO POINT OUT THAT WE KEPT A RUNNING MAP

11  THAT LOOKS LIKE THIS THAT WERE EARLIER VERSIONS AND WE ALSO

12  PLACED PIN FLAGS ON THE GROUND SO WE COULD VISUALLY SEE WHERE

13  WE THOUGHT THE WETLAND/UPLAND INTERFACE WAS.

14  WE CONTINUED THAT WORK DURING THE 2006, 2007 RAINFALL

15  SEASON, AND WE DID FINAL MAPPING IN -- WELL, PRIOR TO

16  PUBLICATION OF OUR REPORT IN JUNE OF 2007.

17  IT'S -- I ALSO SHOULD DESCRIBE JUST BRIEFLY, THE LEVEL OF

18  EFFORT -- I PERSONALLY CONSERVATIVELY VISITED THE SITE, AND

19  REMEMBER I'M A PRINCIPAL AND I'M DIRECTING, I THINK THERE ARE

20  AT LEAST FIVE TO SIX OTHER FOLKS WHO WORK DIRECTLY FOR ME WHO

21  ALSO SPECIALIZE IN WETLAND DELINEATIONS INCLUDING PEOPLE WE

22  BROUGHT UP FROM OUR FRESNO OFFICE, SO I VISITED THE SITE

23  SOMEWHERE BETWEEN 30 AND 40 TIMES.  I HAVEN'T LOOKED AT MY

24  EMPLOYMENT RECORDS OR TIME RECORDS TO CONFIRM ANY OF THAT.

25  BUT THERE WERE OTHER PEOPLE, INCLUDING DR. HARDWICKE, WHO

```
1    STARTED ON THAT PROJECT WHO IS OUT ON THE PROPERTY COLLECTING

2    DATA AND COMPLETING THE COMPLEX DATA FORMS AND DIGGING SOIL

3    TEST PITS, BUT ALSO SHE WENT OUT ALMOST WEEKLY, SOMETIMES

4    TWICE A WEEK TO PHOTOGRAPH THE PROPERTY.  SO SHE WOULD HIKE

5    AND DRIVE EVERYWHERE JUST TO DOCUMENT WHERE THERE WAS PONDED

6    WATER, WHERE THERE WAS SATURATED WATER, WHERE THERE WAS

7    PICKLEWEED, WHERE THERE WAS, YOU KNOW, YELLOW MUSTARDS THAT

8    ARE COMING UP.  YOU SEE A LOT OF THOSE NOW IN THE AREA.

9         SO THE LEVEL OF OTHER EFFORT -- AS I SAY, THERE WERE OTHER

10   PEOPLE WITHIN OUR FIRM, TOTAL OF AROUND FIVE OR SIX BIOLOGISTS

11   WHO VISITED THAT SITE CONSTANTLY.

12   Q.  SO THE LEVEL OF EFFORT WAS FAR GREATER THAN BACK IN '01

13   AND '02?

14   A.  OH, YEAH, MUCH GREATER.  I BELIEVE IN -- IT'S ONLY WHEN WE

15   DID THE BIOTIC CONSTRAINTS REPORT, I WAS BASICALLY THE ONLY

16   PLANT BIOLOGIST TO GO OUT.  THAT MAY HAVE BEEN, YOU KNOW, A

17   HANDFUL, HALF A DOZEN TIMES.  SO ALL TOLD, WHEN WE DID THE

18   '05, '06 LEVEL OF EFFORT IT WAS ORDERS OF MAGNITUDE MORE IN

19   TERMS OF ACTUAL HOURS SPENT ON THE SITE AND NUMBER OF VISITS

20   PAID.

21   Q.  AND IT EXTENDED OVER A TWO-YEAR PERIOD OF TIME?

22   A.  CORRECT.  RIGHT.

23   Q.  INTO A PERIOD OF TIME WHERE THE RAINFALL HAD DROPPED BY

24   50 PERCENT?

25   A.  APPROXIMATELY.
```

1   **Q.**  LET'S MOVE FORWARD.

2       DID YOU DO ANY STUDIES ON THE SITE IN 2009?

3   **A.**  YES.  WE –– OUR FIRM WAS HIRED TO PUT TOGETHER THE

4   ENVIRONMENTAL IMPACT REPORT AND –– STARTING IN 2008.  AND WE

5   WROTE THAT REPORT –– WE WROTE THE BIOLOGICAL RESOURCES SECTION

6   OF IT.

7       ENVIRONMENTAL IMPACT REPORTS HAVE SECTIONS ON TRAFFIC AND

8   SECTIONS ON GEOLOGY AND WATER QUALITY.  WE JUST DID THE

9   BIOLOGY PART OF THAT.

10      SO I WENT BACK OUT, AGAIN AT A LESSER LEVEL BECAUSE I WAS

11  A PRINCIPAL, WE WENT BACK OUT IN 2008 AND, AGAIN, MAPPED

12  BIOTIC HABITATS.

13      BECAUSE WE HAD A MAP –– I'LL BACK UP JUST BRIEFLY.

14      OUR –– WETLAND DELINEATION WAS PROVIDED TO THE CORPS IN

15  JUNE OF '07.  AND BY AUGUST OF '07, I HAD A FIELD VISIT WITH

16  THE WETLAND SPECIALIST FROM THE SAN FRANCISCO DISTRICT.  SO

17  THAT'S ANOTHER TIME I WENT OUT.  AND I BELIEVE WE WENT OUT TWO

18  DAYS TOTAL.

19      SO IN '08, WE STARTED OUR FIELD STUDIES FOR THE

20  ENVIRONMENTAL IMPACT REPORT.  SO I WENT OUT THERE, AS I SAY,

21  RELATIVELY MINIMAL NUMBER OF TIMES.  PEOPLE THAT WORK FOR ME,

22  WE CONDUCTED RARE PLANT SURVEYS OUT THERE, BUT OUR FIRM SENT

23  OUT –– OUR FIRM IS RATHER SPECIALIZED, BUT WE HAVE PEOPLE WHO

24  SPECIALIZE IN INVERTEBRATES, WHO SPECIALIZE IN HERPS LIKE

25  TIGER SALAMANDERS AND FROGS AND BAT SPECIALISTS AND RAPTOR

1    SPECIALISTS.  SO ALL OF THESE WILDLIFE BIOLOGISTS WERE OUT

2    THERE AS WELL AND PEOPLE WHO STUDY MIGRATORY BIRDS AS WELL AS

3    RESIDENT BIRDS.

4        SO THEY WERE OUT.  THEY WERE OUT MORE THAN THE PLANT

5    BIOLOGISTS BECAUSE WE HAD BEEN THERE SO MUCH.  WE PRETTY MUCH

6    KNEW A LOT MORE ABOUT THE PROPERTY.

7        AND, AGAIN, THAT WAS PUT OUT, THAT WAS PUBLISHED IN '09.

8    **Q.**  JUST TO BACK UP A LITTLE BIT.

9        YOU MENTIONED IN AUGUST OF 2007, YOU WENT OUT WITH SOMEONE

10   FROM THE SAN FRANCISCO DISTRICT.  ARE YOU REFERENCING MR. DAN

11   MARTEL FROM THE ARMY CORPS OF ENGINEERS?

12   **A.**  YES.  CORRECT.

13   **Q.**  THAT IS A GOVERNMENT AGENCY THAT ISSUES JURISDICTIONAL

14   DETERMINATIONS OF "WATERS OF THE UNITED STATES"?

15   **A.**  RIGHT.  THAT'S CORRECT.

16   **Q.**  AND BASED OFF OF THOSE VISITS WITH MR. MARTEL, WAS A

17   JURISDICTIONAL DETERMINATION MADE BY THE ARMY CORPS OF

18   ENGINEERS?

19   **A.**  YES.  IT TOOK A LITTLE WHILE BECAUSE THE CORPS HAS TO --

20   THEY TAKE THEIR OWN DATA.  THEY SHOW UP WITH THEIR OWN SHOVEL

21   AND DIG THEIR OWN PITS AND VISIT ALL OF THE VARIOUS SITE.

22       AS WE MENTIONED YESTERDAY, THERE WERE SOME MINOR --

23   RELATIVELY MINOR EXPANSIONS, EXTENSIONS OF THE BOUNDARIES.

24   AND SO THEY ISSUED -- THE SECTION CHIEF AT THAT TIME OR SOUTH

25   SECTION CHIEF AT THE CORPS ISSUED THAT, SIGNED THAT LETTER.

1    IT'S CALLED A JURISDICTIONAL DETERMINATION LETTER.

2         BASICALLY IT SAYS, WE AGREE WITH THIS MAP THAT HARVEY'S

3    PUT TOGETHER AND SUBSEQUENTLY MODIFIED WITH DAN MARTEL.  AND

4    THAT WAS IN, I BELIEVE, OCTOBER OF '07.

5    **Q.**  WOULD IT BE FAIR TO SAY THAT THE ARMY CORPS OF ENGINEERS

6    SAID WE AGREE WITH THIS MAP WITH A COUPLE ADDITIONAL ACRES OF

7    WETLANDS, AND THEY DEEMED THE WETLANDS AND THE AQUATIC AREA,

8    THE GREEN AND THE BLUE AREAS --

9    **A.**  UH-HUH.

10   **Q.**  -- AS "WATERS OF THE UNITED STATES"?

11   **A.**  IT MIGHT BE HELPFUL IF WE -- CAN WE PUT THAT MAP UP HERE

12   OR I CAN COME AND POINT TO THAT.

13   **Q.**  SURE.  WE CAN PUT GOVERNMENT'S EXHIBIT 1138 --

14   **A.**  OR MAYBE I CAN POINT TO THAT ONE.  WHATEVER IS EASIER.

15   **Q.**  WOULD IT BE FAIR TO SAY THAT THE ARMY CORPS OF ENGINEERS,

16   AFTER THEIR SITE VISIT, AFTER THEIR VERIFICATION OF YOUR WORK

17   AND DR. HARDWICKE'S AND YOUR COMPANY'S WORK, THEY SAID THESE

18   AREAS IN GREEN AND BLUE WITH THE ADDITIONAL FEW ACRES OF

19   ADDITIONAL GREEN ARE "WATERS OF THE UNITED STATES"?

20   **A.**  YES.

21        CAN I POINT THOSE OUT?  IT MIGHT BE HELPFUL TO --

22   **Q.**  IF YOU WOULD LIKE TO, SURE.

23   **A.**  SO THE AREAS -- THIS IS THE JUNE MAP.  AND ARMY CORPS WENT

24   OUT.  AND JUST THIS BOUNDARY THAT DIPS DOWN IN THIS DIRECTION

25   (INDICATING) BETWEEN THE TIME WE FINISHED OUR FIELD WORK AND

1    SUBMITTED THE REPORT AND THE ARMY CORPS CAME OUT, AND REMEMBER

2    THIS WAS IN THE MIDDLE OF SUMMER, THE WETLANDS HAD ACTUALLY

3    INCREASED IN THAT DIRECTION (INDICATING).  IT EXPANDED.  AND

4    THAT'S IN THE PRESENCE OF SEEPS, THINGS WE TALKED ABOUT

5    YESTERDAY.

6        SO THIS BOUNDARY, INSTEAD OF GOING DOWN, THE ARMY CORPS

7    THOUGHT DUE TO THE PRESENCE OF WETLAND PLANTS AND SOILS BEING

8    SATURATED, THAT BOUNDARY WAS DRAWN STRAIGHT ACROSS.

9        THEN THERE WERE ONE OR TWO OTHER AREAS DIRECTLY ADJACENT

10   TO THE SLOUGH.  AND YOU CAN SEE, SAY IN THAT AREA RIGHT THERE

11   (INDICATING), IF YOU CAN BLOW THAT UP, THAT WOULD BE GREAT.

12       YOU CAN SEE SORT OF UNDERNEATH THIS AERIAL PHOTOGRAPH

13   THERE ARE SIGNATURES OF SOME SCALDING AND THEN THESE ARE

14   TOPOGRAPHIC LINES.  SO WHAT HAPPENED IS THE WETLAND VEGETATION

15   EXPANDED INTO THIS LITTLE FINGER, IF YOU WILL.

16       AGAIN, IT'S LOW LYING.  AND IT'S AN AREA THAT WE SAW

17   WETLAND PLANTS IN BEFORE BUT THEY HAD FURTHER EXPANDED BETWEEN

18   THE TIME -- WE MAY HAVE BEEN THERE AS LATE AS APRIL OR MAY OF

19   THAT YEAR.  AND BY THE TIME THE CORPS SHOWED UP IN THE AUGUST,

20   THEY HAD CONTINUED TO EXPAND.  I BELIEVE THERE WAS AN

21   EXPANSION, SIMILAR SITUATION, TOPOGRAPHICALLY LOWER AREA, AND

22   THE PLANTS HAD CONTINUED TO GROW OR EXPAND IN THERE.

23       THOSE ARE THE MAIN AREAS.

24   Q.  BUT IT WAS THE AMOUNT OF A SMALL NUMBER OF ACRES OF

25   WETLANDS; IS THAT RIGHT?

BOURSIER – DIRECT / LEE

1   **A.**  RIGHT.  CORRECT.

2   **Q.**  WHEN YOU HAD GONE OUT AGAIN IN 2008 AND 2009 TO DO A MORE

3   LIMITED STUDY OF THE SITE FOR BIOTIC HABITATS, DID THE SITE

4   LOOK THE SAME IN TERMS OF THE WETLANDS, THE AREAS THAT YOU HAD

5   DEEMED TO BE POTENTIAL "WATERS OF THE UNITED STATES"?

6   **A.**  YES.

7       AND WE BASICALLY BASED IT ON THE JURISDICTIONAL

8   DETERMINATION MAP THAT THE CORPS, AND WE AGREED TO, DURING

9   THEIR VISIT.

10  **Q.**  WAS THERE ANYTHING ABOUT YOUR VISUAL INSPECTION OF THE

11  SITE THAT WOULD MAKE YOU THINK THAT THIS MAPPING THAT YOU HAD

12  DONE WITH THE ADDITIONAL ACRES BY THE CORPS, THAT ANYTHING

13  WOULD HAVE CHANGED?

14  **A.**  OH, IT HADN'T CHANGED, NO, AT ALL.

15      AS I MENTIONED YESTERDAY, TOO, THERE WAS -- PART OF OUR

16  JOB IS TO INTERACT WITH THE CORPS AND IDENTIFY AND DOCUMENT

17  AREAS WHERE WE THINK, EVEN THOUGH YOU MIGHT HAVE WETLAND

18  PLANTS, THAT JURISDICTION DOESN'T APPLY.

19      ONE OF THE AREAS I MENTIONED YESTERDAY WAS THE STRIP OF

20  TREES AND GRASS ALONG STEVENSON WHERE THEY WERE JUST

21  OVERWATERING EVERY NIGHT, AND THAT WATER WENT INTO THE AG

22  FIELD AND YOU HAD WETLAND PLANTS.  AND THE CORPS AGREED THAT

23  THEY WOULD DISCLAIM THAT BECAUSE IT'S ARTIFICIAL HYDROLOGY.

24      AND THE SAME, THERE ARE TWO STORM WATER BASINS IN THE AUTO

25  DISMANTLERS AREA.  ONE OF THEM, I THINK, AN OPERATION IS NAMED

1    PICK 'N PULL.  THEY ARE REQUIRED BY THE STATE WATER BOARD TO

2    HAVE THOSE STORM WATER PONDS TO HELP SETTLE OUT SEDIMENTS AND

3    POLLUTION, AND THE CORPS AGREED THAT -- PRETTY MUCH THAT'S

4    EXEMPT BY REGULATION, AND THE CORPS AGREED.

5         WE IDENTIFIED THOSE AS HAVING PHYSICAL CHARACTERISTICS,

6    THEY HAVE WATER, THEY HAVE WETLANDS, BUT THEY AREN'T REGULATED

7    UNDER CLEAN WATER ACT.

8    **Q.**  CAN YOU INDICATE ON THE MAP WHERE THOSE AREAS WERE?

9    **A.**  SURE.  IF YOU CAN EXPAND THAT AREA (INDICATING).

10        SO THERE IS THIS BASIN HERE AND THIS BASIN (INDICATING).

11   **Q.**  LET THE RECORD INDICATE THE WITNESS IS INDICATING THE

12   BASINS BY THE PICK 'N PULL.

13   **A.**  CORRECT.

14   **Q.**  AND WHERE WERE THE AREAS THAT YOU MENTIONED IT WAS THE

15   TREES AND IT WAS BEING OVER SPRINKLERED?

16   **A.**  IT'S ACTUALLY ON NEWARK AREA 3 UP HERE (INDICATING).

17        SO THERE'S A PARALLEL STRIP YOU CAN BARELY SEE THE -- SO

18   HERE OUR LEGEND SAYS, AREAS WITH WETLAND CHARACTERISTICS.  SO

19   THE GROUND WAS WET, THE SOIL WAS WET -- IT WAS FREE WATER

20   STANDING AND THEY ARE WETLAND PLANTS -- IN THIS STRIP, SORT OF

21   PINK, MAGENTA COLOR, RIGHT IN THERE (INDICATING).

22        WE WENT OUT ON A LIMB AND SAID DETERMINE TO BE

23   NONJURISDICTIONAL, AND THE CORPS AGREED WITH THAT.  THEY HAD

24   TO CHANGE THE TERMINOLOGY ON THE LEGEND A LITTLE BIT.

25   **Q.**  AND THAT'S --

BOURSIER – DIRECT / LEE

1    **A.**   IF YOU LEAVE THE SPRINKLER ON IN YOUR FRONT LAWN, WE ARE

2    NOT GOING TO REGULATE THAT.

3    **Q.**   THAT'S BECAUSE OF THE ARTIFICIAL HYDROLOGY?

4    **A.**   THAT'S CORRECT.

5    **Q.**   AS OPPOSED TO THE HYDROLOGY ON THE SITE WHERE IT'S GREEN

6    AND BLUE, WHAT ARE THOSE SOURCES OF HYDROLOGY?

7    **A.**   YEAH.  THAT'S -- THERE ARE -- IT'S REALLY AN IMPORTANT

8    POINT.  AND TO UNDERSTANDING THIS PROPERTY, AND THERE ARE

9    ACTUALLY THREE.  I WILL TRY AND MAKE IT -- IT WILL --

10   STRAIGHTFORWARD.  IT IS BEST IF I CAN POINT.

11            **THE REPORTER:**  CAN YOU PLEASE USE THE MICROPHONE.

12            **THE CLERK:**  YOU NEED TO TURN ON THE SWITCH.

13            **THE WITNESS:**  IS THAT WORKING?

14            **MS. LEE:**  IF YOU TALK INTO IT, YES.

15            **THE WITNESS:**  THAT'S TERRIBLE.

16       SO THERE'S THREE SOURCES OF HYDROLOGY.  AND HYDROLOGY IS

17   SIMPLY A FANCY WORD FOR WATER.

18       THE FIRST ONE IS WHEN IT RAINS, OBVIOUSLY THAT CONTRIBUTES

19   WATER TO THE ENTIRE PROPERTY.  IT'S AROUND... I THINK IT'S

20   UNDER 500 ACRES, SO IT'S RELATIVELY LARGE.

21       THE SECOND SOURCE OF HYDROLOGY THAT WE OBSERVED ON-SITE IS

22   FROM GROUND WATER.  AND THE THIRD SOURCE OF HYDROLOGY IS

23   RELATED TO GROUND WATER, AND THAT IS SEEPS.

24       AND WHERE WE IDENTIFY THE DIFFERENCES THAT -- IN OUR

25   EXPERIENCE, SEEPS ARE AREAS WHERE GROUND WATER COMES IN

1    DISCRETE LOCATIONS CLOSE TO THE SOIL SURFACE.

2        AND WHEN THERE'S AN INFLUENCE OF GROUND WATER THAT --

3    THAT'S WHERE GROUND WATER COMES ABOVE.  AND YOU CAN ACTUALLY

4    SEE FREE WATER.  YOU CAN SEE WATER THROUGH -- OFF TO THE

5    SURFACE.

6            **THE CLERK:**  SOUNDS LIKE OUR BATTERY JUST DIED.

7            **THE WITNESS:**  SORRY.

8        SO THE PORTION OF THE PROPERTY FROM THIS FARM ROAD SOUTH,

9    WE NEVER SAW ACTIVE SEEPS, WE NEVER SAW ACTIVE GROUND WATER.

10   SO ALL OF THESE -- GREAT -- THANK YOU.

11       ALL OF THOSE WETLANDS RESULT PRIMARILY FROM RAINFALL.  AND

12   SO ALL OF THESE LOCATIONS, FOR THE MOST PART, ARE TOPOGRAPHIC

13   LOW POINTS.  I AM TALKING 3 INCHES, 6 INCHES.

14       SO PICTURE A -- A POOL TABLE WITH A MINOR DIP IN THE

15   TOPOGRAPHY.  SO THAT'S WHERE WATER -- ONCE IT HITS THE VERY,

16   VERY DENSE CLAYS THAT ARE ON SITE, WATER SORT OF SETTLES IN.

17       SO THIS WETLAND HERE, WATER FALLS DIRECTLY ON IT, BUT

18   BECAUSE OF THE TOPOGRAPHY, WATER RUNS INTO IT FROM ADJACENT

19   AREAS.  AND THIS PROPERTY, THIS PART OF THE PROPERTY DROPS

20   FROM THAT DIRECTION DOWN.  AND THE SAME -- THERE'S ANOTHER

21   SIGNIFICANT DROP IN TOPOGRAPHY FROM MORE OR LESS NORTHWEST TO

22   SOUTHEAST.

23       SO THAT'S -- THAT IS RELATIVELY STRAIGHTFORWARD WHEN YOU

24   ARE TALKING ABOUT SEASONAL AND HYDROLOGY AND WETLAND PERCIP --

25   INCIDENT RAINFALL.

1     THE AREAS IN BLUE WE DETERMINE WERE PRIMARILY FROM WHAT WE

2  CALL GROUND WATER, THE AREA RIGHT HERE, (INDICATING), AT

3  LEAST, NOT GOING NORTH.  AND, AGAIN, THAT'S THE PICK 'N PULL

4  THERE (INDICATING).

5     THERE'S ALSO -- SO THIS IS OPEN WATER.  AND OFTEN THERE'S

6  DUCKS AND GEESE AND SHOREBIRDS OUT THERE.  BUT THERE'S ALSO

7  ASSOCIATED WITH THIS A PERIMETER OF PERENNIAL MARSH.  THAT

8  MEANS IT'S NOT -- SO PERENNIAL MEANING THESE ARE PLANTS THAT

9  LIVE ALL YEAR ROUND.  THEY MIGHT BE SMALL SHRUBS, THEY MIGHT

10 BE TALL THINGS LIKE CATTAILS OUT THERE, AND THAT PART OF THE

11 PROPERTY IS NOT DISKED, NOT FARMED.

12    IF YOU WERE TO WALK OUT THERE -- SO IF YOU GOT OUT OF YOUR

13 CAR HERE AND CROSSED THE FIELD (INDICATING), YOU ARE IN

14 CHEST-HIGH MUSTARDS, VERY DRY, ANNUAL... WHEAT, WILD OATS AND

15 WHEAT.  AND IF YOU CROSS THE BOUNDARY INTO THIS SORT OF -- SEE

16 THE DARKER PATTERN UNDERNEATH, YOU START TO REALIZE THAT

17 YOU'RE ALMOST ON FLOATING GROUND.

18    AND IF YOU GO A LITTLE FURTHER, YOU ARE GOING TO BE KNEE

19 HIGH IN MARSHY VEGETATION AND PERENNIAL, THINGS LIKE

20 PICKLEWEED.  THAT'S A PLANT THAT GROWS AROUND SAN FRANCISCO

21 BAY.

22    ONE OTHER INDICATION OF THAT, IT'S A LITTLE -- ALL OF

23 THESE -- MOST OF THE PROPERTY ACTUALLY WAS TIDAL... TIDAL

24 MARSH UNTIL AROUND SOMEWHERE IN THE EARLY 1900'S.  COULD HAVE

25 BEEN 1910, COULD HAVE BEEN 1920.

1      AROUND THE SAN FRANCISCO BAY, CARGILL SALT COMPANY AND

2   OTHER SALT-PRODUCING COMPANIES THOUGHT IT A GOOD IDEA TO PUT

3   UP LEVEES AND BERMS AND SEPARATE PROPERTIES THAT WERE ONCE

4   TIDAL FROM THAT TIDAL ACTIVITY.

5      SO MOWRY SLOUGH IS STILL TIDAL, BUT THERE IS A VERY

6   SIGNIFICANT LEVEE THAT SEPARATES THAT FROM THIS PROPERTY SO IT

7   IS NO LONGER TIDALLY INFLUENCED.

8      THE OTHER INDICATION WAS THAT -- SO THESE ARE DESCRIBED BY

9   THE NATURAL RESOURCE CONSERVATION SERVICE AS BEING VERY SALINE

10  BECAUSE THEY WERE TIDAL MARSH.  PICKLEWEED USED TO GO IN AND

11  OUT -- THE TIDE USED TO GO IN AND OUT AND SUPPORT PICKLEWEED.

12     IF YOU LOOK AT THE MIDDLE OF THIS PROPERTY, THERE'S A

13  LARGE STAND OF CATTAILS WHICH IS SOMETHING THAT GROWS IN FRESH

14  WATER.  YOU WONDER WELL WHY.  YOU WALK OUT THERE, AND YOU'LL

15  SEE FRESH WATER RIGHT AT THE SURFACE.

16     AND EVERY TIME, INCLUDING TWO DAYS AGO WHEN I WAS OUT

17  THERE, YOU GO RIGHT IN THIS LOCATION (INDICATING), IF I'VE GOT

18  IT CORRECT, AND THERE IS A CULVERT -- THIS IS A RANCH ROAD

19  (INDICATING), AND THERE IS A CULVERT RIGHT THERE.  AND

20  THERE'S -- THERE'S FRESH WATER JUST FLOWING ANY RAINFALL YEAR,

21  ANY TIME OF YEAR.

22     AND AT ONE TIME, I FORGOT THE NUMBER, I WAS CURIOUS.  I

23  TOOK A FIVE -- I WENT TO THE HOME DEPOT DOWN THE STREET, GOT A

24  5 GALLON BUCKET, AND PUT IT UNDER THAT CULVERT, AND 5 GALLONS

25  OF WATER CAME OUT IN ROUGHLY A MINUTE.  SO A LOT.  AS I SAY,

1    TUESDAY I WAS THERE, AND IT WAS STILL CRUSHING.

2        BUT AN INDICATION THAT SOMETHING IS GOING ON OUT HERE.

3    THERE'S GROUND WATER COMING UP.  IF IT WAS SALINE, YOU'D THINK

4    IT WOULD BE TIDAL, BUT OBVIOUSLY IT'S NOT TIDAL INFLUENCE.

5        AND THEN THE LAST THING, AND I WILL BE BRIEF ABOUT THIS,

6    ARE THE SEEPS.  AND THE SEEP AREAS SORT OF CAUSE THE

7    CONTRIBUTION OF WETLANDS IN THIS LOCATION (INDICATING) ALSO UP

8    ON THE NORTHERN PART OF THE PROPERTY.  AND BOTH OF THOSE --

9    BOTH THE LOCATIONS OF THE FILL AREAS, THE NORTHERN AND

10   SOUTHERN AREAS, YOU CAN SEE THE LIGHTER GREEN.  YOU CAN SEE

11   THE SEEPS RIGHT THERE.  THEY ARE REALLY THE DARKER GREEN.

12       SO THE FARMER OVER THE YEARS HAS BEEN UNABLE IN MOST

13   YEARS -- OR IF HE WAS REALLY AGGRESSIVE AND HE HAD TOO MUCH

14   COFFEE, HE WOULD BURY THE TRACTORS OUT THERE.  THEY ULTIMATELY

15   WENT FROM A WHEEL TRACTOR TO A TRACK.  LIKE AN ARMY TANK TRACK

16   BECAUSE IT DOESN'T PUT SO MUCH WEIGHT IN THE LOCAL -- LIKE IN

17   ONE SPOT.  THEY HAVE ACTUALLY HAD TRACTORS SINK INTO THE

18   GROUND.  I THINK IT HAS TAKEN THEM TWO MONTHS TO GO BACK WHEN

19   IT'S A LITTLE DRYER TO PULL THEM OUT.

20       AND THERE'S SEEPS SCATTERED THROUGHOUT HERE (INDICATING)

21   AS WELL ALL THE WAY DOWN INTO THAT AREA AS WELL.

22   Q.  THANK YOU, DR. BOURSIER.

23       SO THAT TOUCHES UPON THE HYDROLOGY.  I GUESS THAT WOULD BE

24   NATURAL HYDROLOGY AS OPPOSED TO ARTIFICIAL HYDROLOGY YOU

25   MENTIONED EARLIER?

BOURSIER – DIRECT / LEE

1   **A.** EXACTLY RIGHT. YEAH.

2   **Q.** DID THAT FACTOR INTO YOUR DETERMINATION OF WHY THESE WERE

3   WETLANDS AND AQUATIC AREAS IN GREEN AND BLUE ON THE SITE?

4   **A.** RIGHT. EVERYTHING ON THE MAP THERE, EVERYTHING IN GREEN

5   IS A WETLAND AND EVERYTHING IN BLUE IS TERMED "OTHER WATERS",

6   CORRECT.

7   **Q.** AND JUST IDENTIFYING FOR THE RECORD, THE PLACES YOU

8   INDICATED WHERE THERE ARE SEEPS, IS THAT MARKED BY A NO. 3 ON

9   THIS MAP?

10   **A.** YES. YES. CORRECT.

11   **Q.** OKAY.

12   **A.** THAT'S WHERE -- WHERE WE MARKED THE PRESENCE OF SEEPS

13   DOESN'T MEAN THAT'S THE ONLY SOURCE OF HYDROLOGY BECAUSE THE

14   SEEP AREA ALSO HAS RAINFALL ALSO HAS RUNOFF. IT'S AN

15   ADDITIONAL SOURCE OF WATER, IF YOU WILL.

16   **Q.** NOW WE HAVE HEARD ABOUT THE THREE PARAMETERS FOR MAKING A

17   DETERMINATION IF SOMETHING'S A WETLAND. HYDROLOGY,

18   VEGETATION, AND SOILS. I THINK YOU JUST SPOKE ABOUT THE

19   HYDROLOGY THAT INFLUENCES THE SITE.

20      CAN YOU DESCRIBE THE SOIL ANALYSIS AND THE VEGETATION THAT

21   LED YOU TO BELIEVE THAT THESE GREEN AREAS ARE WETLANDS AND

22   THESE BLUE AREAS ARE "OTHER WATERS"?

23      **THE COURT:** WHY DON'T WE TAKE IT IN PIECES WITH Q AND

24   A. WHY DON'T YOU START WITH ONE, GET THAT ANSWER, AND THEN

25   ASK ANOTHER QUESTION.

BOURSIER – DIRECT / LEE

```
1    BY MS. LEE:

2    Q.  LET'S START WITH VEGETATION.

3            THE WITNESS:  IS THAT BECAUSE MY MEMORY IS BAD?

4            THE COURT:  NOT AT ALL.

5            THE WITNESS:  IT'S TRUE THOUGH.

6    BY MS. LEE:

7    Q.  CAN YOU DESCRIBE HOW VEGETATION PLAYED A ROLE IN YOUR

8    DETERMINATION THAT THE GREEN AREAS WERE WETLANDS?

9    A.  SURE.  WELL, I'LL DESCRIBE ALL THREE PARAMETERS, IF THAT'S

10   OKAY.

11   Q.  I THINK WE WOULD LIKE TO TAKE IT KIND OF PIECEMEAL.

12   A.  AS AN OVERVIEW BEFORE THAT, THE ARMY CORPS OF ENGINEERS

13   HAS A MANUAL AND IT SAYS YOU ARE GOING TO LOOK FOR THREE

14   THINGS.  SO VEGETATION IS ONE OF THEM.  THIS IS A MANUAL

15   WRITTEN FOR THE ARMY CORPS MANAGERS BECAUSE THEY DO

16   DELINEATIONS AS WELL, BUT MOSTLY IT'S WRITTEN FOR US

17   CONSULTANTS SO WE DON'T GO ASTRAY AND DO OUR OWN THING.

18       SO THE FIRST COMPONENT IS... IS -- THE TERMINOLOGY THEY

19   USE IS PREDOMINANCE OF HYDROPHYTIC VEGETATION.  AND

20   HYDROPHYTIC IS A FANCY WORD FOR WETLAND.  IT'S A PLANT WHO

21   SPENDS MOST OF ITS TIME IN A WETLAND.

22       AND OF ALL THE MANY, MANY, MANY PLANT SPECIES IN

23   CALIFORNIA, EVERY SINGLE ONE OF THEM, GOING FROM ALPINE

24   COMMUNITIES ABOVE YOSEMITE TO THE SAN FRANCISCO BAY TO THE

25   PACIFIC OCEAN, ALL OF THOSE PLANTS, TREES, AND SHRUBS HAVE
```

BOURSIER - DIRECT / LEE

1    BEEN CATEGORIZED AND GIVEN A WETLAND INDICATOR STATUS BY THE

2    U. S. FISH AND WILDLIFE SERVICE.

3        AND THEY -- THE TERMINOLOGY THEY USE ARE OBLIGATES.  SHORT

4    ACRONYM IS OBL.  OR A FACULTATIVE WETLAND.  THERE'S

5    PERCENTAGES.  IF YOU HAVE AN UPLAND PLANT, IT'S ALMOST NEVER

6    FOUND IN A WETLAND COMMUNITY OR VERY LITTLE.

7        SO WE -- BECAUSE WE ARE PLANT BIOLOGISTS, WE GO OUT THERE

8    AND WE HAVE TO TAKE, WHAT'S THE WORD, TAXONOMIC KEYS AND WE

9    COLLECT PLANT SAMPLES, AND WE IDENTIFY THEM TO SPECIES WHICH

10   IS ON-SITE LIKE THIS, IS RELATIVELY STRAIGHTFORWARD.

11       AND WE IDENTIFY, LET'S SAY THERE'S ONE PLANT OUT THERE,

12   IT'S CALLED LOLIUM PERENNE, WHICH IS JUST PERENNIAL WHEAT OR

13   PERENNIAL RYE GRASS, AND THEN YOU LOOK UP IN THE NATIONAL

14   WETLAND INDICATOR MANUAL, OR THE INDICATOR MANUAL, AND IT HAS

15   THAT -- THAT HAS AN INDICATOR STATUS THAT'S GRASS OF

16   FACULTATIVE.

17       SO YOU DO THAT FOR ALL OF THEM, AND YOU PUT ALL OF THIS

18   INFORMATION DOWN ON THE -- ON THE CORPS DATA FORM.

19       DO YOU WANT ME TO JUMP RIGHT INTO SOILS?

20   **Q.**  SO WHAT I WOULD LIKE TO FOLLOW UP ON IS, HOW WERE YOU ABLE

21   TO DETERMINE, BASED JUST ON VEGETATION AT THIS POINT, WE SPOKE

22   ABOUT HYDROLOGY, WE WILL GET TO SOILS, BUT ON VEGETATION, HOW

23   WERE YOU ABLE TO DISTINGUISH BETWEEN THE GREEN AREAS AND THE

24   YELLOW AREAS, THE WETLAND AND THE UPLAND?

25   **A.**  SURE.

BOURSIER – DIRECT / LEE

1    AS AN EXAMPLE, AND EVEN RIGHT NOW IF YOU WERE TO GO OUT

2    THERE, THE YELLOW AREAS HAVE PRIMARILY... THEY SUPPORT

3    MUSTARDS, VERY UPLAND PLANT, OR THEY -- WILD OATS.  YOU SEE

4    THAT'S VERY COMMON IN CALIFORNIA.  IT TURNS BEAUTIFUL -- OUR

5    HILLS INTO THESE BEAUTIFUL GOLDEN GRASSLANDS.  AND BOTH OF

6    THOSE ARE UPLAND SPECIES.  AGAIN, IF YOU LOOK AT THE FISH AND

7    WILDLIFE MANUAL, IT TELLS YOU THAT.

8    IF YOU GO INTO THE GREEN AREAS, THEY ARE SPECIES LIKE

9    PICKLEWEED, WHICH IS DETERMINED BY THE FISH AND WILDLIFE

10   SERVICE TO BE AN OBLIGATE OR A SALT GRASS, WHICH IS A

11   FACULTATIVE WETLAND PLANT.  SO IT'S VERY MUCH COOKBOOK.

12   YOU LIST ALL OF THOSE SPECIES, THEIR INDICATOR STATUS, AND

13   THEN THE PERCENTAGE.  SO IF I HAD A SAMPLE POINT IN ONE OF

14   THOSE GREEN AREAS, IT MIGHT BE 100 PERCENT PICKLEWEED.  AND SO

15   YOU'RE ABLE TO DETERMINE THAT THE PREDOMINANT VEGETATION THERE

16   IS WETLAND VEGETATION AND YOU'RE ABLE TO CHECK THE BOX ON THE

17   DATA FORM THAT THE CORPS'S DEVELOPED WITH THE EPA.

18   **Q.**  YOU MENTIONED AN OBLIGATE PLANT, LIKE PICKLEWEED.

19   PICKLEWEED IS AN OBLIGATE PLANT, RIGHT?

20   **A.**  RIGHT.

21   **Q.**  WHAT DOES OBLIGATE MEANS?

22   **A.**  OBLIGATE MEANS THAT IT'S -- I FORGET THE EXACT

23   PERCENTAGES, BUT ESSENTIALLY IT'S 100 PERCENT -- IT MIGHT BE

24   99.9 PERCENT OF THE TIME IT'S FOUND WITH ITS FEET WET IN A

25   WETLAND.  YOU WON'T FIND PICKLEWEED GROWING IN A JEFFERY PINE

1    FOREST OR A SAGE BRUSH AREAS, OR YOU WON'T FIND PICKLEWEED

2    GROWING AMONGST MUSTARD USUALLY.

3    **Q.**   WOULD IT BE FAIR TO SAY THAT THE AREAS MAPPED IN GREEN HAD

4    INDICATORS OF WETLAND VEGETATION?

5    **A.**   RIGHT.  AND THE TERMINOLOGY WAS HAVE A PREDOMINANCE OF.

6    SO 50 PERCENT OR GREATER OF THE SPECIES THERE ARE WETLAND

7    VEGETATION.

8    **Q.**   AND THE AREAS IN YELLOW HAD UPLAND VEGETATION?

9    **A.**   THAT'S CORRECT.

10   **Q.**   AND JUST TO CLARIFY, UPLAND IS CONSIDERED

11   NONJURISDICTIONAL?

12   **A.**   RIGHT.

13   **Q.**   SO THE LANDOWNERS THAT HIRED YOU TO DO THIS MAPPING COULD

14   DEVELOP ON ANY OF THE YELLOW PARTS?

15   **A.**   YES, WITH THE SMALL CAVEAT THAT VARIOUS AGENCIES HAVE

16   IMPLEMENTED -- AND THE AGENCIES WOULD BE THE U.S. FISH AND

17   WILDLIFE SERVICE, REGIONAL WATER QUALITY CONTROL BOARD -- WHAT

18   THEY WANT YOU TO DO, AND THIS IS ANALYZED IN THE ENVIRONMENTAL

19   IMPACT REPORT, THEY WANT YOU TO PRESERVE WHAT'S CALLED THE

20   CONTRIBUTING WATERING SHED.

21       SO IF YOU LOOK AT ANY ONE OF THOSE GREEN AREAS, YOU CAN'T

22   FILL THOSE BUT YOU ALSO NEED TO LEAVE A REASONABLE BUFFER.  SO

23   IF A LOT OF THE WATER THAT GOES INTO THESE -- INTO THE

24   WETLANDS DERIVES FROM UPLANDS AND DRAINS DOWNHILL, YOU NEED TO

25   SHOW THAT YOU'RE PRESERVING, NOT NEGATIVELY AFFECTING THAT

1    SURFACE RUNOFF AS WELL.

2        SO YOU MAY HAVE, AND I THINK THE ARBITRARY DISTANCE IN

3    CERTAIN WETLANDS MANDATED BY THE FISH AND WILDLIFE SERVICE IS

4    AROUND 100 FEET TO 200 FEET DEPENDING.

5    **Q.**   SO IS THAT LIKE A HOUSE SET BACK LIKE YOU NEED A CERTAIN

6    AMOUNT OF BUFFER ZONE AROUND THE GREEN?

7    **A.**   THAT'S RIGHT.  AND OTHER SORTS OF AMENITIES –– IF IT WAS A

8    SINGLE FAMILY HOME AND YOU'RE PUTTING IN A LEACH FIELD, YOU

9    WOULD HAVE TO BE FURTHER AWAY.  SO THERE'S A LOT OF, YOU KNOW,

10   SPECIFIC VARIABLES, BUT YOU DO HAVE TO LEAVE A BUFFER IN

11   GENERAL.

12   **Q.**   SO THE AREA IS BASED OFF OF YOUR MAPPING THAT YOUR CLIENTS

13   COULD DEVELOP WITHOUT A PERMIT FROM THE CORPS IS ACTUALLY LESS

14   THAN THE YELLOW PART?

15   **A.**   CORRECT.

16   **Q.**   IF YOU INCLUDE THE SETBACK?

17   **A.**   UH-HUH.

18   **Q.**   OKAY.

19       SO WE'VE TALKED ABOUT VEGETATION AND HYDROLOGY.  TELL ME

20   ABOUT THE SOILS.  WHAT ABOUT YOUR ANALYSIS OF SOILS HELPED YOU

21   DETERMINE THE GREEN FROM THE YELLOW?

22   **A.**   SURE.

23       THE –– AS I MENTIONED, THE ENTIRE PROPERTY, NOT

24   100 PERCENT, BUT A HIGH PERCENTAGE OF THE PROPERTY GOING

25   TOWARDS THE RAILROAD TRACKS WAS TIDAL.  AND THE TIDAL ACTION

1    LAID DOWN VERY FINE PARTICLES, CLAYS.  AND WE ARE TALKING MANY

2    TENS OF THOUSANDS OF YEARS.  AND THESE CLAYS FORM HORIZONTAL

3    STRATA, IF YOU WILL.

4        SO YOU LAY DOWN THE CLAYS.  YOU SUPPORT -- AND THOSE CAN

5    SUPPORT WETLAND VEGETATION.  THE PLANTS DIE, THEY GET

6    INCORPORATED INTO THE SOIL, AND THAT HAPPENS YEAR AFTER YEAR

7    FOR THOUSANDS OF YEARS.  AND SO WHAT HAPPENS IS, THE ORGANIC

8    MATTER AND THE CHEMISTRY THAT CHANGES IN THE SOIL STAINS AND

9    TURNS THE SOIL REALLY BLACK, OR VERY, VERY DARK GRAY.

10       AND THERE'S, AGAIN, THIS IS A REQUIREMENT OF THE ARMY

11   CORPS' MANUAL, AND IT'S SOMETHING WE FILL OUT ON THE DATA

12   FORMS.

13       SO WE LOOKED AT, FOR FIELD CHARACTERISTICS, THE EASIEST

14   THING TO OBSERVE -- AND THERE'S A NICE BOOK THAT I LOVE

15   BECAUSE I'M A NERD, AND IT'S CALLED THE MUNSELL SOIL CHART.

16       AND IT'S THIS BIG (INDICATING).  AND YOU OPEN IT UP, AND

17   IT HAS SOIL COLORS FOR THE ENTIRE UNITED STATES.  IT WILL BE A

18   TAN COLOR, AND IT HAS A NUMBER.  IT WILL SAY 5/YR21, OR 25.

19   AND IT GOES FROM TAN COLORS THROUGH REDS, THROUGH GRAYS,

20   THROUGH BLACKS.  EVERY PAGE HAS MULTIPLE COLORS.  AND IT HAS

21   HOLES IN THE PAGE.

22       SO YOU TAKE A SOIL COLOR, MAKE SURE IT'S MOIST, AND YOU

23   PUT IT UP AGAINST THE COLOR SAMPLE PLATE THAT THEY HAVE, AND

24   YOU NOTE WHAT COLOR IS ON THE OVERALL MATRIX OF THE SOIL.

25       SO THIS PROPERTY HAS A LOT OF SOILS THAT -- THE COLOR

1    NUMBER WOULD BE 10YR20 OR 22.  AND IF YOU LOOKED ON THE SOIL

2    CHART, IT MIGHT BE APPROACHING THIS COLOR VERY, VERY DARK,

3    AGAIN, OR DARK GRAY.

4        THE OTHER THINGS THAT WE LOOK AT, AGAIN, BECAUSE THIS WAS

5    TIDAL MARSH, WE LOOK FOR WHAT ARE CALLED MODELS.  AND THESE

6    THINGS FORM OR MANGANESE CONCRETIONS, AND MODELS FORM BECAUSE

7    OF THE PRESENCE OF IRON.

8        OTHER THINGS WE MIGHT SEE -- AND THOSE HAVE THEIR OWN

9    COLOR.  AND THE PRESENCE OF THOSE THINGS INDICATE THE SOIL IS

10   VERY, VERY WET FOR A LONG TIME.

11       ON THIS SITE, IF WE -- MOST OF OUR SOIL PITS THAT WE DUG

12   WERE 24 INCHES.  THE REQUIREMENT IN THE MANUAL IS LESS THAN

13   THAT, BUT WE WANT TO MAKE SURE WE GO DOWN AND GET IT RIGHT

14   BEING 24 INCHES FROM THE SOIL SURFACE.

15       OTHER THINGS WE LOOK LIKE -- IF WE GO SLIGHTLY LOWER, WE

16   ALWAYS GO DEEPER, WE CAN GO AS FAR AS 10 OR 14 FEET BELOW THE

17   SOIL SURFACE WITH A HAND AUGER.  AND YOU GET DOWN ON THIS SITE

18   TO SOME VERY, VERY ANCIENT CLAYS THAT HAVE BECOME -- IT'S

19   CALLED GLADE, AND THEY BECOME A REALLY BEAUTIFUL TURKISH BLUE

20   COLOR.  AND THAT'S AN INDICATION, AGAIN, THAT THIS SOIL HAS

21   BEEN WET FOR A VERY LONG TIME.

22       THERE ARE TESTS, CHEMICAL TESTS YOU CAN ADD -- YOU COLLECT

23   SOIL WATER, AND THERE'S A TEST CALLED ALPHA ALPHA DIPYRIDYL.

24   AND YOU ADD THAT.  AND, AGAIN, IT'S A COLORIMETRIC TEST WHERE

25   IF SHAKE UP THE WATER, ADD THE CHEMICAL, IT WILL GIVE YOU A

BOURSIER - DIRECT / LEE

1    COLOR FROM A PINKISH COLOR TO A RED, AND YOU COMPARE THAT AND

2    IT WILL SAY IT IS REDUCING SOIL, REDUCING MEANING IT HAS BEEN

3    WET FOR A VERY LONG TIME.

4    Q.  DR. BOURSIER, WOULD THE SOILS BE DIFFERENT IN THE RED

5    VERSUS THE GREEN AREAS?

6    A.  YES -- WELL, FOR THE MOST PART THEY DO HAVE SIMILAR --

7    BECAUSE A LOT OF THESE TRAITS WERE FORMED WHEN IT WAS TIDAL

8    MARSH.

9        SO THE MOST -- MOWRY AND THE RAILROAD TRACKS ABOVE THE

10   PICK 'N PULL, THOSE ARE SLIGHTLY DIFFERENT SOIL TYPES SO THEY

11   MIGHT HAVE A PREDOMINANT -- THEY ARE STILL MOSTLY CLAYS, BUT

12   THE COLORS MIGHT BE SLIGHTLY DIFFERENT.

13       THE OTHER POINT I THINK I MENTIONED IS THAT THE ENTIRE

14   PROPERTY, IN FACT, EVERY COUNTY IN THE STATE HAS BEEN MAPPED

15   FOR DIFFERENT PURPOSES.  ORIGINALLY THEY WERE CALLED THE SOIL

16   CONSERVATION SERVICE.  AND THEY MAP SOIL TYPES THROUGHOUT THE

17   STATE.  AND THEY DID THAT FOR AGRICULTURE REASONS.  CAN WE

18   BUILD A HOME HERE OR CAN WE PLANT APPLES ON THIS SOIL.  IS IT

19   GOOD FOR THAT.?

20       WE USE IT AND THEY MAPPED THIS PROPERTY AS WELL.  THEY

21   HAVE INDICATED THAT THERE ARE EXTREMELY DENSE CLAYS, TIDAL

22   CLAYS THAT ARE -- ARE OLD -- THEY DESCRIBE THE PHYSICAL

23   CHARACTERISTICS OF THOSE SOILS AS WELL.  SO --

24   Q.  WOULD IT BE FAIR TO SAY BECAUSE THIS PROPERTY USED -- MOST

25   OF THIS PROPERTY USED TO BE WITHIN THE ORIGINAL BAY MARGIN

BOURSIER - DIRECT / LEE

1    LINE, MEANING --

2    **A.**  RIGHT.

3    **Q.**  -- BUT FOR THIS LEVEE, THE TIDE WOULD HAVE BEEN WASHING

4    OVER THIS PROPERTY, WOULD IT BE FAIR TO SAY MOST OF THIS

5    PROPERTY HAS HYDRIC SOILS?

6    **A.**  YES.  I BELIEVE, IN FACT, IT'S A HUNDRED PERCENT OR VERY,

7    VERY CLOSE TO HUNDRED PERCENT.

8        I BELIEVE AROUND THE BAY -- AND OUR FIRM HAS WHAT ARE

9    CALLED U.S. GEODETIC SURVEY MAPS.  I THINK THEY'RE THE

10   PREDECESSOR TO THE U.S. GEOLOGICAL SURVEY.

11       THESE MAPS, SOME OF THEM DATE FROM THE 1850'S UP THROUGH

12   THE EARLY 1900'S.  IF YOU LOOK AROUND THE BAY, THE RAILROAD

13   WAS PUT IN A LOCATION THAT WASN'T OBVIOUSLY TIDAL MARSH AND

14   KIND OF DESCRIBES, AND YOU CAN SEE THE RAILROAD LINE -- IT

15   KIND OF DESCRIBES, OKAY, THIS IS THE UPPER EDGE OF WHAT USED

16   TO BE TIDAL MARSH.

17   **Q.**  SO MY QUESTION IS, BECAUSE MOST OF THIS PROPERTY WAS ONCE

18   TIDAL AND HAS HYDRIC SOILS, WOULD IT BE FAIR TO SAY THAT THE

19   DELINEATION BETWEEN A SOIL AND THE YELLOW VERSUS THE GREEN IS

20   LESS PRONOUNCED AND THAT VEGETATION AND HYDROLOGY BECOME MORE

21   OF AN IMPORTANT COMPONENT IN DOING WETLAND DELINEATIONS SINCE

22   THE SOILS ARE MOSTLY --

23   **A.**  RIGHT.  THAT IS A GOOD POINT.  IF YOU FILL OUT A DATA FORM

24   IN THE YELLOW AREA, IT IS GOING TO SHOW THAT THERE ARE HYDRIC

25   SOILS, VERY DARK SOILS.

1    BUT, AGAIN, THE CORPS -- ARMY CORPS' MANUAL REQUIRES THAT

2    YOU HAVE THREE.  SO YOU WOULD HAVE HYDRIC SOILS AND A MUSTARD

3    FIELD.  YOU WOULDN'T MAKE THE VEGETATION, YOU WOULD MAKE THE

4    SOILS.  AND THEN IN AN AREA THAT'S DRY.  YOU WOULDN'T HAVE THE

5    HYDROLOGY.

6        SO YOU WOULD HAVE ONE PARAMETER AND IT'S HISTORIC.  YOU

7    WOULDN'T HAVE THE OTHER TWO.  SO THAT ALLOWS YOU TO THEN NOT

8    INCLUDE THAT WITHIN THE MAPPING.

9    **Q.**  OKAY.

10   **A.**  IT BECOMES A BIT MORE COMPLICATED BECAUSE IT'S FARMED, BUT

11   WE TAKE ALL OF THOSE INTO -- WELL, PART OF IT HAS BEEN MORE

12   ACTIVELY FARMED THAN OTHERS.

13   **Q.**  IS THERE, TO YOUR KNOWLEDGE, IS THERE A FARMING EXCEPTION

14   TO THE CLEAN WATER ACT?

15   **A.**  YES.  IF -- YOU ARE ALLOWED -- IF YOU WERE FARMING A PIECE

16   OF PROPERTY, AND I BELIEVE THIS DATE IS CORRECT, I MEANT TO

17   LOOK IT UP.  IT SHOWS YOU WHAT A NERD I AM.

18       I BELIEVE IF YOU WERE FARMING PRIOR TO DECEMBER, I THINK,

19   IT'S 14TH OR 21ST, 1985, AND YOU HAVE CONTINUED TO FARM ONCE

20   EVERY FIVE YEARS SINCE THEN, THAT YOU ARE EXEMPT AND YOU CAN

21   CONTINUE TO FARM AND DISK THOSE AREAS.

22       CURRENTLY YOU CANNOT CONVERT FROM FARMING TO SOMETHING

23   ELSE.  YOU CAN'T -- IF YOU WANT TO PUT A WALMART OUT THERE,

24   THE ARMY CORPS WILL SAY YOU ARE OKAY TO FARM IT, THESE -- WHAT

25   ARE CALLED FARMED WETLAND AREAS, BUT YOU CAN'T CONVERT IT.

1   YOU CAN'T CHANGE YOUR GENERAL PLAN, CITY, OR YOU CAN'T BUILD

2   SOMETHING ELSE, HOMES OR WALMARTS OR -- ON THERE.

3   **Q.**  YOU COULDN'T BRING IN HUNDREDS OF THOUSANDS OF DIRT AND

4   PILE IT ON TOP OF HERE WITHOUT A PERMIT?

5   **A.**  NO.

6   **Q.**  IS THAT CORRECT?

7   **A.**  ATTRACTS SOME ATTENTION.

8   **Q.**  YOU COULDN'T DO THAT WITHOUT A PERMIT FROM THE ARMY CORPS

9   OF ENGINEERS?

10  **A.**  RIGHT.

11  **Q.**  WHAT I WOULD LIKE TO ASK YOU -- WE'VE TALKED ABOUT SOILS,

12  VEGETATION, HYDROLOGY WHEN IT COMES TO WETLANDS.  WHAT I

13  WANTED TO ASK YOU ABOUT IS THE GENERAL NATURE OF SEASONAL

14  WETLANDS ON THIS PROPERTY.

15  **A.**  UH-HUH.

16  **Q.**  CAN YOU DESCRIBE -- CAN YOU PLEASE DESCRIBE A LITTLE BIT

17  ABOUT THAT?

18  **A.**  RIGHT.

19      I POINTED OUT EARLIER THAT THE AREAS WHERE THERE ARE

20  PREDOMINANTLY SEASONAL WETLANDS, AND IT'S THE AREA AT THE

21  BOTTOM OF THE MAP, THE LARGER PART, AGAIN, WE DIDN'T DIRECTLY

22  OBSERVE ANY SEEPS, OR SPRINGS OR GROUND WATER IN THAT AREA.

23  SO THOSE AREAS AT THE VERY, VERY BOTTOM OF THE MAP BELOW THE

24  BLUE PONDS, THOSE ARE SUPPORTIVE -- THEY'RE TOPOGRAPHICALLY

25  LOW AREAS THAT ARE SUPPORTED MOSTLY BY INCIDENT, WHAT WE CALL

1    INCIDENT RAINFALL.  JUST MEANS IT FALLS IN PLACE.  BUT ALSO

2    RUNOFF.

3        THE REASON IT PONDS THERE, IS THESE ARE TIDAL CLAYS,

4    EXTREMELY DENSE, AND THE PROPERTY HAS BEEN FARMED -- I LOOKED

5    THROUGH ALL THE FARM SERVICES AGENCY PHOTOGRAPHS AND

6    DOCUMENTATION.  IT HAS BEEN FARMED FOR OVER A HUNDRED YEARS.

7        SO IF YOU DRIVE A TRACTOR ACROSS THIS PROPERTY IN VARIOUS

8    DIRECTIONS TO DISK WEEDS OR TO PLANT CROPS OR TO CULTIVATE,

9    YOU'RE COMPACTING THOSE SOILS, ESPECIALLY IF THEY ARE MOIST.

10   AND YOU CULTIVATE ONLY THE TOP 6, 8, 10 INCHES, YOU KNOW, WITH

11   THE PIECE OF EQUIPMENT THAT HAS THOSE DISKS.

12       WHAT HAPPENS IS, YOU COMPRESS THE SUBSOIL AND YOU CREATE

13   THIS LAYER ON TOP THAT'S CALLED THE PLOW LAYER -- IT'S A AP

14   LAYER, WHERE WATER CAN COLLECT IN TOPOGRAPHIC DEPRESSIONS.

15   AND IT CAN'T -- BECAUSE OF THE PROXIMITY OF THE PROPERTY TO

16   THE BAY, THE EVAPORATION RATE ISN'T ALL THAT HIGH, SAY IF YOU

17   COMPARE THAT TO FRESNO WHERE THINGS EVAPORATE READILY, AND

18   BECAUSE OF THE CLAY, THE DENSE NATURE OF THE CLAY, THEY ARE

19   NOT GOING TO, IN OUR LIFETIME, GOING TO PERCOLATE DOWN VERY

20   FAR, AND IT CAN'T RUNOFF BECAUSE THIS PROPERTY, A LOT OF IT,

21   IS WELL BELOW SEA LEVEL.

22       SO TO TAKE -- SO TO GET RID OF THE WATER ON THIS PROPERTY,

23   THE WATER THAT RUNS OFF INTO THE PERIMETER CHANNEL, THE BORROW

24   DITCH -- MAYBE I SHOULD THAT POINT.

25   Q.  NO, NO, THAT'S OKAY.

1    IT WOULD GET PUMPED OUT, CORRECT?

2  **A.**  PUMPED OUT BY A -- WHAT I WOULD CALL A MASSIVE PUMP.  AND

3  IT'S UPHILL.  IT MAY BE AS TALL AS THIS WALL BEFORE IT'S

4  DISCHARGED INTO MOWRY SLOUGH.

5  **Q.**  UNDERSTOOD.

6    YOU MENTIONED THERE'S A RAINY SEASON IN THIS PART OF

7  CALIFORNIA IN NEWARK, AND THERE IS A DRY SEASON.  IT'S ABOUT

8  HALF THE YEAR'S A RAINY SEASON, HALF THE YEAR'S A DRY SEASON.

9    DO YOU HAVE ANY OPINION ON WHETHER OR NOT THESE WETLANDS,

10  EVEN IF IT'S DURING THE DRY SEASON, ARE THEY STILL WETLANDS?

11  **A.**  OH, YES, DEFINITELY.

12  **Q.**  WHY?

13  **A.**  WELL, FROM A TECHNICAL PERSPECTIVE, AND THIS IS WHAT'S

14  INTERESTED ME OVER THE YEARS, IS YOU -- WE ARE LOWLY

15  BIOLOGISTS BUT WHEN WE DO WETLAND DELINEATIONS, WE ACT VERY

16  MUCH LIKE PRIVATE INVESTIGATORS.

17    THERE'S A WHOLE LOT OF INDIRECT EVIDENCE THAT YOU CAN

18  GATHER ON A SITE.  THERE ARE, AS AN EXAMPLE -- WE ARE

19  LOOKING -- WHEN I SAY THAT, I MEAN EVIDENCE, WE ARE LOOKING

20  FOR EVIDENCE OF PLANTS.  AND ACTUALLY THE ARMY CORPS MANUAL

21  SAYS IF IT'S FARMED, YOU DON'T EVEN NEED TO WORRY ABOUT THAT

22  OR COLLECT THAT DATA.

23    BUT WE ARE PRETTY GOOD AT WHAT WE CALL CADAVER BOTANY.  IF

24  A PIECE OF PROPERTY IS DISKED, EVEN THOUGH IT'S DISKED, WE CAN

25  READILY IDENTIFY WHAT SPECIES WERE THERE, YOU KNOW, BY JUST

1    EXCAVATING DOWN A FEW INCHES.  WE ARE LOOKING AT THE PARAMETER

2    OF A FIELD IN A SIMILAR TOPOGRAPHIC LOCATION.

3        THE OTHER SORTS OF EVIDENCE THAT WE CAN SEE IS REMNANTS OF

4    THE WATER THAT WAS THERE.  AND THIS CAN BE -- IF YOU HAD A

5    TOPOGRAPHIC DEPRESSION WITH SIDE SLOPES, RIGHT, AND IT WAS WET

6    ALL WINTER AND IT DRIED DOWN, IT WILL DEPOSIT SORT OF THE

7    DETRITUS OR PIECES OF BRANCHES OR LEAVES.

8        AND YOU CAN SEE, YOU'VE SEEN THIS MAYBE AROUND TIDAL

9    MARSHES, THERE'S BASICALLY A RACK LINE OF DEBRIS THAT

10   INDICATES THAT THE PIECE OF PROPERTY OR THIS DEPRESSION HELD

11   WATER FOR PERIODS OF TIME.  THERE IS ALSO STAINING ON THINGS

12   SUCH AS FENCE POSTS.

13       AND THEN LASTLY WE LOOK FOR ALSO EVIDENCE OF... OF LEAF

14   MAYBE INCORPORATION.  LEAVES HAVE BECOME DOWN IN THE SOIL

15   PROFILE LIKE AN ANNUAL CONTRIBUTION OF LEAVES THAT ARE THEN

16   COVERED BY FINE SEDIMENTS.  AND THE NEXT YEAR LEAVES AND FINE

17   SEDIMENT, YOU CAN SEE THAT STRATIFICATION.

18       AND YOU CAN ALSO SEE SHELLS FROM INVERTEBRATES THAT ARE

19   REMAINING IN THESE DEPRESSIONS.  SO THERE'S A WHOLE LOT OF --

20   **Q.**  DR. BOURSIER, I THINK WHAT YOU ARE DESCRIBING IS HOW

21   SOMEONE WOULD GO ABOUT DELINEATING SOMETHING TO BE A WETLAND

22   EVEN DURING A DRY PERIOD OF TIME?

23   **A.**  UH-HUH, RIGHT.

24   **Q.**  CORRECT?

25   **A.**  CORRECT.

1    **Q.**  WOULD IT BE FAIR TO SAY THAT IT'S NOT AS IF IT'S SUDDENLY

2    DOESN'T BECOME A WETLAND BECAUSE IT'S THE SUMMER; IS THAT

3    RIGHT?

4    **A.**  RIGHT.  WELL, THAT'S –– YEAH.  I GUESS I DIDN'T FINISH.

5        FROM A TECHNICAL PERSPECTIVE THAT EVIDENCE IS STILL THERE.

6    AND THE EVIDENCE THE CORPS ALLOWS YOU TO USE IS HISTORIC

7    AERIAL PHOTOGRAPHS.

8        FROM A REGULATORY PERSPECTIVE, AND I'M NOT THE

9    REPRESENTATIVE FROM THE CORPS, BUT MY EXPERIENCE IS THAT

10   DESPITE THE ABSENCE OF MAYBE WETLAND VEGETATION AT THAT TIME

11   OF YEAR, THE JURISDICTION DOESN'T DISAPPEAR.  IT'S STILL

12   REGULATED BY THE CORPS.

13   **Q.**  WOULD IT BE FAIR TO SAY WETLANDS DON'T EVAPORATE WITH

14   EVERY DROP OF RAIN THAT COMES AND GOES?

15   **A.**  RIGHT.

16   **Q.**  SO, YOUR CLIENTS WHO WOULD LIKE TO DEVELOP ON THIS LAND,

17   THEY COULDN'T COME IN AND START DEVELOPING IN THE SUMMER JUST

18   DURING THE DRY TIME OF THE YEAR?

19   **A.**  NO.

20   **Q.**  AND THEN LET IT SIT, AND THEN COME BACK NEXT SUMMER AND

21   KEEP DEVELOPING?

22   **A.**  NO.

23   **Q.**  THESE ARE JURISDICTIONAL –– IN YOUR OPINION,

24   JURISDICTIONAL "WATERS OF THE UNITED STATES" ––

25   **A.**  RIGHT.

BOURSIER – DIRECT / LEE

1    **Q.**  -- YEAR ROUND.

2    **A.**  RIGHT.

3        THIS IS ACTUALLY SHORT COMMERCIAL HERE.  BECAUSE OF THE

4    SERIES OF DROUGHT YEARS THAT WE'VE HAD, I KNOW WE HAD A NORMAL

5    OR ABOVE NORMAL RAIN LAST YEAR, THE ARMY CORPS DETERMINED THAT

6    THEY WOULD QUIT ISSUING JURISDICTIONAL DETERMINATIONS, AND

7    THEY WOULD QUIT REISSUING OR REVERIFYING DELINEATIONS ON

8    PROPERTIES WHERE THIS WAS A PROBLEM, ESPECIALLY AREAS THAT ARE

9    FARMED.

10       SO I HAVE BEEN WORKING WITH THE CORPS PRIOR TO -- THE TWO

11   YEARS BEFORE I RETIRED, ON A PIECE OF PROPERTY IN THE COYOTE

12   VALLEY OF SAN JOSE WHERE THEY BROUGHT OUT WHERE... FOR THE --

13   FOR THE LANDOWNER, I HAD DETERMINED A CERTAIN DISTRIBUTION OF

14   WETLANDS AND THE ARMY CORPS AGREED, AND THAT LETTER WAS ABOUT

15   TO EXPIRE AND I WANTED THE CORPS TO RE-VERIFY.

16       AND BECAUSE OF THE DROUGHT, THOSE WETLANDS, THEY WERE

17   VERY, VERY DIFFICULT BECAUSE THEY WERE FARMED AND THERE WAS A

18   DROUGHT, AND THE CORPS BROUGHT EXPERTS OUT FROM THEIR

19   EXPERIMENT STATION BACK EAST EVEN TO LOOK AT THE PROPERTY.

20       AND THOSE EXPERTS ULTIMATELY AGREED WITH OUR DETERMINATION

21   THAT THOSE WETLANDS THAT WE ORIGINALLY MAPPED ARE STILL

22   JURISDICTIONAL AND STILL PRESENT.

23       SO THE ONLY TIME THEY WOULD EXCLUDE IT IS IF WE HAD FIVE

24   YEARS OF AVERAGE RAINFALL AND YOU COULDN'T -- THOSE WETLANDS

25   CLEARLY DISAPPEARED UNDER THOSE CONDITIONS.  BUT NOT DURING

1  THE DROUGHT.

2  **Q.**  I WANT TO MOVE ON TO -- I WANT TO MOVE ON TO THE BLUE AREA

3  ON THIS MAP.

4      WHAT DO THEY INDICATE TO YOU?  WHAT ARE THEY?

5  **A.**  THE BLUE AREAS?

6  **Q.**  YES.

7  **A.**  THOSE AREAS -- I DESCRIBED HOW THE ARMY CORPS HAS A MANUAL

8  FOR WETLANDS.  THEY ALSO HAVE REGULATIONS FOR WHAT IS CALLED

9  "OTHER WATERS".

10  THE ARMY CORPS AT SAN FRANCISCO DISTRICT DIRECTED US ON

11  ALL OF OUR DELINEATIONS TO ONLY CATEGORIZE THINGS AS WETLANDS

12  OR "OTHER WATERS".  IT'S SORT OF A CATCH ALL.  AND THE

13  REGULATIONS DEFINE "OTHER WATERS" AS LAKES, PONDS, STREAMS,

14  AND THINGS LIKE SALT PANS, AND THINGS LIKE THAT.

15  SO THAT'S AN AREA WHERE WATERS PONDED FOR A VERY LONG

16  DURATION EXCEPT IN OUR OBSERVATION EXTREME DROUGHTS THAT THOSE

17  AREAS WILL DRY DOWN.  BUT IF YOU WENT OUT THERE TODAY, THEY

18  ARE PRETTY MUCH THE FULL AERIAL EXTENT SHOWN ON THIS MAP AS AN

19  OPEN WATER.

20  IT'S A WAY OF DIFFERENTIATING BETWEEN WETLANDS WHICH HAVE

21  WETLAND VEGETATION AND AREAS THAT HAVE WATER BUT DON'T SUPPORT

22  WETLAND VEGETATION.

23  AND THAT'S FOR A VARIETY OF REASONS.  IT CAN BE BECAUSE

24  THE WATER IS TOO DEEP.  AND CATTAILS CAN GROW, I THINK, AT A

25  MAXIMUM DEPTH OF 3 FEET; BEYOND THAT THEY CAN'T.

BOURSIER - DIRECT / LEE

1    SO IT'S FOR WHATEVER REASON PLANTS ARE PREVENTED FROM

2    ESTABLISHING AND GROWING IN THOSE AREAS.

3    **Q.**  YOU'VE BEEN BACK ONTO THE SITE SINCE THIS WAS MADE.

4    YOU MENTIONED IN '08 AND '09 FOR THE BIOTIC CONSTRAINTS,

5    BIOTIC HABITATS ANALYSIS FOR THE ENVIRONMENTAL IMPACT REPORT

6    THAT YOU WROTE ONE OF THE SECTIONS, THE BIOLOGY SECTION.

7    AT THAT TIME DID YOU NOTICE ANY DIFFERENCE IN THE BLUE

8    AREA HERE IN THE NORTHERN AREA?

9    **A.**  YES.  THE -- WHEN WE WENT OUT IN '05 THROUGH '07, THAT

10   AREA WAS PONDED, HAD PONDED WATER.  IT MAY HAVE BEEN AS MUCH

11   AS 3 FEET DEEP.

12   AND SO USING THE TECHNICAL MANUALS DEFINED BY THE CORPS,

13   WE PUT THAT DOWN AS AN OPEN WATER, NOT A WETLAND.

14   THE PRIMARY -- AND THAT IS THE LOWEST PART OF THE

15   PROPERTY.  IF YOU GO TO THE CORNER OF MOWRY AND THE RAILROAD

16   TRACKS, A DROP OF WATER IN THE CORNER IS GOING TO ULTIMATELY

17   MAKE IT'S WAY DOWN INTO THIS LOW POINT.  AND FROM THIS LOW

18   POINT, THERE'S A CULVERT THAT DISCHARGES INTO MOWRY SLOUGH.

19   AT ONE POINT THERE'S A CULVERT THERE, AND THE CULVERT HAD

20   THIS APPARATUS THAT I CALL A PLATYPUS BILL OR A DUCKBILL.  AND

21   IT WAS A PIECE OF RUBBER FITTED TO THE TIDAL SIDE TO WHERE

22   WATER -- TIDAL WATER WAS NOT SUPPOSED TO BE ALLOWED TO COME

23   IN.  BUT IF ENOUGH WATER ON THE PROJECT SIDE BUILT UP, IT

24   WOULD DISCHARGE AT LOW TIDE.

25   WHAT HAPPENED IS SOME DEBRIS GOT WEDGED APPARENTLY IN THAT

1    DUCKBILL PLATYPUS APPARATUS, AND TIDAL WATER WAS MOVING IN AND

2    CONTRIBUTING AND DIDN'T ALLOW ALL THE WATER ON-SITE.

3         THEY FIXED THAT.  I BELIEVE THAT WAS IN '09 WHEN THAT WAS

4    REPLACED.  AND THAT FIXTURE OR THAT CULVERT IS OWNED AND

5    OPERATED BY THE ALAMEDA -- IT MIGHT HAVE A SLIGHTLY DIFFERENT

6    NAME, ALAMEDA FLOOD CONTROL DISTRICT.  THEY FIXED THAT.

7         AND WHAT HAPPENED BECAUSE OF THAT, WAS THAT CORNER DRIED

8    DOWN SLIGHTLY, STILL RECEIVED ALL THE WATER FROM THE SEEPS AND

9    RUNOFF FROM THE REST OF THE PROPERTY, BUT IT DRIED DOWN AND

10   DIDN'T ALLOW THAT TIDAL WATER TO COME IN.

11        AND PICKLEWEED SAID, THANK YOU VERY MUCH.  AND AS THE

12   WATER DROPPED, IT CREPT INTO THOSE LOWER AREAS.  PICKLEWEED

13   CAN -- IT OCCURS IN TIDAL MARSHES.  AND IT DOES GO UNDER WATER

14   UNDER VARIOUS TIDAL EVENTS.  BUT IT DOESN'T -- AND IT CAN

15   TOLERATE A FEW HOURS, BUT IT CAN'T TOLERATE 24 HOURS OF

16   INUNDATION, AND IT DIES.

17        IT COULD BE, MOST LIKELY, PICKLEWEED WAS THERE AT ONE

18   TIME.  IT BECAME INUNDATED, IT ALL DIED, REVERTED TO OPEN

19   WATER CATEGORIES, AND THEN WENT BACK TO A WETLAND WHEN THE

20   TIDE GATE OR THE PLATYPUS, CULVERT WAS FIXED.

21   Q.  DR. BOURSIER, WOULD IT BE FAIR TO SAY THAT WHEN YOU WENT

22   BACK IN, I GUESS '09, THERE WAS MORE PICKLEWEED IN THIS AREA,

23   IN THE BLUE --

24   A.  THAT'S CORRECT.

25   Q.  DID THE REMAINDER OF THE PROPERTY, WITH THE EXCEPTION OF

BOURSIER – DIRECT / LEE

1   MORE PICKLEWEED IN THIS BLUE NORTHERN AREA, REMAIN LOOKING

2   GENERALLY THE SAME?

3   **A.**  YES, IT DID.

4   **Q.**  YOU MENTIONED THAT THERE IS A SLOPE TO THE SITE THAT WATER

5   DRAINS FROM NORTHEAST TO SOUTHWEST.

6       CAN YOU DESCRIBE HOW WATER DRAINS OUT OF THE NORTHERN

7   SECTION?

8   **A.**  RIGHT.

9       IT DRAINS FROM THAT CULVERT I MENTIONED.  AND YOU CAN

10  STILL SEE THAT CULVERT TODAY.  IT'S UNCOVERED AT LOWER TIDES.

11  AT HIGH TIDES IT'S UNDER WATER AND, AGAIN, IT PREVENTS WATER

12  FROM COMING ON.

13      BUT THAT CORNER DISCHARGES THE BLADDER OPENS UP BECAUSE OF

14  THE HYDROSTATIC PRESSURE, THE PRESSURE FROM THE WATER BEHIND

15  IT DURING THE LOW OR MODERATE TIDES, SO THAT WHOLE PIECE.

16      AND THEN GOING ACROSS, THIS SORT OF MAROON LINEAR FEATURE

17  IS ANOTHER CHANNEL THAT'S -- IT HAS ITS OWN NUMBER, WHICH I

18  DON'T REMEMBER, BUT IT'S ANOTHER FACILITY, A LINEAR FEATURE

19  THAT'S MAINTAINED BY THE ALAMEDA FLOOD CONTROL DISTRICT.

20      THAT HAS AN ENORMOUS WATER SHED THAT GOES WAY UP TOWARDS

21  MISSION PEAK IN THAT GENERAL AREA, AND WATERS COMES DOWN.  I

22  THINK IT DRAINS A LOT OF URBAN, RESIDENTIAL, COMMERCIAL AREAS.

23  SO YOU CAN SEE A LOT OF WATER GOING DOWN THERE.

24      PROBABLY THE BEST COLLECTION OF PLAYGROUND BALLS IN THIS

25  PART OF THE UNITED STATES.  IT SEEMS LIKE KICK BALLS AND

```
1   BASKETBALLS END UP DOWN THERE.
2   Q.  DR. BOURSIER, WOULD IT BE FAIR TO SAY IN THE NORTHERN
3   SECTION WATER DRAINS FROM THE NORTHEAST RIGHT BY -- NORTHEAST
4   IN THE DIRECTION DOWN THROUGH THE PINCH POINT BY THE -- BY THE
5   CONCRETE PAD --
6   A.  RIGHT.
7   Q.  -- THE PICK 'N PULL OUT THROUGH THE CULVERT PIPE INTO THE
8   SLOUGH?
9   A.  INTO MOWRY SLOUGH, CORRECT.
10  Q.  WHAT ABOUT THE SOUTHERN SECTION OF THE PROPERTY?
11      AND I'M NOT TALKING ABOUT THE MOST SOUTHERN SECTION WHERE
12  IT HAS THE PONDING FROM RAIN.  I GUESS MAYBE I SHOULD REFER TO
13  IT AS THE MIDDLE SECTION THEN.
14  A.  RIGHT.
15  Q.  HOW DOES WATER DRAIN THERE?
16  A.  RIGHT.
17      AGAIN, AND THERE ARE A BUNCH OF LINES, HOPEFULLY YOU ALL
18  CAN SEE.  THEY -- SOME ARE RED, SOME ARE, I BELIEVE, MAGENTA
19  COLORED AGAIN.  THOSE ARE TOPOGRAPHIC LINE.
20      SO FROM THE RAILROAD TRACKS -- WE ARE ONLY TALKING ABOUT
21  THE CENTRAL AREA AGAIN, YOU CAN SEE THERE'S A SLOPE.  THE
22  TOPOGRAPHIC LINES INDICATE THAT FROM THE RAILROAD TRACKS,
23  WHICH IS IN AN UPLAND DOWN TOWARDS A BLUE POND, THE GRADIENT
24  IS CONTINUING IN THAT DIRECTION SORT OF IN GENERAL SOUTHEAST.
25  IT'S -- ALSO GOES, FLOWS DOWN TOWARDS ONE OF THE RANCH ROADS.
```

BOURSIER - DIRECT / LEE

```
1    SO WATER COLLECTS INTO THE LOWEST CHANNEL... WELL, THAT

2    CHANNEL THERE.  AND IF YOU GO --

3    Q.  DR. BOURSIER, PERHAPS YOU CAN STAND UP WITH THE MICROPHONE

4    AND SHOW US.  IT MIGHT BE A LITTLE EASIER.

5         MS. HANSEN:  YOUR HONOR, IF WE CAN ASK THE DIAGRAM ON

6    THE SCREEN REFLECT WHAT THE WITNESS IS TESTIFYING TO BEFORE IT

7    IS PLACED?

8         THE COURT:  I DON'T UNDERSTAND.

9         MS. HANSEN:  AGENT SU HAD DRAWN A LINE BEFORE THE

10   WITNESS HAD IDENTIFIED IT.

11        THE COURT:  FAIR ENOUGH.

12        MS. HANSEN:  THANK YOU.

13        THE WITNESS:  OKAY.  SO I'LL JUST BACK UP BRIEFLY.

14   WATER FLOWS FROM THE RAILROAD TRACKS THIS WAY (INDICATING)

15   IN GENERAL AND IT COLLECTS IN -- THERE'S A LINEAR DITCH.

16   NOW, RIGHT BELOW THE DITCH -- THE REASON IT COLLECTS

17   THERE, IT WAS A DITCH INTENTIONALLY EXCAVATED BY THE FARMERS

18   IN THE EARLY 1900'S I'M ASSUMING.

19   SO WATER COLLECTS IN THIS DITCH.  AND ON THE OTHER SIDE OF

20   THE DITCH THERE IS A RAISED FARM ROAD.  SO REALLY COULDN'T GO

21   ANY FURTHER.  IT ENTERS THIS DITCH AND THAT'S WATER, AND

22   THAT'S SURFACE RUNOFF.  AND IT'S ALSO WATER MOVING LATERALLY

23   WITHIN THAT FLUFFY 10-INCH PLOW LAYER.

24   SO IT ENTERS THIS DITCH.  AND BECAUSE OF THE TOPOGRAPHY OF

25   THE SITE, IT FLOWS IN THIS DIRECTION (INDICATING) AND ENTERS
```

BOURSIER – DIRECT / LEE

1    MOWRY SLOUGH -- EXCUSE ME.  IT ENTERS WHAT'S CALLED A BORROW

2    DITCH.  I DON'T KNOW THAT THERE'S ACTUALLY A TECHNICAL NAME

3    FOR THE FEATURE.

4        IF YOU WANT TO BRING THE MAP UP A LITTLE BIT.

5    **Q.**  OKAY.

6    **A.**  MAYBE IF YOU CAN ZOOM IN ON THAT CENTRAL AREA BECAUSE IT'S

7    HARD, I KNOW, TO SEE THAT DITCH.

8    **Q.**  I THINK IF WE CAN ZOOM IN TO THE BORROW DITCH; IS THAT

9    WHAT YOU ARE REFERENCING, DR. BOURSIER?

10   **A.**  YES.  I AM SORRY.

11       YOU CAN SEE THE BORROW DITCH.  IT'S RIGHT THERE

12   (INDICATING).  IT'S -- AND IT'S CALLED A BORROW DITCH BECAUSE

13   THEY BORROW DIRT FROM IT TO MAINTAIN THE ADJACENT LEVEE.

14   USUALLY A PIECE OF EQUIPMENT, A BACKHOE, LONG REACH BACKHOE

15   WILL COME IN, SCOOP OUT THAT, AND SIDE CAST THAT.  THAT'S

16   UNDER PERMIT.  THAT'S ONGOING ACTIVITY AND IT'S ALLOWED.

17       YOU CAN SEE RIGHT NOW -- SEE THE BAND OF BLUE?  THAT'S OUR

18   BORROW DITCH.  SO WATER COMES DOWN FROM THE CENTRAL AREA, GOES

19   THROUGH THIS CHANNEL, AND THEN IS DISCHARGED INTO OUR -- OUR

20   BORROW DITCH (INDICATING).

21   **Q.**  AND THEN HOW DOES IT GET DISCHARGED INTO SLOUGH, FROM THE

22   PUMP?

23   **A.**  RIGHT.  SO IT GOES DOWN THROUGH THE BORROW DITCH, AND THE

24   PUMP IS A LITTLE BIT BELOW OFF OF THIS DIAGRAM.

25   **Q.**  AND THE WATER GETS PUMPED OUT FROM THE PUMP, CORRECT?

BOURSIER – DIRECT / LEE

1   **A.**   THE WATER IS PUMPED OUT, CORRECT.

2   **Q.**   I SEE THERE ARE CERTAIN PARTS WHERE YOU'VE INDICATED BLUE.

3   LIKE THERE IS THE BLUE AQUATIC AREA IN THE NORTH.  THERE'S THE

4   DUCK POND IN THE MIDDLE AREA.  EVEN THE BORROW DITCH, I THINK.

5   ACTUALLY I'M NOT SURE, YOU CAN TELL ME, IF IT HAS A THIN BLUE

6   LINE.  I'M NOT ENTIRELY SURE ON THAT.

7       MY QUESTION TO YOU IS, HOW COME THERE ISN'T A BLUE LINE

8   GOING EAST TO WEST ON THAT -- THAT -- WHAT DO YOU CALL IT, THE

9   FARM DITCH?

10  **A.**   IT'S A -- FARM DITCH THAT PARALLELS THE FARM ROAD, IF YOU

11  WILL.  IF YOU ZOOM INTO IT, IN FACT THERE IS -- THAT

12  FEATURE -- I'LL WAIT UNTIL IT COMES UP.

13      YOU CAN SEE, THE ARMY CORPS SAID THAT WITHIN DITCHES, YOU

14  MR. CONSULTANT, ARE TO MAP AREAS, AND USING A DITCH OR ALSO

15  CALLED A DRAINAGE CHANNEL OR A TRIBUTARY, IT HAS TO HAVE A

16  BED, BANK, AND A CHANNEL.  SIMPLY MEANS THERE'S A BOTTOM TO IT

17  AND SIDES TO IT.

18      AND THIS IS BY CORPS REGULATION.  AND IF THERE'S NO

19  WETLAND VEGETATION -- AND THIS IS THE CORPS TALKING TO US

20  CONSULTANTS -- THAT THERE'S NO VEGETATION IN THAT LINEAR

21  CHANNEL OR TRIBUTARY, THAT YOU WILL MAP THAT AS "OTHER

22  WATERS".  EVEN THOUGH IT'S A CHANNEL, IT'S A DRAINAGE --

23  ANYWHERE IN THAT CHANNEL WHERE EVEN THOUGH YOU HAVE THE SAME

24  CROSS SECTION -- DID I GO BLANK?

25      OKAY.

1    **Q.**  IT'S BACK.

2    **A.**  SO SAY YOU HAVE THE SAME CROSS SECTION, IT'S THE SAME

3    CHANNEL, IT'S THE SAME DEPTH, IF IT SUPPORTS WETLAND PLANTS,

4    YOU NEED TO MAP THAT AS A WETLAND.

5        AND I'M UNCLEAR AS TO THE REASONING IS BECAUSE YOU HAVE TO

6    MITIGATE.  THERE'S CERTAIN TYPE OF PERMITS THAT APPLY IF

7    THERE'S WETLAND AS OPPOSED TO IF IT WAS NOT VEGETATED.

8        A LOT OF DRAINAGE CHANNELS, ESPECIALLY IN THESE FIELDS,

9    AREN'T VEGETATED.  THEY HAVE ALL THE PHYSICAL CHARACTERISTICS

10   OF A DRAINAGE TRIBUTARY, BUT THEY DON'T SUPPORT WETLAND

11   PLANTS, IF YOU WILL.

12   **Q.**  SO WAS IT BECAUSE -- CORRECT ME IF I'M WRONG, DID YOU MARK

13   IT AS GREEN AND WETLAND BECAUSE IT WAS A DRAINAGE CHANNEL THAT

14   ALSO SUPPORTED SOME PICKLEWEED?

15   **A.**  RIGHT.  THE PRIMARY WETLAND PLANT WITHIN THAT CHANNEL IS

16   PICKLEWEED, CORRECT.

17       BUT, AGAIN, AT THAT POINT -- THE TERMINOLOGY DRAINAGE,

18   TRIBUTARY IS A MORE REGULATORY TERM.  AND CORPS TOLD US FLAT

19   OUT, DON'T DO THAT, PUT IT AS A WETLAND OR "OTHER WATER"

20   BECAUSE THE "OTHER WATER" CATEGORY, REMEMBER, IT CAPTURES

21   PONDS, LAKES, STREAMS, DRAINAGES, AND THOSE SORTS OF THINGS.

22       THEY REALLY WANTED THOSE -- THEY WANTED SECTION 404

23   JURISDICTION SPLIT INTO THOSE CATEGORIES.  AND IF YOU HAD

24   SECTION 10, PUT THAT IN THE -- TO MAKE IT AS EASY FOR THEM AS

25   POSSIBLE.

1    I SHOULD SAY I WAS OUT THERE TUESDAY, AND THERE'S

2    EXTENSIVE WATER, THERE'S A HUNDRED PERCENT PICKLEWEED.  ALL

3    THE WATER THAT YOU SEE ON HERE IS STILL THERE.  IN FACT, IT'S

4    BACKED UP IN THAT DIRECTION AS WELL --

5        **MS. HANSEN:**  OBJECTION, YOUR HONOR, BEYOND THE

6    SCOPE --

7        **THE COURT:**  SUSTAINED.

8        **MS. HANSEN:**  MOVE TO STRIKE.

9        **THE COURT:**  LADIES AND GENTLEMEN, THE LAST PART ABOUT

10   CONDITIONS ON TUESDAY IS STRICKEN AND YOU ARE NOT TO CONSIDER

11   IT.

12   **BY MS. LEE:**

13   **Q.**  DR. BOURSIER, IN THE TIMES THAT YOU'VE BEEN ON THE SITE,

14   LET'S -- WE ARE TALKING ABOUT '05, '06, '07, '08, '09, AND I

15   KNOW YOU'VE BEEN ON AFTER, WE'LL GET THERE, HAVE YOU SEEN

16   WATER IN THIS FARM DITCH THAT LEADS TO THE BORROW DITCH?

17   **A.**  YES.  YES, I HAVE.

18   **Q.**  AND HAVE YOU SEEN IT THROUGHOUT ALONG THAT FARM DITCH

19   LINE?

20   **A.**  UH-HUH.  YES.

21   **Q.**  AND APPROXIMATELY, YOU KNOW, HOW OFTEN DO YOU SEE IT?  IS

22   IT SEASONAL?  IS IT DURING THE RAINY SEASON?  IS IT NOT THERE

23   DURING THE DRY SEASON?  TELL US ABOUT IT.  YOU'VE BEEN ON THE

24   PROPERTY SO MANY TIMES.

25   **A.**  IT ISN'T THE DURATION OF THE WATER IN THE CHANNEL IS

1    LONGER THAN A TRULY SEASONAL AREA.  A SEASONAL AREA WOULD BE

2    SUPPORTED DURING THE RAINFALL SEASON.

3        BECAUSE THIS AREA RECEIVES RAINFALL RUNOFF AND IT RECEIVES

4    WATER FROM THE SEEPS THAT ARE DIRECTLY CLOSE TO IT, ADJACENT

5    TO IT, THE DURATION -- THE WETLAND PLANTS ARE THERE ALL YEAR,

6    BUT THE DURATION OF WATER WOULD BE MUCH GREATER.  IT MAY BE

7    SEVEN MONTHS, IT MAY BE EIGHT MONTHS.  IT MAY BE ALL YEAR IN

8    MANY YEARS.

9        BECAUSE IT'S COVERED, A LOT OF IT IS COVERED COMPLETELY IN

10   PICKLEWEED, IT WOULD BE EVEN DIFFICULT THROUGH AERIAL

11   TOPOGRAPHY TO SEE THAT, ALTHOUGH THAT IS POSSIBLE IN CERTAIN

12   STRETCHES.

13   **Q.**  OH, BECAUSE SOMETIMES THE WATER WOULD RUN UNDER THE

14   PICKLEWEED?

15   **A.**  THAT'S CORRECT.  THE PICKLEWEED MAY BE 2 TO 3 FEET TALL

16   AND THE WATER IS UNDERNEATH THAT, SO IT'S HARD TO SEE.

17   **Q.**  AND JUST LIKE SEASONAL WETLANDS, TRIBUTARIES BE SEASONAL

18   AND BE CONSIDERED A "WATER OF THE UNITED STATES"?

19   **A.**  YES.  ABSOLUTELY.

20   **Q.**  AND ARE YOU AWARE THAT SEASONAL, BY DEFINITION, WOULD BE

21   JUST THREE MONTHS OUT OF THE YEAR WOULD BE ENOUGH?

22   **A.**  UH-HUH.  CORRECT.

23       AGAIN, SEASONAL REFERS TO THE HYDROLOGY, NOT NECESSARILY

24   TO THE PLANTS THAT LIVE THERE.  SO IT'S....

25   **Q.**  OKAY.

BOURSIER – DIRECT / LEE

1    NOW WE'VE TALKED ABOUT WHY YOU BELIEVE THESE ARE WETLANDS

2   AND "OTHER WATERS".  THE REASONING WHY YOU CATEGORIZE IT THAT

3   WAY BASED OFF OF YOUR GUIDANCE FROM THE CORPS.

4    CAN YOU TELL US WHY YOU BELIEVE THESE TO BE JURISDICTIONAL

5   WETLANDS AND "OTHER WATERS"?

6   **A.**  SURE.

7    WELL, REALLY FOR THREE REASONS, AND I'VE TALKED ABOUT

8   THOSE QUITE A BIT.  AND THOSE -- THAT'S FOR TECHNICAL REASONS.

9    IF YOU LOOK AT THE ARMY CORPS GUIDANCE, YOU KNOW, THE

10   GUIDANCE ON WETLANDS, THE GUIDANCE ON "OTHER WATERS", THE

11   CORPS' GUIDANCE ON TRIBUTARIES OR DRAINAGES, FOR THOSE

12   TECHNICAL MANUAL, FOR THOSE COOKBOOK REASONS IT MEETS THOSE

13   DEFINITIONS.

14    AND THE NEXT REASON IS FROM A REGULATORY PERSPECTIVE.

15   GOING BACK TO AROUND THE MID '80S, REGULATIONS THAT WERE

16   ISSUED TO THE CORPS INDICATE THAT -- THOSE AREAS DETERMINED TO

17   BE JURISDICTIONAL INCLUDE TRADITIONAL NAVIGABLE WATERS, WHICH

18   AREN'T ON THE SITE BUT DIRECTLY ADJACENT.  THAT'S TRADITIONAL

19   NAVIGABLE WATER HERE IS MOWRY SLOUGH.

20    THEY SAY ALSO THE CORPS IS TO CONSIDER JURISDICTIONAL

21   WETLANDS ADJACENT TO TRADITIONAL NAVIGABLE WATERS.  SO CLEARLY

22   THE MARSHES NEXT TO MOWRY SLOUGH, BUT THE TERM "ADJACENT" CAN

23   ALSO EXTEND INLAND FROM THERE.

24    IN THAT SAME PIECE OF REGULATION OR RULE TALKS ABOUT THE

25   CORPS CLAIMING JURISDICTION OVER TRIBUTARIES THAT CONTRIBUTE

BOURSIER - DIRECT / LEE

1  FLOW SEASONALLY OR PERENNIALLY TO TRADITIONALLY NAVIGABLE

2  WATERS.  SO A LOT OF THE FEATURES ON-SITE, THE DUCKBILL

3  PLATYPUS AND THE BORROW DITCH WITH THE PUMP.

4      AND THEN ALSO FOURTHLY, THE -- THEY ARE TO CLAIM

5  JURISDICTION OVER WETLANDS ADJACENT TO THOSE TRIBUTARIES THAT

6  DUMP INTO TRADITIONAL NAVIGABLE WATERS.

7      BUT AT THE SAME TIME, THEY ARE NOT TO CLAIM JURISDICTION

8  OVER AREAS, AND THAT'S DESCRIBED LIKE STORM WATER BASINS,

9  EXCAVATED IN UPLANDS.  SO THERE'S GUIDANCE THAT SAY YOU,

10  CORPS, AND EPA WILL EXERT JURISDICTION OVER THESE CATEGORIES,

11  BUT NOT OVER OTHER THINGS.

12  **Q.**  DR. BOURSIER, I WILL STOP YOU RIGHT THERE.

13      WOULD IT BE FAIR TO SAY THAT ONE OF THE REASONS YOU

14  BELIEVE THAT THESE WETLANDS ARE JURISDICTIONAL WETLANDS IS

15  BECAUSE THEY ARE ADJACENT TO MOWRY SLOUGH, WHICH IS A

16  TRADITIONAL NAVIGABLE WATER?

17  **A.**  OR ADJACENT TO A TRIBUTARY THAT DISCHARGES INTO A

18  TRADITIONAL NAVIGABLE WATER, RIGHT.

19  **Q.**  NOW FOCUSING ON ADJACENCY, ARE YOU AWARE THAT ADJACENCY

20  MEANS BORDERING, CONTIGUOUS, OR NEIGHBORING, AND THAT THE

21  GUIDANCE FURTHER STATES WETLANDS SEPARATED FROM "OTHER

22  WATERS", SUCH AS A TRADITIONAL NAVIGABLE WATER, WETLANDS

23  SEPARATED FROM "OTHER WATERS" BY MAN-MADE DIKES, BARRIERS,

24  BERMS, AND THE LIKE ARE CONSIDERED ADJACENT WETLANDS?

25  **A.**  UH-HUH, YES.

BOURSIER – DIRECT / LEE

1   **Q.**  I HAVE A QUESTION FOR YOU.

2       LOOKING AT THESE WETLANDS, WHAT MAKES YOU BELIEVE THAT

3   THEY ARE ADJACENT TO MOWRY SLOUGH?

4   **A.**  WELL, THE PHYSICAL ADJACENCY -- ACTUALLY, WHEN I STARTED

5   IN '91, CORPS REGULATIONS WERE NOT ENTIRELY CLEAR ON THE TERM

6   "ADJACENCY", AND BECAUSE I DID BUSINESS -- I DID DELINEATIONS

7   WITH SAN FRANCISCO DISTRICT, SACRAMENTO DISTRICT, AND LOS

8   ANGELES DISTRICT, EACH OF THOSE CORPS DISTRICTS HAD SLIGHTLY

9   DIFFERENT INTERPRETATION OF WHAT IT MEANT.

10      SO -- BUT MOST OF THEM USED A -- EITHER A PHYSICAL

11  PROXIMITY AND THAT WOULD BE -- THAT VARIED A BIT.  IT COULD BE

12  ANYTHING WITHIN 2 MILES, ANYTHING WITHIN 200 FEET.  AND I

13  COLLECTED A LOT OF... SORTS OF GUIDANCE FROM DIFFERENT

14  DISTRICTS AROUND THE UNITED STATES.  AND ONE THAT ALWAYS POPS

15  OUT IN MY MIND SAVANNAH, GEORGIA FOR SOME REASON.

16      SO THEY USE A PHYSICAL PROXIMITY, BUT THEN THEY ALSO USED

17  A BIOLOGICAL NEXUS.  IF SPECIES THAT USE THE SITE ALSO USE

18  SIMILAR HABITAT ADJACENT, THEN, TO THEM, THAT MEANS ADJACENT.

19      AND AS A BIOLOGIST, THE FACT THIS WAS PART OF THE SAN

20  FRANCISCO BAY, IT WAS TIDAL, THE ENTIRE AREA SLOPES DOWN,

21  YOU'RE TALKING ABOUT A MASSIVE COMPLEX OF OVER 250 ACRES OF

22  WETLANDS, SOME SEASONAL, SOME PERENNIAL DIRECTLY ADJACENT TO A

23  TIDAL CHANNEL WHICH IS DIRECTLY PART OF THE SAN FRANCISCO BAY.

24      I'M NOT A REGULATOR, BUT I'M A BIOLOGIST, AND TO ME IT

25  MADE GOOD BIOLOGICAL SENSE THAT THAT --

1          **MS. HANSEN:**  YOUR HONOR --

2          **THE WITNESS:**  -- CONNECTED.

3          **MS. HANSEN:**  -- CAN WE PROCEED WITH QUESTION AND

4    ANSWER?

5          **THE COURT:**  WE REALLY SHOULD.  SUSTAINED.  SO NOTHING

6    IS STRICKEN, BUT JUST ON A GOING-FORWARD BASIS, PLEASE LET'S

7    BE SURE TO PROCEED ON A QUESTION-AND-ANSWER BASIS.

8       WE ARE ACTUALLY CLOSE TO TEN.  WHY DON'T WE TAKE OUR FIRST

9    MORNING RECESS, LADIES AND GENTLEMEN.  WE'LL RECONVENE HERE AT

10   10:15.

11      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

12          **THE CLERK:**  YOU MAY BE SEATED.

13          **THE COURT:**  DO YOU HAVE AN ESTIMATE OF HOW MUCH

14   LONGER YOU ANTICIPATE?

15          **MS. LEE:**  DR. BOURSIER?  POSSIBLY 40 MINUTES.

16          **THE COURT:**  ALL RIGHT.  BUT I DO TAKE THE POINT, I

17   THINK IT WILL BE A LOT CRISPER IF WE JUST HAVE A Q AND A

18   RATHER THAN NARRATIVES.

19          **MS. LEE:**  UNDERSTOOD.

20          **MS. HANSEN:**  HE'S VERY CHARMING AND I DON'T WANT TO

21   INTERRUPT HIM, BUT IF THE DIRECT EXAMINATION COULD BE MORE

22   FOCUSED THAT WOULD BE HELPFUL.  THANK YOU.

23          **THE COURT:**  I WOULD AGREE.

24          **MS. LEE:**  OKAY.

25      (RECESS TAKEN AT 10:00 A.M.; RESUMED AT 10:18 A.M.)

BOURSIER – DIRECT / LEE

```
1        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

2           THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS

3    COURT IS BACK IN SESSION.

4        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

5           THE CLERK:  YOU MAY BE SEATED.

6           THE COURT:  YOU MAY CONTINUE, MS. LEE.

7           MS. LEE:  OKAY.

8    BY MS. LEE:

9    Q.  DR. BOURSIER, I'M JUST GOING TO ASK YOU A FEW QUESTIONS,

10   AND I WILL JUST ASK YOU TO LIMIT YOUR ANSWERS JUST TO THE

11   QUESTION.  OKAY.

12       IS IT YOUR OPINION THAT THE WETLANDS WHERE FILL MATERIAL

13   WERE DUMPED IN -- AND YOU ARE AWARE OF WHERE THE FILL MATERIAL

14   WERE DUMPED IN, CORRECT?

15   A.  UH-HUH.

16   Q.  CORRECT?  YES, RIGHT?

17   A.  YES.  I AM SORRY.

18   Q.  IS IT YOUR OPINION THAT THE WETLANDS WHERE THE FILL

19   MATERIAL WERE DUMPED IN ARE ADJACENT TO MOWRY SLOUGH?

20   A.  THAT'S MY OPINION, YES.

21   Q.  AND IS IT YOUR OPINION THAT THE AREAS -- THE WETLANDS THAT

22   THE FILL MATERIAL WERE DUMPED IN, THAT THOSE WETLANDS ARE

23   ADJACENT BECAUSE THEY ARE PART OF A SINGLE WETLAND -- THEY ARE

24   PART OF A SINGLE WETLAND THAT BORDERS THE SLOUGH?

25   A.  YES, THAT WOULD BE MY OPINION.
```

BOURSIER – DIRECT / LEE

1    **Q.**  AND -- YES, THAT WOULD BE YOUR OPINION?

2    **A.**  YES.

3    **Q.**  AND IS IT PART OF A SINGLE WETLAND -- FOR INSTANCE, WHAT I

4    AM MENTIONING IS, EVEN THIS WETLAND IN THE MIDDLE SECTION

5    WHERE IT -- CLOSE TO WHERE THAT NO. 3 IS FOR THE SEAT, THAT

6    THIS WETLAND IS PART OF THIS WETLAND COMPLEX, THIS SINGLE

7    WETLAND COMPLEX THAT GOES CONTIGUOUS TO THE SLOUGH?

8    **A.**  YES.

9    **Q.**  AND IT'S CONTIGUOUS BECAUSE THE REGULATIONS TELL YOU ALSO

10   THAT YOU'RE SUPPOSED TO NOT TAKE INTO CONSIDERATION A MAN MADE

11   LEVEE; IS THAT CORRECT?

12   **A.**  RIGHT.  AND MY CONCLUSION WOULD BE THE SAME IF I PUT ON MY

13   HAT AS A BIOLOGIST, I SEE IT AS AN -- AS ONE COMPLETE WETLAND

14   ADJACENT.

15   **Q.**  AND IS IT ALSO OPINION -- YOUR OPINION THAT THIS KIND OF

16   ONE COMPLETE WETLAND, THAT IT IS NEIGHBORING THE SLOUGH

17   BECAUSE OF ITS CLOSE PROXIMITY?

18   **A.**  YES.

19   **Q.**  IS IT YOUR OPINION THAT THERE IS A DIRECT HYDROLOGICAL

20   CONNECTION BETWEEN THESE WETLANDS AND THE SLOUGH THROUGH THE

21   CULVERT PIPE?

22   **A.**  YES.

23   **Q.**  AND THROUGH THE PUMP?

24   **A.**  YES.

25   **Q.**  IN TALKING ABOUT ADJACENCY, AND I WILL ASK YOU TO LOOK AT

```
1   YOUR PICTURE, FOR INSTANCE, DOES THE -- DOES THE LITTLE YELLOW

2   SLIVER -- PERHAPS I WILL... THERE IS LIKE LITTLE SLIVERS OF

3   YELLOW IN THAT -- WE HAVE BEEN CALLING IT THE SOUTHERN FILL

4   SECTION OF THE WETLAND.

5       PERHAPS WHAT I WILL CLARIFY QUICKLY FOR THE RECORD IS,

6   DR. BOURSIER, SOMETIMES DURING YOUR TESTIMONY YOU'VE REFERRED

7   TO THE SOUTHERN PORTION OF THE WETLAND.  I JUST WANT TO

8   CLARIFY, YOU ARE REFERENCING THE SOUTHERN PORTION WHERE THE

9   PUMP IS, CORRECT?

10  A.  THE SOUTHERNMOST, YES.

11  Q.  THAT IS THE SOUTHERNMOST?

12  A.  RIGHT.

13  Q.  WHERE I'M NOW REFERENCING YOU AT IS WHERE THE SOUTHERN

14  FILL WAS.

15  A.  YES.

16  Q.  WHICH IS ACTUALLY MORE THE MIDDLE SECTION OF THIS TRIFECTA

17  AREA 4 PROPERTY.

18      DOES A LITTLE SLIVER OF YELLOW UPLAND, DOES THAT CUT OFF

19  ADJACENCY IN YOUR OPINION?

20  A.  NO.

21  Q.  WHAT ABOUT THE FACT THAT THERE IS AN "OTHER WATER" AREA IN

22  THE NORTHERN FILL SECTION OF THE WETLAND, WOULD THAT CUT OFF

23  ADJACENCY?

24  A.  NO.

25  Q.  WHY NOT?
```

1    **A.**  WELL, THOSE AREAS STILL -- WELL, FOR A VARIETY OF REASONS.

2    FROM A BIOLOGICAL PERSPECTIVE THEY ARE STILL ADJACENT FOR, YOU

3    KNOW, WILDLIFE USE OR COULD SUPPORT PLANT SPECIES -- SOME OF

4    THE PLANT SPECIES IN BOTH LOCATIONS.  THEY ARE HYDROLOGICALLY

5    CONNECTED.  THEY DRAIN INTO THE SLOUGH AND FROM THE SLOUGH

6    INTO THE ADJACENT MARSHES OF THE SLOUGH.

7    **Q.**  AND THAT THESE WETLANDS WOULD STILL BE NEIGHBORING THE

8    SLOUGH, CORRECT?

9    **A.**  UH-HUH.

10   **Q.**  THEY ARE IN CLOSE PROXIMITY TO THE SLOUGH, CORRECT?

11   **A.**  YES.

12   **Q.**  AND, IN FACT, WHEN YOU WENT IN MORE RECENT YEARS,

13   PICKLEWEED HAD DEVELOPED WHERE THIS "OTHER WATER" AREA IS SUCH

14   THAT THE WETLAND EXTENDED ALL THE WAY TO PRETTY MUCH THE

15   LEVEE; IS THAT CORRECT?

16   **A.**  NOW, THAT'S IN THE NORTHERN FILL AREA, CORRECT?  YES.

17   **Q.**  IS IT YOUR OPINION THAT THERE IS AN ECOLOGICAL CONNECTION

18   BETWEEN THESE WETLANDS AND MOWRY SLOUGH?

19   **A.**  YES.

20   **Q.**  AND CAN YOU EXPLAIN?

21   **A.**  YES.  THE ECOLOGICAL CONNECTION WOULD BE THE COMMON USE OF

22   BOTH AREAS, THE SLOUGH AND HABITATS OF THE SLOUGH, COMMON USE

23   OF THOSE HABITATS IN THE SLOUGH AREAS AND THOSE HABITATS

24   ON-SITE.

25   **Q.**  AND WOULD YOU CONSIDER THERE TO BE A PHYSICAL CONNECTION

BOURSIER – DIRECT / LEE

1   GIVEN THE WATER THAT LEAVES THE CULVERT PIPE AND THE PUMP AND

2   THE PUMP THAT DIRECTLY PUMPS INTO THE SLOUGH?

3   **A.**  YES.

4   **Q.**  DR. BOURSIER, DID YOU CONDUCT WHAT'S -- WHAT'S CALLED A

5   SIGNIFICANT NEXUS TEST ON THIS SITE?

6   **A.**  NO, WE DID NOT.

7   **Q.**  AND IS THE REASON YOU DIDN'T CONDUCT THAT TEST IS BECAUSE

8   YOU DIDN'T NEED TO PER CORPS GUIDANCE?

9   **A.**  THAT'S CORRECT.

10  **Q.**  AND, IN FACT, I'M REFERENCING THE -- I'M REFERENCING

11  EXHIBIT 228 ONLY AS A DEMONSTRATIVE WITH RESPECT TO THE

12  RAPANOS GUIDANCE.  ISN'T IT YOUR UNDERSTANDING THAT THE ARMY

13  CORPS OF ENGINEERS WILL ASSERT JURISDICTION, MEANING THAT THEY

14  ARE JURISDICTIONAL "WATERS OF THE UNITED STATES,"

15  CATEGORICALLY IF THE WETLANDS ARE ADJACENT TO A TRADITIONAL

16  NAVIGABLE WATER?

17  **A.**  YES, IT IS.

18  **Q.**  SUCH THAT YOU WOULDN'T HAVE TO HAVE CONDUCTED A

19  SIGNIFICANT NEXUS TEST FOR A SITE LIKE THIS?

20  **A.**  YES.

21  **Q.**  HOWEVER, IS IT STILL YOUR TESTIMONY, THOUGH, THAT THERE

22  ARE DIRECT HYDROLOGICAL, PHYSICAL, AND ECOLOGICAL LINKS

23  BETWEEN THE SITE AND THE SLOUGH?

24  **A.**  YES.

25  **Q.**  I WOULD LIKE TO MOVE ON TO A FEW MORE YEARS AHEAD NOW.  I

BOURSIER – DIRECT / LEE

```
1   BELIEVE WE WERE AT -- WE LEFT OFF AT 2009, YOU WENT BACK FOR
2   YOUR BIOTIC HABITATS.  DID YOU GO BACK TO THE SITE IN 2013?
3   A.  YES.  THE SITE VISIT IN 2013, THE PURPOSE OF THAT VISIT
4   WAS TO TAKE THE THEN SOUTH SECTION CHIEF, KATERINA GALACATOS,
5   OUT TO VIEW THE PROPERTY.  THE ORIGINAL JURISDICTIONAL
6   DETERMINATION LETTER WAS DATED 2007, AND THEY ARE VALID
7   GENERALLY FOR FIVE YEARS.  AND PRIOR TO EXPIRATION I REQUESTED
8   A REVERIFICATION, AND SHE WAS ABLE TO MAKE IT OUT IN '13 FOR
9   THAT VISIT.
10  Q.  IS THIS ON -- IN JULY OF 2013?
11  A.  YES.
12  Q.  AND YOU WENT OUT THERE WITH DR. GALACATOS FROM THE ARMY
13  CORPS OF ENGINEERS?
14  A.  YES, CORRECT.
15  Q.  WHAT DID YOU DO THAT DAY WHEN YOU WENT OUT IN JULY OF
16  2013?
17  A.  WE PRIMARILY DROVE WITH A -- I BELIEVE I DROVE AND SHE HAD
18  THE MAP IN HAND.  SHE WANTED TO VISUALLY SEE THE ENTIRE
19  PROPERTY.  SO WE DROVE AND THEN STOPPED IN CERTAIN AREAS WHERE
20  SHE WOULD ASK QUESTIONS.  WHY DID YOU MAP THIS?  WHY IS THIS
21  IN?  AND I WOULD GET OUT THE DATA FORMS FROM OUR ORIGINAL
22  REPORT AND SHOW HER THOSE.
23      SHE WANTED TO MAKE SURE -- THE CORPS CAN ISSUE A
24  REVERIFICATION ONLY IF CONDITIONS HAVEN'T CHANGED.  AND THAT
25  MEANS REGULATORILY BUT ALSO IT MEANS SITE CONDITIONS HAVEN'T
```

1    CHANGED.

2    **Q.**  WHEN YOU WENT OUT THERE IN JULY OF 2013, WHAT WAS YOUR

3    OPINION AS TO WHETHER ANY SITE CONDITIONS HAD CHANGED?

4    **A.**  MY OPINION WAS THAT IT LOOKED VERY, VERY SIMILAR TO OUR

5    PRIOR MAPPING, THE MAPPING FROM -- THAT WAS FINALIZED IN '07.

6    **Q.**  SO WAS IT YOUR OPINION THAT THE AREAS THAT WERE DEEMED TO

7    BE JURISDICTIONAL SHOULD REMAIN JURISDICTIONAL "WATERS OF THE

8    UNITED STATES"?

9    **A.**  YES.  WITH THE EXCEPTION OF THE -- I MEAN, IT WAS STILL

10   JURISDICTIONAL BUT THE AREA THAT CONVERTED FROM, AS WE

11   DISCUSSED BEFORE, AN OPEN WATER NEXT TO THE PICK 'N PULL, IT

12   BECAME DOMINATED WITH PICKLEWEED SO THAT -- THE IDEA WAS TO

13   CONVERT THAT ON A MAP FROM BLUE TO GREEN.

14   **Q.**  YOU ARE TALKING ABOUT THE BLUE AREA IN THE NORTHERN --

15   **A.**  YES.

16   **Q.**  -- FILL AREA?

17   **A.**  CORRECT.

18   **Q.**  THAT IT HAD DEVELOPED SOME PICKLEWEED THERE?

19   **A.**  RIGHT.

20   **Q.**  WITH THE DEVELOPMENT OF PICKLEWEED THERE, DID WATER STILL

21   DRAIN FROM THE NORTHERN SECTION OF THE PROPERTY THROUGH THE

22   PINCH POINT OUT THROUGH THE DUCKBILL?

23   **A.**  YES.

24   **Q.**  THE WATER STILL DRAINED IN THAT DIRECTION AND CONTRIBUTED

25   FLOW TO MOWRY SLOUGH?

1   **A.**  YES.

2   **Q.**  DID THERE COME A TIME WHEN YOU RESPONDED TO THE PROPERTY

3   ON SEPTEMBER 9TH, 2014 TO DOCUMENT THE EXTENT OF THE FILL

4   MATERIAL THAT HAD BEEN BROUGHT TO THE SITE?

5   **A.**  YES.  I BELIEVE I WAS CALLED -- I WAS CALLED ON -- BY THE

6   LANDOWNERS' REPRESENTATIVE, IF I REMEMBER CORRECTLY, IT WAS ON

7   THE 8TH AND I WENT OUT THE NEXT DAY FOR THE PURPOSE OF TAKING

8   PICTURES, AND I BROUGHT A FIELD BIOLOGIST WITH ME TO SURVEY IN

9   VIA GPS THE LATERAL EXTENT, THE FOOTPRINT OF THE NORTHERN AND

10  SOUTHERN FILL AREA.

11  **Q.**  OKAY.  WHEN YOU FOUND OUT ABOUT THIS ILLEGAL -- WITHDRAWN.

12      WHEN YOU FOUND OUT THAT FILL MATERIAL HAD BEEN PLACED ON

13  THE SITE AND YOU WENT OUT THERE ON SEPTEMBER 9TH, WAS IT YOUR

14  JOB -- WAS IT YOUR PURPOSE THAT DAY TO BE ABLE TO DOCUMENT

15  WHERE THE FILL MATERIAL WAS PLACED AND TO DETERMINE IF IT HAD

16  BEEN PLACED IN A "WATER OF THE UNITED STATES"?

17  **A.**  IT WAS PRIMARILY TO DOCUMENT THE FOOTPRINT.  WHEN WE GOT

18  BACK TO THE OFFICE, WE TOOK THAT FILE -- AGAIN, THIS IS A

19  HANDHELD SURVEY DEVICE CALLED A GPS, GEOGRAPHIC POSITIONING

20  SYSTEM, AND SO WE SURVEYED IN, WALKED THE BOUNDARY.  I WAS

21  THERE TO MAKE SURE THAT THE GENTLEMAN WHO WORKED FOR ME

22  UNDERSTOOD WHERE HE SHOULD PLACE THE BOUNDARIES AND WALK.

23      SO WE OVERLAID THAT ON TO THE JURISDICTIONAL MAP THAT WAS

24  FINALIZED BY THE CORPS.  I KNEW WETLANDS HAD BEEN FILLED BUT

25  WE PRESENTED THAT EXHIBIT THAT WOULD SHOW -- DEMONSTRATE THAT

1    THAT'S THE CASE.

2    **Q.**  I WOULD LIKE TO PULL UP EXHIBIT 3, ALREADY IN EVIDENCE.

3                      (DISPLAYED ON SCREEN.)

4        DR. BOURSIER, IS THAT THE EXTENT OF THE FILL AS YOU AND

5    YOUR COLLEAGUE GPS'D ON SEPTEMBER 9TH, 2014?

6    **A.**  YES, IT IS.

7    **Q.**  WOULD YOU LITERALLY WALK THE EXTENT OF THE FILL WITH THE

8    GPS MACHINE IN HAND DOCUMENTING THE BOUNDARIES OF WHERE THE

9    FILL MATERIAL WERE PLACED?

10   **A.**  RIGHT.  THAT DEVICE YOU CAN SET TO TAKE COORDINATES FOR

11   DIFFERENT TIME PERIODS.  YOU CAN SET IT, AS AN EXAMPLE, TO

12   TAKE A LATITUDE/LONGITUDE COORDINATE EVERY THREE SECONDS.

13       SO I WAS SO FAMILIAR WITH THE SITE I COULD EASILY

14   DETERMINE THE BOUNDARY BETWEEN NATIVE SOIL AND FILL SOIL.  AND

15   IT WAS PRETTY EASY -- BRIAN IS A VERY GOOD BIOLOGIST, FIELD

16   BIOLOGIST, BUT WHEREVER IT WAS QUESTIONABLE, I COULD CLARIFY

17   FOR HIM WHERE EXACTLY THAT BOUNDARY WAS.

18   **Q.**  AND DO THESE FAIRLY AND ACCURATELY IN BOTH THE NORTHERN

19   FILL SECTION -- OH, IT IS NOT ON THIS MAP, ON EXHIBIT 3, IN

20   BOTH THE NORTHERN FILL SECTION AND THE SOUTHERN FILL SECTION,

21   DOES THAT FAIRLY AND ACCURATELY DEPICT THE BOUNDARIES OF --

22   CONTAINING FILL BASED OFF OF THE WORK THAT YOU HAD DONE WITH

23   YOUR COLLEAGUE GPS'ING THE FILL LOCATION?

24   **A.**  YES, IT DOES.

25   **Q.**  IS IT YOUR OPINION THAT THE FILL MATERIAL IN PART WHERE

BOURSIER – DIRECT / LEE

1    IT'S ON THE GREEN AREA, INSIDE THE RED LINES, THAT THEY WERE

2    PLACED ON "WATERS OF THE UNITED STATES"?

3    **A.**   YES.

4    **Q.**   CAN YOU DESCRIBE WHAT WAS IN THE FILL MATERIAL THAT YOU

5    SAW ON THE GROUND ON SEPTEMBER 9TH, 2014?

6    **A.**   SURE.  MOST OF IT WAS SOIL.  IT WAS DIFFERENT COLORED SOIL

7    GENERALLY THAN THE NATIVE SOIL THAT IS ON-SITE.  THERE WERE

8    ALSO SUCH THINGS THAT DON'T OCCUR ON THE NATIVE SOIL SUCH AS

9    STONES AND ROCKS.  THERE WERE BRANCHES FROM TREES THAT WERE --

10   I ASSUME TRIMMED OR TAKEN OUT SOMEWHERE ELSE.  THERE WERE

11   PIECES OF ASPHALT AND CONCRETE AND -- YOU KNOW, MAYBE SMALLER

12   PIECES, NOT REALLY LARGE BLOCKS.

13       AND IN THE NORTHERN AREA THERE WERE ALL OF THOSE THINGS IN

14   THE FILL MATERIAL BUT THERE WERE ALSO PIECES OF PLASTIC THAT I

15   REALLY COULDN'T IDENTIFY.  I DON'T KNOW IF THEY WERE -- THEY

16   LOOKED LIKE MAYBE FROM A DEMOLITION SITE, IF YOU WILL.  SO

17   THAT WAS MIXED IN AND BROKEN UP WITHIN THE NORTHERN FILL AREA.

18   I DON'T BELIEVE THERE WAS ANY OF THAT PLASTIC MATERIAL IN THE

19   SOUTHERN.

20   **Q.**   IS IT YOUR UNDERSTANDING THAT FILL MATERIAL, THAT TERM, IS

21   SIMPLY -- IT INCLUDES THINGS LIKE DIRT, ROCK, OTHER THINGS OF

22   THE LIKE, MATERIALS LIKE THAT THAT IS PLACED ON TOP OF

23   SOMETHING THAT IS CONSIDERED A "WATER OF THE UNITED STATES"

24   THAT CHANGES THE BOTTOM ELEVATION OF WHERE THAT "WATER OF THE

25   UNITED STATES" -- WHETHER IT'S AN "OTHER WATER", TRIBUTARY,

1    WETLAND, THAT CHANGES THE BOTTOM ELEVATION OF THAT LAND?

2    **A.**  YES.

3    **Q.**  AND TO YOUR UNDERSTANDING, IS FILL MATERIAL SUCH AS DIRT,

4    IS THAT CONSIDERED A POLLUTANT?

5    **A.**  BASED ON MY OBSERVATIONS OF THE MATERIAL IN THERE, IN THE

6    CORPS DEFINITION, I WOULD SAY YES.

7    **Q.**  DID YOU TAKE PHOTOS THAT DAY, WHEN YOU WENT OUT

8    SEPTEMBER 9TH, TO DOCUMENT THE BOUNDARIES OF THE FILL?

9    **A.**  YES, I DID.

10   **Q.**  I WOULD ONLY LIKE TO SHOW YOU A FEW.  I WOULD LIKE TO SHOW

11   YOU EXHIBIT 207.

12                    (EXHIBIT HANDED TO WITNESS.)

13       IS THAT AN EXAMPLE OF FILL MATERIAL THAT YOU SAW DUMPED IN

14   THAT NORTHERN FILL AREA?

15   **A.**  YES.  I BELIEVE THIS IS THE SOUTHERN, THOUGH.  I BELIEVE.

16   **Q.**  OH, IS THAT RIGHT?  IF YOU ARE NOT SURE, PLEASE JUST LET

17   ME KNOW.

18   **A.**  YEAH, I CAN SEE IN THE BACKGROUND OF THAT PHOTO THERE IS A

19   FENCE POST.

20   **Q.**  OKAY.

21   **A.**  AND IT IS LOOKING TOWARDS THE CLOSED LANDFILL, SO THAT

22   WOULD BE THE SOUTHERN.

23   **Q.**  I STAND CORRECTED.  I SEE IT, ALSO, YES, IT IS THE

24   SOUTHERN FILL AREA.  DOES IT FAIRLY AND ACCURATELY -- THANK

25   YOU.

1    DOES IT FAIRLY AND ACCURATELY DEPICT AN EXAMPLE OF THE

2    FILL MATERIAL THAT YOU SAW IN THE SOUTHERN FILL AREA?

3    **A.**  YES, IT DOES.

4         **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBIT 207 INTO

5    EVIDENCE.

6         **THE COURT:**  ANY OBJECTION?

7         **MS. HANSEN:**  NO OBJECTION.

8         **THE COURT:**  207 IS ADMITTED.

9         (GOVERNMENT'S EXHIBIT 207 RECEIVED IN EVIDENCE)

10                    (DISPLAYED ON SCREEN.)

11   **BY MS. LEE:**

12   **Q.**  AND THAT'S A PHOTO OF THE SOUTHERN FILL AREA WITH THE FILL

13   MATERIAL ON THERE?

14   **A.**  YES, IT IS.

15   **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 208, 210, 212, 214, AND

16   216.

17                 (EXHIBITS HANDED TO WITNESS.)

18    ARE THESE PHOTOS THAT YOU TOOK OF THE FILL IN THE NORTHERN

19   AREA THAT DAY?

20   **A.**  YES, THEY ARE.

21        **MS. LEE:**  I WOULD LIKE TO MOVE THOSE EXHIBITS INTO

22   EVIDENCE.

23        **MS. HANSEN:**  YOUR HONOR, CAN WE HAVE THE NUMBERS

24   AGAIN, PLEASE?

25        **MS. LEE:**  YES.  208, 210, 212, 214, 216.

1          **MS. HANSEN:**  NO OBJECTION.

2          **THE COURT:**  208, 210, 212, 214, AND 216 ARE ADMITTED.

3       (GOVERNMENT'S EXHIBITS 208, 210, 212, 214, AND 216

4    RECEIVED IN EVIDENCE)

5          **MS. LEE:**  IF WE CAN FIRST DISPLAY THE FIRST ONE,

6    WHICH IS 208.

7                    (DISPLAYED ON SCREEN.)

8    **BY MS. LEE:**

9    **Q.**  DOES THIS DEPICT WHAT YOU SAW, FILL MATERIAL PLACED IN THE

10   NORTHERN FILL AREA THAT DAY ON SEPTEMBER 9TH?

11   **A.**  YES, IT DOES.

12   **Q.**  AND HOW ABOUT 210?

13                    (DISPLAYED ON SCREEN.)

14   **A.**  YES.

15   **Q.**  THIS AS WELL?

16      DOES THAT APPEAR TO BE WETLAND VEGETATION IN THE

17   FOREGROUND OF THAT PHOTO, TO YOU?

18   **A.**  YES.  YES, THAT IS.

19   **Q.**  THE FACT THAT THERE IS SOME WETLAND VEGETATION IN THE

20   FOREGROUND, DOES THAT INDICATE THAT THE SITE WAS STILL

21   RECEIVING ENOUGH HYDROLOGY FOR VEGETATION TO PERSIST?

22   **A.**  YES.  THAT AND ADDITIONALLY IF YOU LOOK IN THAT PICTURE

23   TOWARDS THE APPROXIMATE RIGHT CENTER, THERE'S WETLAND

24   VEGETATION THERE, TOO.  RIGHT, YES, EXACTLY, THERE.

25   **Q.**  AND 212, PLEASE.

1          (DISPLAYED ON SCREEN.)

2     **A.**   I TOOK 212 AS WELL.

3     **Q.**   WHAT ARE WE LOOKING AT HERE, DR. BOURSIER?

4     **A.**   WE'RE LOOKING APPROXIMATELY NORTH IN THE FILL AREA.  THIS

5     IS FROM THE MAINTENANCE ROAD FOR THE ALAMEDA FLOOD CONTROL

6     CHANNEL, AND WE'RE LOOKING AT THE FILL DOWN -- THE SORT OF

7     BARREN OR LIGHT-COLORED SOIL AREA --

8     **Q.**   AND 214.

9          (DISPLAYED ON SCREEN.)

10    **A.**   AGAIN, A PHOTOGRAPH I TOOK FROM THE LEVEE.  YOU CAN LOOK

11    DOWN AND SEE THE FILL AREA LOOKING TOWARDS -- AT THAT TIME IT

12    WAS A PIECE OF PROPERTY USED TO SORT RECYCLABLE MATERIALS.  IN

13    THIS PICTURE IN THE FOREGROUND YOU CAN SEE THE FILL MATERIAL

14    SITTING RIGHT ON TOP OF PICKLEWEED, AN OBLIGATE WETLAND PLANT.

15    **Q.**   AND 216, PLEASE.

16         (DISPLAYED ON SCREEN.)

17         DR. BOURSIER, DO YOU SEE THAT THERE IS TWO POSTS?

18    **A.**   YES.  IT'S A SERIES OF FENCE POSTS WITH, I BELIEVE, A

19    FIVE-STRAND BARBWIRE FENCE AT THAT TIME.  YOU CAN SEE IT IS

20    TIPPED OVER.  THERE'S FILL MATERIAL AND, AGAIN, PICKLEWEED HAS

21    BEEN PUSHED AND FILLED ON TOP OF.  IT ALSO SHOWS SOME OF THE

22    LARGER, LIKE STONES AND PIECES OF DEBRIS OFF TO THE RIGHT,

23    SOME BRANCHES, AND SO FORTH.

24    **Q.**   WHAT I WANTED TO ASK YOU, DO YOU SEE THAT -- HOW DO I --

25    THAT POST, THAT WOODEN POST WITH THE RED ARROW?

BOURSIER - DIRECT / LEE

1    **A.**  YES, I DO.

2    **Q.**  HAVE YOU SEEN THAT POST BEFORE ON YOUR VISITS TO THE SITE?

3    **A.**  YES.  IT RUNS PARALLEL WITH THE MAINTENANCE ROAD.  YES.

4    **Q.**  IN THE TIMES THAT YOU'VE SEEN THE SITE PREVIOUSLY, WHAT

5    WAS THE ELEVATION OF THE LAND RELATIVE TO THAT POST AND HOW

6    DOES IT COMPARE TO THE FILL MATERIALS ELEVATION TO THAT POST

7    NOW?

8    **A.**  IF YOU GO BACK TO 214.

9    **Q.**  OKAY.  LET'S GO BACK TO 214.

10   **A.**  THERE IS ALSO A POST THERE OR A COUPLE OF THEM.  AND FROM

11   MEMORY I AM ESTIMATING THOSE POSTS ABOVEGROUND WERE

12   APPROXIMATELY 4 AND A HALF TO 5 FEET TALL.  THAT AREA WAS A

13   RELATIVELY DEEP DEPRESSION, AND I WOULD ESTIMATE WITHOUT

14   MEASURING JUST VISUALLY THAT THERE'S THE -- 5 TO 7 FEET AT

15   LEAST OF THE SOIL PLACED ON TOP OF THAT TO BRING IT UP TO AN

16   ELEVATION THAT IS THE SAME AS THAT RECYCLING YARD.

17   **Q.**  YOU WOULD ESTIMATE ABOUT 5 OR 6 FEET OF FILL MATERIAL THAT

18   HAD BEEN PLACED NEAR WHERE THE POSTS ARE IN ORDER TO RAISE

19   THAT ELEVATION OF THE GROUND TO WHERE IT IS IN THAT PHOTO?

20   **A.**  YES.

21   **Q.**  OKAY.  I WOULD LIKE TO SHOW YOU WHAT IS ALREADY ADMITTED

22   INTO EVIDENCE AS EXHIBIT 118.

23                    (DISPLAYED ON SCREEN.)

24        DR. BOURSIER, IS THAT A FAIR AND ACCURATE PHOTO OF SOME OF

25   THE FILL MATERIAL THAT WAS PLACED IN THE SOUTHERN FILL SECTION

1    OF THE WETLAND?

2    **A.**  YES, IT DOES.  YES, IT IS.

3    **Q.**  AND IS THAT PICKLEWEED TO THE RIGHT -- TO THE LEFT OF THAT

4    FILL MATERIAL?

5    **A.**  YES.  CORRECT.

6    **Q.**  AND THAT WATER THAT YOU CAN SEE BEHIND THAT PICKLEWEED, IS

7    THAT THE FARM DITCH THAT YOU WERE REFERENCING BEFORE THAT

8    SEASONALLY -- OR ACTUALLY YOU SAID MORE THAN SEASONALLY RUNS

9    THE LENGTH OF THAT DITCH?

10   **A.**  YES, IT IS.

11   **Q.**  I WOULD LIKE TO SHOW YOU ONE LAST PHOTO, WHICH IS ALREADY

12   ADMITTED IN EVIDENCE -- THAT LAST PHOTO FROM SEPTEMBER.

13   EXHIBIT 1058-0044.

14                    (DISPLAYED ON SCREEN.)

15       THIS IS A PHOTO THAT SOMEONE BY THE NAME OF DAN MILLER HAD

16   TAKEN FROM SEPTEMBER OF 2014.  DOES THIS FAIRLY AND ACCURATELY

17   DEPICT THE FILL MATERIAL THAT YOU HAD SEEN WHEN YOU HAD WALKED

18   THE NORTHERN FILL AREA ON SEPTEMBER 9TH OF 2014?

19   **A.**  YES.  CORRECT.

20   **Q.**  AND WHAT TYPE OF VEGETATION IS OFF TO THE LEFT?

21   **A.**  LOOKS LIKE PRIMARILY PICKLEWEED.

22   **Q.**  OKAY.

23   **A.**  AND A LITTLE BIT FURTHER BACK THERE IS AN -- UP AGAINST

24   THE FENCE THERE IS A SPECIES CALLED PHRAGMITES, IT IS A

25   SCIENTIFIC TERM, THAT IS IN THE BACKGROUND.

1    **Q.** LOOKING AT THESE PHOTOS AND THE FACT THAT YOU ARE ON THE

2    GROUND ON SEPTEMBER 9TH, 2014, AND THE FACT THAT YOU WERE

3    PREVIOUSLY ON THE SITE IN JULY OF 2013, DO YOU HAVE AN OPINION

4    WHETHER FILL MATERIAL PLACED IN THE NORTHERN AND SOUTHERN

5    SECTION WERE PLACED ON A JURISDICTIONAL "WATER OF THE UNITED

6    STATES"?

7    **A.** I HAVE NO DOUBT THAT THEY WERE -- THAT FILL WAS PLACED ON

8    JURISDICTIONAL WATERS.

9    **Q.** NOW, DO YOU ALSO GO BACK TO THE SITE IN 2015 AS WELL? AND

10   SPECIFICALLY I AM REFERENCING JANUARY 21 OF 2015.

11   **A.** RIGHT. I DID. YES.

12   **Q.** WHAT WAS YOUR PURPOSE OF GOING THEN?

13   **A.** THERE WAS A NUMBER OF LARGE STORM EVENTS DURING THAT

14   MONTH. SO THAT'S THE CHANNEL I DESCRIBED EARLIER THAT CONVEYS

15   STORM WATER RUNOFF FROM UPLAND AREAS.

16       AND THE FLOWS CAME DOWN AND I BELIEVE AT THAT TIME THERE

17   WAS ALSO A VERY -- A HIGH TIDE, AND IT RAISED THE WATER

18   ELEVATION IN THAT FLOOD CONTROL CHANNEL, WHICH IS EARTHEN, TO

19   THE POINT WHERE IT BLEW OUT IN DISCRETE SECTIONS THAT LEVEE,

20   AND WATER WAS ABLE TO RACE ACROSS PARTS OF THE SITE.

21   **Q.** SO WHILE, FOR INSTANCE, THIS PHOTO HERE (INDICATING) IS

22   DURING THE SUMMER TO EARLY FALL, SEPTEMBER OF 2014, BY THE

23   TIME JANUARY ROLLED AROUND THERE WAS ENOUGH RAIN TO THE SITE

24   THAT IT ACTUALLY BLEW OUT THE ALAMEDA FLOOD CONTROL LEVEE?

25   **A.** RIGHT.

1   **Q.**  IS THAT AN EXAMPLE OF A SEASONAL -- JUST A SEASONAL CHANGE

2   IN THIS ARID WEST REGION FROM DRY TO A RAINY SEASON?

3   **A.**  I GUESS I DON'T UNDERSTAND YOUR QUESTION.  I MEAN, IT WAS

4   AN ABNORMAL RAINFALL, PERIOD, WHICH CAUSED THE LEVEE TO BE

5   BLOWN OUT.

6   **Q.**  OKAY.  I GUESS WHAT MY QUESTION WAS -- WITHDRAWN.

7        LET ME SHOW YOU SOME PHOTOS.  DID YOU TAKE PHOTOS WHEN YOU

8   WENT IN JANUARY OF 2015?

9   **A.**  YES, I DID.

10  **Q.**  I WOULD LIKE TO SHOW YOU EXHIBITS NO. 303, 306, AND 312.

11                  (EXHIBITS HANDED TO WITNESS.)

12       ARE THESE PHOTOS YOU TOOK OF THE PROPERTY IN JANUARY OF

13  2015?

14  **A.**  YES, THEY ARE.

15          **MS. LEE:**  I WOULD LIKE TO MOVE THOSE EXHIBITS INTO

16  EVIDENCE.

17          **MS. HANSEN:**  NO OBJECTION.

18          **MS. LEE:**  IF WE CAN --

19          **THE COURT:**  303, 306, AND 312 ARE ADMITTED.

20  (GOVERNMENT'S EXHIBITS 303, 306, AND 312 RECEIVED IN EVIDENCE)

21          **MS. LEE:**  THANK YOU.

22  **BY MS. LEE:**

23  **Q.**  DR. BOURSIER, WHAT ARE WE LOOKING AT HERE?

24  **A.**  WE'RE LOOKING AT -- I ENTERED THE PROPERTY AND WALKED UP

25  THE SAME MAINTENANCE ROAD THAT WE WERE TALKING ABOUT.  AND

BOURSIER – DIRECT / LEE

1    WHAT YOU ARE LOOKING AT IN THE BACKGROUND IS THE PICK 'N PULL

2    YARD.

3        AND STRAIGHT AHEAD, IF YOU LOOK ALONG THE MAINTENANCE

4    ROAD, THERE'S A SERIES OF FIVE TRAFFIC CONES, AND THAT WAS TO

5    PREVENT PEOPLE FROM DRIVING INTO THE -- ONE OF THE BLOWOUTS.

6        AND ON THE RIGHT-HAND SIDE YOU CAN SEE WATER PONDING ON

7    THE PART OF THE -- PART OF THE PROPERTY BETWEEN THE RAILROAD

8    TRACKS AND PICK 'N PULL.

9    **Q.**  AND THIS BLOWOUT, WOULD IT BE FAIR TO SAY THAT THERE WAS

10   QUITE A BIT OF RAIN IN DECEMBER OF 2014?

11   **A.**  YES, THERE WAS QUITE A BIT OF RAIN.

12   **Q.**  SO YOU WENT IN JANUARY 2015.

13       **MS. LEE:**  IF WE CAN GO BACK TO THE FULL PICTURE.

14   **BY MS. LEE:**

15   **Q.**  DOES THIS SHOW SOME OF THE PONDING THAT IS IN THE NORTHERN

16   SECTION OF THIS AREA?

17   **A.**  YES.

18   **Q.**  OKAY.  IF WE CAN JUST TAKE A LOOK AT 306.

19                   (DISPLAYED ON SCREEN.)

20       IS THIS WHAT THE PROPERTY LOOKED LIKE IN THE NORTHERN

21   SECTION -- I'M TALKING ABOUT THE NORTHERN SECTION OF WHERE --

22   RIGHT NEAR WHERE THE NORTH -- WHERE THE FILL MATERIAL WAS

23   PLACED IN THE NORTHERN SECTION, IS THAT WHAT THIS LOOKED LIKE

24   IN JANUARY 2015?

25   **A.**  YES.

1    **Q.**  SO THIS IS LESS THAN FIVE MONTHS AFTER YOU WERE THERE

2    DOCUMENTING THE FILL?

3    **A.**  CORRECT.

4    **Q.**  NOW, IS THIS WATER COMING FROM THE BLOWOUT OF THE ALAMEDA

5    FLOOD CONTROL DRAINAGE LINE, OR IS IT COMING FROM SOMETHING

6    ELSE?  TELL ME ABOUT THAT.

7    **A.**  IT IS MOST LIKELY A COMBINATION OF THE TWO.  THE BLOWOUT

8    WAS IN THE AREA WHERE IT COULD CONTRIBUTE WATER GOING BACK

9    AWAY FROM THE PINCH POINT OF THE PICK 'N PULL YARD.  AND IN

10   ADDITION THERE WAS UNDOUBTEDLY RAINFALL AND WATER CONTRIBUTED

11   FROM THE SEEP.

12   **Q.**  WOULD IT BE FAIR TO SAY THAT WHERE THE -- WHERE THAT FLOOD

13   CONTROL LINE KIND OF BLEW OUT WAS... WAS CLOSER TO MOWRY

14   SLOUGH THAN WHERE THIS PHOTO SHOWS?

15   **A.**  YES.

16   **Q.**  WOULD IT BE FAIR TO SAY THAT THE BLOWOUT WAS ACTUALLY TO

17   THE WEST OF THE PINCH POINT LINE?

18   **A.**  UH-HUH.  CORRECT.

19   **Q.**  SO THAT WATER WOULD THEN FLOW OUT -- GIVEN THE SLOPE OF

20   THE PROPERTY, IT WOULD FLOW OUT THROUGH THE CULVERT INTO THE

21   SLOUGH?

22   **A.**  UH-HUH.  CORRECT.

23   **Q.**  IN FACT, WHAT I WOULD LIKE TO DO IS SHOW YOU A PICTURE

24   THAT KIND OF DEMONSTRATES WHAT THIS PROPERTY LOOKS LIKE A

25   LITTLE CLOSER TO THE PINCH POINT TO JUST GET MORE OF A

1    PANORAMIC VIEW.

2    **A.**  ALL RIGHT.

3    **Q.**  OKAY.  I'M SHOWING YOU EXHIBIT 308.

4                    (EXHIBIT HANDED TO WITNESS.)

5        IS THIS A PHOTO YOU TOOK ON JANUARY 21, 2015?

6    **A.**  YES.

7            **MS. LEE:**  I WOULD LIKE TO MOVE THAT INTO EVIDENCE.

8            **MS. HANSEN:**  ONE MOMENT, YOUR HONOR.

9        NO OBJECTION.

10           **THE COURT:**  308 IS ADMITTED.

11       (GOVERNMENT'S EXHIBIT 308 RECEIVED IN EVIDENCE)

12                  (DISPLAYED ON SCREEN.)

13   **BY MS. LEE:**

14   **Q.**  SO IS THIS A LOOK AT THE NORTHERN AREA RIGHT BY THE

15   CONCRETE PAD BUT IT LOOKS DRY, RIGHT, TO THE EAST OF THE

16   PINPOINT; IS THAT CORRECT?

17   **A.**  YOU ARE REFERRING TOWARDS THE PICKLEWEED AREA.  OR

18   DIRECTLY IN FRONT OF US TOWARDS THE RECYCLING YARD.

19   **Q.**  I'M GOING TO PLACE A RED ARROW SO YOU KNOW (INDICATING).

20   THAT AREA WHICH, FOR THE RECORD, IS WHERE THE NORTHERN FILL

21   AREA WAS, THAT APPEARS LIKE NOT AS PONDED AS FURTHER OUT; IS

22   THAT CORRECT?

23   **A.**  CORRECT.

24   **Q.**  AND TO THE WEST OF THIS CONCRETE PAD, IS THAT PICKLEWEED

25   THERE?

1  **A.** YES.

2  **Q.** AND IF WE GO BACK TO EXHIBIT 306.

3                 (DISPLAYED ON SCREEN.)

4      SO THIS PONDING AREA IS FURTHER -- FURTHER NORTH AND EAST

5  CLOSER TO THE RAILROADS, CORRECT?

6  **A.** CORRECT.

7  **Q.** WHAT DOES THE FACT THAT THERE'S PONDED WATER THERE TELL

8  YOU ABOUT HOW THAT SITE HAS CHANGED BECAUSE OF THE FILL

9  MATERIAL THAT WAS PLACED THERE?

10  **A.** IT APPEARS THAT -- COMPARING 308 TO 306, IT APPEARS THAT

11  THE FILL THAT WAS PLACED THERE IS PREVENTING WATER FROM

12  DRAINING THROUGH THAT PINCH POINT TOWARDS THE PICKLEWEED

13  MARSH.

14  **Q.** BECAUSE THE FILL HAD RAISED THE ELEVATION OF THAT GROUND

15  OF THE PINCH POINT?

16  **A.** YES. CORRECT.

17  **Q.** HAD DUMPED DIRT, ROCKS, DEBRIS ON THAT NORTHERN FILL

18  SECTION SITE?

19  **A.** RIGHT.

20  **Q.** AND SO THE RAIN THAT CAME IN IN SEPTEMBER OF 2014, IT'S

21  PONDING THERE --

22  **A.** CORRECT.

23  **Q.** -- IS THAT CORRECT?

24      I WOULD LIKE TO SHOW YOU 312.

25                 (DISPLAYED ON SCREEN.)

1      THIS IS ALSO FROM JANUARY 21, 2015?

2    **A.**   CORRECT.

3    **Q.**   AND IS THIS SHOWING THE WATER THAT'S RUNNING THROUGH THE

4    PICKLEWEED -- THROUGH THE PICKLEWEED WEST OF THE PINCH POINT

5    AREA OUT THROUGH THE CULVERT PIPE?

6    **A.**   RIGHT.  YOU CAN SEE THE BEGINNING -- THE BARREN DIRT

7    AREA -- THE BARREN DIRT AREA, AT THE END OF THAT EXTENT OF

8    WATER IS THE BEGINNING OF THE CULVERT.

9    **Q.**   SO THERE IS STILL WATER BEING DRAINED OUT THROUGH THE

10   CULVERT PIPE?

11   **A.**   CORRECT.

12   **Q.**   HOWEVER, WOULD IT BE FAIR TO SAY THAT THE FILL MATERIAL

13   PLACED AT THE PINCH POINT AND BEYOND IN THIS NORTHERN SECTION

14   OF THE PROPERTY HAS AN IMPACT ON DRAINAGE AT LEAST SO CLOSE --

15   AT LEAST AS IN JANUARY OF 2015?

16   **A.**   YES, IT DID.

17   **Q.**   SINCE THEN HAVE YOU BEEN BACK ON TO THE PROPERTY IN 2016?

18   **A.**   I DON'T BELIEVE I WAS.

19   **Q.**   HAVE YOU BEEN BACK TO THE PROPERTY IN 2017?

20   **A.**   YES.

21   **Q.**   HAVE YOU BEEN BACK TO THE PROPERTY IN 2018?

22   **A.**   YES, I HAVE.

23   **Q.**   I WOULD LIKE TO JUST ASK YOU ABOUT YOUR TIME IN 2017.

24       WHEN YOU WENT BACK TO THE PROPERTY IN 2017, WHAT DID THIS

25   NORTHERN SECTION OF THIS PROPERTY LOOK LIKE?

1    **A.**  I REMEMBER STILL -- DESPITE THE PLACEMENT OF FILL,

2    PICKLEWEED HAD IN THE LOWER AREAS SORT OF INVADED THOSE

3    LOCATIONS, AND THERE WAS STILL STANDING WATER, SATURATED

4    SOILS, AND WETLAND PLANTS EXTENDING BACK FROM THE FILL AREA.

5    **Q.**  SO WOULD BE IT BE FAIR TO SAY THAT THE WETLANDS REMAINED

6    AND THAT THEY WERE DOING WELL WHEN YOU WENT BACK IN 2017?

7    **A.**  YES.  BUT IT IS MORE OF A HETEROGENEOUS PATTERN BECAUSE OF

8    THE HUMMOCKY TOPOGRAPHY OF THE FILL, IF YOU WILL.  BUT

9    PICKLEWEED APPARENTLY -- I MEAN, IT IS A VERY PROLIFIC SEED

10   PRODUCER, AND IT DIDN'T HAVE ANY PROBLEM COMING IN AND

11   REESTABLISHING ITSELF.

12   **Q.**  AND THAT WATER WAS ABLE TO CONTINUE TO DRAIN FROM THE

13   NORTHEAST DOWN THROUGH THE PINCH POINT OUT THROUGH THE CULVERT

14   PIPE?

15   **A.**  YES, IT IS A VERY NARROW CHANNEL, MAYBE 2 AND A HALF FEET

16   WIDE, BARELY ENOUGH TO JUMP OVER, THAT TO THIS DAY CONVEYS

17   WATER THROUGH THE PINCH POINT.

18   **Q.**  AND SO YOU'RE ABLE TO SEE THE FLOW CONTINUE THROUGH THE

19   PINCH POINT OUT THROUGH THE PIPE?

20   **A.**  YES.

21   **Q.**  AND SAME, HOW WERE THE SOUTHERN WETLANDS DOING BY THE TIME

22   2017 ROLLED AROUND AND YOU WENT TO GO SEE THE SITE AGAIN?

23   **A.**  THE SOUTHERN WETLANDS HAVE ALSO BECOME REESTABLISHED AND,

24   AGAIN, THERE IS MORE OF A HETEROGENEOUS PATTERN THERE BECAUSE

25   OF THE TOPOGRAPHY CHANGES.  A LOT OF THE AREA IS DOMINATED BY

BOURSIER – CROSS / HANSEN

1    SALT GRASS, WHICH IS A WETLAND PLANT, AND ALSO PICKLEWEED.

2    **Q.**  BASED OFF OF YOUR VISIT IN 2017, DO YOU FEEL THAT THE

3    AREAS THAT WERE DETERMINED TO BE JURISDICTIONAL "WATERS OF THE

4    UNITED STATES" REMAINED -- THOSE AREAS REMAINED "WATERS OF THE

5    UNITED STATES" WHEN YOU WENT BACK IN 2017?

6    **A.**  WELL, FOR THE MOST PART.  THE ONLY EXCEPTION, AGAIN, WOULD

7    BE WHERE THE FILL WAS SO DEEP THAT PLANTS COULDN'T BECOME

8    REESTABLISHED.

9    **Q.**  OVER THE YEARS THAT YOU'VE SEEN THIS SITE, 1990S, 2002,

10   2005, 2006, 2007, 2008, 2009, 2013, 2014, 2015, 2017, DURING

11   THAT PERIOD OF TIME DO YOU BELIEVE THAT THE SITE HAS REMAINED

12   RELATIVELY THE SAME AND WITH THE EXCEPTION OF WHAT YOU JUST

13   SAID, SOME OF THE DEEPER AREAS WHERE FILL MATERIAL HAD BEEN

14   PLACED, THAT THEY REMAINED AS MAPPED AS JURISDICTIONAL "WATERS

15   OF THE UNITED STATES"?

16   **A.**  YES.

17          **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR THIS

18   WITNESS.

19          **THE COURT:**  ALL RIGHT.

20          **MS. LEE:**  THANK YOU, DR. BOURSIER.

21          **THE COURT:**  ANY CROSS-EXAMINATION?

22          **MS. HANSEN:**  YES, YOUR HONOR.  ONE MOMENT.

23                          **CROSS-EXAMINATION**

24   BY MS. HANSEN:

25   **Q.**  HI, DR. BOURSIER.

1    **A.** HI.

2    **Q.** I'M ANGELA HANSEN WITH THE FEDERAL PUBLIC DEFENDER OFFICE.

3    WE SPOKE ON THE PHONE BRIEFLY, RIGHT?

4    **A.** UH-HUH.

5    **Q.** WE DIDN'T PREPARE YOUR CROSS-EXAMINATION, DID WE?

6    **A.** NO, WE DIDN'T MEET.

7    **Q.** BUT YOU DID MEET WITH THE GOVERNMENT A NUMBER OF TIMES IN

8    THIS CASE, CORRECT?

9    **A.** UH-HUH.  CORRECT.

10   **Q.** AND BEFORE WE GET TO THAT, I DO WANT TO TALK TO YOU A

11   LITTLE BIT ABOUT THE DIFFERENCE BETWEEN DELINEATIONS AND

12   JURISDICTIONAL FINDINGS.  THE DELINEATION PROCESS IS GOVERNED

13   BY CORPS MANUALS; IS THAT RIGHT?

14   **A.** CORRECT.

15   **Q.** AND THERE ARE SEVERAL DIFFERENT MANUALS; IS THAT RIGHT?

16   **A.** THE MAIN MANUAL -- THAT IS CORRECT, BUT THE MAIN MANUAL IS

17   A 1987 MANUAL, AND THEN THE CORPS DEVELOPED REGIONAL MANUALS

18   TO TAKE INTO CONSIDERATION DIFFERENCES ACROSS THE -- BEFORE

19   THE -- THE '87 MANUAL WAS APPLIED TO THE WHOLE UNITED STATES,

20   AND THE FIT WASN'T ALL THAT GOOD SO THEY DEVELOPED REGIONAL.

21   **Q.** THERE WAS A REGIONAL MANUAL THAT CAME OUT IN SEPTEMBER OF

22   2008, CORRECT?

23   **A.** CORRECT.

24   **Q.** AND THAT IS THE ARID WEST REGIONAL MANUAL THAT YOU WERE

25   JUST REFERENCING, CORRECT?

BOURSIER – CROSS / HANSEN

1   **A.**   RIGHT.

2   **Q.**   THERE IS ALSO ORDINARY HIGH WATER MARK MANUALS, CORRECT?

3   **A.**   YES.

4   **Q.**   AND THAT IS ALSO IMPORTANT TO THE DELINEATION PROCESS,

5   RIGHT?

6   **A.**   IT IS.

7   **Q.**   THE SECOND SET OF MANUALS ARE JURISDICTIONAL MANUALS,

8   CORRECT?

9   **A.**   UH-HUH.

10  **Q.**   AND THOSE ARE HOW YOU APPLY THE SPECIFIC FACTS AND

11  FEATURES ON THE SITE TO THE LAW AND REGULATIONS, CORRECT?

12  **A.**   WELL, IN THE CAPACITY AS A CONSULTANT, WE ARE -- WE ARE

13  BASICALLY BIOLOGISTS GATHERING FILL EVIDENCE.  WE DO NOT MAKE

14  DETERMINATIONS OF JURISDICTION.  WE GATHER EVIDENCE AND

15  PRESENT THAT IN A REPORT.

16      AND THE CORPS JD VISIT, THE JURISDICTIONAL DETERMINATION

17  VISIT, IS THERE SPECIFICALLY FOR THEM TO SAY, YES, WE AGREE

18  YOU GATHERED THE RIGHT EVIDENCE, YOU MAPPED IT CORRECTLY.  BUT

19  WE DON'T SIT AND TALK ABOUT THE NEXT -- THE NEXT STEP WOULD BE

20  FOR THEM TO INTERACT INTERNALLY AT THE CORPS AND FILTER WHAT

21  WE FOUND IN THE FIELD THROUGH REGULATION.  BUT THAT ISN'T OUR

22  PLACE TO DO.

23  **Q.**   TO BE FAIR, YOU DID THAT TODAY, CORRECT?

24  **A.**   I DID THAT TODAY BASED -- BUT THAT'S MY OPINION AS A

25  CONSULTANT, NOT A REGULATOR, THOUGH, CORRECT.

BOURSIER – CROSS / HANSEN

1   **Q.** AND IN MAKING THAT DETERMINATION, YOU WOULD WANT TO FOLLOW

2   THE CORPS GUIDANCE; IS THAT RIGHT?

3   **A.** DO YOU MEAN '87, '86 REGULATIONS OR --

4   **Q.** LET'S TALK ABOUT THE RAPANOS GUIDANCE LEGAL MEMO FROM

5   2005, CORRECT?  I AM SORRY, 2008?

6   **A.** YES, IT IS LATER.

7   **Q.** AND THEN THE ARMY CORPS JURISDICTIONAL DETERMINATION FORM

8   AND INSTRUCTIONAL GUIDEBOOK, CORRECT?

9   **A.** THAT IS FOR THE ORDINARY HIGH OR --

10  **Q.** NO, THIS IS THE ONE THAT HAS THE EIGHT-PAGE FORM AT THE

11  BACK WITH ALL OF THE SIGNIFICANT NEXUS FINDINGS.

12  **A.** OH, YEAH, BUT AS WE INDICATED, WE DIDN'T -- THERE WAS NO

13  NEED.  IN FACT, THAT GUIDANCE WAS BEING DEVELOPED PRETTY MUCH

14  CONCURRENT WITH OUR FIELD WORK.

15  **Q.** THAT GUIDANCE ACTUALLY EXISTS SINCE 2007, CORRECT?

16  **A.** UH-HUH.

17  **Q.** MAY OF 2007?

18  **A.** YEAH, IN AN INTERIM FORM, CORRECT.

19  **Q.** RIGHT NOW I WANT TO TALK ABOUT -- LOOK UP EXHIBIT 3, WHICH

20  HAS ALREADY BEEN ADMITTED.

21              (DISPLAYED ON SCREEN.)

22          **MS. HANSEN:**  IF WE CAN BLOW UP THE -- JUST THE NORTH

23  AND SOUTH FILL AREAS ARE SORT OF BLOWN UP FOR DR. BOURSIER.

24  **BY MS. HANSEN:**

25  **Q.** DR. BOURSIER, I WANT TO MAKE SURE I UNDERSTAND YOUR

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

BOURSIER – CROSS / HANSEN

1    TESTIMONY TODAY.

2         IS IT FAIR TO SAY THAT THE DELINEATIONS -- I'M NOT TALKING

3    JURISDICTION, THE DELINEATIONS OF WHAT FEATURE IS WHAT ON THIS

4    LAND, THAT THE H.T. HARVEY DELINEATIONS AND MAPS, AS A

5    HISTORICAL RECORD OF THE SITE AS IT EXISTED BETWEEN 2007 AND

6    2014, ARE ACCURATELY REFLECTED IN THIS 2014 MAP?

7    **A.**   WELL, THE MAPPING WAS DONE IN 2005 THROUGH '07.

8    **Q.**   YOU ALSO WENT BACK TO THE SITE IN 2012, CORRECT?

9    **A.**   YES.  THAT WAS A -- AN INITIAL SITE VISIT.  IF I CAN, IT

10   WAS RELATED TO THE FACT THAT THE JD LETTER WAS ABOUT TO EXPIRE

11   IN 2012 AND I --

12   **Q.**   WE WILL GET TO ALL THAT, I PROMISE.

13        BUT YOU WENT TO THE SITE IN 2012 AND REDID THE FIELD WORK,

14   CORRECT?

15   **A.**   NO.  NO, THAT -- I WAS TRYING TO ANSWER.  THE -- KATERINA

16   GALACATOS AND I VISITED THE SITE FOR HER TO GET AN OVERVIEW.

17   SHE WAS THE SECTION CHIEF -- PRIOR SECTION CHIEF MARK

18   DAVENOUGH (PHONETIC) HAD LEFT AND SHE TOOK OVER THAT POSITION.

19        AND SHE WAS -- EFFECTIVELY TOOK OVER AS MANAGER OF THIS

20   PROPERTY BUT HAD NEVER SEEN IT.  THE INTENTION WAS TO GO BACK

21   WITH HER AND DO MORE EXTENSIVE FIELD WORK AND -- IF NEEDED,

22   AND MODIFYING THE MAP.

23   **Q.**   SO IT'S YOUR TESTIMONY THAT YOU DID NOT GO BACK AND REDO

24   THE FIELD WORK; IS THAT RIGHT?

25   **A.**   THE ONLY FIELD WORK PER SE THAT WE DID -- NO, WE DIDN'T

BOURSIER – CROSS / HANSEN

```
1    REDO THE FIELD WORK.  I DROVE WITH KATERINA AROUND THE SITE
2    BUT THERE WAS -- AGAIN, IT WAS MORE OF AN OVERVIEW
3    INTRODUCTORY FIELD VISIT FOR HER.  AND THEY NEVER REISSUED
4    THAT JURISDICTIONAL LETTER OR MODIFIED THE MAP FOR THAT
5    PURPOSE.
6    Q.  ONE MOMENT, PLEASE.
7                    (PAUSE IN THE PROCEEDINGS.)
8        OKAY.  SIR, DO YOU REMEMBER BEING INTERVIEWED ON
9    DECEMBER 2ND, 2016 BY THE GOVERNMENT?
10   A.  WAS THAT A TELEPHONE INTERVIEW?
11   Q.  NO --
12   A.  SINCE I RETIRED, MY MEMORY IS SLIPPING.
13   Q.  LET'S SPAN ALL THE DIFFERENT INTERVIEWS YOU'VE DONE.  THIS
14   MIGHT HELP REFRESH YOUR RECOLLECTION.  YOU WERE FIRST
15   INTERVIEWED BY THE GOVERNMENT ON OCTOBER 3RD, 2014 BY
16   AGENT SU, CORRECT?
17   A.  WE TALKED.  I DON'T KNOW IF I WOULD CHARACTERIZE IT AS AN
18   INTERVIEW.
19   Q.  WELL, SHE WAS TAKING NOTES, CORRECT?
20   A.  I DON'T RECALL THAT.
21   Q.  IT WAS YOUR UNDERSTANDING SHE WAS DOCUMENTING THE
22   INFORMATION FOR A GOVERNMENT REPORT?
23   A.  NO, IT WASN'T.
24   Q.  YOU DIDN'T KNOW THAT?
25   A.  NO.
```

BOURSIER – CROSS / HANSEN

1   **Q.**  YOU WERE ALSO INTERVIEWED BY HER ON -- ON DECEMBER 2ND,

2   2016, AND AGENT SU WAS THERE AND STEPHEN BERNINGER WAS THERE,

3   AND I BELIEVE DURING THAT INTERVIEW KELLY HARDWICKE MAY HAVE

4   ALSO SHOWN UP.  DO YOU REMEMBER THAT INTERVIEW?

5   **A.**  I DO REMEMBER A FIELD VISIT, AND I THINK THAT WAS THE

6   EXTENT OF IT.  I DON'T RECALL PHONE INTERVIEWS OR IN-PERSON

7   INTERVIEWS DURING THAT TIME PERIOD.

8       AND THE FIELD VISITS WERE MORE ALONG THE LINES -- WE NEVER

9   ACTUALLY GATHERED -- ARMY CORPS DAN MARTEL WAS THERE AND WE

10  WALKED, AGAIN, TO FAMILIARIZE PEOPLE WITH THE SITE, AND THERE

11  WERE NO -- I WAS NOT INVOLVED IN ANY GROUP DISCUSSIONS OR

12  ANYTHING.

13  **Q.**  ARE YOU SURE YOU DON'T REMEMBER HAVING -- ACTUALLY AGENT

14  SIVOK WAS ALSO THERE, WITH THE FBI?  YOU DON'T REMEMBER THAT?

15  **A.**  OH, YES, ON THE FIELD THERE WERE VARIOUS PEOPLE PRESENT,

16  BUT, AGAIN, PEOPLE WALKED THROUGHOUT.  AND I BELIEVE ANOTHER

17  CONSULTANT, TERRY HUFFMAN, WAS THERE.  WE WALKED THE SITE --

18  **Q.**  DO YOU REMEMBER ALSO THAT -- SO THAT WAS IN 2017.  TERRY

19  HUFFMAN WASN'T INVOLVED IN THIS CASE UNTIL LATER IN THIS

20  PROCESS, CORRECT?

21  **A.**  I'LL TAKE YOUR WORD FOR IT.  I DON'T RECALL.

22  **Q.**  LET'S GO BACK -- I REALLY WANT TO MAKE SURE WE UNDERSTAND.

23  DECEMBER 2ND, 2016 YOU WERE INTERVIEWED BY THE GOVERNMENT.

24  DAVID MOSIER (PHONETIC) WAS THERE.  HE'S AN ATTORNEY FOR THE

25  SOBRATOS, CORRECT?

BOURSIER – CROSS / HANSEN

1    **A.**  AGAIN, I DON'T RECALL THAT.

2    **Q.**  WELL, DO YOU REMEMBER DURING THAT INTERVIEW TELLING THE

3    GOVERNMENT, THE AGENTS, WITH THE SOBRATO ATTORNEY THERE, THAT

4    YOU, QUOTE, REDID YOUR FIELD WORK IN 2012 TO CONFIRM THE

5    CONDITIONS ON THE PROPERTY?

6    **A.**  YEAH, THE FIELD WORK --

7    **Q.**  HOLD ON.  MY QUESTION IS, DO YOU REMEMBER SAYING THAT IN

8    2012?

9    **A.**  I DON'T REMEMBER SAYING THAT, BUT --

10   **Q.**  IN 2016?

11   **A.**  -- IT IS SOMETHING THAT I WOULD LIKELY SAY.

12       AND THE FIELD WORK, AGAIN, WAS FOR THE PURPOSE OF

13   REVERIFYING THE PROPERTY BUT WE NEVER -- KATRINA AND I

14   NEVER -- I DON'T THINK WE EVEN BROUGHT A SHOVEL.  WE DIDN'T

15   GATHER.

16       SO USUALLY DURING A JD VISIT, THE CORPS DIGS THEIR OWN

17   PITS AND ALL OF THAT.  ESPECIALLY WITH SOMEONE LIKE DAN

18   MARTEL --

19   **Q.**  DAN MARTEL WAS 2007.  I WANT TO FOCUS ON 2013 AND 2014.

20       IN 2012, YOU WENT BACK TO THE SITE AND REDID YOUR FIELD

21   WORK.  AND IN 2013 IS WHEN YOU WENT TO THE SITE WITH KATERINA

22   GALACATOS, CORRECT?

23   **A.**  UM --

24       **MS. LEE:**  OBJECTION.

25       **THE WITNESS:**  -- I DON'T REMEMBER DOING, REDOING

1    FIELD WORK.

2              **THE COURT:**  WHAT'S THE OBJECTION?

3              **MS. LEE:**  MISSTATES THE EVIDENCE AS FAR AS FIELD WORK

4    IN 2012.

5              **THE COURT:**  OVERRULED.

6    **BY MS. HANSEN:**

7    **Q.**  SO YOU WERE ON THE SITE WITH KATERINA GALACATOS IN 2013,

8    CORRECT?

9    **A.**  YES, THAT'S CORRECT.

10   **Q.**  AND THE PURPOSE OF THAT WAS TO MAKE SURE THAT THE

11   DELINEATIONS FOR AREA 4 WERE ACCURATE, CORRECT?

12   **A.**  AGAIN, FROM HER PERSPECTIVE --

13   **Q.**  NO, I WANT YOUR PERSPECTIVE, I AM SORRY.

14   **A.**  AS I SAID, SHE HAD JUST BECOME -- UP TO THAT POINT SHE WAS

15   NEVER INVOLVED IN THE PROPERTY.  SHE KNEW THE NAME, THE FILE

16   NAME.  SHE HAD NEVER DONE ANY FIELD WORK.  SHE HAD NEVER SEEN

17   IT.  SO HER GOAL WAS TO SEE THE PROPERTY.

18        BECAUSE SHE WAS PROMOTED RECENTLY TO SOUTH SECTION CHIEF,

19   AND SHE KEPT -- BECAUSE OF THE STAFFING PROBLEMS THEY WERE

20   HAVING, SHE KEPT THIS PROJECT AS A PROJECT MANAGER, EVEN

21   THOUGH SHE WAS SOUTH SECTION CHIEF.  SHE WANTED TO SEE THE

22   PROPERTY.

23        BUT WE NEVER DUG PITS.  WE NEVER -- SHE WANTED -- THIS WAS

24   AN OVERVIEW, IF YOU WILL.  IT DIDN'T TAKE THAT LONG.  WE

25   DROVE, MOSTLY DROVE, HIKED A LITTLE BIT.

BOURSIER – CROSS / HANSEN

1    **Q.**  OKAY.  SO LET'S MAKE SURE.

2        YOU DID FIELD WORK TO REVERIFY THE MAPPING FROM 2007 IN

3    2012, CORRECT?

4    **A.**  I –– I WOULD SAY THAT IT WAS AN INITIAL SITE VISIT WITH

5    THE INTENT THAT THERE WOULD BE SPECIFIC FOLLOW-UP VISITS TO DO

6    MORE FIELD WORK TO REVERIFY, SO THIS COULD BE LIKE A PRELUDE

7    TO THAT.

8    **Q.**  AND THEN IN 2013 YOU WENT WITH KATERINA GALACATOS TO DRIVE

9    AROUND THE PROPERTY, CORRECT?

10   **A.**  YES, '13 WAS –– I DON'T RECALL THE 2012.  2013 I DID GO

11   OUT WITH KATERINA.  THAT IS WHAT I THOUGHT YOU WERE REFERRING

12   TO.

13   **Q.**  YEAH, I WAS FIRST REFERRING TO THE WORK YOU DID BEFORE YOU

14   MET WITH KATERINA.  SO ON JULY 23RD, 2013, THAT'S WHEN YOU MET

15   WITH KATERINA GALACATOS, CORRECT?

16   **A.**  I BELIEVE SO.

17   **Q.**  OKAY.  SO I WANT TO GO BACK TO MY ORIGINAL QUESTION

18   BECAUSE I THINK WE GOT LOST.

19       MY ORIGINAL QUESTION WAS, AS FOR THE DELINEATIONS IN THIS

20   2014 H.T. HARVEY MAP WITH THE FILL OUTLINES ON IT, IS IT FAIR

21   TO SAY YOU STAND BY YOUR MAPS AS A HISTORICAL RECORD OF THE

22   SITE AS IT EXISTED BETWEEN 2007 AND 2014?

23   **A.**  NO, ACTUALLY OUR –– THIS MAP IS NOT THE FINAL MAP ISSUED

24   IN OCTOBER BY THE CORPS.  OUR STAFF –– I DON'T WANT TO THROW

25   THEM UNDER THE BUS, BUT OUR STAFF TOOK THE GPS FILES AND PUT

1    THEM ON THIS MAP, WHICH WAS A WORKING MAP FROM MUCH EARLIER.

2       THIS DOES NOT HAVE THE FINAL MAPPING EFFORTS BY US OR THE

3    CORPS.  THE VERY TOP NORTHERN FILL AREA LINE WOULD HAVE BEEN

4    STRAIGHT, AND THERE WERE A COUPLE OF OTHER DISCHARGED WETLANDS

5    ADDED ALONG THE --

6    **Q.**  SETTING ASIDE THOSE MINOR DISCREPANCIES, CAN WE ANSWER MY

7    QUESTION?  DO YOU STAND BY H.T. HARVEY'S MAPS AS A HISTORICAL

8    RECORD OF THE SITE AS IT EXISTED BETWEEN 2007 AND 2014?

9    **A.**  I WOULD STAND BY THE MAP -- THE CORPS VERSION OF THE MAP

10   AS A HISTORICAL RECORD OF WHAT WAS THERE AT THE TIME WE DID

11   THE FIELD WORK.  IT MAY HAVE CHANGED IN MINOR WAYS BETWEEN '7

12   AND '14, BUT WE DIDN'T GO OUT AND RE-DOCUMENT, DIG PITS,

13   COLLECT DATA FORMS.  AND SO I WOULD SAY UP TILL THE TIME IT

14   WAS VERIFIED BY THE CORPS AND THEY STAMPED IT IN OCTOBER 2007

15   I AGREE.

16   **Q.**  AND IN 2013 WHEN YOU WENT BACK OUT TO THE SITE WITH

17   KATERINA GALACATOS OF THE CORPS, WOULD YOU AGREE THAT THIS MAP

18   ACTUALLY -- ACCURATELY REFLECTED HOW THE SITE APPEARED IN --

19   **A.**  NO.

20   **Q.**  -- 2013?

21   **A.**  NO.  AGAIN, THIS IS NOT THE FINAL MAP.

22   **Q.**  OKAY.  WELL, WHY DON'T WE LOOK AT THE FINAL MAP.  YOU ARE

23   TALKING ABOUT THE CORPS MAP THAT WAS VERIFIED?

24   **A.**  YES.

25   **Q.**  OKAY.  WE CAN GET THAT FOR YOU.

1    **A.**  IT IS JUST UNFORTUNATE THAT WE DIDN'T OVERLAY THE FILL

2    POLYGONS ON THE CORPS FINAL MAP.

3    **Q.**  WELL, FIRST, BEFORE WE GET TO THAT EXHIBIT, I BELIEVE IT

4    IS EXHIBIT 29 -- AND I WILL HAVE TO ENTER IT INTO EVIDENCE

5    THROUGH YOU.

6             **MS. HANSEN:**  EXHIBIT 29, NED.

7    **BY MS. HANSEN:**

8    **Q.**  CAN WE GO BACK TO EXHIBIT 3, PLEASE?

9         WELL, ACTUALLY LET'S GO TO EXHIBIT 1138.  MAYBE

10   DR. BOURSIER WILL PREFER THIS MAP.

11                    (DISPLAYED ON SCREEN.)

12        DR. BOURSIER, THIS IS THE MAP YOU'VE BEEN TESTIFYING ON

13   DIRECT TO; IS THAT RIGHT?

14   **A.**  THIS IS THE MAP, THE JUNE -- I CAN'T SEE THE LEGEND VERY

15   WELL, THE JUNE 2007 MAP THAT WE SUBMITTED TO THE CORPS.

16   **Q.**  OKAY.  AND THIS MAP WAS THE FOUNDATION FOR THE 2007

17   DELINEATION, CORRECT?

18   **A.**  THE FOUNDATION WITH -- THIS DOES NOT SHOW THE ADDITIONS OF

19   THE CORPS THAT I DESCRIBED EARLIER.

20   **Q.**  I'M NOT CONCERNED ABOUT THOSE ADDITIONS.  THEY ARE NOT

21   RELEVANT TO OUR CASE.

22        SETTING THOSE ASIDE, IS THIS MAP THE FOUNDATION FOR THE

23   2007 DELINEATION?

24   **A.**  YES.

25   **Q.**  IS THIS MAP THE FOUNDATION FOR KATERINA GALACATOS'S 2014

1    REVERIFICATION OF THE SITE?

2    **A.**  NO.  SHE WOULD HAVE HAD THE MODIFIED MAP.

3    **Q.**  I WOULD LIKE TO SHOW YOU WHAT HAS BEEN PREMARKED FOR

4    IDENTIFICATION AS DEFENSE EXHIBIT 2051.

5                    (EXHIBIT HANDED TO WITNESS.)

6    **A.**  I AM NOT AWARE THAT THERE IS A 2014 REVERIFICATION MAP.  I

7    HAVE NEVER RECEIVED THAT.

8    **Q.**  IT IS NOT A MAP FROM 2014, THAT'S RIGHT, SHE DIDN'T DO

9    ONE.  BUT SHE WENT OUT AND SHE CREATED A MEMORANDUM

10   REVERIFYING IT.  CAN YOU LOOK AT EXHIBIT 29 -- EXCUSE ME,

11   EXHIBIT 2051, PLEASE.

12   **A.**  IS THAT WHAT I HAVE IN MY HAND HERE?

13   **Q.**  YES.  IS THAT THE 2007 JD OFFICIAL MAP OF THE ARMY CORPS

14   OF ENGINEERS?

15   **A.**  YES, IT LOOKS LIKE IT IS.

16          **MS. HANSEN:**  YOUR HONOR, I MOVE TO ADMIT PREVIOUSLY

17   GOVERNMENT EXHIBIT 29, DEFENSE EXHIBIT 2051 INTO EVIDENCE.

18          **MS. LEE:**  NO OBJECTION.

19        **THE COURT:**  EXHIBIT 2051 IS ADMITTED.

20      (DEFENDANT'S EXHIBIT 2051 RECEIVED IN EVIDENCE)

21   **BY MS. HANSEN:**

22   **Q.**  WE ARE GOING TO SHOW IT ON THE SCREEN NOW.

23                    (DISPLAYED ON SCREEN.)

24      OKAY.  LET'S LOOK AT THE AREA UNDER THE PICK 'N PULL,

25   DR. BOURSIER.

1    WELL, FIRST, WE SHOULD LOOK AT THE LEGEND.  MY MISTAKE.

2    DR. BOURSIER, UNDER THE PICK 'N PULL, "OTHER WATERS" ARE

3    IDENTIFIED BY THE CORPS WITH A SLASH LINE; IS THAT CORRECT?

4    **A.**  YES.

5        **MS. HANSEN:**  LET'S PULL OUT THE AREA UNDER THE PICK

6    'N PULL AGAIN.

7    **BY MS. HANSEN:**

8    **Q.**  AND THE AREA UNDER THE PICK 'N PULL HAS THE SLASH LINE,

9    IT'S HARD TO SEE, WOULD YOU AGREE, FOR THE PONDING AREA THERE?

10   **A.**  YES, THAT'S CORRECT.

11   **Q.**  AND THIS IS THE MAP THAT THE CORPS VERIFIED IN 2007,

12   CORRECT?

13   **A.**  YES.

14   **Q.**  AND THAT WAS BASED ON YOUR MAPPING OF FINDING PONDING IN

15   THAT AREA, CORRECT?

16   **A.**  YES.  AND THEIR OWN OBSERVATIONS IN -- I BELIEVE THEY WENT

17   OUT IN AUGUST OF THAT YEAR.

18   **Q.**  RIGHT.  AND KATERINA GALACATOS WENT BACK OUT WITH YOU IN

19   2013 AND SHE RE-VERIFIED THIS BUT HAS NOT YET ISSUED A MAP,

20   CORRECT?

21   **A.**  AGAIN, I WOULDN'T SAY -- I'M TRYING TO DIFFERENTIATE

22   BETWEEN A -- A RECONNAISSANCE LEVEL INITIAL SITE VISIT AND

23   ANYTHING HAVING TO DO WITH THE FORMAL VERIFICATION PROCESS.  I

24   WOULDN'T SAY IT IS THE LATTER.

25   **Q.**  OKAY.  WELL, YOU WERE OUT THERE WITH HER.  YOU DIDN'T TELL

1    HER, DID YOU, THAT YOU BELIEVE THAT AREA IS NO LONGER AQUATIC,

2    CORRECT?

3    **A.**   I DON'T REMEMBER HAVING THAT CONVERSATION, WHETHER I DID

4    OR DID NOT TELL HER THAT.

5    **Q.**   AND IF IT WERE CHANGED, YOU ARE AN ETHICAL CONSULTANT, YOU

6    WOULD WANT TO FIX THAT ON YOUR MAPS, CORRECT?

7    **A.**   WE CERTAINLY WOULD HAVE AS WE PROCEEDED WITH THE

8    VERIFICATION VISIT.

9    **Q.**   AND THAT'S BECAUSE YOUR MAPS WERE GOING TO GO INTO SOME

10   VERY IMPORTANT DOCUMENTS, CORRECT?  SUCH AS THE EIR?

11   **A.**   THEY HAD ALREADY GONE INTO THE EIR.

12   **Q.**   THAT WAS IN 2009, RIGHT?

13   **A.**   YEAH, '8 AND '9, CORRECT.

14   **Q.**   AND YOUR MAP WAS ALSO RELIED UPON FOR –– IN 2016, CORRECT?

15   **A.**   YOU'RE TALKING ABOUT THE FILL MAP OR THE ––

16   **Q.**   LET'S LOOK AT IT.  I'M GOING TO SHOW YOU WHAT'S BEEN

17   ADMITTED AS DEFENSE EXHIBIT 2006.

18                    (DISPLAYED ON SCREEN.)

19          **MS. HANSEN:**  MR. WANZALA, CAN YOU BLOW UP THIS MAP?

20   **BY MS. HANSEN:**

21   **Q.**   THIS MAP WAS FROM OCTOBER OF 2016, CORRECT?

22          **MS. HANSEN:**  MAYBE, MR. WANZALA, YOU CAN PULL OUT THE

23   DATE ON THE BOTTOM RIGHT WITH THE H.T. HARVEY.

24   **BY MS. HANSEN:**

25   **Q.**   FIGURE 1, POTENTIAL DEVELOPMENT ENVELOPE, CORRECT?

BOURSIER – CROSS / HANSEN

1    **A.**   RIGHT, LOOKS LIKE.

2    **Q.**   NEWARK AREAS 3 AND 4 SPECIFIC PLAN, CORRECT?

3    **A.**   UH-HUH.

4    **Q.**   OCTOBER 2016, CORRECT?

5    **A.**   YES.

6    **Q.**   AND, DR. BOURSIER, THIS IS AN H.T. HARVEY DOCUMENT,

7    CORRECT?

8    **A.**   YES, LOOKS LIKE.

9    **Q.**   AND LET'S LOOK AT THE AREA UNDER THE PICK 'N PULL.

10   **A.**   UH-HUH.

11   **Q.**   SO THIS IS THE POTENTIAL DEVELOPMENT ENVELOPE FOR YOUR

12   CLIENT, CORRECT?

13   **A.**   YES.

14   **Q.**   AND IT HAS THE FILL IMPACT ON IT, CORRECT?

15   **A.**   IT APPEARS -- YES, IT HAS THE FILL IMPACT ON IT.

16   **Q.**   AND IT IS OUTLINED IN RED, CORRECT?

17   **A.**   UH-HUH.

18   **Q.**   AND UNDERNEATH THE PICK 'N PULL, IT IS STILL DESIGNATED AS

19   AQUATIC IN 2016?

20   **A.**   RIGHT.  THAT'S CORRECT.

21   **Q.**   OKAY.  THANK YOU.

22   **A.**   BUT THIS WENT TO THE CLIENT AND NOT THE ARMY CORPS FOR

23   VERIFICATION.  THAT WASN'T THE PURPOSE OF IT.  AGAIN, WE

24   DIDN'T MODIFY THE MAP YET, STILL HAVEN'T TODAY FOR A

25   REVERIFICATION, SO.

BOURSIER – CROSS / HANSEN

1  **Q.**  WELL, THIS IS HOW YOU MAPPED IT IN 2007, CORRECT?  WITH

2  THE --

3  **A.**  YEAH, THE 2007 MAP, RIGHT?

4  **Q.**  THE WAY YOU MAPPED IT IN 2007, IT HAD AN AQUATIC AREA

5  UNDER THE PICK 'N PULL, CORRECT?

6  **A.**  ABSOLUTELY.

7  **Q.**  THE WAY YOU MAPPED IT IN 2014 WITH THE FILL IMPACT, IT HAD

8  AN AQUATIC AREA UNDER THE PICK 'N PULL, CORRECT?

9  **A.**  WELL, WHAT I DESCRIBED IS, OUR GIS STAFF MEMBER OVERLAID

10  THE POLYGONS FROM THE FILL ONTO AN EARLIER VERSION OF THE MAP.

11     SO HIS ERROR, HIS BAD, THAT WASN'T MEANT TO REPRESENT

12  ANYTHING THAT WOULD BE USED FOR A CORPS JD OR CORPS PERMIT OR

13  ANY OTHER PURPOSE.

14  **Q.**  WELL, IT WAS USED FOR A FEDERAL CRIMINAL CASE.  ARE YOU

15  AWARE OF THAT?

16  **A.**  YEAH, I UNDERSTAND THAT.

17  **Q.**  BECAUSE YOU WERE INTERVIEWED BY FEDERAL AGENTS ABOUT THESE

18  MAPS, CORRECT?

19  **A.**  UH-HUH.

20  **Q.**  YOU WERE INTERVIEWED BY THEM AS EARLY AS DECEMBER 2016,

21  CORRECT?  EXCUSE ME, OCTOBER OF -- 3RD OF 2014, CORRECT?

22  **A.**  I WILL TAKE YOUR WORD FOR IT.  I DON'T REMEMBER THAT.

23  **Q.**  LET'S GO BACK TO EXHIBIT 3, WHICH IS ALREADY ADMITTED.

24     YOU SAID THAT THIS WAS JUST AN OVERLAY AND THAT IT WAS A

25  MISTAKE.  LET'S GO TO THE LEGEND BECAUSE, DR. BOURSIER, YOU'RE

BOURSIER – CROSS / HANSEN

1  THE ONE WHO DETERMINED THE FILL OUTLINE, CORRECT?

2  **A.**  UH-HUH.

3  **Q.**  YOU WERE ON THE SITE WITH MS. KIRSCHBAUM, (PHONETIC),

4  CORRECT, AND OTHERS TO VERIFY THE FILL OUTLINE?

5  **A.**  I DON'T REMEMBER THAT NAME BUT I WAS ON THE SITE WITH --

6  **Q.**  YOU DETERMINED WHERE THE FILL WAS LOCATED ON THE SITE,

7  CORRECT?

8  **A.**  I DID DETERMINE THAT.

9  **Q.**  AND LET'S LOOK AT THIS LEGEND.  YOU DETERMINED THAT -- AT

10  THE BOTTOM OF THE LEGEND THERE'S AQUATIC WITH A HORIZONTAL

11  LINE 1.33 ACRES AFFECTED AQUATIC, CORRECT?

12  **A.**  RIGHT.

13  **Q.**  AND 11.86 AFFECTED WETLAND, CORRECT?

14  **A.**  UH-HUH.

15  **Q.**  SO THIS WASN'T A MISTAKE BY SOMEONE.  YOU DELINEATED THAT

16  THE FILL AFFECTED 1.33 ACRES OF AQUATIC?

17  **A.**  ON THIS MAP, I WOULD AGREE WITH THAT.

18  **Q.**  AND YOU WERE ALSO ON THE SITE AT THE TIME, CORRECT?

19  **A.**  AT WHICH TIME?

20  **Q.**  IN 2014.

21  **A.**  AGAIN, I DON'T REMEMBER THAT BUT I WILL TAKE YOUR WORD FOR

22  IT.  I DON'T REMEMBER.

23  **Q.**  YOU WERE ON THE SITE TO VERIFY THE OUTLINE OF THE FILL --

24  **A.**  OH, YEAH.

25  **Q.**  -- IN 2014?

BOURSIER – CROSS / HANSEN

1    **A.**  ABSOLUTELY, YES.

2    **Q.**  SHE WOULD LIKE US TO NOT TALK OVER EACH OTHER --

3    **A.**  I WILL TALK SLOWLY.

4    **Q.**  -- SO I WILL DO MY BEST.

5       I WANT TO TALK TO YOU A LITTLE BIT MORE ABOUT THAT AQUATIC

6    DESIGNATION AND WHAT THAT MEANS.  I WOULD LIKE TO REFER YOUR

7    ATTENTION, SORRY, I'M A LITTLE ALL OVER THE PLACE TODAY, TO

8    THE FIELD WORK YOU DID TO DETERMINE THAT AQUATIC SHAPE --

9          **MS. HANSEN:**  ACTUALLY, MR. WANZALA, WE CAN KEEP THE

10   EXHIBIT 3 UP.

11                    (DISPLAYED ON SCREEN.)

12   **BY MS. HANSEN:**

13   **Q.**  SO YOU DETERMINED IN 2007 FOR YOUR DELINEATION REPORT THE

14   AQUATIC AREAS BECAUSE THEY ARE IDENTIFIED BY THE PRESENCE OF

15   STANDING OR RUNNING WATER AND A GENERAL LACK OF VEGETATION; IS

16   THAT CORRECT?

17   **A.**  A LACK OF WETLAND VEGETATION, RIGHT.

18   **Q.**  AND YOU USED WHAT IS CALLED THE ORDINARY HIGH WATER MARK

19   TO DETERMINE THE OUTER EDGES OF THE AQUATIC AREAS THAT ARE

20   DEPICTED ON YOUR MAPS?

21   **A.**  IT WAS SURVEYED IN USING THE AERIAL EXTENT OF PONDING,

22   RIGHT.

23   **Q.**  THE ORDINARY HIGH WATER MARK IS THE DEFINING ELEMENT USED

24   TO IDENTIFY THE --

25   **A.**  NOT NECESSARILY THERE.  IT WAS THE EXTENT OF PONDING.

1    ORDINARY HIGH WATER MARKS REFER MORE SPECIFICALLY TO LINEAR

2    DRAINAGE FEATURES.

3    **Q.**   PERFECT.  THAT IS EXACTLY WHAT I THOUGHT.  SO THE LINEAR

4    DRAINAGE FEATURES WOULD NEED TO HAVE AN ORDINARY HIGH WATER

5    MARK FOR THEM TO BE A TRIBUTARY, CORRECT?

6    **A.**   RIGHT.  THOSE FEATURES -- YOU CAN SEE ON SOME HISTORICAL

7    AERIAL PHOTOS, THERE IS A LINEAR DRAINAGE FEATURE IN THIS

8    PHOTO UNDERNEATH THE WATER BUT IN OTHER PHOTOS BURIED OR

9    COVERED WITH PICKLEWEED.  SO THERE IS A LINEAR DRAINAGE

10   FEATURE THERE.

11   **Q.**   AND YOU ARE REFERRING TO THE SOUTHERN FILL AREA, CORRECT?

12   **A.**   NORTHERN.

13   **Q.**   OH, YOU ARE REFERRING TO THE NORTHERN --

14   **A.**   THERE IS A LINEAR DRAINAGE FEATURE IN THE NORTHERN AREA.

15   **Q.**   ABOVE THE AREA THAT WE'RE CONCERNED WITH, CORRECT?

16   **A.**   NO, WE'RE LOOKING -- EVEN WITHIN THE FILL AREA AND THE

17   AREA TOWARDS THE SLOUGH, THERE IS A LINEAR DRAINAGE FEATURE

18   THERE.  IT ISN'T REALLY -- YOU CAN SEE IT IN SOME YEARS BUT

19   USUALLY NOT IN OTHER YEARS BECAUSE THE PICKLEWEED IS 2 AND A

20   HALF, 3 FEET TALL, AND KIND OF OBSCURES THAT FEATURE.

21           **MS. HANSEN:**   LET'S PULL OUT THE TOP SO THAT THE JURY

22   CAN SEE WHAT DR. BOURSIER IS REFERRING TO.

23   **BY MS. HANSEN:**

24   **Q.**   SO THAT LINEAR FEATURE YOU ACTUALLY MAPPED IN WHATEVER

25   YEAR -- YOU MAPPED THIS THE FIRST TIME IN 2007, CORRECT?

1    **A.**   THE LINEAR FEATURE I AM REFERRING TO IS UNDERNEATH THE

2    BLUE WATER IN THE NORTHERN AREA.

3    **Q.**   I'M TALKING ABOUT A THIN BLUE LINE THAT LEADS UP TO –– DO

4    YOU SEE THAT?

5            **MS. HANSEN:**   MR. WANZALA, CAN YOU PUT AN ARROW ON

6    THAT (INDICATING)?

7            **THE WITNESS:**   MAYBE SOMEBODY CAN –– RIGHT.  I THINK

8    YOU MEAN NORTH OF THAT, I BELIEVE.

9    **BY MS. HANSEN:**

10   **Q.**   (INDICATING.)

11   **A.**   RIGHT.  THAT'S A DITCH THAT RUNS PARALLEL WITH THE PICK 'N

12   PULL FENCE.

13   **Q.**   AND YOU MAPPED THAT, CORRECT?

14   **A.**   WE DID.  THAT AREA DRAINS THEIR STORM WATER PONDS.

15   **Q.**   AND SO YOU DID MAP LINEAR FEATURES SUCH AS THAT ON THIS

16   MAP, CORRECT?

17   **A.**   WELL, THE CORPS, AS I MENTIONED EARLIER, DIRECTED US TO

18   LUMP –– THERE'S A LOT –– AS YOU KNOW, A LOT OF JURISDICTIONAL

19   FEATURES, AND THE CORPS SAID GIVE US WETLANDS.  EVERYTHING

20   ELSE GOES IN A CATCH-ALL, "OTHER WATERS".  THEY DIDN'T SAY

21   SEPARATE OUT TRIBS OR ANYTHING ELSE.

22   **Q.**   RIGHT.  BUT THAT'S NOT MY QUESTION.

23       MY QUESTION IS, YOU IDENTIFIED A SMALL THIN LINEAR FEATURE

24   IN THE NORTHERN SITE EVEN THOUGH IT WENT THROUGH PICKLEWEED

25   AND WETLAND, CORRECT?

1   **A.**  THE ONE THAT YOU POINTED OUT, RIGHT.

2   **Q.**  RIGHT.  AND YOU ALSO IDENTIFIED OTHER LINEAR LINES ON THIS

3   MAPPING.  LET'S GO OUT TO THE BOTTOM OF THE AREA WHERE YOU

4   WERE TALKING ABOUT EARLIER, THIS SOUTHERN PORTION --

5   SOUTHERNMOST PORTION OF THE PROPERTY.

6   **A.**  RIGHT.

7   **Q.**  SO THERE IS SOME THIN LINEAR FEATURES THAT ARE IDENTIFIED

8   RIGHT THERE.

9       **MS. HANSEN:**  THERE IS SOME GOOD ONES MR. WANZALA IS

10  POINTING OUT FOR US.

11  **BY MS. HANSEN:**

12  **Q.**  YOU WOULD AGREE THAT THOSE ARE THIN LINEAR DRAINAGE

13  CHANNELS, CORRECT?

14  **A.**  I WOULD AGREE PER THE LEGEND THAT THEY ARE "OTHER WATERS"

15  AND THEIR SHAPE IS LINEAR, YES.

16  **Q.**  RIGHT.  AND SO LET'S TALK ABOUT -- LET'S JUST GO RIGHT

17  THERE TO THE SOUTHERN AREA WHERE YOU TESTIFIED EARLIER THAT

18  THERE IS A CONTINUOUS DRAINAGE CHANNEL.  LET'S TALK ABOUT

19  THAT.

20      YOU USE TOPOGRAPHICAL INFORMATION TO PREPARE YOUR ORIGINAL

21  MAPPING IN 2007, CORRECT?

22  **A.**  WE HAD VERY GOOD TOPOGRAPHIC INFORMATION FROM THE SITE,

23  BUT IT WASN'T REALLY USED TO, SAY, DEFINE THE BOUNDARIES OF

24  WETLANDS.

25  **Q.**  LET'S LOOK AT EXHIBIT 1138, ALREADY ADMITTED.

1    **A.**   YOU WANT TO TALK ABOUT THE MIDDLE?

2    **Q.**   YEAH, WE ARE GOING TO GO TO A DIFFERENT EXHIBIT BECAUSE

3    YOU WERE SAYING YOU DIDN'T REALLY USE IT, SO I WANT TO SHOW

4    YOU ONE THAT ACTUALLY HAS THE CONTOUR LINES ON IT.

5         **MS. HANSEN:**  EXHIBIT 1138, MR. WANZALA, CAN YOU BLOW

6    UP THE MIDDLE SOUTHERN FILL PORTION?

7    **BY MS. HANSEN:**

8    **Q.**   DR. BOURSIER, YOU WOULD AGREE THAT THE RED AND PURPLE

9    LINES ON THERE ARE FROM -- THE CONTOUR LINES FROM YOUR REALLY

10   GOOD CIVIL ENGINEERING FIRM OF KIER & WRIGHT, CORRECT?

11   **A.**   UH-HUH, APPEAR TO BE.  THEY ARE RED BECAUSE THEY ARE SO

12   CLOSELY --

13   **Q.**   AND THAT MEANS THAT IS THE BERM THAT IS GOING UP, CORRECT?

14   **A.**   RIGHT.

15   **Q.**   AND YOU WOULD AGREE THAT NO TOPOGRAPHICAL INFORMATION

16   SUPPORTS THE PRESENCE OF A CONTINUOUS TRIBUTARY ALONG THE

17   SOUTHERN BERM, CORRECT?

18   **A.**   RIGHT.  WE -- BIOLOGISTS WALKED THE EDGE AND SEPARATED

19   WHERE THERE WAS OPEN WATER VERSUS WETLANDS.

20   **Q.**   IF YOU --

21   **A.**   SO POLYGONS WERE GATHERED WITH GPS AND WALKING THIS --

22   THAT LINEAR FEATURE, AS YOU CALL IT.

23   **Q.**   IF IT MET THE DEFINITION OF A WETLAND, HOWEVER, EVEN IF IT

24   HAD WATER IN IT, THAT WOULD MEAN IT HAD ALL THREE PARAMETERS,

25   CORRECT?

1    **A.**  YES.  AND AS I MENTIONED EARLIER, THE ARMY CORPS -- IF YOU

2    LOOK AT THAT FEATURE GOING TO THE LEFT THERE, THE ARMY CORPS

3    SAID WE DON'T CARE ABOUT DRAINAGES OR TRIBUTARIES OR THAT

4    TERMINOLOGY.  MAKE IT "OTHER WATERS".  AND --

5    **Q.**  AND "OTHER WATERS" WOULD BE BLUE THEN, CORRECT?

6    **A.**  THEY SAID --

7    **Q.**  WELL, I'M ASKING YOU IF "OTHER WATERS" WOULD BE BLUE.

8    **A.**  SAID TO MAP A LINEAR FEATURE -- LET'S SAY IF WE HAVE A

9    MILE-LONG DRAINAGE, PORTIONS OF IT HAVE WETLANDS, PART OF IT

10   DON'T.  THE CORPS SAID, WE DON'T CARE IF IT'S A DRAINAGE.  IF

11   IT'S WETLANDS, MAP IT AS WETLANDS.  DON'T MAP IT AS A

12   DRAINAGE.  AND THE REST OF IT IS "OTHER WATERS".

13       NOW, THAT MAY CHANGE -- MAY HAVE CHANGED RECENTLY.

14   **Q.**  WELL, LET'S BE CLEAR.  YOU'VE MAPPED OTHER DRAINAGE

15   CHANNELS ON THIS MAP, CORRECT?

16   **A.**  WE HAVE.

17   **Q.**  BUT YOU DIDN'T MAP THIS ONE, CORRECT?

18   **A.**  THE LINEAR FEATURES WE MAPPED WERE "OTHER WATERS" WITHOUT

19   WETLANDS, IF IT IS A BLUE LEGEND.  THIS ONE WAS A LINEAR

20   FEATURE THAT HAD BOTH WATER BENEATH PICKLEWEED, THAT WOULD

21   MAKE IT A WETLAND, AND OPEN WATER, WHICH MADE IT "OTHER

22   WATERS".

23   **Q.**  IT ACTUALLY IS ONE OR THE OTHER.  YOU DELINEATE SOMETHING

24   AS A WETLAND IF IT MEETS THE THREE PARAMETERS, CORRECT?

25   **A.**  UH-HUH.

1    **Q.**  IF IT DOESN'T HAVE THE THREE PARAMETERS, THEN IT WOULD BE

2    DELINEATED AS SOMETHING ELSE, CORRECT?

3    **A.**  AS IN "OTHER WATERS", CORRECT.

4    **Q.**  HERE WE DO NOT HAVE A BLUE INDICATOR ON THIS MAP, CORRECT?

5    **A.**  THERE ARE PIECES, IF YOU BLOW IT UP –– AND, AGAIN, THIS

6    IS –– THIS IS NOT THE FINAL.  THIS IS THE ONE THAT WE

7    SUBMITTED TO THE CORPS.

8    **Q.**  AND YOU WOULD AGREE THAT THAT AREA WHEN YOU MAPPED IT MET

9    THE DEFINITION OF A WETLAND, CORRECT?

10   **A.**  CAN I LOOK AT THIS EXHIBIT CLOSER UP?

11   **Q.**  YES, PLEASE.

12   **A.**  THAT ONE IS KIND OF HARD TO SEE.

13       YOU CAN SEE BLUE –– SLIVERS OF BLUE WHERE THERE IS

14   NON-VEGETATED WATER ––

15   **Q.**  SLIVERS, I'M TALKING ABOUT –– THERE IS NO CONTINUOUS

16   TRIBUTARY THERE ON THIS MAP, CORRECT?  ON THE MAP?

17   **A.**  OH, ON THE MAP.  AGAIN, IF IT WAS –– WE WEREN'T –– I'LL

18   SIT DOWN HERE.

19       WE DIDN'T MAP ANYTHING AS A TRIBUTARY OR NOT.  IF ASKED

20   TODAY, I WOULD SAY THERE IS A CONTINUOUS TRIBUTARY FLOWING

21   FROM LEFT –– OR FROM RIGHT TO LEFT ON THIS FIGURE.

22   **Q.**  WELL, LET'S LOOK AT ANOTHER TRIBUTARY YOU ACTUALLY DID MAP

23   HERE.

24         **MS. HANSEN:**  MR. WANZALA, CAN YOU SHOW US THE LINE

25   THAT ABUTS THE MOWRY SLOUGH.

1                    (DISPLAYED ON SCREEN.)

2    **BY MS. HANSEN:**

3    **Q.**  DR. BOURSIER, DO YOU SEE THE BLUE LINE TO THE RIGHT OF THE

4    SLOUGH?

5    **A.**  YES.  THAT'S WHAT WE REFERRED TO AS THE BORROW DITCH.

6    **Q.**  YEAH.  AND THAT IS A TRIBUTARY, CORRECT?

7    **A.**  AGAIN, WE MAPPED THOSE AS OPEN WATERS AT THAT TIME.  BUT

8    IF YOU LOOK AT THE DEFINITION OF A TRIBUTARY, IT HAS, AS YOU

9    REFERRED, A BED, BANK, AND CHANNEL, AN ORDINARY HIGH WATER

10   MARK, AND IT DISCHARGES INTO A TRADITIONAL NAVIGABLE WATER.

11   **Q.**  AND YOU WOULD AGREE THAT YOU WERE FOLLOWING THE GUIDANCE

12   MANUALS WHEN YOU PREPARED YOUR ORIGINAL DELINEATION, CORRECT?

13   **A.**  WE, AGAIN, WERE NOT FOLLOWING -- MAYBE A MORE RECENT

14   GUIDANCE THAT HAS TO DO WITH JURISDICTIONAL CHANNELS AND

15   TRIBUTARIES.  AGAIN, WE WERE MAPPING "OTHER WATERS" AND

16   WETLANDS.

17   **Q.**  I'M TALKING ABOUT THE ORDINARY HIGH WATER MARK GUIDANCE.

18   YOU WERE FOLLOWING THE 2005 REGULATORY LETTER, CORRECT?

19   **A.**  HAVING TO DO WITH LINEAR DRAINAGE CHANNELS OR --

20   **Q.**  YES, HAVING TO DO WITH IDENTIFYING THE ORDINARY HIGH WATER

21   MARK.

22   **A.**  I WOULD SAY THAT WHAT IS REPRESENTED THERE, THE WIDTH, YOU

23   CAN SEE IT VARIES AS YOU GO ALONG, I WOULD SAY THAT THAT DOES

24   REPRESENT AN APPROXIMATE ORDINARY HIGH.  AND THERE ARE

25   ATTENDANT PICKLEWEED MARSHES ON BOTH SIDES OF THAT.

1    **Q.**  AND YOU STILL MAPPED IT THERE AS BLUE "OTHER WATERS",

2    CORRECT?

3    **A.**  CORRECT.

4    **Q.**  I WONDER --

5    **A.**  PARDON ME, THE WATER ELEVATION IN THAT BORROW DITCH IS

6    DIRECTLY AFFECTED BY THE ACTIVITY OF THE PUMP AND COULD VARY A

7    BIT, BUT IT IS STILL -- IT IS A CONTINUOUS BAND OF OPEN WATER

8    MORE OR LESS.

9    **Q.**  AND YOU IDENTIFIED IT THERE BECAUSE YOU WERE ABLE TO NOTE

10   THE ORDINARY HIGH WATER MARK, CORRECT?

11   **A.**  WE DIDN'T ACTUALLY LOOK -- WHEN WE DO ORDINARY HIGH WATER

12   MARK DELINEATIONS, WE ARE LOOKING FOR OTHER SORTS OF EVIDENCE.

13   THIS WAS SIMPLY THE FULL LATERAL EXTENT OF OPEN WATER, "OTHER

14   WATERS".

15       WHEN WE DO MORE RECENTLY, IN THE LAST FEW YEARS, SINCE ALL

16   OF THE ORDINARY HIGH WATER MANUALS COME OUT, THERE ARE

17   DISCRETE AND DIFFERENT FIELD DATA FORMS.  YOU DO LOADS -- A

18   LOT OF TRANSECTS ACROSS THE LINEAR FEATURE AND COLLECT DATA ON

19   SOILS, TOPOGRAPHY, VEGETATION.

20       BUT THAT WAS NOT DONE.  THOSE WEREN'T IN PLACE AT THAT

21   TIME.  WE DO IT ON OTHER PROPERTIES --

22   **Q.**  YOU ACTUALLY DID DO SOME ORDINARY HIGH WATER MARK MAPPING

23   IN 2007.  I WANT TO GO THROUGH SOME OF THAT WITH YOU.

24       IN 2007, WHEN YOU PREPARED YOUR DELINEATION REPORT, YOU

25   ACTUALLY INDICATED FACTORS IN THAT REPORT SUCH AS, CLEAR

BOURSIER – CROSS / HANSEN

1  NATURAL LINE IMPRESSED ON THE BANK, CORRECT?

2  **A.**  OF CERTAIN FEATURES, YES.

3  **Q.**  SHELVING, CORRECT?

4  **A.**  UH-HUH.

5  **Q.**  CHANGES IN CHARACTER OF SOIL, RIGHT?

6  **A.**  RIGHT.

7  **Q.**  DESTRUCTION OF VEGETATION; IS THAT RIGHT?

8  **A.**  ON CERTAIN -- LIKE MOST OF THE LINEAR -- SOME OF THE FARM

9  DITCHES, RIGHT.

10  **Q.**  EXPOSED ROOTS ON THE BANK, CORRECT?

11  **A.**  RIGHT.  THOSE ARE -- I THINK YOU ARE READING PROBABLY FROM

12  OUR MATERIAL AND METHODS SECTION.

13  **Q.**  FROM YOUR 2007 REPORT.

14  **A.**  YES.  DESCRIBING MATERIALS AND METHODS.

15  **Q.**  YOU ACTUALLY DID MAP THE ORDINARY HIGH WATER MARK FOR YOUR

16  DELINEATION IN 2007, CORRECT?

17  **A.**  WHAT WE MAPPED WAS OPEN WATERS AGAIN.

18  **Q.**  BUT I'M ASKING YOU IF YOU USED THE ORDINARY HIGH WATER

19  MARK TECHNIQUE --

20  **A.**  NO.

21  **Q.**  -- TO MAP WATERS?

22  **A.**  NO.  WE USED WATER.  SORRY.  OH, THE BIOLOGISTS WENT OUT

23  THERE AGAIN WITH THE GPS MAPPING A LATERAL EXTENT OF WATER,

24  AND --

25  **Q.**  I JUST WANT TO MAKE SURE.  DR. BOURSIER, THE SOBRATO

BOURSIER – CROSS / HANSEN

1    ORGANIZATION PAID YOUR FIRM TO DO A DELINEATION SO THIS

2    PROJECT COULD BE DEVELOPED; IS THAT RIGHT?

3    **A.**   THAT WAS THEIR INTENT.  YES.

4    **Q.**   AND THEY WANTED A THOROUGH AND COMPLETE DEVELOPMENT; IS

5    THAT RIGHT?

6    **A.**   THAT WAS THE GOAL AT THAT TIME, AND WHEN WE DID THE

7    ENVIRONMENTAL IMPACT REPORT, YES.  I DON'T KNOW MORE RECENTLY.

8    **Q.**   SO YOU SPENT HOURS AT THE SITE; IS THAT RIGHT?

9    **A.**   OUR FIRM DID.  YES.

10   **Q.**   AND YOUR TEAM?

11   **A.**   ME INCLUDED.

12   **Q.**   RIGHT.  AND YOU WANTED TO DO A REPORT THAT COULD BE RELIED

13   UPON BY YOUR CLIENT, THE CITY, AND ENVIRONMENTAL GROUPS; IS

14   THAT RIGHT?

15   **A.**   CORRECT.

16   **Q.**   AND SO YOU WANTED THAT REPORT TO BE COMPLETE; IS THAT

17   RIGHT?

18   **A.**   RIGHT.

19   **Q.**   AND SO IF THERE WERE A DRAINAGE DITCH THAT WAS CREATING

20   SUCH A SIGNIFICANT FLOW, YOU WOULD THINK THAT THAT SHOULD BE

21   NOTED ON A REPORT OF THIS SIGNIFICANCE, CORRECT?

22   **A.**   UM, WELL, AND IT WAS.  THEY ARE MAPPED AS "OTHER WATERS".

23   **Q.**   THE ONE I'M TALKING ABOUT, THE ONE ALONG THE SOUTHERN AREA

24   UNDER THE BERM, WAS NOT MARKED AS "OTHER WATERS", CORRECT?  IT

25   WAS MAPPED --

1    **A.**   IT IS.

2    **Q.**   IT WAS MAPPED AS A WETLAND; ISN'T THAT RIGHT?

3    **A.**   NO.  IF WE CAN BRING IT BACK UP, THERE'S BOTH --

4    **Q.**   LET'S BRING IT BACK UP IN EXHIBIT 29, THE GOVERNMENT --

5    THE VERIFIED JURISDICTIONAL DETERMINATION.

6              **THE CLERK:**  29 OR 2051?

7              **MS. HANSEN:**  EXHIBIT 29.  AND LET'S BLOW UP THE

8    SOUTHERN FILL AREA AND SEE IF WE SEE ANY OF THE CROSS PATTERN

9    "OTHER WATERS" VERIFIED BY THE ARMY CORPS OF ENGINEERS ON

10   EXHIBIT 29.

11             **THE CLERK:**  OKAY --

12             **THE COURT:**  JUST TO BE CLEAR, I THINK IT GOT ADMITTED

13   AS 2051.

14             **THE CLERK:**  2051.

15             **MS. HANSEN:**  THANK YOU.  I'M SO USED TO REFERRING TO

16   IT -- THANK YOU, MS. RILEY.

17             **THE CLERK:**  2051, RIGHT?

18             **MS. HANSEN:**  YES, THANK YOU.  DIDN'T EXPECT IT

19   ADMITTED HERE.  SORRY.

20        SO IF WE CAN MAYBE EVEN MAKE IT MORE PRONOUNCED SO THAT

21   PEOPLE CAN SEE --

22             **MS. LEE:**  IT IS 2050 ACTUALLY.

23             **MS. HANSEN:**  I THOUGHT IT WAS 2051.

24             **THE CLERK:**  SHE SAID IT WAS 2051.

25             **MS. LEE:**  IT IS LABELED AS 2050 ON THE SCREEN.

1        **MS. HANSEN:**  THEN IT'S MY MISTAKE, YOUR HONOR.  MAY I

2   PLEASE CORRECT EXHIBIT 2051 AS 2050?

3        **THE COURT:**  YES.

4             (DEFENDANT'S EXHIBIT 2051 WITHDRAWN)

5        (DEFENDANT'S EXHIBIT 2050 RECEIVED IN EVIDENCE)

6        **MS. HANSEN:**  THANK YOU.  SO LET'S PUT IT BACK UP.

7                  (DISPLAYED ON SCREEN.)

8   BY MS. HANSEN:

9   **Q.**  DR. BOURSIER, THE CROSS PATTERN HASH TAG IS MAPPED AS

10  WETLAND HERE, CORRECT?

11  **A.**  THIS IS A CORPS EXHIBIT, AND WE MAPPED WETLANDS IN THE

12  FILL LOCATION THERE PREVIOUSLY.

13  **Q.**  WELL, THIS IS THE MAP FROM 2007, CORRECT?

14  **A.**  THIS IS THE CORPS' VERSION OF IT, RIGHT.

15  **Q.**  RIGHT.  THEY ADOPTED YOUR MAP EXCEPT FOR THE FEW CHANGES

16  YOU NOTED ON DIRECT EXAMINATION, CORRECT?

17  **A.**  SUPPOSEDLY.  I HAVEN'T STUDIED THIS.  IT HAS BEEN A WHILE

18  BUT I WOULD SAY YES.

19  **Q.**  AND YOU WOULD AGREE THERE IS NO AQUATIC DESIGNATED NEAR

20  THE FILL AREA ALONG THE SOUTHERN BERM WHICH WOULD BE

21  DESIGNATED WITH A SLASH MARK AS "OTHER WATER", CORRECT?

22  **A.**  I DON'T SEE IT HERE.

23       BUT TO GIVE A FULL ANSWER, IF YOU COMPARED THIS TO THE

24  COLORED MAP, OURS THAT YOU HAD EARLIER, I KNOW THAT THERE ARE

25  OPEN WATER AREAS TO THE LEFT OF THESE CROSS HATCHINGS, BUT I

```
 1    DON'T KNOW --
 2    Q.  THEY ARE ACTUALLY HERE.  LET'S LOOK AT THAT ON HERE.  OPEN
 3    WATER AREAS TO THE LEFT.
 4        LET'S GO UNDER THE DUCK PONDS.
 5        WE HAVE TO GO PROBABLY A LITTLE BIT MORE TIGHT OF A
 6    BLOWUP.  IT'S SO HARD TO SEE.
 7        THE ARROW UNDER THE DUCK PONDS, VERY DARK, BUT YOU CAN SEE
 8    THAT THERE ARE "OTHER WATERS" INDICATED.
 9            MS. HANSEN:  MAYBE MR. WANZALA CAN USE THE ARROW HERE
10    (INDICATING), HERE (INDICATING).  OH, THIS IS A GOOD ONE.
11    BY MS. HANSEN:
12    Q.  THIS IS -- YOU SEE WHERE IT STOPS, DR. BOURSIER, THE
13    "OTHER WATER" INDICATOR ON THE FULL MAP?
14    A.  UH-HUH.
15    Q.  IT STOPS ALONG THE BERM WHERE MR. WANZALA PUT THE ARROW;
16    IS THAT RIGHT?
17    A.  ON THIS MAP, THAT'S CORRECT.
18    Q.  AND THIS IS THE UNITED STATES GOVERNMENT MAP, CORRECT?
19    A.  CORRECT.
20    Q.  THERE IS NO "OTHER WATERS" LOCATED ALONG THE SOUTHERN
21    BERM?
22    A.  I DON'T SEE IT ON THE MAP, NO.
23    Q.  LET'S TAKE THAT OFF NOW, AND I WOULD LIKE TO TALK TO YOU A
24    LITTLE BIT ABOUT WHAT "OTHER WATERS" MEANS.
25        YOU TESTIFIED ON DIRECT EXAMINATION ABOUT THE REGULATORY
```

BOURSIER – CROSS / HANSEN

1    DEFINITION OF "WATERS OF THE UNITED STATES," CORRECT?

2    **A.**   YES, I REFERRED TO IT.

3    **Q.**   AND SO YOU ARE FAMILIAR WITH IT; IS THAT RIGHT?

4    **A.**   I WOULDN'T SAY I'M AN EXPERT IN IT.  I READ IT FOR

5    PURPOSES OF PREPARING PERMIT APPLICATIONS.

6    **Q.**   YOU TESTIFIED TODAY THAT THESE ARE JURISDICTIONAL "WATERS

7    OF THE UNITED STATES," CORRECT?

8    **A.**   ON OUR MAP, CORRECT.

9    **Q.**   TO DO SO YOU WOULD NEED TO KNOW THE REGULATIONS FOR

10   "WATERS OF THE UNITED STATES," CORRECT?

11   **A.**   I KNOW THEM WELL, BUT, NO -- WE DOCUMENT -- WE'RE, AGAIN,

12   FIELD BIOLOGISTS THAT FOLLOW MANUALS THAT DOCUMENT "WATERS OF

13   THE U.S." AND DIFFERENT CATEGORIES.  WE DO NOT MAKE, HAVE

14   NEVER MADE, AND NOT ALLOWED TO MAKE BY THE ARMY CORPS

15   DETERMINATIONS OF JURISDICTION.  THAT'S COMPLETELY -- ALTHOUGH

16   WE HAVE A PROFESSIONAL OPINION BASED ON FIELD CHARACTERISTICS,

17   IT IS NOT SOMETHING -- MAYBE OTHER CONSULTANTS DO, BUT WE DO

18   NOT.

19   **Q.**   BUT TO MAKE A JURISDICTIONAL DETERMINATION, YOU WOULD NEED

20   TO KNOW THE DEFINITION OF WOTUS.  SO ARE YOU FAMILIAR WITH --

21   THE DEFINITION OF WOTUS INCLUDES SEVEN SEPARATE CATEGORIES?

22   **A.**   I AM SORRY, I MISSED -- YOU SAID THE DEFINITION --

23   **Q.**   "WATERS OF THE UNITED STATES" --

24   **A.**   OKAY.

25   **Q.**   -- INCLUDES SEVEN DIFFERENT, SEPARATE CATEGORIES, CORRECT?

1    **A.**  I BELIEVE YOU.

2    **Q.**  AND THE "OTHER WATERS" SECTION IS A SPECIFIC SUBSECTION OF

3    THE REGULATION, CORRECT?

4    **A.**  OKAY.

5    **Q.**  AND FOR AN AQUATIC FEATURE LIKE THE PONDS UNDER THE

6    PICK 'N PULL TO BE CONSIDERED "OTHER WATERS" UNDER THE LEGAL

7    DEFINITION IN THE FEDERAL REGULATIONS, IT WOULD HAVE TO MEET

8    ONE OF THREE SPECIFIC AREAS RELATED TO COMMERCE, RIGHT?

9    **A.**  I AM NOT FAMILIAR WITH THAT, BUT I WILL TAKE YOUR WORD FOR

10   IT.

11   **Q.**  CAN YOU SAY THAT THE POND UNDER THE PICK 'N PULL THAT WAS

12   MAPPED IN ALL OF YOUR MAPS ALL THE WAY UP THROUGH 2016 COULD

13   BE USED IN INTERSTATE OR BY FOREIGN TRAVELERS FOR RECREATIONAL

14   OR OTHER PURPOSES?

15          **MS. LEE:**  OBJECTION.  CALLS FOR A LEGAL CONCLUSION.

16          **THE WITNESS:**  YEAH, I DIDN'T MAKE THAT --

17          **THE COURT:**  NO, OVERRULED.  IT DIDN'T.  OVERRULED.

18   **BY MS. HANSEN:**

19   **Q.**  SO WOULD YOU BE ABLE TO OFFER AN OPINION TODAY OF WHETHER

20   THE WATERS UNDER THE PICK 'N PULL, THE PONDS, COULD BE USED BY

21   INTERSTATE OR FOREIGN TRAVELERS FOR RECREATIONAL OR OTHER

22   PURPOSES?

23   **A.**  I'M NOT -- I'M A BIOLOGIST.  I DON'T MAKE GUESSES OR

24   CLAIMS TO KNOW ANYTHING RELATED TO THAT.  SORRY.

25   **Q.**  THIS RELATES TO WHETHER OR NOT THE "OTHER WATERS" ARE

BOURSIER - CROSS / HANSEN

1    JURISDICTIONAL.  DO YOU UNDERSTAND THAT?

2    **A.**  AND THAT IS -- AGAIN, WE GATHER -- I'M TRYING TO -- WE

3    GATHER -- WE DIG HOLES AND WE GATHER THE EVIDENCE AND TAKE

4    PICTURES AND SURVEY.  THE ARMY CORPS REVIEWS IT.  THEY MAKE

5    THE CLAIM -- IN FACT, WE WERE TOLD DIRECTLY EVEN AS EARLY AS

6    THE EARLY 1990S BY A DIFFERENT SECTION CHIEF THAT YOU -- AND

7    SUBSEQUENTLY WHEN ALL THE DIFFERENT -- RAPANOS AND SWANCC

8    GUIDANCE CAME OUT, A NEW RULE, IT IS NOT OUR JOB AS

9    CONSULTANTS.

10   WE GET OUR HAND SLAPPED.  WE DON'T -- WE DO NOT MAKE THAT

11   DETERMINATION.  WE DO NOT COMPLETE SIGNIFICANT NEXUS FORMS.

12   SO WE DO NOT MAKE A DETERMINATION -- WHEN SWANCC CAME OUT,

13   THERE WERE CONSULTANTS NOT EVEN PUTTING FEATURES ON THE MAP

14   BECAUSE THEY THOUGHT THEY WERE HYDROLOGICALLY DISCONNECTED.

15   WE DON'T.  WE DOCUMENT IT.  WE PROVIDE IT TO THEM.  WE

16   PROVIDE OUR OPINIONS.  THEY MAKE THE DETERMINATION.

17   **Q.**  SO THEN LET ME CLARIFY.  WHEN YOU TESTIFIED ON DIRECT

18   EXAMINATION TODAY THAT THERE WERE JURISDICTIONAL "WATERS OF

19   THE UNITED STATES" AND JURISDICTIONAL "OTHER WATERS," ARE YOU

20   SAYING THAT YOU WEREN'T CAPABLE OF MAKING THAT DETERMINATION

21   IN YOUR TESTIMONY TODAY?

22   **A.**  IT WAS -- IN MY OPINION, BASED UPON A REVIEW OF WHAT YOU

23   HAVE IN YOUR HAND THERE, I WOULD SAY YES.

24   **Q.**  BUT YOU COULDN'T DESCRIBE WHAT THE REGULATIONS ACTUALLY

25   SAY TO MAKE THAT JUDICIAL -- NOT JUDICIAL, EXCUSE ME --

1  **A.**  WELL, I AM AWARE THAT -- AND I THINK I SAID SOME OF THIS,

2  THAT TRADITIONAL NAVIGABLE WATERS ARE REGULATED, WETLANDS

3  ADJACENT ARE, TRIBUTARIES TO THE TRADITIONAL NAVIGABLE WATER

4  ARE, AND WETLANDS ADJACENT TO THOSE TRIBUTARIES ARE, AND

5  "OTHER WATERS" INCLUDING LAKE TAHOE --

6  **Q.**  YES.  EXACTLY.

7  **A.**  -- LAKES, STREAMS, I'M AWARE OF THAT, BUT IT WASN'T MY JOB

8  TO DEVELOP A MAP FILTERING OUR DATA FORMS FROM THE FIELD WITH

9  THAT INFORMATION.

10  **Q.**  AND I AGREE WITH THAT, AND I TOTALLY UNDERSTAND THAT.  IN

11  FACT, MOST OF MY QUESTIONING TODAY WAS GOING TO BE ABOUT THAT.

12  YOU NEVER DID THE JURISDICTIONAL SIDE OF THE DETERMINATIONS,

13  CORRECT?

14  **A.**  NO, WE WERE TOLD BY THE CORPS, YOU DON'T DO THAT.

15  **Q.**  RIGHT.  BUT YOU DIDN'T DO IT IN 2007, CORRECT?  YOU DIDN'T

16  MAKE THE JURISDICTIONAL DETERMINATION IN 2007?

17  **A.**  THAT IS WHEN WE PROVIDED OUR REPORT TO THEM, RIGHT.

18  **Q.**  BUT YOU MADE THE DELINEATION DETERMINATION, CORRECT, NOT

19  THE JURISDICTIONAL DETERMINATION?

20  **A.**  RIGHT.  THAT IS WHY IT IS CALLED A PRELIMINARY

21  JURISDICTIONAL WETLAND REPORT.

22  **Q.**  I WANT TO GET BACK TO WHERE WE WERE, THOUGH.  WE GOT LOST

23  AGAIN.

24     "OTHER WATERS".  "OTHER WATERS" ARE ALSO SOMETHING THAT

25  COULD BE DETERMINED JURISDICTIONAL UNDER THE CLEAN WATER ACT,

BOURSIER - CROSS / HANSEN

1    CORRECT?

2    **A.**  ACCORDING TO THOSE REGULATIONS, YES.

3    **Q.**  YES.  AND YOU WERE JUST TALKING ABOUT, YOU COULDN'T SAY

4    WHETHER OR NOT THE POND COULD BE USED FOR RECREATIONAL

5    PURPOSES BY FOREIGN OR INTERSTATE TRAVELERS, RIGHT?  THAT'S

6    NOT SOMETHING YOU COULD STATE TODAY --

7    **A.**  I COULD GIVE YOU AN OPINION AS A BIOLOGIST, IF YOU WANT

8    THAT.

9    **Q.**  SURE.  HOW THAT ABOUT --

10   **A.**  I DID A DELINEATION ON THE KORESO (PHONETIC) PLANE ON A

11   5,000-ACRE SOLAR SITE.  AND THE CORPS DETERMINED BASED ON THE

12   FACT THAT THEY HAD A SINGLE PHOTO OF SOMEBODY IN A SKI BOAT ON

13   THE LAKE THAT IS INTERNALLY DRAINED, THAT THAT IS INTERSTATE

14   COMMERCE.

15        SO I CAN ENVISION THAT -- AND I HAVE SEEN PEOPLE ON MOWRY

16   SLOUGH ON CANOES AND KAYAKS, AND I OWN A KAYAK, IF I THROW

17   THAT KAYAK IN THAT POND, MY OPINION IS, THAT ESTABLISHES IT.

18   BUT I'M NOT --

19   **Q.**  BUT WE CAN AGREE THAT YOU'RE NOT GOING TO BE ABLE TO PUT A

20   BOAT ON THAT POND THAT IS GOING TO GO INTO THE SLOUGH,

21   CORRECT?

22   **A.**  AGAIN, ARE WE TALKING ABOUT THE POND NEXT TO THE PICK 'N

23   PULL?

24   **Q.**  THE POND NEXT TO THE PICK 'N PULL, IS NOT GOING TO GO FROM

25   THE POND INTO THE SLOUGH UNLESS YOU GO OVER THE LEVEE,

BOURSIER - CROSS / HANSEN

1    CORRECT?

2    **A.**  WELL, THE WATER GOES THROUGH THE LEVEE --

3    **Q.**  THE BOAT CAN'T GO THROUGH THE LEVEE, CORRECT?

4    **A.**  I WOULD AGREE WITH THAT.

5    **Q.**  GREAT.

6         AND YOU WOULD AGREE THAT FISH OR SHELLFISH CANNOT BE TAKEN

7    OR SOLD IN INTERSTATE OR FOREIGN COMMERCE FROM THAT POND,

8    CORRECT?

9    **A.**  I'M NOT AN EXPERT ON THAT.  I DON'T KNOW.

10   **Q.**  DID YOU SEE SHELLFISH IN THE POND THROUGHOUT THE TIME THAT

11   YOU WERE LOOKING AT THE SITE?

12   **A.**  I DIDN'T LOOK FOR THEM, NO.

13   **Q.**  DO YOU THINK YOU WOULD HAVE NOTED THEM IF YOU SAW THEM?

14   **A.**  UNFORTUNATELY I'M THE GUY THAT LOOKS AT DIRT AND PLANTS,

15   SO, NO.

16   **Q.**  YOU -- OKAY.

17        DID YOU EVER NOTE THAT THE POND WAS USED FOR INDUSTRIAL

18   PURPOSES OR BY INDUSTRIES IN INTERSTATE COMMERCE?

19   **A.**  WELL, WHAT I DID -- MAYBE I CAN DESCRIBE, THE PICK 'N PULL

20   YARDS, IF I UNDERSTAND YOUR QUESTION, HAVE STORM WATER BASINS

21   THAT DISCHARGE INTO THE POND WE ARE TALKING ABOUT, AND FROM

22   THERE THAT GOES INTO -- I DON'T KNOW IF THAT MAKES --

23   **Q.**  WELL, THOSE STORM WATER BASINS, THOSE ARE

24   NON-JURISDICTIONAL, CORRECT?

25   **A.**  THEY ARE BUT THEY CONTRIBUTE WATER --

1   **Q.**  BUT THEY ARE NOT JURISDICTIONAL; IS THAT RIGHT?

2   **A.**  RIGHT.

3   **Q.**  YOU AGREE WITH THAT, CORRECT?

4   **A.**  RIGHT.

5   **Q.**  THEY HAVE FEATURES THAT HAVE WETLAND VEGETATION IN THEM,

6   CORRECT?

7   **A.**  UH-HUH.

8   **Q.**  AND WOULD YOU AGREE THAT PONDS THAT ARE ADJACENT TO A

9   TRADITIONAL NAVIGABLE WATER ALSO ARE NOT JURISDICTIONAL?

10  **A.**  I DON'T KNOW THAT.

11  **Q.**  OKAY.  ONE MOMENT, PLEASE.

12  **A.**  I SHOULD SAY, MY EXPERIENCE --

13  **Q.**  EXCUSE ME JUST ONE MOMENT, PLEASE.

14  **A.**  SURE.

15  **Q.**  THANK YOU.  THANK YOU.

16              (PAUSE IN THE PROCEEDINGS.)

17          **MS. HANSEN:**  SORRY, I WANT TO CHANGE TOPICS.

18          **THE COURT:**  WE'RE SWITCHING TOPICS.  IT'S QUARTER TO

19  NOON, SO LET'S TAKE OUR SECOND RECESS.

20          **MS. HANSEN:**  THANK YOU, YOUR HONOR.

21          **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN, WE WILL

22  BREAK NOW AND COME BACK AT NOON FOR THE REST OF OUR SESSION

23  TODAY.  AND JUST KEEP IN MIND YOUR ADMONITIONS REGARDING

24  CONDUCT AS JURORS.  SEE YOU IN 15 MINUTES.

25          (RECESS TAKEN AT 11:45 A.M.; RESUMED AT 12:00 P.M.)

1          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

2          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

3    COURT IS BACK IN SESSION.

4       READY?

5          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

6          **THE CLERK:**  YOU MAY BE SEATED.

7          **THE COURT:**  YOU MAY CONTINUE, MS. HANSEN.

8          **MS. HANSEN:**  THANK YOU, YOUR HONOR.

9    BY MS. HANSEN:

10   **Q.**  DR. BOURSIER, I WANT TO TALK TO YOU A LITTLE BIT ABOUT A

11   TEST YOU DID NOT DO IN THIS CASE, THE SIGNIFICANT NEXUS TEST.

12   THAT TEST MUST BE MADE BASED ON SPECIFIC -- FACT SPECIFIC

13   ANALYSIS, CORRECT?

14   **A.**  THAT'S MY UNDERSTANDING, CORRECT.

15   **Q.**  ONE MUST COLLECT DATA TO MAKE SUCH A DETERMINATION,

16   CORRECT?

17   **A.**  I WOULD SAY YES, BUT COULD I -- MAYBE I CAN OFFER UP THAT

18   TO DATE I HAVE NOT DONE ONE, AND THE PRIMARY REASON IS THE

19   ARMY CORPS SECTION CHIEF ADVISED CONSULTANTS NOT TO COMPLETE

20   THOSE, THAT THOSE ARE TO BE PERFORMED BY STAFF OF THE CORPS.

21   **Q.**  I'M NOT TALKING ABOUT THE FORMS THEMSELVES, BUT JUST AN

22   ANALYSIS OF THINGS SUCH AS THE FLOW CHARACTERISTICS AND

23   FUNCTIONS OF A TRIBUTARY, CORRECT?

24   **A.**  I BELIEVE THAT'S RIGHT.

25   **Q.**  YOU NEED THAT FOR A SIGNIFICANT NEXUS ANALYSIS, CORRECT?

BOURSIER – CROSS / HANSEN

1    **A.**   I'M TAKING YOUR WORD FOR IT.  I HAVEN'T STUDIED THAT IN --

2    SINCE IT PRETTY MUCH CAME OUT.

3    **Q.**   YOU ARE FAMILIAR WITH THE GUIDEBOOKS, CORRECT, FOR

4    SUBSTANTIAL NEXUS?

5    **A.**   NO.

6    **Q.**   OKAY.  BUT YOU --

7    **A.**   AGAIN, NOT FROM ANY DERELICTION OF DUTY ON MY POINT BY THE

8    ARMY CORPS -- REALLY TWO REASONS.  THE ARMY CORPS SAYS, DON'T

9    DO THAT, MR. CONSULTANT.  AND AT MY BILLING RATE, I DON'T HAVE

10   A CLIENT THAT WOULD WANT TO PAY $220 AN HOUR TO HAVE ME FILL

11   OUT FORMS THAT CAN'T BE USED.  SO IT IS FOR THOSE REASONS WE

12   HAVE NOT DONE THOSE.

13   **Q.**   AND I THINK I SAID IT WRONG.  IT IS SIGNIFICANT NEXUS, NOT

14   SUBSTANTIAL.

15      BUT I WANT TO ASK YOU ANOTHER QUESTION, THOUGH.  H.T.

16   HARVEY HAS NOT DONE ANY TESTS TO DETERMINE THE VOLUME,

17   DURATION, OR FREQUENCY OF FLOW FOR ANY TRIBUTARIES ON THE

18   PROJECT SITE, CORRECT?

19   **A.**   YES, BECAUSE -- WELL, WE DIDN'T MAP ANYTHING AS A

20   TRIBUTARY.

21   **Q.**   AND NO ONE AT YOUR FIRM DID A SIGNIFICANT NEXUS ANALYSIS

22   FOR THIS PROPERTY, CORRECT?

23   **A.**   I AM SORRY?

24   **Q.**   NO ONE AT YOUR FIRM DID A SIGNIFICANT NEXUS ANALYSIS,

25   CORRECT?

BOURSIER – CROSS / HANSEN

1    **A.**   NO.  I DID -- RELATED TO THIS, I DID -- AS I DESCRIBED

2    EARLIER, I -- THIS IS VERY QUALITATIVE --

3    **Q.**   I AM SORRY, I --

4    **A.**   -- I MEASURED THE VOLUME OF WATER COMING OFF OF THOSE

5    WATERS TO THE CULVERT -- THE ONE CULVERT, I AM SORRY.

6    **Q.**   BUT THERE ARE OTHER FACTORS THAT YOU DIDN'T MEASURE AND

7    THAT WOULD BE --

8    **A.**   YEAH, THAT CERTAINLY WASN'T PART OF THE SIGNIFICANT NEXUS

9    ANALYSIS.

10   **Q.**   AND NO ONE AT YOUR FIRM FOR THIS PROPERTY DID A

11   SIGNIFICANT NEXUS ANALYSIS, CORRECT?

12   **A.**   THAT'S RIGHT.

13   **Q.**   AND NOW I WANT TO LOOK AT YOUR H.T. HARVEY OCTOBER 2016

14   MAP AGAIN.

15            **THE CLERK:**  WHAT IS THE EXHIBIT NUMBER?

16            **MS. HANSEN:**  EXHIBIT 2006.  DID I GET THAT RIGHT?  I

17   THINK SO.

18                    (DISPLAYED ON SCREEN.)

19       MR. WANZALA, CAN WE BLOW UP THE NORTH AND SOUTH SO IT IS

20   EASIER TO SEE?

21   **BY MS. HANSEN:**

22   **Q.**   SO THIS WAS IN OCTOBER OF 2016 IS WHEN THIS MAP IS DATED;

23   IS THAT RIGHT?

24   **A.**   THAT'S WHAT IT SAYS AT THE BOTTOM, RIGHT.

25   **Q.**   A YEAR LATER DO YOU REMEMBER HAVING AN INTERVIEW WITH THE

BOURSIER – CROSS / HANSEN

```
1    GOVERNMENT AND AGENT SIVOK WITH THE FBI?

2    A.   IS THAT A QUESTION?

3    Q.   YES.  DO YOU REMEMBER THAT?

4    A.   I DON'T, NO.

5    Q.   DO YOU REMEMBER AGENT SIVOK SENT YOU AN EMAIL WITH A MAP

6    ATTACHED TO IT?

7    A.   I DON'T REMEMBER THAT, NO.

8    Q.   I'M GOING TO SHOW YOU WHAT HAS BEEN PREMARKED FOR

9    IDENTIFICATION AS EXHIBIT 2025.  TAKE A MINUTE AND TAKE A LOOK

10   AT EXHIBIT 2025, PLEASE.

11              (EXHIBIT HANDED TO WITNESS.)

12   BY MS. HANSEN:

13   Q.   DO YOU RECOGNIZE EXHIBIT 2025?

14   A.   YES, I DO.  THANK YOU FOR THAT.  A RETIREE'S MEMORY IS --

15   IF I AM DOING MY JOB AS A RETIREE, FADING QUICKLY.

16   Q.   I DON'T THINK THAT'S THE CASE.

17        DO YOU RECOGNIZE THIS EXHIBIT?

18   A.   YES.

19   Q.   IS THAT A FAIR AND ACCURATE COPY OF THE EMAIL AND THE MAP

20   THAT WERE SENT TO YOU ON NOVEMBER 1ST, 2017 BY AGENT SIVOK OF

21   THE FBI?

22   A.   I WILL SAY YES NOT BECAUSE I KNOW EVERYTHING ON THIS MAP

23   BUT BECAUSE IT'S STAPLED TO THE EMAIL THAT WAS SENT TO ME,

24   YES.

25   Q.   IT HAS THE SAME -- THE EMAIL AND THE ATTACHMENTS, YOU CAN
```

1    SEE HAS THE SAME PDF NUMBER AS THE BATES NUMBER -- THE FIRST

2    BATES NUMBER ON THE MAP; IS THAT RIGHT?

3    **A.**   I AM SORRY, I MISSED THAT, IT HAS THE SAME?

4    **Q.**   THE SAME NUMBER 33181 IN THE ATTACHMENT NEXT TO THE PDF.

5    YOU SEE THE FILE --

6    **A.**   MY FILES SAYS -- MY FIGURE SAYS, YES, 33181.

7    **Q.**   AND YOU HAVE NO REASON TO BELIEVE THAT THIS IS A DIFFERENT

8    MAP THAN THE ONE THAT WAS SENT TO YOU, CORRECT?

9    **A.**   IT LOOKS LIKE THE EXHIBIT I WAS SENT, RIGHT.

10           **MS. HANSEN:**   SO, YOUR HONOR, I WOULD MOVE TO ADMIT

11   EXHIBIT 2050.

12           **THE COURT:**   I THOUGHT IT WAS 2025.

13           **MS. HANSEN:**   DID I DO THAT WRONG AGAIN?  2025, SORRY.

14           **THE COURT:**   ANY OBJECTION?

15           **MS. LEE:**   NO OBJECTION, YOUR HONOR.

16           **THE COURT:**   2025 IS ADMITTED.

17        (DEFENDANT'S EXHIBIT 2025 RECEIVED IN EVIDENCE)

18           **MS. HANSEN:**   SO IF WE CAN BLOW UP THE TOP -- OH, NO,

19   PAGE 1, PLEASE.  THANK YOU.

20                   (DISPLAYED ON SCREEN.)

21   **BY MS. HANSEN:**

22   **Q.**   SO IT SAYS:  PAT, I HAVE ATTACHED A MAP TO BE REFERENCED

23   DURING YOUR SCHEDULED CONFERENCE CALL AT 3 P.M.

24        IS THAT RIGHT?

25   **A.**   UH-HUH.

1    **Q.**  AND THEN ON THAT SAME DAY AGENT SIVOK AND MR. KEARNEY

2    INTERVIEWED YOU, CORRECT?

3    **A.**  YES.  WE SPOKE ON THE PHONE.  I DON'T -- WHEN I THINK OF

4    INTERVIEW, I THINK OF SOMETHING DIFFERENT.  YES.  YES, WE

5    SPOKE ON THE PHONE.

6    **Q.**  LET'S LOOK AT THE SECOND PAGE OF THE EMAIL.  AND THIS IS

7    THE MAP THAT THEY WANTED YOU TO REFERENCE, CORRECT?

8    **A.**  THIS IS THE MAP THEY SENT ME.  I DIDN'T -- WHAT WAS

9    YOUR --

10   **Q.**  THAT IS MY ONLY QUESTION.

11          **MS. HANSEN:**  MR. WANZALA, CAN YOU BLOW UP THE NORTH

12   AND SOUTHERN AREA?

13   **BY MS. HANSEN:**

14   **Q.**  AND SO THIS IS THE MAP THAT THE GOVERNMENT WANTED YOU TO

15   REFER TO BEFORE THEY TALKED WITH YOU ON THE PHONE; IS THAT

16   RIGHT?

17   **A.**  I GUESS THAT'S CORRECT.

18   **Q.**  NOW, YOU DON'T KNOW THE LAW ON THE JURISDICTIONAL

19   DETERMINATION SIDE ENOUGH TO BE CONFIDENT TO MAKE THOSE

20   ASSESSMENTS IN PROPERTY DISPUTE CASES; IS THAT RIGHT?

21   **A.**  ARE YOU REFERRING TO SIGNIFICANT NEXUS ANALYSES OR

22   JURISDICTION --

23   **Q.**  JURISDICTIONAL DETERMINATION, NOT THE DELINEATION.

24   **A.**  NO, I HAVE NOT DONE THAT.

25   **Q.**  BUT YOU JUST TESTIFIED TO THIS JURY TODAY IN A CRIMINAL

1    CASE ABOUT THE JURISDICTIONAL DETERMINATION AND THE LAW WITH

2    GREAT CONFIDENCE, DIDN'T YOU?

3    **A.**  YES, IT WAS MY OPINION THAT THOSE AREAS ARE -- WELL, THE

4    ARMY CORPS CONFIRMED THAT THEY ARE JURISDICTIONAL.

5              **MS. HANSEN:**  I HAVE NO FURTHER QUESTIONS.

6              **THE COURT:**  ANY REDIRECT?

7              **MS. LEE:**  YES, YOUR HONOR.

8              **THE WITNESS:**  YOU WANT THIS BACK?

9              **MS. HANSEN:**  THANK YOU.

10                     **REDIRECT EXAMINATION**

11   **BY MS. LEE:**

12   **Q.**  DR. BOURSIER --

13             **MS. LEE:**  IF WE CAN JUST PULL UP 1138 AGAIN.  NOT

14   YOU.  WE WILL PULL IT UP, AND WE'LL REFERENCE YOU TO IT.

15                   (PAUSE IN THE PROCEEDINGS.)

16                    (DISPLAYED ON SCREEN.)

17   **BY MS. LEE:**

18   **Q.**  IN THE BLUE -- PART THAT IS MARKED IN BLUE IN THE NORTHERN

19   AREA, GO BACK, WHY DID YOU LABEL THINGS "OTHER WATER";

20   MEANING, WAS IT A CATCH-ALL PHRASE OF "OTHER WATERS" THAT

21   WOULD BE "WATERS OF THE UNITED STATES," WERE YOU DELINEATING

22   BETWEEN TRIBUTARIES VERSUS OTHER TYPES OF WATER?  WHY -- WHAT

23   DOES BLUE MEAN TO YOU?

24   **A.**  THE BLUE MEANT TO US THAT IT WAS A CATCH-ALL PHRASE THAT

25   COULD INCLUDE A LOT OF DIFFERENT FEATURES.

1    **Q.**   IT IS A CATCH-ALL PHRASE FOR "OTHER WATERS" THAT YOU

2    BELIEVE TO CONTAIN -- YOUR OPINION WOULD BE THAT WOULD CONTAIN

3    POTENTIAL "WATERS OF THE UNITED STATES"?

4    **A.**   YES, DEFINITELY.

5    **Q.**   COULD A TRIBUTARY BE CONSIDERED INCLUDED WITHIN "OTHER

6    WATERS"?

7    **A.**   OH, YES, DEFINITELY.

8    **Q.**   IN FACT, ARE YOU AWARE THAT UNDER THE -- ONE OF THE ARMY

9    CORPS OF ENGINEERS GUIDANCE THEY DEFINE A TRIBUTARY AS IT

10   INCLUDES:  NATURAL, MAN-ALTERED, OR MAN MADE WATER BODIES THAT

11   CARRY FLOW DIRECTLY OR INDIRECTLY INTO A TRADITIONAL NAVIGABLE

12   WATER.

13   **A.**   YES, I AM FAMILIAR WITH THAT LANGUAGE.

14   **Q.**   NOW, WHETHER THAT AREA IS MARKED BLUE OR WHETHER IT

15   BECOMES MORE VEGETATED WITH PICKLEWEED, IN THAT NORTHERN AREA,

16   DOES WATER FLOW THROUGH THERE THAT CONTRIBUTES FLOW TO A

17   TRADITIONAL NAVIGABLE WATER?

18   **A.**   YES, IT DOES.  BUT AS I MENTIONED EARLIER, THE LINEAR OR

19   THE SINUOUS CHANNEL THAT GOES THROUGH THERE THAT WE ARE

20   TALKING ABOUT IS COVERED WITH PICKLEWEED SO YOU WOULD HAVE TO

21   WALK DOWN IN THERE AND GET WET.  BUT IT'S -- FROM ALL OF MY

22   SITE VISITS OVER THE YEARS, IT HAS BEEN THERE AND MOST LIKELY

23   THERE TODAY.

24   **Q.**   COULD YOU SHOW US WHERE THAT CHANNEL IS THAT YOU'RE

25   TALKING ABOUT IF YOU WERE --

1    **A.**   CAN I STAND UP?

2              **THE COURT:**  YOU MAY.

3              **THE WITNESS:**  THE CHANNEL IS -- YOU CAN SORT OF SEE

4    IT.  IT'S RIGHT -- AND THERE IS TOPOGRAPHIC LINES.  THE

5    CULVERT WITH THE DUCKBILL IS RIGHT THERE.  AND THE LINEAR --

6    NOT NECESSARILY LINEAR BUT THE SINUOUS CHANNEL IS UNDERNEATH

7    THAT AREA.  WHEN WE MAPPED THAT, WHEN WE MAPPED IT AS "OTHER

8    WATERS", IT WAS UNDERWATER.  BUT WHEN -- I'VE SEEN ON AERIAL

9    PHOTOGRAPHY THAT THAT IS STILL PRESENT.

10        WHEN IT DRIES DOWN -- IT WAS THERE AFTER THE CULVERT WAS

11   FIXED, THAT CHANNEL WAS THERE.  BUT, AGAIN, THE PICKLEWEED

12   ENCROACHED AND COVERED IT, BUT IT STILL FUNCTIONS AS THAT.

13   **BY MS. LEE:**

14   **Q.**   AND DOES THAT CHANNEL CONTRIBUTE FLOW TO A TRADITIONAL

15   NAVIGABLE WATER?

16   **A.**   IT CONTRIBUTES FLOW TO MOWRY SLOUGH, WHICH I BELIEVE TO

17   BE -- AS A CONSULTANT, TO BE A TRADITIONAL NAVIGABLE WATER AS

18   I UNDERSTAND THE LAW OR THE REGULATIONS.

19   **Q.**   AND JUST SPEAKING ABOUT -- YOU INDICATED YOU DIDN'T DO A

20   SIGNIFICANT NEXUS TEST.  IS THAT BECAUSE ACCORDING TO THE ARMY

21   CORPS OF ENGINEERS RAPANOS GUIDANCE:  THE AGENCIES WILL ASSERT

22   JURISDICTION OVER CERTAIN CATEGORIES OF WATER CATEGORICALLY,

23   INCLUDING TRADITIONAL NAVIGABLE WATERS, WETLANDS ADJACENT TO

24   TRADITIONAL NAVIGABLE WATERS, NON-NAVIGABLE TRIBUTARIES OF

25   TRADITIONAL NAVIGABLE WATERS?

1     **A.**   RIGHT.

2     **Q.**   THERE ARE SOME OTHER -- I'LL CONTINUE:  IT'S NON-NAVIGABLE

3     TRIBUTARIES OF TRADITIONAL NAVIGABLE WATERS THAT ARE

4     RELATIVELY PERMANENT OR THE TRIBUTARIES TYPICALLY FLOW

5     YEAR-ROUND OR HAVE CONTINUOUS FLOW AT LEAST SEASONALLY,

6     EXAMPLE TYPICALLY THREE MONTHS.

7         IS IT FAIR TO SAY THAT UNDER THOSE CATEGORIES OF "WATERS

8     OF THE UNITED STATES" A SIGNIFICANT NEXUS DETERMINATION

9     WOULDN'T NEED TO APPLY?

10    **A.**   THAT'S MY UNDERSTANDING, YES.

11    **Q.**   THAT IT'S IN OTHER CATEGORIES OF WATERS THAT PERHAPS ARE

12    MORE FURTHER REMOVED WHERE YOU WOULD -- WHERE THE CORPS WOULD

13    HAVE TO DO A CASE-BY-CASE --

14    **A.**   THAT'S CORRECT.

15    **Q.**   -- ANALYSIS?

16    **A.**   YES.

17    **Q.**   SO EVEN IF YOU WERE TO DO -- WITHDRAWN.

18        YOU WERE ASKED ABOUT A MEETING THAT YOU HAD WITH VARIOUS

19    MEMBERS LISTED BY MS. HANSEN INCLUDING WITH AGENT SIVOK AND

20    OTHERS.  AND IN THAT MEETING SHE -- MS. HANSEN HAD ASKED YOU

21    ABOUT WHETHER OR NOT YOU HAD SPOKEN ABOUT THAT BLUE AREA NO

22    LONGER HAVING SOME SORT OF -- NO LONGER BECOMING BLUE.

23        ISN'T IT TRUE THAT ACTUALLY IN THAT MEETING, BASED ON A

24    REPORT FROM THAT MEETING, YOU STATED THAT YOU RECALLED THERE

25    WAS A DEPRESSION BEHIND THE WOOD CHIP LOT THAT HAD --

1          **MS. HANSEN:**  OBJECTION, YOUR HONOR.  HEARSAY.  THIS

2    GOES BEYOND THE IMPEACHMENT.

3          **THE COURT:**  YOU'RE TRYING TO INTRODUCE A PRIOR

4    CONSISTENT STATEMENT?

5          **MS. LEE:**  YES.

6          **THE COURT:**  OVERRULED.

7    **BY MS. LEE:**

8    **Q.**  -- THAT HAD TRUE WETLAND VEGETATION SUCH AS PICKLEWEED ON

9    THE SLOPES AND PERIMETER OF THE PROPERTY.  IN 2007, THAT AREA

10   HAD PONDED WATERS.  H.T. HARVEY LABELED IT AS "OTHER WATERS".

11   IN 2012 THE PICKLEWEED HAD COME IN A BIT, AND IF YOU MAPPED IT

12   TODAY, HE WOULD LABEL IT AS WETLANDS.

13   **A.**  THAT'S ACCURATE.

14   **Q.**  DOES THAT REFLECT YOUR FEELINGS DURING THAT MEETING IN

15   2016 WHEN YOU FELT -- WHEN YOU BELIEVED THAT PICKLEWEED HAD

16   VEGETATED THAT BLUE WATER AREA IN THAT NORTHERN SECTION?

17   **A.**  YES.

18   **Q.**  AND WHETHER PICKLEWEED HAD VEGETATED IT OR IT STILL

19   REMAINED MORE PONDED, WOULD WATER STILL HAVE BEEN FLOWING

20   THROUGH THAT CHANNEL CONTRIBUTING FLOW TO A TRADITIONAL

21   NAVIGABLE WATER?

22   **A.**  YES, IT WOULD.

23   **Q.**  AND WOULD IT HAVE BEEN FUNCTIONING AS A TRIBUTARY WHETHER

24   THERE WAS PICKLEWEED IN THERE OR MORE PONDING OF WATER THERE?

25   **A.**  YES.  AND I THINK -- I'M NOT A HYDROLOGIST, BUT I THINK

1    THE -- WHEN WATER IS THERE, AND I'VE SEEN THIS ON ANOTHER

2    PIECE OF THE PROPERTY, THE CULVERT DRAINS THAT WATER AND IT

3    CAUSES A CONDITION THAT HYDROLOGISTS CALL HUNGRY WATER AND IT

4    SCOURS -- THAT WATER IS FUNNELED INTO THE FRONT OF THE

5    CULVERT, AND IT SORT OF SCOURS THE CHANNEL BACK.

6        SO IT'S -- IT'S A FEATURE THAT -- THAT SINUOUS CHANNEL

7    THERE IS SOMETHING THAT WOULD EVEN REFORM IF IT WAS BURIED,

8    AND THAT'S BECAUSE OF THE SCOURING OF THE FLOWING WATER.

9    Q.   AND I WOULD LIKE TO TALK TO YOU ABOUT THAT FARM DITCH THAT

10   MS. HANSEN HAD ASKED YOU ABOUT ON WHY IT WAS NOT MAPPED BLUE.

11   IF WE CAN -- THANK YOU.

12       OVER YOUR DECADES OF BEING THERE ON THIS PROPERTY AND

13   SEEING THIS PROPERTY WITH YOUR OWN EYES, CAN YOU TELL US, HAVE

14   YOU SEEN A -- RUNNING WATER ALONG THAT DRAINAGE CHANNEL

15   HEADING TOWARD THE SLOUGH FROM RIGHT TO LEFT OR EAST TO WEST?

16   A.   FROM RIGHT TO LEFT?  YES, I HAVE.  BUT I MUST SAY THAT IT

17   OCCURS -- INTO THE RAINFALL SEASON.  AND THE FLOW UNDER

18   AVERAGE CONDITIONS IS RELATIVELY SLOW.  AND WE WOULD PUT IN

19   SOMETHING LIKE A TWIG OR A LEAF TO ACTUALLY SEE IT MOVE.  AND

20   THAT'S THE WAY WE WOULD DETERMINE THE WATER IS MOVING IN THAT

21   DIRECTION.

22       YOU CAN ALSO SEE SORT OF STRANDED ALGAE GROWING IN THAT

23   WATER IN THE LITTLE -- WHATEVER STRUCTURAL ALGAE TAKES IS

24   MOVING IN THE DIRECTION OF THE SLOUGH.

25   Q.   SO THERE WOULD BE FLOW IN THAT DRAINAGE CHANNEL TOWARD THE

1    SLOUGH?

2    **A.**  YES, CORRECT.

3    **Q.**  AND WHEN YOU SAY "SEASONALLY," APPROXIMATELY HOW MANY

4    MONTHS IN A YEAR WOULD YOU SEE THAT THERE?

5    **A.**  BECAUSE THE BOTTOM ELEVATION OF THE CHANNEL RAISES

6    SLIGHTLY UP AND DOWN AS IT GOES ACROSS, IT HAS WATER IN IT

7    ALMOST YEAR-ROUND.  IT IS SATURATED ALMOST YEAR-ROUND.

8         THE FLOWING WATER WOULD OCCUR AT LEAST THREE MONTHS, FOUR

9    MONTHS, AND IT STARTS TO OCCUR WHEN ALL OF THE -- YOU GET

10   RAINS, IT MIGHT BE THE BEGINNING OF JANUARY OR SO BEFORE YOU

11   SEE ENOUGH SURFACE RUNOFF AND THE SEEPS ARE ACTIVE ENOUGH TO

12   CONTRIBUTE FLOW TO MOVE THE WATER FROM RIGHT TO LEFT ON THAT

13   EXHIBIT.

14   **Q.**  WOULD IT BE -- SORRY, YOU SAID THE RAINY MONTHS?

15   **A.**  AT LEAST THREE TO FOUR MONTHS.  IT WASN'T -- I DIDN'T

16   ACTUALLY GO OUT AND MARK IT ON A CALENDAR, BUT I'VE BEEN THERE

17   ENOUGH TO KNOW THAT IT IS LONG DURATION.

18        THE OTHER ISSUE -- THE OTHER REASON I KNOW THE FLOW

19   CHARACTERISTICS IS THAT THERE IS ADDITIONAL FLOW THAT ENTERS

20   THAT -- MAYBE IT IS BEST IF I POINT TO THAT?

21   **Q.**  OKAY.

22   **A.**  SO THERE IS ANOTHER DITCH THAT DRAINS WATER.  IT'S

23   CULVERTED UNDER THE ENTRANCE ROAD AND DISCHARGES DIRECTLY INTO

24   THAT FEATURE.  AND THAT CULVERT ROUTINELY GETS BLOCKED UP BY

25   DEBRIS.  SO WE KNOW WHEN A LOT OF FLOW -- WE KNEW WHEN A LOT

1    OF FLOW SHOWS UP AND THAT'S BEEN -- THE CULVERT HAS BEEN

2    REPLACED, AS FAR AS I KNOW, AT LEAST ONCE.  SO THERE'S A FAIR

3    AMOUNT OF WATER, AND -- SO IT WILL BACK UP ON THE OTHER SIDE

4    OF THE CULVERT AND START TO POND UP A BIT BACK THERE SO...

5    **Q.**  SO I WOULD LIKE TO SHOW ONLY A SMALL PORTION OF A VIDEO

6    FROM 2017 THAT SHOWS THAT DRAINAGE DITCH.  AND I WANT TO ASK

7    YOU IF THAT FAIRLY AND ACCURATELY DEPICTS HOW YOU'VE SEEN THAT

8    DITCH LOOK AT LEAST SEASONALLY THROUGHOUT A YEAR.

9        **MS. LEE:**  I'M GOING TO ASK AGENT SU TO PULL UP

10    EXHIBIT 905 AND GO TO... WE ARE GOING TO START PLAYING THIS

11    VIDEO AT 33 SECONDS.

12                    (DISPLAYED ON SCREEN.)

13        IF YOU CAN PRESS PLAY, THANK YOU.

14                    (VIDEO PLAYED.)

15    **BY MS. LEE:**

16    **Q.**  DR. BOURSIER, IS THAT -- THIS VIDEO IS ACTUALLY FROM MARCH

17    OF 2017.  DOES THIS FAIRLY AND ACCURATELY DEPICT WHAT THIS

18    FARM DITCH LOOKS LIKE TO YOU SEASONALLY THROUGHOUT THE YEAR?

19    **A.**  YES.  THE WIDEST AREA CLOSEST TO US IS -- THAT'S ACCURATE

20    AND THE WATER -- BECAUSE THE WATER IS DEEP AND WIDE, YOU CAN

21    SEE THERE'S OPEN WATER GOING AWAY FROM US AND THAT -- THAT

22    PART OF IT, I BELIEVE WHAT'S GOING ON THERE IS THE WATER IS

23    COVERING THE PICKLEWEED.

24        AND SO IF THAT DRIED DOWN -- IT INDICATES IT IS DEFINITELY

25    FLOWING AT THAT POINT.  ONCE IT DRIES DOWN A LITTLE BIT, THE

1    PICKLEWEED IS ABLE TO COME UP ABOVE THAT AREA.  SO WITH THAT

2    CAVEAT, YES.

3    **Q.**  SO WHAT I AM GOING TO DO IS REFERENCE YOU TO THE EXHIBIT

4    THAT WAS ENTERED INTO BY THE DEFENSE.

5                    (PAUSE IN THE PROCEEDINGS.)

6            **MS. LEE:**  IT'S ACTUALLY -- IT'S THE SAME AS

7    GOVERNMENT'S EXHIBIT 17.  SO WHAT I WILL DO IS MOVE

8    GOVERNMENT'S EXHIBIT 17 INTO EVIDENCE.  IT'S THE SAME MAP THAT

9    HAS BEEN MOVED INTO EVIDENCE BY THE DEFENSE.

10           **MS. HANSEN:**  I'M SORRY?

11           **THE COURT:**  WHAT NUMBER DID IT COME IN UNDER?

12           **MS. HANSEN:**  2050.

13           **THE COURT:**  WHY DON'T WE USE 2050 IN EVIDENCE?

14           **MS. LEE:**  I WOULD LIKE TO HAVE 2050 OF THE DEFENSE

15   EXHIBIT PUBLISHED FOR THE JURY.

16                    (DISPLAYED ON SCREEN.)

17                    (PAUSE IN THE PROCEEDINGS.)

18           **THE CLERK:**  2050 IS WHAT YOU REPRESENTED AS

19   EXHIBIT 29 OF THEIRS.

20           **THE COURT:**  IT WAS THE CORPS MAP.

21           **MS. HANSEN:**  EXHIBIT 2050 IS THE JURISDICTIONAL

22   DETERMINATION MAP FROM THE CORPS.  EXHIBIT 2025 IS TERRY

23   HUFFMAN'S 2017 MAP.

24           **MS. LEE:**  SO THE RECORD IS CLEAR, I AM HAVING

25   DR. BOURSIER LOOK AT DEFENSE EXHIBIT 2025.

1          **THE COURT:**  ALL RIGHT.

2     **BY MS. LEE:**

3     **Q.**  DR. BOURSIER, LOOKING AT THIS EXHIBIT WE SEE THERE IS A

4     YELLOW LINE, WHICH THE LEGEND INDICATES IS TRIBUTARY A, WHICH

5     CONNECTS TO A BLUE LINE, WHICH THE EXHIBIT INDICATES IS

6     TRIBUTARY B.  AND THERE'S ALSO IN THE NORTHERN SECTION A

7     THINNER BLUE LINE, WHICH THE LEGEND INDICATES IS TRIBUTARY 1.

8     IT'S THE TRIBUTARY 1 OUTFALL CULVERT WITH TIDEFLEX CHECK

9     VALVE.

10         DOES THIS EXHIBIT FAIRLY AND ACCURATELY DEPICT YOUR

11    UNDERSTANDING OF HOW THE WATER FLOWS OFF OF THE SITE?

12         **MS. HANSEN:**  OBJECTION, YOUR HONOR.  BEYOND THE SCOPE

13    OF RULE 16 AND THIS WITNESS'S KNOWLEDGE.

14         **THE COURT:**  OVERRULED.

15         **THE WITNESS:**  YES, IT IS.

16    **BY MS. LEE:**

17    **Q.**  I WOULD ALSO LIKE TO SHOW YOU GOVERNMENT'S EXHIBIT 152,

18    ALREADY ADMITTED INTO EVIDENCE.

19              (DISPLAYED ON SCREEN.)

20         THIS IS A PHOTO TAKEN BY INVESTIGATOR HARBISON IN OCTOBER

21    OF 2014, ABOUT A MONTH OR SO AFTER THE OPERATION OF DUMPING

22    WAS STOPPED ON THE SITE.  I WOULD LIKE TO DRAW YOUR ATTENTION

23    (INDICATING) TO THIS SQUIGGLY LINE WITHIN THE PICKLEWEED.

24    DOES THAT FAIRLY AND ACCURATELY DEPICT KIND OF THE -- HOW DID

25    YOU CALL IT?  WHAT WERE YOUR WORDS TO DESCRIBE THE CHANNEL?

1   **A.**   SINUOUS OR MEANDERING?   YES.

2   **Q.**   IS THAT THE CHANNEL YOU WERE DESCRIBING THAT CONTRIBUTES

3   FLOW OUT TO MOWRY SLOUGH?

4   **A.**   YES.

5   **Q.**   PRIOR TO THIS FILL, DID THAT CHANNEL SNAKE UP A LITTLE BIT

6   UP INTO THE NORTHERN FILL AREA?

7   **A.**   YES, IT DID.

8            **MS. LEE:**   OKAY.   I HAVE NO FURTHER QUESTIONS FOR THIS

9   WITNESS.

10            **THE COURT:**   ANY RECROSS?

11            **MS. HANSEN:**   YES.

12            **MR. KEARNEY:**   YOUR HONOR, BEFORE RECROSS STARTS, THIS

13   IS SLIGHTLY IRREGULAR, MAY WE APPROACH?

14            **THE COURT:**   YES.   ALL RIGHT.   LADIES AND GENTLEMEN,

15   SO AS I MENTIONED, OCCASIONALLY I WILL NEED TO HAVE A

16   DISCUSSION WITH THE ATTORNEYS OUTSIDE YOUR PRESENCE, AND WE

17   WILL BE AS EFFICIENT AS WE CAN.   SO SIT TIGHT.

18            (THE FOLLOWING PROCEEDINGS WERE HEARD AT THE

19            SIDEBAR:)

20            **MR. KEARNEY:**   MY LEGAL TECH JUST EMAILED ME A BILL MY

21   OFFICE RECEIVED YESTERDAY FROM H.T. HARVEY FOR THEIR JANUARY

22   EXPENSES, WHICH INCLUDES COURT TESTIMONY.   I JUST WANTED YOU

23   GUYS TO KNOW THAT BEFORE YOU FINISHED THE TESTIMONY OF

24   DR. BOURSIER.   I AM SORRY HAVING IT XEROX AND BROUGHT UP.   I

25   LITERALLY GOT THIS MOMENTS AGO.   IT IS DATED FEBRUARY 14TH

```
 1    YESTERDAY, AND SENT TO MY OFFICE BY A --

 2              MS. HANSEN:  HOW MUCH IS IT?

 3              MR. KEARNEY:  I DON'T KNOW.  I WAS LOOKING.

 4              MS. HANSEN:  THIS IS THE FIRST BILL I AM AWARE OF.  I

 5    DIDN'T KNOW IT WAS THE SAME INVOICE WE RECEIVED.

 6              MR. KEARNEY:  SO IT'S --

 7              MS. HANSEN:  DOES IT HAVE DATES OF SERVICE?  IT SAYS.

 8              THE COURT:  WHY DON'T WE DO THIS.  HAVE SOMEBODY IN

 9    YOUR OFFICE PRINT IT, IMMEDIATELY BRING IT UP, AND THEN IF

10    IT'S A BASIS FOR RECALL, THEN THAT IS SOMETHING YOU CAN

11    REQUEST.

12              MS. HANSEN:  I CAN ASK HIM IN A NONLEADING WAY HOW

13    MUCH HE HAS BEEN PAID OR BILLED --

14         WHO SENT THE BILLS?

15              MR. KEARNEY:  HARVEY SENT IT TO MY OFFICE.  WE GOT IT

16    YESTERDAY.

17              MS. HANSEN:  HE WILL PROBABLY DISAVOW KNOWLEDGE

18    AND --

19              MS. LEE:  I DON'T THINK HE KNOWS.

20              MR. KEARNEY:  I CAN RUN DOWN AND PRINT IT.  I JUST

21    FORWARDED IT TO THE FBI TO PRINT IT.  THEY ARE SAYING THEY'RE

22    TRYING TO FIND SOMEBODY ELSE DOWN THERE.

23              THE COURT:  I GUESS, THIS WITNESS THOUGH --

24              MR. KEARNEY:  BY HARVEY.  I THINK HE'S --

25              MS. HANSEN:  HE IS A CONSULTANT.
```

```
 1            THE COURT:  ALL RIGHT.

 2            MR. KEARNEY:  I CAN RUN DOWN, GET IT XEROXED.  I

 3   DIDN'T WANT TO --

 4            MR. SMOCK:  CAN WE LOOK AT IT ON YOUR PHONE?

 5            MR. KEARNEY:  CERTAINLY.

 6                   (PAUSE IN THE PROCEEDINGS.)

 7            MR. SMOCK:  SO THIS IS FOR EACH EMPLOYEE.

 8            MR. KEARNEY:  HARDWICKE IS.  HE IS LISTED ON HERE.

 9            MS. LEE:  HARDWICKE AND BOURSIER.

10            MR. SMOCK:  I THINK SHE WILL WANT TO CROSS ABOUT

11   THIS, BEING PAID $9,000 FOR TRIAL PREPARATION.

12            MS. HANSEN:  AND 17,000 --

13            THE COURT:  LET'S DO THIS.  CAN MS. HANSEN USE YOUR

14   PHONE FOR THE PURPOSE OF ASKING CROSS QUESTIONS FOR NOW?

15            MS. HANSEN:  HE CAN EMAIL IT TO ME AND I CAN LOOK AT

16   IT ON MY PHONE.

17            MR. KEARNEY:  I CAN PRINT IT IN TWO MINUTES AND BRING

18   BACK HERE.

19            MS. LEE:  I GUESS WE COULD EMAIL IT TO ANGELA AND SHE

20   CAN USE IT ON HER PHONE.

21            MR. KEARNEY:  I WILL GO PRINT IT.

22      IF I CAN HAVE TWO MINUTES.  AND THEN SHE CAN READ

23   EVERYTHING.

24            THE COURT:  ALL RIGHT.  LET'S TAKE A TWO-MINUTE

25   BREAK.
```

1          (SIDEBAR CONCLUDED; PROCEEDINGS HELD IN OPEN COURT.)

2              **THE COURT:**  OKAY.  WE ARE GOING TO TAKE A TWO-MINUTE

3      BREAK.  WHY DON'T YOU STAND UP AND STRETCH.

4                  (PAUSE IN THE PROCEEDINGS.)

5              **THE COURT:**  ALL RIGHT.  MS. HANSEN, ANY RECROSS?

6              **MS. HANSEN:**  MAY WE HAVE ONE MOMENT TO LOOK AT THE

7      DOCUMENT WE RECEIVED?

8              **THE COURT:**  YOU MAY.

9                  (PAUSE IN THE PROCEEDINGS.)

10                    **RECROSS-EXAMINATION**

11     BY MS. HANSEN:

12     **Q.**  HI, AGAIN, DR. BOURSIER.

13     **A.**  HELLO.

14     **Q.**  A FEW POINTS.  SO YOU'RE ACTUALLY BEING PAID BY THE

15     FEDERAL GOVERNMENT FOR YOUR COURT PREPARATION AND TESTIMONY IN

16     THIS CASE, CORRECT?

17     **A.**  RIGHT.

18     **Q.**  YOU HAVE A CONTRACTED AMOUNT THROUGH YOUR FIRM IN WHICH

19     YOU ARE NOW A CONSULTANT, CORRECT?

20     **A.**  I'M AN ASSOCIATE WITH THE FIRM AND HAVE HAD NO CONTACT

21     WITH THEM SINCE FEBRUARY OF 2017.  I WAS ASKED TO BE INVOLVED,

22     SO I CAN'T TELL YOU ABOUT CONTRACTS OR ADMINISTRATIVE

23     PURPOSES, SO -- JUST TO BE HONEST.

24     **Q.**  OKAY.

25     **A.**  I ASSUME THAT IS THE CASE BUT I HAVE NOT SEEN THAT.

BOURSIER – RECROSS / HANSEN

1   **Q.**  BUT IT IS YOUR UNDERSTANDING THAT YOU ARE GOING TO BE PAID

2   FOR BOTH PREPARING TESTIMONY AND FOR IN-COURT TESTIMONY,

3   CORRECT?

4   **A.**  YES.

5   **Q.**  AND KELLY HARDWICKE, TOO, IS GOING TO BE PAID FOR BOTH OF

6   THOSE?

7   **A.**  YES.

8   **Q.**  AND THE TOTAL CONTRACT AMOUNT IS ALMOST $17,700, CORRECT?

9   **A.**  AGAIN, I DON'T KNOW.  SINCE I'M NOT PHYSICALLY THERE --

10  I'M NOT TRYING TO BE OBTUSE.  I LIVE IN MORGAN HILL.  THE FIRM

11  IS IN LOS GATOS, AND I DON'T GO BY THOSE OFFICES AND I'M

12  NOT -- I'M NOT -- I DON'T COMMUNICATE WITH ANYBODY THERE --

13  **Q.**  DO --

14  **A.**  -- ON A REGULAR BASIS.  SO I'M SOUNDING IGNORANT BUT I

15  DON'T TRACK ADMINISTRATIVE ACTIONS OF THE COMPANY.

16  **Q.**  THESE ARE --

17  **A.**  I BELIEVE WHAT YOU SAY.

18  **Q.**  DO YOU HAVE ANY REASON TO DISPUTE THAT YOU ARE GOING TO BE

19  PAID FOR YOUR TESTIMONY --

20  **A.**  I DO NOT.  I HOPE.

21  **Q.**  IN THE AMOUNTS THAT WE DISCUSSED?

22  **A.**  AGAIN, THE TOTAL AMOUNTS, I DON'T KNOW THE CONTRACTUAL

23  AMOUNTS, BUT I DON'T DISPUTE I WILL BE PAID.

24  **Q.**  AND ARE YOU AWARE THAT THE BILL WAS SUBMITTED TO THE

25  FEDERAL GOVERNMENT TODAY?

BOURSIER - RECROSS / HANSEN

1    **A.**  I AM NOT AWARE OF THAT, NO.  BECAUSE I -- AS AN ASSOCIATE

2    I SUBMIT MY HOURS ON A MONTHLY BASIS, SO I DON'T KNOW WHAT

3    HAPPENS AFTER THAT.

4    **Q.**  I WANT TO TALK TO YOU ABOUT THIS SOUTHERN BERM, AND THE

5    TESTIMONY TODAY ON REDIRECT THAT YOU SAW FLOW IN THAT DITCH

6    FOR THREE TO FOUR MONTHS.

7        DR. BOURSIER, YOU WOULD AGREE THAT NOWHERE IN ANY OF YOUR

8    REPORTS FROM ALL THE YEARS THAT YOU DOCUMENTED THIS SITE HAVE

9    YOU DOCUMENTED THAT YOU SAW FLOW IN SUCH A DITCH FOR THREE TO

10   FOUR MONTHS, CORRECT?

11   **A.**  I AGREE THAT'S CORRECT.

12   **Q.**  AND NOWHERE IN YOUR REPORTS DID YOU DOCUMENT THE TRIBUTARY

13   THAT YOU IDENTIFIED ON REDIRECT TODAY IN THE NORTHERN AREA

14   UNDER THE PICK 'N PULL, CORRECT?

15   **A.**  THAT'S CORRECT.  COULD I CLARIFY, THOUGH, THERE WAS NO --

16   SINCE WE WEREN'T MAPPING TRIBUTARIES, THERE WAS NO REAL REASON

17   TO DOCUMENT THAT.  WE WERE MAPPING "OTHER WATERS" AND --

18   **Q.**  YOU WERE DOING AN IMPORTANT ANALYSIS FOR YOUR CLIENT,

19   CORRECT?

20   **A.**  YES.

21   **Q.**  THAT WAS THE SOBRATO ORGANIZATION, CORRECT?

22   **A.**  CORRECT.

23   **Q.**  AND THEY WERE PAYING YOU A LOT OF MONEY TO DO THIS

24   DELINEATION, CORRECT?

25   **A.**  THAT'S CORRECT.

BOURSIER – RECROSS / HANSEN

1    **Q.**  AND THEY WANTED TO KNOW ALL THE DETAILS ABOUT THE PROPERTY

2    THAT THEY COULD, CORRECT?

3    **A.**  PERTINENT TO WETLANDS AND "OTHER WATERS", ABSOLUTELY

4    CORRECT.

5    **Q.**  AND THEY WANTED TO KNOW ALL THE FEATURES THAT COULD BE

6    JURISDICTIONAL, CORRECT?

7    **A.**  YES.

8    **Q.**  AND TRIBUTARIES CAN BE JURISDICTIONAL, CORRECT?

9    **A.**  I AM SORRY?

10   **Q.**  TRIBUTARIES CAN BE JURISDICTIONAL AND COVERED UNDER THE

11   CLEAN WATER ACT, CORRECT?

12   **A.**  THAT IS MY UNDERSTANDING.

13   **Q.**  IN FACT, UNDER THE CLEAN WATER ACT, TRIBUTARIES ARE LISTED

14   SEPARATELY -- EXCUSE ME, STRIKE THAT.

15       UNDER THE REGULATIONS TRIBUTARIES ARE LISTED UNDER A

16   SEPARATE SUBSECTION THAN "OTHER WATERS", CORRECT?

17   **A.**  I'LL TAKE YOUR WORD FOR IT.

18   **Q.**  YOU TESTIFIED --

19   **A.**  I HAVE NOT MEMORIZED THAT.

20   **Q.**  BUT YOU TESTIFIED ON DIRECT PRETTY SPECIFICALLY, WHEN

21   MS. LEE REDIRECTED YOU, ABOUT YOUR UNDERSTANDING OF THE

22   DEFINITION LEGALLY OF A TRIBUTARY, CORRECT?

23   **A.**  UH-HUH.

24   **Q.**  SO ARE YOU AWARE THAT UNDER THE CFR COVERING "WATERS OF

25   THE UNITED STATES" THE TERM "OTHER WATERS" IS DEFINED IN

BOURSIER – RECROSS / HANSEN

1   SUBSECTION 3 AND THE TERM "TRIBUTARIES" IS CONTAINED IN

2   SUBSECTION 5?

3   **A.**  IS THAT CORRECT?  I DON'T --

4   **Q.**  WOULD YOU LIKE TO SEE IT?  WOULD THAT REFRESH YOUR

5   RECOLLECTION PERHAPS?

6   **A.**  WELL, I CAN'T CLAIM TO HAVE MEMORIZED OR READ IT IN THE

7   LAST TWO DECADES, BUT, YES.

8   **Q.**  HOLD ON.  I AM GOING TO SHOW YOU A COPY, JUST FOR

9   REFRESHING PURPOSES, OF THE CFR FOR "OTHER WATERS" --

10  **A.**  THIS REFRESHES, AND I AGREE WITH THAT.

11  **Q.**  THEN YOU WOULD AGREE THAT THEY ARE DEFINED IN TWO SEPARATE

12  SUBSECTIONS, CORRECT?

13  **A.**  SOUNDS CORRECT, YES.

14  **Q.**  OKAY.

15  **A.**  AND IT DOES INCLUDE INTERMITTENT STREAMS AND SO FORTH.

16  **Q.**  ONE LAST THING.  THE GOVERNMENT COUNSEL TALKED TO YOU

17  ABOUT YOUR INTERVIEW ON DECEMBER 2ND, 2016, WHEREIN YOU SAID

18  THAT, IF YOU MAPPED IT TODAY, THE AREA IN THE NORTH, YOU WOULD

19  CALL IT WETLANDS.

20      BUT YOU DID NOT SAY IN THAT INTERVIEW, CORRECT, THAT IF

21  YOU MAPPED IT IN 2014, YOU WOULD HAVE -- EXCUSE ME.  STRIKE

22  THAT.

23      YOU DIDN'T SAY THAT IN 2014 THE AREA UNDER THE PICK 'N

24  PULL APPEARED TO BE WETLANDS, CORRECT?

25  **A.**  SO I SAID --

1  **Q.**  IF YOU MAPPED IT TODAY.

2  **A.**  IF I MAPPED IT TODAY, IT WOULD BE WETLAND, YES.

3  **Q.**  IN -- IF YOU MAPPED IT IN 2016, IT WOULD BE WETLAND,

4  CORRECT?

5  **A.**  UH-HUH.

6  **Q.**  BUT NOT IN 2014, CORRECT?  YOU STAND BY THE H.T. HARVEY

7  2014 MAP, CORRECT?

8  **A.**  THAT MAP -- THE 2014 MAP, THE LAST MAP THAT I WOULD STAND

9  BY, AS I SAID EARLIER, IS THE CORPS VERIFIED 2007 MAP.

10  **Q.**  YOU TESTIFIED -- EXCUSE ME.

11      DURING YOUR INTERVIEW WITH THE GOVERNMENT, ISN'T IT TRUE

12  THAT YOU SAID, QUOTE, IN 2016, I WOULD SAY THE "OTHER WATERS"

13  BECAME WETLAND?

14  **A.**  YES.  YEAH.  THAT'S BECAUSE THAT CULVERT WAS FIXED RIGHT

15  DOWN AND PICKLEWEED INVADED.

16  **Q.**  JUST TRYING TO NAIL DOWN THE DATE.  THANK YOU VERY MUCH.

17  **A.**  SORRY TO NOT REMEMBER EVERYTHING.

18          **THE COURT:**  MAY DR. BOURSIER BE EXCUSED?

19          **MS. LEE:**  YES, YOUR HONOR.

20          **THE COURT:**  THANK YOU, DR. BOURSIER.  YOU ARE

21  EXCUSED.

22      THE UNITED STATES MAY CALL ITS NEXT WITNESS.

23          **MS. LEE:**  THE UNITED STATES CALLS DAN MARTEL.

24          **THE CLERK:**  PLEASE COME TO THE WITNESS STAND AND

25  RAISE YOUR RIGHT HAND FOR ME, PLEASE.  I NEED YOU TO STAND AND

BOURSIER – RECROSS / HANSEN

```
1    RAISE YOUR RIGHT HAND FOR ME, PLEASE.

2         (DANIEL MARTEL, CALLED AS A WITNESS FOR THE GOVERNMENT,

3    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

4              THE WITNESS:  I DO.

5              THE CLERK:  YOU MAY BE SEATED AND ONCE SEATED I'M

6    GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

7    LAST NAME FOR THE RECORD, PLEASE.

8              THE WITNESS:  DANIEL MARTEL, D-A-N-I-E-L,

9    M-A-R-T-E-L.

10             THE CLERK:  THANK YOU.

11                     DIRECT EXAMINATION

12   BY MS. LEE:

13   Q.  MR. MARTEL, YOU USED TO WORK FOR THE ARMY CORPS OF

14   ENGINEERS; IS THAT CORRECT?

15   A.  YES.

16   Q.  AND HAVE BEEN RETIRED FOR A FEW YEARS; IS THAT RIGHT?

17   A.  I THINK I RETIRED IN APRIL OF 2012.

18   Q.  OKAY.  HOW LONG DID YOU WORK AT THE ARMY CORPS OF

19   ENGINEERS?

20   A.  APPROXIMATELY 25 YEARS.

21   Q.  FROM WHAT YEAR TO WHAT YEAR?

22   A.  APPROXIMATELY 1988 UNTIL 2012.  AND ALSO I WORKED FOR THE

23   ARMY CORPS IN THE EARLY -- IN THE LATE '70S, I WORKED FOR THEM

24   FOR A SHORT TIME.

25   Q.  WHAT WAS YOUR POSITION AT THE ARMY CORPS OF ENGINEERS?
```

BOURSIER – RECROSS / HANSEN

1  **A.**  MY POSITION WAS –– THE TITLE OF MY POSITION WAS WETLAND

2  SPECIALIST IN THE SAN FRANCISCO DISTRICT, AND ALSO I WAS THE

3  SUBJECT MATTER EXPERT FOR WETLANDS IN THE SOUTH PACIFIC

4  DIVISION, WHICH ENCOMPASSES SAN FRANCISCO, LOS ANGELES,

5  ALBUQUERQUE, AND SACRAMENTO DISTRICTS, WHICH IS –– REACHES

6  MUCH OF THE WESTERN UNITED STATES.

7  **Q.**  CAN YOU DESCRIBE YOUR EDUCATION BACKGROUND?

8  **A.**  I HAVE A BACHELOR'S DEGREE IN BIOLOGY FROM SALEM STATE

9  UNIVERSITY IN SALEM, MASSACHUSETTS, AND VARIOUS TRAINING FROM

10  THE CORPS OF ENGINEERS IN WETLAND AND WETLAND–RELATED

11  SUBJECTS, AND ALSO A LOT OF ACADEMIC WORK.  I WAS ENROLLED IN

12  A GRADUATE PROGRAM AT NORTHEASTERN UNIVERSITY IN BOSTON FOR A

13  WHILE.

14  **Q.**  IN YOUR 25 YEARS AT THE ARMY CORPS OF ENGINEERS,

15  APPROXIMATELY HOW MANY JURISDICTIONAL DETERMINATIONS HAVE YOU

16  MADE?

17  **A.**  I WOULD –– I WOULD GUESS IT IS SOMEPLACE BETWEEN 1200 AND

18  1500, PROBABLY MORE.

19  **Q.**  AND IN TERMS OF THESE DETERMINATIONS, HOW MANY STATES HAVE

20  THEY SPANNED?

21  **A.**  WELL, I DID SOME SPECIAL RESEARCH PROJECTS FOR OUR

22  RESEARCH LABORATORIES MAPPING WETLANDS, SO I PROBABLY HAVE

23  MAPPED WETLANDS IN APPROXIMATELY –– I COUNTED THEM ONCE, THERE

24  WERE 36 DIFFERENT STATES.

25      BUT MOST OF THE WORK THAT I DID WAS IN THE SAN FRANCISCO

1   DISTRICT, WHICH BASICALLY GOES FROM THE OREGON BORDER SOUTH TO

2   SAN LUIS OBISPO AND MOSTLY AROUND -- BETWEEN SANTA ROSA AND

3   SAN JOSE INSIDE ON THE BAY ON THE... OAKLAND SOUTH.

4   **Q.**   AND WE'VE SPOKEN -- THERE'S BEEN MENTION ABOUT --

5   WITHDRAWN.

6        ARE YOU -- DO YOU KNOW OF THE 1987 ARMY CORPS OF ENGINEERS

7   MANUAL FOR WETLAND DELINEATIONS?

8   **A.**   YES.

9   **Q.**   WHAT ABOUT THE ARID WEST REGIONAL SUPPLEMENT?

10  **A.**   YES.  THE CORPS OF '87 WETLANDS DELINEATION MANUAL WAS THE

11  BASIC STANDARD THAT THE CORPS USED TO DELINEATE WETLANDS FOR

12  SECTION 404 OF THE CLEAN WATER ACT FOR PERMITTING PURPOSES.

13       SO THAT SOMEBODY WOULD -- COULD UNDERSTAND -- IF THEY

14  OWNED A PROPERTY AND THEY NEEDED A 404 PERMIT, WHAT THE SIZE

15  OF THE PROPERTY -- WHAT THE IMPACT WOULD BE, THE SIZE OF IT.

16       SO IF THE PROPERTY WAS 10 ACRES AND THEY HAD 1 ACRE OF

17  WETLAND, THEY WOULD CLARIFY EXACTLY HOW MUCH NEEDED TO BE

18  PERMITTED.  ONLY THE WETLANDS NEEDED TO BE PERMITTED.  AND --

19  **Q.**   MR. MARTEL, I WILL STOP YOU THERE FOR A SECOND, IF YOU

20  DON'T MIND.

21       DID YOU HAVE A HAND IN DRAFTING ANY OF THE MANUAL OR THE

22  REGIONAL SUPPLEMENT?

23  **A.**   YES.  SO THE SUPPLEMENTS TO THE '87 MANUAL WERE BEGUN

24  AROUND THE YEAR 2000.  AND ALTOGETHER THERE WERE TEN DIFFERENT

25  SUPPLEMENTS.  WHAT THEY WERE, THEY WERE TRYING TO REGIONALIZE

BOURSIER – RECROSS / HANSEN

1    THE DELINEATION MANUALS SO THEY WOULD BE MORE SPECIFIC TO

2    LOCAL CLIMATIC CONDITIONS AND PLANT CONDITIONS.

3        AND SO I WAS INVOLVED IN TWO COMMITTEES.  ONE WAS A

4    NATIONAL COMMITTEE TO WRITE AND EDIT THE REGIONAL -- THE TEN

5    REGIONAL MANUALS THAT WERE CONSTRUCTED AND I WAS ALSO ON THE

6    REGIONAL COMMITTING FOR THE ARID WEST TO WRITE AND EDIT THAT.

7    THAT WAS FINISHED IN ABOUT 2006, I BELIEVE, IN A DRAFT FORM.

8        AND IT WAS -- IT SET THE STANDARD FOR HOW WETLANDS WERE

9    DELINEATED, WHAT THE TECHNICAL STANDARDS AND THINGS THAT

10   NEEDED TO BE LOOKED FOR IN TERMS OF RELATED TO WETLAND

11   IDENTIFICATION.  MOSTLY PLANTS, SOIL, AND HYDROLOGY

12   CONSIDERATIONS.

13        **MS. LEE:**  YOUR HONOR, AT THIS TIME I WOULD LIKE TO

14   QUALIFIED MR. MARTEL AS AN EXPERT IN MAKING JURISDICTIONAL

15   DETERMINATIONS OF "WATERS OF THE UNITED STATES" IN WETLAND

16   SCIENCE, AND WITH RESPECT TO ALSO PLANT IDENTIFICATION, SOIL

17   SCIENCE, AND HYDROLOGY AS IT RELATES TO MAKING WETLAND

18   DELINEATIONS.

19        **MS. HANSEN:**  NO OBJECTION.

20        **THE COURT:**  ALL RIGHT.  SO, LADIES AND GENTLEMEN,

21   MR. MARTEL WILL BE PERMITTED TO OFFER HIS OPINIONS REGARDING

22   THOSE SUBJECT MATTER AREAS AND THE BASES FOR THOSE OPINIONS.

23   **BY MS. LEE:**

24   Q.  MR. MARTEL, IS THE ARMY CORPS OF ENGINEERS THE ONLY

25   FEDERAL AGENCY THAT HAS THE POWER TO ISSUE A PERMIT ENABLING

1  SOMEONE TO DISCHARGE FILL MATERIAL INTO A "WATER OF THE UNITED

2  STATES"?

3  **A.**  YES.

4  **Q.**  WHAT IS YOUR UNDERSTANDING OF WHAT A "WATER OF THE UNITED

5  STATES" IS?

6  **A.**  A "WATER OF THE UNITED STATES" -- WELL, THERE ARE A COUPLE

7  OF DIFFERENT CATEGORIES.

8      "WATER OF THE UNITED STATES", IT CAN BE EITHER WETLANDS OR

9  "OTHER WATERS".  THOSE WOULD BE PLACES WHERE WATER HAS AN

10  OVERRIDING EFFECT.  AND THEY LEAVE A MARK, WHAT IS CALLED A

11  WATER MARK WHICH IDENTIFIES THE EXTENT, THE LATERAL EXTENT OF

12  WHERE THE WATER WAS DURING THE TIME OF YEAR.

13      THEY DON'T QUITE MAKE THE GRADE OF WETLANDS BECAUSE THEY

14  USUALLY DON'T HAVE A VEGETATIVE COMMUNITY, WHICH IS REQUIRED

15  FOR IT TO BE CONSIDERED A WETLAND.  SO IF IT'S A POND AND IT

16  DROWNS OUT THE VEGETATION, IT'S REGULATED AS A "WATER OF THE

17  UNITED STATES" AS AN "OTHER WATER" RATHER THAN AS A WETLAND.

18  AND THEY ALSO INCLUDE OTHER THINGS LIKE TIDAL WATERS, STREAMS,

19  LAKES, INTERMITTENT STREAMS, PERENNIAL STREAMS.

20  **Q.**  I WILL STOP YOU THERE.

21      I WOULD LIKE TO JUST ASK YOU ABOUT A FEW OF THOSE

22  CATEGORIES.  ARE WETLANDS ADJACENT TO A TRADITIONAL NAVIGABLE

23  WATER A "WATER OF THE UNITED STATES"?

24  **A.**  YES.

25  **Q.**  ARE SEASONAL WETLANDS ADJACENT TO A TRADITIONAL AND

1    NAVIGABLE WATER A "WATER OF THE UNITED STATES"?

2    **A.**   YES.

3    **Q.**   ARE TRIBUTARIES THAT CONTRIBUTE FLOW TO A TRADITIONAL

4    NAVIGABLE WATER A "WATER OF THE UNITED STATES"?

5    **A.**   YES.

6    **Q.**   ARE SEASONAL TRIBUTARIES, MEANING THEY RUN FOR AT LEAST

7    THREE MONTHS OF THE YEAR, ARE SEASONAL TRIBUTARIES THAT

8    CONTRIBUTE FLOW TO A TRADITIONAL NAVIGABLE WATER A "WATER OF

9    THE UNITED STATES"?

10   **A.**   YES.

11   **Q.**   ARE THOSE CATEGORIES THAT I MENTIONED CONSIDERED

12   CATEGORICAL "WATERS OF THE UNITED STATES"?

13   **A.**   YES.   UNDER THE TERMS OF THE RAPANOS WORKSHEET, THEY DON'T

14   REQUIRE FURTHER INVESTIGATION.   THEY ARE JURISDICTIONAL.

15   **Q.**   SO WHAT DOES IT MEAN FOR SOMETHING TO BE CATEGORICALLY A

16   "WATER OF THE UNITED STATES"?   SPECIFICALLY, WHAT NEXT STEPS

17   WOULD HAVE TO BE DONE FOR A WATER THAT IS NOT CATEGORICALLY A

18   "WATER OF THE UNITED STATES"?

19   **A.**   THERE COULD BE FURTHER TESTING REQUIRED, AND THAT WOULD BE

20   TO DETERMINE WHETHER OR NOT IT HAS AN AFFECT ON THE

21   TRADITIONAL NAVIGABLE WATER, THE SIGNIFICANT NEXUS BETWEEN THE

22   WETLAND IN QUESTION AND A TRADITIONAL NAVIGABLE WATER OR, AS

23   THEY WOULD TERM IT, AN AQUATIC RESOURCE IN QUESTION.

24   **Q.**   BUT DURING YOUR TIME, 25 YEARS AT THE ARMY CORPS OF

25   ENGINEERS, IS IT YOUR OPINION THAT IF YOU ARE WITHIN THE

BOURSIER – RECROSS / HANSEN

1    CATEGORICAL CATEGORY, THAT IT ENDS THERE?  THOSE ARE "WATERS

2    OF THE UNITED STATES", YOU DON'T NEED TO TAKE THE NEXT STEPS

3    OF GOING TO A CASE-BY-CASE SIGNIFICANT NEXUS DETERMINATION?

4    **A.**  WELL, I THINK THE EVALUATION AND THE IDENTIFICATION PART

5    OF THE PROCESS IS DETERMINING THAT THEY ARE ONE OF THOSE

6    CATEGORIES OF THINGS THAT DON'T REQUIRE FURTHER TESTING.  AND

7    AS SUCH, THAT YOU'VE ESTABLISHED THE FACT THAT THEY MEET THE

8    CRITERIA FOR WATERS OF WETLANDS AND THAT THEY ARE ONE OF THOSE

9    CATEGORIES THAT DON'T REQUIRE FURTHER TESTING, YES.

10   **Q.**  THOSE CATEGORIES I MENTIONED EARLIER ARE CATEGORICAL?

11   **A.**  YES.

12   **Q.**  YOU ARE FROM THE ARMY CORPS OF ENGINEERS.  YOU ARE THE

13   REGULATORY AGENCY IN MAKING THESE DETERMINATIONS.  I WOULD

14   LIKE TO ASK YOU YOUR OPINION ON WHAT SOME OF THESE TERMS MEAN.

15       WHAT IS A WETLAND?

16   **A.**  SIMPLY PUT, A WETLAND IS A PLACE WHERE WATER SITS IN OR ON

17   THE GROUND FOR A LONG ENOUGH PERIOD OF TIME TO CAUSE CHANGES

18   IN THE SOIL, IN THE SOIL CHEMISTRY, WHICH IN TURN CHANGES THE

19   TYPES OF PLANTS THAT CAN SURVIVE IN THAT ENVIRONMENT.

20       SO THAT THE WATER -- THE CAUSE, THE FORCE OF THE WHOLE

21   THING HAS TO BE THERE, IT HAS TO BE THERE LONG ENOUGH.  AND

22   FREQUENTLY THEY LEAVE TALL TALE SIGNS, THERE ARE VISUAL CLUES

23   LEFT ON THE SURFACE OR IN THE SOIL BESIDES THE PLANT

24   COMMUNITY.

25       SO TYPICALLY PLACES GET SATURATED LONG ENOUGH, CREATE

BOURSIER – RECROSS / HANSEN

1   CONDITIONS FOR A SPECIFIC KINDS OF PLANTS THAT ARE KNOWN TO

2   OCCUR UNDER THOSE CONDITIONS, AND SO WE EVALUATE THE PLANT

3   COMMUNITY TO MAKE SURE THAT THEY ARE ADAPTED FOR LIFE IN

4   SATURATED SOILS.

5   **Q.**  MR. MARTEL, WHAT IS A TRIBUTARY?

6   **A.**  A TRIBUTARY, AS I UNDERSTAND IT, IS A CONVEYANCE.  IT IS A

7   PLACE WHERE TYPICALLY WATER TRAVELS FROM POINT A TO POINT B IN

8   THE TRIBUTARY SYSTEM.

9       IF IT HAS AN ORDINARY HIGH WATER MARK AND IT MEETS THE

10  CRITERIA FOR A "WATER OF THE UNITED STATES", IT COULD

11  POTENTIALLY BE JURISDICTIONAL AND FUNCTION AS A TRIBUTARY.  SO

12  WATER MOVES THROUGH IT, IT MAKES IT THROUGH A TRIBUTARY.  IT

13  IS TRIBUTARY TO SOMETHING.  SO IT'S A CONVEYANCE.

14  **Q.**  COULD A DRAINAGE DITCH THAT CONTRIBUTES FLOW THAT GOES OUT

15  TO A TRADITIONAL NAVIGABLE WATER, COULD THAT BE CONSIDERED A

16  TRIBUTARY THAT IS A JURISDICTIONAL "WATER OF THE UNITED

17  STATES"?

18  **A.**  ABSOLUTELY.

19  **Q.**  WHAT IS A TRADITIONAL NAVIGABLE WATER?

20  **A.**  AS I UNDERSTAND IT, TRADITIONAL NAVIGABLE WATER WOULD BE

21  WATER THAT IS INVOLVED IN COMMERCE, TYPICALLY THOUGHT OF AS

22  THINGS LIKE TIDAL WATERS, THINGS THAT ARE -- WATERS -- EXPOSED

23  TO THE EBB AND FLOW OF THE TIDES SO IT RISES AND FALLS WITH

24  THE TIDES.  BUT IT COULD ALSO BE A LAKE WHERE THERE IS

25  COMMERCE.  INTERSTATE COMMERCE IS INVOLVED, AND THAT WOULD BE

1    A TRADITIONAL NAVIGABLE WATER ALSO.

2    Q.   WE'VE TALKED ABOUT ADJACENT WETLANDS.  WHAT IS ADJACENT

3    MEAN?

4    A.   ADJACENT IS DEFINED IN THE CLEAN WATER ACT REGULATIONS AS

5    BEING... BORDERING, NEIGHBORING, OR CONTIGUOUS IN THE SENSE OF

6    NEIGHBORING BEING CLOSE ENOUGH TO HAVE AN EFFECT UPON SO THAT

7    THERE'S AN INTERACTION BETWEEN ONE SYSTEM AND THE OTHER.

8         BORDERING WOULD BE THAT IT WOULD TOUCH UPON THE EDGE OF A

9    SYSTEM.

10        AND CONTIGUOUS IT WOULD BE ALONG THE SYSTEM FOR A LONG

11   PERIOD OF TIME.

12        ALSO IN THE CONCEPT OF ADJACENCY, MAN-MADE STRUCTURES DO

13   NOT CHANGE OR DO NOT OBLITERATE ADJACENCY.  SO IF YOU HAVE A

14   WETLAND THAT IS... BUMPS UP AGAINST A MAN MADE STRUCTURE LIKE

15   A LEVEE OR A DIKE, AND ON THE OTHER SIDE IS A TRADITIONAL

16   NAVIGABLE WATER, THAT LEVEE OR DIKE WOULD NOT EXTINGUISH THE

17   ADJACENCY BETWEEN THAT WETLAND IN THAT TRADITIONAL NAVIGABLE

18   WATER.

19   Q.   WHAT DOES IT MEAN FOR SOMETHING TO BE SEASONAL?

20   A.   SEASONAL, ONE OF THE MAJOR CONSIDERATIONS IN THE REGIONAL

21   SUPPLEMENT FOR THE ARID WEST IS THAT WHEN YOU ARE IN A CLIMATE

22   WHERE THE PRECIPITATION COMES IN A SEASONAL BASIS, TYPICALLY

23   AROUND HERE IT'S FROM OCTOBER THROUGH APRIL, AND FREQUENTLY

24   BETWEEN APRIL AND OCTOBER IT DOESN'T RAIN AT ALL, SO THAT YOU

25   WOULD END UP TO A SEASONALITY TO THE WETLANDS.

BOURSIER – RECROSS / HANSEN

1    SO PLACES THAT POND OR SATURATE IN THE SOIL DURING THE

2    WETTER PORTION OF THE YEAR MAY NOT SHOW THOSE SAME

3    CHARACTERISTICS OF HYDROLOGY DURING THE DRYER PARTS OF THE

4    YEAR WHEN THE EVAPORATION EXCEEDS THE PRECIPITATION.

5    **Q.**  DURING THOSE DRY PARTS OF THE YEAR, IS THAT SEASONAL

6    WETLAND STILL CONSIDERED A WETLAND?

7    **A.**  YES.  FOR A WETLAND TO BE CONSIDERED, IT NEEDS TO MEET THE

8    CRITERIA FOR WETLANDS DURING ANY PORTION OF THE GROWING

9    SEASON.

10    AND IN THIS CLIMATE AROUND HERE, THE SAN FRANCISCO BAY

11    AREA, IT'S CONSIDERED A MEDITERRANEAN-TYPE CLIMATE.  IT IS

12    TYPICALLY... WOULD -- YOU WOULD NOT EXPECT TO SEE WETLAND

13    CONDITIONS THROUGH THE DRYER MONTHS, FROM APRIL THROUGH

14    OCTOBER.  THEY FREQUENTLY WOULD NOT EXIST.  BUT AS LONG AS

15    THEY MEET THOSE CRITERIA DURING THE WET PORTION OF THE YEAR

16    WHILE IT'S IN THE GROWING SEASON, IT'S CONSIDERED A WETLAND

17    YEAR ROUND.

18    **Q.**  IN ORDER FOR SOMEONE TO DISCHARGE FILL MATERIAL IN A

19    JURISDICTIONAL WETLAND OR A "WATERS OF THE UNITED STATES",

20    THEY NEED A PERMIT FROM THE ARMY CORPS OF ENGINEERS, RIGHT?

21    **A.**  YES.

22    **Q.**  SO I WANT TO TALK ABOUT WHAT IS FILL MATERIAL.

23    **A.**  FILL MATERIAL IS GENERALLY CONSIDERED TO BE EARTHEN

24    MATERIAL, DIRT, SAND, ROCKS, CONCRETE, RUBBLE.  EFFECTIVELY

25    ANYTHING THAT HAS THE CAPACITY TO RAISE THE ELEVATION OF THE

1    GROUND SO THAT THE GROUND SURFACE HAS BEEN RAISED BY A

2    DISCHARGE OF MATERIAL.

3    **Q.**  THAT COULD INCLUDE DIRT?

4    **A.**  WOULD INCLUDE DIRT, YES.

5    **Q.**  AND IS FILL MATERIAL A TYPE OF POLLUTANT?

6    **A.**  IT CAN BE, YES.

7    **Q.**  I WOULD LIKE TO TAKE YOU TO YOUR WORK THAT YOU'VE DONE ON

8    NEWARK AREA 4.  SPECIFICALLY, I WOULD LIKE TO TAKE YOU TO

9    2007, IN WHICH AND YOU WORKED OFF OF REPORTS, RESEARCH

10   MAPPING, DONE BY H.T. HARVEY, AND WHICH H.T. HARVEY PROPOSED

11   WHAT THEY BELIEVED TO BE POTENTIAL WATERS OF THE UNITED

12   STATES.

13       YOU WENT TO GO AND VERIFY THEIR WORK; IS THAT CORRECT?

14   **A.**  YES.

15   **Q.**  YOU WENT ON AUGUST 8TH OF 2007 AND AUGUST 14TH OF 2007; IS

16   THAT RIGHT?

17   **A.**  YES.

18   **Q.**  PRIOR TO GOING ON THOSE TWO DATES, WHAT TYPE OF BACKWORK

19   DID YOU DO TO FAMILIARIZE YOURSELF WITH THAT PROPERTY?

20   **A.**  SO THE NORMAL COURSE OF AFFAIRS IS AN APPLICANT WHO WANTS

21   A DELINEATION ON A PROPERTY WOULD CONTRACT A CONSULTING FIRM

22   TO PUT TOGETHER THE INFORMATION, DO THE TESTING, LOCATE SOILS,

23   VEGETATION, AND HYDROLOGY, THE ISSUES AROUND WETLANDS, PREPARE

24   MAPS THAT WOULD SHOW WHERE AREAS THAT MEET THE CRITERIA OF

25   "WATERS OF THE UNITED STATES", THOSE WOULD INCLUDE "OTHER

1   WATERS" CONSIDERATIONS AND ALSO WETLANDS, TIDAL WATERS,

2   WHATEVER IS OUT THERE.

3      THEY WOULD DOCUMENT THOSE AND THEY WOULD MAP THOSE, DO ALL

4   THE TESTING TO SUPPORT THE DETERMINATION THAT AN AREA WAS A

5   WETLAND OR AN AREA WAS AN UPLAND.  SO THEY WOULD DO SAMPLING

6   IN THOSE KINDS OF AREAS TO TRY TO CHARACTERIZE THE CONDITIONS.

7      THEY WOULD PREPARE ALL THAT MATERIAL AND SUBMIT IT TO THE

8   AGENCY.  AND THEN THE AGENCY WOULD REVIEW IT TO MAKE SURE THAT

9   IT WAS COMPLETE AND, YOU KNOW, LIKELY TO BE A USEFUL DOCUMENT

10  TO TRY TO WORK IT THROUGH.

11     AND THEN WE WOULD LOOK AT ADDITIONAL AERIAL PHOTOGRAPHY.

12  WE HAD LIBRARIES OF AERIAL PHOTOGRAPHS SO THAT WE COULD PULL

13  THE PHOTOGRAPHS FROM THAT PARTICULAR SITE AND BE ABLE TO SEE

14  IMAGES OF WHAT IT LOOKS LIKE DURING VARIOUS PARTS OF THE AREA.

15     WE WOULD REVIEW THEIR REPORT, LOOK FOR WHETHER OR NOT THE

16  MATERIAL WAS COMPLETE, AND MADE SENSE.  AND THEN WE WOULD

17  SCHEDULE A SITE VISIT TO GO OUT.  AND THE PURPOSE WAS TO TRY

18  TO DETERMINE IF THE SUBMITTAL WAS A REASONABLE REPRESENTATION

19  OF THE EXTENT OF WETLANDS AND WATERS ON THE PROPERTY.

20     SO THERE WERE BASICALLY DOING A PROPOSED MAP, AND THEN WE

21  WOULD GO OUT AND EVALUATE IT TO SEE WHETHER OR NOT IT

22  REFLECTED THE REAL CONDITIONS THAT WERE OUT THERE.

23     WE DID THAT THROUGH -- THE CORPS WOULD DO THAT THROUGH A

24  SMALLER AMOUNT OF SAMPLING.  SO WE WOULD RECOVER SOME OF THE

25  BOUNDARIES THAT THEY WERE PROPOSING, DO A SMALL AMOUNT OF

1    SAMPLING, AND COMPARE IT TO THE SAMPLING THAT THEY WERE

2    PRESENTING IN THEIR DOCUMENT, AND SEE WHETHER OR NOT THOSE

3    THINGS WERE REASONABLE, AND LOOK FOR THE VISUAL CLUES THAT

4    WOULD HELP US BE ABLE TO MANEUVER ACROSS THE BOUNDARY.  AND ON

5    OUR SITE, THERE IS A LOT OF DIFFERENT CHANGES THAT OCCUR OVER

6    THE BREADTH OF THE PROPERTY.

7        SO YOU WOULD BASICALLY TRY TO FINE THE LINE AND FOLLOW IT

8    AROUND AND MAKE SURE THAT IT WAS A REASONABLE REPRESENTATION

9    OF THE WETLAND CRITERIA AND THAT IT WASN'T OVER MAPPED OR

10   UNDER MAPPED.  WE WERE LOOKING TO GET THE THING RIGHT.

11       SO THAT WOULD BE THE BASIC, THE BASIC PLAN.

12   **Q.**  I WOULD LIKE TO SHOW YOU YOUR FIELD MAP, WHICH IS THE

13   MAP -- IT'S THE MAP -- H.T. HARVEY THAT YOU WENT ONTO THE SITE

14   WITH IN AUGUST OF '07 AND YOU WROTE YOUR OWN NOTES ONTO THAT

15   MAP TO VERIFY THE ACCURACY OF HARVEY'S WORK; IS THAT CORRECT?

16   **A.**  YES.

17   **Q.**  THIS IS EXHIBIT 180.

18                  (PAUSE IN THE PROCEEDINGS.)

19                  (EXHIBIT HANDED TO WITNESS.)

20       MR. MARTEL, IS THIS YOUR FIELD MAP?

21   **A.**  IT APPEARS TO BE, YES.

22           **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBIT 180 INTO

23   EVIDENCE.

24           **MS. HANSEN:**  NO OBJECTION.

25           **THE COURT:**  180 IS ADMITTED.

1          (GOVERNMENT'S EXHIBIT 180 RECEIVED IN EVIDENCE)

2              **MS. HANSEN:**  THE ORIGINAL OR THE PAPER COPY?

3            **THE COURT:**  ARE YOU SEEING TO ADMIT THE BLOWUP AS

4    WELL?

5              **MS. LEE:**  YES.  WE'LL ADMIT THE BLOWUP AS WELL, WHICH

6    IS EXHIBIT 180.

7              **THE COURT:**  I SEE.  THE BLOWUP ITSELF IS EXHIBIT 180?

8              **MS. HANSEN:**  YES.

9              **MS. LEE:**  YES.

10             **MS. HANSEN:**  THAT IS THE ORIGINAL MAP.

11   **BY MS. LEE:**

12   **Q.**  SO, MR. MARTEL, THIS IS JUST A BLOWUP OF THE MAP.  IT

13   MIGHT ACTUALLY JUST BE EASIER FOR YOU TO SEE IT ON YOUR

14   SCREEN, FRANKLY.

15             (PAUSE IN THE PROCEEDINGS.)

16       MR. MARTEL, CAN YOU WALK US THROUGH WHAT YOU DID IN AUGUST

17   OF '07, KIND OF USING YOUR FIELD MAP AS A GUIDEPOST FOR YOU,

18   WHAT YOU DID TO VERIFY H.T. HARVEY'S PROPOSED DELINEATION OF

19   WHERE THEY THOUGHT POTENTIAL JURISDICTIONAL WETLANDS AND

20   "OTHER WATERS" WERE ON THE SITE?

21   **A.**  YES.  OKAY.

22       SO WHAT I BASICALLY DID WAS TO TRY TO GET SOME KIND OF

23   CONTROL OVER SUCH A BIG SITE WITH A LOT OF DIFFERENT FIELDS ON

24   IT, I LABELED THE FIELDS ALPHABETICALLY, A, B, C, D, E, F, G,

25   H.  THAT WAY I WOULD KNOW WHERE I WAS WORKING FROM SO I COULD

1    KEEP TRACK OF THAT.

2        WHAT I WOULD DO -- SO THIS WAS THE PROPOSED MAP THAT CAME

3    IN FROM HARVEY.  THIS IS WHAT THEY WERE BASICALLY SUBMITTING

4    AS THE VISUAL REPRESENTATION OF THE EXTENT OF WETLANDS AND

5    WATERS.

6        SO WE WOULD TAKE THIS AND ON THIS MAP IT MAY BE DIFFICULT

7    TO SEE, BUT THERE ARE... THERE ARE NUMEROUS POINTS WHERE

8    HARVEY HAD DONE SAMPLING, WHERE THEY DID SAMPLES FOR WETLANDS,

9    WHERE THEY EVALUATE SOILS AND VEGETATION AND HYDROLOGY FROM

10   SPECIFIC POINTS IN THE GROUND.  AND THOSE ARE ALL LABELED.

11   AND I THINK THERE WAS SOME PLACE IN THE ORDER OF 80 DIFFERENT

12   SAMPLE POINTS THEY DID.  SOMETHING LIKE THAT.  IT WAS A NUMBER

13   LIKE THAT.

14       THEY WERE MEANT TO BASICALLY GO UP A TOPOGRAPHIC GRADIENT.

15   SO FROM LOW GROUND TO HIGH GROUND OR FROM HIGH GROUND TO LOW

16   GROUND, BUT BASICALLY GO UP PERPENDICULAR TO THE GRADIENT AND

17   SAMPLE ALONG THE WAY AT VARIOUS INTERVALS TO TRY TO FIND WHERE

18   THE CHANGES WERE, WHERE A PLACE WOULD GO CLEARLY NOT BEING A

19   WETLAND BECAUSE IT DIDN'T VERY HYDRIC SOILS -- WETLAND

20   HYDROLOGY OR HYDROPHYTIC VEGETATION DOWN THAT GRADIENT UNTIL

21   THEY BEGAN TO INTERCEPT PLACES THAT WOULD HAVE HYDROPHYTIC

22   PLANTS BUT NOT WETLAND HYDROLOGY.  STILL NOT A WETLAND.

23   FURTHER DOWN, A LITTLE BIT FURTHER, UNTIL ALL THREE CRITERIA

24   WERE MET, SOILS, VEGETATION, HYDROLOGY, AND THAT WAY THEY

25   COULD BEGIN TO GET CLOSER TO WHERE THE BOUNDARY WAS.

1       SO IF YOU HAD TWO SAMPLE POINTS, ONE THAT WAS IN A WETLAND

2   AND ONE THAT WAS OUTSIDE OF A WETLAND ALONG THE TOPOGRAPHIC

3   GRADIENT, YOU CAN THEN GO BETWEEN THOSE TWO LOCATIONS AND TRY

4   TO FIND OUT THE EXACT PLACE WHERE THOSE THINGS CHANGED.

5       SO THAT'S THE SORT OF STANDARD THAT WE USED TO DO THIS

6   KIND OF WORK.  AND HARVEY WOULD GO AND THEY WOULD DO THESE

7   TRANSECTS ACROSS THE PROPERTIES.

8       AND BY LOCATING THE BOUNDARY, THEY WOULD THEN BEGIN TO

9   HAVE A WAY TO CREATE BOUNDARY LINES.  SO THE MAPS, ON THESE

10  MAPS THE PLACES THAT SHOW UP IN GREEN ARE THE WET ONES.  SO

11  THEY COULD BEGIN TO PUT CONTOURS OF WHERE THOSE BOUNDARIES

12  WERE.

13      SO MY JOB WAS TO RECOVER THOSE SAMPLE POINTS THAT THEY HAD

14  SUBMITTED, CHECK THEM FOR ACCURACY TO DETERMINE IF THE

15  INFORMATION THAT WAS CONTAINED IN THOSE SAMPLE SHEETS WAS

16  CORRECT IN TERMS OF ITS IDENTIFICATION OF SOILS, VEGETATION,

17  AND HYDROLOGY.

18      AND I ALSO, MY WAY OF DOING IT, TO DO THE VERIFICATIONS

19  WERE TO DO SAMPLE POINTS THEMSELVES.  SO I WOULD DO SOME

20  SCATTERED SAMPLE POINTS ACROSS THE SITE AS PART OF THE

21  DOCUMENTATION FOR THE REASONABLE INTERPRETATION PIECE OF THIS.

22      SO I WOULD GO TO VARIOUS AREAS.  I THINK I DID TEN SAMPLE

23  POINTS ACROSS THE SITE, AND THEY ARE NUMBERED ON HERE.  I

24  WOULD LOCATE THEM ON THE MAP.  I DON'T KNOW IF YOU CAN SEE

25  THEM.  BUT THEY ARE NUMBERED ON THE MAP.  SO I DID TEN FULL

BOURSIER – RECROSS / HANSEN

1    SAMPLE POINTS WHICH EVALUATED SOILS, VEGETATION, AND

2    HYDROLOGY.

3         PLUS I DID NUMEROUS SAMPLING POINTS WHERE I ONLY LOOKED AT

4    ONE OR TWO OF THE WETLAND CRITERIA TRYING TO ESTABLISH WHERE

5    THOSE BOUNDARY POINTS WERE RATHER THAN DOING AN INORDINATE

6    NUMBER OF TESTS, BASICALLY HONING IN ON THE PLACES WHERE THE

7    TESTS WERE IMPORTANT.  SO WE CALL THEM OBSERVATION POINTS

8    RATHER THAN SAMPLE POINTS.

9         SO ACROSS THE SITE, I DID A WHOLE NUMBER OF SAMPLE

10   POINTS -- I MEAN OBSERVATION POINTS, MOST OF WHICH ARE NOTED

11   ON THIS MAP.  BUT BECAUSE OF THE SCALE OF IT, YOU CAN'T READ,

12   BUT THERE'S A LOT OF INFORMATION I WOULD PUT DOWN HERE TO HELP

13   SUPPORT THE MAP AS IT WAS PRESENTED OR HELP SUPPORT THE NEED

14   FOR CHANGING THE MAP TO GET IT CORRECTED.

15        SO --

16   **Q.**  STOP YOU RIGHT THERE AND TAKE THIS DOWN.

17        SO OVER THE COURSE OF TWO DAYS IN AUGUST OF '07, YOU WENT

18   OUT AND SAMPLED TEN DIFFERENT SAMPLING POINTS; IS THAT

19   CORRECT?

20   **A.**  YES.

21   **Q.**  AND YOU WOULD SAMPLE THOSE POINTS AND LOOK FOR INDICATORS

22   OF WETLAND VEGETATION, WETLAND SOILS, AND INDICATORS OF

23   HYDROLOGY?

24   **A.**  YES.

25   **Q.**  IN ADDITION TO THOSE TEN SAMPLING POINTS, YOU ALSO

BOURSIER - RECROSS / HANSEN

1    INDICATED THAT YOU HAD DONE OBSERVATION POINTS?

2        HOW MANY OBSERVATION POINTS DID YOU DO?

3    **A.**  I WOULD GUESS THERE'S AT LEAST 30 TO 35 OR 40.  AND THEY

4    WEREN'T FULL-BLOWN SAMPLE POINTS.  I DIDN'T LOOK AT ALL THREE

5    CRITERIA; I WOULD JUST BE LOOKING AT ONE OR POSSIBLY TWO OF

6    THOSE CRITERIA.

7        IT MEANT TO HELP HONE IN ON THE VISUAL CLUES THAT WE

8    NEEDED TO GET THE MAP COMPLETED AND ALSO TO HELP UNDERSTAND,

9    YOU KNOW, WHAT CONSTITUTED A WETLAND AND WHATNOT.

10        SO, AGAIN, THOSE ARE JUST SCATTERED AROUND IN PLACES WHERE

11   IT LOOKED LIKE IT WAS IMPORTANT TO GET INFORMATION TO HELP

12   RESOLVE THE WHOLE ISSUE OF MAKING THE MAP A REASONABLE

13   INTERPRETATION.

14   **Q.**  AND WOULD YOU STRATEGICALLY CHOOSE OBSERVATION AND

15   SAMPLING POINTS AT AREAS THAT DEMARCATED ALMOST A BOUNDARY

16   POINT FROM UPLAND TO WETLAND TO KIND OF CONFIRM THE DIFFERENCE

17   BETWEEN WHY SOMETHING WOULD BE, LET'S SAY, YELLOW VERSUS

18   GREEN?

19   **A.**  YES.  LIKELY.  BUT ALSO OCCASIONALLY THEY WOULD ALSO DO

20   OTHER SAMPLING POINTS THAT WOULD HELP IF WE WERE LOOKING FOR

21   SOME OTHER -- TRYING TO DESCRIBE SOME OF THE FUNCTIONAL

22   CAPACITIES OF THOSE WETLAND.  SO WE WOULD ALSO LOOK AT A PIECE

23   THAT MAYBE WASN'T REALLY IN QUESTION ABOUT IT WHETHER OR NOT

24   IT MET THE CRITERIA FOR WETLANDS OR WATERS, BUT FOR SOME OTHER

25   REASON IT WOULD HELP THINK ABOUT SOME OF THE FUNCTIONAL

BOURSIER – RECROSS / HANSEN

1    CAPACITIES.

2    **Q.**   JUST SPEAKING ABOUT THE WETLANDS PORTION, THE GREEN PART

3    OF THIS MAP, BASED ON THE WORK THAT YOU DID THOSE TWO DAYS AND

4    THE STUDY OF THE SITE YOU DID LEADING UP TO GOING TO THE SITE

5    ON THOSE TWO DAYS, DID YOU COME TO A DETERMINATION ON WHETHER

6    THESE GREEN AREAS WERE JURISDICTIONAL WETLANDS OF THE UNITED

7    STATES?

8    **A.**   YES.   BASED ON THE MATERIAL THAT WAS SUPPLIED AND THE

9    FIELD SAMPLING, YES.

10   **Q.**   AND, HENCE, TO DUMP MATERIAL ON PARTS THAT ARE GREEN IN

11   THIS MAP WOULD REQUIRE A PERMIT; IS THAT CORRECT?

12   **A.**   YES.

13   **Q.**   AND WITHOUT A PERMIT, IT WOULD BE IN VIOLATION OF THE

14   CLEAN WATER ACT?

15   **A.**   YES.

16   **Q.**   AND IS IT THE ARMY CORPS OF ENGINEERS THAT HAS

17   JURISDICTION TO ADMINISTER THE CLEAN WATER ACT?

18   **A.**   IN CONJUNCTION WITH EPA, YES.

19   **Q.**   WHEN YOU WENT OUT THERE AGAIN, AND I AM FOCUSING ON THE

20   GREEN AREAS ON THE MAP, DID YOU ADD ANY AREAS OF WETLANDS TO

21   HARVEY'S WORK?

22   **A.**   YES.   I ADDED ONE, TWO, THREE, I THINK FOUR SMALL PORTIONS

23   THAT WERE CONTINUATIONS OF THINGS THAT WERE ALREADY MAPPED.

24   **Q.**   WOULD YOU BE ABLE TO GET UP AND INDICATE WHERE YOU ADDED

25   THINGS?

```
1    A.  SURE.

2              THE COURT:  THIS IS PROBABLY A GOOD BREAK POINT.  WE

3    ARE AT 1:15.

4              MS. LEE:  OKAY.

5              THE COURT:  WE CAN PICK UP THERE TOMORROW.

6         LADIES AND GENTLEMEN, WE WILL BREAK FOR THE DAY.  JUST

7    KEEP LIVING BY ALL THE RULES, NO DISCUSSION ABOUT THE CASE OF

8    ANY SORT WITH ANYONE BY ANY MEANS.  NO MEDIA OR OTHER

9    INFORMATION ABOUT THE CASE.  NO RESEARCH OF ANY SORT ABOUT THE

10   CASE OR THE ISSUES OR PEOPLE INVOLVED IN IT.  AND CONTINUE,

11   PLEASE, TO KEEP AN OPEN MIND UNTIL ALL OF THE EVIDENCE HAS

12   BEEN PRESENTED, YOU'VE HEARD THE ARGUMENTS OF COUNSEL, MY

13   INSTRUCTIONS, AND YOU'VE HAD THE CHANCE TO HEAR THE VIEWS OF

14   YOUR FELLOW JURORS.

15        WE WILL SEE YOU TOMORROW TO START UP AT 8:30.  HAVE A GOOD

16   REST OF YOUR DAY.

17        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

18             THE CLERK:  YOU MAY BE SEATED.

19             THE COURT:  SEE YOU TOMORROW.

20             MR. KEARNEY:  YES, YOUR HONOR.  I JUST WANTED STATE

21   FOR THE RECORD, I REVIEWED THE SECTION F AND F1.  THERE IS NO

22   EXPLICIT MENTION OF GROUND WATER EITHER IN THE EXHIBITS OR THE

23   TEXT, SO I WILL NOT INQUIRE OF DR. COATS TOMORROW ABOUT GROUND

24   WATER.

25             THE COURT:  ALL RIGHT.  THANKS FOR CONFIRMING THAT.
```

1    **MR. KEARNEY:**  THANK YOU.

2        **THE COURT:**  AND THE ONLY OTHER THING, LOOSE END, WE

3    SHOULD GET THAT STIPULATION ABOUT MOWRY SLOUGH TOGETHER.

4        **MR. KEARNEY:**  I SENT IT TO THE... COUNSEL.  DID YOU

5    GET A CHANCE TO LOOK AT IT?

6        **MS. HANSEN:**  NO, I DID NOT.

7        **MR. SMOCK:**  SORRY.

8        **MS. HANSEN:**  WE'LL GET THAT.  AND YOUR HONOR, IN

9    LIGHT OF SOME OF THE TESTIMONY COMING IN, WE ARE FILING A NEW

10   INSTRUCTION PROPOSED TODAY.

11       **THE COURT:**  AS TO WHAT?

12       **MS. HANSEN:**  AQUATIC AREAS AND... IF I CAN

13   REMEMBER -- OH, THE BIRDS.

14       **THE COURT:**  I'LL LOOK AT IT.  ARE YOU SHARING IT WITH

15   THE GOVERNMENT IN ADVANCE?

16       **MS. HANSEN:**  WE ARE GOING TO FILE IT.  I DON'T THINK

17   THEY WILL AGREE WITH IT, BUT I WILL ABSOLUTELY SEND IT ALONG

18   AS OUR PROPOSED INSTRUCTION.

19       **THE COURT:**  ALL RIGHT.

20       **MS. HANSEN:**  THANK YOU, YOUR HONOR.

21       **THE COURT:**  YOU'RE WELCOME.

22

23           (PROCEEDINGS ADJOURNED AT 1:15 P.M.)

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4           I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

7    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9                    *Diane E. Skillman*

10           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

11              THURSDAY, FEBRUARY 15, 2018

12

13

14

15

16

17

18

19

20

21

22

23

24

25