VOLUME 8

PAGES 1227 – 1405

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-16-00107 HSG |
| | ) | |
| VS. | ) | FRIDAY, FEBRUARY 16, 2018 |
| | ) | |
| JAMES PHILIP LUCERO, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | JURY TRIAL |
| _____ | ) | |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**FOR PLAINTIFF:**          ALEX G. TSE, ESQUIRE
                           ACTING UNITED STATES ATTORNEY
                           450 GOLDEN GATE AVENUE, 11TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94102
                     BY:   PHILIP J. KEARNEY,
                           SHIAO C. LEE,
                           ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**          FEDERAL PUBLIC DEFENDER'S OFFICE
                           1301 CLAY STREET, SUITE 1350N
                           OAKLAND, CALIFORNIA 94612
                     BY:   ANGELA M. HANSEN,
                           NED SMOCK,
                           ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           OFFICIAL COURT REPORTER


          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

I N D E X

**GOVERNMENT'S WITNESSES:**                         **PAGE**   **VOL.**

**MARTEL, DANIEL**

DIRECT EXAMINATION BY MS. LEE (RESUMED)        1233       8

CROSS-EXAMINATION BY MS. HANSEN                1267       8

REDIRECT EXAMINATION BY MS. LEE                1298       8

RECROSS-EXAMINATION BY MS. HANSEN              1304       8

**GALACATOS, KATERINA**

DIRECT EXAMINATION BY MS. LEE                  1305       8

CROSS-EXAMINATION BY MS. HANSEN                1338       8

**COATS, ROBERT**

DIRECT EXAMINATION BY MR. KEARNEY              1349       8

CROSS-EXAMINATION BY MR. SMOCK                 1387       8

REDIRECT EXAMINATION BY MR. KEARNEY            1401       8

```
                    E X H I B I T   I N D E X
```

| GOVERNMENT'S EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|
| 28 | | | 1308 | 8 |
| 37-007 | | | 1260 | 8 |
| 717-001 | | | 1363 | 8 |
| 769 | | | 1362 | 8 |
| 885-001 AND -002 | | | 1359 | 8 |
| 891 | | | 1375 | 8 |
| 901-0004 | | | 1323 | 8 |
| 901-0006 | | | 1330 | 8 |
| 901-0008 | | | 1332 | 8 |
| 901-0009 | | | 1333 | 8 |
| 901-0011 | | | 1334 | 8 |

**DEFENDANT'S EXHIBITS:**

| | | | | |
|---|---|---|---|---|
| 2040 | | | 1270 | 8 |
| 2051 | | | 1394 | 8 |
| 2054 | | | 1395 | 8 |
| 2055 | | | 1396 | 8 |
| 2057 | | | 1395 | 8 |
| 2060 | | | 1275 | 8 |

```
 1    FRIDAY, FEBRUARY 16, 2018                        8:30 A.M.

 2                         P R O C E E D I N G S

 3       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

 4           THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS

 5    IN SESSION.

 6       WE ARE CALLING CR-16-00107 UNITED STATES OF AMERICA VERSUS

 7    JAMES PHILIP LUCERO.  PLEASE STEP FORWARD AND STATE YOUR

 8    APPEARANCES FOR THE RECORD, PLEASE.

 9           MR. KEARNEY:  YOUR HONOR, GOOD MORNING.  PHILIP

10    KEARNEY AND SHIAO LEE FOR THE UNITED STATES.

11           THE COURT:  GOOD MORNING.

12           MS. HANSEN:  GOOD MORNING, YOUR HONOR.  ANGELA HANSEN

13    ON BEHALF OF MR. LUCERO WHO IS PRESENT.

14           MR. SMOCK:  GOOD MORNING, YOUR HONOR.  NED SMOCK ON

15    BEHALF OF MR. LUCERO ALSO.

16           THE COURT:  GOOD MORNING.

17       SO I DID GET THE TWO STIPULATIONS THAT THE PARTIES

18    PREPARED, WHICH LOOK FINE.  I UNDERSTAND YOU WOULD LIKE ME TO

19    READ THEM, WHICH I'M HAPPY TO DO.

20       DO YOU HAVE A PREFERENCE AS TO WHEN THAT HAPPENS OR WOULD

21    YOU LIKE -- WHAT IS YOUR PREFERENCE?

22           MR. KEARNEY:  YOUR HONOR, OUR PREFERENCE IS THAT THEY

23    BE READ AT THE CONCLUSION OF THE EVIDENCE.  IF THE COURT GIVES

24    THEM NOW, IT'S KIND OF HIGHLIGHTING, ESPECIALLY THE PAYMENT

25    ISSUE.  WE ARE NEAR THE END.  I JUST THINK THAT AT THE TIME OF
```

1    JURY INSTRUCTIONS IS A PROPER TIME TO READ THOSE.

2         **MR. SMOCK:**  OUR PREFERENCE IS YOU READ THE PAYMENTS

3    INFORMATION THIS MORNING, IN LARGE PART BECAUSE WE RECEIVED IT

4    IN THE MIDDLE OF CROSS-EXAMINATION YESTERDAY.  THE WITNESS

5    DIDN'T -- SUGGESTED THAT HE DIDN'T KNOW CLEARLY EXACTLY WHAT

6    WAS GOING ON WITH PAYMENTS.  THAT'S INFORMATION THAT SHOULD

7    HAVE COME IN THROUGH MS. HARDWICKE AND ALSO THROUGH

8    DR. BOURSIER, AND I THINK GETTING THAT TO THE JURY NOW IS

9    APPROPRIATE.

10        **THE COURT:**  I THINK THAT'S PROBABLY RIGHT.  I DON'T

11   THINK IT'S A HUGE DIFFERENCE MAKER IN TERMS OF THE TIMING

12   EITHER WAY.

13       AND THEN THE SLOUGH, IT JUST WOULD NEED TO BE BEFORE THE

14   CLOSE OF THE GOVERNMENT'S EVIDENCE.  SO WHY DON'T YOU ALL MAKE

15   SURE YOU PROMPT ME TO DO THAT BEFORE YOU CLOSE.

16        **MR. KEARNEY:**  YOUR HONOR, I WOULD --

17        **THE COURT:**  OR REST.

18        **MR. KEARNEY:**  IF THE COURT IS GOING TO READ ONE STIP,

19   PERHAPS YOU CAN JUST READ BOTH AT THE SAME TIME.  THAT'S --

20   THAT WOULD BE THE GOVERNMENT'S PREFERENCE.

21        **THE COURT:**  THAT'S ALSO FINE WITH ME.

22        **MR. KEARNEY:**  ALL RIGHT.

23        **THE COURT:**  SO I WILL DO THOSE AND GIVE THEM THE

24   STANDARD INSTRUCTION ABOUT HOW THEY TREAT THE STIPULATED

25   FACTS.

1        SO WE'VE GOT MR. MARTEL WHO IS ON THE STAND AND THEN

2   WHAT'S THE GOVERNMENT'S ANTICIPATED ORDER?

3        **MS. LEE:**  MR. MARTEL, THEN DR. GALACATOS, AND THEN

4   DR. COATS.

5        **THE COURT:**  ALL RIGHT.

6        **MR. KEARNEY:**  YOUR HONOR, THERE IS ONE ISSUE WITH

7   DR. COATS.  MR. SMOCK MADE A MOTION YESTERDAY TO EXCLUDE

8   MENTION FROM HIM OF GROUND WATER.  WE AGREED WITH THAT.  WE

9   ARE NOT GOING TO GET INTO THE SCHEMATIC, ALL THOSE THINGS.

10       I JUST WANTED TO BRING TO THE COURT'S ATTENTION, THOUGH,

11  ONE OF THE DATES HE VISITED, HE TOOK A PICTURE OF A SEEP

12  WHICH, IN HIS VIEWS, FEEDS TRIBUTARY A.  IT WAS AN

13  ABOVE-GROUND SEEP MAKING IT SURFACE WATER BUT IT COMES FROM

14  BELOW, OBVIOUSLY, SO I WANTED TO HIGHLIGHT THAT FOR COURT AND

15  COUNSEL -- I'M NOT QUITE SURE HOW TO CATEGORIZE IT.

16       IT IS GROUND WATER, BUT IT WAS OBSERVED ON THE SURFACE AND

17  HE'S GOING TO NEED TO TALK ABOUT IT.  SO I WOULD ASSUME THAT'S

18  APPROPRIATE, THAT'S FAIR GAME, YOUR HONOR, BUT I JUST WANTED

19  TO HIGHLIGHT THAT FOR BOTH COURT AND COUNSEL.

20       **MR. SMOCK:**  I THINK IT FALLS WITHIN THIS COURT'S

21  PREVIOUS RULING.  I MEAN THE FACT HE TOOK A PICTURE OF IT IS

22  ENTIRELY DIFFERENT THAN WHETHER IT WAS DISCLOSED IN A RULE 16

23  EXPERT NOTICE.

24       **MR. KEARNEY:**  IT'S SURFACE WATER.

25       **THE COURT:**  HERE'S THE THING.  BOY, WE ARE QUIBBLING.

```
 1        HE CAN SAY HERE'S HOW THE WATER MOVED AND HERE'S WHERE I

 2   SAW THE WATER FROM.  HE DOESN'T HAVE TO GET INTO THE GEOLOGY

 3   OF THE SEEP AND THE CONE, AND ALL THAT STUFF.  HE CAN SAY

 4   WATER WAS COMING OUT HERE AND HERE'S WHERE IT WAS GOING.

 5        MR. KEARNEY:  ALL RIGHT.  THANK YOU.

 6        THE CLERK:  ARE WE READY?

 7        MS. LEE:  YES.

 8        THE COURT:  I NEED TO CLOSE OUT MY EMAIL.

 9        THE CLERK:  YOU WANT ME TO BRING THEM OUT?

10        THE COURT:  YES.

11        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

12        THE CLERK:  YOU MAY BE SEATED.

13        THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, GOOD

14   MORNING AND WELCOME BACK.

15        AT THIS TIME WE'LL CONTINUE WITH THE PRESENTATION OF THE

16   GOVERNMENT'S CASE.  BEFORE WE DO THAT, I HAVE A COUPLE OF

17   STIPULATIONS TO READ TO YOU.  AND LET ME JUST EXPLAIN WHAT A

18   STIPULATION IS.

19        THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT I'M ABOUT TO

20   STATE TO YOU.  AND THOSE FACTS WILL BE NOW CONCLUSIVELY

21   ESTABLISHED.  THE -- NO FURTHER PROOF WILL BE REQUIRED AS TO

22   THESE FACTS.

23        SO THE FIRST IS THE PARTIES JOINTLY AGREE AND STIPULATE AS

24   FOLLOWS:  THE PARTIES STIPULATE THAT THE GOVERNMENT CONTRACTED

25   WITH H.T. HARVEY AND ASSOCIATES TO PAY UP TO $10,105 FOR COURT
```

1    TESTIMONY BY KELLY HARDWICKE AND PATRICK BOURSIER.

2        FURTHER, THE GOVERNMENT HAS ALSO PAID H.T. HARVEY AND

3    ASSOCIATES $8,456 FOR TIME SPENT BY WITNESSES KELLY HARDWICKE

4    AND PATRICK BOURSIER IN PREPARATION FOR THEIR TRIAL TESTIMONY.

5        THE SECOND FACT TO WHICH THE PARTIES STIPULATE IS THE

6    FOLLOWING:  TRADITIONAL NAVIGABLE WATERS ARE WATERS THAT ARE

7    CURRENTLY USED, WERE USED IN THE PAST, OR MAY BE SUSCEPTIBLE

8    TO USE IN INTERSTATE OR FOREIGN COMMERCE, INCLUDING ALL WATERS

9    WHICH ARE SUBJECT TO THE EBB AND FLOW OF THE TIDE.

10       THE PARTIES HAVE AGREED THAT MOWRY SLOUGH IS A TRADITIONAL

11   NAVIGABLE WATER AND A "WATER OF THE UNITED STATES" UNDER THE

12   CLEAN WATER ACT.

13       SO WITH THAT WE WILL PROCEED WITH THE EXAMINATION OF

14   MR. MARTEL, AND MS. LEE YOU MAY CONTINUE WHENEVER YOU ARE

15   READY.

16                      **DIRECT EXAMINATION RESUMED**

17   **BY MS. LEE:**

18   **Q.**  MR. MARTEL, WE LEFT OFF YESTERDAY ABOUT YOU SPEAKING ABOUT

19   YOUR FIELD MAP, EXHIBIT 180 IN EVIDENCE.

20   **A.**  YES.

21   **Q.**  BASED OFF OF THE FIELD WORK THAT YOU CONDUCTED ON YOUR TWO

22   SITE VISITS IN AUGUST OF 2007, DID YOU DETERMINE THAT THERE

23   SHOULD BE SOME ADDITIONAL ACREAGE OF WETLANDS ADDED TO H.T.

24   HARVEY'S MAP?

25   **A.**  YES.

1    **Q.**  APPROXIMATELY HOW MANY ADDITIONAL ACRES DID YOU DETERMINE?

2    **A.**  I BELIEVE IT WAS ABOUT FIVE.  THERE WERE FOUR -- FOUR

3    AREAS THAT WERE ADDED, AND IT TOTALED TO ABOUT 5 ACRES.

4    **Q.**  WHAT MADE YOU ADD THOSE APPROXIMATE 5 ACRES?

5    **A.**  THROUGH THE SAMPLING WE DID, IT APPEARED THAT THESE AREAS

6    STILL RETAINED THE CHARACTERISTICS OF WETLANDS.  AND SO THE

7    BOUNDARIES WERE MOVED A LITTLE BIT FURTHER TO INCLUDE THEM AS

8    AREAS THAT HAD BEEN IDENTIFIED AS WETLANDS.

9    **Q.**  ON A SITE OF THIS MAGNITUDE, HOW SIGNIFICANT IS AN

10   ADDITIONAL 5 ACRES, IN YOUR OPINION, TO BE ADDED TO THIS

11   PROPOSED JURISDICTIONAL DETERMINATION?

12   **A.**  MINOR.  THIS IS A VERY LARGE SITE WITH AN AWFUL LOT OF

13   BOUNDARIES.  AND SO CHANGES IN INTERPRETATION OF THE CRITERIA

14   JUST WOULD -- AN ADDITIONAL 5 ACRES ON A SITE LIKE THIS WOULD

15   BE MINOR AT BEST.

16   **Q.**  IN FACT, HOW MANY ACRES OF WETLANDS DID H.T. HARVEY FIND

17   ON THIS PROPERTY?

18   **A.**  I BELIEVE IT'S IN THE ORDER OF LIKE 200 PLUS, 240.

19   **Q.**  IF WE WERE TO ZOOM IN ON THE LEGEND, WOULD YOU BE ABLE TO

20   TELL US MORE SPECIFICALLY?

21   **A.**  YEAH -- YES.  WETLANDS WERE IDENTIFIED AS 242.89 ACRES.

22   **Q.**  AND UPLAND?

23   **A.**  UPLANDS WERE IDENTIFIED AS 361.7 ACRES.

24   **Q.**  AND "OTHER WATERS"?

25   **A.**  "OTHER WATERS" WERE IDENTIFIED AT 34.21 ACRES.

MARTEL – DIRECT / LEE

1  **Q.**  AFTER YOU MADE THOSE DETERMINATIONS TO ADD AN APPROXIMATE

2  FIVE ACRES OF WETLANDS, WAS A JURISDICTIONAL DETERMINATION

3  ISSUED BY THE ARMY CORPS OF ENGINEERS?

4  **A.**  YES, TO MY KNOWLEDGE.

5  JUST TO CLARIFY, I'M NOT THE PERSON WHO DID THE

6  CORRESPONDENCE IN THE FINALIZED LETTERS.  I WAS THE TECHNICAL

7  GUY WHO SUPPORTED THE PERSON WHO -- THE PROJECT MANAGER WHO

8  WAS DOING THAT.

9  SO THE LETTER CAME FROM SOMEBODY ELSE.  I DID NOT WRITE

10  IT.  BUT MY UNDERSTANDING IT WAS DONE AND FINALIZED.

11  **Q.**  IS A JURISDICTIONAL DETERMINATION ESSENTIALLY A LETTER

12  THAT IS SENT TO THE OWNERS TELLING THEM THAT THE ARMY CORPS OF

13  ENGINEERS HAS DETERMINED THAT THE PROPERTY THAT THEY OWN

14  CONTAINS A CERTAIN AMOUNT OF JURISDICTIONAL "WATERS OF THE

15  UNITED STATES"?

16  **A.**  YES.

17  **Q.**  ATTACHED TO THAT LETTER, IS IT A JURISDICTIONAL

18  DETERMINATION MAP CREATED BY THE ARMY CORPS OF ENGINEERS THAT

19  SHOWS THE OWNERS WHERE THE "WATERS OF THE UNITED STATES" ARE

20  ON THEIR PROPERTY?

21  **A.**  YES.

22  **Q.**  AND I WOULD LIKE TO SHOW YOU THAT MAP WHICH IS EXHIBIT 29.

23  (EXHIBIT HANDED TO WITNESS.)

24  MR. MARTEL, IS THIS THE JURISDICTIONAL DETERMINATION MAP?

25  **A.**  YES.  I BELIEVE SO.  LET ME LOOK.

1        YES, IT IS.

2            **MS. LEE:**  I WOULD LIKE TO MOVE GOVERNMENT'S 29 INTO

3    EVIDENCE.

4            **MS. HANSEN:**  NO OBJECTION, YOUR HONOR.  IT IS ALSO

5    DEFENSE EXHIBIT 2050.

6            **THE COURT:**  EXACTLY.  IT'S ALREADY IN EVIDENCE,

7    CORRECT?

8            **MS. HANSEN:**  YES, YOUR HONOR.

9            **THE COURT:**  SO IS THERE A REASON TO ADMIT IT AGAIN

10   SINCE IT'S ALREADY IN EVIDENCE AS 2050?

11           **MS. LEE:**  OKAY.  I'LL REFER TO IT AS DEFENSE 2050.

12           **THE COURT:**  I THINK THAT MAKES SENSE.

13           **MS. LEE:**  OKAY.

14   **BY MS. LEE:**

15   **Q.**  MR. MARTEL, WOULD YOU BE ABLE TO, WITH THE COURT'S

16   PERMISSION, STEP DOWN FROM YOUR SEAT AND SHOW US THE PLACES

17   THAT YOU ADDED THE ACREAGE OF WETLANDS?

18   **A.**  YES.

19   **Q.**  AND IF YOU COULD ALSO JUST EXPLAIN THIS MAP BECAUSE IT IS

20   IN BLACK AND WHITE COMPARED TO THE COLORED MAPS WE HAVE BEEN

21   LOOKING AT BEFORE.

22                    (PAUSE IN THE PROCEEDINGS.)

23   **A.**  OKAY.

24   **Q.**  MR. MARTEL, I'M GOING TO PUT THE COLORED ONE NEXT TO IT.

25   **A.**  GREAT.

MARTEL – DIRECT / LEE

1   **Q.**  JUST FOR A REFERENCE POINT.

2           **THE CLERK:**  THE MICROPHONE IS ON THE WITNESS STAND.

3           **THE WITNESS:**  OKAY.  SO THIS IS THE FIELD MAP.

4       THIS IS THE THING WE USE TO DO THE EVALUATION OF THE

5   PROPOSED WORK THAT HARVEY SUBMITTED TO THE CORPS OF ENGINEERS.

6   AND THIS IS THE FINAL PRODUCT.  THIS IS THE ONE THAT HAD THE

7   CORRECTIONS ON IT.

8       SO IN ANSWER TO THE QUESTION WHERE WERE THE AREAS ADDED,

9   THERE WAS A SMALL AREA ADDED HERE, WHICH IS HERE ON THIS MAP

10  (INDICATING).  ANOTHER AREA HERE, WHICH IS I BELIEVE HERE ON

11  THIS MAP (INDICATING).  ANOTHER AREA HERE, I BELIEVE –– ON

12  THIS MAP IT'S THERE (INDICATING), ANOTHER AREA HERE, WHICH

13  WOULD BE OVER HERE ON THIS MAP I BELIEVE (INDICATING).

14      AND THERE WERE AREAS THAT WE DETERMINED BY TESTING TO SEE

15  THAT THEY STILL MET THE CRITERIA FOR WETLANDS SO THEY WERE

16  ADDED ON TO THE MAP.

17      SO THEY TAKE THE MAP BACK, MAKE THE ADDITIONS, AND SEND IT

18  IN.  WHAT THEY HAVE DONE IS THEY HAVE IDENTIFIED WETLANDS AS

19  AREAS THAT ARE CROSSHATCHED, THE UPLANDS OF A STRAIGHT LINE

20  GOING ACROSS.  THE "OTHER WATERS" ARE LEFT HATCHED, THIS WAY

21  (INDICATING).

22  **Q.**  THANK YOU.

23  **A.**  AND THIS WAS THE FINAL MAP THAT THE CORPS APPROVED AS THE

24  EXTENT OF WATERS AND WETLANDS ON THE PROPERTY THAT THEN THEY

25  COULD USE FOR PERMITTING PURPOSES.

1        HOW DOES ONE TURN THIS OFF?

2    **Q.**  THERE'S A BUTTON.

3        WOULD IT BE FAIR TO SAY THAT THE AREAS DEMARCATED AS

4    WETLANDS AND "OTHER WATERS" WERE DETERMINED BY THE ARMY CORPS

5    OF ENGINEERS IN OCTOBER OF 2007 TO BE "WATERS OF THE UNITED

6    STATES"?

7    **A.**  YES.  ALTHOUGH THERE WAS –– THERE WERE TWO OTHER PLACES

8    THAT MET THE CRITERIA, TWO SMALL AREAS THAT MET THE CRITERIA

9    FOR WATERS.  THEY WERE NOT CONSIDERED JURISDICTIONAL.

10   **Q.**  I SEE.

11       ARE YOU REFERENCING THE AREAS THAT WERE MARKED IN RED IN

12   THE H.T. HARVEY MAP BEFORE?

13   **A.**  I BELIEVE SO, YES.

14   **Q.**  FOR THE AREAS THAT WERE DETERMINED TO BE JURISDICTIONAL

15   WETLANDS AND "OTHER WATERS", THE OWNERS WOULD NEED TO APPLY

16   FOR A PERMIT IN ORDER TO BRING FILL MATERIAL ONTO THE PROPERTY

17   OR DEVELOP IT; IS THAT RIGHT?

18   **A.**  TO DISCHARGE FILL MATERIAL ON THE PROPERTY, YES.

19   **Q.**  AND THAT WOULD REQUIRE A SEPARATE PERMIT APPLICATION,

20   RIGHT?

21   **A.**  YES.

22   **Q.**  AND WITHIN THAT APPLICATION, IT WOULD HAVE TO HAVE A

23   WELL–DEFINED PROPOSAL ON WHAT THEY WOULD BRING ONTO THIS

24   PROPERTY AND ANY EFFORTS TO MITIGATE ENVIRONMENTAL IMPACTS

25   BASED OFF OF WHAT THEY WOULD WANT TO BRING ONTO THIS PROPERTY;

MARTEL – DIRECT / LEE

1    IS THAT RIGHT?

2    **A.**  YES.

3    **Q.**  AND I'M GOING TO JUST BE REFERENCING H.T. HARVEY'S MAP

4    1138.  I UNDERSTAND IT DOESN'T INCLUDE THE ADDITIONAL

5    APPROXIMATE 5 ACRES, BUT JUST FOR EASE OF REFERENCE BECAUSE IT

6    IS IN COLOR.

7        WHAT MADE YOU BELIEVE THAT THE AREAS IN GREEN WERE

8    WETLANDS?

9    **A.**  SO THE AREAS THAT WERE IDENTIFIED AS WETLANDS WERE

10   ESTABLISHED BY TESTING, BY FACT OF EVALUATING THREE FACTORS:

11   SOIL, VEGETATION AND HYDROLOGY.

12       FOR WETLANDS, THERE ARE CERTAIN CRITERIA THAT NEED TO BE

13   MET.  PART OF THE TESTING THAT HARVEY DID INCLUDED TWO YEARS'

14   WORTH OF SAMPLING OF WETLAND HYDROLOGY INDICATORS WHICH WOULD

15   INCLUDE OBSERVATION OF STANDING WATER OR SATURATED SOILS,

16   WHICH IS ONE OF THE CRITERIA FOR WETLAND HYDROLOGY.  ALSO PART

17   OF THE CRITERIA FOR HYDRIC SOILS.

18       AND THEN SUBSEQUENTLY AN EVALUATION OF THE VEGETATION,

19   PLANTS.  CERTAIN PLANTS ARE ADAPTED FOR LIFE IN SATURATED

20   SOILS.  AND SO BY IDENTIFYING THOSE PLANTS, YOU CAN GET AN

21   IDEA OF THE EXTENT OF AREAS THAT ARE SATURATED TO THE POINT

22   WHERE THEY CREATE WETLAND CONDITIONS.

23   **Q.**  WHEN YOU WENT IN AUGUST OF 2007, IT'S THE SUMMER MONTHS,

24   WAS ONE OF THE CRITERIAS (SIC) THAT YOU LOOKED AT IN ASSESSING

25   VEGETATION WAS SEEING HOW CERTAIN PLANTS DID IN UPLAND AREAS

1  VERSUS WETLAND AREAS?

2      FOR EXAMPLE, IF CERTAIN UPLAND PLANTS WERE IN WETLAND

3  AREAS, WOULD THEY BE DISTRESSED?

4      WOULD IT BE HARD FOR THEM TO THRIVE?

5  **A.**  YES.  ONE OF THE METHODS THAT'S USED IN THE REGIONAL

6  SUPPLEMENT FOR DELINEATING WETLANDS INCLUDES USING PLANTED

7  COMMUNITIES TO OBSERVE THE RESPONSE OF THE... PLANTS THAT ARE

8  THERE TO THEIR REACTION TO SATURATED SOILS.

9      FOR EXAMPLE, THEY WERE PLANTING OATS OUT HERE.  THERE'S

10  ONE OF THE PLANTS THEY WERE INTRODUCING.  AND WHEN OATS TRY TO

11  GROW IN SATURATED SOILS, THEY DON'T RESPOND VERY WELL.  THEY

12  BECOME STUNTED AND THEY DON'T FORM –– THEY DON'T FORM WELL.

13  THEY END UP WITH A CHLOROTIC, A SORT OF YELLOWISH COLOR.  AND

14  THEY ARE STUNTED AS OPPOSED TO HEALTHY ONES.

15      IN ONE OF THE WAYS THAT YOU CAN SEE HOW THE SOIL –– THE

16  WATER AFFECTS THE SOIL IS TO LOOK ON THE UPLAND AREAS AND YOU

17  SEE WELL-DEVELOPED, HEALTHY PLANTS.  AND YOU LOOK IN THE

18  WETLAND AREAS AND YOU SEE STUNTED, CHLOROTIC PLANTS OF THE

19  SAME SPECIES.

20  **Q.**  AND IS IT BECAUSE IN THOSE SOILS, THEY ARE TOO SATURATED

21  TO SUPPORT THOSE UPLAND PLANTS?

22  **A.**  YES.

23  **Q.**  IN THE BLUE AREAS, THE "OTHER WATER" AREAS, IN YOUR

24  JURISDICTIONAL MAP, THE BLACK AND WHITE ONE, THE FINAL MAP,

25  YOU ALSO CATEGORIZED THOSE BLUE AREAS AS "OTHER WATERS"; IS

1    THAT RIGHT?

2    **A.**  YES.

3    **Q.**  WHAT DOES THAT TERM "OTHER WATERS" MEAN TO YOU?

4    **A.**  "OTHER WATERS" IS ONE OF THE DEFINING CHARACTERS OF

5    "WATERS OF THE UNITED STATES".  IT'S ESSENTIALLY PLACES WHERE

6    WATER EXISTS TO THE POINT WHERE THEY -- WHERE VEGETATION

7    CANNOT BE ESTABLISHED SO THAT WHAT YOU END UP WITH IS STANDING

8    WATER WHICH LEAVES MARKS IN THE SOIL EITHER THROUGH SHELVING,

9    CHANGES IN TERRESTRIAL VEGETATION, SEDIMENTATION PRACTICE, ET

10   CETERA.  AND THE OPEN WATERS, TYPICALLY THEY CAN'T SUPPORT

11   VEGETATION.

12       TO BE CALLED A WETLAND, IT HAS TO SUPPORT HYDROPHYTIC

13   VEGETATION.  IN THESE AREAS, THERE'S WATER FOR SUCH PROLONGED

14   PERIODS THAT VEGETATION CAN'T BE ESTABLISHED.  SO THEY ARE

15   CONSIDERED "OTHER WATERS" OF THE UNITED STATES.

16   **Q.**  ARE YOU AWARE THAT SOME OF THESE BLUE "OTHER WATERS" AREAS

17   SPECIFICALLY IN THE NORTHERN FILL SECTION OF THE MAP --

18   **A.**  YES.

19   **Q.**  -- OVER TIME BECAME VEGETATED ENOUGH TO SUPPORT SOME

20   PICKLEWEED?

21   **A.**  YES.

22   **Q.**  HOW ARE YOU AWARE OF THAT?

23   **A.**  BY THE SITE VISITS IN 2017 AND RECENTLY IN 2018.  NOTICED

24   THAT VEGETATION HAS COME IN AND ESTABLISHED IN MOST OF THE

25   AREA THAT'S COLORED GREEN -- I MEAN, I'M SORRY, BLUE --

1        **MS. HANSEN:**  OBJECTION, YOUR HONOR, RULE 16.

2        **THE COURT:**  OVERRULED.

3        **THE WITNESS:**  I WAS TOLD BY DR. HUFFMAN --

4        **MS. HANSEN:**  OBJECTION HEARSAY.

5        **THE COURT:**  OVERRULED TO THE EXTENT HE'S AN EXPERT

6    RELYING ON -- WELL --

7        **MS. HANSEN:**  THEN WE ARE BACK TO RULE 16.

8        **THE COURT:**  SUSTAINED.

9        **MS. LEE:**  I'LL REPHRASE IT.

10   **BY MS. LEE:**

11   **Q.**  YOU WENT BACK ONTO THE SITE IN 2017, CORRECT?

12       AND YOU WERE ABLE TO SEE THAT THERE WAS SOME PICKLEWEED

13   THAT HAD FORMED WHERE THE BLUE AREA WAS IN THE NORTHERN

14   SECTION --

15       **MS. HANSEN:**  OBJECTION LEADING.

16       **THE COURT:**  OVERRULED.  IT'S PRELIMINARY FOR NOW.

17       **THE WITNESS:**  YES.

18   **BY MS. LEE:**

19   **Q.**  DOES THAT GROWTH OF PICKLEWEED IN THE AREA THAT IS MARKED

20   IN BLUE IN THE NORTHERN SECTION OF THIS PROPERTY, DOES THAT

21   AFFECT YOUR DETERMINATION THAT THAT AREA IN BLUE IS A "WATER

22   OF THE UNITED STATES"?

23   **A.**  NO.

24   **Q.**  WHY NOT?

25   **A.**  IT'S STILL A "WATER OF THE UNITED STATES" IT'S JUST A

1  SPECIAL TYPE OF WATER.  IT'S ONE OF THE SPECIAL AQUATIC SITES

2  WETLAND BECAUSE IT'S VEGETATED.

3      SO AS AN "OTHER WATER", AS A POND OR AN IMPOUNDMENT, IT IS

4  STILL JURISDICTIONAL BECAUSE IT HAS AN ORDINARY HIGH WATER

5  MARK.  AS A WETLAND, IT'S EFFECTIVELY THE SAME CHARACTERISTICS

6  EXCEPT THAT IT SUPPORTS VEGETATION WHICH MAKES IT A SPECIAL

7  AQUATIC SITE WHICH IS TREATED DIFFERENTLY IN THE PERMITTING.

8      SO IT'S STILL A "WATER OF THE UNITED STATES" ONLY NOW IT'S

9  A WETLAND, A SPECIAL AQUATIC SITE AS OPPOSED TO AN "OTHER

10  WATER".

11  Q.  HAVE YOU SEEN WATER RUN THROUGH THIS PINCH POINT IN THE

12  NORTHERN SECTION OUT THROUGH THE CULVERT PIPE, OUT THROUGH A

13  DUCKBILL?

14          **MS. HANSEN:**  OBJECTION, VAGUE AS TO --

15          **THE WITNESS:**  YES.

16          **MS. HANSEN:**  -- AS TO TIMING.

17          **THE COURT:**  OVERRULED.

18          **THE WITNESS:**  YES.  THERE'S A SMALL CHANNEL AT THE

19  BOTTOM OF THE AREA THAT IS IN BLUE.  THERE'S A SMALL CHANNEL

20  THAT'S -- THAT STILL REMAINS UNVEGETATED.  IT'S ABOUT A FOOT

21  TO 2 FEET DEEPER THAN THE SURFACE OF THE GROUND FOR THE AREA

22  IN GENERAL.  AND IT IS UNVEGETATED, SO IT'S STILL A CHANNEL.

23  **BY MS. LEE:**

24  Q.  WOULD YOU CONSIDER A TRIBUTARY --

25          **MS. HANSEN:**  OBJECTION, YOUR HONOR --

1      **MS. LEE:**  TO RUN THROUGH --

2          **MS. HANSEN:**  -- RULE 16, BEYOND THE SCOPE.

3          **THE COURT:**  ALL RIGHT.

4          **MS. HANSEN:**  MAY I BE HEARD OUTSIDE THE PRESENCE OF

5  THE JURY?

6          **THE COURT:**  YES.

7      LADIES AND GENTLEMEN, WE WILL HAVE A BRIEF CONFERENCE AND

8  WE WILL BE BACK WITH YOU AS SOON AS WE CAN.

9              (THE FOLLOWING PROCEEDINGS WERE HEARD AT THE

10             SIDEBAR:)

11         **MS. HANSEN:**  YOUR HONOR PREVIOUSLY RULED THAT THIS

12  WITNESS IS LIMITED TO HIS DISCLOSURE WHICH WAS ABOUT HIS

13  REVERIFICATION IN 2007.  HE IS NOW TESTIFYING THAT IN 2017 HE

14  NOTICED A TRIBUTARY THAT IS BASED ON DR. HUFFMAN'S REPORT.  HE

15  WAS NOT ON THE LIST TO OPINE ABOUT ANY TRIBUTARIES IN 2007

16  WHEN HE VERIFIED THAT JURISDICTIONAL MAP.  HE CHARACTERIZED IT

17  "OTHER WATER" WITH A POND SHAPE.

18     THE GOVERNMENT IS CLEARLY TRYING TO GET IN THE

19  DR. HUFFMAN'S OPINION IT IS A TRIBUTARY THROUGH THIS WITNESS

20  WHO WAS NOT NOTICED FOR THAT PURPOSE.

21     I THOUGHT THE COURT RULED JUST YESTERDAY MORNING, IF I AM

22  REMEMBERING CORRECTLY, THAT THAT WAS NOT ALLOWED.

23         **THE COURT:**  IT JUST SEEMS LIKE YOU ARE TRYING TO DO

24  TOO MUCH WITH ALL THESE WITNESSES.  JUST HAVE THEM TESTIFY

25  ABOUT HIS TESTIMONY, AND WHAT WAS DISCLOSED ABOUT TRIBUTARY --

MARTEL – DIRECT / LEE

1      **MS. HANSEN:** IT WASN'T.

2           **MS. LEE:** MY RECOLLECTION OF WHAT YOU SAID YESTERDAY,

3      YOUR HONOR, IS THAT HE SHOULDN'T TALK ABOUT HIS OPINION ON

4      WHETHER IT WAS A JURISDICTIONAL WATER IN 2014. HE IS TALKING

5      ABOUT WHAT HE SAW IN 2017 WHEN HE WENT BACK AND SAW THE SITE

6      WITH HIS OWN EYES.

7           WHETHER HE REFERS TO IT AS A TRIBUTARY OR NOT, HE CAN

8      CERTAINLY SAY HE HAS SEEN WATER FLOW. THE DEFINITION OF A

9      TRIBUTARY IS JUST A FLOW INTO A TRADITIONAL NAVIGABLE WATER

10     AND HE HAS ACTUALLY SEEN WATER FLOW INTO THE SLOUGH.

11          **MS. HANSEN:** YOUR HONOR, THE GOVERNMENT --

12          **MS. LEE:** I AM NOT TRYING TO PULL ONE OVER ON

13     SOMEBODY.

14          **MS. HANSEN:** THE GOVERNMENT HAS PROVIDED NO REPORTS

15     FROM THIS WITNESS DOCUMENTING WHAT BASIS HE HAS, ANY FINDING

16     THAT THERE WAS A TRIBUTARY IN 2017. WE CANNOT CROSS-EXAMINE

17     THE BASIS AND THE REASONS FOR HIS TESTIMONY IF THERE ARE NONE.

18          HE WAS ON THE SITE AS AN OBSERVANT TO OBSERVE WHAT TERRY

19     HUFFMAN DID. THIS IS TERRY HUFFMAN'S TESTIMONY. IF THE

20     GOVERNMENT WANTS IT IN, THEY NEED TO CALL THAT EXPERT. THEY

21     CAN'T END RUN AROUND RULE 16 TO GET THIS IN.

22          **MS. LEE:** I THINK I'M JUST ASKING IF HE'S SEEN WATER

23     CONTRIBUTE FLOW INTO MOWRY SLOUGH.

24          **MS. HANSEN:** MS. LEE ASKED IF IT WAS A TRIBUTARY, AND

25     THAT'S WHY I STOOD UP AND ASKED FOR A SIDEBAR. WE ARE WELL

1  PASSED RULE 16 NOTICE.  HE HAS NOT BEEN NOTICED TO TESTIFY AS

2  TO TERRY HUFFMAN'S MAP.  HE DID ANALYSIS IN 2007 AND APPROVED

3  A MAP.  THAT'S IT.  THAT'S WHAT THE NOTICE SAYS.  IT SHOULD

4  NOT BE ALLOWED.

5          **MS. LEE:**  I THINK WE ARE GETTING CAUGHT ON THE

6  NOMENCLATURE OF "TRIBUTARY".

7          **THE COURT:**  LOOK, AGAIN, YOU ALL HAVE PUT THIS IN

8  MULTIPLE TIMES.  I COULD ALSO SAY IT IS CUMULATIVE.  A BUNCH

9  OF PEOPLE HAVE SAID IT.  WHY ARE YOU TRYING DO EVERYTHING WITH

10  EVERY WITNESS?

11      I AM GOING TO SUSTAIN THE OBJECTION.  THE WITNESS IS

12  ALLOWED TO TALK ABOUT HIS DESIGNATION IN 2017 -- 2007, AND IT

13  SEEMS TO ME HE HAS DONE THAT, AND THAT'S THE EXTENT OF WHAT I

14  SAID HE CAN TESTIFY ABOUT.

15          **MS. HANSEN:**  YOUR HONOR --

16          **MS. LEE:**  I HAVE MORE QUESTIONS FOR THIS WITNESS

17  ABOUT HIS OPINIONS ON WHY HE BELIEVES IT'S JURISDICTIONAL.  HE

18  HASN'T YET SPOKEN ABOUT WHY HE BELIEVES THERE IS A SIGNIFICANT

19  NEXUS OR WHY HE BELIEVES THE WETLANDS ARE ADJACENT OR WHY HE

20  BELIEVES THAT THE AREAS HE DETERMINED TO BE JURISDICTIONAL

21  ARE.

22          **THE COURT:**  THAT SEEMS FAIRLY WITHIN THE SCOPE OF

23  WHAT HE DID IN 2007.

24          **MS. HANSEN:**  PROVIDED, YOUR HONOR, IT IS BASED ON

25  2007.

1    THIS IS WHERE THE DISASSEMBLING IS COMING IN.  HE DID AN

2    ADJACENCY DETERMINATION.  HE DID NOT DO A SIGNIFICANT NEXUS

3    TEST IN 2007.  HE ADMITTED THAT IN ALL OF HIS INTERVIEWS.  WE

4    PUT THOSE IN OUR FILING.

5    HE IS NOW OPINING BASED ON 2017 FACTS THAT WERE NOT

6    DISCLOSED IN THE NOTICE.  THE GOVERNMENT IS AGAIN TRYING TO

7    GET HIM TO OFFER OPINIONS AS TO WHY NOW IN 2017 WHICH WAS NOT

8    NOTICED, WAS NOT IN THE REPORT, WAS NOTHING.  THIS IS

9    JURISDICTIONAL.  HE NEEDS TO BASE HIS TESTIMONY ON WHAT HE

10   SAW, OBSERVED, UNDERSTOOD, AND WHY HE VERIFIED IT IN 2007,

11   WHICH WAS ADJACENCY.  THIS IS REALLY FAR AFIELD.

12        **THE COURT:**  OKAY.  THE WITNESS CAN TESTIFY TO THE

13   DESIGNATION DETERMINATION IN 2007 AND THE BASES FOR IT, AND

14   THAT'S IT.  AND I THINK THAT THAT ENCOMPASSES HIS EXPLANATION

15   OF WHAT THE BASIS IS FOR THE DETERMINATION.  BUT THAT IS --

16   SHOULD BE THE SCOPE OF HIS TESTIMONY.

17        **MS. LEE:**  YOUR HONOR, I THINK I SHOULD BE ABLE TO ASK

18   HIM IF HE HAS AN OPINION ON WHETHER OR NOT THERE IS A

19   SIGNIFICANT NEXUS.  BECAUSE THE THING IS, WHEN HE MADE THE

20   DETERMINATION IN '07, AS IT STILL EXISTS TODAY, ADJACENT

21   WETLANDS ARE CATEGORICALLY "WATERS OF THE UNITED STATES".  HE

22   WOULDN'T HAVE NEEDED AND -- HE WOULDN'T HAVE NEEDED TO GO TO

23   SIGNIFICANT NEXUS GIVEN THE TYPE OF SITE THIS IS.

24   BUT HE HAS DONE OVER A THOUSAND WETLAND DELINEATIONS.  AND

25   HE HAS -- IS ENTITLED TO HIS OPINION ON WHETHER THIS WETLAND

1    HAS A SIGNIFICANT NEXUS.

2         **MS. HANSEN:**  HE WASN'T NOTICED FOR THAT.

3         **MS. LEE:**  THE COURT'S RULING WAS THAT CERTAIN EXPERTS

4    COULD OPINE ON THIS.  ESSENTIALLY THE FIVE THAT WE NOTICED IN

5    OUR *DAUBERT* MOTION, WE ARE NOT ASKING DR. COATS TO TALK ABOUT

6    THIS.  CARIN HIGH, WE ARE ASKING PEOPLE THAT GOES DIRECTLY TO

7    THEIR EXPERTISE.

8         **THE COURT:**  LOOK, HERE'S THE POINT.  IF HE IS

9    TESTIFYING THAT THERE WAS A SIGNIFICANT NEXUS IN 2007, THAT'S

10   FINE, BUT IT STRIKES ME THAT YOU ARE NOT CABINING IT THAT WAY.

11        **MS. LEE:**  I CAN LIMIT IT TO 2007.  YOUR HONOR, MAY I

12   CLARIFY --

13        **MS. HANSEN:**  IT'S NOT FACTS, THOUGH, YOUR HONOR, THAT

14   HE IS NOW AWARE OF FROM 2017.  I THINK THE -- WE HAVE TO LOOK

15   AT THE BASIS AND THE REASONS FOR THE SIGNIFICANT NEXUS AND WE

16   HAVE TO UNDERSTAND THAT HE DISCLOSED TO US THROUGH REPORTS

17   THAT HE NEVER DID THAT ANALYSIS.  BECAUSE HE NEVER DID IT IN

18   2017, HE WOULD BE OPINING ABOUT IT NOW BASED ON HIS CURRENT

19   UNDERSTANDING OF THE PROPERTY AND THESE TRIBUTARIES.

20        **THE COURT:**  I DON'T THINK THAT'S TRUE.  I THINK HE

21   CAN SAY BASED ON THE CONDITIONS THAT WERE THERE IN 2007 IT

22   ALSO MEETS THE SIGNIFICANT NEXUS.  TO ASK HIM, REALLY, HE CAN

23   TALK ABOUT THE -- I JUST THINK ULTIMATELY WE ARE MAKING THIS

24   MORE COMPLICATED THAN IT NEEDS TO BE.  WE ARE BELABORING IT

25   MORE THAN IT NEEDS TO BE BELABORED.  IT NEEDS TO BE LIMITED TO

```
 1      '07.

 2              MS. LEE:  AND COULD I ASK HIM NOTHING ABOUT

 3      JURISDICTION BUT WHAT HE SAW IN 2017 AS A LAY WITNESS WHEN HE

 4      VISITED?  DOES THE SITE LOOK PRETTY MUCH THE SAME?

 5              THE COURT:  YES.

 6              MS. HANSEN:  THAT IS CUMULATIVE, YOUR HONOR, AND

 7      UNNECESSARY AND BEYOND 403.

 8              THE COURT:  IT BORDERS RIGHT ON CUMULATIVE, BUT YOU

 9      CAN ASK HIM A COUPLE OF QUESTIONS.  I WOULD NOT BELABOR IT.

10              MS. LEE:  OKAY.

11              THE COURT:  THERE HAS BEEN A SUGGESTION THAT EXPERTS

12      CAN BE LED.  WHAT RULE OF EVIDENCE SAYS THAT?

13              MR. SMOCK:  I ACTUALLY WAS JUST RESEARCHING THAT.  I

14      DON'T KNOW SEE ANYTHING.

15              THE COURT:  I DON'T EITHER.  SO YOU SHOULD BE

16      COGNIZANT THAT LEADING OBJECTIONS MAY BE MADE AND SUSTAINED,

17      AND IT'S NOT GOING TO BE SUFFICIENT TO SAY THAT THE WITNESS IS

18      AN EXPERT.

19              MS. LEE:  UNDERSTOOD.

20              MS. HANSEN:  YOUR HONOR, I WOULD MOVE TO STRIKE THE

21      WITNESS'S STATEMENT ABOUT TRIBUTARIES OR WHETHER THAT CAME

22      FROM COUNSEL, I'M NOT SURE.

23              THE COURT:  HE DIDN'T ANSWER IT BECAUSE YOU OBJECTED.

24              MS. HANSEN:  THANK YOU.

25          (SIDEBAR CONCLUDED; PROCEEDINGS HELD IN OPEN COURT.)
```

1    **BY MS. LEE:**

2    **Q.**  MR. MARTEL, YOU TESTIFIED YESTERDAY YOU HAVE DONE MORE

3    THAT A THOUSAND JURISDICTIONAL DETERMINATIONS DURING YOUR 25

4    YEARS AT THE ARMY CORPS OF ENGINEERS; IS THAT CORRECT?

5    **A.**  YES, WAY MORE THAN A THOUSAND.

6    **Q.**  ARE THERE SOME DETERMINATIONS THAT ARE MORE DIFFICULT TO

7    DO THAN OTHERS?

8    **A.**  ABSOLUTELY.

9    **Q.**  HOW ABOUT YOUR DETERMINATION AT THIS SITE?

10   **A.**  WELL, SEPARATE OUT THE TWO THINGS.  ONE IS THE

11   DETERMINATION IN DELINEATION OF THE WETLANDS WHICH IS, YOU

12   KNOW, THE FIRST STEP IN THIS PROCESS IS THAT THOSE AREAS NEED

13   TO BE IDENTIFIED.  AND THEN THE SECOND IS THE JURISDICTIONAL

14   DETERMINATION ABOUT WHETHER THOSE AREAS THAT HAVE BEEN

15   IDENTIFIED AS "WATERS OF THE UNITED STATES" ARE REGULATED.  SO

16   THERE'S A TWO-STEP PROCESS.

17       THE STEP OF IDENTIFYING THE WETLANDS, THE EXTENT IN... IN

18   TYPE OF WETLANDS ON THIS SITE IS LARGE AND... HAD A NUMBER OF

19   FACTORS THAT NEEDED TO BE CONSIDERED, ALL OF WHICH WERE

20   OBSERVABLE AND RELATABLE BACK TO THE STANDARDS, THE CRITERIA

21   FOR WHAT CONSTITUTES WETLANDS AND WATERS.

22   **Q.**  HOW ABOUT THE SECOND STEP; HOW DOES THAT COMPARE?

23   **A.**  THE JURISDICTIONAL STEP:  SO ONCE THE IDENTIFICATION OF

24   THE EXTENT AND LOCATION OF WATERS AND WETLANDS IS COMPLETED,

25   AND -- THEN THE DETERMINATION OF WHETHER OR NOT THEY ARE PARTS

1  OF THE "WATERS OF THE UNITED STATES" THAT ARE REGULATED IS

2  DONE.  AND THE DETERMINATION FOR JURISDICTION ON THIS SITE IS

3  RELATIVELY SIMPLE, STRAIGHTFORWARD, NOT COMPLICATED.

4  **Q.**  WHAT MAKES YOU SAY THAT?

5  **A.**  UNDER THE REGULATIONS FOR DETERMINING JURISDICTION, THERE

6  ARE A NUMBER OF CATEGORIES, ONE OF WHICH IS TRADITIONAL

7  NAVIGABLE WATERS WHICH INCLUDES AREAS THAT ARE SUBJECT TO THE

8  EBB AND FLOW OF THE TIDE.

9      AND IN THOSE STANDARDS, TRIBUTARIES THAT DISCHARGE INTO

10  THOSE TRADITIONAL NAVIGABLE WATERS --

11         **MS. HANSEN:**  OBJECTION, YOUR HONOR, REGARDING

12  SIDEBAR.

13         **THE COURT:**  SUSTAINED.

14  **BY MS. LEE:**

15  **Q.**  MR. MARTEL, WHAT I AM ASKING IS YOU'VE DONE WELL OVER

16  THOUSANDS OF JURISDICTIONAL DETERMINATIONS.

17  **A.**  YES.

18  **Q.**  AND YOU INDICATED SOME ARE HARDER THAN OTHERS TO DO.

19  **A.**  YES.

20  **Q.**  HOW ABOUT FOR THIS SITE?  HOW DOES THAT RANK FOR YOU?

21  **A.**  THIS SITE IS REASONABLY STRAIGHTFORWARD, REASONABLY

22  SIMPLE.

23  **Q.**  WHY DO YOU SAY THAT?

24  **A.**  THE STANDARDS THAT ESTABLISH WHAT WE REGULATE AFTER IT'S

25  BEEN DELINEATED ARE CLEAR THAT THESE AREAS ARE EITHER

MARTEL – DIRECT / LEE

1    TRIBUTARY TO TRADITIONAL NAVIGABLE WATERS OR WETLANDS ADJACENT

2    TO TRIBUTARIES THAT FLOW TO NAVIGABLE WATERS.

3         AND THOSE ARE DIRECTLY IN THE REGULATIONS.

4              **MS. HANSEN:**  YOUR HONOR, WE ARE BACK TO THE SAME --

5              **THE COURT:**  LADIES AND GENTLEMEN, I THINK FOR

6    EFFICIENCY SAKE, LET'S TAKE A SHORT BREAK SO YOU CAN STRETCH

7    OUT.

8         WE WILL BE BACK HERE IN PROBABLY ABOUT TEN MINUTES, BUT

9    STAY TUNED AND PLEASE KEEP IN MIND ALL OF YOUR ADMONITIONS

10   ABOUT YOUR CONDUCT AS JURORS.

11        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

12             **THE COURT:**  AGAIN, I DON'T UNDERSTAND WHAT THE

13   GOVERNMENT'S DOING.  HE'S TESTIFIED TO HIS DETERMINATION IN

14   '07 ALREADY.

15        WHAT ARE WE DOING?

16             **MS. LEE:**  YOUR HONOR --

17             **THE COURT:**  IT'S AS THOUGH HE'S BEING ASKED TO

18   BOLSTER OTHER TESTIMONY.  I'M JUST NOT SURE WHAT YOU'RE DOING.

19             **MS. LEE:**  WELL, I'LL -- LET ME TRY TO -- SO GOING

20   THROUGH MY OUTLINE, I'M GOING TO BE ASKING HIM WHY HE BELIEVES

21   THESE WETLANDS ARE JURISDICTIONAL.

22        I'M GOING TO ASK HIM WHY HE BELIEVES THEY'RE ADJACENT.

23        I'M GOING TO ASK HIM WHETHER HE BELIEVES CERTAIN THINGS ON

24   THIS MAP CUT OFF ADJACENCY, WHICH HE DOESN'T BELIEVE THAT THEY

25   DO.

1      I'M GOING TO ASK HIM IF HE'S AWARE WHEN HE DID HIS STUDY

2    THAT THERE'S HYDROLOGICAL CONNECTIONS BETWEEN THE SITE AND THE

3    NAVIGABLE WATER.

4      I'M GOING TO ASK HIM WHETHER OR NOT HE DID A SIGNIFICANT

5    NEXUS TEST.  AND THE FACT IS HE DIDN'T.  AND WHY NOT?  BECAUSE

6    OF THE REGULATIONS.

7      AND THEN I'M GOING TO ASK HIM, EVEN THOUGH YOU DIDN'T AND

8    YOUR KNOWLEDGE OF THE SITE FROM '07 -- HE'S VERY KNOWLEDGEABLE

9    ABOUT THE SITE -- DO YOU HAVE AN OPINION AS TO THAT.

10      I'M GOING TO ASK HIM, ARE YOU AWARE THAT THESE WETLANDS

11    CONTRIBUTE FLOW INTO MOWRY SLOUGH.  HE'S GOING TO SAY YES.

12      I'M GOING TO ASK HIM HOW THESE WETLANDS IN COMBINATION

13    WITH SIMILARLY-SITUATED WETLANDS HAVE A NEXUS TO A TRADITIONAL

14    NAVIGABLE WATER.

15           **THE COURT:**  NONE OF THAT -- NONE OF THAT IS WHAT YOU

16    ARE DOING RIGHT NOW.

17           **MS. LEE:**  YOUR HONOR, THAT'S WHERE I'M GOING TO GO

18    RIGHT NEXT.  I THINK -- I MEAN THAT'S LITERARY MY NEXT

19    QUESTION.

20           **MS. HANSEN:**  THE WITNESS HAS BEEN COACHED TO TALK

21    ABOUT TRIBUTARIES, AND I THINK THAT'S OUR PROBLEM.  GOVERNMENT

22    COUNSEL'S OPEN QUESTIONS NONLEADING DON'T SAY TRIBUTARIES, BUT

23    THE WITNESS IS USING THAT AS A BASIS FOR HIS FLOW ANALYSIS, ET

24    CETERA.

25      YOUR HONOR, I WOULD JUST CONTINUE WITH MY OBJECTION.  IF

1    THE COURT OVERRULES IT, I CAN CROSS-EXAMINE, BUT I WOULD

2    RESTATE MY OBJECTION.  THE COURT UNDERSTANDS IT.  I'M NOT

3    GOING TO REPEAT IT HERE.

4         **MS. LEE:**  YOUR HONOR, IF I CAN STATE FOR THE RECORD I

5    THINK THERE'S BEEN SOME STATEMENTS MADE THAT -- OF COACHING

6    AND THAT WE ARE TAILORING WITNESSES TO DR. HUFFMAN'S TESTIMONY

7    IN LIEU OF DR. HUFFMAN TESTIFYING.

8         THE TRUTH IS DAN MARTEL HAS BEEN DOING THIS FOR 25 YEARS

9    AND HAS DELINEATED WELL OVER THOUSANDS OF DELINEATIONS.  HE

10   HAS HIS OWN INDEPENDENT OPINION.  AND THE FACT THAT HE THINKS

11   SOMETHING CONTRIBUTES FLOW, WHICH IS THE DEFINITION OF A

12   TRIBUTARY, INTO MOWRY SLOUGH HAS NOTHING TO DO WITH

13   DR. HUFFMAN'S CALLING IT A TRIBUTARY.

14        WE CANNOT -- WE DON'T HAVE TO USE THAT NOMENCLATURE.  AT

15   THE END OF THE DAY, I DON'T THINK THERE'S ANY DISPUTE THAT

16   WATER FLOWS INTO MOWRY SLOUGH.

17        **THE COURT:**  I WOULD ESSENTIALLY AGREE WITH THAT BASED

18   ON MY REVIEW OF THE EVIDENCE WHICH KEEPS ME WONDERING WHY YOU

19   KEEP BELABORING IT.

20        **MS. LEE:**  I WILL MOVE ON FROM THAT.

21        **THE COURT:**  I'M JUST LOOKING AT MY RULING FROM

22   YESTERDAY, THE TRANSCRIPT FROM YESTERDAY.

23        SO YOU SAID:  I ANTICIPATE MR. MARTEL WILL FOCUS MOSTLY ON

24   WHAT HE DID IN '07 WHEN HE VERIFIED HARVEY'S WORK.  HE DIDN'T

25   GO BACK UNTIL 2017.  THE EXTENT OF WHAT HE WOULD TESTIFY

1    OUTSIDE THE WORK IN '07 IS WHAT HE SAW ON THE SITE PERSONALLY

2    WHEN HE WENT IN 2017.

3        I SAID:  FINE.  AGAIN, AS TO HIS OBSERVATION OF CONDITIONS

4    IN 2017.

5        AND YOU SAID:  AND HIS OPINION GENERALLY OF HIS KNOWLEDGE

6    OF HOW WETLANDS PERSIST THROUGH TIME.

7        I SAID:  WHY DO WE NEED TO DO THAT AGAIN?

8        YOU SAID:  WELL, HE'S FROM THE CORPS OF ENGINEERS.

9        I GUESS MY ADVICE TO YOU WOULD BE JUST STREAMLINE IT.  I

10   THINK WHERE WE ARE GETTING INTO PROBLEMS IS THE WITNESS IS

11   TRYING TO DO TOO MUCH.  HE THINKS YOU WANT HIM TO DO TOO MUCH.

12   LET'S JUST KEEP IT CRISP AND I THINK IF YOU CAN KEEP IT

13   FOCUSED, WE'LL HAVE FEWER PROBLEMS.

14           **MS. LEE:**  OKAY.

15           **THE COURT:**  AND, IN OTHER WORDS, WHY DO WE NEED TO GO

16   BEYOND HIS ACTUAL DETERMINATION IN '07?

17       AND IT DOESN'T SEEM TO ME -- I MEAN, I AGREE HE DIDN'T DO

18   A SIGNIFICANT NEXUS ANALYSIS AT THE TIME.  AND HIS REASON FOR

19   NOT DOING THAT IS BECAUSE HE DIDN'T NEED TO UNDER HIS READING

20   OF THE CORPS' REGULATIONS.

21       BUT WHY CAN'T HE SPEAK TO THE TYPES OF CONDITIONS THAT HE

22   SAW AT THE TIME THAT WOULD SUPPORT THEIR BEING A NEXUS, WHICH

23   IS WHAT HE IS DOING.  THERE ARE SOILS, WE LOOK AT THE SOILS.

24   WE LOOK AT VEGETATION, WE LOOK AT CONNECTEDNESS TO A

25   TRADITIONAL NAVIGABLE WATER.

1        IT'S JUST THAT ALL OF THAT SEEMS TO BE FAIR GAME.  WE'RE

2   JUST GETTING INTO A SITUATION BECAUSE OF WHAT THE WITNESS IS

3   BEING ASKED TO DO OR VOLUNTEERING TO DO, IT'S GETTING

4   ENTANGLED IN THE RULE 16 QUESTIONS WHICH HAVE COME TO DOMINATE

5   THE CASE.

6        AND SO IT SEEMS TO ME THAT THERE IS A WAY TO AVOID THAT

7   AND IT WOULD SEEM TO BE IN YOUR INTEREST TO AVOID IT.

8        I DON'T KNOW WHAT MORE TO SAY.

9            **MS. LEE:**  YOUR HONOR, I THINK THE QUESTIONS THAT I

10  EARLIER STATED I WAS GOING TO BE ASKING HIM, I WILL STICK VERY

11  MUCH TO THOSE, WHICH I THINK HAS BEEN RULED ON AS BEING PROPER

12  QUESTIONS.  AND I WILL, YOU KNOW, ENDEAVOR TO STREAMLINE THIS.

13       BUT I DEFINITELY THINK ASKING HIM ABOUT WHY HE BELIEVES

14  THERE ARE BIOLOGICAL, PHYSICAL, AND CHEMICAL IMPACTS FROM THIS

15  WETLAND AND SIMILARLY-SITUATED WETLANDS IS FAIR GAME.  AND I

16  WILL STAY WITHIN THOSE QUESTIONS THAT I'VE LED THE COURT --

17  SUMMARIZED TO THE COURT THAT I WILL BE ASKING.

18           **THE COURT:**  ALL RIGHT.  AND I SUPPOSE YOUR OBJECTION

19  IS PRESERVED.

20           **MS. HANSEN:**  YES, YOUR HONOR.  AND IF WE COULD JUST

21  MAKE SURE THAT THERE'S CLARIFICATION WHEN HE'S TESTIFYING AS

22  TO TIME FRAME.  THAT WOULD BE HELPFUL.

23           **THE COURT:**  I THINK THAT WOULD HELP MATTERS.

24       ALL RIGHT.

25           **MS. LEE:**  YES.

1    **THE CLERK:**  READY FOR THE JURY?

2    **THE COURT:**  YES.

3    (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

4    **THE CLERK:**  YOU MAY BE SEATED.

5    **THE COURT:**  YOU MAY PROCEED, MS. LEE.

6    **MS. LEE:**  THANK YOU, YOUR HONOR.

7    **BY MS. LEE:**

8    **Q.**  MR. MARTEL, WHY DO YOU BELIEVE THESE WETLANDS IN GREEN ARE

9    JURISDICTIONAL "WATERS OF THE UNITED STATES"?

10    **MS. HANSEN:**  OBJECTION, VAGUE AS TO TIME.

11    **BY MS. LEE:**

12    **Q.**  WHY DO YOU BELIEVE THAT THESE WETLANDS IN GREEN ARE

13    JURISDICTIONAL "WATERS OF THE UNITED STATES" WHEN YOU DID YOUR

14    FIELD WORK AND MADE THE FINDINGS THAT RESULTED IN THE FINAL

15    JURISDICTION DETERMINATION MAP IN 2007?

16    **A.**  I WOULD SAY THE SIMPLE AND MOST STRAIGHTFORWARD WAY IS

17    THOSE WETLANDS ARE ADJACENT TO THE TRADITIONAL NAVIGABLE

18    WATERS FOR TWO REASONS.

19    ONE, THEY ARE HYDROLOGICALLY CONNECTED AND THEY DISCHARGE

20    INTO THE TRADITIONAL NAVIGABLE WATERS AND, TWO, THEY EXIST

21    WITHIN THE HISTORIC BAY MARGIN IN THE SAN FRANCISCO DISTRICT

22    ASSERTED JURISDICTION ON WETLANDS AS BEING ADJACENT TO THE

23    BAY.

24    SO FOR BOTH OF THOSE REASONS.

25    **Q.**  DO YOU BASE IT ON PROXIMITY AT ALL?

MARTEL − DIRECT / LEE

1    **A.**   PARTIALLY.  THEY ARE NEIGHBORING.  SO THEY ARE IN CLOSE

2    PROXIMITY AND THEY WOULD HAVE AN EFFECT UPON THE TRADITIONAL

3    NAVIGABLE WATER.

4    **Q.**   COULD YOU DESCRIBE WHETHER THESE WETLANDS, FOR INSTANCE,

5    THESE GREEN WETLANDS IN THE NORTHERN SECTION, THE GREEN

6    WETLANDS IN THE SOUTHERN FILL SECTION, HOW DO YOU SEE THEM?

7        FOR INSTANCE, DO YOU SEE THEM AS A, ONE COMPLEX OF

8    WETLANDS, A SINGLE CONTINUOUS WETLAND, OR SOMETHING ELSE?

9        HOW DO YOU CATEGORIZE THESE WETLANDS?

10   **A.**   WELL, A LARGE PORTION OF THEM ARE CONTIGUOUS WITH... TO

11   THE... HYDROLOGIC DISCHARGE THAT GOES INTO THE... INTO THE

12   BAY.

13       IT'S HARD TO SEPARATE THEM OUT BECAUSE WHEN THE SITE IS

14   WET, THE WETLANDS -- THE UPLANDS ON THIS SITE, ACTUALLY, ARE

15   WET FOR SHORT PERIODS OF TIME.  SO THE ENTIRE SITE IS LARGELY

16   HYDROLOGICALLY CONNECTED.

17       THE DIFFERENCE IS, IS THAT IN THE UPLANDS, THE WATER

18   DRAINS DOWN FASTER AND SO THEY NO LONGER -- THEY DON'T HAVE

19   THE DURATION FOR IDENTIFICATION AS WETLANDS.  BUT AT CERTAIN

20   POINTS OF TIME THE ENTIRE SITE IS BASICALLY HYDROLOGICALLY

21   CONNECTED TO THE BAY.

22   **Q.**   WHAT DO YOU MEAN BY "HYDROLOGICALLY CONNECTED"?

23   **A.**   CONTINUOUS CHAIN OF WATER THAT CAN FLOW DOWN THE

24   TOPOGRAPHIC GRADIENT, BE COLLECTED IN THE COLLECTION DITCHES

25   AROUND THE SITE, AND ELIMINATED INTO THE TRADITIONAL NAVIGABLE

1   WATERS THROUGH THE PUMP.

2   Q.  WHAT FUNCTIONS DO THESE WETLANDS PERFORM FOR THE

3   TRADITIONAL NAVIGABLE WATER THEY ARE ADJACENT TO?

4   A.  THEY WOULD FORM A NUMBER OF FUNCTIONS.  THEY WOULD INCLUDE

5   IN PROBABLY -- AN IMPORTANT ONE WOULD BE TO REMOVE SEDIMENTS

6   FROM BEING -- FLOWING DOWN INTO THE BAY AND CLOGGING THE BAY

7   WITH SILTS AND CLAY PARTICLES.

8       THEY REMOVE SEDIMENTS.  THEY HELP DETOXIFY MATERIALS THAT

9   WOULD BE TOXIC IN THE ENVIRONMENT.  FOR EXAMPLE, WETLANDS ARE

10  KNOWN TO ISOLATE AND RETAIN CERTAIN ORGANIC COMPOUNDS AND THE

11  BACTERIA BREAK THEM DOWN SO THEY ARE NO LONGER TOXIC.

12      THEY ALSO ARE SUITABLE HABITAT FOR AQUATIC ORGANISMS,

13  BIRDS, A LOT OF THINGS CALLED SHOREBIRDS, THE SMALL THINGS YOU

14  SEE THAT RUN ALONG THE BEACH.

15      THEY COME TO THESE PLACES WHEN THE TIDE IS HIGH AND THEIR

16  LOAFING AREAS ARE COVERED WITH WATER.  SO THEY COME UP TO

17  THESE PLACES AND THEY WAIT OUT THE TIDES BEFORE THEY GO BACK

18  TO THE PLACES WHERE THEY FEED.

19  Q.  DO THESE WETLANDS HAVE A PHYSICAL IMPACT ON MOWRY SLOUGH?

20  A.  THEY CONTRIBUTE TO THE FLOW IN MOWRY SLOUGH THROUGH THE

21  PUMP.  AND ALSO THE PHYSICAL SENSE THEY HELP REMOVE, LIKE I

22  SAID, THE SEDIMENTS AND STUFF WHICH WOULD HELP TO STOP

23  CLOGGING MOWRY SLOUGH.

24  Q.  ARE THERE ANY BIOLOGICAL IMPACTS THAT THESE WETLANDS HAVE

25  ON MOWRY SLOUGH?

1    **A.**   YES.   AMONGST OTHER THINGS, PART OF THE SYSTEM HERE IS

2    THAT SMALL PIECES OF DETRITUS, PART OF THE CARBON FOOD CHAIN

3    THAT FEEDS THE ORGANISMS THAT ARE IN THE TRADITIONAL NAVIGABLE

4    WATERS ARE EXPORTED WITH THE AFFLUENT THAT COMES OFF THE SITES

5    SO IT CONTRIBUTES TO THE FOOD CHAINS BIOLOGICALLY.

6    **Q.**   IS THERE A CHEMICAL IMPACT OF THESE WETLANDS ONTO THE

7    SLOUGH?

8    **A.**   YEAH.   THE CHEMICAL IMPACT WOULD BE DETAIN AND DETOXIFY

9    TOXIC MATERIALS THAT WOULD BE A CHEMICAL IMPACT.

10   **Q.**   I WOULD LIKE TO SHOW YOU EXHIBIT 37-0007.

11              (EXHIBIT HANDED TO WITNESS.)

12       MR. MARTEL, DO YOU RECOGNIZE THAT MAP?

13   **A.**   YES.

14   **Q.**   WHAT IS IT?

15   **A.**   IT'S AN OVERVIEW OF THE LOCATION OF THE SITE IN CONTEXT TO

16   THE MUNICIPALITIES AROUND IT AND IN CONTEXT TO THE BAY.

17   **Q.**   DOES IT FAIRLY AND ACCURATELY SHOW WHAT YOU JUST SAID?

18   **A.**   I BELIEVE -- IN TERMS OF PROXIMITY, YES.

19           **MS. LEE:**   I WOULD LIKE TO MOVE EXHIBIT 37-007 INTO

20   EVIDENCE.

21           **MS. HANSEN:**   NO OBJECTION.

22           **THE COURT:**   EXHIBIT 37....

23           **MS. LEE:**   -0007.

24           **THE COURT:**   -0007 IS ADMITTED.

25       (GOVERNMENT'S EXHIBIT 37-0007 RECEIVED IN EVIDENCE)

MARTEL – DIRECT / LEE

1          (DISPLAYED ON SCREEN.)

2     **BY MS. LEE:**

3     **Q.**  MR. MARTEL, DO YOU SEE THE SECTIONS ON THIS MAP THAT ARE

4     MARKED WITH THESE LITTLE RED DOTS?

5          I'M REFERENCING KIND OF THE MUTED GRAY AREA --

6     **A.**  YES.

7     **Q.**  -- WITH LITTLE SPECKLES OF RED?

8     **A.**  IT'S REALLY LITTLE.  YES.

9     **Q.**  ARE THOSE THE FORMER BAYLANDS THAT SURROUND THE BAY AREA?

10    **A.**  NOT ENTIRELY.

11    **Q.**  CAN YOU DESCRIBE IT THERE?

12    **A.**  I BELIEVE THESE ARE THE CURRENT AREAS WHERE THEY --

13    WHERE -- OR THEY'RE SALT PONDS THAT ARE PART OF THE, I BELIEVE

14    IT IS CARGILL'S SALT OPERATIONS.

15    **Q.**  DO THEY ALSO INCLUDE DIKED-OFF BAYLANDS?

16    **A.**  THEY MAY BUT THEY DO NOT INCLUDE ALL OF THE DIKED-OFF

17    BAYLANDS.

18    **Q.**  OKAY.

19         DO YOU HAVE AN OPINION ON WHETHER THE LANDS ON NEWARK

20    AREA 4 IN COMBINATION WITH SIMILARLY-SITUATED LANDS IN THE

21    REGION, WHETHER IT HAS A SIGNIFICANT NEXUS TO MOWRY SLOUGH

22    WHEN YOU WENT TO GO LOOK AT THE SITE IN 2007?

23    **A.**  YES.

24    **Q.**  CAN YOU -- PLEASE TELL US ABOUT THAT.

25    **A.**  SIGNIFICANT IN THE SENSE THAT THEY CONTRIBUTE TO THE

MARTEL – DIRECT / LEE

1   OVERALL HEALTH OF THE AQUATIC SYSTEM, THE TRADITIONAL

2   NAVIGABLE WATERS, THE TIDAL WATERS BECAUSE THEY PERFORM THOSE

3   FUNCTIONS THAT WE SPOKE ABOUT.  AND THIS IS A RELATIVELY LARGE

4   COMPLEX OF WETLANDS IN THE AREA.

5        HISTORICALLY I BELIEVE A VERY LARGE AMOUNT OF THE ORIGINAL

6   BAY SURFACE, THE... WETLAND AREAS THAT SURROUNDED THE BAY HAVE

7   BEEN FILLED OR TAKEN OUT OF TIDAL ACTION, AND SO THE REMAINING

8   WETLANDS THAT ARE LEFT ALONG THESE TRIBUTARIES AND NAVIGABLE

9   WATERS THAT GO HERE ARE REMNANT AMOUNTS.  AND SO THEY

10  CONTRIBUTE WHAT'S LEFT TO THE... TO THE HEALTH OF THE AQUATIC

11  SYSTEM.

12  **Q.**  OKAY.

13  **A.**  I WOULD CONSIDER THAT TO BE SIGNIFICANT.

14  **Q.**  I WOULD LIKE TO TALK TO YOU ABOUT YOUR OPINIONS ON HOW OR

15  IF WETLANDS PERSIST OVER TIME.  SPECIFICALLY, WE HAVE RAINY

16  SEASONS AND DRY SEASONS ANNUALLY IN THE ARID WEST REGION --

17  **A.**  YES.

18  **Q.**  -- AND THERE ARE YEARS THAT ARE BELOW AVERAGE RAINFALL AND

19  YEARS THAT ARE ABOVE AVERAGE RAINFALL; IS THAT CORRECT?

20  **A.**  YES.

21  **Q.**  WHAT IS YOUR OPINION AS TO HOW WETLANDS IN THIS ARID WEST

22  REGION THAT WE ARE IN, HOW OR IF THEY PERSIST THROUGH CHANGING

23  CONDITIONS LIKE THAT.

24  **A.**  YES.

25       THE ISSUE OF SEASONALITY IN WETLANDS AND ANNUAL

1    VARIABILITY IS ONE OF THE ISSUES THAT'S ADDRESSED IN THE

2    REGIONAL SUPPLEMENT FOR THE DELINEATION MANUAL, AND THERE ARE

3    STANDARDS THAT HAVE EVOLVED TO MAKE STATEMENTS ABOUT VARIABLE

4    CONDITIONS THAT OCCUR NATURALLY IN THE ENVIRONMENTS HERE.

5         SO THAT TYPICALLY IF THE RAINFALL YEAR IS SIGNIFICANTLY

6    LOW, IT CAN HAVE AN EFFECT ON SEASONAL WETLANDS IN PLANT

7    DISTRIBUTIONS THROUGH THOSE WETLANDS ON AN ANNUAL OCCURRENCE.

8    BUT THE MANUAL CALLS FOR A LONGER TERM EVALUATION FOR THOSE

9    ANNUAL FLUCTUATIONS.

10        FOR EXAMPLE, IT'S RECOMMENDED THAT YOU LOOK AT TEN YEARS'

11   WORTH OF PRECIPITATION DATA TO DETERMINE WHETHER OR NOT, YOU

12   KNOW, THERE'S SOME ENVIRONMENTAL CHANGE THAT'S CAUSING THIS

13   AREA THAT WAS FORMERLY WETLAND TO BEGIN TO DRY OUT.  SO YOU

14   WANT TO LOOK AT THE PRECIPITATION DATA FOR ABOUT TEN YEARS TO

15   DETERMINE WHETHER OR NOT THOSE YEARS WHEN THE PRECIPITATION

16   WAS LOW IS NOW THE NEW NORMAL OR IF IT WAS JUST THE ANNUAL

17   VARIABILITY THAT OCCURS HERE.

18   **Q.**  WHEN YOU WERE ON THE SITE IN AUGUST OF '07, THE RAINY

19   PERIOD THEN WOULD BE FROM '06 INTO '07?

20   **A.**  YES.

21   **Q.**  DO YOU KNOW WHAT THE -- HOW MANY INCHES OF RAIN THE SITE

22   RECEIVED THEN?

23   **A.**  YES.  IT WAS APPROXIMATELY EIGHT AND A HALF.  THE NORMAL

24   FOR THIS AREA IS APPROXIMATELY 13 -- I'M SORRY, 14.3 WOULD BE

25   THE NORMAL ANNUAL.  AND THAT'S OVER A HUNDRED YEARS OF

1    RECORDKEEPING.  THAT'S AVERAGED OUT.  SO ON AVERAGE, IT'S

2    14.3 INCHES.

3        IN THE YEAR THAT WE EVALUATED THE SITE, IN '07, THE

4    PRECEDING PRECIPITATION SEASON HAD BEEN 8.59 INCHES.  SO

5    SIGNIFICANTLY LOWER THAN THE NORMAL.

6    **Q.**  IN WHAT TYPE OF -- OKAY.

7        THIS JURISDICTIONAL DETERMINATION THAT -- I GUESS YOU

8    DON'T ISSUE IT, LIKE THE PAPERWORK, YOU DON'T DO THE

9    PAPERWORK, BUT YOU DID THE FIELD WORK, CORRECT?

10   **A.**  YES.

11   **Q.**  THE FIELD WORK THAT YOU DID THAT RESULTED IN THIS

12   JURISDICTIONAL DETERMINATION, HOW LONG DID THAT JURISDICTIONAL

13   DETERMINATION LAST FOR?

14   **A.**  JURISDICTIONAL DETERMINATIONS ARE ISSUED FOR FIVE YEARS

15   UNLESS THERE'S AN OVERRIDING ISSUE THAT'S DEALT WITH UP FRONT.

16       BUT I BELIEVE THE STICKER ON THE MAPS SAY THAT THEY ARE

17   VALID FOR FIVE YEARS, AT WHICH TIME THEY CAN BE RENEWED WITH A

18   MINIMAL AMOUNT OF TESTING IF THERE HAD BEEN NO CHANGES TO THE

19   SITE.

20       AND IF THERE ARE CHANGES TO THE SITE, THE APPLICANT IS --

21   BEFORE THEY DISCHARGE FILL, NEEDS TO COME IN AND GET THAT

22   VERIFICATION REDONE BEFORE THEY ACTUALLY DO THE DISCHARGE.

23   **Q.**  WHAT ARE EXAMPLES OF CONSIDERATION OF MAJOR CHANGES TO A

24   SITE?

25   **A.**  OH, FOR EXAMPLE, IF A SITE -- IF THE PRIMARY SOURCE OF

MARTEL – DIRECT / LEE

```
 1    HYDROLOGY WAS DISCHARGED FROM AN UP-SLOPE STREAM, AND FOR SOME
 2    REASON THERE WAS AN EARTHQUAKE AND THE STREAM WAS DIVERTED AND
 3    IT NOW WENT IN A NEW DIRECTION, SO THE SOURCE OF HYDROLOGY
 4    WOULD HAVE BEEN REMOVED, WHICH WOULD MEAN THAT THE DOWN-SLOPE
 5    WETLANDS WOULD NO LONGER BE -- HAVE THAT SOURCE OF HYDROLOGY
 6    AND WOULD NO LONGER MEET THE CRITERIA FOR WETLANDS.
 7        THAT WOULD BE AN EXAMPLE.
 8    Q.  WOULD A YEAR WITH BELOW-AVERAGE RAINFALL BE AN EXAMPLE OF
 9    A MAJOR CHANGE?
10    A.  NO.
11    Q.  WHY DO YOU SAY THAT?
12    A.  BECAUSE THE VARIABILITY HERE IS BIG ENOUGH THAT IT'S
13    THROUGH THE RECORDED HUNDRED-YEAR -- HUNDRED-PLUS-YEARS OF
14    RECORDED WEATHER -- PRECIPITATION DATA IN AND AROUND THE AREA
15    OF NEWARK SHOW GREAT FLUCTUATIONS IN TIME.  THERE ARE MANY
16    YEARS THAT HAVE LOW NUMBERS THAT WOULD BE SIGNIFICANTLY LOWER,
17    GREATER THAN A STANDARD DEVIATION FROM THE MEAN NUMBER.  THERE
18    WOULD BE A SIGNIFICANT NUMBER OF THOSE.  THERE WOULD BE
19    SIGNIFICANT NUMBERS OF EXCESS PRECIPITATION.  SO THERE'S A
20    WIDE VARIABILITY AROUND THE AVERAGE.
21        SO THAT'S NOT UNEXPECTED.  THAT'S NORMAL.
22    Q.  AND I WOULD LIKE TO JUST PULL UP EXHIBIT 3 ALREADY IN
23    EVIDENCE.
24                (DISPLAYED ON SCREEN.)
25        IN THIS EXHIBIT THERE IS A SECTION THAT'S DEMARCATED IN
```

1    RED.

2    **A.**   UH-HUH.

3    **Q.**   AND WITHIN THOSE RED AREAS, IT COVERS SOME GREEN PORTIONS

4    AND BLUE PORTION.

5        DO YOU SEE THAT MR. MARTEL?

6    **A.**   YES.

7    **Q.**   DO YOU HAVE AN OPINION ON IF FILL MATERIAL WERE DISCHARGED

8    IN THE GREEN OR BLUE SECTIONS WITHIN THE RED HATCH MARK --

9    **A.**   YES.

10   **Q.**   -- WITHOUT A PERMIT, DO YOU HAVE AN OPINION WHETHER THAT

11   WOULD BE A DISCHARGE INTO A "WATER OF THE UNITED STATES"?

12   **A.**   I CAN'T SPEAK TO WHETHER OR NOT IT WAS DONE WITHOUT A

13   PERMIT BECAUSE I WAS NO LONGER WORKING THERE WHEN THAT

14   HAPPENED.

15       BUT I CAN SAY THAT THOSE -- THAT THE CROSSHATCHED AREAS IN

16   THE GREEN AND THE HATCHED AREA IN THE BLUE, THERE IS FILL

17   DISCHARGED IN THOSE AREAS AND THOSE WERE IDENTIFIED AS

18   WETLANDS OR "OTHER WATERS".

19   **Q.**   THOSE WERE IDENTIFIED AS WETLANDS OR "OTHER WATERS".  ARE

20   THEY ALSO IDENTIFIED AS JURISDICTIONAL "WATERS OF THE UNITED

21   STATES"?

22   **A.**   YES.  YES.

23   **Q.**   AND ANY DISCHARGE THERE WOULD HAVE REQUIRED A PERMIT FROM

24   THE ARMY CORPS OF ENGINEERS; IS THAT CORRECT?

25   **A.**   YES.

1        **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR THIS

2    WITNESS.

3            **THE COURT:**  ANY CROSS-EXAMINATION?

4        **MS. HANSEN:**  YES.  THANK YOU, YOUR HONOR.

5            (PAUSE IN THE PROCEEDINGS.)

6            **CROSS-EXAMINATION**

7    BY MS. HANSEN:

8    **Q.**  HI.

9    **A.**  HI.

10   **Q.**  HI, MR. MARTEL.  I'M ANGELA HANSEN WITH THE FEDERAL PUBLIC

11   DEFENDER.  NICE TO MEET YOU.

12   **A.**  HELLO.

13   **Q.**  SO YOU WORKED FOR THE CORPS FOR A NUMBER OF YEARS, AND YOU

14   WERE THERE IN 2007, RIGHT?

15   **A.**  YES.

16   **Q.**  AND ON AUGUST 8TH AND 14TH OF 2007, YOU REVIEWED THE

17   PROPOSED JURISDICTIONAL DELINEATIONS FOR NEWARK AREAS 3 AND 4

18   WITH DR. BOURSIER?

19   **A.**  YES.

20   **Q.**  AND YOU WENT TO AREA 4 ON BOTH DATES; IS THAT RIGHT?

21   **A.**  YES.

22   **Q.**  AND YOU WALKED THE AREA?

23   **A.**  YEP.

24   **Q.**  AND YOU NOTED YOUR OBSERVATIONS; IS THAT RIGHT?

25   **A.**  YES.

MARTEL - CROSS / HANSEN

1    **Q.**  AND YOU --

2    **A.**  DID SAMPLING.

3    **Q.**  DID SAMPLING.  AND YOU COMPLETED A WETLAND DETERMINATION

4    DATA FORMS, RIGHT?

5    **A.**  THAT MATERIAL WENT -- THE MATERIAL I DID WAS -- CONSISTED

6    OF NOTATIONS ON THE FIELD MAPS, SAMPLE POINTS, DATA SHEETS

7    THEY'RE CALLED, AND A SITE INSPECTION RECOMMENDATION THAT WENT

8    TO THE PROJECT MANAGER WHO MOVED THE PROCESS FORWARD WITH THE

9    JURISDICTIONAL LETTER AND THE FINALIZED APPROVED MAP AFTER IT

10   HAD BEEN CORRECTED.

11   **Q.**  OKAY.  BUT YOU DID USE SOME FORMS OF DATA COLLECTION TO --

12   **A.**  YES.

13   **Q.**  -- APPROVE THE MAP?

14   **A.**  TO APPROVE THE MAP.

15   **Q.**  OR TO SUBMIT THE MAP FOR APPROVAL TO YOUR SUPERIORS FOR

16   THE CORPS TO APPROVE?

17   **A.**  I FILLED OUT WHAT ARE CALLED SAMPLE SHEETS, THE DATA

18   SHEETS THAT ARE USED FOR THE WETLAND DETERMINATIONS.  THOSE --

19   YEAH, THOSE WENT INTO THE FILE ALONG WITH THE SITE INSPECTION

20   REPORT TO THE PROJECT MANAGER.

21   **Q.**  LET'S TALK ABOUT EXHIBIT 2050, WHICH HAS ALREADY BEEN

22   ADMITTED INTO EVIDENCE, WHICH IS THE VERIFIED JURISDICTIONAL

23   DETERMINATION MAP.

24       I WOULD LIKE TO CALL OUT THE LABEL ON THIS MAP.  AND I

25   WANT TO CLARIFY THAT THE FOUNDATION FOR THIS -- OH, NO, I'M

1    SORRY.  IS THAT THE LABEL I WANT?  OH, YES, PERFECT.

2        THAT LABEL FOR THAT MAP, THAT'S REALLY HARD TO READ; ISN'T

3    THAT RIGHT?

4    **A.**  YES.

5    **Q.**  I'M GOING TO SHOW YOU SOMETHING THAT'S BEEN PREMARKED AS

6    DEFENSE EXHIBIT 2040.  AND THE BATES NUMBER IS 15897.  IT'S

7    NOT ON THIS DOCUMENT, BUT I HAVE THAT FOR COUNSEL.

8            **MS. HANSEN:**  MAY I APPROACH, YOUR HONOR?

9            **THE COURT:**  YOU MAY.

10               (EXHIBIT HANDED TO WITNESS.)

11           **THE WITNESS:**  THANK YOU.

12   **BY MS. HANSEN:**

13   **Q.**  MR. MARTEL, WOULD YOU TAKE A MOMENT TO LOOK AT

14   EXHIBIT 2040?

15   **A.**  THAT'S THIS ONE?

16   **Q.**  YES.  THANK YOU.

17       IS THAT A FAIR AND ACCURATE COPY OF THE LABEL ON

18   EXHIBIT 2050, WHICH IS ON THE SCREEN?

19               (DISPLAYED ON SCREEN.)

20   **A.**  WHAT APPEARS TO BE, YES.

21   **Q.**  IS THAT A MORE LEGIBLE COPY OF THAT?

22   **A.**  YES.

23           **MS. HANSEN:**  YOUR HONOR, I WOULD MOVE TO ADMIT

24   DEFENSE EXHIBIT 2040.

25           **MS. LEE:**  NO OBJECTION, YOUR HONOR.

1        **THE COURT:**  2040 IS ADMITTED.

2        (DEFENDANT'S EXHIBIT 2040 RECEIVED IN EVIDENCE)

3                    (DISPLAYED ON SCREEN.)

4    **BY MS. HANSEN:**

5    **Q.**  SO IT'S JUST A LITTLE EASIER TO READ.

6        AND THE LABEL CERTIFIES THIS PROJECT AND THE BOUNDARY

7    AREAS ARE ACCURATELY DEPICTED ON THE MAP; IS THAT RIGHT?

8    **A.**  YES.

9    **Q.**  AND YOUR SUPERVISOR INITIALED IT MARK D'AVIGNON; IS THAT

10   RIGHT?

11   **A.**  HE WASN'T ACTUALLY MY SUPERVISOR.

12   **Q.**  OKAY.  WHAT WAS HIS ROLE?

13   **A.**  I BELIEVE... HE CHANGED POSITIONS OVER TIME.  HE WAS

14   EITHER A PROJECT MANAGER OR SECTION CHIEF.  I'M NOT SURE AT

15   THE TIME WHAT HE WAS.

16   **Q.**  IS IT CORRECT TO SPELL HIS LAST NAME D-'-A-V-I-G-N-O-N?

17   **A.**  YES.

18   **Q.**  AND CAN YOU PLEASE EXPLAIN WHY WE HAVE A BLACK AND WHITE

19   MAP?

20   **A.**  NO.

21   **Q.**  YOU DON'T KNOW?

22   **A.**  FRANKLY, I THINK IT WAS BECAUSE THE CORPS DIDN'T HAVE A

23   COLOR PRINTER.

24   **Q.**  IT WAS THAT SIMPLE OF A REASON?

25   **A.**  THAT SIMPLE.

MARTEL – CROSS / HANSEN

1   **Q.**  OKAY.  LET'S LOOK AT THE LEGEND ON THE BLACK AND WHITE

2   MAP.

3                    (DISPLAYED ON SCREEN.)

4       WETLAND, I THINK WE HAVE GONE OVER, YOU SAID HAS

5   CROSSHATCH MARKS ON IT?

6   **A.**  UH-HUH.

7   **Q.**  "OTHER WATERS" HAVE A DIAGONAL RIGHT SLASH.  AND THE AREA

8   WITH SLASH MARKS THEN ON THEM, THE DIAGONAL SLASH, THOSE ARE

9   NOT WETLANDS, CORRECT?

10  **A.**  THE ONES THAT SAY "OTHER WATERS" THEY ARE NOT WETLANDS.

11  **Q.**  AND I WOULD LIKE TO IDENTIFY THE AREAS WITH THE SLASH

12  MARKS ON THE BLACK AND WHITE MAP.

13      YESTERDAY WE HAD SOME TROUBLE DOING THAT, SO I WANT TO TRY

14  SOMETHING WITH YOU.

15  **A.**  OKAY.

16  **Q.**  I AM GOING TO SHOW YOU SOMETHING THAT'S BEEN MARKED FOR

17  IDENTIFICATION AS DEFENSE EXHIBIT 2060.  AND IT'S A BLOWUP OF

18  EXHIBIT 2050.

19      I USED A HIGHLIGHTER TO IDENTIFY THE AREAS WITH THE SLASH

20  MARKS.  AND I WANT YOU TO TAKE A LOOK AT IT AND TO SEE IF I

21  DID THAT RIGHT.

22           **MS. HANSEN:**  I AM GOING TO SHOW COUNSEL.

23                    (PAUSE IN THE PROCEEDINGS.)

24  **BY MS. HANSEN:**

25  **Q.**  MR. MARTEL, I'M HANDING YOU WHAT HAS BEEN PREMARKED AS

1    DEFENSE EXHIBIT 2060.

2         I HAVE A BLUE HIGHLIGHTER.  LET'S NOT SHOW THE JURY YET.

3         COULD YOU TAKE A MINUTE JUST TO MAKE SURE THAT I COLORED

4    IN ALL THE BLUE AREAS, THE "OTHER WATERS" CORRECTLY?

5         IF I DIDN'T, I HAVE A BLACK MARKER TO TAKE OFF SOMEWHERE I

6    OVER INCLUDED AND I HAVE A BLUE MARKER FOR YOU TO ADD.

7         IF IT WOULD HELP, I CAN ALSO DISPLAY ON THE SCREEN FOR YOU

8    EXHIBIT 2050.

9    **A.**  I BELIEVE THAT THERE WERE SMALL SEGMENTS OF AREAS THAT

10   WERE PICKED UP ALONG THIS LINE HERE (INDICATING) AS BEING

11   "OTHER WATERS" ALSO.

12   **Q.**  THEY ARE NOT ACTUALLY INDICATED.  I AM ACTUALLY ASKING YOU

13   WHERE THE SLASH MARKS ARE ON THAT MAP.

14        ARE THERE ANY SLASH MARKS THERE OF "OTHER WATERS" ON YOUR

15   BLACK AND WHITE MAP?

16        THE ANSWER IS NO, ISN'T IT?

17   **A.**  THE ANSWER IS THE SCALE OF MAPPING DIDN'T INCLUDE THE ONES

18   THAT WERE HERE.

19   **Q.**  THAT'S NOT MY QUESTION.

20        DID YOU INDICATE ON THIS MAP ANY "OTHER WATERS" UNDER THE

21   SOUTHERN BERM WITH THE SLASH MARK ON THAT MAP?  DO YOU SEE

22   ANY?

23   **A.**  WHAT IS THE SOUTHERN BERM?

24   **Q.**  OKAY.  LET ME POINT FOR YOU.  RIGHT HERE (INDICATING).

25        DO YOU SEE ANY SLASH MARKS OF "OTHER WATERS" INDICATED

 1   RIGHT IN THAT AREA?

 2   **A.**  NO.

 3   **Q.**  SO RIGHT NOW I'VE CORRECTLY COLORED IN BLUE ALL THE AREAS

 4   WITH A SLASH MARK ON YOUR MAP IDENTIFYING "OTHER WATERS",

 5   CORRECT?

 6   **A.**  YES.  AS THE MAP PORTRAYS IT, YES.

 7   **Q.**  AS THE MAP PORTRAYS IT.

 8       AND A MAP LIKE THIS IS AN OFFICIAL GOVERNMENT DOCUMENT,

 9   ISN'T IT?

10   **A.**  YES.

11   **Q.**  THIS IS THE OFFICIAL DOCUMENT OF THE UNITED STATES ARMY

12   CORPS OF ENGINEERS, CORRECT?

13   **A.**  YES.

14           **MS. LEE:**  OBJECTION, YOUR HONOR, AS TO THE SCALE OF

15   THE MAP.  IT WOULD POTENTIALLY BE MORE PRECISE TO BE ABLE TO

16   BLOW UP THAT SECTION ELECTRONICALLY FOR MR. MARTEL TO ACTUALLY

17   SEE THE CROSSHATCHES IN THE AREA DESCRIBED.

18           **THE COURT:**  OVERRULED.

19   **BY MS. HANSEN:**

20   **Q.**  MR --

21           **MS. HANSEN:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

22   TO -- WELL, TO PUBLISH IT TO THE JURY, EXHIBIT 2060.

23           **THE COURT:**  ANY OBJECTION TO ITS ADMISSION?

24           **MS. HANSEN:**  NO, PUBLISHING IT AT THIS TIME.  I MIGHT

25   ADMIT IT LATER.

1        MS. LEE:  I WOULD OBJECT BASED ON WHETHER OR NOT THIS

2   WITNESS CAN SAY IT FAIRLY AND ACCURATELY DEPICTS.

3        THE COURT:  HOW CAN YOU -- HOW CAN YOU PUBLISH IT

4   WITHOUT ADMITTING IT?

5        MS. HANSEN:  AS A DEMONSTRATIVE FIRST, AS HE JUST

6   INDICATED THAT I CORRECTLY COLORED IN.  IT'S THE SAME MAP HE'S

7   INDICATED.  AND HE'S INDICATED THAT I CORRECTLY COLORED IN THE

8   BLUE AREAS THAT ARE IDENTIFIED WITH SLASH MARKS.

9        MS. LEE:  AGAIN, WE WOULD OBJECT.

10        MS. HANSEN:  I AM HAPPY TO ADMIT IT, YOUR HONOR.

11        THE COURT:  DO YOU OBJECT TO ITS ADMISSION?

12        MS. LEE:  THE GOVERNMENT DOES OBJECT TO ITS

13   ADMISSION.  THE MAP HAS A LOT OF FINELY DETAILED ELEMENTS.

14   THE SCALE ON THAT POTENTIALLY NOT BEING ABLE TO BE VIEWED BY

15   MR. MARTEL AS OPPOSED TO THE ACTUAL MAP WHERE WE CAN BLOW

16   THINGS UP --

17        MS. HANSEN:  YOUR HONOR --

18        THE COURT:  HOLD ON.

19     IS THE SCALE ANY DIFFERENT THAN 2050?

20        MS. HANSEN:  NO.

21        MS. LEE:  THE SCALE IS NOT DIFFERENT, BUT THE AREAS

22   COLORED IN BLUE WOULD INDICATE THAT THOSE ARE THE ONLY BLUE

23   AREAS.  THOSE MAY BE THE ONLY BLUE AREAS --

24        THE COURT:  HOLD ON.

25     OVERRULED.  EXHIBIT 2060 IS ADMITTED.

1          (DEFENDANT'S EXHIBIT 2060 RECEIVED IN EVIDENCE.)

2               **MS. HANSEN:**  THANK YOU, YOUR HONOR.  MAY I PUBLISH?

3               **THE COURT:**  YES.

4                    (EXHIBIT DISPLAYED ON EASEL).

5               **MS. HANSEN:**  I HOPE THAT'S EASIER TO SEE ON THE BLACK

6     AND WHITE MAP.

7     **BY MS. HANSEN:**

8     **Q.**  MR. MARTEL, THE RED AREAS, CAN YOU SEE THE RED AREAS?

9     **A.**  YES.

10    **Q.**  AND THOSE ARE NONJURISDICTIONAL, CORRECT?

11    **A.**  YES.

12    **Q.**  THEY HAD WETLAND FEATURES BUT YOU DETERMINED THOSE WERE

13    NOT JURISDICTIONAL, RIGHT?

14    **A.**  NO, THEY DID NOT HAVE WETLAND FEATURES.  I BELIEVE THAT

15    THEY WERE SEDIMENTATION BASINS THAT WERE CONSTRUCTED TO CATCH

16    WATER COMING OFF OF THE AUTO WRECKING FACILITY THERE.

17         SO THEY MAY HAVE HAD AN ORDINARY HIGH WATER MARK, BUT THEY

18    ARE NOT REGULATED BECAUSE THEY ARE NOT ARTIFICIAL IN NATURE.

19    **Q.**  THEY HAD ARTIFICIAL HYDROLOGY, BUT THERE WAS PICKLEWEED IN

20    THOSE AREAS, CORRECT?

21         BUT THEY DIDN'T HAVE THE THREE INDICATORS.  THERE WAS

22    PICKLEWEED, BUT NOT ALL THREE INDICATORS, CORRECT?

23    **A.**  I CAN HONESTLY SAY I DON'T REMEMBER GOING TO LOOK AT

24    THOSE.  HOWEVER, BECAUSE THEY'RE CONSTRUCTED IN... IN UPLANDS

25    AND THEY WERE ARTIFICIAL IN NATURE, ON A CASE-BY-CASE BASIS WE

1    CHOOSE TO NOT REGULATE THEM WHETHER THEY HAVE HYDROPHYTIC

2    VEGETATION OR NOT.

3        I DON'T KNOW IF THEY HAD VEGETATION IN THEM.

4            **MS. HANSEN:**  LET'S BLOW UP ON EXHIBIT 2050 THE AREA

5    ALONG THE SOUTHERN BERM, MR. WANZALA.

6                    (DISPLAYED ON SCREEN.)

7    **BY MS. HANSEN:**

8    **Q.**  SO I JUST WANT TO CONFIRM SO THERE'S NO CONFUSION, ON THIS

9    MAP, THERE IS NO SLASH MARK ALONG THE SOUTHERN BERM TO

10   IDENTIFY "OTHER WATERS", CORRECT?

11       ON THE MAP.

12   **A.**  AS THE MAP IS DEPICTED, NO.  I BELIEVE THEY SHOWED UP ON

13   THE ORIGINAL FIELD MAP THOUGH.  THEY SHOULD HAVE BEEN

14   INCLUDED.  IT'S A POTENTIAL OVERSIGHT.

15   **Q.**  THE ORIGINAL FIELD MAP, IN YOUR OPINION -- LET'S LOOK AT

16   THAT THEN.

17   **A.**  YES.

18            **MS. HANSEN:**  MAY I HAVE EXHIBIT 180?

19       YOUR HONOR, I WANTED TO MAKE SURE THAT THIS EXHIBIT 180,

20   THIS IS THE EXHIBIT, THE BLOWUP, IF IT'S NOT -- THAT

21   MR. MARTEL REFERRED TO OR IS IT A --

22                    (EXHIBIT DISPLAYED.)

23            **THE WITNESS:**  THIS IS IT.

24            **MS. HANSEN:**  THIS IS IT.

25

1    BY MS. HANSEN:

2    Q.  SIR, LOOK UNDERNEATH THE BERM HERE.  LET'S SHOW THE JURY.

3        YOU WOULD AGREE THAT ALONG THE BERM HERE, THERE ARE ONLY

4    RED AND PURPLE LINES.  THERE ARE NO BLUE LINES ON EXHIBIT 180

5    UNDER THE SOUTHERN BERM.

6        THAT'S GREEN (INDICATING).

7    A.  THESE WERE VEGETATED SWELLS.

8    Q.  THEY WERE WETLANDS --

9            THE REPORTER:  SORRY.  EXCUSE ME.

10   BY MS. HANSEN:

11   Q.  THEY WERE IDENTIFIED AS WETLANDS, CORRECT?

12   A.  VEGETATED SWELLS, YES.

13           THE REPORTER:  EXCUSE ME.  WAIT.

14   BY MS. HANSEN:

15   Q.  WETLANDS, NOT WATER.

16           MS. HANSEN:  SORRY.

17   BY MS. HANSEN:

18   Q.  SO YOU WOULD AGREE THAT ON THE FIELD MAP UNDER THE

19   SOUTHERN BERM, WHAT IS IDENTIFIED ON THE FIELD MAP ARE

20   WETLANDS, CORRECT?

21   A.  YES.

22   Q.  NOT "OTHER WATERS", CORRECT?

23   A.  YES.  VEGETATED SWELLS CAN ACT AS "OTHER WATERS".

24   TRIBUTARY -- THEY CAN BE TRIBUTARY.

25   Q.  LET ME CORRECT THE RECORD.

MARTEL - CROSS / HANSEN

1    YOU IDENTIFIED THEM FOR THE ARMY CORPS OF ENGINEERS AS

2 WETLANDS; ISN'T THAT RIGHT?

3 **A.** YES.

4 **Q.** NOT "OTHER WATERS", RIGHT?

5 **A.** YES.

6 **Q.** THANK YOU.

7    SO YOU WOULD AGREE THAT "OTHER WATERS" ARE NOT WETLANDS,

8 CORRECT?

9 **A.** I WOULD.  YES.

10 **Q.** "OTHER WATERS" MEANS THAT THE VEGETATION WAS SUPPRESSED,

11 CORRECT?

12 **A.** THAT COULD BE ONE ISSUE, YES.

13 **Q.** AND PONDS ARE NOT WETLANDS, CORRECT?

14 **A.** IF THEY DON'T HAVE ROOTED HYDROPHYTIC VEGETATION.

15 **Q.** RIGHT.  AND THE SAME THING WITH OTHER NONWETLAND FEATURES,

16 THEY'RE IDENTIFIED AS NONWETLAND FEATURES BECAUSE THEY DON'T

17 HAVE THE VEGETATION, CORRECT?

18 **A.** THEY DON'T MEET THE CRITERIA FOR WETLANDS.  THERE ARE A

19 NUMBER OF SPECIAL AQUATIC SITES.  WETLANDS IS A SPECIAL TYPE

20 THAT HAS DEFINED CHARACTERISTICS.

21    SO SOMETHING CAN BE IDENTIFIED AS AN "OTHER WATER" WITH

22 ISSUES OTHER THAN VEGETATION.

23 **Q.** THE "OTHER WATERS" ARE ALSO IDENTIFIED BY THE

24 IDENTIFICATION OF, I THINK YOU TALKED ABOUT YESTERDAY, THE

25 ORDINARY HIGH WATER MARK, CORRECT?

1    **A.**  YES.

2    **Q.**  AND IN THE NORTHERN AREA UNDERNEATH THE PICK 'N PULL, WE

3    KNOW WHAT THE OUTLINE OF THAT POND IS BECAUSE OF THE

4    IDENTIFICATION OF THE ORDINARY HIGH WATER MARK FACTORS AS

5    WELL, CORRECT?

6    **A.**  SAY THAT AGAIN?

7    **Q.**  THE ORDINARY HIGH WATER MARK FACTORS, THEY OUTLINE THE

8    LATERAL LIMITS --

9    **A.**  FOR --

10   **Q.**  FOR NONWETLAND FEATURES, CORRECT?

11   **A.**  WHICH PIECE ARE WE TALKING ABOUT?

12   **Q.**  UNDERNEATH THE PICK 'N PULL, THE WATER THERE?

13   **A.**  UNDERNEATH THE PICK 'N PULL.  OH, YOU MEAN THE BIG AREA

14   THAT'S IDENTIFIED IN BLUE?

15   **Q.**  THE BLUE AREA.

16   **A.**  YES.

17   **Q.**  YES.

18   **A.**  THAT WAS IDENTIFIED AS AN "OTHER WATER" WHEN I WAS THERE

19   IN 2007.

20   **Q.**  RIGHT.

21       AND YOU CONCURRED WITH THAT DECISION IN 2007, CORRECT?

22   **A.**  YES.  ON MY FIELD NOTES, I TOOK A LOOK AT IT, AND IT HAS A

23   NOTATION THAT THERE WAS STANDING WATER AT THAT TIME IN AUGUST

24   OF 2007.

25   **Q.**  AND FOR A FEATURE TO BE A POND, IT DOESN'T ALWAYS HAVE TO

1    HAVE STANDING WATER, CORRECT?

2    **A.**   CORRECT.

3    **Q.**   NOW YOU WOULD AGREE THAT THE WETLAND --

4            **MS. HANSEN:**   LET'S BLOW UP THE AREA UNDERNEATH THE

5    PICK 'N PULL ON MR. MARTEL'S FIELD MAP, EXHIBIT 180.

6                     (DISPLAYED ON SCREEN.)

7    **BY MS. HANSEN:**

8    **Q.**   THAT -- THE WETLAND THAT'S AT ISSUE IN THIS CASE, WHEN THE

9    GOVERNMENT SHOWED YOU GOVERNMENT EXHIBIT 3 WITH THE FILL AREA,

10   THAT WETLAND, YOU AGREE, DOES NOT DIRECTLY ABUT THE MOWRY

11   SLOUGH, CORRECT?

12       IT ABUTS THE PONDED "OTHER WATER" THERE, CORRECT?

13   **A.**   TRIBUTARY TO MOWRY SLOUGH, YES.

14   **Q.**   LET'S TALK ABOUT THAT.

15       SO, FIRST, LET'S GO WITH MY QUESTIONS BEFORE WE TRY TO

16   TALK ABOUT THE TRIBUTARY THAT I KNOW YOU REALLY WANT TO TALK

17   ABOUT TODAY.

18       LET'S TALK ABOUT THE "OTHER WATERS".  AND LET'S IDENTIFY

19   THEM AS THAT, BECAUSE THAT'S HOW THE CORPS IDENTIFIED THEM,

20   CORRECT?

21   **A.**   YES.

22   **Q.**   AND UNDER THE REGULATIONS, "OTHER WATERS" ARE A SEPARATE

23   CATEGORY FROM TRIBUTARIES, CORRECT?

24   **A.**   NO.

25   **Q.**   OKAY.  LET'S LOOK AT THE REGULATION.

1    **A.** YES.

2    **Q.** YOU ARE FAMILIAR WITH 33 CFR 328.3?

3    **A.** I AM.

4    **Q.** AND SUBSECTION A3 COVERS "OTHER WATERS", CORRECT.

5    **A.** YES.

6    **Q.** AND ALL "OTHER WATERS", SUCH AS INTERSTATE, LAKES, RIVERS,

7    STREAMS, MUDFLATS, SAND FLATS, WETLANDS, SLOUGHS, PRAIRIE

8    POTHOLES, WET MEADOWS, PLAYA LAKES, NATURAL PONDS, THE USE,

9    DEGRADATION, OR DESTRUCTION OF WHICH COULD AFFECT INTERSTATE

10   OR FOREIGN COMMERCE, INCLUDING ANY SUCH WATERS, AND THEN THERE

11   ARE CATEGORIES RELATING TO COMMERCE, CORRECT?

12   **A.** YES.

13   **Q.** AND THEN SUBSECTION 5 TALKS ABOUT TRIBUTARIES OF WATERS

14   IDENTIFIED IN SUBSECTIONS A1 THROUGH --

15   **A.** A4.

16   **Q.** -- A4.

17   **A.** YES.

18   **Q.** YES. BUT THEY HAVE TO BE A TRIBUTARY IS A SEPARATE

19   CATEGORY. IT WOULD HAVE TO BE A TRIBUTARY OF AN "OTHER

20   WATER", CORRECT?

21   **A.** I BELIEVE IT'S TRIBUTARY TO THE TRADITIONAL NAVIGABLE

22   WATER, AND THE TRIBUTARY IS A CONVEYANCE, AND IT COULD INCLUDE

23   A POND OR A STREAM. THAT'S THE TRIBUTARY.

24      SO THE WETLANDS THAT TOUCH THE TRIBUTARY THAT DISCHARGES

25   INTO MOWRY SLOUGH.

1    **Q.**  THAT IS AN "OTHER WATER".  AND IF IT IS ALSO --

2                    (SIMULTANEOUS COLLOQUY.)

3    **Q.**  IT CAN'T ALSO BE A TRIBUTARY UNLESS IT'S CONNECTED TO 1

4    THROUGH 4 UNDER THE REGULATIONS, CORRECT?

5    **A.**  IT IS CONNECTED.  NUMBER ONE IS THE TIDAL WATER.

6    **Q.**  YOU'D HAVE TO MAKE THE AREA UNDER THE PICK 'N PULL A

7    WETLAND FOR IT TO BE A TRIBUTARY UNDER SUBSECTION 5, CORRECT?

8    **A.**  NO.

9             **MS. LEE:**  OBJECTION ARGUMENTATIVE.

10            **THE COURT:**  OVERRULED.

11   **BY MS. HANSEN:**

12   **Q.**  YOU WOULD AGREE THAT THERE ARE, UNDER THE REGULATIONS,

13   TRIBUTARIES IS LISTED UNDER A SEPARATE SUBSECTION, CORRECT?

14   **A.**  YES.

15       BUT IT ALSO REFERS BACK TO THAT THE TRIBUTARY CAN CONNECT

16   ANY ONE -- 1 THROUGH 4.  IF THEY DO THAT, THEY ARE TRIBUTARY

17   TO THE TRADITIONAL NAVIGABLE WATER.

18       SO SINCE 1 IS THE TIDAL WATERS, IT -- TRIBUTARY IS

19   SOMETHING THAT CONVEYS FLOW TO THAT TRADITIONAL NAVIGABLE

20   WATER IS TRIBUTARY.  AND IT COULD BE A POND.  IT COULD BE A

21   WETLAND.  IT COULD BE ANYTHING AS LONG AS IT CONVEYS WATER.

22   **Q.**  THE TRIBUTARIES OF WATERS IDENTIFIED IN PARAGRAPHS A1

23   THROUGH A4.  LET'S GO THROUGH A1 THROUGH A4.

24       A1 IS, FOR EXAMPLE, A TRADITIONAL --

25   **A.**  MOWRY SLOUGH.

MARTEL – CROSS / HANSEN

1    **Q.**  -- NAVIGABLE WATER, THE MOWRY SLOUGH.

2       SO IT WOULD HAVE TO BE A TRIBUTARY OF THE MOWRY SLOUGH,

3    RIGHT?

4    **A.**  IT IS TRIBUTARY TO MOWRY SLOUGH.

5    **Q.**  OKAY.

6       YOU IDENTIFIED THIS NOT AS A TRIBUTARY TO THE MOWRY

7    SLOUGH; YOU IDENTIFIED IT AS AN "OTHER WATER" WHICH IS

8    SUBSECTION 3, CORRECT?

9    **A.**  IT'S AN "OTHER WATER" WHICH IS TRIBUTARY TO MOWRY SLOUGH.

10   **Q.**  I WILL MOVE ON.  I THINK THE POINT HAS BEEN MADE.

11   **A.**  I THINK SO.

12   **Q.**  THE TRIBUTARY THAT YOU ARE NOW REFERRING TO, WHICH --

13          **MR. KEARNEY:**  COUNSEL, CAN WE REMOVE THIS?

14          **MS. HANSEN:**  OH, SURE.

15          **MR. KEARNEY:**  THANK YOU.

16               (PAUSE IN THE PROCEEDINGS.)

17   **BY MS. HANSEN:**

18   **Q.**  YOU HAVE NO FIELD NOTES FROM 2007 DISCUSSING THE FLOW,

19   CORRECT, FROM THE NORTHERN AREA FROM WHAT YOU'RE NO LONGER

20   CALLING AN "OTHER WATER", CORRECT?

21   **A.**  PART OF WHAT WE DID, I OBSERVED THAT THERE WAS A... A

22   CULVERT THAT DISCHARGED WATER FROM THE PONDED AREA INTO MOWRY

23   SLOUGH.

24   **Q.**  MY QUESTION WAS, DO YOU HAVE ANY FIELD NOTES DOCUMENTING

25   YOUR OBSERVATION IN 2007?

MARTEL – CROSS / HANSEN

1  **A.**  ABOUT THE ACTUAL CULVERT, NO.

2  **Q.**  AND YOU DON'T HAVE ANY HYDROLOGY STUDIES FROM 2007 THAT

3  YOU PREPARED TO ASSESS HOW MUCH FLOW WAS GOING INTO THE MOWRY

4  SLOUGH FROM THAT AREA, CORRECT?

5  **A.**  OTHER THAN THE PRACTICAL APPLICATION THAT WATER FLOWS

6  DOWNHILL IN THE WATER THAT WAS PONDED BEHIND THE MAN-MADE

7  STRUCTURE IN GOING THROUGH THE CULVERT WAS TOPOGRAPHICALLY

8  HIGHER AND WOULD GRAVITATIONALLY FLOW THAT WAY.

9  **Q.**  YOU HAVE NO DATA COLLECTION FROM THE WATER THAT WAS COMING

10  OUT TO ASSESS THE RATE, VOLUME, OR DURATION, CORRECT?

11  **A.**  NO.  AND THAT'S REALLY NOT NECESSARY FOR IDENTIFYING --

12  **Q.**  WELL, WE'LL GET INTO THAT, WHETHER IT'S NECESSARY.

13      AND H.T. HARVEY PROVIDED YOU WITH NO SUCH DATA ABOUT THE

14  HYDROLOGY OF WHAT WAS COMING OUT OF THE POND INTO THE SLOUGH,

15  CORRECT?

16  **A.**  I BELIEVE NOT.

17  **Q.**  SO LET'S LOOK AT ONE OF THE GUIDEBOOKS AND SEE WHAT THEY

18  SAY.

19      SO THERE IS A HANDBOOK AFTER *RAPANOS* CAME OUT CALLED THE

20  JURISDICTIONAL DETERMINATION FORM INSTRUCTIONAL GUIDEBOOK,

21  CORRECT?

22  **A.**  YES.

23  **Q.**  CAN I JUST CALL THAT THE RAPANOS GUIDANCE FOR SHORT?

24  **A.**  SURE.

25  **Q.**  AND ACCORDING TO THE RAPANOS GUIDANCE, WE WOULD NEED A

1    SIGNIFICANT NEXUS TO THE TRADITIONAL NAVIGABLE WATER FOR ANY

2    SUCH NONPERMANENT WATER JURISDICTIONAL WITH THE TRADITIONAL --

3    EXCUSE ME.

4         A NONRELATIVELY PERMANENT WATER IS JURISDICTIONAL UNDER

5    THE CLEAN WATER ACT WHERE THERE IS A SIGNIFICANT NEXUS WITH A

6    TRADITIONAL NAVIGABLE WATER, CORRECT?

7    **A.**  I DISAGREE.  THE -- THE -- THERE ARE CATEGORIES THAT THEY

8    BROKE OUT TO DEFINE WHICH ONES NEEDED SIGNIFICANT NEXUS AND

9    WHICH ONES DIDN'T FOR THE ISSUE --

10   **Q.**  AND --

11   **A.**  -- FOR THE ISSUE OF TRADITIONAL NAVIGABLE WATERS.  SO IF

12   YOU HAVE A TRIBUTARY THAT DISCHARGES INTO TRADITIONAL

13   NAVIGABLE WATERS AND IT HAS RELATIVELY PERMANENT FLOW, WHICH

14   IS DEFINED AS SEASONAL FLOW, WHICH THESE SYSTEMS HAVE, AND

15   WETLANDS THAT ABUT THOSE AREAS ARE ALL CONSIDERED

16   JURISDICTIONAL WITHOUT HAVING TO DO WITH SIGNIFICANT NEXUS

17   DETERMINATION.

18   **Q.**  HOLD ON A SECOND.

19        YOU'RE MAKING A FINDING THAT THERE THIS IS A PERMANENT

20   FLOW WITHOUT ANY STUDIES, CORRECT?

21   **A.**  I DID NOT SAY "PERMANENT".  I SAID SEASONAL.

22   **Q.**  SEASONAL BUT A RELATIVELY PERMANENT WATER, IT'S CALLED AN

23   RPW --

24   **A.**  YES.

25   **Q.**  -- WHERE YOU DON'T NEED TO DO THE SIGNIFICANT NEXUS

1    ANALYSIS, YOU HAVE ZERO DATA TO BACK THAT UP, CORRECT?

2    **A.**  NO.  THE SEASONAL PONDING THAT OCCURS THERE LEAVES

3    INDICATIONS OF THE DURATION OF THE PONDING.  AND I SAW THE

4    WATER THERE IN AUGUST --

5    **Q.**  SIR, I AM NOT TALKING ABOUT YOUR OBSERVATIONS.  I AM

6    TALKING ABOUT SCIENCE.

7         DO YOU HAVE ANY STUDIES OF THE HYDROLOGY OF THE WATER TO

8    SUPPORT YOUR FINDING THAT THE TRIBUTARY WAS A RELATIVELY

9    PERMANENT WATER?

10   **A.**  IN THE NORMAL COURSE OF OUR AFFAIRS, THOSE WERE NOT

11   NECESSARY.

12   **Q.**  WELL, IF IT'S NOT A RELATIVELY PERMANENT WATER, THE

13   TRIBUTARY, YOU AGREE THAT YOU WOULD NEED THE SIGNIFICANT NEXUS

14   ANALYSIS, CORRECT?

15   **A.**  IF IT DOESN'T HAVE SEASONAL FLOW AND QUALIFY AS A

16   RELATIVELY PERMANENT WATER, YES.

17   **Q.**  AND UNDER THE SIGNIFICANT NEXUS ANALYSIS --

18          **MS. HANSEN:**  I WOULD LIKE TO USE AS A DEMONSTRATIVE

19   PAGE 15 OF THE MANUAL.  I HAVE COPIES.

20        YOUR HONOR, MAY I HAVE PERMISSION TO USE AS DEMONSTRATIVE

21   PAGE 15 OF THE RAPANOS GUIDANCE WITH THE WITNESS?

22          **THE COURT:**  IS THERE ANY OBJECTION?

23          **MS. LEE:**  WHAT PAGE?

24          **MS. HANSEN:**  15.

25          **MS. LEE:**  NO OBJECTION.

1        **THE COURT:**  ALL RIGHT.

2        SO, LADIES AND GENTLEMEN, THIS MAY BE USED AS A

3   DEMONSTRATIVE EXHIBIT TO ILLUSTRATE THE WITNESS'S TESTIMONY

4   BUT IT'S NOT BEING OFFERED OR ADMITTED IN EVIDENCE ITSELF.

5                    (DISPLAYED ON SCREEN.)

6        **MS. HANSEN:**  MR. WANZALA, CAN YOU HIGHLIGHT THE

7   SIGNIFICANT NEXUS EVALUATION SECTION UP TO THE BOTTOM WHERE IT

8   SAYS "AVERAGE ANNUAL WINTER SNOW PACK".

9   **BY MS. HANSEN:**

10  **Q.**  WOULD YOU AGREE THAT THE MANUAL SAYS, QUOTE:

11           "AN ASSESSMENT OF THE FLOW CHARACTERISTICS AND

12           FUNCTIONS OF THE TRIBUTARY, ITSELF, IN COMBINATION

13           WITH THE FUNCTIONS PERFORMED BY ANY WETLANDS ADJACENT

14           TO THE TRIBUTARY TO DETERMINE IF THEY HAVE MORE THAN

15           AN INSUBSTANTIAL OR SPECULATIVE EFFECT ON THE

16           CHEMICAL, PHYSICAL AND/OR BIOLOGICAL INTEGRITY OF THE

17           TRADITIONAL NAVIGABLE WATER."

18       IS THAT WHAT IT SAYS THERE?

19  **A.**  YES.

20  **Q.**  AND A CONSIDERATION OF HYDROLOGICAL FACTORS SUCH AS

21  VOLUME, CORRECT?

22  **A.**  YES.

23  **Q.**  DURATION, CORRECT?

24  **A.**  YES.

25  **Q.**  FREQUENCY OF FLOW?

1    **A.**  YES.

2    **Q.**  AND THE CONSIDERATION OF PHYSICAL CHARACTERISTICS OF THE

3    TRIBUTARY, CORRECT?

4    **A.**  YES.

5    **Q.**  PROXIMITY TO THE TRADITIONAL NAVIGABLE WATER, CORRECT?

6    **A.**  YES.

7    **Q.**  SIZE OF THE WATERSHED, CORRECT?

8    **A.**  YES.

9    **Q.**  AVERAGE ANNUAL RAINFALL?

10   **A.**  YES.

11   **Q.**  AND WHAT DOESN'T APPLY IN OUR AREA, AVERAGE ANNUAL WINTER

12   SNOW PACK, CORRECT?

13   **A.**  YES.

14       CAN I -- THAT APPLIES -- IT DOES NOT APPLY TO WETLANDS

15   THAT ARE ABUTTING TRIBUTARIES THAT FLOW DIRECTLY INTO

16   TRADITIONAL NAVIGABLE WATERS.  THOSE ARE FOR WETLANDS THAT ARE

17   NOT ABUTTING TRIBUTARIES THAT FLOW TO -- DIRECTLY TO NAVIGABLE

18   WATERS.

19   **Q.**  SIR, THE WETLAND IN OUR PICTURE, YOU WOULD AGREE, DOES NOT

20   ABUT THE TRADITIONAL NAVIGABLE WATER OF THE MOWRY SLOUGH?

21   **A.**  IT ABUTS THE TRIBUTARY THAT FLOWS TO THE TRADITIONAL

22   NAVIGABLE WATER.

23   **Q.**  IT ABUTS THE "OTHER WATER" IDENTIFIED IN YOUR MAP.

24   **A.**  WHICH IS A TRIBUTARY.

25   **Q.**  AND YOU HAVE NO DATA TO BACK UP YOUR CLAIM THAT THIS IS A

MARTEL – CROSS / HANSEN

1    TRIBUTARY, CORRECT?

2    **A.**  I HAVE OBSERVATION.

3         **THE COURT:**  WHY DON'T WE TAKE OUR MORNING BREAK

4    MOSTLY FOR OUR COURT REPORTER'S SAKE.  SHE'S BEEN WORKING THE

5    WHOLE TIME.

6       ALL RIGHT.  LET'S BREAK.  LADIES AND GENTLEMEN, WE WILL

7    COME BACK AT 10:15.  AND JUST KEEP IN MIND ALL OF YOUR

8    ADMONITIONS.

9       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

10        **THE CLERK:**  YOU MAY BE SEATED.

11      (RECESS TAKEN AT 10:00 A.M.; RESUMED AT 10:15 A.M.)

12        **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

13   COURT IS BACK IN SESSION.

14      READY, JUDGE?

15        **THE COURT:**  YES.

16      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

17        **THE CLERK:**  YOU MAY BE SEATED.

18        **THE COURT:**  YOU MAY PROCEED, MS. HANSEN.

19        **MS. HANSEN:**  THANK YOU, YOUR HONOR.

20      I HAVE BEEN WAITING FOR SOME INFORMATION FROM GOVERNMENT

21   COUNSEL, SO I WILL KEEP GOING WITH MY CROSS AND HOPEFULLY I

22   WILL GET THAT BEFORE I FINISH.

23   **BY MS. HANSEN:**

24   **Q.**  MR. MARTEL, IN 2007, YOU DID NOT COMPLETE A JURISDICTIONAL

25   DETERMINATION FORM, CORRECT?

MARTEL – CROSS / HANSEN

1    **A.**  I DID NOT.

2    **Q.**  AND IT'S AN EIGHT-PAGE FORM THAT YOU CALL A SHOCK AND AWE

3    CHECKLIST, CORRECT.

4    **A.**  I BELIEVE IT'S HAS BEEN REFERRED THAT WAY.

5    **Q.**  AND IT TAKES A LOT OF FIELD WORK AND PREPARATION TIME; IS

6    THAT RIGHT?

7    **A.**  YES.

8    **Q.**  AND AS FAR AS YOU KNOW, NO ONE AT THE CORPS FILLED OUT

9    THIS FORM AND CONDUCTED THIS TEST IN 2007, CORRECT?

10   **A.**  I HAVE NOT SEEN THE FILE.  SO I DON'T KNOW IF IT'S IN

11   THERE OR NOT.

12   **Q.**  YOU DID NOT COMPLETE IT, CORRECT?

13   **A.**  NO.  THAT WAS NOT PART OF MY FUNCTION.  THAT GOES BACK TO

14   THE PROJECT MANAGER WHO WOULD HAVE... WHO WOULD HAVE FILLED

15   THAT OUT AND INCLUDED THAT AS PART OF THE RECORD.

16       HOWEVER, FOR THE CLASS OF WETLANDS AND THE TRADITIONAL

17   NAVIGABLE WATERS AND THE ADJACENCY ISSUES WE DID, THE FORM

18   STIPULATES THAT YOU DON'T NEED TO FILL OUT THE EXTENSIVE FORM.

19   IT'S -- BASICALLY IT'S JUST TO CHECK THE FACT THAT IT'S

20   NAVIGABLE WATERS, TRIBUTARIES TO NAVIGABLE WATERS AND WETLANDS

21   ABUTTING THE TRIBUTARIES TO NAVIGABLE WATERS, AND THEN

22   CATEGORICALLY CONSIDER JURISDICTIONAL.

23   **Q.**  WELL, MY QUESTION WAS WHETHER YOU COMPLETED THE FORM.

24       AND YOU DID NOT, CORRECT?

25   **A.**  I DID NOT.

MARTEL - CROSS / HANSEN

1    **Q.**  AND THIS FORM WAS CREATED IN RESPONSE TO THE SUPREME

2    COURT'S DECISION IN *RAPANOS*, CORRECT?

3    **A.**  MY UNDERSTANDING, YES.

4    **Q.**  AND THE SUPREME COURT DECISION CAME OUT RIGHT AROUND THE

5    TIME THAT YOU WERE DOING THE WORK ON THIS CASE, CORRECT?

6    **A.**  I BELIEVE THAT THE -- THAT DOCUMENT, THE... THE WORKSHEET

7    AND THE GUIDANCE BOOK WERE DATED SOMETIME IN JUNE OF 2007.

8    **Q.**  AND YOU WERE AT THE FIELD IN AUGUST OF 2007, CORRECT?

9    **A.**  YES.

10        AND THE LEAD TIME FOR ALL OF THIS, THE APPLI -- THE

11   REQUEST FOR A JURISDICTIONAL DETERMINATION FOR HARVEY'S

12   PROBABLY CAME IN THE OFFICE BEFORE THAT WAS ISSUED.

13   **Q.**  AND I WANT TO TALK TO YOU A LITTLE BIT ABOUT... I AM

14   HOPING TO GET INFORMATION ON IN A MOMENT.

15        SIR, YOU HAVE CONTRACTED WITH THE GOVERNMENT FOR YOUR

16   TRIAL PREPARATION AND TESTIMONY, CORRECT?

17   **A.**  YES.

18   **Q.**  DO YOU KNOW WHEN YOU ENTERED THAT CONTRACT?

19   **A.**  FOR THIS TRIAL?

20   **Q.**  YES.

21   **A.**  I BELIEVE IT WOULD HAVE BEEN JANUARY 2017.

22   **Q.**  WOULD IT -- DO YOU BELIEVE IT WAS THIS YEAR OF JANUARY OR

23   LAST JANUARY?

24   **A.**  LAST JANUARY.

25   **Q.**  JANUARY OF 2017?

MARTEL – CROSS / HANSEN

1    **A.**  YES.

2    **Q.**  IN DECEMBER 19TH, 2016, A MONTH BEFORE THAT, YOU WERE

3    INTERVIEWED BY THE GOVERNMENT, CORRECT?

4    **A.**  I DON'T KNOW THE DATES, BUT THAT SOUNDS RIGHT.

5    **Q.**  DECEMBER 19TH, 2016, MR. KEARNEY WAS THERE, CORRECT?

6    **A.**  I DON'T HAVE THE DATES, BUT IF YOU SAY SO THAT SOUNDS

7    RIGHT.

8    **Q.**  WELL, DO YOU REMEMBER MS. LEE WAS PRESENT?

9    **A.**  YES.

10   **Q.**  DO YOU REMEMBER MR. KEARNEY WAS PRESENT?

11   **A.**  YES.

12   **Q.**  AND AGENT SIVOK WAS PRESENT; IS THAT RIGHT?

13   **A.**  I'M REALLY BAD WITH PEOPLE.  IF YOU SAY SO.

14   **Q.**  WELL, YOU KNOW THESE PEOPLE, RIGHT?

15   **A.**  I'VE BEEN INTRODUCED TO THEM.

16   **Q.**  YOU'VE BEEN MEETING WITH THEM THIS LAST MONTH, CORRECT?

17   **A.**  YES.

18   **Q.**  SO YOU KNOW WHO I'M TALKING ABOUT, RIGHT?

19   **A.**  I'M NOT SURE I KNOW EVERYBODY'S NAME.

20   **Q.**  OKAY.

21      BUT THE PEOPLE AT COUNSEL TABLE, YOU --

22   **A.**  YES.

23   **Q.**  -- MET WITH THESE FOLKS HERE IN DECEMBER OF 2016, CORRECT?

24   **A.**  YES.

25   **Q.**  OKAY.

1      AND WHEN YOU WERE INTERVIEWED, YOU WERE ASKED ABOUT THE

2   NORTHERN AREA UNDER THE PICK 'N PULL, CORRECT?

3   **A.**  I CANNOT REMEMBER THE CONVERSATION, BUT I WOULDN'T -- I

4   WOULD NOT DOUBT THAT THAT WAS AN ISSUE.

5   **Q.**  AND YOU DID NOT SAY DURING THAT INTERVIEW THAT YOU

6   UNDERSTOOD THE "OTHER WATER" TO BE A TRIBUTARY, CORRECT?

7   **A.**  I CAN'T REMEMBER.  LIKE I SAID, WE TALKED ABOUT MANY

8   THINGS AND WE WEREN'T SPECIFIC -- I DON'T THINK THIS THING WAS

9   SPECIFIC -- I BELIEVE THEY WERE MORE INTERESTED IN SORT OF THE

10  BASIC PROCESS OF HOW DELINEATIONS ARE DONE AND WHAT KIND OF

11  MATERIAL WAS DONE FOR THE DELINEATION, AND NOT SO MUCH THE

12  JURISDICTIONAL DETERMINATION, BUT MORE TOWARDS THE

13  IDENTIFICATION AND EXTENT OF WETLANDS.

14      BUT THE CONVERSATION RANGED ALL OVER THE PLACE AND I HAVE

15  NO RECOLLECTION.

16  **Q.**  ISN'T IT TRUE YOU SAID THAT THE "OTHER WATERS" HATCH MARK

17  MEANS IT MEETS THE DEFINITION OF "WATERS OF THE U.S." BUT IT

18  IS NOT A WETLAND.  THE PONDS STAY LONG ENOUGH DURING THE WET

19  SEASON TO MEET THE CRITERIA FOR "OTHER WATERS" BUT NOT

20  NECESSARILY A WETLAND.  CORRECT?

21  **A.**  SOUNDS CORRECT.

22  **Q.**  DID YOU SAY:  NOT CALLING THAT PORTION A WETLAND MEANS THE

23  VEGETATION WAS SUPPRESSED FOR SOME REASON.  HE WOULD HAVE

24  REGULATED AS A WATER IF IT WAS LOWER THAN THE LEVEE.  IT COULD

25  HAVE HAD PONDING WATER BECAUSE THAT AREA WAS LOWER IN

MARTEL – CROSS / HANSEN

```
1    ELEVATION THAN WHAT SURROUNDED IT.
2        CORRECT?
3    A.   YES.
4    Q.   ON JANUARY OF 2017, A MONTH LATER, YOU ENTERED A CONTRACT
5    WITH THE GOVERNMENT, CORRECT?
6    A.   IT SOUNDS RIGHT.
7    Q.   AND YOU ARE BEING PAID, POSSIBLY, I THINK THE CONTRACT
8    AMOUNT IS $16,000 FOR YOUR TRIAL PREPARATION AND TESTIMONY,
9    CORRECT?
10   A.   IF YOU SAY SO.  I DON'T KNOW.
11   Q.   YOU DON'T KNOW THE AMOUNT THAT YOU'VE -- DO YOU HAVE ANY
12   RECORDS OF WHAT YOU SIGNED WITH THE GOVERNMENT?
13   A.   I DON'T EVEN RECOLLECT SIGNING ANYTHING, TO TELL YOU THE
14   TRUTH.  I HAVEN'T SUBMITTED ANY... ANY BILLS OR VOUCHERS YET
15   FOR ANY OF THE SERVICES.
16   Q.   YOU ARE PLANNING TO SUBMIT BILLS OR VOUCHERS?
17   A.   YES.
18   Q.   AND YOU WENT TO THE SITE WITH THE GOVERNMENT TEAM ON
19   FEBRUARY 17TH --
20   A.   YES.
21   Q.   -- OF 2017, CORRECT?
22   A.   YES.
23   Q.   THAT WAS A MONTH AFTER YOU SIGNED YOUR CONTRACT, CORRECT?
24   A.   YES.
25   Q.   DR. HUFFMAN WAS THERE, CORRECT?
```

MARTEL - CROSS / HANSEN

1    **A.**  YES.

2    **Q.**  AND THE GOVERNMENT TEAM WAS THERE, CORRECT?

3    **A.**  YES.

4    **Q.**  AND YOU WEREN'T DOING ANY SCIENCE AT THE SITE, CORRECT?

5    **A.**  I DID NOT DO ANY SAMPLING OR --

6    **Q.**  RIGHT.

7    **A.**  -- OR EVALUATIONS.

8    **Q.**  YOU DIDN'T COMPLETE THE SHOCK AND AWE CHECKLIST, CORRECT?

9    **A.**  COULDN'T BE DONE.

10   **Q.**  AND --

11   **A.**  EXPENSIVE STUDY AND INFORMATION --

12                  (SIMULTANEOUS COLLOQUY.)

13       YOU CAN'T DO THAT STANDING ON THE GROUND.

14   **Q.**  IF THEY WERE A TRIBUTARY, SIR, YOU WOULD HAVE HAD TO DO

15   THE SIGNIFICANT NEXUS ANALYSIS, CORRECT?

16   **A.**  NO.

17   **Q.**  IF IT WAS A NONPERMANENT AND -- TRIBUTARY, NON-RPW --

18   **A.**  RELATIVELY PERMANENT TRIBUTARY WITH SEASONAL FLOW.

19   **Q.**  IF IT WAS A NON-RPW TRIBUTARY, YOU HAVE TO DO THE

20   SIGNIFICANT NEXUS ANALYSIS, CORRECT?

21   **A.**  YES.

22   **Q.**  THANK YOU.

23       MY INVESTIGATOR, FRANK TAMBURELLO TRIED TO CONTACT YOU,

24   CORRECT?

25   **A.**  YES.

1    **Q.**  HE TRIED TO SERVE A SUBPOENA ON YOU, CORRECT?

2    **A.**  I'M NOT ENTIRELY SURE WHAT HE TRIED TO DO.

3            **MS. LEE:**  OBJECTION RELEVANCE.

4            **THE COURT:**  CALLS FOR SPECULATION, SO SUSTAINED.

5    **BY MS. HANSEN:**

6    **Q.**  MY INVESTIGATOR TRIED TO GET IN TOUCH WITH YOU, CORRECT?

7    **A.**  I DID GET A TELEPHONE CALL FROM SOMEBODY WHO IDENTIFIED

8    THEMSELF BY THAT NAME.  I DIDN'T KNOW WHO HE WAS.  SO I WAS A

9    REALLY RELUCTANT.

10       ALL THE KIDS TELL ME, WHEN YOU GET A TELEPHONE CALL AND

11   YOU DON'T KNOW THE NUMBER, DON'T EVEN ANSWER IT.

12   **Q.**  WELL, SIR, HE IDENTIFIED HIMSELF IN AN EMAIL TO YOU,

13   CORRECT?

14   **A.**  ONCE AGAIN, WHEN YOU GET AN EMAIL AND YOU DON'T KNOW WHO

15   IT IS, DON'T ANSWER.

16   **Q.**  HE ALSO IDENTIFIED HIMSELF ON THE PHONE WITH YOU WHEN HE

17   SPOKE TO YOU DIRECTLY, CORRECT?

18   **A.**  SO DOES THE PRINCE OF NIGERIA.

19   **Q.**  AND SO THE U.S. MARSHALS HAD TO GO OUT TO CONTACT YOU,

20   CORRECT?

21   **A.**  I DON'T KNOW.  I WASN'T -- I NEVER SAW A U.S. MARSHAL.

22   **Q.**  YOU SPOKE TO A U.S. MARSHAL ON THE PHONE, CORRECT?

23   **A.**  I DID.

24   **Q.**  AND YOU HUNG UP THE PHONE ON HIM, CORRECT?

25   **A.**  SOMEBODY CALLED ME AND IDENTIFIED THEMSELVES AS A U.S.

MARTEL – CROSS / HANSEN

1    MARSHAL, BUT I DIDN'T KNOW WHO HE WAS.

2        WHAT I DID WAS, EVENTUALLY, WHEN HE CALLED THE SECOND

3    TIME, I ASKED HIM WHAT HE WANTED.  WHEN I FOUND OUT WHAT IT

4    WAS THAT THEY WERE CALLING ME FOR, I IMMEDIATELY AGREED TO

5    ACCEPT THE SUBPOENA.

6        I HAD NO TROUBLE WITH THAT.  THEY DIDN'T IDENTIFY WHAT

7    THEY WANTED TO TALK TO ME ABOUT PRIOR TO THAT, SO I HAD NO

8    IDEA, FIRST OF ALL, WHO THEY WERE, AND SECONDLY WHAT THEY

9    WAND.

10   **Q.**  SIR, THE U.S. MARSHAL WENT TO YOUR HOUSE AND SAW YOUR

11   WIFE, CORRECT, AND IDENTIFIED HIMSELF TO HER?

12           **MS. LEE:**  OBJECTION.

13           **THE WITNESS:**  I DON'T KNOW.

14           **MS. LEE:**  RELEVANCE ASKED AND ANSWERED NUMEROUS

15   TIMES.

16           **THE COURT:**  OVERRULED.

17   **BY MS. HANSEN:**

18   **Q.**  SIR, YOU ONLY ACCEPTED SERVICE AFTER THE COURT INTERVENED

19   AND HAD MR. KEARNEY CALL YOU AND TELL YOU TO DO SO; ISN'T THAT

20   RIGHT?

21   **A.**  NO.

22           **MS. HANSEN:**  NO FURTHER QUESTIONS.

23           **THE COURT:**  ANY REDIRECT?

24           **MS. LEE:**  VERY BRIEF.

25

<div style="border: 2px solid black">

### REDIRECT EXAMINATION

**BY MS. LEE:**

**Q.** MR. MARTEL, YOU ARE -- YOU'VE BEEN RETIRED FROM THE ARMY
CORPS OF ENGINEERS SINCE 2012, RIGHT?

**A.** YES.

**Q.** AND SO THE GOVERNMENT HAS RETAINED YOU, AMONG OTHERS, AS
AN EXPERT IN THIS CASE, CORRECT?

**A.** YES.

**Q.** AND THE GOVERNMENT WILL PAY YOU FOR YOUR WORK ON THIS
CASE, RIGHT?

**A.** IT'S MY UNDERSTANDING.

**Q.** DOES THE FACT THAT THE GOVERNMENT PAYS YOU FOR THE WORK
THAT YOU PERFORM, DO YOU CHANGE YOUR TESTIMONY BECAUSE YOU'RE
PAID FOR THE WORK THAT YOU DO?

**A.** ABSOLUTELY NOT.  I BELIEVE I'VE BEEN HIRED TO RENDER
OPINIONS OF FACT, AND THAT'S WHAT I, YOU KNOW, THAT'S WHAT I
AM HERE TO DO.

**Q.** WE'VE BEEN TALKING ABOUT -- YOU WERE ASKED A FEW QUESTIONS
ABOUT WATER THAT RUNS ALONG THAT SOUTHERN BERM WHERE THE
SOUTHERN FILL SECTION WAS GOING FROM EAST TO WEST.

**A.** YES.

**Q.** JUST BECAUSE THERE IS NOT A BLUE LINE THERE, DOES WATER
EXIST THERE IN REAL LIFE?

**A.** YES.  PARTIALLY.

    **MS. HANSEN:**  YOUR HONOR, OBJECTION AS TO TIME.

</div>

MARTEL – REDIRECT / LEE

1  VAGUE.

2          **THE COURT:**  WELL, MAYBE YOU CAN CLARIFY THAT.

3  **BY MS. LEE:**

4  **Q.**  HAVE YOU SEEN WATER THERE EXIST IN REAL LIFE --

5  **A.**  YES.

6  **Q.**  -- WHEN YOU'VE BEEN ON THE PROPERTY?

7  **A.**  YES.

8          **MS. HANSEN:**  SAME OBJECTION.

9          **THE COURT:**  OVERRULED.

10  **BY MS. LEE:**

11  **Q.**  WHETHER THAT LINE IS CHARACTERIZED AS A GREEN COLOR OR A

12  BLUE COLOR, DOES THAT CHANGE WHETHER OR NOT THAT AREA IS A

13  JURISDICTIONAL "WATER OF THE UNITED STATES"?

14  **A.**  NO.  IN -- LARGELY BECAUSE THE WETLANDS ARE CONTIGUOUS

15  WITH THE RELATIVELY PERMANENT WATER THAT ACTS AS A TRIBUTARY

16  TO THE DISCHARGE INTO THE TRADITIONAL NAVIGABLE WATERS, THE

17  TIDAL WATERS.

18      AND SO IT'S... IT'S -- MEETS THE TEST -- NUMBER ONE, IT

19  ABUTS, IT'S ADJACENT, BY MEANING IT'S NEIGHBORING, BORDERING,

20  AND CONTIGUOUS.  SO THOSE WETLANDS ARE IN A CONTINUOUS LINE.

21  THEY ARE CONNECTED ALL THE WAY DOWN TO THE COLLECTION DITCH

22  WHICH ACTS AS A TRIBUTARY TO THE NAVIGABLE WATERS.

23      SO THOSE WETLANDS ARE ADJACENT TO TRIBUTARIES TO NAVIGABLE

24  WATERS AND ABUTTING ALSO TO THE RELATIVELY PERMANENT WATER.

25  **Q.**  AND MS. HANSEN HAD BROUGHT UP --

1          **MS. LEE:**  IF WE CAN PLACE BACK ONTO THE SCREEN....

2               (PAUSE IN THE PROCEEDINGS.)

3               (DISPLAYED ON SCREEN.)

4     **BY MS. LEE:**

5     **Q.**  IT'S A DEMONSTRATIVE.  IT'S THE U.S. ARMY CORPS OF

6     ENGINEERS JURISDICTIONAL DETERMINATION FORM INSTRUCTIONAL

7     GUIDEBOOK.

8     **A.**  YES.

9     **Q.**  ON PAGE 15.

10    **A.**  YES.

11    **Q.**  IF WE COULD JUST HIGHLIGHT THE FIRST TWO BULLET POINTS.

12         STATES:  THE AGENCIES WILL ASSERT JURISDICTION OVER THE

13    FOLLOWING WATERS:  TNW, WHICH ARE TRADITIONAL NAVIGABLE

14    WATERS, AND WETLANDS ADJACENT TO TRADITIONAL NAVIGABLE WATERS,

15    NON-NAVIGABLE TRIBUTARIES OF TRADITIONAL NAVIGABLE WATERS THAT

16    ARE RELATIVELY PERMANENT.  EXAMPLE:  THE TRIBUTARIES TYPICALLY

17    FLOW YEAR ROUND OR HAVE CONTINUOUS FLOW AT LEAST SEASONALLY

18    AND WETLANDS THAT DIRECTLY ABUT SUCH TRIBUTARIES.

19         IS IT YOUR TESTIMONY THAT UNDER THESE CATEGORIES, A

20    SIGNIFICANT NEXUS TEST DOES NOT NEED TO BE DONE PER THESE ARMY

21    CORPS GUIDANCE?

22    **A.**  YES.

23    **Q.**  AND, IN FACT, IF YOU GO PASSED THAT PARAGRAPH TO WHERE

24    MS. HANSEN HIGHLIGHTED, IT GETS US TO THE PART ABOUT

25    SIGNIFICANT NEXUS WHERE IT SAYS:

1        IN ADDITION, THE FOLLOWING WATERS WILL ALSO BE FOUND

2   JURISDICTIONAL BASED ON A FACT-SPECIFIC ANALYSIS THAT THEY

3   HAVE A SIGNIFICANT NEXUS WITH THE TRADITIONAL NAVIGABLE WATER.

4        AND THAT'S FOR DIFFERENT TYPES OF WATERS THAT ARE NOT IN

5   THE FIRST TWO CATEGORIES; IS THAT CORRECT?

6   **A.**  YES.

7   **Q.**  AND IS IT YOUR OPINION THAT THE WETLANDS ON NEWARK AREA 4

8   ARE ADJACENT TO MOWRY SLOUGH?

9   **A.**  YES.

10  **Q.**  AND THEY ABUT A NON-NAVIGABLE TRIBUTARY OF MOWRY SLOUGH

11  THAT IS RELATIVELY PERMANENT?

12          **MS. HANSEN:**  OBJECTION, YOUR HONOR.  THIS IS LEADING

13  AND BEYOND THE SCOPE.

14          **THE COURT:**  OVERRULED.

15          **THE WITNESS:**  YES.  THEY ABUT TRIBUTARIES THAT

16  DISCHARGE INTO THE TRADITIONAL NAVIGABLE WATERS.

17  **BY MS. LEE:**

18  **Q.**  AND MS. HANSEN HAD BROUGHT TO YOUR ATTENTION AN INTERVIEW

19  THAT YOU HAD WITH INDIVIDUALS FROM MY OFFICE.  I WOULD LIKE TO

20  BRING TO YOUR ATTENTION AN INTERVIEW THAT YOU HAD A MONTH

21  LATER IN FEBRUARY OF 2017.

22          DO YOU RECALL THAT INTERVIEW IN WHICH YOU TALKED ABOUT HOW

23  THERE ARE TRIBUTARIES OF TIDAL WATERS PRESENT ON THE PROPERTY?

24          IF YOU DON'T RECALL.

25  **A.**  I DON'T.

MARTEL - REDIRECT / LEE

1    **Q.** OKAY.

2    **A.** IT MAY HAVE BEEN IN REFERENCE TO THE FACT THAT THESE --

3    MOST OF THE AREA IN QUESTION THAT WAS THE SUBJECT OF

4    JURISDICTIONAL DETERMINATION ABOUT WETLANDS AND WATERS WAS

5    HISTORICALLY TIDAL BAYLANDS. AND SO THEY WERE BELOW THE PLANE

6    OF THE HIGH TIDE LINE. SO HISTORICALLY THEY WERE TIDAL

7    SLOUGHS THAT RAN ALL THOUSAND THOSE FIELDS.

8        IT MAY HAVE BEEN IN REFERENCE TO THOSE THAT THOSE TIDAL

9    SLOUGHS, REMNANTS OF THOSE, WOULD STILL BE REGULATED UNDER A

10   DIFFERENT LAW, SECTION 10 OF THE RIVERS AND HARBORS ACT, AS

11   NAVIGABLE WATERS. THAT'S THE SORT OF A SIDE ISSUE TO THIS.

12       BUT THE -- HISTORICALLY THERE WERE TIDAL SLOUGHS THROUGH

13   THOSE FIELDS THAT ARE NOW AGRICULTURE AND THE AREAS THAT ARE

14   IN QUESTION.

15   **Q.** YOU WERE ASKED BY MS. HANSEN ON CROSS-EXAMINATION ABOUT

16   WHETHER YOU MEASURED THE FLOW RATE OF WATER COMING OUT OF THE

17   CULVERT. AND YOU WEREN'T -- YOU WERE ABOUT TO SAY SOMETHING

18   BUT YOU WEREN'T ABLE TO FINISH. SO I JUST WANTED TO ASK YOU

19   IF YOU HAD ANYTHING YOU WANTED TO SAY WITH RESPECT TO THAT

20   QUESTION.

21       I THINK YOU STARTED BY SAYING IT WASN'T NECESSARY TO

22   MEASURE THE OUTFLOW --

23   **A.** RIGHT.

24   **Q.** -- TO CONDUCT YOUR HYDROLOGICAL ASSESSMENT. I JUST WANTED

25   TO ASK YOU WHY.

MARTEL – REDIRECT / LEE

1    **A.**   I HAVE OBSERVED WATER DISCHARGING FROM THAT PONDED AREA

2    THROUGH THE CULVERT THROUGH A DUCKBILL, SORT OF A FLAP GATE

3    THAT DISCHARGES WATER INTO MOWRY SLOUGH.  I HAVE VISUALLY

4    OBSERVED THAT HAPPENING.

5          **MS. HANSEN:**  OBJECTION, VAGUE AS TO TIME, YOUR HONOR.

6    WHETHER IT WAS 2007 OR 2017.

7          **THE WITNESS:**  IN 2017.

8          **THE COURT:**  ALL RIGHT.  OVERRULED.

9    **BY MS. LEE:**

10   **Q.**   AND MY LAST QUESTION TO YOU IS, EVEN THOUGH YOU DIDN'T

11   NEED TO CONDUCT A SIGNIFICANT NEXUS ANALYSIS ON THIS

12   PARTICULAR SITE, DO YOU HAVE AN OPINION AS TO WHETHER THE

13   WETLANDS ON THIS SITE IN COMBINATION WITH SIMILARLY-SITUATED

14   WETLANDS HAVE A SIGNIFICANT NEXUS TO A TRADITIONAL NAVIGABLE

15   WATER?

16   **A.**   YES, I WOULD -- I WOULD -- I WOULD THINK THAT THEY WOULD.

17   LARGELY BECAUSE OF THE MAGNITUDE OF THE WETLANDS THAT ARE

18   THERE, THAT'S A CONTRIBUTING FACTOR, THE SIZE.  THERE IS A

19   FAIR AMOUNT OF FLOW THAT DISCHARGES THROUGH THOSE WETLANDS

20   INTO THE TRADITIONAL NAVIGABLE WATER.  SO THEY WOULD HAVE AN

21   EFFECT, YES.  IT WOULD BE SIGNIFICANT.

22         **MS. LEE:**  I HAVE NO FURTHER QUESTIONS.

23         **THE COURT:**  ANY RECROSS?

24         **MS. HANSEN:**  ONE MOMENT, YOUR HONOR.

25                 (PAUSE IN THE PROCEEDINGS.)

1            **RECROSS-EXAMINATION**

2  **BY MS. HANSEN:**

3  **Q.**  MR. MARTEL, IN 2007, I THINK YOU JUST TESTIFIED THAT YOU

4  OBSERVED WATER, A TRIBUTARY ALONG THE SOUTHERN BERM.

5       IS THAT RIGHT DOWN HERE (INDICATING) UNDERNEATH THE DUCK

6  PONDS?

7  **A.**  YOU WANT ME TO SHOW IT?

8  **Q.**  I'M JUST ASKING YOU.  YES OR NO?

9  **A.**  I OBSERVED PORTIONS OF IT.  I DIDN'T FOLLOW IT ALL THE WAY

10 DOWN.  IT WAS TOO WET TO BE ABLE TO WALK DOWN THERE.

11 **Q.**  SO -- AND YOU ALSO HAVE NO FIELD NOTES THAT INDICATE THE

12 PRESENCE OF AN ORDINARY HIGH WATER MARK IN THAT AREA, CORRECT?

13 **A.**  EVERYTHING IS NOT SAMPLED.  THIS IS A VERIFICATION FOR

14 REASONABLE INTERPRETATION.  AND EVERY, YOU KNOW, EVERY

15 CONCLUSION ON THE SITE ISN'T SAMPLED; RATHER THERE'S SAMPLING

16 DONE TO ESTABLISH WHAT'S REASONABLE AND THEN IT'S APPLIED.

17 **Q.**  YOU DON'T KNOW IF THERE WAS FLOW FROM THAT AREA IN 2007,

18 CORRECT?

19 **A.**  I DON'T KNOW.

20          **THE COURT:**  MAY MR. MARTEL BE EXCUSED?

21          **MS. LEE:**  YES, YOUR HONOR.

22          **THE COURT:**  THANK YOU, MR. MARTEL.  YOU ARE EXCUSED.

23          **THE WITNESS:**  THANK YOU.

24          **THE COURT:**  AND THE UNITED STATES MAY CALL ITS NEXT

25 WITNESS.

1        **MS. LEE:**  THE GOVERNMENT CALLS DR. KATERINA

2   GALACATOS.

3        **THE CLERK:**  COME UP TO THE WITNESS STAND AND RAISE

4   YOUR RIGHT HAND.

5     RAISE YOUR RIGHT HAND, PLEASE.

6     (**KATERINA GALACATOS**, CALLED AS A WITNESS FOR THE

7   GOVERNMENT, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

8        **THE WITNESS:**  I DO.

9        **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, I'M

10  GOING TO NEED YOU TO STATE AND SPELL YOUR FIRST AND LAST NAME

11  FOR THE RECORD, PLEASE.

12       **THE WITNESS:**  MY NAME IS KATERINA GALACATOS --

13       **THE CLERK:**  CAN YOU USE THE MIC, PLEASE?

14       **THE WITNESS:**  MY NAME IS KATERINA GALACATOS.  IT'S

15  SPELLED K-A-T-E-R-I-N-A.  AND THE LAST NAME IS

16  G-A-L-A-C-A-T-O-S.

17       **THE CLERK:**  THANK YOU.  AND THERE'S WATER IN THE

18  PITCHER.

19                  **<u>DIRECT EXAMINATION</u>**

20  **BY MS. LEE:**

21  **Q.**  DR. GALACATOS, YOU WORK FOR THE ARMY CORPS OF ENGINEERS?

22  **A.**  CORRECT.

23  **Q.**  HOW LONG HAVE YOU WORKED THERE?

24  **A.**  I'VE WORKED THERE SINCE 2002.

25  **Q.**  WHAT IS YOUR POSITION THERE?

GALACATOS – DIRECT / LEE

1   **A.**  I'M CURRENTLY ACTING CHIEF OF THE REGULATORY DIVISION.

2   **Q.**  WHAT DOES THE REGULATORY DIVISION OF THE CORPS DO?  WHAT

3   IS ITS PURPOSE?

4   **A.**  THE CORPS REGULATORY PROGRAM IS TASKED WITH PROTECTING THE

5   NATION'S NAVIGATION IN NAVIGABLE WATERS AS WELL AS THE AQUATIC

6   RESOURCES.

7   **Q.**  IS THE CORPS IN CHARGE OF ISSUING 404 PERMITS FOR ANY

8   DISCHARGES INTO AREAS DEEMED TO BE "WATERS OF THE UNITED

9   STATES"?

10  **A.**  YES.  IT'S ONE OF THE LAWS THAT WE ARE TASKED WITH

11  ENACTING.

12  **Q.**  ARE YOU FAMILIAR WITH THE -- CAN YOU ALSO PLEASE DESCRIBE

13  YOUR EDUCATIONAL BACKGROUND?

14  **A.**  I HAVE A BACHELOR'S OF SCIENCE IN ENVIRONMENTAL SCIENCE

15  FROM THE UNIVERSITY OF MASSACHUSETTS AT AMHERST, AND I HAVE A

16  MASTER'S AND A PH.D. IN AQUATIC ECOLOGY FROM THE STATE

17  UNIVERSITY OF NEW YORK COLLEGE OF ENVIRONMENTAL SCIENCE AND

18  FORESTRY.

19  **Q.**  DR. GALACATOS, IN YOUR ROLE AT THE ARMY CORPS OF

20  ENGINEERS, ARE YOU TASKED WITH MAKING WETLAND DELINEATIONS AND

21  JURISDICTIONAL DETERMINATIONS FOR "WATERS OF THE UNITED

22  STATES"?

23  **A.**  YES.

24  **Q.**  AND APPROXIMATELY HOW MANY HAVE YOU DONE?

25  **A.**  OVER A HUNDRED.

1          **MS. LEE:**  YOUR HONOR, AT THIS TIME I WOULD LIKE TO

2     QUALIFY DR. GALACATOS AS AN EXPERT IN ECOLOGY AS WELL AS

3     WETLAND DELINEATION AND JURISDICTIONAL WATERS DETERMINATIONS.

4          **MS. HANSEN:**  NO OBJECTION.

5          **THE COURT:**  DR. GALACATOS WILL BE PERMITTED TO OFFER

6     OPINIONS AND THE BASES FOR THOSE OPINIONS ON THOSE TOPICS,

7     LADIES AND GENTLEMEN.

8     **BY MS. LEE:**

9     **Q.**  DR. GALACATOS, ARE YOU FAMILIAR WITH NEWARK AREA 4?

10    **A.**  YES, I AM.

11    **Q.**  HOW DID YOU FIRST LEARN ABOUT IT?

12    **A.**  I FIRST LEARNED ABOUT IT HELPING TO FINISH UP THE

13    JURISDICTIONAL DETERMINATION BACK IN 2007.

14    **Q.**  WHAT DID YOU DO?

15    **A.**  I PROCESSED THE DELINEATION MAPPING AND LETTER, THE

16    CORRESPONDENCE THAT WENT OUT TO THE PROPERTY OWNER FOR

17    VERIFYING THAT THERE WERE "OTHER WATERS" AND WETLANDS ON THE

18    PROJECT SITE.

19    **Q.**  WAS IT BASED OFF OF WORK THAT H.T. HARVEY HAD DONE AS WELL

20    AS MR. DAN MARTEL FROM THE CORPS HAD DONE ON THE GROUND?

21    **A.**  YES.

22    **Q.**  DID YOU PERSONALLY VISIT THE SITE IN 2007?

23    **A.**  NO, I DID NOT.

24    **Q.**  YOU WERE DOING THE PAPERWORK FOR THE ISSUANCE OF THE

25    LETTER THAT'S THE JURISDICTIONAL DETERMINATION?

GALACATOS – DIRECT / LEE

1    **A.**  CORRECT.

2    **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 28.

3                    (EXHIBIT HANDED TO WITNESS.)

4       IS THAT THE JURISDICTIONAL DETERMINATION THAT YOU ISSUED

5    FOR THE NEWARK AREA 4 PROPERTY ON OCTOBER 11TH, 2007?

6    **A.**  YES.

7            **MS. LEE:**  I WOULD LIKE TO MOVE EXHIBIT 28 INTO

8    EVIDENCE.

9            **MS. HANSEN:**  OBJECTION HEARSAY, YOUR HONOR.

10           **THE COURT:**  IS IT BEING OFFERED AS A PUBLIC RECORD?

11           **MS. LEE:**  YES.

12   **BY MS. LEE:**

13   **Q.**  ARE THESE PUBLIC RECORDS, DR. GALACATOS?

14   **A.**  YES, THEY ARE.

15   **Q.**  ARE THEY ALSO HELD WITHIN THE ORDINARY COURSE OF BUSINESS

16   AT THE ARMY CORPS OF ENGINEERS?

17   **A.**  YES.

18           **MS. LEE:**  FOR BOTH THOSE PURPOSES, YOUR HONOR.

19           **MS. HANSEN:**  YOUR HONOR, IT CONTAINS FACTUAL FINDINGS

20   TYPE OF RECORD AND IT'S NOT ADMISSIBLE AGAINST AN ACCUSED IN A

21   CASE, IN A CRIMINAL CASE UNDER 803(8).

22           **THE COURT:**  OVERRULED.  I DON'T BELIEVE IT FALLS

23   UNDER THAT SECTION OF 803(A) -- (8)(A)(2).  SO IT IS ADMITTED.

24       (GOVERNMENT'S EXHIBIT 28 RECEIVED IN EVIDENCE)

25           **MS. LEE:**  MS. RILEY, IF WE CAN PUBLISH THIS TO THE

1    JURY.  THANK YOU.

2                    (DISPLAYED ON SCREEN.)

3    **BY MS. LEE:**

4    **Q.**  DR. GALACATOS, CAN YOU WALK US THROUGH WHAT THIS LETTER

5    STATES BRIEFLY?

6    **A.**  THIS LETTER WAS TO THE PROPERTY OWNER, MR. TIM STEELE.

7    AND IT BASICALLY IS SAYING THAT IN RESPONSE TO THEIR REQUEST,

8    WE ARE CONFIRMING THE EXTENT OF JURISDICTIONAL WATERS AND

9    WETLANDS THAT ARE ON THE PROJECT SITE.

10       AT THAT TIME THE AREA WAS INCORPORATED NEWARK AREAS 3 AND

11   4.  THIS CORRESPONDENCE HAD A MAP WHICH WAS AN ENCLOSURE THAT

12   SHOWED THE EXTENT OF OUR –– OF THE JURISDICTION THAT WAS

13   JURISDICTIONAL BASED ON THE CLEAN WATER ACT, SECTION 404 OF

14   THE CLEAN WATER ACT.

15       IT FURTHER HIGHLIGHTED THE NEED FOR GETTING A PERMIT IF

16   THEY ARE GOING TO BE DISCHARGING ANY DREDGE OR FILL MATERIAL

17   INTO THOSE WATERS, AND DIRECTED THEM ON THE PERMITTING

18   PROCESS.

19       AND IT FURTHER IDENTIFIED TWO DIFFERENT PERMITTING

20   MECHANISMS THAT WE WOULD HAVE, WHETHER IT WAS A NATIONWIDE OR

21   AN INDIVIDUAL PERMIT.

22       AND IT ALSO DIRECTED THEM THAT IF THEY WANTED TO, THEY

23   COULD APPEAL THIS JURISDICTIONAL DETERMINATION AND IT ALSO

24   PROVIDED THE FORMS TO APPEAL IF THEY DISAGREED WITH THE

25   MAPPING THAT HAD BEEN DONE.

1   **Q.**   HAD THE OWNERS DISAGREED WITH THE MAPPING THAT HAD BEEN

2   DONE?

3   **A.**   NO.

4   **Q.**   DID THE OWNERS APPEAL?

5   **A.**   NO.

6   **Q.**   IN FACT, IF WE CAN JUST HIGHLIGHT THE FIRST PARAGRAPH OF

7   THAT LETTER, OF THIS JURISDICTIONAL DETERMINATION.

8        THAT FIRST PARAGRAPH INDICATES THIS LETTER IS WRITTEN IN

9   RESPONSE TO YOUR SUBMITTAL OF JUNE 20TH, 2007 REQUESTING

10  CONFIRMATION OF THE EXTENT OF THE CORPS OF ENGINEERS

11  JURISDICTION AT THE NEWARK AREA 3 AND 4 SITE, AND IT GOES ON

12  TO DESCRIBE THE LOCATION.

13       WERE THEY ASKING THE CORPS TO CONFIRM THEIR OWN OPINION

14  THAT THERE WERE POTENTIAL JURISDICTIONAL "WATERS OF THE UNITED

15  STATES" ON THE SITE?

16  **A.**   THE... THE COMPANY THAT OWNED THE PROPERTY HAD HAD THEIR

17  CONSULTANT WHO HAD DONE STUDIES TO DO THE MAPPING, AND THEN

18  THE CORPS WENT OUT TO VERIFY THAT WE AGREED WITH THAT MAPPING

19  THAT THEY HAD DONE.

20  **Q.**   YOU MENTIONED THAT THERE ARE -- THE SECOND PAGE TALKS

21  ABOUT HOW TO GO ABOUT GETTING A PERMIT.

22       WHAT WOULD GETTING A PERMIT FOR DEVELOPING ON A SITE LIKE

23  NEWARK AREA 4 ENTAIL?

24  **A.**   IT DEPENDS ON THE PROJECT AND THE AMOUNT OF IMPACTS THAT

25  THE PROPOSED PROJECT WOULD HAVE.

GALACATOS – DIRECT / LEE

1    SO IF IT WAS A SMALL PROJECT AND HAD LESS THAN HALF AN

2  ACRE OF IMPACTS TO WETLANDS AND "OTHER WATERS", WE WOULD

3  USE -- WE COULD USUALLY PERMIT THAT THROUGH OUR NATIONWIDE

4  PERMIT PROCESS, WHICH IS A FAIRLY STREAMLINED PERMITTING

5  PROCESS.  AND WE DO VERY -- A LOT OF THOSE PERMITS IN OUR

6  DISTRICT.

7    IF IT WAS A LARGER PROJECT THAT HAD OVER A HALF ACRE OF

8  IMPACTS, THEN THEY WOULD NEED TO APPLY FOR AN INDIVIDUAL

9  PERMIT.

10  **Q.**  WOULD THAT PROPOSAL HAVE TO INCLUDE MITIGATION ATTEMPTS TO

11  MITIGATE ANY IMPACTS THAT THE DISCHARGE WOULD HAVE ON THE

12  PROPERTY?

13  **A.**  MOST PROJECTS WOULD HAVE TO BE ABLE TO DEMONSTRATE THAT

14  THEY ARE AVOIDING MINIMIZING AND THEN OFFER SOME FORM OF

15  COMPENSATORY MITIGATION FOR UNAVOIDABLE IMPACTS, YES.

16  **Q.**  HAS THE OWNERS EVER APPLIED FOR A PERMIT AFTER THIS

17  JURISDICTIONAL DETERMINATION WAS ISSUED?

18  **A.**  THEY APPLIED FOR A PERMIT IN FEBRUARY OF 2015.

19  **Q.**  AND WAS A PERMIT ISSUED TO THEM?

20  **A.**  NO.

21  **Q.**  WHY NOT?

22  **A.**  WE WERE UNABLE TO REVIEW AND PROCESS THEIR PERMIT

23  APPLICATION BECAUSE THERE HAD BEEN THE UNAUTHORIZED FILL

24  DISCHARGE.

25  **Q.**  DUE TO THE UNAUTHORIZED FILL DISCHARGE, NO PERMIT COULD BE

GALACATOS – DIRECT / LEE

1  APPROVED ON THIS PROPERTY; IS THAT RIGHT?

2  **A.**  CORRECT.

3  **Q.**  HAS THE CORPS EVER ISSUED A PERMIT TO ANYONE TO DUMP FILL

4  MATERIAL ON NEWARK AREA 4?

5  **A.**  NO.

6  **Q.**  HAS THE CORPS EVER ISSUED A PERMIT TO A PERSON BY THE NAME

7  OF JAMES LUCERO TO DUMP FILL MATERIAL ON NEWARK AREA 4?

8  **A.**  NO.

9  **Q.**  THIS JURISDICTIONAL DETERMINATION, HOW LONG IS IT VALID

10  FOR?

11  **A.**  THIS JURISDICTIONAL DETERMINATION WAS VALID FOR FIVE

12  YEARS.

13  **Q.**  WHY FIVE YEARS?

14  **A.**  IT'S AN APPROVED JURISDICTIONAL DETERMINATION, AND BY

15  CORPS POLICY THOSE ARE VALID FOR FIVE YEARS AND THEY ARE MEANT

16  TO -- THAT'S JUST THE CORPS POLICY.

17  **Q.**  WHAT HAPPENS AFTER FIVE YEARS IF THE OWNERS DON'T ASK TO

18  RE-VERIFY?

19  **A.**  IT JUST STAYS THE WAY IT IS.

20  **Q.**  WHAT DOES THAT MEAN?

21  **A.**  WE ASSUME THAT THE -- THE JURISDICTION ON THE SITE DOES

22  NOT CEASE TO EXIST BECAUSE THE JURISDICTIONAL DETERMINATION

23  HAS EXPIRED.  IT'S JUST THAT THE MAP ITSELF AND THE LETTER

24  AREN'T -- THEY WOULD HAVE TO COME IN AND DO ANOTHER

25  DETERMINATION IF YOU WANTED TO GET A PERMIT.  BUT THE

1    JURISDICTION ITSELF DOESN'T CEASE TO EXIST BECAUSE THE LETTER

2    AND THE MAP HAVE EXPIRED.

3    **Q.**  OKAY.

4        DID THERE COME A TIME AS WE HEADED CLOSER TO 2012 INTO

5    2013 WHEN YOU WERE ASKED TO RE-VERIFY THIS JURISDICTIONAL

6    DETERMINATION?

7    **A.**  YES.

8    **Q.**  WHO ASKED YOU TO DO THAT?

9    **A.**  THE PROPERTY OWNERS THROUGH THEIR CONSULTANT PAT --

10   DR. PAT BOURSIER OF H.T. HARVEY AND ASSOCIATES.

11   **Q.**  DID YOU GO OUT WITH DR. BOURSIER ONTO THE SITE FOR

12   PURPOSES OF RE-VERIFYING THE JURISDICTIONAL DETERMINATION?

13   **A.**  YES.

14   **Q.**  WHEN DID YOU GO?

15   **A.**  I WENT IN JULY OF 2013.

16   **Q.**  WAS THAT THE FIRST TIME THAT YOU WERE PHYSICALLY ON THE

17   SITE?

18   **A.**  YES.

19   **Q.**  CAN YOU DESCRIBE WHAT YOU DID THAT DAY AND JUST -- THIS IS

20   JULY 23RD, 2013; IS THAT CORRECT?

21   **A.**  CORRECT.

22   **Q.**  CAN YOU DESCRIBE WHAT YOU DID THAT DAY WITH DR. BOURSIER?

23   **A.**  WE... WE MET AT THE SITE AND WE TOURED THE SITE TO MAKE

24   SURE THAT NO SUBSTANTIAL CHANGES HAD OCCURRED.

25       THERE HADN'T BEEN ANY GRADING, ANY CONSTRUCTION, OR ANY

1   DISTURBANCE, AND THE SITE SEEMED TO HAVE REMAINED AS IT HAD

2   BEEN WHEN THE DELINEATION HAD BEEN VERIFIED IN 2007.

3   **Q.**  CAN YOU DESCRIBE THE THOROUGHNESS OF AN INITIAL

4   DETERMINATION VERSUS A THOROUGHNESS OF A REVERIFICATION?

5   **A.**  THE INITIAL VERIFICATION RELIED ON THE REPORT THAT WAS

6   DONE BY H.T. HARVEY AND ASSOCIATES WHICH DOCUMENTED, I THINK,

7   ABOUT TWO YEARS OF FIELD WORK.

8       AND WHEN DAN MARTEL WENT OUT TO DO THE FIELD WORK FOR THE

9   INITIAL VERIFICATION, HE ALSO COLLECTED ADDITIONAL SAMPLE

10  POINTS.  AND IF I RECALL, HE HAD DONE SOME MINOR CHANGES TO

11  THE MAP.

12      WHEN I WAS TASKED TO DO THE REVERIFICATION, I REVIEWED THE

13  MATERIAL, THE INITIAL STUDIES BY H.T. HARVEY AND ASSOCIATES AS

14  WELL AS DAN'S NOTES, AND I LOOKED AT AERIAL PHOTOGRAPHY ON

15  GOOGLE EARTH TO LOOK AND SEE HOW THE SITE LOOKED IN AERIAL

16  PHOTOGRAPHY, AND LOOKED AT, YOU KNOW, SUBSTANTIVE YEARS THAT

17  HAD OCCURRED BEFORE 2007 AND AFTER 2007.

18  **Q.**  WOULD IT BE FAIR TO SAY THAT THE REVERIFICATION PROCESS IS

19  A MORE CURSORY PROCESS THAN THE INITIAL DETERMINATION THAT YOU

20  HAD JUST DESCRIBED THAT HAD OCCURRED IN 2007?

21  **A.**  YES.

22  **Q.**  IN FACT, HOW LONG WERE YOU ON THE PROPERTY ON THAT DAY IN

23  JULY OF 2013 APPROXIMATELY, IF YOU CAN REMEMBER?

24  **A.**  IT WAS A COUPLE OF HOURS.

25  **Q.**  AND HAD YOU DUG ANY SOIL PITS?

GALACATOS - DIRECT / LEE

1   **A.**  NO.

2   **Q.**  WHAT DID YOU DO?

3   **A.**  WE STARTED THE SITE VISIT COMING IN FROM THE GATE AT

4   STEVENSON BOULEVARD AND WE DROVE DOWN THAT MAIN LEVEE ROAD.

5   WE LOOKED AT THE FIELDS THAT WERE IN THE CENTRAL PART OF THE

6   PROJECT SITE.

7       THEN WE PROCEEDED TO THE NORTHERN PART OF THE PROJECT SITE

8   THAT IS ABUTTING THE... THE PICK 'N PULL AREAS, AND WE

9   WALKED -- AND WE GOT OUT OF THE CAR AND WE WALKED AROUND TO

10  LOOK AT THOSE AREAS.

11      AND THEN WE TRAVELED TO THE VERY SOUTHERN PART OF THE SITE

12  TO LOOK AT THE LOWER SECTION WHERE THERE ARE THE PUMPS THAT

13  PUMP WATER OFF THE SITE INTO MOWRY SLOUGH.

14  **Q.**  AND WHAT WAS YOUR IMPRESSIONS OF THE SITE IN TERMS OF YOUR

15  DECISION TO RE-VERIFY THE JURISDICTIONAL DETERMINATION?

16  **A.**  THE SITE LOOKED THAT THERE HADN'T BEEN ANY SUBSTANTIVE

17  CHANGES SINCE THE 2007 VERIFICATION.

18  **Q.**  AND YOU HAD INDICATED THAT -- WELL, WITHDRAWN.

19      DID THAT SURPRISE YOU THAT THERE WERE NO MAJOR CHANGES?

20  **A.**  NO, IT DID NOT BECAUSE I HAD ALSO LOOKED AT THE AERIAL

21  PHOTOGRAPHY, AND THE SITE IS A FAIRLY LARGE SITE.  IT'S -- IT

22  HAD A VERY LARGE COMPLEX OF WETLANDS THAT HAVE BEEN -- THAT I

23  COULD SEE IN THE AERIAL PHOTOGRAPHY THROUGH THE YEARS, SO I

24  DID NOT ANTICIPATE SEEING ANY MAJOR CHANGES.

25  **Q.**  WHAT WOULD EXAMPLES OF MAJOR CHANGES BE THAT WOULD LEAD

1    YOU TO THINK, OKAY, MAYBE THE DIRT TERMINATION MIGHT BE

2    DIFFERENT?

3    **A.**   USUALLY IF YOU SEE ANY NEW CONSTRUCTION OR GRADING OR ANY

4    MAJOR CHANGES TO HYDROLOGY.

5    **Q.**   SO, FOR INSTANCE, IF THERE'S A NEW CONSTRUCTION, WHAT DO

6    YOU MEAN; A BUILDING HAD BEEN BUILT IN THE MIDDLE OF THIS

7    LAND?

8    **A.**   A BUILDING, A NEW ROADWAY, IF THEY HAD CHANGED -- IF THEY

9    HAD DUG ADDITIONAL DRAINAGE DITCHES OR IF THEY HAD GRADED THE

10   SITE.

11   **Q.**   IF THE TOPOGRAPHY HAD CHANGED?

12   **A.**   UH-HUH.

13   **Q.**   DO YOU RECALL WHAT THE WEATHER WAS LIKE WHEN YOU WENT OUT

14   THERE IN TERMS OF -- I GUESS WHAT I MEAN IS, WHAT THE

15   PRECIPITATION WAS LIKE AROUND THE TIME PERIOD OF WHEN YOU WENT

16   OUT THERE.

17   **A.**   WE WERE OUT THERE IN JULY, AND SO IT WAS VERY HOT AND DRY.

18   WE -- TYPICAL OF THE BAY AREA DURING THE SUMMER.

19   **Q.**   WOULD YOU SAY DURING THAT TIME PERIOD YOU HAD MENTIONED

20   THAT POTENTIALLY HYDROLOGY COULD BE A CHANGE IN CIRCUMSTANCES.

21       ARE YOU REFERENCING CHANGES THAT MAY HAPPEN FROM YEAR TO

22   YEAR WHEN IT COMES TO RAINFALL?

23   **A.**   NO.  I WAS REFERRING TO IF SOMEBODY HAD DUG MORE DITCHES

24   OR DONE ANY OTHER TYPE OF WORK THAT WOULD HAVE CHANGED THE

25   SITE.  BUT THERE WERE NO SUCH CHANGES.

GALACATOS – DIRECT / LEE

1    **Q.**  ARE YOU AWARE ON THIS SITE WHERE THE SOURCES OF HYDROLOGY

2    COME FROM?

3    **A.**  THE SITE HAS SEVERAL SOURCES OF HYDROLOGY.  IT HAS

4    PRECIPITATION THAT WE GET DURING THE WINTER MONTHS BETWEEN

5    NOVEMBER AND MAY.  IT HAS TWO SEEPS AND IT ALSO HAS GROUND

6    WATER.

7    **Q.**  ARE YOU AWARE -- WERE YOU AWARE THAT THE CULVERT PIPE THAT

8    WAS -- THAT LEADS FROM THAT NORTHERN SECTION OUT TO MOWRY

9    SLOUGH HAD BEEN FIXED IN OR AROUND 2008?

10   **A.**  I'M NOT REALLY CERTAIN ABOUT THE CONDITION OF THAT.

11   **Q.**  WHEN YOU WERE OUT THERE IN JULY 2013 --

12   **A.**  SORRY.

13   **Q.**  THAT'S ALL RIGHT.

14       WHAT MAKES YOU SAY THAT THE SITE GENERALLY LOOKED IN THE

15   SAME CONDITION SUCH THAT YOU COULD RE-VERIFY THE

16   JURISDICTIONAL DETERMINATION?

17   **A.**  WHEN WE WERE TOURING THE SITE, THE WETLAND AREAS STILL

18   APPEARED TO BE WHERE THEY HAD BEEN MAPPED AND THERE STILL WERE

19   THE UPLANDS THAT HAD BEEN MAPPED AND THE OTHER FEATURES THAT

20   HAD BEEN MAPPED WERE STILL THERE.  I DIDN'T REALLY SEE ANY

21   CHANGES.

22   **Q.**  ALL RIGHT.

23       CAN YOU TELL US YOUR OPINION ABOUT THE GENERAL PERSISTENCE

24   OF WETLANDS ON A SITE SUCH AS NEWARK AREA 4?

25   **A.**  THIS PARTICULAR SITE IS LOCATED RIGHT NEXT TO THE BAY.

GALACATOS – DIRECT / LEE

1    PART OF IT USED TO BE TIDAL WETLANDS BEFORE IT WAS DIKED.

2    IT'S A VERY LOW LYING AREA, AND BECAUSE IT HAS MULTIPLE

3    SOURCES OF HYDROLOGY, THE WETLANDS ON THAT SITE ARE FAIRLY

4    STABLE THROUGH TIME, ESPECIALLY IF YOU LOOK AT A LOT OF AERIAL

5    PHOTOGRAPHY.  THEY DON'T -- THEY TEND TO PERSIST THROUGH MANY,

6    MANY YEARS.  AND THE SITE IS QUITE LOW TO THE GROUND.  THAT'S

7    WHY YOU HAVE SOME AREAS THAT HAVE SUCH A HIGH GROUND WATER

8    TABLE THERE.

9    **Q.**  WHEN YOU LEFT IN JULY OF 2013, WAS IT YOUR INTENTION TO

10   RE-VERIFY THE JURISDICTIONAL DETERMINATION FOR ANOTHER FIVE

11   YEARS?

12   **A.**  YES.

13   **Q.**  AND DID YOU RE-VERIFY THAT?

14   **A.**  I DID NOT.

15   **Q.**  WHY NOT?

16   **A.**  IT WAS A WORKLOAD ISSUE.  I DID NOT GET A CHANCE TO

17   FINALIZE THAT JD BEFORE WE GOT NEW CORRESPONDENCE THAT THERE

18   HAD BEEN AN UNAUTHORIZED FILL DISCHARGE ON THIS PROPERTY.

19   **Q.**  WHEN DID YOU LEARN THAT THERE HAD BEEN AN UNAUTHORIZED

20   DISCHARGE ON THE PROPERTY?

21   **A.**  ON SEPTEMBER OF 2014.  SEPTEMBER 11TH.

22   **Q.**  HOW DID YOU LEARN ABOUT THAT?

23   **A.**  WE RECEIVED CORRESPONDENCE FROM MR. DAVID MOSIER, WHO IS

24   THE PROPERTY OWNERS' ATTORNEY.

25   **Q.**  AND YOU WERE NOTIFIED BY THAT PERSON THAT -- THE OWNERS

1    WERE NOTIFYING YOU THAT THERE HAD BEEN AN UNLAWFUL DISCHARGE

2    ON THEIR PROPERTY; IS THAT CORRECT?

3    **A.**   CORRECT.

4    **Q.**   WHAT DID YOU DO ONCE YOU LEARNED ABOUT THAT?

5    **A.**   I SUBSEQUENTLY SCHEDULED A SITE VISIT IN NOVEMBER,

6    NOVEMBER 4TH OF THAT YEAR WITH DR. PAT BOURSIER TO CONFIRM

7    THAT THERE HAD BEEN AN UNAUTHORIZED FILL DISCHARGED IN THE

8    WETLANDS.

9    **Q.**   WHEN DID YOU GO WITH DR. PAT BOURSIER TO THE SITE?

10   **A.**   ON NOVEMBER 4TH, 2014.

11   **Q.**   WAS THAT YOUR SECOND TIME ON THE SITE?

12   **A.**   YES.

13   **Q.**   WHAT WAS THE PURPOSE OF GOING ON NOVEMBER 4TH, 2014?

14   **A.**   THE PURPOSE OF THE SITE VISIT WAS TO CONFIRM THAT THERE

15   HAD BEEN A FILL DISCHARGE IN WETLANDS AND OTHER "WATERS OF THE

16   U.S." AND I WAS CONFIRMING THE MAP THAT DR. BOURSIER HAD

17   PREPARED SHOWING THOSE AREAS.

18   **Q.**   WAS YOUR PURPOSE TO DO A JURISDICTIONAL DETERMINATION?

19   **A.**   NO.

20   **Q.**   WAS YOUR PURPOSE TO DO A WETLAND DELINEATION?

21   **A.**   NO.

22   **Q.**   WAS IT YOUR PURPOSE TO DO ANY OTHER TYPE OF "WATERS OF THE

23   UNITED STATES" DETERMINATION?

24   **A.**   NO.

25   **Q.**   WHAT WERE YOU -- WHAT WAS YOUR INTENTION OF GOING THAT

1    DAY?

2    **A.**  MY ONLY INTENTION WAS TO VERIFY THAT THERE HAD BEEN AN

3    UNAUTHORIZED FILL DISCHARGE IN "WATERS OF THE UNITED STATES".

4    **Q.**  WAS IT -- WOULD IT BE FAIR TO SAY IT WAS -- YOU WERE

5    TRYING TO MEASURE THE EXTENT AND THE DEPTH OF THE FILL?

6    **A.**  I WAS CONFIRMING THE EXTENT BECAUSE I HAD THE MAPPING FROM

7    H.T. HARVEY AND ASSOCIATES, BUT I DID CONFIRM THE DEPTH.

8    **Q.**  HOW DID YOU DO THAT?

9    **A.**  WHAT I DID WAS WHEN WE ARRIVED AT THE SITE, I LOCATED

10   AREAS THAT WERE VISIBLY OUTSIDE OF THE FILL AREA.  IT WAS VERY

11   APPARENT WHERE THE FILL HAD BEEN PLACED BECAUSE IT WAS OF A

12   VERY DIFFERENT COLOR.  THE SOIL WAS NOW A VERY LIGHT TANISH

13   COLOR, AND YOU COULD SEE COBBLE AND BITS OF CEMENT AND OTHER

14   TRASH; WHEREAS THE AREAS THAT HAD NOT HAD ANY FILL DISCHARGED

15   STILL HAD THE VEGETATION, AND THE SOIL WAS UNDISTURBED.

16       AND SO I DUG A PAIR OF SOIL PITS WHERE I COULD LOOK DOWN

17   AND THROUGH THE HORIZON OF THE SOIL AND DETERMINE.  BECAUSE I

18   KNEW WHAT THE SOIL LOOKED LIKE BEFORE IT HAD BEEN DISTURBED

19   AND HAD FILL DISKED INTO IT, I KNEW THAT IT TENDED TO HAVE A

20   VERY DANGER COLOR, IT WAS CLAY, AND IT WAS FAIRLY CONSISTENT,

21   AND ITS STRUCTURE WAS CLAY SOIL AND VERY DARK IN COLOR.

22       THE AREAS THAT HAD A FILL DISCHARGE HAD HAD DIFFERENT

23   COLOR SOIL HAD BEEN WORKED INTO IT, HAD BEEN DISTEND, AND I

24   NOTED THAT IT WAS USUALLY BETWEEN 6 AND 10 INCHES IN DEPTH,

25   AND I WOULD FIND THE SOIL WAS MUCH LIGHTER IN COLOR, IT HAD

1    SAND, COBBLES, GRAVEL, AND BITS OF CONCRETE AS WELL.

2    **Q.**   WAS THE FILL MATERIAL DUMPED IN AREAS PREVIOUSLY

3    DETERMINED TO BE "WATERS OF THE UNITED STATES"?

4    **A.**   YES.

5    **Q.**   DID YOU TAKE SAMPLE POINTS, MEANING YOU DUG INTO THE SOIL

6    IN AREAS THAT -- WHERE FILL WAS PLACED AND ALSO AREAS RIGHT

7    OUTSIDE OF WHERE THE FILL WAS PLACED?

8    **A.**   YES.

9    **Q.**   AND I WANT TO TALK ABOUT THE AREAS RIGHT OUTSIDE WHERE THE

10   FILL WAS PLACED.

11       IN THOSE AREAS, WERE YOU ABLE TO MAKE A DETERMINATION IF

12   IT WAS STILL A WETLAND, STILL JURISDICTIONAL?

13   **A.**   I WASN'T THERE TO MAKE A DETERMINATION, BUT THEY APPEARED

14   TO BE STILL WETLANDS.

15   **Q.**   AND WHAT ABOUT THE SAMPLE POINTS YOU TOOK OF THE FILL

16   MATERIAL?

17   **A.**   AT THAT TIME, I WASN'T MAKING A DETERMINATION WHETHER

18   THOSE WERE WETLANDS OR NOT BECAUSE THEY HAD HAD SUCH A LARGE

19   INFLUX OF FILL MATERIAL.

20   **Q.**   OKAY.

21       I WOULD LIKE TO... YOU CREATED A MEMORANDUM FOR RECORD

22   WHICH WAS BASED OFF OF THE WORK THAT YOU DID ON NOVEMBER 4TH,

23   2014; IS THAT RIGHT?

24   **A.**   CORRECT.

25   **Q.**   THIS MEMORANDUM FOR RECORD WAS WRITTEN BY YOU ON

1    JANUARY 7TH OF 2015?

2    **A.**   CORRECT.

3    **Q.**   AND IT HAD A MAP THAT SHOWED WHERE YOU TOOK SAMPLING

4    POINTS?

5    **A.**   YES.

6    **Q.**   IT INCLUDED PHOTOS OF SOME OF THE WORK THAT YOU PERFORMED?

7    **A.**   YES.

8    **Q.**   AND IT ALSO INCLUDED WETLAND DETERMINATION DATA FORMS IN

9    WHICH YOU TOOK NOTES?

10   **A.**   CORRECT.

11   **Q.**   NOW BECAUSE YOU FILLED OUT THESE FORMS THAT ARE CALLED

12   WETLAND DETERMINATION DATA FORMS, IS THAT WHAT YOU WERE

13   ACTUALLY TRYING TO DETERMINE?

14   **A.**   NO.  WE JUST -- I USE THOSE FORMS BECAUSE THEY ARE A GOOD

15   WAY OF WRITING DOWN YOUR DATA WHEN YOU ARE OUT IN THE FIELD.

16   **Q.**   AND WHY WEREN'T YOU THERE THAT DAY TO MAKE A DETERMINATION

17   ON, FOR INSTANCE, WETLANDS OR DELINEATING WETLANDS OR

18   JURISDICTIONAL DETERMINATIONS?

19       WHY WEREN'T YOU THERE TO DO THAT?

20   **A.**   BECAUSE WHAT -- BECAUSE THERE WAS NO QUESTION THAT THEY

21   WERE STILL WETLANDS OUT THERE.

22   **Q.**   BASED OFF OF WHAT?

23   **A.**   BASED OFF THE PREVIOUS DELINEATION THAT HAD BEEN VERIFIED

24   IN 2007.

25   **Q.**   IS IT ALSO BASED OFF OF WHEN YOU WENT OUT IN JULY OF 2013?

GALACATOS – DIRECT / LEE

1    **A.**  CORRECT.

2    **Q.**  YOU'RE GOING THERE ON NOVEMBER 4TH WAS MAINLY JUST WHERE

3    IS THE FILL, HOW DEEP IS THE FILL?

4    **A.**  CORRECT.

5        **MS. LEE:**  I WOULD LIKE TO SHOW YOU A FEW THINGS FROM

6    YOUR MEMORANDUM FOR RECORD.  THIS IS EXHIBIT 901.  I WOULD

7    LIKE TO SHOW YOU 901-0004.

8        (EXHIBIT HANDED TO WITNESS.)

9        IS THIS A MAP SHOWING WHERE YOU SAMPLED AND DUG THOSE

10    PITS?

11    **A.**  YES.

12    **Q.**  DOES IT FAIRLY AND ACCURATELY DEPICT THE PLACES WHERE YOU

13    DUG THOSE PITS ON NEWARK AREA 4?

14    **A.**  YES.

15        **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

16    EXHIBIT 901-0004 INTO EVIDENCE.

17        **MS. HANSEN:**  NO OBJECTION.

18        **THE COURT:**  901-0004 IS ADMITTED.

19        (GOVERNMENT'S EXHIBIT 901-0004 RECEIVED IN EVIDENCE)

20        **MS. LEE:**  IF WE CAN JUST BLOW UP THAT NORTHERN

21    SECTION. HIGHLIGHT THE SOUTHERN SECTION PLEASE.

22    **BY MS. LEE:**

23    **Q.**  THOSE ARE ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN; IS THAT

24    RIGHT?

25    **A.**  CORRECT.

GALACATOS – DIRECT / LEE

1   **Q.**  HOW DID YOU CHOOSE WHERE TO DO SAMPLING POINTS?

2   **A.**  I CHOSE MY SAMPLING POINTS BASED ON THE ORIGINAL

3   DELINEATION REPORT PREPARED BY H.T. HARVEY AND ASSOCIATES

4   BECAUSE THEY HAD DUG SOIL PITS SAMPLING THE SOIL BEFORE THERE

5   HAD BEEN ANY DISTURBANCE ON THE SITE.  AND I WANTED TO HAVE A

6   REPRESENTATION OF -- THAT WAS CLOSE TO THOSE AREAS AND THAT I

7   KNEW WHAT THE PRE-DISTURBANCE SOIL HORIZON WOULD HAVE LOOKED

8   LIKE.

9   **Q.**  SO LET'S TAKE A LOOK AT SAMPLING POINT 1 AND 2.  1 IS

10  OUTSIDE THE FILL AREA IN GREEN AND 2 IS INSIDE THE FILL AREA

11  IN THE GREEN PART.

12      FOR SAMPLING POINT 1, WERE YOU ABLE TO -- DID THE AREA

13  THAT WAS NOT FILLED, DID THAT STILL LOOK LIKE A WETLAND TO

14  YOU?

15  **A.**  YES.

16  **Q.**  WHAT DO YOU BASE THAT OFF OF?

17  **A.**  IT STILL HAD THE HYDRIC SOIL AND IT HAD HYDRIC VEGETATION

18  THAT WAS STILL THERE.

19  **Q.**  WHAT ABOUT HYDROLOGY?

20  **A.**  I WASN'T REALLY LOOKING AT HYDROLOGY, AND WE WERE IN JULY.

21  AND IT WAS IN THE MIDDLE OF THE SUMMER.

22  **Q.**  WELL, HERE IT'S NOVEMBER 4TH, 2014, RIGHT?

23  **A.**  RIGHT.  BUT IT STILL HADN'T RAINED SUBSTANTIALLY SINCE MAY

24  OF -- BEFORE THE SUMMERTIME.

25  **Q.**  SO YOU WEREN'T LOOKING AT HYDROLOGY AT THAT POINT?

GALACATOS – DIRECT / LEE

1   **A.**  CORRECT.

2   **Q.**  EVEN WITHOUT THE RAIN, WERE YOU ABLE TO STILL SEE WETLAND

3   VEGETATION THERE?

4   **A.**  YES.

5   **Q.**  AND BASED OFF OF YOUR EXPERIENCE AND YOUR EXPERTISE, DID

6   IT STILL APPEAR TO BE A WETLAND TO YOU?

7   **A.**  YES.

8   **Q.**  FOR SAMPLING POINT 2, WHICH IS IN THE GREEN AREA BUT IT

9   WAS COVERED BY FILL, YOU WROTE ON YOUR DATA FORM THAT YOU DID

10  NOT BELIEVE THAT TO BE A WETLAND.

11      WHAT DID YOU MEAN BY THAT?

12  **A.**  I MEANT THAT AT THAT TIME IT DIDN'T SEEM LIKE A WETLAND,

13  BUT I WASN'T MAKING A WETLAND DETERMINATION AT THAT MOMENT.  I

14  WAS JUST NOTING WHAT I HAD SEEN AND THE FACT THAT WE HAD A

15  REASON FILL DISCHARGE IN THAT AREA, AND IT DIDN'T APPEAR TO BE

16  ONE.  BUT I WASN'T MAKING A WETLAND DETERMINATION AT THAT

17  MOMENT IN TIME.

18  **Q.**  I WANT TO CLARIFY WHAT YOU SAID BECAUSE IT'S, I THINK, IT

19  IS IMPORTANT.

20      WHEN YOU SAID IT DIDN'T APPEAR TO BE A WETLAND, ARE YOU

21  REFERENCING WHAT THE LAND WAS LIKE BEFORE THE DUMPING OR ARE

22  YOU REFERENCING WHAT THE LAND IS LIKE BECAUSE OF THE DUMPING?

23  **A.**  WHAT THE LAND LOOKED LIKE BECAUSE OF THE DUMPING.  AND

24  BECAUSE AT THAT MOMENT IN TIME WE ALSO HAD NOT HAD ANY

25  RAINFALL TO SEE WHETHER OR NOT IT WAS STILL GOING TO BE A

1    WETLAND AFTER THAT FILL DISCHARGE.

2    **Q.**   WHAT I WANT TO ASK YOU, AND I WANT TO TAKE THAT PART BY

3    PART.

4        WOULD IT BE FAIR, AND TELL ME IF THIS IS ACCURATE, WOULD

5    IT BE FAIR TO SAY THAT WHEN YOU SAID THAT SAMPLING POINT 2

6    DOES NOT APPEAR TO BE A WETLAND, WHAT YOU'RE REFERENCING IS

7    THE FILL MATERIAL ITSELF, THOSE 6 TO 10 INCHES OF FILL

8    MATERIAL ARE NOT WETLAND?

9    **A.**   CORRECT.

10   **Q.**   WERE YOU MAKING A CONCLUSION ON WHETHER THE LAND

11   UNDERNEATH THE FILL MATERIAL BEFORE FILL MATERIAL WAS PLACED

12   ON IT, WHETHER OR NOT THAT WAS A WETLAND?

13   **A.**   I WAS NOT MAKING A WETLAND DETERMINATION.  I WAS JUST

14   DOCUMENTING WHERE THE FILL MATERIAL HAD BEEN DISKED INTO THE

15   WETLAND.

16   **Q.**   AND BASED OFF OF WHAT YOU SAW THAT DAY, DO YOU HAVE AN

17   OPINION ON WHETHER OR NOT THE FILL MATERIAL WAS PLACED ON A

18   WETLAND THAT IS A JURISDICTIONAL "WATER OF THE UNITED STATES"?

19   **A.**   I DO.

20   **Q.**   WHAT IS THAT OPINION?

21   **A.**   THAT IT WAS PLACED WITHIN A JURISDICTIONAL WETLAND.

22   **Q.**   AND WHY IS THAT?

23   **A.**   BECAUSE THE AREA USED TO BE A WETLAND.  AND SUBSEQUENT TO

24   MY NOVEMBER SITE VISIT IN 2014, I'VE BEEN OUT TO THE SITE TWO

25   MORE TIMES, AND THOSE AREAS STILL HAVE REMAINED BEING A

GALACATOS – DIRECT / LEE

1    WETLAND.

2    **Q.**  WHAT I WOULD LIKE TO ASK YOU IS, THE AREAS THAT THE FILL

3    WERE PLACED ON WERE PREVIOUSLY DEMARCATED AS A JURISDICTIONAL

4    "WATER OF THE UNITED STATES"; IS THAT CORRECT?

5    **A.**  CORRECT.

6    **Q.**  WHEN YOU WENT OUT IN JULY OF 2013, THE SITE STILL APPEARED

7    TO YOU TO BE THE SAME DELINEATION; IS THAT CORRECT?

8    **A.**  CORRECT.

9    **Q.**  AND THEN THE AREA, FOR INSTANCE, SAMPLING POINT 1, RIGHT

10   ABUTTING THE FILL MATERIAL AREA, YOU BELIEVE STILL LOOKED LIKE

11   A WETLAND.

12   **A.**  CORRECT.

13   **Q.**  SO WHEN YOU SAID SAMPLING POINT 2, IT DOES NOT APPEAR TO

14   BE A WETLAND, YOU ARE REFERENCING THE FILL MATERIAL; IS THAT

15   RIGHT?

16   **A.**  CORRECT.

17   **Q.**  I WANT TO TALK TO YOU A LITTLE BIT ABOUT RAIN BECAUSE YOU

18   MENTIONED THAT.

19       WHEN I TALK ABOUT RAIN, I AM NOT TALKING ABOUT IT FROM THE

20   CALENDAR YEAR, BUT FROM THE RAIN -- THE GROWING SEASON OF THE

21   YEAR.  FROM JULY OF 2013 UP TO JUNE OF 2014 BECAUSE THAT TAKES

22   YOU THROUGH THE FULL RAINY SEASON OF THE YEAR BEFORE.

23       DO YOU KNOW HOW MUCH RAIN IN INCHES CAME FROM JULY OF 2013

24   TO JUNE OF 2014?

25   **A.**  IT WAS, I THINK, 6.85 INCHES OF RAIN.

1    **Q.**   AND DO YOU KNOW WHAT USUALLY THE AVERAGE AMOUNT OF

2    RAINFALL THERE IS IN NEWARK, CALIFORNIA?

3    **A.**   APPROXIMATELY 15 TO 16 INCHES.

4    **Q.**   AND WHEN THIS ORIGINAL DETERMINATION WAS MADE IN 2007, DO

5    YOU KNOW HOW MUCH RAINFALL EXISTED FROM THAT JULY OF 2006 INTO

6    JUNE OF 2007 THAT SAME KIND OF RAINY ANNUAL YEAR THAT COVERS

7    THE RAINY SEASON?

8    **A.**   I THINK ONE OF THOSE YEARS WAS ABOUT 12 INCHES OF RAINFALL

9    AND THE OTHER ONE WAS ABOUT EIGHT.

10   **Q.**   WHEN YOU SAY "12", ARE YOU REFERENCING '05 TO '06?

11   **A.**   '05 TO '06.

12   **Q.**   WHAT ABOUT FROM '06 TO '07?

13   **A.**   I THINK I RECALL IT WAS ABOUT 8 INCHES OF THE RAINFALL.

14   **Q.**   DO YOU KNOW THAT THE REASON HARVEY EXTENDED ANOTHER YEAR

15   WAS TO SEE WHAT THE LAND WOULD BE LIKE WITH DIFFERENT TYPE --

16   WITH A DIFFERENT AMOUNT OF PRECIPITATION?

17   **A.**   I JUST KNOW THAT HE HAD DONE A LOT OF SAMPLING OF THE SITE

18   AND LOOKING AT THE DIFFERENT SOURCES OF HYDROLOGY.

19   **Q.**   HOW DOES THE RAINFALL IN '06 TO '07, WHICH IS WHEN -- THIS

20   IS A 2007 DETERMINATION, THAT WAS THE INITIAL DETERMINATION,

21   HOW DOES THAT YEAR'S RAINFALL COMPARE TO THE 2013 TO 2014 YEAR

22   RAINFALL WHICH PRECEDED THE ILLEGAL -- THE UNLAWFUL DISCHARGE

23   OF FILL MATERIAL ON THE SITE?

24   **A.**   IT WAS FROM 2013 TO '14 HAD ABOUT 6.85 INCHES OF RAINFALL,

25   SO IT'S SLIGHTLY LESS THAN IT HAD ON THE 2006 TO 2007 WETLAND.

GALACATOS – DIRECT / LEE

1    **Q.**  WOULD IT BE FAIR TO SAY BOTH YEARS WERE BELOW AVERAGE?

2    **A.**  YES.

3    **Q.**  AND SIGNIFICANTLY BELOW AVERAGE IF YOU'RE TALKING ABOUT

4    15, 16 INCHES; IS THAT CORRECT?

5         IF YOU ARE TALKING ABOUT AN AVERAGE RATE --

6    **A.**  IT WAS LESS, YEAH, THAN AVERAGE.

7    **Q.**  AND THEY'RE, YOU KNOW, WITHIN 2 INCHES OF EACH OTHER,

8    WOULD YOU SAY THAT THE RAINFALL BETWEEN WHEN THE DETERMINATION

9    WAS MADE AND WHEN THE DISCHARGE WAS DONE IS COMPARABLE?

10   **A.**  YES.

11   **Q.**  I WOULD LIKE TO SHOW YOU A FEW OTHER THINGS IN YOUR

12   MEMORANDUM FOR RECORD.

13        I WOULD LIKE TO SHOW YOU EXHIBIT 901-0006.

14                   (EXHIBIT HANDED TO WITNESS.)

15   **BY MS. LEE:**

16   **Q.**  ARE THESE PHOTOS THAT WERE TAKEN THE DAY THAT YOU WERE

17   THERE IN NOVEMBER 4TH, 2014?

18   **A.**  YES.

19   **Q.**  DO THEY FAIRLY AND ACCURATELY SHOW WHAT THE PROPERTY

20   LOOKED LIKE, INCLUDING THE WORK THAT YOU DID IN SOME OF THE

21   SAMPLING POINTS 1 AND 2 ON THAT DAY?

22   **A.**  YES.

23            **MS. LEE:**  YOUR HONOR, I WOULD LIKE TO MOVE

24   EXHIBIT 901-0007 INTO EVIDENCE -- SORRY, 000 -- SORRY, ONE

25   SECOND.

```
 1                    (PAUSE IN THE PROCEEDINGS.)

 2        YES.  0006 INTO EVIDENCE.

 3             MS. HANSEN:  YOUR HONOR, THE PHOTOS CONTAIN HEARSAY.

 4    WE TOLD THE GOVERNMENT WE'D HAVE NO OBJECTION IF THEY JUST

 5    INTRODUCED THE PHOTOGRAPHS ONLY WITHOUT THE HEARSAY COMMENTARY

 6    ON THEM SO THAT THE WITNESS COULD TESTIFY ABOUT THIS

 7    INFORMATION ON THE PHOTOGRAPHS.

 8             MS. LEE:  YOUR HONOR WE WILL REDACT THE LANGUAGE IN

 9    THERE AND HAVE IT JUST BE A PHOTOGRAPH.

10             THE COURT:  ALL RIGHT.  SO YOU DON'T NEED TO SHOW IT

11    AS IT IS RIGHT NOW?

12             MS. LEE:  WE CAN REDACT IT AND PUBLISH IT WITH THE

13    REDACTIONS.

14             THE COURT:  ALL RIGHT.  ADMITTED SUBJECT TO THAT

15    REDACTION.

16        (GOVERNMENT'S EXHIBIT 901-0006 RECEIVED IN EVIDENCE)

17                    (DISPLAYED ON SCREEN.)

18    BY MS. LEE:

19    Q.  DR. GALACATOS, CAN YOU TELL US WHAT THIS PHOTO DEPICTS?

20    A.  THIS PHOTO IS TAKEN RIGHT AT THE AREA THAT WAS MY FIRST

21    AND SECOND SAMPLING POINT.

22        AND TO THE PERSON STANDING WAS ANOTHER CORPS EMPLOYEE AT

23    THE TIME.  HER NAME WAS ALICIA KIRSHBAUM.

24        AND ON THE LEFT SIDE OF THE PICTURE IT'S AN AREA THAT HAD

25    NOT HAD ANY DISKING OF FILL MATERIAL WITHIN THE WETLANDS.  AND
```

GALACATOS – DIRECT / LEE

1    YOU CAN SEE THE UNDISTURBED VEGETATION.

2        ON THE OTHER SIDE, TOWARDS THE RIGHT SIDE OF THE

3    PHOTOGRAPH, YOU CAN SEE THE AREA WHERE YOU'VE HAD THE DISKING

4    OF THE FILL MATERIAL.

5        I'D ALSO LIKE TO POINT OUT, FURTHER BACK IN THE BACKGROUND

6    OF THE PHOTOGRAPH, YOU CAN SEE THE DIFFERENCE IN THE SOIL WITH

7    SOME OF THE FILL MATERIAL BECAUSE THE SOIL HAS, LIKE I SAID

8    EARLIER, A VERY DARK COLOR.  IT'S CHARACTERIZED AS A 10YR31,

9    SO IT'S ALMOST DARK BROWN BLACKISH COLOR.  AND YOU CAN SEE

10   THAT FILL MATERIAL IN THE BACKGROUND IS A LIGHT TANISH COLOR?

11       AND THAT'S ONE OF THE FIRST THINGS THAT WE NOTED WHEN WE

12   ARRIVED ON THE SITE WAS HOW APPARENT SOME OF THE AREAS OF THE

13   FILL WERE BECAUSE OF THAT DIFFERENCE IN... IN COLOR.

14   **Q.**  OKAY.  NOW I WOULD LIKE TO NOW SHOW YOU 901-0008.

15               (EXHIBIT HANDED TO WITNESS.)

16       IS THIS A PHOTO OF TWO ADDITIONAL SAMPLING POINTS THAT YOU

17   HAD TAKEN THAT SHOWS THE DIFFERENCE BETWEEN THE FILL MATERIAL

18   VERSUS THE NATIVE SOIL?

19   **A.**  YES.

20   **Q.**  DOES -- IS IT FAIR AND ACCURATE ON WHAT YOU SAW ON

21   NOVEMBER 4TH, 2014?

22   **A.**  YES.

23           **MS. LEE:**  AND I WOULD LIKE TO ASK AGENT SU TO REDACT

24   ANY OF THE WRITING ON THIS PHOTOGRAPH.

25       AND THEN THE GOVERNMENT WOULD MOVE TO MOVE IN

1    EXHIBIT 901-0008.

2              **MS. HANSEN:**  NO OBJECTION.

3              **THE COURT:**  ADMITTED WITH THOSE REDACTIONS.

4         (GOVERNMENT'S EXHIBIT 901-0008 RECEIVED IN EVIDENCE)

5    **BY MS. LEE:**

6    **Q.**  I WANT TO TAKE EACH OF THESE PHOTOS IN TURN.

7         LET'S START WITH THE PHOTO ON THE LEFT.  WHAT ARE WE

8    LOOKING AT HERE THERE?

9    **A.**  THIS IS SAMPLING POINT 4.  AND YOU CAN SEE THE LIGHTER

10   AREA ON THE TOP.  THERE IS NOT A LOT OF VEGETATION.  IN FACT,

11   THERE'S NO VEGETATION ON TOP.  BUT YOU CAN SEE THAT THE SOIL

12   IS COMPOSED OF SAND.  THERE'S LIKE ROCK AND PARTS OF CONCRETE.

13   **Q.**  IS THAT A THE FILL MATERIAL DR. GALACATOS?

14   **A.**  THAT'S THE FILL MATERIAL.

15   **Q.**  HOW MANY INCHES OF FILL MATERIAL WAS PRESENT AT THAT

16   SAMPLING POINT?

17   **A.**  ABOUT 6 INCHES ON TOP.

18   **Q.**  WHAT WAS UNDERNEATH THAT?

19   **A.**  UNDERNEATH WAS THE NATIVE SOIL WHICH WAS THAT DARK 10YR31

20   CLAY LOAM, AND IT DID NOT HAVE ANY ROCK OR CONCRETE WITHIN IT.

21

22   **Q.**  WAS DOES THE MIDDLE PHOTOGRAPH SHOW US?

23   **A.**  THE MIDDLE PHOTOGRAPH SHOWS YOU ON THE LEFT-HAND SIDE IS

24   THE AREA WHERE THE FILL MATERIAL HAD BEEN DISKED IN TO THE

25   WETLANDS.

1    AND ON THE RIGHT-HAND SIDE IS RIGHT ADJACENT TO THAT IN

2  THE AREA WHERE YOU DIDN'T HAVE ANY FILL MATERIAL AND YOU STILL

3  HAD SOME VEGETATION THAT HAD BEEN UNDISTURBED BY THE DISK.

4  **Q.**  AND SO IS -- WE ARE MOVING TO THE RIGHT-HAND PHOTO.  IS

5  THAT A CLOSEUP OF A SAMPLE POINT OF AN UNDISTURBED WETLAND

6  AREA?

7  **A.**  YES, IT IS.  YOU CAN SEE THE DARK SOIL AND THAT IT DOESN'T

8  HAVE ANY CONCRETE OR ROCKS IN IT, AND YOU CAN ALSO SEE THE

9  VEGETATION ON TOP THAT HASN'T BEEN DISTURBED.

10  **Q.**  I WOULD LIKE TO SHOW YOU EXHIBIT 901-0009.

11                (EXHIBIT HANDED TO WITNESS.)

12          **MS. LEE:**  I WOULD LIKE TO MOVE THIS EXHIBIT IN AS

13  WELL SUBJECT WITH THE REDACTIONS OF THE LANGUAGE.

14          **MS. HANSEN:**  NO OBJECTION, YOUR HONOR.

15      **THE COURT:**  SO -0009 IS ADMITTED WITH THOSE

16  REDACTIONS.

17      (GOVERNMENT'S EXHIBIT 901-0009 RECEIVED IN EVIDENCE)

18  **BY MS. LEE:**

19  **Q.**  NOW THE PHOTO ON THE LEFT, WHAT DOES THAT SHOW US?

20  **A.**  THE PHOTO ON THE LEFT IS SHOWING THE SOIL HORIZON IN AN

21  AREA THAT HAD THE DISKED FILL IN IT.  IT HAS ABOUT 7 INCHES OF

22  FILL MATERIAL.

23      AGAIN, YOU CAN SEE PEBBLES AND BITS OF CONCRETE.  YOU

24  DON'T HAVE ANY VEGETATION GROWING ON TOP.  YOU CAN ALSO -- IF

25  YOU LOOK TOWARDS THE MIDDLE OF THAT PHOTOGRAPH, YOU CAN SEE

1    SOME VEGETATION THAT GOT BURIED DURING THE FILLING MATERIAL.

2    AND IT'S SORT OF LIKE THE LEFTOVER MATERIAL THAT THE

3    VEGETATION THAT STILL IS BELOW THE FILL MATERIAL, IT'S STILL

4    THERE.  AND UNDERNEATH THAT IS THE NATIVE SOIL.  AGAIN, THAT

5    DARK CLAY LOAM.

6    **Q.**  WHAT ABOUT THE PHOTO ON THE RIGHT?

7    **A.**  THE PHOTO ON THE RIGHT IS SHOWING THE UNDISTURBED WETLAND

8    AREA THAT'S RIGHT NEXT TO SAMPLE POINT 5.  YOU CAN SEE THAT

9    THERE IS THE DARK CLAY LOAM LAYER.  THE SOIL, THERE IS NO

10   PEBBLE, THERE IS NO CONCRETE, AND THE VEGETATION ON TOP IS

11   DOMINATED BY A HYDRIC WETLAND PLANT CALLED SALT GRASS.

12   **Q.**  THAT IS IN AN AREA THAT DIDN'T HAVE FILL MATERIAL ON

13   THERE?

14   **A.**  CORRECT.  AND IT'S RIGHT NEXT TO THE AREA THAT DID HAVE

15   THE FILL MATERIAL.

16   **Q.**  AND I WOULD LIKE TO SHOW YOU EXHIBIT 901-0011.

17                    (EXHIBIT HANDED TO WITNESS.)

18         **MS. LEE:**  AND MOVE THIS INTO EVIDENCE WITH THE

19   REDACTIONS.

20         **MS. HANSEN:**  ONE MOMENT, YOUR HONOR.

21      NO OBJECTION.

22         **THE COURT:**  IT'S ADMITTED.

23      (GOVERNMENT'S EXHIBIT 901-0011 RECEIVED IN EVIDENCE)

24   **BY MS. LEE:**

25   **Q.**  TELL US WHAT WE ARE LOOKING AT HERE, DR. GALACATOS.

GALACATOS – DIRECT / LEE

1    **A.**  THIS IS IN THE NORTHERN AREA OF THE FILL.  IT'S NEXT TO

2    THAT FENCE.  BEHIND THE FENCE IS THE PICK 'N PULL THAT'S STILL

3    NEAR THERE.

4         ON THE RIGHT –– ON THE LEFT SIDE IS THE AREA WHERE THEY

5    HAD THE FILL MATERIAL THAT WAS DISKED INTO THE "WATERS OF THE

6    U.S.", AND ON THE RIGHT SIDE IS SHOWING THE VEGETATION THAT

7    HASN'T BEEN DISTURBED IN THE EXISTING WETLAND AREAS.

8    **Q.**  AND ON THE RIGHT SIDE WHERE IT SHOWED THE UNDISTURBED

9    WETLAND AREA, HAD THAT VEGETATION EXTENDED INTO THE LEFT SIDE

10   OF THE PHOTO PRIOR TO THE FILL BASED ON YOUR OBSERVATIONS ON

11   YOUR VISIT IN 2013?

12   **A.**  YES.

13   **Q.**  IN FACT, WAS WETLAND VEGETATION THROUGHOUT THAT NORTHERN

14   AREA IN JULY OF 2013?

15   **A.**  YES.

16   **Q.**  BASED OFF OF YOUR WORK ON NOVEMBER 4TH, 2014, DID YOU

17   WRITE A LETTER TO THE REPRESENTATIVE OF THE OWNERS, TIM

18   STEELE, ON JANUARY 28, 2015?

19   **A.**  YES.

20   **Q.**  AND WHAT WAS THE PURPOSE OF THAT LETTER?

21   **A.**  THE PURPOSE OF THAT LETTER WAS TO INFORM THE PROPERTY

22   OWNER THAT THERE HAD BEEN AN UNAUTHORIZED FILL DISCHARGE ON

23   THE PROPERTY, AND IT WAS DIRECTING THEM TO DO THE INITIAL

24   CORRECTIVE MEASURES OF REMOVING THE UNAUTHORIZED FILL

25   DISCHARGE.

1    Q.   AND THAT'S BECAUSE YOU HAD FOUND THAT FILL HAD BEEN PLACED

2    ON A "WATER OF THE UNITED STATES"; IS THAT RIGHT?

3    A.   CORRECT.

4    Q.   WE'VE BEEN TALKING A LITTLE BIT ABOUT THE FACT THAT YOU

5    STILL BELIEVED IT TO BE A WETLAND RIGHT IN THE AREAS ABUTTING

6    THE FILL, THAT YOU BELIEVE THAT FILL HAD BEEN PLACED ON

7    PREVIOUSLY DEMARCATED WETLANDS.

8         I WANT TO ASK YOU YOUR OPINION BASED ON YOUR VISITS IN

9    2013 AND 2014 AND TIMES THAT YOU'VE SEEN IT AFTER THAT.

10        WELL, ACTUALLY MOSTLY -- WITHDRAWN.

11        I WANT TO ASK YOU, BASED ON YOUR VISITS IN 2013 AND 2014,

12   WHY DO YOU BELIEVE THE WETLANDS IN... I'LL JUST SHOW YOU

13   EXHIBIT 3 AGAIN.

14                      (DISPLAYED ON SCREEN.)

15        WHY DO YOU BELIEVE THAT THE AREAS IN GREEN AND BLUE ARE

16   JURISDICTIONAL "WATERS OF THE UNITED STATES"?

17   A.   THE AREAS IN BLUE AND GREEN ARE JURISDICTIONAL BECAUSE

18   THERE ARE "OTHER WATERS" AND WETLANDS THAT ARE ADJACENT TO A

19   TRADITIONAL NAVIGABLE WATER.  IN THIS CASE IT'S MOWRY SLOUGH.

20   Q.   WHAT MAKES YOU BELIEVE THEY ARE ADJACENT?

21   A.   THEY ARE NEIGHBORING.  AND ADJACENT IS DEFINED AS

22   BORDERING, CONTIGUOUS, OR NEIGHBORING.  AND THEY ARE IN SUCH

23   CLOSE PROXIMITY TO MOWRY SLOUGH AND THEY HAVE A DIRECT

24   HYDROLOGIC CONNECTION BETWEEN THOSE WETLANDS AND THE TNW.

25   Q.   HOW DO THEY HAVE THE DIRECT HYDROLOGICAL CONNECTION?

GALACATOS – DIRECT / LEE

1    **A.**   THERE ARE TWO MAJOR AREAS.  ONE IN THE NORTH AND, AGAIN,

2    THE PUMP IN THE SOUTH THAT TAKE WATER OFF THE SITE AND

3    DISCHARGE IT INTO MOWRY SLOUGH.

4    **Q.**   DOES THE FACT THAT THESE WETLANDS ARE ADJACENT TO MOWRY

5    SLOUGH, A TRADITIONAL NAVIGABLE WATER, HAVE ANY SIGNIFICANCE

6    TO YOU AS TO THE FUNCTIONS THEY PERFORM FOR THAT NAVIGABLE

7    WATER?

8    **A.**   THEY ARE SIGNIFICANT BECAUSE WETLANDS THAT ARE ADJACENT TO

9    A TNW, TRADITIONAL NAVIGABLE WATER, HAS A GROUP OF WETLANDS

10   THAT ARE ALL SIMILARLY SITUATED AROUND THE BAY, ARE HIGHLY --

11   THEY HAVE A LOT OF FUNCTIONS AND SERVICES AND, THEREFORE, BY

12   DEFINITION THEY ARE CONSIDERED JURISDICTIONAL.

13   **Q.**   WHAT FUNCTIONS AND SERVICES DO WETLANDS DO FOR NAVIGABLE

14   WATERS THEY ARE ADJACENT TO?

15   **A.**   THESE -- THE FUNCTIONS THAT THEY HAVE, THEY PHYSICALLY

16   HOLD FLOOD WATERS DURING LARGE RAIN EVENTS.  THEY HELP TO

17   FILTER OUT POLLUTANTS.  THEY INCREASE OUR WATER QUALITY, AND

18   THAT HAS THE DIRECT INFLUENCE ON OUR NAVIGABLE WATER.

19   **Q.**   AND YOU MENTIONED SIMILARLY-SITUATED WETLANDS IN THE BAY.

20   WHAT ARE YOU REFERENCING OUTSIDE OF NEWARK AREA 4?

21   **A.**   AROUND SAN FRANCISCO BAY WE HAVE A LOT OF AREAS THAT

22   ARE -- SIMILARLY SITUATED WOULD BE LIKE OTHER WETLANDS THAT WE

23   HAVE AROUND THE BAY MARGIN, AND THEY HAVE TOGETHER THAT

24   ECOLOGICAL FUNCTIONS THAT I MENTIONED EARLIER.

25           **MS. LEE:**  I HAVE NO FURTHER QUESTIONS FOR THIS

1    WITNESS.

2              **THE COURT:**  ANY CROSS-EXAMINATION?

3              **MS. HANSEN:**  YES, YOUR HONOR.  ONE MOMENT, PLEASE.

4                          **CROSS-EXAMINATION**

5    **Q.**  HI, DR. GALACATOS.  I'M ANGELA HANSEN.

6         NICE TO MEET YOU.

7    **A.**  NICE TO MEET YOU.

8    **Q.**  DR. GALACATOS, YOU HAVE A LOT OF EXPERIENCE WITH THE ARMY

9    CORPS OF ENGINEERS?

10   **A.**  YES.

11   **Q.**  YOU STARTED THERE IN 2002?

12   **A.**  CORRECT.

13   **Q.**  AND YOU WORKED YOUR WAY UP, AND YOU'RE NOW A SUPERVISORY

14   ECOLOGIST FOUGHT THE SOUTH BRANCH OF THE ARMY CORPS IN SAN

15   FRANCISCO, CORRECT?

16   **A.**  CORRECT.

17   **Q.**  AND YOU KNOW DR. BOURSIER, CORRECT?

18   **A.**  YES.

19   **Q.**  AND HE WAS A PRINCIPAL AND HEAD OF THE H.T. HARVEY

20   ANALYSIS FOR THE SITE WE'RE TALKING ABOUT TODAY?

21   **A.**  YES.

22   **Q.**  AND HIS ORIGINAL DELINEATION FOR AREA 4, HIS ORIGINAL

23   MAPS, THEY WERE VERY IN DEPTH, CORRECT?

24   **A.**  YES.

25   **Q.**  AND HIS DELINEATIONS ARE VERY GOOD, CORRECT?

GALACATOS – CROSS / HANSEN

1    A.  YES.

2    Q.  AND THE MAPS HE PRODUCES ARE ACCURATE, CORRECT?

3    A.  IF I RECALL FOR THIS PARTICULAR AREA, THERE HAD BEEN ONLY

4    SOME MINOR MODIFICATIONS THAT DAN MARTEL REQUESTED OF THE

5    ORIGINALLY MAPPED AREAS BY PAT BOURSIER.

6    Q.  WHAT DAN MARTEL DID WAS AREAS THAT WEREN'T WETLANDS HE

7    EXTENDED BECAUSE HE BELIEVED THEY WERE ACTUALLY WETLANDS,

8    CORRECT?

9    A.  YEAH, IT WAS A MINOR.

10   Q.  ABOUT 4 ACRES, CORRECT?

11   A.  I DON'T REMEMBER THE EXACT AMOUNT.

12   Q.  BUT THOSE ARE THE TYPES OF CHANGES THAT A CORPS EMPLOYEE

13   WOULD MAKE WHEN THEY GO TO A SITE IF THEY SEE SOMETHING -- IF

14   THEY SEE WETLAND THAT WAS NOT DELINEATED, THAT WOULD BE

15   CHANGED, CORRECT?

16   A.  CORRECT.

17   Q.  NOW THE JURISDICTION EXPIRES EVERY FIVE YEARS BUT IT'S

18   STILL VALID AS LONG AS THE REQUEST FOR A VERIFICATION IS MADE;

19   IS THAT RIGHT?

20   A.  I'M NOT SURE I UNDERSTAND.

21   Q.  SURE.

22       WELL A JD EXPIRES EVERY FIVE YEARS; IS THAT RIGHT?

23   A.  AN APPROVED JURISDICTIONAL DETERMINATION EXPIRES EVERY

24   FIVE YEARS.

25   Q.  AND IT'S STILL VALID AS LONG AS A REQUEST IS MADE FOR A

1    REVERIFICATION AND IT'S PENDING.

2    **A.**   THE JURISDICTION ON THE SITE REMAINS EVEN IF THE MAP AND

3    THE LETTER HAVE EXPIRED.

4    **Q.**   GOT IT.

5        LET'S LOOK AT EXHIBIT 2050.  IT SHOULD COME UP PREVIOUSLY

6    ADMITTED 2050.

7                    (DISPLAYED ON SCREEN.)

8        THIS IS THE MAP THAT YOU WERE RE-VERIFYING IN 2013 AND

9    THAT YOU SUBMITTED A MEMO IN 2014 ABOUT; IS THAT RIGHT?

10   **A.**   THIS WAS THE ORIGINALLY VERIFIED MAP OF 2007.

11   **Q.**   AND YOU DETERMINED IN FEBRUARY OF 2014 THAT THERE WERE NO

12   SUBSTANTIAL CHANGES TO THE PROJECT SITE SINCE THE 2007

13   VERIFICATION?

14   **A.**   IN 2013, WHEN I WENT OUT, I DIDN'T SEE ANY SUBSTANTIVE

15   CHANGES ON THE PROJECT SITE.

16   **Q.**   AND IF THERE WERE CHANGES TO THE SITE, YOU WOULD HAVE

17   NOTED IT, CORRECT?

18   **A.**   IF THERE WERE SUBSTANTIVE CHANGES, YES.

19   **Q.**   AND DURING YOUR SITE VISIT, YOU OBSERVED THE AREA BY THE

20   PICK 'N PULL WAS VERY LOW; IS THAT RIGHT?

21   **A.**   YES.

22   **Q.**   AND FOR SOMETHING TO BE CALLED AN "OTHER WATER", IT WOULD

23   LACK VEGETATION, CORRECT?

24   **A.**   WE USUALLY DIFFERENTIATE BETWEEN A WETLAND AND AN "OTHER

25   WATER" IF A WETLAND NEEDS TO HAVE AT LEAST 5 PERCENT

GALACATOS – CROSS / HANSEN

1    VEGETATION.

2    **Q.**   SO THE MAP YOU RE-VERIFIED CONTINUED TO CALL THE AREA

3    UNDER THE PICK 'N PULL AN "OTHER WATER", CORRECT?

4    **A.**   CORRECT.

5    **Q.**   AND DID DR. BOURSIER AT ANY TIME EVER CONTACT YOU TO TELL

6    YOU THAT ANY OF THE DELINEATIONS IN THIS MAP WERE EITHER

7    MISSING OR WRONG?

8    **A.**   NOT THAT I RECALL, NO.

9    **Q.**   NOW, THE JURISDICTIONAL DETERMINATION THAT YOU RE-VERIFIED

10   RIGHT NOW IS ACTUALLY CALLED PRE-DECISIONAL; IS THAT RIGHT?

11   **A.**   I DID NOT RE-VERIFY THE MAP.

12   **Q.**   SO IT'S STILL VALID BUT IT'S NOT RE-VERIFIED; IS THAT

13   RIGHT?

14       HOW DOES THAT WORK?

15   **A.**   THE WETLANDS AND "OTHER WATERS" THAT ARE ON THE SITE ARE

16   STILL JURISDICTIONAL EVEN IF THE MAP HAS EXPIRED.

17   **Q.**   GOT IT.

18       NOW ONCE A MAP IS ISSUED, THERE IS A PROCESS BY WHICH THE

19   LANDOWNERS COULD CONTEST IT IF THEY WANTED; IS THAT RIGHT?

20   **A.**   IT'S THE APPEAL PROCESS, CORRECT.

21   **Q.**   AND THE APPEAL PROCESS COULD ALSO GO TO A COURT; THERE

22   COULD BE A CIVIL LAWSUIT ABOUT IT, TOO, AS WELL CHALLENGING

23   THE JURISDICTION.  IS THAT RIGHT?

24   **A.**   CORRECT.

25   **Q.**   AND IN NOVEMBER 2014, YOU WENT BACK TO THE SITE TO VERIFY

GALACATOS – CROSS / HANSEN

1    THE LOCATION OF THE FILL, CORRECT?

2    **A.**   CORRECT.

3    **Q.**   AND DR. BOURSIER WAS WITH YOU ON THAT DAY AS WELL, WASN'T

4    HE?

5    **A.**   YES.

6    **Q.**   AND ON THAT DAY, HE DID NOT NOTE ANY CHANGES TO THE

7    PREVIOUS MAPS, CORRECT?

8    **A.**   ON OUR SITE VISIT ON NOVEMBER 4TH?

9    **Q.**   YEAH, IN NOVEMBER.

10   **A.**   WE WERE JUST THERE TO LOOK AT THE FILL AREAS.

11   **Q.**   RIGHT.  BUT HE DIDN'T MENTION SEEING SOMETHING OUT OF THE

12   ORDINARY OR DIFFERENT FROM THE MAP THAT YOU RECALL?

13   **A.**   NOT THAT I RECALL.

14   **Q.**   ON NOVEMBER 1ST, 2017, DID YOU RECEIVE AN EMAIL FROM AGENT

15   SIVOK WITH A MAP ATTACHED TO IT?

16   **A.**   I DON'T RECALL RIGHT NOW.

17   **Q.**   OKAY.

18       HOLD ON ONE SECOND.

19   **A.**   OKAY.

20                 (PAUSE IN THE PROCEEDINGS.)

21   **BY MS. HANSEN:**

22   **Q.**   DR. GALACATOS, YOU'RE AN EMPLOYEE OF THE ARMY CORPS

23   CURRENTLY; IS THAT RIGHT?

24   **A.**   CORRECT.

25   **Q.**   SO YOU'RE NOT BEING PAID SEPARATELY FOR YOUR TESTIMONY

```
 1    TODAY, CORRECT?

 2    A.   CORRECT.

 3    Q.   YOU JUST GET YOUR SALARY FOR THAT?

 4    A.   UH-HUH.

 5             MS. HANSEN:  THANK YOU.  NO FURTHER QUESTIONS.

 6             THE WITNESS:  ANY REDIRECT?

 7             MS. LEE:  NO, YOUR HONOR.

 8             THE COURT:  MS. GALACATOS -- DR. GALACATOS, THANK

 9    YOU.  YOU ARE EXCUSED.

10             THE WITNESS:  THANK YOU.

11             THE COURT:  AND PERFECT TIMING.  IT'S 11:42.  WHY

12    DON'T WE GO AHEAD AND TAKE OUR SECOND MORNING RECESS, LADIES

13    AND GENTLEMEN, AND COME BACK AT NOON TO FINISH UP FOR THE DAY.

14        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

15             THE CLERK:  YOU MAY BE SEATED.

16             THE COURT:  SO JUST FOR PLANNING, DO WE HAVE

17    DR. COATS?

18             MR. KEARNEY:  YES.

19             THE COURT:  AND THEN THAT'S IT?

20             MR. KEARNEY:  IT IS.

21             THE COURT:  SO IF WE FINISH WITH DR. COATS, WOULD THE

22    GOVERNMENT BE IN A POSITION TO REST TODAY?

23             MR. KEARNEY:  YES, SIR.

24             THE COURT:  ALL RIGHT.  I SUPPOSE THE QUESTION IS, IF

25    THE GOVERNMENT RESTS TODAY, HOW DOES THE DEFENSE PLAN TO
```

1    PROCEED?

2              **MS. HANSEN:**  YOUR HONOR, WE HAVE ONE POTENTIAL

3    WITNESS.  IT SORT OF DEPENDS ON THE TIME, WHICH WOULD BE AGENT

4    SU.  WE WOULD WANT TO GET IN HER PARTY ADMISSION AS AN ADOPTED

5    ADMISSION DECLARATION SHE SUBMITTED TO YOUR HONOR IN RESPONSE

6    TO BRIEFING IN WHICH SHE REFERRED TO THE AREA BY THE PICK 'N

7    PULL AS NOT A WETLAND AND AS AN ""OTHER WATER"".

8         SO IT WOULD BE A VERY SHORT EXAMINATION.  WE WOULD ALSO BE

9    HAPPY TO STIPULATE TO THAT TESTIMONY IF THE GOVERNMENT WERE

10   WILLING.

11             **THE COURT:**  WHY DON'T YOU DISCUSS A STIPULATION ON

12   THAT POINT.

13        AND THEN YOU ANTICIPATE THAT YOU WOULD BE IN A POSITION TO

14   REST AFTER THAT?

15             **MS. HANSEN:**  YES, YOUR HONOR.

16             **THE COURT:**  ALL RIGHT.  WELL, THAT'S HELPFUL.

17        WHY DON'T WE -- I THINK IF WE GET TO THAT POINT, THE JURY

18   WILL BE CLICKING THEIR HEELS AND THEN WE CAN FIGURE OUT IN

19   TERMS OF SCHEDULING.  OBVIOUSLY NO MONDAY, BUT WE WOULD BE IN

20   A POSITION TO COME BACK AND HAVE CLOSINGS ON TUESDAY.  WE

21   WOULD NEED TO FIGURE OUT WHEN TO DO THE FINAL CHARGING

22   CONFERENCE.

23        I HAVE A SET OF THE INSTRUCTIONS THAT BASICALLY TRACKS

24   WHAT I PRESENTED BEFORE.  I COULD SEE DOING SOMETHING LIKE

25   TELLING THE JURY TO COME BACK FOR TEN, AND GETTING TOGETHER

```
1    AND DOING THE CHARGING CONFERENCE AT 8:30.

2         MR. KEARNEY:  DID THE COURT INTEND TO HAVE ANY

3    PROCEEDINGS TODAY AFTER WE LET THE JURY GO, SIR?

4         THE REASON I BRING THAT UP IS I'VE BEEN GETTING TEXT FROM

5    MY WIFE MY OLDEST SON IS HAVING-ATE AN EMERGENCY APPENDECTOMY

6    RIGHT NOW.

7         I WOULD LIKE TO, WITH THE COURT'S PERMISSION, RIGHT AT

8    1:15 LEAVE THE BUILDING.  AND I KNOW THAT THE GOVERNMENT, AT

9    LEAST, WOULD LIKE TO HAVE A FINALIZED SET OF INSTRUCTIONS

10   BEFORE WE CLOSE.  I AM SORRY TO PUT THE COURT IN THAT

11   POSITION.  I JUST -- IS THERE --

12        THE COURT:  I THINK I CAN -- I THINK WE CAN GET YOU

13   WHAT I PROPOSE BY MONDAY, AND THEN WE CAN HAVE THE ARGUMENT ON

14   TUESDAY MORNING BEFORE THE JURORS ARE ASKED TO SHOW UP.

15        I UNDERSTAND THE DEFENSE, THOUGH, IS PLANNING TO SUBMIT

16   ANOTHER INSTRUCTION.  WHEN --

17        MS. HANSEN:  AS SOON AS WE ARE BACK FROM COURT, YOUR

18   HONOR.  IT WAS DELAYED BECAUSE WE HAD SOME -- IT'S OBVIOUSLY

19   VERY COMPLICATED.  SO WE WILL FILE IT THE MINUTE WE ARE BACK

20   AT THE OFFICE.

21        THE COURT:  AND THEN I -- THE PARTIES DIDN'T SUBMIT

22   PROPOSED VERDICT FORMS, DID YOU OR DID YOU?

23        MS. HANSEN:  WE HAVE VERSIONS OF IT.  IT REALLY

24   DEPENDS ON A FEW THINGS THAT YOUR HONOR WILL RULE ON.

25        WE CAN HAVE THOSE READY TO GO ON MONDAY, TWO DIFFERENT
```

```
1    VERSIONS.  WE WILL CONFER WITH THE GOVERNMENT OVER THE

2    WEEKEND.  THE VERSION BASED ON THE EXISTING INSTRUCTIONS AND A

3    VERSION IN THE EVENT THE COURT MODIFIES ANYTHING FOR OUR

4    INSTRUCTION.

5         THE COURT:  ALL RIGHT.  WHEN YOU SAY "MONDAY", YOU

6    MEAN TUESDAY?

7         MS. HANSEN:  YES, I DO.

8         THE COURT:  ALL RIGHT.  WELL, THAT'S FINE.  TO

9    MR. KEARNEY'S IMMEDIATE QUESTION, I DIDN'T HAVE ANY PLAN FOR

10   ANYTHING AFTER 1:15.  I THINK IT IS MORE THAN APPROPRIATE FOR

11   YOU TO GO TAKE CARE OF THAT.

12        MR. KEARNEY:  THANK YOU, YOUR HONOR.

13        THE COURT:  ALL RIGHT.  ALL RIGHT.  WELL, I SUPPOSE

14   ANOTHER POSSIBILITY WOULD BE IF I GET THE DEFENSE PROPOSAL

15   EARLY ENOUGH TODAY, I CAN LOOK AT IT AND EITHER INCORPORATE IT

16   OR NOT IN WHAT I HAVE PUT TOGETHER, AND THEN YOU WOULD KNOW,

17   AT LEAST, WHAT MY PLAN WAS.

18        MS. HANSEN:  YES.  YOUR HONOR, IF THE GOVERNMENT

19   WANTS TO RESPOND, THAT COULD DELAY YOUR HONOR'S RULING.

20        THE COURT:  ALL RIGHT.  I THINK PROBABLY WHAT I WOULD

21   DO IS YOU'D HAVE A PRELIMINARY READ ON WHERE I'M HEADED BY

22   WHETHER I INCLUDED IT OR NOT.

23        AND THE TRICK IS BECAUSE OF THE HOLIDAY, IT'S GOING TO BE

24   TOUGH FOR YOU TO HAVE AS MUCH NOTICE AS YOU MIGHT WANT, BUT I

25   DON'T KNOW THAT THERE IS A WAY AROUND THAT.
```

1          **MR. KEARNEY:**  SHALL WE HAVE A SUBMISSION DATE, YOUR

2     HONOR, ON MONDAY?  I DON'T WANT TO KEEP THE COURT WORKING

3     EITHER ON MONDAY, BUT WE COULD PERHAPS SUBMIT SOMETHING TO THE

4     COURT RESPONSIVELY OVER THE WEEKEND, AND GIVE THE COURT A

5     CHANCE TO THINK ABOUT IT IF YOU ARE SO INCLINED.

6          **THE COURT:**  THAT SOUNDS FINE.

7          **MS. HANSEN:**  THEN THE IDEA WOULD BE MAYBE WE DO THE

8     INSTRUCTION CONFERENCE ON TUESDAY, AND THEN WE CLOSE AT

9     8:30 ON WEDNESDAY.

10          **THE COURT:**  WE COULD.  THE ONLY THING IS, ON THE ONE

11     HAND, WE ARE WITHIN THE ESTIMATE, WELL WITHIN THE ESTIMATE.

12     THAT'S ACTUALLY NOT A BAD IDEA.  THAT WAY THERE WOULD BE

13     ENOUGH TIME FOR YOU TO ASSIMILATE IT.

14          **MS. HANSEN:**  THESE ARE SUCH COMPLEX ARGUMENTS THAT IT

15     WOULD REALLY BE HELPFUL TO HAVE THE FINAL SET FROM THE COURT.

16          **THE COURT:**  ALL RIGHT.  LET'S HAVE THAT BE THE PLAN.

17     SO THE JURORS WOULD KNOW THAT THEY DON'T NEED TO COME BACK ON

18     MONDAY OR TUESDAY, AND THAT THEY WOULD THEN BE COMING BACK

19     FIRST THING WEDNESDAY MORNING FOR THE ARGUMENTS AND FOR THE

20     CASE TO BE SUBMITTED.

21          **MS. HANSEN:**  WHAT TIME WOULD THE COURT WANT US HERE

22     ON TUESDAY MORNING?

23          **THE COURT:**  I THINK SAY TEN.

24          **MS. HANSEN:**  OKAY.

25          **MR. KEARNEY:**  ALL RIGHT.

1          **THE COURT:**  SO EVERYONE CAN STOP SETTING THEIR ALARM

2    CLOCK FOR FIVE SOMETHING.

3          **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

4          **MS. HANSEN:**  THANK YOU.

5        (RECESS TAKEN AT 11:49 A.M.; RESUMED AT 12:00 P.M.)

6          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

7    BACK IN SESSION.

8          **THE COURT:**  SO ANY RESOLUTION ON THE STIPULATION

9    QUESTION?

10         **MS. HANSEN:**  IT IS BEING DRAFTED RIGHT NOW, AND WE

11   WILL SUBMIT IT TO THE GOVERNMENT HOPEFULLY WITHIN THE NEXT 15,

12   20 MINUTES.

13         **THE COURT:**  ALL RIGHT.  THAT SOUNDS GOOD.

14         **THE CLERK:**  ARE YOU READY, JUDGE?

15         **THE COURT:**  WE ARE.

16         **THE CLERK:**  YOUR WITNESS?

17         **MR. KEARNEY:**  HE'S HERE.

18       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

19         **THE CLERK:**  YOU MAY BE SEATED.

20         **THE COURT:**  ALL RIGHT, MR. KEARNEY.  THE GOVERNMENT

21   MAY CALL ITS NEXT WITNESS.

22         **MR. KEARNEY:**  THE GOVERNMENT WOULD CALL DR. ROBERT

23   COATS TO THE STAND.

24         **THE CLERK:**  PLEASE STAND AND RAISE YOUR RIGHT HAND.

25   RAISE YOUR RIGHT HAND.

1           (**ROBERT COATS,** CALLED AS A WITNESS FOR THE GOVERNMENT,

2     HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

3               **THE WITNESS:**  I DO.

4               **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED, I AM

5     GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

6     LAST NAME FOR THE RECORD.

7               **THE WITNESS:**  MY NAME IS ROBERT COATS, C-O-A-T-S.

8               **THE CLERK:**  R-O-B-E-R-T?

9               **THE WITNESS:**  RIGHT.

10              **THE CLERK:**  THANK YOU.

11              **THE COURT:**  YOU MAY PROCEED WHEN YOU'RE READY,

12    MR. KEARNEY.

13              **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

14                         **DIRECT EXAMINATION**

15    BY MR. KEARNEY:

16    **Q.**  DR. COATS, GOOD MORNING, SIR.

17    **A.**  GOOD MORNING.

18    **Q.**  PLEASE TELL US WHAT YOUR OCCUPATION IS.

19    **A.**  I'M A HYDROLOGIST.

20    **Q.**  WHO DO YOU WORK FOR, SIR?

21    **A.**  I'M SELF-EMPLOYED.

22    **Q.**  AND WITH WHAT COMPANY?

23    **A.**  HYDROIKOS, LIMITED.

24    **Q.**  AND I WONDER IF YOU CAN TELL US WHAT HYDROIKOS MEANS.

25    **A.**  WELL, HYDRO, PART OF THE ROOT WORD MEANS WATER.  I THINK

1    EVERYONE KNOWS THAT.

2        OIKOS IS A ROOT WORD OF ECOLOGY FROM WHICH BOTH ECONOMICS

3    AND ECOLOGY TAKE THEIR NAME.

4        SO PUTTING THE TWO TOGETHER I GET HYDROIKOS.  IT'S ABOUT

5    WHAT I DO.

6    **Q.**  OKAY.

7        SIR, AS A HYDROLOGIST, TELL US VERY GENERALLY WHAT IT IS

8    YOU DO DO, SIR?

9    **A.**  MAINLY SURFACE WATER HYDROLOGY.

10       A LOT OF MY WORK HAS BEEN IN WETLAND RESTORATION AND

11   WETLAND MANAGEMENT, AND ALSO IN THE TAHOE BASIN I'VE DONE A

12   LOT OF WORK ON WATER QUALITY AND EFFECTS OF LAND DISTURBANCE

13   ON WATER QUALITY AND TRANSPORT OF NUTRIENTS AND SEDIMENT TO

14   THE LIKE.

15           **THE COURT:**  THE OPPOSITE ISSUE; MAYBE THE MIC CAN BE

16   MOVED FURTHER AWAY FROM THE WITNESS.

17           **MR. KEARNEY:**  YES, IF YOU CAN BACK UP A LITTLE FROM

18   THE MIC.

19   **BY MR. KEARNEY:**

20   **Q.**  AND WHEN YOU SAY THE -- YOU SAID THE TAHOE BASIN YOU DO

21   WORK IN; IS THAT RIGHT?

22   **A.**  THAT'S RIGHT.  YES.

23   **Q.**  OKAY.  SIR, HOW LONG HAVE YOU WORKED IN THE FIELD OF

24   HYDROLOGY?

25   **A.**  WELL, I GUESS SINCE 1971 WHEN I STARTED WORK ON MY PH.D.

COATS – DIRECT / COATS

1    **Q.**  AND THAT'S 47 YEARS; IS THAT RIGHT?

2    **A.**  SOUNDS ABOUT RIGHT.

3    **Q.**  OKAY.  LET'S TALK VERY QUICKLY ABOUT YOUR EDUCATION, IF WE

4    MAY, SIR.

5        WHERE DID YOU GET YOUR DOCTORATE?

6    **A.**  FROM THE UNIVERSITY OF CALIFORNIA IN BERKELEY.  IN THE --

7    IT WAS THE SCHOOL OF FORESTRY AND CONSERVATION AT THE TIME.

8    **Q.**  DID YOU SPECIALIZE IN SOMETHING DURING YOUR DOCTORAL

9    STUDIES?

10   **A.**  YES.  I SPECIALIZED IN WATER QUALITY AND HYDROLOGY AND

11   ECOLOGY.  WATERSHED MANAGEMENT MIGHT BE A BETTER WAY TO PUT

12   IT.

13   **Q.**  OKAY.  DID YOU PREPARE A DISSERTATION DURING YOUR DOCTORAL

14   STUDY?

15   **A.**  YES, I DID.

16   **Q.**  WHAT WAS THAT IN?

17   **A.**  ON THE -- IT WAS ON NITROGEN TRANSPORT THROUGH A FOREST

18   AND WATERSHED NEAR LAKE TAHOE.

19   **Q.**  DID YOU GET A MASTER'S DEGREE, SIR?

20   **A.**  YES.

21   **Q.**  WHERE WAS THAT?

22   **A.**  THAT WAS AT THE UNIVERSITY OF MINNESOTA.

23   **Q.**  AND DID YOU HAVE AN AREA OF EMPHASIS WITHIN YOUR MASTER

24   STUDY?

25   **A.**  YES.  ECOLOGY AND SOILS.

COATS – DIRECT / COATS

1    **Q.**   AND HOW ABOUT YOUR BACHELOR OF SCIENCE?

2    **A.**   THAT WAS IN FORESTRY FROM UNIVERSITY OF CALIFORNIA.

3    **Q.**   AND DID YOU HAVE A MAJOR?

4    **A.**   FORESTRY.

5    **Q.**   AND ANY LEVEL OF YOUR EDUCATION, DOCTOR, OR IMMEDIATELY

6    THEREAFTER, DID YOU TEACH?

7    **A.**   I TAUGHT FOR FOUR YEARS AS A TEACHING ASSOCIATE IN THE

8    DEPARTMENT OF CONSERVATION AND RESOURCE STUDIES AT BERKELEY.

9    **Q.**   AND WHAT DID YOU TEACH?

10   **A.**   IT WAS AN INTERDISCIPLINARY STUDIES CLASS CALLED IDS-10.

11   IT WAS BASICALLY BASIC CONCEPTS OF ECOLOGY AND FOOD ENERGY AND

12   POPULATION.  AND THEN A QUARTER DEVOTED TO PROBLEMS IN THE BAY

13   AREA.

14   **Q.**   ALL RIGHT.  JUST BRIEFLY GOING TO TALK ABOUT YOUR

15   EXPERIENCE BEFORE YOU GOT TO HYDROIKOS, IF WE MAY.

16       AFTER TEACHING AT CAL, DID YOU WORK AT THE JOHN MUIR

17   INSTITUTE?

18   **A.**   YES.  I WORKED THERE FOR FOUR YEARS.  I WAS FUNDED BY A

19   ROCKEFELLER FOUNDATION FELLOWSHIP IN ENVIRONMENTAL AFFAIRS.

20   **Q.**   AND WHAT DID YOU DO THEREAFTER?

21   **A.**   I WORKED ON THE PROBLEM OF CUMULATIVE IMPACTS OF TIMBER

22   HARVEST ACTIVITIES.

23   **Q.**   AND THEN AFTER THE JOHN MUIR INSTITUTE, DR. COATS, WHERE

24   DID YOU GO FROM THERE?

25   **A.**   I WENT TO WORK WITH PHILIP WILLIAMS AND ASSOCIATES, A

1    CONSULTING HYDROLOGY FIRM IN SAN FRANCISCO.

2    **Q.**  AND DURING YOUR PERIOD -- HOW LONG DID YOU WORK AT THE

3    PHILIP WILLIAMS?

4    **A.**  I WAS THERE 13 YEARS.

5    **Q.**  DURING THAT PERIOD OF TIME DID YOU DO ANY WETLAND

6    JURISDICTIONAL ANALYSIS OR HYDROLOGIC, WETLAND HYDROLOGIC

7    ANALYSIS?

8    **A.**  YES.  I WORKED ON THE HYDROLOGIC ASPECTS OF WETLAND

9    JURISDICTION AND I ALSO PREPARED PLANS FOR WETLAND

10   RESTORATION.

11   **Q.**  AFTER PHILIP WILLIAMS, SIR, DID YOU GO TO A COMPANY CALLED

12   STILLWATER SCIENCES?

13   **A.**  YES.  I WAS THERE FOR TWO YEARS.

14   **Q.**  WHAT DID YOU DO DURING YOUR TIME THERE?

15   **A.**  I WORKED ON FORESTRY MANAGEMENT PLANS, ESPECIALLY THE

16   ASPECTS RELATING TO FISH HABITAT AND LICENSING UNDER THE

17   FEDERAL ENERGY REGULATORY COMMISSION FOR HYDROPOWER.

18   **Q.**  SIR, HAVE YOU CONDUCTED APPROXIMATELY 28 PUBLICATIONS -- I

19   SHOULD STRIKE THAT.

20       HAVE YOU AUTHORED AND/OR PRESENTED AT SYMPOSIA

21   APPROXIMATELY 28 TIMES?

22   **A.**  THAT SOUNDS ABOUT RIGHT, YES.

23   **Q.**  HAVE YOU PUBLISHED IN THE FOLLOWING PEER REVIEW JOURNALS:

24   I GUESS JUST MAYBE CORRECT ME IF I'M WRONG.

25       *THE JOURNAL OF AMERICAN WATER RESOURCES ASSOCIATION*, *THE*

1   *CLIMATIC CHANGE JOURNAL*, *THE JOURNAL OF WATER RESOURCES*

2   *RESEARCH*, *THE ENCYCLOPEDIA OF ENVIRONMENTAL SCIENCE*, *THE*

3   *JOURNAL OF ENVIRONMENTAL MANAGEMENT*, AND THE MAGAZINE

4   *ENVIRONMENT*?

5   **A.**   THAT'S RIGHT.

6   **Q.**   ARE THOSE ALL PEER-REVIEWED PUBLICATIONS, SIR?

7   **A.**   YES, THEY ARE.

8   **Q.**   HAVE THE PAPERS OR SYMPOSIA YOU'VE PRESENTED, HAVE ANY OF

9   THEM BEEN IN THE FIELD OF WETLAND ECOLOGY?

10  **A.**   YES, THERE WERE A COUPLE.   ONE DEALING WITH THE HYDROLOGIC

11  CRITERIA FOR WETLAND DETERMINATION, AND THE OTHER USE OF

12  HYDROLOGIC AND HYDRAULIC TOOLS IN PLANNING A WETLAND

13  RESTORATION.   THE LATTER WAS IN ENVIRONMENTAL MANAGEMENT.

14  **Q.**   ALL RIGHT.

15      HAVE YOU WRITTEN ANY PAPERS IN THE FIELD OF

16  BIOGEOCHEMISTRY?

17  **A.**   YES.

18  **Q.**   FIRST OF ALL, I THINK YOU HAVE TO TELL US WHAT THAT IS.

19  **A.**   OKAY.   THAT PERTAINS TO THE CYCLING OF ELEMENTS THROUGH

20  THE BIOSPHERE THROUGH SOIL, WATER, PLANTS, AND ANIMALS.

21  **Q.**   ALL RIGHT.

22  **A.**   AND AIR.

23  **Q.**   HAVE YOU -- WAS ONE OF THE PAPERS YOU PREPARED ON PATTERNS

24  OF NITROGEN TRANSPORTS?

25  **A.**   YES.

1    **Q.**  AND WAS THAT IN *THE JOURNAL OF WATER RESOURCES RESEARCH* IN

2    2001, SIR?

3    **A.**  YES.

4         **MR. KEARNEY:**  YOUR HONOR, I'M GOING TO OFFER

5    DR. COATS, IF I MAY, IN THE FIELD OF HYDROLOGY AND

6    BIOGEOCHEMISTRY.

7         **MR. SMOCK:**  NO OBJECTION.

8         **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN,

9    DR. COATS WILL BE PERMITTED TO OFFER OPINIONS AND THE BASES

10   FOR HIS OPINIONS IN THOSE SUBJECT MATTER AREAS.

11   **BY MR. KEARNEY:**

12   **Q.**  DR. COATS, DID YOU DO A HYDROLOGICAL AND BIOGEOCHEMICAL

13   ASSESSMENTS OF NEWARK AREA 4?

14   **A.**  YES.

15   **Q.**  AND DID YOU VISIT THE SITE ON FOUR DATES IN -- OR THREE

16   DATES IN 2017 AND ONE DATE IN 2018?

17   **A.**  YES, I DID.

18   **Q.**  AND IF -- DO YOU REMEMBER THOSE OR CAN I REFRESH YOUR

19   RECOLLECTION ON THE PARTICULAR DATES YOU WENT?

20   **A.**  JANUARY 9TH, APRIL 21ST, JUNE... REFRESH MY MEMORY HERE.

21   **Q.**  OKAY.  HOW ABOUT HOW JANUARY 7TH --

22   **A.**  JANUARY 7TH AND JUNE 9TH; IS THAT RIGHT?

23   **Q.**  APRIL 21ST --

24   **A.**  I HAVE A NOTE ON THAT HERE.

25   **Q.**  APRIL 21ST, 2017 --

1    **A.**  THAT'S RIGHT.

2    **Q.**  AUGUST 7TH, 2017 --

3    **A.**  THAT'S RIGHT.

4    **Q.**  AND JANUARY 26TH, 2018.

5    **A.**  THAT'S CORRECT.

6    **Q.**  WE'RE -- WE'VE HEARD ENOUGH ABOUT IT AT THIS STAGE IN

7    TRIAL, SIR, DID YOU OBSERVE THE BASIC HYDROLOGY OF THE SITE?

8    **A.**  YES.

9    **Q.**  I WANT TO SHOW YOU WHAT HAS BEEN MARKED AS DEFENSE

10   EXHIBIT 2025-0002, IF I MAY.

11                   (EXHIBIT HANDED TO WITNESS.)

12   **A.**  OKAY.

13   **Q.**  SIR, DO YOU RECOGNIZE THAT MAP?

14   **A.**  YES, I DO.

15   **Q.**  DOES THAT FAIRLY AND ACCURATELY REPRESENT THE BASIC

16   HYDROLOGIC FLOW OF THE SITE AS YOU FOUND IT IN THE DATES IN

17   2017 AND 2018 YOU TOLD US ABOUT?

18   **A.**  YES, IT DOES.

19            **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO PUBLISH

20   THIS TO THE JURY, AGAIN, IF WE MAY.

21            **THE COURT:**  YOU MAY.

22            **THE CLERK:**  IS IT -- YOU SAID YOUR 17 IS EQUIVALENT

23   TO --

24            **MR. KEARNEY:**  YES, SAME ONE.

25                   (DISPLAYED ON SCREEN.)

1    BY MR. KEARNEY:

2    **Q.**  SIR, WE'LL TALK MORE ABOUT THIS IN A MOMENT.

3        DOES THIS BASICALLY ACCURATELY REFLECT THE SITE AS YOU

4    KNOW IT?

5    **A.**  YES, IT DOES.

6    **Q.**  AND IT CAPTURES -- DOES IT CAPTURE THE DISCHARGE POINTS OF

7    WATER OFF OF THE SITE?

8    **A.**  YES.

9    **Q.**  AND THEY ARE WHAT, SIR?

10   **A.**  DISCHARGE POINTS.

11       WELL, THERE'S TRIBUTARY 1, WHICH DRAINS THE NORTH AREA,

12   AND TRIBUTARY 2, WHICH IS BROKEN INTO A AND B.  SEGMENT A IS

13   THE YELLOW LINE AND B IS THE BLUE LINE.

14   **Q.**  AND I THINK WE HAVE HEARD THIS ALREADY; WHERE DO THOSE

15   DRAIN, SIR?

16   **A.**  TRIBUTARY 1 DRAINS TO A CULVERT AT THE SOUTHERN TIP,

17   SOUTHERN CORNER.  TRIBUTARY 2 GOES THROUGH A CULVERT WHERE THE

18   BLUE AND THE YELLOW LINE COME TOGETHER, AND THEN WATER FLOWS

19   SOUTH TO THE OUTFALL PUMP ON NEAR THE SOUTHWEST CORNER.

20   **Q.**  AND HAVE YOU SEEN THOSE FLOWS IN THOSE AREAS YOU JUST

21   DESCRIBED YOURSELF PERSONALLY?

22   **A.**  I'VE SEEN THE WATER DISCHARGING IN TRIBUTARY B.  I -- WHEN

23   I WAS OUT LOOKING AT TRIBUTARY 1 THE FIRST TIME, THE OUTFALL

24   WAS UNDER WATER SO I COULDN'T REALLY SEE THE WATER COMING OUT.

25       AND OTHER TIMES THE WATER ON THE INSIDE HAS BEEN LOW

1  ENOUGH THAT I DIDN'T SEE IT DRAINING.

2  **Q.**  ALL RIGHT.

3      IS ONE OF THE THINGS HYDROLOGICALLY YOU ASSESSED THE MEAN

4  OR THE TIDAL DATUMS FOR MOWRY SLOUGH?

5  **A.**  YES.

6  **Q.**  I HAVE IN MY HAND A TWO-PAGE DOCUMENT.  THIS IS

7  EXHIBIT 885-0001.

8          **MR. KEARNEY:**  MAY I APPROACH, YOUR HONOR?

9          **THE COURT:**  YOU MAY.

10              (EXHIBIT HANDED TO WITNESS.)

11  **BY MR. KEARNEY:**

12  **Q.**  DO YOU RECOGNIZE THAT CHART, SIR?

13  **A.**  YES, I DO.

14  **Q.**  DID YOU PREPARE IT?

15  **A.**  YES.

16  **Q.**  IS IT ACCURATE?

17  **A.**  I BELIEVE IT IS.

18          **MR. KEARNEY:**  YOUR HONOR, MAY WE ADMIT THIS DOCUMENT

19  INTO EVIDENCE?

20          **MR. SMOCK:**  WE'RE JUST TALKING ABOUT PAGE 1 OF THAT?

21          **MR. KEARNEY:**  PAGE 2 I THINK HAS ONE LINE ON IT.

22          **MR. SMOCK:**  HOLD ON.  I'M SORRY.  885?

23          **MR. KEARNEY:**  CAN I SHOW YOU A PHYSICAL COPY?

24          **THE WITNESS:**  SURE.

25              (PAUSE IN THE PROCEEDINGS.)

1          **THE COURT:**  NO OBJECTION?

2          **MR. SMOCK:**  NO OBJECTION.

3          **THE COURT:**  ALL RIGHT.  885-001 AND -002 ARE

4    ADMITTED.

5       (GOVERNMENT'S EXHIBIT 885-001 AND -002 RECEIVED IN

6    EVIDENCE)

7          **MR. KEARNEY:**  LET ME BLOW UP THE DATA, AGENT SU.

8    **BY MR. KEARNEY:**

9    **Q.**  SIR, CAN YOU JUST BRIEFLY TELL US WHAT WE ARE LOOKING AT

10   HERE?

11   **A.**  WE ARE LOOKING AT THE TIDAL ELEVATIONS OF MEAN HIGH OR

12   HIGH WATER, MEAN HIGH WATER, MEAN SEA LEVEL, MEAN TIDE LEVEL,

13   MEAN LOW WATER AND MEAN LOWER LOW WATER.

14      OUR REFERENCE TO --

15   **Q.**  DR. COATS, JUST FOR YOUR OWN HEALTH, SLOW DOWN LITTLE BIT

16   PLEASE.

17   **A.**  OKAY.

18   **Q.**  DID YOU FINISH THE VERTICAL AXES OF THAT LIST?

19   **A.**  YES.

20   **Q.**  WE ARE TALKING ABOUT THE SPAN OF TIDES IN MOWRY SLOUGH; IS

21   THAT A FAIR STATEMENT?

22   **A.**  YES.

23   **Q.**  DID YOU -- WHEN YOU LOOKED AT THIS DATA, DID YOU COMPILE

24   WHAT'S CALLED A MEAN DIURNAL, D-I-U-R-N-A-L TIDE TIDAL CYCLE?

25   **A.**  RANGE IS THE USUAL.

1   **Q.**   OKAY.  SO DID YOU DEVELOP A MEAN DIURNAL TIDE RANGE?

2   **A.**   YES.  THE MEAN DIURNAL RANGE IS THE DIFFERENCE BETWEEN THE

3   MEAN LOWER LOW WATER AND THE MEAN HIGHER HIGH WATER.  IN THIS

4   CASE IN FEET, 8.64.

5   **Q.**   SO JUST IN LAY TERMS, SIR, FROM THE VERY LOWEST OF THE LOW

6   TIDE TO THE VERY HIGHEST OF THE HIGH TIDE?

7   **A.**   NOT QUITE.

8   **Q.**   CORRECT ME IF I'M WRONG.  WHAT DOES 8.64 MEAN?

9   **A.**   THAT'S THE MEAN OF THE DAILY HIGHER HIGH WATER OVER AN

10  18.6-YEAR PERIOD.

11  **Q.**   OKAY.

12      DOES THAT TIDAL FLUCTUATION, THAT 8.64 MEAN TIDAL

13  FLUCTUATION, DOES IT VARY DURING TIMES OF THE MONTH AND MOON

14  CYCLES?

15  **A.**   OH, YES.  IT'S GREATER DURING PERIODS OF NEW MOON AND FULL

16  MOON AND WHAT WE CALL SPRING TIDES, AND THEN PERIODS OF HALF

17  MOON OR THREE-QUARTER MOON IT'S LESS AND THOSE ARE THE NEAP

18  TIDES.

19  **Q.**   WE TALKED ABOUT -- I WANT TO GET TO YOUR FLOW MEASUREMENTS

20  OF THE DISCHARGES INTO MOWRY SLOUGH IN THIS CASE.

21      BUT, FIRST, SIR, I WANT TO SHOW YOU TWO PHOTOGRAPHS.

22  DURING YOUR VISIT TO THE SITE YOU TOLD US ABOUT EARLIER ON

23  APRIL 21ST, 2017, DID YOU TAKE PHOTOGRAPHS OF WHAT YOU

24  REFERRED TO AS TRIBUTARY A?

25  **A.**   YES.

1       **MR. KEARNEY:**  YOUR HONOR, I HAVE IN MY HAND

2    EXHIBIT 769-0001.  MAY I APPROACH?

3       **THE COURT:**  YOU MAY.

4              (EXHIBIT HANDED TO WITNESS.)

5    **BY MR. KEARNEY:**

6    **Q.**  DR. COATS, DID YOU TAKE THAT PHOTOGRAPH ON THE APRIL 21ST,

7    OF 2017?

8    **A.**  YES.

9    **Q.**  DOES IT FAIRLY DEPICT A PARTICULAR AREA OF THE PROPERTY,

10   SIR?

11   **A.**  YES.  THIS IS LOOKING DOWNSTREAM FROM NEAR THE HEAD OF

12   TRIBUTARY A.

13   **Q.**  AND WHAT IS SEEN THERE ON THE RIGHT?

14   **A.**  ON THE RIGHT, THE FAR RIGHT?

15   **Q.**  JUST THE LAND --

16   **A.**  WELL, THIS IS THE -- ON THE AREA ON THE RIGHT IS THE

17   SOUTHERN AREAS IN QUESTION HERE.  THERE'S SOME PONDED WATER ON

18   IT.

19       AND TRIBUTARY -- WE ARE KIND OF LOOKING DOWN THE AXIS OF

20   TRIBUTARY A WITH PICKLEWEED IN THE FOREGROUND AND SOME OPEN

21   WATER IN THE BACKGROUND.

22   **Q.**  LET ME STOP YOU THERE.

23       DR. COATS, DOES THIS FAIRLY AND ACCURATELY DEPICT THE

24   SCENE AS YOU SAW IT ON APRIL 21ST?

25   **A.**  YES, IT DOES.

COATS – DIRECT / COATS

1    I WANT TO POINT OUT BECAUSE IT'S PICKLEWEED IN THE

2  FOREGROUND THAT DOESN'T MEAN THERE'S NO WATER IN THE DITCH

3  THERE.  OFTEN PICKLEWEED HAS ITS HEAD ABOVE WATER AND

4  THERE'S -- BUT IF YOU WALK OVER, YOU CAN GET YOUR FEET WET.

5        **MR. KEARNEY:**  YOUR HONOR, MAY WE ADMIT THIS EXHIBIT

6  INTO EVIDENCE, PLEASE?

7        **THE WITNESS:**  NO OBJECTION.

8        **THE COURT:**  769 IS ADMITTED.

9        (GOVERNMENT'S EXHIBIT 769 RECEIVED IN EVIDENCE)

10        **MR. KEARNEY:**  CAN WE PUBLISH?

11             (DISPLAYED ON SCREEN.)

12        **MR. KEARNEY:**  THANK YOU, SIR.

13  **BY MR. KEARNEY:**

14  **Q.**  IN WHAT GENERAL DIRECTION ARE WE LOOKING NOW IN TERMS OF

15  THE SLOUGH?  ARE WE LOOKING AWAY FROM IT OR TOWARDS IT?

16  **A.**  WE'RE LOOKING TOWARDS IT.

17  **Q.**  AND THE WATER WE CAN SEE IN THAT DITCH, SIR, WHICH IS WAY

18  IS IT RUNNING?  IS IT RUNNING TOWARDS YOU OR AWAY FROM YOU?

19  **A.**  AWAY.

20  **Q.**  I ALSO WANT TO SHOW YOU A PHOTOGRAPH FROM APRIL THE 21ST,

21  2017, I BELIEVE.  THIS IS EXHIBIT 717-001.

22        **MR. KEARNEY:**  MAY I APPROACH?

23        **THE COURT:**  YOU MAY.

24             (EXHIBIT HANDED TO WITNESS.)

25

1    **BY MR. KEARNEY:**

2    **Q.**   DO YOU RECOGNIZE THAT PHOTOGRAPH, DR. COATS?

3    **A.**   YES, I DO.

4    **Q.**   DID YOU TAKE IT?

5    **A.**   YES.

6    **Q.**   WHAT IS IT?

7    **A.**   IT'S A PICTURE OF THE POND AT THE HEAD OF THE TRIBUTARY A

8    ESSENTIALLY BEHIND ME FROM WHERE I WAS STANDING WHEN I TOOK

9    THE OTHER PICTURE.

10   **Q.**   DOES IT FAIRLY AND ACCURATELY DEPICT THE SCENE AS YOU

11   ENCOUNTERED IT ON APRIL 21ST OF 2017.

12   **A.**   YES.

13         **MR. KEARNEY:**   YOUR HONOR, MAY WE ADMIT THIS INTO

14   EVIDENCE?

15         **MR. SMOCK:**   NO OBJECTION.

16         **THE COURT:**   IT'S ADMITTED.

17   (GOVERNMENT'S EXHIBIT 717-001 RECEIVED IN EVIDENCE)

18   **BY MR. KEARNEY:**

19   **Q.**   SIR, THIS IS A POND THERE VISIBLE IN THE PHOTOGRAPH; IS

20   THAT RIGHT?

21   **A.**   YES.

22   **Q.**   WHERE DOES THAT POND DRAIN TO, IF YOU KNOW, SIR?

23   **A.**   DURING PERIODS OF HIGH RUNOFF, IT DRAINS ACROSS THE... THE

24   ROADWAY RIGHT IN FRONT OF ME THROUGH THAT THE POND ON THE LEFT

25   AND THEN OVERFLOWS INTO TRIBUTARY A.

1    **Q.**   OKAY.

2       I WANT TO SHOW YOU ONE LAST PHOTOGRAPH BEFORE WE START

3    GETTING INTO DISCHARGE.

4       THIS IS EXHIBIT 765-0001.

5           **MR. KEARNEY:**   MAY I APPROACH?

6               (EXHIBIT HANDED TO WITNESS.)

7       I BELIEVE THIS HAS BEEN ADMITTED INTO EVIDENCE ALREADY.

8               (EXHIBIT DISPLAYED ON SCREEN.)

9    **BY MR. KEARNEY:**

10   **Q.**   DR. COATS, DO YOU RECOGNIZE THE SCENE THAT IS DEPICTED IN

11   THAT PHOTOGRAPH?

12   **A.**   YES.

13   **Q.**   WHAT IS IT?

14   **A.**   THIS IS THE FLOW OF TRIBUTARY A WHERE IT ENTERS TRIBUTARY

15   B JUST DOWNSTREAM OF A CULVERT THAT'S UNDER A... WHAT APPEARS

16   TO BE AN ABANDONED ROAD ON THE LEVEE.  IT'S ON THE SOUTH SIDE

17   OF AREA -- SOUTHERN AREA.

18   **Q.**   AND IS THIS, DR. COATS, THE AREA WHERE YOU MEASURED THE

19   FLOW OF A GOING INTO B?

20   **A.**   IT'S JUST DOWNSTREAM.  I MEASURED THE FLOW ON THE UPSTREAM

21   SIDE OF THE CULVERT, AND THIS IS DOWNSTREAM.

22   **Q.**   TELL US HOW ONE GOES ABOUT MEASURING FLOW IN A MOVING

23   WATER BODY, PLEASE.

24   **A.**   OKAY.  THERE ARE TWO PARTS TO IT.  ONE, IT IS TO SURVEY

25   THE CHANNEL, MEASURE THE DEPTH AND WIDTH, AND CALCULATE THE

1    CROSS-SECTIONAL AREA.

2        AND THEN WITH A CURRENT METER, MEASURE THE DISCHARGE IN

3    UNITS LIKE CUBIC FEET -- LIKE UNITS OF FEET PER SECOND.  THEN

4    YOU HAVE THE CROSS-SECTIONAL AREA IN SAY SQUARE FEET, AND THE

5    VELOCITY OF THE CURRENT IN THAT CROSS SECTION IN FEET PER

6    SECOND.  THEN YOU MULTIPLY THE TWO AND YOU GET CUBIC FEET PER

7    SECOND, AND THAT'S YOUR DISCHARGE ESTIMATE.

8    **Q.**  HOW DO YOU -- HOW DO YOU MEASURE THE VELOCITY OF FLOW IN A

9    PARTICULAR CHANNEL LIKE THAT?

10   **A.**  I DID IT WITH A CURRENT METER, A MARSH-MCBIRNEY FLO-MATE

11   2000, I BELIEVE IT WAS.

12   **Q.**  THAT'S THE BRAND --

13   **A.**  THAT'S THE BRAND AND MODEL NUMBER.

14   **Q.**  AND THIS MEASUREMENTS OF THE VELOCITY OF A AND B; ON WHAT

15   DATE DID THAT OCCUR ON, SIR, IF YOU REMEMBER?

16   **A.**  I BELIEVE IT WAS JANUARY 9TH.

17   **Q.**  OF 2017?

18   **A.**  OF 2017, YES.

19   **Q.**  ALL RIGHT.  AND WAS A VIDEO TAKEN THAT DAY OF THAT

20   CONFLUENCE AREA BETWEEN A AND B?

21   **A.**  YES.

22        **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO PLAY NOW

23   EXHIBIT 864B.  I BELIEVE THAT'S BEEN PREVIOUSLY ADMITTED.

24        **THE CLERK:**  GIVE ME ONE SECOND.

25        **MR. KEARNEY:**  MAY WE PLAY IT FOR THE JURY, YOUR

1   HONOR?

2          **THE COURT:**  YOU MAY.

3                      (VIDEO PLAYED)

4   **BY MR. KEARNEY:**

5   **Q.**  SO TELL US WHAT WE ARE LOOKING AT HERE, DOCTOR.

6   **A.**  OKAY.

7        WE'RE LOOKING AT THE DRAINAGE THAT'S COMING FROM THE

8   WETLAND IN THE SOUTHERN AREA CONCENTRATED IN A CHANNEL, AND

9   IT'S GOING UNDER A LITTLE BOARDWALK THAT'S BEEN PLACED ACROSS

10  THE CHANNEL AND DOWN INTO THE CULVERT THAT GOES UNDER THE

11  ABANDONED ROAD, WHICH I THINK WE'RE ABOUT TO SEE.

12       THERE'S THE OPENING OF THE CULVERT RIGHT AT THE VERY

13  BOTTOM.  AND A MOMENT AGO YOU SAW MY BOOTS THERE ON THE

14  LEFT-HAND SIDE.

15  **Q.**  SO YOU'RE ACTUALLY PICTURED IN THIS VIDEO; IS THAT RIGHT?

16  **A.**  MY BOOTS ARE, YES.

17  **Q.**  AND AFTER THE WATER ENTERS THAT CULVERT FROM TRIBUTARY A,

18  DR. COATS, WHERE DOES IT GO?

19  **A.**  GOES INTO TRIBUTARY B, AND THEN GOES IN THAT CHANNEL DOWN

20  TO THE OUTFALL PUMP AT THE SOUTHERN END OF THE... OF THE

21  CHANNEL SHOWN IN BLUE ON THE FIGURE THAT WE LOOKED AT.

22  **Q.**  DR. COATS, DID YOU PREPARE AN ESTIMATE OF THE FLOW THAT WE

23  JUST SAW IN -- AT THE CONFLUENCE BETWEEN TRIBUTARY A AND

24  TRIBUTARY B ON JANUARY THE 21ST, 2017?

25  **A.**  JANUARY 21ST?

COATS - DIRECT / COATS

1   **Q.** YES.  I'M SORRY, JANUARY 9TH, 2017.

2   **A.** YES, I DID.

3   **Q.** THANK YOU.

4   AND WHAT WAS YOUR ESTIMATE OF THE FLOW FROM -- IN THE --

5   IN THOSE TWO BODIES OF WATER ON THAT DATE?

6   **A.** IT WAS 2 TO 3 CUBIC FEET PER SECOND.  I MEASURED IT AT TWO

7   DIFFERENT CROSS SECTIONS AND THEN AVERAGED THEM.

8   **Q.** AND CAN YOU ESTIMATE FOR US WHAT 2 TO 3 CUBIC FEET IS IN

9   PERHAPS GALLONS OR CAN YOU MAKE THAT KIND OF A --

10  **A.** WELL, 1 GALLON -- 1 CUBIC FEET PER SECOND IS ABOUT

11  2.5 GALLONS PER SECOND.

12  **Q.** AND SO IF YOU CAN DO THE MATH FOR US, BETWEEN 2 TO 3 IS

13  HOW MUCH, SIR?

14  **A.** WELL, 2 WOULD BE 60... LET'S SEE.

15  WELL, IT WOULD BE 15 GALLONS PER SECOND, 2 CUBIC FEET PER

16  SECOND.

17  **Q.** ALL RIGHT.

18  **A.** AND THEN TIMES 60 WOULD BE 600 GALLONS PER MINUTE.

19  **Q.** ALL RIGHT.  SO IT'S -- IT'S CONSERVATIVELY THE FLOW THERE

20  IS 15 GALLONS PER SECOND; IS THAT AFFAIR STATEMENT?

21  **A.** YES.

22  **Q.** ALL RIGHT.

23  DID YOU GO BACK AGAIN ON APRIL THE 21ST OF 2017 AND ASSESS

24  THE -- THAT SAME CONFLUENCE AREA?

25  **A.** I LOOKED AT IT THEN, BUT I DID NOT DO ADDITIONAL

COATS - DIRECT / COATS

```
 1    MEASUREMENTS.
 2             MR. KEARNEY:  YOUR HONOR, MAY WE PLAY EXHIBIT 1104 AT
 3    THIS TIME, PLEASE.
 4             THE CLERK:  I'M SORRY, 1104?
 5             MR. KEARNEY:  1104.  I BELIEVE IT HAS BEEN PREVIOUSLY
 6    ADMITTED, BUT I MAY BE WRONG, MADAME CLERK.
 7             THE CLERK:  I DON'T HAVE 1104.
 8             MR. KEARNEY:  I'M SORRY, I MEANT 867A.
 9             THE CLERK:  867A?
10             MR. KEARNEY:  YES.  MY MISTAKE.  MY APOLOGIES.
11             THE CLERK:  ONE SECOND.
12             MR. KEARNEY:  I AM TOLD THAT IS ADMITTED.
13             THE CLERK:  YOU'RE GOOD.  YEP.
14             MR. KEARNEY:  OKAY.
15                       (VIDEO PLAYED.)
16    BY MR. KEARNEY:
17    Q.  WHAT ARE WE LOOKING AT HERE, DOCTOR?
18    A.  THIS IS THAT TRIBUTARY.  THAT'S ME GOING OVER ON THE BANK.
19    MY ESTIMATE JUST EYEBALLING IS ABOUT 1 CFS.
20    Q.  THAT'S CUBIC FOOT PER SECOND?
21    A.  YES.
22    Q.  SOMEWHAT LESS THAN YOUR FIRST READING IN JANUARY; IS --
23    A.  THAT'S RIGHT, YES.
24    Q.  DID YOU -- SO THAT WAS -- YOU TOOK A READING IN JANUARY,
25    YOU TOOK ONE IN APRIL, DID YOU --
```

1    **A.**   I TOOK A LOOK IN APRIL, NOT ACTUALLY A MEASUREMENT.

2    **Q.**   FAIR STATEMENT.

3         SO YOU OBSERVED THE FLOW IN JANUARY --

4    **A.**   MEASURED IT, YES.

5    **Q.**   YOU OBSERVED A FLOW IN APRIL?

6    **A.**   YES.

7    **Q.**   DID YOU ALSO OBSERVE THE FLOW IN YOUR AUGUST 7TH, 2017

8    TRIP TO THE PROPERTY?

9    **A.**   YES.

10   **Q.**   AND DID YOU VIDEOTAPE IT THAT DAY?

11   **A.**   I DIDN'T VIDEOTAPE IT, BUT I BELIEVE A VIDEO WAS TAKEN.

12   **Q.**   DID YOU MAKE AN ASSESSMENT, DR. COATS, OF THE FLOW BETWEEN

13   THAT CONFLUENCE ON APRIL 7TH, 2017?

14   **A.**   AUGUST 7TH, 2017.

15   **Q.**   SORRY, AUGUST 7TH, 2017.

16   **A.**   I LOOKED AT IT VISUALLY.  I WAS, FRANKLY, RATHER SURPRISED

17   HOW MUCH WATER WAS COMING OUT.

18   **Q.**   PLEASE EXPLAIN THAT FOR US.

19   **A.**   WELL, THE PRECIPITATION FROM -- OF DURING MAY, JUNE, AND

20   JULY DATES, THE DAYS PRECEDING THAT VISIT, WAS THE -- ONLY DAY

21   WITH RAIN WAS IN JUNE, AND THAT WAS .01 INCHES.  SO IT WAS

22   ESSENTIALLY DRY DURING MAY, JUNE, AND JULY, AND IN AUGUST.

23        SO THAT WATER HAD TO BE COMING FROM SOMEWHERE.  AND THERE

24   ARE ONLY TWO POSSIBILITIES THAT I CAN THINK OF.  ONE IS

25   SEEPAGE THROUGH THE LEVEE, LEAKAGE OF WATER FROM MOWRY SLOUGH

1    AND THE OTHER IS DISCHARGE OF SHALLOW GROUND WATER.

2    **Q.**  THE 1 CUBIC FOOT PER SECOND THAT YOU OBSERVED IN AUGUST OF

3    2017, TELL US WHAT THAT EQUATES TO IN TERMS OF GALLONS,

4    PLEASE.

5    **A.**  THAT WOULD BE ABOUT... LET'S SEE.  15 GALLONS PER SECOND.

6    IF IT'S ONE, IT WOULD BE SEVEN AND A HALF GALLONS PER SECOND.

7    **Q.**  AND THE RATE OF THAT FLOW SURPRISED YOU, SIR?

8    **A.**  YES.

9    **Q.**  JUST BECAUSE THERE HAD BEEN NO RAIN?

10   **A.**  HAD NO RAIN AND ALSO VERY HIGH EVAPOTRANSPIRATION.

11   EVAPOTRANSPIRATION IS THE SUM OF EVAPORATION FROM AN OPEN

12   WATER BODY AND THE TRANSPIRATION FROM VEGETATION.

13        AND THE -- THOSE ESTIMATES ARE AVAILABLE FROM THE STATE OF

14   CALIFORNIA, A SITE DEVOTED TO IRRIGATION MANAGEMENT.  AND IT

15   WAS THE... ANNUAL EVAPOTRANSPIRATION FOR THE NEWARK AREA IS

16   AROUND 50 INCHES PER YEAR.  SO DURING THE SUMMER MONTHS THERE

17   SHOULD BE ENOUGH EVAPOTRANSPIRATION TO PRETTY WELL DRY OUT THE

18   AREA.

19        I NOTICED IN AREA A OR IN AREA 1, THE NORTHERN AREA, IT

20   WAS -- THE WATER WAS PRETTY WELL DRAINED OUT AND PRETTY WELL

21   DRIED UP INDICATING THERE'S NOT VERY MUCH OF AN ACTIVE WATER

22   SOURCE DURING THE SUMMER.  BUT THAT WAS NOT THE CASE AT ALL IN

23   THE SOUTHERN AREA.

24   **Q.**  SO IT SEEMED TO BE, THE FLOW IN THAT SOUTHERN AREA, AT

25   LEAST APPEARED TO YOU, TO BE INDEPENDENT OF RAIN; IS THAT A

1    FAIR STATEMENT?

2    **A.**  I WOULDN'T SAY IT'S INDEPENDENT OF RAIN.  WHEN IT RAINS,

3    THERE'S MORE FLOW.  BUT THERE'S A BASE FLOW THAT CONTINUES

4    DURING THE DRY SEASON.

5    **Q.**  ALL RIGHT.  THANK YOU.

6        ON JANUARY 9TH, 2017, DID YOU ALSO ASSESS THE FLOW OUT OF

7    THE PUMP?

8    **A.**  I OBSERVED IT BUT DIDN'T TRY TO MEASURE IT.

9    **Q.**  WE WILL TALK ABOUT THAT IN A MOMENT.

10        **MR. KEARNEY:**  YOUR HONOR, I WOULD LIKE TO PUBLISH

11   864F, WHICH HAS ALREADY BEEN ADMITTED.

12                    (PAUSE IN THE PROCEEDINGS.)

13                       (VIDEO PLAYED.)

14   **BY MR. KEARNEY:**

15   **Q.**  DOCTOR, IS THIS THE OUTFLOW OF THE PIPES FROM THE PUMP AS

16   YOU OBSERVED IT ON JANUARY 9TH OF 2017?

17   **A.**  YES.

18   **Q.**  I WOULD LIKE TO STOP THIS VIDEO RIGHT HERE FOR A MOMENT,

19   IF WE MAY.

20        DOCTOR, WERE YOU ABLE TO GET A FLOW METER INTO THAT

21   ROILING WATER WE SEE IN THAT --

22   **A.**  I DIDN'T TRY, BUT IT WOULD NOT BE A VERY GOOD PLACE TO

23   MEASURE DISCHARGE BECAUSE IT'S SO TURBULENT AND THE FLOW IS SO

24   DISORGANIZED AS IT COMES OUT OF THE PIPES, I THINK IT WOULD BE

25   AN AWKWARD PLACE TO TRY TO MEASURE DISCHARGE.

COATS - DIRECT / COATS

1  **Q.**  DID YOU MAKE A VISUAL ASSESSMENT OF THE AMOUNT OF WATER

2  FLOWING OUT OF THOSE PIPES?

3  **A.**  WELL, IT'S VERY DIFFICULT TO MAKE A GUESS, BUT IT'S

4  PROBABLY A COUPLE OF CUBIC FEET PER SECOND.

5      THAT'S KIND OF A WILD GUESS.

6  **Q.**  OKAY.  HOW ABOUT THE FOAM THAT WE SEE IN THIS PHOTOGRAPH.

7  **A.**  WHAT ABOUT IT?

8  **Q.**  DO YOU HAVE ANY IDEA WHAT THAT IS, SIR?

9  **A.**  I THINK IT'S... IT'S FOAM CAUSED BY ORGANIC MATTER

10  DISSOLVED IN THE WATER.  YOU OFTEN SEE THIS AROUND THE EDGES

11  OF SAN FRANCISCO BAY.  IT'S ON THE EDGES OF THE SALT PONDS

12  ESPECIALLY.  IT'S A NATURAL PHENOMENON.  IT DOESN'T INDICATE

13  POLLUTION.

14  **Q.**  IS THAT EVIDENCE OF ORGANIC MATTER BEING TRANSPORTED INTO

15  THE SLOUGH FROM THE LAND?

16  **A.**  I THINK SO.

17  **Q.**  WE'LL TALK MORE ABOUT THAT IN A MOMENT.

18      I WOULD LIKE TO PLAY FOR YOU THE LAST VIDEO NOW -- OR

19  SECOND TO LAST VIDEO IF WE MAY.  THIS IS 867B.

20      WHEN YOU WENT BACK ON THE SITE APRIL 21ST, 2017, DID YOU

21  OBSERVE THAT SAME PUMP OUTFALL AGAIN?

22          **THE CLERK:**  I'M SORRY, 867?

23          **MR. KEARNEY:**  B- AS IN BOY.

24          **THE CLERK:**  OKAY.

25                  (VIDEO PLAYED.)

COATS – DIRECT / COATS

| | |
|---|---|
| 1 | **THE WITNESS:**  I LOOKED AT THE AREA.  I DON'T REMEMBER |
| 2 | IF IT WAS DISCHARGING WHILE I WAS THERE OR NOT.  THERE IT IS. |
| 3 | IT CERTAINLY WAS. |
| 4 | **BY MR. KEARNEY:** |
| 5 | **Q.**  IS THERE ANOTHER GENTLEMAN IN THIS PICTURE YOU RECOGNIZE, |
| 6 | SIR? |
| 7 | **A.**  NO.  THAT'S ME I THINK. |
| 8 | **Q.**  ALL RIGHT. |
| 9 | **A.**  TRYING NOT TO SLIP ON THE ROCKS. |
| 10 | **MR. KEARNEY:**  I THINK WE CAN STOP IT THERE. |
| 11 | **BY MR. KEARNEY:** |
| 12 | **Q.**  CAN YOU GIVE US ANY KIND OF ASSESSMENT OF THE FLOW ON THAT |
| 13 | DATE APRIL 21ST OF 2017 AS COMPARED TO THE JANUARY DATE? |
| 14 | **A.**  I THINK IT WAS BASICALLY THE SAME.  IT'S LIMITED BY THE |
| 15 | RATE OF PUMPED DISCHARGE RATHER THAN NATURAL RUNOFF. |
| 16 | **Q.**  THANK YOU, SIR. |
| 17 | DURING YOUR TRIPS TO THE SITE, DID YOU ALSO DO AN ANALYSIS |
| 18 | OF THE FLOW COMING FROM THE DUCKBILL UP IN THE NORTH? |
| 19 | **A.**  I OBSERVED AND PHOTOGRAPHED THE INSTALLATION OF THE |
| 20 | DUCKBILL AND THE CULVERT IT CONNECTS TO.  I DIDN'T DO THE -- |
| 21 | DO MEASUREMENTS THERE, BUT I LATER CALCULATED THE POTENTIAL |
| 22 | DISCHARGE THROUGH THAT CULVERT. |
| 23 | **Q.**  AND HOW DID YOU DO THAT CALCULATION, SIR? |
| 24 | **A.**  I USED A CHART FROM A STATE OF WASHINGTON DEPARTMENT OF |
| 25 | TRANSPORTATION DISCHARGE CURVE FOR A 24-INCH CULVERT FLOWING |

COATS – DIRECT / COATS

1    FLOW.

2    **Q.**  DID YOU ALSO REVIEW SCHEMATICS OF THE ACTUAL CULVERT AND

3    DUCKBILL THAT WAS PUT INTO THIS PROPERTY?

4    **A.**  YES, I DID.

5         **MR. KEARNEY:**  YOUR HONOR, I HAVE IN MY HAND

6    EXHIBIT 891.

7       MAY I APPROACH?

8         **THE COURT:**  YOU MAY.

9         **MR. KEARNEY:**  I SHOULD SAY 891-001,-002.  IT'S TWO

10   PAGES.

11                   (EXHIBIT HANDED TO WITNESS.)

12   **BY MR. KEARNEY:**

13   **Q.**  DO YOU RECOGNIZE THOSE TWO DOCUMENTS, DOCTOR?

14   **A.**  YES.

15   **Q.**  ARE THOSE THE ONES YOU REFERENCED JUST A MOMENT AGO?

16   **A.**  WELL, THE FIRST ONE, THE 24-INCH TIDEFLEX SERIES, THOSE

17   ARE THE CURVES SHOWING THE... WHAT IS CALLED THE HEADLOSS

18   THROUGH A STRUCTURE.

19      THIS IS PROVIDED BY THE MANUFACTURER OF THE TIDEGATE, NOT

20   BY THE WASHINGTON D.O.T.  AND IT SHOWS THE -- THAT AS THE

21   FLOW -- AS THE DISCHARGE INCREASES, THE HEADLOSS INCREASES.

22   SO IT --

23   **Q.**  WE WILL TALK ABOUT WHAT THE CHART SHOWS IN JUST A MOMENT.

24      AT THIS STAGE I JUST WANT TO ASK YOU IF THESE DOCUMENTS

25   ARE... ACCURATELY DESCRIBE ELEMENTS OF THE DUCKBILL AND

1    CULVERT THAT ARE INSTALLED IN THE NORTHERN FILL AREA.

2    **A.**  YES.

3            **MR. KEARNEY:**  MAY WE ADMIT THIS EXHIBIT, YOUR HONOR,

4    INTO EVIDENCE AT THIS TIME?

5            **MR. SMOCK:**  NO OBJECTION.

6            **THE COURT:**  891 IS ADMITTED.

7        (GOVERNMENT'S EXHIBIT 891 RECEIVED IN EVIDENCE)

8    **BY MR. KEARNEY:**

9    **Q.**  I'M GOING TO START, IF I MAY, WITH THE SECOND PAGE,

10   DOCTOR, OF THAT EXHIBIT.

11                       (DISPLAYED ON SCREEN.)

12       THIS IS 891-0002.

13       SO WE'VE BEEN -- WE'VE HEARD A LOT OF TESTIMONY IN THIS

14   CASE ABOUT THE FAMOUS DUCKBILL.  WHAT ARE WE LOOKING AT IN

15   THIS SECOND PAGE OF THIS EXHIBIT, DOCTOR?

16   **A.**  THIS IS A SCHEMATIC SHOWING THE SIDE VIEW, TOP VIEW, AND

17   END VIEW OF THE CULVERT AND DUCKBILL.

18   **Q.**  WHAT IS THE DIAMETER OF THE CULVERT PIPE THAT RUNS INTO

19   THE DUCKBILL?

20   **A.**  IT'S 24 INCHES.

21   **Q.**  HOW ABOUT THE HEIGHT OF THE DUCKBILL ITSELF?

22   **A.**  IT'S, ACCORDING TO THE DRAWING HERE, IT'S 43.5 INCHES.

23   **Q.**  AND DID YOU, BASED ON YOUR ANALYSIS OF THE SITE, DETERMINE

24   ANY KIND OF AN ANGLE OF THAT CULVERT?

25       WAS IT INSTALLED IN A LEVEL MANNER?  WHAT WAS IT DOWNWARD

1    FACING TOWARDS THE SLOUGH?  DOWNWARD FACING TOWARDS THE LAND?

2        CAN YOU TELL US ANYTHING ABOUT THAT?

3    **A.**  THE DRAWINGS SHOW A SLOPE IN IT FROM THE INSIDE TO THE

4    OUTSIDE.

5    **Q.**  SO --

6    **A.**  THAT'S TO ENHANCE THE DRAINAGE AT LOW TIDE.

7    **Q.**  AS YOU STAND ON THE LAND AND LOOK TOWARDS THE SLOUGH, THE

8    PIPE GOES DOWN FROM THE LAND TOWARDS THE SLOUGH; IS THAT A

9    FAIR STATEMENT?

10   **A.**  YES.

11   **Q.**  WHY?

12   **A.**  SO THE WATER WILL DRAIN OUT FASTER.

13   **Q.**  MAY WE SHOW YOU, DOCTOR, EXHIBIT 865A.  THIS IS PREVIOUSLY

14   ADMITTED.

15                    (PAUSE IN THE PROCEEDINGS.)

16                       (VIDEO PLAYED.)

17        **MR. KEARNEY:**  MAY WE STOP IT THERE FOR A MOMENT.  IN

18   FACT, CAN WE BACK IT UP A LITTLE BIT, AGENT SU?  GET THE

19   DUCKBILL MORE IN THE CENTER OF THE PHOTOGRAPH.  THERE WE GO.

20   THAT'S PERFECT.

21   **BY MR. KEARNEY:**

22   **Q.**  DR. COATS, YOU SAID THAT YOU LOOKED AT THE SCHEMATICS AND

23   MANUFACTURING SPECIFICATIONS OF THIS DUCKBILL; IS THAT RIGHT?

24   **A.**  YES.

25   **Q.**  DOES THE LEFT SIDE OF THIS DUCKBILL AS WE SEE IT IN THIS

COATS – DIRECT / COATS

1   VIDEO, MOVE DEPENDING ON THE STATE OF ITS OPERATION?

2   **A.**  BY THE LEFT SIDE, DO YOU MEAN THE END OF IT?

3   **Q.**  THE SLOUGH END OF IT, YES.

4   **A.**  THE SLOUGH END OF IT, YES.  WHEN IT'S NOT FLOWING, IT

5   CURLS TO MAKE GOOD TIGHT SEAL.  AND THEN UNDER PRESSURE, IT

6   STRAIGHTENS OUT.

7       THIS IS NOT QUITE FULLY STRAIGHT, BUT IN A HIGH FLOW, I

8   UNDERSTAND IT WILL STRAIGHTEN OUT COMPLETELY.

9   **Q.**  SO IT'S DESIGNED TO FLEX, TO OPEN AND CLOSE DEPENDING ON

10  THE LEVEL OF FLOW?

11  **A.**  RIGHT.  AND IT'S CALLED A DUCKBILL BECAUSE IF YOU LOOK AT

12  THE END OF IT, IT'S ALMOST LIKE A... THE BILL OF A DUCK.

13  **Q.**  SO --

14  **A.**  YEAH.

15  **Q.**  IT STAYS CLOSED UNTIL WATER FORCES --

16  **A.**  UNTIL WATER STRAIGHTENS IT OUT, AND THEN IT -- THEN THE

17  LIPS (INDICATING), THE LIPS KIND OF OPEN AND THE WATER, AS YOU

18  SEE, DISCHARGE.

19  **Q.**  BASED ON YOUR ANALYSIS OF THE DOCUMENTATION ABOUT THE

20  INSERTION OR THE INSTALLATION OF THIS CULVERT AND DUCKBILL,

21  WHEN WAS THAT DONE, SIR?

22  **A.**  DON'T HAVE THAT IN FRONT OF ME, BUT IT WAS DONE IN THE

23  EARLY 2000'S, I THINK.

24  **Q.**  IF I SAID 2008, SIR, WOULD THAT REFRESH YOUR MEMORY?

25  **A.**  THAT SOUNDS, YEAH, IT COULD BE.  YEAH.

1    **Q.**  ALL RIGHT.

2        BASED ON YOUR ANALYSIS OF THE MANUFACTURING

3    SPECIFICATIONS, THE DIAMETER OF THE CULVERT, THE OPERATION OF

4    THE DUCKBILL, THIS HEAD DISCHARGE CHART THAT YOU SHOWED US,

5    DID YOU DETERMINE AN ESTIMATED FLOW RATE OF THIS CULVERT?

6    **A.**  I DID.

7        IT REALLY DEPENDS ON THE DIFFERENCE IN ELEVATION BETWEEN

8    THE WATER ON THE INSIDE AND THE WATER ON THE OUTSIDE.

9        SO, I CALCULATED A DISCHARGE WITH A HEAD OF 2 FEET, IN

10   OTHER WORDS, 2-FOOT DIFFERENCE IN WATER SURFACE ELEVATION.

11   DEPENDING A LITTLE BIT ON THE FRICTION COEFFICIENT ON THE

12   INSIDE OF THE PIPE, WHICH I'M NOT QUITE SURE OF, BUT THE

13   DISCHARGE THAT I CAME UP WITH WAS BETWEEN 17 AND 24 CUBIC FEET

14   PER SECOND.

15   **Q.**  HOW DOES THAT FIGURE, THE 17 TO 24 CUBIC FEET COMPARE TO

16   THE CUBIC FEET VALUES YOU GAVE US EARLIER IN THE SOUTHERN PART

17   OF THE PROPERTY?

18   **A.**  WELL, IT'S QUITE A BIT MORE.

19   **Q.**  AND THIS IS GOING TO BE A BIG NUMBER, BUT CAN YOU HAZARD A

20   GUESS AS TO WHAT THAT IS IN GALLONS, SIR?

21   **A.**  CUBIC FEET PER SECOND?

22              (PAUSE IN THE PROCEEDINGS.)

23       OKAY.  SO 20 CFS WOULD BE 150 GALLONS PER SECOND.  AND

24   THAT WOULD BE 9,000 GALLONS PER MINUTE.

25   **Q.**  THANK YOU, DR. COATS.

1    I WANT TO MOVE ON TO AN ANALYSIS OF SOME CHEMISTRY THAT

2    YOU DID IN THIS CASE.  I WOULD LIKE TO SHOW YOU WHAT HAS

3    PREVIOUSLY BEEN MARKED AS EXHIBIT 606, IF I MAY.

4              **MR. KEARNEY:**  THIS IS PREVIOUSLY MARKED AND ADMITTED,

5    YOUR HONOR.  I'M SORRY.

6                        (DISPLAYED ON SCREEN.)

7    IF WE CAN BLOW UP THE SAMPLE POINTS, AGENT SU.

8    **BY MR. KEARNEY:**

9    **Q.**  DO YOU RECOGNIZE THIS MAP, DR. COATS?

10   **A.**  YES.

11   **Q.**  WHAT IS IT?

12   **A.**  IT'S A MAP SHOWING THE LOCATIONS OF THE WATER QUALITY

13   SAMPLES THAT WERE TAKEN ON JANUARY 9TH.

14   **Q.**  AND WE'VE HEARD TESTIMONY AS WELL IN THIS CASE FROM A

15   GENTLEMAN BY THE NAME OF DUNCAN KNUDSEN.

16   WERE YOU PHYSICALLY PRESENT AT THE SITES WHEN HE WAS

17   TAKING THIS WATER SAMPLING?

18   **A.**  YES.  I HELPED COLLECT THE SAMPLES.

19   **Q.**  WE'VE HEARD FROM HIM BEFORE THAT THE SAMPLES AT THESE FOUR

20   POINTS WERE TAKEN IN TRIPLICATE; IS THAT RIGHT?

21   **A.**  THAT'S RIGHT.

22   **Q.**  IS THERE A REASON WHY YOU -- WHY WATER SAMPLES WERE TAKEN

23   AT THESE FOUR PARTICULAR PLACES ON THIS SITE?

24   IF YOU CAN TELL US.

25   **A.**  YES.  WE WANTED TO COMPARE THE CHEMICAL QUALITY OF THE

COATS - DIRECT / COATS

1   WATER COMING OUT OF THE AREAS, AND WITH THE WATER ACTUALLY IN

2   THE SLOUGH.

3   **Q.**   SO YOU TOOK -- WE'VE HEARD THIS BEFORE, BUT YOU TOOK AN

4   INBOARD SAMPLE, A LAND SIDE OF THE CULVERT SAMPLE, A MOWRY

5   SLOUGH SIDE OF THE CULVERT SAMPLE; IS THAT RIGHT, IN THE

6   NORTH?

7   **A.**   YES.

8   **Q.**   AND THE MOWRY SLOUGH SIDE OF THAT SAMPLE, WAS IT TAKEN

9   UPSTREAM OR DOWNSTREAM FROM THE DUCKBILL?

10   **A.**   IT WAS TAKEN UPSTREAM.

11   **Q.**   AND WHY?

12   **A.**   BECAUSE WE DIDN'T WANT SAMPLES THAT WERE INFLUENCED BY

13   THE... WHAT WAS COMING OUT OF THE AREA, OF THE DUCKBILL.

14   **Q.**   AND HOW ABOUT IN THE TWO SAMPLE POINTS IN THE SOUTHERN

15   AREA; WHY WERE THOSE CHOSEN AS PLACES TO TAKE SAMPLES?

16   **A.**   FOR THE SAME REASONS.  IN THE SOUTHERN AREA WE DON'T WANT

17   TO GET ABOVE THE DISCHARGE FROM THE... FROM THE PUMPS.

18   **Q.**   SO YOU TOOK ONE AT THE CONFLUENCE OF A AND B AND THEN ONE

19   ON THE SLOUGH SIDE OF THE PUMP OUTFALL; IS THAT RIGHT?

20   **A.**   YES.

21   **Q.**   AND, AGAIN, THAT WAS UPSTREAM OR DOWNSTREAM FROM THE PUMP

22   OUTFALL?

23   **A.**   IT WAS UPSTREAM.  UPSTREAM BEING TOWARD THE LAND.

24   **Q.**   DID YOU PREPARE AN ANALYSIS OF DATA PROVIDED TO YOU IN AN

25   ANALYTICAL REPORT BY MCCAMPBELL ANALYTICAL IN THIS CASE?

COATS – DIRECT / COATS

```
 1   A.  I LOOKED AT THE DATA, YES, AND TRIED TO DRAW SOME
 2   CONCLUSIONS FROM IT.
 3   Q.  THANK YOU.
 4         MR. KEARNEY:  YOUR HONOR, THIS IS EXHIBIT 897-0001,
 5   PREVIOUSLY ADMITTED.  MAY I APPROACH?
 6         THE COURT:  YOU MAY.
 7            (EXHIBIT BINDER HANDED TO WITNESS.)
 8   BY MR. KEARNEY:
 9   Q.  DOCTOR, PLEASE TAKE A LOOK AT 897.
10         MR. KEARNEY:  AND I WONDER, YOUR HONOR, IF WE CAN
11   PUBLISH JUST THE FIRST PAGE OF THAT TO REFRESH EVERYONE'S
12   MEMORY.
13            (DISPLAYED ON SCREEN.)
14   BY MR. KEARNEY:
15   Q.  SIR, THIS IS A LENGTHY CHEMISTRY ANALYSIS OF THOSE WATER
16   SAMPLES THAT WE JUST REFERRED TO; IS THAT RIGHT?
17   A.  YES.
18   Q.  BASED ON YOUR REVIEW OF THE DATA IN THAT REPORT ON THE
19   WATER CHEMISTRY, DID YOU FIND THAT THE LAND OUTFLOW FROM BOTH
20   THE NORTH AND THE SOUTH MADE A CONTRIBUTION TO MOWRY SLOUGH?
21   A.  YES.
22   Q.  TELL US ABOUT THAT, PLEASE.
23   A.  WELL, THE THING THAT STOOD OUT WAS THE DIFFERENCE IN
24   CONCENTRATION OF ORGANIC NITROGEN AND ORGANIC CARBON, WHICH
25   WAS SIGNIFICANTLY HIGHER IN THE WATER COMING OUT OF THE TWO
```

1    DISCHARGE POINTS THAN IT WAS IN THE SLOUGH.

2    **Q.**  WE ARE GOING TO TALK ABOUT WHAT THAT MEANS IN JUST A

3    MOMENT, THE ELEVATED LEVELS OF ORGANIC NITROGEN AND CARBON ON

4    THE LAND AS OPPOSED TO THE SLOUGH.

5        THE FIRST THING I WANT TO ASK YOU IS, BEFORE WE GET INTO

6    THE ACTUAL DATA, IS THAT SOMETHING YOU WOULD EXPECT FROM A

7    RELATIONSHIP BETWEEN A WETLAND AND AN ESTUARY SYSTEM NEXT TO

8    IT?

9    **A.**  YES.  TYPICALLY WETLANDS CONTRIBUTE SIGNIFICANT AMOUNTS OF

10   ORGANIC NUTRIENTS TO A BODY OF WATER SUCH AS A... SUCH AS THE

11   BAY.

12   **Q.**  AND WHY IS THAT?  WHY DO WETLANDS PROVIDE THIS ORGANIC

13   MATTER TO THE SLOUGH NEXT --

14   **A.**  WETLANDS ARE VERY PRODUCTIVE BIOLOGICALLY WITH A LOT OF

15   VEGETATION, A LIMITLESS SUPPLY OF WATER OFTEN RICH IN

16   NUTRIENTS.  SO THE PRIMARY PRODUCTIVITY, THAT IS THE

17   PHOTOSYNTHESIS, THE PRODUCTION OF PLANT MATERIAL IS VERY HIGH.

18   **Q.**  SO HOW DO YOU -- HOW DID YOU DETERMINE THAT THE... BOTH

19   THE NORTHERN AND SOUTHERN AREAS IN OUR CASE WAS CONTRIBUTING

20   CARBON AND NITROGEN TO MOWRY SLOUGH?

21   **A.**  BY COMPARING THE CONCENTRATIONS.

22   **Q.**  AND TELL US ABOUT THAT, PLEASE.

23       IN TERMS OF NITROGEN, WHAT WAS THE DIFFERENCE IN

24   CONCENTRATIONS ON JUST KIND OF A BROAD LEVEL, IF YOU CAN TELL

25   US.

COATS – DIRECT / COATS

1    **A.**  LET ME LOOK AT SOME NOTES HERE, IF I MAY.

2    **Q.**  THESE ARE YOUR -- THESE ARE NOTES OF THE DATA THAT ARE

3    CONTAINED IN THE ANALYTICAL REPORT; IS THAT RIGHT?

4    **A.**  YES.

5        THE CONCENTRATION OF NITROGEN MEASURED AS KELDAHL

6    NITROGEN, THAT IS TOTAL TKN, WE CALL IT.  K STANDS FOR

7    KJELDAHL, WHICH IS THE NAME OF THE GUY WHO INVENTED THIS

8    METHOD.

9    **Q.**  I THINK YOU HAVE TO SPELL THAT FOR US, PLEASE.

10   **A.**  K-J-E-L-D-H --

11   **Q.**  IS IT D-A-H-L.

12   **A.**  D-A-H-L, KJELDAHL.  SWEDE, I THINK.

13   **Q.**  ALL RIGHT.

14   **A.**  SO THE TKN CONCENTRATIONS IN THE OUTFALL WATER WAS -- WERE

15   ABOUT TWICE WHAT THEY WERE IN THE SLOUGH.

16   **Q.**  OKAY.

17   **A.**  AND THE TOTAL CARBON CONCENTRATIONS WERE ABOUT THREE

18   TIMES.

19   **Q.**  ALL RIGHT.

20       SO THE NITROGEN WAS TWICE AS HIGH AS THAT IN THE SLOUGH

21   AND THE CARBON WAS THREE TO FOUR TIMES HIGHER IN THE LAND THAN

22   IN THE SLOUGH?

23   **A.**  YES.

24   **Q.**  OKAY.  LET'S TALK ABOUT WHAT THAT MEANS.

25       WHAT IS -- TELL US WHAT NITROGEN IS, IF YOU COULD.

COATS – DIRECT / COATS

1    **A.**   NITROGEN IS AN ESSENTIAL ELEMENT FOR PLANTS AND ANIMALS

2    FOR –– IT'S A LIMITING NUTRIENT IN ESTUARIAN SITUATIONS

3    TYPICALLY; UNLIKE FRESH WATER SITUATIONS WHERE PHOSPHORUS IS

4    OFTEN THE LIMITING NUTRIENT.

5        WE SAY LIMITING, WE MEAN LIMITING IN ALGAE GROWTH.

6    LIMITING TO PRIMARY PRODUCTIVITY.

7    **Q.**   LET ME STOP YOU THERE FOR A SECOND.

8        THIS ALGAE GROWTH, WHICH IS A NUTRIENT FOR THE MARINE LIFE

9    IN THE SLOUGH, I PRESUME; IS THAT RIGHT?

10   **A.**   YES.

11   **Q.**   SO THE... ONE OF THE LIMITING FACTORS OF THE GROWTH OF

12   ALGAE IS A LACK OF NITROGEN; IS THAT A FAIR STATEMENT?

13   **A.**   YES.

14   **Q.**   SO BY EXPORTING NITROGEN INTO THE SLOUGH, DOES IT ALLOW

15   MORE ALGAE TO GROW THAN IF THAT NITROGEN WAS NOT INJECTED INTO

16   THE SLOUGH?

17   **A.**   YES.

18   **Q.**   AND WHAT HAPPENS TO ALGAE WHEN IT'S IN THE SLOUGH?

19   **A.**   BECOMES FOOD FOR ZOOPLANKTON, SMALL ANIMALS, WHICH ARE

20   THEN –– IT'S BASICALLY THE BASE OF THE FOOD CHAIN IN THE BAY.

21   **Q.**   OKAY.

22   **A.**   SO THERE'S TWO KINDS OF MATERIAL TO COME IN AND FEED THAT

23   FOOD CHAIN.  ONE IS PRIMARY PRODUCTIVITY WITHIN THE WATER AND

24   THE OTHER IS MATERIAL FROM THE OUTSIDE SUCH ALWAYS DETRITUS

25   FROM WETLANDS.

1    **Q.**  SO BOTH OF THOSE FORM BASES OF THE MARINE FOOD CHAIN; IS

2    THAT RIGHT?

3    **A.**  THAT'S RIGHT.

4    **Q.**  OKAY.

5       AND THE WETLANDS AND MOWRY SLOUGH BOTH IN THE NORTH AND

6    SOUTH WERE CONTRIBUTING INCREASED NITROGEN INTO THE SLOUGH

7    THAT WOULDN'T BE THERE WITHOUT THEM; IS THAT A FAIR STATEMENT?

8    **A.**  YES.  I THINK THERE WOULD BE SOME GROWTH REGARDLESS OF THE

9    DISCHARGE, BUT IT'S -- THERE'S MORE FOOD -- MORE BASIS FOR THE

10   FOOD CHAIN WITH THE OUTFALL FROM THE WETLAND AREAS.

11   **Q.**  NOW YOU SAID THAT THE CARBON COMING FROM THE LAND INTO THE

12   SLOUGH WAS THREE TO FOUR TIMES HIGHER THAN WHAT WAS NORMALLY

13   IN THE SLOUGH; IS THAT --

14   **A.**  ON AVERAGE ABOUT THREE TIMES.  WELL, NORMALLY WE DON'T

15   REALLY HAVE A LONG-TERM SEQUENCE IN THE SLOUGH.  IT'S JUST

16   KIND OF A SNAPSHOT IN TIME.

17   **Q.**  ALL RIGHT.  BUT CERTAINLY ON THE DAY YOU TOOK THIS

18   SNAPSHOT, THERE WAS THREE TO FOUR TIMES HIGHER AMOUNTS OF

19   CARBON IN THE -- ON THE WETLAND THAN THERE WERE IN THE SLOUGH;

20   IS THAT A -- IS THAT FAIR?

21   **A.**  YES, THREE -- ON AVERAGE THREE TIMES CONCENTRATION.

22   **Q.**  THREE TIMES, OKAY.  I STAND CORRECTED.

23      AND WHAT DOES THAT MEAN, SIR?  WHAT IS CARBON?

24   **A.**  CARBON IS AN ESSENTIAL ELEMENT.  WE'RE ALL MADE OF

25   BASICALLY CARBON, HYDROGEN, AND OXYGEN WITH A FEW OTHER THINGS

1    MIXED IN.  IT'S THE BASIS OF ALL LIFE.  ALL LIFE ON EARTH

2    CONTAINS CARBON.

3    **Q.**  IS THAT THOSE OF US WALKING AROUND ON SOIL AND THOSE OF

4    US -- OR ANIMALS SWIMMING AROUND IN WATER?

5    **A.**  ALL.

6    **Q.**  AGAIN, DOES CARBON DIRECTLY FEED THE MARINE FOOD CHAIN?

7    **A.**  YES.  DEPENDS ON THE FORM OF THE CARBON.

8        IF IT'S ORGANIC CARBON, YES.  INORGANIC CARBON NOT SO

9    MUCH.  THAT IS DISSOLVED CO2 OR CARBONATE.

10       BUT THOSE AREN'T THE ONLY SOURCES OF ENERGY THAT -- THERE

11   ARE BACTERIA THAT USE OTHER, WHAT ARE CALLED CHEMOAUTOTROPHS,

12   THAT IS, GET THEIR ENERGY FROM OXIDIZING, FOR EXAMPLE,

13   AMMONIUM TO NITRITE AND THEN NITRATE, OR OXIDIZING REDUCE

14   SULPHUR OR IRON OR MANGANESE.  THERE'S A LOT OF DIFFERENT

15   THINGS.

16       THOSE ARE THE ENERGY SOURCES.  THEY STILL HAVE TO GET

17   CARBON.

18   **Q.**  ALL RIGHT.  AND THE CARBON THAT WAS BEING EXPORTED FROM

19   THE LAND INTO SLOUGH HERE WAS ORGANIC CARBON; IS THAT TRUE?

20   **A.**  YES, THAT'S WHAT WAS MEASURED ANYWAY.

21   **Q.**  SO TAKING -- SO WITH THE CONTRIBUTION OF BOTH NITROGEN AND

22   CARBON INTO THE MARINE SYSTEM OF THE SLOUGH, IS IT YOUR

23   OPINION THAT THE LAND HAS A SIGNIFICANT EFFECT ON THE

24   CHEMISTRY OF THE SLOUGH?

25   **A.**  YES.

COATS – CROSS / SMOCK

1    **Q.**  ARE THERE SIMILARLY-SITUATED WETLANDS IN THE SOUTH BAY

2    REGION THAT HAVE A SIMILAR EFFECT ON THE CHEMISTRY OF TIDAL

3    WATERS LIKE MOWRY SLOUGH?

4    **A.**  THE ESTIMATE THAT I'VE SEEN PUBLISHED IS AROUND 7,000

5    ACRES.  AND OUR TWO AREAS TOGETHER WOULD COMPRISE ABOUT

6    9 PERCENT OF THE TOTAL.

7    **Q.**  SO IN THE SOUTH BAY REGION OF SAN FRANCISCO BAY, THERE'S

8    ABOUT 7,000 ACRES OF WETLAND THAT ARE SIMILARLY-SITUATED TO

9    OURS?

10   **A.**  YES, SOUTH OF THE SAN MATEO BRIDGE.

11   **Q.**  AND WHAT PERCENTAGE DOES THE NEWARK AREA 4 PROPERTY

12   CONSTITUTE OF THAT 7,000 --

13   **A.**  ABOUT 9 PERCENT.

14          **MR. KEARNEY:**  THANK YOU.  NO FURTHER QUESTIONS, YOUR

15   HONOR.

16          **THE COURT:**  ANY CROSS-EXAMINATION?

17          **MR. SMOCK:**  YES, THANK YOU.

18                        **CROSS-EXAMINATION**

19   BY MR. SMOCK:

20   **Q.**  GOOD AFTERNOON, DR. COATS.

21   **A.**  GOOD AFTERNOON.

22   **Q.**  ANY NAME IS NED SMOCK.

23      YOU BECAME INVOLVED IN THIS CASE BECAUSE A MAN NAMED TERRY

24   HUFFMAN CONTACTED YOU TO ASK YOU TO DO SOME WORK IN AREA 4; IS

25   THAT RIGHT?

```
 1    A.   THAT'S RIGHT.  YEAH.

 2    Q.   THAT WAS IN DECEMBER OF 2016?

 3    A.   IT WAS LATE 2016, I BELIEVE.  I'M NOT SURE.  I DON'T KNOW

 4    THE EXACT DATE.

 5    Q.   AND YOUR UNDERSTANDING FROM DR. HUFFMAN WAS THAT THE

 6    GOVERNMENT HAD HIRED HIM TO MAKE A DETERMINATION ABOUT WHETHER

 7    AREA -- PARTS OF AREA 4 WERE COVERED BY THE CLEAN WATER ACT IN

 8    2014; IS THAT RIGHT?

 9         MR. KEARNEY:  OBJECTION AS TO HEARSAY.  ASK TO HAVE

10    THAT QUESTION STRICKEN.

11         THE COURT:  SUSTAINED.

12    BY MR. SMOCK:

13    Q.   YOUR UNDERSTANDING WAS THAT DR. HUFFMAN HAD BEEN HIRED BY

14    THE GOVERNMENT AND HE WANTED YOU TO DO WORK ON THE CASE?

15         MR. KEARNEY:  SAME OBJECTION.

16         THE COURT:  THAT'S FOUNDATIONAL.  OVERRULED.

17         THE WITNESS:  YES, HE WANTED ME TO DO SOME WORK ON

18    THE CASE.

19    BY MR. SMOCK:

20    Q.   OKAY.  NOW YOU MADE REFERENCE TO SOMETHING CALLED

21    TRIBUTARY 1 AND TRIBUTARY A IN YOUR TESTIMONY.

22         THOSE ARE NAMES GIVEN TO AREAS OF THIS PROPERTY BY

23    DR. HUFFMAN?

24    A.   I BELIEVE SO, YES.

25    Q.   AND NO SCIENTIST BEFORE DR. HUFFMAN HAD GIVEN ANY AREA ON
```

1    THE MAP THOSE PARTICULAR NAMES, CORRECT?

2    **A.**   NOT THAT I KNOW OF.

3    **Q.**   YOU WERE NOT HIRED AND PART OF YOUR WORK ON THIS CASE WAS

4    NOT TO MAKE A PARTICULAR SCIENTIFIC DETERMINATION ABOUT

5    WHETHER ANY SPECIFIC AREA ON THIS SITE MET THE QUALIFICATIONS

6    TO BE CALLED A TRIBUTARY; THAT WAS DR. HUFFMAN'S WORK,

7    CORRECT?

8            **MR. KEARNEY:**  I'M GOING -- SORRY.  I'M GOING TO

9    OBJECT AS TO CALLING FOR SPECULATION AS TO THE SECOND CLAUSE

10   OF THAT QUESTION ABOUT WHAT SOMEONE ELSE WAS INTENDING TO DO.

11           **MR. SMOCK:**  I CAN -- IT WAS A LONG QUESTION.  I CAN

12   REPHRASE IT.

13   **BY MR. SMOCK:**

14   **Q.**   YOU WERE NOT ASKED TO TAKE THE SCIENTIFIC STEPS AND MAKE

15   THE DETERMINATIONS BASED ON MANUALS AS TO WHETHER PARTICULAR

16   PARTS OF THESE PROPERTIES QUALIFIED AS TRIBUTARIES.

17   **A.**   HE ASKED ME TO DETERMINE THE FLOW PATTERNS.

18   **Q.**   OKAY.

19   **A.**   WHERE THE WATER CAME FROM AND WHERE IT WENT.

20   **Q.**   OKAY.  I WANT TO TALK TO YOU ABOUT THE NORTHERN AREA OF

21   THE PROPERTY.

22       YOU TALKED ABOUT THAT DUCKBILL.  AND THE FLOW OF WATER

23   FROM THAT DUCKBILL.

24       TO BE CLEAR, YOU DIDN'T MAKE ANY ACTUAL MEASUREMENTS OF

25   FLOW COMING OUT OF THAT DUCKBILL YOURSELF, CORRECT?

COATS – CROSS / SMOCK

1    **A.**   NO, I DID NOT.

2    **Q.**   WHAT YOU TESTIFIED TO JUST NOW WAS YOUR ESTIMATES OF THE

3    AMOUNT OF WATER THAT MIGHT COME THROUGH IT BASED ON LOOKING AT

4    A MANUFACTURER'S DIAGRAM, CORRECT?

5    **A.**   THAT AND THE DEPARTMENT OF TRANSPORTATION CHARTS.

6    **Q.**   SO WE SAW A VIDEO OF YOU OR YOU TOLD US ABOUT ANOTHER AREA

7    ON THE PROPERTY ACTUALLY MEASURING THE SPEED OF THE WATER

8    AND -- YOU DIDN'T DO THAT IN THE NORTHERN AREA?

9    **A.**   NO.  THERE WAS NO GOOD PLACE TO ACTUALLY PUT IN A CURRENT

10   METER.

11   **Q.**   AND YOUR ESTIMATE, BASED ON THAT CHART, WAS BASED ON AN

12   ASSUMPTION OF, NUMBER ONE, THAT DUCKBILL WORKING AS THE

13   MANUFACTURER EXPECTED IT TO, CORRECT?

14   **A.**   YES.

15   **Q.**   AND ALSO BASED ON AN ASSUMPTION OF WHAT YOU TOLD US WAS

16   ESSENTIALLY THE MAXIMUM AMOUNT OF WATER THAT COULD COME

17   THROUGH THAT DUCKBILL, CORRECT?

18   **A.**   NOT THE MAXIMUM AMOUNT, BUT THE AMOUNT THAT WOULD COME

19   THROUGH FOR A GIVEN ASSUMED HYDRAULIC HEAD.

20   **Q.**   YOU ARE NOT HERE TO TELL US HOW MUCH ACTUALLY DID COME

21   THROUGH THAT ON ANY GIVEN DAY?

22   **A.**   NO.  YOU WOULD HAVE TO KNOW THE WATER SURFACE ELEVATION ON

23   THE -- THE WATER SURFACE ELEVATION AT A GIVEN MOMENT IN TIME

24   ON THE INSIDE AND THE OUTSIDE.

25   **Q.**   AND YOU DIDN'T HAVE THAT IN THIS CASE?

1    **A.**  NO.

2    **Q.**  AND YOU ALSO DIDN'T SEE ANY DATA FROM OTHER SCIENTISTS IN

3    YEARS PAST ABOUT FLOW RATE IN THE NORTHERN AREA, CORRECT?

4    **A.**  THAT'S CORRECT.

5    **Q.**  AND YOU DIDN'T VISIT THE SITE OR DO ANY OF THOSE

6    CALCULATIONS IN 2014, RIGHT?

7    **A.**  NO.

8    **Q.**  NOW IN THE SOUTHERN AREA -- ACTUALLY, LET ME BACK UP FOR A

9    SECOND.

10       IN DETERMINING SORT OF THE MAGNITUDE OF THE EFFECT OF

11   WATER COMING FROM AREA 4 INTO THE SLOUGH, IT WOULD HELP, WOULD

12   IT NOT, TO KNOW THE VOLUME OF WATER THAT'S IN THE SLOUGH

13   ITSELF.

14   **A.**  NO.  NO, IT WOULD NOT.

15   **Q.**  OKAY.  LET ME SEE IF I CAN FRAME IT THIS WAY.

16       IF YOU PUT A DROP OF WATER OR A DROP OF FOOD COLORING, FOR

17   EXAMPLE, INTO A TABLESPOON OF WATER, THE MAGNITUDE OF THAT

18   EFFECT IS PRETTY DRAMATIC, RIGHT?

19   **A.**  SO YOU'RE SAYING -- YOU'RE TALKING ABOUT THE DILUTION

20   EFFECT OF THE WATER IN THE SLOUGH VERSUS THE -- WHAT'S FLOWING

21   INTO IT?

22   **Q.**  I'M NOT NEARLY THAT SOPHISTICATED.  I WISH I WAS.

23       I AM ESSENTIALLY JUST ASKING YOU, CAN YOU TELL US THE

24   AMOUNT OF WATER THAT WAS IN THE SLOUGH?

25   **A.**  NO.  WE NEED A BIOMETRIC SURVEY OF THE SLOUGH TO DO THAT.

COATS – CROSS / SMOCK

1    **Q.**  YOU DIDN'T DO THAT?

2    **A.**  NO, I DIDN'T DO THAT.

3    **Q.**  WHILE WE ARE TALKING ABOUT, SIR, THE MAGNITUDE OF THE

4    IMPACT, I WANT TO ASK MR. WANZALA TO PUT UP DEFENSE

5    EXHIBIT 2104 WHICH IS ALREADY IN EVIDENCE.

6         **THE CLERK:**  WHAT NUMBER AGAIN?

7         **MR. SMOCK:**  2104.

8    MR. WANZALA, CAN YOU, ONCE YOU HAVE THAT UP THERE, CAN YOU

9    ZOOM IN ON AREA 4.

10                  (DISPLAYED ON SCREEN.)

11   **BY MR. SMOCK:**

12   **Q.**  I'M BACK HERE TO MAKE SURE THAT -- IF YOU CAN'T HEAR ME OR

13   THERE'S SOME CONCERN NOT BEING ABLE TO SEE WHAT I AM POINTING

14   TO, JUST LET ME KNOW.

15   WHAT I'M POINTING TO THAT GOES IN A DIAGONAL LINE ACROSS

16   AREA 4 IS SOMETHING THAT'S CALLED A FLOOD CONTROL CHANNEL?

17   **A.**  THAT'S RIGHT.

18   **Q.**  AND THAT BRINGS WATER FROM, YOU KNOW, INDUSTRIAL,

19   COMMERCIAL, AND RESIDENTIAL AREAS EAST -- OR EAST OF HERE,

20   CORRECT?

21   **A.**  YES.

22   **Q.**  NEWARK AND OTHER PARTS?

23   **A.**  YES.

24   **Q.**  WE HEARD TESTIMONY FROM ANOTHER WITNESS THAT THAT WATER

25   HAS BEEN SO -- COME THROUGH SO HEAVILY THAT IT HAS BROKEN

COATS – CROSS / SMOCK

1  THROUGH THESE LEVEES ON EITHER SIDE.

2  **A.**  I BELIEVE IT'S OVER THE TOP OF THE LEVEES AT SOME POINT IN

3  TIME, YES.

4  **Q.**  AND THAT WATER IS NOT FILTERED IN ANY WAY BEFORE IT GOES

5  DIRECTLY INTO THE SLOUGH; AM I RIGHT?

6  **A.**  YES, AS FAR AS I KNOW.

7  **Q.**  IN OTHER WORDS, IT'S NOT FILTERED.

8  **A.**  THAT'S RIGHT.

9  **Q.**  ALL RIGHT.

10      SO PRESUMABLY THERE ARE POLLUTANTS IN THAT WATER, ARE

11  THERE NOT?

12  **A.**  PROBABLY.

13  **Q.**  AND THAT'S GOING DIRECTLY INTO THE SLOUGH?

14  **A.**  YES.

15  **Q.**  I'M GOING TO SHOW YOU A COUPLE OF PICTURES OF THE FLOOD

16  CONTROL CHANNEL JUST SO WE HAVE A SENSE OF IT.  AND THESE WERE

17  TAKEN ON JANUARY 9TH.

18      I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED DEFENSE

19  EXHIBIT 2051.

20                    (EXHIBIT HANDED TO WITNESS.)

21      DO YOU RECOGNIZE THAT TO BE THE PLACE -- THE FLOOD CONTROL

22  CHANNEL AT THE POINT WHERE IT ENTERS THE SLOUGH?

23  **A.**  YES.  I BELIEVE IT'S LOOKING UP THE FLOOD CONTROL CHANNEL

24  STANDING ON THE STRUCTURE THROUGH WHICH THE CULVERTS PASS.

25  **Q.**  THAT'S SORT OF A BRIDGE, IS IT NOT?

1    **A.**  YOU COULD CALL IT THAT, YEAH.  IT'S KIND OF A... YEAH.

2    THERE ARE CULVERTS IN IT WITH GATES.

3         **MR. SMOCK:**  I WOULD MOVE TO INTRODUCE DEFENSE EXHIBIT

4    2051.

5         **MR. KEARNEY:**  NO OBJECTION.

6         **THE COURT:**  2051 IS ADMITTED.

7         (DEFENDANT'S EXHIBIT 2051 RECEIVED IN EVIDENCE)

8              (EXHIBIT DISPLAYED ON SCREEN.)

9    **BY MR. SMOCK:**

10   **Q.**  SO THAT'S LOOKING -- I'M SORRY, MY DIRECTIONS ARE BAD --

11   INLAND, BASICALLY EASTWARD, AND BEHIND US IN THIS IMAGE IS THE

12   SLOUGH; IS THAT RIGHT?

13   **A.**  YES.

14   **Q.**  OKAY.

15      I'M GOING TO SHOW YOU WHAT'S BEEN PREVIOUSLY MARKED AS

16   DEFENSE EXHIBIT 2054.

17              (EXHIBIT HANDED TO WITNESS.)

18      DO YOU RECOGNIZE THAT TO BE SORT OF A CLOSER-UP VIEW OF

19   THE FLOOD CHANNEL?

20   **A.**  YES, AT A SLIGHTLY DIFFERENT ANGLE.  YOU CAN SEE THE...

21   THE STEPS... OR WHATEVER THAT THING IS ON THE BANK OF THE

22   LEVEE.  IT APPEARS IN BOTH FIGURES.

23         **MR. SMOCK:**  I MOVE TO ADMIT DEFENSE EXHIBIT 2054.

24         **MR. KEARNEY:**  NO OBJECTION.

25         **THE COURT:**  ADMITTED.

COATS – CROSS / SMOCK

1          (DEFENDANT'S EXHIBIT 2054 RECEIVED IN EVIDENCE)

2                    (DISPLAYED ON SCREEN.)

3     **BY MR. SMOCK:**

4     **Q.** SO TO THE LEFT OF THIS IMAGE, IS THAT THE NORTHERN AREA?

5     **A.** YES, BEHIND THE LEVEE.  YES.

6     **Q.** AND IS IT FAIR TO SAY THAT WHAT WE SEE ALONG THE ENTRANCE

7     OR ALONG THAT BRIDGE AREA IS A FAIR AMOUNT OF TRASH; AM I

8     RIGHT?

9     **A.** YES.

10    **Q.** I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS DEFENSE

11    EXHIBIT 2057 FOR IDENTIFICATION.

12                    (EXHIBIT HANDED TO WITNESS.)

13         DO YOU RECOGNIZE THAT TO BE SORT OF A SIDE VIEW LOOKING

14    OVER WHAT I'VE REFERRED TO AS A BRIDGE, AND YOU PROBABLY HAVE

15    A BETTER NAME FOR, SEPARATING THE FLOOD CONTROL CHANNEL AND

16    THE SLOUGH?

17    **A.** YES.

18              **MR. SMOCK:**  I MOVE TO ADMIT 2057.

19              **MR. KEARNEY:**  NO OBJECTION.

20              **THE COURT:**  ADMITTED.

21         (DEFENDANT'S EXHIBIT 2057 RECEIVED IN EVIDENCE)

22                    (DISPLAYED ON SCREEN.)

23    **BY MR. SMOCK:**

24    **Q.** THAT -- THE WAY THAT THE CONCRETE ON THAT BRIDGE IS -- HAS

25    BEEN CRAFTED, SUGGESTS TO ME THAT THERE ARE TIMES WHEN THAT

1    MIGHT EVEN OVERTOP; IS THAT CORRECT?

2    **A.**  YES, I BELIEVE SO.

3    **Q.**  SO WATER GETS HIGH ENOUGH COMING THROUGH THE FLOOD CONTROL

4    CHANNEL THAT IT EVEN GOES OVER THAT BRIDGE, CORRECT?

5    **A.**  YES.  IT COULD GO EITHER DIRECTION.

6    **Q.**  THE LAST ONE I WILL SHOW YOU IS DEFENSE EXHIBIT 2055.

7                      (EXHIBIT HANDED TO WITNESS.)

8        DO YOU RECOGNIZE THAT TO BE LOOKING FROM THAT SAME BRIDGE

9    IN THE DIRECTION OF THE SLOUGH?

10   **A.**  YES.

11           **MR. SMOCK:**  MOVE TO ADMIT DEFENSE EXHIBIT 2055.

12           **MR. KEARNEY:**  NO OBJECTION.

13           **THE COURT:**  ADMITTED.

14       (DEFENDANT'S EXHIBIT 2055 RECEIVED IN EVIDENCE)

15   **BY MR. SMOCK:**

16   **Q.**  SO THAT'S LOOKING IN THE OTHER DIRECTION TOWARDS THE

17   SLOUGH, CORRECT?

18   **A.**  YES.

19   **Q.**  SO WE HAVE LOOKED AT A LOT OF PICTURES OF THE AMOUNT OF

20   WATER THAT CAN COME FROM THAT FLOOD CONTROL CHANNEL.

21       WHEN YOU DID YOUR WATER QUALITY SAMPLING, ISN'T IT TRUE

22   THAT ONE OF THE THINGS THAT YOU DETERMINED WAS THAT THE WATER

23   QUALITY IN THE SLOUGH WAS DOMINATED BY THE OUTFLOW OF WATER

24   FROM THE FLOOD CONTROL CHANNEL?

25   **A.**  IN THE UPPER SAMPLES, YES.

1    **Q.**  AND THAT'S AS OPPOSED TO WATER COMING FROM AREA 4,

2    CORRECT?

3    **A.**  YES.

4    **Q.**  I WANT TO TALK TO YOU NOW ABOUT THE SOUTHERN AREA FOR A

5    MOMENT.

6            **MR. SMOCK:**  AND MR. WANZALA, CAN WE LOOK AT DEFENSE

7    EXHIBIT 2104 AGAIN?

8                        (DISPLAYED ON SCREEN.)

9        CAN YOU ZOOM IN ON AREA 4.

10   **BY MR. SMOCK:**

11   **Q.**  NOW, YOU -- WE SAW A VIDEO, AND YOU TALKED ABOUT MEASURING

12   THE FLOW AND THE AMOUNT OF WATER COMING THROUGH HERE

13   (INDICATING), AND YOU WERE AT THIS POINT (INDICATING),

14   CORRECT?  WHICH WAS WHAT WE REFERRED TO AS A BORROW PIT.

15   **A.**  YOU'RE LOOKING AT THE -- YEAH, OKAY.  THAT'S THE

16   DOWNSTREAM SIDE OF THAT CULVERT WHERE THE ARROW IS POINTING --

17   **Q.**  CORRECT.

18   **A.**  -- AND I WAS ON THE OTHER SIDE OF THAT CULVERT.

19           **MR. SMOCK:**  I'M SORRY, MR. WANZALA, CAN YOU MOVE THAT

20   A TINY BIT.

21           **THE WITNESS:**  IT'S PRETTY CLOSE.

22   **BY MR. SMOCK:**

23   **Q.**  AND YOU PUT A MONITOR DOWN THERE AND WERE ABLE TO SEE A

24   FLOW OF WATER -- MEASURE A FLOW OF WATER THERE?

25   **A.**  THAT'S WHERE I USED THE CURRENT METER, YES.

1  **Q.**  OKAY.

2       NOW, IN THIS PICTURE, YOU CAN SEE FAIRLY WELL THIS DUCK

3  POND WHICH IS SORT OF IN THE MIDDLE OF THE PICTURE IN THE

4  SOUTHERN AREA, CAN YOU NOT?

5  **A.**  THE -- I HADN'T CALLED IT A DUCK POND, BUT I THINK I

6  KNOW -- YOU MEAN THE AREA OF DARK AREA IN THE --

7  **Q.**  CORRECT.

8  **A.**  -- WITHIN THE AREA?

9  **Q.**  RIGHT.

10  **A.**  YES.

11  **Q.**  AND YOU'RE AWARE, ARE YOU NOT, THAT WATER WOULD COME FROM

12  THAT DUCK POND DOWN AND -- AND BE -- AND MEET WHAT YOU

13  REFERRED TO AS TRIBUTARY B AND GO DOWN TO THE PUMP, CORRECT?

14  **A.**  IT WOULD MINGLE WITH THE WATER COMING FROM TRIBUTARY A.

15  **Q.**  OKAY.  LET'S TALK ABOUT THIS FIGURE FROM TRIBUTARY A.

16       YOU DID MEASUREMENTS LIKE WE SAID HERE (INDICATING) AT THE

17  ENTRANCE OF WHAT'S BEEN REFERRED TO AS TRIBUTARY B.  YOU

18  MEASURED THE FLOW OF THE WATER, IN OTHER WORDS, THE SPEED OF

19  THE WATER, CORRECT?

20  **A.**  YES.

21  **Q.**  AND THE VOLUME OF THE WATER, CORRECT?

22  **A.**  THE DISCHARGE IN... WELL, IN UNIT OF VOLUME, YES.

23  **Q.**  YOU DID THAT BECAUSE YOU WERE ABLE TO DO A MEASUREMENT OF

24  I THINK, IN ESSENCE, THE SIZE OF THE CHANNEL AT THAT POINT; IS

25  THAT CORRECT?

COATS – CROSS / SMOCK

1    **A.**  YES.

2    **Q.**  NOW THIS AREA HERE THAT'S GOING ACROSS THE SCREEN THAT YOU

3    REFERRED TO AS TRIBUTARY A, (INDICATING), DID YOU DO A

4    MEASUREMENT OF SPEED OF FLOW OF WATER ALONG THIS LINE?

5    **A.**  NO.

6    **Q.**  DID YOU SHOOT ANY VIDEO OF WATER FLOWING ALONG --

7    **A.**  I DID NOT SHOOT ANY VIDEO OUT THERE.  I TOO, SOME STILL

8    PHOTOGRAPHS, BUT I THINK WE HAVE SOME VIDEO.

9    **Q.**  WE HAVE SEEN A LOT OF VIDEO.

10   **A.**  YEAH.

11   **Q.**  WAS THERE VIDEO TAKEN OF YOU MEASURING FLOW --

12   **A.**  NO.  I DIDN'T MEASURE FLOW SO THERE COULD BE NO SUCH

13   VIDEO.

14   **Q.**  DID YOU MEASURE THE SIZE OF ANY AREA THAT WATER MIGHT HAVE

15   BEEN FLOWING THROUGH --

16   **A.**  NO.

17   **Q.**  -- ALONG THIS AREA?

18   **A.**  NO.

19   **Q.**  SO YOU HAVE NO MEASUREMENTS WITH RESPECT TO THIS AREA?

20   **A.**  NO, JUST VISUAL OBSERVATIONS OF THE WATER IN THAT CHANNEL.

21   **Q.**  OKAY.  BUT NO MEASUREMENT?

22   **A.**  NO MEASUREMENT.

23   **Q.**  YOU ALSO DIDN'T SEE ANY DATA FROM OTHER SCIENTISTS ABOUT

24   FLOW OF WATER ALONG THAT AREA, CORRECT?

25   **A.**  CORRECT.

1    **Q.**   NOW, JUST VERY BRIEFLY, LET ME FIGURE OUT IF I CAN DO THIS

2    IN TWO MINUTES.  AND I'LL SKIP SOME STUFF IN DEFERENCE TO OUR

3    TIME.

4         YOU TALKED ABOUT WATER SAMPLING THAT WAS DONE AND YOU

5    TALKED A LITTLE BIT ABOUT WHERE THOSE SAMPLE POINTS WERE.  AND

6    YOU INDICATED THAT THOSE SAMPLE POINTS WERE IN THE AREA OF...

7    OUTSIDE THE OUTFALLS IN AREA -- IN TWO AREAS IN AREA 4,

8    CORRECT?

9    **A.**   YES.

10   **Q.**   ALL RIGHT.  ONE OF THE THINGS YOU DETERMINED IS THAT NONE

11   OF THE CONSTITUENTS THAT WERE IN THE WATER COMING OUT OF AREA

12   4 ACTUALLY EXCEEDED FEDERAL OR STATE STANDARDS; AM I RIGHT?

13   **A.**   I DIDN'T COMPARE THEM WITH FEDERAL STANDARDS.

14   **Q.**   BUT YOU HAVE NO BASIS TO THINK THAT THEY DID EXCEED IT.

15   **A.**   NO.  YEAH, I WOULD SORT OF WONDER ABOUT SOME OF THE

16   DRINKING WATER STANDARDS, BUT NO ONE IS GOING TO DRINK THAT

17   WATER.

18   **Q.**   AND, AGAIN, THOSE SAMPLE POINTS WERE RIGHT AT THE OUTFALLS

19   FROM THE TWO PLACES IN AREA 4, CORRECT?

20   **A.**   NEARBY, YES, IN THE SLOUGH.

21             **MR. SMOCK:**  MR. WANZALA, CAN YOU PUT UP 2051?

22                  (DISPLAYED ON SCREEN.)

23   **BY MR. SMOCK:**

24   **Q.**   THAT'S THE FLOOD CONTROL CHANNEL AGAIN, CORRECT?

25   **A.**   YES.

COATS – REDIRECT / KEARNEY

1   **Q.**  AND YOU TOLD US THAT THE WATER IN THE SLOUGH WAS

2   DOMINATED, THE WATER QUALITY WAS DOMINATED BY THAT FLOOD

3   CONTROL CHANNEL?

4   **A.**  THAT WAS BASED ON THE CONCENTRATIONS OF SALT.  SO I

5   THOUGHT THERE WAS PROBABLY AN INFLUENCE OF RUNOFF.

6   **Q.**  YOU WROTE A DOMINANT INFLUENCE, CORRECT?

7   **A.**  YEAH.  BUT THAT WAS TRUE AT THE UPPER STATION BUT NOT AT

8   THE LOWER ONE.

9   **Q.**  OKAY.  YOU DIDN'T DO ANY COMPARISONS, CORRECT?

10  **A.**  NO.

11  **Q.**  AND DID YOU PUT ANY WATER QUALITY SAMPLING -- DO ANY WATER

12  QUALITY SAMPLING MEASUREMENTS AT THIS POINT BY THE FLOOD

13  CONTROL --

14  **A.**  BY THE OUTFALL OF THIS FLOOD CONTROL CHANNEL, NO.

15          **MR. SMOCK:**  THANK YOU.  NO FURTHER QUESTIONS.

16          **THE COURT:**  ANY REDIRECT?

17          **MR. KEARNEY:**  JUST ONE QUESTION.

18                      **REDIRECT EXAMINATION**

19  BY MR. KEARNEY:

20  **Q.**  DOES THE EXISTENCE OF THE DRAINAGE CHANNEL AND ITS OUTFLOW

21  EFFECT YOUR OPINION, DR. COATS, THAT THE NEWARK AREA 4

22  PROPERTY SIGNIFICANTLY AFFECTED THE CHEMISTRY WITHIN MOWRY

23  SLOUGH?

24  **A.**  NO.

25          **MR. KEARNEY:**  THANK YOU.  NO FURTHER QUESTIONS.

1          **THE COURT:**  ANY RECROSS?

2          **MR. SMOCK:**  NO.

3          **THE COURT:**  ALL RIGHT.  THANK YOU, DR. COATS.  YOU

4     ARE EXCUSED.

5          **THE WITNESS:**  THANK YOU.

6          **THE COURT:**  SO WE HAVE HIT ABOUT -- WE HAVE HIT 1:15,

7     BUT DOES THE GOVERNMENT HAVE ANY FURTHER WITNESSES TO CALL?

8          **MR. KEARNEY:**  NO, SIR.  THE GOVERNMENT RESTS.

9          **MS. HANSEN:**  YOUR HONOR, THE DEFENSE HAS A RULE 29

10    MOTION.  WE WILL RESERVE FOR THE NEXT COURT DATE.

11         **THE COURT:**  ALL RIGHT.  THAT SOUNDS FINE.

12         ALL RIGHT, LADIES AND GENTLEMEN.  SO AS YOU'VE HEARD, THE

13    GOVERNMENT HAS RESTED.  WHAT THAT MEANS IS THAT THE GOVERNMENT

14    HAS CONCLUDED THE PRESENTATION OF ITS CASE.  SO HERE WILL BE

15    THE NEXT STEPS.

16         WE WILL COME BACK -- YOU WILL COME BACK ON WEDNESDAY

17    MORNING FOR 8:30.  AND WE ANTICIPATE THAT IF THE -- IF THE

18    DEFENSE HAS EVIDENCE TO PRESENT, I'VE TOLD YOU THAT THEY ARE

19    UNDER NO OBLIGATION TO DO SO, THEY WILL HAVE THE OPPORTUNITY

20    TO DO IT AT THAT TIME.  AFTER ANY SUCH EVIDENCE, IF ANY, WE

21    WILL PROCEED TO CLOSING ARGUMENTS, AND THEN I WOULD GIVE YOU

22    YOUR INSTRUCTIONS AND SUBMIT THE CASE TO YOU FOR YOUR

23    DELIBERATIONS.  SO WE ARE WELL AHEAD OF THE SCHEDULE WE

24    ESTIMATED.

25         SO SINCE WE WON'T BE SEEING YOU UNTIL WEDNESDAY, I'LL JUST

1    GIVE YOU THE FULL ADMONITION TO KEEP THESE THINGS IN MIND

2    SINCE WE WON'T BE SEEING EACH OTHER FOR A WHILE.

3        SO REMEMBER, UNTIL THE TRIAL IS OVER, AND IT IS NOT OVER,

4    DO NOT DISCUSS THE CASE WITH ANYONE, INCLUDING YOUR FELLOW

5    JURORS, MEMBERS OF YOUR FAMILY, PEOPLE INVOLVED IN THE TRIAL

6    OR ANYONE ELSE, AND DO NOT ALLOW OTHERS TO DISCUSS THE CASE

7    WITH YOU.  THIS INCLUDES DISCUSSING THE CASE IN PERSON, BY

8    WRITING, BY PHONE OR ELECTRONIC MEANS, VIA EMAIL, VIA TEXT

9    MESSAGING, OR ANY INTERNET CHAT ROOM OR SOCIAL MEDIA

10   APPLICATION.

11       IF ANYONE TRIES TO COMMUNICATE WITH YOU ABOUT THE CASE,

12   PLEASE LET ME KNOW THAT IMMEDIATELY.  DO NOT WATCH, READ OR

13   LISTEN TO ANY NEWS REPORTS OR ACCOUNTS ABOUT THE TRIAL OR

14   ANYONE ASSOCIATED WITH IT, INCLUDING ANY ONLINE INFORMATION.

15   DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

16   SEARCHING THE INTERNET OR USING OTHER REFERENCE MATERIALS, AND

17   DON'T MAY MAKE ANY INVESTIGATION ABOUT THE CASE ON YOUR OWN.

18       FINALLY, AT THIS POINT, AGAIN, AS ALWAYS, CONTINUE TO KEEP

19   AN OPEN MIND UNTIL ALL OF THE EVIDENCE HAS BEEN PRESENTED AND

20   YOU'VE HEARD THE ARGUMENTS OF COUNSEL, MY INSTRUCTIONS ON THE

21   LAW, AND THE VIEWS OF YOUR FELLOW JURORS.

22       WITH THAT, HAVE A GOOD HOLIDAY WEEKEND, AND WE WILL SEE

23   YOU ALL BACK HERE TO GET STARTED PROMPTLY AT 8:30 ON

24   WEDNESDAY.

25       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

```
 1                 THE CLERK:  YOU MAY BE SEATED.

 2                 THE COURT:  ALL RIGHT.  SO I'LL BE ON THE LOOKOUT FOR

 3     THE DEFENSE'S PROPOSED INSTRUCTION AS WELL AS THE VERDICT

 4     FORMS THE PARTIES ARE PLANNING TO SUBMIT.

 5                 MS. HANSEN:  YES, YOUR HONOR.  AND HOPEFULLY WE WILL

 6     HAVE A STIPULATION THAT WE CAN READ IN AND HAVE NO DEFENSE

 7     TESTIMONY, AND THEN IF WE COULD ARGUE THE RULE 29 MOTION ON

 8     TUESDAY MORNING AT TEN A.M. AS WELL?

 9                 THE COURT:  WE CAN.  I AM GOING TO TAKE IT UNDER

10     SUBMISSION.

11                 MS. HANSEN:  WE COULD ALSO SUBMIT ON IT, IF THE COURT

12     WOULD PREFER, AND WE CAN THEN DO A --

13                 THE COURT:  IT'S PROBABLY THE BETTER --

14                 MS. HANSEN:  I WANT TO PRESERVE.

15                 THE COURT:  EXACTLY.  I THINK THE BEST APPROACH IS

16     FOR YOU TO PRESERVE AND THEN BRIEF IT FULLY --

17                 MS. HANSEN:  AFTER.  UNDERSTOOD.

18                 THE COURT:  ALL RIGHT.

19                 MS. LEE:  THE GOVERNMENT WILL SUBMIT OUR PROPOSED

20     JURY INSTRUCTION AS WELL.

21                 THE COURT:  YOU HAVE AN ADDITIONAL INSTRUCTION BEYOND

22     THE ONES THAT WERE IN THE PACKET I DID BEFORE?

23                 MS. LEE:  YES.  JUST THE ADDITIONAL ONES FROM THE ONE

24     THAT WE FILED.  THE GOVERNMENT'S PROPOSED JURY INSTRUCTIONS

25     HAD A FEW MORE PERTAINING TO THE CLEAN WATER ACT THAN THE
```

1  ONES -- I THINK YOURS WERE FOUR PAGES OR SO?  I CAN'T RECALL

2  THE EXACT NUMBER OF PAGES.

3         **THE COURT:**  I GUESS WHAT I WOULD SAY IS THIS:  YOU

4  CAN SUBMIT IT AGAIN.  IF YOU -- IF IT DUPLICATES YOUR

5  SUBMISSION BEFORE, I DECIDED NOT TO GIVE IT.  BUT IF

6  THERE'S -- WHATEVER EITHER OF YOU NEEDS TO DO TO MAKE YOUR

7  RECORD, I'M FINE WITH IT.  BUT I DON'T KNOW THAT YOU NEED TO

8  RE-SUBMIT THE ONES THAT YOU PROPOSED THAT I DIDN'T GIVE.

9         **MS. LEE:**  UNDERSTOOD.

10        **THE COURT:**  ALL RIGHT.  HAVE A GOOD WEEKEND.

11        **MS. HANSEN:**  THANK YOU, YOUR HONOR.

12        **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

13            (PROCEEDINGS ADJOURNED AT 1:22 A.M.)

14

15

16                    **CERTIFICATE OF REPORTER**

17        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

18  UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

19  CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

20  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22                    *Diane E. Skillman*

23            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

24              SATURDAY, FEBRUARY 17, 2018

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**