VOLUME 10

PAGES 1423 - 1575

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,         )    NO. CR-16-00107 HSG
                               )
   VS.                         )    WEDNESDAY, FEBRUARY 21, 2018
                               )
JAMES PHILIP LUCERO,           )    OAKLAND, CALIFORNIA
                               )
            DEFENDANT.         )    JURY TRIAL
_____)

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          ALEX G. TSE, ESQUIRE
                           ACTING UNITED STATES ATTORNEY
                           450 GOLDEN GATE AVENUE, 11TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94102
                      BY:  PHILIP J. KEARNEY,
                           SHIAO C. LEE,
                           ASSISTANT UNITED STATES ATTORNEYS


**FOR DEFENDANT:**          FEDERAL PUBLIC DEFENDER'S OFFICE
                           1301 CLAY STREET, SUITE 1350N
                           OAKLAND, CALIFORNIA 94612
                      BY:  ANGELA M. HANSEN,
                           NED SMOCK,
                           ASSISTANT FEDERAL PUBLIC DEFENDERS


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           OFFICIAL COURT REPORTER


     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
                        I N D E X
```

|                                            | PAGE | VOL. |
|--------------------------------------------|------|------|
| CLOSING ARGUMENT BY MS. LEE                | 1446 | 10   |
| CLOSING ARGUMENT BY MS. HANSEN             | 1491 | 10   |
| REBUTTAL CLOSING ARGUMENT BY MR. KEARNEY   | 1535 | 10   |
| INSTRUCTIONS                               | 1548 | 10   |
| VERDICT                                    | 1570 | 10   |

```
1    WEDNESDAY, FEBRUARY 21, 2018                    8:12 A.M.

2                         P R O C E E D I N G S

3         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4              THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION, THE

5    HONORABLE HAYWOOD S. GILLIAM PRESIDING.

6         WE ARE CALLING CR16-00107, UNITED STATES OF AMERICA VERSUS

7    JAMES PHILIP LUCERO.  PLEASE STEP FORWARD AND STATE YOUR

8    APPEARANCES FOR THE RECORD.

9              MR. KEARNEY:  PHIL KEARNEY AND SHIAO LEE FOR THE

10   UNITED STATES.

11             THE COURT:  GOOD MORNING.

12             MR. SMOCK:  GOOD MORNING, YOUR HONOR.  NED SMOCK WITH

13   MR. LUCERO, WHO IS PRESENT IN COURT.

14             THE COURT:  GOOD MORNING.

15             MS. HANSEN:  GOOD MORNING, YOUR HONOR.  ANGELA HANSEN

16   ALSO ON BEHALF OF MR. LUCERO.

17             THE COURT:  GOOD MORNING.

18        ALL RIGHT.  WHAT'S UP?

19             MR. KEARNEY:  THERE ARE TWO THINGS.  I JUST WANTED

20   TO -- I THINK WE HAVE THE AGENT SU ISSUE TO DISCUSS VERY

21   BRIEFLY AND THEN THE DROUGHT MAP ISSUE THAT WAS -- THE DEFENSE

22   INFORMED THE GOVERNMENT THIS MORNING THAT IT INTENDED TO

23   INTRODUCE THAT EXHIBIT REGARDING THE DROUGHT MAP.

24        FIRST, AGENT SU, YOUR HONOR, THE COURT -- OR THE

25   GOVERNMENT HAS REVIEWED THE DECLARATION OF AGENT SU AND THE
```

```
1    STATE OF REASON AS TO WHY THE DEFENSE WANTS TO ADMIT IT.

2    BASICALLY --

3         THE COURT:  BEFORE -- DO YOU HAVE A COPY?  I THINK I

4    GOT ONE YESTERDAY BUT I DON'T HAVE ONE RIGHT NOW.

5         MR. KEARNEY:  I DO, SIR.

6         MR. SMOCK:  ALSO, I GUESS I WOULD ASK, IF WE ARE

7    GOING TO BE DISCUSSING THE SUBSTANCE OF ANY EXPECTED TESTIMONY

8    OF AGENT SU, SHE BE ASKED TO LEAVE THE COURTROOM.

9         THE COURT:  I THINK THAT'S FAIR.

10      THIS IS THE STIPULATION -- THERE IS NO STIPULATION.  WHERE

11   IS THE DECLARATION ITSELF?  THAT IS WHAT I NEED.

12        MR. KEARNEY:  DO YOU HAVE A COPY, COUNSEL?

13             (PAUSE IN THE PROCEEDINGS.)

14        MR. KEARNEY:  I HAVE A NON-FILED VERSION, YOUR HONOR.

15   THE COURT SHOULD PROBABLY SEE THE FILED VERSION.

16        THE COURT:  I WOULD LIKE WHATEVER IS BEING OFFERED IN

17   EVIDENCE.

18        MR. SMOCK:  JUST TO BE CLEAR, I DON'T ANTICIPATE

19   INTRODUCING THE ENTIRE DECLARATION.  I WOULD ENTER IT AS

20   TESTIMONY WITH RESPECT TO WHAT WAS SAID THEREIN.

21        MS. HANSEN:  OKAY.  YOU CAN GO AHEAD, MR. KEARNEY.

22        MR. KEARNEY:  YOUR HONOR, WHAT IS HAPPENING IS, THE

23   DEFENSE WANTS TO CALL AGENT SU TO SUGGEST THAT SHE WAS WRONG

24   IN A DECLARATION FILED IN 2016 ABOUT A PRONG OF THE

25   REGULATIONS.
```

1          FIRST OF ALL, AN AGENT'S DECLARATION IN THAT REGARD FILED

2     IN 2016 IS NOT RELEVANT TO THESE PROCEEDINGS.  THAT'S

3     NUMBER 1.

4          ALSO, IT CALLS FOR A LEGAL CONCLUSION ON BEHALF OF AGENT

5     SU, NUMBER 2.

6          AND THEN IN EFFECT WHAT IS HAPPENING HERE IS, SHE IS BEING

7     CALLED BY THE DEFENSE JUST TO IMPEACH HER, BY SUGGESTING SHE

8     WAS WRONG IN A CHARACTERIZATION IN A DOCUMENT FILED A YEAR AND

9     A HALF AGO.  WE JUST THINK THAT IS COMPLETELY IMPROPER.  THERE

10    IS NO PROPER FOUNDATION FOR CALLING THIS WITNESS IN THIS

11    MANNER.

12              **THE COURT:**  WHAT IS THE TESTIMONY THAT THE DEFENSE IS

13    SEEKING TO ELICIT?

14              **MR. SMOCK:**  YOUR HONOR, THE MAIN THING WE WANT TO

15    ELICIT IS THAT -- AT PAGE 7, LINE 3, AGENT SU INDICATED

16    THAT -- AND JUST TO LET THE COURT KNOW WHERE WE ARE TALKING

17    ABOUT, WE ARE TALKING ABOUT THE AREA THAT IS CHARGED IN

18    COUNTS I AND II NEAR THE PICK 'N PULL, WHICH WE HAVE BECOME

19    EXTREMELY FAMILIAR WITH, THAT APPROXIMATELY 1.33 ACRES OF THIS

20    DEPRESSION WHERE AQUATIC WATER IS CHARACTERIZED AS "OTHER

21    WATERS", AND IT IS REFERRED TO IN COUNT II IN THE INDICTMENT

22    AS "OTHER WATERS".

23         AND THEN AT PAGE 4, PARAGRAPH 9, A FURTHER DESCRIPTION OF

24    THIS AREA AS "OTHER WATERS" THAT ARE NOT WETLANDS AND ARE

25    INUNDATED WITH WATER MORE THAN WETLANDS, ET CETERA.

THE SIGNIFICANCE OF THIS IS THAT IT IS AN ADMISSION BY A
PARTY OPPONENT AND IT IS INCONSISTENT WITH THE THEORY THAT THE
GOVERNMENT HAS PUT FORTH IN THIS TRIAL THAT, IN FACT, THE
AREAS CHARGED IN COUNTS I AND II ARE A WETLAND AND A
TRIBUTARY.  IN THIS SWORN DECLARATION FROM 2016 AGENT SU
CONCLUDED THAT THEY, IN FACT, WERE "OTHER WATERS" AND WERE NOT
A WETLAND.

IT'S NOT SIMPLY -- THE ISSUE IS THAT IT IS AN ADMISSION BY
A PARTY OPPONENT.  IT WAS A DECLARATION SUBMITTED BY THE
GOVERNMENT IN CONNECTION TO THEIR OPPOSITION TO THE
DEFENDANT'S MOTION TO DISMISS.  SO IT'S NOT SIMPLY AGENT SU
STANDING AT THE SITE TELLING SOMEONE SHE THINKS SOMETHING.  IT
IS AN ACTUAL ADMISSION ADOPTED BY THE GOVERNMENT HERE THAT WAS
FILED WITH THEIR PLEADINGS.

AND, IN FACT, IT IS ENTIRELY CONSISTENT WITH HER TESTIMONY
IN THE GRAND JURY FOR THE FIRST INDICTMENT AND CONSISTENT WITH
THE GOVERNMENT'S ENTIRE THEORY FOR THE FIRST INDICTMENT.  AND
IT'S INCONSISTENT, AGAIN, WITH WHAT HAS BEEN PUT FORTH IN THE
GOVERNMENT'S CASE HERE.  AND UNDER 801(D)(2), (B), (C), OR
(D), I THINK IT QUALIFIES AS AN ADMISSION BY A PARTY OPPONENT.

**MR. KEARNEY:**  YOUR HONOR, IF THAT IS THE OFFER OF
PROOF, THEN IT SHOULD BE FLATLY DENIED.  AGENT SU IS NOT A
PARTY OPPONENT.

**THE COURT:**  REALLY?

**MR. KEARNEY:**  NO.

1          **MR. SMOCK:**  SHE IS A PARTY'S AGENT OR EMPLOYEE MAKING

2     A STATEMENT ON A MATTER WITHIN THE SCOPE OF THAT RELATIONSHIP.

3     SHE'S -- SHE FILED A DECLARATION.  THE GOVERNMENT FILED IT IN

4     CONJUNCTION WITH -- IN SUPPORT OF THEIR POSITION IN THIS CASE

5     IN A LEGAL PLEADING.  AND SHE ASSERTS DETAILED KNOWLEDGE OF

6     THE CLEAN WATER ACT AND OF THE SITE.

7          SHE'S ALSO -- UNDER SUBSECTION C, IT'S A STATEMENT MADE BY

8     A PERSON WHOM THE PARTY AUTHORIZED TO MAKE A STATEMENT ON THE

9     SUBJECT.  IT'S -- UNDER SUBSECTION B, IT'S A STATEMENT THAT

10    THE PARTY MANIFESTED, THAT IT ADOPTED OR BELIEVED TO BE TRUE.

11    IT'S DIRECTLY -- EACH OF THOSE THREE SUBSECTIONS APPLIES.

12          **THE COURT:**  WHY ISN'T THAT TRUE?

13          **MR. KEARNEY:**  I JUST DON'T BELIEVE THAT THE AGENT IS

14    A PARTY OPPONENT IN THIS MATTER, AND SHE IS BEING ASKED TO

15    GIVE A LEGAL CONCLUSION THAT SHE IS NOT COMPETENT TO GIVE.

16    AND IT'S NOT RELEVANT.  AND SHE'S BEING CALLED TO THE STAND

17    EFFECTIVELY FOR THE SOLE PURPOSE OF IMPEACHING HER.

18          **THE COURT:**  HOW?  THEY ARE NOT -- THEY ARE GOING TO

19    ASK HER TO CONFIRM WHAT SHE SAID, NOT IMPEACH WHAT SHE SAID.

20          **MR. KEARNEY:**  THEY ARE GOING TO ASK HER TO -- YOUR

21    HONOR, I THINK IT'S PRETTY CLEAR BY NOW WHAT THE DEFENSE

22    THEORY OF THIS CASE IS, BUT SHE IS BEING ASKED TO GIVE A LEGAL

23    CONCLUSION BEFORE THE JURY.

24          **THE COURT:**  BUT HOW IS THIS DIFFERENT THAN THE SORT

25    OF TESTIMONY THAT MULTIPLE WITNESSES HAVE GIVEN ABOUT THE

```
 1    DESIGNATION?

 2              MR. KEARNEY:  SHE IS NOT AN EXPERT.

 3              THE COURT:  THEN WHY DID SHE OFFER THE OPINION IN THE

 4    FIRST PLACE IN THE DECLARATION?

 5              MR. KEARNEY:  WELL, AGENTS ROUTINELY OFFER SUCH

 6    DECLARATIONS, JUST PROVIDE A FACTUAL BASIS FOR A PLEADING.  IT

 7    DOESN'T MEAN THEY ARE EXPERTS.

 8        AND IT IS REGARDING A CHARGE THAT IS NO LONGER PART OF THE

 9    INDICTMENT AND IT WILL CONFUSE THE JURY.

10              MR. SMOCK:  YOUR HONOR, RESPECTFULLY, I DON'T THINK

11    THIS IS A CLOSE CALL.  I MEAN, THIS IS A STATEMENT BY AN AGENT

12    OF THE GOVERNMENT.  IT FITS UNDER THREE SEPARATE SUBSECTIONS

13    OF 801(D)(2).  AND IT'S ENTIRELY RELEVANT GIVEN THAT ONE OF

14    THE MAJOR CONTESTED FACTS IN THIS CASE IS HOW ONE WOULD

15    DESCRIBE THE AREAS CHARGED IN COUNTS I AND II.

16              THE COURT:  WELL, HERE IS WHAT YOU OUGHT TO HAVE

17    SOMEONE IN YOUR OFFICE DO IN THE NEXT FIVE MINUTES.  IF YOU

18    CLAIM THAT A CASE AGENT IS NOT AN AGENT OR A PARTY THAT CAN

19    MAKE A PARTY ADMISSION UNDER 801(D), THEN HAVE SOMEBODY FIND A

20    CASE THAT SAYS THAT.

21              MR. KEARNEY:  ALL RIGHT.  THANK YOU.

22              THE COURT:  WHAT IS ISSUE NUMBER 2?

23              MR. KEARNEY:  YOUR HONOR, THE DEFENSE HANDED THE

24    GOVERNMENT THIS DROUGHT MAP, WHICH IS -- IN FAIRNESS THEY HAVE

25    GIVEN TO THE GOVERNMENT BEFORE, WHICH HAS A -- DOES THE COURT
```

1    HAVE A COPY OF THIS BEFORE IT?

2              **THE COURT:**  I'VE SEEN IT BEFORE.

3                   (DOCUMENT HANDED TO COURT.)

4         **MR. KEARNEY:**  SO MY UNDERSTANDING IS THAT THE DEFENSE

5    INTENDS TO INTRODUCE THIS WITHOUT ANY FURTHER FOUNDATION, NO

6    WITNESS TO EXPLAIN WHAT'S IN THE DOCUMENT BEYOND THE

7    CERTIFICATION ON THE LAST PAGE OF THE EXHIBIT.  AM I WRONG ON

8    THAT, COUNSEL?

9              **MR. SMOCK:**  THAT'S ABSOLUTELY CORRECT.

10         **MR. KEARNEY:**  SO, YOUR HONOR, IN THAT CASE THE

11   AUTHENTICATION ON THE BACK PAGE JUST AUTHENTICATES THE

12   DOCUMENT.  IT IS STILL REPLETE WITH HEARSAY.  THERE IS NO ONE

13   HERE TO EXPLAIN THE INFORMATION ON THIS EXHIBIT.  IT IS

14   TESTIMONIAL IN NATURE.

15        THE JURY IS GOING TO BE LEFT TO SPECULATE AS TO WHAT THIS

16   MEANS.  WHAT EXCEPTIONAL DROUGHT MEANS, DOES IT MEAN NO RAIN?

17   DOES IT MEAN SOME RAIN?  DOES IT MEAN A COMPLETE ABSENCE OF

18   RAIN?  HOW WAS THIS DATA COLLECTED?

19             **THE COURT:**  SORRY.  WHY DON'T WE START SINCE THE -- I

20   GET YOUR OBJECTION, WHY DON'T YOU GIVE ME THE BASIS FOR THE

21   ADMISSION.

22             **MR. SMOCK:**  YOUR HONOR, IT IS A BUSINESS RECORD UNDER

23   803(6).  THE CERTIFICATE OF AUTHENTICITY SETS FORTH ALL THE

24   NECESSARY ELEMENTS.  IT IS CREATED BY THE NATIONAL DROUGHT

25   MITIGATION CENTER.  THE CLIMATE SCIENTISTS THERE INDICATED

1    THAT IT WAS CREATED IN THE REGULAR COURSE OF THEIR BUSINESS.

2       IT'S STRAIGHTFORWARD.  I DON'T KNOW THAT THERE IS ANY NEED

3    FOR -- AMONG OTHER THINGS, I DON'T KNOW THAT THERE IS ANY

4    REQUIREMENT UNDER THE RULES OF EVIDENCE THAT THERE BE SOMEBODY

5    TO EXPLAIN IT.  IT SIMPLY SETS FORTH THE CONDITIONS IN

6    CALIFORNIA ON JULY 1ST OF 2014 AND JANUARY 24TH OF 2017.

7       I DON'T SEE ANY REASON THAT THERE WOULD NEED TO BE A

8    WITNESS GIVEN THAT WE HAVE THE CERTIFICATE OF AUTHENTICITY.

9    THE GOVERNMENT INTRODUCED EXHIBITS AT TRIAL WITH CERTIFICATES

10    LIKE THIS WITHOUT A SPONSORING WITNESS WHO WAS PRESENT IN

11    COURT.

12          **MS. LEE:**  YOUR HONOR, IF I COULD BE HEARD BRIEFLY.

13    YOU WILL RECALL AT THE BEGINNING OF THE TRIAL WE HAD

14    TALKED ABOUT THESE POTENTIAL EXHIBITS THAT THE DEFENSE HAD,

15    AND I HAD MADE A STATEMENT ABOUT THEIR DISCLOSURE BEING QUITE

16    LATE.  I THINK IT WAS PROBABLY RIGHT AROUND THE DAY OF JURY

17    SELECTION.

18       AND WHAT THE DEFENSE COUNSEL STATED WAS, WE DON'T EVEN

19    NEED TO PRODUCE THESE IF THEY ARE USED FOR IMPEACHMENT

20    PURPOSES AS OPPOSED TO CASE-IN-CHIEF EVIDENCE.  IF THEY WERE

21    USED AS IMPEACHMENT PURPOSES, THE WITNESS SHOULD HAVE THE

22    ABILITY TO BE CONFRONTED WITH IT, TO HAVE AN OPINION ABOUT IT,

23    TO EVEN DETERMINE WHETHER OR NOT THIS IS DIFFERENT FROM WHAT

24    THEY ARE SAYING.

25       I MEAN, RAINFALL AND PRECIPITATION IS A FACT.  THERE IS

1    WETS TABLE THAT TALK ABOUT WHAT A DROUGHT WAS, HOW MANY INCHES

2    OF RAIN.  TO INTRODUCE THIS IN THEIR CASE-IN-CHIEF IS CONTRARY

3    TO WHAT THEY PURPORTED THESE EXHIBITS TO BE, AND THEY WERE

4    DISCLOSED AFTER WE HAD SELECTED A JURY.

5         **THE COURT:**  ALL RIGHT.  YOU ARE SAYING THAT THEY WERE

6    NOT TIMELY DISCLOSED UNDER RULE 16?

7         **MS. LEE:**  YES.  IN ADDITION TO WHAT MR. KEARNEY HAD

8    STATED ALSO ABOUT THESE DOCUMENTS.

9         **THE COURT:**  YOU ARE NOW TRYING TO PUT THIS IN ON YOUR

10   CASE-IN-CHIEF, CORRECT?

11        **MR. SMOCK:**  WELL, YES.  I MEAN, I THINK IT IS

12   PERFECTING IMPEACHMENT.  CANDIDLY, IT WAS SOMETHING THAT I WAS

13   GOING TO GET INTO WITH DR. COATS BUT WE RAN OUT OF TIME.

14        I THINK THERE IS NO BASIS FOR BELIEVING THAT THE

15   GOVERNMENT IS PREJUDICED BY THIS.  I MEAN, THESE ARE

16   STRAIGHTFORWARD FACTS.  THE GOVERNMENT HAS BEEN AWARE OF

17   RAINFALL CONDITIONS I ASSUME SINCE THEY STARTED LOOKING AT

18   THIS CASE, SO IT'S IMPOSSIBLE FOR ME TO ARTICULATE HOW THEY

19   ARE PREJUDICED BY THE INTRODUCTION OF AN EXHIBIT LIKE THIS.

20        **MR. KEARNEY:**  JUST IN BRIEF RESPONSE, PERFECTING

21   IMPEACHMENT?  I HAVE NEVER HEARD THAT TERM BEFORE USED IN A

22   CRIMINAL COURTROOM.  THE WAY YOU IMPEACH WITH A DOCUMENT IS,

23   YOU SHOW IT TO THE WITNESS AND ALLOW HIM EXPLAIN IT.

24        THE GOVERNMENT IS PREJUDICED BY THIS, YOUR HONOR.  OUR --

25   THE TESTIMONY IN THIS CASE FROM KATERINA GALACATOS OF THE

1    CORPS WAS VERY SPECIFIC IN TERMS OF HOW MUCH RAIN FELL IN THE

2    RAINY SEASON IN 2013, 2014.  WE HAVE NO WAY OF KNOWING WHETHER

3    THIS DOCUMENT CONTRADICTS THAT, IS SUPPORT OF THAT.  WHAT IS

4    AN EXCEPTIONAL DROUGHT?  I HAVE NO IDEA.  THE JURY WON'T

5    EITHER.

6        IT'S COMPLETE -- THE RECORD IS AUTHENTIC, BUT THERE'S NO

7    FOUNDATION LAID FOR IT.  IT LEADS -- IT WILL LEAD TO RAMPANT

8    SPECULATION -- IN ADDITION TO THE RULE 16 PROBLEMS, BUT IT

9    WILL LEAD TO RAMPANT SPECULATION BECAUSE THERE IS NO ONE HERE

10   TO EXPLAIN THE EXHIBIT.

11       AND THE FINAL THOUGHT I WOULD SAY IS, BY THE DEFENSE'S OWN

12   WORDS, THEY WERE TO USE THIS IN IMPEACHMENT, THE TIME TO DO

13   THAT HAS PASSED, VERY OBVIOUSLY.

14           **MR. SMOCK:**  IT'S ALSO SOMETHING THAT WE ARE PERMITTED

15   TO INTRODUCE IN OUR OWN CASE.  I DON'T KNOW THAT THERE IS ANY

16   BASIS FOR DOING THAT.  I ALSO DON'T --

17                 (SIMULTANEOUS COLLOQUY)

18           **MR. SMOCK:**  I'M SORRY.

19           **THE COURT:**  GO AHEAD, YOU FINISH.

20           **MR. SMOCK:**  I DON'T THINK THERE IS ANY BASIS IN THE

21   RULES OF EVIDENCE TO REQUIRE THAT THERE BE A WITNESS PRESENT

22   TO EXPLAIN SOMETHING WHEN IT'S BEEN AUTHENTICATED AS A

23   BUSINESS RECORD, MUCH LIKE THE BANK RECORDS THAT WE SAW AND

24   ANY OTHER NUMBER OF EXHIBITS THAT THE GOVERNMENT INTRODUCED.

25           **THE COURT:**  BUT GIVEN THAT YOU ARE ATTEMPTING TO

1    INTRODUCE THIS IN YOUR CASE IN CHIEF, WHY WAS IT NOT SUBJECT

2    TO YOUR RECIPROCAL DISCOVERY OBLIGATION UNDER RULE 16?

3              **MR. SMOCK:**  WE ARE JUST LOOKING AT RULE 16, AND I

4    DON'T KNOW THAT THERE IS ANY SPECIFIC TIMING REQUIREMENT THERE

5    THAT WE DIDN'T MEET WITH RESPECT TO THIS EXHIBIT.  IT WAS

6    TURNED OVER TO THE GOVERNMENT TWO WEEKS OR MORE -- I THINK

7    TWO-AND-A-HALF WEEKS AGO NOW.

8              **MS. HANSEN:**  IT WAS ALSO ATTACHED TO SOME FILINGS

9    EARLIER IN THIS CASE.  WE COULD RECALL DR. COATS IF THAT WOULD

10   HELP.  WE WOULD HAVE TO SUBPOENA HIM.

11             **THE COURT:**  WHAT DATE WAS THIS PRODUCED ON?

12             **MS. HANSEN:**  I THINK FEBRUARY 5TH.

13             **THE COURT:**  WAS IT BEFORE OR AFTER THE TRIAL BEGAN?

14             **MS. HANSEN:**  I BELIEVE IT WAS THE MORNING.  I'M NOT

15   SURE WHAT TIME.  I DON'T REMEMBER.

16             **MR. SMOCK:**  THE MORNING OF JURY SELECTION I THINK.

17             **MS. HANSEN:**  MR. WANZALA HANDED IT TO GOVERNMENT

18   COUNSEL.

19       AND TO BE FAIR, OUR PRODUCTION WAS INCREDIBLY SMALL, MAYBE

20   SIX PAGES.  WHEREAS THE GOVERNMENT, WHO HAD A DISCOVERY

21   CUTOFF, PRODUCED A MASSIVE AMOUNT OF DISCOVERY IN DIGITAL

22   DISCOVERY.  THAT'S THE DIFFERENCE BETWEEN THE TWO DISCLOSURES

23   AND THE TIMING OF IT.

24             **THE COURT:**  WHAT IS THE AUTHORITY FOR INTRODUCTION OF

25   AN EXHIBIT WITH ONLY A CERTIFICATE OF AUTHENTICITY BUT NO

```
 1    OPPORTUNITY TO EXPLORE THE MEANING OF THE DOCUMENT?

 2              MR. SMOCK:  WELL, I THINK IT'S PROPERLY BEEN

 3    AUTHENTICATED UNDER 901.

 4       I GUESS MY POINT WOULD BE THAT I DON'T KNOW OF ANY

 5    AUTHORITY REQUIRING A WITNESS TO SPONSOR AN EXHIBIT LIKE THIS

 6    ONE.  IT HAS BEEN PROPERLY AUTHENTICATED WITH A CERTIFICATE OF

 7    AUTHENTICITY.

 8              MS. HANSEN:  I THINK THE CERTIFIED BUSINESS RECORD

 9    RULE UNDER 902(11) AND (12) MIGHT APPLY.

10              THE COURT:  IT'S NOT (12) BECAUSE IT IS NOT A FOREIGN

11    RECORD.  (11) IS CERTIFIED DOMESTIC RECORDS OF A REGULARLY

12    CONDUCTED ACTIVITY.

13              MR. KEARNEY:  ALSO IN THE USE NOTES OF 902(11), THERE

14    IS A CITATION TO UNITED STATES VERSUS BROWN, A FIFTH CIRCUIT

15    CASE 208 -- FROM 2008, 553 F.3D 768.  IN THE PARENTHETICAL IT

16    STATES:  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN

17    REFUSING TO ADMIT EVIDENCE WHERE DEFENSE DISCLOSED RECORDS BUT

18    NOT THE INTENT TO INTRODUCE THEM SOLELY BY A CERTIFICATE -- OR

19    INTRODUCE THEM BY A CERTIFICATE.

20       THAT'S EXACTLY WHAT IS GOING ON HERE, SIR.  THERE IS NO

21    FOUNDATION LAID FOR THIS DOCUMENT AS TO WHAT IT MEANS.

22              THE COURT:  OKAY.  SUBMITTED.  I'M SORT OF -- I'M

23    SURPRISED THE GOVERNMENT CARES THAT MUCH ABOUT THIS.  YOUR

24    WHOLE POINT WITH ALL OF YOUR WITNESSES IS THAT WETLANDS ARE

25    NOT SUBJECT TO THE VAGARIES OF DROUGHT, CORRECT?
```

1          **MR. KEARNEY:**  ALSO, THOUGH, THAT THE -- THIS CONCEPT

2     OF DROUGHT WAS INACCURATE REGARDING THE RAINY SEASON OF THE

3     RELEVANT TIME PERIOD, AS TESTIFIED TO BY DR. GALACATOS.  IF

4     THE JURY GETS THIS WITH ALL KINDS OF REDS AND LAVENDERS ON IT,

5     THEY ARE NOT GOING TO KNOW WHAT THOSE COLORS MEAN, IF THAT IS

6     DIRECTLY IN CONTRADICTION TO DR. GALACATOS.

7          AND WITHOUT HAVING A WITNESS ON THE STAND, THE GOVERNMENT

8     HAS NO WAY TO TEST THIS TABLE.  SO IN EFFECT IT IMPEACHES

9     DR. GALACATOS, AND WE HAVE NO WAY TO DISCERN IF IT IS PROPER

10    IMPEACHMENT OR NOT.

11         **THE COURT:**  OKAY.  SUBMITTED.

12         I'M GOING TO TAKE TEN MINUTES AND LOOK AT THESE QUESTIONS.

13    AS I SAID, THE GOVERNMENT OUGHT TO REALLY FIND A CASE, IF YOU

14    HAVE ONE, ON THIS PARTY ADMISSION QUESTION.  THAT OUGHT TO BE

15    SOMETHING YOU CAN LOCATE QUICKLY.

16         **MR. KEARNEY:**  THANK YOU, SIR.

17         **THE COURT:**  LET'S COME BACK AT 8:45.

18         (RECESS TAKEN AT 8:33 A.M.; RESUMED AT 8:50 A.M.)

19         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

20         **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

21    COURT IS BACK IN SESSION, THE HONORABLE HAYWOOD S. GILLIAM

22    PRESIDING.

23         **THE COURT:**  ALL RIGHT.  SO WHY DON'T WE TAKE THE

24    AGENT SU ISSUE FIRST.  ANY AUTHORITY THE GOVERNMENT WAS ABLE

25    TO TRACK DOWN?

1          **MR. KEARNEY:**  YOUR HONOR, WE WERE.  WE FOUND TWO

2     STRINGS OF CASES.  I HAVE COPIES FOR THE COURT.  THE FIRST ONE

3     IS *UNITED STATES VERSUS BACKSHINIAN* (PHONETIC), 665 FED.2

4     1104, IT'S FROM THE CENTRAL DISTRICT OF CALIFORNIA.  I'M

5     QUOTING FROM THE DECISION.

6        WOULD THE COURT LIKE A HARD COPY?

7              **THE COURT:**  PLEASE.

8          **MR. KEARNEY:**  I HAVE ONE FOR THE DEFENSE, TOO.

9           (DOCUMENTS HANDED TO COURT AND COUNSEL.)

10         **MR. KEARNEY:**  ON PAGE 1105, 1106 OF THAT DECISION,

11    *PROVAT* (PHONETIC), THAT'S A CIRCUIT COURT CASE THAT'S CITED

12    FROM OUT OF THIS DISTRICT.  PROVAT'S FINDING THAT STATEMENTS

13    BY GOVERNMENT AGENTS SHOULD NOT BE CONSIDERED THOSE OF A PARTY

14    OPPONENT BECAUSE THE AGENTS OF THE GOVERNMENT ARE SUPPOSEDLY

15    DISINTERESTED IN THE OUTCOME OF A TRIAL AND ARE TRADITIONALLY

16    UNABLE TO BIND THE SOVEREIGN; THEREFORE, THEIR STATEMENTS SEEM

17    LESS THE PRODUCT OF THE ADVERSARY PROCESS AND, HENCE, LESS

18    APPROPRIATELY DESCRIBED AS ADMISSIONS OF A PARTY.

19       YOUR HONOR, WE PULLED *PROVAT*, WHICH IS THE SEVENTH CIRCUIT

20    CASE THAT *BACKSHINIAN* IS BASED ON.  WE HAVE COPIES OF THAT FOR

21    THE COURT AS WELL.  HOWEVER -- SO AS A GENERAL PROPOSITION

22    STATEMENTS OF GOVERNMENT AGENTS ARE NOT PARTY OPPONENTS.

23       HOWEVER, YOUR HONOR, WE DID FIND ANOTHER STRING OF CASES

24    WHICH TALKS ABOUT THE FACT THAT IF THOSE STATEMENTS ARE

25    ADOPTED IN A FILING OF THE UNITED STATES, THEN DE FACTO THEY

1    DO BECOME PARTY OPPONENT STATEMENTS.

2         SO WE WILL, ON THAT GROUND, WITHDRAW OUR OBJECTION TO

3    AGENT SU TESTIFYING.  HOWEVER, WE STILL STRONGLY BELIEVE THAT

4    FOR 403 REASONS SHE SHOULD NOT TESTIFY.

5         **THE COURT:**  YEAH, AND HERE IS THE -- IN LOOKING AT

6    THE DECLARATION MORE CLOSELY, WHY IS THERE NOT A DOUBLE

7    HEARSAY PROBLEM?

8         IN OTHER WORDS, EVEN IF I WERE TO FIND THAT AGENT SU'S

9    STATEMENT IS A PARTY ADMISSION, ALL SHE IS DOING IS DESCRIBING

10   THE CORPS' JURISDICTIONAL DETERMINATION, WHICH IS IN EVIDENCE.

11   AND WE HAVE HAD AMPLE TESTIMONY ABOUT IT.

12        WHY IS AGENT SU'S DESCRIPTION OF WHAT IS PLAINLY HEARSAY

13   ADMISSIBLE?  AND EVEN IF IT IS ADMISSIBLE, WHY IS IT NOT

14   EXCLUDABLE ON RULE 403 GROUNDS?  IT JUST SEEMS TO ME THAT ANY

15   PROBATIVE VALUE IT WOULD HAVE IS OUTWEIGHED BY THE POTENTIAL

16   FOR CONFUSING THE ISSUES.

17        WHY IS HER COMMENTARY ON A HEARSAY DOCUMENT THAT'S ALREADY

18   IN EVIDENCE IN ANY WAY RELEVANT?

19        **MR. SMOCK:**  SHE'S NOT SIMPLY COMMENTING ON A DOCUMENT

20   FROM AN EXPERT.  SHE IS ASSERTING THE GOVERNMENT'S POSITION

21   ABOUT HOW ONE WOULD CATEGORIZE THESE AREAS IN THE CASE.  SO

22   SHE'S NOT IN HER DECLARATION SAYING, I SPOKE TO SOMEBODY WHO

23   THEN TOLD ME THAT THIS WAS A WETLAND OR TOLD ME THAT THIS WAS

24   AN AQUATIC AREA.

25        SHE IS SAYING AFFIRMATIVELY, APPROXIMATELY 1.33 ACRES

1   WHICH WERE NOT WETLANDS AND WHICH WERE IDENTIFIED AS "OTHER

2   WATERS" BY THE CORPS IN ITS JD WERE IMPACTED BY THE DUMPING.

3   AND SHE DESCRIBED THESE "OTHER WATERS" AS AREAS THAT ARE MORE

4   INUNDATED WITH WATER THAN WETLANDS.

5       SHE SAID:  BASED ON MY INVESTIGATION I BELIEVE AS AN AGENT

6   OF THE GOVERNMENT THESE 1.33 ACRES WERE LOWER ELEVATION.  AND

7   SHE SAID:  THESE MORE AQUATIC WATERS ARE "OTHER WATERS"

8   CONSTITUTING "WATERS OF THE UNITED STATES".

9       SO SHE IS NOT SIMPLY SAYING, I'VE HEARD THE FOLLOWING.

10  SHE'S STATING THE GOVERNMENT'S POSITION ABOUT HOW ONE WOULD

11  CATEGORIZE THESE AREAS.  THAT AMOUNTS TO AN ADMISSION BY A

12  PARTY OPPONENT AND NOT SIMPLY A STATEMENT IN A DECLARATION

13  ABOUT SOMETHING THAT SHE HEARD.  IT'S AN ASSERTION OF THE

14  GOVERNMENT'S POSITION IN THIS CASE.

15          **THE COURT:**  RIGHT.  BUT BASICALLY -- SO YOU'VE

16  IDENTIFIED ONE SENTENCE THAT, BASED ON MY INVESTIGATION, BUT

17  THE ENTIRE REST OF IT IN PARAGRAPH 9 STARTS WITH THE PHRASE:

18  NEWARK AREA 4, INCLUDING THE SITE, WAS THE SUBJECT OF A JD

19  ISSUED BY THE CORPS, AND THEN THERE'S DESCRIPTION.

20      AND THE OTHER PARAGRAPH IS PARAGRAPH 17 WHICH, AGAIN,

21  SAYS:  1.33 ACRES OF THIS NATURAL DEPRESSION WERE AQUATIC

22  WATERS CHARACTERIZED BY THE CORPS AS JURISDICTIONAL "OTHER

23  WATERS".  IN OTHER WORDS, IT IS A DESCRIPTION OF THE CORPS'

24  CHARACTERIZATION.

25      I AM READY TO RULE.  FIRST, I FIND THAT I WILL ASSUME THAT

THE STATEMENTS IN THE DECLARATION SHOULD BE CONSIDERED PARTY

ADMISSIONS.  HOWEVER, BASED ON WHAT THE DEFENSE HAS PROFFERED,

IT APPEARS TO ME THAT THE CORE OF WHAT'S BEING REQUESTED OF

AGENT SU IS FOR HER TO RECONFIRM HER STATEMENTS ABOUT THE

CORPS' JURISDICTIONAL DETERMINATION AND ASPECTS OF IT IN

PARAGRAPHS 9 AND 17.

THE JURISDICTIONAL MAP ITSELF IS IN EVIDENCE.  THE

DETERMINATION HAS BEEN THE SUBJECT OF SUBSTANTIAL TESTIMONY

AND CROSS-EXAMINATION IN THE CASE.  THE GOVERNMENT'S POSITION

HAS BEEN MADE CLEAR THROUGH THE TESTIMONY OF ITS WITNESSES,

AND THE DEFENSE HAS HAD AN ADEQUATE, IN FACT, AMPLE

OPPORTUNITY TO CROSS-EXAMINE ABOUT THE SUBJECT.

SO THAT EVEN IF -- FIRST OF ALL, I THINK THERE IS A DOUBLE

HEARSAY ISSUE WITH REGARD TO HAVING THIS WITNESS DESCRIBE THE

CONTENTS OF THE CORPS' DETERMINATION.  BUT EVEN IF THAT WERE

NOT TRUE, THE PROBATIVE VALUE OF THIS INCIDENTAL DESCRIPTION

BY AGENT SU IS SUBSTANTIALLY OUTWEIGHED BY THE RISK OF

CONFUSION OF THE ISSUES GIVEN THE EVIDENCE THAT IS ALREADY IN.

SO I WILL GRANT THE OBJECTION --

**MR. SMOCK:**  YOUR HONOR --

**THE COURT:**  -- SUSTAIN THE OBJECTION.

**MR. SMOCK:**  -- I UNDERSTAND THE COURT'S RULING.  IF I

CAN JUST MAKE A RECORD ABOUT SOMETHING?

**THE COURT:**  YES.

**MR. SMOCK:**  THE DEFENSE'S POSITION IS THAT IT IS

1    ENTIRELY RELEVANT AND NECESSARY TO OUR DEFENSE TO MAKE THE

2    JURY AWARE OF THE SHIFTING THEORIES OF THE CASE BY THE

3    GOVERNMENT.

4        THE GOVERNMENT NOT ONLY LISTENED TO STATEMENTS BY THESE

5    EXPERTS, BOURSIER AND OTHERS, BUT THEY ADOPTED THEM.  THEY

6    WENT INTO THE GRAND JURY AND THEY INDICTED MR. LUCERO ON A

7    THEORY THAT THESE AREAS WERE "OTHER WATERS".  THEY -- SO THEY

8    ADOPTED THESE FINDINGS.

9        THEY THEN DECIDED THAT THAT DIDN'T WORK, THAT, IN FACT,

10   THEY WEREN'T ABLE TO ESTABLISH THAT THEY WERE "OTHER WATERS"

11   FOR WHATEVER REASON, I ASSUME IT WAS BECAUSE THEY COULDN'T

12   ESTABLISH AN INTERSTATE NEXUS, SO THEN THEY GO BACK AND SPEAK

13   TO A DIFFERENT EXPERT AND COME UP WITH AN IDEA THAT THEY

14   ARE -- IT'S A TRIBUTARY.

15       SO THE FACT THAT THE GOVERNMENT ADOPTED FINDINGS BY THESE

16   PEOPLE, HAD ONE THEORY AT ONE POINT, WENT INTO THE GRAND JURY

17   AND GOT AN INDICTMENT ON THAT THEORY, AND THEN WENT BACK ON IT

18   AND IS NOW TELLING THIS JURY THAT, IN FACT, THAT IS NOT

19   ACCURATE IS ENTIRELY RELEVANT AND IT'S NECESSARY FOR THE JURY

20   TO BE AWARE OF IT; AND WE ARE PREJUDICED BY NOT BEING ABLE TO

21   LET THEM KNOW THAT.

22           **THE COURT:**  ALL RIGHT.  UNDERSTAND YOUR POSITION.

23       WITH REGARD TO THE DROUGHT MAP ISSUE, IN LOOKING AT

24   RULE 902(11), THERE IS A REQUIREMENT THAT BEFORE THE TRIAL OR

25   HEARING, THE PROPONENT GIVE AN ADVERSE PARTY REASONABLE

```
1    WRITTEN NOTICE OF THE INTENT TO OFFER THE RECORD.

2         NINTH CIRCUIT IN U.S. VERSUS WEILAND, WHICH IS 420 F.3D

3    1062 AT 1072, HAS INTERPRETED THAT AS REQUIRING WRITTEN NOTICE

4    OF INTENTION TO OFFER THE RECORD OF CONVICTION AS

5    SELF-AUTHENTICATING UNDER THE RULE.

6         WAS SUCH WRITTEN NOTICE GIVEN?

7              MR. SMOCK:  NO, YOUR HONOR.

8              MR. KEARNEY:  NO, SIR.

9              THE COURT:  ON THAT BASIS I WILL SUSTAIN THE

10   OBJECTION TO ADMISSION OF THE DROUGHT MAP UNDER RULE 902(11).

11        ARE WE READY TO BRING THE JURY IN?

12             MR. SMOCK:  CAN WE HAVE ONE MOMENT, YOUR HONOR?

13             MR. KEARNEY:  WE ARE, YOUR HONOR.

14                  (PAUSE IN THE PROCEEDINGS.)

15             MR. SMOCK:  YOUR HONOR, THE ONE OTHER THING THAT I

16   WOULD ASK IS THAT YOU READ IN THE STIPULATION THAT WE FILED

17   ABOUT PAYMENTS TO DAN MARTEL?

18             THE COURT:  THAT I WILL DO.

19        DOES THE DEFENSE INTEND TO CALL ANY WITNESSES?

20             MR. SMOCK:  BASED ON THE COURT'S RULING WE HAVE NO

21   BASIS TO CALL AGENT SU.

22             THE COURT:  ALL RIGHT.  SO I WILL READ THE

23   STIPULATION.  I WILL ASK IF THE DEFENSE HAS ANY WITNESSES TO

24   PRESENT.  YOU WILL LET ME KNOW THAT YOU REST, AND WE WILL

25   PROCEED TO CLOSING ARGUMENTS.
```

1          **MR. KEARNEY:** THANK YOU.

2          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

3          **THE CLERK:** YOU MAY BE SEATED.

4          **THE COURT:** ALL RIGHT.  GOOD MORNING, LADIES AND

5    GENTLEMEN.  WELCOME BACK.  I HOPE EVERYONE HAD AN EITHER

6    RESTFUL OR PRODUCTIVE HOLIDAY WEEKEND, DEPENDING ON WHAT YOU

7    WANTED.

8          SO AT THIS TIME WE WILL PROCEED WITH THE CASE.  AND THE

9    FIRST ORDER OF BUSINESS THIS MORNING IS THAT I HAVE ANOTHER

10   STIPULATION TO READ TO YOU.  AND YOU WILL RECALL THAT THE

11   FACTS TO WHICH THE PARTIES STIPULATE ARE ESTABLISHED AND YOU

12   ARE TO TREAT THEM AS HAVING BEEN PROVEN.

13         SO I WILL READ THIS TO YOU.  THE PARTIES JOINTLY AGREE AND

14   STIPULATE TO THE BELOW FACTS BEING ENTERED INTO EVIDENCE AT

15   TRIAL:  THE PARTIES STIPULATE THAT THE GOVERNMENT CONTRACTED

16   WITH WITNESS DAN MARTEL TO PERFORM WORK IN PREPARATION FOR HIS

17   TRIAL TESTIMONY IN THIS CASE.  MR. MARTEL BILLED THE

18   GOVERNMENT A TOTAL OF $11,743.12 FOR WORK AND EXPENSES RELATED

19   TO HIS TRIAL TESTIMONY.

20         MR. MARTEL BILLED FOR 81.25 HOURS OF WORK BEFORE HIS

21   IN-COURT TESTIMONY AT A RATE OF $130 PER HOUR.  INCLUDED

22   WITHIN THOSE 81.25 HOURS WAS THREE HOURS ON FEBRUARY 13TH,

23   2018 SPENT REVIEWING PROVISIONS OF THE CODE OF FEDERAL

24   REGULATIONS AND TERMINOLOGY RELATED TO THOSE REGULATIONS.  AND

25   2.5 HOURS ON FEBRUARY 13TH, 2018 MEETING WITH ATTORNEYS FROM

1   THE GOVERNMENT TO REVIEW TRIAL DOCUMENTS AND CODE OF FEDERAL

2   REGULATIONS SECTION 328.3(A).  MR. MARTEL ALSO BILLED THE

3   GOVERNMENT FOR HIS TIME TESTIFYING ON THE STAND, WHICH IS

4   INCLUDED IN THE TOTAL AMOUNT ABOVE.

5       THE GOVERNMENT EXPECTS TO PAY MR. MARTEL $11,743.12.

6       SO WITH THAT, YOU RECALL THAT WHEN WE LEFT ON FRIDAY, THE

7   GOVERNMENT HAD RESTED ITS CASE, AND THE DEFENSE AT THIS TIME

8   HAS THE OPPORTUNITY TO PRESENT A CASE IF IT SO CHOOSES.  SO

9   WITH THAT, I WILL ASK MS. HANSEN OR MR. SMOCK, DOES THE

10  DEFENSE WISH TO PRESENT A CASE?

11          **MS. HANSEN:**  YOUR HONOR, THE DEFENSE RESTS.

12          **THE COURT:**  ALL RIGHT.  SO THE DEFENSE HAS RESTED,

13  LADIES AND GENTLEMEN, AND SO THE NEXT STAGE IN THE TRIAL IS

14  THAT WE WILL PROCEED TO CLOSING ARGUMENTS.

15      AS I MENTIONED TO YOU AT THE BEGINNING OF THE CASE, THE

16  CLOSING ARGUMENTS, LIKE OTHER STATEMENTS OF THE ATTORNEYS, ARE

17  NOT THEMSELVES EVIDENCE.  RATHER THIS IS AN OPPORTUNITY FOR

18  THE ATTORNEYS TO EXPLAIN TO YOU THEIR VIEW OF WHAT THE

19  EVIDENCE HAS SHOWN.

20      AND SO WE WILL PROCEED WITH THE GOVERNMENT PRESENTING ITS

21  CLOSING ARGUMENT, THEN THE DEFENSE, AND THEN THE GOVERNMENT

22  HAS AN OPPORTUNITY FOR A REBUTTAL.  ONCE WE ARE FINISHED WITH

23  CLOSING ARGUMENTS, I WILL GIVE YOU YOUR INSTRUCTIONS, AND AT

24  THAT TIME THE CASE WILL BE READY TO SUBMIT TO YOU FOR YOUR

25  DELIBERATIONS.

1    SO WITH THAT, MR. KEARNEY OR MS. LEE, IS THE UNITED STATES

2    PREPARED TO PRESENT ITS CLOSING ARGUMENT?

3         **MS. LEE:** WE ARE.

4                    **CLOSING ARGUMENT**

5         **MS. LEE:** LADIES AND GENTLEMEN OF THE JURY, YOU HAVE

6    BEEN LISTENING TO TESTIMONY PATIENTLY FOR THE LAST TWO WEEKS.

7    AND YOU'VE PROBABLY LEARNED MORE ABOUT WETLANDS AND "WATERS OF

8    THE UNITED STATES" MORE THAN YOU EVER THOUGHT YOU WOULD NEED

9    TO KNOW.

10    AND YOU HAVE LISTENED TO TESTIMONY THAT HAVE INCLUDED

11    EXPERTS IN THE FIELDS OF ECOLOGY, BIOLOGY, HYDROLOGY,

12    GEOCHEMISTRY, EVEN ORNITHOLOGY, THE STUDY OF BIRDS.  AND THE

13    REASON THE GOVERNMENT PROVIDED YOU ALL OF THIS DETAIL THROUGH

14    ALL OF THESE WITNESSES THAT BUILD THIS CASE ONE BUILDING BLOCK

15    AT A TIME IS BECAUSE WE ARE HERE TO DETERMINE WHETHER JAMES

16    LUCERO, THE DEFENDANT, VIOLATED THE CLEAN WATER ACT.

17    THE CLEAN WATER ACT HAS FOUR ELEMENTS:

18    1.  THAT ON OR ABOUT A CERTAIN DATE, IN THIS CASE IT WAS

19    THE SUMMER OF 2014, JULY TO SEPTEMBER 8TH OF 2014, THE

20    DEFENDANT KNOWINGLY DISCHARGED A POLLUTANT, IN THIS CASE FILL

21    MATERIAL.

22         **THE CLERK:** IT IS SHOWING ON ALL THE OTHER SCREENS.

23    I MADE THE JUDGE AWARE.  HE DIDN'T WANT TO STOP TO FIX THAT

24    PARTICULAR SCREEN.  ALL THE OTHER SCREENS ARE SHOWING IT

25    INCLUDING -- IT IS NOT --

1       **THE COURT:**  IT IS YOUR CHOICE.  WE CAN PROCEED WITH

2    THE JURORS' INDIVIDUAL SCREENS OR WE CAN TRY TO FIX THIS

3    SCREEN.  IT'S UP TO YOU.

4       **MS. LEE:**  I THINK WE CAN PROCEED.

5    SO THE CLEAN WATER ACT HAS FOUR ELEMENTS:

6    1.  THAT ON OR ABOUT THE SUMMER OF 2014, THE DEFENDANT

7    KNOWINGLY DISCHARGED A POLLUTANT, IN THIS CASE FILL MATERIAL.

8    2.  THAT THE DISCHARGE WAS FROM A POINT SOURCE.

9    3.  THAT THE DISCHARGE WAS INTO A "WATER OF THE UNITED

10   STATES".

11   AND, 4.  THE DEFENDANT DID NOT HAVE A PERMIT FROM THE ARMY

12   CORPS OF ENGINEERS TO DISCHARGE A POLLUTANT INTO A "WATER OF

13   THE UNITED STATES".

14   THOSE ARE THE ELEMENTS OF THE CLEAN WATER ACT.

15   THE DEFENSE DOES NOT DISPUTE ELEMENT 1, A KNOWING

16   DISCHARGE OF A POLLUTANT.

17   DOES NOT DISPUTE ELEMENT 2, THAT THE DISCHARGE WAS FROM A

18   POINT SOURCE, IN THIS CASE DUMP TRUCKS AND A BULLDOZER.

19   IT DOESN'T DISPUTE NO. 4, THAT, IN FACT, THE DEFENDANT

20   DIDN'T HAVE PERMISSION FROM THE ARMY CORPS OF ENGINEERS.  IN

21   FACT, THE ARMY CORPS OF ENGINEERS HAS NEVER ISSUED A PERMIT TO

22   ANYONE, NOT EVEN THE LANDOWNERS THEMSELVES, TO BE ABLE TO

23   DISCHARGE A POLLUTANT ON NEWARK AREA 4.

24   THE ONLY ELEMENT THAT THEY ARE ARGUING IS WHETHER OR NOT

25   THE DISCHARGE WAS INTO A "WATER OF THE UNITED STATES".  SO

1    JUST AT THE GET-GO, I WANT TO VERY BRIEFLY GO OVER WHAT

2    "WATERS OF THE UNITED STATES" ARE, KNOWING THAT I'M GOING TO

3    COME BACK TO THIS IN MORE DETAIL LATER.

4        "WATERS OF THE UNITED STATES" INCLUDE, BUT ARE NOT LIMITED

5    TO, WETLANDS AND TRIBUTARIES THAT HAVE A SIGNIFICANT NEXUS TO

6    A TRADITIONAL NAVIGABLE WATER, IN THIS CASE MOWRY SLOUGH.  YOU

7    WILL HEAR THAT THERE IS NO DISPUTE THAT MOWRY SLOUGH IS A

8    TRADITIONAL NAVIGABLE WATER.  THE JUDGE WILL TELL YOU SO.

9        TRIBUTARIES AND WETLANDS THAT ARE ADJACENT TO A

10   TRADITIONAL NAVIGABLE WATER, THEY HAVE A SIGNIFICANT NEXUS IF

11   THEY EITHER ALONE OR IN COMBINATION WITH SIMILARLY SITUATED

12   WATER BODIES SIGNIFICANTLY AFFECT THE CHEMICAL, PHYSICAL, OR

13   BIOLOGICAL INTEGRITY OF THAT TRADITIONAL NAVIGABLE WATER.

14       SO IN THIS CASE, WHETHER THE WETLANDS AND TRIBUTARY IN

15   NEWARK AREA 4 TAKEN TOGETHER OR ALONE, AND YOU CAN BRING INTO

16   CONSIDERATION SIMILARLY SITUATED WETLANDS AND WATER BODIES IN

17   THE REGION, IN THE BAY, WHETHER THEY SIGNIFICANTLY AFFECT THE

18   CHEMICAL, PHYSICAL, OR BIOLOGICAL INTEGRITY OF A TRADITIONAL

19   NAVIGABLE WATER, WHETHER THAT IS MOWRY SLOUGH OR THE BAY

20   ITSELF.

21       YOU WILL BE INSTRUCTED BY THE JUDGE THAT YOU CAN INFER

22   THAT A SIGNIFICANT NEXUS EXISTS IF YOU FIND THAT THE WETLANDS

23   IN NEWARK AREA 4 ARE ADJACENT TO MOWRY SLOUGH, THE TRADITIONAL

24   NAVIGABLE WATER.  AND WHAT IS ADJACENCY?  IT MEANS THAT THEY

25   ARE IN CLOSE PROXIMITY TO THE SLOUGH, TO MOWRY SLOUGH.

CLOSING ARGUMENT – LEE

1     SO WE ARE GOING TO BREAK THAT DOWN IN MORE DETAIL BUT I

2  WANTED TO WALK YOU THROUGH JUST AT THE GET-GO WHAT A "WATER OF

3  THE UNITED STATES" IS.

4     NOW I WANT TO TAKE YOU THROUGH WHAT THE DEFENDANT DID AND

5  WHY WE ARE ALL HERE.  LADIES AND GENTLEMEN OF THE JURY, WE ARE

6  HERE BECAUSE OF THE CONDUCT THIS DEFENDANT ENGAGED IN IN JULY

7  AUGUST, AND SEPTEMBER OF 2014.

8     HE ORCHESTRATED A LARGE-SCALE DUMPING OPERATION IN WHICH

9  HE DUMPED TENS OF THOUSANDS OF CUBIC YARDS OF DIRT AND

10  CONSTRUCTION DEBRIS.  THOSE ARE FILL MATERIAL AND POLLUTANTS

11  UNDER THE CLEAN WATER ACT.  AND HE DUMPED IT ON LAND THAT HE

12  DIDN'T OWN, AND HE DUMPED IT ON LAND THAT HAD BEEN PREVIOUSLY

13  DETERMINED BY THE ARMY CORPS OF ENGINEERS TO CONTAIN "WATERS

14  OF THE UNITED STATES".

15     THERE WAS A JURISDICTIONAL DETERMINATION BY THE AGENCY

16  TASKED WITH ADMINISTERING THE CLEAN WATER ACT THAT ON THAT

17  LAND IN NEWARK AREA 4 THERE WERE JURISDICTIONAL WETLANDS AND

18  "OTHER WATERS" OF THE UNITED STATES.

19     HE DUMPED ON PRETTY MUCH THE LAST PIECE OF LAND IN NEWARK,

20  CALIFORNIA BEFORE YOU REACH THE SAN FRANCISCO BAY.  HE

21  BROKERED WITH 12 DIFFERENT TRUCKING COMPANIES TO DUMP, EVEN ON

22  THE MOST CONSERVATIVE OF ESTIMATES, APPROXIMATELY 18,000 CUBIC

23  YARDS OF DIRT AND CONSTRUCTION DEBRIS ON THE SITE.  THIS

24  AMOUNTS TO 18,000 TONS OF FILL MATERIAL ON THIS PROPERTY

25  BROUGHT IN ON 1800 INDUSTRIAL SIZED TRUCKLOADS THAT LOOK LIKE

1    THIS, THE TRUCKS ON YOUR SCREEN, 1800 OF THOSE (INDICATING).

2                    (DISPLAYED ON SCREEN.)

3        AND YOU LEARNED THAT HE DIDN'T DO THIS ACCIDENTALLY.  HE

4    LOOKED UP WHO OWNED THE PROPERTY AND HE DISCOVERED IT WAS THE

5    SOBRATO ORGANIZATION.  HE FORGED A PERMISSION NOTE FROM A

6    MICHAEL SOBRATO SHOWING PROSPECTIVE TRUCKING COMPANY EMPLOYEES

7    LIKE SABRINA HAMIDI, WHO TESTIFIED, SHOWING THEM THAT HE HAD

8    PURPORTED PERMISSION TO DUMP ON THIS SITE.

9        HE HAD A BACK STORY READY WHEN IT CAME TO PITCHING THIS

10   DUMP SITE TO TRUCKING COMPANIES.  WHAT DID HE TELL SABRINA

11   HAMIDI WHEN HE MET HER AT SCOTT'S SEAFOOD RESTAURANT IN

12   OAKLAND IN THE SUMMER OF 2014?  HE SAID HE KNEW THE OWNERS,

13   THEY WERE BOTH ITALIANS, AND, IN FACT, THEY WERE RELATED.

14       HE PURPORTED TO ALSO KNOW QUITE A BIT ABOUT THE PROPERTY,

15   TELLING SABRINA WHERE THE TRUCKS SHOULD GO, WHERE THEY SHOULD

16   ENTER THE PROPERTY, WHERE THEY SHOULD DUMP, AND WHERE THE WET

17   AREAS WERE TO AVOID.

18       SO I WANT TO TAKE YOU TO LOOK AT A MAP OF WHERE THE

19   DUMPING OCCURRED.  THIS IS NEWARK AREA 4.  YOU GUYS KNOW THIS

20   MAP WELL.

21                   (DISPLAYED ON SCREEN.)

22       IN JUNE OF 2014, THE DUMPING STARTED HERE (INDICATING).

23   IT WAS IN THE NORTHERN AREA OF THE WETLAND -- OF THE PROPERTY.

24   TRUCKS CAME IN OFF OF MOWRY AVENUE AND TURNED RIGHT IN THERE

25   INTO THE YELLOW AREA.

1    IN JULY IT MOVED THERE (INDICATING).  THE TRUCKS ENTERED

2   AGAIN OFF OF MOWRY AVENUE.  THEY MADE A LEFT ONTO THE CONCRETE

3   PAD.  THEY CIRCLED INTO THAT PINCH POINT BLUE AREA RIGHT OFF

4   OF THE CONCRETE PAD IN THE NORTHERN FILL AREA AND THEY DUMPED

5   TRUCKLOADS OF DIRT AND CONSTRUCTION DEBRIS THERE.

6    YOU HEARD FROM HUMBERTO VALDEZ.  HE WAS THE MAN WHO WORKS

7   ON THAT WOOD CHIP LOT ON THE CONCRETE PAD.  WELL, HE STARTED

8   GETTING UPSET THAT TRUCKS WERE COMING AND GOING ACROSS HIS

9   BUSINESS.

10    AND SO WHAT DID JAMES LUCERO DO?  HE MOVED HIS DUMPING

11   OPERATION TO A THIRD PLACE ON THE PROPERTY.  HE MOVED IT THERE

12   (INDICATING), WHAT WE CALL THE SOUTHERN FILL SECTION, IN WHICH

13   TRUCKS NOW ENTERED, NOT OFF OF MOWRY AVENUE BUT FROM STEVENSON

14   ROAD.  THEY CROSSED THROUGH A GATE THAT LOCKED THE PROPERTY,

15   DROVE ON TO A FIELD, AND DUMPED THERE.

16    NOW, THE MAGNITUDE OF THIS OPERATION CANNOT BE OVERLOOKED.

17   KEVIN OLIVERO, WHO WAS WORKING FOR JAMES LUCERO, HE WAS THE

18   ONE THAT WAS ON THE SITE.  HE OWNS GOLDEN GATE EQUIPMENT

19   RENTAL.  HE BILLED THE TRUCKING COMPANIES.  THEN THE MOVE --

20   THEN THE MONEY FLOWED FROM HIM TO JAMES LUCERO'S COMPANY.

21    WHEN KEVIN OLIVERO TESTIFIED, HE TOLD YOU THAT HE

22   ESTIMATED THAT THERE WERE ABOUT 300 TRUCKLOADS DUMPED AT THAT

23   FIRST LOCATION, APPROXIMATELY 700 TRUCKLOADS DUMPED AT THE

24   SECOND LOCATION OFF OF THE CONCRETE PAD, AND MORE THAN

25   800 TRUCKLOADS DUMPED OFF OF STEVENSON ROAD IN THE SOUTHERN

1    FILL SECTION.

2        IF WE TAKE A MODEST ESTIMATE THAT EACH LOAD CARRIED 10

3    YARDS, AND EACH YARD IS 2,000 POUNDS.  WHAT THAT MEANS IS THAT

4    DURING THOSE MORE THAN TWO-MONTH PERIOD, 36 MILLION POUNDS AND

5    18,000 TONS OF DIRT AND CONSTRUCTION DEBRIS WERE DUMPED ON

6    PROPERTY THAT HAD BEEN PREVIOUSLY DETERMINED BY THE ARMY CORPS

7    OF ENGINEERS TO BE FEDERALLY PROTECTED WETLANDS AND "WATERS OF

8    THE UNITED STATES".

9        THE SIZE AND SCALE OF THIS OPERATION, FRANKLY, SHOULD NOT

10   BE SURPRISING GIVEN THE FACT THAT WHEN SABRINA HAMIDI MET WITH

11   JAMES LUCERO AT THAT RESTAURANT, HE TOLD HER HE WAS LOOKING

12   FOR HUNDREDS OF THOUSANDS OF CUBIC YARDS OF DIRT TO BE DUMPED

13   ON THIS PROPERTY.  THAT'S WHAT HE WAS LOOKING FOR.

14       NEEDLESS TO SAY, THE OPERATION WAS IN FULL SWING.  THE

15   SCALE AND SIZE OF THE OPERATION WAS GROWING IN SIZE BY THE

16   TIME THAT IT WAS DISCOVERED BY DAN MILLER, THEN CARIN HIGH,

17   AND THEN ULTIMATELY STOPPED BY NEWARK POLICE DEPARTMENT ON

18   SEPTEMBER 8TH, 2014.

19       YOU REMEMBER DAN MILLER, HE WAS ONE OF THE -- HE WAS THE

20   SECOND WITNESS WHO HAD TESTIFIED IN THIS CASE TWO WEEKS AGO.

21   HE TOLD YOU THAT HE HAD BEEN GOING TO THIS PROPERTY FOR YEARS.

22   HE LIKES GOING THERE TO ENJOY THE QUIET, THE OPEN SPACE.  HE

23   HAS A SPOT AT THIS PROPERTY THAT HE PARTICULARLY LIKES.  HE

24   TAKES PHOTOS OF THE WATER AND THE WILDLIFE THAT COME TO VISIT

25   THE SITE.

1       BUT WHEN HE WENT THERE IN SEPTEMBER OF 2014, WHAT HE SAW

2   WAS SOMETHING DIFFERENT.  HE SAID HE SAW DIRT AND DEBRIS THAT

3   HAD BEEN PLACED ON WHAT HE ONCE DEEMED TO BE A PICKLEWEED

4   FOREST IN THIS AREA.  AND WHEN HE SAW IT, HE WAS ANGRY.  HE

5   TOLD YOU THAT.  HE SAID, I WAS ANGRY, SO THAT'S WHY I TOOK

6   PHOTOS.

7                   (DISPLAYED ON SCREEN.)

8       AND THESE ARE SOME OF THE PHOTOS THAT HE TOOK.  IF YOU

9   LOOK AT THESE PICTURES, YOU SEE -- IN THE NORTHERN FILL

10  SECTION YOU SEE DIRT AND DEBRIS DUMPED THERE.  YOU SEE THAT

11  THERE IS VEGETATION IN THE BACKGROUND AND YOU SEE PICKLEWEED

12  IN THE FOREGROUND.  THE PICKLEWEED IN THE FOREGROUND LEADS TO

13  THAT CULVERT PIPE IN THE NORTHERN SECTION THAT THEN FLOWS

14  WATER OUT OF THAT INTO MOWRY SLOUGH.

15      NOW, WHY DO I MENTION PICKLEWEED?  IT IS BECAUSE YOU HEARD

16  TESTIMONY THAT PICKLEWEED IS CONSIDERED AN OBLIGATE SPECIES OF

17  A WETLAND PLANT.  MEANING WHEN YOU HAVE PICKLEWEED, IN MORE

18  THAN 99 PERCENT OF CASES THAT IS A WETLAND.

19      NOW, ONE THING I WANT YOU TO REALIZE WHEN YOU ARE LOOKING

20  AT THIS PROPERTY IS THAT THAT AREA RIGHT OFF THE CONCRETE PAD,

21  AS YOU HEAD INTO THE NORTHERN FILL AREA, THAT'S NOT WHAT THE

22  PROPERTY LOOKED LIKE BEFORE THE DUMPING.

23      YOU HEARD TESTIMONY THAT, ONE, THE PROPERTY WAS FILLED

24  WITH WETLAND VEGETATION AND PICKLEWEED.  TWO, YOU HEARD THAT

25  THAT PART OF THE PROPERTY ENTERING THE NORTHERN FILL AREA

 1    RIGHT OFF THE CONCRETE PAD, THAT THAT WAS A DEPRESSED AREA OF

 2    THE SITE.  IN FACT, KEVIN OLIVERO TOLD YOU THAT HE ESTIMATED

 3    THAT THEY FILLED THAT PART OF THE PROPERTY MAYBE 9 TO 10 FEET,

 4    SO THAT IT NOW BECAME FLUSH TO THE CONCRETE PAD.

 5        AND THE CHANGE THAT YOU SEE HERE IN THE PICTURE, WELL,

 6    THAT'S WHAT HAPPENS WHEN APPROXIMATELY 700 LOADS IS DUMPED IN

 7    THIS AREA OF THE PROPERTY.  AND THAT'S 7,000 TONS OF MATERIAL

 8    THAT'S DUMPED THERE AND THEN PUSHED BACKWARDS INTO THE

 9    NORTHERN FILL SECTION WITH A BULLDOZER.

10        AND HERE IS SOME MORE PHOTOS THAT DAN MILLER TOOK.

11                      (DISPLAYED ON SCREEN.)

12        HERE YOU SEE THE SAME, THE FILL MATERIAL.  YOU SEE TIRE

13    TRACKS ON THE FOREGROUND ON THE RIGHT OF THE PHOTO, AND YOU

14    SEE PICKLEWEED RIGHT THERE, RIGHT NEXT TO THE FILL MATERIAL.

15                      (DISPLAYED ON SCREEN.)

16        HERE IS A LARGER, MORE OVERVIEW PHOTO OF THE FILL AND THE

17    DUMPING THAT TOOK PLACE IN THAT NORTHERN FILL SECTION OF THE

18    PROPERTY.

19                      (DISPLAYED ON SCREEN.)

20        THIS IS THE SOUTHERN FILL AREA OFF OF STEVENSON BOULEVARD.

21    HERE YOU SEE THE DIRT, THE DISCOLORATION, THE ROCKS, THE

22    CONCRETE, SOME PIECES OF WOOD.  YOU SEE VEGETATION IN THE

23    BACKGROUND.  THIS IS IN THE SOUTHERN FILL AREA, AND THIS PHOTO

24    WAS TAKEN BY INVESTIGATOR CRISTINA HARBISON ABOUT A MONTH

25    AFTER THE OPERATION WAS SHUT DOWN BY NEWARK POLICE DEPARTMENT.

1    HERE ARE PHOTOS THAT CARIN HIGH TOOK WHEN SHE WENT IN

2    SEPTEMBER OF 2014, AGAIN, SHOWING VEGETATION, SHOWING

3    PICKLEWEED BUT ALSO SHOWING JUST THE MOUNDS OF DIRT THAT HAD

4    BEEN DUMPED ON THIS PROPERTY.

5                    (DISPLAYED ON SCREEN.)

6    WHAT DAN MILLER SAW THAT DAY MADE HIM ANGRY, AND IT SHOULD

7    MAKE YOU ANGRY, TOO.  THIS DEFENDANT COMMITTED A HEINOUS

8    ENVIRONMENTAL CRIME FOR THE PURPOSE OF GREED, TO MAKE MONEY;

9    TO MAKE MONEY FOR EVERY TRUCKLOAD OF DIRT THAT DUMPED ON

10   PROPERTY THAT HE DIDN'T OWN, THAT DUMPED ON PROPERTY THAT

11   CONTAINED "WATERS OF THE UNITED STATES".

12   SO I WANT TO TALK TO YOU A LITTLE BIT ABOUT THE PROPERTY,

13   NEWARK AREA 4.  IT'S NOT AN OVERSTATEMENT TO SAY THAT THIS

14   DEFENDANT CHOSE ONE OF THE MOST HIGHLY ANALYZED, DISSECTED,

15   AND PUBLICLY STUDIED PROPERTIES IN THIS REGION.  AND THAT

16   MAKES YOUR JOB AS JURORS A LOT EASIER.

17                    (DISPLAYED ON SCREEN.)

18   BECAUSE YOU HAVE THE LUXURY OF LEARNING ABOUT A SITE THAT

19   HAS BEEN SO THOROUGHLY ANALYZED AND STUDIED BEFORE THE

20   DEFENDANT COMMITTED THE CRIME.

21   IMAGINE IF THE DEFENDANT HAD PICKED A RANDOM PRIVATE

22   PROPERTY THAT DIDN'T HAVE 200 SAMPLING POINTS, 79 AUGER PITS

23   DUG INTO IT BY H.T. HARVEY.  IMAGINE IF IT WAS A PROPERTY THAT

24   DIDN'T HAVE A DOZEN MORE SAMPLING POINTS DUG INTO IT BY THE

25   ARMY CORPS OF ENGINEERS.  IMAGINE IF IT WASN'T A PROPERTY THAT

CLOSING ARGUMENT – LEE

1    HAD ALREADY BEEN DETERMINED BY THE AGENCY THAT MAKES "WATERS

2    OF THE UNITED STATES" DETERMINATIONS THAT THEY FOUND SUCH

3    WATERS ON THIS SITE.  YOU WOULD BE ASKED TO MAKE A MUCH LESS

4    INFORMED DECISION THAN YOU ARE TODAY.

5        AND I WANT YOU TO THINK ABOUT THE LUXURY FOR A MINUTE.

6    YOU HEARD TESTIMONY THAT THERE WERE BIOTIC CONSTRAINTS REPORTS

7    MADE AT THIS PROPERTY AS EARLY AS 2002 STUDYING THE BIOTIC

8    HABITATS THAT ARE PRESENT ON THIS LAND.

9        H.T. HARVEY, THE LANDOWNERS' OWN PRIVATELY RETAINED

10   ECOLOGICAL CONSULTING FIRM, STUDIED THIS PROPERTY FOR TWO

11   YEARS.  THEY STUDIED IT FROM '05 TO '06 AND THEY STUDIED IT

12   AGAIN IN '06 TO '07 JUST TO SEE WHAT THE PROPERTY WOULD BE

13   LIKE WHEN IT WAS HALF AS MUCH RAINFALL.

14       YOU KNOW WHAT THEY FOUND?  THEY FOUND THAT THE WETLAND

15   BOUNDARIES DIDN'T CHANGE MUCH, AND IT DIDN'T SURPRISE THEM

16   BECAUSE WATER SOURCES THIS PROPERTY FROM MANY MORE SOURCES

17   THAN RAIN.

18       WHAT ELSE DO YOU HAVE?  YOU HAVE A JURISDICTIONAL

19   DETERMINATION, A LETTER AND A MAP THAT WAS CREATED BY THE

20   CORPS.  YOU HAVE AN ENVIRONMENTAL IMPACT REPORT, WHICH IS A

21   STUDY DONE ON THIS PROPERTY ON WHAT ENVIRONMENTAL IMPACTS

22   WOULD TAKE PLACE IF DEVELOPMENT WAS DONE ON THIS PROPERTY.

23       YOU HAVE A VISIT BY DR. KATERINA GALACATOS, WHO WORKS AT

24   THE ARMY CORPS OF ENGINEERS, WHO WENT TO THE SITE ONE YEAR

25   BEFORE THE DEFENDANT DUMPED, AND SHE TOLD YOU THE SITE LOOKED

1    THE SAME AND HER INTENTION WAS TO RE-VERIFY THAT

2    JURISDICTIONAL DETERMINATION.

3        YOU HAVE THE LUXURY OF HEARING FROM EXPERTS WHO HAVE

4    STUDIED THE SITE FOR YEARS AND WHO TELLS YOU WHAT IT LOOKED

5    LIKE BEFORE THE DUMPING AND WHAT IT LOOKED LIKE AFTER THE

6    DUMPING.

7        YOU HAVE THE LUXURY TO EVALUATE THIS PROPERTY IN THE

8    CONTEXT OF LAND THAT WAS LOOKING TO BE DEVELOPED BY LANDOWNERS

9    WHO WANTED TO DO THINGS THE RIGHT WAY.  LANDOWNERS THAT WERE

10   CONSCIENTIOUS ENOUGH TO HIRE H.T. HARVEY, TO GO THROUGH ALMOST

11   TEN YEARS OF WORK AND STUDY ON THE PROPERTY SO THAT THEY COULD

12   GET IT RIGHT AT EVERY LEVEL, SO THAT THEY COULD GET THE PROPER

13   PERMITTING FROM THE FEDERAL, STATE, AND LOCAL ENTITIES, SO

14   THAT THEY COULD BUILD WITH ENVIRONMENTAL IMPACTS AND

15   MITIGATION PLANS IN MIND.

16       SO WITH ALL THIS WORK THAT HAS BEEN DONE ON THE SITE, ONE

17   THING THAT NEEDS TO BE HIGHLIGHTED FOR YOU IS THAT THERE IS

18   UNEQUIVOCAL UNANIMITY IN OPINIONS THAT THIS PROPERTY CONTAINED

19   "WATERS OF THE UNITED STATES".

20                   (DISPLAYED ON SCREEN.)

21       IN THE MAP THAT YOU ARE GOING TO BE LOOKING AT, THE AREAS

22   IN GREEN AND BLUE, THOSE CONTAINS "WATERS OF THE UNITED

23   STATES" IN THE OPINION OF ALL THE EXPERTS WHO TESTIFIED BEFORE

24   YOU.

25       THE LANDOWNERS THEMSELVES DO NOT CONTEST THAT THERE ARE

1    "WATERS OF THE UNITED STATES" ON THEIR PROPERTY.  PROPERTY

2    THAT THEY STUDIED FOR YEARS AND PROPERTY THAT FOR EVERY SQUARE

3    FOOT OF JURISDICTIONAL WATERS FOUND ON THEM, IT MAKES IT THAT

4    MUCH HARDER TO DEVELOP AND THAT MUCH MORE EXPENSIVE TO

5    DEVELOP.

6        FRANKLY, IT IS AGAINST THEIR OWN SELF-INTEREST TO TELL YOU

7    THAT THEY BELIEVE THAT THE GREEN AND BLUE AREAS CONTAIN

8    "WATERS OF THE UNITED STATES".  IT MEANS THAT FOR THEM TO

9    BUILD THEY NEED TO GET A PERMIT FROM THE CORPS, A PERMIT THAT

10   THEY MAY OR MAY NOT GET.

11       IT MEANS THAT FOR THEM TO BUILD, THEY NEED TO FACTOR IN A

12   SETBACK FROM THE GREEN AND BLUE AREAS SUCH THAT EVEN PARTS OF

13   THE YELLOW UPLAND AREAS GET ENCROACHED INTO.  BECAUSE WHEN YOU

14   ARE BUILDING NEAR OR ON JURISDICTIONAL "WATERS OF THE UNITED

15   STATES", YOU NEED TO GIVE IT A SETBACK, JUST LIKE A HOUSE

16   SETBACK, IF YOU WILL.

17       SO AGAINST TRULY THEIR OWN SELF-INTEREST THE OWNERS HAVE

18   NOT ONLY NOT CONTESTED JURISDICTIONAL WATERS ON THEIR SITE,

19   THEY WERE THE ONES THAT PROPOSED IT TO THE ARMY CORPS OF

20   ENGINEERS.  THEY DID THE WORK OVER TWO YEARS.  THEY CREATED

21   THAT MAP.  THEY PROPOSED IT TO DAN MARTEL, THEY PROPOSED IT TO

22   THE ARMY CORPS OF ENGINEERS, AND THEY SAID, THIS IS WHERE WE

23   THINK ARE POTENTIAL "WATERS OF THE UNITED STATES".

24       DAN MARTEL THEN WENT OUT THERE IN THE SUMMER OF 2007, AND

25   HE DID HIS OWN ANALYSIS.  HE SAID, YOU KNOW WHAT, YOU'RE

1   RIGHT, THOSE ARE AREAS OF "WATERS OF THE UNITED STATES", BUT

2   YOU KNOW WHAT, THERE IS A FEW ADDITIONAL ACRES OF WETLANDS AS

3   WELL.

4       AND WHAT THEY DID WITH THAT CONFIRMATION WAS THEY ISSUED A

5   JURISDICTIONAL DETERMINATION LETTER, AND THAT IS THE LETTER

6   THAT YOU ARE LOOKING AT RIGHT NOW ON YOUR SCREEN.  THAT LETTER

7   ENCLOSED A MAP FROM THE ARMY CORPS OF ENGINEERS THAT SHOWED

8   THE EXTENT AND LOCATION OF JURISDICTIONAL WATERS ON THE

9   PROPERTY.

10      ULTIMATELY -- ULTIMATELY THE ARMY CORPS OF ENGINEERS

11  ISSUED THAT MAP, AND THEY FOUND THAT ON THIS NEWARK AREA 4

12  PROPERTY THERE WERE 249.17 ACRES OF JURISDICTIONAL WETLANDS.

13  THAT IS SIGNIFICANT.  THAT IS A LOT OF WETLANDS ON THIS

14  PROPERTY.  ADDITIONALLY THEY FOUND 34.14 ACRES OF "OTHER

15  WATERS" ON THIS PROPERTY, AND THEY IDENTIFIED THEM AS "WATERS

16  OF THE UNITED STATES".

17      SO THINK ABOUT THAT FOR JUST ONE SECOND.  THE LANDOWNERS,

18  H.T. HARVEY, THEIR PRIVATELY RETAINED ECOLOGICAL CONSULTANTS,

19  THE GOVERNMENTAL AGENCY TASKED WITH ADMINISTERING THE CLEAN

20  WATER ACT, THEY BELIEVE AFTER STUDYING THE PROPERTY

21  EXTENSIVELY THAT THERE ARE "WATERS OF THE UNITED STATES" ON

22  THE PROPERTY, AND THOSE INCLUDE WETLANDS, THOSE ALSO INCLUDE

23  "OTHER WATERS", AND THEY TOLD YOU THAT WAS THEIR OPINION IN NO

24  UNCERTAIN TERMS.

25      SO LET'S TALK ABOUT THE FEATURES OF THIS PROPERTY THAT HAS

1    BEEN SO THOROUGHLY STUDIED OVER THE YEARS, AND THE REASON I

2    WANT TO TALK ABOUT THESE FEATURES IS, AGAIN, EACH FEATURE IS A

3    BUILDING BLOCK THAT WILL ENABLE YOU ULTIMATELY -- ULTIMATELY

4    TO MAKE A DECISION, WERE THESE WETLANDS?  WERE THEY ADJACENT?

5    DO THEY HAVE A SIGNIFICANT NEXUS TO MOWRY SLOUGH, A

6    TRADITIONAL NAVIGABLE WATER?

7        SO EVERY ONE OF THESE BUILDING BLOCKS REALLY REFLECT

8    TESTIMONY THAT YOU HEARD FROM THE WITNESS STAND.  AND YOU

9    MIGHT HAVE BEEN THINKING, WHY ARE WE LISTENING TO WHAT THIS

10   PERSON IS SAYING ABOUT ONE PARTICULAR DETAIL?  IT'S BECAUSE

11   EACH OF THOSE THINGS FACTOR INTO YOUR ULTIMATE DETERMINATION.

12       SO THIS PROPERTY.

13                    (DISPLAYED ON SCREEN.)

14       IT IS SITUATED AT THE WESTERN END OF NEWARK, CALIFORNIA.

15   ANY MORE WEST YOU GO, YOU HIT MOWRY SLOUGH, A TRADITIONAL

16   NAVIGABLE WATER, YOU HIT SALT PONDS, AND YOU HIT THE SAN

17   FRANCISCO BAY ITSELF.

18       THIS IS A SITE THAT YOU HEARD LIES WITHIN THE ORIGINAL SAN

19   FRANCISCO BAY MARGIN LINE, AND WHAT THAT MEANS IS THAT BEFORE

20   THAT DIRT LEVEE WAS BUILT SEPARATING THE SLOUGH FROM THE LAND,

21   THAT DURING HIGH TIDES THE SAN FRANCISCO BAY WOULD WASH

22   UPWARDS ON MOST OF THIS PROPERTY.  AND THAT'S WHY THERE ARE

23   HYDRIC SOILS ON THIS PROPERTY THROUGHOUT.  WHAT THAT TELLS YOU

24   IS THAT THIS PROPERTY IS INCREDIBLY CLOSE IN PROXIMITY TO

25   MOWRY SLOUGH AND THE SAN FRANCISCO BAY.

1    YOU ALSO KNOW THAT THIS PROPERTY IS A LOW LYING SITE.

2   THAT AT ITS HIGH END, AND I'M TALKING ABOUT UP ON THE NORTHERN

3   FILL SECTION CLOSER TO MOWRY AVENUE, AT THE HIGH POINT IT IS

4   13 FEET ABOVE THE MEAN SEA LEVEL.  AND THEN THERE IS A

5   DOWNWARD SLOPE, AND AT THE LOW POINT OF THE PROPERTY THERE ARE

6   PARTS THAT ARE BELOW THE MEAN SEA LEVEL.

7    AND SO WHAT THAT TELLS YOU IS THAT WATER RUNS IN A

8   SOUTHWESTERLY DIRECTION.  IT RUNS TOWARD THE DIRECTION OF THE

9   SLOUGH.  IT DRAINS TO THE LOW POINTS AND THEN THE WATER GETS

10  KICKED OUT OF THE PROPERTY THROUGH THE CULVERT PIPE WITH THE

11  DUCKBILL THROUGH THE HYDROLOGICAL PUMP AT THE SOUTHERN SECTION

12  OF THE SITE.

13   AND KEEP THAT IN MIND BECAUSE IT IS NOT JUST THAT THESE

14  LANDS ARE SO CLOSE TO A TRADITIONAL NAVIGABLE WATER.  THEY

15  HAVE DIRECT HYDROLOGICAL LINKS THAT PUMP WATER RIGHT INTO A

16  TRADITIONAL NAVIGABLE WATER.  THAT IS IMPORTANT.

17   WHAT ELSE DO WE KNOW ABOUT THIS LAND?  THE LAND IS NEAR

18  THE DON EDWARDS NATIONAL WILDLIFE REFUGE, OR AS CARIN HIGH PUT

19  IT, SHE WAS THE FIRST WITNESS THAT TESTIFIED, SHE SAYS IT'S

20  THE FIRST NATIONAL WILDLIFE REFUGE IN AN URBAN SETTING.

21   CARIN HIGH TESTIFIED THAT WITH 80 TO 90 PERCENT OF THE

22  BAY'S WETLANDS GONE, THAT THAT MAKES NEWARK AREA 4 THAT MUCH

23  MORE SPECIAL, BECAUSE IT PROVIDES MUCH NEEDED HABITATS AND IT

24  PROVIDES BIODIVERSITY TO THE BAY THAT SURROUNDS IT AND TO THE

25  REFUGE.  IF YOU LOOK ON THE MAP, THE REFUGE ARE THE PARTS THAT

1    ARE MARKED IN GREEN.  THE PART IN YELLOW IS THE SITE NEWARK

2    AREA 4.  AND THAT LINE IN RED, THAT IS MOWRY SLOUGH.

3        WHAT ELSE HAVE YOU LEARNED ABOUT THE PROPERTY?  YOU'VE

4    LEARNED THAT THE PROPERTY HAS HISTORICALLY HAD A DIFFICULT

5    TIME KEEPING WATER OFF OF IT.  MIKE SIRI, ONE OF THE

6    CO-OWNERS, CAME AND TESTIFIED, AND HE HAS TOLD YOU THAT HE HAS

7    BEEN ON THE SITE HUNDREDS OF TIMES SINCE HE WAS A BOY IN THE

8    LATE 1950'S.

9        HE SPOKE ABOUT THE CONTINUOUS STRUGGLE HE'S HAD GETTING

10   WATER OFF THE PROPERTY, AND HE'S TOLD YOU THAT OVER THE COURSE

11   OF TIME THAT THE PROPERTY HAS ONLY BEEN GETTING WETTER AND

12   WETTER.  THAT THAT PONDED AREA, THAT DUCK POND AREA ON THE

13   SITE HAS BEEN GETTING BIGGER AND BIGGER.  THAT FLOW THAT GOES

14   FROM THAT DRAINAGE CHANNEL INTO THE BORROW DITCH, THAT FLOW HE

15   SAID HAS INCREASED TENFOLD IN THE LAST TEN YEARS.  THOSE ARE

16   HIS WORDS.

17       IN FACT, MIKE SIRI STATED THAT THE WHOLE REASON THERE IS

18   THAT CULVERT PIPE IN THE NORTH AND THE WHOLE REASON THERE IS

19   THAT PUMP IN THE SOUTH, THE PURPOSE IS TO GET WATER OFF THE

20   PROPERTY.  BECAUSE WITHOUT THEM THE PROPERTY WOULD BE WASHED

21   OVER AND INUNDATED WITH WATER.

22       YOU LEARNED THAT THE REASON FOR THIS CONTINUOUS STRUGGLE

23   WITH GETTING WATER OFF THE PROPERTY IS BECAUSE OF A COUPLE OF

24   THINGS.  SOME THINGS WE HAVE ALREADY TALKED ABOUT.  ITS

25   PROXIMITY TO MOWRY SLOUGH, A TRADITIONAL NAVIGABLE WATER THAT

1    IS SUBJECT TO THE EBB AND FLOW OF THE TIDES THAT CONNECTS

2    STRAIGHT TO THE MOUTH OF SAN FRANCISCO BAY.  IT IS A LOW LYING

3    SITE.  PORTIONS OF THE SITE ARE BELOW THE MEAN SEA LEVEL.

4         IT IS A PROPERTY THAT RECEIVES WATER FROM MULTIPLE SOURCES

5    OF HYDROLOGY.  IT GETS IT FROM RAIN.  IT GETS IT FROM GROUND

6    WATER, AND GROUND WATER IS PERENNIAL YOU HEARD.  AND IT

7    LITERALLY COMES FROM UNDERGROUND AQUIFERS THAT LITERALLY LIES

8    BENEATH THE SITE.  YOU HEARD TESTIMONY THAT UNDERNEATH THIS

9    SITE THERE IS THIS CONSTANT PUSH AND PULL OF WATER.

10   THERE IS WATER COMING IN FROM THE BAY THAT IS SALT WATER.

11   AND THERE IS WATER COMING IN FROM THE HILLS THAT ARE FRESH

12   WATER.  AND TOGETHER THEY MEET AND THEY ARE CHARGED, AND THEY

13   HAVE THIS ENERGY.

14        AND AT TIMES THIS WATER WILL THEN MOVE UPWARDS, UP TO THE

15   GROUND, AND THERE ARE INSTANCES WHERE IT WILL LITERALLY SPRING

16   OUT OF THE GROUND, AND IT IS LIKE AN ARTESIAN SPRING OR AN

17   ARTESIAN WELL.  THAT IS THE TESTIMONY THAT YOU HEARD.  AND

18   THIS GROUND WATER LARGELY FEEDS THAT DUCK POND RIGHT IN THE

19   MIDDLE OF THIS PROPERTY.

20        YOU ALSO HEARD THAT THE SITE GETS WATER FROM PERENNIAL

21   LATERAL SEEPS.  I WANT TO SHOW YOU A PHOTO OF ONE OF THESE

22   SEEPS.

23                      (DISPLAYED ON SCREEN.)

24        THAT IS A SEEP RIGHT NEAR THE SOUTHERN FILL AREA, THAT IS

25   RIGHT NEARBY THE SOUTHERN FILL AREA OFF OF STEVENSON

1    BOULEVARD.  YOU HEARD WHAT DR. BOURSIER STATED.  HE SAID A

2    SEEP, IMAGINE IT'S LIKE A SPRINKLER HEAD ON YOUR LAWN THAT IS

3    BROKEN AND THAT IS JUST CONTINUALLY LEAKING.  IT JUST FLOODS

4    THAT LAWN WITH WATER NO MATTER WHAT TIME OF THE YEAR.

5        HE TALKED ABOUT HOW HIM AND HIS TEAM -- HE IS NOT THE

6    FIRST ONE THAT HAS GONE ON TO THE SITE DURING AUGUST WHEN YOU

7    WOULD EXPECT IT TO BE DRY, AND HE GETS ONE OF HIS 4 X 4'S, ONE

8    OF THE FRONT TIRES BURIED IN ONE OF THESE SEEPS.

9        PERHAPS DR. BOURSIER'S ANECDOTAL ACCOUNT OF HIS EXPERIENCE

10   ON THE LAND WILL HELP YOU GET AN IDEA OF WHAT THE LAND IS LIKE

11   WHEN YOU WALK ON IT.  THIS IS WHAT HE SAID.

12       HE SAID:  AS YOU WALK FURTHER WEST ON THE PROPERTY, YOU

13   START TO REALIZE THAT YOU'RE ALMOST ON FLOATING GROUND.  AND

14   IF YOU GO A LITTLE FURTHER, YOU'RE GOING TO BE KNEE HIGH IN

15   MARSHY VEGETATION AND PERENNIAL VEGETATION LIKE PICKLEWEED.

16       THAT IS HOW DR. BOURSIER DESCRIBED HIS EXPERIENCE WALKING

17   ON THIS PROPERTY, AND HE HAS BEEN STUDYING AND GOING ON TO

18   THIS PROPERTY FOR TWO DECADES, SINCE THE LATE 1990'S.

19       SO WITH ALL THIS HYDROLOGY FEEDING THE SITE, YOU ALSO

20   HEARD TESTIMONY ABOUT HOW WATER GETS OFF THE SITE, HOW IT GOES

21   RIGHT INTO THE MOWRY SLOUGH, A DIRECT HYDROLOGICAL CONNECTION,

22   AN EFFECT ON THE SLOUGH, A PHYSICAL EFFECT.

23       SO WATER LEAVES THE NORTHERN FILL AREA THROUGH THE CULVERT

24   PIPE AND THE DUCKBILL.  AND HERE'S A VIDEO OF THAT.

25                    (VIDEO PLAYED.)

1       THIS IS A DUCKBILL ON THE OPPOSITE SIDE OF THE LEVEE

2   PUSHING WATER INTO THE SLOUGH.  WATER LEAVES THE SOUTHERN

3   AREA --

4                   (DISPLAYED ON SCREEN.)

5       -- AS DESCRIBED IN THIS MAP.  EVERY EXPERT WHO TESTIFIED

6   TOLD YOU THAT THIS COMPORTS WITH THEIR UNDERSTANDING OF HOW

7   WATER DRAINS FROM THE SOUTHERN PART OF THE SITE.  IT GOES DOWN

8   THAT DRAINAGE DITCH IN YELLOW, WHICH THIS MAP LABELS AS

9   TRIBUTARY A.  IT MEETS THE BORROW DITCH IN BLUE, WHICH THIS

10   MAP LABELS AS TRIBUTARY B.  IT GETS DOWN TO THAT SOUTHERN

11   POINT WHERE THE PUMP IS AND THE PUMP PUMPS THAT WATER OUT.

12       NOW, ONE THING I WANT TO MAKE CLEAR IS, A TRIBUTARY IS

13   JUST A FANCY WAY OF SAYING A WATER BODY THAT CONVEYS FLOW TO A

14   TRADITIONAL NAVIGABLE WATER.  THAT IS ALL IT MEANS.  WHETHER

15   YOU WANT TO CALL IT A DRAINAGE DITCH, A BORROW DITCH, A

16   SINUOUS CHANNEL, A CHANNEL OF WATER, IT DOESN'T MATTER.  THAT

17   IS VOCABULARY.  THE FUNCTION OF A TRIBUTARY IS SIMPLY ANY

18   WATER BODY THAT CONVEYS FLOW THAT ULTIMATELY GOES TO A

19   TRADITIONAL NAVIGABLE WATER.

20                   (DISPLAYED ON SCREEN.)

21       SO HERE IS A SHOT OF THIS TRIBUTARY A.  THIS IS A STILL

22   SHOT FROM THAT HELICOPTER VIDEO THAT YOU SAW THAT FBI'S

23   PHOTOGRAPHER DAVE DIEHL TOOK.

24       YOU MIGHT HEAR THE DEFENSE SAY, YOU KNOW WHAT, THIS

25   TRIBUTARY A DOESN'T EXIST BECAUSE IF IT EXISTED, YOU WOULD

1    HAVE SEEN THIS BLUE LINE ON THAT MAP.  YOU HEARD THAT IN

2    CROSS-EXAMINATION.

3        THE PROBLEM WITH THAT ARGUMENT IS THAT IT'S COMPLETELY

4    UNSUPPORTED BY THE EVIDENCE YOU HEARD AT TRIAL.  EVERY SINGLE

5    WITNESS WHO IS ASKED ABOUT TRIBUTARY A TOLD YOU, YOU KNOW

6    WHAT, IT EXISTS IN REAL LIFE.

7        MIKE SIRI TOLD YOU HE CAN'T REMEMBER A TIME HE DIDN'T SEE

8    WATER THERE.  DR. PAT BOURSIER SAID HE HAS SEEN IT THERE AT

9    LEAST SEASONALLY.  AND SEASONAL TRIBUTARIES CAN BE "WATERS OF

10   THE UNITED STATES".  AND HE SAYS, EVEN IF YOU SEE PICKLEWEED

11   ON TOP, THAT DOESN'T MEAN THERE ISN'T WATER UNDERNEATH FLOWING

12   TO TRIBUTARY B.

13       SO I WANT TO SHOW YOU ABOUT THE FLOW FROM TRIBUTARY A TO

14   TRIBUTARY B.  HERE IS A VIDEO OF THAT FLOW.

15                       (VIDEO PLAYED.)

16       DR. COATS TESTIFIED THAT HE MEASURED THE FLOW RATE FROM A

17   TO B OR FROM THAT DRAINAGE DITCH TO THE BORROW DITCH, HOWEVER

18   YOU WANT TO CALL IT, AND HE MEASURED THAT THE FLOW RATE WAS

19   APPROXIMATELY 600 GALLONS PER MINUTE.

20       AND THEN THIS GOES TO THAT BORROW DITCH, REFERENCED AS

21   TRIBUTARY B ON THAT MAP, AND IT GETS PUMPED OUT.  AND I WANT

22   TO SHOW YOU A VIDEO OF THE WATER GETTING PUMPED OUT FROM THAT

23   PUMP.

24                       (VIDEO PLAYED.)

25       MIKE SIRI DESIGNED THIS PUMP.  HE TOLD YOU HIS FIRST

1    VERSION OF THE PUMP HAD THE CAPACITY TO PUMP OUT WATER AT A

2    THOUSAND GALLONS A MINUTE, AND HE FOUND THAT THAT WASN'T

3    ENOUGH.  IT WASN'T ENOUGH TO GET THE WATER OFF OF THE

4    PROPERTY, SO HE REDESIGNED THE PUMP, AND THIS VERSION OF THE

5    PUMP PUMPS OUT WATER AT 3,000 GALLONS A MINUTE.  THIS IS A

6    DIRECT HYDROLOGICAL LINK OF THOUSANDS OF GALLONS OF WATER PER

7    MINUTE PUMPED ARE BEING PUMPED OUT OF THE LAND DIRECTLY INTO

8    THE SLOUGH.

9        YOU SEE THAT WHITE FOAMY PART OF THE VIDEO?  WELL,

10   DR. COATS TOLD YOU THAT THAT IS ORGANIC MATERIAL BEING

11   DISCHARGED OUT OF THE WETLANDS INTO THE SLOUGH.

12       AND HOW OFTEN IS THIS PUMP WORKING?  WELL, TIM STEELE, WHO

13   ALSO TESTIFIED, HE'S THE OWNERS -- LANDOWNERS' REPRESENTATIVE,

14   HE TOLD YOU THAT THAT PUMP OPERATES, IN HIS WORDS, PRACTICALLY

15   365 DAYS A YEAR.

16       WHAT DID DAN MARTEL TELL YOU ABOUT THE FLOW OF WATER OFF

17   OF THIS SITE, DAN MARTEL, FROM THE ARMY CORPS OF ENGINEERS,

18   THE MAN WHO MADE THAT JURISDICTIONAL DETERMINATION, THAT BLACK

19   AND WHITE MAP?  HE SAID, QUOTE:  THE ENTIRE SITE IS

20   HYDROLOGICALLY CONNECTED TO THE BAY.  THERE IS A CONTINUOUS

21   CHAIN OF WATER THAT CAN FLOW DOWN THE TOPOGRAPHIC GRADIENT, BE

22   COLLECTED IN THE COLLECTION DITCHES AROUND THE SITE, AND

23   ELIMINATED INTO THE TRADITIONAL NAVIGABLE WATER THROUGH THE

24   PUMP.  AND HE WAS TALKING ABOUT THE SOUTHERN SECTION.

25       WHAT ELSE DO WE KNOW ABOUT THE SITE?  WELL, ONE THING WE

1    KNOW, AND WE KNOW THIS BECAUSE ALL OF THE EXPERTS TESTIFIED TO

2    THIS, IS THAT WETLANDS HERE ARE IN WHAT IS CALLED THE ARID

3    WEST REGION OF THE COUNTRY.  THESE WETLANDS ARE IN CALIFORNIA;

4    NEWARK, CALIFORNIA.

5        IN THE ARID WEST REGION THESE WETLANDS COMMONLY DRY OUT IN

6    THE SUMMER AND THEY HYDRATE AGAIN IN THE WINTER.  THAT IS HOW

7    THEY WORK.  AND EVERY EXPERT TOLD YOU THAT WETLANDS CAN BE

8    SEASONAL AND THAT DOESN'T MEAN THAT THEY CEASE BEING A WETLAND

9    DURING THE DRY SEASON OR THAT THEIR STATUS AS A "WATER OF THE

10   UNITED STATES" SOMEHOW EVAPORATES WITH EVERY DROP OF RAIN THAT

11   COMES AND GOES.

12       CAN YOU IMAGINE HOW JURISDICTIONAL WETLANDS WOULD BE

13   IMPACTED IF SOMEONE LIKE THE DEFENDANT COULD DISCHARGE

14   POLLUTANTS ON TO A LAND DURING THE DRY SEASON ONLY FOR IT THEN

15   TO BE WASHED INTO THE NAVIGABLE WATERS IT IS ADJACENT TO

16   DURING THE RAINY SEASON AND SOMEHOW THAT IS OKAY UNDER THE

17   CLEAN WATER ACT?

18       THAT INTERPRETATION WOULD ESSENTIALLY ALLOW ENVIRONMENTAL

19   CRIMINALS TO BE ABSOLVED OF LIABILITY BY SIMPLY DUMPING IN THE

20   SUMMER MONTHS, HIGHTAILING IT OUT OF THERE BEFORE THE RAIN

21   COMES IN, I MEAN, LADIES AND GENTLEMEN OF THE JURY, THAT IS

22   NOT HOW WETLANDS WORK AND THAT IS NOT HOW CLEAN WATER ACT

23   JURISDICTION WORKS.

24       SO I WANT TO TALK ABOUT HOW WE KNOW THESE WERE WETLANDS IN

25   2014.  ALL THE EVIDENCE THAT YOU HEARD AT TRIAL PROVES THAT

CLOSING ARGUMENT - LEE

1  THE DEFENDANT DUMPED ON WETLANDS IN 2014.  WELL, YOU DON'T

2  HAVE TO TAKE MY WORD FOR THAT.  EVERY EXPERT WHO STUDIED THE

3  SITE --

4  (DISPLAYED ON SCREEN.)

5  -- WHO TESTIFIED BEFORE YOU TOLD YOU THAT THESE AREAS --

6  THAT THIS PROPERTY CONTAINED WETLANDS, AND, IN FACT, THE AREAS

7  WHERE THE DEFENDANT DUMPED FILL MATERIAL, THEY TOO CONTAINED

8  WETLANDS.

9  YOU WERE ABLE TO SEE MANY, MANY PHOTOS DURING THE COURSE

10  OF THIS TRIAL.  THE PHOTOS SHOW THAT THERE WAS ENOUGH

11  HYDROLOGY ON THIS SITE IN 2014 FOR VEGETATION TO GROW.  THAT'S

12  WHY YOU SEE THOSE GREEN AND BLUE AND DARKER AREAS ON THE

13  FRINGE OF THIS PHOTO.

14  YOU HEARD TESTIMONY THAT FILL MATERIAL WAS LITERALLY

15  PLACED ON TOP OF PICKLEWEED.  AND, AGAIN, REMEMBER, WHERE

16  THERE IS PICKLEWEED, THERE IS A GREATER THAN 99 PERCENT CHANCE

17  THAT THAT IS A WETLAND.

18  SO I WANT TO SHOW YOU SOME OF THOSE PHOTOS OF THE FILL

19  THAT WERE PLACED ON TOP OF PICKLEWEED.

20  (DISPLAYED ON SCREEN.)

21  SO HERE IS ONE IN WHICH THE FILL THAT YOU CAN SEE, THE

22  DIRT THAT WAS PLACED ON TOP, UNDERNEATH IT YOU CAN SEE THE

23  VEGETATION THAT STILL EXISTS IN THE NORTHERN FILL AREA.  AND

24  YOU HAVE MORE OF THOSE PHOTOS WITH YOU ALREADY ADMITTED INTO

25  EVIDENCE AS EXHIBITS THAT YOU WOULD HAVE THE OPPORTUNITY TO

1    TAKE A LOOK AT BACK IN THE JURY ROOM.

2        HOW ELSE DO YOU KNOW THAT THE LAND IN 2014 WAS A WETLAND?

3    EVEN IF YOU WERE TO PUT ALL THE OTHER EVIDENCE ASIDE,

4    DR. GALACATOS'S WORK, A COUPLE OF MONTHS AFTER THE OPERATION

5    WAS CEASED, IN NOVEMBER OF 2014 DEMONSTRATE ON ITS OWN THAT

6    THE DEFENDANT DUMPED ON WETLANDS.

7        YOU RECALL SHE WENT THERE IN NOVEMBER AND SHE DUG SAMPLING

8    PITS.  SHE DUG SAMPLING POINTS BOTH INSIDE THE FILL AND

9    DIRECTLY OUTSIDE THE FILL.  LOOK AT SAMPLING POINT 1 AND 2

10   VERSUS SAMPLING POINTS 3 AND 4, ON THE NORTHERN SECTION

11   SAMPLING POINTS 8 VERSUS 9.

12       WHAT SHE FOUND WAS THAT THE SAMPLING POINTS RIGHT OUTSIDE

13   THE FILL MATERIAL IN THE UNDISTURBED WETLAND VEGETATION THAT

14   WAS STILL THERE, BECAUSE IT HADN'T BEEN COVERED BY DIRT AND

15   CONSTRUCTION DEBRIS, THAT THAT WAS STILL WETLAND, THAT THERE

16   WAS WETLAND VEGETATION THERE, AND THAT IT WAS HER

17   DETERMINATION THAT THEY WERE JURISDICTIONAL WETLANDS.

18       THEN SHE DUG INTO THE FILL.  AND SHE SAW THAT IN THE

19   SAMPLING POINTS WHERE SHE DUG, THE DEFENDANT HAD FILLED

20   ANYWHERE BETWEEN 6 TO 10 INCHES OF FILL MATERIAL ON TOP OF THE

21   NATIVE SOIL.

22       IN ONE SAMPLING POINT YOU SAW THE FILL MATERIAL WAS PLACED

23   ON TOP OF VEGETATION WHICH THAT WAS ON TOP OF THE NATIVE

24   HYDRIC SOIL.  ESSENTIALLY FILL MATERIAL WAS PLACED ON TOP OF

25   WETLAND VEGETATION.  THAT TELLS YOU THAT HE DUMPED ON TOP OF A

1    WETLAND IN 2014.

2         SO LET'S TAKE A LOOK AT SOME OF THESE PHOTOS AND I CAN

3    EXPLAIN THEM TO YOU.

4                   (DISPLAYED ON SCREEN.)

5         THIS PHOTO SHOWS THE DISTINCTION BETWEEN A SAMPLING POINT

6    OUTSIDE THE FILL, THE ONE ON THE RIGHT, AND A SAMPLING POINT

7    INSIDE THE FILL.  YOU WILL SEE THE NATIVE SOIL ON THE RIGHT,

8    THE WETLAND VEGETATION ON TOP.  YOU'LL SEE ON THE LEFT IT'S

9    THE FILL MATERIAL ON TOP, VEGETATION IN BETWEEN, WETLAND

10   VEGETATION, AND THEN THE NATIVE SOIL UNDERNEATH THAT.

11                  (DISPLAYED ON SCREEN.)

12        HERE WAS A PHOTO THAT KATERINA HAD TAKEN –- DR. GALACATOS,

13   EXCUSE ME, HAD TAKEN THAT SHOWS WETLAND VEGETATION ON THE

14   RIGHT-HAND SIDE OF THE PHOTO RIGHT NEXT TO THE FILL MATERIAL

15   ON THE LEFT SIDE OF THE PHOTO (INDICATING).

16        NOW I WANT TO TAKE A MOMENT AND I WANT TO TALK ABOUT THE

17   TRIBUTARY THAT HAS BEEN IDENTIFIED IN THE NORTHERN PART OF THE

18   PROPERTY BY SEVERAL WITNESSES WHO HAVE TESTIFIED, AND THAT

19   INCLUDES DR. BOURSIER AND DAN MARTEL.

20                  (DISPLAYED ON SCREEN.)

21        AND THE TRIBUTARY THAT I'M TALKING ABOUT IS IN THE

22   NORTHERN SECTION AND IT'S IN BLUE IN THIS MAP, AND IT IS A

23   TRIBUTARY THAT RUNS JUST ABOVE THE PINCH POINT WHERE THE

24   CONCRETE PAD MEETS THE NORTH FILL AREA IN A SOUTHWESTERLY

25   DIRECTION TO THE CULVERT PIPE AND OUT TO THE SLOUGH.  THAT IS

1    WHAT I'M TALKING ABOUT.

2         THE ONLY QUESTION YOU HAVE TO ANSWER IN THINKING ABOUT

3    WHETHER THAT AREA MARKED IN BLUE IS A TRIBUTARY IS THIS

4    QUESTION:  DOES THAT WATER PATHWAY WHICH DRAINS FROM THE

5    NORTHERN SECTION OF THE PROPERTY THROUGH THE PINCH POINT DOWN

6    OUT THE CULVERT PIPE AND INTO THE SLOUGH, DOES THAT WATER

7    PATHWAY CONTRIBUTE FLOW TO MOWRY SLOUGH?

8         AND IT DOES.  YOU'VE SEEN THAT IT DOES.  YOU'VE HEARD THAT

9    IT DOES.  AND THEN YOU MUST FIND THAT THERE IS A TRIBUTARY IN

10   THAT SECTION OF THE NORTHERN SECTION OF THE WETLANDS.

11        BOTH DR. BOURSIER AND DAN MARTEL, THE TWO PEOPLE WHO

12   CREATED THE MAPS AT QUESTION HERE -- THERE ARE TWO MAPS HERE.

13   THERE IS THE MAP THAT H.T. HARVEY SUBMITTED, THAT IS THE

14   COLORED MAP, BLUE, GREEN, YELLOW, THAT'S THE ONE THAT FORMED

15   THE BASIS TO DAN MARTEL.  HE CREATED THE BLACK AND WHITE

16   JURISDICTIONAL MAP.

17        THOSE TWO PEOPLE CREATED THEIR RESPECTIVE MAPS, AND THEY

18   TESTIFIED, THEY SAID THEY BROKE OUT THE CATEGORIES AS WETLANDS

19   AND "OTHER WATERS".  AND THEY SAID THAT THIS "OTHER WATER" WAS

20   A CATCH-ALL CATEGORY.  IT WAS ANY OTHER WATER ON THE PROPERTY

21   THAT THEY DIDN'T DEEM TO BE A WETLAND, AND THAT IT INCLUDES

22   TRIBUTARIES.  DAN MARTEL TOOK THE STAND, AND I DON'T THINK IT

23   WOULD BE AN OVERSTATEMENT TO SAY THAT HE SAID PROBABLY A DOZEN

24   TIMES THAT THIS CATEGORY OF "OTHER WATERS" INCLUDES

25   TRIBUTARIES.

1    I EXPECT THE DEFENSE TO GET UP HERE AFTER I SIT DOWN AND

2    TELL YOU, THIS COULDN'T POSSIBLY BE A TRIBUTARY BECAUSE, LOOK,

3    IT'S MARKED IN BLUE AND IT'S CALLED "OTHER WATERS".  WELL, YOU

4    KNOW THAT TRIBUTARIES ARE SUBSUMED UNDER THAT CATEGORY, BUT I

5    ALSO WANT TO EXPLAIN, AND YOU HEARD THE EVIDENCE, ON WHY IT

6    WAS "OTHER WATERS".

7    YOU HEARD THAT BACK IN 2007 THAT CULVERT PIPE, THAT

8    DUCKBILL AT THE END OF IT THAT LETS WATER OFF OF THE NORTHERN

9    SECTION INTO THE SLOUGH, THAT IT WASN'T FUNCTIONING AS WELL AS

10   IT SHOULD, THAT IT WAS BACKING UP, THAT THERE WAS DEBRIS.

11   THAT INSTEAD OF JUST LETTING WATER OFF THE PROPERTY INTO THE

12   SLOUGH, IT WAS ACTUALLY LETTING SLOUGH WATER BACK UP INTO THE

13   PROPERTY.  SO WHAT HAPPENED IS THAT THERE WAS PONDING THAT

14   DEVELOPED IN THAT AREA.

15                    (DISPLAYED ON SCREEN.)

16   THIS IS A PHOTO OF THAT PONDED AREA FROM 2007.  YOU CAN

17   SEE THE CULVERT PIPE WHICH LEADS OUT TO THE SLOUGH, AND IN THE

18   BACKGROUND THAT'S THE NORTHERN FILL AREA.  YOU CAN SEE THE

19   CONCRETE PAD IN THE BACKGROUND.  THAT SHOWS YOU THE GENERAL

20   PONDING OF WHAT IT LOOKED LIKE IN 2007, AND THAT'S BECAUSE THE

21   DUCKBILL WASN'T FUNCTIONING AS IT IS NOW -- FUNCTIONING AS

22   WELL AS IT IS NOW.

23   SO NOW YOU ALSO HEARD EVIDENCE THAT BY THE TIME 2014 CAME

24   AROUND, THE DUCKBILL HAD BEEN FIXED AND THAT VEGETATION HAD

25   GROWN IN THIS AREA.  AND THE VEGETATION HAD GROWN BECAUSE

1   THERE WAS MORE EFFECTIVE DRAINAGE, WHICH MEANS THE LAND THERE

2   WAS DRIER, THAT IT COULD SUPPORT WETLAND VEGETATION.  THE

3   PONDING ESSENTIALLY WHAT IT DOES IS, IT DROWNS OUT THE

4   VEGETATION.  THERE'S TOO MUCH WATER FOR VEGETATION TO BE ABLE

5   TO LIVE, GROW, AND THRIVE.

6        THIS IS A PHOTO FROM 2014.

7                 (DISPLAYED ON SCREEN.)

8        AND THIS IS AN AERIAL PHOTOGRAPH TAKEN BY CRISTINA

9   HARBISON ABOUT A MONTH AFTER THE DEFENDANT DUMPED, AND YOU CAN

10  SEE THE CONCRETE PAD, YOU CAN SEE THE NORTHERN FILL AREA, YOU

11  CAN SEE THE WETLAND VEGETATION IN THE BACKGROUND, AND THAT

12  DARKER AREA GOING IN A SOUTHWESTERLY DIRECTION TOWARD THE

13  SLOUGH, YOU CAN SEE IT IS KIND OF A BURGUNDY OR JUST A DARKER

14  BROWN COLOR, WELL, THAT IS THE PICKLEWEED THAT HAD GROWN IN.

15       AND THIS IS A VERY IMPORTANT POINT.  THE FACT THAT

16  VEGETATION GREW IN IN THIS PREVIOUSLY PONDED AREA DOES NOT

17  MAKE THIS AREA NON-JURISDICTIONAL.  IT DOESN'T CHANGE THE FACT

18  THAT WATER DRAINED FROM THAT NORTHERN SECTION OF THE SITE

19  THROUGH THE PICKLEWEED AND OUT THE CULVERT PIPE INTO THE

20  SLOUGH.  AND THAT'S ALL YOU NEED TO KNOW TO DETERMINE WHETHER

21  OR NOT THAT AREA HAD A TRIBUTARY.  IT'S JUST A WATER BODY THAT

22  CONTRIBUTES FLOW TO A TRADITIONAL NAVIGABLE WATER.

23       IN FACT, DR. BOURSIER TOLD YOU THAT FROM ALL HIS VISITS

24  OVER THE YEARS ON TO THIS PROPERTY THERE HAS BEEN WHAT HE

25  CALLS A SINUOUS CHANNEL THAT RUNS FROM ABOVE THE PINCH POINT

1    OUT THROUGH THE CULVERT PIPE.  HE SAID THIS SINUOUS CHANNEL,

2    SOMETIMES IT IS UNDERNEATH THE PONDING, AS IT WAS IN 2007, AND

3    THAT SOMETIMES IT IS COVERED BY PICKLEWEED, AS IT WAS IN 2014.

4    BUT HE SAID THAT IT'S ALWAYS THERE AND, QUOTE, IT'S MOST

5    LIKELY THERE TODAY.

6         SO THEN WHAT I DO IS I SHOWED HIM THIS PICTURE, THIS

7    PICTURE OF THE PROPERTY THAT WAS TAKEN A MONTH AFTER

8    DEFENDANT'S DUMPING OPERATION WAS STOPPED.

9                   (DISPLAYED ON SCREEN.)

10        AND I ASKED HIM IF HE SAW THAT CHANNEL IN THIS PHOTO, AND

11   HE SAID YES, AND HE IDENTIFIED THAT DEMARCATED CHANNEL.  AND I

12   ASKED HIM, DID THIS CHANNEL RUN ABOVE THE PINCH POINT INTO

13   THAT NORTHERN FILL AREA?  AND HE SAID YES.

14        IT'S NOT JUST HIS TESTIMONY AND IT'S NOT JUST THESE PHOTOS

15   THAT TELL YOU THERE IS A TRIBUTARY THERE, BUT IT'S THE FACT

16   THAT I DON'T BELIEVE THERE'S ANY DOUBT IN ANYONE'S MIND THAT

17   WATER DRAINS FROM THE NORTHEAST TO THE SOUTHWEST.  AND YOU

18   KNOW THIS BECAUSE THE LAND GOES FROM 13 FEET ABOVE MEAN SEA

19   LEVEL TO AT LEAST AT THE POINT OF THE CULVERT AT -- NEAR OR AT

20   SEA LEVEL.  AND SO WATER DOESN'T FIGHT GRAVITY.  IT JUST CAN'T

21   DEFY GRAVITY.  IT NATURALLY HAS TO FLOW IN THAT DIRECTION.

22        SO WHY DO WE CARE ABOUT THE PROPERTIES AND THE

23   CHARACTERISTICS OF THE LAND?  BECAUSE TO FIND THE DEFENDANT

24   GUILTY OF VIOLATING THE CLEAN WATER ACT, YOU HAVE TO FIND THAT

25   THERE WAS A DISCHARGE OF FILL MATERIAL INTO A "WATER OF THE

1    UNITED STATES", JUST A DISCHARGE OF FILL MATERIAL.

2        WHAT YOU WILL NOTICE IN THE CLEAN WATER ACT IS THAT THERE

3    IS NO AMOUNT OF POLLUTANT THAT IS REQUIRED.  YOU DON'T NEED TO

4    FIND THAT 1800 TRUCKS DUMPED.  IF YOU FIND THAT ONE BUCKET OF

5    FILL MATERIAL WAS DUMPED ON A JURISDICTIONAL "WATER OF THE

6    UNITED STATES", THE DEFENDANT IS GUILTY OF VIOLATING THE CLEAN

7    WATER ACT.

8        SO WE WENT OVER THE ELEMENTS BEFORE BUT I WANT TO TAKE

9    THEM ONE BY ONE A LITTLE BIT HERE WITH YOU.

10       SO ON OR ABOUT A CERTAIN DATE, IN THIS CASE IT WOULD BE

11   FROM JULY TO AUGUST IN THE NORTHERN SECTIONS AND FROM AUGUST

12   TO SEPTEMBER IN THE SOUTHERN SECTIONS.  WE DON'T NEED TO PROVE

13   A PARTICULAR DATE, A PRECISE DATE BECAUSE IT'S ON OR ABOUT

14   THAT THE DEFENDANT KNOWINGLY DISCHARGED A POLLUTANT, IN THIS

15   CASE FILL MATERIAL.  THAT'S THE NEXT POINT.  IF WE CAN JUST GO

16   BACK TO THAT.  THANK YOU, AGENT SU.

17       THE DEFENDANT AS WE SPOKE ABOUT PREVIOUSLY ACTING

18   KNOWINGLY THROUGHOUT THIS OPERATION.  HE ACTED KNOWINGLY

19   THROUGHOUT THIS OPERATION THAT HE PROFITED FROM.  HE

20   DISCHARGED DIRT AND CONSTRUCTION DEBRIS WHICH ARE FILL

21   MATERIALS AND POLLUTANT UNDER THE CLEAN WATER ACT.  SO CHECK

22   THAT ELEMENT YOU CAN CHECK OFF YOUR LIST.

23       NEXT, THE DISCHARGE WAS FROM A POINT SOURCE.  THE JUDGE

24   WILL INSTRUCT YOU THAT A POINT SOURCE INCLUDES BUT IS NOT

25   LIMITED TO DUMP TRUCKS AND BULLDOZERS.  SO WHETHER THE

1    DISCHARGE CAME FROM THE BACK OF A DUMP TRUCK OR WHETHER THE

2    DISCHARGE OF MATERIAL WAS PUSHED BACKWARDS INTO THE PROPERTY

3    THROUGH SPREADING IT WITH THE USE OF A BULLDOZER, BOTH ARE

4    POINT SOURCES AND BOTH CONSTITUTE DISCHARGES OF A POLLUTANT.

5        THIRD, THAT THE DISCHARGE WAS INTO A "WATER OF THE UNITED

6    STATES".  WE ARE GOING TO GET BACK TO THIS ONE.  YOU CAN PUT A

7    CHECK OFF TO THE SECOND ONE.

8        FOURTH, THAT THE DEFENDANT HAD NO PERMIT FROM THE ARMY

9    CORPS OF ENGINEERS TO DISCHARGE A POLLUTANT.  NO ONE DID.  NOT

10   THE LANDOWNERS, CERTAINLY NOT JAMES LUCERO.

11       I WANT TO TALK TO YOU BEFORE GETTING TO "WATERS OF THE

12   UNITED STATES".  I WANT TO TELL YOU THAT HE IS CHARGED WITH

13   THREE COUNTS OF VIOLATING THE CLEAN WATER ACT.

14       COUNT I, FOR DUMPING INTO THE WETLAND IN THE NORTHERN

15   SECTION OF THE PROPERTY.  WHAT WE ARE LOOKING AT IS THE PART

16   OF THE PROPERTY THAT IS SURROUNDED BY RED, OUTLINED IN RED.

17   IN THE GREEN PART OUTLINED IN RED IN THE NORTHERN PART, THOSE

18   ARE THE WETLANDS, AND THAT'S COUNT I.

19       COUNT II IS THE TRIBUTARY IDENTIFIED IN THE BLUE PART OF

20   THIS PROPERTY WHERE HE DUMPED.

21       IN COUNT III ARE THE GREEN PARTS OF THE PROPERTY, THOSE

22   WETLANDS IN THE SOUTHERN SECTION OF THE SITE.  AS LONG AS YOU

23   FIND ONE DISCHARGE OF A POLLUTANT INTO EACH AREA, YOU CAN FIND

24   HIM GUILTY OF ALL THREE COUNTS ON THE INDICTMENT.  THAT'S HOW

25   THE COUNTS WORK.

1    OKAY.  SO WHAT'S A "WATER OF THE UNITED STATES"?  THIS IS

2    A LENGTHY SLIDE, SO WE ARE GOING TO TAKE IT ONE AT A TIME.

3    A "WATER OF THE UNITED STATES" INCLUDES TRADITIONAL

4    NAVIGABLE WATERS.  AND IT IS NOT IN DISPUTE THAT MOWRY SLOUGH

5    IS A TRADITIONAL NAVIGABLE WATER.  SAN FRANCISCO BAY IS

6    TRADITIONAL NAVIGABLE WATER.  BOTH OF THEM ARE.  THEY ARE

7    SUBJECT TO THE EBB AND FLOW OF THE SIDE.

8    TRIBUTARIES TO TRADITIONAL NAVIGABLE WATERS AND WETLANDS

9    ADJACENT TO TRADITIONAL NAVIGABLE WATERS, IF THEY HAVE A

10   SIGNIFICANT NEXUS TO THOSE TRADITIONAL NAVIGABLE WATERS, THEY

11   ARE A "WATER OF THE UNITED STATES".

12   AND TRIBUTARIES AND ADJACENT WETLANDS HAVE A SIGNIFICANT

13   NEXUS IF IT, EITHER ALONE OR IN COMBINATION WITH SIMILARLY

14   SITUATED WATER BODIES IN THE REGION SIGNIFICANTLY AFFECT THE

15   CHEMICAL, PHYSICAL, OR BIOLOGICAL INTEGRITY OF THE NAVIGABLE

16   WATER.  YOU ONLY NEED ONE.  YOU DON'T NEED ALL THREE.

17   TRIBUTARIES ARE WATER BODIES AND THE JUDGE WILL INSTRUCT

18   YOU, THEY CAN BE EITHER NATURAL.  THEY CAN BE MAN-ALTERED.

19   THEY CAN BE MANMADE.  IT CAN BE THE PUMP.  IT CAN BE THE

20   CULVERT PIPE.  THEY JUST NEED TO CONTRIBUTE FLOW TO A

21   TRADITIONAL NAVIGABLE WATER.  TRIBUTARIES, THE JUDGE WILL

22   INSTRUCT YOU, CAN BE SEASONAL.

23   SO WHAT ARE ADJACENT WETLANDS?  ADJACENT WETLANDS ARE

24   WETLANDS THAT BORDER, ARE CONTIGUOUS, OR THEY NEIGHBOR A

25   TRADITIONAL NAVIGABLE WATER, IN THIS CASE MOWRY SLOUGH.  THE

1    JUDGE WILL TELL YOU THAT WETLANDS SEPARATED FROM "WATERS OF

2    THE UNITED STATES" BY MANMADE DIKES OR BARRIERS, NATURAL RIVER

3    BERMS, BEACH DUNES, AND THE LIKE, INCLUDING THAT DIRT LEVEE

4    THAT SEPARATES MOWRY SLOUGH FROM THE WETLAND, THAT THOSE DO

5    NOT CUT OFF ADJACENCY.  THOSE WETLANDS THAT ARE SEPARATED FROM

6    A SLOUGH JUST BY THAT LEVEE ARE ADJACENT WETLANDS.

7        AND THE JUDGE WILL TELL YOU THAT A SIGNIFICANT NEXUS MAY

8    BE INFERRED WHEN THE WETLANDS ARE ADJACENT TO A TRADITIONAL

9    NAVIGABLE WATER, IN THIS CASE MOWRY SLOUGH.  YOU CAN INFER

10   THAT A SIGNIFICANT NEXUS EXISTS BECAUSE THESE WETLANDS ARE SO

11   CLOSE TO THE SLOUGH.  ADDITIONALLY THESE WETLANDS HAVE DIRECT

12   HYDROLOGICAL CONNECTIONS TO THE SLOUGH.

13       SO THAT IS WHAT THE LAW IS.  AND I WANT TO TALK ABOUT

14   THESE CONCEPTS.  THE FIRST ONE IS ADJACENCY.  THE WETLANDS

15   HERE ARE ADJACENT TO MOWRY SLOUGH BECAUSE --

16                     (DISPLAYED ON SCREEN.)

17       -- THEY BORDER THEM, THEY ARE CONTIGUOUS TO THEM, AND THEY

18   NEIGHBOR THEM.  AGAIN, YOU DON'T NEED ALL THREE, JUST ONE, BUT

19   HERE WE HAVE THE LUXURY OF HAVING ALL THREE.  YOU KNOW THIS

20   BECAUSE EVERY EXPERT TESTIFIED BEFORE YOU, DR. HARDWICKE,

21   DR. BOURSIER, DAN MARTEL, DR. GALACATOS, THEY TOLD YOU THAT IN

22   THEIR EXPERT OPINION, IN THEIR STUDIES OF THE SITE, THEY

23   BELIEVE THAT THESE WETLANDS THE DEFENDANT FILLED ARE ADJACENT

24   TO MOWRY SLOUGH.

25                     (DISPLAYED ON SCREEN.)

1    THEY ARE ADJACENT BECAUSE THEY NEIGHBOR THE SLOUGH, WHICH

2    JUST MEANS THEY ARE IN CLOSE PROXIMITY TO THE SLOUGH.  THESE

3    ARE NOT WETLANDS IN THE MIDDLE OF MICHIGAN.  THEY ARE NOT

4    WETLANDS UP IN THE SIERRA'S.  THEY ARE LITERALLY A STONE'S

5    THROW AWAY FROM THE SLOUGH SEPARATED BY A BERM.

6        THEY ARE CONSIDERED BY THE EXPERTS TO BE ONE SINGLE

7    COMPLEX OF WETLAND.  MEANING, YOU DON'T JUST LOOK AT THIS FROM

8    WHERE THE DEFENDANT DUMPED, BUT YOU LOOK AT THE WETLAND AS A

9    SINGLE COMPLEX THAT RUNS RIGHT UP TO THE LEVEE THAT DOESN'T

10   CUT OFF ADJACENCY WITH THE SLOUGH.

11       WHEN ASKED, WELL, WHAT ABOUT LITTLE SLIVERS OF YELLOW ON

12   THE MAP?  I AM GOING TO SHOW YOU -- AND I DID ASK THAT, WHAT

13   ABOUT A LITTLE SLIVER OF YELLOW HERE, WOULD THAT CUT OFF

14   ADJACENCY?  AND THEY ANSWERED DEFINITIVELY NO.

15       AND I ASKED, WHAT ABOUT A WATER BODY LIKE THIS BLUE AREA

16   ON THE MAP, DOES THAT CUT OFF ADJACENCY?  THEY SAID NO.

17   BECAUSE, ONE, THESE WETLANDS NEIGHBOR THE SLOUGH.  THEY ARE IN

18   CLOSE PROXIMITY TO THEM.  TWO, THEY ARE DEEMED TO BE A SINGLE

19   COMPLEX OF WETLAND THAT GO RIGHT UP TO THE SLOUGH.

20       IN FACT, BY 2014, WHEN THE DEFENDANT DUMPED, YOU KNOW THAT

21   THE WETLAND VEGETATION HAD GROWN IN TO THIS AREA THAT HAD BEEN

22   MARKED AS "OTHER WATERS".  IT HAD GROWN BACK.  SO THE WETLAND

23   VEGETATION CONTINUED ALL THE WAY UP TO THE LEVEE, ALL THE WAY

24   UP TO THAT CULVERT PIPE.

25       NOW, DO YOU NEED THAT TO HAPPEN IN ORDER TO FIND

1    ADJACENCY?  NO.  DO YOU NEED THEM TO BE CONTIGUOUS?  DO YOU

2    NEED THEM TO BE BORDERING?  NO.  NEIGHBORING IS ENOUGH.  SO

3    HERE YOU HAVE ALL THREE.

4                    (DISPLAYED ON SCREEN.)

5        HERE, THIS IS A PHOTO FROM 2014 SHOWING THE PICKLEWEED

6    GROWING.  YOU HEARD TESTIMONY THAT THIS PICKLEWEED BEFORE THE

7    DUMPING EXTENDED INTO THIS NORTHERN FILL SECTION.  THIS PART

8    HADN'T BEEN DUMPED IN BECAUSE THE DEFENDANT'S TRUCKS, THEY

9    CAME IN THROUGH THE CONCRETE PAD, THEY MADE THAT LEFT, THEY

10   DUMPED HERE, THE BULLDOZER PUSHED IT BACK HERE (INDICATING).

11       AND THERE WAS MORE BACK HERE.  DON'T FORGET, THE

12   ENTERPRISE STARTED FROM THAT UPLAND AREA WHERE THE TRUCKS

13   ENTERED IN FROM MOWRY AVENUE, NOT FROM THE CONCRETE PAD.  THAT

14   IS WHY YOU ARE SEEING SO MUCH DEBRIS AND DIRT PUSHED IN

15   FURTHER BACK IN THIS PORTION.

16       THIS IS WHAT THE PICKLEWEED LOOKED LIKE IN THE UNDISTURBED

17   AREAS.  IT EXTENDED ALL THE WAY TO THE SLOUGH.  THAT IS WHAT I

18   CALL BORDERING, CONTIGUOUS, AND NEIGHBORING, AND THAT IS WHAT

19   THE EXPERTS CALL IT.

20       SO THE FACT THAT THESE WETLANDS ARE ADJACENT IS IMPORTANT

21   TO YOUR DETERMINATION BECAUSE ADJACENCY IS A VERY POWERFUL

22   CONCEPT.  BECAUSE THE JUDGE WILL TELL YOU THAT YOU CAN INFER

23   THAT THERE IS A SIGNIFICANT NEXUS BETWEEN THESE WETLANDS AND

24   MOWRY SLOUGH BASED ON THIS ADJACENCY.

25       HOW ELSE DO YOU KNOW THAT THE WETLANDS AND TRIBUTARY HAVE

1   A SIGNIFICANT NEXUS TO A TRADITIONAL NAVIGABLE WATER?  YOU

2   KNOW BECAUSE THE EXPERTS TESTIFIED ABOUT THE FUNCTIONS THAT

3   WETLANDS PERFORM AND HOW THESE ARE MAGNIFIED WHEN YOU HAVE A

4   DIRECT HYDROLOGICAL LINK BETWEEN THE WETLANDS AND A

5   TRADITIONAL NAVIGABLE WATER.

6       I WANT TO BE CLEAR HERE ABOUT THIS WHOLE SIGNIFICANT NEXUS

7   DETERMINATION.  A SIGNIFICANT NEXUS EVALUATION IS NOT ABOUT

8   THE IMPACT THE FILL MATERIAL HAD ON THE NAVIGABLE WATER.  IT

9   IS NOT ABOUT THE IMPACT OF THE DIRT AND THE CONSTRUCTION

10  DEBRIS THAT WAS DUMPED ON THE NAVIGABLE WATER.

11      A SIGNIFICANT NEXUS EVALUATION IS ABOUT THE EFFECT THE

12  LAND -- THE WETLANDS, THE TRIBUTARIES ON THE LAND, THE EFFECT

13  THE LAND HAS ON THE CHEMICAL, PHYSICAL, OR BIOLOGICAL

14  INTEGRITY OF THE SLOUGH.  IT'S A LAND DETERMINATION.  IT IS

15  NOT ABOUT THE MATERIAL THAT WAS DUMPED ON THE LAND.

16      AND WHAT YOU WILL LEARN ABOUT SIGNIFICANT NEXUS IS THAT

17  YOU DON'T HAVE TO CONFINE YOURSELF TO JUST DETERMINING IF THIS

18  ONE WETLAND OR THIS ONE TRIBUTARY HAS A SIGNIFICANT EFFECT ON

19  THE CHEMICAL, PHYSICAL, OR BIOLOGICAL INTEGRITY OF THE SLOUGH.

20      YOU WILL BE TOLD THAT YOU CAN CONSIDER AND YOU CAN

21  AGGREGATE SIMILARLY SITUATED WATER BODIES IN THE REGION, SO

22  THAT MEANS THE ENTIRE WETLAND COMPLEX, 240-SOME-ODD ACRES OF

23  WETLANDS ON THIS PROPERTY, 34-SOME-ODD ACRES OF "OTHER WATERS"

24  ON THE PROPERTY, NOT TO MENTION TESTIMONY YOU HEARD OF OTHER

25  FORMER BAYLANDS AND OTHER SIMILARLY SITUATED LANDS IN THE BAY

1    AREA, IN THE SOUTH BAY, SOUTH OF SAN MATEO BRIDGE.

2        YOU CAN TAKE ALL OF THOSE INTO CONSIDERATION IN

3    DETERMINING WHETHER THEY, ALONE OR IN COMBINATION

4    SIGNIFICANTLY AFFECT THE BIOLOGICAL, CHEMICAL, OR PHYSICAL

5    INTEGRITY OF THE A TRADITIONAL NAVIGABLE WATER.

6        AGAIN, YOU ONLY NEED ONE, BUT YOU HAVE THE LUXURY FOR A

7    SITE LIKE THIS, SO LOW LYING, SO CLOSE TO THE SLOUGH, A SITE

8    WITHIN THE ORIGINAL BAY MARGIN LINE OF THE SAN FRANCISCO BAY,

9    A SITE THAT IS FED BY UNDERGROUND AQUIFERS PUSHING BACK AND

10   FORTH THE SALT AND FRESH WATER, YOU HAVE THE LUXURY OF HAVING

11   ALL THREE EFFECTS, SO I'M GOING TO TALK ABOUT EACH ONE.

12       PHYSICAL EFFECT -- HOW DO THESE WETLANDS AFFECT THE

13   PHYSICAL INTEGRITY OF THE SLOUGH?  YOU HEARD TESTIMONY FROM

14   EXPERTS THAT THESE WETLANDS SERVE IMPORTANT FLOOD CONTROL

15   FUNCTIONS.

16       WHAT THAT MEANS IS, THEY PHYSICALLY HOLD FLOOD WATERS

17   DURING HIGH RAIN EVENTS, AND THE EVENTUAL FLOW FROM THE

18   PROPERTY TO THE SLOUGH IS ATTENUATED, IT SLOWS DOWN, THAT IS,

19   IT IS NOT RELEASED ALL AT ONCE, AND THIS PROTECTS AGAINST

20   FLOODING, THE OVER-FLOODING OF A NAVIGABLE WATER OR NAVIGABLE

21   SLOUGH.

22       EXPERTS ALSO DISCUSSED HOW THE WETLANDS TRAP SEDIMENTS.

23   SO, FOR EXAMPLE, MR. MARTEL TESTIFIED THAT THE WETLANDS HELPED

24   PREVENT SEDIMENTS FROM GOING INTO THE SLOUGH AND CLOGGING THE

25   SLOUGH AND THE BAY WITH SILTS AND CLAY PARTICLES WHICH WOULD

1   AFFECT THE WATER QUALITY.  THE IMPORTANCE OF THESE FLOOD

2   CONTROL AND SEDIMENTATION FUNCTIONS THAT WETLANDS PERFORM IS

3   ONLY MAGNIFIED WHEN YOU VIEW THE PROPERTY'S WETLANDS IN

4   COMBINATION WITH SIMILARLY SITUATED WATER BODIES IN THE BAY.

5       I WANT TO GO THROUGH THE CHEMICAL EFFECTS THAT THESE

6   WETLANDS HAVE ON THE SLOUGH.  YOU HEARD FROM DR. HARDWICKE

7   ABOUT HOW SEVERAL HUNDRED ACRES OF WETLANDS IS A LOT OF AREA

8   WITH WHICH TO CONTRIBUTE TO WATER QUALITY IN THE SLOUGH.  SHE

9   TESTIFIED ABOUT THE SIGNIFICANCE OF THIS CHEMICAL EFFECT WHEN

10  CONSIDERED ALONG WITH HISTORICAL -- HISTORIC TIDAL MARSH

11  SURROUNDING -- AROUND THE BAY THAT HAD BEEN DIKED OFF.  SO SHE

12  IS TAKING INTO CONSIDERATION OTHER SIMILARLY SITUATED WATER

13  BODIES.

14      DR. GALACATOS ALSO TESTIFIED ABOUT WATER QUALITY IMPACTS

15  PROVIDED BY THESE WETLANDS, AND SHE TOOK INTO CONSIDERATION

16  THE SAN FRANCISCO BAY WETLANDS WITHIN THE HISTORIC BAY MARGIN

17  LINE, OTHER ONES JUST LIKE THE ONES ON THIS PROPERTY.

18      DR. GALACATOS TOLD YOU THAT THE WETLANDS HELP FILTER OUT

19  POLLUTANTS.  MR. MARTEL DESCRIBED HOW THE WETLANDS DETAIN AND

20  DETOXIFY MATERIALS THROUGH BACTERIAL PROCESSES, AFTER WHICH

21  THE MATERIALS ARE NO LONGER TOXIC IN THE ENVIRONMENT.

22  DR. HARDWICKE TOLD US THAT AMONG THE WAYS THE WETLANDS ARE

23  BENEFICIAL FOR WATER QUALITY IS THAT THEY CAN SEQUESTER OUT

24  THINGS LIKE EXCESS NITRATES.

25      THESE ARE CHEMICAL FUNCTIONS AND EFFECTS THESE WATER

1    BODIES, THESE WETLANDS, AND SIMILARLY SITUATED ONES HAVE ON

2    TRADITIONAL NAVIGABLE WATER.  AND, FRANKLY, THESE ARE ALL

3    DIFFERENT WAYS OF SAYING THE SAME THING ABOUT THE WETLANDS'

4    SIGNIFICANT EFFECT ON THE CHEMICAL INTEGRITY OF THE SLOUGH,

5    SOMETHING THAT DR. COATS ALSO TESTIFIED TO.

6         NOW I WANT TO TALK ABOUT SOME OF THE WAYS THE PROPERTY'S

7    WETLANDS AND TRIBUTARY SIGNIFICANTLY AFFECT THE BIOLOGICAL

8    INTEGRITY OF THE SLOUGH.  SO ONE SUCH BIOLOGICAL EFFECT IS THE

9    IMPORTANT ECOLOGICAL CONNECTION, FOR INSTANCE, SHOREBIRDS AND

10   ANIMALS THAT USE HABITATS FROM BOTH SIDES OF THE SLOUGH.

11        YOU HEARD FROM DR. BOURSIER.  YOU HEARD FROM DR. DEGHI,

12   THE BIRD SPECIALIST.  YOU HEARD THAT THERE ARE NUMEROUS

13   SPECIES OF BIRDS USING AREAS OF THE PROPERTY DURING HIGH

14   TIDES, SO THEY SEEK REFUGE ON TO THE PROPERTY DURING HIGH

15   TIDES.  AND THEN AS THE TIDE FALLS IN THE SLOUGH, THEY GO BACK

16   TO THE SLOUGH TO FEED ON THE OTHER SIDE OF THE LEVEE.

17        THIS IS A REALLY IMPORTANT CONNECTION BECAUSE IT

18   ESTABLISHES THAT THE HABITAT ON THE PROPERTY AND THE HABITAT

19   IN THE SLOUGH ARE VIEWED AS INDISTINGUISHABLE FROM ONE ANOTHER

20   IN TERMS OF HOW SPECIES MOVE FROM ONE TO THE OTHER.  THEY USE

21   BOTH.  AND BOTH PROVIDE BENEFICIAL FUNCTIONS.

22        YOU HEARD DR. HARDWICKE SAY THAT WITH HUNDREDS OF ACRES OF

23   WETLANDS ON THIS PROPERTY, THE SLOUGH IS ABLE TO SUPPORT A LOT

24   MORE LIFE FORMS THAN IT NORMALLY OTHERWISE WOULD BECAUSE THESE

25   SPECIES HAVE A PLACE TO GO DURING THESE TIDAL SHIFTS THAT COME

1    EVERY SINGLE DAY.  THEY USE THESE HUNDREDS OF ACRES OF

2    WETLANDS RIGHT NEXT TO THE SLOUGH.

3        ANOTHER BIOLOGICAL CONNECTION BETWEEN THE PROPERTY'S

4    WETLANDS AND TRIBUTARY AND THE SLOUGH RELATES TO THE VERY

5    IMPORTANT CONTRIBUTION THAT THEY MAKE TO THE AQUATIC FOOD

6    CHAIN IN THE SLOUGH.  LIKE THE OTHER IMPACTS THAT I'VE BEEN

7    SUMMARIZING TO YOU, YOU HEARD THIS FROM SEVERAL EXPERTS.

8        AMONG THE WAYS THE WETLANDS CONTRIBUTE TO THE AQUATIC FOOD

9    CHAIN IS THROUGH THE EXPORT OF CARBON INTO THE SLOUGH.

10   DR. HARDWICKE TOLD YOU ABOUT THE WETLANDS CONTRIBUTING A LOT

11   OF ORGANIC MATTER.  YOU SAW SOME OF THAT WHEN THE PUMP

12   OUTFLOWED INTO THE SLOUGH.

13       BUT THE WETLANDS CONTRIBUTE ORGANIC MATTER DUE TO THE

14   GROWING AND DYING PROCESSES IN A WETLAND, THAT IS WHAT SHE

15   SAID.  SHE AND MR. MARTEL REFERRED TO THIS AS DETRITUS AND

16   TOLD YOU ABOUT HOW CARBON SERVES AS FOOD FOR OTHER ORGANISMS

17   LIVING IN THE SLOUGH.

18       CARBON FROM THE WETLANDS MAKES ITS WAY INTO THE SLOUGH

19   THROUGH THE PROPERTY'S HYDROLOGICAL CONNECTIONS, THAT YOU KNOW

20   SO WELL BY NOW.  HYDROLOGICAL CONNECTIONS THAT WE HAVE TALKED

21   ABOUT IN WHICH THOUSANDS OF GALLONS OF WATER ARE PUMPED OUT A

22   MINUTE.

23       DR. COATS, A HYDROLOGIST, TESTIFIED AND HE ACTUALLY

24   MEASURED THE CARBON ENTERING THE SLOUGH FROM THE PROPERTY.  HE

25   ALSO MEASURED THE NITROGEN ENTERING THE SLOUGH FROM THE

1    PROPERTY.  AND THESE ARE BOTH NUTRIENTS EXPORTED BY THE

2    WETLANDS AND THE TRIBUTARY INTO THE NAVIGABLE WATER.  HE

3    TESTIFIED THAT NITROGEN ALONG WITH CARBON ARE ESSENTIAL

4    ELEMENTS FOR PLANTS AND ANIMALS, AND THAT THEY FORM THE BASIS

5    OF THE MARINE FOOD CHAIN.

6        HE TOOK WATER SAMPLES THAT DEMONSTRATED THAT ORGANIC

7    CARBON FROM THE PROPERTY WAS THREE TIMES AS HIGH IN THE

8    PROPERTY THAN IN THE SLOUGH, SO IT IS CONTRIBUTING CARBON TO

9    THE SLOUGH.  HE TOOK WATER SAMPLES THAT DEMONSTRATED THAT THE

10   NITROGEN WAS TWICE AS HIGH IN THE PROPERTY THAN IN THE SLOUGH,

11   SO IT IS CONTRIBUTING NITROGEN TO THE SLOUGH.  THESE DATA,

12   THEY CONFIRM HIS AND OTHER PEOPLE'S TESTIMONY ABOUT THE VERY

13   HIGH PRODUCTIVITY OF WETLANDS IN TERMS OF THE PLANT MATERIAL.

14       LADIES AND GENTLEMEN OF THE JURY, THAT WAS A LOT, THAT WAS

15   A LOT TELLING YOU ABOUT THE CHEMICAL, PHYSICAL, AND -- OR

16   BIOLOGICAL EFFECTS ON THE SLOUGH, BUT THEY ARE IMPORTANT.  AND

17   YOU CANNOT LOOK AT THIS EVIDENCE THAT HAS BEEN PRESENTED TO

18   YOU, THAT HAS BEEN BUILDING ON ONE BLOCK AFTER ANOTHER DAY

19   AFTER DAY FOR THE LAST TWO WEEKS AND YOU CANNOT REASONABLY

20   FIND THAT THE DEFENDANT DID NOT COMMIT THE CRIMES CHARGED.

21       HE VIOLATED THE CLEAN WATER ACT WHEN IN 2014 HE WAS IN

22   CHARGE OF AN OPERATION THAT DUMPED 18,000 TONS OF POLLUTANTS

23   INTO FEDERALLY PROTECTED "WATERS OF THE UNITED STATES".  HE

24   DUMPED ON PROPERTY THAT HAD ALREADY BEEN DETERMINED BY THE

25   CORPS IN THEIR BELIEF TO BE A "WATER OF THE UNITED STATES", A

CLOSING ARGUMENT – LEE

1    DETERMINATION THAT THE LANDOWNERS HAVE NEVER CONTESTED, THAT

2    THEIR OWN ECOLOGICAL CONSULTANTS WHO STUDIED THE SITE FOR

3    YEARS AGREE WITH.

4        HE DUMPED ON PROPERTY THAT YOU KNOW HAVE ADJACENT

5    WETLANDS, WETLANDS THAT ARE ADJACENT TO MOWRY SLOUGH.  THEY

6    BORDER THEM.  THEY ARE CONTIGUOUS TO THEM.  AND THEY ARE

7    CERTAINLY NEIGHBORING THEM.  THEY ARE CLOSE.  AND YOU CAN

8    INFER THAT THAT ADJACENCY MEANS THAT THESE LANDS HAVE A

9    SIGNIFICANT NEXUS TO THE SLOUGH.

10       BUT YOU HAVE MORE THAN JUST AN INFERENCE.  YOU DO.  YOU

11   HEARD TESTIMONY FROM EXPERTS ABOUT ALL THE FUNCTIONS THAT

12   THESE WETLANDS PERFORM IN CONJUNCTION WITH SIMILARLY SITUATED

13   WATER BODIES.

14       AND WHAT I'M GOING TO DO IS GIVE YOU A QUICK BULLET POINT

15   BECAUSE I KNOW THE EXAMPLES THAT I GAVE YOU BASED ON WHAT THE

16   EXPERTS TESTIFIED TO WAS LENGTHY, AND I WOULD LIKE TO JUST HIT

17   THE MAIN FUNCTIONS THAT WETLANDS AND THEIR TRIBUTARIES PERFORM

18   FOR THE NAVIGABLE WATERS THEY ARE ADJACENT TO.

19       IT IS SEDIMENT TRAPPING.  FLOOD RETENTION.  THEY PROVIDE A

20   HABITAT FOR AQUATIC ORGANISMS.  THEY EXPORT ORGANIC MATTER

21   LIKE CARBON THAT IS BENEFICIAL TO THE AQUATIC SYSTEM IN THE

22   SLOUGH.  THEY CONTRIBUTE TO THE AQUATIC FOOD CHAIN IN THE

23   NAVIGABLE WATER.  THEY FILTER OUT POLLUTANTS.  THEY DETOXIFY

24   MATERIAL BEFORE THE WATER ENTERS THE SLOUGH.  AND THEY

25   ULTIMATELY IMPROVE THE WATER QUALITY OF THE SLOUGH.

1    THESE WETLANDS DO ALL OF THAT BECAUSE, FRANKLY, WE'RE NOT

2    TALKING ABOUT 1 ACRE OF WETLANDS.  ON THAT SITE, AND YOU CAN

3    LOOK AT ALL OF THEM, IT IS MORE THAN 240 ACRES OF WETLANDS AND

4    AN ADDITIONAL 30-SOME-ODD ACRES OF "OTHER WATERS", THAT IS

5    ALMOST 300 ACRES OF "WATERS OF THE UNITED STATES".  SO ALONE

6    THEY HAVE A SIGNIFICANT NEXUS, BUT YOU HAVE MORE THAN THAT.

7    YOU CAN LOOK AT THEM ALONE AND YOU CAN TAKE INTO CONSIDERATION

8    OTHER SIMILARLY SITUATED WATER BODIES IN THE BAY.

9    WHEN DR. COATS TESTIFIED, HE TOLD YOU THAT THESE WETLANDS

10   REPRESENT 9 PERCENT OF THE WETLANDS SOUTH OF THE SAN MATEO

11   BRIDGE.  SO IF YOU TAKE THESE WETLANDS IN CONJUNCTION WITH THE

12   OTHER WETLANDS SOUTH OF THE SAN MATEO BRIDGE, THEY PERFORM

13   MANY FUNCTIONS THAT SIGNIFICANTLY AFFECT THE CHEMICAL,

14   PHYSICAL, OR BIOLOGICAL INTEGRITY OF A TRADITIONAL NAVIGABLE

15   WATER, WHETHER THAT BE THE SLOUGH OR THE SAN FRANCISCO BAY

16   ITSELF.

17   SO THE DEFENDANT HERE, HE DUMPED AN OBSCENE AMOUNT OF

18   POLLUTANT ON THIS PROPERTY, BUT HE WAS ACTUALLY HOPING TO DUMP

19   MORE.  HE DUMPED 18,000 CUBIC YARDS OF DIRT.  HE WAS LOOKING

20   FOR HUNDREDS OF THOUSANDS OF CUBIC YARDS OF DIRT.

21   BUT LUCKILY THIS OPERATION WAS STOPPED AFTER ONLY -- MORE

22   THAN TWO MONTHS OF OPERATION.  IT WAS STOPPED BECAUSE OF

23   PEOPLE LIKE DAN MILLER.  IT WAS STOPPED BECAUSE OF PEOPLE LIKE

24   CARIN HIGH.  IT WAS STOPPED BY NEWARK POLICE DEPARTMENT.  IT

25   WAS STOPPED BY TIM STEELE AND THE LANDOWNERS WHO CAME THE VERY

1    NEXT DAY TO LOOK AT IT.  AND IT STOPS HERE WITH YOU.

2         BECAUSE OF THE DEFENDANT'S CONDUCT, HE IS CHARGED WITH

3    VIOLATING THREE COUNTS OF THE CLEAN WATER ACT, AND THAT IS WHY

4    WE ARE ALL HERE TODAY.  MR. KEARNEY AND I, ON BEHALF OF THE

5    UNITED STATES, WE ARE ASKING YOU TO RETURN THE ONLY VERDICT

6    THAT IS SUPPORTED AND THAT IS CONSISTENT WITH ALL THE EVIDENCE

7    THAT YOU HEARD AT THIS TRIAL, WHICH IS THAT THE DEFENDANT IS

8    GUILTY OF ALL THE CRIMES CHARGED FOR VIOLATING THE CLEAN WATER

9    ACT.  THANK YOU.

10        **THE COURT:**  OKAY.  LADIES AND GENTLEMEN, IT'S ALMOST

11   10:15 SO I THINK THIS IS A GOOD TIME FOR OUR MORNING RECESS.

12   LET'S BREAK AND RETURN AT 10:30.  AND CONTINUE, PLEASE, TO

13   REMEMBER ALL OF YOUR ADMONITIONS AND RULES, THEY ALL STILL

14   APPLY.

15        NO DISCUSSION ABOUT THE CASE.  NO RESEARCH OF ANY KIND

16   ABOUT THE CASE OR THE ISSUES INVOLVED IN IT.  NO CONTACT WITH

17   THE PARTIES OR LAWYERS.  AND CONTINUE TO KEEP AN OPEN MIND AS

18   TO ALL OF THE ISSUES INVOLVED IN THE CASE UNTIL YOU'VE HEARD

19   ALL THE ARGUMENTS OF COUNSEL AND YOU'VE HEARD MY INSTRUCTIONS

20   AND YOU'VE HAD AN OPPORTUNITY TO HEAR THE VIEWS OF YOUR FELLOW

21   JURORS.

22        SO WITH THAT, LET'S BE BACK AT 10:30, AND WE WILL

23   CONTINUE.

24        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

25        **THE CLERK:**  YOU MAY BE SEATED.

1    **THE COURT:**  ALL RIGHT.  WE WILL BE BACK AT 10:30.

2    **MS. HANSEN:**  YOUR HONOR, MAY I SET UP DURING THE

3    BREAK?

4    **THE COURT:**  ABSOLUTELY.

5    (RECESS TAKEN AT 10:15 A.M.; RESUMED AT 10:30 A.M.)

6    (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

7    **THE CLERK:**  REMAIN SEATED, COME TO ORDER.  THIS COURT

8    IS BACK IN SESSION.  THE HONORABLE HAYWOOD S. GILLIAM

9    PRESIDING.

10   **THE COURT:**  ARE WE SET?

11   **THE CLERK:**  YES, JUDGE?

12   **THE COURT:**  YES.

13   (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

14   **THE CLERK:**  YOU MAY BE SEATED.

15   **THE COURT:**  LADIES AND GENTLEMEN, AT THIS TIME THE

16   DEFENSE HAS THE OPPORTUNITY TO PRESENT ITS CLOSING ARGUMENT.

17   MS. HANSEN, ARE YOU PREPARED TO PROCEED?

18   **MS. HANSEN:**  I AM.  THANK YOU, YOUR HONOR.

19                    **CLOSING ARGUMENT**

20   **MS. HANSEN:**  THIS CASE HAS BEEN ABOUT REWRITING

21   HISTORY; THE GOVERNMENT CHANGING ITS BUILDING BLOCKS TO

22   MANUFACTURE FEDERAL JURISDICTION.

23   YOU HEARD TESTIMONY DURING THIS TRIAL FROM EXPERTS WHO

24   DELINEATED THE LAND ON THIS PROPERTY AND EXPLAINED TO YOU WHAT

25   THOSE AREAS WERE.  UPLAND, WHICH IS NOT JURISDICTIONAL,

1    WETLANDS, WHICH ARE SOMETIMES JURISDICTIONAL, AND WATER

2    FEATURES THAT ALSO ARE SOMETIMES JURISDICTIONAL.

3        WHAT THESE EXPERTS FOUND BETWEEN 2017 AND 2016 AS RELEVANT

4    HERE WERE WETLANDS ON PART OF THE NORTHERN FILL AREA, A POND

5    ON PART OF THE NORTHERN FILL AREA, AND WETLANDS IN THE

6    SOUTHERN FILL AREA.

7        THESE EXPERTS DID NOT FIND, AS DR. HUFFMAN DID, IN 2017

8    THAT TRIBUTARIES 1 AND TRIBUTARIES A EXISTED.  THESE EXPERTS,

9    BETWEEN 2017 AND 2016, ALSO DID NOT DO A SIGNIFICANT NEXUS

10   ANALYSIS.  THE OPINIONS OF THESE EXPERTS CHANGED IN

11   NOVEMBER 2017 AND IN THEIR TESTIMONY TO YOU AT TRIAL.

12       NO TRIBUTARIES CHANGED TO TRIBUTARIES IN BOTH FILL AREAS.

13   THE NORTHERN FILL AREA THAT WAS A POND, NOW HAS NO POND.  IT'S

14   A WETLAND.  AND ALL OF A SUDDEN THESE EXPERTS, SOME OF THEM,

15   HAD OPINIONS ABOUT SIGNIFICANT NEXUS.  THEY DID NOT HAVE THESE

16   OPINIONS BETWEEN 2007 AND 2014 WHEN THEY WERE ANALYZING THE

17   PROPERTY.

18       SO WHAT CAUSED THIS CHANGE?  TWO THINGS:  FIRST, THEY WERE

19   PAID BY THE GOVERNMENT.  AND SECOND, THEY RECEIVED THIS MAP.

20                   (DISPLAYED ON SCREEN.)

21       THIS IS DR. HUFFMAN'S 2017 MAP.  THE TERMS TRIBUTARY 1 IN

22   THE NORTHERN FILL AREA AND TRIBUTARY A IN THE SOUTHERN FILL

23   AREA, THESE WERE NOT INDICATED ON ANY OF THE H.T. HARVEY

24   EXPERT WITNESS MAPS THAT EXISTED BETWEEN 2007 AND 2016.

25       THESE TERMS WERE INVENTED IN 2017 BY DR. HUFFMAN, AN

CLOSING ARGUMENT – HANSEN

1    EXPERT YOU DID NOT SEE AT THIS TRIAL, AN EXPERT YOU DID NOT

2    HEAR FROM.

3        THE GOVERNMENT HAD DR. HUFFMAN STUDY THIS PROPERTY IN

4    2017.  THEY CALLED IN PEOPLE TO TESTIFY WHO WORKED WITH HIM

5    AND WHO WORKED FOR HIM.  YOU HEARD THEM.  THEY ALSO HAD THE

6    EXPERTS WHO YOU DID HEAR FROM MEET WITH HIM IN FEBRUARY OF

7    2017.

8        THEY SHOWED HIS MAP TO THESE WITNESSES.  THEY TOLD YOU IN

9    THEIR OPENING STATEMENT ABOUT ALL OF HIS CREDENTIALS.

10   WOULDN'T THAT BE SOMEONE YOU WOULD EXPECT THEM TO CALL AS A

11   WITNESS TO TESTIFY ABOUT HIS CONCLUSIONS, THE CONCLUSIONS THAT

12   THE OTHER WITNESSES ARE RELYING UPON TO FORM THE BASIS FOR

13   FEDERAL JURISDICTION?

14       THEY CALLED HIS SON IN HERE WHO HAS A DEGREE IN

15   ADMINISTRATIVE JUSTICE, BUT THEY DIDN'T CALL DR. HUFFMAN.

16   WHY?  WHY DIDN'T THEY CALL HIM HERE SO HE COULD TELL YOU ABOUT

17   THE TRIBUTARIES THAT HE AND HE ALONE IDENTIFIED?

18       NOW, THERE ARE THREE COUNTS TO THIS CASE AS THE GOVERNMENT

19   STATED.  AND THE COURT'S INSTRUCTION ON THE CLEAN WATER ACT

20   WILL BE PROVIDED TO YOU.  THERE ARE ONLY ONE ELEMENT THAT IS

21   CONTESTED BY THE DEFENSE.  AND THAT IS ELEMENT NO. 3, FEDERAL

22   JURISDICTION.  THAT IS WHETHER THE WETLANDS IN COUNTS I AND

23   III AND THE TRIBUTARY IN COUNT II QUALIFIES AS "WATERS OF THE

24   UNITED STATES", AND THUS COVERED BY THE CLEAN WATER ACT IN

25   2014.  NOT 2017.  2014.

1    MORE GENERALLY, THE QUESTION THAT YOU HAVE TO ANSWER IS

2    WHETHER THIS CASE BELONGS HERE IN THIS FEDERAL COURTROOM UNDER

3    THAT FLAG AND UNDER THIS SEAL OF THE UNITED STATES.  THAT'S

4    WHAT FEDERAL JURISDICTION MEANS.

5    THIS IS NOT A CIVIL LAWSUIT BROUGHT BY THE SOBRATO

6    ORGANIZATION AGAINST MR. LUCERO.  AND THIS IS NOT A STATE

7    TRESPASSING CASE BROUGHT BY THE ALAMEDA COUNTY INVESTIGATORS,

8    LIKE INSPECTOR HARBISON THAT YOU HEARD FROM.  IT IS NOT A

9    STATE TRESPASSING CASE.

10    THIS IS A FEDERAL CASE.  AND BEFORE I TALK TO YOU ABOUT

11    THE FEDERAL JURISDICTIONAL QUESTION THAT IS AT ISSUE HERE, I

12    WANT TO REMIND YOU ABOUT WHAT WAS NOT CONTESTED IN THIS CASE.

13    MR. LUCERO DOES NOT CONTEST THAT HE WAS RESPONSIBLE FOR

14    THE PLACEMENT OF THE FILL IN THE SUMMER OF 2014.  AND WE DID

15    NOT EVEN OR BARELY CROSS-EXAMINED ALL OF THOSE WITNESSES WHO

16    CAME IN TO TELL YOU ABOUT THE TRUCKLOADS OF FILL THAT WERE

17    PLACED, ABOUT THE MEETINGS MR. LUCERO HAD.  YOU CAN REMEMBER

18    THAT WE DID NOT GET UP AND CONTEST THAT.

19    BUT THE GOVERNMENT PRESENTED ALL OF THAT EVIDENCE TO YOU

20    EVEN THOUGH THOSE FACTS HAVE NO BEARING ON WHAT IS AT ISSUE

21    FOR THIS CASE AND WHAT WE DO CONTEST.

22    THE GOVERNMENT ALSO PUT ON SOME WITNESSES FOR YOU TO TALK

23    ABOUT THE FACT THAT MR. LUCERO DID NOT HAVE PERMISSION TO

24    FILL.  AND YOU REMEMBER THE LETTER THAT THEY PUT UP SEVERAL

25    TIMES.  THESE WITNESSES TESTIFIED SO THAT THE GOVERNMENT CAN

1    TELL YOU THAT MR. LUCERO WAS NOT HONEST AND THAT HE MADE UP A

2    PERMISSION NOTE.

3        AFTER THIS TESTIMONY WAS PRESENTED, THOUGH, HIS HONOR,

4    JUDGE GILLIAM, READ TO YOU AN INSTRUCTION.  AND THAT

5    INSTRUCTION TOLD YOU YOU ARE ONLY HERE TO DETERMINE WHETHER

6    THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE CHARGES IN THE

7    INDICTMENT.  THE DEFENDANT IS NOT ON TRIAL FOR CONDUCT OR

8    OFFENSES NOT CHARGED.

9        THE COURT READ THIS INSTRUCTION BECAUSE THE ONLY

10   PERMISSION THAT IS RELEVANT HERE IS PERMISSION FROM THE UNITED

11   STATES GOVERNMENT.

12                       (DISPLAYED ON SCREEN.)

13       I GOT AHEAD OF MYSELF ON THE SLIDES, PARDON ME.  HERE IT

14   IS.

15                       (DISPLAYED ON SCREEN.)

16       THE ONLY PERMISSION THAT MATTERS IS PERMISSION FROM THE

17   UNITED STATES ARMY CORPS OF ENGINEERS.  DOESN'T MATTER.

18   MR. LUCERO WOULD STILL BE SITTING IN THAT SEAT IF HE HAD A

19   SIGNED CONTRACT WITH THE SOBRATO LAWYERS SAYING THAT HE COULD

20   PUT FILL IN THERE SO THAT THEY COULD DO THEIR DEVELOPMENT

21   BECAUSE THE PERMISSION THAT MATTERS HERE IS NOT FROM THE

22   SOBRATOS.

23       SO YOU HAVE TO ASK YOURSELVES WHY DID THE GOVERNMENT

24   PRESENT THIS EVIDENCE TO YOU?  WHAT IS IT THAT THEY WANTED YOU

25   TO FEEL?  THEY WANTED YOU TO FEEL ANGRY OR FRUSTRATION OR THAT

CLOSING ARGUMENT – HANSEN

1    YOU DID NOT LIKE MR. LUCERO FOR NOT BEING HONEST.

2        CONVICTING SOMEONE OF A FEDERAL CRIMINAL CASE IS SERIOUS

3    AND YOU HAVE TO SET ASIDE THOSE FEELINGS.  I REMEMBER DURING

4    JURY SELECTION, I TALKED TO YOU ONE OF YOU.  IT MAY BE ONE OF

5    YOU HERE, I CAN'T RECALL.  ONE OF THE MEMBERS OF THE PANEL

6    SAID THAT THEY HAD A HARD TIME ON A CRIMINAL CASE CONVICTING A

7    DEFENDANT.  THEY FELT EMPATHY FOR THAT DEFENDANT.  AND THEY

8    DIDN'T WANT TO CONVICT.  BUT THAT JUROR TOLD US THAT SHE HAD

9    TO FOLLOW THE LAW.  SHE HAD TO CONVICT DESPITE THOSE FEELINGS.

10       WELL, THE OPPOSITE IS TRUE HERE.  YOU MAY NOT LIKE WHAT

11   MR. LUCERO DID, BUT YOU HAVE TO SET THAT ASIDE AND MEASURE

12   THIS CASE BY THE EVIDENCE THE GOVERNMENT PRESENTS ON FEDERAL

13   JURISDICTION.

14       YOU CANNOT AND SHOULD NOT CONVICT MR. LUCERO OUT OF ANGER.

15   YOU HEARD THE GOVERNMENT CALL THIS IN CLOSING A HEINOUS

16   ENVIRONMENTAL CRIME TO FILL AREAS THAT WILL LATER BE FILLED

17   AND DEVELOPED.  BUT WE CAN'T BASE OUR DECISION ON THOSE

18   FEELINGS.

19       TIM STEELE WAS ANGRY WHEN HE SAW THE TRUCKS ON HIS

20   CLIENT'S PROPERTY, BUT THAT DOESN'T MATTER.  IT'S NOT

21   RELEVANT.  CARIN HIGH, AN ENVIRONMENTALIST, WHO DOESN'T WANT

22   THIS LAND TO BE DEVELOPED, WHO WANTS TO EXPAND THAT REFUGE,

23   SHE WAS ANGRY TOO.  BUT THAT JUST DOESN'T MATTER.

24       DANIEL MILLER, WHO WAS TAKING PICTURES AND SITTING IN HIS

25   SPOT UNDER THE DUCK PONDS, HE, TOO, TOLD YOU THAT HE GETS

 1    ANGRY AND HE TAKES PICTURES.  IT JUST DOESN'T MATTER.  THESE

 2    FEELINGS ARE NOT A SUBSTITUTE FOR EVIDENCE.  SO I WOULD ASK

 3    THAT YOU REMEMBER THAT AND REMEMBER WHAT WE DISCUSSED DURING

 4    THE VOIR DIRE PROCESS.

 5        MR. SMOCK TOLD YOU IN THE OPENING TWO WEEKS AGO THAT WE DO

 6    NOT DISPUTE THAT MR. LUCERO SHOULD NOT HAVE DONE WHAT HE DID.

 7    HE SHOULD NOT HAVE LIED ABOUT IT EITHER.  AND THAT ISSUE MAY

 8    BE RESOLVED IN OTHER FORUMS, BUT YOU ARE NOT HERE TO DECIDE

 9    THAT.

10        THE QUESTION YOU MUST ANSWER IS WHETHER THIS CASE SHOULD

11    BE CHARGED HERE IN FEDERAL CRIMINAL COURT, AND THIS IS AN

12    IMPORTANT QUESTION, THE LAW AND OUR CONSTITUTION REQUIRES THAT

13    YOU DECIDE THIS.

14        SO LET'S NOW TURN TO THE GOVERNMENT'S REWRITE.

15                    (DISPLAYED ON SCREEN.)

16        IN NOVEMBER 2017, DR. HUFFMAN FOUND NO POND UNDER THE

17    JUNKYARD IN THE NORTHERN FILL AREA.  THE POND IS NOW A GREEN

18    WETLAND.  THAT IS WHERE THE ARROW IS ON THIS EXHIBIT.

19        IN 2017, DR. HUFFMAN IDENTIFIED TRIBUTARY 1 IN THE

20    NORTHERN FILL AREA BETWEEN THE WETLAND AND THE MOWRY SLOUGH.

21    IN 2017, DR. HUFFMAN IDENTIFIED A TRIBUTARY A IN THE SOUTHERN

22    FILL AREA ALL ALONG THE BERM UNTIL WHAT HE CALLS TRIBUTARY B.

23                    (DISPLAYED ON SCREEN.)

24        NOW AS AN ASIDE, TRIBUTARY B ON DR. HUFFMAN'S MAP WAS

25    PREVIOUSLY MAPPED BY H.T. HARVEY.

1          (DISPLAYED ON SCREEN.)

2      IT WAS NOT LABELED AS TRIBUTARY B, INSTEAD IT WAS REFERRED

3  TO BY THE GOVERNMENT IN TESTIMONY AS THE BORROW DITCHES, WHICH

4  I BELIEVE MEANS IT WAS A MAN-MADE CHANNEL.  AND IT RUNS ALONG

5  THE OPPOSITE SIDE OF THE LEVEE ALONG THE SLOUGH.  IT WAS ON

6  BOTH MAPS.

7      THIS IS WHAT DR. HUFFMAN CALLED TRIBUTARY B, AND THIS IS

8  WHERE THE DISCHARGE FROM HIS TRIBUTARY A FLOWS DOWN THERE ALL

9  THE WAY TO THE BOTTOM OF THE PROPERTY INTO THE SLOUGH.  WE'VE

10  SEEN LOTS OF PICTURES OF WAY AT THE BOTTOM, LOTS OF VIDEOS OF

11  THAT PUMP WAY AT THE BOTTOM OF THE SLOUGH.

12      WHATEVER IT IS CALLED, TRIBUTARY B EXISTED.  BUT THE OTHER

13  TWO TRIBUTARIES, TRIBUTARY 1 AND TRIBUTARY A, THEY DID NOT.

14  LET'S LOOK AT THE HISTORICAL RECORD.

15          (DISPLAYED ON SCREEN.)

16      MAY 2007, H.T. HARVEY MAP, THIS MAP WAS A PART OF A

17  LENGTHY PRELIMINARY DELINEATION REPORT PREPARED FOR THE

18  SOBRATO DEVELOPMENT PROJECT.  THE POND IN THE NORTHERN FILL

19  AREA EXISTS.  NO TRIBUTARY 1 IN THE NORTH.  NO TRIBUTARY A IN

20  THE SOUTH.

21      AUGUST OF 2007, DAN MARTEL, THE CORPS EMPLOYEE WHO

22  TESTIFIED.  THIS IS HIS FIELD MAP, EXHIBIT 180.  THIS MAP WAS

23  USED BY MR. MARTEL TO CONFIRM H.T. HARVEY'S MAP THAT I JUST

24  SHOWED YOU.  HE ADDED ACRES OF WETLAND THAT HE THOUGHT THEY

25  HAD MISSED.  HE MADE NO OTHER CHANGES TO THIS MAP.  HE DID NOT

CLOSING ARGUMENT – HANSEN

1    INDICATE THE EXISTENCE OF ANY TRIBUTARIES IN THE AREAS

2    IMPACTED BY THE FILL.  THE POND EXISTS.  NO TRIBUTARY 1, NO

3    TRIBUTARY A IN THE SOUTHERN FILL AREA.

4                      (DISPLAYED ON SCREEN.)

5       LET'S GO TO FEBRUARY OF 2009.  THIS IS FROM THE H.T.

6    HARVEY BIOLOGICAL RESOURCES REPORT WHICH WAS SUBMITTED TO THE

7    CITY OF NEWARK FOR THE ENVIRONMENTAL IMPACT REPORT.  THE EIR

8    WAS THE FOUNDATION FOR THE CITY AND THE DEVELOPMENT'S PLANS

9    REGARDING AREA 4.

10      NOW, THIS MAP DELINEATES THE FEATURES A LITTLE BIT

11   DIFFERENTLY THAN THE OTHER MAPS, AND THAT'S BECAUSE

12   DR. HARDWICKE EXPLAINED IT USES DIFFERENT STANDARDS, BUT THOSE

13   DON'T MATTER.  WHAT WE ARE LOOKING AT HERE ON THIS MAP IS THE

14   WATER, THE AQUATIC THAT WAS DELINEATED.  AGAIN, 2009, NO POND,

15   NO TRIBUTARIES.  THIS WAS SUBMITTED TO THE CITY OF NEWARK FOR

16   THE DEVELOPMENT.

17      NOVEMBER 2014 -- EXCUSE ME SEPTEMBER 2014.

18                      (DISPLAYED ON SCREEN.)

19      WE NOW HAVE THE H.T. HARVEY FILL IMPACT.  THIS IS AFTER

20   THE FILL WAS PLACED.  DR. BOURSIER AND OTHERS WENT TO THE SITE

21   TO MAKE THIS MAP.  HE DUG AROUND IN THE EXACT AREAS THAT WERE

22   IMPACTED BY THE FILL.  THERE ARE NO NOTED CHANGES TO THE

23   PREVIOUS DELINEATIONS.  THE POND EXISTS IN THE, NORTH NO

24   TRIBUTARY 1 IN THE NORTH AND NO TRIBUTARY A IN THE SOUTH.

25   LET'S MOVE FORWARD TO NOVEMBER OF 2014.

 1              (DISPLAYED ON SCREEN.)

 2      DR. GALACATOS' FIELD MAP.  SHE TOO WORKED FOR THE ARMY

 3  CORPS OF ENGINEERS, AND SHE STILL IS EMPLOYED THERE.  SHE

 4  ASSESSED THE FILL IMPACT AND DOCUMENTED HER FINDINGS.  YOU SAW

 5  PICTURES FROM HER TIME ON THE SITE IN NOVEMBER OF 2014.  THIS

 6  IS HER FIELD MAP.  AGAIN, THIS FIELD MAP DID NOT NOTE ANY

 7  CHANGES.  NO POND -- EXCUSE ME.  THE POND EXISTS.  NO

 8  TRIBUTARY 1 IN THE NORTH AND NO TRIBUTARY A IN THE SOUTH.

 9      NOW THIS ONE.

10              (DISPLAYED ON SCREEN.)

11      OCTOBER OF 2016, MEMBERS OF THE JURY, THAT WAS JUST 16

12  MONTHS AGO.  THIS IS H.T. HARVEY.  THEY WERE HIRED BY THE

13  SOBRATOS TO ANALYZE THIS SITE.  THEY HAVE ALREADY BEEN AWARE

14  OF THE FILL.  THEY HAVE ALREADY BEEN AWARE OF THIS CASE, AND

15  LOOK AT THIS MAP.  THE FILL IMPACT IS ON THERE.  IT'S IN RED.

16      OCTOBER 2016, THE POND EXISTS.  NO TRIBUTARY 1, NO

17  TRIBUTARY A.  WE KNOW H.T. HARVEY KNEW HOW TO DELINEATE

18  TRIBUTARIES ON THEIR MAPS.  AND EVERY ONE OF THESE MAPS YOU

19  WILL BE ABLE TO SEE THIN LINEAR LINES IN THE MAPPING.

20      I WANT TO SHOW YOU AN EXAMPLE OF THAT.  LET'S GO BACK TO

21  EXHIBIT 1138.

22              (DISPLAYED ON SCREEN.)

23      THE BOTTOM OF THE MAP.  THIS WILL BE IN EVIDENCE.  YOU CAN

24  SEE ALL THE AREAS WHERE H.T. HARVEY CAREFULLY DOCUMENTED SMALL

25  LINEAR CHANNELS AND TRIBUTARIES AND SOMETIMES EVEN THROUGH

 1   WETLANDS.

 2        IN 2017 AND 2018, ALL OF THIS CHANGED.  WHY?  WHY DID THE

 3   H.T. HARVEY MAPS CHANGE?  FOR TWO REASONS.  FIRST, THE

 4   GOVERNMENT NEEDED A HOOK FOR SIGNIFICANT NEXUS FOR THE TWO

 5   AREAS WHERE THE FILL WAS IMPACTED.  SECOND, BECAUSE THE ARMY

 6   CORPS OF ENGINEERS IN 2007 AND AGAIN IN 2014 BASED

 7   JURISDICTION ON THE NORTHERN FILL AREA ON AN "OTHER WATER"

 8   THEORY OF JURISDICTION.

 9                    (DISPLAYED ON SCREEN.)

10        EXHIBIT 2050, HERE ON THE SCREEN, IS THE OFFICIAL

11   GOVERNMENT MAP.  WE AGREE WITH THE SCIENCE OF THE DELINEATIONS

12   ON THIS MAP.  WHAT IS WHERE ON THE PROPERTY.  UPLANDS,

13   WETLANDS, WATERS.  WHAT WE DON'T AGREE WITH IS THE

14   JURISDICTIONAL DETERMINATION.

15        NOW, ALL OF THE WATER FEATURES CAN BE SEEN MORE CLEARLY ON

16   THE COLORED VERSION OF THIS MAP THAT I WILL PUT UP AND TAKE

17   DOWN SO IT DOESN'T OBSTRUCT THE COURT'S VIEW.

18        THIS IS EXHIBIT 2060.  AND IT'S SO MUCH EASIER TO SEE THAN

19   THE BLACK AND WHITE MAP.  THE BLUE AREAS ARE THE ONES THAT HAD

20   THE DIAGONAL SLASH.  AND SO WE COLORED THOSE IN, AND

21   MR. MARTEL SAID THAT THIS WAS A FAIR AND ACCURATE DEPICTION OF

22   HIS MAP AS COLORED IN.

23        ALL OF THESE DELINEATIONS WERE BASED ON THE H.T. HARVEY

24   MAPS THAT I JUST WENT OVER WITH YOU.  WE DO NOT AGREE WITH THE

25   CORPS' LEGAL DETERMINATION, AS YOU CAN SEE FROM THAT SLIDE,

1    THEY CALLED IT "OTHER WATERS".

2        NOW, THE GOVERNMENT DOES NOT AGREE WITH THIS EITHER.  THEY

3    JUST TOLD YOU IN CLOSING ARGUMENT THAT TRIBUTARIES ARE A

4    SUBSET OF "OTHER WATERS".  THAT IS WRONG.  THEY ARE DIFFERENT

5    CATEGORIES UNDER THE REGULATIONS.  THEY ARE IN DIFFERENT

6    SECTIONS.

7        AND HOW DO WE KNOW THAT THE GOVERNMENT KNOWS THIS IS

8    WRONG?  BECAUSE THIS CASE DOES NOT CHARGE MR. LUCERO WITH

9    DEPOSITING FILL INTO JURISDICTIONAL "OTHER WATERS".  WHAT THE

10   GOVERNMENT CHARGED IN THIS CASE, AND YOU WILL SEE IN THE

11   INSTRUCTIONS, FOR COUNT II IS THAT MR. LUCERO DEPOSITED FILL

12   INTO A JURISDICTIONAL TRIBUTARY.

13       THE REASON IS THE PONDED AREA UNDER THE JUNKYARD CANNOT BE

14   AN "OTHER WATER" BECAUSE IT HAS NO EFFECT ON COMMERCE.  THAT'S

15   WHY JURISDICTION CHANGED.  THAT'S WHY THE GOVERNMENT'S

16   BUILDING BLOCKS WERE TAKEN APART AND PUT BACK TOGETHER WITH

17   SOMETHING NEW IN 2017.

18       DR. HARDWICKE EXPLAINED TO US, I ASKED HER ABOUT THE

19   "OTHER WATER" REGULATION THAT CANNOT APPLY HERE, AND WE KNOW

20   IT DOESN'T APPLY BECAUSE SHE AGREED THAT SHE COULD NOT PROVIDE

21   THE COMMERCE CONNECTION THAT WOULD BE REQUIRED.

22       SHE AGREED SHE COULD FIRST CITE NO EVIDENCE THAT THIS

23   LITTLE POND COULD BE USED FOR RECREATIONAL PURPOSES IN

24   INTERSTATE OR FOREIGN COMMERCE.  SHE COULD NOT SAY IF THERE

25   WERE FISH OR SHELLFISH THAT COULD BE SOLD IN COMMERCE.  SHE

 1    COULD NOT SAY THE POND COULD BE USED FOR INDUSTRIAL PURPOSES.

 2        NOW, DR. BOURSIER WOULDN'T CONCEDE THE POINT, AND HE

 3    OFFERED THAT HE COULD PUT HIS KAYAK IN THERE.  BUT UNLESS HIS

 4    KAYAK COULD MAGICALLY GO THROUGH THE SLOUGH, I'M NOT SO SURE

 5    HOW THAT WOULD HAVE AN EFFECT ON INTERSTATE COMMERCE, MEANING

 6    BETWEEN STATES.

 7        THERE IS A REASON H.T. HARVEY AND DR. BOURSIER AND

 8    DR. HARDWICKE CHANGED THE WAY THEY DESCRIBED THE WATER ON

 9    THEIR MAPS.  LET ME TAKE THIS DOWN.

10        YOU CAN SEE ON THE LEFT, EXHIBIT 1138 FROM 2007, WAS

11    DEFINED AS "OTHER WATERS".  LOOK WHAT HAPPENS IN 2014.  LOOK

12    HOW H.T. HARVEY CHANGED THAT TO AQUATIC.

13        THE REASON IS?  THIS POND IS NOT JURISDICTIONAL AS AN

14    "OTHER WATER".  SO NOW WHAT?  THE ARMY CORPS OF ENGINEERS HAD

15    THE WRONG BASIS FOR JURISDICTION.  NOW WHAT?  WE REWRITE

16    HISTORY, AND THAT IS WHAT THE GOVERNMENT DID.

17        IN FEBRUARY OF 2017, ALL OF THE MAIN EXPERTS EXCEPT FOR

18    DR. GALACATOS, A SUPERVISOR FOR THE ARMY CORPS OF ENGINEERS

19    WITH A PH.D., EVERYONE BUT HER TAKES A FIELD TRIP WITH THE

20    GOVERNMENT LAWYERS AND DR. HUFFMAN TO THE SITE.

21        AND DR. GALACATOS' ABSENCE IS IMPORTANT, AND KEEP THAT IN

22    MIND.  SHE IS NOT A PAID EXPERT.  SHE GETS HER SALARY AS AN

23    ARMY CORPS EMPLOYEE.  SHE IS NOT A CONSULTANT.  SHE CAN'T BE

24    PAID FOR HER TESTIMONY.

25        BUT DR. BOURSIER, DR. HARDWICKE, AND FORMER CORPS EMPLOYEE

1    DAN MARTEL GO TO THE SITE IN FEBRUARY OF 2017.  NOT THAT LONG

2    AGO, A YEAR AGO.  TWO YEARS AFTER THE FILL ACTIVITY, AFTER

3    WE'VE HAD AN UNUSUALLY WET WINTER.  THEY GO THERE AND THEY

4    DON'T DO ANY SITE FIELD TEST OR SAMPLING, NOTHING, TO CHANGE

5    THEIR OPINION.  WHAT DO THEY INSTEAD?  THEY TALK TO

6    DR. HUFFMAN.  GUESS WHAT?  YOU DON'T GET TO TALK TO

7    DR. HUFFMAN.  YOU DON'T GET TO HEAR FROM HIM.

8         NINE MONTHS AFTER THIS FEBRUARY MEETING, DR. HUFFMAN'S MAP

9    IS EMAILED TO SOME OF THE EXPERTS YOU HEARD FROM AT THIS

10   TRIAL.  HERE IS THE EMAIL TO DR. BOURSIER.  THIS IS NOVEMBER,

11   JUST THREE MONTHS AGO.

12                    (DISPLAYED ON SCREEN.)

13        WITH THAT MAP IN HAND IN LATE 2017 AND IN TESTIMONY DURING

14   THIS TRIAL, THE H.T. HARVEY EXPERTS MODIFIED THE DELINEATIONS

15   THAT THEY HAD CONSISTENTLY MAPPED FOR A DECADE, 2007 TO 2016.

16        IT WAS QUITE EXTRAORDINARY THAT DR. BOURSIER SPENT THIS

17   DECADE ANALYZING A PIECE OF PROPERTY THAT HAD BEEN IN

18   LITIGATION FOR YEARS AND WAS GOING TO BE USED BY A MAJOR REAL

19   ESTATE DEVELOPER IN THE BAY AREA.

20        AND I ASKED HIM IF HE COULD SAY THAT HIS MAPS PROVIDED AN

21   ACCURATE HISTORICAL RECORD OF THE LAND AS IT EXISTED BETWEEN

22   2007 AND 2014.  HE WOULDN'T EVEN AGREE THAT THE MAPS THAT THE

23   GOVERNMENT PUT INTO EVIDENCE, EXHIBIT 3, WITH THE FILL

24   OUTLINE, HE WOULDN'T EVEN AGREE THAT THAT WAS ACCURATE.  HE

25   SAID HE DIDN'T WANT TO THROW ANYBODY UNDER THE BUS FROM HIS

1    FIRM.

2        HE CLAIMED EXHIBIT 3, THE GOVERNMENT'S EXHIBIT IN THIS

3    CASE, WAS SOMEHOW INACCURATE WITHOUT TELLING YOU WHY.  SO WE

4    CHANGED MAPS.  I USED A DIFFERENT ONE WITH HIM.  AND HIS NEXT

5    LINE OF DEFENSE WAS TO SAY, LIKE DAN MARTEL DID, OH, THERE WAS

6    BLUE ON HIS MAPS.  THERE WAS NO BLUE.  WHEN JUST WENT THROUGH

7    THEM ALL AND YOU WILL SEE THEM IN YOUR DELIBERATIONS.

8        DR. BOURSIER'S LAST LINE OF DEFENSE WAS THAT JUST BECAUSE

9    IT'S NOT ON MY MAPS DOESN'T MEAN IT WASN'T THERE.  TRUST ME.

10   I DIDN'T PUT IT IN ANY OF THE MAPPING FOR TEN YEARS, BUT IT

11   EXISTS.

12       MAPS THAT TOOK YEARS TO CREATE, MAPS THAT ARE FOR

13   MULTIMILLION DOLLAR DEVELOPMENT PROJECT, PLANS THAT H.T.

14   HARVEY TOLD THE SOBRATO ORGANIZATIONS YOU'RE GOING TO HAVE TO

15   PAY A LOT OF MONEY TO GET THIS RIGHT.  DR. HARDWICKE TOLD YOU

16   THAT.

17       MEMBERS OF THE JURY, THIS ALONE IS REASONABLE DOUBT.  I

18   WANT TO GIVE YOU AN EXAMPLE OF WHY THIS IS REASONABLE DOUBT,

19   BUT IN A DIFFERENT CONTEXT.

20       IMAGINE YOU HAVE AN ONGOING SERIOUS MEDICAL CONDITION.

21   AND THAT QUESTION YOU ARE GOING TO HAVE TO DECIDE IS WHETHER

22   YOU NEED SURGERY AND TO HAVE A DEVICE IMPLANTED.  YOU GO TO

23   YOUR DOCTOR WHO YOU'VE SEEN FOR MANY YEARS, AND THEY LOOK BACK

24   AT YOUR DETAILED RECORDS, YOUR MEDICAL FILE, BUT THE

25   INDICATORS ARE NOT THERE IN THAT FILE FOR THIS SURGERY.

CLOSING ARGUMENT – HANSEN

1    THEY WERE NEVER LISTED IN YOUR EXTENSIVE MEDICAL FILE, BUT

2    THE DOCTORS TELL YOU, HOWEVER, TEN YEARS LATER THAT THEY

3    REMEMBER SEEING THE PROBLEM.  DEFINITELY THERE IN REAL LIFE.

4    YOU ASK IF THERE ARE PICTURES, CAT SCANS, OR MRI'S TO

5    DOCUMENT IT.  THERE ARE NONE.  YOU ASK IF THERE ARE RESULTS

6    FROM BLOOD TESTS.  THERE ARE NONE.

7    AND THEN YOU LEARN THAT YOUR DOCTORS ARE BASING THEIR

8    OPINION ON ANOTHER DOCTOR.  AND YOU SEE SOME NEW TEST RESULTS,

9    CONCLUSIONS, REALLY, NO FOUNDATION FOR THOSE CONCLUSIONS, JUST

10   CONCLUSIONS.  AND THOSE ARE INCONSISTENT WITH THE PREVIOUS

11   TESTS.

12   BUT GUESS WHAT?  YOU DON'T GET TO HEAR FROM THAT NEW

13   DOCTOR.  THAT DOCTOR IS NOT AVAILABLE TO YOU TO EXPLAIN HIS

14   FINDINGS.  HE'S NOT COMING.

15   WOULD YOU GO THROUGH WITH THE PROCEDURE IN THOSE

16   CIRCUMSTANCES WITHOUT HEARING FROM THE DOCTOR WHO SAYS THE

17   INDICATORS FOR THE SURGERY EXIST?  NO, YOU WOULDN'T.  BECAUSE

18   YOU HAVE A REASONABLE DOUBT AS TO WHETHER YOU SHOULD HAVE THAT

19   PROCEDURE.

20   IT GETS WORSE.  IMAGINE YOU LEARN THAT YOUR DOCTORS WHO

21   DID NOT PREVIOUSLY DOCUMENT ANY OF THESE INDICATORS HAD A

22   FINANCIAL INTEREST IN THIS MEDICAL PROCEDURE.  AND THEN

23   IMAGINE THAT THOSE DOCTORS MISLED YOU ABOUT GETTING PAID AND

24   HOW MUCH THEY WERE BEING PAID.

25   THIS IS EXACTLY WHAT DR. BOURSIER AND DAN MARTEL DID IN

1    THIS TRIAL.  THEY TESTIFIED INCONSISTENTLY WITH THEIR PRIOR

2    DELINEATIONS INCONSISTENT WITH WHAT WAS WHERE ON THE MAP.  AND

3    THEN THEY WOULD NOT ADMIT THAT THEY WERE BEING PAID FROM THE

4    GOVERNMENT FOR THEIR NEW OPINIONS.

5        DR. BOURSIER AND DR. HARDWICKE'S FIRM WILL BE PAID NEARLY

6    $18,000 FOR DOING NO NEW TESTS OR ANYTHING, JUST FOR COMING

7    AND TESTIFYING AND WORKING WITH THE GOVERNMENT.  SAME WITH DAN

8    MARTEL.  HE HAS A CONTRACT WITH THE GOVERNMENT FOR $11,000.

9    HE, TOO, DID NO NEW WORK TO CHANGE HIS OPINION.  NO NEW FIELD

10   WORK, NO NEW SCIENCE.  THIS EVIDENCE HAD TO COME IN THROUGH

11   HIS HONOR, JUDGE GILLIAM.  THE COURT HAD TO READ THAT EVIDENCE

12   TO YOU BECAUSE THESE WITNESSES WOULD NOT TELL YOU DIRECTLY

13   WHAT THEY WERE BEING PAID.

14       **MR. KEARNEY:**  THAT'S IMPROPER ARGUMENT.  MISSTATES

15   THE TESTIMONY AND THE EVIDENCE.

16       **THE COURT:**  SUSTAINED AS TO THAT POINT.

17       **MS. HANSEN:**  CAN YOU TRUST SOMEONE WHO WOULD NOT

18   ACKNOWLEDGE HOW MUCH HE IS GETTING PAID?

19       DR. BOURSIER DOESN'T KNOW ANYTHING ABOUT HIS FIRM'S

20   CONTRACT HE TOLD YOU BECAUSE HE LIVES IN MORGAN HILL.  WHAT

21   DOES THAT HAVE TO DO WITH ANYTHING?  THERE IS NO REASON FOR

22   DAN MARTEL AND DR. BOURSIER TO HIDE THIS FROM YOU.  IF THEY

23   CANNOT BE TRUSTED TO TESTIFY AS SOMETHING AS SIMPLE AS THEIR

24   CONSULTING FEE AND WHAT THEY ARE GOING TO BE PAID, HOW CAN YOU

25   TRUST THEM IN A SERIOUS CRIMINAL CASE TO TELL YOU ABOUT THE

1   DELINEATIONS AND THEIR JURISDICTIONAL DETERMINATIONS?  UNDER

2   THESE CIRCUMSTANCES VERY FEW OF US WOULD GO THROUGH THE

3   MEDICAL PROCEDURE.

4       THE GOVERNMENT'S THEORY OF JURISDICTION FOR ALL THREE

5   COUNTS DEPENDS ON A MISSING DOCTOR WHO PROVIDES THE FOUNDATION

6   FOR THEIR ENTIRE CASE.  WITHOUT DR. HUFFMAN HERE TO PROVIDE

7   YOU WITH THE EVIDENCE TO SUPPORT HIS 2017 MAP AND THE OTHER

8   EXPERTS' REWRITE, THERE IS MORE THAN REASONABLE DOUBT.

9       LET'S GO THROUGH EACH OF THE THREE COUNTS.

10                  (DISPLAYED ON SCREEN.)

11      COUNT I'S REWRITE.  IN DR. HUFFMAN'S 2017 MAP, THE POND

12  UNDER THE JUNKYARD IS A WETLAND.  THERE IS NO POND.  WHAT

13  EVIDENCE IS THERE FOR THIS REWRITE?  ON THE LEFT IS THE H.T.

14  HARVEY MAP, ON THE RIGHT IS THE 2017 HUFFMAN MAP.

15      NOW IN CLOSING ARGUMENT THE GOVERNMENT SHOWED YOU PICTURES

16  FROM 2014 FROM EITHER CARIN HIGH OR DANIEL MILLER.

17  DR. HARDWICKE WENT THROUGH SOME OF THESE PHOTOS AND TOLD YOU

18  SHE BELIEVED THE PONDED AREA UNDER THE JUNKYARD HAD WETLAND

19  VEGETATION IN IT IN 2014, AND THUS, IT WAS PROBABLY NO LONGER

20  A POND.

21      DR. HARDWICKE WAS NOT AT THE SITE IN 2014.  SHE ADMITTED

22  SHE HAD NOT BEEN THERE FOR TEN YEARS, BETWEEN 2007 AND 2017.

23  DAN MARTEL LOOKED AT A PICTURE, AND THE GOVERNMENT SHOWED IT

24  TO YOU HERE, AND HE OFFERED OPINION TO YOU AS WELL BASED ON A

25  PICTURE.  HE, TOO, WAS NOT AT THE SITE IN 2014.

1      THE TESTIMONY BASED ON GENERALIZED PICTURES DOES NOT PROVE

2   BEYOND A REASONABLE DOUBT DR. HUFFMAN'S MAP.  IN FACT,

3   GENERALIZED PICTURES MIGHT BE ABLE TO TELL YOU ONE OF THE

4   THREE FACTORS THAT MUST BE PRESENTED FOR THERE TO BE A

5   WETLAND.

6      REMEMBER, WETLAND VEGETATION, WETLAND HYDROLOGY, WETLAND

7   SOILS.  THE LAST TWO WOULD REQUIRE A FIELD VISIT.

8      AND DR. HARDWICKE IMPORTANTLY ADMITTED TO YOU ON

9   CROSS-EXAMINATION THAT SHE COULD NOT SAY WITH ANY DEGREE OF

10  SCIENTIFIC CERTAINTY THAT ANY OF THE DELINEATIONS ON THE H.T.

11  HARVEY MAPS WERE INACCURATE.  SHE COULD NOT SAY THAT THE MAP

12  OF THE POND ON THE LEFT WAS NOT PROPERLY DELINEATED ON HER

13  FIRM'S MAP.

14     NOW, DR. BOURSIER, WHO HAD SOME TROUBLE REMEMBERING THINGS

15  WHEN I QUESTIONED HIM, DID ADMIT TO YOU THAT IN A PRIOR

16  INTERVIEW WITH THE GOVERNMENT HE STATED THAT IF THE POND HAD

17  CONVERTED TO A WETLAND, THAT AT SOME POINT IT WOULD HAVE BEEN

18  AROUND 2016 WHEN THAT OCCURRED, NOT 2014.  WHAT MATTERS HERE

19  IS 2014.

20     DR. HARDWICKE ALSO CONFIRMED THAT PONDS CAN BE SEASONAL

21  AND THEY DON'T HAVE TO HAVE WATER IN THEM YEAR ROUND TO BE A

22  POND.  SO HERE'S THE AREA IN 2007.

23              (DISPLAYED ON SCREEN.)

24     THIS IS THE AREA UNDER THE JUNKYARD.  YOU CAN SEE PART OF

25  THE JUNKYARD THERE.

1        NOW YOU CAN SEE THE WETLAND BEHIND IT (INDICATING) AND

2   IT'S NOT VERY DENSE THERE BECAUSE THE EVIDENCE AT TRIAL

3   ESTABLISHED THAT THE LANDOWNERS REGULARLY MOWED AND DISKED THE

4   WETLAND VEGETATION.  AND HERE IS THE POND IN MARCH 2007.

5                    (DISPLAYED ON SCREEN.)

6        THE WATER IS NOT FULLY PONDED THERE.  IT IS THE BEGINNING

7   OF SPRING.  THE WATER DOES NOT HAVE TO BE PRESENT YEAR ROUND

8   FOR IT TO BE A POND.

9        AND JUST BECAUSE THERE IS NO WATER IN THE POND IN 2014,

10  DURING THE DROUGHT, DOES NOT MEAN IT WAS NOT STILL A POND THAT

11  YEAR.  YOU HEARD EVIDENCE AT THIS TRIAL THAT THE ARMY CORPS OF

12  ENGINEERS DOES NOT RE-DELINEATE AREAS DURING NONNORMAL

13  CONDITIONS SUCH AS A DROUGHT.

14       AND NOW HERE'S THE POND IN 2016 FROM AN AERIAL SHOT.

15                   (DISPLAYED ON SCREEN.)

16       THIS IS AFTER THE FILL ACTIVITY IN 2014.  AND EVEN THEN,

17  EVEN AFTER THE FILL WAS PLACED TO RAISE THE ELEVATION, THERE

18  APPEAR TO BE SEASONAL PONDING.

19       BUT THIS IS IMPORTANT:  AFTER THE FILL WAS PLACED THERE,

20  NONE OF THESE PICTURES OF THE POND MATTER.  THE AREA UNDER THE

21  JUNKYARD LIKELY CHANGED BECAUSE THE DEPRESSION THAT

22  DR. GALACATOS TOLD US ABOUT HAD BEEN FILL.  SO ANY PICTURES

23  AFTER 2014, WHATEVER THE EXPERTS OBSERVED IN 2017, SHOULD BE

24  GIVEN VERY LITTLE, IF NO WEIGHT HERE.

25       DR. GALACATOS' TESTIMONY IS WHY THE HUFFMAN REWRITE OF THE

1    POND DOES NOT WORK.  SHE TOLD YOU SHE WAS AT THE SITE IN 2013

2    AND AGAIN IN 2014 AFTER THE FILL.  SHE DID NOT CONFIRM

3    DR. HARDWICKE'S OPINION.  DR. HARDWICKE'S OPINION WAS BASED

4    SOLELY ON PICTURES.  DR. GALACATOS' OPINION WAS BASED ON WHAT

5    SHE SAW WITH HER OWN EYES.

6        SHE SAID, AND SHE WAS THERE IN LATE 2013 TO RECONFIRM THE

7    2007 CORPS MAP.  SHE CONFIRMED THE 2007 DELINEATIONS IN THIS

8    MAP.  SHE TOLD YOU THE AREA UNDER THE JUNKYARD APPEARED TO BE

9    VERY LOW FOR IT TO BE A WETLAND.  IT WOULD HAVE NEEDED TO HAVE

10   AT LEAST 5 PERCENT OF WETLAND VEGETATION.  IT DIDN'T.  AND

11   DR. GALACATOS RE-VERIFIED THE DELINEATIONS IN THE 2007 MAP.

12   SHE RE-VERIFIED THE H.T. HARVEY POND.

13       NOW, SHE DID NOT AND CANNOT CONFIRM KEVIN OLIVERO, WHO

14   WORKED WITH MR. LUCERO, HIS MISTAKEN ESTIMATE OF A 9-FOOT DROP

15   BY THE POND.  WHERE IS THE EVIDENCE OF THAT OTHER THAN WHAT

16   KEVIN OLIVERO SAID?  IF THAT EXISTED, WHY DIDN'T ANYONE ELSE

17   TELL ABOUT THAT?  WHERE ARE THE PICTURES?  WHERE ARE THE

18   MEASUREMENTS?

19       THE GOVERNMENT ARGUED THIS TO YOU TODAY.  THEY USED KEVIN

20   OLIVERO'S ESTIMATE OF A 9-FOOT DROP THAT'S UNSUPPORTED BY

21   ANYTHING ELSE TO ARGUE THAT THERE IS A TRIBUTARY TO REWRITE

22   HISTORY.

23       NOW, THE GOVERNMENT MAY WANT YOU TO BELIEVE THAT KATERINA

24   GALACATOS WAS JUST A RUBBER STAMP, THAT SHE WAS JUST THERE TO

25   LOOK FOR CHANGES THAT WERE -- WOULD RESULT AFTER SOME

1   CATASTROPHIC EVENT, LIKE AN EARTHQUAKE.  IF YOU THOUGHT THE

2   AREA UNDER THE JUNKYARD HAD CONVERTED TO A WETLAND SHE

3   WOULDN'T HAVE NOTED IT?  IN 2007, DAN MARTEL ADDED WETLANDS TO

4   HIS MAP.

5       KATERINA GALACATOS IS AN EXPERIENCED ARMY CORPS OF

6   ENGINEERS EMPLOYEE.  SHE IS A SUPERVISOR.  SHE HAS A PH.D.

7   AND QUITE FRANKLY SHE WAS ONE OF THE MOST POISED AND HONEST

8   WITNESSES IN THIS CASE, AND SHE TOLD YOU THAT HER DELINEATIONS

9   WERE ACCURATE.  SHE CONFIRMED THE POND.

10      SO WITHOUT THE REWRITE, WHAT IS LEFT FOR COUNT I IS THE

11  WETLAND TO THE NORTH OF THE POND WHERE THE FILL WAS PLACED.

12  THAT'S THE GREEN AREA ON THIS MAP.

13      AND THE QUESTION FOR COUNT I IS WHETHER THIS WETLAND HAS A

14  SIGNIFICANT NEXUS TO THE MOWRY SLOUGH.

15      THE COURT'S INSTRUCTION WILL TELL YOU THAT THE TERM

16  "WATERS OF THE UNITED STATES" INCLUDES TRADITIONAL NAVIGABLE

17  WATERS AND TRIBUTARIES AND/OR ADJACENT WETLANDS THAT HAVE A

18  SIGNIFICANT NEXUS TO A TRADITIONAL NAVIGABLE WATER.  AND THIS

19  IS HOW WE ANSWER THE JURISDICTIONAL QUESTION FOR EACH COUNT.

20      SIGNIFICANT NEXUS MEANS DOES THE WETLANDS SIGNIFICANTLY

21  AFFECT THE CHEMICAL, BIOLOGICAL, OR PHYSICAL INTEGRITY OF A

22  TRADITIONAL NAVIGABLE WATER, WHICH HERE IS THE MOWRY SLOUGH.

23  BECAUSE THERE IS A POND THERE THAT IS NOT JURISDICTIONAL AS AN

24  "OTHER WATER" THE WETLAND IN COUNT I IS NOT DIRECTLY ADJACENT

25  OR ABUTTING THE MOWRY SLOUGH.  IT IS SEPARATED BY THAT POND.

1    IT IS ALSO SEPARATED BY THAT MASSIVE JUNKYARD THAT YOU SAW

2    MANY PICTURES OF.

3        NOW A NONJURISDICTIONAL POND AS MAPPED BY H.T. HARVEY

4    EXTINGUISHES THE WETLAND'S ADJACENCY TO THE MOWRY SLOUGH.  AND

5    WITHOUT THE HUFFMAN TRIBUTARY 1 CONTRIBUTING FLOW TO THE MOWRY

6    SLOUGH, THE GOVERNMENT CANNOT PROVE A SIGNIFICANT NEXUS.

7        WHEN I QUESTIONED HIM ABOUT THE REGULATIONS, YOU MIGHT

8    REMEMBER DAN MARTEL SEEMED VERY PROUD WHEN HE SAID THE

9    SUBSECTION RELATED TO TRIBUTARIES RELATES BACK TO THE OTHER

10   CATEGORIES OF "WATERS OF THE UNITED STATES" AS IF THAT FIXED

11   THE GOVERNMENT'S POND PROBLEM.  IT DIDN'T.

12       THE TRIBUTARY HAS TO BE A TRIBUTARY OF A JURISDICTIONAL

13   WATER LISTED IN THE REGULATIONS.  IF THE POND HERE DOES NOT

14   MEET THOSE SPECIFIC COMMERCE ELEMENTS, REMEMBER THE

15   RECREATIONAL, SHELLFISH, INDUSTRIAL, IT IS NOT A

16   JURISDICTIONAL "OTHER WATER".  AND A TRIBUTARY CONNECTED IT

17   WILL NOT BE JURISDICTIONAL EITHER.

18       THIS IS WHY THE HUFFMAN MAP CONNECTS THE TRIBUTARY THAT

19   HUFFMAN IDENTIFIED DIRECTLY TO THE SLOUGH, NOT THE POND.

20                   (DISPLAYED ON SCREEN.)

21       THIS IS THE 2017 HUFFMAN REWRITE.  IT FIXES THE "OTHER

22   WATER" PROBLEM.  NOW, DAN MARTEL, JUST LIKE THE GOVERNMENT DID

23   TODAY, SUGGESTED THAT THE "OTHER WATERS" AND TRIBUTARIES WERE

24   THE SAME THING.  AS I TOLD YOU, HE IS WRONG.  HE VERIFIED THE

25   AREA UNDER THE JUNKYARD AS AN "OTHER WATER", NOT A TRIBUTARY.

CLOSING ARGUMENT – HANSEN

1    AND EVEN DR. BOURSIER HAD TO AGREE WHEN I QUESTIONED HIM

2    THAT "OTHER WATERS" AND TRIBUTARIES ARE LISTED SEPARATELY

3    UNDER THE REGULATIONS.

4        THIS TYPE OF SLEIGHT OF HAND MAY BE GOOD ENOUGH FOR A

5    FORMER EMPLOYEE OF THE ARMY CORPS NOW BEING PAID TO CONSULT

6    WITH THE GOVERNMENT, BUT IT IS NOT GOOD ENOUGH IN A COURT OF

7    LAW.  AND THAT IS WHY THE ARMY CORPS JURISDICTIONAL

8    DETERMINATIONS SHOULD BE GIVEN NO WEIGHT.

9        DO NOT LET THE GOVERNMENT STAND UP HERE AND TELL YOU THAT

10   IT'S ALL "WATERS OF THE UNITED STATES" SO IT DOESN'T MATTER

11   HOW WE DELINEATED IT.  IT IS OKAY WE MADE MISTAKES.  IT

12   DOESN'T MATTER.

13       THIS IS A FEDERAL CRIMINAL CASE, AND IT DOES MATTER.  AND

14   THE GOVERNMENT HAS A HIGH BURDEN.  A CAREFUL AND THOUGHTFUL

15   ANALYSIS OF THE JURISDICTIONAL DETERMINATION IS REQUIRED.

16   THIS, TOO, IS REASONABLE DOUBT.

17       DAN MARTEL WAS NOT A CREDIBLE WITNESS.  HE MISREPRESENTED

18   TO YOU WHERE THE WATER WAS DELINEATED ON HIS MAPS.  HE

19   ADMITTED HE NEVER DID THE REQUIRED SIGNIFICANT NEXUS TEST AND

20   HE DID NOT COMPLETE THE ARMY CORPS' DETAILED EIGHT-PAGE WHAT

21   HE CALLED SHOCK AND AWE FORMS IN THE GUIDANCE MANUALS.

22       HE TRIED TO AVOID BEING SERVED WITH THE TRIAL SUBPOENA.

23   HE AVOIDED SERVICE BY THE FEDERAL PUBLIC DEFENDER INVESTIGATOR

24   AND THE DEPUTY MARSHAL.  HE KNEW THIS CASE WAS GOING TO TRIAL.

25   HE HAD BEEN WORKING WITH THE GOVERNMENT LAWYERS.  IT IS NOT

1    CREDIBLE THAT HE WAS FEARFUL THAT THE DEPUTY U.S. MARSHAL AND

2    THE FEDERAL PUBLIC DEFENDER INVESTIGATOR WERE NIGERIAN

3    PRINCES.  THAT JUST IS INCREDIBLE.

4        LET'S GET BACK TO THE SIGNIFICANT NEXUS FOR COUNT I.

5    DR. BOURSIER DID NOT TESTIFY THAT THERE WAS A SIGNIFICANT

6    NEXUS HERE.  HE TOLD YOU THAT HE AND HIS FIRM NEVER DID THAT

7    ANALYSIS FOR AREA 4.  IT WAS NOT THEIR JOB, IT WAS THE JOB OF

8    THE CORPS.

9        BUT DR. HARDWICKE WHO HAD WORKED WITH HIM DID OFFER HER

10   OPINION ON SIGNIFICANT NEXUS FOR THE WETLANDS ON BOTH COUNT I

11   AND COUNT III.  EVEN THOUGH SHE NEVER DID THIS ANALYSIS WHEN

12   SHE WORKED AT THE SITE BACK IN 2007, AND THINK BACK TO HER

13   TESTIMONY, IS IT CLEAR IF HER OPINION WAS BASED ON HER OWN

14   MAPS, THE H.T. HARVEY MAPS, OR WERE THEY BASED ON THE HUFFMAN

15   2017 REWRITE?

16       HER TESTIMONY WAS GENERAL AND NONSPECIFIC.  ALMOST AS

17   GENERAL AS THE LIST THE GOVERNMENT GAVE YOU ABOUT WETLAND

18   ATTRIBUTES.  SHE RECITED BASIC HYDROLOGIC, BIOLOGICAL AND

19   CHEMICAL CONNECTIVITY ISSUES, BUT SHE DIDN'T GIVE YOU SPECIFIC

20   DETAILS.  SHE IGNORED THE FACT THAT THE WETLANDS THAT WE ARE

21   TALKING ABOUT HERE HAVE BEEN FARMED FOR DECADES, THE

22   VEGETATION PURPOSELY REMOVED, THE HABITAT FOR THE ENDANGERED

23   MOUSE ALTERED, AND THAT URBAN POLLUTION AND GARBAGE ENTERED

24   THESE WETLANDS.

25       THESE ATTRIBUTES THAT DR. HARDWICKE DISCUSSED ARE BASIC

1    WETLAND ATTRIBUTES.  BUT ARMY CORPS GUIDANCE, WHICH I WENT

2    OVER WITH THE EXPERT WITNESSES, REQUIRES A FACT-BASED

3    ANALYSIS.  IT IS NOT ENOUGH FOR THESE EXPERTS TO TELL YOU

4    THESE AREAS HAVE A SIGNIFICANT NEXUS.  THEY NEED TO GIVE YOU

5    EVIDENCE OF THAT.

6        WHERE IS THE EVIDENCE IN 2014 THAT THE WETLAND TO THE

7    NORTH OF THE POND HAD A SIGNIFICANT CONNECTION TO THE MOWRY

8    SLOUGH THROUGH THE POND?  WHERE ARE THE HYDROLOGICAL TESTS

9    FROM 2014?  WHERE IS THE SPECIFIC EVIDENCE THAT THAT DUCKBILL,

10   THAT SPECIAL CULVERT THE GOVERNMENT TOLD YOU ABOUT THAT'S ONLY

11   SUPPOSED TO ALLOW FLOW ONE WAY BUT NOT THE OTHER WAY?  WHERE'S

12   THE EVIDENCE THAT IT WAS ACTUALLY WORKING PROPERLY THROUGHOUT

13   2014?  TIM STEELE TOLD YOU IT DIDN'T ALWAYS WORK.

14       AND LET'S LOOK CLOSELY AT WHERE THE WATER IN THE POND

15   UNDER THE JUNKYARD APPEARS TO BE COMING FROM.

16                   (DISPLAYED ON SCREEN.)

17       I MEAN IT'S CONNECTED TO THAT NONJURISDICTIONAL POND ALONG

18   THE FENCE AT THE JUNKYARD.  REMEMBER DR. HARDWICKE AND DAN

19   MARTEL TOLD YOU THOSE TWO PONDS AGAINST THE PICK 'N PULL WERE

20   NOT JURISDICTIONAL WATERS AND THEY WERE NOT JURISDICTIONAL

21   WETLANDS.  THEY ARE MARKED MORE CLEARLY ON EXHIBIT 2060

22   (INDICATING).  THEY ARE MARKED IN RED.  THE SECOND RED POND ON

23   THAT MAP IS CONNECTED TO THE POND UNDER THE PICK 'N PULL.

24       THESE PONDS HAD AN ARTIFICIAL HYDROLOGY.  DID ANYONE TEST

25   THE PONDS UNDER THE JUNKYARD AT ISSUE IN THIS CASE TO SEE IF

1    THE WATER THERE CAME FROM THE NONJURISDICTIONAL PONDS?

2       THE GOVERNMENT'S 2017 REWRITE DOESN'T EVEN TELL YOU THE

3    FULL STORY.  IN 2017, DR. HUFFMAN'S HYDROLOGIST, DR. COATS,

4    WHO TESTIFIED IN THIS CASE ON FRIDAY, HE ADMITTED TO YOU THAT

5    HE DID NOT MEASURE ANY FLOW FROM THE DUCKBILL CULVERT INTO THE

6    MOWRY SLOUGH IN THE NORTHERN FILL AREA.  HE COULDN'T DO THE

7    SPECIFIC MEASUREMENTS ON THE DAY HE WAS THERE.  THERE WAS TOO

8    MUCH WATER IN THE SLOUGH SO HE NEVER TESTED IT.

9       THE ONLY EVIDENCE VERIFYING ANY FLOW FROM THE DUCKBILL IN

10   THE NORTH IS A VIDEO TAKEN BY TERRY HUFFMAN'S SON IN 2017 THAT

11   YOU SAW IN THE GOVERNMENT'S CLOSING.  AND IT WAS DURING AN

12   ABNORMAL RAINY SEASON.  THIS VIDEO DOES NOT AND CANNOT PROVE

13   THAT THERE WAS ANY FLOW LET ALONE A SIGNIFICANT ONE IN 2014.

14      AS FOR A CHEMICAL CONNECTION?  DR. KNUDSEN -- EXCUSE ME,

15   MR. KNUDSEN, WHO DID NOT KNOW WHAT A DUCKBILL WAS, HE TOOK A

16   WATER SAMPLE FOR DR. HUFFMAN, BUT HE DID IT UPSTREAM FROM THE

17   DUCKBILL.  WHAT THAT MEANS IS YOU WILL NOT GET ANY MEANINGFUL

18   DATA OF WHAT IS COMING OUT OF THE DUCKBILL IF THE SAMPLE HE

19   TOOK WAS ABOVE IT.

20      THE BIRD EVIDENCE FARES NO BETTER HERE.  THE ONLY

21   BIOLOGICAL CONNECTION EVIDENCE PRESENTED AT TRIAL CAME IN

22   THROUGH GARY DEGHI.  HIS TESTIMONY SIMPLY CONFIRMS THAT BIRDS

23   MAY EAT A SEED ON ONE PART OF THE PROPERTY AND DEFECATE IN THE

24   SLOUGH.  BUT WE HAVE SEEN MILLIONS OF BIRDS IN THE SOUTHBAY

25   AND THEY OBVIOUSLY DEFECATE ALL OVER THE SLOUGH AND THE BAY.

1  THIS EXPERT'S SHORT ANALYSIS DID NOT QUANTIFY OR DO ANY

2  COMPARISON TO REACH A CONCLUSION THAT THE EFFECT OF THIS

3  BIOLOGICAL CONNECTION WAS IN ANY WAY SUBSTANTIAL AS OPPOSED TO

4  GENERAL.  EXCEPT FOR SOME SHOREBIRDS ON ONE OCCASION, THE

5  NUMBER OF BIRDS HE OBSERVED IN THE NORTH AND SOUTH AND

6  SOUTHERN AREAS OF THE FILL WAS RELATIVELY SMALL IN COMPARISON

7  TO MILLIONS OF SHOREBIRDS THAT WE KNOW EXIST THROUGHOUT THE

8  BAY AREA.

9      SIGNIFICANT NEXUS CANNOT BE SPECULATIVE.  IT CANNOT BE

10  INSUBSTANTIAL, AND IT MUST BE PROVEN BEYOND A REASONABLE

11  DOUBT.  AND THE GOVERNMENT HAS NOT MET THIS BURDEN ON COUNT I.

12      COUNT II REWRITE.  THIS POND WHICH WE TALKED A LOT ABOUT

13  UNDER THE PICK 'N PULL UNDER JUNKYARD WAS IDENTIFIED BY H.T.

14  HARVEY AFTER YEARS OF OBSERVATIONS OF IT.  IT WAS IDENTIFIED

15  IN TOPOGRAPHICAL MAPS WHICH SCIENTIFICALLY PROVE ELEVATIONS

16  AND DEPRESSIONS AND IT WAS IDENTIFIED WITH THE ORDINARY HIGH

17  WATER MARK.

18      NOW THE ORDINARY HIGH WATER MARK IS HOW NONWETLAND WATERS

19  CAN BE MAPPED.  IT TELLS THE OUTLINE OF THE WATER.  THAT IS

20  WHY THE POND HAS THE SHAPE IT DOES IN THE H.T. HARVEY MAPS.

21  THE ORDINARY HIGH WATER MARK AND THE TOPOGRAPHICAL MAPS.

22      WHERE IS THE ORDINARY HIGH WATER MARK FOR DR. HUFFMAN'S

23  TRIBUTARY?  WHAT EXPERT CAME IN AND TOLD YOU THAT THEY WENT TO

24  THE SITE AND EXAMINED AND SAW THE TRIBUTARY ON THE RIGHT, THE

25  ORDINARY HIGH WATER MARK OUTLINING THAT NARROW THIN LINE?  NO

1   ONE.  THE CORPS HAS GUIDANCE FOR THE ORDINARY HIGH WATER MARK.

2   THERE'S A WHOLE GUIDANCE MANUAL FOR IT.

3       AND REMEMBER, THE HISTORICAL RECORD AND MAPS WHICH

4   DR. HARDWICKE COULD NOT SAY WITH ANY DEGREE OF SCIENTIFIC

5   CERTAINTY WERE ACCURATE DEPICT THE POND, PICTURE ON THE LEFT.

6   DR. HARDWICKE SPENT TWO YEARS STUDYING THAT AREA AND CONFIRMED

7   IT HAD THE SHAPE OF A POND.

8       THE GOVERNMENT'S ARGUMENT TO YOU WAS THAT A TRIBUTARY

9   EXISTS IN COUNT I AND COUNT II REGARDLESS OF THE SHAPE OF THE

10  POND AROUND IT.  BUT THIS ARGUMENT IS NOT SUPPORTED BY

11  TOPOGRAPHICAL MAPS.  LET'S LOOK AGAIN AT THE SHAPE OF

12  DR. HUFFMAN'S TRIBUTARY 1.  IT'S A THIN NARROW LINE.

13                  (DISPLAYED ON SCREEN.)

14       NOW LET'S LOOK AT THE TOPOGRAPHICAL MAPS PREPARED BY THE

15  ENGINEERING FIRM OF KIER & WRIGHT FOR THE SOBRATO DEVELOPMENT

16  PROJECT.  THE CONTOUR LINES IN RED INDICATE DEPRESSIONS IN

17  ELEVATIONS.  THEY DO NOT HAVE ANY CONTINUOUS CHANNEL OR LINEAR

18  TRIBUTARY FROM THE SLOUGH WRAPPING AROUND THE FENCE OF THE

19  JUNKYARD.

20       IN THE JURY ROOM LOOK AT EXHIBIT 2046.

21                  (DISPLAYED ON SCREEN.)

22       THE BLUE NUMBERS REPRESENT ELEVATIONS WITHIN A TENTH OF A

23  FOOT, NOTHING ALONG THE FENCE LINE OF THE JUNKYARD SHOWS ANY

24  REDUCED ELEVATION NUMBERS.  THESE PICTURES OF THE

25  TOPOGRAPHICAL MAPS ARE REASONABLE DOUBT AS TO DR. HUFFMAN'S

1    TRIBUTARY 1 WHICH IS CHARGED IN COUNT II AND IS THE BASIS FOR

2    JURISDICTION IN COUNT I.

3        REMEMBER, THE ONLY PERSON TO OBSERVE THE ACTUAL TRIBUTARY

4    THAT HE SAYS EXISTS AND TO STUDY IT AND TO NAME IT WAS

5    DR. HUFFMAN IN 2017.  AND THE GOVERNMENT DID NOT CALL HIM TO

6    TESTIFY.  WITHOUT HUFFMAN, THERE IS REASONABLE DOUBT THAT THIS

7    TRIBUTARY EXISTED, FLOWED SEASONALLY, OR EVEN THAT IT HAD A

8    SIGNIFICANT NEXUS.

9        WHERE IS THE EVIDENCE THAT IT FLOWED SEVERAL MONTHS OUT OF

10   THE YEAR?  WHO TESTIFIED TO THAT?  DRS. BOURSIER AND HARDWICKE

11   DID NOT EVEN IDENTIFY THIS TRIBUTARY IN THEIR MAPPING.  ANY

12   TESTIMONY FROM THEM HERE WOULD BE BASED ON PURE SPECULATION

13   AND POSSIBLY SOMEONE ELSE'S REPORT.

14       WITHOUT EVIDENCE OF THE ORDINARY HIGH WATER MARK FOR THIS

15   TRIBUTARY THAT DR. HUFFMAN IDENTIFIED, AND WITHOUT

16   TOPOGRAPHICAL MAPS CONFIRMING THE DEPRESSIONS TO THIS

17   TRIBUTARY, THERE IS MORE THAN REASONABLE DOUBT MR. LUCERO IS

18   NOT GUILTY OF COUNT II AND BECAUSE THE SIGNIFICANT NEXUS FOR

19   COUNT I ALSO DEPENDS ON THIS TRIBUTARY, HE IS NOT GUILTY OF

20   COUNT I.

21       LET'S TALK ABOUT THE COUNT III REWRITE.  NO TRIBUTARY IN

22   THE SOUTHERN FILL AREA IS NOW TRIBUTARY A ON THE RIGHT.

23       THE OTHER SOUTHERN FILL AREA RELIES ON A YELLOW LINE THAT

24   DR. HUFFMAN ON THE RIGHT APPEARS TO HAVE BOLDLY DRAWN ACROSS

25   THE MAP WITH A LARGE YELLOW MAGIC MARKER.  IT'S IDENTIFIED AS

CLOSING ARGUMENT – HANSEN

1    TRIBUTARY A.

2        WE ARE ALREADY DISCUSSED THIS TRIBUTARY IS NOT MAPPED ON

3    THE H.T. HARVEY MAPS ON THE LEFT BETWEEN 2007 AND 2014, NOR IS

4    IT ON THE OFFICIAL MAP OF THE ARMY CORPS OF ENGINEERS.  DAN

5    MARTEL TOLD YOU WHEN I QUESTIONED HIM THAT THE OFFICIAL MAP

6    INDICATED IT WAS THERE, BUT WHEN PRESSED HE HAD TO ADMIT THAT

7    HE WAS WRONG.  THE MAP DID NOT DELINEATE ANY WATER THERE.  THE

8    ONLY WATER ALONG THE BERM IN THE SOUTHERN FILL AREA IS UNDER

9    THE DUCK PONDS.

10                    (DISPLAYED ON SCREEN.)

11       AND IT ENDS AT THE ARROW.  DAN MARTEL SAID THAT EVEN IF

12   THIS TRIBUTARY IS NOT ON THE OFFICIAL GOVERNMENT MAP IT WAS

13   MARKED ON HIS FIELD MAP.  SO I MADE HIM LOOK AT THAT FIELD MAP

14   AND HE POINTED OUT A GREEN AREA AND SAID IT WAS BLUE.

15                    (DISPLAYED ON SCREEN.)

16       YOU WILL BE ABLE TO LOOK AT IT FOR YOURSELVES.  IT'S

17   EXHIBIT 180, HIS FIELD MAP.  THE RED CONTOUR LINES ALONG THE

18   BERM ARE NOT THE TRIBUTARY.  AS WELL DISCUSS IN A MOMENT,

19   THOSE RED CONTOUR LINES DEPICT THE BERM INCREASING IN

20   ELEVATION.

21       NOW, MR. MARTEL DID NOT WANT TO ADMIT HE WAS WRONG.  BUT

22   YOU'LL HAVE AN OPPORTUNITY TO STUDY THESE MAPS DURING YOUR

23   DELIBERATIONS.  LOOK FOR THE BLUE ON HIS FIELD MAP.  IT

24   DOESN'T EXIST ALONG THE BERM WHERE DAN MARTEL SAYS IT DOES.

25       NOW, THE TOPOGRAPHICAL MAPS WE'VE ALREADY DISCUSSED DO NOT

1    SUPPORT THE COUNT III REWRITE EITHER.  RYAN AMAYA ADMITTED TO

2    YOU THAT HIS TESTIMONY ON DIRECT EXAMINATION WAS WRONG.  ON

3    DIRECT, HE TOLD YOU THE CONTOUR LINES SHOWED A CONTINUOUS

4    BERM.  BUT WHEN CONFRONTED WITH THE ACTUAL MAPS AND THE

5    CONTOUR LINE, HE ADMITTED TO MR. SMOCK THAT HIS MAPS DID NOT

6    SHOW A DEPRESSION ALONG THE FULL LENGTH OF THE BERM THROUGH

7    THE SOUTHERN FILL AREA.  THE CONTOUR LINES HE AGREED SHOWED

8    THE OPPOSITE.  HE ADMITTED HIS TESTIMONY WAS INACCURATE, AND

9    THE GOVERNMENT SPONSORED THAT TESTIMONY.

10       THE CONTOUR LINES SHOWED THE ELEVATION OF THE BERM AND

11   DR. HARDWICKE TOLD YOU THAT H.T. HARVEY PAID EXTRA FOR THESE

12   MAPS BECAUSE THEY WERE SO ACCURATE.

13       WHAT SPECIFICALLY DID THE CONTOUR MAPS TELL US?  FIRST,

14   THERE IS NO CONTINUOUS CHANNEL ALONG THE BERM.  SECOND, THERE

15   WAS A DEPRESSION ALONG THE BERM UNDER THE DUCK PONDS.  AND YOU

16   CAN SEE THE TOPOGRAPHICAL LINES ON EXHIBIT 1138.  YOU CAN SEE

17   THE PONDING ENDS.  THE DEPRESSION UNDER THE PONDS ALONG THE

18   BERM HAS THAT CLEAR END POINT.  AND YOU WILL SEE FOR A MOMENT

19   THIS IS WHERE ALL THE WATER HUFFMAN'S EXPERT, DR. COATS,

20   STUDIED.  THIS IS WHERE IT CAME FROM, FROM THE DUCK PONDS.

21       AND THIRD, THE TOPOGRAPHICAL MAPS CONFIRM THAT THERE WAS A

22   HOLE OR DEPRESSION NEAR THE SOUTHERN FILL AREA.

23                    (DISPLAYED ON SCREEN.)

24       TAKE A LOOK AT EXHIBIT 173.  IT'S VERY SMALL WRITING, BUT

25   THERE'S A NEGATIVE 1.2 AT THE TOP ARROW OF THE HOLE.  AND YOU

```
 1    CAN SEE WHERE THE HOLE ENDS.  THE CONTOUR LINES HAVE A SHAPE

 2    THAT ENDS.

 3        MR. AMAYA ADMITTED TO YOU THAT THIS HOLE IS JUST THAT, AND

 4    THAT THERE IS NO CONTINUOUS CHANNEL INDICATED IN HIS

 5    TOPOGRAPHICAL MAPS ON THE SOUTHERN BERM.

 6        NOW, THE GOVERNMENT HAS SHOWED YOU MANY PICTURES OF THIS

 7    HOLE.  THIS IS THEIR DOCUMENTED EVIDENCE OF TRIBUTARY A.  THIS

 8    HOLE.

 9                     (DISPLAYED ON SCREEN.)

10        THEY CAN SHOW YOU ALL THESE PICTURES OF THE HOLE.  WHERE

11    ARE THE PICTURES OR VIDEOS DOCUMENTING THE EXISTENCE OF THIS

12    FEATURE ALONG THE ENTIRE LENGTH OF THE BERM?

13        AGAIN, THE SCIENTIFIC UNBIASED TOPOGRAPHICAL MAPS SHOW

14    THAT THIS BERM -- THIS CHANNEL DOES NOT EXIST.

15                     (DISPLAYED ON SCREEN.)

16        LET'S LOOK AT THE AERIAL PHOTO FROM 2014.  THERE IS NO

17    CONTINUOUS CHANNEL IN THIS PICTURE.  THIS IS FACING WEST,

18    LOOKING WEST FROM THE HELICOPTER.

19        NOW THE GOVERNMENT SHOWED YOU JUST NOW IN CLOSING A VIDEO

20    FROM 2017, EXHIBIT 980.  WE TALKED ABOUT THE WET CONDITIONS IN

21    2017, BUT LET'S LOOK CLOSELY AT IT ANYWAY.

22        NOW, HERE IS A STILL SHOT FROM THAT 2017 VIDEO AT FOUR

23    MINUTES IN.  THIS IS WHY GENERALIZED PICTURES DON'T ALWAYS

24    WORK BECAUSE IN OTHER SHOTS IT LOOKS DIFFERENT.

25                       (VIDEO PLAYED.)
```

CLOSING ARGUMENT – HANSEN

1     EVEN IN THIS 2017 OUTLIER WEATHER YEAR, THERE IS NO

2  CONTINUOUS CHANNEL ALONG THE BERM.

3     MOREOVER, YOU HEARD DR. HARDWICKE TELL YOU THAT THE

4  LANDOWNERS WERE DIGGING DITCHES AND WERE PERMITTED TO DO SO

5  UNDER THE REGULATIONS.  HOW DO WE KNOW WHETHER OR NOT THE

6  LANDOWNERS DUG OUT MORE DITCHES ALONG THAT BERM AFTER 2014?

7  WE DON'T KNOW.

8     LET'S GO BACK TO THE SCIENTIFIC EVIDENCE.  WHAT WAS

9  MR. AMAYA EXCUSE FOR THE TOPOGRAPHICAL MAPS NOT DOCUMENTING

10 THE EXISTENCE OF A CONTINUOUS CHANNEL UNDER THE BERM IN THE

11 SOUTHERN FILL AREA?  WHAT DID THE GOVERNMENT RELY ON IN DIRECT

12 EXAMINATION?  HE SAID THE TRIBUTARY MUST HAVE BEEN HIDDEN BY

13 THE WEEDS.  THE TOPOGRAPHICAL MAPS COULD NOT PICK IT UP.

14    DR. BOURSIER SAID THE SAME THING TO YOU.  HE SAID THAT THE

15 TRIBUTARY WAS COVERED BY PICKLEWEED.  BUT WE KNOW FROM THE

16 EXPERT TESTIMONIES THAT A TRIBUTARY OR A NONWETLAND AQUATIC

17 FEATURE, IT WOULD HAVE NOT ONLY AN ORDINARY HIGH WATER MARK,

18 IT WOULD HAVE LESS THAN 5 PERCENT OF VEGETATION IN IT.

19 DR. GALACATOS EXPLAINED THAT TO YOU.

20    THAT IS HOW IT IS IDENTIFIED.  DR. GALACATOS TOLD YOU THAT

21 NONWETLAND WATERS ARE INDICATED BY A LACK OF VEGETATION.  SO

22 EVEN IF WE IGNORE THIS INCONSISTENCY, IT IS NOTABLE THAT

23 DR. BOURSIER'S H.T. HARVEY'S MAPS WERE STILL ABLE TO DELINEATE

24 TRIBUTARIES RIDING THROUGH WETLANDS IN OTHER AREAS ON THEIR

25 MAPS.  THIS IS THE 2007 MAP, EXHIBIT 1138.

1                    (DISPLAYED ON SCREEN.)

2         YOU CAN SEE THE THIN BLUE LINES AND YOU CAN SEE THE

3    CONTOUR LINES FROM THE KIER & WRIGHT TOPOGRAPHICAL MAPS THERE

4    AS WELL.

5         THE GOVERNMENT CANNOT PROVE BEYOND A REASONABLE DOUBT THE

6    EXISTENCE OF THE HUFFMAN TRIBUTARY A ALONG THE SOUTHERN FILL

7    AREA IN 2014.  AND SO THE NEXT QUESTION FOR YOU IS WHETHER THE

8    WETLAND IN COUNT III HAS A SIGNIFICANT NEXUS TO THE MOWRY

9    SLOUGH.

10        THE WETLANDS IN THIS CASE ARE NOT PART OF ONE LARGE

11   WETLAND COMPLEX.  THEY ARE SEPARATE FEATURES AND THEY ARE NOT

12   ALL INTERCONNECTED.  THEY ARE A PATCHWORK OF UPLANDS AND

13   WETLANDS, OF JURISDICTIONAL AND NONJURISDICTIONAL.  LET'S LOOK

14   AT THE UPLAND UNDER THE DUCK POND.

15                   (DISPLAYED ON SCREEN.)

16        THAT AREA IS NONJURISDICTIONAL.  BECAUSE IT IS UPLAND, THE

17   WETLANDS EFFECTED BY FILL IN COUNT III ARE NOT ABUTTING THE

18   SLOUGH AND THEY ARE NOT IMMEDIATELY ADJACENT TO THE SLOUGH.

19   THIS IS A SECOND BARRIER.

20        IF A SIGNIFICANT NEXUS WERE SO SIMPLE A CONCEPT AS HAVING

21   HAD THE SLOUGH IN THE VICINITY OF THE WETLANDS, DO YOU THINK

22   THE GOVERNMENT WOULD HAVE HAD THEIR EXPERTS TRY AS HARD AS

23   THEY DID TO ESTABLISH TRIBUTARIES THAT THEY DIDN'T PREVIOUSLY

24   MAP?  THE GOVERNMENT NEEDS TRIBUTARY A TO PROVE BEYOND A

25   REASONABLE DOUBT THAT THERE IS A SIGNIFICANT NEXUS TO THE

1    MOWRY SLOUGH.  WITHOUT TRIBUTARY AREA A, THERE IS A REASONABLE

2    DOUBT.

3        THE HYDROLOGICAL STUDIES FROM 2017 DO NOT SUPPORT A

4    SIGNIFICANT NEXUS EITHER.  AGAIN, THE GOVERNMENT'S EVIDENCE IN

5    2017 DOES NOT COMPLETELY TELL THE FULL STORY.  THE ONLY

6    STUDIES IN THIS CASE ARE FROM 2017.

7                    (DISPLAYED ON SCREEN.)

8        DR. COATS ADMITTED THAT IN 2017 THE FLOW HE EXAMINED IN

9    THE SOUTHERN AREA WAS FROM THAT SPOT (INDICATING).  IT WAS

10   FROM THE CONFLUENCE OF WATER UNDER THE DUCK PONDS AND THE

11   WATER IN THE BORROW DITCHES THAT HUFFMAN CALLS TRIBUTARY B.

12   THAT'S WHERE HE STUDIED.

13       DR. COATS NEVER STUDIED ANY AREA ALONG THE FULL LENGTH OF

14   THE BERM.  IF THE FULL CHANNEL OR TRIBUTARY EXISTED, AS

15   DR. HUFFMAN'S MAP TELLS US, WHERE IS THE CLOSE UP VIDEO OF

16   THIS CONTINUOUS FLOW?  WHY COULDN'T HE OR TERRY HUFFMAN'S SON

17   SHOW US THAT?  EVERY SINGLE VIDEO THE GOVERNMENT SHOWED IS

18   FROM THE AREA UNDER THIS DUCK POND INCLUDING THE VIDEO THEY

19   PLAYED DURING CLOSING.  LET'S LOOK AT IT.

20                    (VIDEO PLAYED.)

21       THAT'S THE VIDEO THE GOVERNMENT PLAYED FOR YOU ON THE

22   RIGHT.  THAT'S WHERE DR. COATS ON THE LEFT TOLD YOU HE TOOK

23   THAT VIDEO.

24       THE DUCK PONDS ARE PONDING WATER YEAR ROUND.  THAT IS

25   WHERE THIS WATER IS COMING FROM.  DR. COATS DID NOT STUDY OR

1    ANALYZE ANY WATER ALLEGEDLY FLOWING FROM TRIBUTARY A ALONG THE

2    LENGTH OF THE BERM.  HE NEVER THOUGHT TO DOCUMENT THE FLOW

3    FROM HUFFMAN'S TRIBUTARY.  BUT WOULDN'T THAT BE PRUDENT TO DO?

4    INSTEAD, HE SIMPLY ACCEPTED DR. HUFFMAN'S MAP AS BEING

5    ACCURATE WITHOUT DOING ANY INDEPENDENT INVESTIGATION ON HIS

6    OWN.  AND YOU, MEMBERS OF THE JURY, SHOULD NOT BE ASKED TO DO

7    THE SAME.  THE GOVERNMENT SHOULD HAVE SHOWED YOU VIDEO ALONG

8    THE BERM.

9         ALL WE HEARD ABOUT OVER AND OVER IN THIS TRIAL IS HOW THE

10   LAND SLOPED, BUT HOW DOES THAT PROVE THAT ANY OF THE WATER

11   FROM THE WETLANDS CONTRIBUTED TO THE FLOW TO THE MOWRY SLOUGH?

12   YOU NEED TRIBUTARY A TO DO THAT.

13        BUT DR. HUFFMAN IS NOT HERE TO TELL YOU HOW HE KNOWS THIS

14   FEATURE EXISTS.  INSTEAD, WE HAVE DR. BOURSIER TELLING YOU HE

15   SAW FLOW IN THIS TRIBUTARY FOR SEVERAL MONTHS, AND YET HE

16   NEVER DOCUMENTED IT ON ANY OF HIS MAPS OR HIS MANY REPORTS

17   THAT HE NEEDED TO PROVIDE TO HIS CLIENT FOR A MAJOR

18   MULTIMILLION DOLLAR DEVELOPMENT PROJECT.

19        MORE IMPORTANTLY, MAYBE DR. BOURSIER WAS TALKING ABOUT THE

20   SAME SPOT.  MAYBE THAT'S WHERE HE SAW THE FLOW.  WE KNEW THE

21   AREA UNDER THE DUCK PONDS HAD WATER.  ALL THE PRIOR MAPS

22   SHOWED THAT.  BUT WE KNEW IT ENDED AS WELL.  IT DID NOT GO THE

23   FULL LENGTH OF THE BERM.

24        FINALLY, DR. COATS DID NOT COMPARE FLOW VOLUME AND

25   DURATION OF FLOW TO THE MOWRY SLOUGH.  JUST GOING OUT AND

1   MEASURING FLOW UNDER THE DUCK PONDS AT DAN MILLER'S FAVORITE

2   SPOT IS NOT ENOUGH.  JUST TELLING YOU HOW MANY GALLONS PER

3   MINUTE HE MEASURED WITHOUT A COMPARISON TO WHAT IS IN THE

4   SLOUGH, WHICH IS LIKELY TO BE MANY THOUSANDS IF NOT MILLIONS

5   OF GALLONS PER MINUTE IS MISLEADING.

6       BY WAY OF EXAMPLE, IF I PUT A DROP OF FOOD COLOR ON A

7   TEASPOON, THAT WOULD HAVE A SUBSTANTIAL EFFECT.  IT WOULD HAVE

8   A SIGNIFICANT EFFECT.  BUT IF I PUT THE SAME ONE DROP INTO A

9   LARGE CONTAINER OF WATER, IT WOULD NOT.  THIS IS WHY THE

10  MEASUREMENTS IN THE SLOUGH ARE REQUIRED.

11      COMPARE THE AMOUNTS OF WATER FROM THE NORTH AND SOUTH FILL

12  AREAS THAT THE GOVERNMENT SAYS WERE FLOWING IN 2017, AND,

13  AGAIN, WE HAVE NO EVIDENCE FROM 2014, COMPARE THAT TO THAT OF

14  THE FLOOD CONTROL CHANNEL.

15                  (DISPLAYED ON SCREEN.)

16      THE FLOOD CONTROL CHANNEL IS INDICATED ON THE LEFT MAP,

17  EXHIBIT 3, WITH AN ARROW.  IT RUNS THROUGH THE PROPERTY.  ON

18  THE RIGHT IS A PICTURE OF IT.

19      YOU HEARD DR. COATS ACKNOWLEDGE THAT HUGE AMOUNTS OF RAIN

20  AND RUNOFF WATER COME FROM THE REST OF NEWARK AND BEYOND THIS

21  CHANNEL AND DIRECTLY INTO THE SLOUGH.  IT'S NOT FILTERED.  IT

22  HAS GARBAGE IN IT, AND THE FLOW IS SO HEAVY THAT SOMETIMES

23  THIS BREAKS THE LEVEE HOLDING IT.  AND SOMETIMES EVEN OVER

24  TOPS AT THE BRIDGE TO THE ENTRY TO THE SLOUGH.

25      DR. COATS GAVE YOU THE ANSWER FOR SIGNIFICANT NEXUS.  HE

1    TOLD YOU THE WATER FROM THE FLOOD WATER CONTROL CHANNEL

2    DOMINATES THE MOWRY SLOUGH.  THIS, TOO, IS REASONABLE DOUBT.

3        WITHOUT EVIDENCE DOCUMENTING THE MAGIC MARKER LINE OF

4    TRIBUTARY A AND DR. HUFFMAN'S 2017 MAP AND WITHOUT DR. HUFFMAN

5    TO EXPLAIN IT, THE GOVERNMENT CANNOT PROVE TO YOU BEYOND A

6    REASONABLE DOUBT THAT TRIBUTARY A EXISTS OR THAT THE WETLANDS

7    IN COUNT III HAVE A SIGNIFICANT NEXUS TO THE MOWRY SLOUGH, AND

8    ARE THUS "WATERS OF THE UNITED STATES".

9        NOW, THE GOVERNMENT SUGGESTED THAT THE SOBRATO

10   ORGANIZATION'S ACCEPTANCE OF THE JURISDICTIONAL DETERMINATION

11   EQUALS JURISDICTION AND MEANS THAT THEY HAVE JURISDICTION

12   HERE, BUT IT DOES NOT.

13       THE DEVELOPMENT OF AREA 4 IS LIKELY TO MOVE FORWARD.  AND

14   AT SOME POINT IT WILL BE FILLED, IT WILL BE BUILT, AND THE

15   SOBRATO ORGANIZATION WILL BE SEEKING PERMITS FROM THE ARMY

16   CORPS OF ENGINEERS.  AND THAT ORGANIZATION LIKELY MADE A

17   CALCULATED DECISION TO WORK WITH THE ARMY CORPS AND TO ACCEPT

18   THE DEVELOPMENT WOULD TOUCH UPON JURISDICTIONAL AREAS BECAUSE

19   IT INCLUDED SO MUCH OF AREA 4.

20                (DISPLAYED ON SCREEN.)

21       TAKE A LOOK AT EXHIBIT 2003.  IT'S AN H.T. HARVEY MAP FROM

22   2009.  IT WOULD NOT BE WORTHWHILE FOR THE SOBRATO ORGANIZATION

23   TO CONTEST JURISDICTION GIVEN THE EXTENT OF THIS PROJECT.  THE

24   DEVELOPER AND THE CITY WORKING TOGETHER TO PUSH THIS PROJECT

25   THROUGH WILL SEEK PERMITS.  AND IT WOULD BE EASIER TO WORK

1    WITH THE CORPS TO OBTAIN A PERMIT THAN IT WOULD BE TO GO

2    THROUGH THE COST OF AN ADMINISTRATIVE APPEAL AND THEN LATER

3    COURT COSTS TO CONTEST THE CORPS' JURISDICTION AS WE HEARD

4    WOULD HAVE TO BE DONE ACRE BY ACRE.

5        IF THEY HAD GONE THAT ROUTE, IMPORTANTLY, THIS STANDARD

6    WOULD BE BY A PREPONDERANCE OF EVIDENCE, MUCH LOWER THAN WE

7    HAVE HERE.  THAT IS NOT THE BURDEN WE HAVE IN THIS CASE.  THE

8    GOVERNMENT HAS TO PROVE THE JURISDICTION IN THE AREAS AFFECTED

9    BY THE FILL EXIST BY PROOF BEYOND A REASONABLE DOUBT.

10       THE DEVELOPERS NEEDED SPECIFIC PLANS AND THEY COULDN'T

11   RELY ON SPECULATIVE MAPS THAT INCLUDED SOME FEATURES BUT

12   IGNORED OTHERS.  H.T. HARVEY WAS HIRED TO PROVIDE THOSE MAPS.

13   THE DEVELOPER RELIED ON THESE PLANS TO DECIDE WHERE TO BUILD.

14   I SHOWED YOU THOSE DEVELOPMENT PLANS.

15       THESE PLANS WERE SUBMITTED TO THE CITY.  THEY WERE

16   SUBMITTED TO ENVIRONMENTAL GROUPS.  AND OF COURSE THEY HAD TO

17   BE ACCURATE.  THEY WERE EVEN THE BASIS FOR A LAWSUIT BY CARIN

18   HIGH'S ORGANIZATION.  ANY BUILDING ON THAT PROPERTY WOULD HAVE

19   REQUIRED INFRASTRUCTURE.  AND WITH INFRASTRUCTURE, WE WOULD

20   NEED PIPES, SEWAGE, INTERNET, CABLE, WATER, ELECTRICAL

21   SYSTEMS, ROADS, AND SIDEWALKS.  THAT INFRASTRUCTURE WOULD

22   NECESSARILY TOUCH UPON WETLANDS AND POTENTIALLY JURISDICTIONAL

23   ONES.

24       THE DEVELOPERS AND THE CORPS MAY HAVE BEEN LOOKING AT THIS

25   PROPERTY AS ONE WHOLE UNIT, AND THEY WERE NOT PARSING OUT

1   INDIVIDUAL AREAS TO DETERMINE IF THERE WAS SPECIFIC

2   JURISDICTION.  THEY WERE NOT DETERMINING WHICH SPECIFIC

3   PATCHES OF WETLANDS QUALIFIED AS "WATERS OF THE UNITED

4   STATES".  BUT THAT IS YOUR JOB HERE.  YOUR JOB IN THIS CASE IS

5   TO DETERMINE WHETHER WHERE THE FILL WAS PLACED IN 2014 WAS A

6   "WATER OF THE UNITED STATES".

7        THE GOVERNMENT NEEDS THE HUFFMAN MAP TO PROVE JURISDICTION

8   TO YOU BEYOND A REASONABLE DOUBT.  IT WOULD NOT HAVE

9   COMMISSIONED A REPORT FROM HIM OR GONE OUT OF ITS WAY DURING

10  THIS TRIAL TO PROVE THE EXISTENCE OF TRIBUTARIES THROUGH

11  EXPERTS WHO DID NOT MAP THEM IF THE GOVERNMENT DID NOT NEED

12  THEM.

13       WITHOUT HUFFMAN AND HIS TRIBUTARIES, THE GOVERNMENT CANNOT

14  MEET THEIR BURDEN.  AND SO WHY CAN'T YOU RELY ON THE OTHER

15  EXPERTS TO ESTABLISH JURISDICTION FOR THESE COUNTS BEYOND A

16  REASONABLE DOUBT?

17       FIRST, THESE EXPERTS NEVER DELINEATED THE FEATURES ON THE

18  PROPERTY THE WAY DR. HUFFMAN'S 2017 MAP DID.

19       SECOND, THEY DID NO NEW SCIENTIFIC WORK ON THE CASE TO

20  FORM THEIR OPINIONS.

21       THIRD, IN 2017 THEY WERE ADDED TO THE GOVERNMENT PAYROLL

22  AND WERE EVASIVE ABOUT THAT.

23       FOURTH, THEY DID NOT EVALUATE THE PROPERTY IN ANY

24  MEANINGFUL WAY IN 2014.

25       AND, FIVE, THEY HAD NOT CONDUCTED THROUGH 2007 AND 2016

CLOSING ARGUMENT - HANSEN

1    THE SIGNIFICANT NEXUS TEST AND THEY NEVER COMPLETED THE ARMY

2    CORPS GUIDANCE THAT IS REQUIRED FOR SIGNIFICANT NEXUS.

3        REASONABLE DOUBT IS THAT FEELING YOU GET WHEN YOU LEAVE

4    HOME AND YOU THINK YOU MAY HAVE LEFT THE OVEN, OR FOR ME IT'S

5    THE CURLING IRON OR MAYBE YOU FORGOT TO CLOSE THE GARAGE DOOR.

6    AND TO BE SURE YOU GO BACK AND CHECK.  YOU DRIVE BACK BECAUSE

7    YOU HAVE A REASONABLE DOUBT.  THAT'S THE FEELING.

8        WHERE IS DR. HUFFMAN?  WHY DID THE EXPERTS TESTIFY

9    INCONSISTENT WITH THEIR OWN PRIOR MAPS AND TRY TO SUPPORT THE

10   HUFFMAN MAP?  WHY WOULD THEY NOT ADMIT THEY WERE BEING PAID?

11   THIS IS ALSO WHAT REASONABLE DOUBT FEELS LIKE.

12       BUT IF YOU LEAVE THE CURLING IRON ON OR THE OVEN ON AND

13   THERE'S A FIRE, YOU CAN REBUILD YOUR KITCHEN.  YOU CALL YOUR

14   INSURANCE COMPANY HOPEFULLY AND GET THOSE REPAIRS PAID FOR.

15   THE SAME IS NOT TRUE HERE.  IN THIS CASE, YOUR DECISION ABOUT

16   MR. LUCERO'S FATE IS FINAL.  IT CAN'T BE TAKEN BACK AND IT

17   CAN'T BE REMODELED OR FIXED LATER.

18       THIS IS NOT A CIVIL CASE.  THIS IS NOT ABOUT WHETHER THE

19   DEVELOPER NEEDS A PERMIT TO BUILD A NEW COMMUNITY IN NEWARK OR

20   TO BUILD A GOLF COURSE THERE.  IT'S ABOUT MR. LUCERO'S LIFE,

21   AND THAT IS WHY THE GOVERNMENT'S BURDEN HERE IS HIGH.

22       THIS AREA OF LAW IS CONFUSING AND THERE'S NO DOUBT ABOUT

23   THAT.  GUILTY VERDICTS CAN ONLY BE REACHED BASED ON PROOF THAT

24   IS CLEAR AND PROVEN TO YOU BEYOND A REASONABLE DOUBT.  IT IS

25   THE GOVERNMENT THAT CHOSE TO CHARGE MR. LUCERO WITH THREE

1    COUNTS OF CLEAN WATER ACT VIOLATIONS, SO IT WAS THEIR DUTY TO

2    PROVE THIS CASE TO YOU.

3        IF YOU GO BACK TO THE JURY ROOM AND DO NOT UNDERSTAND THE

4    ISSUES OF THE CASE OR WHAT WAS PROVEN, THAT IS NOT YOUR FAULT

5    AND IT IS NOT MR. LUCERO'S FAULT.  MR. LUCERO HAS NO BURDEN

6    HERE.  IF YOU FEEL THAT WAY, IT SIMPLY MEANS THE GOVERNMENT

7    DID NOT DO THEIR JOB, AND YOU HAVE YOUR ANSWER.  NOT GUILTY.

8        MEMBERS OF THE JURY, PLEASE DO NOT LET THE GOVERNMENT

9    MANUFACTURE JURISDICTION WITH HUFFMAN'S 2017 MAP WHEN YOU DID

10   NOT EVEN HEAR FROM HIM.  DO NOT LET THEM RE-WRITE HISTORY WITH

11   THOSE TRIBUTARIES.

12       ON BEHALF OF MY CLIENT, ON BEHALF OF MR. SMOCK AND

13   MR. WANZALA, WE ASK THAT YOU FIND MR. LUCERO NOT GUILTY OF ALL

14   THREE COUNTS.  NOT GUILTY.

15       THANK YOU.

16           **THE COURT:**  ALL RIGHT.

17       LADIES AND GENTLEMEN, SO IT IS 11:41.  WHAT I WOULD LIKE

18   TO DO IS TAKE A LITTLE BIT SHORTER BREAK THAN USUAL.  LET'S

19   TAKE A TEN-MINUTE BREAK, AND WE WILL THEN COME BACK AND

20   PROCEED WITH THE CASE.

21       JUST REMEMBER TO KEEP ALL OF YOUR ADMONITIONS IN MIND

22   THROUGH THIS LAST BREAK.

23       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

24           **THE CLERK:**  YOU MAY BE SEATED.

25           **THE COURT:**  JUST FOR PLANNING, MR. KEARNEY, DO YOU

```
 1    HAVE AN ESTIMATE OF HOW LONG YOUR REBUTTAL WILL GO?

 2            MR. KEARNEY:  20 MINUTES, YOUR HONOR.

 3            THE COURT:  THANK YOU.

 4            MS. HANSEN:  A VERY QUICK POINT ABOUT THE JURY

 5    INSTRUCTION.

 6        WE ARE CONCERNED ABOUT GOVERNMENT COUNSEL'S ARGUMENT THAT

 7    THIS CATEGORY OF WATERS "OTHER WATERS" INCLUDES A TRIBUTARY,

 8    AND THAT IT'S SUBSUMED UNDER THAT CATEGORY.

 9        WE BELIEVE THAT THAT'S A CONSTRUCTIVE VARIANCE.  THE

10    ORIGINAL INDICTMENT CHARGED "OTHER WATERS" AND WE WOULD ASK

11    AGAIN THAT THE COURT CONSIDER ADDING TO THE TRIBUTARY

12    DEFINITION THAT TRIBUTARIES ARE NOT "OTHER WATERS" AND THOSE

13    ARE CHARGED SEPARATELY UNDER THE REGULATIONS AND "OTHER

14    WATERS" ARE NOT CHARGED HERE.

15            THE COURT:  ALL RIGHT.  I'VE NOTED YOUR RENEWED

16    ARGUMENTS, AND WE WILL REMAIN WITH THE INSTRUCTION AS

17    CURRENTLY DRAFTED.

18            MS. HANSEN:  THANK YOU, YOUR HONOR.

19        (RECESS TAKEN AT 11:43 A.M.; RESUMED AT 11:53 A.M.)

20            THE CLERK:  REMAIN SEATED COME TO ORDER.  THIS COURT

21    IS BACK IN SESSION.

22        READY FOR THE JURY, JUDGE?

23        JUST KNOCK.

24        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

25            THE CLERK:  YOU MAY BE SEATED.
```

1      ALL RIGHT.  LADIES AND GENTLEMEN, AT THIS TIME THE

2  GOVERNMENT HAS THE OPPORTUNITY TO PRESENT A REBUTTAL CLOSING

3  ARGUMENT IN RESPONSE.

4      MR. KEARNEY, ARE YOU PREPARED TO PROCEED?

5          **MR. KEARNEY:**  I AM, SIR.

6              **REBUTTAL CLOSING ARGUMENT**

7          **MR. KEARNEY:**  LADIES AND GENTLEMEN, GOOD AFTERNOON.

8  WE ARE NOT REWRITING HISTORY.  THEY ARE REWRITING TESTIMONY.

9  AND I WILL TALK ABOUT THAT IN A MOMENT.

10     BUT FIRST I WANT TO TALK ABOUT THE TRUTH FOR A MOMENT.

11 THE TRUTH IS SOMETIMES YOU JUST GET CAUGHT.  SOMETIMES YOU

12 COMMIT AN ACT SO BRAZEN, SO OUTSIDE THE NORM OF HUMAN BEHAVIOR

13 THAT WHEN YOUR CRIME IS DISCOVERED AND THE LIGHT OF DAY IS

14 SHOWN UPON IT IT'S REVEALED THAT THERE IS NO DEFENSE.  THIS IS

15 ONE OF THOSE TIMES.

16     WHY IS THERE NO DEFENSE?  BECAUSE THE ONLY EXPERT EVIDENCE

17 BEFORE YOU IS AS FOLLOWS:  WETLANDS IN THE NORTHERN AND

18 SOUTHERN FILL AREAS WERE DUMPED ON.  THE WETLANDS IN THOSE

19 AREAS HAD EXISTED FOR YEARS IF NOT DECADES BEFORE THE DUMPING.

20 THE WETLANDS THAT WERE DUMPED ON IN BOTH THOSE AREAS WERE

21 ADJACENT TO MOWRY SLOUGH.  THESE ARE ALL EXPERT OPINIONS

22 RECEIVED IN EVIDENCE BEFORE YOU.

23     DAN MARTEL LABELED IT A SIMPLE, STRAIGHTFORWARD CALL.  THE

24 WETLANDS WERE DETERMINED TO BE "WATERS OF THE UNITED STATES"

25 BY THE ARMY CORPS OF ENGINEERS BOTH BEFORE AND AT THE TIME OF

REBUTTAL CLOSING ARGUMENT – KEARNEY

1    DUMPING.  THIS IS ALL SWORN TESTIMONY BEFORE YOU.

2        THE NORTHERN AND SOUTHERN WETLANDS HAD A DIRECT HYDROLOGIC

3    CONNECTION TO THE SLOUGH.  THE TRIBUTARY IN THE NORTHERN AREA

4    CONTRIBUTED FLOW TO MOWRY SLOUGH AT LEAST SEASONALLY.

5    SOMETHING WE ALL KNOW.  A PORTION OF THIS TRIBUTARY WAS DUMPED

6    ON BY THE DEFENDANT.  THE NORTHERN AND SOUTHERN WETLANDS IN

7    THE NORTHERN TRIBUTARY AND SIMILARLY SITUATED WATER BODIES IN

8    THE REGION SIGNIFICANTLY EFFECTED THE CHEMICAL INTEGRITY OF

9    TRADITIONAL NAVIGABLE WATERS.  DIRECT EXPERT TESTIMONY WE

10   RECEIVED IN THIS CASE.

11       THE SAME STATEMENT IS TRUE REGARDING THE PHYSICAL

12   INTEGRITY OF A TRADITIONAL NAVIGABLE WATER.  AND THE

13   BIOLOGICAL INTEGRITY.  THAT IS THE ONLY EXPERT EVIDENCE

14   RECEIVED BY YOU.

15       YOU'RE GOING TO BE INSTRUCTED BY THE COURT.  I WANT TO

16   READ YOU AN INSTRUCTION THE JUDGE WILL GIVE YOU IN JUST A

17   MOMENT.  THIS IS FOR THOSE OF YOU KEEPING TRACK, THIS IS

18   INSTRUCTION NO. 6.

19       WHAT IS NOT EVIDENCE.  THE FOLLOWING THINGS ARE NOT

20   EVIDENCE AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE

21   FACTS ARE:  QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS

22   BY THE LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT

23   WITNESSES.  ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO

24   UNDERSTAND THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS

25   ARE NOT EVIDENCE.

1     WHEN YOU GO BACK IN YOUR DELIBERATION ROOM, PLEASE KEEP

2     THAT IN MIND.  YOUR JOB IS TO ASSESS WHAT THE PEOPLE RIGHT UP

3     THERE TOLD YOU, INCLUDING ALL THE EXPERTS IN THIS CASE.

4     AN EXAMPLE OF THAT:  WELL DR. HARDWICKE'S ANALYSIS OF

5     PHOTOGRAPHS, IT'S NOT RELEVANT BECAUSE SHE COULD ONLY TALK

6     ABOUT ONE OF THE THREE FACTORS OF WETLAND EXISTENCE.

7     WELL, DOES THAT FIT THE EVIDENCE?  NO.  DR. HARDWICKE

8     SAID, YES, THERE IS WETLAND VEGETATION, I SEE IT, AND I KNOW

9     THERE'S HYDRIC SOIL THERE BECAUSE I HAVE SEEN IT AND DUG IN IT

10    MYSELF, AND I KNOW THERE'S HYDROLOGY PRESENT BECAUSE A LOT OF

11    STUFF IS BRIGHT GREEN.  IT'S GETTING WATER FROM THE GROUND

12    WATER.  THAT'S HER TESTIMONY IN EVIDENCE AFTER SHE RAISED HER

13    HAND ON THAT CHAIR.

14    THAT IS WHAT THE LAW TELLS YOU YOU HAVE TO CONSIDER IN

15    MAKING YOUR DETERMINATION.  THAT'S IT.  NOT WHAT I SAY, NOT

16    WHAT SOMEONE ELSE SAYS, WHAT PEOPLE UP THERE SAY.  PLEASE KEEP

17    THAT IN MIND.

18    I JUST READ TO YOU THE LITANY OF EXPERT OPINIONS IN THIS

19    CASE THAT WERE GIVEN UNDER OATH.  THEY DICTATE ONLY ONE

20    VERDICT TO ALL THREE COUNTS IN THIS CASE.  BUT I WOULD ALSO

21    LIKE YOU TO FOCUS ON THE FACT THAT WE HAD A CORPS, CORPS

22    WITNESSES TESTIFY.  THE U.S. ARMY CORPS OF ENGINEERS IS THE

23    FEDERAL AGENCY TASKED WITH OVERSIGHT OF "WATERS OF THE UNITED

24    STATES", INCLUDING WETLANDS AND TRIBUTARIES.  THEY ARE

25    LITERALLY THE ONES WHO SAY WHAT "WATERS OF THE UNITED STATES"

1    IS AND WHAT IT'S NOT.  IT'S THEIR JOB.

2       IN THIS CASE, KATERINA GALACATOS VISITED THE SITE ON

3    NOVEMBER THE 4TH, 2014.  NOVEMBER THE 4TH, DUMPING STOPPED

4    SEPTEMBER 8TH, TWO MONTHS.  LESS THAN TWO MONTHS LATER.

5       SHE WENT; SHE DUG.  AND THERE'S BEEN SOME CHARACTERIZATION

6    OF THE CORPS AS NOT THOROUGH.  IT'S NOT TRUE.  SHE GOT DOWN ON

7    HER HANDS AND KNEES AND DUG.  THIS IS THE ACTING DIRECTOR OF

8    ENFORCEMENT FOR THE U.S. ARMY CORPS OF ENGINEERS IN THIS

9    COUNTRY.

10      AND WHAT DID SHE FIND WHEN SHE DUG LESS THAN 60 DAYS AFTER

11   THE DUMPING?  SHE FOUND WETLAND.  MORE IMPORTANTLY SHE FOUND

12   HYDRIC SOIL, SHE FOUND EVERYTHING YOU NEED TO FIND TO

13   ESTABLISH WETLAND IN BOTH AREAS, IN ALL THREE AREAS.  AND SHE

14   ALSO FOUND ON THAT DAY "WATERS OF THE UNITED STATES" HAD BEEN

15   DUMPED ON.

16      YOU CAN BASE YOUR VERDICTS ON THAT TESTIMONY ALONE.  SHE'S

17   THE ONE, THE U.S. ARMY CORPS OF ENGINEERS WHO DICTATE WHAT THE

18   CHARACTER OF THIS LAND SHOULD BE.

19      IT WAS REFERENCED THAT SHE'S THE ONLY PERSON NOT ON THE

20   GOVERNMENT'S PAYROLL IN THIS CASE.  SHE'S GETTING A SALARY.

21   WELL, OKAY.  THEN SHE IS TO BE TRUSTED.  AND THAT'S WHAT SHE

22   SAID.

23      I WANT TO READ YOU ONE OTHER INSTRUCTION.  I KNOW THAT --

24   I APOLOGIZE, LADIES AND GENTLEMEN, FOR DOING THIS, BUT MANY OF

25   YOU ARE NEW TO JURY SERVICE AND I THINK IT'S WORTH MENTIONING.

1      THIS IS JURY INSTRUCTION NO. 1, THE FIRST ONE YOU ARE

2   GOING TO HEAR WHEN THE JUDGE INSTRUCTS YOU IN A FEW MOMENTS.

3      TALKS ABOUT YOUR DUTIES AS JURORS, WHAT YOU DO.  THE

4   BASICS.

5      IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE

6   EVIDENCE RECEIVED IN THE CASE AND, IN THAT PROCESS, TO DECIDE

7   THE FACTS.  YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

8   AND THE LAW AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES

9   OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHIES.

10      IT IS YOUR DUTY TO WEIGH AND EVALUATE ALL OF THE EVIDENCE

11   RECEIVED IN THE CASE AND, IN THAT PROCESS, TO DECIDE THE

12   FACTS.  SO YOUR JOB IS TO LOOK AT THE EVIDENCE.

13      THERE'S AN ANALOGY, USEFUL ANALOGY ABOUT TRIALS THAT I

14   WANT TO TELL YOU RIGHT NOW.  IT INVOLVES AN ANALOGY THAT

15   TRIALS ARE AN ANALOGY TO AN EMPTY CARDBOARD BOX.

16      JUST IMAGINE THAT ACTUALLY THE JUDGE IS HOLDING AN EMPTY

17   CARDBOARD BOX.  AND DURING TRIAL, AS EVIDENCE COMES IN ON THAT

18   CHAIR FROM WITNESSES TESTIFYING UNDER OATH, EVIDENCE GOES INTO

19   THE BOX.  SOMEBODY TESTIFIES, THEIR EVIDENCE GOES INTO THE

20   BOX.  A PHOTOGRAPH GETS ADMITTED, INTO THE BOX.  A CHART GETS

21   ADMITTED, INTO THE BOX.  A STIPULATION GETS READ, INTO THE

22   BOX.

23      THE COURT PROTECTS THAT BOX.  KEEPS OUT IRRELEVANT

24   EVIDENCE.  THERE'S AN OBJECTION THAT IS SUSTAINED, SOMETHING

25   IS STRICKEN, OUT OF THE BOX.  SOMETHING ELSE ADMITTED, IT GOES

1    INTO THE BOX.

2        AT THE END OF THE TRIAL, THAT BOX IS GIVEN TO YOU.  AND

3    YOU TAKE IT INTO THE DELIBERATION ROOM AND YOU LOOK AT THE

4    EVIDENCE IN THAT BOX AND BASE YOUR DECISION.  THAT'S WHAT A

5    TRIAL IS.

6        YOU HAVE A JUDGE MAKING SURE ONLY GOOD EVIDENCE GOES INTO

7    THE BOX.  THE BOX IS GIVEN TO YOU TO MAKE A DECISION BASED ON

8    THAT EVIDENCE.  YOUR JOB, JURY INSTRUCTION NO. 1, IT IS TO

9    BASE YOUR DECISION ON THE EVIDENCE.

10       WHY DO I BRING THAT UP?  BECAUSE OF THIS.

11       THERE IS SO MUCH STUFF BEING DISCUSSED THAT IS NOT IN THE

12   BOX.  THIS INSINUATION THAT TERRY HUFFMAN DIDN'T TESTIFY AND

13   HE WOULD HAVE SAID X, Y OR Z AND YOU CAN'T BELIEVE ANYBODY

14   ELSE, EVERYBODY IS LYING, AND THEY ARE ALL IN CAHOOTS AND

15   EVERYTHING.  THAT EVIDENCE IS NOT IN THE BOX.

16       THE TRUTH IS DR. HUFFMAN DID NOT TESTIFY.  YOU CAN'T

17   SPECULATE AS TO WHY NOT BECAUSE IT'S NOT IN THE BOX.

18       IT'S JUST AS SIMPLE AS THAT.  AND IT IS YOUR JOB, YOU

19   SWORE AN OATH TO FOLLOW THE INSTRUCTIONS AS GIVEN TO YOU.

20   THAT'S ONE OF THEM.

21       THE GOVERNMENT NEEDS DR. HUFFMAN'S MAP TO ESTABLISH

22   JURISDICTION.  NO, WE DON'T.  THAT'S JUST NOT TRUE.  THESE

23   EXPERTS YOU HEARD FROM HAVE BEEN LOOKING AT THE SITE FOR

24   YEARS, IF NOT DECADES.  THEY HAVE ALWAYS FOUND IT TO CONTAIN

25   "WATERS OF THE UNITED STATES".

1    EVERY ONE OF THEM WAS SHOWN THE MAP.  DOES THIS ACCURATELY

2    PORTRAY THE HYDROLOGY ON THE SITE?  OF COURSE IT DOES.

3    EVERYBODY KNOWS WATER FLOWS DOWNHILL AND OUT.  THERE'S ONLY

4    TWO EXIT POINTS.

5    SOMETHING ELSE THAT'S NOT IN THE BOX:  OH, THERE'S THIS

6    HUGE DROUGHT THAT CHANGED ALL THE WETLAND VEGETATION AND MADE

7    THE WETLAND DRY UP, AND IT WAS GONE BY THE TIME SEPTEMBER OF

8    2014 ROLLED AROUND.

9    OKAY.  WHERE'S THE EVIDENCE OF THAT?  BECAUSE THE EVIDENCE

10   THAT CAME IN FROM THE STAND WAS THAT IN THE RAINY SEASON 2013,

11   2014 THERE WAS 6.85 INCHES OF RAIN.  THE AVERAGE WAS ABOUT 15,

12   MAYBE 16.  SO LITTLE LESS THAN HALF.  IT WAS A LIGHT RAIN

13   YEAR.  WAS IT ABJECTLY DRY BONE ARID?  NO, IT WAS NOT.

14   YOU KNOW WHAT'S REALLY INTERESTING ABOUT THIS WHOLE

15   ARGUMENT ABOUT DROUGHT, IT'S SUCH AN INSIDIOUS THING, NOTHING

16   WAS PROVEN TO YOU ABOUT IT.  IT'S NOT IN THE BOX.

17   BUT WHAT DID WE HEAR ABOUT THE IMPACT OF LESS RAIN ON THIS

18   LAND.  IT'S VERY COUNTERINTUITIVE.  THIS CAME FROM

19   DR. HARDWICKE.  SHE SAID THE AQUIFER UNDER THIS LAND HAS TWO

20   FORCES COMPETING UNDER IT.

21   MY COLLEAGUE, MS. LEE, MENTIONED THIS IN HER OPENING

22   REMARKS TO YOU.  THERE IS SALT WATER COMING FROM THE BAY THAT

23   KIND OF JAMS INTO RAIN WATER OR FRESH WATER COMING DOWN

24   THROUGH THE SOIL.  AND THEY KIND OF BATTLE IT OUT.  THIS IS ON

25   PAGE 887 OF THE TRANSCRIPT IF ANYBODY CARES TO LOOK AT IT.

1        WHAT DR. HARDWICKE SAID WAS, WHEN THERE'S LESS RAIN, THE

2    FRESH WATER PART OF THE AQUIFER IT'S LESS CHARGED.  AND IN THE

3    ZERO SUM GAME UNDERNEATH THE GROUND, THE SALT WATER ADVANCES.

4    AS YOU WOULD EXPECT, IT'S RIGHT NEXT TO THE BAY.  RIGHT?  AND

5    WHAT LOVE SALT WATER?  WETLAND VEGETATION.

6        DR. HARDWICKE TOLD US THAT'S WHY THE PICKLEWEED WAS SO

7    HEALTHY AND THE SALT GRASS IN THE NORTHERN FILL AREA WAS SO

8    HEALTHY AND GREEN BECAUSE IT WAS GETTING PLENTY OF SALT WATER.

9        VERY COUNTERINTUITIVE, BUT I WOULD ENCOURAGE YOU TO STICK

10   WITH THE EVIDENCE, STICK WITH THE BOX.  BECAUSE IF YOU LOOK IN

11   THE BOX, THERE'S ONLY ONE INTERPRETATION OF THIS EVIDENCE YOU

12   CAN COME TO IS THE DEFENDANT IS GUILTY.  HE JUST GOT CAUGHT.

13       SO LET'S TALK ABOUT PAID EXPERTS.  YES, WE PAY EXPERTS.

14   THAT'S THE STANDARD PRACTICE.

15       DR. BOURSIER, I KNOW YOU ARE ENJOYING YOUR RETIREMENT,

16   BUT, GEE, CAN YOU COME AND GIVE US 60, 80 HOURS TO PREPARE, GO

17   BACK OVER ALL OF YOUR NOTES, GET UP TO SPEED AGAIN, AND

18   EVERYTHING, LOOK AT ALL THE PHOTOGRAPHS, WAIT AROUND OUTSIDE

19   THE COURTROOMS, COME AND TALK TO LAWYERS AND GO BACK HOME, GO

20   BACK AND FORTH; CAN YOU DO ALL THAT FOR FREE?  REALLY?  WE

21   WOULDN'T GET MUCH OF A RESPONSE.

22       I THOUGHT IT WAS VERY INTERESTING THAT TO A PERSON

23   EVERYBODY SAID, YEAH, I THINK I'M GETTING PAID.  I DON'T KNOW

24   WHAT IT IS.  THESE ARE CAREER PROTECTORS OF THE ENVIRONMENT.

25       LOOK AT DR. COATS.  HE'S BEEN DOING THIS FOR 47 YEARS.

```
1    HE'S HEAVILY INVOLVED IN CLIMATIC CHANGE.  HE CARES.  THESE
2    PEOPLE CARE DEEPLY ABOUT THE ENVIRONMENT.  YES, THEY GET PAID.
3    DOES IT MEAN THEY SOMEHOW ARE CORRUPT AND THEY'RE COOKING UP
4    THEIR STORIES?  ABSOLUTELY POSSIBLY NOT.  THERE'S NO EVIDENCE
5    OF THAT.  IT'S NOT IN THE BOX.
6        AND EVASIVE ABOUT NOT GETTING PAID?  WELL, GO BACK AND
7    LOOK AT THE TESTIMONY.  HE JUST DIDN'T KNOW.
8        THERE HAS BEEN A LITTLE... UNDERCURRENT OF THE EVIL
9    DEVELOPER.  OH, THEY WANT TO STILL DEVELOP THE LAND.  WELL,
10   YEAH, BUT I'LL TELL YOU SOMETHING, BASED ON THE EVIDENCE WE
11   HEARD, IF EVERY DEVELOPER IN THIS COUNTRY IN THE WORLD WERE AS
12   CONSCIENCE AS THE SOBRATOS, THIS PLACE -- THIS PLANET WE LIVE
13   ON WOULD BE A MUCH BETTER PLACE.
14       THINK OF TIM STEELE.  THINK OF THE DECADE OF WORK HE DID
15   TO TRY AND LEGALLY DEVELOP SOMETHING ON THAT LAND.  ALL THE
16   BIOTIC HABITAT REPORTS THAT HE COMMISSIONED, THE ENVIRONMENTAL
17   IMPACT REPORTS HE PAID FOR.  THE PRELIMINARY DELINEATIONS HE
18   PAID FOR.
19       THESE ARE PEOPLE WHO WERE SERIOUS AND TRIED TO DO IT
20   RIGHT.  THEY CONTACTED THE CORPS.  ONCE HARVEY DELINEATED THE
21   FORMALLY THE WETLANDS, WHO CONTACTED THE CORPS?  SOBRATO.
22   HEY, WE THINK THERE'S FEDERAL WETLANDS ON HERE.  LET US KNOW
23   WHAT WE CAN DO.
24       THIS WHOLE EVIL DEVELOPMENT THING JUST DOESN'T WASH IN
25   THIS CASE.  THE EVIDENCE DEMANDS THAT YOU FIND DIFFERENTLY.
```

1       THE FARMING DESTROYED THE WETLAND IN THIS CASE.  IT'S NOT

2   TRUE.  THE EXPERTS TOOK INTO ACCOUNT THAT PARTS OF THE SITE

3   HAD BEEN FARMED, BUT THE FARMING, THE ACTUAL EVIDENCE FROM

4   OVER THERE (INDICATING), MIKE SIRI TOLD US THE FARMING ENDED

5   WHEN THE NEWARK PARTNERS TOOK OVER AROUND 2006.  MIKE (SIC)

6   STEELE SAID THE CUTTING DOWN OF THE HAY CAME TO AN END AROUND

7   2008, 2009, AND THE FARMING FOR VEGETABLES AND OTHER

8   COMMERCIAL PRODUCTS HADN'T TAKEN PLACE SINCE BEFORE HE GOT ON

9   THE SITE IN 2003.

10      FARMING IS PERMITTED BY CLEAN WATER ACT ANYWAY, BUT IT

11  DIDN'T CHANGE THE FACT THAT THERE WAS WETLAND VEGETATION OUT

12  THERE.  IT JUST DIDN'T.

13      NOW, ONE OF THE BIG TICKET ITEMS:  TRIBUTARY A DOESN'T

14  EXIST.  HOW MUCH VIDEOGRAPHIC, PHOTOGRAPHIC TESTIMONIAL PROOF

15  CONTRADICTS THAT STATEMENT.  SO MIKE SIRI HAS BEEN GOING TO

16  THIS LAND FOR SIX DECADES.  I FORGET WHAT THE NUMBER HE SAID

17  WAS ADVERTISED PER YEAR, BUT EVEN AT TEN TIMES PER YEAR, IT'S

18  600 TIMES, BUT SEVERAL HUNDRED TRIPS HE'S MADE THERE.

19      JUST A SALT-OF-THE-EARTH GENTLEMAN, OLDER GENTLEMAN CAME

20  IN TO TALK.  AND HE GOES, WELL -- WHEN I ASKED HIM DOES WATER

21  FLOW TOWARDS THE LEVEE IN TRIBUTARY A, THE ONE BY THE SOUTHERN

22  FILL AREA, HE GOES OF COURSE.

23      AND HE GOES, YOU KNOW, I CAN'T REMEMBER A TIME OVER ALL MY

24  TRIPS OVER ALL MY DECADES TO LAND WHERE I DIDN'T SEE WATER

25  FLOWING IN THERE OR AT LEAST I DIDN'T SEE WATER IN THERE.

1    AND IS IT ONLY ON THE WESTERN EDGE DOWN BY THE LEVEE?  NO.

2   IT IS FED LARGELY BY -- IT'S FED BY THAT SEEP ON THE EXTREME,

3   WHAT IS THAT, SOUTHERN END OF THE SOUTH FILL AREA.

4    SO, I WOULD JUST ENCOURAGE YOU TO REMEMBER THAT THE

5   EVIDENCE COMES FROM UP THERE NOT FROM HERE.

6    YOU KNOW, THE RYAN AMAYA INTERPRETING A TOPOGRAPHIC MAP

7   TRYING TO FIGURE OUT IS THAT A HOLE OR IS THAT A FLOWING

8   WATER?  THAT'S WHAT THE DEFENDANT IS TRYING TO ASK YOU TO

9   BELIEVE.  GEE, THERE'S TWO TOPOGRAPHIC LINES COMING TOGETHER

10  SO, THEREFORE, THERE IS NO TRIBUTARY THERE?

11    LOOK AT THE EVIDENCE.  LOOK AT THE STUFF IN THE BOX.  THAT

12  WILL TELL YOU WHAT THE TRUTH IS.

13    AND MAYBE THE BIGGEST HEAD SCRATCHER OF ALL, TRIBUTARY 1

14  THE NORTHERN TRIBUTARY, WE ARE REWRITING HISTORY.  NOBODY IS

15  REWRITING ANYTHING.  FLOW HAS BEEN GOING THROUGH THERE FOR

16  DECADES.  BEFORE THE DUCKBILL WENT IN, IT WAS NOT QUITE AS

17  EFFICIENT.  NOW IT IS.  CALL IT A TRIBUTARY, A POND, "OTHER

18  WATER", IT DOESN'T MATTER.

19    THE TRUTH IS THAT IN 2008, THE DUCKBILL GOT FIXED --

20  ACTUALLY THE DUCKBILL GOT INSTALLED.  AND IT CHANGED THE FLOW

21  OF WATER THROUGH THERE.  THERE'S A --

22    CAN WE SEE THAT PHOTOGRAPH, AGENT SU?

23                    (DISPLAYED ON SCREEN.)

24    THERE WE GO.  THIS WAS SHOWN TO YOU BY MS. LEE.  THERE IS

25  THE TRIBUTARY.  SOMETIMES IT'S UNDER WATER, SOMETIMES IT'S

1    NOT, BUT IT FLOWS THERE.

2        HOW DO WE KNOW IT FLOWS THERE?  BECAUSE THEY BUILT A

3    CULVERT TO RECEIVE IT.  RIGHT?  THE HOLE REASON THEY BUILT A

4    CULVERT WAS SO THE WATER COULD FLOW DOWN THERE AND OUT.  YOU

5    CAN SEE THE TRIBUTARY RIGHT THERE.  THAT'S IN THE BOX, THAT

6    PHOTOGRAPH.

7        WELL, TRIBUTARY 1 WAS ONLY SEEN BY DR. HUFFMAN, THE EVIL

8    DR. HUFFMAN WHO... YOU KNOW, THE BOGEYMAN IN THIS CASE.  IT

9    WAS ONLY SEEN BY HIM.  WELL, IT'S NOT TRUE.

10       DR. BOURSIER TALKED ABOUT IT RIGHT THERE.  TALKED ABOUT

11   SEEING IT RIGHT THERE.  WELL, IN 2007 IT WAS CHARACTERIZED AS

12   A POND.  AND HOW DARE YOU NOW CALL IT A TRIBUTARY.

13       A TRIBUTARY IS THIS:  SOMETHING THAT CONTRIBUTES FLOW TO A

14   TNW.  THAT'S IT.  A POND COULD DO IT, AN "OTHER WATER" COULD

15   DO IT, A TRIBUTARY COULD DO IT.  PICK ANY NOMENCLATURE YOU

16   WANT, IT DOESN'T MATTER; THAT'S WHERE WATER FLOWS OUT.  A

17   DIRECT HYDROLOGIC CONNECTION TO THE SLOUGH.

18       NO ONE PERFORMED A FORMAL SIGNIFICANT NEXUS ANALYSIS.  SO,

19   THEREFORE, WHAT?  THE DEFENDANT IS NOT GUILTY?  THEREFORE, THE

20   LAND DOESN'T HAVE AN IMPACT ON THE SLOUGH?  WE KNOW IT DOES BY

21   ALL OF THE TESTIMONY.

22       THIS IS WHAT THE JUDGE WILL READ TO YOU ABOUT SIGNIFICANT

23   NEXUS.  I WOULD LIKE YOU TO LISTEN FOR SOME THINGS IN HERE.

24   LISTEN IF YOU HEAR SHELLFISH ANYWHERE MENTIONED OR INTERSTATE

25   COMMERCE.

1    A TRIBUTARY OR ADJACENT WETLAND HAS A SIGNIFICANT NEXUS TO

2   TRADITIONAL NAVIGABLE WATERS IF IT EITHER ALONE OR IN

3   COMBINATION WITH SIMILARLY SITUATED WATER BODIES IN THE REGION

4   SIGNIFICANTLY AFFECTS THE CHEMICAL, PHYSICAL, OR BIOLOGICAL

5   INTEGRITY OF TRADITIONAL NAVIGABLE WATERS.  THAT IS WHAT

6   SIGNIFICANT NEXUS IS.

7    WE HAVE HEARD SO MUCH EVIDENCE ON EVERY LEVEL THAT THIS

8   LAND AFFECTS THE SLOUGH.  AND, GEE, THERE'S MORE FLOW THROUGH

9   THERE, THERE'S MORE GARBAGE FLOWING IN TO THE SLOUGH FROM THE

10   DRAINAGE CHANNEL.  WELL, YOU KNOW WHAT?  EVEN MORE NEED FOR

11   OUR WETLAND TO ACTUALLY PUT SOME NUTRIENTS IN THERE THAT THE

12   MARINE LIFE CAN LIVE ON.

13    IT DOESN'T MEAN THAT THERE'S NOT A SIGNIFICANT IMPACT OR

14   EFFECT ON THE SLOUGH OR THE LAND.  ESPECIALLY WHEN YOU VIEW IT

15   IN CONJUNCTION WITH ALL THE OTHER WETLANDS IN THIS REGION.

16    THE LAST I WANT TO READ TO YOU, LADIES AND GENTLEMEN, IS

17   PROOF BEYOND A REASONABLE DOUBT.  WE'VE HEARD SOME TALK ABOUT

18   WHAT IT'S LIKE.  LET ME TELL YOU WHAT IT IS.

19    PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

20   FIRMLY CONVINCED THE DEFENDANT IS GUILTY.  FIRMLY CONVINCED.

21   IT IS NOT REQUIRED THAT THE GOVERNMENT PROVE BEYOND ALL

22   POSSIBLE DOUBT THE DEFENDANT IS GUILTY.  IF YOU STILL HAVE

23   LINGERING QUESTIONS, SOMETHING DIDN'T GET ANSWERED, I DON'T

24   KNOW THE NUMBER OF TRUCKS, MAYBE IT WAS 1500, MAYBE IT WAS

25   1200, MAYBE IT WAS 2,000, I DON'T KNOW.  YOU'RE ALWAYS GOING

1    TO HAVE QUESTIONS UNANSWERED.  BUT ARE YOU FIRMLY CONVINCED

2    THE DEFENDANT IS GUILTY.  AND YOU HAVE TO BE ON THIS EVIDENCE.

3    IT IS AS SIMPLE AS THAT.

4        WHAT HAPPENED HERE IS FAIRLY OBVIOUS.  AS A DIRT BROKER,

5    THE DEFENDANT MADE HIS MONEY ON THE MARGIN, RULE THAT

6    MR. OLIVERO TOLD US.  IT MIGHT COST MR. OLIVERO 70 BUCKS A

7    LOAD TO DUMP HIS REFUGE FROM HIS RECYCLING BUSINESS, BUT IF

8    MR. LUCERO HAD A SPECIAL RATE AT THE LANDFILL AND HE CAN TAKE

9    IT FOR 25 BUCKS, GREAT.

10       IN THIS CASE, UNDER THAT SCENARIO, MR. LUCERO STILL HAS TO

11   PAY THE DUMP.  WHAT A MUCH BETTER PROFIT MODEL TO CUT OUT THAT

12   PAYMENT PART ALTOGETHER.  JUST CUT THE LOCK ON SOMEBODY'S

13   LAND, GO IN, AND START DUMPING AND START CHARGING, AND MAKE

14   ALMOST 50 GRAND IN 90 DAYS, THE EQUIVALENT OF 200 GRAND A

15   YEAR, WHILE OTHER PEOPLE WERE DOING THE WORK FOR HIM, PUTTING

16   A DISABLED KID DRIVING THE TRACTOR.

17       SOMETIMES YOU JUST GET CAUGHT.  AND THAT'S WHAT HAPPENED.

18       THANK YOU.

19           **THE COURT:**  ALL RIGHT.

20       LADIES AND GENTLEMEN, SO AT THIS TIME, I WILL GIVE YOU THE

21   INSTRUCTIONS THAT WILL GUIDE YOUR DETERMINATION OF THE CASE.

22   AND IT MAY TAKE A BIT, BUT WE'LL MOVE THROUGH THESE AS

23   EFFICIENTLY AS WE CAN.

24       MEMBERS OF THE JURY, NOW THAT YOU'VE HEARD ALL THE

25   EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT

1    APPLIES TO THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE

2    AVAILABLE IN THE JURY ROOM FOR YOU TO CONSULT.

3       IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL THE EVIDENCE

4    RECEIVED IN THE CASE AND, IN THAT PROCESS, TO DECIDE THE

5    FACTS.  IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO

6    YOU TO THE FACTS AS YOU FIND THEM, WHETHER YOU AGREE WITH THE

7    LAW OR NOT.  YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

8    AND THE LAW, AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES

9    OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  YOU WILL

10    RECALL THAT YOU TOOK AN OATH PROMISING TO DO SO AT THE

11    BEGINNING OF THE CASE.

12       YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

13    OUT SOME AND IGNORE OTHERS; THEY ARE ALL IMPORTANT.  PLEASE DO

14    NOT READ INTO THESE INSTRUCTIONS OR INTO ANYTHING I MAY HAVE

15    SAID OR DONE ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD

16    RETURN.  THAT IS A MATTER ENTIRELY UP TO YOU.

17       THE INDICTMENT IS NOT EVIDENCE.  THE DEFENDANT HAS PLEADED

18    NOT GUILTY TO THE CHARGES.  THE DEFENDANT IS PRESUMED TO BE

19    INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE DEFENDANT

20    GUILTY BEYOND A REASONABLE DOUBT.  IN ADDITION, THE DEFENDANT

21    DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE.  THE

22    DEFENDANT DOES NOT HAVE TO PROVE INNOCENCE; THE GOVERNMENT HAS

23    THE BURDEN OF PROVING EVERY ELEMENT OF THE CHARGES BEYOND A

24    REASONABLE DOUBT.

25       A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL RIGHT

1    NOT TO TESTIFY.  IN ARRIVING AT YOUR VERDICT, THE LAW

2    PROHIBITS YOU FROM CONSIDERING IN ANY MANNER THAT THE

3    DEFENDANT DID NOT TESTIFY.

4        PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

5    FIRMLY CONVINCED THE DEFENDANT IS GUILTY.  IT IS NOT REQUIRED

6    THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

7        A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON

8    SENSE AND IS NOT BASED PURELY ON SPECULATION.  IT MAY ARISE

9    FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL THE

10   EVIDENCE, OR FROM LACK OF EVIDENCE.

11       IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL THE

12   EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT THAT

13   THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND THE DEFENDANT

14   NOT GUILTY.  ON THE OTHER HAND, IF AFTER A CAREFUL AND

15   IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE, YOU ARE CONVINCED

16   BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS

17   YOUR DUTY TO FIND THE DEFENDANT GUILTY.

18       THIS INSTRUCTION IS CALLED WHAT IS EVIDENCE.  THE EVIDENCE

19   FROM WHICH YOU ARE TO DECIDE WHAT THE FACTS ARE CONSISTS OF

20   THE SWORN TESTIMONY OF ANY WITNESS, THE EXHIBITS WHICH HAVE

21   BEEN RECEIVED IN EVIDENCE, AND ANY FACTS TO WHICH THE PARTIES

22   HAVE AGREED.

23       IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

24   TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.  THE FOLLOWING

25   THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN

DECIDING WHAT THE FACTS ARE:

QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES. ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT EVIDENCE.  SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN, OR INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.  IN ADDITION, SOME EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE; WHEN I HAVE INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY, YOU MUST DO SO.

ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID. CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU CAN FIND ANOTHER FACT.

YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.  THE LAW

MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER

DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE

HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

NONE OF IT.

IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

INTO ACCOUNT:

ONE, THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

HEAR OR KNOW THE THINGS TESTIFIED TO.

TWO, THE WITNESS'S MEMORY.

THREE, THE WITNESS'S MANNER WHILE TESTIFYING.

FOUR, THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE,

IF ANY.

FIVE, THE WITNESS'S BIAS OR PREJUDICE, IF ANY.

SIX, WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

TESTIMONY.

SEVEN, THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN

LIGHT OF ALL THE EVIDENCE.

AND, EIGHT, ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

1   HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

2   THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT

3   REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,

4   BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT

5   DIFFERS FROM OTHER TESTIMONY.

6        HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

7   TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

8   CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.  ON THE

9   OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY

10  ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY

11  ACCEPT THE PART THAT YOU THINK IS TRUE AND IGNORE THE REST.

12       THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

13  NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

14  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

15  MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

16       THE SPANISH LANGUAGE HAS BEEN USED DURING THIS TRIAL.  YOU

17  WILL RECALL WE HAD ONE WITNESS WHO WAS A SPANISH SPEAKER.

18       THE EVIDENCE YOU ARE TO CONSIDER IS ONLY THAT PROVIDED

19  THROUGH THE OFFICIAL COURT INTERPRETER.  ALTHOUGH SOME OF YOU

20  MAY KNOW THE SPANISH LANGUAGE, IT IS IMPORTANT THAT ALL JURORS

21  CONSIDER THE SAME EVIDENCE.  THEREFORE, YOU MUST ACCEPT THE

22  EVIDENCE PRESENTED IN THE ENGLISH INTERPRETATION AND DISREGARD

23  ANY DIFFERENT MEANING.

24       YOU ARE HERE ONLY TO DETERMINE WHETHER THE DEFENDANT IS

25  GUILTY OR NOT GUILTY OF THE CHARGES IN THE INDICTMENT.  THE

1    DEFENDANT IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT

2    CHARGED IN THE INDICTMENT.

3        A SEPARATE CRIME IS CHARGED AGAINST THE DEFENDANT IN EACH

4    COUNT.  YOU MUST DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT

5    ON ONE COUNT SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER

6    COUNT.

7        YOU'VE HEARD TESTIMONY THAT THE DEFENDANT MADE STATEMENTS.

8    IT IS FOR YOU TO DECIDE, ONE, WHETHER THE DEFENDANT MADE THE

9    STATEMENTS AND, TWO, IF SO, HOW MUCH WEIGHT TO GIVE TO IT OR

10   THEM.  IN MAKING THOSE DECISIONS, YOU SHOULD CONSIDER ALL THE

11   EVIDENCE ABOUT THE STATEMENTS, INCLUDING THE CIRCUMSTANCES

12   UNDER WHICH THE DEFENDANT MAY HAVE MADE THEM.

13       YOU HAVE HEARD TESTIMONY FROM PERSONS WHO, BECAUSE OF

14   EDUCATION OR EXPERIENCE, WERE PERMITTED TO STATE OPINIONS AND

15   THE REASONS FOR THEIR OPINIONS.

16       SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER

17   TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH

18   WEIGHT AS YOU THINK IT DESERVES CONSIDERING THE WITNESS'S

19   EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

20   AND ALL OF THE OTHER EVIDENCE IN THE CASE.

21       YOU HAVE HEARD TESTIMONY FROM SEVERAL WITNESSES WHO

22   TESTIFIED TO BOTH FACTS AND OPINIONS AND THE REASONS FOR THEIR

23   OPINIONS.

24       FACT TESTIMONY IS BASED ON WHAT THE WITNESS SAW, HEARD, OR

25   DID.  OPINION TESTIMONY IS BASED ON THE EDUCATION OR

1    EXPERIENCE OF THE WITNESS.

2         AS TO THE TESTIMONY ABOUT FACTS, IT IS YOUR JOB TO DECIDE

3    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

4    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

5    NONE OF IT.  TAKE INTO ACCOUNT THE FACTORS DISCUSSED EARLIER

6    IN THESE INSTRUCTIONS THAT WERE PROVIDED TO ASSIST YOU IN

7    WEIGHING THE CREDIBILITY OF WITNESSES.

8         AS TO THE TESTIMONY ABOUT THE WITNESS'S OPINIONS, THIS

9    OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR

10   EXPERIENCE OF THE WITNESS.  OPINION TESTIMONY SHOULD BE JUDGED

11   LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT ALL OF IT, PART OF

12   IT, OR NONE OF IT.  YOU SHOULD GIVE IT AS MUCH WEIGHT AS YOU

13   THINK IT DESERVES CONSIDERING THE WITNESS'S EDUCATION AND

14   EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL THE

15   OTHER EVIDENCE IN THE CASE.

16        DURING THE TRIAL CERTAIN CHARTS AND SUMMARIES WERE SHOWN

17   TO YOU IN ORDER TO HELP EXPLAIN THE EVIDENCE IN THE CASE.

18   THESE CHARTS AND SUMMARIES WERE NOT ADMITTED IN EVIDENCE AND

19   WILL NOT GO INTO THE JURY ROOM WITH YOU.  THEY ARE NOT

20   THEMSELVES EVIDENCE OR PROOF OF ANY FACTS.  IF THEY DO NOT

21   CORRECTLY REFLECT THE FACTS OR FIGURES SHOWN BY THE EVIDENCE

22   IN THE CASE, YOU SHOULD DISREGARD THESE CHARTS AND SUMMARIES

23   AND DETERMINE THE FACTS FROM THE UNDERLYING EVIDENCE.

24        THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS FOR THE

25   COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

1    WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST THE

2    DEFENDANT BEYOND A REASONABLE DOUBT.

3        NOW THERE WILL BE A SERIES OF INSTRUCTIONS ABOUT THE

4    ELEMENTS OF THE CHARGED OFFENSES.

5        THE DEFENDANT IS CHARGED IN COUNTS I, II, AND III OF THE

6    SUPERSEDING INDICTMENT WITH KNOWINGLY DISCHARGING OR CAUSING

7    TO BE DISCHARGED POLLUTANTS, NAMELY FILL MATERIAL AT THE

8    LOCATIONS DESCRIBED IN COUNTS I, II, AND III OF THE

9    SUPERSEDING INDICTMENT FROM A POINT SOURCE OR POINT SOURCES

10   INTO A "WATER OF THE UNITED STATES" WITHOUT A PERMIT ISSUED BY

11   THE UNITED STATES ARMY CORPS OF ENGINEERS, ALL IN VIOLATION OF

12   THE CLEAN WATER ACT, WHICH IS 33 UNITED STATES CODE SECTION

13   1311(A) AND SECTION 1319(C)(2)(A) AND 1344.

14       IN ORDER FOR YOU TO FIND THE DEFENDANT GUILTY OF THE

15   CRIMES CHARGED IN COUNTS I, II, OR III, THE GOVERNMENT MUST

16   PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE

17   DOUBT.

18       FIRST, THAT ON OR ABOUT THE DATES CHARGED, THE DEFENDANT

19   KNOWINGLY DISCHARGED OR CAUSED TO BE DISCHARGED A POLLUTANT,

20   IN THIS CASE, FILL MATERIAL.  SECOND, THAT THE POLLUTANT WAS

21   DISCHARGED FROM A POINT SOURCE.  THIRD, THAT THE DISCHARGE WAS

22   TO A "WATER OF THE UNITED STATES" AND, FOUR, THAT THE

23   DEFENDANT HAD NO PERMIT FROM THE UNITED STATES ARMY CORPS OF

24   ENGINEERS TO DISCHARGE THE POLLUTANT.

25       THE DISCHARGES ARE ALLEGED TO HAVE OCCURRED AS FOLLOWS.

YOU WILL SEE IN THE JURY INSTRUCTION THAT YOU HAVE WITH YOU IN THE JURY ROOM THAT THERE'S A CHART WITH THIS INFORMATION.

FOR COUNT I, THE DATE IS BEGINNING IN OR ABOUT JULY 2014 THROUGH IN OR ABOUT AUGUST 2014, AND THE LOCATION IN THE CHART IS JURISDICTIONAL WETLANDS IN THE NORTHERN SECTION OF THE SITE.

FOR COUNT II, THE DATE IS THE SAME, BEGINNING IN OR ABOUT JULY 2014 THROUGH IN OR ABOUT AUGUST 2014, AND THE LOCATION FOR THAT COUNT IS WITHIN A JURISDICTIONAL TRIBUTARY ON THE NORTHERN SECTION OF THE SITE.

AND FOR COUNT III, THE DATE IS BEGINNING IN OR ABOUT AUGUST 2014 THROUGH ON OR ABOUT SEPTEMBER 8TH, 2014, WITH THE LOCATION BEING THE JURISDICTIONAL WETLANDS IN THE SOUTHERN SECTION OF THE SITE.

THE GOVERNMENT IS NOT REQUIRED TO PROVE DEFENDANT'S KNOWLEDGE OF THE LAW.  THAT IS, THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT THE DEFENDANT KNEW THAT THE MATERIAL CAME WITHIN THE LEGAL DEFINITION OF POLLUTANT, THAT THE CONVEYANCE CAME WITHIN THE LEGAL DEFINITION OF A POINT SOURCE, THAT THE WATER HAS A SIGNIFICANT NEXUS TO TRADITIONAL NAVIGABLE WATERS, OR THAT A PERMIT WAS REQUIRED FOR THE DISCHARGE.  NEITHER IS THE GOVERNMENT REQUIRED TO PROVE DEFENDANT'S KNOWLEDGE OF ANY CONNECTIONS BETWEEN THE RECEIVING BODY OF WATER AND ANY "OTHER WATER" BODY, NOR THAT DEFENDANT KNEW HIS ACTIONS WERE UNLAWFUL OR THAT THEY VIOLATED THE CLEAN WATER ACT.

1        THE INDICTMENT, AS I JUST MENTIONED, CHARGES THAT THE

2   OFFENSES ALLEGED IN THIS CASE WERE COMMITTED ON OR ABOUT A

3   CERTAIN DATE.

4        ALTHOUGH IT IS NECESSARY FOR THE GOVERNMENT TO PROVE

5   BEYOND A REASONABLE DOUBT THAT THE OFFENSE WAS COMMITTED ON A

6   DATE REASONABLY NEAR THE DATES ALLEGED IN THE INDICTMENT, IT

7   IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE OFFENSE

8   WAS COMMITTED PRECISELY ON THE DATE CHARGED.

9        AN ACT IS DONE KNOWINGLY IF THE DEFENDANT IS AWARE OF THE

10  ACT AND DOES NOT ACT THROUGH IGNORANCE, MISTAKE, OR ACCIDENT.

11  THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT THE DEFENDANT

12  KNEW THAT HIS ACTS OR OMISSIONS WERE UNLAWFUL.  YOU MAY

13  CONSIDER EVIDENCE OF THE DEFENDANT'S WORDS, ACTIONS, OR

14  OMISSIONS ALONG WITH ALL THE OTHER EVIDENCE IN DECIDING

15  WHETHER THE DEFENDANT ACTED KNOWINGLY.

16       THE TERM "POINT SOURCE" MEANS ANY DISCERNIBLE, CONFINED

17  AND DISCRETE CONVEYANCE, INCLUDING BUT NOT LIMITED TO ANY

18  PIPE, DITCH, CHANNEL, TUNNEL, CONDUIT, CONTAINER, DUMP TRUCK,

19  BULLDOZER, BACKHOE, AND SIMILAR EQUIPMENT OR MACHINERY FROM

20  WHICH POLLUTANTS CAN BE DISCHARGED.

21       THE TERM "FILL MATERIAL" MEANS MATERIAL PLACED IN "WATERS

22  OF THE UNITED STATES" WHERE THE MATERIAL HAS THE EFFECT OF,

23  ONE, REPLACING ANY PORTION OF A "WATER OF THE UNITED STATES"

24  WITH DRY LAND OR, TWO, CHANGING THE BOTTOM ELEVATION OF ANY

25  PORTION OF A "WATER OF THE UNITED STATES".  EXAMPLES OF SUCH

1    FILL MATERIAL INCLUDE BUT ARE NOT IMPLEMENTED TO DIRT, ROCK,

2    GRAVEL, SAND, SOIL, CLAY, PLASTICS, CONSTRUCTION DEBRIS, AND

3    WOOD CHIPS.

4        THERE'S AN INSTRUCTION REGARDING THE DEFINITION OF "WATERS

5    OF THE UNITED STATES".

6        THE TERM "WATERS OF THE UNITED STATES" INCLUDES

7    TRADITIONAL NAVIGABLE WATERS AND TRIBUTARIES AND/OR ADJACENT

8    WETLANDS THAT HAVE A SIGNIFICANT NEXUS TO TRADITIONAL

9    NAVIGABLE WATERS.  A TRIBUTARY OR ADJACENT WETLAND HAS A

10   SIGNIFICANT NEXUS TO TRADITIONAL NAVIGABLE WATERS IF IT,

11   EITHER ALONE OR IN COMBINATION WITH SIMILARLY SITUATED WATERS

12   BODIES IN THE REGION SIGNIFICANTLY AFFECTS THE CHEMICAL,

13   PHYSICAL, OR BIOLOGICAL INTEGRITY OF TRADITIONAL NAVIGABLE

14   WATERS.  IN ORDER TO FIND A DISCHARGE WAS INTO A TRIBUTARY OR

15   A WETLAND THAT IS A "WATER OF THE UNITED STATES", YOU MUST

16   UNANIMOUSLY AGREE THAT THE FACTS SATISFY THIS DEFINITION.

17       TRADITIONAL NAVIGABLE WATERS ARE WATERS THAT ARE CURRENTLY

18   USED, WERE USED IN THE PAST, OR MAYBE SUSCEPTIBLE TO USE IN

19   INTERSTATE OR FOREIGN COMMERCE, INCLUDING ALL WATERS WHICH ARE

20   SUBJECT TO THE EBB AND FLOW OF THE TIDE.  THE PARTIES HAVE

21   AGREED THAT MOWRY SLOUGH IS A TRADITIONAL NAVIGABLE WATER AND

22   A "WATER OF THE UNITED STATES".

23       TRIBUTARIES ARE WATER BODIES, EITHER NATURAL, MAN-ALTERED,

24   OR MAN-MADE THAT CONTRIBUTE FLOW TO A TRADITIONAL NAVIGABLE

25   WATER.  TRIBUTARIES THAT FLOW SEASONALLY CAN BE "WATERS OF THE

UNITED STATES" IF THEY HAVE A SIGNIFICANT NEXUS TO TRADITIONAL

NAVIGABLE WATERS.

WETLANDS ARE THOSE AREAS THAT ARE INUNDATED OR SATURATED

BY SURFACE OR GROUND WATER AT A FREQUENCY AND DURATION

SUFFICIENT TO SUPPORT, AND THAT UNDER NORMAL CIRCUMSTANCES DO

SUPPORT, A PREVALENCE OF VEGETATION TYPICALLY ADAPTED FOR LIFE

IN SATURATED SOIL CONDITIONS.  WETLANDS IMMEDIATELY ADJACENT

TO "WATERS OF THE UNITED STATES" INCLUDE SWAMPS, MARSHES,

BOGS, AND SIMILAR AREAS.

THE TERM "ADJACENT" MEANS BORDERING, CONTIGUOUS, OR

NEIGHBORING.  WETLANDS SEPARATED FROM "OTHER WATERS" OF THE

UNITED STATES BY MAN-MADE DIKES OR BARRIERS, NATURAL RIVER

BERMS, BEACH DUNES, AND THE LIKE ARE ADJACENT WETLANDS.  A

SIGNIFICANT NEXUS MAY BE INFERRED WHEN WETLANDS ARE ADJACENT

TO TRADITIONAL NAVIGABLE WATERS.

TO BE NAVIGABLE, "WATERS OF THE UNITED STATES" INCLUDING

WETLANDS DO NOT NEED TO BE NAVIGABLE IN FACT, THAT IS, BOATS

NEED NOT BE ABLE TO NAVIGATE ON THEM.

IF YOU FIND THE SUBJECT WATERS ARE "WATERS OF THE UNITED

STATES", THEN YOU MAY CONSIDER THE FOLLOWING:

THE CLEAN WATER ACT PROHIBITS DISCHARGES OF POLLUTANTS

INTO THE "WATERS OF THE UNITED STATES" EXCEPT IN COMPLIANCE

WITH A PERMIT.  PERMITS ISSUED BY THE UNITED STATES ARMY CORPS

OF ENGINEERS PURSUANT TO SECTION 404 OF THE CLEAN WATER ACT

ARE REQUIRED FOR THE DISCHARGE OF FILL MATERIAL INTO "WATERS

OF THE UNITED STATES" REGARDLESS OF WHO OWNS THE PROPERTY

WHERE THE DISCHARGE OCCURRED.

THE GOVERNMENT NEED ONLY SHOW THAT THE DEFENDANT DID NOT

HAVE AT THE TIME OF THE DISCHARGE A PERMIT ISSUED BY THE

UNITED STATES ARMY CORPS OF ENGINEERS ALLOWING HIM TO

DISCHARGE FILL MATERIAL INTO THE "WATERS OF THE UNITED

STATES".  NO OTHER STATE OR FEDERAL AGENCY IS AUTHORIZED BY

FEDERAL LAW TO ISSUE A PERMIT FOR OR OTHERWISE EXCUSE ACTION

THAT VIOLATES THE CLEAN WATER ACT.

A DEFENDANT MAY BE FOUND GUILTY OF A CLEAN WATER ACT

VIOLATION EVEN IF THE DEFENDANT PERSONALLY DID NOT COMMIT THE

ACT OR ACTS CONSTITUTION THE CRIME BUT AIDED AND ABETTED IN

ITS COMMISSION.  TO PROVE A DEFENDANT GUILTY OF A CLEAN WATER

ACT VIOLATION BY AIDING AND ABETTING, THE GOVERNMENT MUST

PROVE EACH OF THE FOLLOWING BEYOND A REASONABLE DOUBT:

FIRST, A VIOLATION OF THE CLEAN WATER ACT WAS COMMITTED BY

SOMEONE.

SECOND, THE DEFENDANT AIDED, COUNSELED, COMMANDED, INDUCED

OR PROCURED THAT PERSON WITH RESPECT TO AT LEAST ONE ELEMENT

OF THE CLEAN WATER ACT VIOLATION.

THIRD, THE DEFENDANT ACTED WITH THE INTENT TO FACILITATE

THE CLEAN WATER ACT VIOLATION.

AND, FOURTH, THE DEFENDANT ACTED BEFORE THE CRIME WAS

COMPLETED.

IT IS NOT ENOUGH THAT THE DEFENDANT MERELY ASSOCIATED WITH

THE PERSON COMMITTING THE CRIME OR UNKNOWINGLY OR

UNINTENTIONALLY DID THINGS THAT WERE HELPFUL TO THAT PERSON OR

WAS PRESENT AT THE SCENE OF THE CRIME.  THE EVIDENCE MUST SHOW

BEYOND A REASONABLE DOUBT THAT THE DEFENDANT ACTED WITH THE

KNOWLEDGE AND INTENTION OF HELPING THAT PERSON COMMIT A CLEAN

WATER ACT VIOLATION.

A DEFENDANT ACTS WITH THE INTENT TO FACILITATE THE CRIME

WHEN THE DEFENDANT ACTIVELY PARTICIPATES IN A CRIMINAL VENTURE

WITH ADVANCE KNOWLEDGE OF THE CRIME AND HAVING ACQUIRED THAT

KNOWLEDGE WHEN THE DEFENDANT STILL HAD A REALISTIC OPPORTUNITY

TO WITHDRAW FROM THE CRIME.

ALL RIGHT.  THIS IS AN INSTRUCTION THAT WILL SOUND

FAMILIAR TO YOU ALL BASED ON THESE LAST TWO WEEKS.

BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT

THE CASE OR TO THE ISSUES IT INVOLVES.  EXCEPT FOR DISCUSSING

THE CASE WITH YOUR FELLOW JURORS DURING YOUR DELIBERATIONS:

DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS

OF THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES

DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, OR

ELECTRONIC MEANS, BY EMAIL, TEXT MESSAGING, OR ANY INTERNET

CHAT ROOM, BLOG, WEBSITE, OR OTHER FEATURES.  THIS APPLIES TO

COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE

1    MEDIA OR PRESS, PEOPLE INVOLVED IN THE TRIAL.  IF YOU ARE

2    ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR

3    ANYTHING ELSE ABOUT THIS CASE, YOU MUST RESPOND THAT YOU HAVE

4    BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

5    CONTACT TO THE COURT.

6        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

7    ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

8    IT.  DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

9    SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS,

10   AND DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO

11   LEARN ABOUT THE CASE ON YOUR OWN.

12       THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

13   HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

14   HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

15   RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS.

16   IF ANY JUROR IS EXPOSED TO THE ANY OUTSIDE INFORMATION, PLEASE

17   NOTIFY THE COURT IMMEDIATELY.

18       SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR

19   NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT

20   WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD

21   NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW

22   JURORS.

23       WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE

24   JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER THE

25   DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

```
1        YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

2   REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER

3   GUILTY OR NOT GUILTY, MUST BE UNANIMOUS.

4        EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT YOU

5   SHOULD DO SO ONLY AFTER YOU'VE CONSIDERED ALL THE EVIDENCE,

6   DISCUSSED IT FULLY WITH THE OTHER JURORS, AND LISTENED TO THE

7   VIEWS OF YOUR FELLOW JURORS.  DO NOT BE AFRAID TO CHANGE YOUR

8   OPINION IF THE DISCUSSION PERSUADES YOU THAT YOU SHOULD.  BUT

9   DO NOT COME TO A DECISION SIMPLY BECAUSE OTHER JURORS THINK IT

10  IS RIGHT.

11       IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

12  VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

13  HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

14  HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

15  SIMPLY TO REACH A VERDICT.

16       A VERDICT FORM HAS BEEN PREPARED FOR YOU, AND YOU WILL

17  HAVE THE VERDICT FORM TO TAKE BACK WITH YOU INTO THE JURY

18  ROOM.  AFTER YOU HAVE REACHED UNANIMOUS AGREEMENT ON A

19  VERDICT, YOUR FOREPERSON SHOULD COMPLETE THE VERDICT FORM

20  ACCORDING TO YOUR DELIBERATIONS, SIGN AND DATE IT, AND ADVISE

21  THE CLERK THAT YOU ARE READY TO RETURN TO THE COURTROOM.

22       IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

23  COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH MY CLERK,

24  MS. RILEY, SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE

25  JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A
```

SIGNED WRITING.  AND I WILL RESPOND TO THE JURY CONCERNING THE

CASE ONLY IN WRITING OR HERE IN OPEN COURT.  IF YOU SEND OUT A

QUESTION, I WILL CONSULT WITH THE LAWYERS BEFORE ANSWERING IT

WHICH MAY TAKE SOME TIME.  YOU MAY CONTINUE YOUR DELIBERATIONS

WHILE WAITING FOR THE ANSWER TO ANY QUESTION.  REMEMBER THAT

YOU ARE NOT TO TELL ANYONE, INCLUDING ME, HOW THE JURY STANDS

NUMERICALLY OR OTHERWISE ON ANY QUESTION SUBMITTED TO YOU

INCLUDING THE QUESTION OF THE GUILT OF THE DEFENDANT UNTIL

AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR YOU HAVE BEEN

DISCHARGED.

SO THOSE ARE YOUR INSTRUCTIONS, LADIES AND GENTLEMEN.  AND

I SHOULD TELL YOU ONE OTHER POINT THAT WILL BE IMPORTANT TO

YOU.

AT THIS TIME, THE JURY IS FREE TO SET ITS OWN SCHEDULE FOR

DELIBERATIONS.  YOU NO LONGER LIVE BY MY SCHEDULE.  YOU CAN

TALK AND AGREE ON WHATEVER SCHEDULE IS AGREEABLE FOR YOU AS A

JURY FOR YOUR DELIBERATIONS.  AND ONCE YOU DECIDE THAT, YOU

CAN LET MS. RILEY KNOW THAT VIA A NOTE AND THAT WILL BE

HELPFUL.

ALL RIGHT.  SO AT THIS TIME, THE REGULAR JURORS WILL BEGIN

THEIR DELIBERATIONS IN THE CASE.  AND I HAVE A FEW MORE WORDS

FOR THE ALTERNATE JURORS WHO ARE NOT EXCUSED, BUT WILL BE --

WILL NOT BE PARTICIPATING IN THE DELIBERATIONS AT THIS TIME.

SO, MEMBERS OF THE JURY, EVERYONE UP THROUGH

MS. SERDINA....

```
 1              (CLERK AND COURT CONFER.)

 2         THE COURT:  WORKING OUT SOME LOGISTICS.

 3              (PAUSE IN THE PROCEEDINGS.)

 4         THE COURT:  SO, WE HAVE TO COORDINATE THIS A LITTLE

 5    BIT, LADIES AND GENTLEMEN.

 6         MR. BARRANCO, MS. FIGUEIREDO, MR. CHOY, AND

 7    MR. PISCITELLO, IF YOU CAN JUST GO GRAB ANY OF YOUR BELONGINGS

 8    FROM THE JURY ROOM AND COME RIGHT BACK, AND I WILL HAVE SOME

 9    INSTRUCTIONS TO GIVE YOU.  AND THEN THE JURY, AFTER YOU'VE

10    LEFT THE JURY ROOM, CAN THEN HEAD OUT AND BEGIN THEIR

11    DELIBERATIONS.

12         DO YOU WANT TO TAKE 30 SECONDS TO DO THAT?

13              (PAUSE IN THE PROCEEDINGS.)

14         THE CLERK:  YOU MAY NEED TO READ THE NAMES AGAIN.

15         THE COURT:  MR. PISCITELLO, DO YOU HAVE ANY

16    BELONGINGS BACK THERE TO GRAB?

17         THE CLERK:  LOOKS LIKE MS. SERDINA THINKS SHE'S AN

18    ALTERNATE.  SHE NEEDS TO BE REMINDED.

19         THE COURT:  WE'LL CLEAR IT UP.

20         THE CLERK:  SHE'S STAYING.

21         THE COURT:  MS. SERDINA, YOU ARE A REGULAR JUROR SO

22    YOU CAN GO PUT YOUR THINGS BACK.

23         JUROR SERDINA:  OKAY.

24         THE COURT:  ALL RIGHT.  SO NEXT STEP IS THEN, LADIES

25    AND GENTLEMEN, WE WILL SWEAR IN OUR COURT SECURITY OFFICER WHO
```

```
 1   WILL BE CHARGED WITH SAFEGUARDING YOU DURING YOUR

 2   DELIBERATIONS.

 3            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

 4               (COURT SECURITY OFFICER SWORN.)

 5       COURT SECURITY OFFICER:  SO HELP ME GOD.

 6       THE CLERK:  THANK YOU.

 7       THE COURT:  ALL RIGHT.  SO, LADIES AND GENTLEMEN, SO

 8   JURORS 1 THROUGH 12, EVERYONE UP THROUGH MS. SERDINA, YOU ARE

 9   NOW EXCUSED TO BEGIN YOUR DELIBERATIONS.

10            (JURORS BEGIN DELIBERATIONS AT 12:53 P.M.)

11       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

12            THE CLERK:  YOU MAY BE SEATED.

13       THE COURT:  SO FOR OUR FOUR ALTERNATE JURORS, AT THIS

14   TIME I AM NOT EXCUSING YOU.  AND THE REASON FOR THAT IS THAT

15   IF SOMETHING WERE TO HAPPEN TO ONE OF THE JURORS, IT IS STILL

16   POSSIBLE THAT I WOULD NEED ONE OR MORE OF YOU TO COME BACK AND

17   JOIN DELIBERATIONS.

18       BUT YOU WILL NOT NEED TO WAIT HERE DURING THAT TIME.  SO

19   YOU WILL BE ABLE TO GO BACK TO WORK OR HOME, WHEREVER ELSE YOU

20   WOULD BE, BUT YOU REMAIN ON CALL.

21       AND THE CRITICAL THING IS THE ADMONITION THAT I JUST GAVE

22   YOU AND HAVE GIVEN YOU THROUGHOUT THE TRIAL ABOUT NOT

23   DISCUSSING THE CASE WITH ANYONE, SO EACH OTHER, THE JURORS,

24   MEMBERS OF YOUR FAMILY, ANYONE INVOLVED IN THE TRIAL OR ANYONE

25   ELSE CONTINUES TO APPLY AS DO ALL OF THE ADMONITIONS THAT I
```

1    GAVE YOU JUST A MINUTE AGO ABOUT NOT RESEARCHING ABOUT THE

2    CASE, NOT REVIEWING ANY MEDIA OR OTHER INFORMATION ABOUT THE

3    CASE FROM ANY SOURCE.

4         AND THE REASON FOR THAT IS BECAUSE AS WE'VE DISCUSSED, IF

5    YOU WERE TO COME BACK AND JOIN THE DELIBERATIONS, IT WOULD BE

6    VERY IMPORTANT THAT YOU ONLY BE DECIDING THE CASE AND ONLY

7    CONSIDERING EVIDENCE THAT YOU LEARNED IN THIS COURTROOM DURING

8    THE TRIAL.  AND SO ALL OF THE ADMONITIONS CONTINUE TO APPLY

9    AND UNTIL I NOTIFY YOU OTHERWISE.

10        ALL RIGHT?  AND THE REASON FOR THAT, AGAIN, IS THAT WE

11   NEED TO DO THAT IN CASE YOU MIGHT BE CALLED UPON TO DELIBERATE

12   AT SOME POINT.

13        SO WITH THAT, WE HAVE YOUR CONTACT INFORMATION.  YOU ARE

14   FREE TO GO, BUT YOUR JURY SERVICE IS NOT COMPLETE YET UNTIL

15   YOU ARE NOTIFIED OTHERWISE.  SO JUST CONTINUE TO ADHERE TO ALL

16   OF THOSE DIRECTIONS THAT I'VE GIVEN, AND I WANT TO THANK YOU

17   ON BEHALF OF THE COURT FOR YOUR SERVICE TO NOW, YOUR ATTENTION

18   TO THE CASE, AND FOR THE TIME THAT YOU'VE COMMITTED TO IT.

19        AS I SAID AT THE BEGINNING OF THE TRIAL, IT IS ONLY

20   THROUGH THE COMMITMENT TO SERVE OF FOLKS LIKE EACH OF YOU WHO

21   I KNOW HAVE MANY OTHER COMMITMENTS THAT OUR SYSTEM CAN WORK.

22        THANK YOU.  AT THIS TIME YOU MAY LEAVE, AND YOU ARE -- YOU

23   WILL BE NOTIFIED EITHER THAT YOUR OBLIGATIONS ARE COMPLETE OR

24   YOU'LL GET WORD THAT WE NEED YOU TO COME BACK IN.

25        THANK YOU.

```
 1              (ALTERNATE JURORS EXIT COURTROOM.)

 2         THE CLERK:  YOU MAY BE SEATED.

 3         THE COURT:  ALL RIGHT.  WE HAVE EVERYONE'S CONTACT

 4    INFORMATION?

 5         THE CLERK:  WE DO.

 6         MR. SMOCK:  CAN I BRIEFLY CORRECT THE RECORD ON ONE

 7    THING ON AGENT SU?  I MAY NOT HAVE COMPLETELY MADE CLEAR FOR

 8    THE RECORD.

 9         THE DECLARATION THAT WE INTENDED TO QUESTION AGENT SU

10    ABOUT WAS AT DOCKET NO. 25-1.  THE QUESTIONS WOULD HAVE

11    PERTAINED TO PAGE 7, LINES 3 TO 5 AND PAGE 4, LINES 13 TO 19.

12         AND, YOU KNOW, THE ISSUE BECAME CLEAR AGAIN DURING

13    CLOSINGS WHEN THE GOVERNMENT REFERRED TO THIS SORT OF

14    INTERCHANGEABILITY OF TRIBUTARIES AND "OTHER WATERS".

15         I THINK DURING MS. LEE'S OPENING, SHE SAID TRIBUTARIES ARE

16    SUBSUMED WITHIN THE CATEGORY OF "OTHER WATERS".  DURING THE

17    REBUTTAL, MR. KEARNEY SAID SOMETHING ALONG THE LINES OF THE

18    QUESTION IS WHETHER IT CONTRIBUTES FLOW, A TRIBUTARY CAN DO

19    IT, A POND CAN DO IT, AN "OTHER WATER" CAN DO IT, IT DOESN'T

20    MATTER.

21         AND OUR POINT ALONG THOSE LINES IS, GIVEN THAT THE

22    GOVERNMENT PURSUED THIS CASE WITH RESPECT TO COUNT II AND TO

23    SOME EXTENT IN CONNECTION TO THAT WITH COUNT I ON A THEORY

24    INITIALLY THAT IT WAS "OTHER WATERS" AND THAT THAT WAS THE

25    BELIEF OF THE GOVERNMENT THAT A CHANGED THEORY THAT IT WAS A
```

```
 1    TRIBUTARY NOW IS SIGNIFICANT TO THE DEFENSE.  AND I JUST

 2    WANTED TO MAKE A RECORD OF THAT.

 3              THE COURT:  FAIR ENOUGH.  ALL RIGHT.

 4              MS. HANSEN:  YOUR HONOR, WILL THE COURT NOTIFY US

 5    WHEN WE GET THE JURY SCHEDULE?

 6              THE COURT:  YES.

 7              MS. HANSEN:  THANK YOU.

 8         (PROCEEDINGS IN RECESS AT 1:15 P.M.; RESUMED AT 1:37 P.M.)

 9         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

10              THE CLERK:  REMAIN SEATED AND COME TO ORDER.  REMAIN

11    SEATED -- PLEASE BE SEATED.  THIS COURT IS BACK IN SESSION.

12    THE HONORABLE HAYWOOD S. GILLIAM PRESIDING.

13              THE COURT:  I UNDERSTAND THAT WE HAVE A VERDICT.

14              THE CLERK:  READY, JUDGE?

15              THE COURT:  YES.

16         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

17              THE CLERK:  YOU MAY BE SEATED.

18              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, SO I

19    UNDERSTAND FROM YOUR FOREPERSON THAT YOU HAVE A VERDICT.

20         WHO IS YOUR FOREPERSON?

21         MS. KOSMOWSKI?

22              JUROR KOSMOWSKI:  YES.

23              THE COURT:  MS. KOSMOWSKI, DID THE JURY UNANIMOUSLY

24    AGREE ON ITS VERDICT?

25              JUROR KOSMOWSKI:  YES.
```

1           **THE COURT:**  SO I HAVE HERE THE VERDICT FORM IN AN

2     ENVELOPE THAT MS. RILEY HAS HANDED TO ME THAT YOU HANDED TO

3     HER.

4        ALL RIGHT.  AND SO, LADIES AND GENTLEMEN, NOW I AM GOING

5     TO WHAT'S CALLED PUBLISH THE VERDICT.  AND THAT'S A FANCY WAY

6     OF SAYING I'M GOING TO READ IT.  IT'S IMPORTANT FOR EACH OF

7     YOU TO LISTEN CAREFULLY AND PAY CLOSE ATTENTION AS I READ THE

8     VERDICT BECAUSE YOU MAY AFTER THE VERDICT IS READ BE POLLED.

9     AND WHAT THAT MEANS IS THAT YOU CAN BE ASKED INDIVIDUALLY TO

10    AFFIRM ON THE RECORD THAT THIS IS YOUR VERDICT.  SO PLEASE

11    LISTEN CAREFULLY TO IT FOR THAT REASON.

12       ALL RIGHT.  SO THE VERDICT FORM IN UNITED STATES VERSUS

13    JAMES PHILIP LUCERO AS TO COUNT I:  WE, THE JURY, FIND THE

14    DEFENDANT, JAMES PHILIP LUCERO, GUILTY OF KNOWINGLY

15    DISCHARGING AND CAUSING TO BE DISCHARGED A POLLUTANT, NAMELY,

16    DIRT, SOIL, AND OTHER SIMILAR MATERIAL, FROM A POINT SOURCE TO

17    "WATERS OF THE UNITED STATES", NAMELY JURISDICTIONAL WETLANDS

18    IN THE NORTHERN PART OF THE SITE, WITHOUT A PERMIT ISSUED

19    UNDER TITLE 33, UNITED STATES CODE 1344, IN VIOLATION OF TITLE

20    33, UNITED STATES CODE, SECTION 1311(A) AND 1119(C)(2)(A), AS

21    CHARGED IN COUNT I OF THE SUPERSEDING INDICTMENT.

22       AS TO COUNT II, THE VERDICT FORM READS:  WE, THE JURY,

23    FINDS THE DEFENDANT, JAMES PHILIP LUCERO, OF KNOWINGLY

24    DISCHARGING AND CAUSING TO BE DISCHARGED A POLLUTANT, NAMELY,

25    DIRT, SOIL, AND OTHER SIMILAR MATERIAL, FROM A POINT SOURCE

1    INTO "WATERS OF THE UNITED STATES", NAMELY WITHIN A

2    JURISDICTIONAL TRIBUTARY IN THE NORTHERN SECTION OF THE SITE,

3    WITHOUT A PERMIT ISSUED UNDER TITLE 33, UNITED STATES CODE,

4    SECTION 1344, IN VIOLATION OF TITLE 33, UNITED STATES CODE,

5    SECTION 1311(A) AND 1319(C)(2)(A) AS CHARGED IN COUNT II OF

6    THE SUPERSEDING INDICTMENT.

7        AS TO COUNT III, THE VERDICT FORM READS:  WE, THE JURY,

8    FIND THE DEFENDANT, JAMES PHILIP LUCERO, GUILTY OF KNOWINGLY

9    DISCHARGING AND CAUSING TO BE DISCHARGED A POLLUTANT, NAMELY,

10   DIRT, SOIL, AND OTHER SIMILAR MATERIAL, FROM A POINT SOURCE

11   INTO "WATERS OF THE UNITED STATES", NAMELY JURISDICTIONAL

12   WETLANDS IN THE SOUTHERN SECTION OF THE SITE, WITHOUT A PERMIT

13   ISSUED UNDER TITLE 33, UNITED STATES CODE, SECTION 1344, IN

14   VIOLATION OF TITLE 33, UNITED STATES CODE, SECTIONS 1311(A)

15   AND 1319(C)(2)(A) AS CHARGED IN COUNT III OF THE SUPERSEDING

16   INDICTMENT.

17       DATED FEBRUARY 21ST, 2018 AND SIGNED BY MS. KOSMOWSKI AS

18   FOREPERSON.

19       ALL RIGHT.  DOES EITHER PARTY REQUEST POLLING OF THE JURY?

20           **MS. HANSEN:**  NO, YOUR HONOR.

21           **MR. KEARNEY:**  NO, YOUR HONOR.

22           **THE COURT:**  ALL RIGHT.

23       SO, LADIES AND GENTLEMEN, AT THIS TIME YOUR JURY SERVICE

24   IS COMPLETE.  I WANT TO ECHO THE THINGS THAT I SAID AT THE

25   BEGINNING OF THE TRIAL A COUPLE OF WEEKS AGO.

1        ON BEHALF OF THE COURT, YOUR SERVICE IS DEEPLY

2   APPRECIATED.  AS I SAID WHEN WE STARTED THIS TRIAL, IT'S ONLY

3   BY THE WILLINGNESS AND DILIGENCE OF FOLKS LIKE YOU WHO ARE

4   WILLING TO SERVE AS JURORS THAT OUR SYSTEM OF JUSTICE CAN

5   WORK.

6        SO THANK YOU FOR YOUR SERVICE.  YOU ARE EXCUSED AT THIS

7   TIME.  AND YOU CAN STOP FOLLOWING MY ADMONITIONS.

8        NOW, I'LL TELL YOU ONE THING.  SOMETIMES THE ATTORNEYS ARE

9   INTERESTED IN SPEAKING TO THE JURORS AFTER A VERDICT.  AND

10  REALLY THE REASON FOR THAT IS THAT IT CAN BE HELPFUL FOR THEM

11  TO UNDERSTAND WHAT THEY DID AND DIDN'T WORK IN ORDER AS A

12  PROFESSIONAL DEVELOPMENT EXERCISE.

13       YOU ARE FREE TO SPEAK WITH THEM.  YOU ARE ABSOLUTELY FREE

14  NOT TO SPEAK WITH THEM IF YOU WOULD PREFER THAT.  IF YOU WOULD

15  PREFER NOT TO DO THAT, SIMPLY LET MS. RILEY KNOW THAT AND

16  WE'LL BE SURE THAT THAT IS RESPECTED.

17       I WOULD REMIND YOU OR SUGGEST THAT THE DELIBERATIONS OF

18  THE JURY ARE CONFIDENTIAL, AND SO I WOULD ASK YOU TO CONSIDER

19  IF YOU DO DECIDE TO TALK, WHETHER YOU'RE COMFORTABLE DOING SO

20  WITH REGARD TO YOUR DELIBERATIONS.  BUT AS I SAID, THE

21  DECISION OF WHETHER TO HAVE THOSE CONVERSATIONS OR NOT IS

22  ENTIRELY UP TO YOU.

23       ALL RIGHT.  SO WITH THAT, THANK YOU AGAIN, LADIES AND

24  GENTLEMEN.  YOU'RE EXCUSED.  YOUR JURY SERVICE IS COMPLETE.

25  AND THANK YOU AGAIN.

```
 1                          (JURY EXCUSED.)

 2              THE CLERK:  YOU MAY BE SEATED.

 3              THE COURT:  ALL RIGHT.

 4        SO WE PROBABLY HAVE A COUPLE OF THINGS TO DO.  ONE IS TO

 5   SET A SENTENCING DATE AND THE SECOND IS YOU SHOULD PROBABLY

 6   HAVE A MEET AND CONFER ABOUT THE BRIEFING FOR THE POST-TRIAL

 7   MOTIONS.

 8        I THINK ON THAT SCORE, MY INCLINATION WOULD BE TO LEAVE IT

 9   TO YOU INITIALLY TO HAVE THE DISCUSSION ABOUT WHAT IS

10   SENSIBLE, AND THEN IF IT'S WELL THOUGHT THROUGH, I'LL LIKELY

11   AGREE WITH IT.

12        AS TO A SENTENCING DATE, MADAME CLERK?

13              THE CLERK:  OUR SENTENCING DATE WILL BE JUNE 4TH AT

14   2:00 P.M. IN THIS DEPARTMENT.

15              THE COURT:  ALL RIGHT.  I ASSUME NO OBJECTION TO

16   MR. LUCERO REMAINING ON RELEASE UNDER HIS CURRENT TERMS OF

17   PRETRIAL RELEASE?

18              MR. KEARNEY:  NO, SIR.

19              THE COURT:  ALL RIGHT.  SO, MR. LUCERO, YOU ARE

20   PERMITTED TO REMAIN ON RELEASE PENDING SENTENCING UNDER YOUR

21   CURRENT CONDITIONS OF RELEASE.

22        IT'S IMPORTANT FOR YOU TO CONTINUE TO ADHERE TO ALL OF

23   THOSE CONDITIONS.  FAILING TO DO SO COULD BE THE BASIS FOR

24   REVOCATION OF YOUR RELEASE AND REMAND, SO IT IS IMPORTANT TO

25   BE VERY DILIGENT ABOUT THAT.  AND OBVIOUSLY ALSO VERY
```

1    IMPORTANT TO APPEAR FOR ANY SUBSEQUENT PROCEEDINGS, INCLUDING

2    THE SENTENCING HEARING THAT IS NOW SET FOR JUNE, AND ANYTHING

3    ELSE THAT GETS PUT ON CALENDAR.

4        ALL RIGHT.  AND I WILL WAIT FOR WORD FROM YOU TWO AS TO

5    THE PROPOSED TIMING OF THE BRIEFING ON THE RULE 29 MOTION.

6            **MS. HANSEN:**  I'M GOING TO BE OUT FOR THE NEXT COUPLE

7    OF DAYS, BUT I'M HOPING MR. KEARNEY AND I CAN AGREE TO

8    SOMETHING ON MONDAY.  WE WILL FILE.

9            **MR. KEARNEY:**  THAT'S FINE.

10           **THE COURT:**  THAT TIMING SOUNDS FINE TO ME.

11           **MS. HANSEN:**  THANK YOU.

12           **MR. KEARNEY:**  THANK YOU, YOUR HONOR.

13           **THE COURT:**  YOU'RE WELCOME.

14               (PROCEEDINGS CONCLUDED AT 1:50 P.M.)

15

16                   **CERTIFICATE OF REPORTER**

17       I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

18   UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

19   CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

20   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22                 *Diane E. Skillman*

23           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

24           WEDNESDAY, FEBRUARY 21,2018

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**