STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA MILELLA HANSEN
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:    (510) 637-3507
Email:        Angela_Hansen@fd.org


Counsel for Defendant Lucero

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES LUCERO,<br><br>Defendant. | **Case No.:** CR 16–107 HSG<br><br>**DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT, SENTENCING GUIDELINES AND RESTITUTION**<br><br>**Hearing Date:**   January 14, 2019<br>**Hearing Time:**   2:00 p.m. |

1

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I.     The Disputed Guidelines Enhancements (§ 2Q1.3(b)(1)(A) and § 2Q1.3(b)(3))............2

       A.     Applicable Standards ....................................................................................2

       B.     The Court Should Not Apply a Six-Level Increase for "Ongoing, Continuous, or Repetitive" Discharge of a Pollutant under Guideline § 2Q1.3(b)(1)(A)............4

       C.     The Court Should Not Apply a Four-Level Increase for Cleanup Requiring a Substantial Expenditure under Guidelines § 2Q1.3(b)(3)....................................7

II.    Mr. Lucero is Entitled to the Two-Level Adjustment for Acceptance of Responsibility ..................................................................................................................11

III.   The Court May Not Order the Restitution Specified in the PSR ...................................15

       A.     The Court May Not Order Mr. Lucero to Pay Restitution under the MVRA.....16

       B.     The Court May Not Order Restitution as a Condition of Supervised Release ...17

              1.     The Sobrato Organization is not the victim of the Clean Water Act offenses ..................................................................................................18

              2.     The government has not proven that there is a loss for purposes of restitution ................................................................................................19

              3.     The government has not carried its burden of establishing by sufficiently reliable and detailed evidence that the Sobrato Organization suffered losses for which the Court may order restitution ....................................20

              4.     The extent of restitution requested by the Sobrato Organization goes beyond what the Court may order.............................................................21

                     i     The Court may not order restitution for losses that go beyond the counts of conviction.................................................................21

                     ii    The Court may not order restitution for losses that were not foreseeable .................................................................................22

                     iii   The Court may not order Mr. Lucero to pay restitution for losses stemming from prosecution delays attributable to the government ..................................................................................23

CONCLUSION.................................................................................................................24

# TABLE OF AUTHORITIES

**Federal Cases**                                                              **Page(s)**

*Hughey v. United States*,
   495 U.S. 411 (1990) .................................................................................... 18

*Paroline v. United States*,
   572 U.S. 434 (2014) .............................................................................. 17, 18

*Pepper v. United States*,
   562 U.S. 476 (2011) ...................................................................................... 2

*Safe Sts. All. v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ............................................................... 19-20

*United States v. Alvarez*,
   835 F.3d 1180 (9th Cir. 2016) ...................................................................... 17

*United States v. Barany*,
   884 F.2d 1255 (9th Cir. 1989) ...................................................................... 20

*United States v. Barragan*,
   871 F.3d 689 (9th Cir. 2017) .......................................................................... 3

*United States v. Batson*,
   608 F.3d 630 (9th Cir. 2010) ........................................................... 16, 17, 18

*United States v. Blake*,
   81 F.3d 498 (4th Cir. 1996) ......................................................................... 19

*United States v. Carter*,
   742 F.3d 440 (9th Cir. 2014) ....................................................................... 20

*United States v. Cooper*,
   173 F.3d 1192 (9th Cir. 1999) .................................................................... 4, 5

*United States v. Cortes*,
   299 F.3d 1030 (9th Cir. 2002) ..................................................................... 15

*United States v. De La. Fuente*,
   353 F.3d 766 (9th Cir. 2003) ................................................................. 22, 23

*United States v. Dorvee*,
   616 F.3d 174 (2d Cir. 2010) .......................................................................... 5

*United States v. Fellows*,
   157 F.3d 1197 (9th Cir. 1998) ....................................................................... 2

*United States v. Ferrin*,
   994 F.2d 658 (9th Cir. 1993) ................................................................. 4, 5, 6

*United States v. Garrido*,
   596 F.3d 613 (9th Cir. 2010) ................................................................. 12, 13

*United States v. Goldfaden*,
   959 F.2d 1324 (5th Cir. 1992) ....................................................................... 4

*United States v. Hai Waknine,*
543 F.3d 546 (9th Cir. 2008) ........................................................................ 17, 20, 21

*United States v. Hanousek,*
176 F.3d 1116 (9th Cir. 1999) ................................................................................ 19

*United States v. Henderson,*
649 F.3d 955 (9th Cir. 2011) ................................................................................... 5

*United States v. Hernandez,*
894 F.3d 1104 (9th Cir. 2018) ................................................................................ 12

*United States v. Hill,*
953 F.2d 452 (9th Cir. 1991) ................................................................................... 15

*United States v. Ing,*
70 F.3d 553 (9th Cir. 1995) ........................................................................ 12, 13, 15

*United States v. Jackson,*
480 F.3d 1014 (9th Cir. 2007) ................................................................................ 11

*United States v. Kennedy,*
643 F.3d 1251 (9th Cir. 2011) ......................................................................... 17, 18

*United States v. Knopfle,*
93 F. App'x 111 (9th Cir. 2004) ............................................................................. 14

*United States v. Kones,*
77 F.3d 66 (3d Cir. 1996) ...................................................................................... 19

*United States v. Laney,*
189 F.3d 954 (9th Cir. 1999) ................................................................................... 2

*United States v. Lincoln,*
2018 WL 4934071 (D. Idaho Oct. 11, 2018) ......................................................... 5

*United States v. Lomow,*
266 F.3d 1013 (9th Cir. 2001) ................................................................................ 19

*United States v. Merino,*
190 F.3d 956 (9th Cir. 1999) ................................................................................. 10

*United States v. Ochoa-Gaytan,*
265 F.3d 837 (9th Cir. 2001) ................................................................................. 15

*United States v. Paccione,*
751 F. Supp. 368 (S.D.N.Y. 1990) ......................................................................... 11

*United States v. Perez,*
366 F.3d 1178 (11th Cir. 2004) ............................................................................... 4

*United States v. Phillips,*
367 F.3d 846 (9th Cir. 2004) ......................................................................... 7, 19, 22

*United States v. Rodrigues,*
229 F.3d 842 (9th Cir. 2000) ........................................................................... 18, 22

*United States v. Rojas-Flores,*
384 F.3d 775 (9th Cir. 2004) ........................................................................... 12, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Sawyer*,
   825 F.3d 287 (6th Cir. 2016) ............................................................................ 19

*United States v. Schultz*,
   917 F. Supp. 1343 (N.D. Iowa 1996) .......................................................... 13, 14

*United States v. Smith*,
   944 F.2d 618 (9th Cir. 1991) ............................................................................ 23

*United States v. Spain*,
   591 F. Supp. 2d 970 (N.D. Ill. 2008) .................................................................. 6

*United States v. Spatig*,
   870 F.3d 1079 (9th Cir. 2017) ........................................................................ 10

*United States v. Technic Servs., Inc.*,
   314 F.3d 1031 (9th Cir. 2002) ................................................................... 18, 19

*United States v. Tsosie*,
   639 F.3d 1213 (9th Cir. 2011) ........................................................................ 20

*United States v. Tyler*,
   767 F.2d 1350 (9th Cir. 1985) ........................................................................ 23

*United States v. Van Loben Sels*,
   198 F.3d 1161 (9th Cir. 1999) .......................................................................... 2

*United States v. Waknine*,
   543 F.3d 546 (9th Cir. 2008) ......................................................................... 20

*United States v. Weitzenhoff*,
   35 F.3d 1275 (9th Cir. 1993) .......................................................................... 19

*United States v. Wells Metal Finishing, Inc.*,
   922 F.2d 54 (1st Cir. 1991) ............................................................................ 14

*United States v. Wilson*,
   503 U.S. 329 (1992) ....................................................................................... 11

