STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA MILELLA HANSEN
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:       Angela_Hansen@fd.org

Counsel for Defendant Lucero

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 16–107 HSG |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM RE:  18 U.S.C. § 3553** |
| v. | |
| JAMES LUCERO, | **Hearing Date:**   January 14, 2019 |
| Defendant. | **Hearing Time:**   2:00 p.m. |

**INTRODUCTION**

In late 2014, James Lucero coordinated the discharge of mostly "clean fill" on privately owned property in Newark, California, that was slated for development.  He did not have a permit from the Army Corps of Engineers.  When confronted by a landowner's representative, Mr. Lucero "offered to immediately remove the dumped dirt" and further offered to "rectify whatever offenses [may] have occurred."  Bates JL-4389.  Unbeknownst to Mr. Lucero, however, the government had asserted federal jurisdiction over parts of the property at issue here.  After the government learned of the discharge, it charged this regulatory violation as a criminal matter under the Clean Water Act ("CWA").  But the government did not have to do so.  It could have brought this case as a civil enforcement action or it could have left the case in the hands of local prosecutors who had thoroughly investigated the case.  Instead, it chose to file federal felony criminal charges, a rare sanction reserved for egregious environmental violations or repeat offenders who had been warned that permits were required.

Unlike more serious environmental pollution cases, this prosecution will not protect the environment; it will not deter future polluters.  This is a unique case that involves the deposit of mostly "clean fill" on wetlands that have been manipulated for many years with pumps, ditches, mowing and discing under a nominally legal agricultural exemption to the CWA.  These activities took place on a swatch of land that will soon be filled with a million cubic yards of clean fill for a major development project.  The fill locations sit on the edge of a junk yard that overlaps a flood control channel that pours garbage and debris from neighboring communities in to the Mowry Slough, a Water of the United States.  This case does not involve sewage, it does not involve harmful chemicals, nor is there any evidence that the fill damaged the environment in any way.  Moreover, the government's full-bore prosecution of this case appears inconsistent with the Administration's current pivot away from environmental protection.

Mr. Lucero is a 62-year-old grandfather who was charged in this case after he served one year in custody for a state-related fraud case.  He was arraigned on this indictment nearly two years after the alleged conduct in this case, and he committed this offense before he served his time on the state sentence.  In other words, he did not commit a new crime after his release from state custody.  This

1   Court should not punish Mr. Lucero more severely here because of his record, or to avenge the

2   landowners for his trespass, which arguably would support a civil lawsuit in state court.  This Court

3   should take a measured approach and consider the lack of environmental impact of Mr. Lucero's

4   conduct here, together with the nature of most criminal enforcement cases, to assess the appropriate

5   term of custody that Mr. Lucero should serve for depositing dirt and fill material onto wetlands that

6   will soon become a major housing and recreational development project.  A punishment is required,

7   but a sentence of more than a year is unnecessary to achieve the goals of sentencing for this

8   regulatory permit violation.

9                                             **ARGUMENT**

10          Mr. Lucero seeks a sentence of 12 months and one day.  Depending on the Court's final

11   determination about the applicability of the enhancements addressed in Mr. Lucero's simultaneously

12   filed objections to the PSR, this requested sentence is an upward variance from a range of 4 to 10

13   months in Zone B (offense level 8), a low-end sentence at a range of 12 to 18 months in Zone C

14   (offense level 12),[1] or a variance from the advisory range (offense level greater than 12 to level 20).

15   The reasons for Mr. Lucero's requested sentence are set forth below.

16   **I.      LEGAL STANDARD**

17          The Court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005) and

18   18 U.S.C. § 3553(a).  The Sentencing Guidelines range is not mandatory, and the Court has a duty to

19   exercise judgment and discretion in arriving at an appropriate sentence.  Importantly, the district

20   court may not presume the Guidelines range is reasonable.  *Nelson v. United States*, 555 U.S. 350,

21   352 (2009) (per curiam).  Instead, the Court also must consider the nature and circumstances of the

22   offense, the history and characteristics of the defendant, as well as the need to avoid unwarranted

23   sentence disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6).

24          Section § 3553(a) "contains an overarching provision" directing the district court to impose a

25   sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of

26

27   _____

28          [1]If the Court applies either the disputed six-level enhancement under § 2Q1.3(b)(1)(A) with a
two-level downward departure under the Application Note, or the four-level enhancement under §
2Q1.3(b)(3), both with a two-level decrease for acceptance, the adjusted offense level would be 12.

