Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )       NO. CR 16-00107-HSG
                                )
JAMES PHILIP LUCERO,            )
                                )
            Defendant.          )
_____ )

                        Oakland, California
                        Monday, February 25, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        **DAVID L. ANDERSON**
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                BY:     **PHILIP J. KEARNEY, JR.**
                        **SHIAO LEE**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        STEVEN G. KALAR
                        Federal Public Defender
                        1301 Clay Street - Suite 1350N
                        Oakland, CA  94612
                BY:     **ANGELA M. HANSEN**
                        **DEPUTY FEDERAL PUBLIC DEFENDER**


Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

| | |
|---|---|
| 1 | <u>**Monday - February 25, 2019**</u>                              <u>**10:00 a.m.**</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---000--- |
| 4 | **THE CLERK:**  We're calling CR 16-107, United States vs. |
| 5 | James Philip Lucero. |
| 6 | Please step forward and state your appearances for the |
| 7 | record, please.  State your appearances for the record. |
| 8 | **MR. KEARNEY:**  Your Honor, good morning.  Philip |
| 9 | Kearney and Shiao Lee for the United States. |
| 10 | **THE COURT:**  Good morning, Mr. Kearney. |
| 11 | **MS. HANSEN:**  Good morning, Your Honor.  Angela Hansen |
| 12 | on behalf of Mr. Lucero, who is present, Your Honor, and out of |
| 13 | custody. |
| 14 | **THE COURT:**  Good morning, Ms. Hansen. |
| 15 | **THE PROBATION OFFICER:**  Good morning, Your Honor. |
| 16 | Brian Casai for Probation. |
| 17 | **THE COURT:**  Good morning, Mr. Casai. |
| 18 | We are here for sentencing in this matter.  There are a |
| 19 | number of materials that have been submitted as part of the |
| 20 | record. |
| 21 | First, I've reviewed the Presentence Report that was |
| 22 | disclosed on October 9th, 2018.  The United States filed a |
| 23 | Sentencing Memorandum on January 7th of 2019 with exhibits. |
| 24 | The Defendant filed a Sentencing Memorandum with exhibits on |
| 25 | January 7th as well. |

1    The Defense filed a document that was called "Objection to

2  PSR."  And do you have the date of that filing, Ms. Hansen?

3    **MS. HANSEN:**  It was the same date, Your Honor,

4  January 7th.

5    **THE COURT:**  All right.  That's right.

6    And then the United States filed a response to that

7  document on --

8    **MR. KEARNEY:**  February 19th.

9    **THE COURT:**  -- February 19th.

10    Are there other materials that are part of the sentencing

11  record beyond those?

12    **MS. HANSEN:**  No, Your Honor.

13    **MR. KEARNEY:**  Not that we're aware of, sir.

14    **THE COURT:**  All right.  So does either side anticipate

15  an evidentiary hearing today?  We may need to discuss that with

16  regard to restitution, but beyond restitution, is there a

17  request for an evidentiary hearing?

18    **MR. KEARNEY:**  No, sir.

19    **MS. HANSEN:**  No, Your Honor.

20    **THE COURT:**  All right.

21    And so then there are a number of objections to the

22  Presentence Report that I think we need to work through first.

23  So let's just walk through those.

24    So the first, as I understand it, is perhaps not an

25  objection but an argument by the Defense that as to the two

1   enhancements at issue, one under Section 2Q1.3(b)(1)(A), and

2   with regard to the enhancement under 2Q1.3(b)(3), that the

3   clear and convincing standard of proof should apply based on

4   the relative magnitude of those enhancements as compared to the

5   Base Offense Level.

6        The parties appear to agree that the Ninth Circuit's

7   *Barragan* case sets out the factors that I consider, and on

8   balance, I'm inclined to assume that the clear and convincing

9   evidence standard applies given that we're talking about a

10  six-level or a four-level increase to the Base Offense Level.

11       I will say that based on this record, I don't think the

12  choice of standard particularly matters, given the nature of

13  the evidence, but I am inclined to conclude that clear and

14  convincing is the proper standard.

15       Any argument on that point?

16       **MS. LEE:**  Your Honor, the Government concurs with

17  that.

18       **THE COURT:**  All right.  As to at least those two

19  enhancements.

20       Okay.  So then we need to talk about the substance of

21  those two proposed enhancements:  That first, the Probation

22  Office recommends the application of a six-level increase under

23  Section 2Q1.3(b)(1)(A) based on ongoing, continuous, or

24  repetitive discharge of a pollutant.

25       The Government joins in that recommendation.

1      The Defense objects to the recommendation.

2      It's obviously briefed at length in the papers, but I am

3  inclined to find that clear and convincing evidence supports

4  the imposition of that enhancement.  As I read it, the point of

5  the enhancement is to cover crimes that involve a repetitive

6  discharge of a pollutant as opposed to a one-time spill or a

7  limited incident, and here the evidence at trial amply

8  established that the Defendant was responsible for the dumping

9  of something on the order of 1800 large truckloads of fill

10  material, which included not just dirt and soil but concrete,

11  PVC pipe, and other contaminants over a period of several

12  months.  And I find that under any reading of the enhancement,

13  it covers what the Defendant was found guilty of doing here.

14      The Defense is further arguing that there should be a

15  two-level departure under Application Note 4 due to the minor

16  nature of the harm resulting, and I also am inclined to

17  disagree that any downward enhancement is warranted on that

18  basis.

19      Here essentially we have the Defendant asserting, but only

20  asserting, that there was no material harm to the environment,

21  that the material was mostly clean that was dumped, and I,

22  again, believe that the trial record establishes to the

23  contrary given that large portions of wetlands were covered

24  with up to even feet of dirt with construction debris mixed

25  into it.  And so for those reasons, I conclude that that

1    enhancement should apply and that the record supports it by

2    clear and convincing evidence.