**Federal Statutes**

18 U.S.C. § 1365 ................................................................................................ 16

18 U.S.C. § 1593 ................................................................................................ 16

18 U.S.C. § 2248 ................................................................................................ 16

18 U.S.C. § 2259 ........................................................................................... 16, 18

18 U.S.C. § 2264 ................................................................................................ 16

18 U.S.C. § 2326 ................................................................................................ 16

18 U.S.C. § 2327 ................................................................................................ 16

18 U.S.C. § 3553 ........................................................................................ *passim*

18 U.S.C. § 3663 ....................................................................................... 16, 18, 19

18 U.S.C. § 3664 ............................................................................................ 17, 18, 20

21 U.S.C. § 670 .................................................................................................... 16

21 U.S.C. § 853 .................................................................................................... 16

21 U.S.C. § 856 .................................................................................................... 16

33 U.S.C. § 1362 .................................................................................................... 3

42 U.S.C. § 7413 .................................................................................................. 10

**Other**

U.S.S.G. § 2Q1.3 ........................................................................................... *passim*

U.S.S.G. § 2Q1.2 ......................................................................................... 4, 10, 11

1

2

**INTRODUCTION**

Mr. Lucero submits this memorandum to provide the Court with the legal and factual basis for

his objections to the sentencing guidelines calculation in the Pre-sentence Investigation Report

("PSR"). In addition, for the reasons set forth in the argument section below, he objects to the

probation office's determination that restitution is required in this case.[1]

The applicable Guideline for Mr. Lucero's violations of the Clean Water Act is § 2Q1.3

("Mishandling of Other Environmental Pollutants; recordkeeping, tampering, and falsification"). Mr.

Lucero's base offense level under § 2Q1.3 is 6. There is a four-level increase for a discharge without

a permit under § 2Q1.3(b)(4), for a resulting offense level 10.

The PSR places Mr. Lucero at a final adjusted offense level 20, Criminal History Category II,

resulting in an advisory sentencing range of 37 to 46 months. The PSR includes two sentencing

enhancements – § 2Q1.3(b)(1)(A) and § 2Q1.3(b)(3) – that do not apply, and it fails to grant Mr.

Lucero a two-level reduction for acceptance of responsibility. Without these enhancements and with

the two-level reduction for acceptance, the applicable offense level is 8, with a Guidelines range of 4

to 10 months.

For the reasons set forth herein, the Court should adopt Mr. Lucero's sentencing guideline

calculations. In addition, based on these objections and for the reasons stated in Mr. Lucero's

separately filed analysis of the § 3553 sentencing factors, Mr. Lucero asks the Court to impose a

sentence of no more than 12 months and one day in the custody of the ("BOP"). Finally, for the

reasons set forth below, the Court cannot and should not impose restitution.

---

[1]During the presentence investigation process, Mr. Lucero raised a number of other factual
objections to the PSR that do not need to be resolved by the Court for sentencing, provided that these
objections are noted by the Court and remain in the PSR for the appellate record. *See* PSR
Addendum ¶¶ 13-30.

**I.     The Disputed Guidelines Enhancements (§ 2Q1.3(b)(1)(A) and § 2Q1.3(b)(3))**

Mr. Lucero disagrees with two enhancements included in the PSR's Guidelines calculation. The first disputed enhancement, § 2Q1.3(b)(1)(A), applies to discharges that were "ongoing, continuous, or repetitive" that resulted in "actual environmental contamination" and increases the offense level by six.  As discussed below, the Court should exercise its discretion not to apply the § (b)(1)(A) enhancement.  If the Court does apply the enhancement, it should grant a departure of two levels under Application Note 4 due to the minor nature of the harm resulting from the placement of what was mostly clean construction fill.

The second disputed enhancement, § 2Q1.3(b)(3), applies to discharges where "cleanup required a substantial expenditure" and increases the offense level by four.  This enhancement is not applicable because there has been no cleanup to date, and it is intended for cases in which the discharge of a pollutant required evacuations or a disruption in services.

**A.     Applicable Standards**

When interpreting the text of the Sentencing Guidelines, courts should apply the rules of statutory construction.  *United States v. Laney*, 189 F.3d 954, 959 (9th Cir. 1999).  The Court's analysis starts "with the language of the statute itself" and then considers "the provisions of the whole law" and "its object and policy."  *Id.* (citing *United States v. Fellows*, 157 F.3d 1197, 1200 (9th Cir. 1998)).  If the statute's language is unambiguous, the plain meaning controls.  *United States v. Van Loben Sels*, 198 F.3d 1161, 1165 (9th Cir. 1999).  Although district courts must give "respectful consideration" to the Sentencing Guidelines and their accompanying policy statements, they are "effectively advisory."  *Pepper v. United States*, 562 U.S. 476, 490 (2011) (internal quotation marks omitted).  Ultimately, district courts must base federal criminal sentences on "appropriate consideration of all of the facts listed in § 3553(a)."  *Id.*

For enhancements that increase a guidelines range by a substantial amount, such as the six-level and four-level enhancements the government seeks here, the government bears the burden of showing, and the Court must determine, that the enhancements apply by clear and convincing evidence.  The totality of factors the Court must consider in deciding whether the clear-and-convincing standard applies include:

(1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment;

(2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;

(3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;

(4) whether the increase in sentence is based on the extent of a conspiracy;

(5) whether an increase in the number of offense levels is less than or equal to four; and

(6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*United States v. Barragan*, 871 F.3d 689, 717-18 (9th Cir. 2017).

In this case, factors (3), (5) and (6) warrant the higher burden of proof.  As discussed below, the 2Q1.3(b)(1)(A) enhancement requires proof that the discharge resulted in actual contamination, which was not an element of the charged offenses.  *See* Dkt. 214 at 19 (jury instruction stating elements of offenses); Dkt. 126 at 2 (*in limine* order "find[ing] that the environmental effects of Defendant's conduct are not probative of the charged offense.").  Enhancing Mr. Lucero's sentence based on a finding by the Court that he contaminated a WOTUS would punish him for a different offense than the ones of which he was convicted.  *Compare* 33 U.S.C. § 1362(6) (defining "pollutant") *with id.* § 1362(13) (defining "toxic pollutant"); *id.* § 1362(19) (defining "pollution").  Each of the challenged enhancements would increase the offense level by at least four levels.  *See* § 2Q1.3(b)(1)(A) (six-level enhancement); § 2Q1.3(b)(3) (four-level enhancement).  And each enhancement has a disproportionately large effect on what would otherwise be a "relatively short sentence."[2]  *Barragan*, 871 F.3d at 718.  Accordingly, the government should be required to prove the enhancements by clear and convincing evidence.

---

[2]With the two-level acceptance-of-responsibility reduction, and an adjusted offense level of 8, Criminal History Category II, Mr. Lucero's unenhanced Guideline range is 4 to 10 months.  The six-level enhancement under § 2Q1.3(b)(1)(A) would increase his Guideline range to 18 to 24 months, more than doubling it.  Even the four-level enhancement under § 2Q1.3(b)(3), which produces a Guidelines range of 12 to 18 months, would approximately double Mr. Lucero's sentencing range.

**B.** **The Court Should Not Apply a Six-Level Increase for "Ongoing, Continuous, or Repetitive" Discharge of a Pollutant under Guideline § 2Q1.3(b)(1)(A)**

There are two similar guideline provisions for offenses involving the "mishandling" of polluting substances.  Guidelines section 2Q1.2 applies to the more serious "mishandling of hazardous or toxic substances or pesticides."  Guidelines section 2Q1.3, at issue here, applies to "mishandling of other environmental pollutants."  Each of these guidelines provides for two types of increases if the offense involved a "discharge, release, or emission" of the substance.  Guideline § 2Q1.2(b); § 2Q1.3(b).  Under each guideline, "[i]f the offense resulted in an ongoing, continuous, or repetitive discharge . . . into the environment, increase by 6 levels."  §§ 2Q1.2(b)(1)(A), 2Q1.3(b)(1)(A).  "[I]f the offense otherwise involved a discharge . . . , increase by 4 levels."  §§ 2Q1.2(b)(1)(B), 2Q1.3(b)(1)(B).  This subsection of each guideline "assumes a discharge . . . into the environment resulting in actual environmental contamination."  Guideline §§ 2Q1.2, comment. (n.5), 2Q1.3, comment. (n.4).