1   sentencing. *Kimbrough v. United States*, 552 U.S. 82, 101 (2007).  In crafting a sentence that is

2   "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. §

3   3553(a), the Court also must consider the need for the sentence imposed:  (A) to reflect the

4   seriousness of the offense, to promote respect for the law, and to provide just punishment for the

5   offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from

6   further crimes of the defendant.  18 U.S.C. § 3553(a)(2).  In short, this Court has the authority and

7   responsibility in this case to impose a sentence, without undue regard for the advisory Guideline

8   range, that is no greater than necessary in light of all the facts before it.  The sentencing factors

9   addressed below weigh in favor of a one-year sentence.

10  **II.    THE COURT SHOULD IMPOSE MR. LUCERO'S REQUESTED SENTENCE BASED
        ON THE RELEVANT SENTENCING FACTORS**

11          **A.      The Nature and Circumstances of the Offense**

12                  **1.      The Nature of the Site**

13          From the outset, the government has presented an incomplete picture of the property at issue in

14  this case.  The baseline for this property is not a pristine or unspoiled wetland, in part, because of the

15  nature of the surrounding areas and the land-management activities of the landowners, which

16  themselves may have violated the Clean Water Act.  Exhibit B at 11 (CCCR alleging that the

17  landowners' continuous discing of areas that have supported pickleweed cover may be a "violation of

18  the Clean Water Act and Endangered Species Act, as areas that support pickleweed clearly are not in

19  agricultural production and therefore should not qualify for agricultural exemptions.").  Moreover,

20  the site was contaminated before the charged conduct and will require significant remediation before

21  it is used for residential purposes.  These facts are offered under 18 U.S.C. § 3553 to give the Court

22  the full context of the site at issue, rebut the government's overstated claims about the nature of the

23  site and to put Mr. Lucero's conviction conduct in perspective.

24

25

26

27

28

The annotated map, below, shows that the fill locations (marked with red dots) are in an area surrounded by an industrial park, a landfill, a flood control channel, an auto dismantler business and a recycling center.  The recycling center is next to Mowry Slough and has no barriers to prevent run-off into the Slough, which is a tributary of the Bay and itself a Water of the United States.  The auto dismantler, aptly named "Pick n' Pull," directly abuts the Northern fill site and the charged areas at



issue in Counts One and Two.  Bordering these areas is an old, broken, corrugated metal fence, and there are car parts, large containers, chemicals such as oil and antifreeze, and other debris and garbage on the exact area at issue in this case.  For example, the image below depicts the area next to the Pick n' Pull relevant to Counts One and Two.





        In addition, the flood control channel running through the property dumps rainwater and debris directly into the Mowry Slough from neighboring communities, arguably contaminating the Slough and the Bay.  The government's own expert at trial explained that this flood control channel contains a large collection of debris, including balls. TR at 1105 (explaining that there is "a lot of water" in the flood control channel draining from urban, residential, commercial areas).  The flood control channel is depicted in this January 2017 image below.

1   Most importantly, well before Mr. Lucero's fill activity, an analysis of the soil conditions

2   revealed that the site was contaminated and will require significant mitigation measures:

> PES [environmental engineers] understand[s] that development plans
> for the non-wetland portions of the property would include import of at
> least a few feet of fill to raise the elevation of the site.  Future site use,
> although not known at this time, may be a golf course or residential.
> Filling the site with clean imported fill material will reduce or
> eliminate future long term exposure to *the residual agricultural*
> *chemicals encountered across the site* and site use can be designated to
> avoid unacceptable exposures or risks *due to the residual*
> *contaminants*.

> Although residential use may not be a likely option for the property, if
> the site is to be developed for residential use, [existing] soils with
> elevated levels of toxaphene, cadmium and/or heavy hydrocarbons may
> need to be further addressed.  *Options for these soils include, but are*
> *not limited to: capping, grading, bioremediation, relocation and/or*
> *conducting a risk assessment to evaluate whether these soils present a*
> ***risk to human health*** under the future redevelopment plan.  Once the
> development plans are further defined, a more detailed analysis of
> options can be prepared and appropriate mitigation measures, if needed,
> can be incorporated into the design.

*See* Exhibit G at 11 (excerpts from Sept. 25, 2006 PES Environmental, Inc., Report (emphases

added)).

Long before Mr. Lucero's fill activity, the landowners' activities affected the nature and quality

of the site.  It was annually farmed, disced and managed.  Indeed, the CCCR, an environmental

group, complained in a 2010 challenge to the landowners' development plans that the "land

management practices of frequent and ongoing disturbance [by the landowners] has resulted in

reduced habitat values [on the site].  This is an artificial condition and *habitat values would improve*

*if agricultural habitats in particular seasonal wetlands were not frequently disced*."  Exhibit B at 11

(emphasis added).

The wetlands already had been affected by 50 years of plowing and discing that "removed

wetland vegetation, altered the soil profile, and removed surface indications of seasonal hydrology."