3        Anything further beyond the record that's been made in the

4    papers?

5        **MS. HANSEN:**  Yes, Your Honor.  Briefly.

6        The Court has indicated that it's simply the Defendant

7    asserting these facts.  It's actually the Government's burden

8    to prove the enhancement and that it should apply, and it's not

9    our burden to disprove it.  However, the record at trial

10   established that it was predominantly clean fill, and the type

11   and nature of the material was not such that a departure should

12   not be given.

13       An example of that would be the *Perez* case, which was

14   cited by the Government, Your Honor.  In that case, even though

15   the court applied the enhancement, because the materials

16   discharged were not the worst type of pollutants -- they

17   weren't toxins, they weren't any sort of contaminants like we

18   have here, they're not -- the two-level reduction was

19   warranted.

20       So we believe if the Court is going to apply that

21   enhancement simply because a pollutant was discharged, which is

22   a very broad definition and also includes basic dirt, which is

23   what the evidence at trial established was predominantly what

24   was discharged at this site, the departure should be given.

25       And then we also have statistics, Your Honor, that this

1    enhancement applies in 80 percent of the cases and that's

2    because it seems to encompass the offense conduct itself, is

3    the discharge of a pollutant.  So in that case, it overstates

4    the Offense Level, and that was a separate argument we had

5    made.

6            **THE COURT:**  I did see that, although why isn't there a

7    difference between repeated pollution and one time, and if most

8    cases involve multiple instances, then why does that counsel

9    against the application of the enhancement?

10           **MS. HANSEN:**  Well, in that case, then, the

11   enhancement -- if Your Honor's reasoning is it was because it

12   was repetitive, then only four levels should apply not six,

13   given the nature of the pollutant.

14       In addition, Your Honor, we submitted evidence from our

15   exhibits at trial showing that the levels in the soil were

16   tested, and this was not the types of toxins that other courts

17   and other environmental cases would find notable.  And I think

18   that's an important piece of evidence that we submitted, even

19   though it is not our burden.

20           **THE COURT:**  All right.  Anything further on that?

21           **MR. KEARNEY:**  No, Your Honor.  Submitted.

22           **THE COURT:**  All right.

23       So I will find that that enhancement is warranted by the

24   record.

25       The next enhancement that is at issue is the four-level

increase for a cleanup requiring a substantial expenditure under Section 2Q1.3(b)(3).

Again, the Probation Department is recommending application of that enhancement, as is the United States.

The Defense is objecting on the basis that there has not been any cleanup to date such that the Government hasn't carried its burden of establishing substantial expenditure in a reliable manner, and essentially there is an objection to the nature of the estimate offered by the landowners as to what it will cost to clean up the site.

The Defense is also essentially arguing that because under *U.S. vs. Merino*, the Ninth Circuit case, "substantial" requires something on the same magnitude as a public utilities disruption or an evacuation, that this conduct does not rise to that level. And the Defense is then arguing that even if the enhancement did apply, that the Court should apply a downward adjustment of two levels under Application Note 6 based on the nature of the contamination.

And, again, I am inclined to find by clear and convincing evidence that the massive scope of the dumping that was proven in this case abundantly establishes that a cleanup would amount to a substantial expenditure. I think that's separate from the question that we'll have to address later as to whether the restitution figure is accurate down to the dollar, but I don't think that's relevant for this purpose.

1    I think plainly if you're talking about 1800 truckloads of

2    construction waste, the cost for remediation is going to be

3    substantial, and I just don't see any way that the remediation

4    for this is not substantial within the meaning of the

5    Guideline.

6    Essentially the landowner is saying it's $6 million.  We

7    can talk about the basis for that figure as we go forward, but

8    I just don't see any circumstance under which this doesn't rise

9    to the level of substantiality, and *Merino* seems to me to be a

10   very different case that involved something like $30,000 of

11   cleanup.

12   I think here, it's established, in the Court's view, that

13   this is going to entail hundreds of thousands or potentially

14   millions of dollars in cleanup expenses, and I think that that

15   abundantly rises to the level of substantiality under the

16   Guideline.  And I also don't find a basis for departing

17   downward under the Application Note, given the record.

18   Does the United States have anything further on that

19   point?

20       **MS. LEE:**  No, Your Honor.

21       **THE COURT:**  Ms. Hansen?

22       **MS. HANSEN:**  Yes, Your Honor.

23   Importantly, the Government has not established that any

24   cleanup that Your Honor is discussing here is actually going to

25   happen.  The new letter that they submitted from the EPA,

1    Your Honor, 2015, suggests the type of cleanup that would only

2    remove the fill and put it in the same -- on one of the upland

3    areas.  That was from 2015.

4        We have no EPA document that is recent from 2018 or 2019.

5    There are changes in circumstances that suggest that this

6    cleanup may not even happen.  Number one, Government Footnote

7    11 concedes that they may not clean it up in its recent

8    response brief.  If that's the case, substantial cleanup will

9    not be required.

10       Second, and more importantly, the wetlands have grown back

11   over the fill.  That's because the fill didn't contain the type

12   of contaminants that would have prevented that.  We have

13   established that clearly in our papers and the Government's own

14   expert in his reports conceded that he was gratified to see the

15   wetlands growing back.

16       Where is the EPA today saying what they would recommend,

17   given that the wetlands have grown back, Your Honor?  Where is

18   the EPA saying that it's okay to disrupt those, to tear them

19   out, only to remove dirt that is not the type of toxic dirt

20   that would require that?  The Government's admissions in its

21   latest filings prove that this will not require substantial

22   cleanup expenses.