Although some circuits have ignored the commentary and do not require the government to prove that actual environmental contamination occurred, the Ninth Circuit does.  *Compare U.S. v. Perez*, 366 F.3d 1178 (11th Cir. 2004) (proof of actual environmental contamination not required) *and United States v. Goldfaden*, 959 F.2d 1324 (5th Cir.1992) (proof of actual environmental contamination not required for parallel provision § 2Q1.2) *with United States v. Cooper*, 173 F.3d 1192 (9th Cir. 1999) (proof of actual contamination required).  "[W]e conclude that an enhancement under subsection (b)(1) requires a showing that some amount of hazardous substance in fact contaminated the environment."  *United States v. Ferrin*, 994 F.2d 658, 664 (9th Cir. 1993) (applying enhancement under parallel provision § 2Q1.2).

However, the Ninth Circuit's "contamination" requirement is minimal:  A "contamination" occurs when a pollutant comes into contact with "land or water or was released into the air."  *Id.*; *see also Cooper*, 173 F.3d at 1205 (adopting *Ferrin* definition of contamination for § 2Q1.3 enhancement).  An offense that involves "illegal discharge of industrial waste . . . necessarily embraces a contaminating environmental discharge."  *Id.*  Contamination can occur even where there was no actual harm to the environment.  *Cooper*, 173 F.3d at 1205.  This enhancement thus applies whenever a nonhazardous pollutant comes into contact with water, even if it causes no environmental

1    harm.  *Id.*; *see also Ferrin*, 994 F.2d at 664 ("Even a small amount of hazardous discharge may

2    suffice for an upward adjustment").

3          Even if the Court were to find that actual contamination occurred and the § 2Q1.3(b)(1)

4    enhancement applies in this case, the Court should reject the PSR's recommendation to increase Mr.

5    Lucero's sentencing range by six levels for two reasons.  First, the Court should exercise its

6    discretion not to apply the six-level enhancement because it applies in nearly every case sentenced

7    under this Guideline and merely duplicates the conduct of which Mr. Lucero was convicted.  Second,

8    even if it applies the enhancement, the Court should exercise its authority, explicitly acknowledge in

9    the Guidelines commentary, to depart downward based on the absence of actual harm to the

10   environment in this case.

11         This Court has the discretion "to vary from the Sentencing Guidelines based on policy

12   disagreements with them and not simply based on an individualized determination that they yield an

13   excessive sentence in a particular case."  *United States v. Henderson*, 649 F.3d 955, 956 (9th Cir.

14   2011).  Courts have recognized that a policy-based departure from the Guidelines may be appropriate

15   when an enhancement called for by the Guidelines would apply in almost all cases sentenced under

16   that Guideline.  *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010) (discussing

17   child-pornography guidelines); *United States v. Lincoln*, 2018 WL 4934071, at *2 (D. Idaho Oct. 11,

18   2018) (same).  For example, the Second Circuit in *Dorvee* noted that five enhancements under the

19   child-pornography Guideline applied in between 63.1% and 97.2% of all cases sentenced under that

20   Guideline.  616 F.3d at 186 & n.9; *see also Lincoln*, 2018 WL 4934071, at *2 (noting that computer

21   enhancement applied in 96.4% of all child pornography cases in fiscal year 2012).

22         This is true of the discharge enhancement under 2Q1.3.  Of the 252 § 2Q1.3 sentences imposed

23   nationwide between 2010 and 2017, 206 – or 81.7%  – included an enhancement for discharge under

24   § 2Q1.3(b)(1).  Declaration of Jordan Schaer, filed separately, ¶ 7.  In the Ninth Circuit:  82.0% of

25   the 61 § 2Q1.3 defendants received the enhancement.  *Id.*  As with the child-pornography computer

26   enhancement, "[s]uch a finding indicates that the conduct is not an enhancement, but is, in most

27   cases, intertwined with the crime itself."  *Lincoln*, 2018 WL 4934071, at *2.  Indeed, the discharge of

28   a pollutant into the environment was the essence of Mr. Lucero's conduct of conviction.  *See* Dkt.

1   195 at 20 (jury instruction that elements of offense include "knowing[] discharge[] . . . [of] a

2   pollutant . . . to a 'water of the United States.'").  Because the enhancement applies in nearly every §

3   2Q1.3 case, and because it merely mirrors the conduct of which Mr. Lucero was convicted, the Court

4   should exercise its discretion to disagree with the Guidelines as a policy matter and decline to apply

5   the enhancement in this case.

6          If the Court applies the enhancement, it should depart downward two levels.  The Guidelines

7   recognize the propriety of a departure of up to two levels "depending upon the amount of harm to the

8   environment, the quantity discharged, the nature of the substance involved, and the duration of and

9   risk associated with the offense."  *Ferrin*, 994 F.2d at 664; *see* § 2Q1.3, comment. (n.4).  Mr. Lucero

10  caused to be discharged many truckloads of fill over the course of two months.  However, his conduct

11  caused no material "harm to the environment."  *See United States v. Spain*, 591 F. Supp. 2d 970, 976

12  (N.D. Ill. 2008) (holding that a two-level decrease was "appropriate due to the lack of any actual

13  environmental harm").  The wetlands already had been affected by 50 years of plowing and discing

14  that "removed wetland vegetation, altered the soil profile, and removed surface indications of

15  seasonal hydrology."  Declaration of Michael Josselyn in Support of Defendant's Offer of Proof, Dkt.

16  191-2 ¶ 5; *see also* Exhibit A at 26 (HT Harvey 2007 Preliminary Jurisdictional Report noting that

17  jurisdictional wetlands have been "highly disturbed and affected by agricultural and other

18  anthropogenic activities"); Exhibit B at 11 (Citizens Committee to Complete the Refuge ("CCCR")

19  letter alleging that habitat values would improve if the landowners would cease discing seasonal

20  wetlands.)  Moreover, the "nature of the substance involved" was mostly clean fill.  *See*, *e.g.*, TR at

21  52, 65, 80, 135 and 145; *see also* Exhibit C at 6 (September 2015 California Department of Toxic

22  Substances Control Report verifying that "none of the samples exceeded hazardous waste criteria

23  thresholds for metals, diesel or chlorinated pesticides").  Finally, the offense did not cause any "risk"

24  of harm to anyone.  *See Spain*, 591 F. Supp. 2d at 976 (decreasing offense level by two, under

25  Application Note 4, despite "*risk* of harm" to chemical-company employees and "potential *risk* to

26  sewage treatment workers" (emphases in original)).  Thus, if the Court imposes the § 2Q1.3(b)(1)

27  enhancement, it should depart downward two levels.

28

### C. The Court Should Not Apply a Four-Level Increase for Cleanup Requiring a Substantial Expenditure under Guidelines § 2Q1.3(b)(3)

The Guidelines provide for a four-level enhancement "[i]f the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure." Guideline § 2Q1.3(b)(3).  Under this provision, "a district court must include all *reliable* cleanup costs in its calculation of whether a defendant's actions required a substantial expenditure for cleanup." *United States v. Phillips*, 367 F.3d 846, 857-58 (9th Cir. 2004) (emphasis added).  The commentary allows for "a departure of up to two levels in either direction" "[d]epending upon the nature of the contamination involved."  § 2Q1.3, comment. (n.6).

The Court should reject the four-level enhancement because the government has not carried its burden of establishing an estimate of cleanup costs that is reliable.  The PSR recommends this enhancement based on information provided by the government that the "cleanup related to the instant offense" is estimated to cost $2,715,798 and $3,578,437.  PSR ¶ 53.  The government submitted, and the PSR relies on to support the cleanup costs, an inflated and speculative estimate from the landowners.  No cleanup has been conducted and there is no agency report regarding what cleanup is actually recommended or required, and so we do not know what costs actually will be necessary to remove the fill, if that is even something that could or should be done at this late date.

The estimate provided by the landowners' expert for the cleanup relates to the removal of *all* fill on the entire property, not just fill that was placed in wetland areas.  The jury found that fill was placed on 13 acres of wetlands and tributary, yet the cost estimate was prepared for more than 27 acres of property.  The landowners have not indicated that there is any harm to the property from the *upland* fill, and the conviction did not cover that aspect of the fill activity.  Therefore, the cost of the cleanup should be a fraction of the estimate, even if we accept the estimated costs as true and accurate.  But even if the cost is discounted by the reduced acreage, the cost estimates are still too high for a number of reasons.