Declaration of Michael Josselyn in Support of Defendant's Offer of Proof, Dkt. 191-2 ¶ 5; *see also*

Exhibit A (HT Harvey 2007 Preliminary Jurisdictional Report at 26 (noting that jurisdictional

1   wetlands have been "highly disturbed and affected by agricultural and other anthropogenic

2   activities")).  The landowners "routinely disced the entire approximately 400-acre property at this

3   time of year . . . by [bringing] [heavy] mowing and discing equipment to the site each year."  *See*,

4   *e.g.*, Exhibit E (May 20, 2016, letter from landowners' attorney).  Although the discing was

5   ostensibly to minimize a fire hazard by deterring invasive weeds, it actually may have encouraged

6   their growth.  *See* Exhibit B (2010 letter from CCCR: "We are also extremely concerned that areas

7   that were previously dominated by pickleweed but have been disced have been subsequently invaded

8   by Russian thistle.").  Whatever its justification, the landowners' discing, mowing, draining and

9   pumping clearly removed pickleweed, a vegetative indicator of wetlands and a potential home for the

10  salt marsh harvest mouse.  *See* Exhibit H (statement by team of landowners' expert Patrick Boursier,

11  in environmental impact statement for another project: "One of the most serious cumulative effects

12  on the harvest mouse has been the degradation of diked wetlands, typically by the elimination of

13  wetland vegetation by grazing, discing, grubbing, and plowing, and/or the elimination of appropriate

14  hydrologic conditions by installing drains, ditches, and pumps.").

15          Whatever the purpose, these land management activities made it very difficult to determine the

16  extent of wetlands on the property such that the wetland consultants hired by the landowners, Dr.

17  Boursier and HT Harvey & Associates, had to go to extraordinary lengths to determine wetland

18  boundaries by studying it for a number of years.  Indeed, they referred to the site as a problem wetland

19  because of the landowner's activity.  For example, in the 2007 Preliminary Jurisdictional Report

20  prepared by HT Harvey, the government's expert conceded as follows:

21                  In conclusion, jurisdictional wetlands across the site are complex, highly
22                  disturbed and affected by agricultural and other anthropogenic activities,
                    and extensive due to the abundance of wetland hydrology drivers found
23                  at this site. This methodology used in preparing this report represents our
                    best efforts to characterize a variety of agricultural field conditions
24                  exhibiting a range of conflicting indicators, including broad transitional
                    areas, as either upland or wetland.
25

26  *See* Exhibit A at 26 (excerpt from 2007 HT Harvey Report).

27          Although not excusing Mr. Lucero's actions, the fact that even experts had a problem

28  recognizing the property as a federal wetland lends credence to the damage that was done prior to Mr.

1   Lucero's fill placement.[2]  Moreover, the post-fill regrowth of the wetlands in areas where the

2   landowners did not disc because of this case suggests that the discing and mowing of the wetland

3   vegetation had a greater effect on the nature and quality of the site than the fill activity.




Nov. 1, 2017: Looking northeast across the Northern Section of the Site, from near the fence just downhill from the levee. The reddish shrubs in the foreground are wetland vegetation growing on the fill site that comprises Counts 1 and 2.




Nov. 1, 2017: Close up of wetland vegetation on fill

The photographs above depict the area relevant to Counts One and Two of the Indictment as it appeared on November 1, 2017, several years after the charged conduct in this case.  The wetland vegetation appears to be flourishing in the filled section of the site, while the wetlands adjacent to the fill have no vegetation because of the landowner's land management activities.

**B.     The material discharged was not toxic or hazardous and was mostly "clean fill"**

The evidence in discovery and at trial establishes that the fill material that Mr. Lucero caused to be discharged at the site was cleared by the drivers and the trucking companies as "clean fill."  *See*, *e.g.*, TR 52 (referencing letter with estimated load count at 680 loads of "clean fill"), 65 (Lucero admitting need to dump "clean dirt"), 80 (Lucero discussing need to make sure "dirt we brought in

---

[2]As the Court is aware, the government revamped its jurisdictional theory between the initial and superseding indictments, including presenting conflicting testimony from EPA Agent Su before the two grand juries about whether jurisdiction for Count Two was based on "other waters," 33 C.F.R. § 328.3(a)(3), or a tributary, 33 C.F.R. § 328.3(a)(5), and obtaining a new expert in January 2017 to support the changed jurisdictional theory in the superseding indictment.