23       And then finally, Your Honor, where is the EPA today with

24   a letter explaining what they would require to remediate this

25   alleged harm when the EPA has changed its policies over the

1  last several years?  It is no longer looking at WOTUS the same
2  way it did before.
3      So the Court cannot rely on a 2015 letter when
4  circumstances have changed so substantially, and the
5  Government's brief and the filings they submitted concede that
6  the cleanup might not happen.
7      This enhancement was intended.  You look at the three
8  words that are used, the three types of activities, and the
9  basic principles of statutory construction that these words
10  should give each other meaning.  This is the type of
11  evacuations for environmental harms that would require
12  communities to leave, public utilities being dismantled, and a
13  cleanup like an oil spill.  That's the intention of this
14  statute.  Not only does the words itself in the Guideline speak
15  of it in the past tense but so does the application note where
16  substantial expense for cleanup has been required.
17      In this case, the Government has provided the Court with
18  insufficient evidence, not less clear and convincing evidence,
19  that this substantial cleanup will be required.
20      The landowner's estimate, Your Honor, is absolutely
21  inflated, and it was based on a mistaken theory that the
22  Government had that the Mandatory Victim Restitution Act
23  applied, and so they piled on costs that the EPA, even in 2015,
24  weren't requiring, like offsite storage, grading the land when
25  they're going to disc it and mow it.  Those costs are

1    absolutely inflated, and the Court should not even rely on

2    those estimates at all.

3        What we need here is a government agency estimate, and so

4    far to date, there is no current one on this record given the

5    nature and the site as it exists today with regrowth in the

6    wetlands and with the way the EPA is now looking at WOTUS in

7    the particular wetlands and the changes in the regulations.

8        There should have been something submitted with the

9    Government's last filing and it wasn't.  Nothing was.

10           **THE COURT:**  All right.  What is the import of this

11   Footnote 11?  What does that mean?  "Although the ownership

12   group is hoping to avoid this cleanup based on their

13   scaled-down current plan."  What does that mean?

14       **MS. LEE:**  So back in 2015, the Army Corps of Engineers

15   had sent the landowners a pretty stern letter, once they were

16   notified of the dumping, that owners are to remove all

17   unauthorized fill in jurisdictional wetland and water of the

18   United States, and they had to remove it to an approved upland

19   location, not just anywhere that they wanted to move it to.

20   That was the last communication the Army Corps of Engineers has

21   had with the landowners.

22       Since then, the case has been litigating, trial and

23   sentencing.  The landowners at this time don't know if they

24   plan to build where they used to build.  Essentially, I think

25   they had at one point an approved 1200 lot throughout the

1    Newark Area 4, but given the case and how complicated it's been

2    and the repercussions with the Army Corps of Engineers, the

3    landowners are concerned about any penalties they will face

4    should they start removing that fill from the wetland area.

5        They are going to need a permit to remove, just like

6    people need a permit to dump, and a penalty could potentially

7    be assessed on the removal itself, and so as to avoid that

8    cost, the landowners at this time are thinking about avoiding

9    the jurisdictional wetland areas and developing solely on the

10   upland areas.

11       **THE COURT:**  All right.  But, again, so then why

12   doesn't that mean that a substantial expenditure is not going

13   to be required if they make that choice?

14       **MS. LEE:**  Because the Army Corps of Engineers has the

15   ability to demand that they remove pollutants from

16   jurisdictional waters, as they did in 2015.  There is no

17   guarantee that just because the landowners decide *we're not*

18   *going to build where the wetlands are*, that they can then just

19   leave that fill material there indefinitely.

20       And the last communication to them was *Landowners, remove*

21   *everything or you could be subject to different types of*

22   *penalties*.  So I'm not sure the landowner's discretion in this

23   case is the end-all-be-all.

24       **THE COURT:**  I don't get what you're saying at all.

25   You've got a clear and convincing evidence burden.  I don't

1    understand anything about what you just said in terms of how it

2    establishes the substantial expenditure requirement that is

3    your burden.

4        I honestly don't understand what you just said and what it

5    means in terms of what the magnitude will be.  What are you

6    saying the magnitude will be?

7        **MS. LEE:**  The magnitude, I guess at this point, is

8    potential, Your Honor.  It's that the Army Corps of Engineers

9    can say remove all 1800 truckloads of pollutants from the

10   wetland areas, and that will be a substantial expenditure.

11   Whether it's $6 million, $4 million, hundreds of thousands of

12   dollars, that removal cost of that much fill material from

13   jurisdictional wetlands will end up being a substantial expense

14   on the landowners, who really haven't done anything wrong in

15   this case.

16       **THE COURT:**  There is no question about that, but how

17   can I find that there is clear and convincing evidence when

18   you're saying the magnitude is speculative?

19       **MS. LEE:**  Because I would say that the last

20   communication that the Army Corps of Engineers has had with the

21   landowners has said remove all of the materials from all 13

22   acres of jurisdictional waters.  That has been the agency's

23   only and most recent order.

24       And so for the landowners now to be telling us *we're not*

25   *sure we're going to do that,* at the end of the day, it's the

1   Army Corps of Engineers that has ordered them as of January 28,

2   2015 to remove it.

3        **THE COURT:**  Based on the record that is presented, I

4   find that the Government has failed to meet the clear and

5   convincing evidence burden to warrant this enhancement.

6        All right.  Then next question is acceptance of

7   responsibility.  The Probation Department defers to the Court.

8   The Government argues that the acceptance of responsibility

9   enhancement is not warranted.  The Defense argues to the

10  opposite point.