First, because the landowners plan on developing the site, removal of the fill should wait until it is determined that removal is necessary, given that they will subsequently need to place additional fill to develop the property.  For this reason, the cost estimates provided by the landowners are speculative and overblown.  Additionally, the developer will continue to manage the property by

1    discing it to remove vegetation, as it has done during the duration of this case on those portions of the

2    property not filled, so that it will not be functioning as a natural upland or wetland habitat area.  *See,*

3    *e.g.,* Exhibit D (November 2017 photograph of new growth at fill locations and mowed and disced

4    wetlands in non-filled locations).[3]  These activities, which the CCCR has alleged may violate the

5    Clean Water Act, diminishes the wetlands and its habitat, which would support the landowner's

6    future development plans.  Exhibit B at 11 ("land management practices of frequent and ongoing

7    disturbance [by the landowners] has resulted in reduced habitat values.  This is an artificial condition

8    and habitat values would improve if agricultural habitats in particular seasonal wetlands were not

9    frequently disced.").  As a result, the actions necessary to restore a "natural wetland" at this site will

10   be moot given that the wetlands at the fill sites have regrown and, more importantly, because of the

11   expected land management actions by the landowner and its future development of the site.  Any cost

12   estimates provided by the government must be offset by these likely future land management and

13   development activities.

14       Second, the most substantial cost for the removal of the fill in the landowners' estimate is for

15   off-site disposal.  It makes no sense to remove the fill materials to a landfill if, in fact, the property

16   will require fill for the planned development.[4]  Assuming that the fill met the requirements for "clean

17   fill," it could be left in the upland areas, and the wetland fill could be moved to the upland areas to

18   await the development.  Accordingly, the off-site disposal cost estimate is too speculative or, at least,

19   inflated.

20       Third, the "soft costs" for plan preparation and bid documents are inflated given that the only

21   work is to remove soil.  Detailed engineering and design and permitting costs are inflated; indeed, if

22

23

24   [3]Letters produced in discovery verify that the landowners routinely mowed the wetland
     vegetation in prior years and were interested in continuing to do so.  *See* Exhibit E (May 19, 2016,
     letter from landowners' expert, Patrick Boursier, recommending that the landowners disc the filled
25   areas under the guise of needing to control "invasive weeds"; May 20, 2016, letter from landowners'
     attorney admitting that "[his] clients routinely disc the entire approximately 400-acre property at this
26   time of year . . . by [bringing] [heavy] mowing and discing equipment to the site each year.").  The
     landowners did not mow or disc the fill locations after 2014 due to this ongoing litigation.  Exhibit D.

27

28   [4]According to Newark city officials, "[t]o develop [the land at issue here], about a million cubic
     yards [of fill material will] be needed to lift it out of the flood zone."  Riley McDermid, Newark
     Gives 386-House Development the Green Light, SAN FRANCISCO BUSINESS TIMES (Dec. 14, 2015).

the Army Corps of Engineers determined that the fill removal was necessary, it could simply issue a Restoration Order to the landowner. [5]  The listed "SWPPP" and fine grading costs appear to be excessive as well, especially since the property is regularly disced and farmed.  Why would fine grading be necessary if the land was going to be disced, disturbed and ultimately developed in the future?

To illustrate how inflated and speculative the cost estimate here is, the Court should contrast this case to the cost the EPA decided was required in the more serious *United States v. Duarte Nursery, Inc., et al.*, case, 16-CR-1498 KJM (E.D. Cal. 2017).  The *Duarte* defendants had to correct farming activity that irreparably harmed jurisdictional wetlands by ripping through the clay layers and affected 44 acres of vernal pools that also supported a threatened species, the vernal pool fairy shrimp.  The consent decree called for:

> (1) Civil penalty of $330,000;
> (2) No use of the 44 acres other than for grazing;
> (3) Smooth the surface of the soil; and
> (4) $770,000 for off-site compensation

The cost associated with Duarte's 44 acres – far more than the 13 acres here – is substantially less than what is being sought by the landowners in this case ($273,000 per acre here versus $25,500 per acre for Duarte).  Exhibit F (*U.S. v. Duarte* civil consent decree).  The *Duarte* case and settlement clearly illustrate the unreasonable nature of the landowner's unreliable and inflated estimate here.  Without a reliable and reasonable estimate of costs for a cleanup that has not yet occurred, the Court should decline to apply the § 2Q1.3(b)(3) enhancement.

In contrast to the § 2Q1.3(b)(1) enhancement, which applies in nearly every case sentenced under that Guideline, the § 2Q1.3(b)(3) enhancement applies infrequently.  Since 2010, only 11.9% of § 2Q1.3 cases nationally applied this enhancement.  Schaer Decl. ¶ 8.  Within the Ninth Circuit

---

[5]The defense has not received any documents suggesting that any federal agency has issued an independent assessment of cleanup costs, nor has the government issued a Restoration Order for the property, and so it is not possible to understand what actions the EPA or Army Corps may require in this case. A Restoration Order would focus only on the violations to wetlands and therefore would be the appropriate basis for calculating any costs associated with compliance.  No such document has been produced in this case.

1   during the same time period, the enhancement applied in only 4.9% of cases – 3 cases out of 61.  *Id.*

2   This paucity of substantial-expenditure cases is not surprising.  Because "'substantial expenditure' is

3   listed in the guideline next to two severe circumstances – "public utilities disruption" and

4   "evacuation" – the Ninth Circuit has concluded that it "must have a similarly serious impact on the

5   community." *United States v. Spatig*, 870 F.3d 1079, 1085 (9th Cir. 2017) (considering identical

6   enhancement under § 2Q1.2).  "For an expenditure to be 'substantial' in this context, it ought to be of

7   the same order of magnitude in its impact on the community." *United States v. Merino*, 190 F.3d

8   956, 958 (9th Cir. 1999) (considering identical enhancement under § 2Q1.2).

9       In what appears to be just one of two post-2010 case within the Ninth Circuit that applied the

10  enhancement based on "substantial expenditure," the defendant pled guilty to two CWA offenses –

11  misdemeanor negligently causing a discharge of oil to a WOTUS and felony failing to report the

12  discharge – based on his failed scheme to scrap a boat anchored in the Columbia River.[6] *United*

13  *States v. Simpson*, No. 11-5472 RJB, Dkt. 24 at 1 (W.D. Wash. Dec. 7, 2012).  According to the

14  government's sentencing memorandum, the substantial-cleanup enhancement was warranted because

15  "[c]ontractors retained by the federal government expended over $22 million over a ten month

16  period" to recover "approximately tens of thousands of gallons of fuel oil and other contaminants, all

17  of which would have been discharged directly to the Columbia River but for these recovery efforts."

18  *Id.* at 2.

19      Mr. Lucero's case contrasts dramatically with *Simpson*.  The landowner's cleanup-cost estimate

20  here, although significant, is a fraction of the $22 million that the government spent in *Simpson*.  Mr.

21  Lucero's offense did not even involve "contaminants."  There is no evidence that the dirt he caused to

22  be deposited actually affected any body of water.  Rather, the property onto which he deposited the

23  fill had long been farmed, plowed and disced and has long been planned to be – and is in the process

24  of being – developed.  The property developers ignored Mr. Lucero's initial offer to clean up the

25

26      [6]In a 2009 case from within the Ninth Circuit in which the enhancement applied, the basis for
    the enhancement appears to have been a significant disruption of public services due to a fire.  In that
27  case, the defendant pled guilty to one count of tampering with a monitoring method, 42 U.S.C. §
    7413(c)(2)(C), based on allegations that he knowingly reported false readings of carbon dioxide,
28  methane, nitrogen and oxygen emitted from a landfill, which resulted in "an underground fire" at the
    landfill.  *United States v. Gee*, No. 09-4121 BTM, Dkt. 1 at 2, 5 (S.D. Cal. Nov. 12, 2009).