1    was absolutely clean dirt . . . [with] analyticals and geotechnical reports."), 135 (co-conspirator

2    admission that plan was to dump clean fill material) and 145 (testimony of truck driver who

3    described dirt as clean with no garbage).  Some construction debris was found at the site, but there is

4    no evidence that any of the material was toxic, nor did this case involve sewage, chemicals or any

5    hazardous materials.  *See*, *e.g.*, Exhibit C at 6 (2015 California Department of Toxic Substances

6    Control Report verifying that "none of the [post-fill] samples exceeded hazardous waste criteria

7    thresholds for metals, diesel or chlorinated pesticides").  Moreover, the photograph of the site in

8    November 2017 above depicting how the wetlands grew back on the area where the fill was

9    deposited belies any claim the government may make that the fill material damaged the wetlands.

10    The wetlands are now flourishing, where before the fill was placed the area was basically barren from

11    the landowner's diking, discing and mowing activities.

12          **C.**    **Future development plans on the wetlands**

13          In assessing the damage from the offense conduct, the Court also must consider that the area in

14    question will be filled for future development.  According to Newark city officials, "[t]o develop [the

15    land at issue here], about a million cubic yards [of fill material will] be needed to lift it out of the

16    flood zone."  Riley McDermid, Newark Gives 386-House Development the Green Light, SAN

17    FRANCISCO BUSINESS TIMES (Dec. 14, 2015).

18          As of 2016, the development plans included housing and a golf course[3] on the exact site where

19    Mr. Lucero caused the fill to be deposited.  The map below is an HT Harvey document verifying the

20

21

22

23

24

25

26

---

27          [3]At trial, a former business partner of the landowners, Michael Siri, claimed: "there were

28    changes as to definitely the golf course is out.  We have no part of it." But Mr. Siri also conceded that
     he is out of the partnership and is "not intimately knowledgeable of the development plans."  TR 411.

landowner's development plans, even after the placement of the fill outlined in red.



Figure 1. Potential Development Envelope
Newark Areas 3 & 4 Specific Plan (2596-11)
October 2016

H. T. HARVEY & ASSOCIATES
Ecological Consultants

**Legend**
- Area 3 Boundary
- Area 4 Boundary
- Aquatic
- Wetlands
- Potential Development Envelope
- Illegal Fill Impacts
  Aquatic Fill Impacts = 1.33 ac
  Wetland Fill Impacts = 11.85 ac

### D.     Mr. Lucero's lack of knowledge

As discussed above, it was difficult even for experts to delineate the site as a jurisdictional wetland. Mr. Lucero was unaware of the nature of the property and would not have known that the area was a protected federal wetland. *See* Dkt. 191-2 (Dr. Michael Josselyn declaration). As discussed below, in contrast to many other Clean Water Act criminal defendants, Mr. Lucero was never warned that a permit was necessary for depositing fill on the property. The purpose of the Clean Water Act is "'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Rapanos v. United States*, 547 U.S. 715, 722 (2006) (plurality) (quoting 33 U.S.C. § 1251(a)). Mr. Lucero not only had no effect on the integrity of "the Nation's waters" but also had

1   no reason to believe that his conduct was or would have such an effect.  Mr. Lucero's lack of

2   knowledge that this empty dry field was a wetland is relevant for sentencing mitigation and an

3   analysis of the § 3553 factors.

4   **III.    The History and Characteristics of Mr. Lucero**

5         Mr. Lucero is a son, father and grandfather.  He helps to care for his elderly mother when she

6   needs to go to medical appointments, and he has a loving relationship with his children.  He has the

7   full support of his family, including his ex-wife and his current partner.  Exhibit I.  As his sister,

8   Tracy Geiger, put it in her letter to the Court:

9           My brother Jim is kind, generous, and a loving father, grandfather, son and
            brother.  I know my elderly mother relies on him for many things . . . [and]
10          he is always there to help her, for which I am eternally grateful.  I worry
            about her living alone, so it's very comforting to know that he checks in
11          on her and can be there at a moment's notice.

12  Exhibit I at 4.

13        Mr. Lucero's family recognizes that he made terrible decisions in the past, but he has taken

14  responsibility for those actions.  He paid his debt to society for his state offense and will have to live

15  with those consequences for the rest of his life.  He had hoped to move forward in his life, but then

16  this case was charged and he was arraigned just after his release from state custody.  Mr. Lucero's

17  life has changed dramatically over the last several years, but through it all "he has persevered even

18  with a serious heart condition."  He has pulled himself back up out of "devotion to his children, his

19  family and loved ones."  *Id.*; *see also id.* at 2, Nicole Dawson letter ("Ten years ago Jim made some

20  very poor business decisions that he will forever regret. I remember how happy he was to put the past

21  ten years behind him and pay his time so he could finally start a new healthy and happy chapter in his

22  life.").