11       I need to hear from Mr. Lucero on this point.

12       **MS. HANSEN:**  I'm sorry.  I missed what the Court said.

13       **THE COURT:**  I need to hear from Mr. Lucero so I can

14  determine whether he has met the burden of establishing

15  acceptance.

16       **MS. HANSEN:**  Yes, Your Honor.

17       **THE DEFENDANT:**  Good morning, Your Honor.

18       I just want to say I'm extremely sorry for depositing this

19  control dirt on this property.  I take full responsibility for

20  my conduct charged in this case, and a day doesn't go by that I

21  wish I had been more diligent in researching the property.

22       I absolutely take responsibility for my actions without

23  reservation.  And I am fortunate that I have the support of my

24  family and my partner, Nichole, and I am deeply pained with

25  distress that everyone involved, such as my mother who has been

1    so supporting in this case.

2         I'm sorry.  I'm just very nervous right now.

3         My sons have been so supportive, and I -- and it's really

4    helped me get through all this, and it tears my sole to think

5    that my actions have caused her sorrow, my mom.

6         I thank you, Your Honor, for allowing me this opportunity

7    to address the Court, and my deepest thanks to my attorney for

8    all her hard work in this case.

9         Thank you.

10        **THE COURT:**  All right.  Thank you.

11        So with regard to the acceptance -- and I'll hear from

12   counsel -- but my strong inclination is that an acceptance of

13   responsibility reduction is not warranted here.

14        I will note that I thought that the submissions that were

15   submitted before today were unimpressive on this score and

16   appear to me to dramatically minimize the nature of what

17   happened here rather than reflecting genuine responsibility,

18   acceptance, and contrition.  For example, in paragraph 47 of

19   the Presentence Report, the Defendant admitted to having placed

20   dirt at the location, while denying that he knew that it was a

21   wetland.

22        Placing dirt at the location dramatically understates the

23   scope of the offense.  This involved going on to someone else's

24   land, there was a padlock cut, and huge amounts of construction

25   waste were dumped there.

1    I also took note that the Defendant said that he felt
2    confused that he committed an offense, and, again, I think that
3    is a minimization that is inconsistent with genuine acceptance.

4    And I thought that the letter that the Defendant submitted
5    was somewhat better but also inadequate for these purposes.
6    There is a claim in that letter that it was his intention that
7    all loads taken to the location in connection with the project
8    were only clean fill dirt backed up by analytical soil reports.
9    In the Court's view, that sounds more like plausible
10   deniability rather than actual contrition and was not supported
11   by any evidence that I'm aware of.

12   The Defendant also said that he wouldn't have done this
13   out in the open in daylight if he realized that he was
14   encroaching on federally-protected land, and, again, I don't
15   see that as relevant to this question.  That sounds to me like
16   an acknowledgment that *I'm sorry that this was a jurisdictional*
17   *wetland because that brought me here to federal court and had*
18   *consequences for me.*  But openly dumping on someone else's land
19   in daylight on a massive scale is a significant offense,
20   whether the Defendant knew it was a wetland or not.

21   And I thought that the statement that I just heard had
22   similar issues to these, that the idea of depositing clean fill
23   dirt -- *I wish I had been more diligent in doing my research* --
24   just doesn't reckon with the nature of the crime here, and I
25   find that it's inconsistent with an acceptance of

1    responsibility within the meaning of the Guidelines.

2         I will also finally note that it's clear that the

3    Defendant did not raise a purely legal defense at trial;

4    instead, he comprehensively disputed a factual element of the

5    offense, which is that the location of the dumping was a

6    jurisdictional wetland.  And the argument throughout was that

7    the property impacted simply was not a wetland; for example, a

8    Tributary 1 didn't exist.  And otherwise, the Defendant took

9    issue at length with the facts that the Government needed to

10   prove.

11        I also note that under Section 3E1.1, Application Note 2

12   directed to consider in this circumstance that a determination

13   that the Defendant has accepted responsibility will be based

14   primarily upon pretrial statements and conduct.  And here, it's

15   significant to me that one of the most important pieces of

16   pretrial conduct was the fact that the Defendant created a fake

17   permission note and presented it to the owners, naming someone

18   who -- no one that the owner had ever heard of as having

19   supposedly given permission to deposit clean fill dirt.

20        On the totality of the record, I find the Defendant has

21   not clearly demonstrated acceptance of responsibility for his

22   offense and that a two-level reduction is not warranted for

23   that reason.

24        I'll allow either counsel to make any further record that

25   they wish.

1        **MR. KEARNEY:**  Counsel -- Your Honor, based on the

2   Court's statements, we would submit the matter, but we

3   wholeheartedly agree, obviously.  This was a very, very

4   contested factual trial.  The nature of the land, the nature of

5   the land's connection to the slough, the very existence of

6   tributaries, the actions of the landowners being truly

7   responsible for the degradation of the land, this was not a

8   purely legal argument, as many of the cases envisage in this

9   area.

10        **THE COURT:**  All right.

11     Ms. Hansen?

12        **MS. HANSEN:**  Yes, Your Honor.  Three brief points.

13     The facts that we contested at trial, the facts that

14   everything in the Government's brief related to and what

15   Your Honor has recited today relate to the jurisdictional

16   challenge.  They do not relate to the factual elements of his

17   guilt, for example, the act of dumping and that he did do the

18   activities and that he did discharge the soil.

19        **THE COURT:**  But it's a factual element.  Whether it

20   should be or not, whether this made sense as a trial, is an

21   open question, but it was the only factual element at issue;

22   correct?