DEFENDANT'S OBJECTIONS TO THE PSR AND GUIDELINES
*LUCERO*, CR 16–107 HSG

1   property.  Indeed, the government waited two years to bring charges against him and still has not

2   conducted any cleanup.[7]  *See* § 2Q1.3(b)(3) (providing for enhancement where "cleanup *required* a

3   substantial expenditure" (emphasis added)); *see also United States v. Jackson*, 480 F.3d 1014, 1018

4   (9th Cir. 2007) (citing *United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress's use of a verb

5   tense is significant in construing statutes.").  During this time, when the landowners stopped discing

6   and plowing the fill areas because of this pending case, the wetland vegetation in the fill areas grew

7   back.  As a result, the wetlands in the fill areas are healthier than those in the non-fill areas that the

8   owners continued to disc and plow.  *See* Exhibit D.  Under these circumstances, the Court should not

9   apply the four-level enhancement for substantial expenditure.

10      Even if the Court applies the four-level enhancement, however, it should depart downward

11   based on the "nature of the contamination involved." § 2Q1.3, comment. (n.6).  Mr. Lucero's

12   discharge contained only fill material that had been moved from one construction site to another

13   future construction site.  There may have been a few items of random garbage or concrete, but the fill

14   material did not contain contaminants or chemicals, and his actions caused no environmental harm to

15   the property.  *See*, *e.g.*, Exhibit C at 6.  Because his conduct did not contaminate the site, if the Court

16   imposes the four-level adjustment under § 2Q1.3(b)(3), it also should depart downwards two levels

17   under Application Note 6.

18   **II.   Mr. Lucero is Entitled to the Two-Level Adjustment for Acceptance of Responsibility**

19      The PSR concludes that Mr. Lucero is not entitled to a two-level reduction for acceptance of

20   responsibility under § 3E1.1(a).  Mr. Lucero did not dispute any material elements at trial.  He went

21   to trial to preserve a legal argument.  He is entitled to this two-level reduction.

22   _____

23   [7]In its response to Mr. Lucero's objection to this enhancement, the PSR cited an out-of-circuit
    district court case, *United States v. Paccione*, 751 F. Supp. 368, 376 (S.D.N.Y. 1990), as "stating that

24   future anticipatory costs to cleanup is sufficient for the enhancement to apply."  Addendum to PSR ¶
    8.  In fact, although the district court in *Paccione* enhanced the defendants' sentences by four levels

25   under § 2Q1.2(b)(3) based on estimated cleanup costs of between $15 million and $30 million, it
    stated no such thing.  Its brief discussion of the issue – in a fraud case that led to the illegal dumping

26   of garbage, "some of which contained asbestos" – focused only on the "substantial sum of money"
    required to mitigate "the actual harm that was done to the environment by such wide-spread dumping

27   of garbage."  *Paccione*, 751 F. Supp. at 376.  Given the past-tense language of the enhancement, it is
    not clear that the enhancement can apply when no steps have been taken towards the cleanup.

28

DEFENDANT'S OBJECTIONS TO THE PSR AND GUIDELINES
*LUCERO*, CR 16–107 HSG

1    The Guidelines provide for a two-level reduction in offense level when a defendant "clearly

2    demonstrates acceptance of responsibility for his offense." Guideline § 3E1.1(a).  "This adjustment is

3    not intended to apply to a defendant who puts the government to its burden of proof at trial *by*

4    *denying the essential factual elements of guilt*, is convicted, and only then admits guilt and expresses

5    remorse."  *Id.*, comment. (n.2) (emphasis added).

6    However, a defendant does "not have to plead guilty to be eligible for a reduction for

7    acceptance of responsibility." *United States* v. *Garrido*, 596 F.3d 613, 617 (9th Cir. 2010).  The

8    Guidelines explicitly provide that "'conviction by trial does not automatically preclude a defendant

9    from consideration for such a reduction' where, for example, the defendant goes to trial to challenge

10   the constitutionality of a statute or the application of a statute to her or his conduct." *Id.* at 618

11   (quoting § 3E1.1, comment. (n.2) (2007); brackets and ellipses omitted).  The Ninth Circuit

12   repeatedly has made clear that a district court may not deny the reduction to penalize a defendant for

13   exercising his constitutional right to go to trial.  *United States v. Hernandez*, 894 F.3d 1104, 1109-12

14   (9th Cir. 2018).  When a defendant has gone to trial, "a determination that a defendant has accepted

15   responsibility will be based primarily upon pre-trial statements and conduct." § 3E1.1, comment.

16   (n.2).

17   The acceptance Guideline "does not require the defendant to stipulate to the elements of the

18   offense." *United States v. Rojas Flores*, 384 F.3d 775, 781 (9th Cir. 2004).  Any purely legal

19   argument a defendant raises at trial – regardless of eventual merit – may not be held against him for

20   purposes of the acceptance reduction. *See, e.g., id.* at 780-81 (holding that defendant who "raised a

21   purely legal defense" by "challeng[ing] only the applicability of [the statute] to the facts, which were

22   essentially undisputed," was not precluded from reduction).  This logic is reflected in the Guidelines,

23   which specifically allow for the reduction even if the defendant went to trial to challenge the

24   applicability of the statute to his conduct.  Guideline § 3E1.1, comment. (n.2). This was the type of

25   purely legal argument Mr. Lucero made, which does not preclude an acceptance of responsibility

26   reduction. *See United States v. Ing*, 70 F.3d 553, 556 (9th Cir. 1995) (vacating sentence and

27   remanding because district court erroneously denied acceptance credit based on defendant's assertion

28   of entrapment defense; defendant "admitted his conduct and his intent throughout" and

1   acknowledged wrongdoing and expressed remorse at sentencing).

2       The defense conceded in its opening statement that Mr. Lucero was responsible for depositing

3   fill and that he did not have the necessary permission.  TR 68.  Both parties pointed out in their

4   closing arguments that Mr. Lucero contested only the jurisdictional element.  *See* TR 1447

5   (government closing), TR 1493-94 (defense closing); *see also* Dkt. 242 at 16 (government opposition

6   to new-trial motion recognizing "Lucero's choice to dispute only one of the four elements required to

7   prove a CWA violation").  Accordingly, the government devoted its entire closing argument to the

8   jurisdictional element.  *See* TR 1448-87 (government closing), TR 1535-47 (government rebuttal).

9   Because his purpose in going to trial was merely "to challenge . . . the application of [the CWA] to . .

10  . his conduct," *Garrido*, 596 F.3d at 617, he is eligible for an acceptance reduction.

11      District courts have granted reductions for acceptance of responsibility for defendants who

12  raised similar jurisdictional challenges at trial.  In *United States v. Schultz*, the district court granted

13  the defendant the two-level acceptance reduction even though he went to trial and the PSR

14  recommended no reduction.  917 F. Supp. 1343, 1344 (N.D. Iowa 1996).  The district court

15  emphasized that the defendant's "principal defense" at trial was that the gambling business that he

16  admitted he ran "did not violate the federal statute, because it did not involve the requisite five

17  persons necessary to establish federal jurisdiction or a violation under the federal statute."  *Id.* at

18  1345.  Developing appropriate jury instructions "involved a difficult legal inquiry into the meaning of

19  the statute and its applicability to the gambling business involved here."  *Id.*  Although the defendant

20  did not challenge the constitutionality of the statute, he did "challenge the applicability of the statute

21  to his conduct."  *Id.* at 1355.  Even though the statutory element he challenged was "both

22  'jurisdictional' and a factual element of the violation," the district court held that the defendant

23  "asserted these legal questions as the basis for his defense, and it was for the court, in the first

24  instance, and ultimately for the jury, to determine the applicability of the statute to the largely

25  undisputed facts of the case."  *Id.*  "Furthermore, the factual question, to the extent it was pivotal to a

26  determination of guilt, was at least one step removed from any of Mr. Schultz's own conduct."  *Id.*

27  Thus, the defendant fell within the Guidelines commentary provision that a defendant who goes to

28  trial to challenge the applicability of the statute to his conduct may be eligible for acceptance credit.