23        Mr. Lucero is remorseful for his conduct in this case.  His first wife explained that her ex-

24  husband has "expressed his deepest regrets about the offense, particularly the serious repercussions

25  for his family and his future."  *Id.* at 6, Shelly Rigisich Letter.  Notwithstanding his past, Mr. Lucero

26  is a "hard working, good hearted person who is liked and appreciated by many."  He is "a

27  dependable, responsible and conscientious man who has always shown kindness and generosity to

28  others, especially his family and close friends."  *Id.*

Mr. Lucero has expressed his regrets as well.  In his letter to the Court he stated:

> I deeply regret my actions in this case. I am responsible for the fill activity on the Sobrato's property, and understand that I must face the consequences of my actions. I understand that there was some concrete and construction garbage in some of the loads. For that I am sorry as well. But it was my intention that all loads taken to this location in connection with my project were only clean fill dirt, backed up with analytical soil reports.

Exhibit J.

Importantly, Mr. Lucero has always accepted responsibility for his conduct in this case.  When he was confronted by the landowner's agent, he never denied that he was running the show and that he was responsible for the fill, and he voluntarily produced records that were used against him in this federal prosecution.  Bates JL-4398-440.  Mr. Lucero told the landowner's representative that he had put feelers out for a place to deposit clean fill, and that he was approached by a person who claimed to be one of the landowners.  *Id*.  That person, however, was not authorized in any way to allow Mr. Lucero to fill at the site.[4]  Mr. Lucero understands now that more was required of him.  He has never denied that he did not have the appropriate permits from the government, nor did he deny any element of the offense other than federal jurisdiction.

As the Court is aware, Mr. Lucero went to trial only to dispute federal jurisdiction. The jurisdictional question is a complicated one.  Indeed, the government's jurisdictional theory evolved over the many years it took to investigate this case, requiring a superseding indictment and a new $250,000.00 expert – with a belatedly disclosed criminal record – to prove its jurisdiction over a non-jurisdictional pond in which fill was deposited.[5]

Because he is responsible for the fill activities at the site, Mr. Lucero understands that a

---

[4]Although irrelevant to any element of the offense conduct, an early investigator on the case from the Newark Police Department, Jeff Neithercutt, posited to a defense investigator that Mr. Lucero likely believed that he had permission from someone to enter the site. Over the course of many weeks there were large trucks exiting and entering the property in broad daylight, and the fill was placed exactly where the landowners needed it for their planned development.  When Officer Neithercutt began to investigate this theory, he was soon removed from the police team working on the case and, he believes, wrongly terminated from his employment with the department.

[5]Through counsel, Mr. Lucero had made settlement offers that the government largely ignored, perhaps because it already had committed to hiring a new expert and planned to supersede with its new theory of federal jurisdiction as to Counts One and Two.

1    punishment is required.  But he is 62 years of age with a serious medical condition.  He is not likely

2    to re-offend given his age and also given the one-year term he already served in state prison after the

3    offense conduct in this case.  Mr. Lucero's sincere remorse is demonstrated also in that he has been

4    supervised in the community since 2016 and has had no violations of his pretrial release.

5    **IV.    The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment and to Avoid Unwarranted Disparity**

6           **A.    Deterrence, Seriousness of the Offense and Just Punishment.**

7           A sentence of 12 months and one day, with federal supervision to follow, meets the goals of

8    sentencing.  This sentence will serve the specific deterrence goal of § 3553 and will promote respect

9    for the law.  It will provide a just punishment for the offense because Mr. Lucero will serve time in

10   custody, and his activities will be monitored by the federal probation office after he is released.

11   Moreover, Mr. Lucero was charged with this case in 2016, after his release from a year in state

12   custody.  The offense conduct had occurred two years earlier, in 2014, and thus that already-served

13   state sentence is a further deterrent to future conduct.  Mr. Lucero is now 62 years old, and this

14   prosecution alone has taken a significant toll on him. Mr. Lucero's life was again put on hold for

15   many years after having already served his state time for his unrelated case.

16          Regarding the seriousness of the offense conduct and the need for retribution, it is not disputed

17   that a punishment is required.  Mr. Lucero should not have deposited fill onto the property without

18   doing more to ensure he had the appropriate permission.  It certainly is an aggravating factor that he

19   committed this offense while his state case was pending, and for this he will be punished more

20   severely because the prior conviction places him in Criminal History Category II.  But his conduct

21   and the de minimis impact on the environment should be measured against other environmental

22   cases, as set forth below, and nationally, to actions taken by the EPA over the last two years.