23        **MS. HANSEN:**  It was a legal element, Your Honor.  It

24   was establishing whether the Government should be in this

25   courtroom as opposed to a state court.  So they were facts, but

1  they related to a legal argument, not a factual dispute about

2  whether Mr. Lucero did the actions that were charged in the

3  Indictment.

4      Second, Your Honor, the record is filled with truck

5  drivers who came in and testified, and we cited to those

6  references in our brief, that this was clean fill.  So we do

7  dispute the characterization that that was self-serving of

8  Mr. Lucero.  The evidence does show that that was the

9  intention, that is what the truck drivers brought to the

10 property and believed that was in their truckloads.

11     Third, Your Honor, because the Court is relying on this

12 idea that the Government keeps bringing up and is not an

13 element of the offense, that he went on someone else's land

14 without permission, I think the record has to be made a little

15 bit more clear.  Not only is that something that was not proven

16 at trial, but there is no evidence that Mr. Lucero trespassed

17 knowingly, Your Honor.  He believed wrongly that he had

18 permission from the person he paid to go on that property.

19 That's why --

20          **THE COURT:**  Where is the evidence of that?

21          **MS. HANSEN:**  I have a letter that the Government

22 provided two weeks ago from Officer Neithercut who did the main

23 investigation of this case.  Officer Neithercut wrote the

24 original report.  He was with the Newark Police Department.  I

25 handed a copy to counsel and to Probation.

1    Officer Neithercut believes that Mr. Lucero was set up by

2    someone but didn't know who, so he started investigating the

3    case.  He was then fired from the Newark Police Department,

4    even though he did the preliminary interview of all of the

5    witnesses and he was the main investigative agent.

6        Now, this letter alone does not need to establish that

7    there is someone out there, but the point is that that piece of

8    this has not been proven by the Government, that he knowingly

9    trespassed.

10       Mr. Lucero -- that's why his statements have been couched

11   the way they have.  He recognizes that the Sobratos didn't give

12   him permission.  He recognizes that he was sloppy and should

13   have done more to investigate this person who came up to him

14   and who he paid.  He acknowledges all of that.  But he was

15   approached by someone and paid them to do this on the land.

16   And an officer who investigated this case agreed with that and

17   sent a letter to the DA, apparently in August, that we received

18   two weeks ago.

19       Now, we, as a defense team, talked to Officer Neithercut

20   and decided not to bring this up at trial because Your Honor

21   ruled that whether or not Mr. Lucero knew the nature of the

22   land was not relevant and his state of mind was not relevant,

23   but now that it seems that the Government's sort of main charge

24   against Mr. Lucero, which makes this case so aggravating, not

25   the environmental damage but the trespass, I think we should

1    just make sure the record is a bit more expanded and clear as
2    to what happened here.
3        This officer was let go of the police department he
4    believes because of where his investigation was going with
5    respect to trying to find out who was responsible for telling
6    Mr. Lucero that he had permission to be on the land.
7        **THE COURT:**  There is no declaration, I take it, from
8    this officer?
9        **MS. HANSEN:**  There is no declaration from this
10   officer, Your Honor.
11       **THE COURT:**  All right.  Anything further?
12       **MR. KEARNEY:**  Your Honor, just regarding that last
13   point, we're not going -- I'm not going to stand here and
14   disparage this officer, but he was dismissed for valid reasons
15   having nothing to do with this case.
16       This letter is a wild conspiracy theory that is not based
17   in any factual truth that the Government can determine, and to
18   suggest that *oh, gee, I was mistaken when I cut the locks and*
19   *trespassed on this land and tried to make a note to lie about*
20   *it* is just -- does not fit with the proven trial evidence in
21   this case.
22       And regarding this -- even today's statement, Your Honor,
23   about this acceptance of responsibility, there is a lot of
24   things the Government did not hear from the Defendant in that
25   statement.  He is sorry for the hard work of his own attorney.

1  How about the hard work of all the first responders, the Corps,

2  the EPA, the United States Attorney, the landowners themselves?

3  How about the contrition and apologies for the massive

4  environmental assault he caused burying under tens of thousands

5  of yards of construction debris some of the last remaining

6  wetland in Newark, California and the East Bay?  How about

7  that?  The Government has heard none of that.  And it's exactly

8  what you would think from a repeat environmental offender like

9  the Defendant.

10      **THE COURT:**  Okay.  Submitted on that point?

11      **MR. KEARNEY:**  Submitted.

12      **MS. HANSEN:**  Submitted.

13      **THE COURT:**  So I do continue to find that an

14  acceptance of responsibility reduction is not warranted.

15      I think those were the legal objections to the Presentence

16  Report to the extent that they are relevant to the calculation

17  of the Guidelines Range.

18      There were also a number of what appeared to be factual

19  disputes with facts listed, and I saw that the Defense said

20  that those didn't need to be individually taken up.

21      **MS. HANSEN:**  Exactly, Your Honor.  We just wanted to

22  preserve issues on appeal and not concede something in the PSR

23  that could then hurt our factual arguments on appeal.

24  Your Honor does not need to rule on those and we do not intend

25  for the Court to do so.  They are noted in the record through

1   the Presentence Report.

2          **THE COURT:**  All right.  Although don't I have to at

3   least deny the objection to the extent that I'm not going to

4   order a revision of the Presentence Report?

5          **MS. HANSEN:**  Agreed.

6          **THE COURT:**  All right.  So I will so rule as to those

7   objections.

8      So I think that that is everything that is relevant to the

9   calculation of the Guidelines Range, correct, in terms of the

10  objections?

11         **MS. HANSEN:**  Yes, Your Honor.