1   *Id.*

2   The district court in *Schultz* also considered the defendant's forthright trial testimony, which

3   "openly acknowledged the factual elements of the government's case" and his "genuine[] regret[],

4   not just at being 'caught,' but at involvement in a business that was illegal." *Id.* at 1346. Construing

5   and applying Eighth Circuit cases addressing post-trial acceptance credit, the district court in *Schultz*

6   recognized "a constant emphasis on the defendant's acceptance of responsibility for his or her

7   *conduct*, and remorse for that conduct, and honesty about the *factual basis* for the offense, rather than

8   an emphasis on whether the defendant pleaded guilty or took the matter to trial." *Id.* at 1354. Mr.

9   Lucero's trial defense, admissions of conduct and showing of contrition are strikingly similar to those

10   in *Schultz*. The Ninth Circuit and other courts also have granted acceptance credit for defendants

11   who, like Mr. Lucero, went to trial on CWA charges. *See, e.g.*, *United States v. Knopfle*, 93 Fed.

12   Appx. 111, 1114-15 (9th Cir. 2004) (unpublished) (affirming acceptance credit); *United States v.*

13   *Wells Metal Finishing, Inc.*, 922 F.2d 54, 56 (1st Cir. 1991) (noting that defendant received two-level

14   reduction for acceptance of responsibility despite going to trial on multiple counts of knowingly

15   violating CWA by "discharging excessive amounts of zinc and cyanide into the City of Lowell's

16   sewer system").

17   Nor do the Guidelines require a defendant to refrain from all objections to the government's

18   evidence in order to preserve the right to acceptance-of-responsibility credit. Here, as in *Rojas-*

19   *Flores*, the evidentiary challenges "did not alter the tenor of [the defendant's] argument, which was a

20   legal argument regarding the applicability of the statute." 384 F.3d at 780-81 (vacating sentence and

21   remanding because district court erroneously denied acceptance credit; defendant "raised a purely

22   legal defense"). Mr. Lucero did not call any witnesses. His cross-examination of government

23   witnesses went only to the contested jurisdictional element or to disputing the government's

24   references to non-charged offenses or uncharged bad acts, such as suggestions that his conduct

25   caused environmental damage. Defense cross-examination of government witnesses, under these

26   circumstances, does not warrant denial of credit for acceptance of responsibility. *See id.* at 781

27   (rejecting government's argument that cross-examination of government witnesses supported denial

28   of acceptance credit).

1    In the PSR's Addendum, the government argues that Mr. Lucero's pre-trial filings are a basis

2    for denying him credit for acceptance of responsibility.  There is no authority for such a position.

3    Indeed, a district court may not deny the credit based on a defendant's attempt to suppress evidence

4    on constitutional grounds.  *See United States v. Ochoa-Gaytan*, 265 F.3d 837, 844 (9th Cir. 2001)

5    (holding that district court committed "legal error" by denying "a reduction for acceptance of

6    responsibility only because he moved to suppress his custodial statements and proceeded to trial

7    rather than plead guilty.").

8    The key question in determining whether a defendant is entitled to an acceptance of

9    responsibility reduction is whether he "manifest[ed] a genuine acceptance of responsibility for his

10   actions."  *United States v. Cortes*, 299 F.3d 1030, 1038 (9th Cir. 2002) (brackets added and omitted;

11   internal quotation marks omitted).  "If [the defendant's] statements and conduct made it clear that his

12   contrition was sincere, he was entitled to the reduction."  *Id*.  In determining whether a defendant has

13   shown acceptance, appropriate considerations include whether he "truthfully admit[ted] the conduct

14   comprising the offense."  § 3E1.1, comment. (n.1).  A district court may rely for this purpose on an

15   "eleventh-hour" apology before or even at sentencing.  *United States v. Hill*, 953 F.2d 452, 461 (9th

16   Cir. 1991); *see also, e.g., Ing*, 70 F.3d at 556 (remanding because district court erred in denying

17   reduction based on defendant's assertion of entrapment defense and noting that defendant expressed

18   contrition at sentencing).

19   Mr. Lucero truthfully admitted that he caused the discharge of fill onto the property without a

20   federal permit.  He did not present any witnesses at trial, and his defense was based solely on a

21   challenge to the jurisdictional element of the CWA offenses.  He has expressed remorse and

22   contrition for his conduct, as reflected in the PSR.  He is entitled to the two-level reduction for

23   acceptance of responsibility.

24   **III.   The Court May Not Order the Restitution Specified in the PSR**

25   The government asks the Court to order Mr. Lucero to pay millions of dollars in restitution to

26   the landowners.  The mandatory-restitution statute cited by the PSR does not authorize restitution in

27   this case, and the PSR has not identified any other statutory basis.  Moreover, the victim-impact

28   statement submitted by the landowners does not support the restitution sought by the government for

DEFENDANT'S OBJECTIONS TO THE PSR AND GUIDELINES
*LUCERO*, CR 16–107 HSG

1    several reasons, detailed below.  The Court should decline to order restitution in this case.

2    **A.      The Court May Not Order Mr. Lucero to Pay Restitution under the MVRA**

3    "The power to order restitution is not inherent in the federal courts; it is conferred only by

4    statute." *United States v. Batson*, 608 F.3d 630, 633 (9th Cir. 2010).  The PSR claims that restitution

5    must be ordered under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  PSR

6    ¶¶ 45, 97.  That statute requires courts to order restitution "when sentencing a defendant convicted of

7    an offense described in subsection (c)."  18 U.S.C. § 3663A(a)(1).  Subsection (c) says that it

8        shall apply in all sentencing proceedings for convictions of . . . any
9        offense—

10       (A) that is—

11              (i) a crime of violence, as defined in section 16;

12              (ii) an offense against property *under this title*, or under section
     416(a) of the Controlled Substances Act (21 U.S.C. § 856(a)), including
13     any offense committed by fraud or deceit;

14              (iii) an offense described in section 1365 (relating to tampering
     with consumer products); or

15              (iv) an offense under section 670 (relating to theft of medical
     products); *and*
16     (B) in which an identifiable victim or victims has suffered a physical
     injury or pecuniary loss.

17   18 U.S.C. § 3663A(c) (emphases added).  The MVRA does not authorize restitution in this case.

18   Mr. Lucero's CWA violations are *not* "under this title," *i.e.*, Title 18, or drug offenses or

19   committed by fraud or deceit.  *Id.; see Batson*, 608 F.3d at 633 (describing MVRA as applying "to

20   any person who suffered a physical injury or pecuniary loss as a direct or proximate result of the

21   commission of (1) a crime of violence, (2) *an offense against property under 21 U.S.C. § 856(a) or*

22   *Title 18*, or (3) an offense under 18 U.S.C. § 1365, relating to the act of tampering with consumer

23   products." (emphasis added)).  Because Mr. Lucero's conviction offense did not fall within one of the

24   categories specified in the MVRA, the Court cannot impose mandatory restitution under that statute.

25   Nor do the Guidelines authorize restitution under the MVRA in this case.  The Guidelines'

26   restitution provision lists several statutes under which restitution may be awarded.[8]  *See* § 5E1.1(a).

27

28
     _____

     [8]*See* 18 U.S.C. § 1593 (authorizing restitution for offenses under chapter 77 (Peonage, Slavery,

1  None of these statutes authorizes restitution for violations of the Clean Water Act.

2  **B.     The Court May Not Order Restitution as a Condition of Supervised Release**

3       Courts have discretion to order restitution for offenses not specified in the restitution statutes as

4  a condition of supervised release.  *Batson*, 608 F.3d at 636.  Restitution ordered as a condition of

5  supervised release must be reasonably related to the nature and circumstances of the offense, the

6  history and characteristics of the defendant and the need for deterrence, protection of the public and

7  the provision to the defendant of educational or vocational training, medical care or other correctional

8  treatment.  *United States v. Alvarez*, 835 F.3d 1180, 1184 (9th Cir. 2016).  It may not be imposed "'to

9  reflect the seriousness of the offense, to promote respect for the law, [or] to provide just punishment

10  for the offense.'"  *Id.* (quoting 18 U.S.C. § 3553(a)(2)(A); brackets added).