23          Since 2016, the administration and the EPA have cast off efforts to protect the environment.

24   The current administration has "shifted the debate" on the environment "in the direction of industry

25   interests."  Eric Lipton, Steve Eder and John Branch, *President Trump's Retreat on the Environment

26   is Affecting Communities Across America*, NEW YORK TIMES (Dec. 27, 2018) (detailing how the

27   government has allowed many industries and corporations "off the hook" for cleanup and protection

28   efforts that they had long resisted).  "In just two years, President Trump has unleashed a regulatory

rollback, lobbied for and cheered on by industry, with little parallel in in the past half-century." *Id.*; *see also*, Nadja Popovich, Livia Albeck-Ripka and Kendra Pierre-Louis, *76 Environmental Rules on the Way Out Under Trump*, NEW YORK TIMES (July 6, 2018).  Their actions pose a real risk to the health and safety of the nation's waters and by extension to the people who live near and depend on them.

At the same time, the government in this case has allocated hundreds of thousands of dollars on a criminal prosecution that will have no real impact on the environment.  The considerable resources it spent litigating this case could have been used to make a real difference to the health of the environment.  Over the last two years, for example, the EPA stalled the cleanup of toxic chemicals that are the likely cause of young children developing cancer near a former industrial plant in Ohio. Hiroko Tabuchi, *A Trump County Confronts the Administration Amid a Rash of Child Cancers*, NEW YORK TIMES (Jan. 2, 2019).  Victim families are calling for a federal investigation into the EPA's "serious mismanagement" and "significant delays" in cleaning up a toxic site, even after the dangers of a carcinogenic chemical that the prior administration had identified were apparent in the community.  *Id.*  This is the exact type of egregious case that merits a multi-year study and a criminal investigation.  At one time, the EPA agreed.

According to the EPA website, the EPA and the Corps reserve their *criminal* enforcement authority for only the most "flagrant and egregious" violations.  CWA Section 404 Enforcement Overview, *Section 404 of the Clean Water Act*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (last viewed Mar. 3, 2016).  The EPA held out *United States v. Lucas* as an example.  In that case, developers installed septic systems on wetlands despite repeated cease-and-desist orders from the Corps and the EPA.  516 F.3d 316, 323 (5th Cir. 2008).  From the beginning, the defendants in *Lucas* knew the lots were on saturated soils following a Mississippi Department of Health investigation, but they nonetheless proceeded with septic-system installation and damaged homes and approximately *260 acres* of wetlands without permits.  *Id.*; CWA Section 404 Enforcement Overview.

In contrast, Mr. Lucero discharged soil and dirt on *13 acres* of land that is currently being prepared for development.  Moreover, there is no indication (and the government was not required to

prove at trial) that Mr. Lucero had any notice or even reason to believe that the areas on which he caused the discharge of fill arguably were wetlands or a tributary subject to the Clean Water Act.

Many CWA cases similar to the instant offense are resolved civilly, not criminally, as the chart below indicates. The only distinguishing factors between this case and many of the more serious environmental cases listed below is that Mr. Lucero had a pending criminal case at the time of the offense conduct, and he was not the landowner or acting on its behalf.  These factors alone do not merit a substantial prison term when the government brings criminal charges for these CWA violations only infrequently.  In assessing similarly situated cases under § 3553, the Court should consider the list below, which confirms that criminal prosecutions in CWA cases have historically been reserved for the most "egregious" violators, like the defendants in *Lucas*, whose conduct in installing septic systems on wetlands actually damaged more than 250 acres and the homes of victims.

| Case Name/Date | Impacted Wetlands | Civil Penalties | Restoration Requirement | Other Mitigation | Notes | Link |
|---|---|---|---|---|---|---|
| Justice Companies and High Mtn. Living 2015 | Constructed 20 dams on creeks | $220K and $125K | Remove all dams and restore creek bed | Apply for permit; place deed restriction on restored areas on property | | https://www.epa.gov/enforcement/james-c-justice-ii-and-james-c-justice-companies-inc-and-high-mountain-living-llc-clean |
| XTO Energy Settlement 2014 | Discharge to eight sites associated with oil and gas production facilities; 3.38 acres of wetlands and 5,357 linear feet of stream | $2.3 million | Restoration of sites where restoration can be done and monitor for 10 years | Required to do mitigation for sites that could not be restored | | https://www.epa.gov/enforcement/xto-energy-inc-settlement-2014 |
| Trans Energy 2014 | 15 sites with 1.329 acres of wetlands and 13K linear feet of stream | $3 million | Restore all areas where restoration is possible and permanent preserve | Purchase credits in wetland mitigation bank nearby for sites that cannot be restored | Second largest CWA settlement | https://www.epa.gov/enforcement/trans-energy-inc-clean-water-act-settlement |
| Gasco Energy 2014 | Gas drilling facilities in floodplain area | $110K | Restore wetlands on site by abandoning gas wells and monitor for 5 years | Set aside land and do not disturb | | https://www.epa.gov/enforcement/gasco-energy-inc-clean-water-act-settlement |