12         **THE COURT:**  All right.  So with the rulings that I

13  just made, the final Offense Level ends up being 16, with a

14  Criminal History Category of II, resulting in an Advisory

15  Guidelines Range of 24 to 30 months.

16     Do the parties agree?  Obviously there are arguments that

17  both sides made, but given the rulings that I have just made,

18  does everyone agree that that is the accurate Advisory

19  Guidelines Range?

20         **MS. LEE:**  Yes, Your Honor.

21         **MS. HANSEN:**  Yes, Your Honor.

22         **THE COURT:**  And then are there any motions for

23  departure?

24         **MS. HANSEN:**  Other than what was made in the

25  Sentencing Memos, Your Honor, I'll submit on that.

1          **THE COURT:**  All right.

2          **MS. HANSEN:**  Oh, departure --

3          **THE COURT:**  It's more of a variance.

4          **MS. HANSEN:**  It's more of a variance, correct.

5          **THE COURT:**  From the United States?

6          **MR. KEARNEY:**  Your Honor, we still believe the top,

7   the high end of the relevant Guideline is appropriate based on

8   the completely singular conduct in this case.

9       Your Honor, we have all, at this stage in this litigation

10   after years, read, I think, every Clean Water Act case,

11   certainly ever reported in this country.

12          **THE COURT:**  Let me focus you on what I'm asking.  Are

13   you seeking an upward departure from the Advisory Guidelines

14   Range that I just stated?

15          **MR. KEARNEY:**  No, sir.  I'm sorry.  I misunderstood

16   your question.  My apologies.

17          **THE COURT:**  All right.  Okay.  So no motions for

18   departure being made and I find no basis in the record for a

19   departure otherwise, I will not depart within the Guidelines

20   structure, understanding that there is a variance issue that

21   has been raised.

22       So I'm then required to consider the factors set out in

23   Section 3553(a) to arrive at a sentence that is sufficient but

24   no greater than necessary to accomplish the objectives of the

25   statute, taking into account the nature and circumstances of

1   the offense, the history and characteristics of the Defendant,

2   the need to ensure just punishment, accomplish adequate

3   deterrence, both general and specific, and protect the public,

4   the need to avoid unwarranted sentencing disparities, and the

5   opportunity for rehabilitation.

6       Obviously this case was tried.  There is a lengthy record

7   that has been established, and I think I've discussed many of

8   the relevant factors already in dealing with the objections,

9   but in terms of the nature and circumstances of the offense, as

10  we've talked about, the crime involved the dumping of somewhere

11  in the neighborhood of 1800 large truckloads of construction

12  debris over a period of several months.  I do continue to find

13  it significant that when confronted by the landowner, the

14  Defendant presented a phony permission note, and taking

15  everything, even that we just heard, everyone who testified or

16  spoke about it from the landowner said they had no idea who

17  that person was and certainly hadn't given permission.

18      In terms of the history and characteristics of the

19  Defendant, I do find it significant that Mr. Lucero has a prior

20  conviction for a scheme to bribe Santa Clara County Landfill

21  employees, and the record reflects that over a period of two

22  years, he engaged in bribery, paying the employees

23  approximately $500,000 to permit truckloads of

24  intentionally-misclassified waste to be dumped in a county

25  landfill at a reduced rate.

1    There was a reference somewhere in the materials to this

2    being a poor business decision.  I couldn't agree with that

3    less.  It was not a business decision.  It was a long-term

4    corrupt scheme that resulted in inappropriate waste being

5    dumped in county landfills.  And that prior conviction, as well

6    as the current offense, in the Court's view, reflect repeated

7    dishonesty and disregard for the law in the Defendant's conduct

8    of his business.

9    In terms of the need to avoid unwarranted sentencing

10   disparities, in my view, the nature and circumstances of the

11   offense warrant a sentence within the Guidelines Range.  So on

12   balance, I conclude that a sentence in that range is sufficient

13   but no greater than necessary taking all of these

14   considerations into account.  When the range was different, the

15   Probation Department was recommending a 30-month sentence.  I

16   continue to believe under the circumstances that that sentence

17   is warranted.

18   I will hear from counsel for each party on those questions

19   and then we'll proceed to the restitution issue, which I would

20   like to take up separately.

21   **MS. HANSEN:**  Given the Court's comments, I will submit

22   on my papers.  We've argued disparity.  I know Your Honor has

23   read everything.

24   I did just want to note briefly for the record that

25   Mr. Lucero's family is here today:  Tracy Lucero, his sister;

1    Mike Lucero, his brother; his son Austin; and his mother,

2    Shirley Lucero.  His father was here for the last scheduled

3    sentencing but had to leave, and his uncle, too, who is from

4    out of town, couldn't be here today.

5         And Your Honor has already heard from Mr. Lucero, so the

6    allocution has been satisfied.

7              **THE COURT:**  All right.

8         Ms. Lee?

9              **MS. LEE:**  The Government also submits.

10             **THE COURT:**  All right.  So then finally, let's talk

11   about restitution.  And here, I do have some substantial

12   concerns about the figures that have been floated and about my

13   ability to order even discretionary restitution as a condition

14   of supervised release in any given amount.

15        When I look through the record, it seems to me that there

16   are just multiple numbers.  Paragraph 23 of the Presentence

17   Report says, "Damage in the amount of 862,000 to

18   1.725 million."  Then paragraph 45 of the Presentence Report,

19   that I think was taken from the Victim Impact Statement, says

20   "2.7 to 3.5 million."  And then later, we've got 6-plus million

21   with something -- including something called "a 25-percent

22   contingency," and it says Docket 260-1, all of which just begs

23   the question, how can I possibly say what the restitution

24   figure is at this point given these shifting numbers?

25        What I'm inclined to do, to the extent it's legally

permissible, is there's an estimate that the cleanup would take
something on the order of four months.  The question is whether
either party thinks there is some legal impediment to simply
continuing the restitution hearing until that can be done,
there can be an actual figure, and then I can figure out what,
if anything, is warranted in terms of restitution?