11       There are three additional predicates to a restitution award:  (1) the party seeking restitution

12  must be a victim of the conviction offense; (2) the conviction offense must have proximately caused

13  the victim's losses; and (3) the eligible losses must be able to be calculated with "reasonable

14  certainty."  *United States v. Kennedy*, 643 F.3d 1251, 1263 (9th Cir. 2011).  The government bears

15  the burden of proving both that a person or entity seeking restitution is a victim and the amount of the

16  loss.  18 U.S.C. § 3664(e); *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).  "[I]f the

17  defendant's offense conduct did not cause harm to an individual, that individual is by definition not a

18  'victim' entitled to restitution."  *Paroline v. United States*, 572 U.S. 434, 445 (2014).  Under these

19  standards, the Court should decline to order restitution to the property owners in this case.

20       Restitution may not be imposed as punishment, and it is not reasonably related to the nature

21  and circumstances of the conviction offense, Mr. Lucero's history or characteristics or the need for

22  deterrence or protection.  Moreover, the Sobrato Organization is not a victim of the Clean Water Act

23  offenses of which Mr. Lucero was convicted.  Even if it were, the government has not carried its

24  _____

25  and Trafficking in Persons)); 18 U.S.C. § 2248 (authorizing restitution for offenses under chapter
26  109A (Sexual Abuse)); 18 U.S.C. § 2259 (authorizing restitution for offenses under chapter
   110 (Sexual Exploitation and Other Abuse of Children)); 18 U.S.C. § 2264 (authorizing restitution for
27  offenses under chapter 110A (Domestic Violence and Stalking)); 18 U.S.C. § 2327 (authorizing
   restitution for offenses subject to enhanced penalty under 18 U.S.C. § 2326 for telemarketing or
28  email marketing frauds); 21 U.S.C. § 853(q) (authorizing restitution for amphetamine and
   methamphetamine offenses under drug abuse control and enforcement subchapter).

DEFENDANT'S OBJECTIONS TO THE PSR AND GUIDELINES
*LUCERO*, CR 16–107 HSG

1    burden of establishing that the Sobrato Organization suffered a loss for purposes of restitution.  Given

2    the lack of a knowledge instruction, the specialized cleanup for which the Sobratos seek restitution

3    was not foreseeable to Mr. Lucero.  Nor should Mr. Lucero be held financially responsible for any

4    losses stemming from the delay in prosecuting this case, which was solely the responsibility of the

5    government.  Finally, the government has not produced a reliable estimate of any eligible losses on

6    which an order of restitution may be based.

7                    1.        **The Sobrato Organization is not the victim of the Clean Water Act offenses**

8           "[A]n award of restitution ordered as a condition of supervised release can compensate 'only

9    for the loss caused by the specific conduct that is the basis of the offense of conviction.'" *Batson*, 608

10   F.3d at 637 (quoting *Hughey v. United States*, 495 U.S. 411, 413 (1990)).  Restitution may be ordered

11   "only for losses for which the defendant's conduct was an actual and proximate cause." *Kennedy*,

12   643 F.3d at 1261 (quotation marks omitted).  "[F]or purposes of determining proximate cause, a court

13   must identify a causal connection between the defendant's offense conduct and the victim's specific

14   losses." *Id.* at 1262 (considering restitution under 18 U.S.C. § 2259).  Proximate cause requires a

15   "direct relation between the injury asserted and the injurious conduct alleged." *Paroline*, 572 U.S. at

16   444 (quotation marks omitted).  "Restitution is not available for consequential losses . . . or other

17   losses too remote from the offense of conviction." *United States v. Rodrigues*, 229 F.3d 842, 846

18   (9th Cir. 2000) (citation omitted).

19          The government bears the burden of proving that an entity seeking restitution is a victim.  18

20   U.S.C. § 3664(e).  A "victim" who may receive restitution is "a person directly and proximately

21   harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C.

22   § 3663(a)(2).  The elements of the conviction offenses in this case were (1) knowing discharge of fill

23   material (2) from a point source (3) to a "water of the United States" (4) without a permit from the

24   Army Corps of Engineers.  *See* Dkt. 195 at 20 (jury instruction for elements of CWA violation).  The

25   Sobrato Organization is not a victim of the Clean Water Act offenses.

26          "Because the Clean Water Act and the Clean Air Act are public welfare legislation, *the victim*

27   *of those offenses is the public.*"  *United States v. Technic Services, Inc.*, 314 F.3d 1031, 1049 (9th Cir.

28   2002) (emphasis added), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135,

1136 (9th Cir. 2010) (en banc); *see also United States v. Hanousek*, 176 F.3d 1116, 1121 (9th Cir.

1999) ("The criminal provisions of the CWA constitution public welfare legislation," which "is

designed to protect the public from potentially harmful or injurious items."); *United States v.*

*Weitzenhoff*, 35 F.3d 1275, 1286 (9th Cir. 1993) ("The criminal provisions of the CWA are clearly

designed to protect the public at large from the potentially dire consequences of water pollution . . .

and as such fall within the category of public welfare legislation.").

Courts have granted restitution in Clean Water Act and Clean Air Act cases to the government

as victim. *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016); *United States v. Phillips*, 367

F.3d 846, 894 (9th Cir. 2004). But here it is a private party, not the government, that seeks restitution

for Mr. Lucero's Clean Water Act violations. Because the Sobrato Organization is not a victim of the

offenses of conviction, it is not entitled to restitution. *See, e.g.*, *United States v. Blake*, 81 F.3d 498,

506-07 (4th Cir. 1996) (holding that, for purposes of restitution, people from whom defendant stole

credit cards were not victim of his conviction offense of use of unauthorized access devices); *United*

*States v. Kones*, 77 F.3d 66, 71 (3d Cir. 1996) (holding that, for purposes of restitution, patient who

was injured by defendant-doctor's improper prescribing of drugs was not victim of his conviction

offense of submitting false insurance claims, including for patient). The Court may not grant

restitution to the Sobrato Organization.

### 2. The government has not proven that there is a loss for purposes of restitution

Under the restitution statutes, restitution ordered for "an offense resulting in damage to . . .

property of a victim of the offense" should be "the greater of . . . the value of the property on the date

of the damage . . . or . . . the value of the property on the date of sentencing, less . . . the value (as of

the date the property is returned) of any part of the property that is returned." 18 U.S.C. §

3663A(b)(1)(B). "The amount of restitution must be reduced by the value of the property as of the

date the victim took control of the property. . . . A district court abuses its discretion by valuing the

property at the time of the final disposition of the property by the victim . . . rather than at the time

the victim gained control of the property." *United States v. Lomow*, 266 F.3d 1013, 1021 (9th Cir.

2001), *superseded by statute on other grounds as recognized in United States v. McEnry*, 859 F.3d

893, 899 n.8 (9th Cir. 2011) (quotation marks, citation, emphasis and brackets omitted; first ellipses added); *see also United States v. Carter*, 742 F.3d 440, 447 (9th Cir. 2004) ("An item returned is no longer a loss as of the day it lands in the victim's hands (even if the victim incurs costs in liquidating it.")).  Mr. Lucero's conviction conduct never deprived the Sobrato Organization of possession or control of the property.  Accordingly, there is no loss to be computed for purposes of restitution.

### 3.      The government has not carried its burden of establishing by sufficiently reliable and detailed evidence that the Sobrato Organization suffered losses for which the Court may order restitution

The government bears the burden of proving the amount of the loss for restitution purposes.  18 U.S.C. § 3664(e).  Although district court have some flexibility in assessing restitution, the statutory restitution scheme "minimally requires that facts be established by a preponderance of the evidence, and the district court may utilize only evidence that possesses sufficient indicia of reliability to support its probable accuracy."  *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (brackets and quotation marks omitted).  "[W]hen there is a dispute as to restitution, a restitution order must be supported by evidence in the record showing that it is more likely than not that the defendant's offense proximately caused the losses for which restitution was awarded and that it did so in the amounts awarded."  *United States v. Tsosie*, 639 F.3d 1213, 1222 (9th Cir. 2011).

In determining the appropriate amount of restitution,

> the district court should not accept uncritically an amount recommended by the probation officer.  [The restitution statutes] require a sentencing court to establish the losses resulting from defendant's conduct as a basis for ordering appropriate restitution.  It would be an abdication of judicial responsibility simply to adopt a suggested figure without making an independent determination that the amount actually reflects the damages suffered by the victim.