| Case Name/Date | Impacted Wetlands | Civil Penalties | Restoration Requirement | Other Mitigation | Notes | Link |
|---|---|---|---|---|---|---|
| Chesapeake Appalachia<br><br>2013 | Impacted 27 sites for gas/oil extraction; 12,874 linear feet stream and 3.74 acres of wetlands | $3.2 million | Restore all sites where restoration is feasible and monitor for 10 years | Purchase mitigation by purchasing credits | Largest ever CWA consent decree | https://www.epa.gov/enforcement/gasco-energy-inc-clean-water-act-settlement |
| Falls Creek Farm<br><br>2012 | Impacted 10.5 acres of forested wetlands by filling, and earlier impacted 2.9 acres | $405K | Restore 5.7 acres and create 3.2 acres of wetlands on site. Also restore 2.4 acres of previously altered wetlands | Preserve 19 acres of wetlands on site under conservation easement | Long history of non-permitted activities | https://www.epa.gov/enforcement/falls-creek-farm-sterling-connecticut-settlement |
| Union Pacific<br><br>2009 | Cleared and graded stream channels and placed flow diversion devices; discharge of untreated storm water | $800K | Remove fill from 21 locations and monitor stream restoration on approximately 122 acres of waters | Fund tamarisk removal and native plant restoration on 50 acres | Activities over a large number of areas in West | https://www.epa.gov/enforcement/union-pacific-railroad-company-clean-water-act-settlement |
| Savoy Senior Housing Corp<br><br>2009 | Constructed housing in 3,765 linear feet of stream | $300K | $1.08 million in restoration work including $250K on site and $825K to purchase credits | | Restoration work to be approved by EPA | https://www.epa.gov/enforcement/consent-decree-savoy-senior-housing-corporation-et-al-civil-action-no-606-cv-00031nk |
| Rapanos<br><br>2009 | Altered 54 acres of wetlands for development | $150K | Construct a mitigation project of at least 100 acres | Preserve 134 acres of land including 53.40 acres of wetlands in conservation area; protect other wetlands on various parcels | Followed Supreme Court decision in his favor | https://www.epa.gov/enforcement/consent-decree-john-rapanos-et-al-no-94-cv-70788-dt |

Moreover, CWA cases that are prosecuted criminally normally result in non-custodial or short

custodial sentences.  To illustrate, cases brought between 2010 and 2017 that fall under Guideline §

2Q1.3 resulted in an average sentence of just 3.2 months in custody.[9]  Declaration of Jordan Schaer ¶

---

[9]When the guideline for § 2Q1.2 is included, which applies to the mishandling of hazardous or toxic substances, the average sentence for both § 2Q1.2 and § 2Q1.3, the guideline at issue here, is a bit higher, at 5.6 months.  At an offense level 20, which is the offense level as determined by the probation office here, the average sentence is 18.26 months. Schaer Decl. ¶ 10.

10, filed separately.



In addition, as illustrated in the pie charts below, almost three-quarters of defendants under Guideline § 2Q1.3 serve no prison time whatsoever. *Id.* at ¶ 11. Even those defendants sentenced to terms of imprisonment under Guideline § 2Q1.3 receive variances from the Guidelines more often than defendants nationally who are sentenced under other Guidelines. *Id.* ¶ 12. Specifically, only 34.13% of § 2Q1.3 defendants were sentenced within the advisory range compared with 48.31% of defendants sentenced within the range for all offenses nationwide.

Variance Rates (2Q1.3) — Government Sponsored 74 (29.37%), Below Range 90 (35.71%), Above Range 2 (0.79%), Within Range 86 (34.13%)

Variance Rates (All Cases) — Above Range 11426 (2.15%), Below Range 109285 (20.56%), Within Range 256728 (48.31%), NA 8 (0%), Government Sponsored 154007 (28.98%)

Finally, the Court should consider varying degrees of culpability among defendants sentenced under the same Guideline.  This is a common approach in, for example, child pornography cases.  *See*, *e.g.*, *United States v. R.V.*, 157 F. Supp. 3d 207, 210-11 (E.D.N.Y. Jan. 26, 2016) (departing downward in child pornography case after categorizing harms and surveying cases in which courts imposed sentences outside the applicable advisory range).  It allows courts to assess the defendant's particular offense conduct against the "heartland" of cases encompassed by the Guideline.  *See*, *e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) ("a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the 'heartland' to which the Commission intends individual Guidelines to apply." (quotation marks omitted)).