Now, I know that were we talking about statutory
restitution, I think I'd be limited to 90 days.  Does either
party know of any corresponding limit when the basis for
restitution is my discretionary authority as a condition of
supervised release?

MS. HANSEN:  Your Honor, I'm not aware of whether or
not the restitution hearing can be continued that long as a
discretionary restitution order.  It might be safer to stay
under the statute of limitations under the Mandatory Victim
Act.

My concern here, though, is given the new record, the
Government had an opportunity to address restitution, and what
they submitted to the Court now is the landowner saying that
they're likely to not clean it up, and we have a 2015 order
from the Corps that has not been updated to in fact consider
changed circumstances and whether they would even now, at this
date, given that the wetlands have re-grown, actually order any
cleanup.

And second, of how they feel about the wetlands and WOTUS

1    given the change in the administration and the rules.

2         So I think the Court could, on this record, given that it

3    is the Government's burden and restitution has to be calculated

4    with reasonable certainty -- the Government was given the

5    opportunity to provide the Court with an EPA estimate, an EPA

6    order of what they are requiring, and didn't do so, that on

7    this record, the Court should decline to apply the

8    discretionary restitution.

9         **THE COURT:**  Ms. Lee, what is the Government's

10   perspective?

11        **MS. LEE:**  Your Honor, I think we can come back and set

12   this case over for about 30 to 45 days in which we will contact

13   the Army Corps of Engineers which will issue likely another

14   letter demanding what type of cleanup is required of the

15   landowners, and we can come back in that time.  I think what's

16   clear is that there is a clear victim in this case.

17        Looking at the totality of the circumstance outside of

18   just this topic of restitution, the landowners will be

19   incurring a significant amount of money cleaning up the upland

20   areas already because as our filing showed, they can't leave

21   that material there and build on top of it.  It's considered

22   undocumented fill and it's not stable for the soil.  Nothing

23   can sit on top of it.  That's an expense that is already out of

24   their own pocket.

25        With respect to restitution, I would just point out two

1    things.  Yes, their initial number is 6.7 million.  If you were

2    to take away the acreage that's not wetland, then it comes down

3    to 4 million.  Let's say --

4         **THE COURT:**  With a, quote/unquote, 25 percent

5    contingency which, by definition, means it's speculative.  We

6    are going to need to be in a position where either you can come

7    up with actual numbers, not estimates, or not.

8         **MS. LEE:**  Yes.

9         **THE COURT:**  My inclination, given the amount of moving

10   parts here, would be to continue this for 90 days for a

11   restitution hearing.  I take Ms. Hansen's point.  I don't know

12   formally whether the 90-day cap applies under these

13   circumstances, but I think it's a good rough guide as to what

14   ought to be the outside for that.  So that's my inclination.

15       But as of right now, given the dispute, I don't think the

16   Government has met its burden as we sit here today.  But the

17   cases tell me that the method for flushing out that record is

18   an evidentiary proceeding on restitution.  That's what I'm

19   inclined to do.

20        **MS. HANSEN:**  Your Honor, would the Court be willing to

21   order the EPA to update its restoration order for 2019 as to

22   what they would require on the areas that are affected by the

23   offense of conviction?  I want to make sure we're clear that

24   getting another estimate from the landowners is not helpful in

25   this instance because, number one, under the Mandatory Act,

1   they are not victims; and, number two, the Government just

2   cited the uplands as they have this expense to remove the fill

3   there.  It's clear that -- and the Government concedes, it's in

4   its filings, that the restitution has to be limited to the

5   offense of conviction.

6        So I'm asking the Court to order the Government to provide

7   the Court with directives from the Army Corps of Engineers and

8   the EPA to see what they would require at this point and that

9   we could have that at least perhaps three weeks before the

10  hearing.

11       **THE COURT:**  Well, I don't know that I am at liberty to

12  order the Corps of Engineers or the EPA as to what they do, but

13  I think you take the point as to what you probably ought to be

14  seeking if you're going to try to meet your burden.

15       **MS. LEE:**  Right.

16       And it's not the EPA.  It would be the Army Corps of

17  Engineers.  They would be the ones to issue a removal letter.

18       **MS. HANSEN:**  Your Honor, just for the record, though,

19  the order that is in the record now is from the EPA; correct?

20       **MS. LEE:**  No.  It's from the Army Corps of Engineers.

21       **MS. HANSEN:**  Okay.  Then that was my mistake.

22  Apologies.

23       **MS. LEE:**  My only point of mentioning-- Your Honor is

24  right.  We will nail down the figure so it's not such an

25  estimate in terms of 6.7 or 4.  The Government completely hears

1   Your Honor's point on that.

2         What I was simply saying is from the landowners's

3   perspective, they're either forced to remove it, which will

4   come out to some number that will hopefully be much more

5   definitive in 90-days' time.  Or, for instance, if they weren't

6   to remove it, the amount of money that they lose from not

7   building on the wetland area, as you saw from our filings, is

8   upwards of 80, 90 million.  Obviously, we're not seeking that.

9         But what we're simply saying is that there is a landowner

10  victim who is losing money either way here.  If they're not

11  building there, they're losing money on the lots.  If they are

12  building there, they are going to have to be forced to remove

13  the material, so there is a visible identifiable victim who has

14  been harmed by this conduct.

15        **MS. HANSEN:**  Your Honor, restitution is not allowed

16  for such -- choosing not to build a development project on the

17  wetlands.  That is clear from the law.  The cost of litigation

18  cannot be assessed to a defendant, especially under -- where

19  we're dealing with this discretionary supervised release

20  restitution.  That is way beyond what we're dealing with here.