*United States v. Barany*, 884 F.2d 1255, 1261 (9th Cir. 1989) (rejecting restitution for attorney's fees and costs victim "chose to expend" for defending against defendant's civil suit as "only tangentially related to the defendant's original offenses.").  The Ninth Circuit has rejected district court restitution orders that were based only on cursory, unverified documentation.  *See Tsosie*, 639 F.3d at 1221 (rejecting as basis for restitution spreadsheet that was "unsupported by any sworn affidavit" and included many expenses that were "difficult to interpret or seem inappropriate"); *Waknine*, 543 F.3d at 557 ("the district court erred by relying exclusively on the one-page loss summaries provided by

1    the victims and in not requiring more detailed explanations of the losses each victim suffered."). The

2    evidence submitted by the government to support the restitution claim in this case is no more reliable

3    or detailed than the evidence the Ninth Circuit rejected in *Tsosie* or *Waknine*.

4         The government provided in discovery an e-mail dated March 23, 2017, from field engineer

5    Chris Heckert to Robert Tersini of the Sobrato Organization with estimates for "for [o]ff-haul of

6    approximately 12 acres of illegal fill @ average 2' depth," excluding, *inter alia*, "protection and

7    replacement of wetlands," permits and fees. Bates 34041-42. The estimates ranged from

8    approximately $1.6 million to $3.2 million, depending on the nature of the dirt. *Id.*

9         The Sobrato Organization's victim impact statement, dated April 24, 2018, includes a one-page

10   attorney statement, a page explaining the assumptions underlying the cost estimate, a paragraph

11   explaining the soil-sampling procedure, two maps showing fill depth and a one-page cost summary.

12   Bates 42440-48. The statement gives a "project cost summary" of $6,742,500. Bates 42446.

13        The 2018 estimate is more than double the high end of the 2017 estimate. The 2018 estimate is

14   for more than $6 million – and $3 million for "mass excavation, loading, offhaul, & disposal" alone –

15   even though it is based on fill that, in all but one of the sampled locations, averaged between less than

16   an inch and 8 inches, rather than the 48-inch depth assumed in the 2017 estimate. *Compare* Bates

17   34042 *with* Bates 42447-48.

18        The government has not offered any explanation or justification for the extreme cost inflation

19   for removing the fill. It has not offered any sworn statements to back up its restitution request. It has

20   not provided an independent cost analysis nor any estimate or cleanup order from the agency tasked

21   with oversight. The government has not carried its burden of establishing that any of the Sobrato

22   Organization's requested restitution can and should be ordered.

23        **4.**     **The extent of restitution requested by the Sobrato Organization goes**

24                 **beyond what the Court may order**

      Even if the Court finds the government's restitution request supported by reliable evidence, it

25   should not grant all the restitution requested.

26

27         **i**     **The Court may not order restitution for losses that go beyond the**

                  **counts of conviction**

28       The Sobrato Organization's 2018 estimate covers 22 acres. Bates 42444. This is nearly double

the acreage involved in the three counts of conviction.  *See* Dkt. 39 at 4-5 (superseding indictment

alleging 3.90 acres in Count One, 1.28 acres in Count Two and 7.95 acres in Count Three); PSR ¶ 31

(11.85 acres of wetlands).  Any costs associated with these additional acres are beyond the counts of

conviction and thus not properly a basis for a restitution order.

The 2018 estimate also covers not only planning, permitting and project management,

construction documents and excavation, loading, offhaul and disposal but also "Pre-Construction &

Construction Wildlife Monitoring," "Wildlife Exclusion Fencing," "Saturated Soil Handling,"

"Hydroseeding," and monitoring, reporting and weed control for five years.  Bates 042446.  The

government has offered nothing to justify these expenses or to explain how they were proximately

caused by Mr. Lucero's conviction conduct and not consequential or remote.  *Rodrigues*, 229 F.3d at

846.

### ii       The Court may not order restitution for losses that were not foreseeable

In determining whether restitution is authorized, the question is "whether the costs were

incurred as a direct and foreseeable result of the defendant's wrongful conduct."  *United States v.*

*Phillips*, 367 F.3d 846, 863 (9th Cir. 2004) (quotation marks omitted); *see United States v. De La*

*Fuente*, 353 F.3d 766, 773 (9th Cir. 2003) (affirming restitution for cleanup expenses that were "a

necessary and foreseeable result of De La Fuente's offense conduct").  The Court may not order Mr.

Lucero to pay restitution for costs that were not a foreseeable result of his conviction conduct.

In this case, the Court denied Mr. Lucero's request for a jury instruction that would have

required the government to prove that he "knew that the body of water in which he allegedly

discharged fill material was a 'water of the United States' with the meaning of the CWA."  Dkt. 109

at 1 (Order Regarding Contested Jury instructions).  Accordingly, any part of the Sobrato

Organization's requested restitution that relates to the fill areas' particular status as wetlands or

tributary under the CWA was not foreseeable to Mr. Lucero and may not be the basis for ordering

restitution.  *See* Victim Impact Statement at 42440 (referring to expenses caused by requirements of

state and federal agencies); *id.* at 4244-45 (referring to expenses for permits from multiple

governmental agencies, "potential presence of special status wildlife species," "special status species

1    and habitat protection measures" and five years of monitoring and reporting).

2               **iii**       **The Court may not order Mr. Lucero to pay restitution for losses**

3                            **stemming from prosecution delays attributable to the government**

4         The letter from the Sobrato Organization attorney submitted with its victim impact statement

5 refers to the delays in the organization's development plans because of "Mr. Lucero's crime, and the

6 resulting need to avoid disturbing the illegally dumped material prior to the conclusion of the federal

7 prosecution of Mr. Lucero." Bates 42440. Any losses attributable to this delay were caused not by

8 Mr. Lucero, who had nothing to do with the property since his 2014 conduct of conviction, but by the

9 government, which delayed investigating and charging this case, and then caused additional delay by,

10 in January 2017, changing its theory of jurisdiction and working over that year to obtain a new and

11 voluminous expert report that further delayed the trial in this case. *See* Dkt. 18 (motion challenging

12 pretrial delay); Dkt. 53 and 60 (motion to continue trial date and order granting motion and setting

13 government discovery deadline).

14         The Ninth Circuit has rejected restitution orders based on changes in the property over time that

15 were not attributable to the defendant. *See United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985) (in

16 timber-theft case, reversing order of restitution that was based on decline in value of timber between

17 time of offense and time of sentencing). "The timber was restored to the government on the day of

18 the theft. Any reduction in its value stems from the government's decision to hold the timber during

19 a period of declining prices, not from Tyler's criminal acts." *Id.* at 1352. "[E]ven if the entire

20 decline in value of the timber could fairly be characterized as a cost of investigating and prosecuting

21 Tyler's case, [the restitution statute] would afford no basis for placing that burden on the defendant."

22 *Id.*; *see also United States v. Smith*, 944 F.2d 618, 625 (9th Cir. 1991) (holding that "district court

23 used incorrect dates in valuing the property"; defendant should have been credited for value of

24 property as of the date it was transferred to victims; "As of that date, the new owner had the power to

25 dispose of the property and receive compensation.").

26         For the same reasons, Mr. Lucero may not be required to pay restitution for any loss

27 attributable to the government's extensive delays in investigation and prosecuting this case.

28

1

**CONCLUSION**

2      For all the above reasons, the Court should decline to apply the sentencing enhancements for

3 the repetitive discharge of a pollutant or for substantial cleanup expenditures.  If the Court does apply

4 these enhancements, downward departures, as provided in the guideline application note, are

5 appropriate.  The Court also should grant Mr. Lucero a two-level reduction for acceptance of

6 responsibility.  Finally, there is no lawful basis for the Court to order restitution.

7

8   Dated:      January 7, 2019                          Respectfully submitted,

9                                                        STEVEN G. KALAR
                                                         Federal Public Defender
10                                                       Northern District of California

11                                                          /S/Angela M. Hansen
                                                         ANGELA MILELLA HANSEN
12                                                       Assistant Federal Public Defender

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28