Here, a survey of criminal environmental cases throughout the country demonstrates that a majority of courts have imposed sentences with little to no custodial time for conduct far more serious than the conduct at issue here.  *See* Schaer Decl. ¶¶ 2, 9; *see also* Exhibit K.  In contrast, cases with substantial prison terms involved real environmental damage or particularly outrageous conduct not present here.  In *United States v. Van Dyke*, for example, the defendant discharged diesel fuel and

1  sewage sludge from a wastewater treatment facility. *Id*. *United States v. Hagerman* involved the

2  falsification of monitoring reports at a wastewater treatment facility, and permit limits were violated

3  for serious toxins. *Id*. Defendants in *United States v. Tuma* coordinated and falsified records for the

4  collection of wastewater, and discharged it directly into a river and into to the city's sewer system.

5  The highest sentence imposed – 108 months – was reserved for the main defendant in the *Lucas* case

6  who had been repeatedly warned that his activities were problematic. This case is discussed above

7  and listed on the EPA's website as a notable violation of the CWA. In *Lucas*, families moved into

8  what was advertised as a habitable development, but because of septic systems improperly installed

9  in the wetlands, the systems failed, causing raw sewage to seep up from the ground and flow across

10 the development. Homes smelled foul and had brown water backing up, and standing water with

11 debris rose to the surface. *Id*.

12     The list includes plenty of examples of patently harmful and egregious conduct for which the

13 defendants received minimal sentences. The case *United States v. Flury*, for example, involved the

14 discharge of 11 thousand gallons of wastewater into a water draining and pipe system that followed

15 into a tributary. The defendant falsified records and received no custody for his offense. *Id*. In

16 *United States v. Anderson*, the defendant received 12 months of community confinement yet falsified

17 records and caused the release of untreated liquid and solid sewage into the Ohio River. *Id*. In

18 *United States v. International Petroleum*, the defendants operated a wastewater treatment facility and

19 manipulated monitoring systems to accept more material. The highest sentence imposed for the most

20 culpable defendant was 15 months custody. *Id*. The other defendants received no custodial time

21 whatsoever. *Id*. The *United States v. Koch Petroleum Group* case involved the discharge of

22 hundreds of thousands of gallons of fuel that affected a wetland and waterway. The defendant

23 learned of the spill but did not develop a recovery plan until years later, causing actual damage to

24 ecosystems and wildlife habitat. No custodial sentences were imposed. *Id*.

25     In contrast to this case, many cases prosecuted nationwide involve defendants who continued to

26 violate the law after they were warned by authorities. In *United States v. Steven Burnett*, for

27 example, the defendants cleared wetlands to develop a parking lot. The government warned them,

28 but they continued with the project. *Id*. No custodial sentences were imposed. Similarly, in *United*

*States v. Vaughan*, the defendant discharged septic sewage on his property despite repeated cease and desist orders.  He too received a non-custodial sentence.  *Id*.  The defendant in *United States v. Moses* received only 18 months in custody after he continued development efforts despite being told by officials from the Corps that he would need a permit; his development project completely transformed a creek and its surrounding wetlands.  *Id*.  The defendant in *United States v. Capano* not only ignored repeated instructions from the Corps, he also lied about his non-compliance and worked on weekends to avoid detection.  His project included the installation of retaining walls through wetlands, large amounts of fill and the placement of water, gas and electric lines.  Mr. Capano received a 21-month sentence.  *Id*.  In *United States v. Caldwell*, the defendant received a non-custodial sentence even though he filled wetlands despite two cease and desist orders from the Corps. *Id*.

In determining a reasonable and appropriate sentence, the sentencing statute, § 3553, directs the Court to analyze similarly situated defendants.  To avoid unnecessary disparities, the Court should consider that the sentence recommended by the government here is disproportionately high when the conduct and the impact of Mr. Lucero's conduct is compared with these other cases prosecuted nationwide.

## CONCLUSION

Based on Mr. Lucero's background and history and the nature and circumstances of the offense – particularly in comparison with other cases prosecuted as felony violations of environmental laws – the Court should impose a sentence of 12 months and one day in custody.  The Court should consider also Mr. Lucero's lack of knowledge of the nature of the property, the landowners' ultimate plan to develop the subject property, the massive amount of fill that will be required for that project, and the decades of land-management activities that have degraded the wetlands.  Given the facts of this case and the lack of environmental harm involved, Mr. Lucero's request sentence is reasonable and warranted.

1

2     Dated:      January 7, 2019                    Respectfully submitted,

3                                                    STEVEN G. KALAR
4                                                    Federal Public Defender
                                                     Northern District of California
5
                                                      /S/Angela M. Hansen
6                                                    ANGELA MILELLA HANSEN
7                                                    Assistant Federal Public Defender

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28