21        The question is how much will it cost to remove and is it

22  required to remove the fill in the wetland areas, the 13 acres?

23  That is the question for restitution for this provision that is

24  applicable here.

25        **THE COURT:**  I think there are two questions, and I

1    think the exchange that just happened was passing by each

2    other.

3        The Defendant has argued that there is no such thing as a

4    victim in a Clean Water Act case other than the United States.

5    I don't agree with that.  Under these circumstances, the owners

6    of this land have been subjected to whatever expense I

7    ultimately find based on the Defendant's criminal conduct.

8        That's a separate question from the amount of restitution

9    and what the components of it are, and I'm not making any

10   prediction about that because I've just set a proceeding at

11   which the evidentiary issue will be resolved.

12       All right.  Anything further before I impose sentence?  I

13   will ask Mr. Casai, from Probation's perspective, anything

14   further?

15           **THE PROBATION OFFICER:**  Not at this point, Your Honor,

16   no.  Thank you.

17           **THE COURT:**  Thank you for your work on this

18   Presentence Report.  This was obviously a very complex case,

19   and I thought that your work was thorough and well-considered,

20   so thank you.

21           **THE PROBATION OFFICER:**  I appreciate that, Your Honor.

22   Thank you.

23           **THE COURT:**  Anything from the United States?

24           **MS. LEE:**  No, Your Honor.

25           **THE COURT:**  On behalf of the Defense?

1          **MS. HANSEN:**  No, Your Honor.

2          **THE COURT:**  All right.  So for the reasons that I have

3  indicated, I will impose sentence as follows:

4          Pursuant to the Sentencing Reform Act of 1984, it is the

5  judgment of the Court that James Philip Lucero is hereby

6  committed to the custody of the Bureau of Prisons to be

7  imprisoned for a term of 30 months.

8          This term consists of terms of 30 months on each of Counts

9  1 through 3, all counts to be served concurrently.

10         Upon release from imprisonment, the Defendant shall be

11  placed on supervised release for a term of one year.  This term

12  consists of terms of one year on each of Counts 1 through 3,

13  all such terms to run concurrently.

14         Within 72 hours of release from the custody of the Bureau

15  of Prisons, the Defendant shall report in person to the

16  Probation Office in the district to which he is released.

17         While on supervised release, the Defendant shall not

18  commit another federal, state, or local crime; shall comply

19  with the standard conditions that have been adopted by this

20  court; shall refrain from any unlawful use of a controlled

21  substance and submit to a drug test within 15 days of release

22  on supervised release and two periodic drug tests thereafter;

23  and shall comply with the following conditions:

24         You must pay any restitution and special assessment that

25  is imposed by this judgment and that remains unpaid at the

1   commencement of the term of supervised release.

2        You must not open any new lines of credit and/or incur new

3   debt without the prior permission of the Probation Officer.

4        You must provide the Probation Officer with access to any

5   financial information, including tax returns, and shall

6   authorize the Probation Officer to conduct credit checks and

7   obtain copies of income tax returns.

8        You must cooperate in the collection of DNA as directed by

9   the Probation Officer.

10        And is there not even any search condition recommended,

11   Mr. Casai?

12             **THE PROBATION OFFICER:**  There is not, Your Honor.

13             **THE COURT:**  All right.

14        It is further ordered that the Defendant must pay to the

15   United States a special assessment of $300.  Payments shall be

16   made to the Clerk of U.S. District Court, 450 Golden Gate

17   Avenue, Box 36060, San Francisco, 94102.

18        During imprisonment, payment of criminal monetary

19   penalties are due at the rate of not less than $25 per quarter

20   and payments shall be through the Bureau of Prisons Inmate

21   Financial Responsibility Program.

22        The Court finds that the Defendant does not have the

23   ability to pay a fine and orders the fine waived.

24        As I discussed earlier, this matter is set for a

25   restitution hearing to be held 90 days from today.

1      Madame Clerk, what day is that?

2              **THE CLERK:**  May 28th, Your Honor.  Is that going to be

3      a 2:00 p.m. hearing?

4              **THE COURT:**  Yes.  May 28th at 2:00 for restitution

5      hearing.

6              **MS. HANSEN:**  Your Honor, when should filings be done

7      for that hearing so we could have the evidence to be able to

8      understand what we're contesting?

9              **THE COURT:**  I think probably two weeks before.

10             **MS. HANSEN:**  And the Defense response would be the

11     21st?

12             **THE COURT:**  I think that makes sense, yes.

13             **MS. HANSEN:**  Thank you, Your Honor.

14     Your Honor, may we have a surrender date in eight weeks?

15     Mr. Lucero is making some medical appointments.  He has an

16     ongoing heart condition, which was verified in the PSR.  He

17     would like to see those doctors before he goes in to serve the

18     sentence, so eight weeks we think would give him sufficient

19     time to do that.

20             **THE COURT:**  Any objection?  That's basically two weeks

21     longer than the default.

22             **MR. KEARNEY:**  No, sir.

23             **THE COURT:**  All right.  I will order a self-surrender

24     date eight weeks out.

25             Madame clerk?

1          **THE CLERK:**  April 22nd, Your Honor.

2          **THE COURT:**  All right.  Anything further for today?

3          **MR. KEARNEY:**  No, Your Honor.  Thank you.

4          **MS. HANSEN:**  No, Your Honor, thank you.

5          **THE PROBATION OFFICER:**  Thank you, Your Honor.

6          **THE COURT:**  You're welcome.

7               (Proceedings adjourned at 10:56 a.m.)

1

2

3                         <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Thursday, March 21, 2019

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25